# EXHIBIT A

IN THE SUPREME COURT OF OHIO

League of Women Voters of Ohio,
100 East Broad Street, Suite 1310
Columbus, OH 43215

A. Philip Randolph Institute of Ohio,
6805 Oak Creek Drive
Columbus, OH 43229

Tom Harry,
9116 N Creek Ln.
Dayton, OH 45458

Tracy Beavers,
1030 W Comet Rd.
New Franklin, OH 44216

Valerie Lee,
5000 Sycamore Woods Blvd.
Dayton, OH 45426

Iris Meltzer,
1012 Vine St.
Kent, OH, 44240

Sherry Rose,
241 Whittier Dr.
Kent, OH 44240

Bonnie Bishop,
8160 Sunset Ln. #208
Sylvania, OH, 43560

*Relators*,

v.

Ohio Redistricting Commission,
Ohio Statehouse
1 Capitol Square
Columbus, Ohio 43215

Michael DeWine,
Riffe Center

Original Action Pursuant to
Ohio Const., Art. XI

30th Floor
77 S. High St.
Columbus, OH 43215

Frank LaRose,
22 N. Fourth St.,
16th Floor
Columbus, Ohio 43215

Keith Faber,
88 E. Broad St.,
5th Floor
Columbus, Ohio 43215

Matt Huffman,
Ohio Statehouse
1 Capitol Square
2nd Floor
Columbus, OH 43215

Robert R. Cupp,
77 S. High St.
14th Floor
Columbus, OH 43215

Vernon Sykes, and
Senate Building
1 Capitol Square
Ground Floor
Columbus, OH 43215

Emilia S. Sykes,
77 S. High St.
14th Floor
Columbus, OH 43215

*Respondents.*

# Complaint

2

Robert D. Fram*
Donald Brown*
Joshua González*
Juliana Goldrosen (PHV 25193 - 2021)
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-6000
rfram@cov.com

James Smith*
Megan C. Keenan*
L. Brady Bender (PHV 25192 - 2021)
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
mkeenan@cov.com

Anupam Sharma*
James Hovard*
Yale Fu*
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306-2112
(650) 632-4700
asharma@cov.com

Madison Arent*
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841 1000
marent@cov.com

Freda J. Levenson (0045916)
ACLU of Ohio Foundation, Inc.
4506 Chester Avenue
Cleveland, Ohio 44103
(614) 586-1972 x125
flevenson@acluohio.org

David J. Carey (0088787)
ACLU of Ohio Foundation, Inc.
1108 City Park Avenue, Suite 203
Columbus, OH 43206
(614) 586-1972 x2004
dcarey@acluohio.org

Alora Thomas*
Julie A. Ebenstein*
American Civil Liberties Union
125 Broad Street
New York, NY 10004
(212) 519-7866
athomas@aclu.org
jebenstein@aclu.org

*Counsel for Relators*
* *Pro Hac Vice Motion Forthcoming*

# INTRODUCTION

1.     Just after midnight on September 16, 2021, with a 5-2 vote along strictly partisan lines, Ohio's Redistricting Commission enacted maps that are intended to, and will, entrench a Republican veto-proof supermajority in both chambers of Ohio's General Assembly for the next four years. This extreme partisan gerrymandering flouts the clear commands of Article XI of the Ohio Constitution that "[n]o general assembly district plan shall be drawn primarily to favor or disfavor a political party," Ohio Const. art. XI, § 6(A), and that the number of seats held by a party in the Ohio General Assembly "shall correspond closely to the statewide preferences of the voters of Ohio" over the previous decade, *id.* § 6(B).

2.     Over the past decade, Republicans have received between 46.2% and 59.7% of the statewide vote. *See* Ex. 10, Testimony of Collin Marozzi to Ohio Redistricting Commission at Table 1 (submitted Aug. 27, 2021); *see also* Ex. 9, Ohio Redistricting Commission, *Article XI, Section 8(C)(2) Statement* (Sept. 16, 2021) (according to the Redistricting Commission's own statement, Republicans have only garnered an average 55% of the votes in statewide elections over the past 10 years). But the enacted map draws 67% of the House districts and 69% of the Senate districts to favor Republicans, locking in Republican veto-proof supermajorities in both chambers for the next four years. *See* Ex. 1, Warshaw Aff., at 5, 24–25.

3.     This brazen manipulation of district lines for extreme partisan advantage doubly dishonors the voters of this state: by adopting a map that utterly fails to correspond with voters' preferences as manifested by the vote share of the two major parties' candidates over the past decade; and by openly defying a constitutional amendment adopted overwhelmingly by Ohio voters just six years ago, which sought to put an end to precisely this kind of extreme partisan gerrymandering.

4.      The constitutional amendment to end partisan gerrymandering arose as a direct response to the severe partisan manipulation of the last decade. The 2011 General Assembly maps were drawn in secrecy, without public oversight or minority party participation, in a location referred to as "the bunker." And under that map, Republicans maintained a hammerlock on supermajority status in elections between 2012 and 2020—at times controlling more than 65% of the seats in the Ohio House of Representatives and 75% of the seats in the Ohio State Senate, even though their statewide vote share over the decade ranged from only 46.2% to 59.7%. *See* Ohio Sec. of State, *131th General Assembly Ohio House of Representatives* (2016), https://bit.ly/ 2XHuXAp; Ohio Senate, *Senators* (2021), https://bit.ly/3u57eGB; Ex. 10, Testimony of Collin Marozzi to Ohio Redistricting Commission at Table 1 (submitted Aug. 27, 2021).

5.      In 2011, a group of voters challenged Ohio's legislative map on the basis of partisan unfairness, but this Court found it lacked the power to act because, at that time, the "words used in Article XI d[id] not explicitly require political neutrality, or for that matter, politically competitive districts or representational fairness, in the apportionment board's creation of state legislative districts. Unlike Ohio, some states specify in either constitutional or statutory language that no apportionment plan shall be drawn with the intent of favoring or disfavoring a political party." *Wilson v. Kasich*, 2012-Ohio-5367, ¶ 14, 134 Ohio St. 3d 221, 225, 981 N.E.2d 814, 820.

6.      In response, on November 3, 2015, Ohio voters—by an overwhelming margin of 71.5% to 28.5%—amended the constitution by adding precisely what this Court previously found missing: express constitutional commands that districts not be drawn "to favor or disfavor a political party," and that the distribution of seats "shall correspond closely to the statewide preferences of the voters of Ohio." Ohio Const. art. XI, §§ 6(A), 6(B); *see also* Ohio Sec'y of State, 2015 Official Statewide Election Results (Nov. 3, 2015), https://bit.ly/3hZWnJm. The

express purpose of the amendment was to "[e]nd the partisan process for drawing Ohio House and Senate districts, and replace it with a bipartisan process with the goal of having district boundaries that are more compact and politically competitive." Ohio Sec'y of State, *Issue 1 Ballot Language* (Nov. 2015), https://bit.ly/3ElgrPY. Ohioans were promised that a "yes" vote on the ballot measure amending the constitution would "make sure state legislative districts are drawn to be more competitive and compact, and ensure that <u>no district plan should be drawn to favor or disfavor a political party</u>." Sens. K. Faber & J. Schiavoni and Reps. K. Schuring & M. Curtin, *Vote Yes on Issue 1*, https://bit.ly/3tWHrjR (emphasis in original).

7.      The constitutional amendment established the bipartisan Ohio Redistricting Commission, tasked that Commission with redistricting the General Assembly in line with the goals of increasing transparency and ending partisan gerrymandering, and gave this Court jurisdiction to hear claims that the Commission failed to adhere to constitutional standards. *See* Ohio Const., art. XI, § 9.

8.      It is necessary and appropriate for this Court to exercise its constitutionally-delegated authority. While the U.S. Supreme Court has held that partisan gerrymandering claims are non-justiciable in federal court, it has also acknowledged that it is the providence of state courts to address the scourge of partisan gerrymandering. *Rucho v. Common Cause*, 139 S. Ct. 2484, 2507 (2019) ("Provisions in state statutes and state constitutions can provide standards and guidance for state courts to apply."). "Indeed, state courts are particularly well-positioned to adjudicate redistricting disputes," and "[s]tate courts' duty to decide constitutional cases applies with full force in the redistricting context." *Common Cause v. Lewis*, N.C. Super. No. 18 CVS 014001, 2019 WL 4569584, at *124–25 (Sep. 03, 2019); *see also League of Women Voters v. Commonwealth*, 645 Pa. 1, 8, 178 A.3d 737, 741 (2018) (Supreme Court of Pennsylvania finding

that it could establish a workable standard for adjudicating partisan gerrymandering claims under the state constitution). *See also Ohio A. Philip Randolph Inst. v. Householder*, 140 S. Ct. 101, 101 (2019) (citing *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019)).

9. There is a long history of state courts finding that partisan gerrymandering violates state constitutional rights. "In Wisconsin, the State Supreme Court declared that the challenged 'apportionment act violates and destroys one of the highest and most sacred rights and privileges of the people of this state, guarantied [sic] to them by the ordinance of 1787 and the constitution, and that is 'equal representation in the legislature.''" *Ohio A. Philip Randolph Inst. v. Householder*, 373 F. Supp. 3d 978, 1090 (S.D.Ohio 2019) (quoting *State ex rel. Att'y Gen. v. Cunningham*, 81 Wis. 440, 51 N.W. 724, 729 (1892)); *League of Women Voters v. Commonwealth,* 645 Pa. at 8 (Pennsylvania Supreme Court holding that "the 2011 [Congressional] Plan violates Article I, Section 5—the Free and Equal Elections Clause—of the Pennsylvania Constitution" because it is a partisan gerrymander); *Lewis*, 2019 WL 4569584, at *128 (holding that the "extreme partisan gerrymanders" at issue "violate[d] the fundamental constitutional rights of free elections, equal protection, speech, assembly and association").

10. Judicial intervention is necessary because the kind of extreme partisan gerrymandering that has occurred once again in Ohio violates "the core principle of republican government . . . that the voters should choose their representatives, not the other way around." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2677 (2015) (internal quotation marks omitted); *see also League of Women Voters v. Commonwealth*, 645 Pa. 1, 8, 178 A.3d 737, 740–41 (2018) ("It is a core principle of our republican form of government "that the voters should choose their representatives, not the other way around."). "A principal danger feared by our country's founders lay in the possibility that the holders of governmental authority would

7

use official power improperly to perpetuate themselves, or their allies, in office." *Stanson v. Mott*, 17 Cal. 3d 206, 217 (1976) (citing The Federalist Papers, Nos. 52, 53 (Madison), 10 Richardson, Messages and Papers of the Presidents 98–99 (1899) (President Jefferson)). Rather than reflecting voters' actual preferences, elections under gerrymandered systems, like Ohio's General Assembly map, systematically lock in candidates from the legislators' preferred party and discourage electoral competition.

11. Indeed, the distortion of the map enacted last week is just as extreme—and in some ways, even more extreme—than the gerrymander that had finally motivated Ohioans to pass the anti-gerrymandering constitutional amendment.

12. This Court must act expeditiously before Ohio's democracy is distorted yet again. The primary election for candidates for the General Assembly is currently scheduled for May 3, 2022, and the candidate filing deadline is scheduled for February 2, 2022.

13. Relators bring this action to ensure that the fair, neutral, and constitutionally-mandated requirements of Article XI govern the current reapportionment process and the map that will obtain in the 2022 elections.

## JURISDICTION

14. This Court has original jurisdiction of this matter under Article XI of the Ohio Constitution. Ohio Const., art. XI, § 9 ("The supreme court of Ohio shall have exclusive, original jurisdiction in all cases arising under this article."). Pursuant to Article XI, Relators seek a determination that the apportionment plan adopted by the Ohio Redistricting Commission is invalid.

## PARTIES

A. **Relators**

15.     Relator League of Women Voters of Ohio ("LWVO") is the Ohio chapter of the League of Women Voters of the United States, a nonpartisan, statewide non-profit founded in May 1920, shortly before the ratification of the Nineteenth Amendment in August 1920 granting women's suffrage. With 3,661 members across the state, LWVO and its 29 local Leagues and 4 at-large units are dedicated to empowering citizens and ensuring an effective democracy. The LWVO has members, the vast majority of whom are registered Ohio voters, in all of Ohio's Senate districts and 94 of Ohio's 99 House districts. Ex. 2, Miller Aff. ¶ 4.

16.     As part of its mission to empower voters and defend democracy, LWVO aims to shape public policy, to educate the public about policy issues and the functioning of our democracy, and to protect and expand Ohioans' access to elections and their government. Individual LWVO members invest substantial volunteer time in voter education, civic engagement, and voter registration. *Id.* ¶ 5.

17.     The gerrymandered general assembly map impairs LWVO's work by deterring and discouraging its members and other Ohio voters from engaging in the political process, thereby making it more difficult for LWVO to engage voters through its education, registration, and outreach efforts. For example, LWVO and its members have struggled to engage and activate self-identified Democratic voters in districts drawn in a manner that favors Republican candidates. When LWVO hosts forums for candidates in districts that are not competitive, it is difficult to get candidates from the favored party to attend. *Id.* ¶ 6.

18.     Concern about the prospect of a gerrymandered general assembly map has forced LWVO during 2021 to divert staff responsibilities, member efforts, and financial resources to an advocacy campaign for fair districts. If LWVO and its members could rely on a nonpartisan

9

process to produce fair maps and competitive districts, those resources would otherwise have been devoted to LWVO's traditional nonpartisan voter education services and programs. *Id.* ¶ 7.

19. Instead, LWVO has been forced to expend money and time advocating for fair districts. This advocacy by members and staff includes attending and testifying at multiple hearings across the state, mobilizing voter communications with elected officials, and organizing lobbying visits and rallies at the Statehouse in Columbus, among other efforts. During the 2021 redistricting cycle, LWVO helped sponsor a competition for citizens to draw redistricting maps that privileged good governance aims over partisan ends. LWVO has deployed all of its staff members on redistricting-related work, hired a new staff person to work strictly on redistricting, and hired a mapping expert to run the citizen map-drawing competition and analyze the Ohio Redistricting Commission map proposals as they became available. *Id.* ¶ 8.

20. In addition, fundraising by LWVO for its traditional programs has suffered during 2021 due to the fair districts campaign. Financial supporters of LWVO have been forced to choose between supporting LWVO's traditional programs and funding the advocacy campaign for fair districts in 2021. As an example, LWVO's fundraising for Women's Equality Day is down roughly 40 percent in 2021 compared to 2020. *Id.* ¶ 9.

21. LWVO is suing on its own behalf as well as in its capacity as representative of its members in order to seek a constitutional map. *Id.* ¶ 14.

22. Relator Ohio A. Philip Randolph Institute ("APRI") is the Ohio chapter of the A. Philip Randolph Institute, a national organization for African-American trade unionists and community activists, with eight chapters across Ohio and hundreds of members and volunteers statewide. Ex. 3, Washington Aff. ¶¶ 4–5.

23.     While APRI supports a variety of charitable ventures unrelated to voting, the bulk of APRI's work is focused on voter education, registration, civic engagement, and outreach efforts. These efforts have continued during the COVID-19 pandemic, with APRI leadership and members conducting in-person and virtual voter outreach and voter education events, and partnering with churches to educate the public about absentee voting. *Id.* at ¶¶ 4–5, 7–8.

24.     The gerrymandered general assembly map impairs APRI's work by deterring and discouraging its members and other Ohio voters from engaging in the political process, thereby making it more difficult for APRI to engage voters through its education, registration, and outreach efforts. At voter outreach events throughout 2021, both in person and virtual, APRI representatives have routinely heard attendees reiterate that because of gerrymandering, they believe nothing will ever change and they will never get a fair district map where their votes will matter. As a result, it is more difficult for APRI members to get people engaged. *Id.* ¶¶ 9–10.

25.     The prospect of another gerrymandered map has consumed APRI's time and resources throughout 2021 that would otherwise have gone to traditional voter registration and outreach efforts, and that APRI would not have had to divert if its members could rely on Ohio's process to produce nonpartisan, fair maps. For example, APRI members have invested time and energy testifying at redistricting hearings in response to the Commission's proposed maps, at times forcing them to cancel or set aside other activities. In addition, APRI members have been forced to educate citizens and answer countless questions about the redistricting process, what "packing" and "cracking" are, why there is an initiative for fair districts and what its goals are, why their neighborhoods have been chopped up in unprecedented ways, and why a system has been designed that leads them to feel that their votes do not count. *Id.* ¶¶ 11–13.

26.     Members of the public frequently contact APRI with questions about gerrymandering and similar issues, because they cannot get through to their elected representatives or get an answer from them. Responding to questions about redistricting also takes up a significant amount of APRI's time and resources. *Id.* at ¶ 14.

27.     APRI is suing on its own behalf as well as in its capacity as representative of its members in order to seek a constitutional map. *Id.* ¶ 15.

28.     Relator Tom Harry is a United States citizen, registered to vote in the State of Ohio, and an active Ohio voter. He is a Democratic voter, has supported Democratic state legislative candidates for Ohio's State House of Representatives and Senate in the past, and plans to support such candidates in the future. Relator Harry lives at 9116 N Creek Lane, Dayton, Ohio 45458, which is in Ohio House District 37 and Ohio Senate District 6. Relator Harry's interests in electing members of the General Assembly under a fair map have been prejudiced by the maps that Respondents adopted. The improper partisan unfairness of the maps that Respondents adopted has resulted in an illegally large number of districts whose voters have supported Republican candidates. House District 37 is amongst those improperly drawn districts.

29.     Relator Tracy Beavers is a United States citizen, registered to vote in the State of Ohio, and an active Ohio voter. She is a Democratic voter, has supported Democratic state legislative candidates for Ohio's State House of Representatives and Senate in the past, and plans to support such candidates in the future. Relator Beavers is an active member of the League of Women Voters of Ohio. Relator Beavers lives at 1030 W Comet Road, New Franklin, Ohio 44216, which is in Ohio House District 31 and Ohio Senate District 27. Relator Beavers' interests in electing members of the General Assembly under a fair map have been prejudiced by the maps that Respondents adopted. The improper partisan unfairness of the maps that Respondents adopted

has resulted in an illegally large number of districts whose voters have supported Republican candidates. House District 31 and Senate District 27 are amongst those improperly drawn districts.

30.     Relator Valerie Lee is a United States citizen, registered to vote in the State of Ohio, and an active Ohio voter. She is a Democratic voter, has supported Democratic state legislative candidates for Ohio's State House of Representatives and Senate in the past, and plans to support such candidates in the future. Relator Valerie Lee is an active member of the League of Women Voters of Ohio. Relator Lee lives at 5000 Sycamore Woods Boulevard, Dayton, Ohio 45426, which is in Ohio House District 39 and Ohio Senate District 5. Relator Lee's interests in electing members of the General Assembly under a fair map have been prejudiced by the maps that Respondents adopted. The improper partisan unfairness of the maps that Respondents adopted has resulted in an illegally large number of districts whose voters have supported Republican candidates. House District 39 and Senate District 5 are amongst those improperly drawn districts.

31.     Relator Iris Meltzer is a United States citizen, registered to vote in the State of Ohio, and an active Ohio voter. She is a Democratic voter, has supported Democratic state legislative candidates for Ohio's State House of Representatives and Senate in the past, and plans to support such candidates in the future. Relator Meltzer is an active member of the League of Women Voters of Ohio. Relator Meltzer lives at 1012 Vine Street, Kent, Ohio, 44240 which is in Ohio House District 72 and Ohio Senate District 32. Relator Meltzer's interests in electing members of the General Assembly under a fair map have been prejudiced by the maps that Respondents adopted. The improper partisan unfairness of the maps that Respondents adopted has resulted in an illegally large number of districts whose voters have supported Republican candidates. House District 72 and Senate District 32 are amongst those improperly drawn districts.

32. Relator Sherry Rose is a United States citizen, registered to vote in the State of Ohio, and an active Ohio voter. She is a Democratic voter, has supported Democratic state legislative candidates for Ohio's State House of Representatives and Senate in the past, and plans to support such candidates in the future. Relator Rose is an active member of the League of Women Voters of Ohio. Relator Rose lives at 241 Whittier Drive, Kent, Ohio 44240, which is in Ohio House District 72 and Ohio Senate District 32. Relator Rose's interests in electing members of the General Assembly under a fair map have been prejudiced by the maps that Respondents adopted. The improper partisan unfairness of the maps that Respondents adopted has resulted in an illegally large number of districts whose voters have supported Republican candidates. House District 72 and Senate District 32 are amongst those improperly drawn districts.

33. Relator Bonnie Bishop is a United States citizen, registered to vote in the State of Ohio, and an active Ohio voter. She is a Democratic voter, has supported Democratic state legislative candidates for Ohio's State House of Representatives and Senate in the past, and plans to support such candidates in the future. Relator Bishop is an active member of the League of Women Voters of Ohio, and former President of the League of Women Voters of Toledo-Lucas County. Relator Bishop lives at 8160 Sunset Lane #208, Sylvania, Ohio, 43560, which is in Ohio House District 43 and Ohio Senate District 2. Relator Bishop's interests in electing members of the General Assembly under a fair map have been prejudiced by the maps that Respondents adopted. The improper partisan unfairness of the maps that Respondents adopted has resulted in an illegally large number of districts whose voters have supported Republican candidates. House District 43 and Senate District 2 are amongst those improperly drawn districts.

34. The maps that Respondents adopted deprive Relators and all similarly situated individuals of rights guaranteed to them under Article XI of the Ohio Constitution.

### B. Respondents

35.    Respondents are the Ohio Redistricting Commission and the members of the Ohio Redistricting Commission, namely Ohio Governor Michael DeWine, Ohio Secretary of State Frank LaRose, Ohio Auditor Keith Faber, President of the Ohio Senate Matt Huffman, Speaker of the Ohio House Robert R. Cupp, Ohio Senator Vernon Sykes, and Minority Leader of the Ohio House Emilia Sykes.

## LEGAL BACKGROUND

### A. Article XI

36.    "Prior to the [Ohio] Constitution of 1851, the apportionments of legislative districts had been made by the General Assembly with the result that oftentimes political advantage was sought to be gained by the party in power. Accordingly, Article XI was incorporated in the Constitution for the purpose of correcting the evils of former days." *State ex rel. Herbert v. Bricker*, 139 Ohio St. 499, 508, 41 N.E.2d 377 (Ohio 1942). "The objective sought by the constitutional provisions was the prevention of gerrymandering." *Id.* at 509.

37.    The Article XI in Ohio's 1851 Constitution aimed to prevent gerrymandering by imposing new constraints on Ohio's redistricting process and transferring the process from the General Assembly to the Ohio Apportionment Board.

38.    Earlier incarnations of Article XI, however, proved insufficient to prevent partisan gerrymandering, as this Court determined that it lacked clear commands regarding partisan fairness. *Wilson*, 2012-Ohio-5367, ¶ 14, 134 Ohio St. 3d at 225, 981 N.E.2d at 820. In response, the voters of Ohio overwhelmingly passed a constitutional amendment in 2015, amending Article XI in several respects. First, the amended Article XI established the Ohio Redistricting Commission, which is responsible for redistricting the State's House and Senate Districts in compliance with Article XI of the Ohio Constitution. The Commission consists of seven members:

the Governor, the Auditor of State, the Secretary of State; one person appointed by the Speaker of the House of Representatives, one person appointed by the legislative leader of the largest political party in the House of Representatives of which the Speaker of the House is not a member, one person appointed by the president of the Senate, and one person appointed by the legislative leader of the largest political party in the Senate of which the president of the Senate is not a member. Ohio Const., art. XI, § 1(A).

39.     "The affirmative vote of four members of the commission, including at least two members of the commission who represent each of the two largest political parties represented in the general assembly district plan shall be required to adopt any general assembly district plan." *Id.* § 1(B)(3). "If the Ohio redistricting commission fails to adopt a final general assembly district plan not later than the first day of September [2021], the commission shall introduce a proposed general assembly district plan by a simple majority vote of the commission." *Id.* § 8(A)(1).

40.     Article XI imposes detailed guidelines for redistricting that include objective, rules for the reapportionment process, as well as mandates that the commission be guided by partisan fairness, and eschew any quest for unfair partisan advantage.

### a)     Commission Process and Deadlines: Section 1

41.      "The affirmative vote of four members of the commission"—"including at least two" opposition party members of the commission—"shall be required to adopt any general assembly district plan." *Id.* § 1(B)(3).

42.     The Commission was required to hold three hearings "before adopting, but after introducing, a proposed plan." *Id.* §1(B)(3)(c).

43.     The Commission was to adopt a plan by September 1, 2021.

44.     If the Commission was unable to reach consensus with the two opposition members by September 1, 2021, it could use the impasse procedure. Under the impasse procedure, the

Commission could introduce a proposed General Assembly plan by simple majority vote. *Id*. §8(A)(1).

45.     At least one hearing was required after the introduction of a simple majority map, in which the public could give testimony and there could be amendments to the plan. *Id*. § 8(A)(2).

46.     Under the impasse procedure, the Commission had until September 15, 2021 to adopt a final map. *Id*. § 8(A)(3).

47.     If a plan were adopted with the two members of the opposition party voting in favor of the plan, it would be in force for 10 years. *Id*. § 8(B).

48.     A plan adopted by a simple majority vote, without at least two of the opposition party members, would be in force for only four years. *Id*. § 8(C)(1)(a).

49.     When a simple majority four-year plan is adopted, the Commission "***shall include*** a statement explaining what the commission determined to be the statewide preferences of the voters of Ohio and the manner in which the statewide proportion of districts in the plan whose voters, based on statewide state and federal partisan general election results during the last ten years, favor each political party corresponds closely to those preferences." *Id*. § 8(C)(2) (emphasis added).

50.     Further, "[a]t the time the plan is adopted, a member of the commission who does not vote in favor of the plan may submit a declaration of the member's opinion concerning the statement included with the plan." *Id.*

### b)     Political Fairness: Section 6

51.     In addition to the Section 8 requirement for a statement by the Commissioners who enact a simple majority map, explaining how they considered statewide voter preferences in drawing their map, Section 6 mandates that the Commission be guided by political fairness in the drawing of all maps under Article XI.

17

52.     Section 6 provides that the Commission "shall attempt to draw a general assembly district plan that meets all of the following standards":

(A) *No* general assembly district plan *shall be drawn* primarily to favor or disfavor a political party.

(B) The statewide proportion of districts whose voters, based on statewide state and federal partisan general election results during the last ten years, favor each political party *shall* correspond closely to the statewide preferences of the voters of Ohio.

*Id.* § 6 (emphasis added).

53.     The provisions of Section 6(a) and Section 6(b) are complementary. Together, they require that map drawers not draw maps to the favor of one party or another, and one way that favoritism can be measured is through the deviation from statewide vote share in statewide elections over the past decade.

54.     Section 6 further provides that all maps "shall be compact." *Id*. § 6(C).

### c)     Jurisdiction: Section 9

55.     Article XI, Section 9 gives this Court "exclusive, original jurisdiction in all cases arising under this article" without limitation. *Id.* § 9(A).

56.     Section 9(B) states that, "[i]n the event that any section of this constitution relating to redistricting, any general assembly district plan made by the Ohio redistricting commission, or any district is determined to be invalid by an unappealed final order of a court of competent jurisdiction then, notwithstanding any other provisions of this constitution, the commission shall be reconstituted as provided in Section 1 of this article, convene, and ascertain and determine a general assembly district plan in conformity with such provisions of this constitution as are then valid, including establishing terms of office and election of members of the general assembly from districts designated in the plan, to be used until the next time for redistricting under this article in conformity with such provisions of this constitution as are then valid." *Id.* § 9(B).

57.     Section 9(B) thereby provides the global remedy for any case in which the court determines that the plan or any district is "invalid," including on the basis of Section 6 of Article XI. It provides that where this Court determines that a plan is "invalid" that it shall direct that the Redistricting Commission shall be reconstituted so as to "ascertain and determine a general assembly district plan" that conforms with the terms of the Ohio Constitution. Article XI, Section 6—and its specific partisan fairness requirements—is precisely just such a constitutional provision with which a plan must comply.

58.     There are additional remedies set forth in Section 9 for violations of specified articles. In particular, Section 9(D)(3) provides specific remedies to be applied when a plan includes violations of Sections 2, 3, 4, 5, or 7 of Article XI. It provides that if those other sections are violated that this Court can direct three different remedies: (a) the correction of isolated errors, *see* § 9(D)(3)(a); (b) a direction that an entirely new map be enacted (if certain numerical requirements are met (*i.e.,* 6 invalid House districts and/or 2 invalid Senate districts), *see* § 9(D)(3)(b); or (c) a direction, even where these numerical minima are not met, that an entirely new map be enacted whenever a violation of Section 2,3,4,5 or 7 results in partisan unfairness, *see* § 9(D(3)(c)). That the Constitution went out of its way to make sure that partisan fairness considerations have extra weight in Section 9(D)(3)(c)—requiring an entirely new statewide map just for one instance of a municipal split infraction—only underscores the importance of those considerations to Article XI.

## FACTS

### A.    Respondents Engaged in an Unduly Partisan Process.

59.     The State of Ohio has a history of gerrymandered maps. The maps that came out of Ohio's 2011 decennial apportionment process were particularly gerrymandered. For example, in 2012 elections, the year the map was new, Democratic candidates won 50.2% of the statewide

vote, but they won only 39.4% of Ohio's state house seats. *See* Ex. 1, Warshaw Aff., at 18. This bias persisted: Democrats won 45.6% of the votes, but only 35.4% of the seats, in the 2020 state house elections. *Id.* The extreme seat bias was the result not of political geography, but of a manipulated process. *Id.* at 18–22.

60.     The process used by the Redistricting Commission mirrors the process that was used in 2011 to draw the map. The prior manipulated apportionment process was outlined in detail in the three-judge federal panel in *Ohio A. Philip Randolph Inst. v. Householder*. While the litigation focused on the congressional process, both the congressional and state legislative maps were drawn using the same process at the same time. *Ohio A. Philip Randolph Inst. v. Householder*, 18-cv-357 (S.D. Ohio), Dkt 230-12 (Ray DiRossi Deposition Tr.) at 52:14–53:14, 63:21–64:14, 89:14–90:3, 95:7–15, 164:11–15, 178:6–13, 232:24–233:6, 276:20–277:3. Based on the court's review of extensive evidence, the panel found that "partisan intent predominated" the map drawing process. *Ohio A. Philip Randolph Inst. v. Householder*, 373 F. Supp. 3d at 1099. The court specifically credited "evidence of the timeline and logistics of the map-drawing process, the map drawers' heavy use of partisan data, contemporaneous statements made by the map drawers about their efforts, the characteristics of the map itself (including the irregular shape of the districts, their lack of compactness, and the high number of county and municipality splits), and finally, the outlier partisan effects that the map has produced since its enactment." *Id.*

61.     One procedural issue that the three-judge panel found particularly relevant was that "[t]here was a severe disconnect between the outward face of the map-drawing process and its true inner workings." *Id.* at 1099–1100. While the process was supposed to be conducted by the bipartisan apportionment board, in reality the map was drawn in secret by partisan actors. *Id.*

62.     The 2021 state redistricting process was just as flawed and as infected with partisan bias as the 2011 state redistricting process. The 2021 Ohio Redistricting Commission was convened on August 6, 2021. There were only two Democrats on the Commission; the rest of the members were from the Republican Party. As in 2011, all deliberations happened behind closed doors and the process was controlled by one party.

63.     Despite the constitutional mandate that any general assembly district plan must be adopted, including with the support of at least two Democratic members of the Commission, by September 1, 2021, Ohio Const., art. XI, §§ 1(B)(3), 1(C), the Republicans failed to even present a map until nine days after that constitutional deadline.

64.     In flouting the constitutional deadlines of Section 1 of Article XI, the Republican members of the Commission repeatedly invoked the delayed release of the Census data as a rationale. Ex. 5, Tr. of Sept. 9, 2021 Morning Hrg., at 3, 12, 13; Ex. 6, Tr. of Sept. 9, 2021 Afternoon Hrg., at 5–6. But this delayed data did not come as a surprise to the Commission—the Commission had been well aware by early 2021 that the Census data would be received later than usual. In fact, Ohio Republican leadership filed a lawsuit seeking an earlier release of Census data, but withdrew their request when the Census Bureau announced that it would be able to produce Census data by August 16, 2021, over a month earlier than the previously-announced release date of September 30, 2021. With full awareness of both this new release date and its constitutionally-mandated deadline to adopt a general assembly district plan, the Republican administration specifically represented to the Sixth Circuit that, "[a]lthough Ohio would prefer to get its data sooner, Ohio agrees that an August 16 delivery would allow it to complete its redistricting process." *Ohio v. Raimondo*, 848 F. App'x 187, 188 (6th Cir. 2021).

65. On September 9, 2021, the Republican members of the Commission presented a map through the testimony of Ray DiRossi, the chief map drawer. The map was introduced at the first of two hearings that day, which took place at 10:00 A.M.

66. DiRossi has a long history in the state of drawing Republican maps and was one of two chief map drawers of the gerrymandered map in 2011. *Ohio A. Philip Randolph Inst.*, 373 F. Supp. 3d at 995–96 (describing how DiRossi served "as [one of] the principal on-the-ground map drawers" and left his position in government to serve as a Republican consultant in order to draw the map). In 2011, DiRossi secured a room at the DoubleTree Hotel in Columbus, and dubbed it the "bunker." Only Republicans had access to the bunker while he was drawing his maps. *Id.*

67. This time around, DiRossi once again worked at the direction of only the Republican members of the Commission, with no input or oversight from the Democratic members.

68. This dynamic first became clear at the Commission's August 31, 2021 hearing. Having never been consulted by Republican members of the Commission about drawing a proposed map, the Democratic members of the Commission presented a proposed map on August 31, 2021, in advance of the Commission's constitutional deadline. At that time, the Republican members of the Commission refused to inform the Democratic members as to when they would be introducing any separate map, but one Republican member, Senate President Matt Huffman, indicated that he was "not prepared to discuss" the constitutionality of the Democrats' proposed map because he would "rather have our version of . . . the Senate Democrats' expert here today . . . to talk about that." Ex. 4, Tr. of Aug. 31, 2021 Hrg., at 9. House Minority Leader Emilia Sykes indicated that she had "not been privy to any of those conversations" regarding other maps that Commission members were working on, and she asked what, if anything, she could "expect in

22

terms of participating" in the drawing of other maps the Commission would consider. *Id.* at 8. No Republican member indicated that she would be included or that her input would be considered in drawing an alternative map.

69.     At the Commission hearing on September 9, 2021, it became clear that the Republicans' expert was DiRossi. At that September 9 hearing, DiRossi testified that he had been "directed," by General Assembly leadership, "not to use" any "racial data or demographic data" when drawing the map. Ex. 5, Tr. of Sept. 9, 2021 Morning Hrg., at 8. In response, House Minority Leader Emilia Sykes—who is part of General Assembly leadership as the Leader of the Democrats in the Ohio House—asked who directed him thus, and indicated she was not privy to any request that DiRossi ignore racial data. *Id.* at 9.

70.     Mr. DiRossi also stated that the Republican representatives and staffers responsible for drafting this map were "conducting an analysis of the election data contemplated by the constitution," but that analysis was "ongoing," and was "not complete" at the time that this map was proposed to the Commission. Ex. 5, Tr. of Sept. 9, 2021 Morning Hrg., at 8.

71.     In the second hearing on September 9, 2021, in a 5-2 vote along partisan lines, the Commission voted to introduce the Republicans' map that had been proposed at the 10:00 A.M. meeting as the official proposed map of the Commission. Ex. 6, Tr. of Sept. 9, 2021 Afternoon Hrg., at 2, 7–8. Not only did the Commission embrace the Republicans' map as its proposed plan over the objection of its Democratic members, but it selected the Republicans' map as the Commission's proposed plan before giving the public any meaningful opportunity to look at, much less review, the map.

72.     The map was first presented to the public at 10:00 A.M., and the Commission selected that map as its proposed plan the same day at its 2:00 P.M. hearing. Both hearings had

been announced with only one day's notice. Many witnesses testified that they were provided insufficient notice to fully participate and did not have enough time to view the map in order to provide feedback. *See* Ex. 5, Tr. of Sept. 9, 2021 Morning Hrg.; Ex. 6, Tr. of Sept. 9, 2021 Afternoon Hrg.

73.     Similarly, in 2011, the Court found that the maps had been drawn in secret and only shared at the last moment with little opportunity for engagement from the opposition party or public. *Ohio A. Philip Randolph Inst.*, 373 F. Supp. 3d. at 1100.

74.     On the evening of September 15, 2021, Senate President Huffman introduced an amendment to the Republican-proposed map that the Commission had passed on September 9, revising several district boundaries. Within ten minutes of its introduction, the Commission had passed the amendment along party lines. Just after midnight on September 16, 2021, the Commission voted—again in a 5-2 vote along party lines—to adopt the Republicans' amended map, introduced less than an hour earlier, as the general assembly plan for the next four years.

75.     Though most of the Republicans' process took place behind closed doors, Republican Commission members made public statements revealing that their map was plainly unduly partisan, candidly admitting that their map would not stand up to scrutiny under Article XI of the Ohio Constitution.

76.     Governor DeWine expressed regret and doubt about of the legality of the final maps at the Commission's final hearing, stating he was "sure" the Commission could have reached an outcome "that was much more clearly constitutional," Ex. 7, Tr. of Sept. 15, 2021 Hrg., at 11. In a separate statement after the vote, Governor DeWine likewise said that the Commission's "job is to make [the redistricting plan] as constitutional as we can, and ***I thought we could have done***

***better.***" Susan Tebben, *Huffman Defends his Maps, Redistricting Process Despite No Bipartisan Support*, Ohio Capital Journal (Sept. 17, 2021), https://bit.ly/3nWEwqf (emphasis added).

77.    Secretary of State LaRose similarly lamented at the final meeting that the Commission's "***map has many shortcomings,***" and expressed "fear we're going to be back in this room very soon." Ex. 7, Tr. of Sept. 15, 2021 Hrg., at 10 (emphasis added).

78.    Auditor Faber acknowledged that the Commission's map was "***not that good.***" Ex. 7, Tr. of Sept. 15, 2021 Hrg., at 14 (emphasis added).

79.    Because the Republicans' amended map did not receive the support of two members of the minority party, the Commission was required under Article XI, Section 8(C)(2) to adopt a "statement explaining what the commission determined to be the statewide preferences of the voters of Ohio and the manner in which the statewide proportion of districts in the plan whose voters, based on statewide state and federal partisan general election results during the last ten years, favor each political party corresponds closely to those preferences."

80.    During the Commission's hearings, witnesses frequently cited the importance of these Section 6(B) requirements, and asked how compliance with this constitutional requirement would be determined. *See, e.g.*, Ex. 5, Tr. of Sept. 9, 2021 Morning Hrg.; Ex. 6, Tr. of Sept. 9, 2021 Afternoon Hrg. Republican Commission members did not provide any clear explanation of how this provision should be interpreted, however, or how their maps would comply with this requirement: Auditor Faber even dismissed the requirements of Section 6 as "aspirational." Ex. 5, Tr. Of Sept. 9, 2021 Morning Hrg., at 23. During the Commission's final meeting on September 15, in fact, Secretary of State LaRose expressed concern that he had been "been asking for the rationale [for compliance with Section 6(B)] for days" but had "not gotten an answer until tonight,"

25

and asked whether "there [was] a reason for, for not sort of sharing this sooner to sort of guide the conversations as we've been having them." Ex. 7, Tr. of Sept. 15, 2021 Hrg., at 17.

81.     At the final meeting, Senate President Huffman introduced a statement to comply with Section 8(C)(2), which he said "was prepared probably in the last five or six hours," and was "simply listing all" of the partisan metrics that could be "considered" to determine compliance with Section 6(B). Ex. 7, Tr. of Sept. 15, 2021 Hrg., at 17. Senate President Huffman's statement was adopted by the Commission along a 5-2 party-line vote. The statement did not provide a constitutionally valid, or even credible, justification for the enacted map, but was bald sophistry. *See infra* ¶¶ 87–88.

**B.     Respondents' Partisan Process Created Unduly Partisan Results.**

82.     This extremely partisan process described above yielded predictably partisan results. In violation of Article XI, the maps that Respondents adopted on September 16, 2021 were drawn primarily to favor Republicans and disfavor Democrats, and the statewide proportion of districts whose voters favor each political party does not correspond closely to the statewide preferences of the voters of Ohio. These violations are detailed in the causes of action below.

83.     Beyond the procedural irregularities, the extremity of the skew of the map itself illustrates that Republican members of the Commission sought to ensure that the enacted plan would favor their party, even if doing so violated Article XI.

84.     Despite Section 6's requirement that the map "correspond closely" with the manifest leanings of the electorate, the enacted map, and the Huffman statement accompanying it, reveal the majority's rejection of Section 6, and their disdain for the voters of Ohio or their well-established preferences. Over the past decade, Republicans have received between 46.2% and 59.7% of the statewide vote. *See* Ex. 10, Testimony of Collin Marozzi to Ohio Redistricting Commission at Table 1 (submitted Aug. 27, 2021); *see also* Ex. 9, Ohio Redistricting Commission,

*Article XI, Section 8(C)(2) Statement* (Sept. 16, 2021) (according to the Redistricting Commission's own statement, Republicans have only garnered an average 55% of the votes in statewide elections over the past 10 years). In the past decade, Democrats have won on average 45.5% of the statewide two-party vote. Ex. 1, Warshaw Aff., at 5, 24–25. Yet, they are only projected to win an approximate 32% to 33% of the seats in the Ohio House and 29% to 31% of the seats in the Ohio Senate—numbers that are just as disproportional as the 2012-2020 gerrymandered map—and in the Senate, even *more* disproportionate. *Id.* at 24–25.

85.     Nor can Respondents reasonably contend that they even "attempted" to meet the requirements of Section 6. The blatant partisan unfairness of the enacted map belies any such contention.

86.     Moreover, as the Cooper Affidavit makes plain, it was wholly possible to enact a map that complied with the other provisions of Article XI without violating the partisan fairness requirements of Section 6. Ex. 8, Cooper Aff. ¶¶ 20, 22. These alternative maps highlight that disproportionately advantaging Republicans was not necessary to achieve equal population requirements or other compelling state interests, but rather was done in order to advance the partisan aims of the Commission's Republican majority.

87.     In the Commission's statement concerning how it considered the statewide voter preferences, it stated that "the Commission determined that Republican candidates won thirteen out of sixteen of those elections resulting in a statewide proportion of voters favoring statewide Republican candidates of 81 % and a statewide proportion of voters favoring statewide Democratic candidates of 19%." Ex. 9, Ohio Redistricting Commission, *Article XI, Section 8(C)(2) Statement* (Sept. 16, 2021).

88.     The Commission's suggestion that it could somehow comply with Section 6(B) by counting up the number of elections in which Republican candidates were victorious finds no support in the language of Section 6(B). Rather, that provision expressly states that partisan fairness is to be determined by comparing two measures: (1) the proportion of *districts* in the plan whose *voters* favor a political party, based on statewide elections over the past ten years; and (2) the statewide preferences of the *voters* of Ohio. To suggest that one should merely count up the number of elections that Republicans won to determine the statewide preferences of the voters effectively means that all of the votes cast for a Democrat in an election count for nothing. Under the Commission's methodology, if the Republicans won 100% of the elections, each by 51% of the vote, then instead of constituting 51% of the statewide voter preferences, the Republicans would supposedly constitute 100% of the statewide voter preferences and that all the voters in the state preferred Republican candidates. Accordingly, under the Commission's approach, the Republicans would be entitled to 100% of the seats in the General Assembly rather than 51%. Such a methodology tortures Section 6(B) beyond any reasonable construction. *See also* Warshaw Aff. § 4.1 (noting that, under the Commission's explanation, "[I]f Republicans had won each statewide election with 50.1% of the vote, the statewide proportion of voters favoring Republican candidates is 100%. Thus, Republicans would be entitled to win 100% of the legislative seats. It makes much more sense that the text of Section 6(B)'s proportionality requirement instead implies that Republicans are entitled to 50.1% of the legislative seats if they win 50.1% of the votes.").

89.     Accordingly, it is clear that the Commission did not draw a map that complied with the requirements of Article XI, Section 6, and in fact intentionally rejected Section 6.

## FIRST CAUSE OF ACTION
### Violation of Article XI

### (The Districts of the Ohio House of Representatives)

90.     Relators restate and incorporate by reference the allegations of paragraphs 1 through 89 above as though fully set forth in this Paragraph.

91.     The House map that Respondents adopted is invalid because it violates Section 6 of Article XI in several ways. The House map that Respondents adopted violates Section 6(a) as it was drawn primarily to favor the Republican Party, which is demonstrated through statements made by the members of the Commission, the map drawing process, and the extreme nature of the partisan skew of the map. *See, e.g.* Ex. 1, Warshaw Aff. at 23–28 (describing the partisan skew of the map). The House map that Respondents adopted further does not comply with the requirement of Article XI, Section 6(B), because the statewide proportion of districts whose voters, based on statewide state and federal partisan general election results during the last ten years, favor each political party does not correspond closely to the statewide preferences of the voters of Ohio. *See* Ex. 1, Warshaw Aff. at 23–28.

## SECOND CAUSE OF ACTION
### Violation of Article XI

### (The Districts of the Ohio Senate)

92.     Relators restate and incorporate by reference the allegations of paragraphs 1 through 91 above as though fully set forth in this Paragraph.

93.     The Senate map that Respondents adopted is invalid because it violates Section 6 of Article XI in several ways. The Senate map that Respondents adopted violates Section 6(a) as it was drawn primarily to favor the Republican Party, which is demonstrated through the procedure of the map drawing process and the partisan bias metrics of the map. *See* Ex. 1, Warshaw Aff., at 23–28. The Senate map that Respondents adopted further does not comply with the requirement

of Article XI, Section 6(B), because the statewide proportion of districts whose voters, based on statewide state and federal partisan general election results during the last ten years, favor each political party does not correspond closely to the statewide preferences of the voters of Ohio. *See* Ex. 1, Warshaw Aff., at 23–28.

## PRAYER FOR RELIEF

Accordingly, Relators respectfully request that this Court:

1.      Declare that the maps that Respondents adopted are invalid for failure to comply with Article XI of the Ohio Constitution;

2.      Order the Commission to adopt a new general assembly district plan or, at a minimum, to amend the maps that Respondents adopted to correct the violations, as contemplated in Article XI, Section 9(B);

3.      Issue a permanent injunction and judgment barring Respondents from calling, holding, supervising, administering, or certifying any elections under the maps that Respondents adopted, as Relators have no adequate remedy at law and will be irreparably harmed by the continued violation of their constitutional and statutory rights;

4.      Hold hearings, consider briefing and evidence, and otherwise take actions necessary to adopt redistricting plans for the state of Ohio or to direct the Commission as to plans to be adopted;

5.      Retain jurisdiction of this action to render any and all further orders that the Court may from time to time deem appropriate, including, but not limited to, determining the validity of any new redistricting plans adopted by the Commission pursuant to the Ohio Constitution; and

6.      Grant such other or further relief the Court deems appropriate, including, but not limited to, an award of Relators' attorneys' fees and reasonable costs.

Respectfully submitted,

*/s Freda J. Levenson*

Robert D. Fram*
Donald Brown*
Joshua González*
Juliana Goldrosen (PHV 25193 - 2021)
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-6000
rfram@cov.com

James Smith*
Megan C. Keenan*
L. Brady Bender (PHV 25192 - 2021)
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
mkeenan@cov.com

Anupam Sharma*
James Hovard*
Yale Fu*
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306-2112
(650) 632-4700
asharma@cov.com

Madison Arent*
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841 1000
marent@cov.com

Freda J. Levenson (0045916)
ACLU of Ohio Foundation, Inc.
4506 Chester Avenue
Cleveland, Ohio 44103
(614) 586-1972 x125
flevenson@acluohio.org

David J. Carey (0088787)
ACLU of Ohio Foundation, Inc.
1108 City Park Avenue, Suite 203
Columbus, OH 43206
(614) 586-1972 x2004
dcarey@acluohio.org

Alora Thomas*
Julie A. Ebenstein*
American Civil Liberties Union
125 Broad Street
New York, NY 10004
(212) 519-7866
athomas@aclu.org
jebenstein@aclu.org

*Counsel for Relators*
*\* Pro Hac Vice Motion Forthcoming*

# Exhibit 1

# Warshaw Affidavit





## Warshaw Affidavit.pdf

| | |
|---|---|
| DocVerify ID: | DBFE2537-827C-47D0-9584-70B76BDA0A11 |
| Created: | September 23, 2021 07:10:09 -8:00 |
| Pages: | 1 |
| Remote Notary: | Yes / State: OH |

This document is a DocVerify VeriVaulted protected version of the document named above. It was created by a notary or on the behalf of a notary, and it is also a DocVerify E-Sign document, which means this document was created for the purposes of Electronic Signatures and/or Electronic Notary. Tampered or altered documents can be easily verified and validated with the DocVerify veriCheck system. This remote online notarization involved the use of communication technology.

Go to www.docverify.com at any time to verify or validate the authenticity and integrity of this or any other DocVerify VeriVaulted document.

**E-Signature Summary**

**E-Signature 1: Christopher Warshaw (CW)**
September 23, 2021 08:33:15 -8:00 [BDE06C6B6751] [69.143.174.137]
warshaw@email.gwu.edu (Principal) (Personally Known)

**E-Signature Notary: Theresa M Sabo (TMS)**
September 23, 2021 08:33:15 -8:00 [FCBE739C4315] [23.28.168.121]
tess.sabo@gmail.com
I, Theresa M Sabo, did witness the participants named above electronically
sign this document.



DocVerify documents cannot be altered or tampered with in any way once they are protected by the DocVerify VeriVault System. Best viewed with Adobe Reader or Adobe Acrobat.
All visible electronic signatures contained in this document are symbolic representations of the persons signature, and not intended to be an accurate depiction of the persons actual signature as defined by various Acts and/or Laws.



# IN THE SUPREME COURT OF OHIO

**LEAGUE OF WOMEN VOTERS OF OHIO, et al.,**

       **Relators**

v.

**OHIO REDISTRICTING COMMISSION, et al.,**

       **Respondents.**

**Case No.**

**Original Action Pursuant to Ohio Const., Art. XI**

## AFFIDAVIT OF CHRISTOPHER WARSHAW

Franklin County
     /ss
State of Ohio

     Now comes affiant Christopher Warshaw, having been first duly cautioned and sworn, deposes and states as follows:

1. I am over the age of 18 and fully competent to make this declaration. I have personal knowledge of the statements and facts contained herein.

2. For the purposes of this litigation, I have been asked by counsel for Relators to analyze relevant data and provide my expert opinions.

3. To that end, I have personally prepared the report attached to this affidavit as Exhibit A, and swear to its authenticity and to the faithfulness of the opinions expressed and, to the best of my knowledge, the accuracy of the factual statements made therein.

FURTHER AFFIANT SAYETH NAUGHT.

09/23/2021
Executed on _____, 2021.

                         Christopher Warshaw

Sworn and subscribed before me this ____ day of 09/23/2021 _____, 2021.

**Theresa Michelle Sabo**
**Commission # 2016-re-619622**
Electronic Notary Public
State of Ohio
My Comm Exp. Nov 28, 2021

Notary Stamp 2021/09/23 08:33:15 PST

     Notary Public

DBFE2537-827C-47D0-9584-70B76BDA0A11 — 20210923 07:10:09 -8:00 — Remote Notary



# Exhibit A

# An Evaluation of the Partisan Bias in Ohio's Enacted State Legislative Districting Plan

Christopher Warshaw[*]

September 23, 2021

---

[*]Associate Professor, Department of Political Science, George Washington University. `warshaw@gwu.edu`. Note that the analyses and views in this report are my own, and do not represent the views of George Washington University.

# Contents

**1 Introduction**     **1**

**2 Qualifications, Publications and Compensation**     **1**

**3 Summary**     **4**

**4 Background on Partisan Gerrymandering**     **6**
    4.1 Proportionality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    4.2 Efficiency Gap . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    4.3 Mean-median Gap . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    4.4 Symmetry in the Vote-Seat Curve Across Parties . . . . . . . . . . 12
    4.5 Declination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    4.6 Comparison of Partisan Bias Measures . . . . . . . . . . . . . . . . 14
    4.7 The Responsiveness of a Legislative Districting Plan to Changes in Voters' Preferences . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    4.8 Partisan Control of the Redistricting Process and Gerrymandering . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**5 Historical Analysis of Partisan Bias in Ohio's Legislative Districts**     **18**

**6 Partisan Bias in Ohio's Enacted State Legislative Districting Plans**     **23**
    6.1 Analysis based on Proportionality Metric . . . . . . . . . . . . . . 24
    6.2 Evaluation using Additional Partisan Bias Metrics . . . . . . . . . . 25
    6.3 The Responsiveness of Ohio's Enacted State Legislative Plan to Changes in Voters' Preferences . . . . . . . . . . . . . . . . . . . . 28

**7 Partisan Gerrymandering & Representation in State Government**     **29**
    7.1 Polarization in State Legislatures . . . . . . . . . . . . . . . . . . . 29
    7.2 Gerrymandering and Roll Call Voting in State Legislatures . . . . . . . . . 31
    7.3 The Efficiency Gap and Policy Outputs in State Legislatures . . . . . . . . 33
    7.4 Summary of Gerrymandering & Representation in State Government . . . . 34

**8 Conclusion**     **34**

**A Measurement Model for Uncontested Races**     **A-1**
    A.1 Overview of Data . . . . . . . . . . . . . . . . . . . . . . . . . . . A-2
       A.1.1 Congressional Districts . . . . . . . . . . . . . . . . . . . . A-2
       A.1.2 State Legislative Districts . . . . . . . . . . . . . . . . . . . A-3
    A.2 Details of Statistical Models . . . . . . . . . . . . . . . . . . . . . A-5
    A.3 Validation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-7

# 1   Introduction

My name is Christopher Warshaw. I am an Associate Professor of Political Science at George Washington University. Previously, I was an Associate Professor at the Massachusetts Institute of Technology from July 2016 - July 2017, and an Assistant Professor at MIT from July 2012 - July 2016.

I have been asked by counsel representing the plaintiffs in this case to analyze relevant data and provide my expert opinions about whether Ohio's enacted state legislative districting plan meets the criteria in Article XI, Section 6 of Ohio's Constitution. More specifically, I have been asked:

- To evaluate whether the plan meets the requirement of Article XI, Section 6(B) that the "statewide proportion of districts whose voters, based on statewide state and federal partisan general election results during the last ten years, favor each political party [] correspond[s] closely to the statewide preferences of the voters of Ohio."

- To evaluate whether the plan appears to meet the requirement of Article XI, Section 6(A) that "No general assembly district plan shall be drawn primarily to favor or disfavor a political party" based on a variety of standard academic metrics typically used to assess the degree of partisan bias in a districting plan.

- To examine the consequences of the enacted redistricting plans on the representation that Ohio residents receive in state government.

# 2   Qualifications, Publications and Compensation

My Ph.D. is in Political Science, from Stanford University, where my graduate training included courses in political science and statistics. I also have a J.D. from Stanford Law School. My academic research focuses on public opinion, representation, elections, and polarization in American Politics. I have written multiple papers that focus on elections and two papers that focus specifically on partisan gerrymandering. I also have a forthcoming book that includes an extensive analysis on the causes and consequences of partisan gerrymandering in state governments.

My curriculum vitae is attached to this report. All publications that I have authored and published appear in my curriculum vitae. My work is published or forthcoming in peer-reviewed journals such as: the *American Political Science Review*, the *American Journal of Political Science*, the *Journal of Politics*, *Political Analysis*, *Political Science Research and Methods*, the *British Journal of Political Science*, *Political Behavior*, *Science*

1

*Advances*, the *Election Law Journal*, *Nature Energy*, *Public Choice*, and edited volumes from Cambridge University Press and Oxford University Press. My book entitled *Dynamic Democracy in the American States* is forthcoming from the University of Chicago Press. My non-academic writing has been published in the *New York Times* and the *Washington Post*. My work has also been discussed in the *Economist* and many other prominent media outlets.

My opinions in this case are based on the knowledge I have amassed over my education, training and experience, including a detailed review of the relevant academic literature. They also follow from statistical analysis of the following data:

- In order to calculate partisan bias in state legislative elections, I examined:

  - Precinct-level data on recent Ohio elections: I use precinct-level data on Ohio's statewide elections between 2016-20 from the Voting and Election Science Team (University of Florida, Wichita State University). I obtained these data from the Harvard Dataverse.[1] As far as I know, there are no publicly available datasets with precinct-level returns from 2012-14 that are linked to precinct boundaries (e.g., shapefiles). For these elections, I obtained data via the ACLU that their expert Bill Cooper put together.[2]

  - A large canonical data set on candidacies and results in state legislative elections: I obtained results from 1972-2020 collected by Carl Klarner and a large team of collaborators. The results from 1972-2012 are based on data maintained by the Inter-university Consortium for Political and Social Research (ICPSR) (Klarner et al. 2013). The data from 2013-2020 were collected by Klarner.

  - Data on presidential election returns in state legislative districts: For elections between 1972 and 1991, I used data on county-level presidential election returns from 1972-1988 collected by the Inter-university Consortium for Political and Social Research (ICPSR 2006) and mapped these returns to state legislative districts. For elections between 1992 and 2001, I used data on presidential

---

1. See https://dataverse.harvard.edu/dataverse/electionscience.

2. Cooper provided the following description of the data via Counsel: The 2012 results are disaggregated to the block level (based on block centroids) from the statewide 2012 precinct file. The 2014 results are based on a geocoding of about 3.15 million voters who cast ballots in Nov. 2014. These addresses were matched to census blocks and the blocks were aggregated to the precinct level. These "virtual" precincts were next matched to the 2014 election results and then disaggregated back to the block level, with block-level matches. When aggregated to the congressional level, the differences are measured in the tenths of a percent for House contests. As a final step, these datasets were aggregated from the block-level to the 2010 VTD level. Finally, it is important to note that there is a 2% to 3% undercount statewide for all votes cast in the 2014 election.

election returns in the 2000 election collected by McDonald (2014) and Wright et al. (2009). For elections between 2002 and 2011, I used data on the 2004 and 2008 presidential elections collected by Rogers (2017). For elections between 2012 and 2020, I used data on presidential election returns for the 2012 and 2016 elections from the DailyKos website.

– <u>Information on who controlled each redistricting plan in state legislative elections:</u> (e.g., Democrats, Republicans, or a Commission) from 1972-2012 assembled by Stephanopoulos (2018).

– <u>The Plan Score website:</u> PlanScore is a project of the nonpartisan Campaign Legal Center (CLC) that enables people to score proposed maps for their partisan, demographic, racial, and geometric features. I am on the social science advisory team for PlanScore.

- In order to examine the effect of gerrymandering in state legislative elections on representation in state government, I examined:

  – <u>Well established estimates of the ideology of state legislators</u> based on their roll call votes developed by Professors Nolan McCarty and Boris Shor (Shor and McCarty 2011).[3]

  – <u>Estimates of the policy liberalism of state governments</u> based on approximately 180 policies using a model I developed in a co-authored paper which was published in the *American Journal of Political Science* (Caughey and Warshaw 2016) and that we extended for our book *Dynamic Democracy in the American States.*

I have previously provided expert reports in three redistricting-related cases: *League of Women Voters of Pennsylvania v. Commonwealth of Pennsylvania*, No. 159 MM 2017, *League of Women Voters of Michigan* v. *Johnson*, 17-14148 (E.D. Mich), and *APRI et al.* v. *Smith et al.*, No. 18-cv-357 (S.D. Ohio). In addition, I have provided expert testimony and reports in several cases related to the U.S. Census: *State of New York et al.* v. *United States Department of Commerce*, 18-cv-2921 (SDNY), *New York* v. *Trump*; *Common Cause* v. *Trump*, 20-cv-2023 (D.D.C.), and *La Union Del Pueblo Entero (LUPE)* v. *Trump*, 19-2710 (D. Md.).

I am being compensated at a rate of \$325 per hour. The opinions in this report are my own, and do not represent the views of George Washington University.

---

3. These scores were downloaded from the Harvard Dataverse website, `https://dataverse.harvard.edu/dataset.xhtml?persistentId=doi:10.7910/DVN/GZJOT3`.

# 3   Summary

This report examines whether Ohio's enacted state legislative maps meet the criteria in the Ohio Constitution. Article XI, Section 6 of Ohio's Constitution requires that the Redistricting Commission "attempt to draw a general assembly district plan" that meets the following standards related to partisan fairness. Section 6(A) prohibits a district plan from being "drawn primarily to favor or disfavor a political party." Section 6(B) states that "the statewide proportion of districts whose voters, based on statewide state and federal partisan general election results during the last ten years, favor each political party shall correspond closely to the statewide preferences of the voters of Ohio."

My report provides evidence relevant to evaluating both of these criteria. Ohio's Constitutional criteria requiring districting plans refrain from benefiting a particular political party are related to a long-line of Political Science literature on democratic representation. The relationship between the distribution of partisan support in the electorate and the partisan composition of the government—what Powell (2004) calls "vote–seat representation"—is a critical link in the longer representational chain between citizens' preferences and governments' policies. If the relationship between votes and seats systematically advantages one party over another, then some citizens will enjoy more influence—more "voice"—over political outcomes than others (Caughey, Tausanovitch, and Warshaw 2017).

I use two complementary methodologies to evaluate whether Ohio's state legislative plans meet the requirements of Article XI, Section 6 in its Constitution. First, I use a composite of previous statewide election results between 2012-2020. This approach is based directly on the text of Article XI, Section 6(B), which states that "statewide state and federal partisan general election results during the last ten years" shall be used to evaluate whether a plan meets the Constitution's proportionality requirement. However, this approach has some methodological weaknesses. Therefore, I complement this approach using additional approaches from the open source PlanScore.org website, which is a project of the Campaign Legal Center.[4] PlanScore uses a statistical model to estimate district-level vote shares for a new map based on the relationship between presidential election results and legislative results between 2012-2020.[5] Based on these two approaches, I characterize the bias in Ohio's plans based on both simple proportionality and a large set of established metrics of partisan fairness. I also place the bias in Ohio's plans into historical perspective.

---

[4]. I am on the social science advisory board of Plan Score, but I am not compensated by Campaign Legal Center nor do I have any role in PlanScore's evaluation of individual maps.

[5]. See `https://planscore.campaignlegal.org/models/data/2021B/` for more details.

All of these analyses indicate an extreme level of pro-Republican bias in Ohio's enacted state house and state senate plans. In the 2020 presidential election, Democrat Joe Biden received about 46% of the two-party vote.[6]  However, he would have only won 35% of the state house districts and 33% of the state senate districts in the enacted plan.  In the 2018 gubernatorial election, Democrat Richard Cordray did a little bit better.  He received about 48% of the two-party vote.  Yet again, however, he would have only won 37% of the state house districts and 36% of the state senate districts under the enacted plan.  In the 2018 Senate election, Democratic Senator Sherrod Brown did even better. He received about 53% of the two-party vote.  But he would still have won less than half of the state house districts and just over half the state senate districts under the enacted plan.

Based on all the available statewide elections in Ohio between 2012-2020, I find that the enacted state house and state senate plans lead to a much higher Republican share of the seats than their share of the statewide vote.  Indeed, across the 16 statewide elections, the Democrats' statewide two-party vote share averaged about 45.5%, but they are only likely to win about 33% of the seats in the state house and 31-32% of the seats in the state senate.[7]

We reach the same conclusion using the predictive model on the PlanScore website. It indicates that the enacted plans favor Republican candidates in 97-99% of scenarios. Even though Republicans only get about 56% of the statewide vote in recent elections, PlanScore analysis indicates that Republicans are expected to win 71% of the seats in Ohio's state senate and 68% of the seats in Ohio's state house.  Thus, the plans have a pro-Republican proportionality bias of 15% and 12%.  Based on generally accepted Political Science metrics (the Efficiency Gap and the Declination), PlanScore indicates that Ohio's enacted plan would have historically extreme levels of pro-Republican bias.  In fact, the pro-Republican bias in Ohio's enacted state senate plan is larger than 91% of previous plans, and the bias in Ohio's state house plan is larger than 90% of previous plans.

Overall, this analysis indicates that the enacted plan appears to be drawn to favor one political party based on a variety of metrics, and the two-parties' seat shares do not correspond closely to their vote shares.

The rest of this report proceeds as follows.  First, I provide an overview of partisan gerrymandering and how social scientists measure the degree of partisan bias in a districting plan.  Second, I trace the levels of partisan bias in Ohio's state legislative plans over the

---

6. Following standard convention, throughout my analysis I focus on two-party vote shares.

7. I weight the composite scores to give each election cycle equal weight in the index.  The seat-level projections are based on the 13 statewide elections where I have precinct-level data.  In these elections, the Democrats' statewide two-party vote share averaged 45%.

past fifty years. Third, I evaluate the enacted plans and compare them to the 2012-2020 map. Finally, I show the consequences of partisan gerrymandering for the representation that citizens of Ohio receive in its state government.

# 4 Background on Partisan Gerrymandering

The goal of partisan gerrymandering is to create legislative districts that are as "efficient" as possible in translating a party's vote share into seat share (McGhee 2014, 2017; Caughey, Tausanovitch, and Warshaw 2017). In practice, this entails drawing districts in which the supporters of the advantaged party constitute either a slim majority (e.g., 55% of the two-party vote) or a small minority (e.g., 20%). The former is achieved by "cracking" local opposing-party majorities across multiple districts and the latter by "packing" them into a few overwhelming strongholds. In a "cracked" district, the disadvantaged party narrowly loses, while in a "packed" district, the disadvantaged party wins overwhelmingly (Buzas and Warrington 2021). The resulting *asymmetry* or *advantage* in the efficiency of the vote–seat relationships of the two parties lies at the core of normative critiques of partisan gerrymandering. Asymmetries in the translation of votes to seats "offer a party a means of increasing its margin of control over policy without winning more votes from the public" (McGhee 2014).

In addition to creating a plan that skews the vote-seat curve toward their party, the advantaged party also often seeks to build a map that is *insulated* against changes in the public's preferences. This type of unresponsive map enables the advantaged party to continue to win the majority of seats even in the face of large gains in the disadvantaged party's statewide vote share. It ensures that the gerrymander is durable over multiple election cycles.

There are a number of approaches that have been proposed to measure partisan advantage in a districting plan. These approaches focus on asymmetries in the efficiency of the vote–seat relationships of the two parties. In recent years, at least 10 different approaches have been proposed (McGhee 2017). While no measure is perfect, much of the recent literature has focused on a handful of related approaches. The results of these metrics sometimes diverge in states where one party dominates elections. But they generally all yield similar substantive results in competitive states (see Stephanopoulos and McGhee 2018, 556). In the analysis that follows, I use a number of these metrics to examine the proposed plans as well as the trajectory of partisan gerrymandering in Ohio and the nation as a whole.[8]

---

8. For historical elections, I use data on the results of legislative elections over the past few decades. For

## 4.1   Proportionality

Arguably, the simplest metric of partisan bias in a districting plan is whether each party's share of the seats is proportional to its share of the votes. Ohio has embedded this simple metric in Section 6(B) of its Constitution, which states that "the statewide proportion of districts whose voters, based on statewide state and federal partisan general election results during the last ten years, favor each political party shall correspond closely to the statewide preferences of the voters of Ohio." We can thus calculate the proportionality of a districting plan using the following equation:

$$Proportionality = S - V \qquad (1)$$

where $S$ is the Democratic seat share and $V$ is the Democratic vote share in statewide elections.

We can illustrate the proportionality metric by reference to Ohio's state house elections in 2020. In this election, the Democratic candidate won about 46% of the statewide two-party vote in the presidential race. But Democrats won only 35% of the state house seats in Ohio. This led to a pro-Republican bias in the proportionality metric of about 11%.

It is worth briefly comparing my definition of the proportionality metric to the one used by the Commission in their Article XI, Section 8(C)(2) Statement.[9] In that Statement, the Commission defined the statewide preferences of the voters of Ohio largely based on the percentage of statewide elections won by Republicans over the past ten years rather than Republicans' vote share in those elections.[10] I do not know of a single academic

---

all legislative elections that were contested between two major party candidates, I use the raw vote totals to calculate various metrics that measure the degree of partisan gerrymandering. For legislative elections that are uncontested (i.e., those that lacked either a Democratic or Republican candidate), we do not directly observe the number of people that support each party's candidate. In these cases, it is necessary to estimate the two-party vote share because "determining the degree of packing and cracking requires knowing how many people in each district support each party" (Stephanopoulos and McGhee 2015, 865). Using publicly available data and statistical models, I estimate the two-party vote share in each district based on previous and future elections in that district as well as the results in similar districts elsewhere. This is similar to the approach used in a variety of other studies that estimate these gerrymandering metrics (e.g., Gelman and King 1994a; Stephanopoulos and McGhee 2015; Brennan Center 2017; Jackman 2017; McGhee 2018; Warrington 2018b) The details of this calculation for uncontested races are described in further detail in the Appendix and in Stephanopoulos and Warshaw (2020). I then use this information to estimate the gerrymandering metrics discussed below for congressional elections between 1972 to 2020. I start the analysis in 1972 since those are the first districting plans drawn after the Supreme Court cases stemming from *Baker v. Carr* ended malapportionment and established the principle of one-person, one-vote.

9. https://www.redistricting.ohio.gov/assets/organizations/redistricting-commission/events/commission-meeting-september-15-2021-76/article-xi-sec-8c2-statement.pdf.

10. "The Commission considered statewide state and federal partisan general election results during the last ten years. There were sixteen such contests. When considering the results of each of those elections, the Commission determined that Republican candidates won thirteen out of sixteen of those elections

book, article, or paper that defines voters' statewide preferences in this way. Moreover, the Commission's definition makes little logical sense. It implies that if Republicans had won each statewide election with 50.1% of the vote, the statewide proportion of voters favoring Republican candidates is 100%. Thus, Republicans would be entitled to win 100% of the legislative seats. Based on the academic literature, it makes much more sense to read the requirements that the proportion of districts correspond to the statewide preferences of voters to imply that Republicans are entitled to 50.1% of the legislative seats if they win 50.1% of the votes.

In much of this report, I focus on proportionality since it is explicitly discussed in Article XI, Section 6(B) of the Constitution. But there are at least two important limitations associated with using proportionality as the sole metric of whether a districting plan is "drawn primarily to favor or disfavor a political party" (Article XI, Section 6(A)). One is that historically there tends to be a winner's bonus in legislative elections. This means that a party that wins 55% of the votes tends to win about 60% of the seats (Stephanopoulos and McGhee 2015, 854). As I discuss below, however, Ohio's map is very disproportionate even after taking into consideration this winner's bonus. Another limitation is that the proportionality metric "looks more favorably than the [other metrics] on parties that win a majority of seats with a minority of votes—a situation many feel ought to be punished more aggressively—and otherwise requires more sacrifice from a majority party than is typical in American elections" (McGhee 2017). As a result of these limitations, academics tend to supplement the proportionality metric with a number of other approaches to characterize partisan bias in districting plans that favors a particular political party. I will now discuss these other approaches.

## 4.2  Efficiency Gap

Both cracked and packed districts "waste" more votes of the disadvantaged party than of the advantaged one (McGhee 2014; Stephanopoulos and McGhee 2015).[11] This suggests that gerrymandering can be measured based on asymmetries in the number of wasted votes for each party. The *efficiency gap* (EG) focuses squarely on the number of each party's wasted votes in each election. It is defined as "the difference between the parties' respective wasted votes, divided by the total number of votes cast in the election"

---

resulting in a statewide proportion of voters favoring statewide Republican candidates of 81%..."

11. The authors of the efficiency gap use the term "waste" or "wasted" to describe votes for the losing party and votes for the winning party in excess of what is needed to win an election. Since the term is used by the efficiency gap authors, I use it here when discussing the efficiency gap.

(Stephanopoulos and McGhee 2015, 831; see also McGhee 2014, 2017).[12] All of the losing party's votes are wasted if they lose the election. When a party wins an election, the wasted votes are those above the 50%+1 needed to win.

If we adopt the convention that positive values of the efficiency gap imply a Democratic advantage in the districting process and negative ones imply a Republican advantage, the efficiency gap can be written mathematically as:

$$EG = \frac{W_R}{n} - \frac{W_D}{n} \tag{2}$$

where $W_R$ are wasted votes for Republicans, $W_D$ are wasted votes for Democrats, and $n$ is the total number of votes in each state.

Table 1 provides a simple example about how to calculate the efficiency gap with three districts where the same number of people vote in each district. In this example, Democrats win a majority of the statewide vote, but they only win 1/3 seats. In the first district, they win the district with 75/100 votes. This means that they only wasted the 24 votes that were unnecessary to win a majority of the vote in this district. But they lose the other two districts and thus waste all 40 of their votes in those districts. In all, they waste 104 votes. Republicans, on the other hand, waste all 25 of their votes in the first district. But they only waste the 9 votes unnecessary to win a majority in the two districts they win. In all, they only waste 43 votes. This implies a pro-Republican efficiency gap of $\frac{43}{300}$ - $\frac{104}{300}$= -20%.

Table 1: Illustrative Example of Efficiency Gap

| District | Democratic Votes | Republican Votes |
|---|---|---|
| 1 | 75 | 25 |
| 2 | 40 | 60 |
| 3 | 40 | 60 |
| **Total** | 155 (52%) | 145 (48%) |
| **Wasted** | 104 | 43 |

12. The efficiency gap calculations here focus on wasted votes in *legislative elections* since these results directly capture voters' preferences in these elections. However, we might also calculate the efficiency gap using district-level results from presidential elections or other statewide races. These have the "advantage of being (mostly) unaffected by district-level candidate characteristics" (Stephanopoulos and McGhee 2015, 868). This feature is particularly useful for simulating efficiency gaps from randomly generated districting plans since candidate characteristics are clearly influenced by the final districting plan. Presidential elections or other statewide races are less closely tied, however, to voters' preferences in legislative elections given the district lines that actually exist. In practice, though, both legislative races and other statewide races produce similar efficiency gap results for modern elections where voters are well sorted by party and ideology. Indeed, the data indicate that the correlation between efficiency gap estimates based on congressional elections and presidential elections is approximately 0.8 for elections held after 2000 and about 0.9 for elections held after the 2011 redistricting cycle.

In order to account for unequal population or turnout across districts, the efficiency gap formula in equation 2 can be rewritten as:

$$EG = S_D^{margin} - 2 * V_D^{margin} \tag{3}$$

where $S_D^{margin}$ is the Democratic Party's seat margin (the seat share minus 0.5) and $V_D^{margin}$ is is the Democratic Party's vote margin. $V_D^{margin}$ is calculated by aggregating the raw votes for Democratic candidates across all districts, dividing by the total raw vote cast across all districts, and subtracting 0.5 (McGhee 2017, 11-12). In the example above, this equation also provides an efficiency gap of -20% in favor of Republicans. But it could lead to a slightly different estimate of the efficiency gap if districts are malapportioned or there is unequal turnout across districts.[13] In the case of Ohio's state house, equation 3 implies there was a pro-Republican efficiency gap of approximately 10.5% in 2012 and 9.9% in 2020.

The efficiency gap mathematically captures the packing and cracking that are at the heart of partisan gerrymanders (Buzas and Warrington 2021). It measures the extra seats one party wins over and above what would be expected if neither party were advantaged in the translation of votes to seats (i.e., if they had the same number of wasted votes). A key advantage of the efficiency gap over other measures of partisan bias is that it can be calculated directly from observed election returns even when the parties' statewide vote shares are not equal.

## 4.3   Mean-median Gap

Another metric that some scholars have proposed to measure partisan bias in a districting plan is the *mean-median gap*: the difference between a party's vote share in the median district and their average vote share across all districts. If the party wins more votes in the median district than in the average district, they have an advantage in the translation of votes to seats (Krasno et al. 2018; Best et al. 2017; Wang 2016). In statistics, comparing a dataset's mean and median is a common statistical analysis used to assess skews in the data and detect asymmetries (Brennan Center 2017). The mean-median difference is very easy to apply (Wang 2016). It is possible, however, for packing and cracking to occur without any change in the mean-median difference. That is, a party could gain seats in the

---

13. In general, the two formulations of the efficiency gap formula yield very similar results. Because Democrats tend to win lower-turnout districts, however, the turnout adjusted version of the efficiency gap in equation 3 tends to produce results that suggest about a 2% smaller disadvantage for Democrats than the version in Equation 2 (see McGhee 2018).

legislature without the mean-median gap changing (McGhee 2017).[14] It is also sensitive to the outcome in the median district (Warrington 2018b). In addition, the mean-median difference lacks a straightforward interpretation in terms of the number of seats that a party gains through gerrymandering. Finally, the assumptions of the mean-median gap are less tenable in less electorally competitive states.

| District | Democratic Vote Share |
|---|---|
| 6 | 25.6 % |
| 4 | 30.2 % |
| 7 | 30.2 % |
| 8 | 31 % |
| 5 | 32 % |
| 15 | 36.6 % |
| 16 | 36.8 % |
| 2 | 38.9 % |
| 14 | 39.9 % |
| 10 | 41.6 % |
| 12 | 43.1 % |
| 1 | 46.3 % |
| 13 | 53.9 % |
| 9 | 63.1 % |
| 3 | 70.8 % |
| 11 | 80.1 % |
| Mean | 43.8% |
| Median | 39.4% |

Table 2: Results in 2020 Ohio Congressional Elections

Table 2 illustrates the mean-median approach using the district-level election results in the 2020 Ohio congressional elections. It indicates that many Democratic voters were packed into just 4 districts where the Democratic candidates won by overwhelming margins. The remaining Democratic voters were cracked across the other districts. This table shows the disproportionate percentage of the statewide vote that Democrats would have needed to win a majority of Ohio's congressional seats in 2020. Across all districts, Democrats won an average of 43.8% of the vote. But they only won 39.4% in the median district. This translated into a pro-Republican mean-median difference of 4.4%.

---

14. As McGhee (2017), notes, "If the median equals the win/loss threshold–i.e., a vote share of 0.5–then when a seat changes hands, the median will also change and the median- mean difference will reflect that change. But if the median is anything other than 0.5, seats can change hands without any change in the median and so without any change in the median-mean difference." See also Buzas and Warrington (2021) who make a similar point using simulated packing and cracking.

## 4.4 Symmetry in the Vote-Seat Curve Across Parties

Basic fairness suggests that in a two-party system each party should receive the same share of seats for identical shares of votes. The *symmetry* idea is easiest to understand at an aggregate vote share of 0.5—a party that receives half the vote ought to receive half the seats—but a similar logic can apply across the "seats- votes curve" that traces out how seat shares change as vote shares rise and fall. For example, if a party receives a vote share of 0.57 and a seat share of 0.64, the opposing party should also expect to receive a seat share of 0.64 if it were to receive a vote share of 0.57. An unbiased system means that for $V$ share of the votes a party should receive $S$ share of the seats, and this should be true for all parties and vote percentages (Niemi and Deegan 1978; Gelman and King 1994a; McGhee 2014; Katz, King, and Rosenblatt 2020).

Gelman and King (1994a, 536) propose two ways to measure partisan bias in the symmetry of the vote-seat curve. First, it can be measured using counter-factual election results in a range of statewide vote shares between .45 and .55. Across this range of vote shares, each party should receive the same number of seats. Symmetry captures any departures from the standard that each party should receive the same seat share across this range of plausible vote shares. For example, if partisan bias is -0.05, this means that the Democrats receive 5% fewer seats in the legislature than they should under the symmetry standard (and the Republicans receive 5% more seats than they should).

To illustrate the symmetry metric, Table 3 calculates what each party's share of the seats would have been in Ohio's 2020 state house elections across a range of statewide vote shares from 45%-55%. It shows that Democrats only received 36% of the seats in most of the scenarios where they received less than 50% of the votes. This might not have been problematic under the symmetry standard if Republicans also only received 36% of the seats when they received less than 50% of the votes. However, Table 3 shows that Republicans still would have received half of the seats even when they won a minority of the votes. Across this range of statewide vote shares from 45%-55%, Democrats receive an average of 40% of the seats (and Republicans win 60%). This implies a partisan bias of 10% using the symmetry metric. That is, Republicans won 10 percentage points more of the seats than they would have won if the seat-vote curve was symmetric between the two parties.

The symmetry metric is closely related to the efficiency gap. In the special case where each party receives half of the statewide vote, the symmetry and the efficiency gap metrics are mathematically identical (Stephanopoulos and McGhee 2015, 856). More generally, the symmetry and efficiency gap yield very similar substantive results when each party's statewide vote share is close to 50% (as is the case in Ohio). When elections are uncompet-

| Dem. Vote Share | Dem. Seat Share | Rep. Vote Share | Rep. Seat Share |
|---|---|---|---|
| 45% | 34% | 55% | 66% |
| 46% | 35% | 54% | 65% |
| 47% | 36% | 53% | 64% |
| 48% | 36% | 52% | 64% |
| 49% | 38% | 51% | 62% |
| 50% | 40% | 50% | 60% |
| 51% | 40% | 49% | 60% |
| 52% | 43% | 48% | 57% |
| 53% | 44% | 47% | 56% |
| 54% | 48% | 46% | 52% |
| 55% | 51% | 45% | 49% |
| Mean Seat Share | 41% | | 59% |
| Bias | -9% | | 9% |

Table 3: Symmetry Calculations for 2020's State House Elections

itive, however, and one party wins a large percentage of the statewide vote, the efficiency gap and these symmetry metrics are less correlated with one another (Stephanopoulos and McGhee 2015, 857).

A weakness of the symmetry approach is that it requires the analyst to calculate counterfactual elections. This approach has both conceptual and empirical limitations. At a conceptual level, it is not clear that it aligns perfectly with the usual definition of a gerrymander. Indeed, "when observers assert that a district plan is a gerrymander, they usually mean that it systematically benefits a party (and harms its opponent) in actual elections. They do not mean that a plan would advantage a party in the hypothetical event of a tied election, or if the parties' vote shares flipped" (857). At an empirical level, in order to generate symmetry metrics, we need to simulate counter-factual elections by shifting the actual vote share in each district a uniform amount (McGhee 2014).[15] In general, this uniform swing assumption seems reasonable based on past election results (though is probably less reasonable in less competitive states). Moreover, it has been widely used in past studies of redistricting. But there is no way to conclusively validate the uniform swing assumption for any particular election.

An important strength, however, of the symmetry approach is that it is based on the shape of the seats-votes curve and not any particular point on it. As a result, it is relatively immune to shifts in party performance (McGhee 2014). For instance, the bias toward

---

15. In principle, the uniform swing election could be relaxed, and swings could be estimated on a district-by-district basis. But this is rarely done in practice since it would require a much more complicated statistical model, and probably would not improve estimates of symmetry very much.

Republicans in Ohio's symmetry metric was very similar in 2012-2020. Moreover, the symmetry approach has been very widely used in previous studies of gerrymandering and redistricting (Gelman and King 1994a; McGhee 2014). Overall, the symmetry approach is useful for assessing partisan advantage in the districting process.

## 4.5 Declination

Another measure of asymmetries in redistricting plans is called *declination* (Warrington 2018b, 2018a). The declination metric treats asymmetry in the vote distribution as indicative of partisan bias in a districting plan (Warrington 2018a). If all the districts in a plan are lined up from the least Democratic to the most Democratic, the mid-point of the line formed by one party's seats should be about as far from the 50 percent threshold for victory on average as the other party's (McGhee 2018).

Declination suggests that when there is no gerrymandering, the angles of the lines ($\theta_D$ and $\theta_R$) between the mean across all districts and the point on the 50% line between the mass of points representing each party will be roughly equal. When they deviate from each other, the smaller angle ($\theta_R$ in the case of Ohio) will generally identify the favored party. To capture this idea, declination takes the difference between those two angles ($\theta_D$ and $\theta_R$) and divides by $\pi/2$ to convert the result from radians to fractions of 90 degrees.[16] This produces a number between -1 and 1. As calculated here, positive values favor Democrats and negative values favor Republicans.[17] Warrington (2018b) suggests a further adjustment to account for differences in the number of seats across legislative chambers. I use this adjusted declination estimate in the analysis that follows.[18]

## 4.6 Comparison of Partisan Bias Measures

All of the measures of partisan advantage discussed in the previous sections are closely related both theoretically and empirically (McGhee 2017; Stephanopoulos and McGhee 2018). Broadly speaking, all of the metrics consider how votes between the two parties are distributed across districts (Warrington 2018a). For example, the efficiency gap is mathematically equivalent to partisan bias in tied statewide elections (Stephanopoulos

---

16. This equation is: $\delta = 2* (\theta_R - \theta_D) / \pi$.

17. In order to validate my estimates of declination, I compare my estimates to the ones presented in Warrington (2018b). I find that my declination estimates are nearly identical to the estimates originally developed by Warrington in the appendix to his article. In fact, the correlation between the declination values that I calculate and those in Warrington (2018b) is .94 for the U.S. House (note that Warrington does not estimate declination values for state senate elections). Small differences between the declination estimates likely stem from minor differences in how we impute vote shares in uncontested races.

18. This adjustment uses this equation: $\tilde{\delta} = \delta * \ln(\text{seats}) / 2$

and McGhee 2018). Also, the median-mean difference is similar to the symmetry metric, since any perfectly symmetric seats-votes curve will also have the same mean and median (McGhee 2017).



Figure 1: Correlation between measures of partisan bias in states.

Second, each of the concepts are closely related empirically, particularly in states with competitive elections. Figure 1 shows the correlation between each measure. The various measures have high correlations with one another.[19] Moreover, most of the variation in the metrics can be summarized on a single latent dimension (Stephanopoulos and McGhee 2018; Stephanopoulos and Warshaw 2020). So, overall, while there may be occasional

---

19. While each measure is highly correlated with one another, the efficiency gap and declination measures are particularly closed related and the symmetry and mean-median measures are very closely related. This could be because the efficiency gap and the declination consider the seats actually won by each party, while the symmetry metric and the mean-median difference do not (Stephanopoulos and McGhee 2018, 1557).

cases where the metrics disagree about the amount of bias in a particular plan, the various metrics usually yield similar results for the degree of partisan bias in a districting plan (Nagle 2015).

In the case of Ohio, all the metrics indicate that Republicans had a large advantage in the districting process in Ohio since the 2011 plan went into place, and that the new plan would further cement this advantage. The fact that all the metrics are in agreement in Ohio strengthens our confidence that the new plan is a partisan gerrymander designed to favor a particular political party.

## 4.7　The Responsiveness of a Legislative Districting Plan to Changes in Voters' Preferences

The responsiveness of a map indicates how many seats change hands as vote shares rise and fall. Thus, it can be thought of as the slope of the seats-votes curve across a range of vote shares (McGhee 2014). An unresponsive map ensures that the bias in a districting plan toward the advantaged party is insulated against changes in voters' preferences, and thus is durable across multiple election cycles. In addition to serving as an indicator of the durability of a gerrymander, some scholars have suggested that responsiveness is another metric to measure gerrymandering itself (Cox and Katz 1999). There are a couple of approaches we might use to measure the responsiveness of a districting plan.

First, we could simply look at the number of competitive districts. In general, a plan with more competitive elections is likely to be more responsive to changes in voters' preferences than a plan with fewer competitive elections (McGhee 2014). Uncompetitive districts tend to protect incumbents and lock in the gerrymandering party's electoral advantage (Tufte 1973; Gelman and King 1994a). Following past work, I measure whether a district was competitive in an election based on whether the winning party received less than 55% of the two-party vote (Jacobson and Carson 2015, 91). Based on this definition, only 16% of the district in Ohio's state house plan were competitive in 2012 and just 13% were competitive in 2020.

Second, we could directly measure the responsiveness of the vote-seat curve to counter-factual changes in each party's statewide vote share. Gelman and King (1994a, 535) propose a technique that measures responsiveness based on uniform swings in the two parties' counterfactual vote shares. Specifically, they propose varying each party's vote shares in the average district between 45% and 55% and then measuring the degree to which this change in vote share leads to a change in seat share. In responsive systems, a 10% change in vote share from 45% to 55% will generally lead to a change in seat share of



(a) Vote-seat curve in 2012 elections       (b) Vote-seat curve in 2020 elections

Figure 2: Vote-seat curve in Ohio using uniform swings in 2012 and 2020 election results. The shaded area shows the range between the minimum and maximum Democratic statewide vote share in state house elections from 2012-2020.

around 20%. In an unresponsive system, there could be little or no change in seat share from a 10% change in vote share.

To illustrate the concept of responsiveness, Figure 2 shows the vote-seat curve in Ohio generated by applying uniform swings in the 2012 and 2020 election results.[20] Specifically, I apply a uniform swing in the actual election results until I achieve an average Democratic vote share of 40%. Then I steadily increase the average Democratic vote share until it reaches 60%. Figure 2 indicates that the vote-seat curves in Ohio in 2012 and 2020 were extremely unresponsive to changes in voters' preferences. In fact, Republicans win 50% or more of the seats across all of the range of actual election swings over the past decade.

## 4.8   Partisan Control of the Redistricting Process and Gerrymandering

While many factors could influence the degree of partisan advantage in the districting process,[21] there is a wide body of evidence from previous studies that control of the re-

---

20. The layout of this chart is adapted from charts of responsiveness in Royden, Li, and Rudensky (2018).

21. Partisan advantage in the districting process can differ across states for reasons unrelated to the drawing of district lines, such as variation in how different demographic groups are distributed across geographic space (Chen and Rodden 2013). It can also be affected by the intentional drawing of district

districting process has a large effect on partisan advantage in subsequent elections carried out under a given plan. Cox and Katz (2002) show that Democratic control of the redistricting process in many states during the 1960s led to a lasting partisan advantage for Democrats in House elections. More generally, Gelman and King (1994b) find that the party in control of redistricting shifts outcomes in its favor, and that "the effect is substantial and fades only very gradually over the following 10 years" (543). This result has been confirmed in numerous recent articles. McGhee (2014) finds that "parties seek to use redistricting to shift bias in their favor and that they are successful in these efforts" (74).[22] Finally, Stephanopoulos (2018) shows that partisan control of the districting process has a substantial effect on the efficiency gap.[23]

# 5    Historical Analysis of Partisan Bias in Ohio's Legislative Districts

In this section, I provide an historical overview of the partisan bias in Ohio's state legislative districts over the past 50 years. Figure 3 shows trends in the proportionality bias in Ohio's state legislative districts between 1972 and 2020.[24] It indicates that the 2011 redistricting plan led to a large Republican advantage in Ohio state legislative elections.

In the state house elections in 2012, Democratic candidates won 50.2% of the statewide vote, but they won only 39.4% of Ohio's state house seats. This led to a pro-Republican proportionality bias, for instance, of approximately -11%. The results in the next few state house elections were fairly similar to those in 2012. Democrats won 45.1% of the votes, but only 35.4% of the seats in the 2020 state house elections. Thus, Ohio's state house had a pro-Republican proportionality bias approximately 10% in 2020.

The state senate is similar. Over the 2015-2022 period when the previous map was fully in place, Democrats controlled about 27% of the seats and the state senate had a pro-Republican proportionality bias of about -16%.[25] Democrats only controlled 24% of the seats after the state senate election in 2020, despite winning nearly 45% of the

lines to accomplish goals other than maximizing partisan seat share, such as ensuring the representation of racial minorities (e.g., Brace, Grofman, and Handley 1987).

22. McGhee (2014) finds that partisan control affects the districting process using both the Gelman and King (1994b) measure of partisan symmetry and the efficiency gap as outcome variables.

23. He shows that states with unified Republican control have about 5 percentage points more pro-Republican efficiency gaps than states with split control, and states with unified Democratic control have about 3 percentage points more pro-Democratic efficiency gaps than states with split control.

24. Note that detailed nationwide data on state legislative elections in 2020 is not yet available.

25. If we also include 2012 when only half the seats were elected under the 2012-2020 map, Democrats controlled about 28% of the seats over the course of the decade.



Figure 3: Historical Trajectory of the Proportionality in Ohio. Each vertical line shows the demarcation between decennial redistricting plans. The blue line shows the moving average and the grey bar is a confidence interval. The dots represent the proportionality bias in each year in Ohio.

statewide vote.

We see similar levels of pro-Republican bias using other metrics of partisan bias. Figures 5 and 6 compare Ohio to other states using a variety of different metrics. Each dot in the charts represents a particular state's partisan advantage for state house and state senate elections in that state that year. Overall, Ohio's state house election in 2012 (when the last districting plan went into place) had a larger pro-Republican bias in its Efficiency Gap than 95.9% of the state house elections over the past five decades, and it had a larger absolute bias than 87% of previous plans. Figures 5 and 6 also show that the pro-Republican bias in Ohio's state legislative plans was very durable and stable across the 2012-2020 period.

Turning to other metrics of partisan bias in districting plans, Ohio's 2012 elections



Figure 4: Map of 2011 Districting Plan for State House and Senate Districts from PlanScore.org

also had:

- A more extreme declination value than 88.1% of previous state house elections and a larger pro-Republican bias in its declination than 94.7% of the previous elections.

- A more extreme difference between the mean and median district than 87.2% of previous state house elections and a larger pro-Republican bias than in 90.3% of previous elections.

- A more extreme symmetry metric than 89.1% of previous state house elections and a larger pro-Republican bias in its declination than 93.4% of the previous elections.

Likewise, Ohio's state senate results in the first election after its 2011 plan fully went into place in 2014 had a larger absolute Efficiency Gap than 65.7% of previous state senate elections, and it had a larger pro-Republican bias than 83% of the state senate elections over the past five decades. Using other metrics of partisan bias in districting plans, it also had:

- A more extreme declination value than 80.5% of previous state senate elections and a larger pro-Republican bias in its declination than 90.5% of the previous elections.

- A more extreme difference between the mean and median district than 88.8% of previous state senate elections and also a larger pro-Republican bias in the difference between the mean and median district than 90% of previous elections.

- A more extreme symmetry metric than 98.8% of previous state house elections and a larger pro-Republican bias in its declination than 99% of the previous elections.



Figure 5: Partisan Advantage in Ohio's State House Relative to Other States. The dots represent the metrics in individual states. The metrics in Ohio are labelled to distinguish them from other states. Negative values are pro-Republican and positive values are pro-Democratic.

Overall, this evidence indicates that Ohio's state legislative plans during the 2012-2020 period has a historically extreme level of pro-Republican bias. The next section will examine whether the state Commission's enacted plans reduce this bias and are likely to yield legislative results that are proportional to the statewide vote and not designed to



Figure 6: Partisan Advantage in Ohio's State Senate Relative to Other States. The dots represent the metrics in individual states. The metrics in Ohio are labelled to distinguish them from other states. Negative values are pro-Republican and positive values are pro-Democratic.

favor a political party as Article XI, Section 6 of Ohio's Constitution requires.

# 6 Partisan Bias in Ohio's Enacted State Legislative Districting Plans

In this section, I will provide a comprehensive evaluation of the partisan fairness of Ohio's enacted state legislative districting plan (see Figure 7 for maps of the enacted plans).



Figure 7: Map of Enacted State House and Senate Districts from PlanScore.org

The analysis in the previous section used actual, historical legislative election results to estimate the partisan fairness of Ohio's past state legislative district plans. In order to evaluate the enacted plans, however, we need to predict future election results on this map. Unfortunately, there is no way to know, with certainty, the results of future elections. I use two complementary methodologies to predict future legislative elections in Ohio and generate the various metrics I discussed earlier.

First, I use a composite of previous statewide election results between 2012-2020.[26] This approach is based on the approach discussed in Article XI, Section 6 of Ohio's Constitution, which states that the "statewide state and federal partisan general election results during the last ten years" shall be used to determine the proportion of voters supporting each party. I aggregate these election results to estimate the Democratic and Republican vote shares in each district of the enacted state legislative plans.[27] This

---

26. These elections include the 2012 Presidential election, the 2012 Senate election, the 2014 gubernatorial election, the 2014 Secretary of State election, the 2016 Presidential election, the 2016 Senate election, the 2018 Senate election, the 2018 gubernatorial election, the 2018 attorney's general election, the 2018 Secretary of State election, the 2018 Auditor election, the 2018 Treasurer, and the 2020 Presidential election. Geographic data on the other three statewide elections in 2014 is not readily available. But this probably doesn't affect my results much since these elections were similar to the average of the 2014 gubernatorial and Secretary of State elections.

27. I weight the composite scores to give each election cycle equal weight in the index.

approach implicitly assumes that future election results will look like the average of these recent statewide elections.

Second, I evaluate the enacted plans using a more sophisticated, predictive model from the PlanScore.org website. PlanScore uses a statistical model of the relationship between districts' latent partisanship and election outcomes. This enables it to estimate district-level vote shares for a new map and the corresponding partisan gerrymandering metrics.[28] Based on these two approaches, I characterize the bias in Ohio's plan using each of the metrics discussed above. I also place the bias in Ohio's plan into historical perspective.

Both of these approaches indicate that the enacted plan is just as biased, if not even more biased, than the 2012-2020 plan. Moreover, the enacted plan has an extreme level of partisan bias compared to other plans over the past 50 years. Overall, the enacted plan appears to violate both Article XI, Section 6(A) and (B) of Ohio's Constitution. It violates Section 6(A) by appearing to being drawn to favor on political party based on a variety of metrics. It violates Section 6(B) because the two-parties' seat shares do not correspond closely to their vote shares.

## 6.1 Analysis based on Proportionality Metric

First, I evaluate the enacted plans based on the proportionality metric embedded in the State's Constitution. Table 4 shows the proportionality of the enacted state Senate plans using both the composite of recent statewide elections and the PlanScore predictive model. The top two rows show the results for the current 2012-2020 plan. They indicate that this plan is estimated to lead Democrats to get 13-14% fewer seats than votes. Thus, this plan clearly fails the proportionality test established by Ohio's Constitution. The next two rows show the proportionality of the Commission's enacted map for 2022-2030. This map too is predicted to lead Democrats to get 14-15% fewer seats than votes. Thus, it too fails the proportionality test established by the Constitution.

| Plan | Modeling Approach | Dem. Voteshare | Dem. Seatshare | Proportion-ality Bias | More Biased than % of Plans | More Pro-Rep. than % of Plans |
|------|-------------------|----------------|----------------|-----------------------|-----------------------------|-------------------------------|
| 2012-2020 Plan | 2012-20 Composite | 45% | 32% | -13% | 68% | 86% |
| 2012-2020 Plan | PlanScore | 44% | 30% | -14% | 70% | 87% |
| Commission's Plan | 2012-20 Composite | 45% | 31% | -14% | 69% | 87% |
| Commission's Plan | PlanScore | 44% | 29% | -15% | 73% | 89% |

Table 4: Proportionality metrics for State Senate plan

---

28. See https://planscore.campaignlegal.org/models/data/2021B/ for more details.

Figure 5 shows the proportionality for the enacted state House plans. Once again, the top two rows show the results for the current 2012-2020 plan. They indicate that this plan is estimated to lead Democrats to get 12-13% fewer seats than votes. Thus, this plan violates the proportionality requirements set forth in Ohio's Constitution. The next two rows show the proportionality of the Commission's enacted map for 2022-2030. This map too is predicted to lead Democrats to get about 12% fewer seats than votes. As a result, it too fails the proportionality test established by the Constitution.

| Plan | Modeling Approach | Dem. Voteshare | Dem. Seatshare | Proportionality Bias | More Biased than % of Plans | More ProRep. than % of Plans |
|---|---|---|---|---|---|---|
| 2012-2020 Plan | 2012-20 Composite | 45% | 33% | -12% | 68% | 88% |
| 2012-2020 Plan | PlanScore | 44% | 31% | -13% | 72% | 89% |
| Commission's Plan | 2012-20 Composite | 45% | 33% | -12% | 66% | 86% |
| Commission's Plan | PlanScore | 44% | 32% | -12% | 68% | 88% |

Table 5: Proportionality metrics for State House plan

## 6.2  Evaluation using Additional Partisan Bias Metrics

In this section, I evaluate the Commission's enacted plans using the other metrics I discussed earlier (Tables 6 and 7). These metrics further support the conclusion that Ohio's enacted plan violates Article XI, Section 6(A) of Ohio's Constitution because they are drawn to favor a particular political party.

First, I use the composite of previous statewide election results to estimate the various metrics. For the state Senate, the average efficiency gap of the enacted plan based on these previous election results is -9%. This is more extreme than 73% of previous plans and more pro-Republican than 86% of previous plans. The other metrics also show that Ohio's enacted plan has a substantial pro-Republican bias. When we average across all four metrics, the plan is more extreme than 77% of previous plans and more pro-Republican than 86% of previous plans.

For the state House, average efficiency gap of the enacted plan based on these previous election results is -7%. This is more extreme than 65% of previous plans and more pro-Republican than 85% of previous plans. The other metrics also show that Ohio's enacted plan has a large pro-Republican bias. When we average across all four metrics, the plan is more extreme than 75% of previous plans and more pro-Republican than 87% of previous plans.

Next, I use the PlanScore website to evaluate the enacted state legislative plan. PlanScore uses a statistical model to predict the results of each district in the enacted

| Metric | Value | More Biased than this % Historical Plans | More Pro-Republican than this % Historical Plans |
|---|---|---|---|
| **2012-2020 Plan** | | | |
| Efficiency Gap | -8% | 70% | 85% |
| Mean-Median Diff | -3% | 68% | 76% |
| Declination | -.40 | 72% | 84% |
| Symmetry | -12% | 92% | 94% |
| Average | | 76% | 85% |
| | | | |
| **Commission's Enacted Plan** | | | |
| Efficiency Gap | -9% | 73% | 86% |
| Mean-Median Diff | -4% | 71% | 78% |
| Declination | -.44 | 75% | 86% |
| Symmetry | -11% | 88% | 92% |
| Average | | 77% | 86% |

Table 6: Additional partisan bias metrics for State Senate plan based on composite election results

| Metric | Value | More Biased than this % Historical Plans | More Pro-Republican than this % Historical Plans |
|---|---|---|---|
| **2012-2020 Plan** | | | |
| Efficiency Gap | -7% | 70% | 88% |
| Mean-Median Diff | -4% | 75% | 83% |
| Declination | -0.58 | 86% | 93% |
| Symmetry | -9% | 82% | 88% |
| Average | | 78% | 88% |
| | | | |
| **Commission's Enacted Plan** | | | |
| Efficiency Gap | -7% | 65% | 85% |
| Mean-Median Diff | -3% | 61% | 77% |
| Declination | -.50 | 82% | 91% |
| Symmetry | -11% | 91% | 94% |
| Average | | 75% | 87% |

Table 7: Composite partisan bias metrics for State House plan

plan based on relationship between past legislative elections over the past decade and recent presidential election results.[29] It then calculates various partisan bias metrics. In this case, PlanScore provides estimates of the efficiency gap and declination.[30]

The efficiency gap and declination metrics estimated by PlanScore are very similar to my estimates based on a composite of recent election results. Across these two metrics, the enacted state Senate plan favors Republicans in 99% of PlanScore's scenarios (Table

---

29. The model is described in more detail on this web page: `https://planscore.campaignlegal.org/models/data/2021B/`.

30. The partisan symmetry and mean-median difference scores are only shown when the parties' statewide vote shares fall between 45% and 55% because outside this range the metrics' assumptions are less plausible (McGhee 2017, 9). In the PlanScore model, the Democrats' two-party vote share is just below 45%.

8).[31] It is more extreme than 80% of previous plans and more pro-Republican than 91% of previous plans.

| Metric | Value | Favors Rep's in this % of Scenarios | More Biased than this % Historical Plans | More Pro-Republican than this % Historical Plans |
|---|---|---|---|---|
| **2012-2020 Plan** | | | | |
| Efficiency Gap | -8% | 97% | 72% | 85% |
| Declination | -.38 | 99% | 75% | 87% |
| Average | | 98% | 74% | 86% |
| **Commission's Enacted Plan** | | | | |
| Efficiency Gap | -9% | 98% | 80% | 92% |
| Declination | -.46 | 99% | 80% | 90% |
| Average | | 99% | 80% | 91% |

Table 8: PlanScore partisan bias metrics for state senate plan

PlanScore indicates that the enacted state House plan also has a substantial pro-Republican bias. The state House plan favors Republicans in 98% of the scenarios estimated by PlanScore (Table 9).[32] Moreover, it is more extreme than 75% of previous plans and more pro-Republican than 90% of previous plans.

| Metric | Value | Favors Rep's in this % of Scenarios | More Biased than this % Historical Plans | More Pro-Republican than this % Historical Plans |
|---|---|---|---|---|
| **2012-2020 Plan** | | | | |
| Efficiency Gap | -8% | 97% | 75% | 91% |
| Declination | -.54 | 99% | 87% | 95% |
| Average | | 98% | 81% | 93% |
| **Commission's Enacted Plan** | | | | |
| Efficiency Gap | -6.5% | 97% | 68% | 90% |
| Declination | -.47 | 99% | 81% | 90% |
| Average | | 98% | 75% | 90% |

Table 9: PlanScore partisan bias metrics for state house plan

---

31. See https://planscore.campaignlegal.org/plan.html?20210917T195933.527730209Z
32. See https://planscore.campaignlegal.org/plan.html?20210917T195948.683202507Z

## 6.3 The Responsiveness of Ohio's Enacted State Legislative Plan to Changes in Voters' Preferences

As I discussed earlier, the responsiveness of a map indicates how many seats change hands as vote shares rise and fall. An unresponsive map ensures that the bias in a districting plan toward the advantaged party is insulated against changes in voters' preferences, and thus is durable across multiple election cycles. In addition to serving as an indicator of the durability of a gerrymander, some scholars have suggested that responsiveness is another metric to measure gerrymandering itself (Cox and Katz 1999). There are a couple of approaches we might use to measure the responsiveness of a districting plan.

I evaluate the responsiveness based on the number of competitive districts. I use slightly different approaches to define a competitive district in the composite election results and the PlanScore predictive model. In the composite election results, I define it based on whether the winning party received less than 55% of the two-party vote (Jacobson and Carson 2015, 91). In the PlanScore results, I define it based on whether there is at least a 50% probability that each party will win a district over a decade-long redistricting cycle.[33] I find that the Commission's enacted plans lead to a small number of competitive districts. In both plans, approximately 20% of the districts would be competitive.

|  | 2012-20 Composite | PlanScore |
|---|---|---|
| 2012-2020 Plan | 18% | 21% |
| Commission's Enacted Plan | 16% | 21% |

Table 10: Competitiveness metrics for State Senate plan

|  | 2012-20 Composite | PlanScore |
|---|---|---|
| 2012-2020 Plan | 17% | 22% |
| Commission's Enacted Plan | 18% | 21% |

Table 11: Competitiveness metrics for State House plan

---

33. In general, however, these definitions are similar. There is roughly a 50% probability that each party will win a district over a decade-long redistricting cycle when the expected two-party vote share is between 45-55%.

# 7 Partisan Gerrymandering & Representation in State Government

In the previous section, I have shown that Ohio's enacted districting plans is likely to lead to a substantial partisan advantage for Republicans in state legislative elections. Now, I turn to the effects of this partisan advantage for the representation that citizens of Ohio receive in state government. A bias in the translation of votes to seats diminishes the ability of voters in Ohio to elect representatives of their choice. Specifically, it reduces the representation of Democratic voters. The polarization in state legislatures means that representatives in state legislatures nearly always vote the party line. So gerrymandering leads Democrats to be less likely to have their views represented in state government. This means that they have little, if any, voice on important issues in Ohio's state government.

## 7.1 Polarization in State Legislatures

Earlier, we saw that the Congress has become extremely polarized in recent years. In this section, we will examine polarization in state legislatures over the past two decades.



Figure 8: Polarization in Lower State Legislative Chambers in each State from 2001-2018.

Although an individual state legislator may cast hundreds or even thousands of roll call votes, their voting behavior can usually be parsimoniously summarized in terms of a single left–right score, their estimated ideology (Shor and McCarty 2011; Poole and Rosenthal 1997). Using roll-call records from all fifty state legislatures, Shor and McCarty (2011) have estimated the ideology of the members of every state legislature in each session between 1995 and 2018.[34] These estimated ideology scores summarize the ideological differences between different legislators, as expressed in their roll-call votes for and against legislative proposals.

Figure 8 (above) shows that state legislatures have become quite polarized in recent years. This chart shows the difference between the ideology scores of the median Democratic and Republican in each state's lower legislative chamber from 2001-2018. It indicates that the median Republican is over one standard deviation more conservative than the median Democrat in nearly every state legislature. This is even true of legislators that represent similar, or even identical, constituencies (Shor and McCarty 2011; Fowler and Hall 2017; Caughey, Tausanovitch, and Warshaw 2017).

In Ohio, the median Republican is about 1.5 standard deviations more conservative than the median Democrat. Figure 9 shows the average ideology of Democrats and Republicans in the Ohio state house over the past 20 years. It also shows the ideology of every individual member. This figure indicates that there is a large difference between the roll call voting patterns of Democrats and Republicans in Ohio. Moreover, Republican state legislators in Ohio are always more conservative than Democratic state legislators.

---

34. Shor and McCarty (2011) use data from the National Political Awareness Test, a survey of legislators run by Project Vote Smart, in order to make comparisons between legislators across different states. Each legislator is assigned an ideology score based on all roll call votes using a statistical model that takes advantage of the similarities between the coalitions that emerge on different votes, rather than by subjective judgements of the individual votes.



Figure 9: Average Ideology of Dem.'s and Rep's in Ohio State House

## 7.2 Gerrymandering and Roll Call Voting in State Legislatures

We know that partisan advantages in the translation of votes to seats give one party a larger seat share than they would have received without any advantage in the efficiency gap.[35] We also know that Republicans take much more conservative roll call positions than Democrats in state legislatures (Shor and McCarty 2011). Putting these facts together leads to the clear expectation that changes in the partisan bias of a districting plan should lead to changes in the position of the median voter in state legislatures. But the magnitude of changes in the position of the median voter is not clear *a priori*. This depends on whether additional members of the majority party tend to be moderate (because they are winning closer districts) or typical for their party (when parties are polarized). As the seat share of the majority party grows, the median voter will be closer to the center of the majority party. At the same time, the center itself may be moving depending on the positions of the new members.

---

35. This section is adapted from a peer-reviewed paper published in the *Election Law Journal* that I wrote with several co-authors (Caughey, Tausanovitch, and Warshaw 2017).

31

Table 12: The Effect of the Efficiency Gap on the Median Ideology in State Lower Chambers

| | *Dependent variable:* | |
|---|---|---|
| | Median Ideology in State House | |
| | (1) | (2) |
| Efficiency Gap$_{t-1}$ | −0.038*** | −0.038*** |
| | (0.007) | (0.007) |
| | | |
| Republican Presidential Share | | 0.032*** |
| | | (0.008) |
| | | |
| Lagged Outcome | 0.382*** | 0.333*** |
| | (0.080) | (0.081) |
| | | |
| Constant | 0.805*** | 2.244*** |
| | (0.191) | (0.360) |
| Year FEs | X | X |
| State FEs | X | X |
| Lagged Outcome Variable | X | X |
| Observations | 339 | 339 |
| R$^2$ | 0.859 | 0.869 |
| Adjusted R$^2$ | 0.832 | 0.843 |
| *Note:* | *p<0.1; **p<0.05; ***p<0.01 | |

In my published work, I have shown that a pro-Republican bias in the efficiency gap leads to more conservative median ideology scores of state legislators in lower chambers (Caughey, Tausanovitch, and Warshaw 2017; Caughey and Warshaw 2022). I reproduce that analysis here in Table 12 using the Efficiency Gap measures developed for this report and the ideology measures of state legislators developed by Shor and McCarty (2011).[36] The first column shows the results of a model that include fixed effects (FEs) for state as well as year and a lagged outcome variable. The second column adds a control for the results of most recent presidential election.[37] The estimates indicate that state-years in which the efficiency gap was more pro-Republican than average for that state also

---

36. Note that I obtain similar substantive findings using the mean-median and declination measures in this analysis as well as in the analysis in the next section on the effect of gerrymandering on state policy.

37. These specifications capture the relationship between the efficiency gap and legislative roll call voting patterns within states net of national trends, eliminating the influence of time-invariant state-specific confounders. It also includes a lagged outcome variable to control for states' recent policy history. In column (2), we add the Republican presidential vote in the previous presidential election. This controls for variation in the position of the median voter in the state. Not surprisingly, we find that states that are more Republican in presidential elections also have a more conservative state house. The effect of the efficiency gap, however, is essentially identical here to the model in column (2).

tended to have more conservative roll call voting behavior in the state house. Across both regression specifications, a one percentage point pro-Republican shift in the efficiency gap moves the median ideology scores in the state house 0.04 standard deviations to the right. These estimates suggest, for example, that the median ideology of the Ohio state house, which had about a 10% pro-Republican efficiency gap in 2012, would shift nearly half a standard deviation to the left if it adopted a districting plan with no efficiency advantage for either party.

## 7.3   The Efficiency Gap and Policy Outputs in State Legislatures

Next, I examine the effect of the efficiency gap on state policy conservatism. In my published work, co-authors and I have shown that the partisan composition of state legislatures has an important effect on policy (Caughey, Xu, and Warshaw 2017; Caughey and Warshaw 2022). I have also shown that partisan bias in districting can skew policy in favor of the advantaged party (Caughey, Tausanovitch, and Warshaw 2017; Caughey and Warshaw 2022).

Table 13: The Effect of the Efficiency Gap on State Policy Conservatism, 1972-2014

|  | *Dependent variable:* | |
| --- | :---: | :---: |
|  | State Policy Conservatism | |
|  | (1) | (2) |
| Efficiency Gap$_{t-1}$ | -0.003*** | -0.003*** |
|  | (0.001) | (0.001) |
| Republican Governor$_{t-1}$ | 0.022** | 0.023*** |
|  | (0.009) | (0.008) |
| Republican Presidential Share |  | −0.005*** |
|  |  | (0.001) |
| Lagged Outcome | 0.933*** | 0.904*** |
|  | (0.019) | (0.021) |
| Year FEs | X | X |
| State FEs | X | X |
| Lagged Outcome Variable | X | X |
| Observations | 814 | 814 |
| $R^2$ | 0.991 | 0.992 |
| Adjusted $R^2$ | 0.991 | 0.991 |
| *Note:* | *p<0.1; **p<0.05; ***p<0.01 | |

Table 13 reproduces these results using regression specifications analogous to those in

Table 12. It indicates that a one percentage point pro-Republican shift in the efficiency gap increases state policy conservatism by 0.003 standard deviations. This means that a 10 percentage point increase in the efficiency gap would increase policy conservatism by 0.03 standard deviations, which is equivalent to about a percentage point increase in the percentage of conservative policies in a state. This effect is similar to the effect of a shift of one percentage point in the composition of the vote for president (column 2) and is larger than the effect of a governor's partisanship.

## 7.4 Summary of Gerrymandering & Representation in State Government

Overall, the analyses in this section show that partisan bias in districting plans has large consequences for state government. States with pro-Republican bias in their districting plans have 1) more conservative state legislatures and 2) more conservative policy outcomes (and conversely for states with pro-Democratic districting plans).

# 8 Conclusion

Overall, there is a substantial and durable Republican bias in the translation of votes to seats in the enacted state legislative plans in Ohio.

- The statewide proportion of districts whose voters favor each political party in Ohio's enacted state legislative districting plans do not correspond closely to the statewide preferences of the voters of Ohio. Based on a variety of different analyses, I find that Republicans are likely to get a much larger share of the seats in the enacted maps than their share of the statewide vote.

- The plans appear to be drawn to favor the Republican Party. Based on a variety of metrics, the pro-Republican bias in Ohio's state legislative districting plans is very large relative to other states over the past 50 years. The pro-Republican bias in Ohio's plan cannot solely be a function of geography. This suggests that the plan was drawn to favor legislative candidates from the Republican Party.

- The pro-Republican advantage in state legislative elections in Ohio causes Democratic voters whose votes are wasted to be effectively shut out of the political process. Due to the growing polarization in Congress and state legislatures, there is a large difference between the roll call voting behavior of Democrats and Republicans. A

34

representative from one party increasingly does not represent the views of a constituent of the opposite party. Thus, Democratic voters whose votes are wasted are unlikely to see their preferences represented by policymakers.

# References

Best, Robin E, Shawn J Donahue, Jonathan Krasno, Daniel B Magleby, and Michael D McDonald. 2017. "Considering the Prospects for Establishing a Packing Gerrymandering Standard." *Election Law Journal: Rules, Politics, and Policy.*

Brace, Kimball, Bernard Grofman, and Lisa Handley. 1987. "Does Redistricting Aimed to Help Blacks Necessarily Help Republicans?" *Journal of Politics* 49 (1): 169–185.

Brennan Center. 2017. *Extreme Maps.* https://www.brennancenter.org/publication/extreme-maps.

Buzas, Jeffrey S, and Gregory S Warrington. 2021. "Simulated packing and cracking." *Election Law Journal: Rules, Politics, and Policy.*

Campagna, Janet, and Bernard Grofman. 1990. "Party control and partisan bias in 1980s congressional redistricting." *The Journal of Politics* 52 (4): 1242–1257.

Caughey, Devin, Chris Tausanovitch, and Christopher Warshaw. 2017. "Partisan Gerrymandering and the Political Process: Effects on Roll-Call Voting and State Policies." *Election Law Journal* 16 (4).

Caughey, Devin, and Christopher Warshaw. 2016. "The Dynamics of State Policy Liberalism, 1936–2014." *American Journal of Political Science* 60 (4): 899–913.

———. 2022. *Dynamic Democracy: Citizens, Politicians, and Policymaking in the American States.* University of Chicago Press.

Caughey, Devin, Yiqing Xu, and Christopher Warshaw. 2017. "Incremental democracy: The policy effects of partisan control of state government." *The Journal of Politics* 79 (4): 1342–1358.

Chen, Jowei, and Jonathan Rodden. 2013. "Unintentional Gerrymandering: Political Geography and Electoral Bias in Legislatures." *Quarterly Journal of Political Science* 8 (3): 239–269.

Cox, Gary W., and Jonathan N. Katz. 1999. "The reapportionment revolution and bias in US congressional elections." *American Journal of Political Science:* 812–841.

———. 2002. *Elbridge Gerry's Salamander: The Electoral Consequences of the Reapportionment Revolution.* New York: Cambridge University Press.

Dunham, James, Devin Caughey, and Christopher Warshaw. 2016. *dgo: Dynamic Estimation of Group-Level Opinion. R package version 0.2.3.* `https://jamesdunham.github.io/dgo/`.

Fowler, Anthony, and Andrew Hall. 2017. "Long Term Consequences of Elections." *British Journal of Political Science* 47 (2): 351–372.

Gelman, Andrew, and Gary King. 1994a. "A unified method of evaluating electoral systems and redistricting plans." *American Journal of Political Science* 38 (2): 514–554.

———. 1994b. "Enhancing Democracy Through Legislative Redistricting." *American Political Science Review* 88 (03): 541–559.

ICPSR. 2006. *State Legislative Election Returns in the United States, 1968-1989.*

Jackman, Simon. 2015. *Assessing the Current Wisconsin State Legislative Districting Plan.* Expert Analysis by Political Scientist, Stanford, CA: Stanford University.

———. 2017. *Assessing the Current North Carolina Congressional Districting Plan.* Expert Analysis by Political Scientist, Stanford, CA: Stanford University.

Jacobson, Gary C. 2015. "It's nothing personal: The decline of the incumbency advantage in US House elections." *The Journal of Politics* 77 (3): 861–873.

Jacobson, Gary C, and Jamie L Carson. 2015. *The politics of congressional elections.* Rowman & Littlefield.

Kastellec, Jonathan P, Andrew Gelman, and Jamie P Chandler. 2008. "Predicting and dissecting the seats-votes curve in the 2006 US House election." *PS: Political Science & Politics* 41 (1): 139–145.

Katz, Jonathan N, Gary King, and Elizabeth Rosenblatt. 2020. "Theoretical foundations and empirical evaluations of partisan fairness in district-based democracies." *American Political Science Review* 114 (1): 164–178.

King, Gary, and Andrew Gelman. 1991. "Systemic consequences of incumbency advantage in US House elections." *American Journal of Political Science:* 110–138.

Klarner, Carl, William Berry, Thomas Carsey, Malcolm Jewell, Richard Niemi, Lynda Powell, and James Snyder. 2013. *State Legislative Election Returns (1967–2010).* ICPSR34297-v1. Ann Arbor, MI: Inter-university Consortium for Political and Social Research [distributor], 2013-01-11. doi:`10.3886/ICPSR34297.v1`.

Kollman, K., A. Hicken, D. Caramani, D. Backer, and D. Lublin. 2017. *Constituency-level elections archive [data file and codebook].* Ann Arbor, MI: Center for Political Studies, University of Michigan.

Krasno, Jonathan S, Daniel Magleby, Michael D McDonald, Shawn Donahue, and Robin E Best. 2018. "Can Gerrymanders Be Detected? An Examination of Wisconsin's State Assembly." *American Politics Research.*

McDonald, Michael P. 2014. "Presidential vote within state legislative districts." *State Politics & Policy Quarterly* 14 (2): 196–204.

McGhee, Eric. 2014. "Measuring Partisan Bias in Single-Member District Electoral Systems." *Legislative Studies Quarterly* 39 (1): 55–85.

———. 2017. "Measuring Efficiency in Redistricting." *Election Law Journal: Rules, Politics, and Policy.*

———. 2018. *Assessing California's Redistricting Commission: Effects on Partisan Fairness and Competitiveness.* Report from the Public Policy Institute of California. Available at `http : / / www . ppic . org / publication / assessing - californias - redistricting-commission-effects-on-partisan-fairness-and-competitive ness/`.

MIT Election and Data Science Lab. 2017. *U.S. House 1976–2016.* Available on the Harvard Dataverse at `http://dx.doi.org/10.7910/DVN/IG0UN2`.

Nagle, John F. 2015. "Measures of partisan bias for legislating fair elections." *Election Law Journal* 14 (4): 346–360.

Niemi, Richard G, and John Deegan. 1978. "A theory of political districting." *American Political Science Review* 72 (4): 1304–1323.

Poole, Keith T., and Howard Rosenthal. 1997. *Congress: A Political-Economic History of Roll Call Voting.* New York: Oxford UP.

Powell, G. Bingham, Jr. 2004. "Political Representation in Comparative Politics." *Annual Review of Political Science* 7:273–296.

Rogers, Steven. 2017. "Electoral Accountability for State Legislative Roll Calls and Ideological Representation." *American Political Science Review* 111 (3): 555–571.

Royden, Laura, Michael Li, and Yurij Rudensky. 2018. *Extreme Gerrymandering & the 2018 Midterm.*

Shor, Boris, and Nolan McCarty. 2011. "The Ideological Mapping of American Legislatures." *American Political Science Review* 105 (3): 530–551.

Stephanopoulos, Nicholas. 2018. "The Causes and Consequences of Gerrymandering." *William and Mary Law Review* 59.

Stephanopoulos, Nicholas O, and Christopher Warshaw. 2020. "The impact of partisan gerrymandering on political parties." *Legislative Studies Quarterly* 45 (4): 609–643.

Stephanopoulos, Nicholas O., and Eric M. McGhee. 2015. "Partisan Gerrymandering and the Efficiency Gap." *University of Chicago Law Review* 82 (2): 831–900.

———. 2018. "The measure of a metric: The debate over quantifying partisan gerrymandering." *Stan. L. Rev.* 70:1503.

Tufte, Edward R. 1973. "The relationship between seats and votes in two-party systems." *American Political Science Review* 67 (2): 540–554.

Wang, Samuel. 2016. "Three Tests for Practical Evaluation of Partisan Gerrymandering." *Stan. L. Rev.* 68:1263–1597.

Warrington, Gregory S. 2018a. "Introduction to the declination function for gerrymanders." *arXiv preprint arXiv:1803.04799.*

———. 2018b. "Quantifying Gerrymandering Using the Vote Distribution." *Election Law Journal* 17 (1): 39–57.

Wright, Gerald, Tracy Osborn, Jon Winburn, and Jennifer Hayes Clark. 2009. "Patterns of representation in the American states and Congress." In *annual conference on State Politics and Policy, Chapel Hill, NC.*

# Supplementary Appendix

## A    Measurement Model for Uncontested Races

A factor that complicates the computation of the Efficiency Gap (as well as any other measure of partisan bias) is that many seats are uncontested. As Stephanopoulos and McGhee (2015, 865) put it, "Since gerrymanders redistribute voters in order to pack and crack the opposition, determining the degree of packing and cracking requires knowing how many people in each district support each party."[38] In uncontested races, however, it is not possible to calculate a two-party vote share. Thus, we have no way of knowing based on the election returns alone how many people supported each party.

As a result, we need some strategy to impute the two-party vote shares in these districts in order to estimate the Efficiency Gap. There are a variety of potential approaches to address this problem. The simplest strategy is to simply assume that the winning candidate receives 75% of the vote and the losing candidate receives 25% of the vote. Many political science studies have adopted this approach (e.g., Gelman and King 1994a; Kastellec, Gelman, and Chandler 2008).[39] However, Kastellec, Gelman, and Chandler (2008) point out that "there is no way to know whether the losing candidate would have actually received 25% of the vote. For example, in a heavily Democratic district in Philadelphia, this probably over-estimates the vote share a Republican candidate would have gotten. In contrast, it might under-estimate the Republican vote share in a more suburban, swing district."

A more sophisticated strategy to address uncontested races is to estimate the two-party vote share in district$_i$ based on previous and future elections in that district as well as the results in similar districts elsewhere. A variety of recent analyses have used this approach. The Brennan Center's recent report uses a variant of this approach for its estimates of Efficiency Gaps between 1992-2016 (Brennan Center 2017, 16).[40] This

---

38. A variety of other scholars have noted this problem. For instance, Campagna and Grofman (1990, 1247) note that "One key issue [for studies of redistricting] is how to handle uncontested seats. [One needs] to avoid using 100% as the vote share for a party in an uncontested seat (which, for Congress, tends to bloat ... vote share)."

39. Kastellec, Gelman, and Chandler (2008) justify this strategy by noting that King and Gelman (1991) and Gelman and King (1994a) examined the "vote shares received in the last election before a district became uncontested and the first election after a district became uncontested. The average of these values was about 0.75 for the incumbent party and represents the average 'effective support' for the party in uncontested races."

40. Brennan Center (2017, 16) states that 'For districts without both a Democrat and Republican running in the general election, we estimated the vote share both parties would have received in a contested two-party election based on the prior election's House results, the most recent district-level

strategy is also used by the Public Policy Institute of California for its estimates of the Efficiency Gap over the last decade (McGhee 2018), and by Professor Simon Jackman in his expert reports for litigation in Wisconsin and North Carolina (Jackman 2015, 2017). One downside of this approach, however, is that it relies on less transparent assumptions than the simpler strategy described above.

Unfortunately, there are no publicly available, published estimates of the Efficiency Gap that span the past four decades for all three legislative chambers, including congressional, state house, and state senate districts. As a result, I build my own estimates using both approaches described above for imputing uncontested districts. That is, I build one set of Efficiency Gap estimates based on the assumption that the winning party receives 75% of the vote in uncontested districts and another version using a model that imputes the vote shares in uncontested districts based on previous and future elections in that district as well as the results in similar districts elsewhere. I use the latter estimates in the main body of the report. But it is important to note that the substantive results in the report are robust to the precise details of how we calculate the Efficiency Gap.

## A.1 Overview of Data

### A.1.1 Congressional Districts

For congressional districts, the foundation of my analysis was congressional election results from 1972-2018 collected by the Constituency-Level Elections Archive (CLEA) (Kollman et al. 2017). The results from 1972-1990 are based on data collected and maintained by the Inter-university Consortium for Political and Social Research (ICPSR) and adjusted by CLEA. The data from 1992-2018 are based on data collected by CLEA from the Office of the Clerk at the House of the Representatives. I supplemented this dataset with election results collected by the MIT Election and Data Science Lab (MIT Election and Data Science Lab 2017). I used data on presidential election returns and incumbency status in Congressional elections collected by Professor Gary Jacobson (University of California, San Diego). This dataset has been used in many Political Science studies and has canonical status in the political science profession (Jacobson 2015). I group elections by decade and estimate the Efficiency Gap for each state's plan in each election year.

---

Presidential results using totals calculated and compiled by Daily Kos Elections for both 2012 and 2016, a district's Cook Partisan Voter Index, and the winning candidate's incumbency status."

### A.1.2 State Legislative Districts

For state legislative districts, the foundation for my analysis was a large canonical data set on candidacies and results in state legislative elections from 1972-2018 collected by Carl Klarner and a large team of collaborators. The results from 1972-2012 are based on data maintained by the Inter-university Consortium for Political and Social Research (ICPSR) (Klarner et al. 2013). I obtained data from 2013-2018 directly from Klarner. I obtained Ohio's returns in 2020 directly from the state government's website.

I used a variety of sources of data on presidential election returns in state legislative districts. For elections between 1972 and 1991, I used data on county-level election returns from 1972-1988 collected by the Inter-university Consortium for Political and Social Research (ICPSR 2006) and mapped these returns to state legislative districts in order to estimate presidential, senate, and governor election results by state legislative district. For elections between 1992 and 2001, I used data on presidential election returns in the 2000 election collected by McDonald (2014) and Wright et al. (2009). For elections between 2002 and 2011, I used data on the 2004 and 2008 presidential elections collected by Rogers (2017). For elections between 2012 and 2018, I used data on presidential election returns for the 2012 and 2016 elections from the DailyKos website.

I group each state's elections based on its redistricting plan using data from Carl Klarner. In most cases, redistricting plans are constant over the course of a decade. However, a handful of states have redistricted mid-decade for various reasons. In general, I drop these states from my analysis. I also drop state legislative elections from my analysis where I am unable to match to data on presidential vote share. I also drop state senate elections in the first cycle after a redistricting from my analysis because it is not clear whether each district in the chamber is using the post-redistricting map.

Many state legislative elections are conducted in multimember districts. Previous studies have dropped the bulk of these districts from their analyses (e.g., Jackman 2015). However, I include multimember districts in my analysis of the Efficiency Gap in state legislative elections. For multimember districts with posts, I treat each post as if it's a separate district. For multimember systems without posts, I match each winner with a maximum of one loser of the opposite party, and assume that they ran against each other in a post election. Specifically, I match the worst-performing winner with the best-performing loser of the opposite party, and then the next-worst performing winner with the second-best performing loser of the opposite party, etc. If there are more winners than losers, then there will be some "uncontested" races.

Finally, if only a portion of a state legislative chambers were elected in a particular year, I group these elections with the most recent previous election in each district in



Figure A1: States and election cycles where I estimate the Efficiency Gap in State House Districts.

order to calculate each party's seat share, vote share, the number of wasted votes, the Efficiency Gap, and other statistics.

Figure A1 (above) shows the states and election cycles where I estimate an efficiency gap for state house districts. Overall, I have estimated the Efficiency Gap for 896 of the 1123 (80%) state house election years in partisan legislatures between 1972 and 2016.[41] This is substantially more than previous analyses of gerrymandering in state legislatures using the Efficiency Gap (e.g., Stephanopoulos and McGhee 2015; Jackman 2015).

---

41. I have dropped state-years for the following reasons. First, I drop state-years where I am unable to match presidential election results to state legislative districts. Second, I drop state-years that precede a mid-decade redistricting.

## A.2 Details of Statistical Models

This section presents the details of the statistical models that I use to impute uncontested races.

1. First, I estimate the Efficiency Gap assuming that the winner in uncontested races receives 75% of the vote and the loser receives 25% of the vote. I estimate the statewide Democratic vote share by assuming that turnout in each district was equal and simply taking the average of the two-party vote shares in each district.

2. Second, I estimate the Efficiency Gap using a statistical model to impute both the vote share and turnout in uncontested districts. This model is closely related to the imputation strategy for uncontested districts adopted by previous studies of the Efficiency Gap (Stephanopoulos and McGhee 2015; Jackman 2015, 2017; Brennan Center 2017; McGhee 2018).

   - In order to estimate the vote shares in uncontested districts, I model the proportion of the two-party vote received by the Democrat ($p_{d,t}$) in each district (d) using a binomial model.

$$s_{d,t}^v \sim \text{Binomial}(n_{d,t}^v,\ p_{d,t}^v), \tag{4}$$

   where d indexes districts and t indexes elections. $n_{d,t}^v$ is set to 2000[42] and $s_{d,t}^v$ is the two-party vote share multiplied by 2000. For uncontested races, we set $n_{d,t}^v$ and $s_{d,t}^v$ to zero. We then model $p$ as a function of: previous and future results in that district, each district's presidential vote share, whether there is an incumbent running, and if so, their party, and the region (congressional districts) or state (state legislative districts) that the district is in. For state legislative races, I also include the Democrats' vote share in governors and senate races during the 1970s and 1980s as a predictor since state legislative races during this period were less nationalized than in more recent decades. More formally, for congressional districts, we model

$$p_{d,t}^v = \Phi(\gamma_t +\ p_{d,t-1}^v + \beta_1 * pvote_{d,t} + \beta_2 * incumbency_{d,t} + \alpha_{s[d]}^{region}) \tag{5}$$

---

42. This number is set for computational efficiency. However, it could be arbitrarily set to some other number, and this would not affect the model results.

where *pvote* is the percentage of the two-party presidential vote received by the Democratic candidate in each district; *incumbency* is a factor equal to 1 if there is a Democratic incumbent, 0 if there is no incumbent, and -1 if there is a Republican incumbent; regions are based on economic regions defined by the Bureau of Economic Advisors; and the normal CDF $\Phi$ maps $p$ to the $(0, 1)$ interval. I estimate the model separately each decennial redistricting period (i.e., years ending in 02 - 12) using the `dgmrp` function in the `dgo` package in R (Dunham, Caughey, and Warshaw 2016).[43] The mean estimate of Democratic vote share in uncontested congressional races won by Democrats is 71% and the average estimate of Democratic vote share in uncontested races won by Republicans is 31%.[44]

- In order to estimate the turnout in uncontested congressional districts, I model the proportion of the population ($p_{d,t}$) that votes in each district (d) using a similar binomial model.

$$s_{d,t}^t \sim \text{Binomial}(n_{d,t}^t, \ p_{d,t}^t), \tag{6}$$

where $n_{d,t}^t$ is set to 2000 and $s_{d,t}^t$ is the proportion of the population that voted for either the Democratic or Republican candidate multiplied by 2000. For districts with uncontested races, we set $n_{d,t}^t$ and $s_{d,t}^t$ to zero. We then model $p$ as a function of: previous and future results in that district, whether there is an incumbent running, and if so, their party, and the region that the district is in. More formally, we model

$$p_{d,t}^t = \Phi(\gamma_t + \ p_{d,t-1}^t + \beta_1 * incumbency_{d,t} + \alpha_{s[d]}^{region}) \tag{7}$$

where *incumbency* is a factor equal to 1 if there is a Democratic incumbent, 0 if there is no incumbent, and -1 if there is a Republican incumbent; regions are based on economic regions defined by the Bureau of Economic Advisors; and the normal CDF $\Phi$ maps $p$ to the $(0, 1)$ interval. I estimate the model separately each decennial redistricting period (i.e., years ending in 02 - 12)

---

43. Due to data limitations, for both the models of turnout and vote share in congressional elections, I do not split apart states' plans due to mid-decade redistrictings. In recent decades, however, only a handful of states have conducted mid-decade redistrictings. For state legislative districts, I drop elections from districting plans established prior to a mid-decade redistricting.

44. These estimates are very similar to those of Stephanopoulos and McGhee (2015, 866). Based on a similar approach, they estimate a "mean Democratic vote share [in uncontested races] of 70 percent," and for uncontested Republicans, they estimate "a mean Democratic vote share of 32 percent."

using the `dgmrp` function in the `dgo` package in R (Dunham, Caughey, and Warshaw 2016).

- In order to estimate the turnout in uncontested state legislative districts, I take the average of the turnout in district$_d$ in other presidential or midterm years in a given decade. If no data on district$_d$ is available, I take the average of turnout in year$_t$ elsewhere in the state. I use this simpler approach due to the unavailability of population data for state legislative districts.

- Finally, for uncontested congressional and state legislative districts, I estimate the number of Democratic votes in each district by multiplying the estimated, imputed Democratic vote share ($p_{d,t}^v$) by the estimate of the total turnout. For contested districts, I use the actual number of Democratic votes and total votes in each district. Combining these approaches, I estimate the statewide Democratic vote share by simply summing the Democratic votes in each district and dividing by the total number of votes.

Now that we know voters' two-party preferences in contested districts and we have estimates of their preferences in uncontested districts, we are finally in position to estimate the partisan advantage in the congressional and state legislative districting process during each state-year. I estimate the efficiency gap in all states for each election between 1972 to 2016 using equation 3.[45]

In the discussion of congressional districts in the main body of the report, I focus on states with more than 6 congressional seats. I omit smaller states for two reasons. First, these states contribute less to the overall distribution of seats in Congress (Stephanopoulos and McGhee 2015, 868). Second, the Efficiency Gap in smaller states tends to be more volatile and thus less informative about partisan bias. For example, in a state with only three seats, a change in the winner of one seat could cause a huge shift in their Efficiency Gap.

## A.3 Validation

Prior to examining our results, it is useful to validate my measures of the Efficiency Gap to make sure that it aligns closely with alternative modeling approaches for uncontested races. In fact, Figure A2 shows that the precise method used to impute uncontested congressional races makes relatively little difference for estimates of the Efficiency Gap.

---

45. I start the analysis in 1972 since those are the first districting plans drawn after the Supreme Court cases stemming from *Baker v. Carr* ended malapportionment and established the principle of one-person, one-vote.

- The correlation between estimates of the Efficiency Gap for congressional districts I calculated using the Bayesian method described above and a simpler approach that assumes the winner in uncontested races received 75% of the two-party vote is 0.95.

- The correlation between my estimates of the Efficiency Gap for congressional districts and estimates for 1992-2016 developed by the Brennan Center is 0.95.

- The correlation between my estimates of the Efficiency Gap for congressional districts and estimates for 2002-2016 developed by the Public Policy Institute of California is 0.98.



Figure A2: Validation of the Efficiency Gap Measure for Congressional Elections

I also find very high correlations between my estimates of the Efficiency Gap in state house districts and other modeling approaches for estimating the Efficiency Gap.

- The correlation between estimates of the Efficiency Gap for congressional districts I calculated using the Bayesian method described above and a simpler approach that assumes the winner in uncontested races received 75% of the two-party vote is 0.84.

- The correlation between my estimates of the Efficiency Gap for congressional districts and estimates for 1972-2014 developed by Jackman (2015) is 0.91.[46]

- I also find very high correlations between my estimates of the Efficiency Gap and the declination measures discussed in the main body of the report.

---

46. It is important to note that my methodology for estimating the Efficiency Gap differs from Jackman (2015)'s approach in three relatively minor ways which slightly attenuates the correlation between our measures. First, I adjust for unequal turnout across districts. If I do not adjust for differences in turnout, my Efficiency Gap estimates have a 0.96 correlation with Jackman's estimates. Second, I use presidential vote share as a predictor of state legislative elections throughout the entire time period to estimate uncontested districts. Finally, I include states with multimember districts in my analysis.

# Christopher S. Warshaw

Department of Political Science
2115 G Street, N.W.
Monroe Hall 440
Washington, D.C. 20052

Office: 202-994-6290
Fax: 202-994-1974
Email: warshaw@gwu.edu
Homepage: www.chriswarshaw.com

## Academic Employment

**George Washington University**, Washington, DC

Associate Professor (2020-present)

Assistant Professor, 2017 - 2020

**Massachusetts Institute of Technology**, Cambridge, MA

Associate Professor of Political Science (without tenure), 2016 - 2017

Assistant Professor of Political Science, 2012 - 2016

## Education

**Stanford University**, Ph.D., Political Science, 2012

Fields: American Politics, Comparative Politics, and Political Methodology (Statistics)

**Stanford Law School**, Juris Doctorate, 2011

**Williams College**, B.A., *magna cum laude*, 2002

## Research Interests

American Politics, Representation, Elections, Public Opinion, State & Local Politics, Environmental Politics and Policy, Statistical Methodology

## Research

*Publications*

### Book

"Dynamic Democracy: Citizens, Politicians, and Policymaking in the American States." Forthcoming. University of Chicago Press. (with Devin Caughey)

### Peer Reviewed Articles

24. "The Effect of Television Advertising in United States Elections." Forthcoming. *American Political Science Review*. (with John Sides and Lynn Vavreck).

23. "Using Screeners to Measure Respondent Attention on Self-Administered Surveys: Which Items and How Many?" 2021. *Political Science Research and Methods*. 9(2): 430–437. (with Adam Berinsky, Michele Margolis, and Mike Sances)

22. "The Impact of Partisan Gerrymandering on Political Parties." 2020. *Legislative Studies Quarterly*. 45(4): 609-643. (with Nicholas Stephanopoulos)

21. "Fatalities from COVID-19 are reducing Americans' support for Republicans at every level of federal office." 2020. *Science Advances*. (with Lynn Vavreck and Ryan Baxter-King)

20. "Accountability for the Local Economy at All Levels of Government in United States Elections." 2020. *American Political Science Review*. 114(3): 660-676. (with Justin de Benedictis-Kessner)

19. "Politics in Forgotten Governments: The Partisan Composition of County Legislatures and County Fiscal Policies." 2020. *Journal of Politics*. 82(2): 460-475. (with Justin de Benedictis-Kessner)

18. "On the Representativeness of Primary Electorates." 2020. *British Journal of Political Science*. 50(2): 677-685. (with John Sides, Chris Tausanovitch, and Lynn Vavreck)

17. "Geography, Uncertainty, and Polarization." 2019. *Political Science Research and Methods*. 7(4): 775-794. (with Nolan McCarty, Jonathan Rodden, Boris Shor, and Chris Tausanovitch)

16. "Policy Ideology in European Mass Publics, 1981–2016." 2019. *American Political Science Review*. 113(3): 674-693. (with Devin Caughey and Tom O'Grady).

15. "Does Global Warming Increase Public Concern About Climate Change?" 2019. *Journal of Politics*. 81(2): 686-691. (with Parrish Bergquist)

14. "Local Elections and Representation in the United States." 2019. *Annual Review of Political Science*. 22(1): 461-479.

13. "The Ideological Nationalization of Party Constituencies in the American States". 2018. *Public Choice*. Keith Poole Symposium. 176(1-2): 133-151. (with James Dunham and Devin Caughey)

12. "Policy Preferences and Policy Change: Dynamic Responsiveness in the American States, 1936-2014." 2018. *American Political Science Review*. 112(2): 249-266. (with Devin Caughey)

11. "Does the Ideological Proximity Between Candidates and Voters Affect Voting in U.S. House Elections?" 2018. *Political Behavior*. 40(1): 223-245. (with Chris Tausanovitch)

10. "Partisan Gerrymandering and the Political Process: Effects on Roll-Call Voting and State Policies." *Election Law Journal*. December, 2017. 16(4): 453-469. Symposium on Partisan Gerrymandering and the Efficiency Gap. (with Devin Caughey and Chris Tausanovitch)

9. "Incremental Democracy: The Policy Effects of Partisan Control of State Government." 2017. *Journal of Politics*. 79(4): 1342-1358. (with Devin Caughey and Yiqing Xu)

8. "Renewable energy policy design and framing influences public support in the United States." 2017. *Nature Energy*. 2(17107). (with Leah Stokes)

7. "Estimating Candidates' Political Orientation in a Polarized Congress." 2017. *Political Analysis*. 25(2): 167-187. (with Chris Tausanovitch)

6. "The Dynamics of State Policy Liberalism, 1936-2014." 2016. *American Journal of Political Science*. 60(4): 899-913. (with Devin Caughey)

5. "Mayoral Partisanship and Municipal Fiscal Policy." 2016. *Journal of Politics*. 78(4): 1124-1138. (with Justin de Benedictis-Kessner)

4. "Dynamic Estimation of Latent Opinion Using a Hierarchical Group-Level IRT Model." 2015. *Political Analysis*. 23(2): 197-211. (with Devin Caughey)

3. "Representation in Municipal Government." 2014. *American Political Science Review*. 108(3): 605-641. (with Chris Tausanovitch)

2. "Measuring Constituent Policy Preferences in Congress, State Legislatures and Cities." 2013. *Journal of Politics*. 75(2): 330-342. (with Chris Tausanovitch)

1. "How Should We Measure District-Level Public Opinion on Individual Issues?" 2012. *Journal of Politics*. 74(1): 203-219. (with Jonathan Rodden)

**Editor Reviewed Articles in Journals and Law Reviews**

4. "A preference for constant costs." 2020. *Nature Climate Change*. News & Views. 10: 978–979

3. "Public Opinion in Subnational Politics." 2019. *Journal of Politics*. 81(1): 352-363. Editor reviewed for Symposium on Subnational Policymaking. (with Devin Caughey)

2. "Spatial variation in messaging effects." 2018. *Nature Climate Change*. News & Views. April, 2018.

1. "Business as Usual? Analyzing the Doctrinal Development of Environmental Standing Doctrine since 1976." 2011. *Harvard Law and Policy Review*. Volume 5.2. (with Gregory Wannier).

**Book Chapters**

5. "Elections and Parties in Environmental Politics." 2020. *Handbook on U.S. Environmental Policy*. David Konisky, ed. (with Parrish Bergquist)

4. "Latent Constructs in Public Opinion." 2018. *Oxford Handbook on Polling and Polling Methods*. R. Michael Alvarez and Lonna Atkeson, ed. Oxford: Oxford University Press.

3. "The Application of Big Data in Surveys to the Study of Elections, Public Opinion, and Representation." 2016. *Data Analytics in Social Science, Government, and Industry*. R. Michael Alvarez, ed. Cambridge: Cambridge University Press.

2. "The Political Economy of Expropriation and Privatization in the Oil Sector." 2012. *Oil and Governance: State-Owned Enterprises and the World Energy Supply*. David G. Victor, David Hults, and Mark Thurber, eds. Cambridge: Cambridge University Press.

1. "Democratization and Countermajoritarian Institutions: The Role of Power and Constitutional Design In Self-Enforcing Democracy." 2012. *Comparative Constitutional Design*. Cambridge: Cambridge University Press. (with Susan Alberts and Barry R. Weingast).

**Policy Reports**

1. "Reforming Baltimore's Mayoral Elections." 2020. Abell Foundation Report.
   `https://www.abell.org/publications/reforming-baltimores-mayoral-elections`

**Articles Under Review**

"The Effect of Fox News Channel on U.S. Elections: 2000-2020" (with Elliott Ash, Sergio Galletta, and Matteo Pinna)

"Moderates" (with Anthony Fowler, Seth Hill, Jeff Lewis, Chris Tausanovitch, Lynn Vavreck)

"Partisan Polarization in the Mass Public in South Korea and the United States"

*Christopher S. Warshaw*                                                                                   4

**Works in Progress**

"Electoral Accountability for Ideological Extremism in American Elections" (with Devin Caughey)

"Gerrymandering in Local Governments" (with Laura Royden)

"Partisan Selection in City Councils" (with Justin de Benedictis-Kessner and Dan Jones)

"When Mass Opinion Goes to the Ballot Box: A National Assessment of State Level Issue Opinion and Ballot Initiative Results" (with Jonathan Robinson and John Sides)

"Inequalities in Participation, Voting, and Representation in Local Governments" (with Justin de Benedictis-Kessner and John Sides)

"The Ideology of State Party Platforms " (with Justin Phillips and Gerald Gamm)

*Non-Academic Writing*

"Here are six big takeaways from the 2020 elections." *Washington Post*. November 7, 2020. (with Emily Thorson)

"TV ads still win elections. And Democrats are buying a lot more of them." *Washington Post*. October 28, 2020. (with John Sides and Lynn Vavreck)

"How Local Covid Deaths Are Affecting Vote Choice." *New York Times*. July 28, 2020. (with Lynn Vavreck)

"Allowing Only Older Americans to Vote by Mail Leads to Severe Racial Disparities." *Election Law Blog*. July 1, 2020.

"A coronavirus recession would hurt all kinds of Republican candidates – not just Trump." *Washington Post*, Monkey Cage. March 18, 2020. (with Justin de Benedictis-Kessner).

"The Supreme Court is deciding a gerrymandering case. Here's the social science that the Justices need to know." *Washington Post*, Monkey Cage. June 1, 2019.

"New research shows just how badly a citizenship question would hurt the 2020 Census." *Washington Post*, Monkey Cage. April 22, 2019. (with Matt Barreto, Matthew A. Baum, Bryce J. Dietrich, Rebecca Goldstein, and Maya Sen)

"G.O.P. Senators Might Not Realize It, but Not One State Supports the Health Bill." *New York Times*. June 14, 2017. (with David Broockman)

# Invited Talks

2020-2021: University of Maryland; Stony Brook University

2019-2020: Princeton; UC Berkeley

2018-2019: Stanford; Northeast Political Methodology Meeting at NYU; University of Maryland

2017-2018: USC PIPE Symposium on Studying Subnational Policy Making; BYU; University of Chicago Conference on Political Polarization

2016-2017: University of Virginia; UCLA

2015-2016: Washington University in St. Louis; Texas A&M; Arizona State University Conference on Campaigns, Elections and Representation

2014-2015: Yale; Columbia; Duke

2013-2014: Princeton; Boston University; Rochester University

2012-2013: MIT American Politics Conference; Columbia Representation Conference; Princeton Media & Politics Conference; Annual Meeting of the Society for Political Methodology

## Grants

Russell Sage Foundation, 2019-2021 ($119,475)

GW UFF, 2019-2020 ($14,433)

MIT Elections Lab, 2019-2020 ($14,000)

Jeptha H. and Emily V. Wade Award, 2014-2016 ($59,686)

MIT Energy Institute (MITEI) Seed Grant, 2014-2016 ($137,147)

MIT SHASS Research Fund, 2012-2014 ($8,734)

## Software

dgo: Dynamic Estimation of Group-Level Opinion. 2017. R package. `https://CRAN.R-project.org/package=dgo`. (with James Dunham and Devin Caughey)

## Awards and Honors

OVPR Early Career Scholar at George Washington University, 2019.

APSA award for best journal article on State Politics & Policy in 2016.

Award for best paper on State Politics & Policy at the 2014 American Political Science Conference.

Graduate Fellowship, Dept. of Political Science, Stanford University, 2006-2012

David A. Wells Prize in Political Economy for Best Undergraduate Economics Thesis, Williams College, 2002

Phi Beta Kappa, Williams College, 2002

## Teaching Experience

**Instructor:**

Measurement Models (Graduate-level) (GW), 2020

Political Representation (Graduate-level) (GW), 2019

Elections (GW), 2018, 2019

Multi-level and Panel Models (Graduate-level) (GW), 2017, 2018, 2019

Public Opinion (GW), 2017

American Political Institutions (Graduate-level) (MIT), 2014, 2016

Public Opinion and Elections (MIT), 2016

Energy Policy (MIT), 2013

Democracy in America (MIT), 2013, 2014

Constitutional Law & Judicial Politics (MIT), 2013, 2015

Making Public Policy (MIT), 2012, 2014

**Teaching Assistant:**

Introduction to American Law (Stanford University), 2010

Judicial Politics and Constitutional Law (Stanford University), 2009

Political Economy of Energy Policy (Stanford University), 2008

Introduction to International Relations (Stanford University), 2008

Introduction to Public Policy (Stanford University), 2007

Introduction to Econometrics (Williams College), 2002

## Graduate Advising

**George Washington University:**

Alex Beck (Dissertation committee chair)

Kerry Synan (Dissertation committee co-chair)

Jared Heern (Dissertation committee member)

Colin Emrich (Graduates in 2021, Dissertation committee member)

**Massachusetts Institute of Technology:**

Leah Stokes (Graduated in 2015, Dissertation committee member)

Krista Loose (2016, Dissertation committee member)

Tom O'Grady (2017, Dissertation committee member)

Justin de Benedictis-Kessner (2017, Dissertation committee member)

Alex Copulsky (2017, Masters thesis committee member)

James Dunham (2018, Dissertation committee member)

Parrish Bergquist (2018, Dissertation committee member)

Meg Goldberg (2019, Dissertation committee member)

## University Service

**George Washington University:**

Member, Academic Program Review Committee, Sociology Dept., 2021

Coordinator, Graduate Political Science Admissions Committee, 2019-2020

Coordinator, American Politics Workshop, 2018-2020

Member, Methods Exam Committee, 2017-2020

Member, Graduate Political Science Admissions Committee, 2018-2019

**Massachusetts Institute of Technology:**

Member, Energy Education Task Force, 2012-2017

Parking and Transit Committee, 2013-2017

Member, Graduate Political Science Admissions Committee, 2013-2015

Faculty Fellow, Burchard Scholars, 2013-2015

**Stanford University (as graduate student):**

President, Stanford Environmental Law Society, 2009-2010

Executive Board Member, Stanford Environmental Law Society 2008-2010

Member, University Committee on Graduate Studies, 2007-2009

Member, University Library Committee, 2007-2008

President, Political Science Graduate Students Association, 2007-2008

## Professional Service

**Reviewer:** American Political Science Review, American Journal of Political Science, Journal of Politics, Political Analysis, Political Behavior, Econometrica, Quarterly Journal of Political Science, Legislative Studies Quarterly, Political Research Quarterly, American Politics Research, British Journal of Political Science, Journal of Law and Courts, Public Opinion Quarterly, Political Science Research and Methods, State Politics and Policy Quarterly, Journal of Experimental Political Science, Nature Climate Change, Urban Affairs Review, Journal of Health Politics, Policy and Law, Perspectives on Politics, Review of Economics and Statistics, Cambridge University Press

**Member**, Best Dissertation Committee, Urban Politics Section of the American Political Science Assoc., 2021

**Member**, Program Committee, Midwest Political Science Association Conference, 2020

**Lead Organizer**, Local Political Economy APSA Pre-Conference at George Washington University, 2019

**Member**, Planning Committee, Cooperative Congressional Election Study (CCES), 2018

**Member**, Best Paper Committee, State Politics Section of the American Political Science Assoc., 2018

**Editorial Board**, Journal of Politics, 2017-18

**Executive Committee**, Urban Politics Section of the American Political Science Association, 2015-2017

**Organizing Committee**, Conference on Ideal Point Models at MIT, http://idealpoint.tahk.us, 2015

**Member**, Best Paper Committee, Urban Politics Section of the American Political Science Assoc., 2015

## Consulting

Expert, *La Union del Pueblo Entero , et al.* v. *v. Trump*, Effect of Excluding Undocumented Immigrants from Census on Apportionment (2020)

Expert, *Common Cause et al.* v. *v. Trump*, Effect of Excluding Undocumented Immigrants from Census on Apportionment (2020)

Expert, *New York Immigration Coalition* v. *Trump* and *State of New York* v. *Trump*, Effect of Excluding Undocumented Immigrants from Census on Apportionment (2020)

Consultant, *Abell Foundation*, Report on Potential Institutional Reforms for Baltimore's City Elections

Expert, *APRI et al.* v. *v. Smith et al.*, Partisan Gerrymandering Case (2018-2019)

Expert, *League of Women Voters of Michigan* v. *Johnson*, Partisan Gerrymandering Case (2018-2019)

Expert, *New York Immigration Coalition* v. *US Dept of Commerce* & *State of NY* v. *US Dept of Commerce*, Effects of Undercount on Census due to Citizenship Question (2018)

Expert, *League of Women Voters of Pennsylvania* v. *the Commonwealth of Pennsylvania*, Partisan Gerrymandering Case (2017-18)

## Community Service

PlanScore: Leadership Team (2020-2021)

Sierra Club: National Board of Directors (2009-2015)

Last updated: September 23, 2021

# Exhibit 2

# Miller Affidavit



## Affidavit of Jen Miller.pdf

| | |
|---|---|
| DocVerify ID: | 9E029E8E-BE61-4878-9ECD-57BB4443FEFE |
| Created: | September 22, 2021 12:34:38 -8:00 |
| Pages: | 4 |
| Remote Notary: | Yes / State: OH |

This document is a DocVerify VeriVaulted protected version of the document named above. It was created by a notary or on the behalf of a notary, and it is also a DocVerify E-Sign document, which means this document was created for the purposes of Electronic Signatures and/or Electronic Notary. Tampered or altered documents can be easily verified and validated with the DocVerify veriCheck system. This remote online notarization involved the use of communication technology.

Go to www.docverify.com at any time to verify or validate the authenticity and integrity of this or any other DocVerify VeriVaulted document.

**E-Signature Summary**

**E-Signature 1: Jennifer (JM)**
September 22, 2021 13:11:21 -8:00 [8E65F04FDA4E] [74.132.171.149]
director@lwvohio.org (Principal) (Personally Known)

**E-Signature Notary: Theresa M Sabo (TMS)**
September 22, 2021 13:11:21 -8:00 [DEC741215624] [23.28.168.121]
tess.sabo@gmail.com
I, Theresa M Sabo, did witness the participants named above electronically
sign this document.



DocVerify documents cannot be altered or tampered with in any way once they are protected by the DocVerify VeriVault System. Best viewed with Adobe Reader or Adobe Acrobat.
All visible electronic signatures contained in this document are symbolic representations of the persons signature, and not intended to be an accurate depiction of the persons actual signature as defined by various Acts and/or Laws.



## **AFFIDAVIT OF JEN MILLER**

STATE OF OHIO                          )

                                       )   SS:

COUNTY OF FRANKLIN                     )


Affiant Jen Miller, having been first duly cautioned and sworn, deposes and states as follows:

1.  I am over the age of 18 and fully competent to testify to the statements and facts contained herein, and I have personal knowledge of all of them.

2.  I am a resident and elector of the State of Ohio.

3.  I am the Executive Director of the League of Women Voters of Ohio ("LWVO").

4.  Relator LWVO is the Ohio chapter of the League of Women Voters of the United States, a nonpartisan, statewide non-profit founded in May 1920, shortly before the ratification of the Nineteenth Amendment in August 1920 granting women's suffrage. With 3,661 members across the state, LWVO and its 29 local Leagues and 4 at-large units are dedicated to empowering citizens and ensuring an effective democracy. The LWVO has members, the vast majority of whom are registered Ohio voters, living in all of Ohio's Senate districts and in 94 of Ohio's 99 House districts.

5.  As part of its mission to empower voters and defend democracy, LWVO aims to shape public policy, to educate the public about policy issues and the functioning of our democracy, and to protect and expand Ohioans' access to elections and their government. Individual LWVO

9E029E8E-BE61-4878-9ECD-57BB4443FEFE — 20210/9/22 12:34:38 -8:00 — Remote Notary

members invest substantial volunteer time in voter education, civic engagement, and voter registration.

6.     The gerrymandered general assembly map impairs LWVO's work by deterring and discouraging its members and other Ohio voters from engaging in the political process, thereby making it more difficult for LWVO to engage voters through its education, registration, and outreach efforts. For example, LWVO and its members have struggled to engage and activate self-identified Democratic voters in districts drawn in a manner that favors Republican candidates. When LWVO hosts forums for candidates in districts that are not competitive, it is difficult to get candidates from the favored party to attend.

7.     Concern about the prospect of a gerrymandered general assembly map has forced LWVO during 2021 to divert staff responsibilities, member efforts, and financial resources away from the full range of our mission, and instead to an advocacy campaign for fair districts. If LWVO and its members could rely on a nonpartisan process to produce fair maps and competitive districts, the diverted resources would otherwise be used for LWVO's traditional nonpartisan voter education services and programs.  This year, especially, the LWVO has had to turn its focus away from voter registration programs; reviewing Supplemental Process lists (lists of voters who are in danger of being purged) for accuracy;   educating the public to check and update their registrations; training Local Leagues on best practices for holding candidate forums and voter guide production;  conducting advocacy on current legislation including HB 294 and HB 387; and training volunteers to work with local boards of election, to be recruited as poll workers to help inform voters about new machines, poll locations and new protocols.

9E029E8E-BE61-4878-9ECD-57BB4443FEFE — 2021/09/22 12:34:38 -8:00 — Remote Notary

8.    Instead, LWVO has been forced to expend money and time advocating for fair districts. This advocacy by members and staff includes attending and testifying at multiple hearings across the state, mobilizing voter communications with elected officials, and organizing lobbying visits and rallies at the Statehouse in Columbus, among other efforts. During the 2021 redistricting cycle, LWVO helped sponsor a competition for citizens to draw redistricting maps that privileged good governance aims over partisan ends.   LWVO has deployed all of its staff members on redistricting-related work, hired a new ¾ FTE staff person to work strictly on redistricting, and hired a mapping expert to run the citizen map-drawing competition and analyze the Ohio Redistricting Commission map proposals as they became available.

9.    In addition, fundraising by LWVO for its traditional programs has suffered during 2021 due to the fair districts campaign. Financial supporters of LWVO have been forced to choose between supporting LWVO's traditional programs and funding the advocacy campaign for fair districts in 2021. As an example, LWVO's fundraising for Women's Equality Day is down roughly 40 percent in 2021 compared to 2020.

10.   I attended all of the hearings of the Ohio Redistricting Commission, starting on August 31.  No map was presented at that hearing.

11.   A map was first presented to the public at 10:00 A.M at the Commission's second hearing on September 9.  The Commission selected that map as its proposed plan that same afternoon, at a 2:00 P.M. session.  Both of these hearings had been announced with only one day's notice.

12.   When the Commission held its next meeting, at 10:30 am on Sept 15, Co-chair Cupp immediately moved to recess until 3 pm.  When asked by another Commission member to explain to the public what would be happening during the recess, he said that the Commissioners would be

9E029E8E-BE61-4878-9ECD-57BB4443FEFE — 2021/09/22 12:34:38 -8:00 — Remote Notary

recessing to "work" on the map. The Commission didn't return to session until nearly 13 hours later -- at about 11:15 pm. At that time, Senate President Huffman immediately introduced an amendment that revised several district boundaries in the Commission's proposed plan. The Commission passed the Amendment, 5-2, along party lines. Then, just after midnight, the Commission voted—again in a 5-2 party line vote—to adopt the Republicans' amended map, introduced less than an hour earlier, as the general assembly plan for the next four years.

13. Most of the Republicans' deliberations and other process took place behind closed doors, so the public could not see or hear it.

14. LWVO is suing on its own behalf as well as in its capacity as representative of its members, to seek state legislative maps that comply with the provisions of the Ohio Constitution which was amended by the overwhelming majority of Ohio voters in 2015 in order to put an end to the practice of partisan gerrymandering in our state.

FURTHER AFFIANT SAYETH NAUGHT.

Executed on September    09/22/2021   , 2021

Jennifer
Signed on 2021/09/22 13:11:21 -8:00

Jen Miller

Sworn to and subscribed before me this   09/22/2021   day of September 2021



My commission expires

NOTARY PUBLIC
STATE OF OHIO

**Theresa Michelle Sabo**
**Commission # 2016-re-619622**
Electronic Notary Public
State of Ohio
My Comm Exp. Nov 28, 2021

Notary Stamp 2021/09/22 13:11:21 PST

# Exhibit 3

# Washington Affidavit



**Washington - to be signed.pdf**

| | |
|---|---|
| DocVerify ID: | 84E3E182-F27D-457C-83DF-83B323ABA349 |
| Created: | September 22, 2021 07:10:07 -8:00 |
| Pages: | 3 |
| Remote Notary: | Yes / State: OH |

This document is a DocVerify VeriVaulted protected version of the document named above. It was created by a notary or on the behalf of a notary, and it is also a DocVerify E-Sign document, which means this document was created for the purposes of Electronic Signatures and/or Electronic Notary. Tampered or altered documents can be easily verified and validated with the DocVerify veriCheck system. This remote online notarization involved the use of communication technology.

Go to www.docverify.com at any time to verify or validate the authenticity and integrity of this or any other DocVerify VeriVaulted document.

**E-Signature Summary**

**E-Signature 1: Andre Washington (AJW)**
September 22, 2021 07:41:21 -8:00 [08218C01A4DF] [12.36.94.252]
AWashington@oapse.org (Principal) (Personally Known)

**E-Signature Notary: Theresa M Sabo (TMS)**
September 22, 2021 07:41:21 -8:00 [C57731A09F4D] [23.28.168.121]
tess.sabo@gmail.com
I, Theresa M Sabo, did witness the participants named above electronically
sign this document.



DocVerify documents cannot be altered or tampered with in any way once they are protected by the DocVerify VeriVault System. Best viewed with Adobe Reader or Adobe Acrobat.
All visible electronic signatures contained in this document are symbolic representations of the persons signature, and not intended to be an accurate depiction of the persons actual signature as defined by various Acts and/or Laws.



## <u>AFFIDAVIT OF ANDRE WASHINGTON</u>

STATE OF OHIO          )
                                  ) SS:
COUNTY OF FRANKLIN   )

Now comes affiant Andre Washington, having been first duly cautioned and sworn, deposes and states as follows:

1. I am over the age of 18 and fully competent to make this declaration. I have personal knowledge of the statements and facts contained herein.

2. I am a resident and elector of the State of Ohio.

3. I am the President of the Ohio Chapter of the A. Philip Randolph Institute ("APRI"), which is a Relator in *League of Women Voters of Ohio, et al. v. Ohio Redistricting Commission, et al.*, an original action brought in the Supreme Court of Ohio pursuant to Article XI of the Ohio Constitution.

4. APRI is a national organization for African-American trade unionists and community activists, and is devoted to political, social, and economic justice for all working Americans. While APRI supports a variety of charitable ventures unrelated to voting, the bulk of APRI's work is focused on voter education, registration, civic engagement, and outreach efforts.

5. APRI has eight local chapters in Ohio, and hundreds of members and volunteers statewide. We organize, for example, voter registration drives, educational events, and "get out the vote" activities. We do this through door-to-door canvassing, community events like group meetings and clam bakes, and virtual events.

6. In my role as President, I coordinate the local chapters and our statewide activities. It is my personal mission to help get everyone in my community registered to vote and involved in

1

84E3E182-F27D-457C-83DF-83B323A4BA349 — 2021/09/22 07:10:07 -8:00 — Remote Notary

DocVerify ID: 84E3E182-F27D-457C-83DF-83B323ABA349
www.docverify.com
Page 1 of 3    183B323ABA349

the political process, through my work with APRI, with other organizations, and in my private life.

7. During COVID-19, we have continued conducting voter outreach and education events, both in person and virtually. Sometimes we "piggyback" on other virtual events, by arranging for some time to talk about voter registration and the importance of voting.

8. We've partnered with churches all over the state, making announcements to ensure that voters understand how they can deliver absentee ballots, as well as to provide information on voting hours and locations. We attend church to talk to people, give brief presentations, and answer questions or take comments.

9. The gerrymandered general assembly map impairs APRI's work by deterring and discouraging its members and other Ohio voters from engaging in the political process. It makes it more difficult for APRI to engage voters through our education, registration, and outreach efforts.

10. At voter outreach events throughout 2021, both in person and virtual, APRI speakers and members have routinely heard variations of the same theme from attendees: "This shit don't matter." People are tired of feeling like nothing will change, and feeling like we can never get a fair district map where their votes will matter. As a result of the gerrymandered maps, it's very hard for our members to get people engaged.

11. The prospect of another gerrymandered map has also consumed APRI's time and resources throughout 2021, which we would otherwise have been able to spend on traditional voter registration and outreach efforts. If APRI's members could rely on Ohio's process to produce nonpartisan, fair maps with competitive districts, APRI would not have to divert those resources.

2

84E3E182-F27D-457C-83DF-83B323ABA349 — 2021/09/22 07:10:07 -8:00 — Remote Notary

DocVerify ID: 84E3E182-F27D-457C-83DF-83B323ABA349
www.docverify.com

Page 2 of 3    283B323ABA349

12. For example, our members have invested time and energy testifying at redistricting hearings. I personally had to cancel an APRI leadership meeting recently, because I needed to attend a Redistricting Commission hearing to testify about the unfairness of the proposed maps.

13. We have been forced to educate citizens and answer countless questions about the redistricting process, what "packing" and "cracking" are, why there is an initiative for fair districts and what its goals are, why their neighborhoods have been chopped up in unprecedented ways, and why a system has been designed that leads them to feel that their votes don't count.

14. When people are angry and upset about gerrymandering and similar issues, they frequently don't call their elected representatives because they can't get through or can't get an answer. Instead, they call APRI because we'll give them an answer. Responding to questions about redistricting also takes up a significant amount of our time and resources.

15. APRI is suing on its own behalf as well as in its capacity as representative of its members to seek state legislative maps that comply with the requirements of Ohio Constitution.

FURTHER AFFIANT SAYETH NAUGHT.

Executed on _____09/22/2021_____, 2021.        

Andre Washington

Sworn and subscribed before me this ____ day of _____09/22/2021_____, 2021.



N_____

My commission expires 11/28/21_____

3

DocVerify ID: 84E3E182-F27D-457C-83DF-83B323ABA349
www.docverify.com                                    Page 3 of 3    383B323ABA349

# Exhibit 4

# 8.31.21 Hearing Transcript

This transcript was exported on Sep 02, 2021 - view latest version here.

Robert Cupp (00:00):

... being time for, scheduled for the meeting of the Ohio Redistricting Commission, I will call the, uh, Commission's meeting to order. Um, first, uh, we will have a roll call. And will staff please call the roll?

Speaker 1 (00:14):

Co-chair Cupp?

Robert Cupp (00:15):

Present.

Speaker 1 (00:16):

Co-chair Sykes?

Vernon Sykes (00:18):

Present.

Speaker 1 (00:18):

Governor Dewine?

Mike Dewine (00:19):

Here.

Speaker 1 (00:20):

Auditor Faber?

Keith Faber (00:21):

Here.

Speaker 1 (00:21):

President Huffman?

Matt Huffman (00:22):

Here.

Speaker 1 (00:23):

Secretary LaRose?

LaRose (00:24):

Here.

Speaker 1 (00:25):

Leader Sykes?

This transcript was exported on Sep 02, 2021 - view latest version here.

Emilia Sykes ([00:26](#)):

Here.

Robert Cupp ([00:30](#)):

The quorum present, uh, we will meet as a full committee. Next item of business is the minutes. In your folders are the minutes of the last, uh, meeting. Um, does anybody need more time to, um, look 'em over? Or is there a motion to accept the minutes?

Male ([00:48](#)):

Motion to accept the minutes.

Robert Cupp ([00:50](#)):

Is there a second?

Male ([00:50](#)):

Second.

Robert Cupp ([00:52](#)):

It's been moved and seconded. Are there any objections to the minutes that are laid before you? Seeing none, the minutes are approved without objection. Um, we'll move on to adoption of the rules. At this time I would entertain a motion... Oh. Yeah, at this time I would entertain a motion to adopt the rules that have circulated, uh, to the members' offices, uh, yesterday, that are in the folders before you. Is there a motion to adopt?

Male ([01:20](#)):

I so move.

Robert Cupp ([01:22](#)):

It's been moved. Is there a second?

Male ([01:24](#)):

Second.

Robert Cupp ([01:24](#)):

It's been moved and seconded. Um, before we, um, take a vote on it, I just wanted to, um, sort of verbally, um, list some of the highlights, um, of the rules, if there are highlights to rules. Um, the, uh, on Rule 9, contains, um, the procedure for presenting a plan to the Commission. Um, anyone can submit a plan for consideration to the Commission. The plan should contain visual representation of the proposed boundaries, and the plan could be submitted, uh, through the website at www.redistrictingohio.org, or mailed to the Ohio Redistricting Commission, care of the Clerk of the Ohio Senate, to Ohio State House, Columbus, Ohio, 43215.

Robert Cupp ([02:19](#)):

This transcript was exported on Sep 02, 2021 - view latest version here.

Um, and Rule t- 10, the important points in Rule 10 are that any meeting of the Com- at any meeting of the Commission, a sponsor of a complete General Assembly, um, plan, may present the plan to the Redistricting Commission. The rule allows for a 10 minute presentation by the sponsor. Um, five minute comment period from the public. A majority vote of the Commission is required to allow the sponsor or public to, uh, exceed the time limits. Members of the Commission are, uh, permitted to ask questions of the sponsor, and members of the Commission may request expert testimony about the plan.

Robert Cupp (02:57):

Um, also there's a provision for amendments of the plan. Any member of the Commission may offer amendments to the plan. Um, the Co-Chairs may offer amendments on behalf of the sponsors who are not members of the Commission. Um, and, um, Commission is not required to vote on every plan, uh, presented to it, pursuant to the Constitutional, um, rules.

Robert Cupp (03:24):

Article, um, 11, um, on selecting a plan, is the Redistricting Commission's proposed General Assembly District Plan, which of course is different from a plan that is submitted, um, by an individual, uh, to the Redistricting Commission for consideration. The Redistricting Commission will select one plan to present to the public as its proposed General Assembly district plan for boundaries of the 99 House districts and 33 Senate districts. Any member of the Commission may move to, uh, select a plan presented to the Commission as the Commission's one proposed General Assembly district plan. And a simple majority vote of the Commission is required to select the proposed General Assembly, um, district plan.

Robert Cupp (04:09):

Uh, Rule 10 provides that there are three public hearings, um, after the Commission introduces its proposed plan, but before adoption of the plan. The Commission will hold three public hearings on three separate days to seek public input into the plan. And, uh, members and Co-Chairs, uh, on behalf of the sponsors, may move to amend the plan at any stage... amend the plan at this stage, as, as well.

Robert Cupp (04:35):

And then, finally, adoption of the plan by the Redistricting Commission at the next meeting following the three hearings, Redistricting Commission may vote to adopt the proposed plan. Uh, to reiterate, the 10 year map requires affirmative votes of four members, including at least two members of the Commission who represent each of the two largest political parties in the General Assembly.

Robert Cupp (04:59):

The four year map, um, if the Commission is unable to achieve their requisite vote for a 10 year map, the Commission may adopt a four year map by a simple majority vote of the Commission. So those are some of the highlights that are contained in the rules, uh, before us.

Robert Cupp (05:18):

Um, are there any objections? We had a motion and second. Any objections to adopting the rules? Well, seeing none, the rules of the Commission will stand as adopted without objection.

Robert Cupp (05:32):

This transcript was exported on Sep 02, 2021 - view latest version here.

Um. All right. We are now moving in, on the agenda, to other business. Um, I think first we need a motion, uh, that the expenses incurred by the Commission members and their designated staff for mileage and supplies in conjunction with the regional hearings held August 23 through, uh, 27, 2021, be reimbursed with the approval of both Co-Chairs. Is there a motion for that?

Male (06:06):

I would so move.

Robert Cupp (06:10):

Is there a second?

Male (06:10):

Second.

Robert Cupp (06:11):

It's been moved and seconded. Any objections? Without objection the motion, um, will pass. Um, the col- the Co-Chairs' office will provide further information at the conclusion of the meeting for those who need reimbursement.

Robert Cupp (06:28):

All right, um, is there, uh, further business to come before, uh, this meeting of the Ohio Redistricting Commission?

Vernon Sykes (06:34):

Mr. Chair?

Robert Cupp (06:35):

Mr. Co-Chair.

Vernon Sykes (06:37):

Mr. Chair, I'd like to present a map from the members of the Ohio Senate Democratic Caucus. Would the staff please pass out the materials that are being submitted to the Commissioners?

Vernon Sykes (06:59):

Before you is map that is our est- that in our estimation not only meets our constitutional requirements, but follows the spirit of reform that Ohio voters have demanded of us. We heard loud and clear from the public last week during our road show that we need to meet our deadlines, have an open and transparent process, and share maps with the public. I've asked Randall [Routt 00:07:30], Minority Caucus Policy Advisor, to be here today to briefly summarize the map and how it was crafted. Before Randall gives the summary, I'd like, uh, the members of the Commission and the public to know that this map has not been vetted or viewed by any outside groups or organizations. This is a starting point and the members of the Senate Democratic Caucus urge the members of the Commission and the public to provide feedback and suggestions. I'm eager for the public discussion of maps to begin. I look forward to other members of the Commission submitting maps or offering amendments to our map.

This transcript was exported on Sep 02, 2021 - view latest version here.

Vernon Sykes (08:13):

At this point, Mr. Routt, would you give your overview?

Randall Routt (08:19):

Thank you, Senator. My name is Randall Routt. I'm a Minority Caucus Policy Advisor for the Senate Democratic Caucus. Um, I know many of your for a number of years working in the Senate. Co-Chair Cupp, Co-Chair Sykes, and members of the Ohio Redistricting Commission, thank you for the opportunity to speak about the redistricting plan as presented to you today. I'd like to take some time to walk you through how this plan was generate in compliance with, and the spirit of, constitutional reforms to the Ohio Redistricting Process.

Randall Routt (08:56):

To, to draw the House map, we first looked at the largest county in the state by population. Franklin County, as required by the Ohio Constitution, Franklin County has a population of 1,323,807, which allowed us to create 11 district within it. We drew the remainder of the county within one additional district. We then repeated the process for the other 21 counties in the state with more than one House ratio representation. In other words, for the other 21 counties in Ohio, whose populations are large enough to contain more than one House district, we did so from the largest county to the smallest, resulting in the creation of the first 77 districts.

Randall Routt (09:55):

Two additional districts encompassing entire counties, Richland and Wayne, were then created. Finally, the remaining 20 districts were created-

PART 1 OF 4 ENDS [00:10:04]

Randall Routt (10:03):

Finally, the remaining 20 districts were created by combining whole counties, municipalities and townships. As you will see, our House map fully complies with all constitutional redistricting requirements. It does not illegally split a single contiguous municipality or township in any district in the state. It splits counties as little as possible and only allow for population requirements. Only 12 of 64 counties with one, listing one House ratio representation are split between two districts. Our map also makes zero illegal community splits.

Randall Routt (10:43):

We used the same process for the center districts, each of which much encompass three house districts. We started the process with the four 20 ... With the 24 counties in the state comprised of at least one house district, which resulted in the creation of the first 28 Senate districts. We then drew the remaining five districts by minimizing county splits. In our map, only seven of 80 counties with less than one Senate ratio of representation are split between two districts.

Randall Routt (11:15):

In regards to representational fairness. The Ohio Constitution, Article 11, section six, also requires that districts closely match the voter preferences for candidates as expressed in statewide partisan elections of the past decade. Or as we heard from last week's testimony, representational fairness. In short, our

This transcript was exported on Sep 02, 2021 - view latest version here.

general assembly districts should roughly match the way Ohio voters have indicated their preferences over the past decade.

Randall Routt (11:47):

We calculated this in two ways. First, we used data from the 2021 Ohio Common Unified Redistricting database to determine the total democratic and republican vote share. We then looked at the simple vote totals of each eligible election, each partisan statewide election from 2012 to 2021, which resulted in a ratio of 45.9% democratic, and 45 point, 45 ... 54.1% republican voter split over 10 years.

Randall Routt (12:24):

For the purpose of map drawing, this would mean that a map would most closely match the call of Ohio voters would include 45 likely democratic, and 54 likely republican seats in the House of Representatives, and 15 likely democratic and 18 likely republican seats in the Senate. Our House ma-, our House map includes 44 likely democratic districts and 55 likely republican districts. Our senate map includes 14 likely democratic districts and 19 likely republican districts.

Randall Routt (12:57):

K-, on th-, on the issue of compactness. As you heard repeatedly last week in testimony, the Ohio Constitution also requires that general assembly districts are compact and kept communities of interest within the same district. It's important to note that many subdivisions are irregularly shaped and are simply not contiguous. The map before you minimizes these community splits to the greatest extent possible. You know, some of these districts we see like in Cincinnati, they have this little tail going in Cincinnati, that's part of the city. So, we had, we tried to keep the city together there.

Randall Routt (13:31):

In summary, these map plans adhere to the spirit of reforms passed overwhelmingly by the voters of Ohio and with, as with federal law, including provisions concerning the protection of minority voting rights. It's merely a starting proposal by the members of the Senate democratic caucus. No outside group or organization have reviewed the maps before, before you in advance of our submission to the commission and the public today. In addition to my testimony, I'm providing more detailed description of our plan and additional materials. I'd be happy to take any questions. And we also have our consultant, Chris Glassburn with Project Govern here to help answer any questions for you as well. Thank you very much for this opportunity.

Robert Cupp (14:16):

All right. Thank you. Thank you for your presentation. Are there questions from members of the commission, uh, for the witness? I see none. Thank you.

Randall Routt (14:27):

Thank you.

Robert Cupp (14:28):

Um, is there any member of the public that, uh, wishes to testify at this time on, on this proposal? All right. Seeing none, that will, um, stand as, um, uh, for consideration of the proposed, uh, map. Um, is there any further ... [inaudible 00:14:55] if you want to go ahead, sen-, Senator Sykes.

This transcript was exported on Sep 02, 2021 - view latest version here.

Speaker 2 (14:58):

[inaudible 00:14:58].

Robert Cupp (14:58):

Oh, that's right. Uh, Leader Sykes.

Senator Sykes (15:04):

Thank you, mister ... Thank you, Mr. Chair. Uh, to the chair, to the committee, uh, last week I asked a question when we were in the Lima stop about when we could expect a map from the commission, uh, so we could start having the public hearings and, um, under our responsibility in Article 11, section three, it says that, "The commission shall put forth a map, uh, before the deadline," in subsequent paragraphs. The deadline is tomorrow.

Senator Sykes (15:29):

Uh, my question to the co-chairs and, and perhaps to the remaining members of the committee is, again, what is the pleasure of this committee and, and this commission in putting forth a commission map, uh, by which we can all talk about, or the members of the public can communicate with us about. We heard hours upon hours of testimony of people asking and requesting for that transparency, and the ability to comment on the maps, and so I would like us to discuss at some point, or have an answer before we leave today as to when the commission will put forth a map that people and members of the public can comment on?

Robert Cupp (16:14):

Um, other members may have, uh, some other comments, but, um, the, uh, a map, uh, is, um, is, um, being developed, um, carefully, uh, with regard to the, uh, data and the constitutional requirements. It is, um, uh, unlikely to be available, uh, before September, uh, 1st. Um, had the census data arrived on time, um, probably would've had, uh, a map, um, uh, weeks ago. Uh, but because this is a new process, and one which requires a fairly, uh, careful, um, uh, compliance with new constitutional requirements, um, I do not see a, a map that, that I'm avail-, under, uh, aware of that, that would, uh, be coming before the commission before September 1.

Robert Cupp (17:09):

Um, and that I think would also fall within the constitutional, uh, provision that there is a fallback if a map isn't adopted, uh, by September 1 that there is a, an additional process to go through in order to develop a, a map. So, um, I think in this case, uh, being careful and deliberate, uh, is a virtue, uh, when we're doing something, um, this significant, which will have an impact, uh, for, uh, hopefully, uh, at least a decade.

Senator Sykes (17:42):

[inaudible 00:17:42].

Robert Cupp (17:42):

Uh, Leader Sykes.

Senator Sykes (17:44):

This transcript was exported on Sep 02, 2021 - view latest version here.

Thank you, uh, Mr. Chair. Appreciate that response and I, I, I do hope we are thoughtful and consider and work towards a 10-year map. Uh, you did refer to, uh, maps being drawn currently using the data, it being delayed. I can only speak for myself in this one, I have not been privy to any of those conversations. And so, again, my question that I mentioned from last week, which I am carrying over this week, who on this commission is participating in that? I am, I am not aware of such activity and have not been contacted about, uh, the data that you are looking at or considering in these maps that the commission, uh, that I am a member of, is considering to put forth. So, is this a ... So, I guess I'm, I'm re-stating the question from last week. Is this a commission map by the majority party? Is it just by the legislative leaders? Is it just through public and legislative leaders? Uh, and what can I expect in terms of participating in that, if anything at all?

Robert Cupp (18:43):

Well, thank, thank you for the question. But as you know, um, maps are proposed by, uh, any, anyone, any member of the public. In fact, there's a contest I believe to draw a map and the deadline is somewhere after September 1st, so the commission itself is not, uh, drawing a map, but we would expect maps to be presented to us for the commissions' consideration, such as the map, uh, that was presented here today.

Senator Sykes (19:11):

[inaudible 00:19:11], Mr. Chair.

Robert Cupp (19:13):

Uh, you may proceed.

Senator Sykes (19:16):

Thank you. So, if I could read for you Article 11, section C, uh, paragraph two, which says, "The commission shall release to the public a proposed general assembly district plan for the boundaries of each of the 99 House repres-, of Representative districts and 33 Senate commissioned districts. Uh, the commission shall draft the proposed plan in the manner prescribed in this article." Uh, so I think that's pretty clear that it is the commission who is responsible for putting forth a plan, uh, to ... And as it subsequently says, "For it to be considered," to have those three hearings that we just voted for in the rules, in Rule 9. Uh, and again, I would just like to for the third or fourth time, inquire as to when as a commission can we expect this-

PART 2 OF 4 ENDS [00:20:04]

Senator Sykes (20:03):

... or as to when, as a commission, can we expect this, or if we don't have an answer to that at this very moment, perhaps we can set a date on our next commission meeting and figure this out.

Robert Cupp (20:13):

I do not know when other maps are going to be presented, uh, offered to the commission for consideration, but we obviously, um, have a time deadline ticking of September 15th with a lot of procedure, uh, before that, which, uh, I would expect, uh, to be, to be met. So I don't have any timeline

This transcript was exported on Sep 02, 2021 - view latest version here.

here today. But certainly, uh, willing to work with the, with the co-chair and members of the commission to, uh, begin to, to set those timelines.

Robert Cupp (20:43):

Senator Sykes, co-chair Sykes.

Senator Vernon Sykes (20:46):

Mr. Co-chair, uh, uh, in addition, uh, uh, one of the main reasons we put forward the map today is to indicate that maps can be, uh, presented. Uh, and, uh, we're hopeful, uh, in a talk with you just, just now, uh, hopeful that we're going to be able to put a schedule together, uh, so that we will have adequate time and the public will have adequate time, will have several hearings, not maybe just three hearings, but will have several hearings, uh, so that we can, uh, meet our deadline and hopefully have a bipartisan plan.

Robert Cupp (21:26):

We did have a conversation and that is certainly my goal. And I believe, um, not want to speak for other members of the commission, but I would think that's a goal that all members have. Um, chair recognizes, Senator Huffman.

Senator Matt Huffman (21:40):

Uh, thank, thank you, uh, co-chair Cupp. Um, and, and I guess, uh, it's my understanding there, there's sort of a, a presentation which anyone can present in the Senate, Senate Democratic Caucus, uh, showed that they were the, uh, uh, quickest to execute on this. Um, I, uh, unfortunately, uh, however, I just learned about this effort a few minutes ago. Um, and, uh, there's already been some analysis. (laughs). Uh, apparently there are some constitutional violations in this map and my staff will get with, um, uh, uh, Senator Sykes and talk about that.

Senator Matt Huffman (22:20):

Um, and, uh, uh, section five of the constitution has to do with incumbent senators and who have a three and a, in this case three and a half years remaining on their term and the protection that those senators have, and those would be frankly, Senator Sykes and myself, and all senators who are in an even numbered year. Um, and those apparently were not taken into account. And I'm not prepared to discuss that today because I, I'd rather have our version of, um, of the Senate Democrats, uh, expert here today to, to talk about that.

Senator Matt Huffman (22:58):

Um, I, I guess I'm a little, I'm not sure if the, the De- House Democrats are not going to present a map if senator, if leader Sykes is not involved in that, or maybe that's a separate effort. But it was, it was my expectation that ultimately there would be not only a Senate Democrat map and a Senate, or excuse me, a House Democrat map, or perhaps combined, but, you know, we could have four separate caucus legislative maps, and then multiple maps presented by the public, through who- whoever that would be.

Senator Matt Huffman (23:30):

And that, and I think the purpose of the introduction language is if the commission is, if the commission is going to adopt a map, there needs to be a hearing on that map rather than in a separate time when

This transcript was exported on Sep 02, 2021 - view latest version here.

it's introduced, unlike past procedure. Because in the past, the former apportionment board would have a hearing pass at all in the same hearing.

Senator Matt Huffman (23:54):

And what we've done with the rules today, if, if folks don't realize is the constitution requires an introduction and one hearing. What we've done today is a, uh, in addition, addition to the introduction three, two additional hearings in different parts of the state, not required by the constitution, but collectively all same, seven members of this commission agreed to have two additional hearings. And the point here is that we're getting away from the way this was done, uh, in the past. It won't simply be meeting vote and it's over with, there will obviously be considerable, uh, hearings on this. And those hearings may change what the commission wants to do, uh, in, in one way or another.

Senator Matt Huffman (24:36):

So, um, I appreciate the effort, uh, by the Senate Democrats and, and I'm, uh, you know, the, I think this is the kind of discussion that, uh, Senator Sykes and I anticipated when we introduced this in 2014. And then, uh, with Senator Faber I should add as the president of the Senate at the time, and then it's Senator Sykes, then representative Sykes, and I campaigned on in 2015.

Senator Matt Huffman (25:02):

Um, so I, I would expect, in addition to this map, there will be other maps, whether there's a House Democratic map separately, or perhaps not. Um, but, you know, we look forward to those other presentations and then ultimately for the one introduction that the constitution calls for.

Robert Cupp (25:23):

Chair recognizes, um, Auditor Faber.

State Auditor Keith Faber (25:25):

Tha- thank you. I, I just, I want to make sure I'm clear. And I, I, I thought I was until, until the discussion just a second ago. Um, Senator Sykes in the House, the, the Senate Democrats did not intend for us to vote on this map today because we haven't had the public hearings and we don't have the time to have the three public hearings prior to the, the first date. It was just a starting point, the, the way I understood it was just a starting point, first off take a look at it and start seeing some concepts as we start working down this process. Wa- was that the intent or were w- was this expected to be something that we could get done by by, uh, September 1st?

Senator Vernon Sykes (26:04):

Um, Mr. Auditor, that is the intent.

State Auditor Keith Faber (26:07):

Thank you. Not, not to have it done by September 1st, just to start the discussion, and, and a benchmark to start from.

Senator Vernon Sykes (26:13):

This transcript was exported on Sep 02, 2021 - view latest version here.

We are not trying to put any, any impediments in trying to meet the deadline of September 1st. That's the constitutional provision that the voters voted for. We still have that obligation. And so we're not trying to skirt that. We're just trying to start the process of reviewing maps.

Senator Sykes (26:33):

[inaudible 00:26:33].

Robert Cupp (26:35):

Chair recognizes, um, representative Emilia Sykes.

Senator Sykes (26:38):

Thank you so much, Mr. Chair. And, and I agree this is a great discussion, I'm glad that we are having it. Um, again, uh, uh, the responsibility of this commission is to put forth a map and it is laid out in very plain language in article 11, section three, it is in the second paragraph. The commission shall release to the public, a proposed general assembly plan for the boundaries for each of the 99 house of representative districts and the 33 senate districts. The commission shall draft the proposed plan in the manner prescribed in this article.

Senator Sykes (27:14):

I think it is very clear that it is the responsibility of the commission. Uh, it is not say that is responsibility of the Senate Dems or the House Dems or the Senate Republicans, or the House Republicans or the secretary of state or the governor or the auditor of state, it is the commission. And so again, I would like to ask the question, when will the commission release to the public, a proposed general assembly plan for the boundaries for each of the 99 house of representative districts and the 33rd senate districts?

Senator Matt Huffman (27:49):

Mr. Chair.

Robert Cupp (27:50):

Right now-

Senator Matt Huffman (27:50):

And, and I know that question is addressed to the two chairs, but, uh, I mean, it's very possible that, and, I think, uh, leader Sykes is, uh, that's accurate reading directly from the constitution. Um, I think what the constitution says is the commission needs to introduce a map collectively and the public needs to have at least one hearing on the map. We've added two today in the rules for additional activity. And what that means is the commission, at least, uh, by four to three vote, uh, must agree that they're going to introduce a map. And we may never get to that point, or we may never get to that point by September 15th. Um, and there's a lot of reasons for that.

Senator Matt Huffman (28:38):

But it, it's, may simply be that, uh, only two, one or two or three people agree with a particular map for introduction. Now, I think probably eventually we'll get to something, especially if we have the kind of dialogue, uh, that the Senate Democrats talked about, uh, today in their presentation that chairman Sykes talked about.

This transcript was exported on Sep 02, 2021 - view latest version here.

Senator Matt Huffman (28:59):

So, um, I'm, I'm optimistic that we can have a map, um, that the commission will introduce, uh, in time to do what we asked today in the rules, which is three. And that, that, um, the constitutional requirements will allow us to have, uh, a ten-year map. Um, but, um, so far, I don't think anyone has presented a constitutional map. Uh, you know, we, we are, we, mean, we're the Senate Republicans, uh, are gonna, are working hard to try to do that and it's extraordinarily difficult. We, as we, as I said the half of the senators, uh, in the general assembly are protected, um, over the next three and a half years, and that needs to be taken into account. That's not part of what changed in 2014, by the '15, uh, that's been in the constitution since 1967 and has been a bugaboo for mapmakers ever since.

Senator Matt Huffman (29:55):

So I, I'm, I'm convinced that there will be something that at least a majority of the commission will allow to be, uh, consider...

PART 3 OF 4 ENDS [00:30:04]

Senator Matt Huffman (30:03):

At least a majority of the Commission will allow to be, uh, considered. I, I encourage all four caucuses, uh, to, uh, do that work and make a presentation for consideration and, and any of the statewide office holders, uh, also, if they have, if not a full map, the suggestions on, on how this thing should be.

Speaker 3 (30:23):

Chair.

Robert Cupp (30:23):

Uh, Chair recognizes, um, Representative Leader Sykes.

Senator Sykes (30:28):

Thank you, Mr. Chair. I think that, uh, President Huffman and I are explaining very clearly how lawyers manage to keep themselves employed by arguing two sides of an argument.

Robert Cupp (30:39):

(laughs)

Senator Sykes (30:39):

Um, and I would, uh, say for the record, that I don't believe that it says we should only have one hearing. That we should maintain the three hearings at no matter the point in which the Commission maps, the maps that shall be produced by the Commission, are being put forth. Uh, but again, I would like to ask the question, at what point will the Commission offer these maps? Um, and let me re-up a previous question. The maps that, uh, the Co-Chair previously, previously discussed as being worked on, looking at data. At what point will the remaining members of the Commission have an opportunity to weigh in on those, uh, on those details as they're being considered?

Robert Cupp (31:23):

This transcript was exported on Sep 02, 2021 - view latest version here.

Obviously, when a map is presented, members of the Commission have an opportunity to, to weigh in. Uh, um, Chair recognizes, um, Secretary of State Larose.

Frank Larose (31:32):

Uh, Mr. Co-Chair, I appreciate the opportunity to speak. And I, I think that, I, I, I want to make sure that we're not talking past each other in some ways. Because I think here, as friends and colleagues, we, we, we want the same thing. We're, we're working through a process for the first time. What comes to mind to me is three words: situation, mission and execution. Now this comes from... I went on a run a couple days ago. That's when I do my best thinking. These are three words that come from my military background: situation, mission and execution. So I was trying to think through this process in that sort of way that I was taught to think through mission planning.

Frank Larose (32:06):

I want to talk through that just briefly. Situation: We did something remarkable, as a state, in 2015 and 2018. We created a new and hopefully, balanced process for creating district lines for both congressional and state legislative districts. Many of us voted on that. Many of us worked very hard on that. I can tell you I did, personally, and, uh, and, and many of you remember that I came into the legislature in 2011, coming from Summit County, uh, really dead set on we needed to change this process.

Frank Larose (32:33):

Uh, part of that situation is that it requires bipartisan compromise to reach that 10-year map, compromise leading to consensus to reach that 10-year map. We know that 70 and then 75% of Ohioans voted to approve that process, essentially charging us with this important mission. Now we were thrown a curve ball. We were given an explicable delay by the U.S. Census Bureau that has put us in a very untenable situation. We know how complex this is. And that's why I, I, really, my hats are off to the, uh, to the senate Democrats for getting this process done so quickly because it is hard. I think that sometimes it's over-simplified in the public eye of, "Why don't you guys just sit down with your state road map and your pencils and get this done?" Well, the, the work of drawing shape files in a GIS system that complies with all of these requirements is en- enormously complex. And if we had gotten the Census Bureau in the spring when we should have, yeah, we would've been well into this process of compromise and finding the consensus between the, the two sides to get that done.

Frank Larose (33:31):

Um, we saw a map today. And again, I thank the senate Democrats for doing that. That's a starting point, as they said in their, in their testament. It's a starting point for negotiation. Candidly, it sounds like, uh, there are work being done by Republican legislative caucuses to present a map. They're just not done yet. And as soon as they are done, then that'll be presented for our consideration. And that's, that, that's the, the, where the mission part comes in.

Frank Larose (33:55):

I, I want to be clear. I want a 10-year map. I hope, I sincerely hope that' the desire of, of all my colleagues. And I, I've heard some speculation about, you know, "Well, one side or the other is just resigned to a four-year map." I certainly hope that's not the case. Because the, the mission that the people of Ohio gave f- for us was to, was to create a 10-year map.

This transcript was exported on Sep 02, 2021 - view latest version here.

Frank Larose (34:14):

Um, we know that part of this situation is that three Republicans could vote no on the map and it'd still pass. But if any one Democrat votes no on the map, it's not a, it's not a 10-year map. And so that means, you know, Leader Sykes and Senator Sykes, th- th- that, that creates a, a unique scenario there where we need to work together if we're going to reach a 10-year map.

Frank Larose (34:33):

So here's th- the execution part, um, the, the mission accomplishment part. We've seen one map today. Hopefully soon... And I hope we don't be unduly hasty about this... But soon, we can see some other maps. And at that point, when both sides or parties or people groups, whoever, put out their proposals, then we can start the compromise. And compromise is not a failure. It's how statesmen and women solve problems. And it's what leads to consensus. So that's when the compromising and the consensus building can begin. And we will get to that, hopefully, very soon. So that then we can adopt a Commission map and then have our three public hearings. And then finalize that and create a 10-year map that complies with both the spirit and the letter of the Ohio Constitution. That's my sincere hope. And I've got to tell you, all of you, that I am willing and eager to work with any one of you to make that, uh, mission, uh, successful.

Speaker 3 (35:26):
Mr. Chair.

Robert Cupp (35:28):
Chair recognizes, uh, Representative Leader Sykes.

Senator Sykes (35:31):
Thank you, uh, Mr. Chair. And I, I appreciate all of the commentary and the lectures, um, and the responsibility. I think we all understand our, our task at hand. Uh, but the reality is, there is no map put forth by the Commission, which is required by the Constitution that the minority party members can vote yes or no on. And my question still remains, at what point and what is the process for us to do that? I think that deserves an answer and a clear answer. Um, and if we can't get an answer today, then I propose we set forth, a- another meeting of this Commission to, to move forward and figure this out.

Robert Cupp (36:12):
Um, well I would disagree a bit that you haven't received an answer. I think you got an answer three or four times already. Um, and there will be another meeting of the Commission, you know, fairly shortly to, um, to, to commence all that, that, that process. And I will be working with the Co-Chair to set those, set those future meeting dates.

Robert Cupp (36:33):
All right, is there, is there further business to come before the Commission today? Hearing none, is there-

Speaker 4 (37:32):
One-

This transcript was exported on Sep 02, 2021 - view latest version here.

Robert Cupp (37:33):

Oh, whoops, whoops, whoops.

Speaker 4 (37:35):

Uh, I will be working with the Co-Chair, uh, to, uh, come up with a schedule as soon as possible.

Robert Cupp (37:42):

We will be working very diligently to have that schedule set. And working with members of the Commission to make sure they're available.

Robert Cupp (37:50):

All right, with that, is there any further, um, business to come before the Commission today? Hearing none, without objection, the, uh, meeting will be adjourned. Hearing no objection, the meeting is adjourned.

PART 4 OF 4 ENDS [00:38:05]

# Exhibit 5

# 9.9.21 Morning Hearing Transcript

This transcript was exported on Sep 09, 2021 - view latest version here.

| Vernon Sykes: | ... of the Ohio Redistricting Commission. Will the staff please call the role. |
| --- | --- |
| Speaker 1: | Co-chair, Speaker Cupp. |
| Cupp: | Present. |
| Speaker 1: | Co-chair, Senator Sykes. |
| Vernon Sykes: | Present. |
| Speaker 1: | Governor DeWine. |
| DeWine: | Yes. |
| Speaker 1: | Auditor Faber. |
| Faber: | Present. |
| Speaker 1: | President Huffman. |
| Huffman: | Here. |
| Speaker 1: | Secretary LaRose. |
| LaRose: | Here. |
| Speaker 1: | Leader Sykes. |
| Sykes: | Here. |
| Vernon Sykes: | Well, the quorum present [00:00:30] will meet as a full commission. At this time, the commission will hear public testimony from sponsors of submitted plans and from members of the public on those plans in accordance with the commission rules, uh, in the, in article 11 of the Ohio Constitution. Under the rules of sponsor of a complete statewide general assembly plan may present their plan to the redistricting commission for up to 10 minutes.

We will not be taking testimony on incomplete [00:01:00] plans or congressional maps. A member of the public may testify on a redistricting plan before the commission for up to five minutes. Should the commission itself vote to introduce a plan at the hearing or a subsequent hearing, a commission, the commission will hold three additional public hearings around a state on separate days, uh, on the introduced plan. We will now begin with our first witness [00:01:30] here today. Please state and spell your name for the record. And a- |
| Huffman: | I'm sorry, go ahead. |

This transcript was exported on Sep 09, 2021 - view latest version here.

| Vernon Sykes: | And also please indicate that if you're testifying as a sponsor of a plan or a member of the public on which, uh, you're talking about particular plan. |
| --- | --- |
| Huffman: | Mr. Co-chair. |
| Vernon Sykes: | Yes. |
| Huffman: | Um, I would, uh, pursuant to rule 10 of the commission, I would like to present to the commission a proposed general assembly district plan for all 99 seats of the Ohio House of Representatives and all 33 seats [00:02:00] of the Ohio Senate. And, uh, for the commission's benefit, I've asked, uh, Mr. Ray DiRossi and Blake Springhetti to present the substance of the proposed plan, and they're here today to do that. And, uh, for the record, uh, Mr. DiRossi, uh, serves as a caucus staff to the Senate Majority Caucus. Mr. Springhetti serves as the caucus staff for the House Majority Caucus. |
| Vernon Sykes: | Thank you. At this time, we are ready for the presentation. |
| | (Silence) |
| Ray DiRossi: | Good [00:03:00] morning. |
| Vernon Sykes: | Good morning. |
| Ray DiRossi: | Um, [00:03:30] I am Ray DiRossi and as was mentioned, I'm from the caucus staff for the Senate Majority Caucus and my colleague Blake Springhetti, caucus staff for the Ohio House Majority Caucus. Um, co-chairs and distinguished members of the Redistricting Commission, it's great to be with you today. |
| Audience: | [inaudible 00:03:44]- |
| Audience: | Your mic is not working. |
| Ray DiRossi: | Uh, spelling of names, Ray, R-A-Y, DiRossi, D-I-R-O-S-S-I, Blake Springhetti, B-L-A-K-E, Springhetti, S- [00:04:00] P-R-I-N-G-H-E-T-T-I. |
| Vernon Sykes: | Thank you. |
| Ray DiRossi: | Is that, on the volume, is that- |
| Vernon Sykes: | Yes, I [crosstalk 00:04:07]. |
| Ray DiRossi: | ... good? Better. |
| Vernon Sykes: | Thanks a lot. |

This transcript was exported on Sep 09, 2021 - view latest version here.

Ray DiRossi:    Thank you. We are pleased to present for you a consideration, a proposed general assembly districting plan for 2022 through 2032. This is the culmination of a drastic- drastically expedited process, significantly delayed by the lack of timely census data. The receipt of the census data, 134 [00:04:30] days after the federally required April 1st delivery date made this process more challenging than usual. Having previously been through this process, I want to personally thank all of the citizens of the state who took time to testify at the regional hearings and all those who took time to submit thoughtful plans. Blake and I know the time and commitment it takes to produce a complete plan, and I know my counterpart and the Senate Democratic Caucus, Randall Routt would also acknowledge this.

[00:05:00] Ohio's population from the 2010 census was 11,536,504. Ohio's population under the 2020 census is 11,799,448. This represents an increase of 262, 263,000, or about 2.28%. And while that percentage growth over 10 years might appear small, the growth or loss of population [00:05:30] in our states, 88 counties has varied and certainly not evenly distributed across the state. Of the state's 33 current Senate districts, 13 are outside the allowable 5% population deviation. In the House, 46 districts are currently either overpopulated or underpopulated. This simple fact, um, of either being underpopulated or overpopulated will require modification simply because we do no longer comply with the population requirements of the Ohio Constitution.

[00:06:00] Population shifts are also demonstrated by the change in county populations. For example, under the 2010 census, the population of Cuyahoga County dropped by roughly 114,000 persons. Under the 2020 census Cuyahoga's population only I dropped by about 15,000 persons. Franklin County has continued its growth trend as has Delaware and Warren counties. Also noteworthy is that Hamilton County grew by over 28,000 people [00:06:30] this decade.

Generally, the Appalachian region experienced population loss over the decade, an interesting fact for your consideration. If you start in the Northeast corner of the state in Ashtabula County and listed each county along the Eastern and Southern border, border of the state that lost population, you would up, end up counting 15 counties in a row that lost population, and not until you reach Claremont County, one county shy of Hamilton County in Cincinnati [00:07:00] would you find a county with a positive growth rate over the last 10 years.

Blake and I want to share some observations with you about the geography of the state. While most of Ohio's 88 counties are relatively square or rectangular, the physical boundaries of Ohio cities, villages and townships are far from pristine. While some townships, mainly in the rural, the rural counties of the state are still square-like, the boundaries of our cities and incorporated areas can take on [00:07:30] very odd shapes. And we do have some examples to show, uh, and they are included in the packet that was provided to you. And so we'll have those on the screen and also in, in the packet.

This transcript was exported on Sep 09, 2021 - view latest version here.

So the point I wanna make here, and we'll go through these pretty quickly, um, is that the, um, the geography and the irregular geography of political subdivisions or jurisdictions in the state can lead to districts that take on irregular shapes, especially if one of these jurisdictions with an odd shape is on the outer [00:08:00] boundary of a district that is proposed. Um, so the first example on this, on the screen is in Stark County. We have three political subdivisions, three cities, uh, Canton, Massillon and Canal Fulton. And you can see that they are far from, um, regular shaped or square shape like some of our townships in other cities that are, take on more general shapes. They also have, you could call them tales, but they're sewer, sewer systems and canal systems that are part of the political subdivisions themselves. [00:08:30] And so when we're drawing districts, those boundaries have to be maintained or else you are splitting the jurisdiction, something that we are tr- striving not to do.

Uh, the next example is in Licking County. So what we have on the screen here is the collection of three cities put together. This is Granville, Heath and Newark, and we've just shown you the map of just the geography of the state, but now we're gonna add the county subdivisions lines, the township lines, and also the city [00:09:00] lines, and you can see that that shape is actually the perfect outline of those three cities. So, um, and I do, we do have one more example, but again, the point we're making here is that the geography of the state is challenging and the geography of the state takes on irregular shapes itself.

Here in Franklin County, um, where the geography is the most challenging for anybody who has looked at a map, what we are showing in green are the political subdivisions that are not Columbus, Ohio, and there, there [00:09:30] are a number of them and you can see that they ain't completely circumscribe or in circle, um, Columbus does those jurisdictions. And then we have the City of Columbus, which is shown in pink and you can see it protrudes north into Delaware County. It also protrudes east and, um, I don't believe it has penetrated the southern border yet, but due to annexation policies that may not be far off, but you can see this geography presents us with significant challenges in drawing districts and trying to maintain the [00:10:00] boundaries of political subdivisions and having them take on irregular shapes.

This is a map of the townships of Franklin County. So now we've removed all of the cities and municipal corporations in Franklin County, and now you're looking at the remnants of townships. And as you can see, a number of township, Franklin Township, Mifflin Township, uh, Prairie Township, other townships are somewhat appear shattered into a number of pieces. I, [00:10:30] I think by last count, Franklin Township was in over 25 pieces non-contiguous distinct pieces. So this also pres- presents significant challenges when, in drawing a district down to the level of detail that the constitution requires. Thank you, Blake. Very, helpful.

County splits. So redistricting this year is occurring for the first time under the historic amendments to our state constitution approved by the voters in 2015.

This transcript was exported on Sep 09, 2021 - view latest version here.

These amendments provide very prescriptive, detailed, but neutral [00:11:00] rules for drawing State House and Senate districts. The plan that we are presenting today fully complies with the requirements imposed by the state constitution. We want to highlight a few of those requirements for you.

The constitution requires us to start with the largest counties in the state and proceed to the smallest counties of the state with population greater than 1.05% of one House district ratio of representation. The constitutional limits determine how [00:11:30] counties can be divided depending on their population. I wanna take a few minutes and discuss Northeast Ohio, and I will apologize in advance, uh, for the brief recap of history, but I feel this history is important for your consideration of plans before you.

Northeast Ohio. This, this area of this state has been very challenging to the apportionment boards of decades past. And the specific issue in Northeast Ohio is the significantly high concentration of counties that contain enough population to be more than one House district. [00:12:00] In fact, 10 counties that stretch from Lorain all the way to the Mahoning Valley create two rings of counties that have additional House district and Senate district requirements. These 10 counties surround Geauga and Ashtabula counties and pin them between Pennsylvania and Lake Erie.

This collection of counties is also home to almost 33% of Ohio's residents. So we are not dealing with small populations in, in that quadrant of the state. [00:12:30] This mathematical challenge has confronted apportionment boards of previous decades. The 1991 apportionment board had no geographic or mathematical solution that was possible to create House districts and Senate districts. There was no mathematical or geographic way to fully comply with the requirements of the constitution.

In 2001, this problem recurred, but a solution was found and implemented by splitting at least one township in Northeast Ohio. [00:13:00] I believe it was in Trumbull County. In the 2011 map, the current maps that we are operating under, this problem arose again, and like 1991, no constitutional solution was ever found or presented to the apportionment board, which brings us to 2021, which brings us to today, with some additional constitutional requirements under the new constitutional provisions that were imposed on us for creation of House and Senate district. This makes Northeast Ohio very difficult, [00:13:30] but not impossible. There is a solution in this decade.

The solution that we are proposing following all of the rules of the constitution is the pairing of Cuyahoga and Summit Counties. Now, those words were pretty easy for me to say, but implementing those proved to be very difficult because combining the populations of Cuyahoga and Summit County, um, we ended up having to create 15 House districts and all of those 15 House districts had to be roughly 4% [00:14:00] heavy on their population targets. And anybody who has, uh, played around or, or worked on a map, knows that coming up with a few

This transcript was exported on Sep 09, 2021 - view latest version here.

districts that naturally without splitting subdivisions are that heavy is difficult. Having 15 of them all together inside two counties is extremely difficult.

In addition, the constitution, uh, contains specific language addressing the splitting of counties. The current map, the 2011 House map [00:14:30] splits 39 counties while the Senate map splits 19. So of those 39 and 19 splits, many are actually required because of various Ohio constitutional provisions, because various Ohio counties contain too much population to avoid being split. The same is true for counties being whole Senate districts. In fact, of the 39 current house splits, 21 are required by the constitution. On the Senate side of the 19 [00:15:00] split counties that I mentioned, eight are required by the constitution.

It's an important point that for the commission to understand that half of the county divisions in the current maps are required by the constitution. A similar dynamic occurs in the current decade with similar amounts of required splits. We are happy to report that the plan being proposed today significantly reduces the number of split counties, and the proposed House map, we have reduced [00:15:30] the number of divided counties from 35, uh, 39 to 35, a little spoiler alert. I let the number out too early.

It is very important to note that 22 of these 35 splits are required by Article 11, Section 3C1. The county splits now required by that section, only number 13 compared to 18 such divisions in the previous House map. Thus, our proposed House map should contain a total of five less divided counties than the number divided in [00:16:00] the current map. However, because Wood County grew and is now too large to be a single district as it was in the last decade, the net reduction is only four. Similar reductions can be found in the proposed Senate map that we are displaying.

The 2011 Senate map split 19 counties. The Senate map proposed today only splits 13 or six less than the 2011 Senate map, a significant reduction. Together, the proposal before you reduces this county splits in the two [00:16:30] plans, the House and the Senate map, um, respectively by 10. Splitting cities, villages, and townships, um, the reforms adopted in the constitution also address what constitutes a split of a city, a village, or a township. The constitution now clarifies that cities, villages or townships are considered split only when contiguous portion is divided into separate districts.

Additionally, a city is not considered split where portions [00:17:00] of the city are located in different counties and are placed in different districts. I live in Dublin, Ohio and Dublin, Ohio is in three different counties. And so that's very applicable there, and I think there are numerous examples of that all over the State of Ohio. Based upon these constitutional clarifications and looking at the 2011 House map backwards or re- retrospectively, there are 14 cities or townships in this state that were split. Now, six of them should be obvious to all of us, Columbus, [00:17:30] Cleveland, Cincinnati, Toledo, Dayton, and Akron.

This transcript was exported on Sep 09, 2021 - view latest version here.

These six cities were and continued to be too large to be contained in a single district, and therefore must be split according to the constitution.

In addition to those six cities, a total of eight other cities or townships were divided in the 2011 House map. Those included Cuyahoga Falls in Summit County, Massillon and Plain Township in Stark County, North Ridgeville in Lorain, Austintown Township [00:18:00] in the Mahoning Valley in Mahoning County, Middletown in Butler and Mentor in Lake County, and also Brunswick in Medina. We are happy to report that none of these eight governmental units are split in the map that we are proposing. They are all whole, and all of the splits have been washed away.

In fact, aside from the largest six counties that I mentioned previously, our plan only splits one city and one township, and let me tell you why that is. [00:18:30] As I previously mentioned, to implement our Northeast Ohio solution, the remainder of Cuyahoga County, the remainder of Summit County must be paired with the remainder of Geauga County. And if anybody here is familiar with that geography that I just described, all three of those counties meet at one non-contiguous or a point contiguous point. The City of Solon was selected to be split in House district 23 to accomplish this constitutional [00:19:00] footprint to make the district's contiguous. The only other split jurisdiction in the entire proposal, again, noting the, the big six cities that I previously, previously mentioned is Jackson Township in Stark County, and that is done to ensure that the three House districts are contiguous and meet the population requirements of the constitution.

And again, if you recall, we showed a, a graphic of some of the challenging geography in Stark County. Um, we had endeavored not to split any jurisdiction, but we felt that it was necessary [00:19:30] to conform to the constitution and follow those guidelines. I wanna thank the co-chairs for your time. I know I probably went a little long, um, but, um, Blake and I are happy to answer any questions that you might have, and thank you for your consideration.

Vernon Sykes:     Thank you, Mr. DiRossi. Uh, I'd like to just notify the, uh, commission that we did allow him to go over, uh, [inaudible 00:19:54] the comm- commission plan and so we did not interrupt, uh, the presentation. [00:20:00] Uh, one question that I have is, you mentioned the historic amendments of the constitution that put in different new requirements. Uh, I'd like to know, and you didn't mention this in your presentation, how you satisfy, uh, the new requirement on section 6B of the constitution, uh, that deals with the statewide proportion of districts whose voters based on statewide and federal partisan [00:20:30] general election results during the last 10 years favor each political party shall correspond closely to the statewide preferences of the voters of Ohio.

That is really significant, uh, is of course, a new provision that you might know about. Uh, as well, uh, it relates to the issue of fairness because within the guidelines, uh, you can satisfy [00:21:00] compactness, you can satisfy, uh,

This transcript was exported on Sep 09, 2021 - view latest version here.

contiguous districts or not splitting the districts, uh, and still gerrymander a district to favor a political party. So the, the issue here is whether or not you comply with all of the provisions of the constitution, and this one is special. It has a, it is in a special section. Compactness is not identified on how it, is not enumerated how you calculate that, but this [00:21:30] concept of representational fairness is. And so I'm just wondering how you address that issue.

Ray DiRossi:    Co-chairs and distinguished members, I mean, our, our maps, our proposal that we have before you fully complies with the constitutional requirements. Um, we are conducting an analysis of the election data contemplated by the constitution. That analysis is ongoing. It is not complete as of today, and it is ongoing.

Vernon Sykes:    [00:22:00] Incomplete analysis. Okay. Fair, fair. Any other questions? Yes. Leader Sykes.

Sykes:    Uh, thank you to the co-chairs and to Mr. Springhetti and Mr. DiRossi. Thank you, uh, for the work that you put together, uh, put, so you could present to us to get, today. Excuse me. Uh, my question is specific to, um, how this current map complies with, uh, any provisions of the Voting Rights Act and what provisions of the Voting Rights Act [00:22:30] d- did you consider in constructing this map that you presented, or these maps that you presented today?

Ray DiRossi:    Co-chairs, Leader Sykes, thank you for the question. We did not use demographic data or racial data in the production of our maps.

Sykes:    Any follow up.

Vernon Sykes:    Yes, please.

Sykes:    Thank you for answering the question. Uh, so are there any provisions of the Voting Rights Act in which you considered while you drew the, or while you drew these maps [00:23:00] before us today?

Ray DiRossi:    I guess I would ... Co-chairs I guess I would say it on my previous statement, we did not use racial data or demographic data for the map, but we feel that the map complies with all the provisions of the Ohio Constitution.

Sykes:    Thank you. Uh, I appreciate your answer, and I, I certainly appreciate the brevity of it. Uh, can you explain why you didn't consider any parts of the Voting Rights Act in your consideration of these maps [00:23:30] before us today?

Ray DiRossi:    Well, I said we didn't consider racial data or demographic data in our maps, but we were directed not to use that data by the legislative leaders, and so we did not use it.

This transcript was exported on Sep 09, 2021 - view latest version here.

| | |
|---|---|
| Audience: | (laughs) |
| Vernon Sykes: | Yeah. [inaudible 00:23:46]. |
| Sykes: | So I, I would count myself as a legislative leader and I don't think that I shared that information with you and I, this is not an ambush, this is simply a question. The Voting Rights Act is certainly, uh, a part of our, uh, [00:24:00] election and electoral fabric. Uh, and so really just trying to get a better idea of how we are, or not in compliance with that, with these maps. So, um, hopefully we can have some deeper conversations about that, but, but again, thank you for your responses. |
| Ray DiRossi: | Thank you. |
| Vernon Sykes: | And just on the another note, uh, follow up, uh, to the Leader Sykes, uh, uh, we just can't leave it to chance. Uh, it's a, it is prescribed in the constitution that we comply with [00:24:30] it. So you have to have some evidence, it has to be intentional or deliberate, some evidence that you comply with the requirements of the constitution, and by not having that, we just consider, uh, your presentation somewhat incomplete. But you said and you indicated it's ongoing. Any other questions? Thank you for your presentation. |
| Ray DiRossi: | Thank you. |
| Vernon Sykes: | Who is the next? [00:25:00] The next witness we have is Anastasia [inaudible 00:25:06]. The [00:25:30] next witness will be Gerald Banner. Gerald Banner. The next [00:26:00] person to testify will be Susan Jolly. Susan Jolly. Okay. Melissa Sull. |
| Melissa Sull: | [00:26:30] Um, good morning commission. Uh, my name is Melissa Sull from Gahanna, Ohio. I vote in Ohio House- |
| Vernon Sykes: | Can you spell your name please? |
| Melissa Sull: | Oh, yep. M-E-L-I-S-S-A, Sull is S-U-L-L. |
| Vernon Sykes: | Thank you. |
| Melissa Sull: | Sure. Um, so I vote in House District 19, Ohio Senate District three and Congressional District 12. I testified to this commission on August 27th in Mansfield [00:27:00] about our Gahanna Jefferson school District, which is broken into three Ohio House districts. The public has just now only seen a map from this commission this morning. Uh, I suffer less than equal representation because of gerrymandering. Today's opportunity for public comment on the proposed map is limited, late and scheduled on short notice in the middle of a weekday. |

This transcript was exported on Sep 09, 2021 - view latest version here.

Uh, it's troubling that [00:27:30] our elected officials are making it increasingly difficult for citizens to participate in the political process. It appears that this commission's majority members have decided to rush through a four year solution rather than work in good faith with the minority party. I suppose the cheating out in the open is a slight improvement over the secret of cheating used in 2011 to create our current district maps. Ohioans have voted repeatedly and in great majorities [00:28:00] to have both a voice and fairness in the redistricting process. It appears we will get very little of either. Citizen action through petition is clearly the only way to gain the attention of Ohio's majority party. They have proven death to any call for fair, ethical and constitutional behavior on this topic from Ohio voters and the courts. I will be both surprised and appreciative if this commission grants me [00:28:30] the equal of representation to which I'm entitled by law. Thank you for your time.

Vernon Sykes: Are there any questions or [inaudible 00:28:35].

Huffman: [inaudible 00:28:35].

Vernon Sykes: Okay. Okay.

Speaker 1: I would to-

Vernon Sykes: We'd like to ask the audience to please, uh, [00:29:00] uh, not clap or we in a different form it's, uh, being, uh, uh, it is being livestreamed and for the courtesy of everyone, if you would refrain from that, please, thank you. The next person to testify will be Tommie Radd.

Tommie Radd: Good morning members of the commission. [00:29:30] My name is Dr. Tommie Radd. I vote in Ohio Senate District three, House District 19 and Congressional District three. I testified on Aug- August the 27th in Mansfield and submitted that testimony. The reason I'm here is to voice my appreciation to the minority party for submitting a map before September one. My disappointment is that the majority party commission [00:30:00] members did not submit a map for review at a minimum. The commission was responsible to work jointly to meet the September one timeline. That didn't happen despite hours of testimony in Ohio hearings, requesting your diligence to create fair maps, follow the constitutionally required timeline and work fairly as a team.

The commission had access to the basic data [00:30:30] and could have done the basic groundwork and then plug in the census data to modify the maps per the constitutional, um, requirements. The governor chose to do nothing until the last minute, and now the majority members on the commission are just as unresponsive. When I contacted your offices to voice my concern that no hearings were set or a joint map submitted, I was informed to contact someone else on the commission. That is not acceptable. [00:31:00] Each commission member is constitutionally responsible for the Ohio redistricting process, maps and end results. Everyone on this commission is accountable for the way they

This transcript was exported on Sep 09, 2021 - view latest version here.

conduct themselves and work transparently with the process. That hasn't happened.

The detrimental impact that partisan gerrymandering of our Ohio House, Senate and congressional districts has on our community and state was well documented [00:31:30] in the statewide hearings from August the 20 through third through August the 27th, 2021. Ohioans voted in record numbers to have Ohio cons- constitutional amendment added in 2015 and 2018 to address these inequities. Ohioans expect representative fairness in the new districts, and the calculation of those districts to be done fairly and transparently.

Gerrymandering is [00:32:00] cheating. Drawing maps without transparency is deception. A group of people who need to resort to those tactics must not believe they can win the vote by their ideas and policies to benefit the majority of Ohioans. To gerrymander to create and maintain a super majority in the House, Senate and congressional representation is wrong. That is the reason the citizens of Ohio stepped up to fix [00:32:30] this problem and hold you accountable. The Ohioans voted for you to fix this unfairness and stand for all people now.

This redistricting commission has a responsibility to draw fair maps per the letter and the spirit of our Ohio constitutional amendments as demanded by the voters. We expect you to follow the constitutional requirements, hold public hearings to review the maps prior to approval and to integrate public [00:33:00] input into the maps prior to implementation. As a lifelong educator, I taught my students that cheating was not allowed and they needed to follow the rules to the latter and the spirit of the assignment, to be team players when working with the group.

So far you haven't passed that basic requirement we expect of elementary through doctoral students. It's overdue that you do your jobs and know you will be graded on the process and pro- maps [00:33:30] you create. The voters stand ready to give you a grade. Thank you for the opportunity to speak today. I appreciate your time and your attention. Have a wonderful day. Thank you for your help.

Vernon Sykes:      Dr. Radd, if I, if I may ask a question, uh-

Tommie Radd:      Yes.

Vernon Sykes:      ... you, please, speak of our fairness. Uh, how do you, you know, this is something that we are trying to get to. This is what we've been charged to do-

Tommie Radd:      Yes.

Vernon Sykes:      ... and we'd like to fulfill that, uh, commitment. How do you see fair- What do you mean when you say fair?

This transcript was exported on Sep 09, 2021 - view latest version here.

Tommie Radd: [00:34:00] When I say fair, I know that the-

PART 1 OF 4 ENDS [00:34:04]

Speaker 2: ... Fair.

Tommie Radd: When I see fair, I know that the vote in the last decade has a proportional fairness of what portion of the population voted for Republicans and for Democrats. And that those factors need to be sent into the maps that we project and that we approve. And I'm disappointed that we saw, uh, maps this morning that [00:34:30] were obviously ready with AV equipment and printouts that were not submitted online for art to give, for us to even give feedback as did the minority maps.

But we are expecting that the voting rights, that minority rights, that the percentages of Democrats and Republicans voting across the state be represented fairly. And that means we have a 45% to 55% voting record as it stands [00:35:00] right now, in spite of the gerrymandering, which I believe it could be different if it hadn't been gerrymandered. And that's what the voters are expecting. And that's what we're watching for and waiting for. I hope that addresses your question.

Speaker 2: Yes, it does. Thank you.

Vernon Sykes: Any other questions. Secretary LaRose.

Frank LaRose: Doctor, thank you for your testimony.

Tommie Radd: You bet.

Frank LaRose: Uh, I'm sure that you're aware that the census data was 134 days late. Uh, [crosstalk 00:35:27]-

Tommie Radd: Yes, I was. And that wasn't anybody's fault.

Frank LaRose: [00:35:30] Well, I would argue that it was the Census Bureau's fault. And they-

Tommie Radd: Well-

Frank LaRose: Let me finish my question, ma'am. Uh, the Census Bureau put us at a great disadvantage by being nearly five months late. And we're not the only state that's operating at that disadvantage. Our friends in that state up north just announced yesterday that their redistricting commission is going to be months delayed before they are able to draw their maps or get their maps drawn and, and, and passed by the public.

This transcript was exported on Sep 09, 2021 - view latest version here.

|  | Uh, the process can't really begin until those census data are received [00:36:00] by the, uh, map, various map drawers. My question for you is this, though, I heard a lot of testimony over the week of public- |
|---|---|
| Tommie Radd: | Mm-hmm (affirmative). |
| Frank LaRose: | ... testimony that we got, that, um, people want us to take our time to collaborate, to work on this. I've, I've heard a lot of outrage over the last few days about missing a September 1st deadline. |
| Tommie Radd: | Mm-hmm (affirmative). |
| Frank LaRose: | My argument would be that if we take the time to collaborate and work together, the deadlines are less important than getting the work done right. Would you agree with that? |
| Tommie Radd: | [00:36:30] It depends, Sen- Um, Secretary. My concern is that the basic criteria established in our constitutional amendments has been well established. We had a minority map submitted that we could all discuss in debate on August the 31st. The maps that we saw this morning, if people had been diligent, could have also been a made available then. So then, [00:37:00] the census data could be then established and plugged into that. But to say we're going to postpone and not have some kind of conversation within the timeline, we don't see as really acceptable. |
| Frank LaRose: | Okay. Thank, ma'am. |
| Tommie Radd: | You're welcome. Thank you for the question. |
| Vernon Sykes: | Are there any additional questions? Dr. Radd, thank you very much. |
| Tommie Radd: | Thank you so much for your time and your questions, and again [00:37:30] for your hard work. We're having big expectations for something that will be acceptable to our constitution. Thank you. |
| Vernon Sykes: | The next witness is Deborah Sanders. Deborah Saunders. |
| Deborah Saunder...: | Good morning. I'm Deborah Saunders. Deborah, D-E-B-R-A. Saunders, S-A-U-N-D-E-R-S. And [00:38:00] I am here, uh, speaking as a member of the public. I live here in the Columbus Area in Dublin and my Ohio legislative du- districts are 16 and 21. I provided personal testimony at the Dayton hearing on August 24th, and I also attended the commission meeting here in the State House last Tuesday on August 31st. |
|  | Uh, I will have to say I came away from that meeting pretty disappointed, [00:38:30] and it instilled in me a sense of uncertainty. If you, the members of the commission, uh, are listening to us, uh, the set 70% plus Ohioans who have |

This transcript was exported on Sep 09, 2021 - view latest version here.

stated clearly to you are elected officials that we want and expect fair redistricting by ending gerrymandering while being informed as to how this will be achieved by this commission.

First, I commend the Ohio Senate Democratic Caucus in presenting [00:39:00] mapping at week's meeting, to demonstrate that it could be accomplished, uh, to be used at least as a working draft, uh, for discussion and debate. And it showed a real effort and willingness to present a substantive plan for discussion and debate, uh, for further mapping submissions. Um, and, uh, I think it provided a catalyst for next steps and it appears it did compel further mapping submissions as we saw here today.

[00:39:30] I feel the September 2nd updated map addition by the Senate Democrats demonstrates, uh, much greater representation of my district within the rogue, uh, carve out that position, the street that I live on, it's only a roadway, route, uh, 33 Riverside Drive. It has no any... It has no residence on it. Um, it is in a different district than I am in. And it, um, obviously was a conduit to grab [00:40:00] residences that are north of where I live.

Um, I see the maps. I was sitting in front of the, uh, of the display this morning and I see the maps that were submitted today by the GOP retains that same carve out. Um, and one might say, uh, it, with a convenient argument, that it keeps the subdivisions together, um, as required by the constitution. But, you know, we, the voters of Ohio now expect to see the [00:40:30] officially presented maps coming from this commission, not just the Democrat or Republican-created maps. Redistricting maps that we the public can review and then provide comment.

Additionally, we want this entire process to be transparent. The short notice for hearings and commission meetings do not provide a confidence that transparency is happening. We expect the commission to provide us how you will get to redistricting in a constructive, [00:41:00] non-partisan manner, with a complete schedule for the introduction of official maps and dates for public hearings for comment on those maps very soon as the September 15th deadline is looming. Thank you.

| | |
|---|---|
| Vernon Sykes: | Thank you. Any questions of the witness? Thank you very much. The next witness is Paul [00:41:30] Ilbling. Paul Ilbling. Anastasia Birosh. Anastasia Birosh. |
| Anastasia Biros...: | [00:42:00] Sorry. Um, I wanna thank you, uh, first of all, for hearing my testimony. I drove down from... Well, yeah, down. This is down from Brunswick. Um, and, uh, I was just kinda like flying down the highway. Um- |
| Vernon Sykes: | Can you pronounce your name and spell it, please, for the record? |
| Anastasia Biros...: | Oh yeah. I'm so sorry. |

This transcript was exported on Sep 09, 2021 - view latest version here.

Vernon Sykes:          Oh, no. Don't have to.

Anastasia Biros...:    I'm Anastasia Birosh. And [00:42:30] the last name is pronounced like the alcoholic drink beer and OshKosh B'gosh jeans. So it's not spelled that way, but it's pronounced that way. Um, so, to Ohio Redistricting Commission members and co-chairs Senator Vernon Sykes and Ohio House Speaker Robert Cupp, I'm pleased to see members in attendance today. I'm, I'm, [00:43:00] I'm thrilled beyond belief. Um, thank you for allowing me to submit written and verbal testimony to the Ohio Redistricting Commission.

My name is Anastasia Birosh and I currently vote in Ohio House District, 70 Ohio Senate District 22, and Ohio Congressional District 16. Brunswick is currently divided between two a- Ohio House Districts, 69 and 70, and two congressional [00:43:30] districts, seven in 16. It's time that Brunswick be in one Ohio House District and one Congressional District.

I testified before this commission on August 27th in Akron. And I'm back because I care greatly about having competitive, competitive. I can spell it out if it would assist you all. Competitive Ohio Senate and Ohio House districts. [00:44:00] I acknowledge that my white privilege affords me the opportunity to travel, to and attend these hearings occurring in the late-morning and announce at the least possible minute.

I'm grateful that, on it website, the Ohio Redistricting Commission has a public input tab that, one clicked, displays a lip- a list of all maps submitted to the commission. I'd like to draw the commission's attention to [00:44:30] Ohio Senate and Ohio House maps proposed by Jeff Wise. And I will hand these out to you. I printed up seven of them last night. [inaudible 00:45:00]. [00:45:00] Okay. Thank you.

Okay. So I'd like to draw your, um, the, attention to those maps proposed by Jeff Wise. He's a PhD engineer by day and a concerned citizen by night. Uh, he's come up [00:45:30] with proposed maps that even I, an ordinary citizen with no technical expertise in analytical computations or anything else of that nature, can understand. Very helpful to me.

Uh, he was even responsive, though worried, when I called him late last night with a few questions just after this meeting was announced. It was easier to speak with him than it was to [00:46:00] speak with my own representative. What he did with his proposal was no small feet, considering the gerrymander district's drawn up behind closed doors in 2011.

In his comments and explanation of the quantitative analysis methodology, he clearly explains how Senate incomency complicates fixing these gerrymandered districts. He [00:46:30] calls them creatively drawn. I'll tell them what they are, gerrymandered. And due to this in other factors, trade offs and compromise will be necessary in drawing these final competitive maps.

This transcript was exported on Sep 09, 2021 - view latest version here.

In the end, though, his concern, as mine, is more, is drawing more equitable and competitive maps than we were presented with [00:47:00] in 2011. I appreciate your time. I thank you for hearing my testimony. Um, if you have any questions, um, I believe he said he's gonna be here at two o'clock. So if they're of the technical nature, ask him. If they're of the ordinary citizen nature, go ahead. Do you have any questions?

Vernon Sykes:     Do we have any que- citizen questions?

Anastasia Biros...:     [00:47:30] Nara?

Vernon Sykes:     Thank you very much. Okay. Susan Kavanaugh. Bailey Cope. [00:48:00] Sierra Dobbs-Brown.-

Sierra DobbsBro...:     Hello. Um, my name is Sierra Dobbs Brown. That's spelled SIERRA. My last name is D, as in dog, O, B, as in boy, B as in boy, S, hyphen, brown, like the color. Chair Cupp, Chair Sykes, and members of the Ohio Redistricting [00:48:30] Commission, um, as I mentioned, my name is Sierra Dobbs-Brown and I've lived in Columbus, Ohio, for nearly 26 years, my entire life.

I am testifying today in support of the maps that were proposed by the Ohio Citizens Redistricting Commission. Currently, I live in Clintonville. I live near a Whit's Frozen Custard. I live near a Lucky's Market. I live near more antique shops than anyone needs. And [00:49:00] I also live near the Wetstone Park of Roses. This is somewhere I go often. This is somewhere I can walk to. This is somewhere I see as a pillar of my community, yet this is somewhere that is not in my district. I'm represented by Senator Andrew Brenner in a district that picks up a small chunk of my more progressive community and sprawls all the way up to Mansfield, Ohio, where there are folks with very different priorities and needs than in Clintonville.

Aside from being someone who can't [00:49:30] seem to leave this wonderful state, I'm also the Central Ohio regional field manager at Planned Parenthood Advocates of Ohio. We have been in these halls countless times, year after year to speak to members of this legislative body about the 30 attacks we have seen on reproductive freedom since 2011, only to see this body vote in opposition to the once and needs of Ohioan's time and time again.

And I'm here again today on behalf of Planned [00:50:00] Parenthood Advocates of Ohio and the hundreds of thousands of supporters that we represent. Ohioans overwhelmingly support access to abortion, but when our district lines were drawn to keep one party sec- securely in power, Ohioans lost. We lost the fair and equitable representation from our elected officials that we are promised as the foundation of a successful democracy. And since 2011, Ohio has lost half of the [00:50:30] abortion providers in our state.

This is directly related to the onslaught of attacks. Abortion providers have been under at the whim of this legislature. All people, regardless of our race, gender, socio-economic status, or zip code, deserve to be able to make the best decisions for our hut- for our healthcare. Yet, when district maps were drawn that dilute our vote, anti-abortion extremism that is out of touch with what Ohioans [00:51:00] want and need only went further.

Young people, black folks, other communities of color, and queer people are all disproportionately impacted by laws that chip away at our access to abortion. And when we look at the racial and partisan gerrymandering that happened in 2011, these are also the communities that were intentionally cracked apart or patched together to take away their power. I stand before this commission today to state clearly that Ohioans [00:51:30] want and need access to abortion. But because Ohio politicians have been picking their voters for the last decade, these needs have not been reflected by this elected body.

I hope that as you move forward in the process of redistricting, Ohioans will receive the fair representation we deserve, which is at least 44 Democratic seats in the House and 14 Democratic seats in the Senate. And in turn, we [00:52:00] will have a legislature that is proudly fighting to ensure each person can access the healthcare they need, including, and especially, access to abortion and all reproductive healthcare. I thank you for your time, and I welcome any questions you may have.

Vernon Sykes:     All right. Any questions? Thank you very much. Mark Erhardt.

Mark Erhardt:     [00:52:30] Good morning. Thank you for allowing me to, uh, speak today. Uh, my name is Mark Erhardt. That is spelled M-A-R-K. Last name Erhardt, E-R-H-A-R-D-T. I live in the Columbia-Tusculum neighborhood in Cincinnati. I drove up this morning. I am in the Ohio House 27th, the Ohio Senate 7th, and the U.S. Congressional 2nd.

[00:53:00] Um, I did provide written testimony to the, uh, Cincinnati hearing in August. Um, I would want to thank, first, the, um, Ohio Senate, uh, Democratic Plan that was, uh, available for the public to review. Uh, it was very helpful for me to be able to see that and see, uh, many, I think positive changes to the way the current districts are drawn.

I would have to admit, I was a little bit disappointed this [00:53:30] morning, uh, in the presentation that I heard. Uh, it seemed to focus a lot on, um, certain technical aspects of the changes, but, uh, other aspects of the changes such as the, uh, proportional, uh, party representation, uh, were not addressed and not yet been studied. Uh, and it also seemed to miss a bit on the spirit of what the voters of this state have asked for. Um, and so in that respect, um, I will have to, uh, obviously take a detailed [00:54:00] look at those. From what I could see, it appears that some of the, um, current issues, uh, in my own representation

This transcript was exported on Sep 09, 2021 - view latest version here.

maybe have not been addressed, but again, I'll, I'll have to look at that in more detail.

Um, I do wanna, um, say one thing, and I, I do agree here with, uh, Secretary LaRose on this. Um, I personally believe that, um, you know, missing a deadline by a day or two in order to, uh, allow for, um, public review and [00:54:30] input of the process, in particularly bipartisan work on this commission, uh, would be greatly appreciated and wanted by the voters of this state. And if a deadline is missed by a day or two here and there, I think, uh, many of us would understand that because what we're really looking for here, uh, are the right outcomes and fair outcomes, and, um, as I said, a better process maybe than we've had in the past.

Thank you for your time. Any, uh, questions?

Vernon Sykes:     Any questions. [00:55:00] Seeing none. Thank you very much.

Mark Erhardt:     All right. Thank you.

Vernon Sykes:     The next witness is Jen Miller.

Jen Miller:       Good morning, co-chairs, good morning, commission members. It's my honor to be here. I'm the executive director of the Legal Women Voters of Ohio. Um, I'm sorry to have not gotten you testimony in advance. [00:55:30] 24 hours is hard on the general public. It's also hard on folks like us who have full schedules. Um, I'm not here, really, to talk, um, in great technical details, but I do have a lot of questions.

The first thing I just wanna mention is that the Legal Women Voters, uh, of Ohio members love our state. Um, they come from all corners of the state. In fact, we have members in all 16 congressional districts. Um, they love our democratic Republic. That's [00:56:00] why they spend hours and hours and hours registering voters, doing candidate forums, doing everything they can to ensure that our system works. That's why we got out our clipboards in 2015 and 2018. And that is why, uh, we worked so hard on those negotiations and to get those passed at the ballot.

I hope that you are seeing the support friending partisan gerrymandering. Um, I do ask for forgiveness, um, about the applause. I know we don't do that. ( [00:56:30] laughs) Usually in State House hearings. Um, but I, for those of you that weren't for, at all of them, I just wanna say a few things. The Toledo hearing room had to be moved to a larger space, and it was still packed. Cleveland's main and overflow rooms were packed. The Akron hearing went... They had to double will triple the number of seats that came in and it went over a lot of time causing the Mansfield hearing to start late.

This transcript was exported on Sep 09, 2021 - view latest version here.

If you were in the Mansfield hearing, you might not have realized that not only was it standing room only, but there were [00:57:00] people sitting on the floor. Indeed, nine of the 10 rooms were packed, maybe even more than any of us expected. And overwhelmingly asking for transparency and fairness and a plan moving forward. Um, I hope that... I wanna bring that up because they're here and, and they're gonna continue to be here. And so I think the more time you can give them the more, uh, you know, for attending hearings. The more information you [00:57:30] give them on the process, I think the less frustrated they'll be.

Um, I think that you'll see, not only higher quantity, which maybe some don't want, but a high-higher quantity of participation, but also quality of participation where they can actually be better prepared. Again, I'm not here to talk about my own technical definitions right now, but I do have questions. And the first is, will we be hearing from political scientists, mapping experts, legal experts? Can [00:58:00] we allow virtual testimony just for those experts?

You know, there's a lot of questions that need to be defined. And I think part of the frustration, Secretary, is that some of these should have been defined. This commission should have been convened before the data came out so that we could talk about some of these technical questions. But representational fairness, how are we defining that and counting that as Ohio, not just the commission, but all of us.

Um, the Voting Rights Act, absolutely [00:58:30] needs to be considered in this case, uh, um, in these maps. And in the congressional, I understand we're not talking about congressional, but I will just say that we argued in federal court and one, um, in front of a bipartisan panel that the VRA was wrong for interpreted last time in the congressional map, um, and caused more vote dilution in minority communities in Northeast Ohio than needed for, um, Democratic Party voters. So are we going to be talking about the Voting Rights Act and [00:59:00] how that should be applied?

Section 5 was brought up, um, by a commissioner last time. That's not a rule. That is about how to draw a map. It's about what happens when maps are drawn. Inevitably, there's going to be some incumbents that have pieces of their district, um, in, in more than one district, the former district into more than one future district. It's not about a constitutional requirement for drawing map maps, it's about how you assign those incumbents once [00:59:30] the maps are drawn and agreed upon.

Equal population, I'm hearing once again, just like 10 years ago, there's some argument about how that should really be defined. When are we going to grapple with these issues as a state, in a thoughtful, deliberative manner? Will we be bringing in experts to discuss the different pieces so that you as a commission could maybe have the same [01:00:00] common understanding of these legal questions?

This transcript was exported on Sep 09, 2021 - view latest version here.

Um, that's one of my questions. The next is, and maybe it's on, and maybe it's already happened so far, but when will we get the shape files of the proposed Republican maps? Um, when will we get the rest of the analysis? Um, absolutely, we should have the analysis on what, what they think in terms of the Voting Rights Act. Absolutely, We should have the analysis on, you know, basically the predictive analysis of how we think seats will go, and if that [01:00:30] will be representationally fair.

Um, those are mostly my questions. Um, and I would say I would prefer not to have a 2:00 PM hearing today so that we have time to review, uh, the Republican map, um, with some more details. But, um, if that's how you're gonna move forward, I understand it. So with that, I'm happy to take questions and I thank you for your time.

Vernon Sykes:          Any questions. Secretary LaRose.

Frank LaRose:          Thank you, co-chair. [01:01:00] Uh, thank you so much for your testimony. Wou-would, would, would you agree that the, um, the outcome is more important than the schedule? That, uh, taking the time to get it done right and, and continuing to strive toward a 10-year map is more important than the deadlines? And I recognize the deadlines are important, but this is a, a, a judgment call between two different competing and both important and things.

Jen Miller:          I... Thank you, co-chairs. Thank you, Secretary LaRose. Um, [01:01:30] I do. Here's the problem, though. Is, last week, we were, a day before a deadline and there wasn't even agreement among this commission, how many maps were gonna, you know, how the commission would decide which map to present to the public. Um, we didn't have any idea when these public hearings would be. Again, we hadn't decided what kinds of other issues the commission needed to discuss.

So it is hard to just say, okay, we've missed deadlines, [01:02:00] um, and that's inevitable, when, quite for frankly, this commission should have been convened earlier. We should have been doing this work already. And if, if you weren't gonna make the deadline as the commission, that at least the public understood what the process would be and how we were really moving forward. Those rules were thin, um, and I think there's still a lack of clarity, potentially even among all of you, but it's definitely among us, um, in the public.

And so [01:02:30] it doesn't really pass the smell test a little bit. Um, it would be one thing to say, yep, it's gonna be late, but, but if we started this in July or August, you know, early, oh, oh well, I should say July, June or July, at least. And we were trying to grapple with these things and we were trying to figure out how to move it forward. Or the day before, yep, we're gonna miss it, but this is the process moving forward.

This transcript was exported on Sep 09, 2021 - view latest version here.

It's hard, I think, from the outside to feel trust in this process [01:03:00] because of the lack of clarity, because of the lack of preparation. And, and so I can't just... So I'm with you to an extent.

Vernon Sykes: Thank you. And also, uh, you know, thank you for your questions. I'm sorry we're not in a position to answer. Let me, [inaudible 01:03:20] assure you that the issues of virtual testimony of experts have been discussed, uh, between the co-chairs and, uh, uh, representational [01:03:30] fairness, how you calculate. That that's been discussed. There has to be... This is a bipartisan process to a certain extent. And there has to be agreement. There has been no agreement on it thus far. Thank you for raising the issue. We'll continue to grapple with those.

Jen Miller: Thank you, uh, co-chair, both co-chairs. I'll just say, but we should be grappling with these together. That's what should be happening here. We should be having hearings where we are grappling with these definition [01:04:00] together, and we are, you know, no one has a... You know, actually, Secretary, I-I'm sorry, Senator Sykes, you have asked for, um, some input on representational fairness, but we should be having experts come in together to talk to all of us.

Vernon Sykes: Thank you.

Keith Faber: Uh, Sen-

Vernon Sykes: Yes.

Keith Faber: Senator Sykes, uh, uh, the co-chair, to, to the witness, you've used the term representational fairness a number of times. I recall very distinctly, when this constitutional provision was drafted, that that term was never included in the constitution. [01:04:30] So what section of the constitution are you defining with regard to legislative redistricting that uses the term representational fairness? Are you implying that representational fairness means the number of congressional are, uh, looking back over the elections of the last 10 years? Is that what you're substituting the term representational fairness for? Or can you give me a better definition?

Jen Miller: Thank you, co-chairs. Thank you, Auditor Faber. Actually, what I'm saying is we need to be having a conversation about how we're defining it. And it is in the constitution. [01:05:00] I'm sorry, I don't have it in front of me, but representational fairness is in the constitution. I think we need to decide how we measure that. Um, so, uh, I could excuse myself and, and get them, or, or maybe Colin could get it for me, but, um, it is in the constitution. Yes.

Keith Faber: Um-

Jen Miller: Article 6.

This transcript was exported on Sep 09, 2021 - view latest version here.

Keith Faber: I, I Believe the term representational fairness is not in, in there with regard to legislative redistricting.

Jen Miller: Okay. Well, again, um, Article 6, that's what it's capturing this [01:05:30] idea of. as we use predictive analysis, um, past vote in, um, um, electoral information, that partisan indexing, how the seats, um, we think will go versus how, um, versus the, the general voting, um, so, uh, results. And so, again, I, this is my point exactly, is, um-

Keith Faber: Which, which is, which, Mr. Chairman, which is why I asked the question.

Jen Miller: Yeah.

Keith Faber: Because we keep hearing [01:06:00] these terms banded about. And I think people put different meanings to different things. And that's why I asked the question because you used the term that I think specifically regard to legislative redistricting is not in there. Um, maybe I'm wrong. Uh, I'm pretty sure it's not, but, um-

Jen Miller: Thank you.

Vernon Sykes: Additional clarification. I was involved also in the negotiation and the, for the inclusion of this concept. And is clear that, uh, we did not want to leave it, uh, undefined the concept, uh, [01:06:30] and deal with the terms. Lik- as I have indicated before, compactness is not defined or how you calculate it. So instead of just using the term, phrase, representational fairness, we actually spelled it out how it is calculated. So that it would be clear for everyone from now on of what we're talking about.

Jen Miller: Thank you, uh co-chair. And actually, thank you, Auditor Faber. I think you're actually making my point. The point actually is that, um, uh, [01:07:00] Section 6, A and B, are defined, but there's still a lot to be decided in terms of how we really implement that language. Right? There's decisions along the way.

So, for example, um, federal par- you know, statewide and federal partisan general election results during last 10 years, um... I'm not actually sure. I, I, I would argue that what OU provided is not exactly that. We should have been having conversations [01:07:30] about that piece alone. How the data is used, how the data is cleaned, what data we used to look at these past results over the 10 years, um, that matters. What the term shall correspond closely to the statewide preferences. What do we mean by correspond closely?

Keith Faber: I agree. I-

Jen Miller: So, so this is m... That was my first point, was that I wish that we had been talking about this in, in months ago.

This transcript was exported on Sep 09, 2021 - view latest version here.

Keith Faber:     And-

Jen Miller:      Um, and, and this is my point now, is, when [01:08:00] are we going to have experts, not Jen Miller, but political scientist-

PART 2 OF 4 ENDS [01:08:04]

Jen Miller:      And are we going to have experts, not Jen Miller, but political scientists and legal experts, um, coming and helping us decide together how this is upheld?

Keith Faber:     So Miss Chairman, which was exactly my point. And so you, I think we're making the same point. The term has not been defined. It is somewhat nebulous 'cause you can read this different ways. But it very clearly says you can't draw a district primarily to favor or disfavor a po- political party. And that in many cases, [01:08:30] is at odds with trying to wo- draw a certain number of Democrat or a certain number of Republican districts. A- and so that's where the next provision, and this is why when we debate what these things mean, the next provision, provision C says the district shall be compact. That's not a discretionary term. Uh, compact is, is I agree, not specifically defined, but at least those are things that are in concept if done will be drawing districts based on geography and communities [01:09:00] of interest and, and not splitting political subdivisions, which the rules require, which aren't discretionary.

Um, when you get to this aspirational section here, I think that's where we need to have a lot more discussion as apply, how it applies across the maps. And so specifically now that we're at the point of discussing various maps, because we do have maps and, and I appreciate it would be nice if this had been done six months ago, four months ago, three months ago, where some of us started having conversations. [01:09:30] But at the end, my question is this, to get to the landing field that we're talking about on the 15th, and I'd like to see us hit the 15th, we got a lot of things to do between now and then. I'd really like to see bipartisan discussions going on, 'cause I want a 10 year map.

And so as we go down that route and we plan to have more hearings, it's helpful if we have specific discussions about maps and, and where we're gonna land if we're [01:10:00] gonna land this plane by the 15th, um, and land it in a way that leads us to a better bipartisan map. So that's my point on some of these things as to what we're talking about. Um, we had a lot of discussions during our tour around Ohio and I'm curious to see how those all fit in and, and I've done an analysis of all the maps. And so when we go through those, those are gonna be things that we wanna see and have input as people provide input. But I would just ask future testimony from everybody. And I know your organization [01:10:30] has helped deliver and present a lot of testimony. I mean, you certainly have been very active about getting people to share their thoughts and views.

This transcript was exported on Sep 09, 2021 - view latest version here.

I would just encourage us to have specific thoughts and views about whether it's map A, map B, map C as to how those maps can better meet the concept of making sure that people are represented by somebody to some extent, 'cause you really can't do it 100%. You're always gonna have somebody that's represented by somebody who doesn't share their extent unless you have 100% of people [01:11:00] ever agreeing in a district. But that's, I think our overall goal that all of us have said that's where we wanna land the plane. So thank you.

Jen Miller: Thank you, um, auditor Faber and co-chairs. I'll just say even that section C like how we measure compactness, there's different measurements for that too. So I think it's worth the conversation. 24 hours in advance is not enough time to get experts in to help think about this, which is why I'm saying, could we even have a hearing specifically where [01:11:30] we are inviting some technical folks? Can I work with you to help think about some technical folks who might even disagree on how some of these things should be applied or defined? Um, but 24 hours in advance isn't enough time to do that. So, um, that is part of my request.

Vernon Sykes: Thank you very much. Any additional questions or comments? Thank you so much.

Jen Miller: Thank you.

Vernon Sykes: Ryan Goodman.

Speaker 3: [inaudible 01:12:06] [01:12:00] Hedges.

Vernon Sykes: Mindy Hedges.

Speaker 4: [inaudible 01:12:19].

Speaker 3: [inaudible 01:12:24].

Vernon Sykes: [01:12:30] Thanks.

Mindy Hedges: My name is Mindy Hedges and it's sort of, Mindy, M-I-N-D-Y and Hedges like bush or shrub, H-E-D-G-E-S. Co-chair Senator Sykes and House speaker Cupp, and members of the Ohio Redistricting Commission. My name is Mindy Hedges from Radnor, Ohio. I'm in House district 67, Senate district 19, and congressional district 12. Thank you for hearing my previous testimony last week [01:13:00] when I told you about how our founding fathers and past presidents spoke vehemently against gerrymandering and also about my rural area. And I'm sort of a fish out of water, but I also spoke about reminding you about my area. It's in a very wealthy county, but our rural area is still without much internet access, water or sewage, renewable [01:13:30] energy resources, garbage, healthcare facilities or transportation because our House, Senate and

ste- and s- and hou- our Ohio House and Senate representatives know they don't have to care about any of their rural voters.

They have their campaign signed, sealed, and delivered by a gerrymandered vote. But about this process you've been going through to ensure a fair mapping procedure. I normally don't like to begin [01:14:00] any discussion with a negative, but I'm disappointed with how this process has progressed to this point. I'm concerned therefore with the process in general, almost less than 24 hours to call this meeting with testimony, on what? There was no map. And then only four hours to ask us for testimony again, with no map? It has made me and many others wonder [01:14:30] whether this will be a fair mapping assessment and completion, or whether it will be reduced to backroom antics and more gerrymandered, unfair, embarrassing, and undemocratic districts.

But you see, the voters do have the upper hand. Don't ever forget that over 70% of Ohioans voted to redistrict and we were close to bringing this to a ballot vote. We can and will do this again. [01:15:00] Um, Ohioans were sick of being laughed at by the entire country because their district quacked or slithered. They were sick of being ignored by their representative. They were sick of their needs not being met by someone who had no clue even whether O- Ohio Town was on a map. In fact, when I had an initial look at what the map was shown to us today, [01:15:30] when you took Westerville out of Delaware County and put it in Morrow County, that makes absolutely no sense. Westerville is a city, a vibrant city, and you took it and put it in a rural county? Makes absolutely no sense whatsoever.

And of course you took what was a vibrant and democratic part of Delaware County and put it totally in a Republican county? Of course, that was done partisan. So it makes no [01:16:00] sense. But I'm more than this negativity. I'm normally an optimist, not a pes- uh, an optimist, not a pessimist. I believe you will do the right thing for your state, your communities, your friends, and your families. Your actions to date have not been driven by a democracy in action. This is not the kind of government you wanna hand down to your children or grandchildren. [01:16:30] This is not what we were handed down by our grandparents. Let's be real. This appears to be more fascist than it is Democratic. Make the right choice and start by really discussing this with your neighbors on both sides of the aisle. And listen to the hundreds who testified over the past 10 sessions.

We did this because we want our Ohio back. We want it to prosper, not shrink in [01:17:00] wealth. We wanted it to grow, not diminish. We wanted it to prosper, not shrink in wealth. We wanted it to increase in resources for our children and grandchildren so they can prosper. Our younger generation is leaving Ohio because of the politics. Let's help it grow again. Thank you for your time and consideration of my request. Do you have any questions?

Vernon Sykes:            Are there any questions? [01:17:30] Thank you very much.

This transcript was exported on Sep 09, 2021 - view latest version here.

Mindy Hedges:     Thank you.

Keith Faber:      Uh, [inaudible 01:17:33]-

Vernon Sykes:     Oh, you-

Keith Faber:      ... have a question, uh, to the chairs.

Vernon Sykes:     Uh, Faber.

Keith Faber:      Um, my understanding is, is, and we've heard a lot. This is to the chairs, not, not, not the witness. I'm sorry.

Mindy Hedges:     Oh, okay. Thank you.

Keith Faber:      Um, my understanding based on the conversations that, that my staff have had is that we do anticipate having other hearings between now and the 15th. Uh, specifically, I think we're trying to do at least three public hearings after our maps are introduced or adopted by this commission. [01:18:00] So I know a lot of people apparently were confused that there was, this was going to count as one of those three public hearings. My understanding from the leadership is that that is not the intent of the chairs. And I think that might help alleviate some of the concerns, including the concerns I just heard from this nice lady who just testified, that other testimony is gonna be available in other hearings to talk about the maps. And, and if I'm mistaken, please correct me. But I think just to clarify that.

Vernon Sykes:     Audi- auditor, you are, uh, correct, uh, that we do have, and that [01:18:30] s- schedule will be, uh, finalized-

Keith Faber:      [crosstalk 01:18:33].

Vernon Sykes:     ... this afternoon and distributed this afternoon.

Keith Faber:      So we are anticip- just to make sure I'm clear so the witnesses are clear, we are anticipating hearings at some point between tomorrow and Tuesday or Wednesday that will include at least three other public hearings around Ohio on whatever maps we go forward on.

Vernon Sykes:     Yes. And we understand that the time is still constrained because we have the September, [01:19:00] uh, 15th deadline, but we do, uh, intend to comply with the rules, uh, with three additional hearings, uh, around the state, uh, to review, uh, a proposed map by the commission.

Keith Faber:      Thank you.

Vernon Sykes:     [Diane Meeves 01:19:20].

This transcript was exported on Sep 09, 2021 - view latest version here.

Speaker 5:          [inaudible 01:19:22].

Speaker 3:          [01:19:30] Carrie [inaudible 01:19:38] Coisman.

Vernon Sykes:       Carrie Coisman.

Carrie Coisman:     I'm too tall for this podium. Okay. Hello commissioners. My name is Carrie, C-A-R-R-I-E, Coisman, C-O-I-S-M-A-N. [01:20:00] And I'm the Ohio digital organizer for All On The Line, a grassroots advocacy organization that's working to end gerrymandering. I'm here today testifying on behalf of myself, but also on behalf of all of our volunteers and activists who could not attend today due to the timing of today's hearings, um, and the short notice of when today's hearing would be happening. I'm going to speak on three things today. Firstly, the process and how it has impacted Ohioans. The fact that representational fairness is in fact listed as [01:20:30] a requirement in the constitution and how I define that representational fairness. And number three, why we deserve both a fair process that is upheld by the constitution and a fair map that also follows the constitution.

                    Firstly, on the process, I am grateful to be able to do this work full-time. I'm not a parent, a family caregiver. I am fully vaccinated and I'm not immunocompromised, making it safe for me to be here in this body today. And I live only 10 minutes away from Cap Square in Clintonville. [01:21:00] All of these factors make my presence and testimony here today possible. But the way that these hearings have been conducted excludes the voices of thousands of Ohioans. Over the last six months, I, my organization and numerous partner groups have trained thousands of Ohioans, myself alone, 4,000 about this new redistricting process and how they can engage with this body.

                    I spend hours, and I truly mean hours every week talking with Ohioans who feel like their government and elected officials do not serve them as constituents, [01:21:30] but rather serve special interest groups and elected officials' own self interests. Every day I get calls, texts, emails, and social media messages from people from around the state asking the following questions. "Why is this process not fair and transparent when Ohioans overwhelmingly supported the reform measures that promise that our process would be different?" Those reform measures were voted on in 2015 and 2018. "We voted for this process to be different, but where are the maps?" "Why [01:22:00] is this commission keeping Ohioans in the dark?" "Why are all the meetings being scheduled at the 11th hour?" "Why does all of this feel similarly to a broken process like in 2011?"

                    "Are members of this commission going to gerrymander my community again?" "Will my neighborhood be cracked apart?" "Will my urban neighborhood like mine be pulled into a sprawling, rolling, rural district?" And lastly, and most devastatingly, "Will my vote count for the next decade?" And All On The Line volunteer, [01:22:30] volun- an All On The Line volunteer and proud union

member, Erica White said this at your hearing in Toledo, "Gerrymandering further distance representatives from accountability at the ballot box, but there is hope. Gerrymandering is fixable. Citizens across Ohio are fired up about fair maps for redistricting. This could be the political moment to solve these problems and get Ohio back on track for fair representation. Let's fix this today and stop this train on democracy and together try to [01:23:00] stank in the pillars of our democracy."

Erica could not be here today because of work obligations and because the commission again has failed to live up to the promise of a fair and transparent process by not allowing virtual testimony options in the midst of this pandemic. However, her, excuse me, her words ring true. And I thought it was important to bring them to you today. Excuse me. Gerrymandering is political cheating, but it is solvable and that is your [01:23:30] duty as members of this commission. Hiding behind excuses of the census delay is no longer valid when this commission has received dozens of maps from Ohioans and organizations who are able to produce maps in a timely manner using the same dataset which you all have access to with staff, I may add.

My second piece that I wanna talk on is representational fairness and to answer auditor Faber's earlier question about representational fairness and how it is cited in the constitution Article Six. [01:24:00] The constitution says, "No general assembly district plan shall be drawn primarily to favor or disfavor a political party. The statewide proportion of districts were voters based on state and federal partisan general election results during the last 10 years favoring each political party shall correspond closely to the state preferences of the voters of Ohio." I grant the auditor that it does not say representational fairness, but as someone who did not go to law school, I even can understand (laughs) that that is what this article [01:24:30] is saying.

Ohioans have voted across the decade in a split of 45% Democratic and 55% Republican. That is an average across the last decade. At first glance, it appears that the map that was just presented today by the majority party actually further reduces adequate representation of Ohioans. If we have any hope of maintaining the promise of our democracy, Ohioans deserve a map that reflect the true partisan makeup of this state, which means our future maps [01:25:00] must include at least 44 Democratic House seats and at least 14 Democratic Senate seats. We deserve maps that keep our communities together as much as possible and especially our major metropolitan communities and Ohio's communities of color, which I was devastated was not taken into account, um, when the GOP drew their map today, or presented their map today.

This will ensure that all Ohioans have a pathway to political representation. And I am, again, disappointed that this commission has failed to [01:25:30] provide a map for Ohioans to review until days until our final deadline. And finally, why we deserve both a fair process and a fair map. Missing a deadline is in fact, a big deal. It is important. These deadlines are constitutional requirements, not just

soft suggestions. By keeping their map in the can as long as they did, the Ohio GOP has denied Ohioans a real opportunity to review the maps and to give public input. We are [01:26:00] seeing this map just six days before our final deadline. That is not what Ohioans voted for in the reform measures. We are not picking between a fair process and a fair map. We voted for both, not one or the other.

It is frankly, a declaration of duty and an insult to the constitution that we are being asked by the commission if we would prefer a fair process or a fair map. That answer was made clear 2015 and in [01:26:30] 2018. We are done with backroom deals, lack of preparation, and excuses because the majority party is so secure in their power due to the partisan gerrymandering of the last decade. We are seeing a troubling repeat of strategies that were deployed in 2011 to dilute the political power of Ohioans. This is a sham and an insult to democracy. This process did not have to be rushed. We are running up against the final deadline. [01:27:00] This is made obvious again by the fact that maps have been submitted by Ohioans, good government groups and the Ohio Senate Democrats.

I hope that when all the hearings are done and you're prepared to adopt a final plan, this commission will have done its due diligence in ensuring that Ohioan voices are heard and fairly not represented, not just the ones that this body picks for yourselves, your friends and your colleagues in the Ohio General Assembly. Thank you. Any questions?

| Vernon Sykes: | Are there any questions? [01:27:30] Thank you very much. |
| Carrie Coisman: | Yep. |
| Vernon Sykes: | Ann Shroyer. |
| Ann Shroyer: | Hello. Excuse me. Um, my name is Ann Shroyer. Thank you commission members for the opportunity to speak today. My first name is Ann, A-N-N. Last name, Shroyer, S-H-R-O-Y-E-R. Excellent pronunciation, again. Um, just to shout out to governor [01:28:00] DeWine's UT Rocket, um, mass today, appreciate that as a graduate from there. Um, so as I said, I live in, my name's Ann Shroyer. I live in Westerville, Ohio in the 68th state legislative district and the 19th state Senate district. As I pointed out in Lima, my city of 41,000 is cut into two state representative districts and two state Senate districts, even though we are only 12.7 miles, um, and the new maps are dividing us again or moving us completely out of the counties that we live in. |
| Speaker 6: | [inaudible 01:28:29]. |
| Ann Shroyer: | [01:28:30] No, [inaudible 01:28:31]. Thank you though. Um, so these unfairly drawn lines leave voters with no real representation and we demand a fair and transparent end to this. As many have said, the importance of fairly drawn |

districts cannot be overstated. When district lines are drawn to give extreme advantage to one party or the other, then the true constituents of that legislator are the large donors and lobbyists who can donate and bribe with enough money to bend the ear and get the attention of elected officials. For [01:29:00] one example, um, of how this lack of representation affects us. My county, Delaware County has the highest COVID vaccination rate in the State of Ohio. Yet we are represented by a state Senator who has been railing against vaccines and mass the entire pandemic.

And by the new map that was presented today, Delaware County will be included in the state Senate district with Holmes County or part of Holmes County because they have such a huge population they have to be split apparently. Um, and Holmes County has the lowest vaccination rate in this State of Ohio. [01:29:30] So the, just that is just one characteristic that would seemingly not put us in the same district. Um, the state g- government is beset by a massive bribery scandal, and yet almost the entire state legislature was reelected because gerrymander districts guarantee their seats are safe thanks to the district lines that we currently have. And I'll finish with, um, most of the remarks that I said in Lima two weeks ago when I had the opportunity to speak.

The lack of true representation, thanks to unfairly drawn districts can be seen. Thus 90% of Ohioans, including 87% [01:30:00] of gun owners in Ohio approve of universal background checks. And yet this gerrymandered state legislature has made no movement on passing it because the majority have donors in the gun lobby. Columbus has over 142 homicides so far this year, again, on their way to setting a record. Most of them by firearm and many guns are purchased with no background check at the perpetual gun show on the east side. But the gerrymandered legislature continues to do nothing to pass background checks, even after Dayton. [01:30:30] The legislature did pass the stand your ground [inaudible 01:30:32] last Christmas. At the height of COVID deaths in the state, the priority was to protect shooters.

The only proponent testimony given at that hearing was from a, from a gun lobbying group, not from an actual voter. The gun lobbying groups pay a lot of money directly and through independent expenditures to our lawmakers and get their bills passed while mothers mourn their dead children. Mothers are shot and killed with their infant children by domestic abusers. That happened less than three miles from my house. Um, and [01:31:00] Aisha's Law never made it out of committee in the Senate last year. A mother mourned her daughter who was, who died by gun suicide less than an hour after purchasing the gun, despite attempts by families to keep her safe because an extreme risk protection order cannot get passed in this gerrymandered state.

We have an entire family shot and killed in a murder suicide in Avon Lake two days ago less than two miles from my son's grandparents' house. An entire family gone by gunfire. And maybe [01:31:30] Aisha's Law or [inaudible 01:31:31] could have saved that mother, those children, and even the shooter

This transcript was exported on Sep 09, 2021 - view latest version here.

and gotten him help. But yet, because those bills, b- but because [inaudible 01:31:39] and Aisha's Law do not have a well financed lobbying group to get lawmakers' attention, they do not, they, those, excuse me, those bills die in committee. Maybe if more mothers had a huge budget for donating campaigns, we would save li- we could save lives with common sense legislation that the majority of Ohioans want, or maybe fair districts would give mothers a [01:32:00] voice in the state House.

Mothers will continue to show up and we demand that we have fair districts to elect lawmakers motivated by their voters. We demand there is a transparent and fair process with well publicized hearings, so I don't have to repeat myself because I didn't have time to realign my testimony. Gerrymandering is killing Ohioans literally, and the new GOP map will continue this tradition. Thank you very much for the opportunity to speak.

Vernon Sykes:    Thank [01:32:30] you. Are there any questions?

Ann Shroyer:    Thank you.

Vernon Sykes:    Zara Smith.

Speaker 3:    [inaudible 01:32:40] Charles Spencer.

Vernon Sykes:    Charles Spencer.

Speaker 3:    [inaudible 01:32:53].

Vernon Sykes:    [Ralph Terrick 01:32:58].

Speaker 3:    [inaudible 01:33:08].

Vernon Sykes:    [01:33:00] Andrea Yagoda.

Andrea Yagoda:    Co-chairs, member of the, um, commission, thank you for affording me the opportunity to speak today. I did address, uh, the members that were present in Mansfield about how gerrymandering directly [01:33:30] affected me as an individual. I'm sure I'm not alone when I say this is not the map making process I envisioned when I worked so hard to pass the constitutional amendment and I voted for it. I envisioned a commission working together to review maps that were submitted, discuss them in earnest and then work together to draft a proposed commission map. So far what I'm seeing is reminiscent of 2011. [01:34:00] No bipartisan discussion, but a backroom map drawing process. So it appears to me that all the town halls and these hearings today are merely window dressing to give the impression that the map making process has changed.

This transcript was exported on Sep 09, 2021 - view latest version here.

And secretary LaRose, I'm not giving you legal advice here, but I understand that other states that ran against deadlines went to their Supreme Court, which ours, I think has exclusive jurisdiction. And they [01:34:30] asked for an extension. Although I can honestly say after seeing the map today, where the Republicans picked and chose which parts of the constitution they were gonna follow in drafting their maps makes me believe that no matter how many more months you had, or how many more weeks you had, there wouldn't be bipartisan, um, commission working together, um, to draft maps. I envisioned a website with a portal [01:35:00] where, where, whereby Ohioans could not only submit maps, but where other Ohioans could review them and have input.

What I found was a hastily constructed website where maps submitted are not labeled, so you have to download. You can't just open the map. You have to download each and every map. And then I have to go look on my hard drive to see... I have to remember the name of the map. Then I have to [01:35:30] search for it and then I have to open it. Then there is no place for me to comment on that map. It would've been a lot easier if you just posted the maps on Facebook, everyone could've commented on them. And this commission could have seen all the public input for all of those maps. Right now what you have to do is keep a list and then maybe put it in your testimony somewhere to comment on each map. That is not a transparent [01:36:00] process with input from Ohioans everywhere that don't have to show up in a meeting to testify, they don't have to draft testimony. They could just comment on the map.

Even the witness slip is not fillable. So you have to download the witness slip. You have to print out the witness slip, and then you either have to scan the wis- witness slip, take a photograph of the witness slip. If [01:36:30] you're like me and you have a flip phone, you don't take a photograph of that. So if you don't have a scanner, you can't even get your witness slip to this commission. And rule 10 specifically says that in order for me to testify about a map, I must submit and notify you that I plan to testify if I, in order for me to be able to do so. Why a s- easy, fillable witness slip was not included on your website can only show me that you really [01:37:00] don't wanna hear from us. Why would you make it so difficult?

Honestly, as one average person with average knowledge of computer, I really got tired of trying to open the maps and downloading them, and I just gave up on the effort. And I'm sure that I am not alone. Mr. Fa- Faber, you test, someone from your office indicated that you had reviewed all of the maps submitted. Um, and I commend [01:37:30] you if in fact you did that. But my question is, is even if you did do it, what input did you have that went into either the Democratic submitted map or the Republican map that we saw today? I'm willing to bet that you didn't have any input in that map after reviewing the citizens' maps that were submitted by Ohioans.

I'm sorry, but I, I didn't have a chance to write, um, my testimony, but [01:38:00] this whole process has been really disheartening for someone who

spent days at the fair district's office reviewing petitions to make sure that they were accurate, scanning petitions, putting data in so we could keep track, for someone who went on street corners on the weekends, went to fairs, um, stood on street corners, went to farm markets. I got over 3,000 signatures on petitions and it's disheartening to see nothing's changed. I don't see anything that has changed. [01:38:30] The failure to submit timely maps. The failure to request an extension from the Supreme Court. You could have moved the primaries and requested that. And I think some of the Democrats had even requested that you, that the Republicans request that and they took no action.

Governor, you failed us by failing to convene this committee back in March or April. So a lot of this pro- process could have been done. That was a complete failure. I'm sorry, everyone on this commission knew who was gonna be appointed [01:39:00] to sit here. You could have, you could have sped this process up. We could have spent this time instead of doing town halls, talking to the legal women voters to define what you needed to do in these maps. I'm sorry. There are no excuses. We are tired. You are not going to silence me for the next 10 years. I have had enough, Ohioans have had enough. We did not vote for this. We all, we all worked hoping that you would act in good faith [01:39:30] and do what the voters want you to do. This is not what we voted for. This is not the process.

This is not acting in good faith. This is not a meaningful process. This is just a charade, uh, to make it look like something's changed. I hope, I hope and pray to God that you prove me wrong in the next few days, but really, I don't go to bed tonight thinking that that's gonna be the case. Thank you for giving me the opportunity [01:40:00] to speak. I'd be glad to answer any questions. I will try to get something in writing to you, but I have a life too. And when you give me 24 hours notice, I have to decide whether I wanna spend my time writing something or spend my time coming to a hearing. Does anyone have any questions?

Vernon Sykes:     Any questions?

Andrea Yagoda:     Thank you.

Vernon Sykes:     Thank you. Oh, excuse me. There is a question. Leader Sykes.

Sykes:     Thank you, uh, to the co-chairs. [01:40:30] Uh, and thank you for your testimony. And, um, I appreciate your, your passion in sharing exactly how you felt with us. Uh, it is deserved for sure. Um, moving forward, what could this commission do to help satisfy your concerns about what has not happened and what should be happening, uh, to make you feel like your work was not done in vain and the voters [01:41:00] in both 2015 and 2018 who requested a new way and new process would feel like they are being respected and their wishes are being granted?

This transcript was exported on Sep 09, 2021 - view latest version here.

Andrea Yagoda:     Well, first, I don't think we get to pick and choose which constitutional amendments. I had hoped, I think it would've been great if we could have been on the Ohio channel even if we couldn't appear and we could see you folks discussing maps. Pull up, I don't know, a lady just brought a map in that was submitted. If I, if I could see this committee say, "Oh, you know what? [01:41:30] We got a map from John Doe. Let's discuss what's in that map. Let's discuss the pros and cons." Um, there should have never been a Democrat map and a Republican map 'cause you know what I see when I see that? And I, I don't mean to insult anybody on the commission, but what I see is I see this majority saying, you know what? We don't really give a damn what the minority says. This is the map. We have the majority and this is what we're doing. I think what would've been, [01:42:00] people would've had more faith if, um-

PART 3 OF 4 ENDS [01:42:04]

Andrea Yagoda:     People would've had more faith if, um, we didn't t- be talking Republican maps and Democrat maps. But really, this commission, I think you had indicated at one of the hearings, probably the last one, when are we going to work together on a map?

And when a map is produced, and it doesn't, and the person comes in here today and says, "We didn't even consider, um, you know, representational fairness or how, how Ohioans voted in the last 10 [01:42:30] years," that does not give me any faith whatsoever in this system.

So I think what we need to see is we need to see this g- this body that, that we, we created through a constitutional amendment, we need to see you publicly speaking together on what your objections are to the maps, how you're going to change the maps, not just bring us something and say, "This is our map."

We need to see the bipartisanship. [01:43:00] We need to see the discussions of this commission. We need the transparency, which we're not seeing now. We're just seeing... We're not seeing anything.

We're just seeing this charade, uh, that you bring us here, really, so we can vent. That's what I see. You're just bringing here so we can vent. No offense. I can make you listen, but I can yell out in this mic and get your attention, make you listen, but I can't make you hear anything that we're saying. And I think that we, that we don't believe [01:43:30] you are hearing anything.

We called your office, Governor DeWine. We begged you to convene this committee. If you had done so, we'd be a lot further along in this process. And now, we're just, it seems like you're just spinning wheels. So I think we need to see you.

You want to say bipa- we're going to be bipartisan. Secretary LaRose, you say you want that. Why aren't we seeing it? Why aren't we seeing this commission

This transcript was exported on Sep 09, 2021 - view latest version here.

work together in a bipartisan manner? I don't know if that [01:44:00] answers your question, but thank you.

Vernon Sykes: Thank you. Any additional questions? Thank you. Sha'tisha Young.

Sha'tisha Young: Hello. One second here. I apologize for my voice being shaky. Um, public speaking makes me really nervous, but I'm here anyways, because I think it's important [01:44:30] that you all hear from me. Um, so my name is Sha'tisha Young. That's spelled S-H-A apostrophe T-I-S-H-A, Young, Y-O-U-N-G.

Um, I'm from Xenia, Ohio, and I am here today because I was around 15 the last time the maps were drawn. Um, and since then, I have watched time and time again as my fellow Ohioans have suffered under a series of maps that were drawn behind closed doors and with a sense of secrecy that we should not be seeing in modern day politics.

[01:45:00] Um, more often than not, it seems my colleagues, friends, family, and I find ourselves at the State House protesting for our basic rights while a group of people who could never truly represent me, even if they wanted to, and they clearly don't, um, continue to legislate based on their own personal beliefs and the wants of those who line their pockets.

Um, in 2019, in Dayton, Ohio, I stood in a crowd of mourners and listened as Governor Mike DeWine and other elected officials promised to do something about the gun violence, um, we had just [01:45:30] seen tear apart a community, and by extension, our entire state.

Um, earlier this year, I watched in horror again as DeWine and his fellow Republicans signed a stand your ground bill into law, despite the wishes of experts and advocates within our community, um, effectively endangering the black and brown people of this state.

Our elected officials are meant to represent the people and are meant to advocate for the betterment of all Ohioans. Clearly, this is not what has been happening at the State House in recent [01:46:00] years.

Since our maps were last drawn, the GOP have won around 55% of the statewide vote, as others have said today, um, but have managed to walk away with supermajorities in both state legislative chambers. Um, they hold an (laughs) alarming 75% of Ohio Senate seats. That's not fair or reasonable.

At the start of this process, I had incredibly high hopes that you would honor your commitment to bring fair maps to Ohioans. But after seeing you all skip meeting after meeting and miss [01:46:30] deadline after deadline, only to present yet another set of hearings held during the workday, when the people you need to be hearing from the most are working to provide for their families, it has become abundantly clear to me that this is not the case.

This transcript was exported on Sep 09, 2021 - view latest version here.

|  | Ohioans are not going to suffer through another 10 years of gerrymandered maps that value the votes of some over others. We are watching, and we are waiting. Thank you for your time today, and I can answer any questions. |
|---|---|
| Vernon Sykes: | Thank you. Are there any questions? |
| Sha'tisha Young: | Thank you for your time. |
| Vernon Sykes: | Thank you very [01:47:00] much. Is there anyone else that would like to testify this morning? Please come forward. We don't have a witness slip for you, but, but when you finish, if you could complete one, that would be great. |
| Mike Ahern: | Sure. Uh, yeah. I appreciate that. I, I didn't want to walk in front of everyone to fill out a slip. |
|  | Uh, my name is [01:47:30] Mike Ahern. I live in Blacklick, Ohio. Um, I'm in, uh, House District 20 and Senate District 3. And I do have written testimony that I'll submit online. |
| Vernon Sykes: | Thank you. |
| Mike Ahern: | Uh, I did submit testimony down in Rio Grande. Uh, there was representation of voters down there. And, um, I came prepared today to talk a little bit about the, uh, map that had been submitted by the Democrats at [01:48:00] the previous hearing. I saw the presentation this morning, and I'm going to submit this hard copy and let you consider it. It is comments on the map and proportionality, compactness, all that. |
|  | Uh, but I, I guess I'll just make two highlight points to try to shorten things up here a little bit today. Uh, the first is, and this is related to my prior testimony, I just want to highlight to the commission members that were not down in Rio [01:48:30] Grande. And I really appreciate, uh, Co-Chair Sykes 00:06:33 traveling from, uh, Northwest Ohio to Southeast Ohio. |
|  | Uh, you are part of a larger process, as you all know. Ohio elections are run in a non-partisan fashion. They're run by Democrats, and they're r- run by Republicans. And during the time that people are doing that work, they set aside their party. They do their best to do their job [01:49:00] in a non-partisan fashion so that we have free and fair elections in Ohio. Okay? |
|  | This past November, there were people that suited up because they knew that they were going to be exposed to people with COVID-19. People that felt so strongly about their ability to vote that they came to the polling locations sick so that they could vote. |
|  | And there were people like these folks in this picture, [01:49:30] I'm going to give these to you so each of you can look at them and keep them in mind, that |

processed their vote, at a risk to their health. So I'd like you to keep that in mind as you're considering these maps.

Non-partisanship should be a driver in this process, because it's a driver in the entire rest of the process. [01:50:00] Set aside your political parties and create districts that are fair, that are competitive, that represent the will of the voters, because the voters are the source of power. You're the representatives.

And I appreciate the service that you all provide, but please, listen to all these people from all corners of the state that are demanding [01:50:30] representational fairness through districts that are drawn fairly. Win your elections based on the strength of your arguments, not based on cheating through gerrymandered districts.

Second item that I'd like to highlight, and I just want to make sure I heard this correctly, when the, uh, staff for the Republican Party [01:51:00] presented the map this morning, there was a question about, uh, consideration of the Voting Rights Act, whether that was, uh, included as part of the analysis of drawing up their maps.

Did I hear correctly that they were told or requested by some leadership either in the State House or even on this commission to not consider that [01:51:30] information? Wouldn't that be a bedrock item to include as consideration in drawing maps, rather than focusing on geography and township lines? I hope I didn't hear that correctly. Thank you.

Vernon Sykes:     Thank you. Any, any questions? Thank you very much.

Mike Ahern:      Thank you.

Vernon Sykes:     Is there anyone else who wants to testify?

Speaker 7:       [inaudible 01:51:59] [01:52:00] lady way in the back.

Vernon Sykes:     Yeah?

Speaker 7:       Lady way in the back.

Vernon Sykes:     Come forward, please.

Susanne Dyke:    Hi. Um, some of you, well, probably only two or three of you will recognize me from the Cleveland hearings, because that's all that bothered to show up that was on this commission. Um, my name is Susanne, S-U-S-A- [01:52:30] N-N-E, Dyke, D-Y-K-E.

                 Um, I am from Cleveland Heights. I drove here from Cleveland. And, um, as I mentioned in my testimony in Cleveland, I gathered signatures for fair districts. I

This transcript was exported on Sep 09, 2021 - view latest version here.

am an activist, an advocate, and I am going to hold all of your feet to the fire, especially the majority party, to get these maps the way we thought that they would be, [01:53:00] um, uh, created.

I did not prepare testimony until I came here, because of the last minute nature, um, of this meeting. I am here, though, uh, to, um, represent teachers who need to be at their jobs today, uh, people, uh, doctors, nurses, because we are in the middle of a pandemic. Some of you seem to have forgotten that. People who are at work. People who can't [01:53:30] drive.

People who are in a high risk category and can't, can't take the chance to be in this room, because you, who are not wearing masks, don't care enough about your constituents to protect them from disease.

People who have appointments they can't cancel without penalty or charge. People who are waiting for the appliance repair person to show up, because they've been waiting for two months bi- for, for their dishwasher to be repaired during the pandemic. [01:54:00] People who can't find last minute daycare.

And I'm here for all of those thousands of volunteers and Ohioans who wanted to see a change, which we are not seeing here today. And by the way, I wanted to just acknowledge [Andrea Goda 01:54:14]. Her, her testimony was so powerful. I don't think I could follow that up, but thank you.

Um, but anyway, like I said, I can't comment on the maps, because I was driving from Cleveland when they were presented. But I will comment on the process, and I have a number of [01:54:30] questions. And in, in probably 99% of the case, I am addressing the majority party. Um, and I would like you to listen.

This commission, the majority party on this commission, is unprepared to do these maps. You are not doing [01:55:00] what your voters, who voted for you, want you to do. You are not serving the public. You're not acting in good faith.

I'm still, still, still livid that Speaker Cupp could only bother to be at two meetings. That's 20%. That's usually a failing grade. Anything under five, which is almost all of you on this commission, that's a failing grade.

[01:55:30] Either you don't care about this process, or, uh, you're y- you're def- I can't imagine why, uh, that you'd be even taking this process, that you are even taking this process seriously. Very frustrated by that.

As Andrea mentioned, your website, your own offices can't find things that your people within your office have posted. I called yesterday to ask a question about, um, uh, Attorney, um, [Blessing 01:56:00]. [01:56:00] No one could find it on the website, but she had posted information on the website that led us to be confused about the purpose of this meeting today.

This transcript was exported on Sep 09, 2021 - view latest version here.

S- Sloppy, rude, and disrespectful to the public who you work for, I have to remind you of that, and pay your salary. You all work for me, whether I am in your district or not. We got different answers yesterday from every single legislative [01:56:30] office about what these meetings were about. Your own offices didn't know.

And Senator Huffman, your office seemed to have the best knowledge, but is that, why is that? Is that because you are running the show here, not the co-chairs? Well, it sure feels that way.

You have been disrespectful to those who have fought for decades, years, months, to stop you [01:57:00] all from cheating. You act indignant about not being able to meet deadlines. But unpaid, regular citizens are doing a better job than you are, and there is no indication that the delays are resulting in a better map. And it surely has not resulted in a better process.

You have had the time. You have squandered, every single majority member on this commission, you have squandered your opportunity. [01:57:30] You're doing the bare minimum and not in the spirit of what voters vote f- voted for. And this meeting is a prime example.

You're still cheating. It's just not in a hotel room. Maybe it's in the State House. How can you ex- you know, people, like, oh, why are you all so angry? How can you expect us to trust this process? You, or this process?

[01:58:00] Anyway, so here's my questions. Why did you wait so long to get started? There have been funds available for 20 n- since 2019 to start this process. That, the census wasn't even a problem back then. Okay?

You, you could've started, but you didn't. Why? My guess is because you intended to not, to not, uh, actually follow d- t- to follow the bare minimum of the rules.

Why [01:58:30] would Dem co-chair or anyone else in this room be in the dark about the maps you showed this morning? Was it, why was it a secret, who was drawing your maps? You knew who it was. Why couldn't you release that to the public?

I don't understand. This is very confusing. Why wouldn't you... I, I, I am assuming that many of the c- at least the minority party on the commission had no idea who was drawing your maps. Why is that? Are you guys not working together? I'm confused. This is a commission. You [01:59:00] guys are supposed to be working together. Why not?

When will you take responsibility and work together instead of making excuses? I've been calling your offices, uh, since March, along with some friends of mine.

This transcript was exported on Sep 09, 2021 - view latest version here.

And every single time, there was an excuse. Oh, the census data. Oh, the budget.

You didn't have to say this, but yeah, you were also conspiring to, to create anti-voter legislation. [01:59:30] All right? You focused on everything but what was the most important thing that you could do in the ne- for the next 10 years. You blew it off, and I'm disgusted as a citizen of this state.

The recent hearings show that the public demands fair maps. Are you all working across the aisle to make sure that that happens? Are you? [02:00:00] Based on what we're seeing, you're not. And again, a failure on this commission.

Why is anyone in charge who failed to attend the hearings, the 10 hearings that you had across Ohio, um, and sent their B team on a regular basis, their JV? You have once again disrespect... Why are, why are you even on this commission? You're not fulfilling your duty to [02:00:30] show up to a meeting with Ohioans, unless it's in your own hometown.

And then I'd like to know, is why does it appear that Senator Huffman is running the show when there are bipartisan co-chairs? And why do the bipartisan co-chairs not seem to be talking to each other? And I, I, I rest that on you, uh, Speaker Cupp, to reach out and do more than sit next to your counterpart [02:01:00] and your colleague.

I say that if you didn't bother to show up to any meetings, like you Senator d-uh, t- Governor DeWine, or anyone else on this committee who showed up to less than, commission who showed up to less than five, you don't deserve to be, to be, to, to keep your office, number one, and number two, uh, I think you, you, you really need to step aside and let someone else do a better job than you [02:01:30] can.

Finally, my last statement is all of this just leads me to believe that the majority party is still cheating and just not in a hotel room. That's all. Any questions?

Vernon Sykes:     Any questions from the members? Thank you very much.

Susanne Dyke:     Thanks.

Vernon Sykes:     Is there anyone else that would like to testify? [02:02:00] Is there anyone else who would like to testify? Come forward, please. State your name and spell it please.

Deidra Reese:     [inaudible 02:02:16]. Good afternoon. My name is Deidra Reese. Uh, that's spelled D-E-I-D-R-A, last name R-E-E-S-E.

And I'm here representing the Ohio Unity Coalition [02:02:30] regarding the Ohio redistricting process. It is our belief that democracy is a fundamental

cornerstone of America. Though we are still a nation seeking to be a more perfect union, we were built on solid ideals of freedom, liberty, and the concept of true representation.

Ohio voters spoke loudly when they passed not one but two constitutional amendments changing the way district lines are drawn for legislative and congressional [02:03:00] district maps. While no process is perfect, the new process offers a great improvement over past processes for, for drawing district lines by two major elements, keeping communities together, requiring bipartisan supported maps.

The Ohio Coalition on Black Civic Participation or the Ohio Unity Coalition engages in black civic participation in elections with the goal of electing candidates who will best represent their interests. However, if politicians are able to select their [02:03:30] voters through gerrymandered districts based on partisan criteria, it undercuts t- the true purpose of our voting process.

We are aware that we will lose one congressional seat due to the 2020 census, and we're particularly sensitive to the lack of representation of people of color in our legislative bodies. Currently, there is only one majority minority district in Ohio, and I guess we're using this, um, term minority opportunity districts. And there are only [02:04:00] two districts represented by people of color, though one of them is vacant right now, in the United States Congress.

In the Ohio General Assembly, there are 20 districts represented by minority, um, members. That representation is 12.5% and 15%, respectively. According to the 2020 census, the Ohio minority population in total, including African American, Hispanic, Asian, Pacific Islander, and Native Americans, is 24%.

[02:04:30] While that current minority representation of the populas-population is underrepresented in the General Assembly by 6%, and 9% in the Congress, this is an opportunity to consider districts that reflect the true population of the people who live in the districts, as well as the issues and concerns that bind them tode- together by their experiences.

I was sitting at home watching this presentation, um, on the phone, and I was greatly [02:05:00] disappointed, and that's a very, um, weak word, really, for what I was feeling when I heard the presentation by the Senate Republican Caucus, that they did not even consider racial data, um, in drawing the lines.

I feel invisible. I feel as if I don't matter. I feel f- as other people of color don't matter at all, as they were presenting their map. And I just, I raced down here. You probably saw me rushing in the room. [02:05:30] That's why I'm out of breath, because I need to come here and stand before you and tell you that I feel invisible.

This transcript was exported on Sep 09, 2021 - view latest version here.

The numbers say I'm underrepresented, but I feel very, very, um, disgusted by the fact that someone was told not to use that data in drawing those lines. And I'm certain I'm, I'm expressing that for other people of color when you're in this process right now.

It's disgusting. It's absolutely disgusting [02:06:00] and demeaning that someone would say don't even consider me when you're drawing lines to represent me and other people who look like me.

Race, ethnicity, economic status, and educational attainment are often factors that are similar enough to require a voice that will represent a unique and needed view in the halls of government. [02:06:30] The ro- the Voting Rights Act, and indeed, several SCOTUS decisions say that you can allow consideration of race as a criterion, along with other issues of common interest.

In a season of significant racial and economic disconnect and division, it is imperative that there be voices to raise concern and voice concerns of a significant portion of the citizens of this state.

It is my sincere hope that as this commission conducts its work, [02:07:00] that there is consideration for at least one majority minority congressional district in our state and consideration of that representation for our legislative districts as well.

There have been very spirited discussions of issues that have s- centered in sensitive historical and current racial dynamics that require a voice in policy debate and discussion, but more importantly, decision making.

As this body deliberates the redistricting in our [02:07:30] state, please do not adopt a colorblind approach that ignores the complex experiences that are at times are unique to the racial diversity in our state and should be represented in our halls of government.

The new assis- the new system affords you the structure to meet this request, and I hope that you will provide that fair opportunity, because until we are colorblind in outcomes, some of o- some of which are still tied [02:08:00] to class, race, and geography, our diversity should be embraced so that we can all benefit from our differences and learn what we share in common.

As we talk about representational fairness, partisan fairness cannot be the only prism considered. Communities of color also deserve representational fairness that has been grossly lacking in our political discourse. While I'm keenly aware that the concept of minority opportunity districts and maps that I have [02:08:30] seen thus far, opportunity does not often translate from potential to reality.

This transcript was exported on Sep 09, 2021 - view latest version here.

I ask that this body be deliberate in its action to assure the ability for communities of color to truly impact and influence the outcome of elections, and more importantly, those who will ultimately represent them in the congress and state legislature. Those current levels of underrepresentation of 6% in the General Assembly and 9% in Congress [02:09:00] are out of step with our diversifying population.

I implore you to take this opportunity using the Supreme Court approved policy to use racial data as one of your criteria to consider as you draw the new maps. I hope this information is not new to you, as this testimony was submitted to this body in written form for the Zanesville hearing.

In closing, I would like to thank you for the opportunity to share [02:09:30] this testimony and wish you much success in this tight timeframe to create fair and equitable districts that gain bipartisan support. Thank you very much for the opportunity to stand before you today, and I hope I can answer any questions.

Vernon Sykes: Are there any questions to the presenter? Seeing none. Thank you very much.

Deidra Reese: Thank you.

Vernon Sykes: Is there, are there any others? Yes. Come forward. Are there any others after this person, uh, speaks? [02:10:00] Okay.

Mike Halaiko: Uh, co-chairs and members of the commission, thank you for this opportunity to testify. I'm sorry I did not turn in written testimony. I will have some, and I'll fill out a slip. I just have a couple of questions. Um.

Vernon Sykes: Can you state your name, please [crosstalk 02:10:22]?

Mike Halaiko: Yes. My name is Mike, M-I-K-E. Last name is Halaiko, H-A-L-A-I-K-O. [02:10:30] Officially, my first name is John.

I did get to testify at Zanesville, and I was quite honored to do that. Uh, I saw one member of this commission at every public hearing, and I want to thank you, Co-Chair Sykes, for being there.

Um, I just have, I want to go back to the beginning of the meeting. And with all due respect, [02:11:00] one of the statements that we hear is that the census data was late. And I would like to ask Secretary LaRose, why was that census data late? Anybody?

Vernon Sykes: Yeah. Y-

Mike Halaiko: Co-chairs? Anyone?

Secretary LaRos...: Uh.

This transcript was exported on Sep 09, 2021 - view latest version here.

| | |
|---|---|
| Vernon Sykes: | Secretary, yes. |
| Secretary LaRos...: | Co-Chair, I g- I guess, you know, I, I accept that the, uh, Census Bureau's explanation [02:11:30] for why it was late had something to do with the pandemic. But, uh, the, the fact remains that it was egregiously late by, by, uh, orders of magnitude. |
| Mike Halaiko: | Okay. Thank you. Um, you know, there was great excitement in the meetings, the public hearings. Uh, I came here on August 31, and I, I have to tell you quite [02:12:00] frankly, uh, it's, it's a little depressing to see that, you know, the people of Ohio have spoken. What is it going to take? |
| | This is a bipartisan commission, and I listened to Senator Emilia Sykes ask this question. What is the timeline? What are, what are w- you know, th- asked a simple question. [02:12:30] How are we moving forward? And I don't know if we have an answer to that yet. That was how many days ago? How many days do we have left to the second constitutional date? |
| | I just want to ask one more question. Okay. It's a bipartisan commission. Outside of August 6, August 31, and this date, how many bipartisan [02:13:00] meetings have you had? Anyone? Well, thank you for this opportunity. No questions? |
| Vernon Sykes: | Are there any questions? Seeing none. Thank you very much. |
| Mike Halaiko: | Are there any answers to my questions? |
| Group: | (laughs) |
| Vernon Sykes: | We'll continue to work on it. |
| Mike Halaiko: | Thank you. |
| Vernon Sykes: | Are there any comments [02:13:30] to be made by any of the members of the commission? Seeing no other witness to be, uh, present here today, uh, no further business to be brought before the commission, uh, the commission is adjourned. |

PART 4 OF 4 ENDS [02:13:46]

# Exhibit 6

# 9.9.21 Afternoon Hearing Transcript

This transcript was exported on Sep 10, 2021 - view latest version here.

Speaker Robert Cupp (00:00:01):

The, uh, meeting of the Ohio Redistricting Commission will now come to order. Um, first item of business is, um, the roll call. So I ask the, um, staff to please call the roll.

Speaker 1 (00:00:13):

Co-chair Speaker Cupp.

Speaker Robert Cupp (00:00:15):

Present.

Speaker 1 (00:00:16):

Co-chair Senator Sykes.

Senator Sykes (00:00:18):

Present.

Speaker 1 (00:00:19):

Governor DeWine.

Governor DeWine (00:00:19):

Here.

Speaker 1 (00:00:21):

Auditor Fabre.

Auditor Fabre (00:00:22):

Here.

Speaker 1 (00:00:23):

President Huffman.

President Huffman (00:00:23):

Here.

Speaker 1 (00:00:23):

Secretary Larose.

Secretary Larose (00:00:26):

Here.

Speaker 1 (00:00:27):

Leader Sykes.

This transcript was exported on Sep 10, 2021 - view latest version here.

Leader Sykes ([00:00:28](#)):

Here.

Speaker Robert Cupp ([00:00:31](#)):

Quorum is present and we will, uh, meet as a full, um, commission. Um, the order of business for this afternoon's meeting will be as follows. Um, we, we didn't adopt the meet, minutes from the August 31st meeting this morning, so we'll do that first. Um, then, um, we'd entertain, um, um, motioned set of schedule for the upcoming hearings and meetings of the Redistricting Commission, and then consideration of selecting a map for the commission to introduce to start the hearing process. And then public testimony, um, as was in the notice will be limited to two, um, statewide general assembly proposed maps, either the sponsor, or, um, member of the public wishing to testify to a, to a map.

 Um, so t-, um, at this time, in the interest of providing advance notice, and I will say that, um, Senator Sykes and I have been discussing this for at least a week or more, so we have been working on this, about setting an advance schedule so everyone knows when the upcoming hearings, uh, will be. Um, I would move that the commission adopt the schedule for public hearings for the commission's introduced map as follows. Uh, Sunday, September 12th at 4:00 PM in Dayton. Monday, um, September 13th at 4:00 PM in Cleveland. Tuesday, uh, September 14 at 10:00 AM here in Columbus.

Senator Sykes ([00:02:00](#)):

I second the motion.

Speaker Robert Cupp ([00:02:03](#)):

It's been moved and seconded. Are there any objections to this hearing schedule? Seeing and hearing none, schedule is a-, is adopted without objection. Um, at this time I'd recognize Senator Huffman for a motion.

President Huffman ([00:02:21](#)):

Uh, thank you co-chair Cobb. Mister co-chair, pursuant to section 8A1 of article 11 of the Ohio Constitution, I move that the commission introduce the proposed general assembly district plan, uh, that I presented earlier, uh, and through the testimony of, uh, masters' Derossi and Springetti.

Speaker Robert Cupp ([00:02:39](#)):

Uh, there is a motion. Is there any objections to the motion?

Speaker 2 ([00:02:42](#)):

Object.

Speaker Robert Cupp ([00:02:43](#)):

Um, chair hears an objection. Any discussion? Now, you can go ahead and call the roll, yep. Leader Sykes?

Leader Sykes ([00:02:53](#)):

Thank you to the co-chairs and to the members of the commission. Uh, thank you for allowing me to express some concern, um, and speak to the objection that is before us on adopting, uh, the maps that,

uh, Senate President Huffman has, has just offered up to us. Um, you know, we've gone through this before as a legislature where we see a proposal put forth. It is very detrimental, it is very extreme, uh, and it is usually used to shock the, uh, sensibilities of the members of the legislature for example.

Um, through the process, it tends to get marginally better with the attempt that perhaps there would be some support from the minority party, uh, suggesting that it could have been as worse as the first option. And that is what I view as the maps that we saw today. Uh, however, this is a much different process. This is uh, a constitutional mandate that voters have told us not once, but twice, that they want us to do something different. Uh, and the status quo which we see in the legislative process of offering something, uh, really shocking and then pulling it back marginally, uh, is just not going to work here in this, uh, scenario.

Uh, we were able to raise the concerns of lack of consideration, or I think more appropriately no consideration of the voting rights act. Uh, we heard that the constitutional mandate and requirement that uses shall language of, uh, the proportional representation or representational fairness, which is the colloquialism that folks have been using over the past week, was also not considered and would likely not be considered. Uh, and those two issues alone I think are reasons, uh, that we may need, well, at least that I will not be willing to, uh, fully support, uh, this contention, although I do know it is very important for us to move forward.

Uh, we've heard often, um, that the census bureau is delayed us, and it is the reason why we are where we are. Um, and I take exception to that for multiple reasons, particularly because we knew in January of this year, that the census date would be late, yet there was little to nothing done in order to rectify, uh, that issue. We could have done a lot more. Uh, our attorney general filed a lawsuit to help in the commission, additionally could've been much more resourceful and reasonable in its attempt to make its deadlines.

So uh, I imagine that this map will still be adopted so that we have a place to continue to move forward, so we can start this process. Uh, but I do hope that the members of this commission are taking a good fo-, faith effort to make adjustments, uh, to eliminate the cracking and packing that we have seen, uh, in the preliminary observation and analysis of this current map, uh, that people do not wanna continue to see the status quo. Uh, and I think that we have not lived up to that in this so far. So I, uh, am encouraged by the spirit of bipartisanship that I've heard from every member on this commission, that we can get to a 10 year plan by Wednesday.

Uh, it is a tall task, but if, if I can have faith in these members of this commission, and I hope you all don't let me down, uh, we can find our way to get there, and I am confident that we are all committed to that process, and I assure you that I will be equally as committed to it, as well. So, as we move forth with this map, and of course, I can't predict the future, uh, there is a lot of room for improvement, but I am happy to be a part of it, and I look forward to working, uh, with all the members of this commission, uh, to make sure that we, uh, fulfill our constitutional duties, and we provide a, a 10 year map for the people of this state.

Speaker Robert Cupp (00:06:44):

Thank you Leader Sykes. Senator Sykes?

Senator Sykes (00:06:46):

Thank you chair, co-chair. Uh, we had an opportunity to, uh, look and to analyze, uh, the proposed map, uh, during our break. And in revealing it, it seems that the partisan proportions are worse than what they are existing today. And for that purpose, I think that that purpose alone is enough for me not to be

This transcript was exported on Sep 10, 2021 - view latest version here.

supportive of this. And would hope, that we can work together hand in hand, hopefully over the next few days to come up with some, with a much better proposal.

Speaker Robert Cupp (00:07:24):

Further discussion? Uh, Auditor Fabre?

Auditor Fabre (00:07:27):

Uh, thank you Mr. Chairman. I, I, um, I would like to see us hit a 10 year map, and I'd like to see us work in a bipartisan fashion to do it. So, with that regard, and, and my vote today will be contingent on this. I would really encourage that, uh, between now and certainly the first hearing on Sunday, uh, our staffs and us if we're available, certainly work in the background to compare the maps, to look at areas of, of compromise, to find a bipartisan solution. And uh, I am willing to offer up my staff, I'm willing to offer up our team's conference calling system, uh, to, to make that bipartisan discussion in the background a-, available.

And, and certainly, um, I wanna, um, echo the conversation I had with Senator Sykes, co-chair Sykes when he was kind enough to let me go through their map with great detail, um, district by district. And, and we found a lot of areas I thought we could reach compromise on, just between the two of us. And I know you've had similar conversations with other members, when I asked to sit down and go through your maps in great detail. And so I would encourage that, initially it does not look like we're all that far apart, although there are concerns, candidly that, that I have with regard to certain areas in the map that have nothing to do with partisan issues.

Um, that have more to do with, with, with communities of interest, and, and keeping communities together and, and shared ideology. So one of the things my staff did quickly, pulling off today's redistricting site which now has them up there to compare, it is pointing out that between the sen-, senate Democrat map and, and the, uh, GOP, uh, House and Senate map, you're within a couple of districts on the competitive side, and, and the House, and actually the Senate version, uh, I'm sorry, the GOP version when you look at the Senate, actually has more competitive districts in the Republican produced map than the Democrat map.

Um, but, you know, you do have a difference in what are the solid leaning Republican and the solid leaning Democrat districts in both, both maps. But it doesn't look like they're that far off. You're talking about a couple of districts here and there. Uh, so it seems to me that there is ample area of compromise, and I will commit my team and myself to that, certainly tomorrow and Saturday, and Sunday. And, and on past that as we go forward. But I do think it's important that our staffs start sitting down collectively in going district by district and looking at where we can find compromise.

Um, and, and with that, I will agree to, um, move this forward for a discussion point. But I really, really would like to see a 10 year map. I really would like to see us have bipartisan buy-in on it, and uh, from, from that perspective, I, I think it's a place for us to start.

Speaker Robert Cupp (00:10:10):

Further discussion, Secretary, uh, Larose?

Secretary Larose (00:10:13):

Thank you co-chair Cupp, and um, there you go. For the, um... adjustment on that then. Try that. All right. Thank you leader, so for the, uh, for the folks that, that have been so good to come and offer testimony, uh, not only here but at all of the different remote sites that we've been to, I really share, I

This transcript was exported on Sep 10, 2021 - view latest version here.

can talk louder? Um, for those that have had the, the, uh, the opportunity to come and offer testimony, I sincerely appreciate your engagement in the process, and I share a lot of the passion and a lot of the concern that you have. Remember that, uh, I worked very closely with many of you as we got this process enacted, uh, many years ago.

I remember the all nighter that we pulled, uh, to get this, um, initial proposal on the Senate floor, and I think it happened at about 4AM by the time the, the compromising was done. And so while I share the concern, I, I guess I, I, I don't share the pessimism. Uh, and here's why. Uh, I think that now is when that real collaborative process can, can get started. Uh, we are weeks and weeks behind thanks to the, the delay in the census bureau data, but we have the opportunity now, the seven of us, to do the thing that lies at the heart of this process. And that is collaborate and compromise, and find the middle ground. And the auditor and, and I did the same analysis over the, the little break that we just had just now, and I, I got the information off of davesredistricting.org as well. What I see is that the two maps aren't as far apart as some might think they are, and just again, this back of the envelope analysis here shows that, um, there are, you know, in the Republican map, there are 20 competitive districts. In the, uh, in the, uh, in the House. Uh, in the Senate Democrat map, there are 22. So that's a difference of two competitive districts. In the, uh, in the Senate, there's eight competitive districts, uh, on the GOP plan, and there's four competitive districts on the, on the Democratic plan, a difference of four.

Uh, there's a difference of zero between, uh, the Republicans and the Democrats on how many Republican leaning districts there are, difference of four on how many Democratic leaning dif-, districts in the Senate. Again, uh, we're talking single digits here. Uh, this is that, that time that, that we now need to roll up our sleeves as a group though. The seven of us, and, and, and find those compromises over the weekend. I, I am prepared to, uh, allow this map to go forward as the work in progress, as the first draft. But I think it needs substantial work.

One of the other things that I was looking at, is the, um, majority and minority districts, or minority opportunity districts. I think that that's something that's important, um, the Republican map that was introduced this morning again, according to Dave's show, 11 majority, minority districts in the House, and two majority minority districts in the Senate. So room for, for progress on there. Um, my objective has been from the beginning a 10 year map. Uh, I think that that can only happen if we work diligently tomorrow, Saturday, Sunday and throughout the next few days. Um, and again, I, I echo what the auditor said that, um, I for one am willing to put in the hours this weekend and tomorrow to get that done.

Uh, I know my staff shares that, uh, and I think that we have, have a real opportunity here to reach a 10 year map, um, with this map that was proposed this morning as the starting point for that conversation. But just the starting point, um, by no means a finished product. Thank you.

Speaker Robert Cupp (00:14:14):

Further discussion? Further discussion (laughs)? Senator Huffman.

President Huffman (00:14:17):

Uh, thank you very much, um, Senator Cupp. Yeah, in, uh, a little bit of history, um, when, when this was, um, proposal was negotiated in 2014, with Senator Sykes and I from the House, and, and President Fabre, uh, and I think minority leader Shavony, if it, uh, if memory serves us right. Of course, uh, Senator now Secretary Larose was there. The, the concept was that when we got the, uh, data on April 1st, and it took some time to put this in the political finish, and that usually was a two month to 10 day, or 10 week process, and somewhere at the end of June we would have it.

This transcript was exported on Sep 10, 2021 - view latest version here.

And we would have a full two months plus, to do the negotiation that we're now going to try to do in six days. Um, and, and, and try to come up with a 10 year map, and um, negotiating these things is as, uh, is difficult. It's not just a matter of, of, um, you know, pressing one button, and it all falls into place. Um, but we didn't get that 60 day to 75 day period. Um, and uh, and, and actually longer than, we didn't get our si-, our about five months period that we had, because as we know, there was a pandemic, the census bureau, um, did, uh, whatever they could do, and, and, and here we are.

So now we have seven days. Um, frankly, and I have to say, this is one of the reasons why I asked that we get a 30 to 60 day extension in April, and asked to take that to the voters, and many folks probably some people in this room, opposed us doing that. And so here we are, with the September 15th deadline. I'm optimistic, because I know everyone on this panel, um, and I know they're all intelligent people, people of good will, um, that we can, um, substantially, um, take, um, have substantial negotiations, substantial, um, uh, conversation to, to get to a 10 year map, in a six, in, in the six day period that we have left.

I wish it were 60 days, but it is what it is. Um, I, uh, a couple of oth-, in, in, in, as I mentioned, uh, I think a couple of folks have mentioned, but I mentioned in my comments to the media, um, you know, we, I met yesterday with, uh, Senator Sykes and Leader Sykes, and we reviewed, um, the map that you saw today, and uh, then two days ago I met with Senator Sykes and his staff, uh, and reviewed the Senate Democrat map in detail.

So there have been ongoing conversations from, from, uh, both sides. Um, and I think what we walked out, and what I think the Secretary and the Auditor are suggesting is an excellent plan. Uh, because of the detail, uh, involved in this, it's, it's, let's take these two days for our staff to get together and begin making suggestions on how to make this a, a comprehensive collective commission, uh, product. Um, and so I, again, I... a couple of things I did wanna say.

There, there's, and, and I think for the public, you know, these terms of our, aren't particularly important, and maybe not relevant, but in fact constitutionally they are. We, we have maps that are presented formally, and we have that, uh, this morning, uh, with one map a, a week or so ago with another. Um, but the constitution calls for the commission to introduce a map. Now, in the olden days, uh, what happened was a map was introduced to what was then called the reapportionment commission. They'd walk in, set the map down, there'd be a couple hours of conversation, and they would pass it.

The reason we came up with this process, where long negotiation period, but deadlines, and we had a deadline by the way of September 15th for the General Assembly, so that nobody could get redistrict out of their district after a year, uh, because that's a constitutional requirement. Uh, you know, so, September 15th, and then we'd work on a congressional, uh, lines after that. Um, but we changed that process, and said, we have to have hearings on the map separate from the, when the time the map is being introduced, so the public can digest it, people can make objections, uh, supporting comments, whatever it may be.

This commission, although the constitution only required one hearing, in this September 1st to 15th deadline, added two additional hearings, um, and some would argue, some would argue added another hearing. But the, the point is, that um, in, in the, um, contracted timeframe, um, uh, the commission is not only adding hearings, um, but doing all of the things that the con-, constitution requires, including introducing a map. Uh, the Secretary's correct, this is a, a working document that can be changed. Um, and we're going to have hearings, that's the point of having the hearings, is that so the public, um, not just through this microbo-, phone, but through the, the website that's established, through all the other ways that, that uh, people communicate, uh, can do that, and there can be due consideration.

This transcript was exported on Sep 10, 2021 - view latest version here.

Um, I do wanna say a couple things. Uh, I, I wanna thank, uh, Ray Derossi, and I, and I, I'll let speaker, Speaker Cupp talk about his staff. Ray has worked since the data was received about 16 to 18 hours a day, uh, (laughs) maybe more than that. Uh, for about the past three weeks straight to try to produce the map today which is a map which, uh, meets all the constitutional standards. So, um, he's working very hard, and he's gonna work very hard for the next eight days straight also, uh, in negotiations and making other changes.

And finally, Mr. Chairman, I wanna thank the co-chairs, with working with this extraordinarily truncated time period, trying to get the hearings done, um, and uh, especially the, uh, Senator Sykes and you have, uh, been a great working team, and, and managing this, uh, this difficult schedule, so thank you.

Speaker Robert Cupp (00:20:35):

Uh, thank you. Um, I am encouraged by the optimism that I hear in this, uh, on this commission today. So I would just echo that the introduction of a map is not the end of the process. It's the action necessary to commence the next set of hearings, which we have, uh, already set. And that does create the opportunity for bipartisan discussions, and um, certainly the, um, the House majority staff is available. Um, the, the next three days and throughout the hearings, uh, and Mike Springetti is, um, staff person, um, uh, that has been working on this, which we've previously acknowledged, and stated.

And again, many, many times, uh, kind of sleepless nights. And I would also add that the, the software and the equipment was all set up way in advance, not way in advance, but in advance of knowing, of getting the census data, so it would be ready when it came. So there was really no delay, but rather on the contrary, an opportunity to move this along as fast as possible, understanding the truncated, uh, process. So, I would also say that, um, uh, having, um, these hearings, uh, provides a greater opportunity for the public to understand.

I mean, some are, you know, very, uh, interested in the map. Others are very interested in the concept. Um, and we hope that, uh, many members of the public will actually tune in, log on and look at the maps, and see the contrast and, and understand what the discussion is that, uh, is going on. So public education is also a part of this, uh, this process. Um, I would, uh, also add that, um, in these hearings to come, uh, experts are welcome to come and testify. We've heard, you know, the need for some of that.

Uh, this is an opportunity for experts to come and to provide their expertise, whichever side of the equation they're on. Maybe they'll all be on the, the same, uh, um, same path, which would, that would really help things a lot. Um, and so, this is a, is a, is a great opportunity. So, um, no further discussion. Um, I have the, um, staff call the roll.

Speaker 1 (00:23:00):

Co-chair Cupp.

Speaker Robert Cupp (00:23:01):

Yes.

Speaker 1 (00:23:02):

Co-chair Senator Sykes.

Senator Sykes (00:23:03):

This transcript was exported on Sep 10, 2021 - view latest version here.

No.

Speaker 1 (00:23:04):
Governor DeWine.

Governor DeWine (00:23:04):
Yes.

Speaker 1 (00:23:06):
Auditor Fabre.

Auditor Fabre (00:23:07):
Yes.

Speaker 1 (00:23:08):
President Huffman.

President Huffman (00:23:09):
Yes.

Speaker 1 (00:23:10):
Secretary Larose.

Secretary Larose (00:23:12):
Yes.

Speaker 1 (00:23:13):
Leader Sykes.

Leader Sykes (00:23:14):
No.

Speaker 1 (00:23:19):
Five to two.

Speaker Robert Cupp (00:23:19):
The vote is five to two, the motion passes. The commission has now introduced its map, which is publicly available.

Speaker 1 (00:23:26):
We need to [inaudible 00:23:33].

Speaker Robert Cupp (00:23:35):

This transcript was exported on Sep 10, 2021 - view latest version here.

Um, in addition to the, um, the hearings, I, also we have agreed that the next meeting of the Ohio Redistricting Commission will be at, uh, 10AM, um, Wednesday, September 15th, 2021. And it will be, we're gonna go back to the House. It'll be room 313, the, um, known as the House, um, Finance, uh, Room. All right, um, at this time then, um, we're moving into, um, to witness, uh, testimony. Uh, again, this testimony, uh, as provided in the notice is limited to, um, comment on, uh, statewide general assembly proposed maps.

Um, and uh, so if there is a map that someone wishes yet to propose, uh, you would have, uh, 10 minutes, um, more or less, um, to do that. If you just wish to comment on one of the, uh, proposed, uh, full statewide maps, um, the rules provide for five minutes, uh, to do that. Uh, if you testify, we'd ask you to, to state your name, and as, if you're testifying to a complete statewide map, and whether you are a plan sponsor, or a, a general witness. So, um, do we have any, uh, witness slips?

Speaker 1 (00:25:06):

Yes, sure, yeah. [inaudible 00:25:07].

Speaker Robert Cupp (00:25:06):

All right. Uh, first witness, um, is, um, a Gerald, um, let me find your name up here. Gerald Barnup? All right. He has provided witness, or um, written testimony.

Speaker 1 (00:25:32):

Okay. I think it's Areuna Pajanchu.

Speaker Robert Cupp (00:25:33):

Our next witness, Ar-, Areuna Pajanchu. I'm not saying that right, so we're gonna have you, uh, come and, uh, spell your name and um, and pronounce it, uh, for us. Um, and I would, uh, ask, are, are you testifying to a complete statewide map?

Areuna Bajancherul (00:25:50):

I'm sorry?

Speaker Robert Cupp (00:25:51):

Are you testifying to a complete statewide map?

Areuna Bajancherul (00:25:54):

Yes.

Speaker Robert Cupp (00:25:54):

All right.

Areuna Bajancherul (00:25:55):

Hello commissioners, my name is Areuna Bajancherul. I am an MD PhD candidate at the Ohio State University, studying biology and pediatric cancer. I moved to America when I was 18 years old with 300 dollars in my pocket. Even then, I was able to recognize the potential and the promise of United States

This transcript was exported on Sep 10, 2021 - view latest version here.

of America, where an immigrant can aspire to participate in democracy. I watched American democracy from the sidelines for more than 10 years, until I became US citizen.

The importance of exercising our votes as citizen had been strongly emphasized while I was preparing for the civics test, and when I became the US citizen. I knew I was joining an imperfect country, but I also knew I was joining a country that aspired for a more perfect union. When I casted my first vote at the ballot, I saw many of these imperfections at the ballot box, of our, uh, American political system. The issues I came personally and professionally is not, has not been the topic of any discussion or policy.

Instead Ohio politicians pander to coal industry corporations and powerful few. Despite the disa-, disappointment I felt with my options at the ballot box, and beyond, I still firmly believe the way to participate in American democracy is through voting, through fair and transparent elections. As our elected officials, you have duty to ensure we Ohioans are fairly represented at the state and at the federal level, because we spoke up. We want fair maps, and fair representations that reflect who we are, and what our values are.

The current process which we hold hearing today is not neither fair, not tr-, transparent process that Ohioan wanted. Here are some examples. Waiting until the last minute to assemble the commission, and blaming the timeline is not a fair or transparent process. Giving the public less than 24, four hours to prepare testimony is limiting who can voice their voice. Proposing a map late in the process and blaming the census data when more than 20 organizations were able to draw maps from easily accessible data to lawmakers. GOP prepared map doesn't meet the VRA requirement, diluting down the [inaudible 00:28:31] community's political power, and also does not ensure fair representation of partisanship in Ohio.

This blatant effort to limit and dilute people's political power is anti-American. The beauty and promise of America that depends on the fact that my vote counts just as your vote. As our elected official, now is your time to stand up, and fulfill the promise of America, by ensuring Ohioans have fair maps, and representation through transparent process.

PART 1 OF 5 ENDS [00:29:04]

Speaker 3 (00:29:00):

Fair maps and representation through transparent process. And thank you for your time.

Speaker Robert Cupp (00:29:06):

Uh, and thank you, and I would just remind, uh, future witnesses today that the testimony is limited to a plan, a statewide plan, not general comments, so we can move through this. And we have, there's the next six days to, uh, testify, uh, on these, on these maps. Uh, is there any additional witness?

Speaker 4 (00:29:30):

Shela Blanchard.

Speaker Robert Cupp (00:29:32):

Um, next is Shela Blanchard from Columbus, Ohio. Um, Ms. Blanchard, are you testifying on a statewide map?

Shela Blanchard (00:29:56):

This transcript was exported on Sep 10, 2021 - view latest version here.

At this point, yes.

Speaker Robert Cupp (00:29:59):

Okay.

Shela Blanchard (00:29:59):

Yes. I am.

Speaker Robert Cupp (00:30:01):

And you're sponsor, or a witne- a general witness? Are you a spons- testifying as a sponsor or a general witness?

Shela Blanchard (00:30:04):

A general witness.

Speaker Robert Cupp (00:30:05):

All right. Um, if you'll state your name for the record, you may proceed.

Shela Blanchard (00:30:09):

Yes. Sheila Blanchard, S-H-E-L-A B-L-A-N-C-H-A-R-D. And thank you for allowing me to speak today. I am looking at reviewing the proposed maps, as that is what I'm here to speak to, uh, on today. I initially wanted to speak about the effects of it and how it, a lot of people don't understand the effects of an injustice map, an unfair map.

But as I'm looking at this map that was presented this morning, I am wondering, and my question is, down here in District 9, 8, 7, at the bottom, is that clear? I see overlap, um, just not understanding that, um, overlap. And it just, I don't know, just looks, I don't want to say the word dump, but, um, just unfair, as to how are the people that can be fairly represented in this section of our state?

Eight, nine, seven, then you have 14, which I've never really understood, because in the Cincinnati area down there on the border of Ohio, you have this large and, and I don't have the statistics with me of how many people are here in se- in District 14. Why is that split between the 14 all there right there on the river? Is there... Um, I'm real confused about that, so maybe that's something that could possibly be addressed.

Um, also here, it just does not... And then 17. That... Do you follow me? So anyway, today, I al- I wanted to speak to the map, but I also wanted to speak to you individually and say that as a African American, that these maps do not represent the effects that, that the unfair just j- drawn maps affect everything from prison reform, criminal justice, our education system, our budget system, commonsense gun legislation.

And it affects me when I go to the gas station. It affects me for any and everything. Not just me, but all people of Ohio. And from Lake Erie to Cincinnati, these maps are not fair.

And so I just ask, from my perspective and from the people of Ohio, to revisit. And that's what you're planning to do over the next few days. I don't know how you're going to do it within seven days, but I'm praying that you are able to come back with something that is more fair and just for all people of Ohio, not just for the 1%, but for 100% of the state.

This transcript was exported on Sep 10, 2021 - view latest version here.

We went to the ballot box. We requested fair maps. And so we just, following the Ohio Constitution, that's what we deserve. And so as I look at this, I'm just looking at one, and it just does not... I'm just asking for more. Thank you for your time.

Speaker Robert Cupp (00:34:11):

Thank you for your testimony. Any questions for the witness? All right. Thank you.

Leader Sykes (00:34:17):

[inaudible 00:34:17] for the witness.

Speaker Robert Cupp (00:34:20):

Okay. Um, Leader Sykes.

Leader Sykes (00:34:20):

Thank you. Thank you, Mr. Chair. And I apologize. I don't have a question for you, but thank you for testifying with us. Just as, your testimony did, uh, illuminate something I think might be helpful for all of us as we're just taking in the feedback.

I mean, the maps that we have, we have a PDF form and, and various colors and lines and numbers. The House maps are incredibly difficult to see, especially in the urban areas, where they're very tight.

Uh, so is there any way that we could have either staff support help us explain or understand some of these, these issues? For example, as I just heard the testimony about these Senate districts, eight, nine, and seven, I don't know what communities are even a part of these districts? Um, I know the map pretty well and the counties pretty well.

So is there some way that we can have either staff support so we can identify exactly what people are testifying about? Um, I know we, we all just got this information this morning, and we're struggling to do our best to adhere to the, the question about what o- of testifying solely on these state legislative maps.

But it's, it's a little hard to get quality feedback when, uh, the maps aren't labeled by county, by city, and just some of the detailed information we just don't have yet. So I don't, I don't know w- if I have an answer to the question, but perhaps someone on the commission does.

Speaker Robert Cupp (00:35:49):

W- We will work to have, uh, large, and problem is these are large maps that are condensed real small, and you can't see 'em. And I was having the same issue. Uh, so it's, we'll try to figure out a way of getting additional information, maybe larger, larger maps, uh, in some way so it can be better elucidated. So, all right. Uh, next witness is Steven Castro. Oh, I see it says no testimony [inaudible 00:36:17]. Welcome. Welcome back, Steven.

Steve Castro (00:36:21):

Thank you.

Speaker Robert Cupp (00:36:21):

So are, are you testifying, um, as a, on a statewide map, complete statewide map?

This transcript was exported on Sep 10, 2021 - view latest version here.

Steve Castro (00:36:27):

I am.

Speaker Robert Cupp (00:36:28):

All right.

Steve Castro (00:36:29):

I am commenting on maps, multiples.

Speaker Robert Cupp (00:36:31):

All right. Very good. Are you, you're a sponsor or a general witness?

Steve Castro (00:36:34):

General witness.

Speaker Robert Cupp (00:36:35):

You may proceed, and state your name for the record, please.

Steve Castro (00:36:38):

Okay. Thank you, co-chairs and commission members. My name is Steve Castro. I'm coming from Reynoldsburg. I, uh, testified in Zanesville. Previously, I testified on a measuring, uh, uh, compactness. It's something I consider really important, personally. Uh, it is in the Constitution.

Uh, so first of all, I just want to say thank you so much for providing the digital files. That was one of the things I requested. So both the Democrats and the, uh, Republicans have, have, uh, released the digital files on the redistricting website, and I'm very thankful for that, because I was able to analyze both the Democrats' and the Republicans' maps. I scrambled to do that this morning in time to be here today.

Um, so I want to talk about three maps and two principles. First, I want to say the Democrats' and the Republicans', uh, proposals are actually very similar in terms of compactness. They are better in terms of compactness than the current maps, which is a good thing.

Um, their averages are pretty much similar, almost identical. We're talking about, now I'm ta- uh, I'm using the measure, uh, convexity coefficient. So we're looking at 75% average convexity for the House maps for both the Democrats and Republicans. So very, very similar.

Um, now, the Republicans, the minimum is a little bit lower, so the median is a little bit lower, and there are f- there are more lower compact districts on the Republican side but, um, at the same time, there's, there's a lot fewer. When you start going up to, like, 60%, it's actually a little better for the Republicans' map.

So basically, in terms of compactness, they're both very, very similar. Um, however, the Ohio Citizens' Redistricting Commission, who has submitted a proposal, their maps are far more compact than either one of these maps. So we're talking about 81% on the House side and 83% on the Senate side. So, far more compa- far more compact.

This transcript was exported on Sep 10, 2021 - view latest version here.

And so I'll just say that, you know, I, I, when I testified before, I said that less than 50% convexity I consider kind of a red line, you know. A, a glass less than half full is objectively not full by any, by any standard.

So, um, with the current map, let's, let's start with the House. With the current map that we have right now, we have 14 districts under 50%. The Democrats r- have proposed 11, a little better. Could be better, but it is better than what we have now. Republicans, even better, nine. The OCRC has two, two districts less than 50% compact. That is highly compact.

And on the Senate side, we're looking at four for the Democrats and two for the Republicans, both better than what we have right now, and the OCRC has zero districts, zero Senate districts below 50%. The OCRC has produced a highly compact map and so showing that it is possible and that we should consider looking at the OCRC's map.

Now, the second principle I want to talk about is section 6B. Now, I'm going to use the term proportional party favoring districts. Um, I think the term representational fairness, it was left out of the Constitution intentionally. I think proportional party favoring is much closer to, uh, you know, what the Constitution actually says.

Now, and when we, let's first we'll start with the Democrats' and Republicans' maps. The Democrats, uh, for the House, they've achieved 55 to 44. That was from their presentation. That is, I haven't heard anyone argue that that's not correct. (laughs) I mean, that's very roughly what it should be.

Now, the OCRC has also achieved 55 44 in the House, so the OCRC and the Democrats have achieved very similar proportional party favoring as the Constitution expects.

However, the Republicans' maps that they submitted this morning are not near that at all. So instead of, so i- if 55 is somewhere ideal, they've given f- 56 safe districts to the Republicans and only 23 for the Democrats. So they've given themselves more safe districts than what's, to the Republicans than, uh, what the target is, and half as many for the Democrats. And that's just safe seats.

Now, as far as the competitive districts, competitive districts I believe are fully constitutional. I don't think you, every single district has to be party favoring. But if, uh, if you look at the way they still lean, now you're talking about 66 districts for Republicans and 33 for Democrats. This is nowhere near the constitutional expectation of proportional party favoring.

And, uh, some people have characterized this section as aspirational, and I want to push back on that, because I think, yes, it says, you know, "You shall attempt." That is a constitutional requirement to try. And when you have a failure, and as, uh, Senator Sykes has pointed out, this is worse than what we have now in terms of Republican favoring districts on the House side.

And I just want to point out that aspirational should not be confused for optional. This is something that the Constitution expects this commission to strive for.

And so, uh, and I, and I also say that proportional party favoring, I disagree with the assessment that it's in, somehow in conflict with section 6A. I bel- you know, we, we can't be making maps to favor one party. And I think section B saying that the, uh, they need to be proportionally party favoring is specifying this is the way that you avoid favoring one party over the other. It is not in conflict. It is how you do it.

And so, and I'll also say that if, when the Democrats produce a map that still keeps the Republicans in the majority, you can't rightly say that that (laughs) is somehow favoring the Democrats. They could've made a map that, you know, gave the Democrats a majority, but they didn't. They did it according to the Constitution.

This transcript was exported on Sep 10, 2021 - view latest version here.

So, um, I just want to say that in terms of compromising between the Democrats' and Republicans' maps that have been proposed, I believe the Democrats' maps are much closer to where the compromise should be, and that the Republicans' maps, I, I'd really like them to go back to their drawing board. I think it's very far from what the Constitution is, is expecting, uh, in terms of this proportional party favoring section 6B.

Uh, and I think that at some point, if, if, if it's not proportional party favoring districts, such as the one that's been proposed, then I would say that they have demonstrated a failure to attempt to adhere to this. And so I, I consider that unconstitutional.

So finally, I will just say, um, I highly advocate this commission to accept the OCRC's proposed map that has been submitted. It's available on the, uh, redistricting site. Um, if there is a compromise that d- you know, doesn't consider the OCRC's, I think the Democrats' is much closer to it. And as far as the Republicans, I think it's far too far away from the constitutional expectations to be, uh, considered something sh- you should accept. Um.

Speaker Robert Cupp (00:43:55):
Mister, uh, your time has expired [inaudible 00:43:57].

Steve Castro (00:43:57):
Okay. I'll say one last thing. The Republicans' map on the Senate side-

Speaker Robert Cupp (00:43:57):
I, I'll give you-

Steve Castro (00:44:01):
... has the lowest-

Speaker Robert Cupp (00:44:01):
.... I'll give you one minute to conclude.

Steve Castro (00:44:02):
The-

Speaker Robert Cupp (00:44:02):
(laughs)

Steve Castro (00:44:03):
Oh. Sorry. Has the lowest district convexity for the, for the last several decades of any of the maps at 25%. Uh, are there any questions?

Speaker Robert Cupp (00:44:12):
Questions for the witness? Thank you very much. Interesting testimony. Uh, next, uh, witness is, uh, Tala Dahbour. Welcome. Are you, uh, testifying on a map today?

Tala Dahbour (00:44:39):

This transcript was exported on Sep 10, 2021 - view latest version here.

Yes.

Speaker Robert Cupp (00:44:39):

All right. And are you a plan sponsor or a general witness?

Tala Dahbour (00:44:43):

General witness.

Speaker Robert Cupp (00:44:43):

All right. You, um, uh, spell your name for the record, if you would, and then you may proceed. You have five minutes.

Tala Dahbour (00:44:49):

Sure. T-A-L-A, last name D-A-H-B-O-U-R. Good afternoon, Co-Chair Cupp, Co-Chair Sykes, and members of the Ohio Redistricting Commission. My name is Tala Dahbour, and I'm here today testifying on behalf of the Ohio Chapter of the Council on American Islamic Relations, known as CARE Ohio. Thank you for the opportunity to appear before you to present testimony in support of the Ohio Citizens' Redistricting Commission proposed unity maps.

As a civil rights and advocacy organization for Ohio Muslims and a proud member of the Equal Districts Coalition, CARE Ohio has been working for several months to fight for fair maps. Muslims, who are often the subject of political discourse, rarely have the opportunity to advocate for themselves.

As it stands, Islamophobia, racism, xenophobia pervades our political system, leading to the creation of discriminatory policy. This emphasizes the need for diverse representation among our elected officials. At the very least, Muslims should have adequate representation in government that will be accessible and responsive, much less advocate for our needs.

The redistricting process is crucial to establishing proportional representation and ensuring that all Ohio, Ohioans have a voice at the ballot box. This is why Ohioans overwhelmi- overwhelmingly voted for these reforms.

Also part of these reforms was for this process to be fair, transparent, and provide ample opportunity for public input. Thus far, we have seen this commission seriously cha- challenge the spirit of the redistricting reforms Ohioans were promised.

Today's hearing was announced with one day's notice and during work hours for most Ohioans. Fair maps come from a fair process, and we are deeply concerned that that is not what we are getting here today.

The Ohio Citizens' Redistricting Commission has accomplished what this commission has failed to do. The OCRC has been regularly soli- soliciting public input from across the state during biweekly meetings since May of this year with ample opportunity for public testimony.

The OCRC has made a concerted effort to get perspectives from minority groups such as our Muslim community. For example, one of our Muslim community members, [Hadya Uchta 00:47:13], testified about her residential community around the Noor Islamic Cultural Center, one of the busi- biggest mosques in Central Ohio. She testified about how her neighbors are split between two congressional and two State House districts, theref- therefore diluting their collective voting power as a community.

This transcript was exported on Sep 10, 2021 - view latest version here.

The OCRC was able to take Hadya's testimony into account when drawing the proposed unity maps. These maps meet all of the relevant constitutional requirements and mostly, and most importantly, reflect representational fairness. To reach representational fairness, we strongly believe this warrants 15 State Senate Democratic seats and 44 state representative de- Democratic seats. Over the last decade, Ohio Republicans have only captured about 55% of the statewide vote. Our maps need to reflect that reality.

Such an important task that implicates all Ohioans and has the power to dictate policy reforms demands a substantial amount of time, care, and attention. With looming deadlines and hearings announced with such short notice, the commission clearly does not appreciate the great responsibility that has been assigned to them.

We need to ensure that Ohio voters are fair, fairly represented in Ohio government seats for the next 10 years. These maps will shape our lives, laws, and policies for th- for at least the next decade. We need fair maps to make sure all of us, especially immigrant communities like mine and other communities of color, are fairly and equitably represented, no exceptions.

Thank you for your time today. This concludes my testimony.

Speaker Robert Cupp (00:48:55):

All right. Thank you. Um, questions for the, uh, witness, representative, Leader Sykes?

Leader Sykes (00:49:01):

Thank you to the co-chair, and thank you for your testimony today. I do recall Hadya's testimony in Cleveland, uh, and she discussed how the, the mosque that she was a member of has members who live nearby but separated in plenty, in, in numerous committees, or excuse me, state legislative districts as well as congressional ones.

Based on what you know about the map that was just adopted, I know you talked about the, the unity maps, but based on the maps that were just adopted today, does, would the mosque and the, and the community that it serves be treated fairly, uh, as far as you can tell under what was just a- adopted this afternoon?

Tala Dahbour (00:49:42):

Thank you, Leader Sykes, for your question. Uh, unfortunately, I have not been able to make that determination, just based on, uh, the amount of time I was given, um, in order to come here prepared. So, um, I hope that that's something that we'll, um, be able to discover. Thank you.

Speaker Robert Cupp (00:50:03):

Thank you. I appreciate that. Um, I was, um, just informed we have, um, 20 s- 20... No. I'm fine. Thank you very much. 27 witnesses, um, to go. So what I would, again, ask you to, um, limit it to five minutes each. And if you could, try not to be repetitive. Um, so if, if you have a new point to add, talking to the map, that would probably be most helpful, uh, to the commission. Um, next witness is Tony [Dambrosio 00:50:38] from Cincinnati. Is Tony here? Okay. Next witness, then, is-

Speaker 4 (00:50:58):

Sue Dyke.

This transcript was exported on Sep 10, 2021 - view latest version here.

Speaker Robert Cupp (00:50:59):

... Sue Dyke. Is Sue here?

Sue Dyke (00:51:02):

I did testify this morning, but I have a couple of comments on the map that I did not comment on this afternoon [crosstalk 00:51:09].

Speaker Robert Cupp (00:51:09):

Then you may, may proceed if, please limit your comments to the map.

Sue Dyke (00:51:13):

I will. [inaudible 00:51:15] my ch- my, uh, my chance to speak. Um, I just had a couple of questions. Um, you know, it's really hard to comment on the maps when the c- when the counties and the communities aren't labeled. Really hard.

Speaker Robert Cupp (00:51:31):

Well, well that'll, that'll be coming. These are little, tiny maps, but that'll all be labeled.

Sue Dyke (00:51:36):

But that speaks to the rushed process and the fact that th- that, you know, so, so I think that, um it, like I said, it's difficult to comment on when, when the proper preparations have not happened.

Um, any map has the cities and the counties identified, and the communities. Um, otherwise, it's just a, it's just a drawing on a piece of paper.

Also, the maps, I noticed, were taken away, so we can't even really look at them. And we asked for them to be put back, and they said that they didn't know if they had them anymore. Where are they? Where'd they go? Don't know? Uh, I mean, I would really like to take a closer look, but I can't.

Um, and so if you're a- if you're being very, very, uh, a stickler about commenting on the maps, you're not providing the resources that are needed for people to make good testimony about the maps. Um, and the one thing I would like to mention, because President Huffman, uh, over here mentioned earlier that he, uh, was not running the process. And my question is, is why is his name the only one that's on the map that was submitted by the GOP? Those are my comments. Thank you.

Speaker Robert Cupp (00:52:47):

Okay. Thank, thank you.

Sue Dyke (00:52:50):

Any questions?

Speaker Robert Cupp (00:52:50):

Next witness. What does that mean?

Speaker 4 (00:53:01):

[inaudible 00:53:01].

This transcript was exported on Sep 10, 2021 - view latest version here.

Speaker Robert Cupp (00:53:01):

Oh. [inaudible 00:53:01]. Okay. Our next witness is Richard [Gunther 00:53:03] from Worthington. Is Richard here? All right. Next witness, uh, is Stanley [Hurtle 00:53:18] from Dayton. Stanley here? Next witness. Uh, Christopher Hicks from Cincinnati. Welcome, Mr. Hicks. Are-

Christopher Hicks (00:53:40):

Well, thank you. I-

Speaker Robert Cupp (00:53:40):

Are-

Christopher Hicks (00:53:41):

... I'm a general witness, and I think on the full map.

Speaker Robert Cupp (00:53:44):

On map. Very good.

Christopher Hicks (00:53:44):

Okay.

Speaker Robert Cupp (00:53:44):

You may proceed.

Christopher Hicks (00:53:45):

So (laughs) thank you for the opportunity to speak. I'm going to try to be brief and take less than five minutes. My comments, uh, eventually are going to be specifically on the distribution of seats in the maps and th- that, of what I know and what I've read in the press so far.

I just want to recurs- precursor them by saying I think I'm more conservative than any person sitting up there. I'm a conservative, right wing Republican, and I wish most of my Republican friends up there would be more conservative. Okay?

So, but I, I just want to comment before getting to the distribution that we're here because the Constitution requires you to be here. The Constitution requires you to be here. You know, it also requires that this meeting is electronically streamed. It also requires that there be citizen input. And I'd just like to ask the question, why isn't that the standard for all public meetings in Ohio? Why isn't that the standard for all public meetings in Ohio?

Now, specifically, starting to move into the district maps, there's two things I want to hit on. What do districts matter if the legislature does not meet and get the business of the citizens done?

If the legislature is not meeting, acting, and being on the record taking up and down votes on things that the citizens are clamoring in the streets about, whatever they be, Republican things, Democrat things, but that the citizens see their legislature acting. Districts mean nothing. What's the point of electing people that don't meet and act on the business of the citizens?

One of those things, for me as a conservative, I know some people here might not agree with me, would be House Bill 248. At least there should be an up and down vote on whether there should be

This transcript was exported on Sep 10, 2021 - view latest version here.

vaccine mandates allowed in Ohio. Why doesn't our citizen, why doesn't our legislature meet to even allow those votes to take place? And what do districts matter?

Second point I want to make before talking about the specific distribution is, what do districts matter if dark money controls our elections in Ohio? I just received a piece in the mail from Mike DeWine's people, I guess, from Ohioans for Free and Fair Elections. Do we really need another dark money PAC trying to buy elections in Ohio?

I notice that that PAC is not registered with the Federal Election Commission. It is also not registered with the Secretary of State. Even Larry Householder registered Growth and Opportunity PAC with both of those things.

Audience (00:55:59):

(laughs)

Christopher Hicks (00:56:01):

Even Larry Householder had the decency to do that. But one thing that is common to them is Ohioans for Free and Fair Elections is incorporated in Delaware, just like Larry Householder incorporates his dark money operations.

Speaker Robert Cupp (00:56:15):

Do, do you have some-

Christopher Hicks (00:56:16):

Now-

Speaker Robert Cupp (00:56:16):

... comments going to the map?

Christopher Hicks (00:56:18):

... Now I'm going to speak specifically about the distribution on the map. So I already told you I'm a right wing conservative. I would love right wing conservatives in our government offices and in our legislature to feel some heat so that they would get the business done. I don't like the idea, if I believe the press reports I read, of a map that increases Republican control, and I'm a conservative Republican.

Audience (00:56:39):

(laughs)

Christopher Hicks (00:56:41):

I want there to be debate. I want there to be legislative sessions. So I'm very concerned with a map that increases control, even though I'm a right wing Republican. I want you guys to keep control. Okay? But I want our government to work for the people.

I want to remind people here, and Mr. Cupp, this might be something you'll remember, that in 2012, the map process went to the Supreme Court. At the time, it was a-

Speaker Robert Cupp (00:56:41):

This transcript was exported on Sep 10, 2021 - view latest version here.

I remember that very well.

Christopher Hicks (00:57:06):

... 6-1 Republican majority on the Supreme Court. 6-1 Republican majority on the Supreme Court. At the time, Justice O'Connor voted with the Democrats on the map. Now, it's a 4-3 majority. Now, Justice O'Connor is Chief Justice O'Connor.

You might remember this, because you were on the Supreme Court when this took place, which is another thing about fair districts, competitive districts, is we have a revolving door system in Ohio. You're on the Supreme Court. You're in this. You're in this. You're in this. You're in this.

And I think Republican and Democrat people are sick of this. We want districts that allow for vibrant competition, that get the people fo- that get our legislators and our elected officials focused on at least meeting to get the business of the citizens done. Heck, if House Bill 248 doesn't pass in an up and down vote, at least it had a vote. At least it got taken care of. So I would encourage that you really think about the map that's-

PART 2 OF 5 ENDS [00:58:04]

Christopher Hicks (00:58:00):

... courage that you really think about the map that's been [inaudible 00:58:05], because I see it landing at the Supreme Court again. And that's the makeup of the Supreme Court's different than it was back in 2012. Mr. Cupp, you would know that. So, the map that's been proposed, and the notion of gerrymandering to increase control, I don't think as a conservative republican is the right answer. Frankly, I want my republicans to feel some heat. To feel some heat so that they would get the business done that I think a lot of grassroots republicans wanna see get done, instead of hiding behind big majorities to not get anything done. I thank you very much for the time to address you to today.

Speaker 5 (00:58:41):

Thank you, Mr. Hicks, are there questions for the witness?

Christopher Hicks (00:58:52):

Hearing none?

Speaker 5 (00:58:53):

Hearing none. (laughs)

Audience (00:58:53):

(laughs)

Speaker 5 (00:58:55):

My five minute marker went off, I was trying to shut it off. So, uh, next, uh, witness is [Susan Jolley 00:59:01]. Susan is from Springfield. (silence) Okay, next witness. Uh, Benita Kahn, from Bexley. Welcome.

Benita Kahn (00:59:32):

This transcript was exported on Sep 10, 2021 - view latest version here.

Good afternoon. Uh, general testimony on the, I guess the map that was presented this morning, uh, it wasn't really designated as the redistricting commission map, so ... but that is what I would like to talk about.

Speaker 5 (00:59:47):

All right, very good, you may proceed. You have five minutes.

Benita Kahn (00:59:50):

Yeah. Um, I'm from Bexley, Ohio, which is currently House District 18, Senate District 15, congressional district 3. I'm testifying today because of the history of unfair practices, lack of transparency, and failure to allow, much less accept, public input when drawing maps after the 2010 census. These unfair practices resulted in Ohio voters passing by 71% and 75% amendments to the Ohio Constitution, for redistricting commission to draw new legislative and congressional maps. And in spite of this history, and the adoption of articles XI and XIX to the Ohio Constitution, this process is still broken.

Ohio voters wanted to ensure transparency, and real public participation in the redistricting process. And of particular importance is the map proposed by the redistricting commission, from what I indicated, I thought was this morning, um, we voted for the creation of districts that are compact, contiguous, do not favor or disfavor either political party, have limited splitting of counties, municipalities and t- townships. And I will add here, the map that I was able to pull up, uh, from the website ... I, there's no way I can tell whether counties, municipalities, or townships are split on that map. So, we definitely need something better to be able to look at, to determine that.

They're also supposed to con- correspond closely to the preference of Ohio voters over the last 10 years. This is what the redistricting commissions re, map should reflect, um, but since that map was submitted at 9:30 morning, certainly there's not adequate time especially for us to review that issue of whether it corresponds to the preference of Ohio voters. But against the clear will of the voters, the transparency and true ability of public participation have not been met, as has indicated that, you know, indicated by the significant delay in appoint members to the redistrict commission, redistricting commission, getting it started, the failure to timely introduce maps to the public by September first. So at least there would be some time to review the proposed 99 house districts and 33 senate districts prior to hearings.

And the requirements under our constitution have complexity which requires time for the public to review and provide real input. That's not what, what's happening here. Um, so, in spite of this clear September 1 requirement to provide the maps, the commission submitted its map this morning at 9:30. The impact of the 2010 unfair districts has been clear. And I think, (laughs) while we are opposite sides of our political views, uh, the last witness and I are in agreement on one thing, the gerrymandered districts have skewed heavily in one political direction, and that's resulted in Ohio voters, including myself, having their voice and their vote limited or lost at the Ohio legislature.

Their house senate is currently 75% rep, republican, 25% democrat. The house is 65-35 split in favor of republicans, and in particular, the public must have time to review the repose, the proposed maps, to ensure that they shall correspond closely to the statewide preference of Ohio voters, based on quote, " Statewide, state and federal partisan general elected results during the last 10 years." I would ask, what process did this commission go through to determine if that map complies with this statewide preference? I would also ask, at some point you will have to submit a statement as to, you know, how you came to that conclusion. And I wanna know who's gonna write that statement and what you think that statement is going to be. Ohio's gerrymandered districts have resulted in politicians making

This transcript was exported on Sep 10, 2021 - view latest version here.

extreme positions to win primaries, knowing they don't really have to do anything in a skewed district in a general election. That's eliminated incentive to comp, incentive to compromise at the legislature on issues that are Ohi, are important to really almost all Ohioans. They're just not taken care of. Rather than voters having the freedom to elect officials who represent them, this once again looks like the officials have created districts to select voters that represent the official's position. So, in closing, I want to emphasize the importance of having a transparent process, with time for real public input that is recognized and taken. Uh, that there is time, uh, to do that. And that the districts must be compact, contiguous, not favor or disfavor either political party, and correspond closely to the preference of Ohio voters over the last 10 years. We cannot have fair representation if voters' voices are silenced. Any questions?

Speaker 5 (01:05:13):

Thank you, are there questions for the witness?

Benita Kahn (01:05:16):

Thank you.

Speaker 5 (01:05:16):

See none. Thank you. Uh, Deborah Krantz, from Columbus. Deborah? Next witness. Uh, Linda [Mackoff 01:05:37], from Worthington. Uh, Lucy Ann McCloskey, from Dayton. Welcome. Welcome [crosstalk 01:05:58].

Lucy Ann McCloskey (01:05:57):

Uh, speaker Cupp, Senator Sykes, and members of the commission, thank you for this opportunity to speak. My name is Lucy Ann McCloskey and I'm a resident of Washington Township, Montgomery County. Uh, I was speaking today, uh, I would like to speak in support of the Ohio, uh, citizens redistricting commission map. Uh, as previous witnesses have stated, it, uh, leads the other proposals in compactness, and representational, proportional representation. Both of these criteria are, uh, essential, uh, and of utmost importance to the voters. I cannot comment on the republican plan, because unfortunately, it wasn't available until after I had to leave home this morning. (laughs) From what I understand of, it lags, uh, the other plans in the important considerations of compactness, competitiveness, and representational, uh, uh, fairness.

The fact that it doesn't show political subdivisions makes it impossible to evaluate on the criteria, criterion of not dividing political, uh, jurisdictions. And suggests that it was not submitted in good faith for public input. When the people of Ohio went to the polls in 2015 and again in 2018, to pass constitutional amendments, to reform the redistricting process, the people spoke loud and clear, we want an end to gerrymandering. We want to choose our representatives, and we want them to work for us. We've seen the results of gerrymandering over the last 10 years. Uncompetitive districts are represented by unresponsive legislators. The legislature has time to pass laws on hot button issues that are actually supported by only a minority of citizens, but they fail to act on significant issues and pass legislation that has the support of a majority of Ohioans.

Special interests wield unprecedented power and unprecedented corruption has followed. Now it is up to this commission to implement the new requirements. How you do this will tell the people of Ohio much about you as leaders of our government. Will you produce a map with fair districts that give voters really choice in their representatives? Or will you use all the wiggle room you can find to produce

This transcript was exported on Sep 10, 2021 - view latest version here.

maps that prove preserved partisan advantage and ensure that incumbents will be reelected? If you choose the first course, you'll show the world that you are statesmen, who serve the people and who work to strengthen democracy. If you choose the latter course, you'll reveal that you serve the interest of your party and yourselves, and you value control more than democracy. We understand that you're laboring under constraints brought on by the delay in receiving the census data. But we also know that you delayed in organizing the commission and lost valuable time that could've been used to lay the groundwork for a fair map making process. We appreciate that you're holding public hearings, but hearings convened with only one day's notice don't give most Ohioans the opportunity for meaningful participation. The maps you draw will bind all Ohioans for years to come. They will affect our health and safety, our children's education, and our elders' wellbeing. The people of Ohio want a legislature that represents us and passes laws that support our priorities. The people are watching. We know what was done 10 years ago, and we have made it clear at the ballot box that it should not happen again. It's in your hands now. Show us that you are statesmen, in service to the people of Ohio, and give us fair and competitive districts. Thank you for your time, and for consideration of my words.

Speaker 5 (01:10:45):

Thank you, I assume that, um, that you know, as we announced, setting the hearing date, that S- S- Sunday there's a hearing in Dayton-

Lucy Ann McCloskey (01:10:55):

Yes.

Speaker 5 (01:10:55):

... so you won't have to drive so far next time.

Lucy Ann McCloskey (01:10:57):

Thank you.

Speaker 5 (01:10:59):

Uh, the commission will take a five minute recess and then we'll reconvene. (silence) The meeting of the commission will come, uh, back to order. Um, the next witness that we have is Diane [Meaves 01:21:37] from Columbus, uh, Ohio. Diane? Diane Meaves? Um, M- Meryl Neiman, from Bexley? Welcome, uh, Meryl, and I see you've marked here you wanna to talk about the senate republican plan, so ...

Areuna Bajancherul (01:22:01):

Oh, I'm sorry. I missed what you just said.

Speaker 5 (01:22:03):

I said, you've marked here you wanna talk about the senate republican plan, so, you go right ahead-

Areuna Bajancherul (01:22:03):

Yes, of the, the-

Speaker 5 (01:22:08):

This transcript was exported on Sep 10, 2021 - view latest version here.

... you have, uh, you have five minutes.

Areuna Bajancherul (01:22:10):

Sorry, I'm just ...

Speaker 5 (01:22:10):

That's all right.

Areuna Bajancherul (01:22:10):

... pulling this up here. So, my apologies. Um, and, uh, thank you, oh-

Speaker 5 (01:22:16):

No, th, no that's all right. We understand technology and it's harder for us probably to do it than you, so ...

Areuna Bajancherul (01:22:22):

I was, I had major printer problems, uh, this morning. So, I'm working off my phone here. But, um, thank you, uh, for affording me, uh, this opportunity. Um, my name, as you mentioned is Meryl Neiman, I'm in, uh, Bexley, which is a part of the Columbus area. I'm disappointed that we've already lost several members of the commission. It was nice to actually see all of you for once, um, here in one place as part of this process. I previously testified at the hearing in, uh, Mansfield. I'm testifying once more because I'm, uh, dismayed by how the majority members of the commission, um, have been abdicating their constitutional responsibility. And I think that that's been, um, manifested in the map that was so quickly, um, introduced, and then, voted on to move, uh, forward as your working, uh, proposal.

But, um, before I get into the, the, the substance of that testimony, I wanted to, again, point out what a privilege it is, uh, for me and others, uh, to be here today. And I don't mean like what a joy it is, I mean like-

Audience (01:23:34):

(laughs)

Areuna Bajancherul (01:23:35):

... an actual privilege. Uh, most Ohioans, as you know, don't live in the Columbus area, like myself, um, or have the ability to travel somewhere else, like I did to go to Mansfield. Um, most don't have the luxury of being able to attend a hearing during the day. Um, I notice that once again, it's a challenge for even some of you all to be attending a meeting during the work day. Um, most people don't have the ability to stay so on top of this process, that they even know that a hearing has been scheduled with less than 24 hours notice. Um, many people don't have internet access or a printer, or they have a bum one like I did this morning, to be able to download and complete the witness slip. Um, and others may be understandably uncomfortable about being indoors in a large group, during our, uh, fourth COVID wave that's overtaking Ohio.

Um, and again, especially with, um, you know, members of the commission and others not even sort of demonstrating the curtesy of, of wearing a mask to protect those who might be vulnerable. Um, so, I have asked in Mansfield for hearings to be offered virtually. Um, and to be offered in the evening so

This transcript was exported on Sep 10, 2021 - view latest version here.

that all Ohioans who want to participate would be able to, um, access the process. Um, but, but they can't under these conditions. I find that disappointing, um, and at least in the spirit of the, the constitution, I find that, um, you know, r- really upsetting, right? That you would n- not want to deny, that you would not want to permit everyone to, to participate. And that's been manifested again by the schedule going forward for the next few hearings have the same problems.

Um, but so now for the substance, so, you know, obviously we're all here today, and as I said in Mansfield, because, um, no matter our color, our background, our zip code, must of us can agree that voters should pick their voters, and leaders shouldn't pick their voters. And that's why, um, every decade we have this process, and that's why Ohioans went to the polls and voted in vast numbers for the constitutional amendments to reorient the process from where it had been, um, in the past, in terms of how we got here to a gerrymandered, uh, state. The electoral maps are supposed to ensure that each of our votes have equal weight, each of our voices are equally heard, and each of our communities have equal access to government resources.

Um, and that's what was supposed to happen, and it wasn't. And so that was what was supposed to be corrected through these amendments. But now, we're seeing, with this map that just appeared today, I'm really disappointed that, um, senator Huffman is not here, because it seems to be his baby, um, this map. Um, but it's, um, you know, from the testimony that I saw this morning, they did not, um, meet ... it does not even on its face attempt to meet the constitutional requirements. Someone ... I- I was wanting to ask him, but, uh, presumably Senator Huffman, advised the-

PART 3 OF 5 ENDS [01:27:04]

Areuna Bajancherul (01:27:00):

... but, I, presumably, Senator Huffman, advise the map drafters as they testified not to even look at the demographic, uh, data when drawing their maps so that we know on it's face, that's there's no way it can be compliant with the Voting Rights Act because they were directed improperly not to look at that. They also testified that they have not assessed their map to see whether it complies with section six for, uh, representational fairness, and now, from the, the brief time that people have had to review the maps, it's clear that it does not.

So, um, how you could be voting to move forward a map that on it's face, although, someone said, again, I think it was Senator Huffman that it's constitutionally compliant, it is not. Um, and so it's one thing to say, "We're gonna all huddle together and work to come to agreement among the parties," but you put forward a map that we didn't have time to talk about, um, that we had all these hearings about nothing but the process which is the same thing we all voted for already. And now, we have this, no opportunity-

Speaker Robert Cupp (01:28:21):

Your time, your time has expired.

Areuna Bajancherul (01:28:22):

Okay, well then, well just to finish up, we've had no opportunity to speak. You then, at the beginning of this second hearing, so it was strategic, right? The first hearing, you throw out the map, and then, at the beginning of the second hearing, you vote. So in no way were you even pretending to take feedback on whether the map that you all will be working on was, um, something that the people are comfortable

This transcript was exported on Sep 10, 2021 - view latest version here.

with. And, um, and I think it's really appalling that you knew on it's face that it wasn't constitutionally compliant.

And I'm just gonna remind you all as I did in Mansfield, that we are still watching. That even if you attempt to do the same thing that was done, um, you know, even worse perhaps in, with regard to the rigging and the cheating and the gerrymandering, this is in the Constitution. And we will continue to watch. We will be on social media. We will be here. We will be at the courthouse, the Supreme Court-

Speaker Robert Cupp (01:29:17):
Your t- your time has expired.

Areuna Bajancherul (01:29:18):
Um, and we'll make sure that, um, our, our rights as voters, uh, all of us, uh, Republican and Democrats are, uh, respected. Thank you. Do you have any, um-

Speaker Robert Cupp (01:29:28):
Thank you. Are there any questions?

Areuna Bajancherul (01:29:29):
Questions for me? I really did wanna ask questions of some of you, but they disappeared. Um-

Speaker Robert Cupp (01:29:39):
Thank you.

Speaker 6 (01:29:39):
[inaudible 01:29:39] Senator Antani's in there, and [inaudible 01:29:41].

Speaker Robert Cupp (01:29:42):
Yeah, uh, would, um, uh, note that, uh, Senator Antani is, uh, sitting as a designee for, um, Senator Huffman, uh, is, rest of the afternoon. Next witness is Meryl, Meryl Neiman.

Areuna Bajancherul (01:29:56):
Hold on. That was me [inaudible 01:30:00], um.

Speaker Robert Cupp (01:29:56):
Oh, did I... Yeah, okay.

Areuna Bajancherul (01:30:04):
So I would ask do you know? Was Senator Huffman the person who directed the drafters of the map to ignore the Voting Rights Act and not consider demographic information, since you're his designee? What, do you know that? [crosstalk 01:30:18].

Speaker Robert Cupp (01:30:20):
All right, l-l-let's, let's move on to the next witness.

This transcript was exported on Sep 10, 2021 - view latest version here.

Areuna Bajancherul (01:30:23):

Who you know is the co-chair. Who [crosstalk 01:30:26].

Speaker Robert Cupp (01:30:25):

Well, let's, let's move, let's... Harriet Sil-Silva, Silve, here? Next witness. Frederick Smith Junior from Euclid. Frederick Smith? Um, Zara Smith from Bellbrook? I know I'm probably not being very loud, or I mean, Sara, Zara Smith from Bellbrook? Charles Spencer from Cincinnati? Are you, you're here to testify?

Charles Spencer (01:31:10):

I'm Charles Spencer from Cincinnati, and I bring my warm greetings and respect and gratitude to the Ohio Redistricting Commission. This is difficult work you're doing, and it's critical to the well-being of all Ohio citizens.

I was fortunate to be born of the son of an Eisenhower Republican dad, and a Stevenson Democrat mom. They were both committed to civic engagement, and they knew they needed strong relationships with the diverse groups of neighbors they each worked together with to improve our communities. Their voices and the sight of them gathered with neighbors at the kitchen table in our home are with me today.

In my adult years, I became a strong advocate for social and economic justice and racial equality, but I always considered both the conservative instinct and the progressive instinct to be the lifeblood of our country. It always seemed plain as day to me that if either party commits itself completely to crushing the other party, it will be a disaster for both parties and for our country.

So it is natural for me to be an advocate of the Ohio Constitution's Articles 11 and 12 and it's standards for redistricting. I'm speaking today in support of the Ohio Citizen's Redistricting Commissions plan and maps as much as I could read in the time allowed. My district, my s- uh, House of Representative district, uh, where I am in Cincinnati is a lot better than what we have now in that plan. And I will do more reading as it becomes available and as, uh, now that I know where to find everything.

We have a good set of guidelines in the Constitution, to the extent that they push us towards fairness, logical ground rules and a transparent process designed to give citizens a chance to review and comment on the commission's progress. It's not surprising that this commission has had a hard time meeting deadlines. That is common. I've studied several redistricting efforts, and it's a lot to do. It's complicated. If you me- move peg A, peg B falls out, so on and so forth.

But neither sacrificing public engagement and transparency nor shotty work should be justified by having to meet deadlines. And I know you all know that. You've been working hard for it, on it as I've heard today. Uh, and I know you will continue to do. The commission needs to get it done and according to the Constitution. I urge the dis- the redi- Ohio Redistricting Commission especially to strive for compa-compact and contiguous legislative districts, to base district boundaries to the extent possible on county and municipal and, uh, township boundaries, to seek maps that do not favor one party over the other, and to, uh, r- and provide representational fairness that matches the overall percentages of votes the parties have received over the past 10 years and to avoid partisan gerrymandering at, in all districts, all maps.

Now is the time to burn the midnight oil and spare no effort at fairness and an on-time redistricting plan that will make all Ohioans proud. Thank you. Any questions.

Speaker Robert Cupp (01:35:13):

This transcript was exported on Sep 10, 2021 - view latest version here.

Thank you. Any questions for Mr. Spencer?

Charles Spencer (01:35:14):
Okay.

Speaker Robert Cupp (01:35:15):
Thank you for coming. I would also, uh, note that hm, hm, hm Senator Favor's designee for the rest of the afternoon is Alex, uh, [Beechack 01:35:27]. Hm. Next one is Melissa Saul. Think she testified this morning.

Speaker 7 (01:35:15):
She was this morning.

Speaker Robert Cupp (01:35:35):
I believe, yeah. All right, um, Ralph [Turic 01:35:41] from Strongsville? Is mis- is Ralph here? Uh, Reverend Joan, uh, Van Becelaere (laughs) from, uh, Columbus? Renee Westermeyer from Springboro? Geoff Wise from Wyoming, O-Ohio?

Geoff Wise (01:36:12):
I'm Geoff Wise, and I'm just gonna present my map.

Speaker Robert Cupp (01:36:12):
Sure.

Geoff Wise (01:36:15):
Can I get audio and visual for that?

Speaker Robert Cupp (01:36:16):
Sure.

Geoff Wise (01:36:16):
So we have some documents-

Speaker Robert Cupp (01:36:19):
So we have some technical people here that can set that up.

        (silence).

Geoff Wise (01:36:44):
I apologize [crosstalk 01:36:44]. And I have also physical maps I can hand out if that would be helpful. Should I, should I distribute those?

Speaker Robert Cupp (01:36:57):
Sure. Anything that you have that you want to submit to the commission, you should do so.

This transcript was exported on Sep 10, 2021 - view latest version here.

Geoff Wise (01:37:00):

So let me get those. Sorry, it's in my...

Speaker 8 (01:37:03):

[inaudible 01:37:03].

Speaker Robert Cupp (01:37:02):

Okay, thank you.

Geoff Wise (01:37:33):

All right. So hopefully, is this gonna, is it on? And I apologize if it, it doesn't come through clearly.

Speaker Robert Cupp (01:37:40):

We do have some folks from, um, IT coming to-

Geoff Wise (01:37:44):

Okay.

Speaker Robert Cupp (01:37:45):

Help get this working so-

Geoff Wise (01:37:45):

Yeah, I, I'd warn ahead of time, so, um, I mean, I can start talking or you want me to wait?

Speaker Robert Cupp (01:37:50):

Go ahead and start talking, and then-

Geoff Wise (01:37:52):

Okay.

Speaker Robert Cupp (01:37:52):

Maybe we can get all this covered.

Geoff Wise (01:37:54):

All right. Uh, so my name is Geoff Wise. I, I live in Cincinnati. I, I attended the A24 hearing. Uh, some of you were there. Uh, I did a little bit of, uh, trying a dramatic thing here. I'm not doing anything dramatic here. I wanna be, I wanna be serious, and I recognize that the, the task in front of the committee is pretty, pretty daunting.

And what is was prepared to talk about, um, before this morning was how we can do better than, uh, the plan that co-chair Sykes introduced, as well as the OCRC because at that time, I thought there would not be a Republican plan to compare to. And so that's all changed, uh, this morning, in fa- I mean, I looked at the website at 9:00 and it still wasn't there, but, um, it is now. Um, so that's, that kinda changes the dynamic here.

This transcript was exported on Sep 10, 2021 - view latest version here.

But I heard very clearly that the two sides wanna come together and form a compromise that's gonna work for Ohio, and I think that's great. And if you can listen to me for the next 10 or maybe 15 minutes, you guys can get your weekends back. You're gonna meet the compromise with the plan I have, and I'm gonna save everyone the time.

Speaker Robert Cupp (01:38:58):

(laughs).

Geoff Wise (01:38:58):

No, I'm serious, okay? And this is gonna require a compromise from both sides, so you need to listen and hear me out. And there's gonna be a little give from this side, a little give from that side, and we're gonna get through a plan and, and that, that's the pl- that's the hope that I have here today.

So what I'd initially planned, uh, to share was a comparison, uh, of my plan to those, those two plans from, from the democrats and the, and the OCRC which other people have already talked about today. Um, we all already know that, you know, we missed the 9/1 deadline, and we've got six days, uh till the 9/15 deadline. And the map has to be compliant with Article 11 or else, it gets pushed to the courts. And it might get rejected, and then, we're back to where we started, square one.

So what I was hoping to share was a comparison of the Sykes and OCRC plans on things like how compact they are, how much people of color get voting power, competitiveness, fairness, and if there's time, I wanna talk about the issue of senate incumbency, which, if, uh, Senator Huffman were here he, I know he has a lot of passion for that. So I do address that in my plan. I haven't, I didn't see that in the two plans that were posted before this morning.

And at this point, I think I really need to wait for someone to be able to turn on the monitors.

Speaker Robert Cupp (01:40:11):

Yeah, yeah. Yeah, we'll, we'll, we'll stand at ease, uh-

Geoff Wise (01:40:15):

Yeah, I'm sorry.

Speaker Robert Cupp (01:40:16):

Till we get hooked up. No, it's not a pro- not a problem.

Geoff Wise (01:40:21):

Do you [inaudible 01:40:21]. Are they, they're on?

Speaker 9 (01:40:23):

Yeah, they are on.

Geoff Wise (01:40:23):

Okay. Let me see if this one. Let me just try to unplug and put it back in there. Oh, there it goes, okay. Uh, let me dup-duplicate here. Is it coming?

Speaker 9 (01:40:41):

This transcript was exported on Sep 10, 2021 - view latest version here.

Hooking up? Want to try it? We can do it [inaudible 01:40:57].

Geoff Wise (01:40:41):
Yeah, we'll try extend.

     (silence).

Speaker Robert Cupp (01:40:41):
We'll reconvene.

Geoff Wise (01:45:03):
Is this, how do you get this to presentation mode? Sorry.

Speaker Robert Cupp (01:45:05):
You're fine.

Speaker 9 (01:45:07):
Here you go.

Geoff Wise (01:45:07):
Okay, all right. So, uh, thanks for the, apologies for the delay. Uh, again, from Cincinnati, this is adopted from my 9/15 commission, and I'm trying to do a comparison because I think we need to meet in the middle between, uh, the plans from one side versus the other. Okay?

     And I just want to be transparent on the process that I use for generating these maps. Uh, the team consisted of me, myself, and I, and, uh, I got a late start. There are questions?

Speaker Robert Cupp (01:45:33):
Mr. Wise, if you would just direct your comments to the commission.

Geoff Wise (01:45:35):
Okay, sorry. Yeah, sorry. So I-I started, I started, I got a late start. I-I saw, uh, a sign in someones yard on the 10th, um, so I spent about two, three days on, equivalent of that, uh, on background material and getting ready. And then, I was ready to use the census data, and it took me about maybe five total days to put together a map as well as this analysis and presentation so about nine working days total for me from start to finish so just to get... I don't know how it compares to what's going on here, but that's where it came. And I'm pretty exhausted, um, after doing that.

     So I'm not gonna go through the details of what the maps look like, um, but I have those comparisons. Uh, I did use Day's Redistricting, which other people are using, which is great. I don't have to explain the methodology, but for those here, it uses the 2020 census data as well as like the past three or four elections. And that leads to about a 56/44 split for the republicans versus the democrats.

     Um, so the analysis I was gonna go through, a little bit on, you know, are we compact or not? Are we sufficiently empowering minorities? Is it competitive, and the real thing is, you know, how do we translate votes into seats. That's very important. Um, and if we have time, I wanna talk about incumbency.

This transcript was exported on Sep 10, 2021 - view latest version here.

So the first thing I wanna look at is are we unnecessarily splitting some cities. Now, there's certain cities that you cannot split and those are the last four, less, last five or so in the table, and all these are compliant for that. For the larger cities, we're trying to minimize splits, and the OCRC plan slices and dices a couple of the larger cities, more than you'd like honestly. Uh, co-chair Sykes plan is, is the best for that. Um, I had a little bit of a piece of Cincinnati I put into eastern Hamilton County to make it more competitive district there, but those work out well.

The other thing you wanna do is not overly split urban coun- I-I'm sorry, uh, not urban counties, the rural counties. Um, you know, there's some that you have to split from population but minimizing that's important to avoid confusion for people there. It's unnecessary to split them too much. So again, the OCR plan's a little bit non-desired on that.

And then, you can look at compactness with vari-various measures. Um, what I was using was the know it when you see it measure. Um, a little bit lower than the others on the senate, and I think it's the way I stitched away, stitched some things together on the senate side as far as I have this long, uh, south Ohio piece, um, and I've gotta c- And then, I brought Delaware into northern Columbus. We can change those things if people think those are problematic. But otherwise, things look, look pretty good from compactness for all of them.

Uh, the thing I really wanna focus on here is, uh, minority power because and competitiveness 'cause I think these are two primary measures that people look for. Um, so in those, I'm pretty comparable to the OCRC plan, um, at least for the House, um, for the minority power. For the, for the Senate, the OCRC does a little bit better, but that's because of what I've done with, with Dayton, which, uh, I can go into that detail later if we need to.

The big deal is, is competitiveness. I've really raised the bar on competitiveness as far as the number of districts, um, that are competitive, which I think is a really important part of this so people get, you know, quality representation. So I-I probably glazed over some people here, um, and I just wanna cut to the chase here in terms of, you know, how many seats does each party get? I think people really focused on that. How many do we get? How many do would get?

A-and the answer is you don't get seats, okay? You get the opportunity to compete for seats, and I tried to make this as competitive as possible. And I tried to put as many seats in this box of competition between 45% for one party and 55% in the other and vice versa, so by boosting the number of competitive seats, I think we get higher quality government because people are competing across party lines for votes. And they're gonna resonate more with other voters.

So that was really the objective of what I was trying to do, and you can see I got much higher numbers of, of seats in that box for the Ohio House and also for, for the Senate. The other thing to notice here is that, what that does is that means the swings are gonna be bigger than they would be otherwise. If you look at the Ohio House plan, uh, for, um, OCRC and, and Sykes, those numbers don't even get up to 50% until, you know, you know, all of those, all those GOP friendly seats in that light orange actually go GOP and then some. So they're never gonna get it to 50%, uh, of the, of the, uh, control of the, of, over one of those houses until they get a substantially large portion of the votes.

That didn't even make sense to me why they did it that way, um, but the, but that's, that's the basis of my work here. I'll skip this side here, and I just want to talk a little about, uh, proportionality 'cause I think there's a lot of people here who think, "Okay, if we have 55% seats, votes, that should 55% seats." And I wanna look forward to the congressional districts in thinking this through 'cause the math's really easy here. So if you think about congressional districts, we've got 15 of them. If it's about 50/50, that means, you know, if seven to eight or eight to seven, and 50% should be that line where that seat flips. And then, the Ohio republicans tend to do a little bit better than democrats, so they have a chance

This transcript was exported on Sep 10, 2021 - view latest version here.

to win another seat at about the 57% threshold. It's gonna be very rare for the republicans to get up to a 63% threshold. It's gonna be very rare for the democrats to have a blue wave, and they gain, you know, and they get 57%. And, uh, republicans get 43.

So if you do something proportional, there's really only two seats in play, and that means there's seven safe red seats and six safe blue seats. And when you get that sort of dynamic, you get these types of people on the extremes as your representatives that you send to congress, all right? And I-I don't think we need to send seven of those and six of those t-to congress and the same thing for the statehouse.

So I would, I think there's gonna be some communities where you've got homogeneity, and it makes sense to send people on the extremes. But I don't think we should be only sending two people who have to compete for seats across party. Um, so that's a consequence of proportionality that I think we really need to think through before we decide on the final map.

And then, if you only have two con-congressional seats that are up for grabs, where do we put 'em? You know, does Cincinnati take a turn for 10 years and hand it off to Dayton, you know? We've got lots of spots in the space, in the state where we have, um, we have opportunities for competitive. Let's use them to cultivate our political talent and get better results.

Um, so I'm gonna go into a little bit of, a little bit of the technical detail here because to really understand how you could translate votes into seats, you have to actually look at the seats to votes curve. And so the x-axis here is the fraction of votes. In this case, the software says democratic votes are positive. I know that's a problem for some people. Let's let that go. Okay?

Speaker Robert Cupp (01:45:35):

(laughs).

Geoff Wise (01:52:26):

But how many seats do they get, and the most important thing to do is say is that 50% votes, you should get 50% seats. All right, I think that's, that's like, like a basic thing that you need to do. All right? And if you look at the the, the plan from, uh, OCRC and from, from Sykes, bec- in order to force that proportionality, the actually, they actually miss that a little bit. And the, the democrats don't get as, quite as many seats when they're having a good year because they're forcing that proportionality.

That doesn't make sense t-to me. Now, in my laptop version of the presentation, I pulled in the Huffman plan. Um, I was about to leave here from Cincinnati and I saw them post it, so I ran up and did that. The di- difference from that 50/50 line is much greater for the Huffman plan. It's a really strong partisan bias. In my opinion, it's a non-starter. We cannot get that sort of a map through the courts, all right? It's just, it's just too biased. It's not gonna work. I think we need to recognize that we need to make a map that's fair enough that people are going to accept. And it's gonna get through the courts, so that's the House.

In the Senate, it's the same sort of thing. It, you should be able to hit that 50/50 line, and you can see how I'm really hugging that line of this is the natural slope of the seats versus vote curve. I know this is technical stuff, but you can just see how they've bent this line. And they've done that just by, you know, switching precincts until they get to a proportional thing, and that's a thing you have to distort to get pr-proportional. So for all those here-

Speaker Robert Cupp (01:53:57):

Mr., Mr. Wi- Mr. Wise-

This transcript was exported on Sep 10, 2021 - view latest version here.

Geoff Wise (01:53:57):

Yeah.

Speaker Robert Cupp (01:53:57):

Can-

Geoff Wise (01:53:58):

Yeah.

Speaker Robert Cupp (01:53:58):

Can you point out which line you're talking about?

Geoff Wise (01:54:01):

Um, sure. I don't know if this thing have a... I mean, I'll go over to it. I'm gonna see if my ma-

Speaker 8 (01:54:08):

[inaudible 01:54:08] right?

Geoff Wise (01:54:08):

Oh, oh, I-I, can you see the mouse? Okay. Yeah, sorry. So here, here, you see how this green line, you see how it's, it's staying on the curve? What that's saying is the response of seats to votes is smooth. But if you look over here, the slope of this line here of seats to votes, it's has to be bent. They have to bend it to make it, to make your proportional. So they're, they're artificially contorting the districts so that they get to proportionality. And what, in order to do that, they have to drop districts out of the competitive zone to make that work. All right?

So I know this is a technical point, but that's, that's the, that's the basis of the problem here is that you're, you're making fewer competitive districts in order to fit to meet this arbitrary standard of proportionality. This, the, the Constitution says it has to closely correlate. It doesn't say that it has to exactly proportional. And I checked that with LCE Ohio, okay? All right.

So, um, I'll skip this. I just want to talk a little about incumbency before we go. Um, and that's, we have to find a home for all the senators, and, uh, Senator Huffman really pointed this out well last week. Uh, there's really, the big problem area is the fact that we've got this mini snake near the lake. I wouldn't say it's on the lake, um, as far as a House d- a Senate district for number 24 in Cuyahoga County. And that creates some problems, um, that, I'll show how we, how we can fix that.

so overall on my map, there is one orphan seat, um, near like the, the, the Bell Fountain, Wapakoneta area, uh, because there's isn't a natural senator to put there. But besides that, everything kind of matches up well as far as you look at the old districts versus the new districts and where they line up. And this is, comes out better on, on my laptop than it looks like here. But I can actually match things up even though you've got some really spidery shaped districts now. Okay? So all that works. The only-

PART 4 OF 5 ENDS [01:56:04]

Geoff Wise (01:56:00):

This transcript was exported on Sep 10, 2021 - view latest version here.

Really spidery-shaped districts now. Okay? So all that works. The only problems we have to do is between these two distinguished gentlemen here, we have to figure out who stays in 26 and who moves to 22. I don't know if they're gonna thumb wrestle or rock, paper, scissors, or dance off, however they're gonna figure that out, they can figure it out and then we got to have Senator Dolan figure out which of these four districts from 2011 is his home, and the other three are odd numbers so they're gonna be open seats. Okay? So that- the senate incumbency problem is solved. The OCRC, I've really pushed those folks to declare what they're senate incumbency plan. I haven't heard from them what that is. Uh, I'm not sure if it's clear on Senator Sykes' plan. Obviously I haven't looked at it for Huffman's. But I have solved that for here. So, in- in summary, you know, you guys can go hash things out for three days and try to meet in the middle. I've just tried to make that work done for you with realistic compromise between the two parties and I think it- it's worth taking a look at. I'm happy to take any questions or, um, even- even later on from- from- from the group offline, um, my contact information is listed on my slides.

Speaker Robert Cupp (01:57:07):

Any questions for the witness?

Senator Vernon Sykes (01:57:13):

Thank you for your testimony. Uh, I would just be interested in your complete, uh, analysis with the Huffman plan too, uh, so that we can see a total comparison. That would be great.

Geoff Wise (01:57:26):

Yeah. I- I- tonight I'll go back and I- I'll post that as an update to my public input.

Senator Vernon Sykes (01:57:30):

Okay, thank you.

Speaker Robert Cupp (01:57:33):

Mr. Wise, I know your time has expired, but-

Geoff Wise (01:57:35):

Yes.

Speaker Robert Cupp (01:57:35):

... in a very brief nutshell, what generated your interest in this topic?

Geoff Wise (01:57:40):

Oh, um, I've done some research into reforming the US Electoral College and, um, I could see that there was a gap in really applying the partisan bias ideas here and I reached out to many people on this committee saying how I have this expertise, I'd love to help with this, and I got nowhere, I'll be honest with you. I wanted to help on the inside and help and get this to be a process that would work well, and I just got stonewalled and so I said, "I have to do this by myself."

Speaker Robert Cupp (01:58:12):

This transcript was exported on Sep 10, 2021 - view latest version here.

Well thank you for your interest and testimony and for your initiative in- in coming here and doing that. Thank you.

Geoff Wise (01:58:18):

You're welcome.

Speaker Robert Cupp (01:58:25):

Next- I have some here, yeah. Next witness is Sarah Uranka from Akron.

Speaker 10 (01:58:35):

Thank you. Oh, yeah.

Sarah Uranka (01:58:47):

Good afternoon and thank you. Um, first off I wanted to s- um, before I talk about the maps I wanted to thank Senator Sykes and leader Sykes for wearing their mask. My daughter has been an ICU nurse since the beginning of COVID and I have never seen her more stressed as she is now, and I strongly encourage everyone to wear a mask at all times.

This has not been a fair process. We voted on it, we want a fair process. You all have not shown up to every public hearing, except Senator Sykes. You blame the census, yet OCRC drew fair maps. You did not have hearings during times that people can attend. This map process has not been your priority, and it shows to all of us here in Ohio. I have been working in politics in many decades, and in the history of Ohio politics has there ever been a vote where all 88 counties vote in favor of one thing? We did, twice.

Our votes should matter. We deserve better from you. We deserve to be represented by competitive districts. We deserve to be heard. We deserve districts to be competitive and representative of who we are. The proposed maps divides marginalized communities and people of color, especially in Cleveland and Akron, 'cause that's where I'm from, Akron. The maps should represent us and the elected officials should be accountable to the voters. Every voice in Ohio should be heard. Yet you want us to comment on these maps and answer questions about these maps, but yet you gave them to us a few hours ago, and they're not even labeled. So you want us to do something and be here, but not give us the tools to- to be educated about it. Thank you for your time.

Speaker Robert Cupp (02:00:49):

All right. First, I see no questions, so next witness is Mindy Hedges, I think you testified this morning. Okay.

Speaker 11 (02:01:02):

[inaudible 02:01:02] Mindy?

Speaker Robert Cupp (02:01:06):

All right, Susan Cavanaugh from Columbus. Welcome.

Susan Cavanaugh (02:01:21):

This transcript was exported on Sep 10, 2021 - view latest version here.

Well, thank you very much. Um, thank you co-chairs, members of the commission, and those of you sitting in for members of the commission. Uh, my name is Susan Cavanaugh, that's Cavanaugh, C-A-V-A-N-A-U-G-H. Um, I'd like to first comment on the Republican map introduced this morning. I haven't had an opportunity to review it in detail, but I was struck by two things. First, according to the person who introduced it, it did not address section six of the citizen's constitutional amendment. Section- section six B states, "The statewide proportion of districts whose voters, based on statewide, state, and federal partisan general election results during the last ten years, favor each political party shall correspond closely to the statewide preferences of the votes of Ohio."

Um, second, the Republican plan does not address the Voter Rights Act and the presenter said that the Republican leadership told them not to. I was appalled by that. Now, the OCRC map shows that fair maps are possible. Instead of starting with that, the commission voted just a little while ago, and they voted on partisan- partis- partisan lines to start with the highly partisan Republican plan. That's disappointing.

I also came to the last meeting of the commission on redistricting last week hoping to hear something substantive regarding the work of the commission that would lead to fair redistricting. I left disappointed. When I read the constitutional amendment that created this commission, I read about what the commission shall and shall not do. I read shall as a directive in the biblical sense, not as a suggestion that the commission might or might not choose to consider. I also came to that meeting with a background that tells me that if a bipartisan plan were to be developed, the first order of business would have been to form a bipartisan subcommittee to start work immediately. [inaudible 02:03:56] nothing gets done without that kind of thing, and that still if- to my knowledge hasn't been done, although there's talk about working together over this weekend.

Much has been said about the short time span. I, with very limited computer skills, managed to create maps and upload them to the fair Districts site eight days ago. I don't accept that people being paid by the citizens of Ohio to do this work don't have the time to do it.

At the last meeting, a Democratic plan for maps was submitted. The main objection I heard from a member of this commission, who is not here at this moment, was that it didn't include the constitutional provision that his job as a senator be protected. I now have no confidence that the commission plans to follow the directive of the citizens of Ohio in drawing bipartisan maps. I really hope I'm wrong, but my only hope at this point is that there are citizens currently working on the next constitutional amendment that could be voted on in 2024, and that would take the process away from the legislature and the governor. I'd also like that next amendment to strike section five of the Ohio constitution. I see no reason why senators who have their jobs because of gerrymandering, and who have no intention to follow the citizens constitutional amendment should have protection. I'm really tired. I didn't like standing on corners getting signatures, but I'm ready to collect signatures again in support of fair elections. Thank you.

Speaker Robert Cupp (02:06:00):

Thank you.

Susan Cavanaugh (02:06:00):

Any questions?

Speaker Robert Cupp (02:06:01):

Any questions for the witness? There are none. Thank you. Um, Sandy Bo- Bo-

This transcript was exported on Sep 10, 2021 - view latest version here.

Leader Sykes (02:06:11):

Bolzenius.

Speaker Robert Cupp (02:06:13):

Yes, that's it (laughs). From Columbus, welcome.

Leader Sykes (02:06:18):

Thank you.

Speaker Robert Cupp (02:06:21):

I'll have you pronounce and spell that for the record, thank you.

Leader Sykes (02:06:23):

Bo- oh, Bolzenius, at least that's how I say it, others in my family say it differently. Um, B as in boy, O-L-Z as in zebra, E-N as in Nancy, I-U-S as in Sam.

Speaker Robert Cupp (02:06:43):

All right, yes, you may proceed.

Leader Sykes (02:06:43):

Okay. Hello everybody. Um, I have to say, I was barely able to make it here today. I only found out about this hearing last night from a friend who heard about it on some other way. Uh, she also wanted to come, as did a few others that found out last night, and I'm sure many, many others in town, um, but she was not able to, um, change her plans around. It was difficult for me.

Um, so I just- I mainly have questions. Um, why- these have been brought up today, but not answered. Why was this hearing not announced earlier, giving people proper time to prepare, um, prepare themselves and attend? Why are there not evening hours for Ohioan- so more Ohioans may attend? Why is this, um, not available virtually, especially for people susceptible to COVID? I'm really worried about it, and I'm not even that susceptible.

Um, what's the deal with this newly proposed map that missed the September 1 deadline, went up and then down this morning, and is not even available to us in this hearing today? I would have thought it would be here in paper form. Why is the author, Senator Huffman, not here today? To me that's- makes no- absolutely no sense, um, if we're treating this seriously, which begs the question, how serious is this panel about this- this, um, overwhelmingly popular, um, opinion among Ohioans to have fair elections and fair, um, districting? Um, in fact, let's face it. We all know the answers to these questions. The one thing I cannot figure out is, given how essential that fair maps, that accurately represent Ohioans is to the democratic process, why are most of you okay with the unavoid- avoidable- the avoidable delays, lack of needed materials available, and absent numbers during public hearings, among the other things I mentioned? How in the world does this build public faith in the commission? I'm scared to death about being a banana republic, and I really, really want to know from the people here how you feel about this. This is not just about one districting. This is about the future of Ohio, the future of the country, and, might I say, the global world.

I have to say that I find it curious, um, I find curious to talk about desiring bipartisanship among repre- representatives who have wildly- widely- wildly exploited the skewed three-fourths majority of-

This transcript was exported on Sep 10, 2021 - view latest version here.

of the state, um, that is more or less split 50-50 between parties and gives no room to other parties, right, left, whatever. Um, it's really scary to me. I am a historian, I have taught overseas. Mostly overseas, but also this- in this country, um, middle school and high school students, about how important democracy is. Genuine democracy, not fake democracies.

So I will conclude with this. Um, all the people of Oh- of all the people of Ohio, I would hope you, all of you, want a genuine democracy. If you're not so concerned about it today, like, "Oh, we can- we can mess around a little bit here just so long as we keep our seats, it's okay," please think about your children, the future. Because you either use democracy or you lose it. And I'm a history teacher, I can give you lots of examples of that. Um, this re- so, in order to have a genuine democracy, this requires representatives who are sincerely committed to genuine democracy, one that represents the people, not guarantee seats to one party or candidates over others. I'm gonna leave it there.

Please look beyond how this is going to affect your elections. This whole idea of having safe seats and equal safe seats, I- I don't even understand that concept. Shouldn't we just be looking at maps that will make sure that people in a particular area have a representative that they can call on to represent their interest in connection with the rest of the state and country? This idea we have to somehow find safe seats and- and some competitive that are [inaudible 02:11:31] this or that. This is not democracy, folks. So, before I go off anymore, I'll be quiet (laughs).

Speaker Robert Cupp (02:11:42):

Are there any questions, uh, for the witness? There are none. Thank you for coming to testify.

Leader Sykes (02:11:44):

And thank you, for those of you who are sincerely thinking about democracy. Thank you.

Speaker Robert Cupp (02:11:52):

Tammy Wilson from Delaware? Hi. Will you be testifying, um, on a complete statewide plan for general assembly?

Areuna Bajancherul (02:12:05):

Yes.

Speaker Robert Cupp (02:12:05):

I know you have an interest in- in another kind of plan.

Areuna Bajancherul (02:12:08):

No cords, I'm not gonna trip today (laughing). I just wanted to, I did study the map, that's why I was a little late. So, my concerns- I'm not gonna say that they favor the Republicans, 'cause you asked us not to repeat things, I heard that (laughs). But I will say is-

Speaker 12 (02:12:26):

We don't mind! (laughing)

Areuna Bajancherul (02:12:28):

This transcript was exported on Sep 10, 2021 - view latest version here.

... Um, repetition's key, right? Um, the Republicans have taught us that. But, so, I- I- I'm really concerned because you guys have such an enormous responsibility for what you're doing, and it is appalling to me as an Ohioan, as an Ohio voter, that not everyone's present. You guys are here to represent 11 million lives. It's a big deal. And it is appalling that not everyone's present. The other thing that really disturbs me is that, if you really wanted to really represent and give fairness, why don't you have fair representation in the committee? I mean, I will- this is Buckeye nation, and if we had a committee that was all Michigan, uh, football players and there were two Ohio State, I mean, I'm sure we would all think that that was pretty unfair, right?

So I just have major concerns, um, and especially I'm running for Congress, um, it is an extreme concern for me. My district, um, the way that the Republicans have redrawn the lines, um, I don't feel it represents equal representation to the citizens of those counties. Um, the way that they have redrawn the lines, um, they included, um, Holmes County, I believe it is, and, um, they are not representative- I'm of- I'm from Delaware, and Delaware is really close. It is a suburb of Columbus. We have a lot of people that work in Columbus, it's a big city, um, and those other areas are more rural. So I really feel that you need to take into account that people should have people that can represent their district, rather than having, you know, such a big portion of, like, a big city mixed in with, like, rural areas. It just doesn't make sense to me. So I just though that that was really unfair.

And also, the way that the lines are drawn, they do favor incumbent Republicans and I just think that you guys should really take it more seriously. I just- I- you know, you have such a huge responsibility and you should really redo the committee and have fair representation in the committee. I mean, I think it's a joke to, I mean, it's nice that you have these hearings, but it's like you're just going through the motions and, like, yeah sure, but there's people not even here. I mean, it's just ridiculous. So that's all I wanted to say. Thank you (laughs).

Speaker Robert Cupp (02:15:11):

Thank you. Any questions? I'd just point out one thing, that the members on here are, many of them are, um, required by the Ohio constitution, so it's not just gonna pick and choose on the- on the- the composition of the committee, so yeah.

Areuna Bajancherul (02:15:26):

But then we saw the map this morning, though, right? Yeah it's still not- it's still not drawn fairly, so-

Speaker Robert Cupp (02:15:26):

All right.

Areuna Bajancherul (02:15:33):

... it's something to think about. Thank you!

Speaker Robert Cupp (02:15:35):

Thank you. Next, uh, witness is Bailey Culp, student at Ohio State University, The Ohio State University. All right. Um, Ryan Goodman, from Orient, Ohio. Paul Hebling from- don't have a city. Paul Hebling here? All right. Is there anybody else that- those are the ones that we have for witness slips, is there anyone else to testify? I know you testified this morning, you have something additional to say that's not a repeat of this morning's testimony?

This transcript was exported on Sep 10, 2021 - view latest version here.

Mindy Hedges (02:16:12):

I have a witness slip, too.

Speaker Robert Cupp (02:16:13):

Yeah. Okay, yes, do- do you have something additional to testify other than what you testi-

Mindy Hedges (02:16:27):

Yes, I do.

Speaker Robert Cupp (02:16:28):

Well, come on up.

Mindy Hedges (02:16:29):

I- I also have a witness slip.

Speaker Robert Cupp (02:16:31):

Yeah, I think you were out when I called, so that's fine.

Mindy Hedges (02:16:34):

Okay. Thank you. Uh, Co-chair Senator Sykes and House Speaker Cupp, um, Redistricting Commission, again, my name is Mindy Hedges. I'm from Radnor, Ohio, in Ohio House District 67, Senate District 19, and Con- Congressional District 12. With regards to proportional party favoritism, um, today in the Columbus Dispatch, and I think you all need to read it and hear this, um, "Republicans could retain 67 of 99 seats in the Ohio House, and 25 of 33 seats in the Ohio Senate. You just have to realize they- currently they have 64 of the 99 seats. So they're gonna gain from the current map three more seats in the, um, in the House and- hold on a second- and they have 24 of the 33 seats in the Ohio Senate currently, they would be gaining one more seat in the Ohio Senate in the current map.

Now, it was my understanding that this map was supposed to be more fair and equal to currently, at least from what the Ohio voters voted for the last gubernatorial election, which is, um, I believe that was a 45 to 55%. Um, that is not what this map represented. Very disappointed. And this was according to Dave's Redistricting, um, application, or app, a commonly used redistricting website that assigns partisan designations based on recent election results. Based on that website's analysis, 16.5% of House districts and 19.8% of Senate districts would be competitive, defined as a partisan lean between 45% and 55%. Voter-approved changes to the Ohio constitution added guardrails to how mapmakers draw districts for the Ohio House and Senate.

The commission must try to draw a map that does not favor a political party, is compact, and corresponds to the statewide breakdown of Democrats and Republican votes, and the reason I got up here right now is because I just didn't have time to do any analysis on that map that was represented- or, excuse me, proposed to us this morning because I was on my way to drive here when that map was- was shared. So I apologize for having done two different, um, testimonies today. So I- I appreciate the fact that you allowed me to speak again, and I thank you. So, um, are there any questions?

Speaker Robert Cupp (02:19:19):

This transcript was exported on Sep 10, 2021 - view latest version here.

And- and I appreciate the fact you had two different testimonies, so they weren't the same one twice (laughing).

Mindy Hedges (02:19:25):

No, I would not have done that to you, that would've been awful.

Speaker Robert Cupp (02:19:28):

Any questions for the witness? There are none, thank you.

Mindy Hedges (02:19:31):

Thank you.

Speaker Robert Cupp (02:19:33):

Any, uh, one-

Mindy Hedges (02:19:34):

I'll also get this in writing to you [inaudible 02:19:36].

Speaker Robert Cupp (02:19:35):

That'd be fine, thank you. Any, uh, further witnesses today? If not, that'll conclude our hearing today and, uh, we will then convene on, um, Sunday. Let me find my list again. Sunday, Septemper 12th, 4:00 P.M. in, uh, Dayton. That is a weekend, it is not a work day for most people, and it is later in the afternoon, so. Commission adjourned.

PART 5 OF 5 ENDS [02:20:10]

Exhibit 7

9.15.21 Hearing
Transcript

This transcript was exported on Sep 19, 2021 - view latest version here.

Speaker Cupp (00:00:00):

... the, uh, to order this meeting of the Ohio Redistricting, uh, Commission. I will ask the staff to please call the role?

Staff (00:00:08):

Co-Chair Speaker Cupp?

Speaker Cupp (00:00:09):

Present.

Staff (00:00:10):

Co-Chair Senator Sykes?

Senator Sykes (00:00:12):

Present.

Staff (00:00:12):

Governor DeWine?

Governor DeWine (00:00:13):

Here.

Staff (00:00:14):

Auditor Fabor?

Auditor Fabor (00:00:14):

Here.

Staff (00:00:15):

President Huffman?

President Huffman (00:00:16):

Here.

Staff (00:00:17):

Secretary LaRose?

Secretary LaRose (00:00:18):

Here.

Staff (00:00:19):

Leader Sykes?

This transcript was exported on Sep 19, 2021 - view latest version here.

Leader Sykes (00:00:20):

Here.

Speaker Cupp (00:00:22):

We, uh, have a quorum and will proceed as a full, uh, commission. Um, I think let's, uh, we have some minutes that, uh, we maybe have not approved yet. There's meet- uh, minutes from the meetings of August the 31st, September 9th at 10:00 AM and September 9th at 2:00 PM. They are before you. Is there a motion to accept the minutes as presented?

Secretary LaRose (00:00:44):

So moved.

Speaker Cupp (00:00:46):

Is there any objection?

Seeing and hearing none, the minutes of the previous meetings, uh, stand as accepted. Um, um, Senator Huffman for a motion?

President Huffman (00:01:00):

Uh, thank you, Mr. uh, Co-Chair Cupp. At this time, um, I move that the Commission stand in recess.

Speaker Cupp (00:01:08):

Until?

President Huffman (00:01:09):

Pardon me?

Speaker Cupp (00:01:10):

Until?

President Huffman (00:01:11):

Uh, until 3:00 PM.

Speaker Cupp (00:01:13):

Thanks.

President Huffman (00:01:13):

I believe (laughs).

Speaker Cupp (00:01:13):

All right.

President Huffman (00:01:15):

[crosstalk 00:01:15].

This transcript was exported on Sep 19, 2021 - view latest version here.

Speaker Cupp (00:01:14):

Let's move this commission, uh, be in recess until 3:00 PM. Um, I-

Leader Sykes (00:01:19):

Mr. Chair? Uh-

Speaker Cupp (00:01:19):

Yeah? Uh, Leader Sykes?

Leader Sykes (00:01:23):

Th- thank you, Mr. Chair. Uh, if we could just, um, obviously we have people who are anxious to understand what is happening next, so for the benefits of those who are here and perhaps watching, uh, could we have a bit of a discussion of what the recess will entail and for what purpose are we recessing?

Speaker Cupp (00:01:43):

We will be recessing so that, uh, we can continue some consultations that are going on, some work that is being done on the, uh, map, uh, for, um, the, the finalization that needs to be done, as well as, uh, any changes that, uh, might be, uh, considered, uh, in the interim.

Is there any objection to the motion to recess?

Hearing none, the commission is recessed until 3:00.

Pursuant to the recess the meeting of the Ohio Redistricting Commission, uh, will come back to order. Uh, a little leftover business from this morning, um, and at this time I would entertain a motion to accept any remaining written testimony from the regional hearings on the introduced plan, uh, to be part of the record of the September 14th, uh, hearing. Do I have a motion for that?

Senator Sykes (00:02:41):

So moved.

Speaker Cupp (00:02:42):

It's been moved. Is there a second?

Governor DeWine (00:02:43):

Second.

Speaker Cupp (00:02:44):

It's been moved and seconded. Is there any objection?

Um, seeing none, the, uh, written testimony, uh, is accepted as part of the record. Um, at this time I will ask what is the will of the commission with regard to the introduced state redistricting plan? Chair-

President Huffman (00:03:00):

Mr. Co-Chair?

This transcript was exported on Sep 19, 2021 - view latest version here.

Speaker Cupp (00:03:01):

Chair recognizes, uh, Senator Huffman.

President Huffman (00:03:03):

Uh, thank you, Mr. Co-Chair. I'd like to present to the commission an amendment to the introduced proposed general assembly district plan, uh, for its consideration.

Thank you, uh, Speaker. The, um, commission, as we know, introduced a proposed general assembly district plan last week, and since that time we've been actively, uh, talking with, uh, all of the commissioners, uh, on the, uh, uh, uh, the folks serving up here, including of course our, our democratic, uh, colleagues. Uh, in response to those conversations we've made a number of changes, uh, based on really a variety of suggestions and feedback, and of course that feedback includes the several, um, uh, public hearings that we've had, the, the submitted testimony and, and of course, you know, other, other public, uh, input that we have had.

Um, as, uh, additionally, this amendment itself was presented to the, uh, seven commissioners, uh, last evening, uh, along with the appropriate, uh, computer files and other items that, uh, could be reviewed. Um, I, this amendment, uh, moves the introduced plan much closer to what, uh, our democratic colleagues, um, had sought in their, uh, amendment, which was presented and, and explained by Mr. Glassberg in Cleveland, um, last week. So, I want to talk a little bit about the amendment itself. Uh, I should say initially that we've made a number of, uh, technical changes. This is of course a big job with a lot of, of, uh, data, so that's, uh, naturally these things happen, but there are a number of technical changes. These fix, uh, misassigned census blocks in the block assignment files, and, um, really those changes for the most part had, had no impact on, on population. These were simply, uh, bits and pieces, uh, that, that had to be, uh, cleaned up.

However, there were a, a number of substantive changes, uh, that were made, uh, that did reconfigure, uh, the geography of the introduced plan, the plan that, um, was, uh, introduced by the commission last week, uh, in a way that did change, uh, demographics in, in other parts of various districts. Um, the, the, the first part I would say is that this plan reduces the, um, this amendment reduces the number of republican seats, uh, collectively in both houses, um, by six, and of course these are house, uh, according to the, the indexes, um, uh, that were developed I think that both sides were using. So, um, the, it again takes us much closer to the, the democratic plan that was presented, um, where, uh, this amendment, uh, will have 62, uh, republican seats and the democratic amendment had 57 republican seats, so, so fairly close really, and then in the Senate the numbers are 23 and 20. So again, this, this amendment is, uh, much closer to, uh, the, uh, democratic amendment than the original proposed, uh, plan.

Uh, a couple of other comments, um, and, and I, I do want to, uh, cla- uh, compliment, um, Mr. Glassburn? Berg?

Speaker Cupp (00:06:24):

It's Burn.

President Huffman (00:06:25):

Burn. I apologize, I keep getting that name wrong. He did an excellent job in Cleveland explaining their plan, um, an- and, and, uh, there, there were a variety of maps, um, that were, uh, uh, submitted in a variety of ways, either through the website or, or, or, and, and, and many of those maps, uh, were not constitutional, as, as, uh, was pointed out the other night. The, the winning map in the Fair Districts

This transcript was exported on Sep 19, 2021 - view latest version here.

Competition had 10 to 15 constitutional violations and about 50 or so other local splits, uh, that, that weren't necessary, um, and, uh, so those are all things, I think, that, that, uh, need to be taken into account. Um, the, um, many of the, um, uh, the, an actually I, I should say that this, the last proposed democratic map, um, although I, I think took care of many of the things that were originally, um, issues when first submitted, um, including numbering and, and a number of, of constitutional problems, there were still some, um, uh, constitutional problems especially as, as related to the contiguity of, uh, at least one of the districts that I know, uh, know of.

So, um, uh, I, I, I would say that, um, you know, I think it's important that this commission vote on a map that is constitutional. Uh, this is the only map, um, so, uh, you know, and with this amendment will continue to be the only map that is, is constitutional, uh, that's been submitted to the plan. We have, um, about 37 minutes according to my watch to, for this commission to act according to the constitution, um, and, um, these are things that, uh, you know, like I think many of us who have been here a while often act in a, um, uh, we have to act late at night, whether it's a budget on June 30th or, or other deadlines, so I'm sure we'd all rather be, um, uh, someplace else right now, but in, in this case, uh, this is something that we, a task that we have to complete, according to the Ohio Constitution that all of us swore to uphold, um, that has to be done.

So, um, pursuant to, um, the comments that I've made regarding the amendment, and, and by the way, the amendment has been downloaded on the website for some time now. Of course, this is the amendment that has been circulating among all the commissioners, uh, since yesterday afternoon. So based on those comments, um, Mr. uh, Co-Chairs, uh, in pursuant to Article 11 of the Ohio Constitution I move, uh, for the commission to amend the introduced proposed general assembly district plan with the amendment that I just explained.

Speaker Cupp (00:09:18):

Is there a second to the motion, uh, on the amendment?

I'll second the motion.

It's been moved and, uh, seconded that the, um, um, motion to amend the, uh, commission plan be adopted. Is there a discussion?

Hearing no discussion-

Senator Sykes (00:09:40):

M- M- Mr. Sp-

Speaker Cupp (00:09:40):

I'm sorry? Okay, go ahead.

Senator Sykes (00:09:41):

Mr. Speaker, uh, uh, at this point, an- and looking at the different proposals that have been introduced over the course of this couple of weeks, uh, you know, we appreciate the, uh, offer, the amendment, uh, that ma- the adjustments that the amendment makes, but it far, falls far below what's considered to be fair, and for that reason I, uh, object to it and do not support the amendment.

Speaker Cupp (00:10:19):

Is there further discussion?

This transcript was exported on Sep 19, 2021 - view latest version here.

The, um, Staff will call the role, please. [crosstalk 00:10:28]-

Staff (00:10:29):

Co-Chair Senator Sykes?

Senator Sykes (00:10:31):

No.

Staff (00:10:34):

Co-Chair Speaker Cupp?

Speaker Cupp (00:10:35):

Yes.

Staff (00:10:36):

Governor DeWine?

Governor DeWine (00:10:38):

Yes.

Staff (00:10:38):

Auditor Fabor?

Auditor Fabor (00:10:39):

Yes.

Staff (00:10:40):

President Huffman?

President Huffman (00:10:41):

Yes.

Staff (00:10:42):

Secretary LaRose?

Secretary LaRose (00:10:44):

Yes.

Staff (00:10:45):

Leader Sykes?

Leader Sykes (00:10:46):

No.

This transcript was exported on Sep 19, 2021 - view latest version here.

Speaker Cupp (00:10:49):

Uh, five votes to two, if my count is right. Um, the motion, uh, to amend, uh, has been adopted. Um, is there further motions? Chair-

President Huffman (00:11:01):

Uh, Mr. Chairman?

Speaker Cupp (00:11:02):

Chair recognizes Senator Huffman.

President Huffman (00:11:03):

Thank you very much, Mr. Chairman. Pursuant to Article 11 of the Ohio Constitution I move for the commission to adopt the introduced proposed general assembly district plan as amended as the final general assembly district plan.

Leader Sykes (00:11:16):

I object.

Speaker Cupp (00:11:17):

Is there a second to the motion?

I'll second the motion. There's been an objection. Um, discussion? Any discussion?

Chair recognizes Leader Sykes.

Leader Sykes (00:11:31):

Thank you, Mr. Co-Chair and, uh, members of the committee, and I, I know it is late, uh, and we are on a time crunch, but if you could indulge me a bit, uh, so I can share, uh, my thoughts about this plan, uh, this map and why I will be voting no, uh, this evening.

[crosstalk 00:11:57]-

Speaker Cupp (00:11:57):

Commissioner, you ma- may proceed.

Leader Sykes (00:11:58):

Tha- thank you. Thank you, Mr. Chair.

People ask me pretty regularly why do I wear white all of the time, and, and if you'll indulge it'll all make sense, it'll come together. Uh, I often wear white, especially in moments of importance, to honor the women of the suffrage movement who fought so hard for the right to vote, women who through no fault of their own except to be born as a female did not receive equal access to speaking up and about the government to the government on behalf of themselves and their families. As the only woman on this commission I take my responsibility incredibly, incredibly seriously, and beyond just what this vote may mean for a tenure map I bring with me those women who suffered for generations for the right to speak up so that someone like me could have the audacity to stand up and speak out on a commission that is made of six men and one woman.

This transcript was exported on Sep 19, 2021 - view latest version here.

I recognize that the men in the majority, in the majority party on this commission have never had ancestors or the experience of having to fight for their access to basic human rights that others enjoyed just simply because they were born, and to have before us today a map that summarily and arrogantly eliminates the ability for women like me, the women of the past to engage in a process and have their votes heard is not only offensive, it is plain wrong. I think of the women of the suffrage movement, and we just celebrated a hundred years of white women having the right to vote, and people like Mary Church T- Terrell or Ida B. Wells and Sojourner Truth who fought so that women like me, who look like me could have the nerve to say the things that I say in rooms just like this when people tell me I don't belong here. I call it offensive and plain wrong to move forward this map after we heard hundreds of people come before us, hours of testimony in cities across this great state, and to put forth something that so arrogantly flies in the face of what people, our voters asked us to do not once, but twice through a citizen led initiative that forced the hand of the legislature to ensure that people have the right to vote to, and not only that, uh, they have that right, that they feel like it is counted and they can make a difference in their government.

I often talk about my faith, and I continue to have the faith of a mustard seed, and that faith does not live within men, and including the men on this commission, and I am reminded and I was continuously reminded through the many hearings that I sat through of Proverbs 29:2 that says "When the righteous are in authority, the people rejoice: but when the wicked beareth rule, the people mourn." The people of Ohio have been mourning, they have been in mourning, and it is because they have not been able to access their government in the way in which they deserve.

We may no longer be in the 1920s where women, or some women, or even just 1963 when Black people didn't have their full enfranchisement, but every day I am faced with the opportunity, and really the privilege, to pushback, and to standup and be proud of where I am and not to ever disrespect the people who got me here. There is no way that I can in good conscience vote for this map and I urge every single member of this commission to join me in voting no. This is not simply a matter of republican versus democrat, male versus women, younger versus older, millennial, boomers, this is about the human right to access and participate in our government.

The democrats on this commission that the maps that we saw yesterday were a nonstarter, that we would not be supporting them, and any suggestion that we should be voting for them or that they are closer is a patently false statement, and to make the suggestion that perhaps we should vote for this because it may get us closer is just wrong. I am not going to be fooled and neither will the people of this state. They have invested too much time and energy in this process and they deserve better than what this map is. It is very clear that in drawing this map, because it was stated, that no one considered the Voting Rights Act, an act that allowed me, someone like me to even be able to be in this position, to allow someone like Co-Chair Sykes to be a co- chair ...

PART 1 OF 4 ENDS [00:19:04]

Leader Sykes (00:19:00):

... chair of a constitutionally mandated commission. But I know the people who have never had to fight for their rights cannot appreciate what it means when people who have not had rights beg for them. Things that they should've already had. These people who came and spent hours of testimony did not deserve to beg us to do right. It just wrong. This map, we can talk about constitutionality, but I think all of us, especially those who have graduated from law school, know we don't have the ability to determine anything to be constitutional or not. That will be left up to the courts. But I do know one

This transcript was exported on Sep 19, 2021 - view latest version here.

thing that is very clear, that there is a section in the Constitution that requires us to draw maps that follow the proportional results of elections over the last 10 years, and this map falls short of that.

And we can argue all day about the legislative intent, but I don't have to do that, because I can talk to my co-chair who was a part of writing this and he will share with you that the proportionality or representational fairness is what he meant and that is why it's in the Constitution, period. And you can ask him yourself if anyone else has any questions. And so, as I conclude, I just want to say and make another appeal to my colleagues on this commission, this is a vote that should be any easy no. It's an easy no for me. I will no-, lose not a second of sleep over voting no on this.

Because at some point, when the government refuses to listen to the people who elected us and direct us, there are consequences. And I am always going to stand on the side of the people who brought me here, whether it's those suffragettes, those civil rights fighters, the people of House District 34, the birthplace of champions, they got me here. And I am proud to vote no on their behalf because I know they deserve better than this, and I would hope every member on this commission feels the same way about their constituencies, whether it is a district or it is a state, and you join me in voting no. Thank you, Mr. Chair.

Speaker Cupp (00:22:03):

Further discussion, chair recognizes, um, co-chair Sykes.

Co-Chair Sykes (00:22:09):

Co-chair, and members of the commission, and people of the state of Ohio, I have a very, very heavy heart tonight. I've been advocating for fair districts since the 80s, when I first came on as a member of the Ohio House of Representatives. I have worked really hard to formulate the provisions of the Constitution that the citizens adopted, and I'm so disappointed at this particular time that we're at this juncture. That now it's almost 12: 00 on September the 15th, 2021, and we've come to this juncture. I was hopeful, I was hopeful that the people in place at that particular time when we were contemplating this would have the will to promote fairness. I was hopeful that we could take an adjust, make an adjustment in the apportionment board, expand it, make sure we make minority representation on it, adequate.

I was hopeful that they would have the courage and the insight to promote fairness. And we put guardrails in it. One of the very distinctive factors of the Constitution provision in 2015 was we added a provision that dealt with fairness. Before, we were just looking at technical compliance, issues like compactness, or the number of splits. But it's been proven with the map that's been presented before you today that you can comply with the technical compliance, but still gerrymander districts as much as you'd like. And so, it was the wisdom of the Constitution provision to put in place a different concept of representational fairness. And that concept was considered to be somewhat vague at the time. And so, we wanted to make sure it was understood. So, instead of putting the words, "Representational fairness," in, we actually defined the concept, described it, so it would be clearly understood what the intentions were.

And this was the guardrail, because in Section 6A, it says you can't favor or disfavor a party. And then in B, it describes how we make sure that that doesn't take place. Because we got to look at the voting preferences expressed by the people in the vote in the elections over a 10 year period. And we take all of the partisan elections, we're not going to be selective. We're going to take all of them. We do it over a 10 year span so we don't have problems with outliers, so it's kind of an average. We ask scholars to come forward to analyze it. To read the Constitution and then say, "How would you interpret

This transcript was exported on Sep 19, 2021 - view latest version here.

this?" And they came one at a time and every one of them came up with the, basically the same quotient. Basically the same per-, percentages, proportions. And that's considered to be fairness. And I can't stand up here and support anything but fairness.

You know, I'm just astounded by the arrogance of the super majority having such a callous disregard for the people of this state. You know, I went, I went to every one of the hearings. I presided over most of them. And I listened to every testimony. And the people came and they pleaded with us. Some of them scolded us and others cried. Because they wanted us, they were trying to appeal, make an appeal to our sense of good judgment. And they waited in hearings that were four, five, and six hours long to present their written testimony. And as they spoke, and they went over the time limit, they kept speaking. And as I tried to even gather them down, they kept speaking. I asked them not to applaud and they kept clapping anyway. They have spoken. We ... Hundreds of them from all over the state, 15 regional hearings in 15 different locations, and they all, they all want fairness.

And when we campaigned, Senator Huffman, when we campaigned, we campaigned under a slogan for the ... Our campaign committee statewide, we raised money and campaigned, fair districts was the name of the committee. Fair districts, not technically complying districts, but fair districts. And I can't ... As, as bad as I would lo-, just ... I would love for us to have a 10 year plan, a fair plan, there's no way that I would slap the people in the face that promote fair districts and put them in a sluth-, put them in the misfortune that we've been suffering for decades for another 10 years. And I ask this committee, please, listen to the constituents this time.

Speaker Cupp (00:30:04):

Further discussion on the motion? Chair recognizes Secretary LaRose.

Senator LaRose (00:30:12):

Thank you, Co-Chair. Though our votes are different, I share the deep disappointment that Co-Chair Sykes just expressed. I'm no stranger to trying valiantly for a worthwhile cause, but I don't like to fail. I'm no stranger to striving hard and spending myself for a mission that matters. My mission has been clear, bipartisan compromise that yields a 10 year map. I believed all along that it was possible. I even told a couple of you that our state motto is, with God, all things are possible. That was my guiding north arrow over the last couple weeks, with God, all things are possible. We've fallen short. Not enough members of this commission wanted to come along with that effort.

I'm casting my yes vote with great unease. I fear, I fear we're going to be back in this room very soon. This map has many shortcomings, but they pale in comparison to the shortcomings of this process. It didn't have to be this way. It didn't have to be this way. Some of us worked in good faith in a bipartisan way to try to get a compromise. There are members of this committee who I do not believe worked in good faith to try to reach that compromise, but here we are. When we are back here, whenever that is, I know for sure, I believe, October 1st we'll be back here, back here with a new mission, drawing congressional districts for the state of Ohio. And when we are, this process will be different. It is not going to work this way next time. I'm casting a yes vote today, but I wish it didn't have to be this way.

Speaker Cupp (00:32:17):

Further discussion on the motion? Governor DeWine?

Governor DeWine (00:32:22):

This transcript was exported on Sep 19, 2021 - view latest version here.

Thank you, Mr. Chairman. I'm deeply disappointed at where we are tonight. I'm very, very sorry that we are where we are. Uh, I know, I know that this committee could've produced a more clearly constitutional bill. But that's not the bill that we have in front of us. I have felt throughout this process that there was a compromise to be had, that the bill could be improved, become much more clearly constitutional. That we could produce a bill that all seven members ... A map that all seven members of this committee could vote for and that we would have a 10 year map. I was wrong. I felt even today, as late as early this evening, that there was still a deal to be had and that parties could get together. And I thought if that could not occur tonight, that it could occur tomorrow, or the next day, and that it was possible.

The parties are not that far apart. I won't go into the details, but they're not. They think they are, but they're not. Tonight it has become clear to me that there is not going to be a compromise. There can't be a coming together. I talked to Republican legislative leaders. I talked to the Democrat legislative leaders separately. And it's clear in talking to both sides that there's not going to be an agreement. And that we could go tomorrow, or the next day, or the next day and it simply was not going to occur. I have respect, deep respect for all members of this committee, but I'm saddened by the fact that it was clear when talking to them that there was not going to be any real ability. And so, tomorrow we would be exactly where we are today, and the next day, and the next day.

So, along with the Secretary of State, I will vote to send this matter forward, but it will not be the end of it. We know that this matter will be in court. I'm not judging the bill one way or another, that's up for ... Up to a court to do. What I do, what I am sure in my heart is that this committee cou-, could've come up with a bill that was much more clearly, clearly constitutional. And I'm sorry we did not do that.

Speaker Cupp (00:36:10):

Further discussion? Um, Chair recognizes Auditor Faber.

Auditor Faber (00:36:14):

Thank you, Mr. Chairman. And, and a question to the sponsors. Uh, do we have a statement pursuant to HC2 prepared to explain the proportionality issues?

President Huffman (00:36:25):

Uh, Mr. Chairman, yeah-

Speaker Cupp (00:36:25):

Go ahead.

President Huffman (00:36:28):

Yeah, yeah. In fact, there is, um, it's not appropriate to present that until after the vote is taken, um, which I could, I could present it now. But, um, it's only presented in the, in the case of a four year map, which I think we're going to have, but formerly we have to have the vote first.

Auditor Faber (00:36:44):

L-, uh, Mr. Chairman, the reason I ask is, is that I think that that discussion may help, uh, at least, eh, certainly have the discussion as to, to, at least some folks belief as to whether this map complies, or how

This transcript was exported on Sep 19, 2021 - view latest version here.

it complies with Section 6. Um, and, and so, I don't know if that's helpful or we can wait to have that discussion, but I'm just, just ... Um, um, at your discretion.

President Huffman (00:37:13):

Uh, uh, I'm sure if it's my discretion or the co-chair's discretion, I'd b- ... Would you like me to, uh, distribute the statement now, Auditor Faber?

Auditor Faber (00:37:21):

Uh-

President Huffman (00:37:21):

Is that what you're asking?

Auditor Faber (00:37:22):

I, I, I guess my short answer is yes. Uh, you know, it's not required until after that, but it certainly would help the, the proportionality explanation.

Speaker Cupp (00:37:33):

At the request of Auditor Faber, if we could, um, distribute the statement that, um, um, conditionally would be offered.

(silence).

PART 2 OF 4 ENDS [00:38:04]

Speaker Cupp (00:38:24):

Anybody need a minute here or?

Auditor Faber (00:38:30):

While we're doing that, Mr. Chair.

Speaker Cupp (00:38:32):

Pardon. Do you need, do you need a minute?

Auditor Faber (00:38:34):

No, no, I'm.

Speaker Cupp (00:38:35):

Okay.

Auditor Faber (00:38:36):

I have a question or a statement.

Speaker Cupp (00:38:38):

This transcript was exported on Sep 19, 2021 - view latest version here.

Oh, Chair recognizes Auditor Faber.

Auditor Faber (00:38:40):

Thank you. Uh, this has been an interesting process to, to say it has gone like I anticipated is probably not just an overstatement, but, but frankly, a great disappointment. Uh, this process has been, um, uh, is an example of, of, from a management perspective of what needs to be improved going forward for future redistricting commissions. And in candidly, I anticipate offering some suggestions on rule changes and things to better involve the non legislative members in the process earlier and, and to give resources equally so we can have the ability to, to draw other maps. Having said that, I think it's important that everybody understands some truisms that we heard some of the witnesses testify to and the redistricting process, first that Ohioans tend to live around people that think and vote like them.

And that's why the compactness provisions in the constitution are very important. And the no splitting provisions are very important because we heard a lot of people testify that they didn't wanna necessarily be drawn into districts that put them in places that didn't think like them or to be represented by somebody who doesn't share their values. Now we're in a representative form of government. And that always means that you're always gonna have somebody representing you that you don't agree with in some ways, heck most of us who are legislators will say, "We don't always agree with ourselves." So it's tough to have 100% agreement.

So we don't expect perfect alignment, but that's why we elect people. And why majorities in the district get to say, the problem with, with, with looking at other factors when you have such a organization in Ohio, as we do with urban and suburban and rural areas, means that it's very difficult to draw districts that have some divine competitiveness ratio, one of the versions of the maps. And I'm gonna talk about the maps before I get to the process. One of the merge versions of the map submitted by one of the legislative caucuses at one point almost had no competitive districts.

And so most all of the races would have been determined in primaries. We heard over and over and over just how many people had concerns with that as to its potential to lead to extremism. So I did a quick count on this map based on information that we got a little earlier off of. And because we don't have access to the high tech programs, we were stuck using Dave's Redistricting, which seems to be an okay tool. But the reality is, is I counted the com, con, competitive districts and we've had different debates about what competitive means between all the participants here. And so I use two different metrics. The, the one Dave's uses is, is 10 points, 45 to 55. I think a better tighter competitive number is, is 4852. Uh, it's real tough for somebody to win a 55, uh, or to lose a 55 district.

And it's real tough for somebody to win a 45 district, but candidates matter, we have examples, frankly, I think one of the members on this panel won a district that wasn't much above 45, and everybody said, "He couldn't win." I remember being one of those people who said, "He could, he did." And I'm proud of him as my colleague. So you can win those districts. Candidates matters, campaigns matters and, and, and, and those issues matters. So in this map, that's presented. If I've got the right set of numbers, we've got 23 districts that are competitive, 12 of which happened to fall in, in the Democrat side and 11 fall on the Republican side. If you're striving for a competitive map, that's pretty darn good with the number of tight districts that you have to draw that are gonna be the sure things in, in the Republican strong areas, in the Democrat strong areas of this state.

So that means depending on what happens, elections and candidates and issues and districts, you got 23 districts in this map that could flop one way or another, that not bad going through the rest of the map. There are things in it that I don't like. My colleagues have heard me repeatedly talk about why I think you need to keep communities that have a long track record of being represented together, together, my home community isn't such a community in this map. It's not tied to the state Senator,

This transcript was exported on Sep 19, 2021 - view latest version here.

including the now speaker. I think who represented this district some 20 plus years ago, uh, with, with the counties that it's with. The moral of the story is we'd all don't get everything we want despite our efforts. So when you draw maps sometimes you have to allocate disappointment.

I will tell you there's some disappointment in my view, as the way some of the counties are split in Northwest Ohio, that's just the way the cookie crumbles some would say. But the reality is compared to some of the other maps, we've had a choice to go with this map isn't that bad. It's not that good either. There are things in this map that given a perfect world, I would change. Uh, we tried to make some of those suggested changes, but that brings me now to the process. I spent a lot of time trying to figure out how to get to a seven person tenure map.

We did that in good faith. After 24, 25 years as a mediator, I always said, "You never stopped negotiating until it's clear you're done." I still believe today that if we had more time putting the parties in a room in a way they could candidly talk without fear of lawsuits and without fear of showing their hand, we'd got a better map, but I do agree that as of where we sit today in the timeframe and everything else that we see, this is as good as it's gonna get today. I don't like that. I'm disappointed profoundly that we do not have a ten-year map, that we do not have a seven person vote. I can tell you that the governor and secretary LaRose and I spent hours trying to find compromise.

I wish we'd found it with that because I believe votes are binary things. I don't have another choice to vote yes or no on, I don't have the ability because of the resource allocation to make amendments here or there, that would have made a difference without causing more problems one way or another, and potentially violating the constitution. Because there is this provision that you can't unnecessarily split cities or townships, and we don't even have good census blocks and Dave's Redistricting to do that. And I have to give a shout out to the Democrat staffers that helped educate me on some of that, frankly, I wasn't aware of that and their time and their work with us in good faith, I think at times. Okay.

I, I think they worked good with us. Um, what's helpful to me and helpful to me to understand this with that I'm gonna vote yes on this map. I'm gonna vote yes with some apprehension and I'm gonna vote yes in reliance on the representation that I've gotten from various legal counsel that these provisions fully meet with the constitutional parameters and the people who have had the ability to make those assessments, that this map meets all those standards, because we have not had the ability to look at those things. Um, having said that what I do get to see from Dave's, it does appear to do that. Um, I just would encourage us to look at the process, to continue to talk to each other and find opportunities for compromise.

Um, and, and if we have to go about this again, whether it's in four years or four weeks, I urge us to remember that when we negotiate, we shouldn't be negotiating from positions. We should be negotiating on shared interests. And if we do that, I think we'll have a better product. Thank you, Mr. Chair.

Speaker Cupp (00:46:46):

The question is, shall the motion be agreed to the staff will call the roll.

Speaker 1 (00:46:52):

Co-chair Senator Sykes.

Sen. Sykes (00:46:54):

No.

This transcript was exported on Sep 19, 2021 - view latest version here.

Speaker 1 (00:46:55):

Co-chair Speaker Cupp.

Speaker Cupp (00:46:56):

Yes.

Speaker 1 (00:46:57):

Governor DeWine.

Gov. DeWine (00:46:58):

Yes.

Speaker 1 (00:47:00):

Auditor Faber.

Auditor Faber (00:47:01):

Yes.

Speaker 1 (00:47:02):

President Huffman.

President Huffman (00:47:03):

Yes.

Speaker 1 (00:47:03):

Secretary LaRose.

Senator LaRose (00:47:05):

Yes.

Speaker 1 (00:47:06):

Leader Sykes.

Sykes (00:47:06):

No.

Speaker Cupp (00:47:10):

Um, five votes in favor, uh, two votes, uh, uh, opposed according to the constitutional provision, the map has not been adopted as a seven year plan, but has been adopted as a four year plan chair recognizes Senator Huffman.

President Huffman (00:47:28):

This transcript was exported on Sep 19, 2021 - view latest version here.

Thank you, um, um, Mr. Co-chairman pursuant to article 11 of the Ohio constitution I move for the commission to adopt the statement that has been distributed to the members of the commission. That's the, uh, statement that was distributed by, uh, at the request of, uh, Auditor Faber.

Speaker Cupp (00:47:47):

Uh, I'll second the motion it's been-

President Huffman (00:47:49):

Discussion.

Speaker Cupp (00:47:50):

Uh, chair recognizes Secretary LaRose.

Senator LaRose (00:47:57):

Having just been presented with this and none of us like to vote on something that we just got, but I understand the time crunch that we're under here, I'm going to ask for some explanations on some things, uh, this Section 8C2 statement explains the rationale that the people that drew this map used to reach what they considered the proportionality requirements. It's my understanding. It seems like they're sort of using two different factors. One is the raw number of races, one of statewide state and federal, and then the other is the number of votes and sort of mixing those two standards together instead of picking one. Uh, President Huffman could you explain the rationale since I assume it was your staff that drafted up this statement?

President Huffman (00:48:46):

Um, yeah, I, first thing I would say is I don't, I don't think that there's a requirement in the constitution that, um, there'd be one standard chosen, uh, over another. Um, there is no formula in the constitution, um, percentages of, uh, votes or percentages of, um, of, uh, races won, et cetera. Um, this is simply a statement again, pursuant to, uh, the constitution, uh, in only in, only to be submitted in, uh, where there is a, uh, a four-year map. Um, and I, and I, I think it might be helpful just to read if I could that portion of the constitution, um, right there?

Speaker 2 (00:49:33):

Yes.

President Huffman (00:49:34):

Right. So that's a final general assembly district plan adopted under, and this is the four year provision, um, shall include a statement, explaining what the commission determined to be the statewide preferences of the voters of Ohio and the manner in which the statewide proportion of districts in the plan whose voters based on statewide state and federal partisan general election results during the last 10 years, favor each political party corresponds closely to those preferences as described in division B of section six of this article, at the time the plan is adopted a member of the commission who does not vote in favor of the plan may submit a declaration, the member's opinion concerning the statement included with the plan.

So, um, uh, leader Sykes or Senator Sykes, uh, could do that as those who, who, um, voted no, if, if there's a separate plan. So this, this is really, uh, nothing more than that. It's a statement of things that

This transcript was exported on Sep 19, 2021 - view latest version here.

were considered, um, and tried to include all of the relevant information, um, that, uh, which of course includes, uh, many of the things that, uh, have been discussed here, um, in, including, um, the percentages of votes. So, um, we, we tried to in this, in this case to try to make it, uh, clear, uh, just use basic, uh, factual information that I think is available to, you know, the public and, and everyone else.

Senator LaRose (00:50:59):

Another question, uh-

President Huffman (00:51:01):

Okay.

Senator LaRose (00:51:01):

Mr. President, I would guess that this rationale was reached and guided the map making process. It would have to, I, for one have been asking for the rationale for days, is there a reason why that wasn't shared with us until now?

President Huffman (00:51:24):

We are going to do services. Sit down. Yeah.

Speaker Cupp (00:51:25):

Chair recognizes, um, Senator Huffman.

President Huffman (00:51:27):

Yeah. Could you repeat the question Secretary LaRose.

Senator LaRose (00:51:30):

Yeah, Mr. President. So I've been trying to understand, as we've been talking to members of your staff and you yourself, how you believe that you're reaching the representational fairness or proportionality requirement in section six. And so I've been asking, "How do you calculate those numbers? What do you consider that proportionality?" And I've not gotten an answer until tonight, but I would assume that this has been guiding the map-making process for a long time. Was there a reason for, for not sort of sharing this sooner to sort of guide the conversations as we've been having them?

President Huffman (00:52:06):

Sure.

Speaker Cupp (00:52:06):

I recognize Senator Hoffman.

President Huffman (00:52:08):

Yeah. This, this statement was prepared probably in the last five or six hours. I think it was sent over to your office, uh, probably about four or five hours ago. And the, um, so the, these are facts that are well-known there, that are discoverable on the public, uh, website. I think we've been talking about these percentages that, uh, all the state, so this is just simply a recapitulation of all of those in a simple

This transcript was exported on Sep 19, 2021 - view latest version here.

statement that the constitution requires. So, um, some of these things are, are, you know, some folks discard, some of those are things, some are more important. And, uh, you know, the simple fact is that, that, um, you know, there are a lot of opinions about what that portion of the constitution means for example, when the word results is used, does that mean a adding together of all the votes and all those races over the last 10 years?

Well, I suppose it could mean that. Does it mean, uh, the results of the elections that are described there in 13 out of the last 16 of those races won by Republicans. And so we're simply listing all of that is those are things, um, that are considered. Um, now I, I, I can tell you, you know, if you, if you ask my personal opinion, I can tell you that a lot of this doesn't have a lot to do with why people win races.

Senator LaRose (00:53:34):

Sure.

President Huffman (00:53:35):

We know that Stephanie Kunze just won in a district that was a 40% index. We know that, um, I think it's representative Troy, Dan's the Dan Troy in Lake County, he just won in a, uh, 53% Republican district. So this is a, is a big discussion point among a lot of folks about what is exactly these things may be. But the, the best thing we can do is put out all of the facts for everyone and, and, and anyone, uh, can make whatever conclusions they wanna make about that.

Senator LaRose (00:54:12):

Thank you. I appreciate that. And yeah, there has been a lot of discussion about what is, what are the words in, in Section six mean? I, I've mauled over what is shallow attempt mean, uh, for, for example, and I, I, I think that going forward in the future, it would be nice to have this conversation in advance and try to come to a commission agreement on what the, what these factors are gonna be. So it can guide the rest of our negotiations that's all. way. Thank you, Mr. President.

President Huffman (00:54:38):

Mr. Co-chair and I could just respond to that. One of the, one of the designs of this going back to 2014 was that the sense data is received on April 1st and the, the, uh, map work that needs to be done usually takes in this case, it took only 10 days, but typically takes a couple of months and the map-makers can begin in mid June to make this determination. They would have about two and a half months to negotiate. Okay. 'Cause that would take them till September, until September 1st, to have this negotiation. Well, as we know, we didn't get the information until mid August and, and really in a usable form until about the last week in August. Um, and that began the process on both sides. As we know, there's money allocated and consultants, and map-makers hired by both sides and no map was produced, uh, at least until August 31st.

Now I will tell you that the Senate Democrats map, although a map was, had several constitutional problems in it. And, and that was solved a week later, about the same time that the Republican map, uh, was presented. So folks have done extraordinary amount of work on both sides, my staff, and I'm sure it's the same for the Senate, uh, Democrat staff. My staff's worked 16 to 18 hours a day for 25 straight days working on this. So it's been an extraordinary task just to get this part. And I've said this, I've said this a number of times. It bears repeating now, that last April, when I came to many folks and said, "Let's get a 30 day extension. So we'll have time to do the negotiation that we wanted to

This transcript was exported on Sep 19, 2021 - view latest version here.

do, that the governor's talked about that you have talked about," for whatever reason folks said, "That was a bad idea. We don't want more time."

And now here we sit with, uh, a process that many are criticizing because not enough time was taken or given. So I, I appreciate that, but I also hope that's also something we can take into account. There may be another pandemic. The next time we do this, and perhaps we need to be more flexible on the ability, uh, you know, or what we have in the constitution in these timelines.

PART 3 OF 4 ENDS [00:57:04]

President Huffman (00:57:00):

... the ability, uh, y- or what we have in the constitution in these timelines. Thank you.

Speaker Cupp (00:57:07):

Further discussion. Chair recognize Co-Chair Sykes.

Senator Sykes (00:57:12):

Mr Co-Chair and, uh, I just wanted to make it clear that this is, is just, uh, the opinion of the majority on this particular issue. Uh, so, by no way, uh, am I agreeing to, uh, any of this. Uh, but [inaudible 00:57:27] accepted of your opinion.

President Huffman (00:57:31):

I appreciate that as th- If I could, Co-Chair Cupp, I appreciate that-

Senator Sykes (00:57:36):

[crosstalk 00:57:36].

President Huffman (00:57:35):

... and, as mentioned, uh, in the, um, constitutional provision I just read, those members, um... those members who vote no may submit a declaration of the, of that member's opinion, Senators... Senators Sykes and Leader Sykes, so certainly that's appropriate if there's an alternate opinion that you wish to submit. So...

Senator Sykes (00:57:58):

We do have that, a- and, uh...

President Huffman (00:58:01):

Very good.

Speaker Cupp (00:58:03):

Further discussion.

Leader Sykes (00:58:03):

Uh, yes, Mr [crosstalk 00:58:06]-

This transcript was exported on Sep 19, 2021 - view latest version here.

Speaker Cupp ([00:58:05](#)):

Leader Sykes?

Leader Sykes ([00:58:06](#)):

I do have a question, uh, as such, uh, Co-Chair Sykes did mention that we have, um, a... minority report to offer as well. Procedurally, as we, uh, had not discussed how this will move forward, at what point in this evening before we... adjourn would you like this minority report to be, um, put forth?

Speaker Cupp ([00:58:37](#)):

Can we just stand at... Can we just stand at ease for a moment while we consider that and consult with the parliamentarian?

... statement is available now if you just want to distribute it, it'll be included with the record.

Leader Sykes ([00:58:50](#)):

Uh, thank you very much Mr Chair, I would like to, to speak of the minority port, report, uh, if I, if I may have the chance to do so.

Speaker Cupp ([00:58:56](#)):

Yes, the Chair recognizes Leader Sykes.

Leader Sykes ([00:58:58](#)):

Thank you, Mr Chair, and I am going to read it in its entirety because I do believe it is important and pursuant to Article... 11 section 8 of the Ohio constitution, uh, the Ohio Redistricting Commission, and I do, uh, put forth this minority report on behalf of Senator Vernon Sykes, Co-Chair, and myself, house minority leader, Emilia Strong Sykes, Commissioner. It reads, 'the state legislative district plan adopted by the Republican members of the Ohio Redistricting Commission egregiously violates the anti-gerrymandering provisions of the Ohio constitution. These anti-gerrymandering provisions were enshrined in the Ohio constitution just six years ago for state legislative districts by the overwhelming majority of Ohio voters'.

Gerrymandering is defined by the Merriam-Webster Dictionary as 'the practice of dividing or arranging and territorial unit into election districts in a way that gives one political party an unfair advantage in elections'. Simply put, gerrymandering is partisan unfairness. The Ohio constitution requires partisan fairness. Article 11 of the Ohio constitution is clear in its provisions that dictate the drawing of our state legislative maps. It requires that the maps respect the existing boundaries of countries, townships, and municip- municipalities. It also requires that the maps reflect the statewide political preferences of Ohio voters over the previous decade of partisan statewide elections. Unfortunately, the maps adopted by the commissioned Republican majority today do neither. Votes never intended for Republicans to draw themselves another ten years of gerrymandered districts, and give themselves another decade of unchecked power.

Article 11, Section 6 of the Ohio constitution contains two new elements not met by the Republican-drawn district maps. Part A and Part B of Sexon- Section 6 are important guardrails, not aspirational goals, which ensure that the main purpose of the reform effort in 2015 is met by the Commission's majority. Districts must be drawn to meet the requirements of the constitution, taking

This transcript was exported on Sep 19, 2021 - view latest version here.

into account compactness and contiguousness, including the fairness concept demanded by voters which is enshrined and enforced in Subsections A and B of Section 6.

Subsection A of Section 6 states that quote, 'No general assembly district plan shall be drawn primarily to favor or disfavor a political party', end quote. In contrast the maps adopted today go to absurd lengths to create a Republican monopoly on legislative power that they have not earned at the ballot box. Subsection B of Section 6 also states that quote, 'The statewide proportion of districts whose voters based on a state and federal partisan general election results during the last ten years favor each political party shall correspond closely with the statewide preferences of votes of Ohio,' end quote.

The district maps adopted by Republicans today in no way reflect the statewide preferences of voters in Ohio and do not closely correspond to the statewide election results of the last ten years. Subsections A and B cannot be read separately. Subsection B is important because it creates the litmus test for what constitutes primarily favoring or disfavoring a political party. No reasonable person would interpret the maps adopted by the Commission today as reflecting the will of Ohioans, and not primarily favoring one party over anther, as required in Section Six, Subsection A and B.

In Ohio, over the past decade, the Republican party won 54% of the statewide partisan general election votes, while Democrats won 46%, and please see Appendix A that is attached to this statement.

The calculations were presented to the Commission in ext-extensive witness testimony, as well as by researchers at Ohio university as part of the contract between the legislative taskforce on redistricting, reapportionment, and demographic research, of which I am the Co-Chair, and owe you to produce the Ohio Common Unified Redistricting Database. The election results are not in dispute. They are publicly available on the Ohio Secretary of State's website. One does not need to be an expert to know that the statewide... does not to be an expert to know the statewide partisan election results. Hundreds of Ohioans were able to draw maps in the constitutionally appropriate timeframe. Legislative maps wh- would closely correspond with the statewide voter preferences. If they yielded close to 45 house districts that would likely be won by Democratic candidates, 54 house districts that would likely be won by Republican candidates, 15 senate districts that would likely be won by Democratic candidates, and 18 senate districts that would likely be won by Republican candidates.

The Republicans on the Commission, in a naked attempt to maintain a gerrymandered, unearned super majority drew in adopted districts that would likely yield 34 Democratic house districts, 65 Republican house districts, 8 Democratic senate districts, and 25 Republican senate districts. The senate district numbers and maps approved today are even worse than under the current maps approved in 2011, which were so egregiously gerrymandered that they inspired voters to go to the polls twice to put fairness and equity in our redistricting process via constitutional amendments. In the interest of fairness, bipartisanship, and the realities of geography, demography, and politics, the Democratic members of the Ohio Redistricting Commission produced maps that followed the constitutional demands of proper district drawing, including Article 11, Section 6 A and B, which were ignored by Republicans. These three maps respectively produced 14 likely sen- Democratic senate seats, and 44 likely Democratic house seats, 13 likely Democratic senate seats, and 42 likely Democratic house seats, and 13 likely Democratic senate seats, and 42 likely Democratic house seats. These correspond closely to the ratio of proportionality that the Ohio constitutions prescribes in Article 11 Section 6.

The Democratic members of the Commission and their staff worked tireless to incorporate Republican feedback into the map making process, while also drawing maps that adhere to the requirements of the Ohio constitution in Article 11, Section 6. The Democratic members of the Commission produced three separate map plans that did not disproportionately favor either party, that did, that did represent the will of voters, demonstrated over the previous decade of statewide partisan elections, and met the criteria of limiting splits of communities.

This transcript was exported on Sep 19, 2021 - view latest version here.

Throughout the process, Republicans appeared to follow a pa-playbook of delay and deflection. They used as much time as possible for deadlines, skipped deadlines, and then offered unconstitutional map plans in unacceptable ultimatums to Democratic members of the legislature and the Commission. Their actions included a last minute attempt this spring to change the constitution to give themselves control of the process, delaying the convening of the Commission until early August, dragging their feet on approving the Commission rules, blaming this senseless delay for not convening Commission, the Commission before August 6th, purposely missing the September 1st constitutional deadline for releasing a plan, holding hearings and adopting a plan and feigning interest in a compromise before the September 15th deadline by o-only offering gerrymandered maps. And please see Appendix B for a June 11th letter signed by myself and Leader Kenny Yuko requesting that the Ohio Redistricting Commission be reconvened by the Governor at a most timely manner, so that we could avoid many of the things that we just heard, and the Republican response, and over several weeks of this testimony.

Republicans did not d- demonstrate fully good faith participation in the process. Democratic solutions went unheeded while Republicans only made token changes to their maps that appeared to d-designed to protect their incumbents. This c-culminated again in heavily gerrymandered maps and their second offering, sent to Democratic Commission members and staff late on September 14th, the night before the constitutional deadline. Their latest maps would produce nine likely Democratic senate districts and a single additional 50/50 toss up Republican-leaning senate district. The remaining 23 senate districts were clearly drawn to favor the Republican party. It would produce 32 likely Democratic house districts and 5 toss up Democratic-leaning house seats.

This plan, like the first plan put forward by Republican map drawers, does not reflect the statewide political preferences of Ohio voters, because it creates a higher proportion of Republican districts than the proportion of votes they earn in Ohio. The GOP adopted map lays out in absurd description of how it allegedly meets the requirements of Section 6B. The voters of Ohio do not favor Republicans in a range of 54% to 81%. We, the two members of the minority party, could not in good conscience violate the voters' will, by- as expressed by the redistricting reforms approved in 2015 and 2018 nor could we ignore the Ohio constitution's clear language that legislative district maps must correspond closely to the statewide preferences of voters, as measured by the statewide partisan general election results over the past ten years.

The plan adopted by the majority violates that requirement. In fact, the Republican members did not demonstrate any attempt to meet the requirements. Until just a few moments ago, we had no idea how they decide to calculate or figure out proportional representation. For these reason, we are voting against the maps that the majority of the Commission are choosing to adopt. Thank you, main Chair.

Speaker Cupp (01:08:43):

Um, I need to back up for a moment. There was, uh, a motion, uh, to adopt, um, the rationale, um, offered by Senator Huffman, and we didn't actually take a vote on that, so... Um, at this time, uh, for [inaudible 01:09:00] any further discussion, Senator Faber... Oh-

Auditor Faber (01:09:05):

So-

Speaker Cupp (01:09:05):

I'm sorry, Auditor Faber (laughs).

This transcript was exported on Sep 19, 2021 - view latest version here.

Leader Sykes ([01:09:05](#)):

(laughs)

Auditor Faber ([01:09:07](#)):

I, I just made to he- make sure I heard Faber, that's all I need to hear.

Speaker Cupp ([01:09:11](#)):

(laughs)

Auditor Faber ([01:09:12](#)):

Uh... Mr Chairman, a-as I went through this an-and, I know some of you will remember that a number of us were in the trenches a-at a similar hour, uh, working on the constitutional amendment that led to this, and I remember sitting there during the time, actually going back and manually counting who won the last, all the statewide an-an-and federal seats over the last decade, a-an-and putting that number together. I-I guess we didn't anticipate what exactly those words said and how they could be interpreted or we coulda been clear, but I do recall having the conversation about whether it's, it's, it's percentage of vote or percentage of who won the races. And the great debate of the time was do we go back in, into the prior time period, or do we go just into the time period of the decade. And so I think in that capacity, putting both of those terms in here is fair and certainly represents the intent of at least one side of the drafters at the time, to talk about races won. And so, uh, with that I can support this, this statement.

Speaker Cupp ([01:10:19](#)):

Further discussion? ...Okay. Um... Staff, call the roll please.

Senator Sykes ([01:10:28](#)):

If, i-if I may-

Speaker Cupp ([01:10:28](#)):

Yep, yep, uh, Co-Chair Sykes.

Senator Sykes ([01:10:32](#)):

Uh, since we're not voting to agree with... this, just... to allow it to officially go into the record, then I think it should go, both statements, without objection.

President Huffman ([01:10:46](#)):

Yeah, Mr Co-Chair, the first, um... I think the, the statement of, um, that Leader Sykes read does go into the record, and that certainly would be without objection by me. So, yes.

Speaker Cupp ([01:11:07](#)):

Let me consult... Let me consult the parliamentarian chair, the committee will be at ease.

... a breach of the constitution, as it is an act of the Commission and that would reca- uh, require a, um, uh, role call vote, so we will proceed with the role call vote on the... statement to go with the four year plan. T-this is after which we can accept for, uh, filing... with the records the minority report.

This transcript was exported on Sep 19, 2021 - view latest version here.

Senator Sykes (01:11:39):

Yes, M-Mr Chairman, if I may.

Speaker Cupp (01:11:40):

Yes.

Senator Sykes (01:11:41):

Uh, just being clear that this is simply to accept the report?

Speaker Cupp (01:11:45):

Yep. Right. Staff will call the roll please.

Staff (01:11:51):

Co-Chair Senator Sykes?

Senator Sykes (01:11:53):

Yes.

Staff (01:11:53):

Co-Chair Speaker [Cupp?

Speaker Cupp (01:11:55):

Yes.

Staff (01:11:56):

Governor DeWine?

Governor Mike DeWine (01:11:57):

Yes.

Staff (01:11:57):

Auditor Faber?

Auditor Faber (01:11:59):

Yes.

Staff (01:11:59):

President Huffman?

President Huffman (01:12:00):

Yes.

Staff (01:12:01):

This transcript was exported on Sep 19, 2021 - view latest version here.

Secretary LaRose?

Secretary of State Frank LaRose (01:12:02):
Yes.

Staff (01:12:03):
Speaker, or Leader Sykes, please excuse me.

Leader Sykes (01:12:06):
I like the first one, but yes.

Staff (01:12:06):
(laughs)

Speaker Cupp (01:12:12):
Uh, the, um, the statement has been adopted, um, unanimously, and at this time, uh, there's a motion to, uh, accept for filing the, um, minority report.

Senator Sykes (01:12:27):
So, moved.

Speaker Cupp (01:12:29):
Um... You wanna deal with that was without objection, or...?

Senator Sykes (01:12:32):
That can be done without objection.

Speaker Cupp (01:12:34):
[inaudible 01:12:34]. Yeah, that one can.

Senator Sykes (01:12:35):
Yes, sir.

Speaker Cupp (01:12:36):
All right. Uh, is there any objection to the minority report? Hearing none, it will be, uh, admitted to the, uh, record of the proceedings. Is there any further business to come before the Commission this evening? If-

PART 4 OF 4 ENDS [01:12:54]

# Exhibit 8

# Republican Commission Members' 8(c)(2) Statement

Article XI, Section 8(C)(2) Statement

Pursuant to Article XI, Section 8(C)(2) of the Ohio Constitution, the Ohio Redistricting Commission issues the following statement:

The Commission determined that the statewide preferences of the voters of Ohio predominately favor Republican candidates.

The Commission considered statewide state and federal partisan general election results during the last ten years. There were sixteen such contests. When considering the results of each of those elections, the Commission determined that Republican candidates won thirteen out of sixteen of those elections resulting in a statewide proportion of voters favoring statewide Republican candidates of 81% and a statewide proportion of voters favoring statewide Democratic candidates of 19%. When considering the number of votes cast in each of those elections for Republican and Democratic candidates, the statewide proportion of voters favoring statewide Republican candidates is 54% and the statewide proportion of voters favoring statewide Democratic candidates is 46%. Thus, the statewide proportion of voters favoring statewide Republican candidates is between 54% and 81% and the statewide proportion of voters favoring statewide Democratic candidates is between 19% and 46%. The Commission obtained publicly available geographic data for statewide partisan elections in 2016, 2018, and 2020. Publicly available geographic data for those elections was not available for elections in 2012 and 2014. Using this data, the Commission adopted the final general assembly district plan, which contains 85 districts (64.4%) favoring Republican candidates and 47 districts (35.6%) favoring Democratic candidates out of a total of 132 districts. Accordingly, the statewide proportion of districts whose voters favor each political party corresponds closely to the statewide preferences of the voters of Ohio.

The final general assembly district plan adopted by the Commission complies with all of the mandatory requirements of Article XI, Sections 2, 3, 4, 5, and 7 of the Ohio Constitution. The Commission's attempt to meet the aspirational standards of Article XI, Section 6 of the Ohio Constitution did not result in any violation of the mandatory requirements of Article XI, Sections 2, 3 ,4, 5, and 7 of the Ohio Constitution.

# Exhibit 9

# Cooper Affidavit



## Affidavit of Bill Cooper.pdf

| | |
|---|---|
| DocVerify ID: | 9D17DB1D-8E91-4F50-8D0B-2809EA8909FC |
| Created: | September 22, 2021 16:18:02 -8:00 |
| Pages: | 7 |
| Remote Notary: | Yes / State: OH |

This document is a DocVerify VeriVaulted protected version of the document named above. It was created by a notary or on the behalf of a notary, and it is also a DocVerify E-Sign document, which means this document was created for the purposes of Electronic Signatures and/or Electronic Notary. Tampered or altered documents can be easily verified and validated with the DocVerify veriCheck system. This remote online notarization involved the use of communication technology.

Go to www.docverify.com at any time to verify or validate the authenticity and integrity of this or any other DocVerify VeriVaulted document.

**E-Signature Summary**

**E-Signature 1: William S.Cooper (WSC)**
September 22, 2021 16:37:36 -8:00 [C0B37E35774A] [76.77.160.155]
bcooper@msn.com (Principal) (Personally Known)

**E-Signature Notary: Theresa M Sabo (TMS)**
September 22, 2021 16:37:36 -8:00 [DF9F5EAE7674] [23.28.168.121]
tess.sabo@gmail.com
I, Theresa M Sabo, did witness the participants named above electronically sign this document.



DocVerify documents cannot be altered or tampered with in any way once they are protected by the DocVerify VeriVault System. Best viewed with Adobe Reader or Adobe Acrobat. All visible electronic signatures contained in this document are symbolic representations of the persons signature, and not intended to be an accurate depiction of the persons actual signature as defined by various Acts and/or Laws.



## <u>AFFIDAVIT OF WILLIAM S. COOPER</u>

STATE OF OHIO             )

                                   )   SS:

COUNTY OF FRANKLIN    )

Affiant William S. Cooper, having been first duly cautioned and sworn, deposes and states as follows:

I am over the age of 18 and fully competent to testify to the statements and facts contained herein, and I have personal knowledge of all of them.

### A.    Redistricting Experience

1. I have a B.A. in Economics from Davidson College. As a private consultant, I have been retained as a demographic and redistricting expert for the Plaintiffs. I am compensated at a rate of $150 per hour, and my compensation is not contingent on the outcome of this litigation.

2. I have qualified at trial as an expert witness on redistricting and demographics in approximately 45 voting rights cases litigated in 18 states.

3. One of those lawsuits was *Ohio A. Philip Randolph Institute v. Smith,* in the United States District Court for the Southern District of Ohio. I served as a

9D17DB1D-8E91-4F50-8D0B-2809EA8909FC — 2021/09/22 16:18:02 -8:00 — Remote Notary

redistricting expert for the plaintiffs and was qualified as an expert and testified at trial in March of 2019.

4.    Six of those 45 lawsuits resulted in changes to state legislative boundaries that were favorable to the plaintiffs: In the 1990s – *Rural West Tennessee African-American Affairs v. McWherter*; In the 2000s – *Old Person v. Cooney* and *Bone Shirt v. Hazeltine*. In the 2010s – *Alabama Legislative Black Caucus v. Alabama* and *Thomas v. Bryant.* Approximately 30 of the 45 cases led to changes in local election district plans.

5.    In the 2010s, I developed nine state legislative plans (Alabama, Connecticut, Florida, Georgia, Kentucky, Mississippi, South Carolina, Texas, and Virginia) and about 150 local redistricting plans – primarily for organizations working to protect minority voting rights. In addition, I prepared congressional plans for clients in nine states (Alabama, Florida, Georgia, Louisiana, Maryland, Ohio, Pennsylvania, South Carolina, and Virginia).

6.    I have been retained as expert and consultant by both civil rights plaintiffs and governments.

7.     I currently serve as a redistricting consultant to the San Juan County, Utah Commission and the Wenatchee, Washington City Council.

8.    For additional historical information on my redistricting experience, see Exhibit A attached to this report.

9D17DB1D-8E91-4F50-8D0B-2809EA8909FC — 2021/09/22 16:18:02 -8:00 — Remote Notary

DocVerify ID: 9D17DB1D-8E91-4F50-8D0B-2809EA8909FC
www.docverify.com

**B.      Purpose of Affidavit**

9.    The attorneys for the plaintiffs in this lawsuit have asked me to analyze partisan balance in the legislative plans (House and Senate) adopted by the Ohio Redistricting Commission ("the Commission") on September 16, 2021.

10.  I was also asked by the plaintiffs' attorneys to analyze partisan balance in the final Democratic Caucus House and Senate plans that were submitted to the Commission prior to the September 16, 2021 vote.

11.  In addition, the attorneys asked me to examine partisan balance in several legislative plans prepared by Ohio voters[1] in advance of the September 15, 2021 Commission deadline.

**B.      Methodology**

12.  For the purpose of this affidavit, I define contemporary partisan balance using a mean average composite Democratic percentage score based on head-to-

---

[1] I selected four sets of legislative plans prepared by the general public prior to the adoption of the Commission's legislative plans.

Two sets were submitted to the Commission (Tim Clarke) and (Ohio Citizens Redistricting Commission) -- available at: https://www.redistricting.ohio.gov/maps.

Two sets were submitted to the Ohio Fair Districts competition: (Pranav Padmanabhan) and (Paul Nieves) -- available at: https://www.fairdistrictsohio.org/mappingwinners.

9D17DB1D-8E91-4F50-8D0B-2809EA8909FC — 2021/09/22 16:18:02 -8:00 — Remote Notary

DocVerify ID: 9D17DB1D-8E91-4F50-8D0B-2809EA8909FC
www.docverify.com

Page 3 of 7      32809EA8909FC

head contests combining 2018 and 2020[2] – for 2018: US Senate (Brown-Renacci), Governor (Cordray- DeWine), Treasurer (Richardson -Sprague) and for 2020: President (Biden-Trump).

13. I define majority as 50%+ 1.

14. For the 2020 election, I disaggregated 2020 VTD-level election results to the 2020 census block level based on voting age population, as reported in the OCURD database.[3] For the 2018 election, I disaggregated 2020 VTD-level election results to the 2020 census block level, as reported in data prepared by VEST.[4]

15. I used Caliper Corporation's *Maptitude for Redistricting 2021* GIS software in the preparation of this affidavit. *Maptitude* is used by many local and state governing bodies across the country for redistricting and other types of demographic analysis

## C. Findings

### (i) Partisan Balance

16. The Commission plans fall far short of meeting the state constitutional mandate to approximate the statewide 2012 to 2020 partisan vote share (45%

---

[2] I am in the process of supplementing my partisan balance analysis with additional analysis to include data from the 2012-2016 elections.

[3] https://www.redistricting.ohio.gov/resources

[4] https://redistrictingdatahub.org/dataset/2018-oh-election-data-projected-to-2020-vtds/

4

9D17DB1D-8E91-4F50-8D0B-2809EA8909FC — 2021/09/22 16:18:02 -8:00 — Remote Notary

Democratic). The Adopted House Plan contains **38 composite majority-Democratic districts (38.4%)** and the Adopted Senate Plan contains **12 composite majority-Democratic districts (33.4%)**. (Exhibit B-1 and B-2).

17. By contrast, the Democratic Caucus House Plan submitted to the Commission contains **44 composite majority-Democratic districts (44.4%)** and the Democratic Caucus Senate Plan submitted to the Commission contains **14 composite majority-Democratic districts (42.4%)**. (Exhibit C-1 and C-2).

18. All four of the citizen House plans I examined are superior to the Adopted House Plan in terms of composite partisan balance. The mean average House plan score for the four plans is **43 composite majority-Democratic districts (43.4%)**. See Exhibit D-1 (*Tim Clarke*); Exhibit E-1 (*Ohio Citizens Redistricting Commission*); Exhibit F-1 (*Pranav Padmanabhan*); Exhibit G-1 (*Paul Nieves*).

19. All four of the citizen Senate plans I examined are superior to the Adopted Senate Plan in terms of partisan balance. The mean average Senate plan score for the four plans is **14 composite majority-Democratic districts (43.2%)**. See Exhibit D-2 (*Tim Clarke*); Exhibit E-2 (*Ohio Citizens Redistricting Commission*); Exhibit F-2 (*Pranav Padmanabhan*); Exhibit G-2 (*Paul Nieves*).

**(ii) Traditional Redistricting Principles**

20. Adherence to traditional redistricting principles, such as compactness and preservation of jurisdictional and precinct boundaries, does not support the

5

9D17DB1D-8E91-4F50-8D0B-2809EA8909FC — 2021/09/22 16:18:02 -8:00 — Remote Notary

Commission's decision to adopt legislative plans that weigh heavily in favor of Republican candidates.

21. The Adopted House Plan scores a mean average of .40 on the Reock compactness measure[5] and .30 on the Polsby-Popper measure[6]. The Adopted Senate Plan has a mean average of .39 Reock score and a .31 Polsby-Popper score. (Exhibits H-1 and H-2) **Legislative plans can be drawn as compact or more compact without the skewed partisan bias found in the adopted plans**.

22. The Adopted House Plan contains 72 unique county/district splits, while splitting populated areas in 87 VTDs. (Exhibits I-1 and I-2) **Legislative plans with similar – or better – county and VTD split metrics can be drawn without the skewed partisan bias found in the adopted plans.**

---

[5] "The Reock test is an area-based measure that compares each district to a circle, which is considered to be the most compact shape possible. For each district, the Reock test computes the ratio of the area of the district to the area of the minimum enclosing circle for the district. The measure is always between 0 and 1, with 1 being the most compact. The Reock test computes one number for each district and the minimum, maximum, mean and standard deviation for the plan." *Maptitude For Redistricting* software documentation (authored by the Caliper Corporation).

[6] The Polsby-Popper test computes the ratio of the district area to the area of a circle with the same perimeter: 4pArea/ (Perimeter2). The measure is always between 0 and 1, with 1 being the most compact. The Polsby-Popper test computes one number for each district and the minimum, maximum, mean and standard deviation for the plan. *Maptitude For Redistricting* software documentation (authored by the Caliper Corporation).

6

9D17DB1D-8E91-4F50-8D0B-2809EA8909FC — 2021/09/22 16:18:02 -8:00 — Remote Notary

23. The Adopted House Plan pairs 3 sets of incumbents and the Adopted Senate Plan pairs 3 sets of incumbents. **Legislative plans with the same number, similar — or fewer —incumbent conflicts can be drawn without the skewed partisan balance found in the adopted plans.**

FURTHER AFFIANT SAYETH NAUGHT.

Executed on September 22 , 2021



William S. Cooper

09/22/2021

Sworn to and subscribed before me this          day of September 2021



N

My commission expires



7

DocVerify ID: 9D17DB1D-8E91-4F50-8D0B-2809EA8909FC
www.docverify.com

Page 7 of 7     72809EA8909FC

Exhibit A

**June 30, 2021**

*William S. Cooper*
*P.O. Box 16066*
*Bristol, VA 24209*
*276-669-8567*
*bcooper@msn.com*

## Summary of Redistricting Work

I have a B.A. in Economics from Davidson College in Davidson, North Carolina.

Since 1986, I have prepared proposed redistricting maps of approximately 750 jurisdictions for Section 2 litigation, Section 5 comment letters, and for use in other efforts to promote compliance with the Voting Rights Act of 1965. I have analyzed and prepared election plans in over 100 of these jurisdictions for two or more of the decennial censuses – either as part of concurrent legislative reapportionments or, retrospectively, in relation to litigation involving many of the cases listed below.

From 1986 to 2020, I have prepared election plans for Section 2 litigation in Alabama, Connecticut, Florida, Georgia, Louisiana, Maryland, Mississippi, Missouri, Montana, Nebraska, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, and Wyoming.

## Post-2010 Redistricting Experience

Since the release of the 2010 Census in February 2011, I have developed statewide legislative plans on behalf of clients in nine states (Alabama, Connecticut, Florida, Georgia, Kentucky, Mississippi, South Carolina, Texas, and Virginia), as well as over 150 local redistricting plans in approximately 30 states – primarily for groups working to protect minority voting rights. In addition, I have prepared congressional plans for clients in eight states (Alabama, Florida, Georgia, Louisiana, Maryland, Ohio, Pennsylvania, South Carolina, and Virginia).

1

**June 30, 2021**

In March 2011, I was retained by the Sussex County, Virginia Board of Supervisors and the Bolivar County, Mississippi Board of Supervisors to draft new district plans based on the 2010 Census. In the summer of 2011, both counties received Section 5 preclearance from the U.S. Department of Justice (DOJ).

Also in 2011, I was retained by way of a subcontract with Olmedillo X5 LLC to assist with redistricting for the Miami-Dade County, Florida Board of Commissioners and the Miami-Dade, Florida School Board. Final plans were adopted in late 2011 following public hearings.

In the fall of 2011, I was retained by the City of Grenada, Mississippi to provide redistricting services. The ward plan I developed received DOJ preclearance in March 2012.

In 2012 and 2013, I served as a redistricting consultant to the Tunica County, Mississippi Board of Supervisors and the Claiborne County, Mississippi Board of Supervisors.

In *Montes v. City of Yakima* (E.D. Wash. Feb. 17, 2015) the court adopted, as a remedy for the Voting Rights Act Section 2 violation, a seven single-member district plan that I developed for the Latino plaintiffs. I served as the expert for the Plaintiffs in the liability and remedy phases of the case.

In *Pope v. Albany County* (N.D.N.Y. Mar. 24, 2015), the court approved, as a remedy for a Section 2 violation, a plan drawn by the defendants, creating a new Black-majority district. I served as the expert for the Plaintiffs in the liability and remedy phases of the case.

In 2016, two redistricting plans that I developed on behalf of the plaintiffs for consent decrees in Section 2 lawsuits in Georgia were adopted (*NAACP v. Fayette County, Georgia* and *NAACP v. Emanuel County, Georgia).*

2

In 2016, two federal courts granted summary judgment to the plaintiffs based in part on my *Gingles 1* testimony: *Navajo Nation v. San Juan County, Utah* (C.D. Utah 2016) and NAACP v. *Ferguson-Florissant School District, Missouri* (E. D. Mo. August 22, 2016).

Also in 2016, based in part on my analysis, the City of Pasco, Washington admitted to a Section 2 violation. As a result, in *Glatt v. City of Pasco* (E.D. Wash. Jan. 27, 2017), the court ordered a plan that created three Latino majority single-member districts in a 6 district, 1 at-large plan.

In 2018, I served as the redistricting consultant to the Governor Wolf interveners at the remedial stage of *League of Women Voters, et al. v. Commonwealth of Pennsylvania*.

In August 2018, the Wenatchee City Council adopted a hybrid election plan that I developed – five single-member districts with two members at-large. The Wenatchee election plan is the first plan adopted under the Washington Voting Rights Acts of 2018.

In February 2019, a federal court ruled in favor of the plaintiffs in a Section 2 case regarding Senate District 22 in Mississippi, based in part on my *Gingles* 1 testimony in *Thomas v. Bryant (S.D. Ms. Feb 16, 2019)*.

In the summer of 2019, I developed redistricting plans for the Grand County (Utah) Change of Form of Government Study Committee.

In the fall of 2019, a redistricting plan I developed for a consent decree involving the Jefferson County, Alabama Board of Education was adopted *Traci Jones, et al. v. Jefferson County Board of Education, et al*.

In May 2020, a federal court ruled in favor of the plaintiffs in a Section 2 case in *NAACP et al. v. East Ramapo Central School District, NY,* based in part on my *Gingles* 1 testimony. In October 2020, the federal court adopted a consent decree plan I developed for elections to be held in February 2021.

3

June 30, 2021

In May and June of 2020, I served as a consultant to the City of Quincy, Florida – the Defendant in a Section 2 lawsuit filed by two Anglo voters (*Baroody v. City of Quincy*). The federal court for the Northern District of Florida ruled in favor of the Defendants. The Plaintiffs voluntarily dismissed the case.

In the summer of 2020, I provided technical redistricting assistance to the City of Chestertown, Maryland.

I am currently a redistricting consultant and expert for the plaintiffs in *Jayla Allen v. Waller County, Texas.* I testified remotely at trial in October 2020.

Since 2011, I have served as a redistricting and demographic consultant to the Massachusetts-based Prison Policy Initiative for a nationwide project to end prison-based gerrymandering. I have analyzed proposed and adopted election plans in about 25 states as part of my work.

In 2018 (Utah) and again in 2020 (Arizona), I have provided technical assistance to the Rural Utah Project for voter registration efforts on the Navajo Nation Reservation.

**Post-2010 Demographics Experience**

My trial testimony in Section 2 lawsuits usually includes presentations of U.S. Census data with charts, tables, and/or maps to demonstrate socioeconomic disparities between non-Hispanic Whites and racial or ethnic minorities.

I served as a demographic expert for plaintiffs in four state-level voting cases related to the Covid-19 pandemic (South Carolina, Alabama, and Louisiana) and state court in North Carolina.

I have also served as an expert witness on demographics in non-voting trials. For example, in an April 2017 opinion in *Stout v. Jefferson County Board of Education* (Case no.2:65-cv-00396-MHH), a school desegregation case involving the City of Gardendale,

4

Ala.,  the court made extensive reference to my testimony.

I provide technical demographic and mapping assistance to the Food Research and Action Center (FRAC) in Washington D.C and their constituent organizations around the country. Most of my work with FRAC involves the Summer Food Program and Child and Adult Care Food Program. Both programs provide nutritional assistance to school-age children who are eligible for free and reduced price meals. As part of this project, I developed an online interactive map to determine site eligibility for the two programs that has been in continuous use by community organizations and school districts around the country since 2003.  The map is updated annually with new data from a Special Tabulation of the American Community Survey prepared by the U.S. Census Bureau for the Food and Nutrition Service of the U.S. Department of Agriculture.

**Historical Redistricting Experience**

In the 1980s and 1990s, I developed voting plans in about 400 state and local jurisdictions – primarily in the South and Rocky Mountain West.  During the 2000s and 2010s, I prepared draft election plans involving about 350 state and local jurisdictions in 25 states. Most of these plans were prepared at the request of local citizens' groups, national organizations such as the NAACP, tribal governments, and for Section 2 or Section 5 litigation.

Election plans I developed for governments in two counties – Sussex County, Virginia and Webster County, Mississippi –  were adopted and precleared in 2002 by the U.S. Department of Justice. A ward plan I prepared for the City of Grenada, Mississippi was precleared in August 2005. A county supervisors' plan I produced for Bolivar County, Mississippi was precleared in January 2006.

In August 2005, a federal court ordered the State of South Dakota to remedy a

Section 2 voting rights violation and adopt a state legislative plan I developed (*Bone Shirt v. Hazeltine*).

A county council plan I developed for Native American plaintiffs in a Section 2 lawsuit (*Blackmoon v. Charles Mix County*) was adopted by Charles Mix County, South Dakota in November 2005. A plan I drafted for Latino plaintiffs in Bethlehem, Pennsylvania (*Pennsylvania Statewide Latino Coalition v. Bethlehem Area School District*) was adopted in March 2009. Plans I developed for minority plaintiffs in Columbus County, North Carolina and Montezuma- Cortez School District in Colorado were adopted in 2009.

Since 1986, I have testified at trial as an expert witness on redistricting and demographics in federal courts in the following voting rights cases (approximate most recent testimony dates are in parentheses). I also filed declarations and was deposed in most of these cases.

**Alabama**
*Chestnut v Merrill (2019)*
*Alabama State Conference of the NAACP v. Alabama (2018)*
*Alabama Legislative Black Caucus et al. v. Alabama et al. (2013)*

**Colorado**
*Cuthair v. Montezuma-Cortez School Board (1997)*

**Florida**
*Baroody v. City of Quincy (2020)*

**Georgia**
*Cofield v. City of LaGrange (1996)*
*Love v. Deal (1995)*
*Askew v. City of Rome (1995)*
*Woodard v. Lumber City (1989)*

**Louisiana**
*Terrebonne Parish NAACP v. Jindal, et al. (2017)*
*Wilson v. Town of St. Francisville (1996)*
*Reno v. Bossier Parish (1995*)
*Knight v. McKeithen (1994)*

June 30, 2021

**Maryland**
*Cane v. Worcester County (1994*

**Mississippi**

*Thomas v. Bryant (2019)*
*Fairley v. Hattiesburg (2014)*
*Boddie v. Cleveland School District (2010)*
*Fairley v. Hattiesburg (2008)*
*Boddie v. Cleveland (2003)*
*Jamison v. City of Tupelo (2006)*
*Smith v. Clark (2002)*
*NAACP v. Fordice (1999)*
*Addy v Newton County (1995)*
*Ewing v. Monroe County (1995)*
*Gunn v. Chickasaw County (1995)*
*Nichols v. Okolona (1995)*

**Montana**
*Old Person v. Brown (on remand) (2001)*
*Old Person v. Cooney (1998)*

**Missouri**
*Missouri NAACP v. Ferguson-Florissant School District (2016)*

**Nebraska**
*Stabler v. Thurston County (1995)*

***New York***
*NAACP v. East Ramapo Central School District (2020)*
*Pope v. County of Albany (2015)*
*Arbor Hills Concerned Citizens v. Albany County (2003)*

**Ohio**
*A. Philip Randolph Institute, et al. v. Ryan (2019)*

**South Carolina**
*Smith v. Beasley (1996)*

**South Dakota**
*Bone Shirt v. Hazeltine (2004)*
*Cottier v. City of Martin (2004)*

**Tennessee**
*Cousins v. McWherter (1994)*
*Rural West Tennessee African American Affairs Council v. McWherter (1993)*

June 30, 2021

***Texas***
*Jayla Allen v. Waller County, Texas*

***Utah***
*Navajo Nation v. San Juan County (2017),*brief testimony –11 declarations, 2 depositions

**Virginia**
*Smith v. Brunswick County (1991)*
*Henderson v. Richmond County (1988)*
*McDaniel v. Mehfoud (1988)*
*White* v. *Daniel (1989)*

***Wyoming***
*Large v. Fremont County (2007)*

       In addition, I have filed expert declarations or been deposed in the following

cases that did not require trial testimony. The dates listed indicate the deposition date or

date of last declaration or supplemental declaration:

**Alabama**
*People First of Alabama v. Merrill (2020),* Covid-19 demographics only
*Alabama State NAACP v. City of Pleasant Grove (2019)*
*James v. Jefferson County Board of Education (2019)*
*Voketz v. City of Decatur (2018)*

**Arkansas**
*Mays v. Thurston (2020)--* Covid-19 demographics only)

**Connecticut**
*NAACP v. Merrill (2020)*

**Florida**
*Calvin v. Jefferson County (2016)*
*Thompson v. Glades County (2001)*
*Johnson v. DeSoto County (1999)*
*Burton v. City of Belle Glade (1997)*

**Georgia**
*Dwight v. Kemp (2018)*
*Georgia NAACP et al. v. Gwinnett County, GA (2018*
*Georgia State Conference NAACP et al v. Georgia (2018)*
*Georgia State Conference NAACP, et al. v. Fayette County (2015)*
*Knighton v. Dougherty County (2002)*
*Johnson v. Miller (1998)*
*Jones v. Cook County (1993)*

8

**June 30, 2021**

**Kentucky**
*Herbert v. Kentucky State Board of Elections (2013)*

**Louisiana**
*Power Coalition for Equity and Justice v. Edwards (2020),* Covid-19 demographics only
*Johnson v. Ardoin (2019*
*NAACP v. St. Landry Parish Council (2005)*
*Prejean v. Foster (1998)*
*Rodney v. McKeithen (1993)*

**Maryland**
*Benisek v. Lamone (2017)*
*Fletcher  v. Lamone (2011)*

**Mississippi**
*Partee v. Coahoma County (2015)*
*Figgs v. Quitman County (2015)*
*West v. Natchez (2015)*
*Williams v. Bolivar County (2005)*
*Houston v. Lafayette County (2002)*
*Clark v. Calhoun County (on remand)(1993)*
*Teague v. Attala County (on remand)(1993)*
*Wilson v. Clarksdale (1992)*
*Stanfield v. Lee County(1991)*

**Montana**
*Alden v. Rosebud County (2000)*

**North Carolina**
*Lewis v. Alamance County (1991)*
*Gause v. Brunswick County (1992)*
*Webster v. Person County (1992)*

**Rhode Island**
*Davidson v. City of Cranston (2015)*

**South Carolina**
*Thomas v. Andino (2020),* Covid-19 demographics only
*Vander Linden v. Campbell (1996*

**South Dakota**
*Kirkie v. Buffalo County (2004*
*Emery v. Hunt (1999)*

**Tennessee**
*NAACP v. Frost, et al. (2003)*

**June 30, 2021**

**Virginia**
*Moon v. Beyer (1990)*

***Washington***
*Glatt v. City of Pasco (2016)*
*Montes v. City of Yakima (2014*

# # #

Exhibit B-1

## Adopted House

| District | Population | Deviation | % Deviation | Biden-Trump | Brown-Renacci | Cordray-Dewine | Richardson-Sprague- | 4- Election Dem Composite |
|---|---|---|---|---|---|---|---|---|
| 1 | 115498 | -3688 | -3.09% | 81.78% | 83.93% | 81.21% | 78.79% | 81.43% |
| 2 | 117559 | -1627 | -1.37% | 77.35% | 80.63% | 78.15% | 77.08% | 78.30% |
| 3 | 114104 | -5082 | -4.26% | 84.79% | 88.30% | 86.50% | 85.24% | 86.21% |
| 4 | 114500 | -4686 | -3.93% | 58.76% | 59.16% | 54.67% | 51.50% | 56.02% |
| 5 | 116735 | -2451 | -2.06% | 55.27% | 60.91% | 56.91% | 54.94% | 57.01% |
| 6 | 115517 | -3669 | -3.08% | 53.57% | 61.59% | 57.78% | 55.40% | 57.08% |
| 7 | 115170 | -4016 | -3.37% | 79.01% | 80.80% | 78.18% | 74.69% | 78.17% |
| 8 | 115189 | -3997 | -3.35% | 68.08% | 68.42% | 64.31% | 60.89% | 65.43% |
| 9 | 120997 | 1811 | 1.52% | 70.44% | 72.74% | 69.51% | 67.54% | 70.06% |
| 10 | 113326 | -5860 | -4.92% | 46.30% | 51.96% | 49.14% | 44.32% | 47.93% |
| 11 | 114236 | -4950 | -4.15% | 61.12% | 61.28% | 56.45% | 52.17% | 57.76% |
| 12 | 113760 | -5426 | -4.55% | 44.52% | 46.48% | 41.38% | 38.42% | 42.70% |
| 13 | 124554 | 5368 | 4.50% | 70.81% | 77.19% | 73.50% | 72.16% | 73.42% |
| 14 | 125064 | 5878 | 4.93% | 55.94% | 64.52% | 58.71% | 57.83% | 59.25% |
| 15 | 125088 | 5902 | 4.95% | 48.45% | 58.91% | 52.66% | 51.82% | 52.96% |
| 16 | 121879 | 2693 | 2.26% | 56.80% | 59.88% | 54.24% | 51.72% | 55.66% |
| 17 | 124819 | 5633 | 4.73% | 44.51% | 50.13% | 44.39% | 41.92% | 45.24% |
| 18 | 123226 | 4040 | 3.39% | 89.91% | 93.24% | 91.22% | 91.68% | 91.51% |
| 19 | 124679 | 5493 | 4.61% | 73.58% | 76.86% | 72.47% | 71.81% | 73.68% |
| 20 | 125098 | 5912 | 4.96% | 86.01% | 90.28% | 88.06% | 87.42% | 87.94% |
| 21 | 122023 | 2837 | 2.38% | 87.77% | 89.18% | 86.85% | 85.84% | 87.41% |
| 22 | 124633 | 5447 | 4.57% | 73.46% | 77.56% | 73.51% | 73.05% | 74.39% |
| 23 | 122775 | 3589 | 3.01% | 52.10% | 56.21% | 50.64% | 48.93% | 51.97% |
| 24 | 123469 | 4283 | 3.59% | 75.26% | 76.88% | 73.51% | 72.50% | 74.54% |
| 25 | 123568 | 4382 | 3.68% | 82.45% | 83.12% | 80.56% | 79.70% | 81.46% |
| 26 | 124802 | 5616 | 4.71% | 71.28% | 72.23% | 68.63% | 66.61% | 69.69% |
| 27 | 116286 | -2900 | -2.43% | 50.19% | 48.59% | 44.04% | 41.84% | 46.16% |
| 28 | 114050 | -5136 | -4.31% | 57.06% | 57.22% | 52.84% | 51.56% | 54.67% |
| 29 | 114653 | -4533 | -3.80% | 45.89% | 49.98% | 45.44% | 45.21% | 46.63% |
| 30 | 113811 | -5375 | -4.51% | 31.85% | 34.83% | 28.47% | 27.48% | 30.66% |
| 31 | 124467 | 5281 | 4.43% | 46.75% | 52.22% | 47.98% | 45.24% | 48.05% |
| 32 | 122679 | 3493 | 2.93% | 55.57% | 64.13% | 61.61% | 59.94% | 60.31% |
| 33 | 123791 | 4605 | 3.86% | 62.53% | 69.48% | 66.93% | 65.64% | 66.15% |
| 34 | 121807 | 2621 | 2.20% | 56.82% | 61.10% | 56.94% | 54.66% | 57.38% |
| 35 | 121171 | 1985 | 1.67% | 46.01% | 52.29% | 45.44% | 45.53% | 47.32% |
| 36 | 114991 | -4195 | -3.52% | 53.15% | 57.32% | 50.93% | 50.50% | 52.97% |
| 37 | 125125 | 5939 | 4.98% | 41.49% | 44.46% | 37.65% | 36.73% | 40.08% |
| 38 | 122075 | 2889 | 2.42% | 68.59% | 74.20% | 69.85% | 69.97% | 70.65% |
| 39 | 116366 | -2820 | -2.37% | 36.56% | 45.53% | 40.22% | 39.79% | 40.52% |
| 40 | 113280 | -5906 | -4.96% | 50.73% | 61.65% | 55.46% | 52.13% | 54.99% |
| 41 | 113996 | -5190 | -4.35% | 75.69% | 82.25% | 78.92% | 77.43% | 78.57% |
| 42 | 115350 | -3836 | -3.22% | 66.82% | 73.90% | 69.02% | 66.21% | 68.99% |

## Adopted House

| District | Population | Deviation | % Deviation | Biden-Trump | Brown-Renacci | Cordray-Dewine | Richardson-Sprague- | 4- Election Dem Composite |
|---|---|---|---|---|---|---|---|---|
| 43 | 115804 | -3382 | -2.84% | 43.67% | 51.60% | 44.51% | 41.07% | 45.21% |
| 44 | 123473 | 4287 | 3.60% | 38.92% | 43.76% | 39.90% | 38.81% | 40.35% |
| 45 | 123472 | 4286 | 3.60% | 40.98% | 41.96% | 38.07% | 37.01% | 39.50% |
| 46 | 121992 | 2806 | 2.35% | 36.19% | 39.47% | 35.68% | 34.74% | 36.52% |
| 47 | 115745 | -3441 | -2.89% | 36.08% | 47.69% | 42.60% | 41.93% | 42.08% |
| 48 | 113975 | -5211 | -4.37% | 38.78% | 45.95% | 40.86% | 39.86% | 41.36% |
| 49 | 124555 | 5369 | 4.50% | 50.14% | 55.81% | 51.57% | 50.67% | 52.05% |
| 50 | 113841 | -5345 | -4.48% | 28.96% | 42.75% | 36.72% | 36.79% | 36.31% |
| 51 | 125115 | 5929 | 4.97% | 57.35% | 69.81% | 64.38% | 63.58% | 63.78% |
| 52 | 124642 | 5456 | 4.58% | 44.85% | 52.50% | 45.68% | 43.90% | 46.73% |
| 53 | 121772 | 2586 | 2.17% | 37.76% | 52.19% | 45.30% | 44.01% | 44.81% |
| 54 | 121704 | 2518 | 2.11% | 41.03% | 41.00% | 36.84% | 35.60% | 38.62% |
| 55 | 120633 | 1447 | 1.21% | 28.24% | 31.16% | 26.77% | 26.13% | 28.07% |
| 56 | 124454 | 5268 | 4.42% | 44.99% | 54.35% | 46.79% | 46.15% | 48.07% |
| 57 | 124671 | 5485 | 4.60% | 40.26% | 49.36% | 42.54% | 41.72% | 43.47% |
| 58 | 116292 | -2894 | -2.43% | 61.03% | 72.74% | 69.05% | 68.37% | 67.80% |
| 59 | 123105 | 3919 | 3.29% | 38.36% | 49.68% | 45.11% | 42.77% | 43.98% |
| 60 | 113964 | -5222 | -4.38% | 45.08% | 46.53% | 41.55% | 38.67% | 42.96% |
| 61 | 113860 | -5326 | -4.47% | 45.41% | 47.03% | 42.23% | 39.29% | 43.49% |
| 62 | 124425 | 5239 | 4.40% | 34.66% | 37.02% | 32.81% | 31.91% | 34.10% |
| 63 | 113544 | -5642 | -4.73% | 24.65% | 31.08% | 26.93% | 26.39% | 27.26% |
| 64 | 124731 | 5545 | 4.65% | 51.11% | 63.35% | 58.62% | 57.61% | 57.67% |
| 65 | 117025 | -2161 | -1.81% | 33.32% | 47.62% | 42.57% | 40.53% | 41.01% |
| 66 | 116342 | -2844 | -2.39% | 38.63% | 44.87% | 39.60% | 38.30% | 40.35% |
| 67 | 118575 | -611 | -0.51% | 32.24% | 42.64% | 36.30% | 35.50% | 36.67% |
| 68 | 115385 | -3801 | -3.19% | 36.98% | 43.86% | 38.49% | 37.05% | 39.10% |
| 69 | 114369 | -4817 | -4.04% | 29.74% | 39.65% | 34.00% | 33.18% | 34.14% |
| 70 | 116643 | -2543 | -2.13% | 40.88% | 43.52% | 36.33% | 36.12% | 39.21% |
| 71 | 115026 | -4160 | -3.49% | 33.11% | 41.94% | 34.75% | 34.33% | 36.03% |
| 72 | 122012 | 2826 | 2.37% | 48.32% | 56.58% | 52.62% | 50.75% | 52.07% |
| 73 | 123971 | 4785 | 4.01% | 41.68% | 47.57% | 41.87% | 40.09% | 42.80% |
| 74 | 121539 | 2353 | 1.97% | 26.49% | 38.51% | 32.41% | 30.80% | 32.05% |
| 75 | 116122 | -3064 | -2.57% | 40.02% | 51.06% | 41.82% | 42.46% | 43.84% |
| 76 | 116323 | -2863 | -2.40% | 47.40% | 56.87% | 49.46% | 46.53% | 50.07% |
| 77 | 124936 | 5750 | 4.82% | 29.84% | 40.43% | 34.32% | 33.70% | 34.57% |
| 78 | 116894 | -2292 | -1.92% | 31.19% | 38.91% | 34.77% | 33.69% | 34.64% |
| 79 | 117815 | -1371 | -1.15% | 26.85% | 39.26% | 33.88% | 32.94% | 33.23% |
| 80 | 124211 | 5025 | 4.22% | 25.95% | 34.13% | 26.72% | 26.12% | 28.23% |
| 81 | 113487 | -5699 | -4.78% | 27.89% | 40.69% | 30.15% | 29.48% | 32.05% |
| 82 | 122541 | 3355 | 2.81% | 22.99% | 31.86% | 25.39% | 25.29% | 26.38% |
| 83 | 113996 | -5190 | -4.35% | 25.78% | 35.93% | 26.60% | 23.77% | 28.02% |
| 84 | 118816 | -370 | -0.31% | 18.59% | 29.04% | 21.72% | 21.00% | 22.59% |

## Adopted  House

| District | Population | Deviation | % Deviation | Biden-Trump | Brown-Renacci | Cordray-Dewine | Richardson-Sprague- | 4- Election Dem Composite |
|---|---|---|---|---|---|---|---|---|
| 85 | 115560 | -3626 | -3.04% | 23.67% | 34.84% | 27.91% | 26.13% | 28.14% |
| 86 | 114486 | -4700 | -3.94% | 28.01% | 38.41% | 29.01% | 29.52% | 31.24% |
| 87 | 113433 | -5753 | -4.83% | 27.23% | 39.62% | 33.17% | 31.90% | 32.98% |
| 88 | 113965 | -5221 | -4.38% | 34.39% | 48.34% | 38.85% | 36.90% | 39.62% |
| 89 | 115986 | -3200 | -2.68% | 41.87% | 53.81% | 47.57% | 44.69% | 46.99% |
| 90 | 115793 | -3393 | -2.85% | 25.21% | 39.99% | 33.49% | 33.62% | 33.08% |
| 91 | 114286 | -4900 | -4.11% | 22.01% | 31.12% | 25.67% | 25.08% | 25.97% |
| 92 | 119113 | -73 | -0.06% | 28.38% | 42.07% | 35.47% | 35.03% | 35.24% |
| 93 | 117981 | -1205 | -1.01% | 25.44% | 40.23% | 33.25% | 33.51% | 33.10% |
| 94 | 122131 | 2945 | 2.47% | 39.58% | 53.12% | 47.60% | 47.04% | 46.83% |
| 95 | 124027 | 4841 | 4.06% | 26.79% | 41.30% | 32.57% | 34.33% | 33.74% |
| 96 | 124223 | 5037 | 4.23% | 28.91% | 47.56% | 37.35% | 41.09% | 38.72% |
| 97 | 121818 | 2632 | 2.21% | 28.55% | 42.07% | 33.99% | 34.02% | 34.66% |
| 98 | 113571 | -5615 | -4.71% | 24.42% | 33.78% | 29.04% | 27.98% | 28.81% |
| 99 | 125112 | 5926 | 4.97% | 35.91% | 47.33% | 40.44% | 39.99% | 40.92% |
| | | | | | | | | |
| **Total** | **11,799,448** | | **9.94%** | | | | | |

Exhibit B-2

## Adopted Senate

| District | Population | Deviation | % Deviation | Biden-Trump | Brown-Renacci | Cordray-Dewine | Richardson-Sprague- | 4- Election Dem Composite |
|---|---|---|---|---|---|---|---|---|
| 1 | 350024 | -7535 | -2.11% | 25.49% | 35.97% | 27.27% | 26.06% | 28.70% |
| 2 | 348113 | -9446 | -2.64% | 44.20% | 53.92% | 47.02% | 43.94% | 47.27% |
| 3 | 346752 | -10807 | -3.02% | 56.30% | 60.29% | 56.11% | 53.52% | 56.56% |
| 4 | 368937 | 11378 | 3.18% | 38.78% | 41.69% | 37.84% | 36.81% | 38.78% |
| 5 | 361748 | 4189 | 1.17% | 36.02% | 43.99% | 37.43% | 37.12% | 38.64% |
| 6 | 362191 | 4632 | 1.30% | 52.41% | 56.46% | 50.42% | 49.96% | 52.31% |
| 7 | 358623 | 1064 | 0.30% | 39.84% | 40.56% | 36.21% | 34.77% | 37.85% |
| 8 | 342514 | -15045 | -4.21% | 44.77% | 47.17% | 42.02% | 41.20% | 43.79% |
| 9 | 371839 | 14280 | 3.99% | 76.40% | 77.47% | 74.33% | 73.00% | 75.30% |
| 10 | 347791 | -9768 | -2.73% | 38.09% | 45.28% | 37.47% | 37.45% | 39.57% |
| 11 | 342626 | -14933 | -4.18% | 62.88% | 71.47% | 66.50% | 63.87% | 66.18% |
| 12 | 348862 | -8697 | -2.43% | 23.22% | 33.91% | 26.04% | 25.39% | 27.14% |
| 13 | 371529 | 13970 | 3.91% | 45.86% | 57.09% | 50.60% | 49.29% | 50.71% |
| 14 | 353762 | -3797 | -1.06% | 28.69% | 36.05% | 31.20% | 30.69% | 31.66% |
| 15 | 347161 | -10398 | -2.91% | 81.24% | 84.17% | 81.80% | 80.17% | 81.85% |
| 16 | 341322 | -16237 | -4.54% | 50.95% | 53.63% | 49.33% | 45.30% | 49.80% |
| 17 | 351380 | -6179 | -1.73% | 25.28% | 37.86% | 31.51% | 31.25% | 31.48% |
| 18 | 374237 | 16678 | 4.66% | 40.70% | 50.55% | 43.46% | 42.80% | 44.38% |
| 19 | 341395 | -16164 | -4.52% | 39.42% | 43.24% | 38.45% | 35.96% | 39.27% |
| 20 | 367328 | 9769 | 2.73% | 32.52% | 42.85% | 36.28% | 35.13% | 36.69% |
| 21 | 371335 | 13776 | 3.85% | 78.36% | 81.43% | 77.89% | 77.17% | 78.71% |
| 22 | 351811 | -5748 | -1.61% | 34.28% | 42.35% | 37.07% | 35.99% | 37.42% |
| 23 | 372878 | 15319 | 4.28% | 81.88% | 86.86% | 84.25% | 83.74% | 84.18% |
| 24 | 372031 | 14472 | 4.05% | 53.92% | 61.02% | 55.14% | 53.65% | 55.93% |
| 25 | 351356 | -6203 | -1.73% | 72.17% | 73.70% | 70.31% | 67.30% | 70.87% |
| 26 | 352334 | -5225 | -1.46% | 30.55% | 42.82% | 35.47% | 34.22% | 35.76% |
| 27 | 372061 | 14502 | 4.06% | 47.84% | 52.92% | 47.71% | 45.44% | 48.48% |
| 28 | 368277 | 10718 | 3.00% | 58.00% | 64.40% | 61.21% | 59.42% | 60.76% |
| 29 | 354275 | -3284 | -0.92% | 41.48% | 49.64% | 44.82% | 43.96% | 44.97% |
| 30 | 370381 | 12822 | 3.59% | 31.53% | 47.30% | 39.13% | 40.80% | 39.69% |
| 31 | 343595 | -13964 | -3.91% | 32.00% | 42.15% | 36.48% | 35.73% | 36.59% |
| 32 | 363768 | 6209 | 1.74% | 44.21% | 55.90% | 51.34% | 49.68% | 50.28% |
| 33 | 357212 | -347 | -0.10% | 41.11% | 53.07% | 48.56% | 47.02% | 47.44% |
| **Total** | **11,799,448** | | **9.20%** | | | | | |

Exhibit C-1

## Democratic Caucus  House

| District | Population | Deviation | % Deviation | Biden-Trump | Brown-Renacci | Cordray-Dewine | Richardson-Sprague- | 4- Election Dem Composite |
|---|---|---|---|---|---|---|---|---|
| 1 | 113314 | -5872 | -4.93% | 80.89% | 82.06% | 79.59% | 76.22% | 79.69% |
| 2 | 113317 | -5869 | -4.92% | 61.50% | 62.17% | 58.04% | 55.15% | 59.21% |
| 3 | 113371 | -5815 | -4.88% | 76.60% | 78.84% | 75.72% | 73.98% | 76.28% |
| 4 | 113395 | -5791 | -4.86% | 62.19% | 61.97% | 57.15% | 53.24% | 58.64% |
| 5 | 113398 | -5788 | -4.86% | 84.15% | 87.61% | 85.72% | 84.78% | 85.56% |
| 6 | 113302 | -5884 | -4.94% | 70.17% | 71.46% | 68.04% | 65.75% | 68.86% |
| 7 | 113242 | -5944 | -4.99% | 59.87% | 60.28% | 55.48% | 51.31% | 56.73% |
| 8 | 113326 | -5860 | -4.92% | 56.47% | 61.68% | 58.06% | 54.57% | 57.69% |
| 9 | 113345 | -5841 | -4.90% | 60.50% | 68.12% | 64.64% | 62.02% | 63.82% |
| 10 | 113272 | -5914 | -4.96% | 54.22% | 61.17% | 58.57% | 54.36% | 57.08% |
| 11 | 124868 | 5682 | 4.77% | 60.61% | 62.66% | 58.41% | 55.95% | 59.41% |
| 12 | 124196 | 5010 | 4.20% | 51.41% | 60.14% | 56.29% | 54.78% | 55.66% |
| 13 | 122665 | 3479 | 2.92% | 62.34% | 68.70% | 63.87% | 62.22% | 64.28% |
| 14 | 123152 | 3966 | 3.33% | 90.75% | 93.17% | 91.14% | 91.22% | 91.57% |
| 15 | 124739 | 5553 | 4.66% | 52.60% | 62.51% | 56.60% | 55.95% | 56.91% |
| 16 | 123088 | 3902 | 3.27% | 64.21% | 66.32% | 61.43% | 58.92% | 62.72% |
| 17 | 125002 | 5816 | 4.88% | 47.14% | 53.04% | 47.48% | 45.23% | 48.22% |
| 18 | 125125 | 5939 | 4.98% | 55.97% | 65.67% | 59.85% | 59.70% | 60.30% |
| 19 | 122602 | 3416 | 2.87% | 69.23% | 72.42% | 67.65% | 66.71% | 69.00% |
| 20 | 123965 | 4779 | 4.01% | 80.55% | 87.29% | 84.68% | 84.89% | 84.35% |
| 21 | 123174 | 3988 | 3.35% | 71.47% | 75.45% | 71.55% | 70.77% | 72.31% |
| 22 | 122477 | 3291 | 2.76% | 87.79% | 89.07% | 86.76% | 85.60% | 87.31% |
| 23 | 123608 | 4422 | 3.71% | 53.45% | 57.67% | 52.17% | 50.58% | 53.47% |
| 24 | 124278 | 5092 | 4.27% | 70.87% | 73.39% | 69.71% | 69.26% | 70.81% |
| 25 | 113281 | -5905 | -4.95% | 86.53% | 87.55% | 85.38% | 84.40% | 85.97% |
| 26 | 113236 | -5950 | -4.99% | 69.45% | 69.79% | 66.00% | 63.67% | 67.23% |
| 27 | 122969 | 3783 | 3.17% | 50.44% | 49.00% | 44.45% | 42.28% | 46.54% |
| 28 | 118318 | -868 | -0.73% | 59.46% | 59.32% | 55.17% | 53.81% | 56.94% |
| 29 | 115434 | -3752 | -3.15% | 55.36% | 58.18% | 53.82% | 53.83% | 55.30% |
| 30 | 123123 | 3937 | 3.30% | 29.59% | 32.94% | 26.75% | 25.68% | 28.74% |
| 31 | 124857 | 5671 | 4.76% | 42.55% | 51.38% | 48.06% | 45.42% | 46.86% |
| 32 | 123719 | 4533 | 3.80% | 52.99% | 56.65% | 51.98% | 49.70% | 52.83% |
| 33 | 124276 | 5090 | 4.27% | 69.01% | 76.40% | 74.59% | 73.39% | 73.35% |
| 34 | 123335 | 4149 | 3.48% | 57.64% | 62.17% | 58.24% | 56.33% | 58.60% |
| 35 | 114134 | -5052 | -4.24% | 72.67% | 77.99% | 73.69% | 74.07% | 74.60% |
| 36 | 116227 | -2959 | -2.48% | 55.32% | 60.04% | 54.09% | 53.75% | 55.80% |
| 37 | 120132 | 946 | 0.79% | 52.41% | 58.23% | 52.13% | 52.25% | 53.75% |
| 38 | 125134 | 5948 | 4.99% | 35.69% | 41.90% | 34.87% | 34.33% | 36.70% |
| 39 | 114924 | -4262 | -3.58% | 41.49% | 44.41% | 37.19% | 36.67% | 39.94% |
| 40 | 113587 | -5599 | -4.70% | 41.61% | 50.93% | 43.69% | 40.19% | 44.11% |
| 41 | 113767 | -5419 | -4.55% | 76.08% | 81.57% | 77.99% | 76.18% | 77.95% |
| 42 | 113530 | -5656 | -4.75% | 62.69% | 71.64% | 66.33% | 63.60% | 66.07% |

## Democratic Caucus  House

| District | Population | Deviation | % Deviation | Biden-Trump | Brown-Renacci | Cordray-Dewine | Richardson-Sprague- | 4- Election Dem Composite |
|---|---|---|---|---|---|---|---|---|
| 43 | 123306 | 4120 | 3.46% | 51.78% | 60.58% | 54.63% | 51.19% | 54.54% |
| 44 | 116641 | -2545 | -2.14% | 32.67% | 37.03% | 33.04% | 32.13% | 33.72% |
| 45 | 118121 | -1065 | -0.89% | 42.34% | 43.08% | 39.20% | 38.10% | 40.68% |
| 46 | 122121 | 2935 | 2.46% | 36.18% | 39.47% | 35.67% | 34.73% | 36.51% |
| 47 | 120154 | 968 | 0.81% | 24.75% | 35.17% | 28.41% | 28.17% | 29.12% |
| 48 | 115936 | -3250 | -2.73% | 38.32% | 45.39% | 40.41% | 39.41% | 40.88% |
| 49 | 113513 | -5673 | -4.76% | 50.03% | 59.61% | 55.53% | 54.87% | 55.01% |
| 50 | 115252 | -3934 | -3.30% | 38.59% | 46.73% | 41.65% | 40.79% | 41.94% |
| 51 | 123415 | 4229 | 3.55% | 29.80% | 43.27% | 37.29% | 37.18% | 36.89% |
| 52 | 122559 | 3373 | 2.83% | 49.10% | 58.51% | 51.67% | 50.44% | 52.43% |
| 53 | 125112 | 5926 | 4.97% | 52.69% | 62.65% | 57.12% | 55.63% | 57.03% |
| 54 | 116782 | -2404 | -2.02% | 43.87% | 55.81% | 49.94% | 48.28% | 49.48% |
| 55 | 120633 | 1447 | 1.21% | 28.24% | 31.16% | 26.77% | 26.13% | 28.07% |
| 56 | 121704 | 2518 | 2.11% | 41.03% | 41.00% | 36.84% | 35.60% | 38.62% |
| 57 | 124786 | 5600 | 4.70% | 47.28% | 56.62% | 49.42% | 49.02% | 50.59% |
| 58 | 125108 | 5922 | 4.97% | 37.89% | 47.14% | 39.91% | 38.84% | 40.94% |
| 59 | 116273 | -2913 | -2.44% | 61.03% | 72.74% | 69.05% | 68.37% | 67.80% |
| 60 | 123124 | 3938 | 3.30% | 38.36% | 49.69% | 45.12% | 42.78% | 43.99% |
| 61 | 115920 | -3266 | -2.74% | 50.88% | 49.86% | 44.94% | 41.54% | 46.81% |
| 62 | 116803 | -2383 | -2.00% | 38.29% | 42.11% | 37.24% | 34.98% | 38.16% |
| 63 | 124425 | 5239 | 4.40% | 34.66% | 37.02% | 32.81% | 31.91% | 34.10% |
| 64 | 113544 | -5642 | -4.73% | 24.65% | 31.08% | 26.93% | 26.39% | 27.26% |
| 65 | 124630 | 5444 | 4.57% | 50.73% | 63.10% | 58.38% | 57.31% | 57.38% |
| 66 | 124142 | 4956 | 4.16% | 33.65% | 47.53% | 42.66% | 40.71% | 41.14% |
| 67 | 116342 | -2844 | -2.39% | 38.63% | 44.87% | 39.60% | 38.30% | 40.35% |
| 68 | 118575 | -611 | -0.51% | 32.24% | 42.64% | 36.30% | 35.50% | 36.67% |
| 69 | 122017 | 2831 | 2.38% | 41.03% | 47.39% | 42.21% | 40.85% | 42.87% |
| 70 | 121099 | 1913 | 1.61% | 25.80% | 36.94% | 30.88% | 29.51% | 30.78% |
| 71 | 114724 | -4462 | -3.74% | 42.31% | 45.70% | 38.42% | 38.56% | 41.25% |
| 72 | 114996 | -4190 | -3.52% | 49.57% | 57.74% | 53.69% | 51.77% | 53.19% |
| 73 | 122374 | 3188 | 2.67% | 42.20% | 47.57% | 42.01% | 40.28% | 43.01% |
| 74 | 116122 | -3064 | -2.57% | 40.02% | 51.06% | 41.82% | 42.46% | 43.84% |
| 75 | 113325 | -5861 | -4.92% | 26.89% | 36.63% | 30.04% | 28.45% | 30.50% |
| 76 | 114226 | -4960 | -4.16% | 47.91% | 56.66% | 49.23% | 46.33% | 50.03% |
| 77 | 124936 | 5750 | 4.82% | 29.84% | 40.43% | 34.32% | 33.70% | 34.57% |
| 78 | 116894 | -2292 | -1.92% | 31.19% | 38.91% | 34.77% | 33.69% | 34.64% |
| 79 | 114974 | -4212 | -3.53% | 26.88% | 34.84% | 27.58% | 26.86% | 29.04% |
| 80 | 114502 | -4684 | -3.93% | 28.01% | 38.41% | 29.01% | 29.51% | 31.23% |
| 81 | 124884 | 5698 | 4.78% | 18.08% | 27.88% | 20.80% | 20.12% | 21.72% |
| 82 | 117815 | -1371 | -1.15% | 26.85% | 39.26% | 33.88% | 32.94% | 33.23% |
| 83 | 121818 | 2632 | 2.21% | 28.55% | 42.07% | 33.99% | 34.02% | 34.66% |
| 84 | 122490 | 3304 | 2.77% | 26.45% | 40.25% | 32.57% | 31.52% | 32.70% |

## Democratic Caucus House

| District | Population | Deviation | % Deviation | Biden-Trump | Brown-Renacci | Cordray-Dewine | Richardson-Sprague- | 4- Election Dem Composite |
|---|---|---|---|---|---|---|---|---|
| 85 | 119113 | -73 | -0.06% | 28.38% | 42.07% | 35.47% | 35.03% | 35.24% |
| 86 | 115100 | -4086 | -3.43% | 32.58% | 43.34% | 33.84% | 30.78% | 35.13% |
| 87 | 115793 | -3393 | -2.85% | 25.21% | 39.99% | 33.49% | 33.62% | 33.08% |
| 88 | 123941 | 4755 | 3.99% | 29.19% | 46.24% | 36.19% | 39.62% | 37.81% |
| 89 | 124663 | 5477 | 4.60% | 24.50% | 41.41% | 32.51% | 34.23% | 33.16% |
| 90 | 115483 | -3703 | -3.11% | 23.09% | 34.37% | 28.16% | 26.26% | 27.97% |
| 91 | 113548 | -5638 | -4.73% | 33.71% | 40.83% | 35.51% | 33.90% | 35.99% |
| 92 | 124957 | 5771 | 4.84% | 24.84% | 35.83% | 30.44% | 29.93% | 30.26% |
| 93 | 121777 | 2591 | 2.17% | 42.09% | 54.52% | 49.04% | 48.82% | 48.62% |
| 94 | 123393 | 4207 | 3.53% | 37.20% | 50.73% | 43.06% | 39.85% | 42.71% |
| 95 | 117981 | -1205 | -1.01% | 25.44% | 40.23% | 33.25% | 33.51% | 33.10% |
| 96 | 114286 | -4900 | -4.11% | 22.01% | 31.12% | 25.67% | 25.08% | 25.97% |
| 97 | 113487 | -5699 | -4.78% | 27.89% | 40.69% | 30.15% | 29.48% | 32.05% |
| 98 | 114464 | -4722 | -3.96% | 23.08% | 33.27% | 25.62% | 25.47% | 26.86% |
| 99 | 125141 | 5955 | 5.00% | 37.00% | 48.18% | 41.44% | 40.96% | 41.90% |
| **Total** | **11,799,448** | | **9.99%** | | | | | |

Exhibit C-2

## Democratic Caucus Senate

| District | Population | Deviation | % Deviation | Biden-Trump | Brown-Renacci | Cordray-Dewine | Richardson-Sprague- | 4- Election Dem Composite |
|---|---|---|---|---|---|---|---|---|
| 1 | 352957 | -4602 | -1.29% | 31.17% | 42.85% | 34.58% | 32.43% | 35.26% |
| 2 | 341300 | -16259 | -4.55% | 39.15% | 49.62% | 41.27% | 38.85% | 42.22% |
| 3 | 351487 | -6072 | -1.70% | 63.64% | 65.03% | 61.06% | 58.50% | 62.06% |
| 4 | 356883 | -676 | -0.19% | 37.31% | 40.09% | 36.21% | 35.21% | 37.21% |
| 5 | 350813 | -6746 | -1.89% | 54.84% | 62.57% | 59.26% | 56.49% | 58.29% |
| 6 | 354782 | -2777 | -0.78% | 39.74% | 43.97% | 36.80% | 36.48% | 39.25% |
| 7 | 365306 | 7747 | 2.17% | 40.12% | 40.86% | 36.51% | 35.06% | 38.14% |
| 8 | 356875 | -684 | -0.19% | 47.43% | 49.57% | 44.60% | 43.79% | 46.35% |
| 9 | 350795 | -6764 | -1.89% | 75.13% | 76.60% | 73.38% | 72.02% | 74.29% |
| 10 | 344421 | -13138 | -3.67% | 30.92% | 40.53% | 32.87% | 32.29% | 34.15% |
| 11 | 350603 | -6956 | -1.95% | 62.37% | 70.43% | 65.39% | 62.70% | 65.22% |
| 12 | 359540 | 1981 | 0.55% | 23.25% | 33.47% | 25.77% | 25.61% | 27.02% |
| 13 | 364453 | 6894 | 1.93% | 48.52% | 58.92% | 52.84% | 51.37% | 52.91% |
| 14 | 353762 | -3797 | -1.06% | 28.69% | 36.05% | 31.20% | 30.69% | 31.66% |
| 15 | 340083 | -17476 | -4.89% | 80.41% | 82.56% | 80.03% | 77.89% | 80.22% |
| 16 | 339963 | -17596 | -4.92% | 59.74% | 61.26% | 56.76% | 52.87% | 57.66% |
| 17 | 351380 | -6179 | -1.73% | 25.28% | 37.86% | 31.51% | 31.25% | 31.48% |
| 18 | 363768 | 6209 | 1.74% | 44.21% | 55.90% | 51.34% | 49.68% | 50.28% |
| 19 | 357659 | 100 | 0.03% | 40.16% | 44.43% | 39.20% | 36.98% | 40.19% |
| 20 | 365490 | 7931 | 2.22% | 36.21% | 43.85% | 38.26% | 36.77% | 38.77% |
| 21 | 369594 | 12035 | 3.37% | 86.56% | 89.79% | 87.48% | 87.05% | 87.72% |
| 22 | 351811 | -5748 | -1.61% | 34.28% | 42.35% | 37.07% | 35.99% | 37.42% |
| 23 | 370878 | 13319 | 3.72% | 61.23% | 66.89% | 61.76% | 60.18% | 62.51% |
| 24 | 372915 | 15356 | 4.29% | 56.96% | 63.65% | 58.61% | 57.39% | 59.15% |
| 25 | 369929 | 12370 | 3.46% | 58.23% | 61.98% | 57.03% | 55.39% | 58.16% |
| 26 | 351521 | -6038 | -1.69% | 27.56% | 38.41% | 31.98% | 30.45% | 32.10% |
| 27 | 350493 | -7066 | -1.98% | 58.88% | 64.20% | 58.64% | 58.65% | 60.09% |
| 28 | 372468 | 14909 | 4.17% | 55.34% | 62.47% | 59.37% | 57.45% | 58.66% |
| 29 | 344701 | -12858 | -3.60% | 41.60% | 49.67% | 44.88% | 44.05% | 45.05% |
| 30 | 370381 | 12822 | 3.59% | 31.53% | 47.30% | 39.13% | 40.80% | 39.69% |
| 31 | 370190 | 12631 | 3.53% | 27.88% | 40.68% | 34.15% | 33.98% | 34.17% |
| 32 | 375035 | 17476 | 4.89% | 40.70% | 50.52% | 43.45% | 42.77% | 44.36% |
| 33 | 357212 | -347 | -0.10% | 41.11% | 53.07% | 48.56% | 47.02% | 47.44% |
| **Total** | **11,799,448** | | **9.81%** | | | | | |

Exhibit D-1

## Tim Clarke  House

| District | Population | Deviation | % Deviation | Biden-Trump | Brown-Renacci | Cordray-Dewine | Richardson-Sprague- | 4- Election Dem Composite |
|---|---|---|---|---|---|---|---|---|
| 1 | 114725 | -4461 | -3.74% | 56.13% | 57.33% | 48.92% | 52.89% | 53.82% |
| 2 | 113846 | -5340 | -4.48% | 64.90% | 65.19% | 57.50% | 60.79% | 62.10% |
| 3 | 114732 | -4454 | -3.74% | 60.74% | 61.27% | 53.99% | 57.00% | 58.25% |
| 4 | 114822 | -4364 | -3.66% | 55.81% | 59.58% | 52.35% | 55.43% | 55.79% |
| 5 | 115194 | -3992 | -3.35% | 66.22% | 66.64% | 57.78% | 62.14% | 63.20% |
| 6 | 113995 | -5191 | -4.36% | 78.13% | 81.28% | 77.83% | 79.03% | 79.07% |
| 7 | 114947 | -4239 | -3.56% | 79.93% | 82.94% | 79.59% | 80.39% | 80.71% |
| 8 | 114461 | -4725 | -3.96% | 81.44% | 83.02% | 77.67% | 80.55% | 80.67% |
| 9 | 113913 | -5273 | -4.42% | 75.65% | 79.32% | 73.57% | 76.35% | 76.22% |
| 10 | 114819 | -4367 | -3.66% | 63.36% | 67.06% | 61.81% | 63.50% | 63.94% |
| 11 | 116322 | -2864 | -2.40% | 50.72% | 57.99% | 50.75% | 55.25% | 53.68% |
| 12 | 124466 | 5280 | 4.43% | 55.10% | 59.42% | 51.49% | 53.73% | 54.93% |
| 13 | 125135 | 5949 | 4.99% | 69.76% | 74.27% | 68.24% | 69.94% | 70.55% |
| 14 | 124896 | 5710 | 4.79% | 51.51% | 58.75% | 51.45% | 52.95% | 53.67% |
| 15 | 125088 | 5902 | 4.95% | 48.45% | 58.91% | 51.82% | 52.66% | 52.96% |
| 16 | 124988 | 5802 | 4.87% | 52.52% | 57.00% | 49.72% | 51.66% | 52.73% |
| 17 | 124312 | 5126 | 4.30% | 82.21% | 88.56% | 86.42% | 86.04% | 85.81% |
| 18 | 124834 | 5648 | 4.74% | 89.54% | 92.54% | 90.10% | 90.69% | 90.72% |
| 19 | 124320 | 5134 | 4.31% | 85.57% | 87.26% | 83.48% | 84.74% | 85.26% |
| 20 | 125117 | 5931 | 4.98% | 80.26% | 85.00% | 81.74% | 81.76% | 82.19% |
| 21 | 125023 | 5837 | 4.90% | 73.72% | 77.71% | 73.04% | 73.43% | 74.48% |
| 22 | 123849 | 4663 | 3.91% | 29.72% | 33.11% | 25.83% | 26.90% | 28.89% |
| 23 | 116045 | -3141 | -2.64% | 52.50% | 54.60% | 49.93% | 50.06% | 51.77% |
| 24 | 120009 | 823 | 0.69% | 56.46% | 55.89% | 50.29% | 51.80% | 53.61% |
| 25 | 117112 | -2074 | -1.74% | 72.07% | 74.58% | 70.18% | 70.85% | 71.92% |
| 26 | 115227 | -3959 | -3.32% | 79.81% | 81.82% | 78.37% | 79.21% | 79.80% |
| 27 | 116817 | -2369 | -1.99% | 74.72% | 74.58% | 68.85% | 71.24% | 72.35% |
| 28 | 121580 | 2394 | 2.01% | 54.32% | 53.61% | 47.11% | 49.07% | 51.03% |
| 29 | 123580 | 4394 | 3.69% | 52.76% | 56.48% | 49.36% | 51.44% | 52.51% |
| 30 | 123464 | 4278 | 3.59% | 57.22% | 66.35% | 61.84% | 63.76% | 62.29% |
| 31 | 123753 | 4567 | 3.83% | 53.24% | 57.84% | 51.40% | 53.62% | 54.02% |
| 32 | 122285 | 3099 | 2.60% | 66.08% | 72.72% | 69.10% | 70.47% | 69.59% |
| 33 | 124767 | 5581 | 4.68% | 38.46% | 46.76% | 40.11% | 42.29% | 41.91% |
| 34 | 119214 | 28 | 0.02% | 53.20% | 59.33% | 53.38% | 53.16% | 54.77% |
| 35 | 118009 | -1177 | -0.99% | 69.16% | 75.48% | 71.43% | 70.91% | 71.75% |
| 36 | 122890 | 3704 | 3.11% | 53.35% | 57.67% | 51.03% | 51.57% | 53.40% |
| 37 | 113816 | -5370 | -4.51% | 43.32% | 45.78% | 37.98% | 38.93% | 41.50% |
| 38 | 116913 | -2273 | -1.91% | 34.68% | 42.54% | 35.99% | 36.73% | 37.48% |
| 39 | 117062 | -2124 | -1.78% | 47.26% | 54.28% | 44.47% | 47.81% | 48.45% |
| 40 | 117630 | -1556 | -1.31% | 60.05% | 68.47% | 59.51% | 62.83% | 62.72% |
| 41 | 117484 | -1702 | -1.43% | 75.87% | 82.00% | 76.85% | 78.49% | 78.30% |
| 42 | 119467 | 281 | 0.24% | 47.60% | 60.46% | 50.65% | 53.78% | 53.13% |

## Tim Clarke  House

| District | Population | Deviation | % Deviation | Biden-Trump | Brown-Renacci | Cordray-Dewine | Richardson-Sprague- | 4- Election Dem Composite |
|---|---|---|---|---|---|---|---|---|
| 43 | 115855 | -3331 | -2.79% | 31.08% | 36.41% | 32.05% | 32.61% | 33.04% |
| 44 | 117579 | -1607 | -1.35% | 38.64% | 42.15% | 37.23% | 37.96% | 39.00% |
| 45 | 123449 | 4263 | 3.58% | 41.25% | 41.38% | 36.13% | 37.65% | 39.10% |
| 46 | 114688 | -4498 | -3.77% | 37.20% | 45.81% | 39.97% | 40.78% | 40.94% |
| 47 | 119726 | 540 | 0.45% | 50.24% | 59.64% | 54.79% | 55.49% | 55.04% |
| 48 | 124889 | 5703 | 4.78% | 38.19% | 45.69% | 39.58% | 40.56% | 41.01% |
| 49 | 118032 | -1154 | -0.97% | 52.99% | 62.86% | 55.95% | 57.44% | 57.31% |
| 50 | 115008 | -4178 | -3.51% | 52.19% | 62.35% | 54.83% | 56.11% | 56.37% |
| 51 | 118452 | -734 | -0.62% | 39.18% | 50.40% | 41.79% | 43.60% | 43.74% |
| 52 | 120807 | 1621 | 1.36% | 41.73% | 41.80% | 36.32% | 37.58% | 39.36% |
| 53 | 121530 | 2344 | 1.97% | 27.05% | 30.04% | 25.11% | 25.70% | 26.97% |
| 54 | 124562 | 5376 | 4.51% | 48.54% | 56.62% | 48.54% | 49.46% | 50.79% |
| 55 | 124679 | 5493 | 4.61% | 40.35% | 48.93% | 41.08% | 41.96% | 43.08% |
| 56 | 113584 | -5602 | -4.70% | 47.89% | 59.82% | 53.38% | 55.33% | 54.11% |
| 57 | 115030 | -4156 | -3.49% | 50.36% | 61.27% | 56.23% | 57.31% | 56.29% |
| 58 | 115397 | -3789 | -3.18% | 50.26% | 49.57% | 41.32% | 44.73% | 46.47% |
| 59 | 117720 | -1466 | -1.23% | 41.70% | 44.12% | 36.75% | 39.10% | 40.42% |
| 60 | 118762 | -424 | -0.36% | 35.28% | 37.48% | 32.36% | 33.30% | 34.61% |
| 61 | 119207 | 21 | 0.02% | 24.54% | 30.91% | 26.21% | 26.73% | 27.10% |
| 62 | 124312 | 5126 | 4.30% | 51.09% | 63.87% | 57.89% | 59.04% | 57.97% |
| 63 | 116221 | -2965 | -2.49% | 35.05% | 48.94% | 41.97% | 43.45% | 42.35% |
| 64 | 114406 | -4780 | -4.01% | 38.66% | 47.23% | 40.02% | 41.23% | 41.79% |
| 65 | 120511 | 1325 | 1.11% | 32.39% | 40.40% | 33.93% | 34.83% | 35.39% |
| 66 | 119369 | 183 | 0.15% | 39.89% | 46.37% | 39.77% | 41.26% | 41.82% |
| 67 | 115458 | -3728 | -3.13% | 41.15% | 43.76% | 36.36% | 36.58% | 39.46% |
| 68 | 120573 | 1387 | 1.16% | 48.51% | 56.91% | 50.82% | 52.82% | 52.27% |
| 69 | 122470 | 3284 | 2.76% | 42.31% | 47.50% | 40.24% | 42.02% | 43.02% |
| 70 | 116122 | -3064 | -2.57% | 40.02% | 51.06% | 42.46% | 41.82% | 43.84% |
| 71 | 122787 | 3601 | 3.02% | 47.01% | 56.14% | 45.92% | 48.83% | 49.47% |
| 72 | 124936 | 5750 | 4.82% | 29.84% | 40.43% | 33.70% | 34.32% | 34.57% |
| 73 | 116894 | -2292 | -1.92% | 31.19% | 38.91% | 33.69% | 34.77% | 34.64% |
| 74 | 118558 | -628 | -0.53% | 26.87% | 35.18% | 27.11% | 27.87% | 29.25% |
| 75 | 117531 | -1655 | -1.39% | 27.26% | 37.47% | 28.75% | 28.33% | 30.46% |
| 76 | 117427 | -1759 | -1.48% | 27.15% | 38.96% | 32.54% | 33.62% | 33.07% |
| 77 | 118212 | -974 | -0.82% | 36.90% | 47.20% | 39.71% | 40.27% | 41.02% |
| 78 | 119984 | 798 | 0.67% | 28.15% | 41.94% | 35.97% | 36.07% | 35.53% |
| 79 | 117402 | -1784 | -1.50% | 24.40% | 37.88% | 30.00% | 30.69% | 30.74% |
| 80 | 119557 | 371 | 0.31% | 29.63% | 43.99% | 36.66% | 37.05% | 36.83% |
| 81 | 117182 | -2004 | -1.68% | 24.79% | 37.12% | 25.71% | 26.87% | 28.62% |
| 82 | 115561 | -3625 | -3.04% | 27.44% | 36.96% | 25.25% | 28.30% | 29.49% |
| 83 | 115793 | -3393 | -2.85% | 25.21% | 39.99% | 33.62% | 33.49% | 33.08% |
| 84 | 117663 | -1523 | -1.28% | 29.15% | 45.79% | 39.24% | 35.93% | 37.52% |

### Tim Clarke  House

| District | Population | Deviation | % Deviation | Biden-Trump | Brown-Renacci | Cordray-Dewine | Richardson-Sprague- | 4- Election Dem Composite |
|---|---|---|---|---|---|---|---|---|
| 85 | 119179 | -7 | -0.01% | 27.19% | 38.92% | 31.97% | 33.35% | 32.86% |
| 86 | 121871 | 2685 | 2.25% | 27.59% | 36.61% | 30.24% | 31.56% | 31.50% |
| 87 | 117100 | -2086 | -1.75% | 45.90% | 58.72% | 52.03% | 52.78% | 52.36% |
| 88 | 115837 | -3349 | -2.81% | 26.68% | 42.43% | 35.68% | 33.15% | 34.49% |
| 89 | 123426 | 4240 | 3.56% | 34.41% | 48.54% | 36.93% | 38.92% | 39.70% |
| 90 | 118814 | -372 | -0.31% | 33.73% | 47.41% | 39.30% | 40.52% | 40.24% |
| 91 | 120570 | 1384 | 1.16% | 47.43% | 57.23% | 51.62% | 53.23% | 52.38% |
| 92 | 120113 | 927 | 0.78% | 24.60% | 38.03% | 31.15% | 31.12% | 31.23% |
| 93 | 115349 | -3837 | -3.22% | 18.26% | 28.38% | 20.79% | 20.43% | 21.97% |
| 94 | 114405 | -4781 | -4.01% | 30.75% | 39.42% | 32.23% | 31.95% | 33.59% |
| 95 | 123310 | 4124 | 3.46% | 21.66% | 31.57% | 23.72% | 25.39% | 25.58% |
| 96 | 119273 | 87 | 0.07% | 22.65% | 35.29% | 28.97% | 28.69% | 28.90% |
| 97 | 118311 | -875 | -0.73% | 28.59% | 36.89% | 28.98% | 31.41% | 31.47% |
| 98 | 119952 | 766 | 0.64% | 22.71% | 35.64% | 29.59% | 29.95% | 29.47% |
| 99 | 123125 | 3939 | 3.30% | 26.26% | 36.59% | 28.69% | 28.77% | 30.08% |
| **Total** | **11,799,448** | | **9.69%** | | | | | |

Exhibit D-2

## Tim Clarke  Senate

| District | Population | Deviation | % Deviation | Biden-Trump | Brown-Renacci | Cordray-Dewine | Richardson-Sprague- | 4- Election Dem Composite |
|---|---|---|---|---|---|---|---|---|
| 1 | 355868 | 10054 | 2.81% | 26.13% | 36.89% | 27.97% | 26.56% | 29.39% |
| 2 | 365680 | 1228 | 0.34% | 42.88% | 54.88% | 47.01% | 44.33% | 47.28% |
| 3 | 343674 | -8854 | -2.48% | 71.23% | 73.26% | 70.02% | 68.25% | 70.69% |
| 4 | 356883 | -14842 | -4.15% | 37.31% | 40.09% | 36.21% | 35.21% | 37.21% |
| 5 | 346078 | -1905 | -0.53% | 32.31% | 39.23% | 32.37% | 31.89% | 33.95% |
| 6 | 360113 | -6259 | -1.75% | 57.63% | 63.08% | 57.38% | 57.40% | 58.88% |
| 7 | 362346 | -936 | -0.26% | 41.64% | 42.93% | 38.75% | 37.56% | 40.22% |
| 8 | 357778 | 13408 | 3.75% | 55.55% | 57.85% | 53.19% | 51.86% | 54.61% |
| 9 | 352852 | -12660 | -3.54% | 60.94% | 62.02% | 58.04% | 57.01% | 59.50% |
| 10 | 345985 | -14878 | -4.16% | 37.36% | 44.48% | 36.58% | 36.79% | 38.80% |
| 11 | 352176 | 16474 | 4.61% | 59.11% | 66.59% | 61.15% | 58.36% | 61.30% |
| 12 | 359399 | -3971 | -1.11% | 25.21% | 34.69% | 27.18% | 26.49% | 28.39% |
| 13 | 351492 | 3248 | 0.91% | 47.66% | 58.12% | 51.95% | 50.39% | 52.03% |
| 14 | 353762 | -3797 | -1.06% | 28.69% | 36.05% | 31.20% | 30.69% | 31.66% |
| 15 | 343568 | -3427 | -0.96% | 73.61% | 75.37% | 71.91% | 68.50% | 72.35% |
| 16 | 343393 | -1918 | -0.54% | 59.15% | 60.89% | 56.55% | 53.08% | 57.42% |
| 17 | 359622 | -10188 | -2.85% | 25.65% | 39.27% | 32.73% | 32.50% | 32.54% |
| 18 | 374264 | 14744 | 4.12% | 53.55% | 60.90% | 54.77% | 54.00% | 55.81% |
| 19 | 351428 | -15633 | -4.37% | 40.98% | 44.15% | 39.11% | 36.28% | 40.13% |
| 20 | 356972 | -16409 | -4.59% | 37.37% | 48.02% | 41.83% | 40.73% | 41.99% |
| 21 | 373466 | 17375 | 4.86% | 85.76% | 89.13% | 86.80% | 86.18% | 86.97% |
| 22 | 351811 | -4994 | -1.40% | 34.28% | 42.35% | 37.07% | 35.99% | 37.42% |
| 23 | 375193 | 16633 | 4.65% | 59.51% | 66.16% | 61.22% | 60.29% | 61.79% |
| 24 | 374497 | 16713 | 4.67% | 58.32% | 63.69% | 58.37% | 56.58% | 59.24% |
| 25 | 351711 | 16463 | 4.60% | 53.68% | 60.75% | 57.32% | 54.72% | 56.62% |
| 26 | 362929 | 14378 | 4.02% | 30.28% | 42.21% | 36.00% | 34.95% | 35.86% |
| 27 | 370797 | -5748 | -1.61% | 54.22% | 59.81% | 55.75% | 53.71% | 55.87% |
| 28 | 367625 | -4267 | -1.19% | 49.16% | 57.14% | 53.38% | 51.54% | 52.80% |
| 29 | 359303 | 10176 | 2.85% | 41.23% | 49.53% | 44.67% | 43.86% | 44.82% |
| 30 | 353484 | -13806 | -3.86% | 27.99% | 43.42% | 35.05% | 36.99% | 35.86% |
| 31 | 360513 | -7197 | -2.01% | 30.66% | 39.86% | 34.39% | 33.42% | 34.58% |
| 32 | 358745 | 14013 | 3.92% | 40.97% | 53.30% | 47.57% | 46.47% | 47.08% |
| 33 | 346041 | -13217 | -3.70% | 41.86% | 53.69% | 49.19% | 47.63% | 48.09% |
| **Total** | **11,799,448** | | **9.45%** | | | | | |

Exhibit E-1

## Ohio Citizens Redistricting Commission  House

| District | Population | Deviation | % Deviation | Trump-Biden | Renacci-Brown | Dewine-Cordray | Sprague-Richardson | 4- Election Composite |
|---|---|---|---|---|---|---|---|---|
| 1 | 116195 | -2991 | -2.51% | 72.86% | 75.7% | 72.61% | 70.93% | 73.01% |
| 2 | 117795 | -1391 | -1.17% | 71.11% | 72.9% | 69.64% | 67.84% | 70.37% |
| 3 | 114715 | -4471 | -3.75% | 59.95% | 60.1% | 55.79% | 52.70% | 57.14% |
| 4 | 113852 | -5334 | -4.48% | 82.97% | 85.9% | 83.73% | 82.22% | 83.71% |
| 5 | 124669 | 5483 | 4.60% | 53.43% | 58.3% | 55.05% | 51.45% | 54.54% |
| 6 | 115611 | -3575 | -3.00% | 68.54% | 73.4% | 70.44% | 69.06% | 70.35% |
| 7 | 116226 | -2960 | -2.48% | 63.85% | 67.7% | 64.07% | 60.84% | 64.12% |
| 8 | 122253 | 3067 | 2.57% | 55.23% | 63.4% | 59.98% | 56.75% | 58.83% |
| 9 | 117162 | -2024 | -1.70% | 81.07% | 82.6% | 80.15% | 76.92% | 80.19% |
| 10 | 124414 | 5228 | 4.39% | 65.43% | 64.9% | 60.25% | 56.12% | 61.68% |
| 11 | 124449 | 5263 | 4.42% | 58.65% | 59.0% | 54.12% | 50.30% | 55.51% |
| 12 | 123074 | 3888 | 3.26% | 35.40% | 40.5% | 35.80% | 33.43% | 36.28% |
| 13 | 124826 | 5640 | 4.73% | 86.18% | 88.7% | 85.80% | 86.18% | 86.72% |
| 14 | 125140 | 5954 | 5.00% | 49.96% | 60.8% | 54.77% | 54.12% | 54.91% |
| 15 | 124968 | 5782 | 4.85% | 65.61% | 73.6% | 69.22% | 67.95% | 69.10% |
| 16 | 125024 | 5838 | 4.90% | 53.79% | 59.3% | 54.22% | 52.71% | 55.00% |
| 17 | 124611 | 5425 | 4.55% | 91.00% | 92.8% | 91.03% | 90.70% | 91.39% |
| 18 | 124637 | 5451 | 4.57% | 79.93% | 82.0% | 78.80% | 78.63% | 79.83% |
| 19 | 124790 | 5604 | 4.70% | 68.20% | 72.3% | 67.76% | 65.71% | 68.48% |
| 20 | 124936 | 5750 | 4.82% | 51.56% | 59.3% | 53.51% | 52.53% | 54.24% |
| 21 | 124466 | 5280 | 4.43% | 55.10% | 59.4% | 53.73% | 51.49% | 54.93% |
| 22 | 124364 | 5178 | 4.34% | 76.59% | 79.3% | 75.41% | 74.00% | 76.33% |
| 23 | 124750 | 5564 | 4.67% | 45.09% | 53.1% | 45.97% | 44.86% | 47.25% |
| 24 | 124421 | 5235 | 4.39% | 62.20% | 62.9% | 58.83% | 57.22% | 60.28% |
| 25 | 124842 | 5656 | 4.75% | 58.67% | 57.8% | 53.82% | 52.22% | 55.63% |
| 26 | 121704 | 2518 | 2.11% | 63.15% | 62.3% | 58.36% | 56.06% | 59.98% |
| 27 | 115205 | -3981 | -3.34% | 77.77% | 79.3% | 76.37% | 75.39% | 77.20% |
| 28 | 116284 | -2902 | -2.43% | 59.23% | 61.6% | 57.36% | 57.28% | 58.86% |
| 29 | 113410 | -5776 | -4.85% | 66.57% | 69.1% | 64.66% | 64.03% | 66.09% |
| 30 | 114773 | -4413 | -3.70% | 27.22% | 30.6% | 24.63% | 23.65% | 26.54% |
| 31 | 117262 | -1924 | -1.61% | 76.50% | 82.4% | 80.73% | 80.23% | 79.95% |
| 32 | 122161 | 2975 | 2.50% | 42.07% | 50.5% | 47.21% | 44.46% | 46.06% |
| 33 | 113869 | -5317 | -4.46% | 51.47% | 58.3% | 54.57% | 52.58% | 54.24% |
| 34 | 123343 | 4157 | 3.49% | 56.14% | 60.8% | 56.33% | 54.08% | 56.83% |
| 35 | 124037 | 4851 | 4.07% | 51.91% | 54.8% | 49.62% | 47.52% | 50.96% |
| 36 | 121041 | 1855 | 1.56% | 63.10% | 69.4% | 64.46% | 64.58% | 65.38% |
| 37 | 114535 | -4651 | -3.90% | 55.05% | 59.2% | 53.11% | 52.63% | 55.00% |
| 38 | 120078 | 892 | 0.75% | 59.68% | 65.5% | 59.85% | 60.08% | 61.28% |
| 39 | 122332 | 3146 | 2.64% | 43.12% | 45.8% | 38.97% | 38.09% | 41.48% |
| 40 | 114430 | -4756 | -3.99% | 22.60% | 31.6% | 24.99% | 23.77% | 25.74% |
| 41 | 123848 | 4662 | 3.91% | 66.81% | 74.1% | 69.31% | 66.76% | 69.24% |
| 42 | 125100 | 5914 | 4.96% | 63.59% | 73.7% | 69.08% | 66.86% | 68.31% |

## Ohio Citizens Redistricting Commission  House

| District | Population | Deviation | % Deviation | Trump-Biden | Renacci-Brown | Dewine-Cordray | Sprague-Richardson | 4- Election Composite |
|---|---|---|---|---|---|---|---|---|
| 43 | 125085 | 5899 | 4.95% | 56.25% | 63.7% | 57.91% | 54.51% | 58.08% |
| 44 | 122840 | 3654 | 3.07% | 35.97% | 46.4% | 37.94% | 35.62% | 38.98% |
| 45 | 113579 | -5607 | -4.70% | 42.22% | 43.2% | 39.28% | 38.24% | 40.73% |
| 46 | 113453 | -5733 | -4.81% | 32.61% | 37.2% | 33.21% | 32.34% | 33.83% |
| 47 | 115685 | -3501 | -2.94% | 38.75% | 41.2% | 37.36% | 36.31% | 38.41% |
| 48 | 117398 | -1788 | -1.50% | 25.83% | 35.6% | 29.41% | 28.98% | 29.94% |
| 49 | 119639 | 453 | 0.38% | 52.84% | 59.1% | 54.63% | 53.86% | 55.10% |
| 50 | 123441 | 4255 | 3.57% | 33.30% | 43.0% | 37.95% | 36.96% | 37.80% |
| 51 | 124655 | 5469 | 4.59% | 39.06% | 47.6% | 42.62% | 41.88% | 42.79% |
| 52 | 121163 | 1977 | 1.66% | 26.61% | 38.5% | 32.72% | 32.70% | 32.63% |
| 53 | 123543 | 4357 | 3.66% | 52.91% | 62.9% | 57.33% | 55.89% | 57.26% |
| 54 | 113276 | -5910 | -4.96% | 40.71% | 50.7% | 43.42% | 41.90% | 44.19% |
| 55 | 123988 | 4802 | 4.03% | 53.22% | 64.0% | 58.65% | 57.15% | 58.26% |
| 56 | 123512 | 4326 | 3.63% | 40.85% | 40.8% | 36.74% | 35.52% | 38.49% |
| 57 | 118825 | -361 | -0.30% | 27.83% | 30.9% | 26.40% | 25.77% | 27.71% |
| 58 | 124908 | 5722 | 4.80% | 42.05% | 51.5% | 44.27% | 43.64% | 45.36% |
| 59 | 113818 | -5368 | -4.50% | 50.25% | 60.8% | 56.69% | 55.55% | 55.82% |
| 60 | 114796 | -4390 | -3.68% | 47.99% | 60.2% | 55.87% | 53.98% | 54.52% |
| 61 | 114457 | -4729 | -3.97% | 51.11% | 50.1% | 45.07% | 41.67% | 46.98% |
| 62 | 113840 | -5346 | -4.49% | 28.54% | 39.4% | 34.21% | 32.72% | 33.73% |
| 63 | 122488 | 3302 | 2.77% | 34.95% | 37.3% | 33.03% | 32.11% | 34.34% |
| 64 | 114614 | -4572 | -3.84% | 24.29% | 30.5% | 26.45% | 25.86% | 26.78% |
| 65 | 121935 | 2749 | 2.31% | 51.87% | 64.4% | 59.69% | 58.73% | 58.66% |
| 66 | 124615 | 5429 | 4.56% | 34.90% | 48.9% | 43.15% | 41.58% | 42.13% |
| 67 | 120308 | 1122 | 0.94% | 38.92% | 46.8% | 40.94% | 39.74% | 41.61% |
| 68 | 114609 | -4577 | -3.84% | 31.72% | 40.4% | 34.74% | 33.87% | 35.18% |
| 69 | 113494 | -5692 | -4.78% | 35.75% | 43.9% | 38.28% | 37.03% | 38.73% |
| 70 | 114070 | -5116 | -4.29% | 31.00% | 38.8% | 33.98% | 32.56% | 34.07% |
| 71 | 113413 | -5773 | -4.84% | 41.24% | 43.9% | 36.68% | 36.44% | 39.55% |
| 72 | 115706 | -3480 | -2.92% | 31.66% | 41.7% | 33.58% | 33.56% | 35.12% |
| 73 | 124923 | 5737 | 4.81% | 42.30% | 53.8% | 49.92% | 47.92% | 48.49% |
| 74 | 116348 | -2838 | -2.38% | 42.08% | 48.1% | 42.34% | 40.58% | 43.27% |
| 75 | 114358 | -4828 | -4.05% | 26.78% | 37.5% | 31.52% | 29.72% | 31.37% |
| 76 | 113562 | -5624 | -4.72% | 40.47% | 51.0% | 41.87% | 42.55% | 43.96% |
| 77 | 113541 | -5645 | -4.74% | 48.37% | 56.7% | 49.46% | 46.56% | 50.26% |
| 78 | 123965 | 4779 | 4.01% | 29.63% | 39.8% | 30.54% | 27.07% | 31.77% |
| 79 | 124936 | 5750 | 4.82% | 29.84% | 40.4% | 34.32% | 33.70% | 34.57% |
| 80 | 116894 | -2292 | -1.92% | 31.19% | 38.9% | 34.77% | 33.69% | 34.64% |
| 81 | 114538 | -4648 | -3.90% | 28.21% | 35.8% | 28.74% | 28.08% | 30.21% |
| 82 | 122106 | 2920 | 2.45% | 26.95% | 37.7% | 28.31% | 28.96% | 30.48% |
| 83 | 115728 | -3458 | -2.90% | 26.82% | 38.7% | 33.51% | 32.46% | 32.88% |
| 84 | 125022 | 5836 | 4.90% | 36.51% | 46.4% | 39.52% | 38.84% | 40.31% |

## Ohio Citizens Redistricting Commission  House

| District | Population | Deviation | % Deviation | Trump-Biden | Renacci-Brown | Dewine-Cordray | Sprague-Richardson | 4- Election Composite |
|---|---|---|---|---|---|---|---|---|
| 85 | 113824 | -5362 | -4.50% | 27.92% | 44.5% | 36.05% | 38.41% | 36.71% |
| 86 | 113586 | -5600 | -4.70% | 29.32% | 42.6% | 34.24% | 34.50% | 35.17% |
| 87 | 116665 | -2521 | -2.12% | 29.27% | 44.2% | 37.37% | 37.19% | 37.02% |
| 88 | 113928 | -5258 | -4.41% | 27.44% | 41.8% | 34.30% | 33.15% | 34.18% |
| 89 | 116660 | -2526 | -2.12% | 25.45% | 40.4% | 33.84% | 34.05% | 33.44% |
| 90 | 115375 | -3811 | -3.20% | 26.36% | 44.0% | 34.32% | 36.68% | 35.33% |
| 91 | 113629 | -5557 | -4.66% | 38.82% | 42.8% | 37.73% | 35.52% | 38.73% |
| 92 | 113391 | -5795 | -4.86% | 43.01% | 58.0% | 53.46% | 52.19% | 51.67% |
| 93 | 113769 | -5417 | -4.54% | 26.54% | 40.6% | 32.19% | 33.57% | 33.22% |
| 94 | 113701 | -5485 | -4.60% | 37.45% | 50.6% | 43.13% | 40.01% | 42.81% |
| 95 | 116593 | -2593 | -2.18% | 24.54% | 37.7% | 30.78% | 31.00% | 31.00% |
| 96 | 121281 | 2095 | 1.76% | 25.92% | 38.8% | 30.01% | 28.24% | 30.74% |
| 97 | 121417 | 2231 | 1.87% | 17.71% | 27.9% | 19.64% | 19.74% | 21.24% |
| 98 | 114286 | -4900 | -4.11% | 22.01% | 31.1% | 25.67% | 25.08% | 25.97% |
| 99 | 122667 | 3481 | 2.92% | 26.52% | 36.9% | 29.15% | 28.93% | 30.38% |
| | | | | | | | | |
| **Total** | **11,799,448** | | **9.96%** | | | | | |

Exhibit E-2

## Ohio Citizens Redistricting Commission  Senate

| District | Population | Deviation | % Deviation | Biden-Trump | Brown-Renacci | Cordray-Dewine | Richardson-Sprague- | 4- Election Dem Composite |
|---|---|---|---|---|---|---|---|---|
| 1 | 367613 | 10054 | 2.81% | 30.07% | 40.52% | 31.98% | 31.28% | 33.46% |
| 2 | 358787 | 1228 | 0.34% | 34.45% | 45.06% | 36.64% | 33.85% | 37.50% |
| 3 | 348705 | -8854 | -2.48% | 67.23% | 68.70% | 65.07% | 62.84% | 65.96% |
| 4 | 342717 | -14842 | -4.15% | 38.14% | 40.77% | 36.87% | 35.87% | 37.91% |
| 5 | 355654 | -1905 | -0.53% | 59.08% | 64.41% | 58.80% | 58.76% | 60.26% |
| 6 | 351300 | -6259 | -1.75% | 31.89% | 38.27% | 31.47% | 30.53% | 33.04% |
| 7 | 356623 | -936 | -0.26% | 30.91% | 34.60% | 30.01% | 29.17% | 31.17% |
| 8 | 370967 | 13408 | 3.75% | 61.38% | 61.04% | 57.03% | 55.19% | 58.66% |
| 9 | 344899 | -12660 | -3.54% | 67.30% | 69.61% | 65.80% | 65.24% | 66.99% |
| 10 | 342681 | -14878 | -4.16% | 37.69% | 45.15% | 37.10% | 37.22% | 39.29% |
| 11 | 374033 | 16474 | 4.61% | 61.73% | 69.86% | 64.73% | 61.96% | 64.57% |
| 12 | 353588 | -3971 | -1.11% | 23.53% | 31.17% | 24.36% | 23.93% | 25.75% |
| 13 | 360807 | 3248 | 0.91% | 48.79% | 59.15% | 53.04% | 51.59% | 53.14% |
| 14 | 353762 | -3797 | -1.06% | 28.69% | 36.05% | 31.20% | 30.69% | 31.66% |
| 15 | 354132 | -3427 | -0.96% | 67.39% | 71.81% | 69.01% | 66.80% | 68.75% |
| 16 | 355641 | -1918 | -0.54% | 67.15% | 72.44% | 69.34% | 66.09% | 68.76% |
| 17 | 347371 | -10188 | -2.85% | 32.97% | 43.31% | 37.17% | 35.87% | 37.33% |
| 18 | 372303 | 14744 | 4.12% | 50.60% | 56.63% | 52.08% | 49.95% | 52.32% |
| 19 | 341926 | -15633 | -4.37% | 40.53% | 44.71% | 39.67% | 37.13% | 40.51% |
| 20 | 341150 | -16409 | -4.59% | 32.08% | 41.67% | 35.53% | 34.68% | 35.99% |
| 21 | 374934 | 17375 | 4.86% | 67.29% | 74.93% | 70.63% | 70.24% | 70.77% |
| 22 | 352565 | -4994 | -1.40% | 31.83% | 44.59% | 37.54% | 35.86% | 37.45% |
| 23 | 374192 | 16633 | 4.65% | 58.55% | 63.91% | 58.60% | 56.79% | 59.46% |
| 24 | 374272 | 16713 | 4.67% | 74.11% | 77.79% | 74.45% | 73.88% | 75.06% |
| 25 | 374022 | 16463 | 4.60% | 54.72% | 61.99% | 56.08% | 54.94% | 56.93% |
| 26 | 371937 | 14378 | 4.02% | 54.10% | 56.18% | 51.50% | 47.87% | 52.41% |
| 27 | 351811 | -5748 | -1.61% | 34.28% | 42.35% | 37.07% | 35.99% | 37.42% |
| 28 | 353292 | -4267 | -1.19% | 54.17% | 61.74% | 58.73% | 56.92% | 57.89% |
| 29 | 367735 | 10176 | 2.85% | 40.90% | 49.26% | 44.38% | 43.56% | 44.52% |
| 30 | 343753 | -13806 | -3.86% | 30.85% | 45.27% | 38.55% | 38.75% | 38.36% |
| 31 | 350362 | -7197 | -2.01% | 26.99% | 42.48% | 34.44% | 36.08% | 35.00% |
| 32 | 371572 | 14013 | 3.92% | 40.75% | 52.90% | 47.13% | 46.03% | 46.70% |
| 33 | 344342 | -13217 | -3.70% | 41.86% | 53.70% | 49.25% | 47.69% | 48.13% |
| **Total** | **11,799,448** | | **9.45%** | | | | | |

Exhibit F-1

## Pranav Padmanabhan  House

| District | Population | Deviation | % Deviation | Biden-Trump | Brown-Renacci | Cordray-Dewine | Richardson-Sprague- | 4- Election Dem Composite |
|---|---|---|---|---|---|---|---|---|
| 1 | 122732 | 3546 | 2.98% | 76.64% | 82.9% | 79.83% | 78.22% | 79.41% |
| 2 | 123621 | 4435 | 3.72% | 55.25% | 65.8% | 59.70% | 56.48% | 59.30% |
| 3 | 119872 | 686 | 0.58% | 58.23% | 65.1% | 59.51% | 56.26% | 59.76% |
| 4 | 120616 | 1430 | 1.20% | 38.30% | 48.4% | 40.94% | 38.19% | 41.45% |
| 5 | 119399 | 213 | 0.18% | 47.32% | 56.6% | 49.08% | 46.19% | 49.79% |
| 6 | 123393 | 4207 | 3.53% | 37.20% | 50.7% | 43.06% | 39.85% | 42.71% |
| 7 | 121856 | 2670 | 2.24% | 27.96% | 40.0% | 30.65% | 30.19% | 32.20% |
| 8 | 116867 | -2319 | -1.95% | 27.42% | 38.1% | 28.73% | 29.30% | 30.90% |
| 9 | 114233 | -4953 | -4.16% | 27.30% | 37.4% | 28.62% | 24.90% | 29.54% |
| 10 | 124905 | 5719 | 4.80% | 18.12% | 27.4% | 19.77% | 19.94% | 21.31% |
| 11 | 120751 | 1565 | 1.31% | 26.33% | 34.4% | 27.05% | 26.37% | 28.53% |
| 12 | 122109 | 2923 | 2.45% | 19.36% | 30.0% | 22.90% | 22.30% | 23.63% |
| 13 | 113647 | -5539 | -4.65% | 82.88% | 86.5% | 83.18% | 83.97% | 84.12% |
| 14 | 115166 | -4020 | -3.37% | 50.13% | 56.6% | 50.24% | 49.88% | 51.72% |
| 15 | 124406 | 5220 | 4.38% | 38.29% | 44.9% | 37.81% | 37.63% | 39.66% |
| 16 | 122378 | 3192 | 2.68% | 43.12% | 45.8% | 38.97% | 38.09% | 41.48% |
| 17 | 115011 | -4175 | -3.50% | 45.58% | 48.2% | 41.13% | 40.59% | 43.88% |
| 18 | 114667 | -4519 | -3.79% | 38.82% | 44.7% | 37.11% | 37.62% | 39.56% |
| 19 | 120172 | 986 | 0.83% | 39.75% | 42.0% | 38.13% | 37.00% | 39.21% |
| 20 | 119035 | -151 | -0.13% | 38.42% | 42.0% | 37.81% | 37.07% | 38.82% |
| 21 | 119069 | -117 | -0.10% | 34.40% | 39.3% | 35.73% | 34.64% | 36.01% |
| 22 | 116777 | -2409 | -2.02% | 66.36% | 67.6% | 63.99% | 63.58% | 65.38% |
| 23 | 121580 | 2394 | 2.01% | 52.16% | 53.2% | 48.61% | 47.42% | 50.35% |
| 24 | 117145 | -2041 | -1.71% | 29.35% | 32.6% | 26.66% | 25.70% | 28.57% |
| 25 | 123062 | 3876 | 3.25% | 64.14% | 66.7% | 61.93% | 61.30% | 63.51% |
| 26 | 120171 | 985 | 0.83% | 84.78% | 86.1% | 83.96% | 83.04% | 84.48% |
| 27 | 115011 | -4175 | -3.50% | 72.18% | 72.6% | 69.10% | 66.88% | 70.19% |
| 28 | 118374 | -812 | -0.68% | 47.69% | 46.2% | 41.75% | 39.72% | 43.85% |
| 29 | 121210 | 2024 | 1.70% | 38.15% | 40.0% | 35.59% | 34.40% | 37.03% |
| 30 | 117991 | -1195 | -1.00% | 28.65% | 32.7% | 28.81% | 27.78% | 29.48% |
| 31 | 114790 | -4396 | -3.69% | 27.19% | 40.2% | 32.30% | 31.83% | 32.88% |
| 32 | 124936 | 5750 | 4.82% | 29.84% | 40.4% | 34.32% | 33.70% | 34.57% |
| 33 | 117667 | -1519 | -1.27% | 28.17% | 41.1% | 32.42% | 30.94% | 33.15% |
| 34 | 115516 | -3670 | -3.08% | 23.96% | 34.3% | 27.41% | 26.04% | 27.92% |
| 35 | 121063 | 1877 | 1.57% | 39.95% | 50.6% | 41.36% | 42.05% | 43.49% |
| 36 | 120851 | 1665 | 1.40% | 26.22% | 37.2% | 31.67% | 30.32% | 31.36% |
| 37 | 124286 | 5100 | 4.28% | 41.57% | 41.7% | 37.49% | 36.27% | 39.26% |
| 38 | 118051 | -1135 | -0.95% | 27.43% | 30.3% | 25.94% | 25.30% | 27.24% |
| 39 | 114748 | -4438 | -3.72% | 21.16% | 30.2% | 24.69% | 24.75% | 25.19% |
| 40 | 115723 | -3463 | -2.91% | 26.01% | 42.0% | 35.49% | 35.49% | 34.74% |
| 41 | 115031 | -4155 | -3.49% | 24.57% | 38.6% | 31.79% | 31.87% | 31.72% |
| 42 | 115373 | -3813 | -3.20% | 40.42% | 54.7% | 49.83% | 48.83% | 48.44% |

## Pranav Padmanabhan  House

| District | Population | Deviation | % Deviation | Biden-Trump | Brown-Renacci | Cordray-Dewine | Richardson-Sprague- | 4- Election Dem Composite |
|---|---|---|---|---|---|---|---|---|
| 43 | 124815 | 5629 | 4.72% | 80.34% | 84.1% | 81.70% | 80.89% | 81.76% |
| 44 | 114619 | -4567 | -3.83% | 80.58% | 82.5% | 79.68% | 77.37% | 80.02% |
| 45 | 119129 | -57 | -0.05% | 74.69% | 77.5% | 74.57% | 73.42% | 75.05% |
| 46 | 115573 | -3613 | -3.03% | 80.31% | 81.3% | 78.78% | 75.49% | 78.98% |
| 47 | 117066 | -2120 | -1.78% | 62.91% | 63.7% | 59.04% | 54.75% | 60.09% |
| 48 | 124774 | 5588 | 4.69% | 53.23% | 57.5% | 53.66% | 50.42% | 53.71% |
| 49 | 119871 | 685 | 0.57% | 27.75% | 37.9% | 32.47% | 30.82% | 32.25% |
| 50 | 116614 | -2572 | -2.16% | 50.81% | 49.8% | 44.87% | 41.45% | 46.74% |
| 51 | 125018 | 5832 | 4.89% | 41.94% | 44.6% | 39.64% | 37.60% | 40.94% |
| 52 | 117953 | -1233 | -1.03% | 65.82% | 72.9% | 69.65% | 67.09% | 68.85% |
| 53 | 124663 | 5477 | 4.60% | 50.96% | 57.9% | 55.25% | 51.72% | 53.96% |
| 54 | 114783 | -4403 | -3.69% | 32.05% | 43.0% | 36.89% | 35.22% | 36.80% |
| 55 | 115475 | -3711 | -3.11% | 59.68% | 59.9% | 55.45% | 52.28% | 56.82% |
| 56 | 119299 | 113 | 0.09% | 67.45% | 68.4% | 64.67% | 61.78% | 65.57% |
| 57 | 117477 | -1709 | -1.43% | 60.92% | 60.9% | 56.11% | 52.37% | 57.58% |
| 58 | 121736 | 2550 | 2.14% | 41.08% | 47.4% | 42.24% | 40.88% | 42.90% |
| 59 | 119504 | 318 | 0.27% | 26.65% | 35.8% | 30.79% | 29.32% | 30.63% |
| 60 | 123022 | 3836 | 3.22% | 28.60% | 41.9% | 33.70% | 33.93% | 34.54% |
| 61 | 113657 | -5529 | -4.64% | 90.90% | 93.3% | 91.27% | 91.46% | 91.74% |
| 62 | 121992 | 2806 | 2.35% | 81.72% | 87.4% | 84.70% | 85.14% | 84.75% |
| 63 | 117621 | -1565 | -1.31% | 72.94% | 81.4% | 78.16% | 77.19% | 77.42% |
| 64 | 113728 | -5458 | -4.58% | 67.23% | 71.2% | 66.61% | 64.52% | 67.40% |
| 65 | 115609 | -3577 | -3.00% | 53.87% | 58.8% | 52.95% | 50.90% | 54.13% |
| 66 | 122375 | 3189 | 2.68% | 47.40% | 53.8% | 48.03% | 46.02% | 48.80% |
| 67 | 122475 | 3289 | 2.76% | 75.89% | 79.5% | 75.64% | 75.20% | 76.55% |
| 68 | 116497 | -2689 | -2.26% | 84.81% | 86.7% | 84.03% | 82.76% | 84.57% |
| 69 | 116777 | -2409 | -2.02% | 75.65% | 79.2% | 75.04% | 74.62% | 76.12% |
| 70 | 122640 | 3454 | 2.90% | 49.03% | 58.4% | 51.54% | 50.31% | 52.32% |
| 71 | 120153 | 967 | 0.81% | 53.28% | 63.2% | 57.66% | 56.23% | 57.59% |
| 72 | 121660 | 2474 | 2.08% | 43.77% | 55.8% | 49.89% | 48.20% | 49.40% |
| 73 | 113368 | -5818 | -4.88% | 48.92% | 59.8% | 53.57% | 52.89% | 53.79% |
| 74 | 119697 | 511 | 0.43% | 51.21% | 54.9% | 49.18% | 47.00% | 50.57% |
| 75 | 123524 | 4338 | 3.64% | 39.94% | 48.4% | 41.42% | 40.46% | 42.55% |
| 76 | 119167 | -19 | -0.02% | 26.60% | 40.6% | 32.26% | 34.02% | 33.37% |
| 77 | 120236 | 1050 | 0.88% | 25.23% | 39.8% | 32.88% | 31.89% | 32.46% |
| 78 | 122487 | 3301 | 2.77% | 42.30% | 47.5% | 42.02% | 40.24% | 43.01% |
| 79 | 116253 | -2933 | -2.46% | 43.94% | 55.1% | 51.34% | 49.40% | 49.95% |
| 80 | 116924 | -2262 | -1.90% | 50.31% | 54.6% | 49.48% | 47.36% | 50.43% |
| 81 | 117088 | -2098 | -1.76% | 51.67% | 56.6% | 51.95% | 49.92% | 52.54% |
| 82 | 114720 | -4466 | -3.75% | 55.91% | 61.8% | 58.67% | 56.06% | 58.12% |
| 83 | 122892 | 3706 | 3.11% | 75.66% | 81.6% | 79.99% | 79.32% | 79.15% |
| 84 | 114342 | -4844 | -4.06% | 42.51% | 51.5% | 47.94% | 45.55% | 46.86% |

## Pranav Padmanabhan  House

| District | Population | Deviation | % Deviation | Biden-Trump | Brown-Renacci | Cordray-Dewine | Richardson-Sprague- | 4- Election Dem Composite |
|---|---|---|---|---|---|---|---|---|
| 85 | 124638 | 5452 | 4.57% | 33.38% | 42.5% | 37.42% | 36.37% | 37.42% |
| 86 | 125130 | 5944 | 4.99% | 51.33% | 58.7% | 54.24% | 53.48% | 54.43% |
| 87 | 125085 | 5899 | 4.95% | 39.00% | 47.6% | 42.62% | 41.88% | 42.78% |
| 88 | 122059 | 2873 | 2.41% | 40.52% | 47.8% | 42.33% | 40.92% | 42.88% |
| 89 | 123280 | 4094 | 3.43% | 27.30% | 36.4% | 30.51% | 30.03% | 31.05% |
| 90 | 116894 | -2292 | -1.92% | 31.19% | 38.9% | 34.77% | 33.69% | 34.64% |
| 91 | 116790 | -2396 | -2.01% | 26.90% | 39.4% | 33.45% | 33.11% | 33.22% |
| 92 | 124543 | 5357 | 4.49% | 28.33% | 43.0% | 36.47% | 36.83% | 36.15% |
| 93 | 116833 | -2353 | -1.97% | 29.80% | 47.2% | 37.22% | 40.51% | 38.69% |
| 94 | 118178 | -1008 | -0.85% | 33.89% | 48.0% | 42.34% | 40.79% | 41.24% |
| 95 | 118246 | -940 | -0.79% | 39.86% | 50.5% | 43.58% | 42.84% | 44.19% |
| 96 | 118905 | -281 | -0.24% | 44.34% | 53.8% | 46.48% | 46.10% | 47.68% |
| 97 | 113318 | -5868 | -4.92% | 39.93% | 51.3% | 46.75% | 44.44% | 45.61% |
| 98 | 115296 | -3890 | -3.26% | 61.17% | 72.8% | 69.15% | 68.49% | 67.91% |
| 99 | 119719 | 533 | 0.45% | 51.38% | 63.8% | 59.02% | 57.97% | 58.05% |
| **Total** | **11,799,448** | | **9.91%** | | | | | |

Exhibit F-2

## Pranav Padmanabhan   Senate

| District | Population | Deviation | % Deviation | Biden-Trump | Brown-Renacci | Cordray-Dewine | Richardson-Sprague- | 4- Election Dem Composite |
|---|---|---|---|---|---|---|---|---|
| 1 | 366225 | 8666 | 2.42% | 61.87% | 69.99% | 64.88% | 62.11% | 64.71% |
| 2 | 363408 | 5849 | 1.64% | 40.73% | 51.76% | 44.24% | 41.28% | 44.50% |
| 3 | 352956 | -4603 | -1.29% | 27.57% | 38.52% | 29.36% | 28.18% | 30.91% |
| 4 | 367765 | 10206 | 2.85% | 21.21% | 30.50% | 23.14% | 22.79% | 24.41% |
| 5 | 353219 | -4340 | -1.21% | 55.11% | 61.24% | 55.58% | 55.66% | 56.90% |
| 6 | 352056 | -5503 | -1.54% | 42.70% | 46.30% | 39.17% | 38.82% | 41.75% |
| 7 | 358276 | 717 | 0.20% | 37.51% | 41.02% | 37.19% | 36.20% | 37.98% |
| 8 | 355502 | -2057 | -0.58% | 48.57% | 50.64% | 45.84% | 45.04% | 47.53% |
| 9 | 358244 | 685 | 0.19% | 73.66% | 75.24% | 71.83% | 70.48% | 72.80% |
| 10 | 357575 | 16 | 0.00% | 38.54% | 40.11% | 35.87% | 34.38% | 37.22% |
| 11 | 357393 | -166 | -0.05% | 28.44% | 40.56% | 33.06% | 32.21% | 33.57% |
| 12 | 357430 | -129 | -0.04% | 29.92% | 40.74% | 33.47% | 32.80% | 34.23% |
| 13 | 357085 | -474 | -0.13% | 30.51% | 34.26% | 29.65% | 28.99% | 30.85% |
| 14 | 346127 | -11432 | -3.20% | 30.26% | 45.31% | 39.22% | 38.94% | 38.43% |
| 15 | 358563 | 1004 | 0.28% | 78.43% | 81.27% | 78.52% | 77.07% | 78.82% |
| 16 | 354793 | -2766 | -0.77% | 65.02% | 67.78% | 64.09% | 60.48% | 64.34% |
| 17 | 361503 | 3944 | 1.10% | 40.89% | 44.57% | 39.51% | 37.02% | 40.50% |
| 18 | 357394 | -165 | -0.05% | 48.91% | 57.32% | 53.34% | 50.72% | 52.58% |
| 19 | 354876 | -2683 | -0.75% | 62.54% | 62.95% | 58.61% | 55.35% | 59.86% |
| 20 | 364262 | 6703 | 1.87% | 32.12% | 41.62% | 35.59% | 34.67% | 36.00% |
| 21 | 353270 | -4289 | -1.20% | 81.95% | 87.73% | 85.11% | 85.07% | 84.97% |
| 22 | 351712 | -5847 | -1.64% | 56.00% | 61.24% | 55.84% | 53.81% | 56.73% |
| 23 | 355749 | -1810 | -0.51% | 78.88% | 81.91% | 78.43% | 77.70% | 79.23% |
| 24 | 364453 | 6894 | 1.93% | 48.52% | 58.92% | 52.84% | 51.37% | 52.91% |
| 25 | 356589 | -970 | -0.27% | 46.68% | 53.92% | 47.65% | 46.25% | 48.62% |
| 26 | 361890 | 4331 | 1.21% | 31.65% | 42.76% | 35.87% | 35.52% | 36.45% |
| 27 | 350265 | -7294 | -2.04% | 48.95% | 55.46% | 50.90% | 48.86% | 51.04% |
| 28 | 351954 | -5605 | -1.57% | 56.22% | 63.56% | 60.70% | 58.77% | 59.81% |
| 29 | 374853 | 17294 | 4.84% | 40.59% | 49.05% | 44.17% | 43.34% | 44.29% |
| 30 | 362233 | 4674 | 1.31% | 33.58% | 41.55% | 36.40% | 35.36% | 36.72% |
| 31 | 358166 | 607 | 0.17% | 28.35% | 43.26% | 35.76% | 36.85% | 36.06% |
| 32 | 355329 | -2230 | -0.62% | 39.45% | 50.78% | 44.16% | 43.27% | 44.42% |
| 33 | 348333 | -9226 | -2.58% | 49.80% | 61.57% | 57.13% | 55.76% | 56.07% |
| **Total** | **11,799,448** | | **8.04%** | | | | | |

Exhibit G-1

## Paul Nieves  House

| District | Population | Deviation | % Deviation | Biden-Trump | Brown-Renacci | Cordray-Dewine | Richardson-Sprague- | 4- Election Dem Composite |
|---|---|---|---|---|---|---|---|---|
| 1 | 122777 | 3591 | 3.01% | 51.81% | 60.3% | 56.71% | 54.05% | 55.72% |
| 2 | 118506 | -680 | -0.57% | 55.15% | 61.5% | 58.81% | 54.41% | 57.47% |
| 3 | 118958 | -228 | -0.19% | 70.88% | 73.5% | 69.78% | 68.39% | 70.63% |
| 4 | 115230 | -3956 | -3.32% | 66.01% | 69.3% | 65.88% | 62.44% | 65.91% |
| 5 | 120144 | 958 | 0.80% | 74.33% | 74.5% | 70.99% | 67.15% | 71.75% |
| 6 | 124204 | 5019 | 4.21% | 58.09% | 58.5% | 53.64% | 49.75% | 54.99% |
| 7 | 119811 | 625 | 0.52% | 67.53% | 67.9% | 63.72% | 60.22% | 64.83% |
| 8 | 122622 | 3436 | 2.88% | 58.86% | 59.1% | 54.59% | 51.35% | 55.98% |
| 9 | 119971 | 785 | 0.66% | 73.63% | 76.3% | 73.53% | 71.79% | 73.82% |
| 10 | 118611 | -575 | -0.48% | 82.70% | 85.4% | 83.05% | 81.57% | 83.17% |
| 11 | 122972 | 3786 | 3.18% | 71.12% | 75.5% | 73.07% | 71.82% | 72.89% |
| 12 | 114287 | -4899 | -4.11% | 77.15% | 80.4% | 76.30% | 76.04% | 77.46% |
| 13 | 113655 | -5531 | -4.64% | 86.10% | 88.5% | 86.19% | 85.51% | 86.58% |
| 14 | 113351 | -5835 | -4.90% | 86.59% | 88.5% | 85.91% | 85.43% | 86.61% |
| 15 | 113352 | -5834 | -4.89% | 57.02% | 60.6% | 55.08% | 53.15% | 56.46% |
| 16 | 115419 | -3767 | -3.16% | 87.71% | 91.4% | 89.36% | 88.54% | 89.26% |
| 17 | 113934 | -5252 | -4.41% | 77.87% | 84.2% | 80.83% | 81.31% | 81.06% |
| 18 | 115970 | -3216 | -2.70% | 68.01% | 77.0% | 72.81% | 72.53% | 72.58% |
| 19 | 113476 | -5710 | -4.79% | 48.92% | 59.8% | 53.58% | 52.91% | 53.80% |
| 20 | 123088 | 3902 | 3.27% | 64.21% | 66.3% | 61.43% | 58.92% | 62.72% |
| 21 | 114532 | -4654 | -3.90% | 54.66% | 62.1% | 56.43% | 54.72% | 56.97% |
| 22 | 113753 | -5433 | -4.56% | 44.91% | 50.9% | 45.08% | 42.90% | 45.94% |
| 23 | 121919 | 2733 | 2.29% | 47.25% | 51.3% | 46.78% | 46.55% | 47.96% |
| 24 | 119149 | -37 | -0.03% | 32.04% | 35.1% | 28.70% | 27.79% | 30.91% |
| 25 | 115605 | -3581 | -3.00% | 75.53% | 76.0% | 73.09% | 72.29% | 74.22% |
| 26 | 118975 | -211 | -0.18% | 78.88% | 80.5% | 77.37% | 76.67% | 78.36% |
| 27 | 115565 | -3621 | -3.04% | 78.14% | 80.0% | 77.35% | 75.68% | 77.79% |
| 28 | 122838 | 3652 | 3.06% | 58.07% | 56.7% | 52.20% | 49.69% | 54.15% |
| 29 | 116588 | -2598 | -2.18% | 50.35% | 49.8% | 45.14% | 43.31% | 47.16% |
| 30 | 121517 | 2331 | 1.96% | 50.21% | 59.6% | 56.38% | 54.63% | 55.19% |
| 31 | 118405 | -781 | -0.66% | 76.01% | 79.8% | 77.78% | 76.53% | 77.52% |
| 32 | 114351 | -4835 | -4.06% | 45.23% | 52.3% | 48.88% | 46.10% | 48.12% |
| 33 | 123305 | 4119 | 3.46% | 52.94% | 56.7% | 51.63% | 49.60% | 52.72% |
| 34 | 123247 | 4061 | 3.41% | 45.64% | 53.3% | 48.00% | 46.31% | 48.32% |
| 35 | 113542 | -5644 | -4.74% | 75.52% | 79.2% | 75.42% | 75.75% | 76.46% |
| 36 | 115536 | -3650 | -3.06% | 37.28% | 43.3% | 36.60% | 35.98% | 38.30% |
| 37 | 118653 | -533 | -0.45% | 50.86% | 56.9% | 50.46% | 50.61% | 52.20% |
| 38 | 118805 | -381 | -0.32% | 47.26% | 49.4% | 42.49% | 41.60% | 45.18% |
| 39 | 116202 | -2984 | -2.50% | 49.70% | 56.8% | 49.92% | 50.29% | 51.66% |
| 40 | 122537 | 3351 | 2.81% | 36.81% | 40.7% | 33.04% | 33.10% | 35.91% |
| 41 | 119054 | -132 | -0.11% | 54.94% | 66.8% | 60.94% | 57.77% | 60.11% |
| 42 | 116212 | -2974 | -2.50% | 57.53% | 63.9% | 58.30% | 54.98% | 58.69% |

**Paul Nieves  House**

| District | Population | Deviation | % Deviation | Biden-Trump | Brown-Renacci | Cordray-Dewine | Richardson-Sprague- | 4- Election Dem Composite |
|---|---|---|---|---|---|---|---|---|
| 43 | 117063 | -2123 | -1.78% | 77.20% | 82.8% | 79.34% | 77.82% | 79.28% |
| 44 | 121663 | 2477 | 2.08% | 40.35% | 50.2% | 42.99% | 40.11% | 43.41% |
| 45 | 124983 | 5797 | 4.86% | 40.49% | 47.1% | 41.99% | 40.96% | 42.63% |
| 46 | 125009 | 5823 | 4.89% | 51.02% | 60.1% | 55.82% | 55.45% | 55.59% |
| 47 | 124861 | 5675 | 4.76% | 32.47% | 42.7% | 37.56% | 36.49% | 37.29% |
| 48 | 114938 | -4248 | -3.56% | 41.01% | 49.4% | 42.57% | 41.68% | 43.67% |
| 49 | 117665 | -1521 | -1.28% | 45.07% | 54.7% | 47.08% | 46.44% | 48.31% |
| 50 | 124133 | 4947 | 4.15% | 50.52% | 49.5% | 44.55% | 41.15% | 46.43% |
| 51 | 124941 | 5755 | 4.83% | 35.82% | 41.3% | 36.39% | 34.37% | 36.98% |
| 52 | 120153 | 967 | 0.81% | 53.28% | 63.2% | 57.66% | 56.23% | 57.59% |
| 53 | 116068 | -3118 | -2.62% | 49.57% | 58.7% | 51.84% | 50.63% | 52.69% |
| 54 | 114452 | -4734 | -3.97% | 38.42% | 52.5% | 45.62% | 44.26% | 45.19% |
| 55 | 122073 | 2887 | 2.42% | 38.19% | 45.1% | 39.70% | 38.46% | 40.37% |
| 56 | 115328 | -3858 | -3.24% | 24.63% | 36.2% | 29.39% | 28.92% | 29.79% |
| 57 | 120198 | 1012 | 0.85% | 28.15% | 30.8% | 26.43% | 25.74% | 27.77% |
| 58 | 122139 | 2953 | 2.48% | 40.37% | 40.9% | 36.66% | 35.51% | 38.35% |
| 59 | 118762 | -424 | -0.36% | 35.28% | 37.5% | 33.30% | 32.36% | 34.61% |
| 60 | 119207 | 21 | 0.02% | 24.54% | 30.9% | 26.73% | 26.21% | 27.10% |
| 61 | 121606 | 2420 | 2.03% | 41.64% | 41.5% | 37.83% | 36.33% | 39.33% |
| 62 | 119113 | -73 | -0.06% | 40.05% | 43.3% | 39.18% | 38.48% | 40.25% |
| 63 | 124169 | 4983 | 4.18% | 28.29% | 34.1% | 30.17% | 29.55% | 30.52% |
| 64 | 118349 | -837 | -0.70% | 24.81% | 35.6% | 28.55% | 28.34% | 29.33% |
| 65 | 120065 | 879 | 0.74% | 27.49% | 35.6% | 28.11% | 27.51% | 29.68% |
| 66 | 124710 | 5524 | 4.63% | 39.29% | 50.2% | 41.09% | 41.52% | 43.03% |
| 67 | 121856 | 2670 | 2.24% | 27.96% | 40.0% | 30.65% | 30.19% | 32.20% |
| 68 | 116894 | -2292 | -1.92% | 31.19% | 38.9% | 34.77% | 33.69% | 34.64% |
| 69 | 124936 | 5750 | 4.82% | 29.84% | 40.4% | 34.32% | 33.70% | 34.57% |
| 70 | 115986 | -3200 | -2.68% | 41.87% | 53.8% | 47.57% | 44.69% | 46.99% |
| 71 | 113965 | -5221 | -4.38% | 34.39% | 48.3% | 38.85% | 36.90% | 39.62% |
| 72 | 118137 | -1049 | -0.88% | 47.67% | 56.3% | 48.90% | 46.01% | 49.72% |
| 73 | 117955 | -1231 | -1.03% | 27.31% | 40.0% | 33.16% | 31.00% | 32.87% |
| 74 | 123482 | 4296 | 3.60% | 26.50% | 36.7% | 27.34% | 24.35% | 28.73% |
| 75 | 116973 | -2213 | -1.86% | 28.84% | 39.3% | 29.91% | 30.45% | 32.11% |
| 76 | 114368 | -4818 | -4.04% | 17.54% | 26.7% | 19.43% | 19.47% | 20.79% |
| 77 | 113307 | -5879 | -4.93% | 22.33% | 32.6% | 26.06% | 24.60% | 26.41% |
| 78 | 120675 | 1489 | 1.25% | 31.17% | 37.3% | 32.30% | 30.16% | 32.72% |
| 79 | 116736 | -2450 | -2.06% | 49.30% | 57.3% | 53.42% | 51.49% | 52.88% |
| 80 | 118301 | -885 | -0.74% | 36.48% | 45.1% | 39.23% | 37.47% | 39.56% |
| 81 | 119725 | 539 | 0.45% | 36.77% | 48.9% | 42.10% | 41.69% | 42.38% |
| 82 | 115707 | -3479 | -2.92% | 39.65% | 53.7% | 48.73% | 47.09% | 47.28% |
| 83 | 122319 | 3133 | 2.63% | 51.36% | 64.0% | 59.28% | 57.99% | 58.16% |
| 84 | 119460 | 274 | 0.23% | 60.29% | 70.7% | 66.93% | 66.04% | 65.99% |

## Paul Nieves  House

| District | Population | Deviation | % Deviation | Biden-Trump | Brown-Renacci | Cordray-Dewine | Richardson-Sprague- | 4- Election Dem Composite |
|---|---|---|---|---|---|---|---|---|
| 85 | 117414 | -1772 | -1.49% | 32.90% | 44.6% | 39.52% | 37.53% | 38.63% |
| 86 | 122817 | 3631 | 3.05% | 28.57% | 42.8% | 35.67% | 36.88% | 35.99% |
| 87 | 119984 | 798 | 0.67% | 28.15% | 41.9% | 36.07% | 35.97% | 35.53% |
| 88 | 119273 | 87 | 0.07% | 22.65% | 35.3% | 28.69% | 28.97% | 28.90% |
| 89 | 120735 | 1549 | 1.30% | 41.17% | 47.5% | 42.28% | 40.86% | 42.94% |
| 90 | 120505 | 1319 | 1.11% | 26.62% | 35.8% | 30.79% | 29.40% | 30.65% |
| 91 | 121818 | 2632 | 2.21% | 28.55% | 42.1% | 33.99% | 34.02% | 34.66% |
| 92 | 122282 | 3096 | 2.60% | 25.51% | 44.8% | 34.33% | 37.30% | 35.49% |
| 93 | 122202 | 3016 | 2.53% | 42.00% | 54.0% | 48.23% | 48.46% | 48.18% |
| 94 | 121440 | 2254 | 1.89% | 42.35% | 47.6% | 42.12% | 40.33% | 43.10% |
| 95 | 124070 | 4884 | 4.10% | 26.06% | 38.6% | 32.29% | 30.71% | 31.92% |
| 96 | 123279 | 4093 | 3.43% | 22.33% | 31.9% | 26.32% | 25.84% | 26.59% |
| 97 | 122307 | 3121 | 2.62% | 28.86% | 43.9% | 36.88% | 36.65% | 36.58% |
| 98 | 122470 | 3284 | 2.76% | 24.57% | 38.1% | 31.39% | 31.47% | 31.37% |
| 99 | 115793 | -3393 | -2.85% | 25.21% | 40.0% | 33.49% | 33.62% | 33.08% |
| **Total** | **11,799,448** | | **9.82%** | | | | | |

Exhibit G-2

## Paul Nieves  Senate

| District | Population | Deviation | % Deviation | Biden-Trump | Brown-Renacci | Cordray-Dewine | Richardson-Sprague- | 4- Election Dem Composite |
|---|---|---|---|---|---|---|---|---|
| 1 | 353197 | -4362 | -1.22% | 24.57% | 35.06% | 26.45% | 26.48% | 28.14% |
| 2 | 363282 | 5723 | 1.60% | 38.01% | 47.66% | 39.64% | 36.68% | 40.50% |
| 3 | 356513 | -1046 | -0.29% | 58.04% | 64.01% | 60.80% | 57.22% | 60.02% |
| 4 | 364888 | 7329 | 2.05% | 36.78% | 39.65% | 35.77% | 34.78% | 36.75% |
| 5 | 347731 | -9828 | -2.75% | 53.12% | 58.82% | 53.16% | 53.07% | 54.54% |
| 6 | 357544 | -15 | 0.00% | 44.12% | 48.01% | 40.82% | 40.62% | 43.39% |
| 7 | 365616 | 8057 | 2.25% | 30.81% | 34.75% | 30.11% | 29.30% | 31.24% |
| 8 | 357656 | 97 | 0.03% | 43.05% | 45.14% | 39.91% | 38.90% | 41.75% |
| 9 | 350145 | -7414 | -2.07% | 77.36% | 78.59% | 75.70% | 74.66% | 76.58% |
| 10 | 363124 | 5565 | 1.56% | 30.48% | 40.44% | 32.54% | 32.40% | 33.97% |
| 11 | 352329 | -5230 | -1.46% | 62.36% | 70.38% | 65.34% | 62.63% | 65.18% |
| 12 | 351937 | -5622 | -1.57% | 26.99% | 36.52% | 30.43% | 28.50% | 30.61% |
| 13 | 350591 | -6968 | -1.95% | 44.34% | 56.27% | 50.08% | 48.11% | 49.70% |
| 14 | 360807 | 3248 | 0.91% | 40.78% | 43.41% | 39.18% | 37.61% | 40.25% |
| 15 | 360541 | 2982 | 0.83% | 74.63% | 77.98% | 75.14% | 73.77% | 75.38% |
| 16 | 364160 | 6601 | 1.85% | 66.26% | 66.95% | 62.77% | 59.04% | 63.75% |
| 17 | 360570 | 3011 | 0.84% | 26.18% | 40.58% | 33.82% | 33.82% | 33.60% |
| 18 | 350744 | -6815 | -1.91% | 41.51% | 51.68% | 46.73% | 44.97% | 46.22% |
| 19 | 366726 | 9167 | 2.56% | 59.46% | 59.80% | 55.51% | 52.67% | 56.86% |
| 20 | 367328 | 9769 | 2.73% | 32.52% | 42.85% | 36.28% | 35.13% | 36.69% |
| 21 | 345323 | -12236 | -3.42% | 77.95% | 84.47% | 81.32% | 81.14% | 81.22% |
| 22 | 356151 | -1408 | -0.39% | 27.53% | 39.01% | 33.52% | 33.20% | 33.32% |
| 23 | 353688 | -3871 | -1.08% | 56.74% | 62.78% | 57.09% | 55.20% | 57.95% |
| 24 | 340581 | -16978 | -4.75% | 50.55% | 57.06% | 51.25% | 49.59% | 52.11% |
| 25 | 341293 | -16266 | -4.55% | 83.32% | 85.89% | 82.91% | 82.44% | 83.64% |
| 26 | 354229 | -3330 | -0.93% | 29.61% | 41.69% | 34.23% | 33.23% | 34.69% |
| 27 | 368625 | 11066 | 3.09% | 45.74% | 51.94% | 46.66% | 44.98% | 47.33% |
| 28 | 354273 | -3286 | -0.92% | 56.08% | 63.32% | 60.46% | 58.53% | 59.60% |
| 29 | 374853 | 17294 | 4.84% | 40.59% | 49.05% | 44.17% | 43.34% | 44.29% |
| 30 | 367301 | 9742 | 2.72% | 31.86% | 47.30% | 39.48% | 40.95% | 39.90% |
| 31 | 366181 | 8622 | 2.41% | 34.47% | 41.44% | 36.41% | 34.77% | 36.77% |
| 32 | 352328 | -5231 | -1.46% | 41.19% | 51.13% | 44.04% | 43.38% | 44.93% |
| 33 | 359193 | 1634 | 0.46% | 47.17% | 58.86% | 54.31% | 52.89% | 53.31% |
| **Total** | **11,799,448** | | **9.59%** | | | | | |

Exhibit H-1

User:
Plan Name: **adopted_House_9_15_vtd**
Plan Type: **Senate**

# Measures of Compactness Report

Wednesday, September 22, 2021                                                                                      8:28 AM

|        | **Reock** | **Polsby-Popper** |
|--------|-----------|-------------------|
| Sum    | N/A       | N/A               |
| Min    | 0.20      | 0.08              |
| Max    | 0.63      | 0.78              |
| Mean   | 0.40      | 0.30              |
| Std. Dev. | 0.10   | 0.15              |

| **District** | **Reock** | **Polsby-Popper** |
|--------------|-----------|-------------------|
| 1            | 0.22      | 0.20              |
| 2            | 0.24      | 0.12              |
| 3            | 0.46      | 0.33              |
| 4            | 0.39      | 0.14              |
| 5            | 0.36      | 0.15              |
| 6            | 0.44      | 0.14              |
| 7            | 0.39      | 0.14              |
| 8            | 0.46      | 0.22              |
| 9            | 0.27      | 0.16              |
| 10           | 0.37      | 0.14              |
| 11           | 0.40      | 0.09              |

**Maptitude**
For Redistricting

# Measures of Compactness Report

|          | Reock | Polsby-Popper |
|----------|-------|---------------|
| Sum      | N/A   | N/A           |
| Min      | 0.20  | 0.08          |
| Max      | 0.63  | 0.78          |
| Mean     | 0.40  | 0.30          |
| Std. Dev.| 0.10  | 0.15          |

| District | Reock | Polsby-Popper |
|----------|-------|---------------|
| 12       | 0.43  | 0.44          |
| 13       | 0.43  | 0.44          |
| 14       | 0.35  | 0.30          |
| 15       | 0.51  | 0.49          |
| 16       | 0.51  | 0.41          |
| 17       | 0.38  | 0.30          |
| 18       | 0.44  | 0.19          |
| 19       | 0.43  | 0.27          |
| 20       | 0.20  | 0.17          |
| 21       | 0.40  | 0.24          |
| 22       | 0.38  | 0.16          |
| 23       | 0.38  | 0.25          |
| 24       | 0.23  | 0.13          |
| 25       | 0.41  | 0.12          |

# Measures of Compactness Report

adopted_House_9_15_vtd

|  | Reock | Polsby-Popper |
|---|---|---|
| Sum | N/A | N/A |
| Min | 0.20 | 0.08 |
| Max | 0.63 | 0.78 |
| Mean | 0.40 | 0.30 |
| Std. Dev. | 0.10 | 0.15 |

| District | Reock | Polsby-Popper |
|---|---|---|
| 26 | 0.38 | 0.14 |
| 27 | 0.28 | 0.14 |
| 28 | 0.39 | 0.13 |
| 29 | 0.33 | 0.31 |
| 30 | 0.37 | 0.23 |
| 31 | 0.25 | 0.13 |
| 32 | 0.38 | 0.18 |
| 33 | 0.39 | 0.12 |
| 34 | 0.37 | 0.17 |
| 35 | 0.30 | 0.16 |
| 36 | 0.38 | 0.12 |
| 37 | 0.33 | 0.23 |
| 38 | 0.38 | 0.08 |
| 39 | 0.54 | 0.18 |

# Measures of Compactness Report

|          | Reock | Polsby-Popper |
|----------|-------|---------------|
| Sum      | N/A   | N/A           |
| Min      | 0.20  | 0.08          |
| Max      | 0.63  | 0.78          |
| Mean     | 0.40  | 0.30          |
| Std. Dev.| 0.10  | 0.15          |

| District | Reock | Polsby-Popper |
|----------|-------|---------------|
| 40       | 0.23  | 0.18          |
| 41       | 0.56  | 0.34          |
| 42       | 0.47  | 0.25          |
| 43       | 0.26  | 0.16          |
| 44       | 0.33  | 0.23          |
| 45       | 0.24  | 0.22          |
| 46       | 0.52  | 0.27          |
| 47       | 0.29  | 0.09          |
| 48       | 0.51  | 0.20          |
| 49       | 0.33  | 0.10          |
| 50       | 0.45  | 0.42          |
| 51       | 0.36  | 0.15          |
| 52       | 0.46  | 0.21          |
| 53       | 0.27  | 0.24          |

## Measures of Compactness Report

|  | Reock | Polsby-Popper |
|---|---|---|
| Sum | N/A | N/A |
| Min | 0.20 | 0.08 |
| Max | 0.63 | 0.78 |
| Mean | 0.40 | 0.30 |
| Std. Dev. | 0.10 | 0.15 |

| District | Reock | Polsby-Popper |
|---|---|---|
| 54 | 0.48 | 0.37 |
| 55 | 0.40 | 0.28 |
| 56 | 0.31 | 0.32 |
| 57 | 0.46 | 0.29 |
| 58 | 0.38 | 0.36 |
| 59 | 0.40 | 0.30 |
| 60 | 0.59 | 0.53 |
| 61 | 0.38 | 0.31 |
| 62 | 0.46 | 0.47 |
| 63 | 0.59 | 0.55 |
| 64 | 0.39 | 0.32 |
| 65 | 0.41 | 0.30 |
| 66 | 0.40 | 0.47 |
| 67 | 0.23 | 0.26 |

## Measures of Compactness Report

|           | Reock | Polsby-Popper |
|-----------|-------|---------------|
| Sum       | N/A   | N/A           |
| Min       | 0.20  | 0.08          |
| Max       | 0.63  | 0.78          |
| Mean      | 0.40  | 0.30          |
| Std. Dev. | 0.10  | 0.15          |

| District | Reock | Polsby-Popper |
|----------|-------|---------------|
| 68 | 0.56 | 0.33 |
| 69 | 0.25 | 0.20 |
| 70 | 0.38 | 0.34 |
| 71 | 0.41 | 0.32 |
| 72 | 0.36 | 0.51 |
| 73 | 0.54 | 0.45 |
| 74 | 0.40 | 0.34 |
| 75 | 0.32 | 0.40 |
| 76 | 0.40 | 0.33 |
| 77 | 0.48 | 0.58 |
| 78 | 0.63 | 0.78 |
| 79 | 0.41 | 0.42 |
| 80 | 0.39 | 0.48 |
| 81 | 0.50 | 0.61 |

## Measures of Compactness Report

|  | Reock | Polsby-Popper |
|---|---|---|
| Sum | N/A | N/A |
| Min | 0.20 | 0.08 |
| Max | 0.63 | 0.78 |
| Mean | 0.40 | 0.30 |
| Std. Dev. | 0.10 | 0.15 |

| District | Reock | Polsby-Popper |
|---|---|---|
| 82 | 0.35 | 0.46 |
| 83 | 0.33 | 0.34 |
| 84 | 0.42 | 0.41 |
| 85 | 0.47 | 0.55 |
| 86 | 0.52 | 0.49 |
| 87 | 0.51 | 0.44 |
| 88 | 0.58 | 0.71 |
| 89 | 0.42 | 0.50 |
| 90 | 0.39 | 0.38 |
| 91 | 0.54 | 0.58 |
| 92 | 0.27 | 0.23 |
| 93 | 0.29 | 0.26 |
| 94 | 0.50 | 0.32 |
| 95 | 0.38 | 0.28 |

# Measures of Compactness Report

|  | Reock | Polsby-Popper |
|---|---|---|
| Sum | N/A | N/A |
| Min | 0.20 | 0.08 |
| Max | 0.63 | 0.78 |
| Mean | 0.40 | 0.30 |
| Std. Dev. | 0.10 | 0.15 |

| District | Reock | Polsby-Popper |
|---|---|---|
| 96 | 0.27 | 0.27 |
| 97 | 0.51 | 0.45 |
| 98 | 0.28 | 0.27 |
| 99 | 0.35 | 0.31 |

## Measures of Compactness Report

Measures of Compactness Summary

| | |
|---|---|
| **Reock** | The measure is always between 0 and 1, with 1 being the most compact. |
| **Polsby-Popper** | The measure is always between 0 and 1, with 1 being the most compact. |

Exhibit H-2

User:
Plan Name: **adopted_Senate_9_15_vtd**
Plan Type: **Senate**

## Measures of Compactness Report

Wednesday, September 22, 2021                                                                                                      8:30 AM

|          | **Reock** | **Polsby-Popper** |
|----------|-----------|-------------------|
| Sum      | N/A       | N/A               |
| Min      | 0.26      | 0.06              |
| Max      | 0.59      | 0.65              |
| Mean     | 0.39      | 0.31              |
| Std. Dev.| 0.09      | 0.15              |

| **District** | **Reock** | **Polsby-Popper** |
|--------------|-----------|-------------------|
| 1            | 0.42      | 0.33              |
| 2            | 0.33      | 0.24              |
| 3            | 0.33      | 0.06              |
| 4            | 0.51      | 0.35              |
| 5            | 0.48      | 0.20              |
| 6            | 0.41      | 0.10              |
| 7            | 0.33      | 0.24              |
| 8            | 0.35      | 0.18              |
| 9            | 0.33      | 0.09              |
| 10           | 0.45      | 0.53              |
| 11           | 0.28      | 0.32              |

**Maptitude**
For Redistricting

# Measures of Compactness Report

|  | Reock | Polsby-Popper |
|---|---|---|
| Sum | N/A | N/A |
| Min | 0.26 | 0.06 |
| Max | 0.59 | 0.65 |
| Mean | 0.39 | 0.31 |
| Std. Dev. | 0.09 | 0.15 |

| District | Reock | Polsby-Popper |
|---|---|---|
| 12 | 0.51 | 0.43 |
| 13 | 0.32 | 0.39 |
| 14 | 0.30 | 0.33 |
| 15 | 0.39 | 0.16 |
| 16 | 0.26 | 0.20 |
| 17 | 0.39 | 0.32 |
| 18 | 0.59 | 0.65 |
| 19 | 0.27 | 0.29 |
| 20 | 0.37 | 0.38 |
| 21 | 0.44 | 0.21 |
| 22 | 0.49 | 0.53 |
| 23 | 0.46 | 0.43 |
| 24 | 0.44 | 0.41 |
| 25 | 0.30 | 0.09 |

# Measures of Compactness Report

|           | Reock | Polsby-Popper |
|-----------|-------|---------------|
| Sum       | N/A   | N/A           |
| Min       | 0.26  | 0.06          |
| Max       | 0.59  | 0.65          |
| Mean      | 0.39  | 0.31          |
| Std. Dev. | 0.09  | 0.15          |

| District | Reock | Polsby-Popper |
|----------|-------|---------------|
| 26       | 0.42  | 0.31          |
| 27       | 0.27  | 0.12          |
| 28       | 0.49  | 0.36          |
| 29       | 0.55  | 0.39          |
| 30       | 0.31  | 0.31          |
| 31       | 0.30  | 0.29          |
| 32       | 0.44  | 0.55          |
| 33       | 0.45  | 0.51          |

# Measures of Compactness Report

Measures of Compactness Summary

| | |
|---|---|
| **Reock** | The measure is always between 0 and 1, with 1 being the most compact. |
| **Polsby-Popper** | The measure is always between 0 and 1, with 1 being the most compact. |

User:
Plan Name: **adopted_House_9_15_vtd**
Plan Type: **Senate**

# Political Subdivison Splits Between Districts

Wednesday, September 22, 2021                                                                                    8:33 AM

## Split Counts

| Number of subdivisions split into more than one district: | | Number of splits involving no population: | |
|---|---|---|---|
| County | 35 | County | 0 |
| Voting District | 110 | Voting District | 31 |

Number of times a subdivision is split into multiple districts:

| | |
|---|---|
| County | 72 |
| Voting District | 118 |

| County | Voting District | District | Population |
|---|---|---|---|
| *Split Counties:* | | | |
| Ashtabula OH | | 57 | 16,522 |
| Ashtabula OH | | 99 | 81,052 |
| Auglaize OH | | 84 | 34,142 |
| Auglaize OH | | 86 | 12,280 |
| Belmont OH | | 95 | 20,908 |
| Belmont OH | | 96 | 45,589 |
| Brown OH | | 63 | 29,368 |
| Brown OH | | 90 | 14,308 |
| Butler OH | | 39 | 21,420 |
| Butler OH | | 44 | 123,473 |
| Butler OH | | 45 | 123,472 |
| Butler OH | | 46 | 121,992 |
| Clark OH | | 71 | 19,879 |
| Clark OH | | 75 | 116,122 |
| Clermont OH | | 62 | 124,425 |
| Clermont OH | | 63 | 84,176 |
| Columbiana OH | | 59 | 10,783 |
| Columbiana OH | | 79 | 91,094 |
| Cuyahoga OH | | 13 | 124,554 |
| Cuyahoga OH | | 14 | 125,064 |
| Cuyahoga OH | | 15 | 125,088 |
| Cuyahoga OH | | 16 | 121,879 |
| Cuyahoga OH | | 17 | 124,819 |
| Cuyahoga OH | | 18 | 123,226 |
| Cuyahoga OH | | 19 | 124,679 |
| Cuyahoga OH | | 20 | 125,098 |
| Cuyahoga OH | | 21 | 122,023 |
| Cuyahoga OH | | 22 | 124,633 |
| Cuyahoga OH | | 23 | 23,754 |
| Darke OH | | 80 | 15,437 |
| Darke OH | | 84 | 36,444 |
| Defiance OH | | 81 | 6,010 |
| Defiance OH | | 82 | 32,276 |

## Political Subdivison Splits Between Districts

| County | Voting District | District | Population |
|---|---|---|---|
| Delaware OH | | 60 | 113,964 |
| Delaware OH | | 61 | 100,160 |
| Fairfield OH | | 73 | 123,971 |
| Fairfield OH | | 74 | 34,950 |
| Franklin OH | | 1 | 115,498 |
| Franklin OH | | 2 | 117,559 |
| Franklin OH | | 3 | 114,104 |
| Franklin OH | | 4 | 114,500 |
| Franklin OH | | 5 | 116,735 |
| Franklin OH | | 6 | 115,517 |
| Franklin OH | | 7 | 115,170 |
| Franklin OH | | 8 | 115,189 |
| Franklin OH | | 9 | 120,997 |
| Franklin OH | | 10 | 113,326 |
| Franklin OH | | 11 | 114,236 |
| Franklin OH | | 12 | 50,976 |
| Geauga OH | | 23 | 51,337 |
| Geauga OH | | 99 | 44,060 |
| Greene OH | | 70 | 116,643 |
| Greene OH | | 71 | 51,323 |
| Hamilton OH | | 24 | 123,469 |
| Hamilton OH | | 25 | 123,568 |
| Hamilton OH | | 26 | 124,802 |
| Hamilton OH | | 27 | 116,286 |
| Hamilton OH | | 28 | 114,050 |
| Hamilton OH | | 29 | 114,653 |
| Hamilton OH | | 30 | 113,811 |
| Hancock OH | | 43 | 11,226 |
| Hancock OH | | 83 | 63,694 |
| Holmes OH | | 69 | 14,623 |
| Holmes OH | | 98 | 29,600 |
| Lake OH | | 56 | 124,454 |
| Lake OH | | 57 | 108,149 |
| Licking OH | | 68 | 115,385 |
| Licking OH | | 69 | 63,134 |
| Lorain OH | | 51 | 125,115 |
| Lorain OH | | 52 | 124,642 |
| Lorain OH | | 53 | 63,207 |
| Lucas OH | | 40 | 113,280 |
| Lucas OH | | 41 | 113,996 |
| Lucas OH | | 42 | 115,350 |
| Lucas OH | | 43 | 88,653 |
| Mahoning OH | | 58 | 116,292 |
| Mahoning OH | | 59 | 112,322 |
| Medina OH | | 66 | 116,342 |
| Medina OH | | 67 | 66,128 |
| Montgomery OH | | 35 | 121,171 |

## Political Subdivison Splits Between Districts

| County | Voting District | District | Population |
|---|---|---|---|
| Montgomery OH | | 36 | 114,991 |
| Montgomery OH | | 37 | 125,125 |
| Montgomery OH | | 38 | 122,075 |
| Montgomery OH | | 39 | 53,947 |
| Morrow OH | | 61 | 13,700 |
| Morrow OH | | 98 | 21,250 |
| Portage OH | | 65 | 39,779 |
| Portage OH | | 72 | 122,012 |
| Stark OH | | 47 | 115,745 |
| Stark OH | | 48 | 113,975 |
| Stark OH | | 49 | 124,555 |
| Stark OH | | 50 | 20,578 |
| Summit OH | | 23 | 47,684 |
| Summit OH | | 31 | 124,467 |
| Summit OH | | 32 | 122,679 |
| Summit OH | | 33 | 123,791 |
| Summit OH | | 34 | 121,807 |
| Trumbull OH | | 64 | 124,731 |
| Trumbull OH | | 65 | 77,246 |
| Warren OH | | 54 | 121,704 |
| Warren OH | | 55 | 120,633 |
| Washington OH | | 94 | 23,688 |
| Washington OH | | 95 | 36,083 |
| Wood OH | | 43 | 15,925 |
| Wood OH | | 76 | 116,323 |
| Wyandot OH | | 83 | 15,851 |
| Wyandot OH | | 87 | 6,049 |
| *Split  VTDs:* | | | |
| Auglaize OH | DUCHOUQUET E | 84 | 2 |
| Auglaize OH | DUCHOUQUET E | 86 | 1,863 |
| Auglaize OH | DUCHOUQUET W | 84 | 703 |
| Auglaize OH | DUCHOUQUET W | 86 | 451 |
| Auglaize OH | MOULTON | 84 | 0 |
| Auglaize OH | MOULTON | 86 | 1,585 |
| Auglaize OH | NOBLE | 84 | 16 |
| Auglaize OH | NOBLE | 86 | 1,199 |
| Auglaize OH | WAPAKONETA 2B | 84 | 1,221 |
| Auglaize OH | WAPAKONETA 2B | 86 | 0 |
| Butler OH | HANOVER TWP 7 | 44 | 1,309 |
| Butler OH | HANOVER TWP 7 | 45 | 6 |
| Butler OH | MADISON TWP 5 | 39 | 249 |
| Butler OH | MADISON TWP 5 | 46 | 298 |
| Butler OH | ROSS TWP 4 | 44 | 5 |
| Butler OH | ROSS TWP 4 | 45 | 1,328 |
| Butler OH | ST. CLAIR TWP 1 | 39 | 1 |
| Butler OH | ST. CLAIR TWP 1 | 46 | 1,452 |
| Butler OH | ST. CLAIR TWP 2 | 39 | 251 |

## Political Subdivison Splits Between Districts

| County | Voting District | District | Population |
|--------|-----------------|----------|-----------|
| Butler OH | ST. CLAIR TWP 2 | 44 | 0 |
| Butler OH | ST. CLAIR TWP 2 | 46 | 275 |
| Butler OH | ST. CLAIR TWP 5 | 44 | 828 |
| Butler OH | ST. CLAIR TWP 5 | 46 | 122 |
| Clark OH | MR-1 | 71 | 1,657 |
| Clark OH | MR-1 | 75 | 0 |
| Clermont OH | BATAVIA TWP H | 62 | 0 |
| Clermont OH | BATAVIA TWP H | 63 | 1,046 |
| Cuyahoga OH | CLEVELAND-09-H | 18 | 114 |
| Cuyahoga OH | CLEVELAND-09-H | 20 | 724 |
| Cuyahoga OH | CLEVELAND-09-I | 18 | 288 |
| Cuyahoga OH | CLEVELAND-09-I | 20 | 353 |
| Cuyahoga OH | CLEVELAND-09-K | 18 | 423 |
| Cuyahoga OH | CLEVELAND-09-K | 20 | 194 |
| Cuyahoga OH | CLEVELAND-11-A | 13 | 851 |
| Cuyahoga OH | CLEVELAND-11-A | 14 | 378 |
| Cuyahoga OH | UNIVERSITY HEIGHTS-00-D | 19 | 1,269 |
| Cuyahoga OH | UNIVERSITY HEIGHTS-00-D | 21 | 6 |
| Fairfield OH | BLOOM B | 73 | 0 |
| Fairfield OH | BLOOM B | 74 | 1,655 |
| Fairfield OH | VIOLET D | 73 | 1,503 |
| Fairfield OH | VIOLET D | 74 | 0 |
| Franklin OH | BLENDON-B | 4 | 499 |
| Franklin OH | BLENDON-B | 9 | 3 |
| Franklin OH | BLENDON-C | 4 | 1,091 |
| Franklin OH | BLENDON-C | 9 | 530 |
| Franklin OH | BLENDON-D | 4 | 1,950 |
| Franklin OH | BLENDON-D | 9 | 39 |
| Franklin OH | BROWN-B | 10 | 692 |
| Franklin OH | BROWN-B | 11 | 250 |
| Franklin OH | CLINTON-A | 3 | 1,392 |
| Franklin OH | CLINTON-A | 7 | 121 |
| Franklin OH | CLINTON-A | 8 | 0 |
| Franklin OH | COLS 37-C | 5 | 3,242 |
| Franklin OH | COLS 37-C | 10 | 52 |
| Franklin OH | FRANKLIN-C | 6 | 1,294 |
| Franklin OH | FRANKLIN-C | 7 | 17 |
| Franklin OH | FRANKLIN-D | 1 | 0 |
| Franklin OH | FRANKLIN-D | 5 | 27 |
| Franklin OH | FRANKLIN-D | 6 | 1,541 |
| Franklin OH | HAMILTON-A | 2 | 0 |
| Franklin OH | HAMILTON-A | 5 | 1,351 |
| Franklin OH | JACKSON-A | 5 | 0 |
| Franklin OH | JACKSON-A | 6 | 77 |
| Franklin OH | JACKSON-A | 10 | 1,060 |

## Political Subdivison Splits Between Districts

| County | Voting District | District | Population |
|---|---|---|---|
| Franklin OH | JEFFERSON-H | 2 | 52 |
| Franklin OH | JEFFERSON-H | 4 | 1,736 |
| Franklin OH | JEFFERSON-H | 5 | 34 |
| Franklin OH | MADISON-C | 2 | 15 |
| Franklin OH | MADISON-C | 5 | 1,405 |
| Franklin OH | MADISON-D | 2 | 0 |
| Franklin OH | MADISON-D | 5 | 2,027 |
| Franklin OH | NEW ALBANY-A | 4 | 1,535 |
| Franklin OH | NEW ALBANY-A | 9 | 30 |
| Franklin OH | NORWICH-A | 7 | 6 |
| Franklin OH | NORWICH-A | 10 | 1,151 |
| Franklin OH | NORWICH-A | 11 | 115 |
| Franklin OH | PERRY-B | 8 | 28 |
| Franklin OH | PERRY-B | 11 | 1,149 |
| Franklin OH | PERRY-C | 7 | 309 |
| Franklin OH | PERRY-C | 8 | 221 |
| Franklin OH | PERRY-C | 11 | 34 |
| Franklin OH | PLAIN-A | 4 | 405 |
| Franklin OH | PLAIN-A | 9 | 60 |
| Franklin OH | PRAIRIE-C | 6 | 662 |
| Franklin OH | PRAIRIE-C | 10 | 480 |
| Franklin OH | PRAIRIE-E | 6 | 3 |
| Franklin OH | PRAIRIE-E | 10 | 1,550 |
| Franklin OH | PRAIRIE-K | 6 | 35 |
| Franklin OH | PRAIRIE-K | 10 | 633 |
| Franklin OH | SHARON-A | 4 | 3 |
| Franklin OH | SHARON-A | 8 | 796 |
| Franklin OH | SHARON-A | 9 | 57 |
| Franklin OH | TRURO-A | 2 | 17 |
| Franklin OH | TRURO-A | 5 | 155 |
| Franklin OH | WASHINGTON-A | 11 | 8 |
| Franklin OH | WASHINGTON-A | 12 | 985 |
| Hamilton OH | DELHI A | 24 | 9 |
| Hamilton OH | DELHI A | 30 | 2,005 |
| Hamilton OH | NORWOOD 4-C | 25 | 0 |
| Hamilton OH | NORWOOD 4-C | 26 | 1,572 |
| Hamilton OH | WHITEWATER A | 29 | 1,865 |
| Hamilton OH | WHITEWATER A | 30 | 0 |
| Hancock OH | ALLEN TWP WEST-VAN BUREN | 43 | 1,475 |
| Hancock OH | ALLEN TWP WEST-VAN BUREN | 83 | 0 |
| Licking OH | HARRISON TWP A | 68 | 7 |
| Licking OH | HARRISON TWP A | 69 | 1,484 |
| Licking OH | MADISON TWP A | 68 | 10 |
| Licking OH | MADISON TWP A | 69 | 1,906 |
| Licking OH | PATASKALA 1-B | 68 | 2,795 |

## Political Subdivison Splits Between Districts

| County | Voting District | District | Population |
|---|---|---|---|
| Licking OH | PATASKALA 1-B | 69 | 15 |
| Lorain OH | CARLISLE TWP #1 | 51 | 6 |
| Lorain OH | CARLISLE TWP #1 | 52 | 897 |
| Lorain OH | CARLISLE TWP #2 | 51 | 20 |
| Lorain OH | CARLISLE TWP #2 | 52 | 1,943 |
| Lorain OH | EATON TWP #1 | 51 | 9 |
| Lorain OH | EATON TWP #1 | 52 | 1,763 |
| Lorain OH | GRAFTON TWP #1 | 52 | 0 |
| Lorain OH | GRAFTON TWP #1 | 53 | 1,496 |
| Lorain OH | GRAFTON VILL #1/#2 | 52 | 1,128 |
| Lorain OH | GRAFTON VILL #1/#2 | 53 | 6 |
| Lucas OH | MAUMEE 1 | 40 | 1,452 |
| Lucas OH | MAUMEE 1 | 43 | 0 |
| Lucas OH | SYLVANIA TOWNSHIP A | 42 | 123 |
| Lucas OH | SYLVANIA TOWNSHIP A | 43 | 1,515 |
| Medina OH | YORK TWP A | 66 | 36 |
| Medina OH | YORK TWP A | 67 | 1,180 |
| Montgomery OH | CLAY-B | 35 | 1,088 |
| Montgomery OH | CLAY-B | 39 | 13 |
| Montgomery OH | CLAY-C | 35 | 1,613 |
| Montgomery OH | CLAY-C | 39 | 0 |
| Montgomery OH | DAYTON 3-B | 35 | 9 |
| Montgomery OH | DAYTON 3-B | 38 | 1,064 |
| Montgomery OH | JEFFERSON-B | 36 | 251 |
| Montgomery OH | JEFFERSON-B | 39 | 1,667 |
| Montgomery OH | JEFFERSON-C | 36 | 63 |
| Montgomery OH | JEFFERSON-C | 39 | 1,439 |
| Montgomery OH | MIAMI-C | 37 | 470 |
| Montgomery OH | MIAMI-C | 39 | 1,051 |
| Montgomery OH | MIAMI-G | 36 | 0 |
| Montgomery OH | MIAMI-G | 37 | 1,561 |
| Montgomery OH | RIVERSIDE-B | 35 | 373 |
| Montgomery OH | RIVERSIDE-B | 38 | 1,821 |
| Montgomery OH | TROTWOOD 4-A | 38 | 18 |
| Montgomery OH | TROTWOOD 4-A | 39 | 1,426 |
| Montgomery OH | TROTWOOD 4-C | 38 | 153 |
| Montgomery OH | TROTWOOD 4-C | 39 | 1,176 |
| Stark OH | CANTON TWP 1 | 47 | 1,560 |
| Stark OH | CANTON TWP 1 | 49 | 58 |
| Stark OH | CANTON TWP 6 | 47 | 1,710 |
| Stark OH | CANTON TWP 6 | 49 | 33 |
| Stark OH | JACKSON TWP 1 | 47 | 42 |
| Stark OH | JACKSON TWP 1 | 49 | 1,987 |
| Stark OH | NIMISHILLEN TWP 1 | 47 | 36 |
| Stark OH | NIMISHILLEN TWP 1 | 48 | 1,121 |
| Stark OH | NIMISHILLEN TWP 2 | 47 | 54 |
| Stark OH | NIMISHILLEN TWP 2 | 48 | 959 |

## Political Subdivison Splits Between Districts

| County | Voting District | District | Population |
|---|---|---|---|
| Stark OH | OSNABURG TWP 3 | 47 | 1,611 |
| Stark OH | OSNABURG TWP 3 | 49 | 0 |
| Stark OH | PERRY TWP 4 | 47 | 1,826 |
| Stark OH | PERRY TWP 4 | 50 | 106 |
| Stark OH | PIKE TWP 3 | 47 | 0 |
| Stark OH | PIKE TWP 3 | 50 | 1,138 |
| Stark OH | PLAIN TWP 12 | 48 | 1,106 |
| Stark OH | PLAIN TWP 12 | 49 | 17 |
| Stark OH | PLAIN TWP 2 | 48 | 792 |
| Stark OH | PLAIN TWP 2 | 49 | 978 |
| Stark OH | PLAIN TWP 23 | 48 | 421 |
| Stark OH | PLAIN TWP 23 | 49 | 937 |
| Stark OH | PLAIN TWP 25 | 48 | 1,137 |
| Stark OH | PLAIN TWP 25 | 49 | 0 |
| Stark OH | PLAIN TWP 4 | 48 | 903 |
| Stark OH | PLAIN TWP 4 | 49 | 134 |
| Stark OH | PLAIN TWP 6 | 48 | 749 |
| Stark OH | PLAIN TWP 6 | 49 | 141 |
| Stark OH | TUSCARAWAS TWP 2 | 47 | 200 |
| Stark OH | TUSCARAWAS TWP 2 | 50 | 1,617 |
| Stark OH | WASHINGTON TWP 1 | 47 | 1,621 |
| Stark OH | WASHINGTON TWP 1 | 48 | 57 |
| Summit OH | BATH TWP A | 31 | 1,190 |
| Summit OH | BATH TWP A | 34 | 0 |
| Summit OH | BATH TWP D | 31 | 1,065 |
| Summit OH | BATH TWP D | 34 | 96 |
| Summit OH | COVENTRY TWP A | 32 | 1,414 |
| Summit OH | COVENTRY TWP A | 33 | 18 |
| Summit OH | COVENTRY TWP D | 32 | 1,228 |
| Summit OH | COVENTRY TWP D | 33 | 13 |
| Summit OH | COVENTRY TWP E | 31 | 63 |
| Summit OH | COVENTRY TWP E | 32 | 1,168 |
| Summit OH | HUDSON 2-A | 23 | 0 |
| Summit OH | HUDSON 2-A | 31 | 1,472 |
| Summit OH | NEW FRANKLIN 1-C | 31 | 1,052 |
| Summit OH | NEW FRANKLIN 1-C | 32 | 0 |
| Summit OH | NEW FRANKLIN 4-A | 31 | 1,101 |
| Summit OH | NEW FRANKLIN 4-A | 32 | 0 |
| Summit OH | SAGAMORE HILLS TWP I | 23 | 48 |
| Summit OH | SAGAMORE HILLS TWP I | 31 | 719 |
| Summit OH | SPRINGFIELD TWP A | 32 | 1,665 |
| Summit OH | SPRINGFIELD TWP A | 33 | 0 |
| Summit OH | TWINSBURG TWP C | 23 | 1,149 |
| Summit OH | TWINSBURG TWP C | 31 | 15 |
| Trumbull OH | WARREN TWP B | 64 | 44 |
| Trumbull OH | WARREN TWP B | 65 | 1,182 |
| Trumbull OH | WARREN TWP D | 64 | 14 |

## Political Subdivison Splits Between Districts

| County | Voting District | District | Population |
|--------|-----------------|----------|-----------|
| Trumbull OH | WARREN TWP D | 65 | 1,246 |
| Trumbull OH | WARREN TWP E | 64 | 6 |
| Trumbull OH | WARREN TWP E | 65 | 1,239 |
| Trumbull OH | WARREN TWP F | 64 | 102 |
| Trumbull OH | WARREN TWP F | 65 | 911 |
| Warren OH | DEERFIELD TWP E | 54 | 1,131 |
| Warren OH | DEERFIELD TWP E | 55 | 0 |
| Warren OH | DEERFIELD TWP Z | 54 | 1,418 |
| Warren OH | DEERFIELD TWP Z | 55 | 0 |
| Warren OH | HAMILTON TWP A | 54 | 0 |
| Warren OH | HAMILTON TWP A | 55 | 818 |
| Warren OH | HAMILTON TWP F | 54 | 0 |
| Warren OH | HAMILTON TWP F | 55 | 1,286 |
| Warren OH | HAMILTON TWP U | 54 | 2 |
| Warren OH | HAMILTON TWP U | 55 | 1,049 |
| Warren OH | TURTLECREEK TWP A | 54 | 1,578 |
| Warren OH | TURTLECREEK TWP A | 55 | 372 |
| Warren OH | TURTLECREEK TWP L | 54 | 979 |
| Warren OH | TURTLECREEK TWP L | 55 | 860 |
| Washington OH | Warren NE | 94 | 1,120 |
| Washington OH | Warren NE | 95 | 40 |
| Wood OH | MIDDLETON TWP NORTH | 43 | 2,565 |
| Wood OH | MIDDLETON TWP NORTH | 76 | 124 |
| Wood OH | PLAIN TWP | 43 | 1,559 |
| Wood OH | PLAIN TWP | 76 | 66 |

Exhibit I-2

User:
Plan Name: **adopted_Senate_9_15_vtd**
Plan Type: **Senate**

# Political Subdivison Splits Between Districts

Wednesday, September 22, 2021                                                              8:32 AM

## Split Counts

| Number of subdivisions split into more than one district: | | Number of splits involving no population: | |
|---|---|---|---|
| County | 13 | County | 0 |
| Voting District | 45 | Voting District | 9 |

Number of times a subdivision is split into multiple districts:
| | |
|---|---|
| County | 18 |
| Voting District | 45 |

| County | Voting District | District | Population |
|---|---|---|---|
| *Split Counties:* | | | |
| Butler OH | | 4 | 368,937 |
| Butler OH | | 5 | 21,420 |
| Cuyahoga OH | | 21 | 371,335 |
| Cuyahoga OH | | 23 | 372,878 |
| Cuyahoga OH | | 24 | 372,031 |
| Cuyahoga OH | | 27 | 148,573 |
| Darke OH | | 5 | 15,437 |
| Darke OH | | 12 | 36,444 |
| Franklin OH | | 3 | 346,752 |
| Franklin OH | | 15 | 347,161 |
| Franklin OH | | 16 | 278,538 |
| Franklin OH | | 25 | 351,356 |
| Geauga OH | | 18 | 44,060 |
| Geauga OH | | 27 | 51,337 |
| Hamilton OH | | 7 | 116,286 |
| Hamilton OH | | 8 | 342,514 |
| Hamilton OH | | 9 | 371,839 |
| Hancock OH | | 1 | 63,694 |
| Hancock OH | | 2 | 11,226 |
| Holmes OH | | 19 | 29,600 |
| Holmes OH | | 31 | 14,623 |
| Lucas OH | | 2 | 88,653 |
| Lucas OH | | 11 | 342,626 |
| Montgomery OH | | 5 | 175,118 |
| Montgomery OH | | 6 | 362,191 |
| Stark OH | | 29 | 354,275 |
| Stark OH | | 31 | 20,578 |
| Summit OH | | 27 | 172,151 |
| Summit OH | | 28 | 368,277 |
| Wyandot OH | | 1 | 15,851 |
| Wyandot OH | | 26 | 6,049 |
| *Split VTDs:* | | | |
| Butler OH | MADISON TWP 5 | 4 | 298 |

## Political Subdivison Splits Between Districts

| County | Voting District | District | Population |
|---|---|---|---|
| Butler OH | MADISON TWP 5 | 5 | 249 |
| Butler OH | ST. CLAIR TWP 1 | 4 | 1,452 |
| Butler OH | ST. CLAIR TWP 1 | 5 | 1 |
| Butler OH | ST. CLAIR TWP 2 | 4 | 275 |
| Butler OH | ST. CLAIR TWP 2 | 5 | 251 |
| Cuyahoga OH | CLEVELAND-11-A | 23 | 851 |
| Cuyahoga OH | CLEVELAND-11-A | 24 | 378 |
| Franklin OH | BLENDON-B | 3 | 499 |
| Franklin OH | BLENDON-B | 25 | 3 |
| Franklin OH | BLENDON-C | 3 | 1,091 |
| Franklin OH | BLENDON-C | 25 | 530 |
| Franklin OH | BLENDON-D | 3 | 1,950 |
| Franklin OH | BLENDON-D | 25 | 39 |
| Franklin OH | CLINTON-A | 15 | 1,392 |
| Franklin OH | CLINTON-A | 25 | 121 |
| Franklin OH | COLS 37-C | 3 | 3,242 |
| Franklin OH | COLS 37-C | 16 | 52 |
| Franklin OH | FRANKLIN-C | 3 | 1,294 |
| Franklin OH | FRANKLIN-C | 25 | 17 |
| Franklin OH | FRANKLIN-D | 3 | 1,568 |
| Franklin OH | FRANKLIN-D | 15 | 0 |
| Franklin OH | HAMILTON-A | 3 | 1,351 |
| Franklin OH | HAMILTON-A | 15 | 0 |
| Franklin OH | JACKSON-A | 3 | 77 |
| Franklin OH | JACKSON-A | 16 | 1,060 |
| Franklin OH | JEFFERSON-H | 3 | 1,770 |
| Franklin OH | JEFFERSON-H | 15 | 52 |
| Franklin OH | MADISON-C | 3 | 1,405 |
| Franklin OH | MADISON-C | 15 | 15 |
| Franklin OH | MADISON-D | 3 | 2,027 |
| Franklin OH | MADISON-D | 15 | 0 |
| Franklin OH | NEW ALBANY-A | 3 | 1,535 |
| Franklin OH | NEW ALBANY-A | 25 | 30 |
| Franklin OH | NORWICH-A | 16 | 1,266 |
| Franklin OH | NORWICH-A | 25 | 6 |
| Franklin OH | PERRY-B | 16 | 1,149 |
| Franklin OH | PERRY-B | 25 | 28 |
| Franklin OH | PERRY-C | 16 | 34 |
| Franklin OH | PERRY-C | 25 | 530 |
| Franklin OH | PLAIN-A | 3 | 405 |
| Franklin OH | PLAIN-A | 25 | 60 |
| Franklin OH | PRAIRIE-C | 3 | 662 |
| Franklin OH | PRAIRIE-C | 16 | 480 |
| Franklin OH | PRAIRIE-E | 3 | 3 |
| Franklin OH | PRAIRIE-E | 16 | 1,550 |
| Franklin OH | PRAIRIE-K | 3 | 35 |
| Franklin OH | PRAIRIE-K | 16 | 633 |

## Political Subdivison Splits Between Districts

adopted_Senate_9_15_vtd

| County | Voting District | District | Population |
|--------|-----------------|---------:|----------:|
| Franklin OH | SHARON-A | 3 | 3 |
| Franklin OH | SHARON-A | 25 | 853 |
| Franklin OH | TRURO-A | 3 | 155 |
| Franklin OH | TRURO-A | 15 | 17 |
| Hamilton OH | DELHI A | 8 | 2,005 |
| Hamilton OH | DELHI A | 9 | 9 |
| Hancock OH | ALLEN TWP WEST-VAN BUREN | 1 | 0 |
| Hancock OH | ALLEN TWP WEST-VAN BUREN | 2 | 1,475 |
| Lucas OH | MAUMEE 1 | 2 | 0 |
| Lucas OH | MAUMEE 1 | 11 | 1,452 |
| Lucas OH | SYLVANIA TOWNSHIP A | 2 | 1,515 |
| Lucas OH | SYLVANIA TOWNSHIP A | 11 | 123 |
| Montgomery OH | DAYTON 3-B | 5 | 9 |
| Montgomery OH | DAYTON 3-B | 6 | 1,064 |
| Montgomery OH | JEFFERSON-B | 5 | 1,667 |
| Montgomery OH | JEFFERSON-B | 6 | 251 |
| Montgomery OH | JEFFERSON-C | 5 | 1,439 |
| Montgomery OH | JEFFERSON-C | 6 | 63 |
| Montgomery OH | MIAMI-C | 5 | 1,051 |
| Montgomery OH | MIAMI-C | 6 | 470 |
| Montgomery OH | RIVERSIDE-B | 5 | 373 |
| Montgomery OH | RIVERSIDE-B | 6 | 1,821 |
| Montgomery OH | TROTWOOD 4-A | 5 | 1,426 |
| Montgomery OH | TROTWOOD 4-A | 6 | 18 |
| Montgomery OH | TROTWOOD 4-C | 5 | 1,176 |
| Montgomery OH | TROTWOOD 4-C | 6 | 153 |
| Stark OH | PERRY TWP 4 | 29 | 1,826 |
| Stark OH | PERRY TWP 4 | 31 | 106 |
| Stark OH | PIKE TWP 3 | 29 | 0 |
| Stark OH | PIKE TWP 3 | 31 | 1,138 |
| Stark OH | TUSCARAWAS TWP 2 | 29 | 200 |
| Stark OH | TUSCARAWAS TWP 2 | 31 | 1,617 |
| Summit OH | BATH TWP A | 27 | 1,190 |
| Summit OH | BATH TWP A | 28 | 0 |
| Summit OH | BATH TWP D | 27 | 1,065 |
| Summit OH | BATH TWP D | 28 | 96 |
| Summit OH | COVENTRY TWP E | 27 | 63 |
| Summit OH | COVENTRY TWP E | 28 | 1,168 |
| Summit OH | NEW FRANKLIN 1-C | 27 | 1,052 |
| Summit OH | NEW FRANKLIN 1-C | 28 | 0 |
| Summit OH | NEW FRANKLIN 4-A | 27 | 1,101 |
| Summit OH | NEW FRANKLIN 4-A | 28 | 0 |

# Exhibit 10

# 8.27.21 Written Testimony of Collin Marozzi



Ohio

TO:         The Ohio Redistricting Commission

FROM:       Collin Marozzi, Policy Strategist, ACLU of Ohio

DATE:       August 27, 2021

RE:         General Assembly District Map Plan – Interested Party Testimony

My name is Collin Marozzi and I am a Policy Strategist at the American Civil Liberties Union of Ohio.  Thank you to The Ohio Redistricting Commission (The Commission) for this opportunity to testify.  With approximately eight million members, activists, and supporters nationwide -- and over 200,000 members, supporters, and activists representing all of Ohio's 88 counties, the American Civil Liberties Union (ACLU) is a nationwide organization that advances its mission of defending the principles of liberty and equality embodied in our Constitution and civil rights laws. Here in Ohio, this includes extensive work to safeguard our democracy and the right to vote, including fair and equal maps and representation.

As the Commission turns, for the first time in Ohio's history, to the task of drawing fair and representative maps, we remind you of the need to comply with the following:

First, Ohio's 2020 Census data reveals several trends that make the composition of the state of Ohio noticeably different than in 2010. The majority of Ohio's counties shrunk in population — in most rural areas, and city centers like Cleveland and Toledo. Meanwhile, the population has boomed in Ohio's capital and the suburbs surrounding Columbus. Population has also grown in the Cincinnati metropolitan area.

The Columbus and Cincinnati urban and suburban regions made up for population losses elsewhere. Franklin County grew by more than 160,000 people — a 13.8% increase. Neighboring Delaware, and Union counties both grew by more than 20%.  However, Ohio's total population grew by only 2.3%  — more slowly than the rest of the nation, resulting in the loss of a Congressional seat. The fact is, if not for sizable population growth in Ohio's minority communities, the state would have ended the decade smaller than it started it. The Commission must account for these demographic shifts when drawing new maps.

Ohio's stagnating population should incentivize this Commission to create fair and representative districts, and end the blight that gerrymandering has inflicted on the people of Ohio. According to public testimony given to this Commission, the people of Ohio feel left behind; victims of a gerrymandered system that perpetuates partisan extremism, stifles competitive elections, and emboldens legislators to neglect their constituents. Chris Warshaw,

 Associate Professor at George Washington University, wrote on the effects gerrymandering has on political attitudes and his research found data that "suggests that partisan gerrymandering not only distorts the link between elections and the legislature, it undermines Americans' faith in democracy itself.[1]" In light of witness testimony, it is evident Ohioans' faith in their government and representation needs to be restored.

 Next, we want to focus the attention of The Commission on its obligation to comply with Article XI, Section 6 of the Ohio Constitution[2]. The new requirements in Article XI, Section 6, were passed through ballot measure Issue 1 in 2015[3], with overwhelming public support, winning over 71% of the vote.

 Not only does the Ohio Constitution mandate compliance with Section 6. Compliance with Section 6 is the only way to ensure The Commission's legitimacy in the eyes of Ohio voters. Compliance with the population and jurisdiction splitting rules in Sections 3 and 4 is not the ultimate goal, but only the means to an end. Creating a General Assembly map that complies with the Standards prescribed in Section 6 is the ultimate goal. The end product of this Commission must be a map that provides for proportional partisan representation, and that doesn't primarily favor one political party over another. In this era of intentional extreme partisan gerrymanders, Ohio's Section 6(a) provides our citizens with an essential safeguard by removing any one political party's desired outcome from this process.

 In addition, Section 6(b) mandates that The Commission draw a General Assembly map in which the statewide proportion of districts reflects the statewide partisan vote share over the last decade[4]. In 2015, millions of Ohioans supported Issue 1, not because it called for a 10% allowable variance in Ohio's ratio of representation, and not because it created a procedure for determining incumbency following senate boundary line changes. The millions of Ohioans who supported Issue 1 did so because it promised to deliver fair, proportional, and bipartisan districts. Fulfilling that promise should be the goal of this Commission.

 We compiled data from all statewide partisan elections between 2012-2020. This data provides not only a close look into the statewide partisan preferences of Ohio voters, but also demonstrates how far our current map deviates from the essential protections of Section 6(b). In 2020, Republicans received just over half of the votes for statewide partisan races (53.3%), but won nearly two-thirds of the State House seats (64.6%) and more than three-fourths of state senate seats (75.8%). This level of variance violates the new rules established in Section 6(b), as the current map has afforded Republicans disproportionate representation in both the State House and State Senate in every election since 2012. In fact, over the past decade, Ohio Republicans have never had less than a 6 percentage point advantage in the state house and a

---

[1]  *APRI v. Householder* , 18-cv-357  (S.D. Ohio), Trial Ex. P571 (Dr. Chris Warshaw Report) at 10 (hereinafter Trial Ex. 571).

[2]  Ohio Const. art. XI § 6.

[3]  Ballotpedia, *Ohio Bipartisan Redistricting Commission Amendment, Issue 1 (2015)*, https://ballotpedia.org/Ohio_Bipartisan_Redistricting_Commission_Amendment,_Issue_1_(2015) (last visited Aug. 24, 2021).

[4] Ohio Const. art. XI § 6 ("That statewide proportion of districts whose voters, based on statewide state and federal partisan general election results during the last ten years, favor each political party shall correspond closely to the statewide preferences of the voters of Ohio.").

10 percentage point advantage in the state senate. Since 2014, the statewide vote share for Republicans has dropped, while their share of seats in the General Assembly has grown.

Tables 1 and 2, at the bottom of my testimony, demonstrates the discrepancy in statewide election vote totals and the allocation of General Assembly seats over the past ten years. Section 6(b) requires this Commission to create a General Assembly map with minimal variance between the vote share for all statewide partisan elections, and legislative seats. We look forward to finally ending an era where the representation in the General Assembly does not reflect the will of Ohio voters.

Lastly, we remind The Commission of Article XI, Section 1(c), which charges The Commission to seek public input on the proposed plan[5].  Because meaningful public input requires community members to first critically analyze the proposed map, we ask that The Commission share the proposed map in a form that supports public interaction, such as in a machine-readable electronic ESRI shapefile format, or, if shapefiles are not available, in a .csv-format Block Equivalency file. Meaningful public input also requires adequate time between a map's introduction and the constitutionally required public hearings. Adequate time is needed to conduct a thorough review and analysis before informed comments can be submitted to the Commission. We ask the Commission to allow for days - not hours - between a map's introduction, and the subsequent hearings.

Thank you to all Commissioners for your service in this vital task for our democracy, and I'm happy to answer any questions.

**Table 1: Average vote share for statewide candidates and share of the state house and state senate in Ohio, 2012-2020[6]**

| year | Rep. vote share - all statewide candidates | Dem. vote share - all statewide candidates | Other vote share - all statewide candidates | Rep. share of state house | Dem. share of state house | Rep. share of state senate | Dem. share of state senate |
|------|------|------|------|------|------|------|------|
| 2012 | 46.2% | 50.7% | 3.10% | 60.6% | 39.4% | 69.7% | 30.3% |
| 2014 | 59.7% | 37.7% | 2.54% | 65.7% | 34.3% | 69.7% | 30.3% |
| 2016 | 54.8% | 40.4% | 4.78% | 66.7% | 33.3% | 72.7% | 27.3% |

---

[5] Ohio Const. art. XI § 1.
[6] **https://www.ohiosos.gov/elections/election-results-and-data/?__cf_chl_jschl_tk__=pmd_Z8hLRrkFGR7A8ZSjsE1sG.zEeeGlfOO2aCcqyCZHvgw-1629835990-0-gqNtZGzNAjujcnBszQkR**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2018 | 51.2% | 46.9% | 1.88% | 61.6% | 38.4% | 72.7% | 27.3% |
| 2020 | 53.3% | 45.2% | 1.49% | 64.6% | 35.4% | 75.8% | 24.2% |
| **Avg.** | **53.04%** | **44.18%** | **2.76%** | **63.84%** | **36.16%** | **72.12%** | **27.88%** |

**Table 2: Electoral vote totals and vote share by year and contest for all statewide partisan contests[7]**

| Year | Contest | Dem. Votes | Rep. Votes | Other Votes | Rep. Vote % | Dem. Vote % |
|---|---|---|---|---|---|---|
| 2012 | President | 2827709 | 2661439 | 91791 | 47.7% | 50.7% |
| 2012 | Senate | 2762766 | 2435744 | 250618 | 44.7% | 50.7% |
| 2014 | Governor | 1009359 | 1944848 | 101706 | 63.6% | 33.0% |
| 2014 | Auditor | 1149305 | 1711927 | 143363 | 57.0% | 38.3% |
| 2014 | SoS | 1074475 | 1811020 | 141292 | 59.8% | 35.5% |
| 2014 | Treasurer | 1323325 | 1724060 | 0 | 56.6% | 43.4% |
| 2014 | Attorney General | 1178426 | 1882048 | 0 | 61.5% | 38.5% |
| 2016 | President | 2394164 | 2841005 | 261318 | 51.7% | 43.6% |
| 2016 | Senate | 1996908 | 3118567 | 258689 | 58.0% | 37.2% |
| 2018 | Governor | 2067847 | 2231917 | 129818 | 50.4% | 46.7% |

---

[7] **https://www.ohiosos.gov/elections/election-results-and-data/?__cf_chl_jschl_tk__=pmd_Z8hLRrkFGR7A8ZSjsE1sG.zEeeGlfOO2aCcqyCZHvgw-1629835990-0-gqNtZGzNAjujcnBszQkR**

| 2018 | Auditor | 2006204 | 2152769 | 175790 | 49.7% | 46.3% |
|------|---------|---------|---------|--------|-------|-------|
| 2018 | SoS | 2049944 | 2210356 | 103471 | 50.7% | 47.0% |
| 2018 | Treasurer | 2022016 | 2304444 | 0 | 53.3% | 46.7% |
| 2018 | Attorney General | 2084593 | 2272440 | 0 | 52.2% | 47.8% |
| 2020 | President | 2679165 | 3154834 | 88203 | 53.3% | 45.2% |