# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| Michael Gonidakis, *et al.*, | : | |
| | : | Case No. 2:22-cv-773 |
| Plaintiffs, | : | |
| | : | |
| v. | : | Circuit Judge Amul R. Thapar |
| | : | |
| Frank LaRose, | : | Chief Judge Algenon L. Marbley |
| | : | |
| Defendant. | : | Judge Benjamin J. Beaton |
| | : | |

## PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER TO MAINTAIN THE THIRD PLAN

Now come Plaintiffs Michael Gonidakis, Mary Parker, Margaret Conditt, Beth Ann Vanderkooi, Linda Smith, Delbert Duduit, Thomas W. Kidd Jr., and Ducia Hamm ("Plaintiffs"), by and through undersigned counsel, and move this Court for a temporary restraining order pursuant to Fed. R. Civ. P. 65(b) to enjoin the Ohio Secretary of State Frank LaRose, in his official capacity, and all persons acting on his behalf or in concert with him, from deviating from the status quo: implementing the Third Plan adopted by the Ohio Redistricting Commission. A Memorandum in Support of this Motion is attached.

Respectfully submitted,

**Isaac Wiles & Burkholder LLC**

*/s/ Donald C. Brey*
Donald C. Brey (0021965)
Brian M. Zets (0066544)
Matthew R. Aumann (0093612)
Ryan C. Spitzer (0093515)
Trista M. Turley (0093939)
Two Miranova Place, Suite 700
Columbus, Ohio 43215

Tel: 614-221-2121; Fax: 614-365-9516
dbrey@isaacwiles.com
bzets@isaacwiles.com
maumann@isaacwiles.com
rspitzer@isaacwiles.com
tturley@isaacwiles.com

*Attorneys for Plaintiffs Michael Gonidakis, Mary Parker, Margaret Conditt, Beth Ann Vanderkooi, Linda Smith, Delbert Duduit, Thomas W. Kidd, Jr., and Ducia Hamm*

**MEMORANDUM IN SUPPORT**

More than four weeks ago Plaintiffs asked for a preliminary injunction to protect their right to vote. With key election deadlines a month away, it was a prudent remedy. But since then, Secretary LaRose has started implementing the Ohio Redistricting Commission's Third Plan though he may stop at any time. Plaintiffs therefore seek a temporary restraining order to maintain the status quo, an election under the Third Plan, until this Court can rule on Plaintiffs' pending motion for a preliminary injunction.

**I.   BACKGROUND**

The Third Plan adopted by the Ohio Redistricting Commission is currently being implemented by the Secretary of State. Should Ohio's Chief Election Officer stop implementing this plan, then there will be no statewide legislative districts for the 2022 election. Without statewide legislative districts, there cannot be a May 3, 2022, primary election.

**A.  Ohio's 2010 legislative district maps and Ohio's population changes.**

Ohio's 2010 legislative district maps were created after receipt of the 2010 U.S. Census data showing that Ohio had a population of 11,536,504 people. The 2020 U.S. Census data showed that much has changed in Ohio over the last ten years, including a net gain of more than 250,000 people and double-digit growth in several regions. (ECF No. 8, First Amended Complaint, ¶ 1). Many political subdivisions such as Franklin, Delaware, Warren, and Union Counties grew by double-digits. (*Id.*, ¶ 33). Franklin, Cuyahoga, and Hamilton Counties, Ohio's most populous counties, saw a total shift of more than 200,000 people. (*Id.*, ¶ 34).

**B.  The Redistricting Commission adopts First Plan and Second Plan, and both are rejected by the Ohio Supreme Court.**

The Ohio Redistricting Commission was created in 2015 by an amendment to the Ohio Constitution. The Redistricting Commission creates statewide legislative districting using the most

recent federal census data. The Redistricting Commission met and adopted the First Plan in September 2021. (ECF No. 8-1, First Amend. Compl., Exhibit A). It was later sent back to the Redistricting Commission by the Ohio Supreme Court in January 2022. *See League of Women Voters of Ohio v. Ohio Redistricting Comm.*, 2022-Ohio-65, ¶ 138.

