**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| MICHAEL GONIDAKIS, MARY PARKER, MARGARET CONDITT, BETH VANDERKOOI, LINDA SMITH, DELBERT DUDUIT, THOMAS W. KIDD JR., DUCIA HAMM, | |
| Plaintiffs, | Case No. 2:22-cv-00773 |
| BRIA BENNETT, REGINA C. ADAMS, KATHLEEN M. BRINKMAN, MARTHA CLARK, SUSANNE L. DYKE, MERYL NEIMAN, HOLLY OYSTER, CONSTANCE RUBIN, EVERETT TOTTY, | Judge Amul R. Thapar Judge Algenon L. Marbley Judge Benjamin J. Beaton |
| Intervenor-Plaintiffs, | |
| v. | |
| FRANK LAROSE, in his capacity as Ohio Secretary of State, | |
| Defendant. | |

**BENNETT PETITIONERS' OPPOSITION TO PLAINTIFFS'
MOTION FOR TEMPORARY RESTRAINING ORDER**

Intervenor-Plaintiffs Bria Bennett, Regina C. Adams, Kathleen M. Brinkman, Martha

Clark, Susanne L. Dyke, Meryl Neiman, Holly Oyster, Constance Rubin, and Everett Totty (the

"Bennett Petitioners") hereby oppose the Gonidakis Plaintiffs' Motion for a Temporary

Restraining Order, ECF No. 84.

# TABLE OF CONTENTS

INTRODUCTION AND LOCAL RULE 7.2(a)(3) SUMMARY ................................................. 1

BACKGROUND ............................................................................................................................ 2

    A.   Ohio's history of extreme partisan gerrymandering prompted the adoption of the state's anti-gerrymandering provisions. ........................................................................ 2

    B.   The Ohio Supreme Court struck down the September 16 Plan and gave the Commission clear guidance on how to comply with the Fair District Amendments. ....................................................................................................................... 5

    C.   The Ohio Supreme Court struck down the January 22 remedial plan as violating the Constitution and failing to comply with the Court's order, again giving clear guidance for remediation and retaining jurisdiction. ......................................................... 6

    D.   The Ohio Supreme Court struck down the Third Plan, finding it violated the Constitution in the same ways as earlier plans, giving the Commission until March 28 to comply with its orders and draw a constitutional map. ............................... 7

    E.   The Commission is presently in the process of preparing a new remedial plan. ............. 9

LEGAL STANDARD ................................................................................................................... 9

ARGUMENT ............................................................................................................................... 10

    I.   A TRO is inappropriate because it would disrupt the status quo and interfere with the state's ongoing redistricting process. ......................................................................... 10

    II.   Plaintiffs do not meet the requirements for temporary or preliminary relief. .................... 14

        A.   Plaintiffs are unlikely to succeed on the merits. ................................................... 14

            1.   Plaintiffs lack standing because they assert only a generalized grievance affecting all Ohio voters. ................................................................................ 15

            2.   Plaintiffs have no federal claim, because the scheduling of the General Assembly primary is a question of Ohio law. ........................................... 18

            3.   Plaintiffs cannot obtain the sole remedy they seek because it violates valid Ohio state law as authoritatively construed by the Ohio Supreme Court. ................. 21

        B.   Plaintiffs do not face irreparable harm, merely a delayed primary. ............................... 24

        C.   A TRO would irreparably harm the vast majority of Ohio voters, who amended the Ohio Constitution's requirements for state legislative redistricting. ........................ 24

        D.   The public interest weighs against a TRO. ............................................................... 25

CONCLUSION ............................................................................................................................ 26

CERTIFICATE OF SERVICE .................................................................................................. 28

## INTRODUCTION AND LOCAL RULE 7.2(a)(3) SUMMARY

In 2015, more than 70 percent of Ohio voters voted to adopt the "Fair District Amendments" to Article XI of the Ohio Constitution and bring an end to partisan gerrymandering of the General Assembly. The relief Plaintiffs seek in their motion for a TRO would leave those Amendments a dead letter. And it would require Ohio officials to conduct General Assembly elections under a reapportionment plan *that the Ohio Supreme Court has already held violates the Ohio Constitution*. This would be an extraordinary and entirely unnecessary intrusion into Ohio's state sovereignty. There is no basis in law for the order that Plaintiffs seek. Plaintiffs' motion should be denied.

As explained in Part I, *infra* pp. 10-14, granting Plaintiffs' TRO would not preserve the status quo—it would irreversibly alter it. And it would have this Court usurp the Ohio Supreme Court's authority and improperly cut short the Ohio Redistricting Commission's ongoing, daily proceedings to prepare districts that comply with Ohio law, in violation of the Supreme Court's command for deference to state redistricting processes. *Growe v. Emison*, 507 U.S. 25, 33-34 (1993).

Moreover, as explained in Part II, *infra* pp. 14-26, Plaintiffs do not meet any of the four requirements for preliminary relief.

Plaintiffs are unlikely to succeed on the merits. *Infra* Part II.A., pp. 14-24. They lack standing because they assert a generalized grievance equally affecting all Ohio voters. *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220 (1974); *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 294 (6th Cir. 1997); *Nolles v. State Comm. for Reorganization of Sch. Dists.*, 524 F.3d 892, 900 (8th Cir. 2008); *infra* Part II.A.1, pp. 15-17. And a delay to the General Assembly primary currently set by statute for May 3, which is all that is threatened, does not violate any federal law. *Thompson v. DeWine*, 976 F.3d 610, 620 (6th Cir. 2020) (per curiam); *Nolles*, 524

F.3d at 898; *infra* Part II.A.2, pp. 18-21. Nor can Plaintiffs obtain the sole relief they seek—an order imposing the Third Plan—because the Ohio Supreme Court has already held that the Third Plan violates Ohio law, it is possible to draw a map that is lawful under both Ohio and federal law, and federal courts in reapportionment cases must "follow the policies and preferences of the State, as expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature, whenever adherence to state policy does not detract from the requirements of the Federal Constitution." *White v. Weiser*, 412 U.S. 783, 794-95 (1973); *infra* Part II.A.3, pp. 21-23.

For similar reasons, Plaintiffs do not face irreparable harm. *Infra* Part II.B., p. 24. The sole issue is a delay to the May 3 primary while lawful maps are prepared, not an election under malapportioned maps or no election at all, and Plaintiffs make no showing that such a delay will irreparably harm them. In contrast, a TRO requiring use of the Third Plan will substantially harm all Ohio voters and the public interest by rendering the Fair District Amendments a nullity and requiring Ohio voters to elect and be governed by representatives from districts that the Ohio Supreme Court has held were primarily and unlawfully drawn to disfavor one political party. *Infra* Parts II.C., II.D., pp. 24-25].