The Redistricting Commission then met and adopted the Second Plan on January 22, 2022. The Second Plan also used the most recent federal census data. (ECF No. 8-2, First Amend. Compl., Exhibit B). Still, in February 2022, the Ohio Supreme Court sustained objections relating to the Redistricting Commission's Second Plan. *See League of Women Voters of Ohio v. Ohio Redistricting Comm.*, 2022-Ohio-342, ¶ 67.

### C. The Redistricting Commission adopts the Third Plan and Secretary of State LaRose implements it.

The Redistricting Commission then convened to create a Third Plan, which passed by a 4-3 vote. (Plaintiffs' Proposed First Supplemental Complaint ("First Supp. Compl."), ECF No. 75-1, ¶ 56). The Third Plan accounts for Ohio's population changes. (First Supp. Compl., Exhibit C, ECF No. 75-2, PageID # 1089). Ohio's population on April 1, 2020, was 11,799,488, meaning the target population for each Ohio House district is 119,186. (*Id.*, PageID # 1092). The chart accompanying the Third Plan shows that the population of each House District is no more than 5% above or below the target population. The same is true for each Ohio Senate District. (*Id.*, PageID # 1095).

Because the Third Plan satisfied the requirements of the U.S. Constitution and the Ohio Constitution, and anticipating no more delay, Secretary of State LaRose began implementing the Third Plan shortly after it was adopted. (First Supp. Compl., Exhibit D, ECF No. 75-2, PageID # 1098). This included a set of revised deadlines to comply with Ohio law and generally avoid election chaos by setting candidate petitions for March 14 and candidate protests for March 17.

4

(*Id.*, PageID # 1101). This, along with a "little divine blessing," would allow the primary election to go forward on May 3, 2022. (*Id.*, PageID # 1098). The Secretary of State cannot move the date of the primary election.

### D. The Third Plan speeds forward.

The Secretary of State ordered the county boards of election to move forward with the Third Plan on February 26. (First Supp. Compl., Exhibit D, ECF No. 75-2, PageID # 1098). But on March 16, more than two weeks later, the Ohio Supreme Court invalidated the Third Plan. (*Id.*, ¶ 66). However, it is too late for Secretary of State LaRose to implement an unknown "Fourth Plan" and still have an election ready for the May 3 primary. (LaRose Notice, ECF No. 71).

Should Secretary of State LaRose deviate from the Third Plan, it will cause even more election chaos. (Affidavit of Michael Gonidakis ("Gonidakis Aff."), Exhibit 1, ¶ 7). Mr. Gonidakis, for example, typically participates in the state legislative election process, including leaning about candidates, supporting candidates, and associating with like-minded voters (*Id.*). He did so during the most recent election for state legislative officer. (*Id.*, ¶ 8). Despite the confusion posed by the adoption and then rejection of the First Plan and the Second Plan, Mr. Gonidakis started engaging in his usual election activity for the Third Plan, such as supporting candidates. (*Id.*, ¶ 9). Any change from the Third Plan would undo all of Mr. Gonidakis' election efforts so far, and could even deny him the right to vote. (*Id.*, ¶ 12). A change from the Third Plan could also force local boards to revert back to the old districts (i.e., the 2010 statewide legislative districts); however, the old districts fail to account for Ohio's population changes. Mr. Gonidakis, for example, lives in political subdivisions that have grown by more than double-digits percentage points in the last ten years while other parts of Ohio have lost population, meaning his vote would be worth less than other Ohioans. (*Id.*, ¶ 14–15).

Should Secretary LaRose deviate from the Third Plan, then it could also make for less competitive elections. (Affidavit of Dr. Michael Barber ("Dr. Barber Aff.", Exhibit 2). Election expert Dr. Michael Barber analyzed the Third Plan and found that it generally meets proportionality requirements. (Report of Dr. Barber, Exhibit 2, p. 2). The last ten years of statewide election results yielded a ratio of roughly 54% Republican and 46% Democratic, and the Third Plan nearly mirrors that ratio for the Ohio House of Representatives and the Ohio Senate, and does so better than other plans considered. (*Id.*). This is a significant achievement considering that Ohio's Democrats are clustered together in urban areas, making it difficult to create districts that are proportional yet compact. (*See* Affidavit of Sean Trende, Exhibit 3).