## BACKGROUND

### A.    Ohio's history of extreme partisan gerrymandering prompted the adoption of the state's anti-gerrymandering provisions.

Ohio adopted the Fair District Amendments in 2015, after a long struggle with partisan gerrymandering that was particularly pronounced during last decade's redistricting cycle. In 2011, when the Apportionment Board that previously governed redistricting convened, Republicans made up a majority of the Board and, as Ohio's Constitution then stood, could take action without consulting Democrats. *Wilson v. Kasich*, 134 Ohio St. 3d 221, 223, 225-26 (2012). The result was

maps wholly out of line with Ohio voters' preferences: In the first state house elections held under the new maps in 2012, Democratic candidates won a majority (50.2%) of the statewide vote, but a mere 39.4% of the state house seats. Ex. 1 to Decl. of Derek S. Clinger, filed herewith, at 18. The same pattern occurred in election after election, such that Republicans maintained supermajorities all decade irrespective of the statewide vote share. *Id.*

The partisan excesses of the 2011 redistricting cycle led to a groundswell of support for redistricting reform. Responding to this public sentiment, members of the Ohio House of Representatives introduced House Joint Resolution 12, which became the Fair District Amendments, in late 2014. HJR 12 passed the General Assembly overwhelmingly: 28-1 in the Senate and 80-4 in the House. *See* Ohio Legislative Services Commission, Final Analysis, Am. Sub. H.J.R. 12, at 15 (2014), https://www.lsc.ohio.gov/documents/gaDocuments/analyses130/14-hjr12-130.pdf. The Governor signed the bill, and it was placed on the ballot for the November 2015 election.

The run-up to the vote on the Fair District Amendments featured significant public discussion and grassroots activity. The official statement in support of the Fair District Amendments was submitted by a bipartisan group of legislators and described the Amendments as creating "a fair, bipartisan, and transparent process," which would "establish fair and balanced standards for drawing state legislative districts, including that no district plan should favor a political party." Ex. 2 to Clinger Decl. The Amendments were endorsed by both major political parties, as well as a host of organizations from across the political spectrum. Ex. 3 to Clinger Decl. Many of these organizations publicly promoted voting for the Amendments as a means to end partisan gerrymandering, increase transparency, and create accountability. Ex. 4 to Clinger Decl.; Statewide Issue History, Frank LaRose, Ohio Sec'y of State, https://www.ohiosos.gov/

elections/election-results-and-data/historical-election-comparisons/statewide-issue-history/ (last accessed Mar. 23, 2022). On November 3, 2015, voters approved the Fair District Amendments by a vote of over 70%—exhibiting overwhelming consensus in a typically divided state. Take the Next Step in Redistricting, The Columbus Dispatch (Nov. 19, 2015, 11:01 PM), https://www.dispatch.com/story/opinion/columns/2015/11/20/take-next-step-in-redistricting/ 23439962007/. The amendment became effective on January 1, 2021.

The Fair District Amendments abolished the Apportionment Board and replaced it with the Ohio Redistricting Commission. Ohio Const, art. XI, § 1. They imposed a partisan fairness requirement, and they were explicit about what must be done to make the maps fair: the Commission must attempt to draw maps that reflect voters' statewide preferences, and it must *not* draw maps primarily to favor one party. *Id.* § 6. And they provided for robust judicial review of redistricting plans. *Id.* § 9. The amended Article XI is cast in mandatory terms and contains detailed judicial review provisions, including ones delineating specific remedies for specific violations of the Article. *Id.* Notably, judicial review was placed in the original jurisdiction of the Ohio Supreme Court. *Id.* The provisions of Article XI are detailed, contain a nuanced and complex articulation of state policy on General Assembly reapportionment, and as discussed below, have been exhaustively analyzed and interpreted in multiple opinions of the Ohio Supreme Court. Thus, Article XI establishes precisely the sort of state-specific approach that the U.S. Supreme Court and others have identified as a promising local solution to the national problem of gerrymandering. *See Rucho v. Common Cause*, 139 S. Ct. 2484, 2507-08 (2019); Jeffrey S. Sutton, Who Decides? 294 (2021) (arguing that with state constitutional amendments, "[t]he states not only offer a venue for auditioning potential national solutions to this problem, but they also offer a rich source of state-customized approaches to fix, or at least ameliorate, the problem at the local level.").

**B.    The Ohio Supreme Court struck down the September 16 Plan and gave the Commission clear guidance on how to comply with the Fair District Amendments.**

On September 16, 2021, the Commission approved its first plan (the "September 16 Plan"), which parties promptly challenged as a blatant partisan gerrymander in the Ohio Supreme Court. *See League of Women Voters of Ohio v. Ohio Redistricting Comm'n*, No. 2022-Ohio-65, 2022 WL 110261 (Ohio Jan. 12, 2022) ("*LWV I*"). Even though Republican candidates have received an average of just 54% of the vote in Ohio over the last decade, the September 16 Plan contained 85 districts (64.4%) favoring Republican candidates and 47 districts (35.6%) favoring Democratic candidates out of a total of 132 districts. *Id.* ¶ 25. For that and other reasons, the Bennett Petitioners and other parties challenged the passage of the September 16 Plan under the Fair District Amendments. On January 12, 2022, a bipartisan majority of the Ohio Supreme Court held the 2021 Plan unconstitutional under Article XI of the Ohio Constitution. *See id.*

In its opinion, the Ohio Supreme Court provided clear direction on the requirements of the Fair District Amendments, explaining that the Commission must take "affirmative steps to comply" with the Constitution's anti-gerrymandering standards, and that if it is possible for a district plan to comply with technical requirements in Article XI and the anti-gerrymandering requirements in Section 6, the Commission must adopt a plan that does so. *See id.* ¶¶ 86-88. The only circumstance under which the Commission need *not* comply with Section 6 is if doing so would be *impossible* without "run[ning] afoul of" the other line-drawing requirements enumerated in the constitution. *Id.* ¶ 86 n.10. The Court declared the 2021 Plan invalid and ordered the Commission to adopt a new plan within ten days. *Id.* ¶¶ 135, 139. The Court further retained jurisdiction and ordered Petitioners to file any objections to the Commission's remedial plan within three days of the plan's adoption. *Id.* ¶ 139.