### E. This litigation.

Four weeks ago, Plaintiffs asked for the adoption of the most recent plan approved by the Redistricting Commission, and moved for a preliminary injunction for that relief. (ECF Nos. 1, 2). But the case stalled. Now, with election chaos growing ever greater, Plaintiffs now move for temporary restraining order so that Secretary LaRose maintains his efforts implementing the Third Plan until Plaintiffs' motion may be resolved. (ECF Nos. 10, 72).

## II. STANDARD OF REVIEW

As this Court knows, in adjudicating a temporary restraining order this Court must balance four factors: "(1) plaintiff is likely to succeed on the merits; (2) the chance that plaintiff would suffer irreparable injury without immediate injunctive relief; (3) the possibility of harm to others; and (4) the public interest." *Women's Med. Prof'l Corp. v. Baird*, No. 03-CV-162, 2008 U.S. Dist. LEXIS 128327, at *3 (S.D. Ohio Feb. 27, 2008) (Marbley, J.) (citing *Chabad of S. Oh. & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 432 (6th Cir. 2004)). Because the purpose of temporary restraining order is to prevent harm before a hearing can be held for a preliminary injunction, courts may also focus on the irreparability and the immediacy of the harm.

*Miller v. Ohio Civil Rights Comm'n*, No. 2:21-cv-03973, 2022 U.S. Dist. LEXIS 11939, at *8 (S.D. Ohio Jan. 24, 2022) (Marbley, J.) (citation omitted).

Plaintiffs are likely to succeed on the merits, and will suffer irreparable and immediate harm if the work implementing the Third Plan is halted, so this Court should maintain the status quo until a preliminary injunction hearing may be held.

### III. LAW AND ARGUMENT

Because Plaintiffs' will suffer irreparable and immediate harm if the work on the Third Plan halts, as their constitutional right to vote will have been violated, this Court must maintain the Third Plan until a hearing on Plaintiffs' preliminary injunction may be held.

**A. Plaintiffs' risk immediate harm without this Court's intervention.**

With an eye towards the May 3, 2022, primary, Plaintiffs moved for a preliminary injunction in mid-February. (ECF Nos. 1, 2). But since Plaintiffs moved a month ago, their risk of harm has grown imminent.

First, Plaintiffs currently effectively have voting districts under the Third Plan. (LaRose Notice, ECF No. 71; First Supp. Compl., Exhibit D). That is because Secretary LaRose instructed county boards of election to begin implementing the Third Plan. It now appears, however, that Secretary LaRose may be prepared to stop that implementation. (*See* ECF No. 76). Indeed, Secretary LaRose's most recent filing suggests he may be in the process of telling county boards of election not to implement the Third Plan. (*Id.*, PageID # 1108). This could happen at any time, and would strip Plaintiffs' voting rights away. Because Secretary LaRose could eliminate Plaintiffs' state legislative districts at any time, Plaintiffs face imminent constitutional harm.

Second, Plaintiffs have already started engaging in their election activity under the Third Plan. (Gonidakis Aff., ¶ 7). Mr. Gonidakis, for example started engaging in his usual election activity for the Third Plan, such as supporting candidates. (*Id.*, ¶ 9). Any change from the Third

7

Plan would undo all of Mr. Gonidakis' election efforts so far, and could even deny him the right to vote. (*Id.*, ¶ 12).

Third, **this Thursday** is the last day for candidates to change residence for senators and representatives. *See* Ohio Constitution, Article XI, Section 9(C). This deadline combined with Secretary LaRose's suggestion that he may pause or stop the implementation of the Third Plan means that there is imminent risk of harm to Plaintiffs.