**C. The Ohio Supreme Court struck down the January 22 remedial plan as violating the Constitution and failing to comply with the Court's order, again giving clear guidance for remediation and retaining jurisdiction.**

On the tenth day after the Supreme Court's decision, the Commission convened once again to consider a new plan (the "January 22 Plan"), which it adopted on a 5-2 party-line vote by the Commission's Republican majority just hours after it was introduced. *League of Women Voters of Ohio v. Ohio Redistricting Comm'n*, No. 2022-Ohio-342, 2022 WL 354619, ¶ 25 (Ohio Feb. 7, 2022) ("*LWV II*").

The Bennett Petitioners and others objected to the constitutionality of the January 22 Plan, arguing that the Commission did not follow the Court's order. In particular, the January 22 Plan contained 20 Republican-leaning Senate districts and just 13 Democratic-leaning Senate districts, a clear violation of Section 6(B), and created more than a dozen Democratic-leaning House seats with razor-thin margins to seed Republican advantage, running afoul of Section 6(A). *Id.* ¶¶ 28, 39, 59. On February 7, the Ohio Supreme Court held that the January 22 Plan violated Sections 6(A) and 6(B) of Article XI. *Id.* ¶ 1. The Court emphasized that the Commission could not claim to achieve partisan fairness and proportionality while at the same time allocating competitive districts to one party in a "monolithically disparate" manner. *See id.* ¶ 40. The Court explained that "competitive districts . . . must either be excluded from the proportionality assessment or be allocated to each party in close proportion to its statewide vote share." *Id.* ¶ 62. The Court then ordered as follows:

> We . . . order the commission to be reconstituted, to convene, and to draft and adopt an entirely new General Assembly-district plan that conforms with the Ohio Constitution, including Article XI, Sections 6(A) and 6(B) as we have explained those provisions above. We further order the commission to adopt the new plan and file it with the secretary of state no later than February 17, 2022, and to file a copy of that plan with this court by 9:00 a.m. on February 18, 2022. We retain jurisdiction for the purpose of reviewing the new plan.

*Id.* ¶¶ 67-68.

> **D.** **The Ohio Supreme Court struck down the Third Plan, finding it violated the Constitution in the same ways as earlier plans, giving the Commission until March 28 to comply with its orders and draw a constitutional map.**

The February 17 deadline came and went, while the Commission failed to pass a new plan. Instead, a majority of the Commission took the position that it was impossible for them to adopt a map. *See* Notice of Impasse of the Ohio Redistricting Comm'n, *Bennett v. Ohio Redistricting Comm'n,* No. 2021-1198 (Ohio Feb. 18, 2022), http://supremecourt.ohio.gov/ pdf_viewer/pdf_viewer.aspx?pdf=919714.pdf. On February 24, however—after the Ohio Supreme Court threatened to hold the Commission members in contempt, *see Ohio Supreme Court 02/24/2022 Case Announcements #3,* 2022-Ohio-518, the Commission reconvened once again and ultimately passed a new remedial plan (the "Third Plan"). *See* Tr. of Ohio Redistricting Comm'n Feb. 24, 2022 Mtg. at 13-14, https://redistricting.ohio.gov/assets/organizations/redistricting-commission/events/commission-meeting-february-23-2022-197/transcript-february-24th-2022.docx. There, Senate President Matt Huffman introduced a new General Assembly plan his staff had been working on. *Id.*

According to President Huffman, this new plan had 18 Republican-leaning Senate seats (54.5%) and 54 Republican-leaning House seats (54.5%). *League of Women Voters of Ohio v. Ohio Redistricting Comm'n*, 2022-Ohio-789, 2022 WL 803033 ¶ 15 ("*LWV III*") (Ohio Mar. 16, 2022). But the Third Plan drew 19 of the Democratic-leaning House districts to have a Democratic vote share of just barely above 50% (between 50% and 52%), while *none* of the Republican-leaning seats in the new House map fell within a 50% to 52% vote share range. *Id.* ¶ 32. Similarly, the proposed plan drew seven of the total Democratic-leaning Senate districts to have Democratic vote shares below 52%. *Id.* Thus, while the new proposal purported to achieve partisan

7

proportionality, it in fact exacerbated the January 22 Plan's failure to allocate competitive seats "to each party in close proportion to its statewide vote share." *LWV II*, 2022 WL 354619 ¶ 62.

The plan passed 4-3, with Auditor Keith Faber voting against the plan with the Democratic members. *LWV III*, 2022 WL 803033 ¶ 16. Auditor Faber later stated that he voted against the plan because he believed it was not constitutional, as it unnecessarily split political subdivisions and was not compact. Susan Tebben, *GOP majority passes third round of Ohio Statehouse maps in 4-3 vote*, Ohio Capital Journal (Feb. 25, 2022, 4:00 AM), https://ohiocapitaljournal.com/2022/02/25/gop-majority-passes-third-round-of-ohio-statehouse-maps-in-4-3-vote/.

The Bennett Petitioners and others once again objected to this remedial map, arguing the plan violated both the partisan fairness requirement of Section 6(A) and the proportionality requirement of Section 6(B). And the Ohio Supreme Court once again agreed, holding that the Third Plan violated Sections 6(A) and 6(B) of Article IX of the state constitution. *LWV III*, 2022 WL 803033 ¶ 44. The Ohio Supreme Court found unconstitutional the way the February 24 Plan once again stacked the deck in favor of the Republican Party, noting the fact that the plan "include[d] 19 Democratic-leaning House districts in which the Democratic vote share [was] between 50 and 52 percent" and "at least seven Senate districts in which the Democratic vote share is in that range" but "no Republican-leaning House or Senate districts that [had] a Republican vote share that [was] less than 52.7 percent." *Id.* ¶ 32. Furthermore, the Court reiterated that for purposes of Section 6(B), competitive districts must be either "'excluded from the proportionality assessment or be allocated to each party in close proportion to its statewide vote share.'" *Id.* ¶ 38 (quoting *LWV II*, 2022 WL 354619 ¶ 62).

The Court again remanded the plan back to the Commission, giving it a deadline of Monday, March 28, 2022 to file a new plan with the secretary of state. *Id.* ¶ 45. The Court further

ordered that the drafting occur in public and the Commission hold frequent public meetings to promote transparency and bipartisanship. *Id.* ¶ 44. The Court also required processes to ensure that a compliant map would be drawn, including the retention of "an independent map drawer—who answers to all commission members." *Id.* ¶31.