Fourth, the risk is imminent because it is ongoing. The back-and-forth between the Redistricting Commission and Ohio Supreme Court continues to grant and deny Plaintiffs' right to vote as well as their right to engage the election process (i.e., associate with candidates and like-minded voters). This back-and-forth happened to Plaintiffs a third time on March 16, 2022, and with the Redistricting Commission starting to convene again, it is likely to occur a fourth time upon the Ohio Supreme Court's review. Plaintiffs know this to be the case because it has happened three times before.

### B. Plaintiffs are likely to succeed on the merits because their right to vote and right to associate has been denied.

Without the Third Plan Plaintiffs' right to vote will be violated, so Plaintiffs are therefore likely to succeed on the merits.

#### 1. Without the Third Plan, no state legislative districts exist so Plaintiffs cannot vote in violation of the U.S. Constitution.

Should Secretary LaRose cease implementing the Third Plan, there would be a complete lack of legislative districts in violation of the U.S. Constitution. The right to vote is a fundamental right, and the Equal Protection Clause and the Substantive Due Process Clause prohibit blanket disenfranchisement. *George v. Hargett*, 879 F.3d 711, 727 (6th Cir. 2018) (citing *Warf v. Bd. of Elections of Green Cty.*, 619 F.3d 553, 559 (6th Cir. 2010)); *see also, League of Women Voters v. Brunner*, 548 F.3d 463, 478 (6th Cir. 2008). In these instances, "federal court intervention may be

8

appropriate" to avoid an unfair election. *Brunner*, 548 F.3d at 478 (citing *Griffin v. Burns*, 570 F.2d 1065, 1078-79 (1st Cir. 1971)).

Here, this Court should maintain the Third Plan or Plaintiffs will be without legislative districts to vote. (*See* Gonidakis Aff., Exhibit A). Secretary of State LaRose began moving forward with the Third Plan in February shortly after it was adopted. (First Supp. Compl., Exhibit D). This included directing the local boards of election to begin implementation. (ECF No. 71, PageID # 1038). Should this work be undone, then it would be mean that Plaintiffs would not have districts to vote in or candidates to vote for: Plaintiffs' voting power would be diluted to zero. This sort of blanket disenfranchisement would violate the U.S. Constitution fundamentally.

### 2. Alternatively, the state legislative districts are based on the 2010 census, so they are now malapportioned in violation of the U.S. Constitution.

The Third Plan should also be maintained because using the old legislative districts is not an option. *See, Evenwel v. Abbott*, 578 U.S. 54, 59, 136 S. Ct. 1120, 1124 (2016). As the U.S. Supreme Court recently explained, when drawing state legislative districts, the maximum population deviation between the largest and smallest districts is 10%. *Id.* (citing *Brown v. Thomson*, 462 U.S. 835, 842-843, 103 S. Ct. 2690, 77 L. Ed. 2d 214 (1983)). In fact, "[m]aximum deviations above 10% are presumptively impermissible." *Id.* Such deviations violate the Equal Protection Clause of the U.S. Constitution. *Id.* (citing *Reynolds v. Sims*, 377 U.S. 533, 568, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964)); *see also, Kopald v. Carr*, 343 F. Supp. 51, 52 (M.D. Tenn. 1972).

Here, the population in Plaintiffs' state legislative districts are more than 10% above the least populous state legislative districts, in violation of the Equal Protection Clause, so this Court should adopt the Second Plan. Plaintiffs' house and senate districts are based on based on 2010 decennial census. (*See* First Supp. Compl., ECF No. 75-1, ¶¶ 69–72). Mr. Gonidakis, Ms.

9

Vanderkooi, and Ms. Smith live in Franklin County, which has gained more than 150,000 people since the last census, and their respective cities have experienced more than 10% in population gains. (*Id.*). Mr. Gonidakis specifically lives in Dublin, Ohio, which has grown in population by more than 20%, so his legislative districts are malapportioned. (Gonidakis Aff., ¶ 6).