     **E.**     **The Commission is presently in the process of preparing a new remedial plan.**

The Commission promptly began proceedings to prepare a fourth plan in response to the Ohio Supreme Court's order, and those proceedings are ongoing. On Saturday March 19, the Commission reconvened to develop a plan to prepare a lawful map. *See* Commission Meetings, Ohio Redistricting Comm'n, https://redistricting.ohio.gov/meetings (as last accessed Mar. 23, 2022). The Commission has met nearly every day since then, and it has resolved to meet daily, including on weekends, through at least Monday, March 28, the date by which the Ohio Supreme Court ordered the Commission to adopt a lawful plan. *See id.* To enable the preparation of a new plan, the Commission has retained two expert map-drawers, subject to conflict checks, who were slated to arrive in Ohio this morning and begin their work. *See* Tr. of Ohio Redistricting Comm'n Mar. 21, 2022 Mtg. at 14, https://www.redistricting.ohio.gov/assets/organizations/redistricting-commission/events/commission-meeting-march-21st-257/transcript-1381.pdf. The Commission is also working with the Sixth Circuit's chief mediator. *Id.* at 14-15. And the Ohio Supreme Court has retained jurisdiction to review the Commission's new plan once it is adopted. *LWV III*, 2022 WL 803033 ¶ 45.

## LEGAL STANDARD

In determining whether to issue a TRO, the Court must consider: "(1) whether the movant has a strong likelihood of success on the merits, (2) whether the movant would suffer irreparable injury absent a stay, (3) whether granting the stay would cause substantial harm to others, and (4) whether the public interest would be served by granting the stay." *Ne. Ohio Coal. for Homeless*

*v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006). "Because they are extraordinary remedies, [TROs] are only granted where the movant carries his burden of proving that the circumstances clearly demand it." *Shelby Cnty. Advocs. for Valid Elections v. Hargett*, 348 F. Supp. 3d 764, 768-69 (W.D. Tenn. Oct. 24, 2018).

## ARGUMENT

I. **A TRO is inappropriate because it would disrupt the status quo and interfere with the state's ongoing redistricting process.**

A TRO is a discretionary remedy. *Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008). Its sole purpose is to "preserve the status quo so that a reasoned resolution of a dispute may be had." *Procter & Gamble Co. v. Bankers Tr. Co.* 78 F.3d 219, 226 (6th Cir. 1996). Plaintiffs' Motion, however, does not seek to *preserve* the status quo: it seeks to fundamentally *change* it, asking this federal court to insert itself and cut short the ongoing state redistricting process that is being conducted under the active jurisdiction of the Ohio Supreme Court. That overreach provides reason enough, standing alone, to deny the Motion. *See, e.g.*, *Jenkins v. Scotta*, No. 17-cv-11781 2018 WL 1998339, at *2 (E.D. Mich. Apr. 3, 2018) (denying TRO where "plaintiffs do not seek to preserve the status quo with the temporary restraining order; rather, they seek to undo the status quo until after the case is heard before this Court"); *Hayes v. Joiner*, No. 1:05-cv-575, 2005 WL 2372854, at *1 (S.D. Ohio. Sept. 27, 2005) (denying TRO where the "status quo is that Plaintiff claims that he suffered a deprivation of constitutional rights whereas his claim for injunctive relief seeks affirmative action to correct institutional deficiencies yet to be proven"); *cf. Turner Broad. Sys., Inc. v. FCC*, 507 U.S. 1301, 1302-03 (1993) (Rehnquist, C.J., in chambers) ("By seeking an injunction, applicants request that I issue an order altering the legal status quo. Not surprisingly, they do not cite any case in which such extraordinary relief has been granted, either by a single Justice or by the whole Court.").

As Secretary of State Frank LaRose's March 22 filing made clear, Plaintiffs' Motion is based on a false premise. ECF No. 88 at 1-3, Page ID # 1310-12. The status quo, absent relief from this Court, is not a May 3 primary under the Third Plan. To the contrary, the Ohio Supreme Court's ruling that the Third Plan violates the Ohio Constitution means that no primary election can be held under the Third Plan. That is the status quo. The only way a primary election could be held under the Third Plan is for *this* Court to affirmatively and immediately order that the primary election proceed under that map notwithstanding the Ohio Supreme Court's clear order to the contrary. *Id.* at 3, Page ID # 1312. Far from preserving the status quo, the TRO Plaintiffs seek would affirmatively and irreversibly change the status quo, by requiring Ohio's government to conduct elections for Ohio's state legislature under districts that violate the Ohio Constitution. Such an order would cause Ohio to be governed for the next two years by a legislature elected from districts that the Ohio Supreme Court has already found to be unlawful and unconstitutional. That is a sea change, not a temporary pause to preserve the status quo while the Court considers the issues.

Moreover, according to Secretary LaRose's filing, by the time this Court addresses Plaintiffs' Motion, it will be too late to hold the General Assembly primary on May 3 even if the Court grants the motion. Secretary LaRose explained that holding the General Assembly primary on May 3 would require that he instruct county boards of elections to include General Assembly races on the ballots by the date of this filing, March 23, and that he can do so only if this Court so orders him. ECF No. 88 at 3. According to its scheduling order, the Court will not adjudicate the Motion until March 25, ECF No. 85, which will already be too late to give Plaintiffs the May 3 primary under the Third Plan that they seek.

Delay to the General Assembly primary is thus inevitable. But delay is all that is threatened. Plaintiffs' Motion assumes that the alternative to a May 3 primary under the Third Plan is either an election under the now-malapportioned 2011 districts or no election at all. ECF No. 84 at 8-10. Not so. Secretary LaRose has made clear that if the General Assembly primary is not held on May 3, it will be held on a later date, once lawful plans have been adopted. *See, e.g.*, ECF No. 76 at 2, Page ID # 1108 ("At present, the primary election for those districts will have to be held at a later date."); Frequently Asked Questions: The Latest on Ohio's May 3 Primary (Mar. 19, 2022), Ohio Sec'y of State, https://www.ohiosos.gov/globalassets/elections/may3primaryfaq.pdf ("If the General Assembly races aren't on the May 3 ballot, when will those primary contests be held? The Ohio General Assembly has the authority to make that decision, and they can go one of two directions. First, they could move the entire primary election to a later date. Second, they could allow the statewide, congressional, and local races to continue on the May 3 ballot and reschedule the General Assembly primary contests for a later date, possibly in August when boards of elections typically hold special elections.").