Because Ohio's population has changed, so too has the population in the state legislative districts. Double-digit growth in some areas and population losses in others means that the state legislative districts cannot be within 5% of the target population for a state legislative district. (*Id.*, ¶ 62). As a result, Plaintiffs' districts, including House Districts 18, 19, 21, 52, 62, 68, 70, and 90 and Senate Districts 3, 4, 7, 14, 15, 16, 19, and 22, dilute their vote in violation of the "one-person, one-vote" requirement.

### 3. Plaintiffs cannot freely associate with others in their district in violation of the U.S. Constitution.

This Court should maintain the Third Plan so Plaintiffs may freely associate. "The rights of political association and free speech occupy a similarly hallowed place in the constitutional pantheon." *Graveline v. Benson*, 992 F.3d 524, 535 (6th Cir. 2021) (citation omitted). Though the right to politically associate is not absolute, a severe restriction must be narrowly drawn to advance a state interest of compelling importance. *Kishore v. Whitmer*, 972 F.3d 745, 749 (6th Cir. 2020) (citation omitted).

Here, should this Court allow the Third Plan to lapse, then Plaintiffs cannot associate with members of their state legislative districts in violation of the U.S. Constitution. Mr. Gonidakis, for example, has historically learned about his candidates, supported candidates, and associated with like-minded voters. (Gonidakis Aff., ¶ 7). He has started to do so under the Third Plan. (*Id.*, ¶ 9). Should this Court allow the Third Plan to be undone, then so will Mr. Gonidakis' work as well as First Amendment rights. (*Id.*). Moreover, this severe restriction has no compelling interest of state

10

importance. Indeed, Plaintiffs' fundamental rights appear to be burdened for no reason at all. Accordingly, Plaintiffs' right to associate and engage in political discourse has been violated, and this Court should intervene.

### 4. Without the Third Plan, Plaintiffs' voting rights risk arbitrary denial.

This Court should maintain the Third Plan because the Ohio Supreme Court's evolving standards violate the U.S. Constitution. The Due Process Clause of the Fourteenth Amendment to the Constitution states that no State shall "deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. Amend XIV, § 1. It "imposes on the **States** the standards necessary to ensure that judicial proceedings are fundamentally fair," *Lassiter v. Dep't of Soc. Servs.,* 452 U.S. 18, 33 (1981), requiring that litigants receive "notice and opportunity for hearing appropriate to the nature of the case," *Mullane v. Cent. Hanover Bank & Tr. Co.,* 339 U.S. 306, 313 (1950) (emphasis added). This procedural fairness requirement applies to state courts. *See Reich,* 513 U.S. at 110–14; *Bouie v. City of Columbia,* 378 U.S. 347, 354–55 (1964); *Saunders, v. Shaw,* 244 U.S. 317, 319–20 (1917).

The U.S. Supreme Court has repeatedly recognized that a state supreme court cannot give "retroactive effect" to an "unforeseeable" decision, if the application of that decision would deny "a litigant a [fair] hearing." *Bouie,* 378 U.S. at 354–55; *Reich,* 513 U.S. at 110–14; *Saunders,* 244 U.S. at 319–20. In *Saunders,* a defendant won a judgment in a state trial court after that court concluded that the plaintiff's factual claim "was not open to the plaintiff" under then-existing law. 244 U.S. at 319–20. The state supreme court reversed, resting its opinion on a case decided *after* the trial court's judgment, thus making the plaintiff's factual claim legally available to him. But what the state supreme court did not do was remand the action to the trial court to afford the defendant "the proper opportunity to present his evidence" on that now-relevant factual claim. *Id.* at 319. Unsurprisingly, the Supreme Court of the United States reversed, holding that it is "contrary

11

to the 14th Amendment" for a state supreme court to reverse the favorable judgment obtained by a defendant based on the application of a new judicial decision without also remanding to give the defendant "a chance to put his evidence in" to respond to that new decision—at least where the defendant never "had the proper opportunity to present his evidence" before. *Id.*

Similarly, in *Reich,* a plaintiff sought a tax refund for retirement payments paid by the federal government after his military service. 513 U.S. at 108. The Supreme Court of the United States had declared state laws that exempted from taxation retirement benefits paid by the State, but not by the federal government unconstitutional, and Georgia repealed its version that statute. *Id.* The plaintiff sued to recoup those taxes paid on his federal benefits under that repealed statute, but the Georgia Supreme Court first opined that its "refund statute [did] not [] apply to the situation where the law under which the taxes are assessed and collected is itself subsequently declared to be unconstitutional or otherwise invalid." *Id.* at 109 (citation omitted).