Meanwhile, Ohio's state redistricting process is active and ongoing. The Commission has already met four times in the days since the Ohio Supreme Court held the Third Plan unconstitutional on Wednesday, March 16, and it has resolved to meet daily, including on weekends, through at least Monday March 28, *See* Commission Meetings, Ohio Redistricting Comm'n, https://redistricting.ohio.gov/meetings (as last accessed Mar. 23, 2022). The Commission has retained two expert map-drawers, who were slated to arrive in Ohio this morning, and it is working with the Sixth Circuit's chief mediator. *See* Tr. of Ohio Redistricting Commission Mar. 21, 2022 Mtg. at 14-15, https://www.redistricting.ohio.gov/assets/organizations/redistricting-commission/events/commission-meeting-march-21st-257/transcript-1381.pdf. And

the Ohio Supreme Court has retained jurisdiction to review the Commission's new plan under an expedited briefing schedule once it is adopted. *LWV III*, 2022 WL 803033 ¶ 45.

A TRO would improperly cut short all of this state activity, which is ongoing in response to orders from—and under the active jurisdiction of—the Ohio Supreme Court. "[T]he Constitution leaves with the States primary responsibility for apportionment of their federal congressional and state legislative districts," such that "'reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court.'" *Growe*, 507 U.S. at 33 (quoting *Chapman v. Meier*, 420 U.S. 1, 27 (1975)). Thus, "the Court has required federal judges to defer consideration of disputes involving redistricting where the State, through its legislative *or* judicial branch, has begun to address that highly political task itself." *Id.* at 33. "[W]hen parallel State proceedings exist, the decision to refrain from hearing the litigant's claims should be the routine course." *Rice v. Smith*, 988 F. Supp. 1437, 1439 (M.D. Ala. 1997).

To be sure, Ohio's redistricting process has taken a winding path. But while the delays in completing that process are unfortunate, they are not surprising. This is the first redistricting cycle since Ohio's voters overwhelmingly voted in 2015 to amend the Ohio Constitution to adopt the procedurally and substantively complicated Fair District Amendments governing the General Assembly redistricting process. Those amendments worked a dramatic change to Ohio redistricting law, and effectively require the unwinding of the 2011 partisan gerrymander that preceded them, with all the attendant disgorgement of political power that entails. It is understandable that this process has taken time, and that it has ultimately required the Ohio Supreme Court to authoritatively interpret the new provisions and resolve disputes over their meaning and application in a series of three decisions. *LWV I*, 2022 WL 110261; *LWV II*, 2022 WL 354619; *LWV III*, 2022 WL 803033. The result is that it is now too late for *anyone*—this Court

13

or the Commission—to adopt a lawful General Assembly plan in time to hold the General Assembly primary as originally scheduled on May 3. *See* ECF No. 76 at 1-2, Page ID # 1107-08 ("With military and overseas voting ('UOCAVA') and early voting for the primary set to begin shortly, logistically, county boards of election cannot hold primary elections for those races on May 3 with yet *another* legislative district plan." (emphasis in original)).

But as the Commission's and the Ohio Supreme Court's ongoing proceedings amply demonstrate, Ohio is "fully prepared to adopt a [lawful] plan in as timely a manner as" this Court could. *Growe*, 507 U.S. at 37. Given all of the ongoing activity of the Commission, it cannot be said that Ohio is "either unwilling or unable to adopt a" legislative plan. *Id.* There is therefore no basis for a TRO from this Court cutting that activity short.

## II. Plaintiffs do not meet the requirements for temporary or preliminary relief.

Plaintiffs' request for a TRO also fails when the four prerequisites for issuance of a TRO are considered: Plaintiffs are unlikely to succeed on the merits and do not face irreparable harm, and a TRO would harm Ohio voters and the public interest by requiring Ohio to elect its state legislators from districts that have already been held unconstitutional under Ohio law.

### A. Plaintiffs are unlikely to succeed on the merits.

Plaintiffs are unlikely to succeed on the merits because they lack standing or any meritorious federal claim: their quarrel is with the scheduling of a state primary election, which is a question of state law that affects all Ohio voters equally. Moreover, Plaintiffs cannot receive the sole remedy they seek—an order mandating the use of the Third Plan—because it violates Ohio law and is not required by federal law.

1. **Plaintiffs lack standing because they assert only a generalized grievance affecting all Ohio voters.**

In addressing a TRO motion, the Court must "examine first the issue of standing." *Ne. Ohio Coal. for Homeless*, 467 F.3d at 1010. Each element of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). In a motion for preliminary relief, "the district court . . . should normally evaluate standing 'under the heightened standard for evaluating a motion for summary judgment.'" *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255 n.3 (6th Cir. 2018) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912 (D.C. Cir. 2015)). Thus, "mere allegations will not support standing at the preliminary injunction stage." *Doe v. Nat'l Bd. of Med. Examiners*, 199 F.3d 146, 152 (3d Cir. 1999). Rather, "plaintiffs must make a 'clear showing' that they have standing to maintain the preliminary injunction." *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017); *Nat'l Bd. of Med. Examiners*, 199 F.3d at 152 (holding that the party seeking preliminary relief must "adduce[] evidence" demonstrating his standing).

"[S]tanding to sue may not be predicated upon an interest . . . which is held in common by all members of the public"—a generalized grievance. *Schlesinger*, 418 U.S. at 220. A plaintiff has no standing to sue if "whatever [his] injury, it [is] one he share[s] with 'all members of the public.'" *United States v. Richardson*, 418 U.S. 166, 178 (1974). The Supreme Court has "consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large--does not state an Article III case or controversy." *Lujan*, 504 U.S. at 573-75. "The party who invokes the power [of judicial review] must be able to show, not only that the statute is invalid, but that he has

sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally." *Nat'l Rifle Ass'n of Am.*, 132 F.3d at 294 (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923)).

This rule is fully applicable in cases, like this one, in which voters challenge state supreme court decisions relating to elections as allegedly violating federal rights. *Lance v. Coffman*, 549 U.S. 437, 439-442 (2007) (per curiam). Such voters must show some harm to themselves in particular; they may not sue based on arguments that the state's actions generally impair voting rights or render an election unfair. *See id.*; *Nolles*, 524 F.3d at 900; *Looper v. Bowman*, 958 F. Supp. 341, 344 (M.D. Tenn. 1997). As the Eighth Circuit has explained, the claim that an interpretation of state law "resulted in a fundamentally unfair election does not allege a personalized injury" if plaintiffs "do not allege that they were treated differently than other voters or that their votes were diluted as compared to other voters, that election officials refused to count their votes or failed to follow state election procedures, or even that the [state officials] violated state law . . . ." *Nolles*, 524 F.3d at 900; *see also Looper*, 958 F. Supp. at 344 ("The Court finds that Plaintiff's allegations of denial of the right to associate with like minded voters and participate in a democratic election do not identify any 'concrete and particularized' injury which he has suffered or will suffer because of the Defendants' conduct. . . . The alleged injuries . . . are abstract and common to all voters or candidates in Putnam County . . . .").