The U.S. Supreme Court remanded for reconsideration in light of an intervening decision in *Harper v. Virginia Department of Taxation,* 509 U.S. 86 (1993). Instead of considering the intervening opinion, the Georgia Supreme Court denied the plaintiff's tax-refund request by claiming, for the first time, that its own predeprivation state-law remedies sufficed to remedy any Due Process Clause violation, even though previously the State also offered postdeprivation remedies. *Reich,* 513 U.S. at 110. This was an entirely different explanation than the Georgia court offered in its first opinion. On appeal, the U.S. Supreme Court explained that this was exactly "what a State may *not* do . . . reconfigur[ing] its scheme, unfairly, in *midcourse*—to 'bait and switch'" the plaintiff. *Id.* at 111. The Georgia Supreme Court's reliance on predeprivation procedures, this Court held, "was entirely beside the point" because "no reasonable taxpayer would

have thought that they represented . . . the exclusive remedy for unlawful taxes." *Id.* (emphasis omitted).

This Court should maintain the Third Plan because the Plaintiffs' voting rights could be arbitrarily denied. In its decision invalidating the original legislative plan, the Ohio Supreme Court held that the plan was unconstitutional for failing to "closely correspond" to the Ohio statewide voter preference of 54% Republican to 46% Democrat. *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, Slip Opinion No. 2022-Ohio-65, ¶ 88. In response, the Redistricting Commission enacted the first remedial plan with the goal of closely corresponding to the 54-46 ratio. *See League of Women Voters of Ohio v. Ohio Redistricting Comm.*, Slip Opinion No. 2022-Ohio-342, ¶ 97 (Kennedy and DeWine, JJ., dissenting). The Court shortly thereafter invalidated the first remedial plan; apparently "closely correspond" meant "exactly." *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, Slip Opinion No. 2022-Ohio-342,¶ 63–64. Now required to draw an *exact* 54-46 plan, the Redistricting Commission again met the Ohio Supreme Court's new criteria and enacted a second revised plan with five (5) more democratic leaning state House districts and two (2) more democratic leaning state Senate districts, representing a perfect statewide proportionality of 54 to 46%. *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, Slip Opinion No. 2022-Ohio-789, ¶ 84 (Kennedy and DeWine, JJ., dissenting). Yet again, the Court invalidated the plan after arbitrarily creating a new formula that assessed individual districts, instead of the plan as a whole. *Id.* at ¶ 85.

The Ohio Supreme Court's untenable one-upmanship is also seen in the Court's shifting definition of a competitive district. In *LWV I*, the Court merely required the first remedial map to meet the 54-46 "statewide proportion of Republican-leaning districts to Democratic-leaning districts." *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, Slip Opinion No. 2022-

13

Ohio-65, ¶ 86. When the Redistricting Commission met this standard in the first revised plan, the Court cried foul and for the first time held that labeling 50-51% Democratic-leaning districts as competitive was "absurd on its face." *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, Slip Opinion No. 2022-Ohio-342, at ¶ 61. The Commission then enacted a second revised plan that "reduced from 12 to five the number of seats favoring Democrats by less than 51 percent." *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, Slip Opinion No. 2022-Ohio-789, ¶ 87 (Kennedy and DeWine, JJ., dissenting). Yet again, the Court invalidated the plan after arbitrarily deciding that "even districts in which Democrats have a 2 percent advantage do not count as districts that '"favor" [the Democratic] party.'" *Id.* at ¶ 88 (citing majority opinion at ¶ 41).