Plaintiffs present evidence of injury only as to one individual Plaintiff, Mr. Gonidakis himself. *See* Aff. of Michael Gonidakis, ECF No. 84-1. And Mr. Gonidakis's asserted injuries are shared with every active voter in Ohio: he "typically participate[s] in the statewide legislative primary election process" by "learning about candidates; supporting candidates, financially or

otherwise; and associating with like-minded voters," he has begun "engaging in [his] usual election-related activity concerning General Assembly legislative districts," but if the election is not held under the Third Plan, then "all [his] work to-date engaging in the election process will be for nothing." *Id.* ¶¶ 7-12. Mr. Gonidakis does not identify anything concrete that he has done as part of his "usual election-related activity," *id.* ¶ 9, much less make any showing that such activities differ from those all of all other Ohio voters. And regardless, Mr. Gonidakis's investment of "personal resources into" the election process "does not transform a fundamentally generalized grievance into a personal one." *Johnston v. Geise*, 88 F. Supp. 3d 833, 842 (M.D. Tenn. 2015). Any uncertainty created by the invalidation of the Third Plan is in no way unique or particularized to Mr. Gonidakis—it is true in equal measure of every single voter in Ohio.

Mr. Gonidakis also asserts an additional form of injury from the malapportionment, under the 2020 census, of his legislative districts from last decade. *Id.* ¶ 14. Unlike Mr. Gonidakis's other asserted injuries, injury from residing in overpopulated districts would suffice to give Mr. Gonidakis standing, were there any prospect whatsoever of elections proceeding under last decade's districts. But there is no such prospect. Secretary LaRose has never once suggested that the invalidation of the Third Plan means that elections will proceed under last decade's districts. To the contrary, Secretary LaRose has made clear that (absent relief from this court) the primary will be postponed while new, lawful districts are drawn. *Supra* Part I. Without any realistic prospect that an election will actually be held under a malapportioned map, any malapportionment injury to Mr. Gonidakis is purely hypothetical, not certainly impending as would be required to provide standing to sue. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).

      **2.**     **Plaintiffs have no federal claim, because the scheduling of the General Assembly primary is a question of Ohio law.**

Plaintiffs also are unlikely to succeed in proving any violation of federal law. Their threatened injury stems entirely from the delay of the May 3 General Assembly primary. But Plaintiffs have no *federal* right to have the General Assembly primary held on May 3 rather than on some other day. The timing of the primary election for the Ohio General Assembly is entirely a question of Ohio law. And the lack of a federal claim will be dispositive, because "federal courts lack jurisdiction to enjoin state officials on the basis of state law." *Ohio Republican Party,* 543 F.3d at 360 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 124-25 (1984)).

In arguing otherwise, Plaintiffs rely upon their "fundamental right" to vote, Mot. at 8-9, and freedom of association, Mot. at 10-11. But to the extent those rights are threatened, it is only because Ohio will hold the General Assembly primary later than it was originally scheduled. Nothing in federal law prohibits such a delay. To the contrary, "the Federal Constitution gives states, not federal courts, 'the ability to choose among many permissible options when designing elections.'" *Thompson v. DeWine*, 976 F.3d 610, 620 (6th Cir. 2020) (per curiam) (quoting *Thompson v. DeWine*, 959 F.3d 804, 812 (6th Cir. 2020)). Federal courts "don't have the power to tell states how they should run their elections." *Id.* That is particularly so for a wholly state election, as here: "[e]lection law, as it pertains to state and local elections, is for the most part a preserve that lies within the exclusive competence of the state courts." *Nolles*, 524 F.3d at 898 (quoting *Bonas v. Town of N. Smithfield*, 265 F.3d 69, 74 (1st Cir. 2001)).

This case does not involve any of the "limited circumstances" in which an election procedure involving only state officials may violate federal law. *Id*. There is no allegation of "discriminat[ion] against a discrete group of voters." *Id.* Rather, the delay to the General Assembly primary affects all Ohio voters equally. Nor is this a case involving "willful and illegal conduct of

18

election officials result[ing] in fraudulently obtained or fundamentally unfair voting results." *Id.*
at 899. Finally, there is no question of "election officials refus[ing] to hold an election though
required by state law, resulting in a complete disenfranchisement." *Id.* at 898. Unlike in the cases
in which courts have found such a violation, Ohio has not refused to hold an election and thereby
entirely prevented voters from selecting public officials for some term of office. *Cf. Bonas*, 265
F.3d at 78 (town officials extended their terms and "dispense[d] with the 2001 election" without
legal authority); *Duncan v. Poythress*, 657 F.2d 691, 695 (5th Cir. 1981) (governor appointed a
new Supreme Court justice where Georgia law required a special election). Unlike in *Bonas* and
*Duncan*, no one has been or will be disenfranchised, and no official has taken office or extended
their term without authority. Rather, Ohio voters will merely vote in a primary election held at
some date later than May 3—a primary date set more than half a year before the general election
date—once lawful districts can be established. *Supra* Part I. The lawfulness of that delay is entirely
a question of state law and provides no basis for this Court's intervention. Many states conduct
late-summer primaries, and just today, the U.S. Supreme Court emphasized that there is still plenty
of time to draw districts for them. *See Wisc. Legislature v. Wisc. Elections Comm'n*, No. 21A471,
slip op. at 2 (U.S. Mar. 23, 2022) (reversing the Wisconsin Supreme Court's adoption of legislative
maps and explaining that "[s]ummarily correcting the error gives the [state] court sufficient time
to adopt maps consistent with the timetable for Wisconsin's August 9th primary election").

Plaintiffs' argument that the 2010 General Assembly districts are now malapportioned does
nothing to change this. Mot. at 9-10. Again, even if this Court does nothing, there is no prospect
of an election occurring under the 2010 districts. Everyone agrees that such an election would be
unconstitutional (as a matter of both federal and state law), and there is no evidence that Ohio
plans to conduct one. *Supra* Part I. Rather, the status quo is a delay to the primary while the

19

Commission finalizes lawful maps. *Id.* If some threat of an election under the 2010 districts later emerges, the Court can step in then.