The Ohio Supreme Court's three decisions further conflict in their analysis of expert reports and statistical measures by creating, then ignoring, benchmarks for what might be constitutional. *Id.* at ¶¶ 94–102. The end result sought by the Ohio Supreme Court is unknown to all. But the current result is "electoral chaos for Ohioans," *id.* at ¶ 59, created at the expense of Plaintiffs' Due Process rights.

### C. Because fundamental rights would otherwise be denied, the remaining preliminary injunction factors favor maintaining the Third Plan.

As Plaintiffs' fundamental rights risk being denied , the remaining preliminary injunction factors favor this Court maintaining the Third Plan. No right is more fundamental than the right to vote. The United States Supreme Court has repeatedly held that the U.S. Constitution *undeniably* protects the "right of all qualified citizens to vote, in state and federal elections" and, furthermore:

> A consistent line of decisions by this Court in cases involving attempts to deny or restrict the right of suffrage has made this indelibly clear. It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote, *Ex parte Yarbrough*, 110 U.S. 651, and to have their votes counted, *United States v. Mosley*, 238 U.S. 383. In *Mosley* the Court stated that it is 'as equally

> unquestionable that the right to have one's vote counted is as open to protection . . . as the right to put a ballot in a box.' 238 U.S., at 386.

*Reynolds v. Sims*, 377 U.S. 533, 554-555, 84 S. Ct. 1362, 1377-1378, 12 L. Ed. 2d 506, 523-524, (1964). This includes the right to not have votes diluted or discarded. *Id.* at 555 ("the right of suffrage can be denied by a debasement or dilution of the weight of a citizens vote just as effectively as by wholly prohibiting the free exercise of the franchise."); *see, Baker v. Carr*, 369 U.S. 186, 206 (1962) (finding voters who allege facts showing disadvantage to themselves have standing to sue.).

Because the right to vote is so fundamental, district courts may maintain a map to fix a constitutional violation. *See Rucho v. Common Cause*, 139 S. Ct. 2484, 2495 (2019). Indeed, "there is a role for the courts" to resolve one-person, one-vote and other violations. *Id.* (citations committed); *see, e.g.*, *Kopald v. Carr*, 343 F. Supp. 51, 52 (M.D. Tenn. 1972). In *Kopald*, multiple plans were proposed by the legislative authority, including one with a population variance of 21%. *Id.* In response, the court adopted a modified plan that reduced the variance to 4% and maintained jurisdiction for one election cycle. *Id.* at 54 (citing *Ely v. Klahr*, 403 U.S. 108, 91 S. Ct. 1803, 29 L. Ed. 2d 352 (1971)); *see also, McConchie v. Scholz*, No. 21-cv-3091, 2021 U.S. Dist. LEXIS 201160, at *67 (N.D. Ill. Oct. 19, 2021) (ordering submission of proposed map to be considered by the court following Equal Protection Clause violation). Therefore, a court may modify state legislative cycles so that it complies with one-person, one-vote for at least one election cycle.

Here, this Court should maintain the Third Plan so that Plaintiffs' constitutional rights are no longer violated. Unlike this Court, the Ohio Supreme Court cannot intervene. It is prohibited by the Ohio Constitution from adopting a plan. *See* Ohio Constitution, Article XI, Section 9(D). Because the Redistricting Commission declared an impasse, without this Court's intervention, Plaintiffs' vote will be diluted by using the 2010 state legislative districts or otherwise denied.

Given Plaintiffs' constitutional right to vote (and an equal right to have their votes not diluted or discarded), Plaintiffs suffer irreparable harm if the 2010 legislative district maps are used because they live in districts where the population increased, which, in turn, dilutes their voting power. Alternatively, if Ohio has no maps at all, Plaintiffs have no ability to vote, and no election occurs. Maintaining the Third Plan eliminates Plaintiffs' irreparable harm.

Maintaining the Third Plan would not harm third parties. And unless this Court adopts the Third Plan, the 2022 election cycle will continue to stall, creating greater election chaos.

Lastly, the public interest favors maintaining the Third Plan because the public has interest in voting—either in undiluted districts or at all. Moreover, the validity of statewide elections strikes at the heart of America's representative democracy.