Finally, Plaintiffs' procedural due process arguments about the Ohio Supreme Court's three decisions reviewing General Assembly plans likewise do not assert a valid federal claim. Mot. at 11-14. The Gonidakis Plaintiffs were not and are not parties to the Ohio Supreme Court proceedings. The Due Process Clause's procedural rights in state court belong solely to *litigants*, not third parties. *See, e.g.*, *Gilbert v. Ferry*, 298 F. Supp. 2d 606, 616-17 & n.11 (E.D. Mich. 2003) (dismissing § 1983 due process claim against Michigan Supreme Court by an attorney in state proceedings because the attorney was "either reasserting the due process interests of his clients or predicating his claim on the rights of his clients to a fair and impartial tribunal"); *In re Goodman*, No. 14-br-62333, 2015 WL 3507119, at *3 (N.D. Ohio Bankr. June 1, 2015) ("Debtor was not a party to the first state court action and was therefore not injured by it. Consequently, the court rejects Debtor's argument that the due process violations resulting in entry of the first state court judgment are the source of his injury.").

Moreover, even a *party* to the Ohio Supreme Court proceedings could not challenge the fairness of its decisions in this court: under the *Rooker-Feldman* doctrine, review of such decisions lies solely via a writ of certiorari from the United States Supreme Court. *See D.C. Ct. App. v. Feldman*, 460 U.S. 462, 482 (1983). It is no coincidence that every one of the procedural due process cases Plaintiffs cite involved a party to the state court decision challenging that decision on direct Supreme Court review. *See Reich v. Collins*, 513 U.S. 106 (1994) (direct review of Georgia Supreme Court decision); *Bouie v. City of Columbia*, 378 U.S. 347 (1964) (direct review of Supreme Court of South Carolina decision); *Saunders v. Shaw*, 244 U.S. 317 (1917) (direct review of Louisiana Supreme Court decision).

In any event, Plaintiffs' quarrel is with the substance of the Ohio Supreme Court's rulings, not the procedure. Plaintiffs make plain that they disagree with the Ohio Supreme Court's interpretation of Article XI's requirements. Mot. at 13-14. But the Ohio Supreme Court is the arbiter of the Ohio Constitution, and its decisions are controlling. *In re Darvocet, Darvon, & Propoxyphene Prod. Liab. Litig.*, 756 F.3d 917, 937 (6th Cir. 2014). In any event, Plaintiffs' second-guessing of the Ohio Supreme Court's interpretation of Ohio law, in a case to which they are not a party, cannot show a violation of Plaintiffs' federal procedural due process rights.

### 3. Plaintiffs cannot obtain the sole remedy they seek because it violates valid Ohio state law as authoritatively construed by the Ohio Supreme Court.

Even if Plaintiffs had standing and a potential federal claim associated with the date of Ohio's primary election, they still have no likelihood of success in obtaining the sole remedy they seek: an order requiring Secretary LaRose to conduct General Assembly elections under the Third Plan. The Ohio Supreme Court has already held that the Third Plan violates the Ohio Constitution, and there is no basis for this Court to order that the Third Plan nevertheless be used.

To be sure, federal courts can order state officials to conduct legislative elections under particular reapportionment plans if doing so is necessary to remedy a violation of federal law. *White*, 412 U.S. at 794-95. But when federal courts do so, they must "follow the policies and preferences of the State, as expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature, whenever adherence to state policy does not detract from the requirements of the Federal Constitution." *Id.* at 795; *see also Perry v. Perez*, 565 U.S. 388, 393 (2012) ("'[F]aced with the necessity of drawing district lines by judicial order, a court, as a general rule, should be guided by the legislative policies underlying' a state plan—even one that was itself unenforceable—'to the extent those policies do not lead to violations of the Constitution or the Voting Rights Act.'" (quoting *Abrams v. Johnson*, 521 U.S. 74, 79 (1997)).

Thus, a federal court may not impose a "court-ordered plan that reject[s] state policy choices more than [is] necessary to meet the specific constitutional violations involved." *Upham v. Seamon*, 456 U.S. 37, 42 (1982) (per curiam). Rather, federal reapportionment remedies must be "limited to those necessary to cure any constitutional or statutory defect." *Id.* at 43. This is just a particular application of general preemption principles, under which federal law displaces state redistricting laws only if those laws "are an *unavoidable obstacle* to the vindication of the federal right." *Large v. Fremont Cnty., Wyo.*, 670 F.3d 1133, 1145 (10th Cir. 2012).[1] In remedying a federal-law violation, federal courts therefore may not "gratuitously disregard[] state laws—laws that need *not* be disturbed to cure the [federal law] violation." *Id.* (emphasis in original). "In that situation, the conflict with state law is not a necessary consequence of the remedial operation of federal law but, rather, it reflects a mere policy disagreement" between the state law and the reviewing court. *Id.* at 1146.

Here, the Ohio Supreme Court has spoken very clearly: the Third Plan violates Ohio law's partisan fairness provisions, and those violations run so deep they taint the plan in its entirety and require the drafting of an entirely new plan. *LWV III*, 2022 WL 803033 ¶¶ 2, 44. Nothing about that Ohio-law holding is contrary to or preempted by federal law. To the contrary, the Supreme Court has expressly held that "[p]rovisions in state statutes and state constitutions can provide standards and guidance for state courts to apply" in combatting excessive partisan gerrymandering. *Rucho v. Common Cause*, 139 S. Ct. 2484, 2508 (2019). Thus, federal law provides no justification for ordering Ohio to conduct elections under the unconstitutional Third Plan. Plaintiffs cannot

---

[1] *Large* involved a remedial plan adopted by a local government, not a federal court. *See id.* But the preemption question is the same: the extent to which state law districting requirements are displaced by federal law.

wield a TRO motion in this Court as a magic wand to conjure away the Ohio Supreme Court decision rejecting use of the Third Plan because it violates Ohio law.