Thus, in addition to Plaintiffs establishing that they have a strong likelihood of success on the merits, the remaining injunctive factors favor Plaintiffs, and this Court should order Secretary LaRose to keep implementing the Third Plan until Plaintiff's preliminary injunction motion is decided.

**D. This Court has the power to protect Plaintiffs from unconstitutional state actors by ordering the Third Plan.**

This Court may order the Third Plan even though it was rejected by the Ohio Supreme Court. State court decisions and state constitutions must yield to the U.S. Constitution. The whole purpose of 42 U.S.C. § 1983 is to protect people from unconstitutional action under color of state law "whether that action be executive, legislative, or judicial." *Mitchum v. Foster*, 407 U.S. 225, 242, 92 S. Ct. 2151, 2162 (1972) (citation omitted). For example, it is 42 U.S.C. § 1983 that allowed the U.S. Supreme Court to overcome the Alabama Constitution to protect voting rights under the Equal Protection Clause. *Reynolds v. Sims*, 377 U.S. 533, 537, 84 S. Ct. 1362, 1369

16

(1964). Indeed, the "purpose of § 1983 was to interpose the federal courts between the States and the people . . . ." *Mitchum*, 407 U.S. at 242.

Here, Plaintiffs do not seek challenge the constitutionality of the Redistricting Commission. Instead, Plaintiffs ask for a remedy, the Third Plan, that the Ohio Supreme Court found violates the Ohio Constitution. The Bennett Petitioners have argued that this is a "nonstarter." (ECF No. 78, PageID # 115). Yet the U.S. Supreme Court provided a similar remedy in *Reynolds*, expressly overcoming the Alabama Constitution. *See also McDaniel v. Patty*, 435 U.S. 618 (1978).

Therefore, to protect rights guaranteed by the U.S. Constitution, this Court may order the Third Plan even though the Ohio Supreme Court believes it may be contrary to state law. This is particularly true because of the back-and-forth between the Ohio Supreme Court and the Redistricting Commission and the resulting ongoing harm incurred by Plaintiffs and voters statewide as a result of that back-and-forth. *Espinoza v. Montana Dept. of Revenue*, 140 S.Ct. 2246 (2020) (discussing as-applied constitutional challenge to Montana Constitution).

There are other advantages to using the Third Plan instead of this Court drawing its own plan. First, Secretary LaRose has already started implementing the Third Plan, unlike a plan a federal court would draw, which would require significant state resources. Second, the Redistricting Commission is made up of seven elected officials who can be held accountable by voters, unlike federal judges. Third, these elected officials made difficult policy decisions based on the inherent geographic challenges of a Democratic voter-base that coalesces inside just a few political subdivisions. These policy decisions are best left to elected officials rather than federal judges.

Ultimately, deferring to one of the three plans adopted by Redistricting Commission more closely aligns with Ohio law, in process and in substance, than this Court creating and ordering an unknown "fourth plan."

## IV. CONCLUSION

For all these reasons, Plaintiffs respectfully request that this Court require that Secretary of State Frank LaRose maintain the Third Plan until Plaintiffs' preliminary injunction motion can be heard.

Respectfully submitted,

**Isaac Wiles & Burkholder LLC**

*/s/ Donald C. Brey*
Donald C. Brey (0021965)
Brian M. Zets (0066544)
Matthew R. Aumann (0093612)
Ryan C. Spitzer (0093515)
Trista M. Turley (0093939)
Two Miranova Place, Suite 700
Columbus, Ohio 43215
Tel: 614-221-2121; Fax: 614-365-9516
dbrey@isaacwiles.com
bzets@isaacwiles.com
maumann@isaacwiles.com
rspitzer@isaacwiles.com
tturley@isaacwiles.com

*Attorneys for Plaintiffs Michael Gonidakis, Mary Parker, Margaret Conditt, Beth Ann Vanderkooi, Linda Smith, Delbert Duduit, Thomas W. Kidd, Jr., and Ducia Hamm*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 21, 2022, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

<i>/s/Donald C. Brey</i><br>
Donald C. Brey (0021965)