In arguing otherwise, Plaintiffs rely on *Reynolds v. Sims*, 377 U.S. 533, 537 (1964). Mot. at 16-17. But *Reynolds* is entirely consistent with this analysis. *Reynolds* emphasized that "state constitutional provisions should be deemed violative of the Federal Constitution only when validly asserted constitutional rights could not otherwise be protected and effectuated," and held that "courts should attempt to accommodate the relief ordered to the apportionment provisions of state constitutions insofar as is possible." 377 U.S. at 584. But "[w]hen there is an unavoidable conflict between the Federal and a State Constitution, the Supremacy Clause of course controls." *Id.* Such a conflict was present in *Reynolds* itself, because the federal right at issue—the right to districts of substantially equal population—was directly inconsistent with state constitutional provisions providing for unequal districts. *Id.* at 568-69.[2]

There is no inconsistency here. Ohio law prohibits General Assembly plans drawn primarily to favor one political party, including the Third Plan, but nothing in Federal law *requires* unfair districts. It is entirely possible to draw General Assembly districts that comply with both Ohio law's requirements and federal law—the Ohio Supreme Court expressly so concluded, and Plaintiffs make no contrary showing. *LWV I*, 2022 WL 110261, at * 27. Even if the Court at some point concludes that it must impose its own districts to redress Plaintiffs' federal claims, the Court would need to impose districts that comply with the Fair District Amendments. *White*, 412 U.S. at 794-95; *Reynolds*, 377 U.S. at 584. The Third Plan emphatically does not fit the bill.

---

[2] Similarly, in *McDaniel v. Paty*, 435 U.S. 618 (1978), and *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246 (2020), which Plaintiffs also cite, state constitutional provisions prohibiting ministers from serving as legislators and prohibiting aid to religious schools, respectively, were held directly inconsistent with the First Amendment, and thus preempted. Nothing in either case suggests that a federal court may order a remedy that violates state law where, as here, doing so is *not* required to protect federal rights.

**B.      Plaintiffs do not face irreparable harm, merely a delayed primary.**

The requirement of irreparable harm "is indispensable" to a motion for preliminary relief: "If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit." *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019) (emphasis in original). And "[t]o merit a preliminary injunction, an injury 'must be both certain and immediate,' not 'speculative or theoretical.'" *Id.* at 327 (quoting *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991)); *see also Doe v. Univ. of Cincinnati*, No. 1:15-CV-600, 2015 WL 5729328, at *1 (S.D. Ohio Sept. 30, 2015) ("The standard for issuing a temporary restraining order is logically the same as for a preliminary injunction with emphasis, however, on irreparable harm given that the purpose of a temporary restraining order is to maintain the status quo." (citation omitted)).

Plaintiffs argue that they face irreparable harm absent relief because elections will either be held under the malapportioned 2011 maps or will not be held at all. Mot. at 16. But as explained above, *supra* Part I, that is just not so: the status quo is a primary held on a later date once lawful maps are drafted, not the 2011 maps or no election at all. Plaintiffs offer no evidence or argument that a delay to the primary will irreparably harm them, and no such harm is apparent.

**C.      A TRO would irreparably harm the vast majority of Ohio voters, who amended the Ohio Constitution's requirements for state legislative redistricting.**

While Plaintiffs will not be irreparably harmed in the absence of a TRO, ordering Secretary LaRose to maintain the Third Plan would cause substantial and irreparable harm to the Ohio voters who amended Article XI of Ohio's Constitution to include anti-gerrymandering provisions. In November 2015, Ohio voters overwhelmingly approved the Fair District Amendments to Article XI, which overhauled the redistricting process for General Assembly districts and set forth clear and enforceable standards for partisan fairness. *See LWV I*, 2022 WL 110261, ¶ 4; *see also* Jeffrey

24

S. Sutton, *Who Decides?* 296 (2021) (explaining that Ohio's redistricting reform had "a wide spectrum of support in the state legislature" and won "75% of the vote"). The Ohio Supreme Court invalidated the Third Plan under Article XI's new provisions.

A federal court order mandating implementation of the Third Plan would render Article XI a nullity for the primary and general 2022 elections, and cause Ohio to be governed for the next two years by legislators elected from districts that unfairly disfavor one political party in violation of Ohio law. Moreover, granting Plaintiffs' requested relief would set a precedent, in any future election cycles in which the Commission delays implementation of a legally compliant map, for federal courts to mandate the implementation of General Assembly maps that violate Article XI. This outcome would irreparably harm those Ohioans who advocated for and achieved state constitutional reform.

In addition, an order mandating implementation of the Third Plan would irreparably harm the Bennett Petitioners and the other two Petitioner groups, who are composed of Ohio voters and nonprofit, nonpartisan organizations with members residing in Ohio, who have successfully obtained a ruling from the Ohio Supreme Court invalidating the Third Plan. Those parties' rights under Article XI of the Ohio Constitution ought to weigh heavily in the balancing of harms.

### D. The public interest weighs against a TRO.

The public interest would not be served by the implementation of a General Assembly plan that the state's highest court has already held to violate the state constitution. "The public has an interest in ensuring that the State's [primary] election is conducted pursuant to state law." *Smith v. S.C. State Election Comm'n*, 901 F. Supp. 2d 639, 649 (D.S.C. 2012). In determining whether to issue a temporary restraining order, this Court should weigh heavily the "[s]erious and irreparable harm [that will] result if Ohio cannot conduct its election in accordance with its lawfully enacted"

redistricting procedures. *See Thompson*, 959 F.3d at 812. Indeed, "giving effect to the will of the people by enforcing the laws they and their representatives enact serves the public interest." *Id.*

## CONCLUSION

For the forgoing reasons, the Court should deny the Gonidakis Plaintiffs' Motion for a Temporary Restraining Order.

Respectfully submitted,

/s/ Donald J. McTigue
Donald J. McTigue* (OH 0022849)
*Counsel of Record
Derek S. Clinger (OH 0092075)
MCTIGUE COLOMBO & CLINGER LLC
545 East Town Street
Columbus, OH 43215
T: (614) 263-7000
F: (614) 368-6961
dmctigue@electionlawgroup.com
dclinger@electionlawgroup.com

Abha Khanna**
Ben Stafford **
ELIAS LAW GROUP LLP
1700 Seventh Ave, Suite 2100
Seattle, WA 98101
T: (206) 656-0176
F: (206) 656-0180
akhanna@elias.law
bstafford@elias.law

David R. Fox**
Jyoti Jasrasaria**
Spencer W. Klein**
Harleen Gambhir***
Raisa Cramer***
ELIAS LAW GROUP LLP
10 G St NE, Suite 600
Washington, DC 20002
T: (202) 968-4490
F: (202) 968-4498
dfox@elias.law
jjasrasaria@elias.law
sklein@elias.law
hgambhir@elias.law
rcramer@elias.law

** Admitted pro hac vice
*** Motion for admission pro hac vice
pending*Counsel for Bennett Petitioners*

27

## CERTIFICATE OF SERVICE

This is to certify a copy of the foregoing was served upon all counsel of record by means of the Court's electronic filing system on this 23rd Day of March, 2022.

/s/ Donald J. McTigue_____
Donald J. McTigue (OH 0022849)