# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| Michael Gonidakis, *et al.*, | : | |
| | : | Case No. 2:22-cv-773 |
| Plaintiffs, | : | |
| | : | |
| v. | : | Chief Judge Algenon L. Marbley |
| | : | |
| Frank LaRose, | : | Circuit Judge Amul R. Thapar |
| | : | |
| Defendant. | : | Judge Benjamin J. Beaton |

---

## PLAINTIFFS' SECOND AMENDED MOTION FOR A PRELIMINARY INJUNCTION AND DECLARATORY RELIEF

---

Now come Plaintiffs Michael Gonidakis, Mary Parker, Margaret Conditt, Beth Ann Vanderkooi, Linda Smith, Delbert Duduit, Thomas W. Kidd Jr., and Ducia Hamm ("Plaintiffs"), by and through undersigned counsel, and move this Court for a preliminary injunction pursuant to Fed. R. Civ. P. 65(a) and request that this Court enjoin Ohio Secretary of State Frank LaRose, in his official capacity, and all persons acting on his behalf or in concert with him, from deviating from the Third Plan adopted by the Ohio Redistricting Commission. A Memorandum in Support of this Motion is attached.

Respectfully submitted,

**Isaac Wiles & Burkholder LLC**

*/s/ Donald C. Brey*
Donald C. Brey (0021965)
Brian M. Zets (0066544)
Matthew R. Aumann (0093612)
Ryan C. Spitzer (0093515)
Trista M. Turley (0093939)
Two Miranova Place, Suite 700
Columbus, Ohio 43215
Tel: 614-221-2121; Fax: 614-365-9516

dbrey@isaacwiles.com
bzets@isaacwiles.com
maumann@isaacwiles.com
rspitzer@isaacwiles.com
tturley@isaacwiles.com

*Attorneys for Plaintiffs Michael Gonidakis, Mary Parker, Margaret Conditt, Beth Ann Vanderkooi, Linda Smith, Delbert Duduit, Thomas W. Kidd, Jr., and Ducia Hamm*

# TABLE OF CONTENTS

I.  STATEMENT OF THE CASE...................................................................................... 4

II. FACTUAL BACKGROUND ....................................................................................... 4

III. STANDARD OF REVIEW .......................................................................................... 8

IV. LAW AND ARGUMENT............................................................................................. 8

    A.    **Plaintiffs are likely to succeed on the merits because their right to vote and right to associate risk denial.** .................................................................. 8

        1.    Without the Third Plan, no state legislative districts exist so Plaintiffs cannot vote in violation of the U.S. Constitution................................................ 8

        2.    Alternatively, the state legislative districts are based on the 2010 census, so they are now malapportioned in violation of the U.S. Constitution............. 9

        3.    Plaintiffs cannot freely associate with others in their district in violation of the U.S. Constitution. ............................................................................... 10

        4.    Without the Third Plan, Plaintiffs' voting rights risk arbitrary denial............ 11

    B.    **The Third Plan avoids Plaintiffs' irreparable harm—denial of the rights to vote and associate.**.............................................................................. 15

    C.    **Maintaining the Third Plan will benefit Third Parties.** ................................... 16

    D.    **Maintaining the Third Plan will serve the public interest.** ............................. 17

    E.    **This Court has the power to implement the Third Plan.** ................................ 19

V.  CONCLUSION .......................................................................................................... 21

# I.   STATEMENT OF THE CASE

Plaintiffs have watched the back-and-forth between the Ohio Redistricting Commission and the Ohio Supreme Court for six months. And with no sign that the volleys will end before the May 3 primary election, Plaintiffs ask this Court to maintain the Third Plan adopted by the Redistricting Commission. This will allow the primary election and the general election to go forward, and avoid the election chaos created by Ohio's failed process and a bifurcated primary. *See Reynolds v. Sims*, 377 U.S. 533, 568, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964).

The Third Plan may not be the "best" plan, but it would secure Plaintiffs' fundamental rights to vote and associate. Moreover, the Third Plan was adopted by elected officials through a series of negotiations and policy decisions. These difficult decisions are reflected in the Third Plan, and this Court should not stand in the place of the Redistricting Commission and make up its own.

# II.   FACTUAL BACKGROUND

The Third Plan adopted by the Ohio Redistricting Commission should be implemented because without statewide legislative districts, there cannot be a May 3, 2022, primary election.

## A.  Ohio's 2010 legislative district maps and Ohio's population changes.

Ohio's 2010 legislative district maps were created after receipt of the 2010 U.S. Census data showing that Ohio had a population of 11,536,504 people. (First Supplemental Complaint ("FSC"), ECF No. 86, ¶ 16). The 2020 U.S. Census data showed that much has changed in Ohio over the last ten years, including a net gain of more than 250,000 people and double-digit growth in several regions. (*Id.*, ¶¶ 28–31). Many political subdivisions such as Franklin, Delaware, Warren, and Union Counties grew by double-digits. (*Id.*, ¶ 30). Franklin, Cuyahoga, and Hamilton Counties, Ohio's most populous counties, saw a total shift of more than 200,000 people. (*Id.*, ¶ 31). The population of Mr. Gonidakis' resident city and area grew by double-digit percentage points. (Affidavit of Michael Gonidakis ("Gonidakis Aff."), ECF No. 84-1, ¶ 6, PageID # 1175).

**B. The Redistricting Commission adopts First Plan and Second Plan, and both are rejected by the Ohio Supreme Court.**

The Ohio Redistricting Commission was created in 2015 by an amendment to the Ohio Constitution. The Redistricting Commission creates statewide legislative districts using the most recent federal census data. The Redistricting Commission met and adopted the First Plan in September 2021. (FSC, ECF No. 86, ¶¶ 32–35). It was later sent back to the Redistricting Commission by the Ohio Supreme Court in January 2022. *See League of Women Voters of Ohio v. Ohio Redistricting Comm.*, 2022-Ohio-65, ¶ 138.

The Redistricting Commission then met and adopted the Second Plan on January 22, 2022. The Second Plan also used the most recent federal census data. (FSC, ECF No. 86, ¶¶ 35–50). Still, in February 2022, the Ohio Supreme Court sustained objections relating to the Redistricting Commission's Second Plan. *See League of Women Voters of Ohio v. Ohio Redistricting Comm.*, 2022-Ohio-342, ¶ 67.

**C. The Redistricting Commission adopts the Third Plan and Secretary LaRose implements it.**

The Redistricting Commission then convened to create a Third Plan, which passed by a 4-3 vote. (FSC, ECF No. 86, ¶ 56). The Third Plan accounts for Ohio's population changes. (*Id.*, Exhibit C, PageID # 1291). Ohio's population on April 1, 2020, was 11,799,488, meaning the target population for each Ohio House district is 119,186. (*Id.*, PageID # 1294). The chart accompanying the Third Plan shows that the population of each House District is no more than 5% above or below the target population. The same is true for each Ohio Senate District. (*Id.*, PageID # 1294).

Because the Third Plan satisfied the requirements of the U.S. Constitution and the Ohio Constitution, and anticipating no more delay, Secretary of State LaRose began implementing the

Third Plan shortly after it was adopted. (Affidavit of Amanda Grandjean ("Grandjean Aff."), ECF No. 88-1, ¶ 15, PageID # 1322).

**D.  The Third Plan speeds forward.**

The Secretary LaRose ordered the county boards of elections to move forward with the Third Plan on February 26, 2022. (*See* Directive 2022-30, ECF No. 88-1, PageID # 1315). The local county boards began carrying out the Third Plan. (Grandjean Aff., ECF No. 88-1, ¶ 15, PageID # 1322). Boards of elections started reprogramming voter registration and tabulating systems. (*See* Directive 2022-30, ECF No. 88-1, PageID # 1315).

The Secretary of State's order was reasonable because the Third Plan creates competitive elections in compact districts despite the geographic challenges of the Democratic Party. Dr. Michael Barber is a political science professor with a Ph.D. from Princeton University's Department of Politics. (Affidavit of Dr. Michael Barber ("Dr. Barber Aff."), ECF No. 84-1, PageID # 1202). He has served as an expert in several election-related cases (*Id.*, PageID # 1189), and he explained that the Third Plan achieves a 54% Republican and 46% Democratic statewide proportionality for the Ohio House and the Ohio Senate as considered by the Article XI, Section 6 of the Ohio Constitution. (*Id.*, PageID # 1190). This was difficult because the Ohio Constitution restricts splitting townships and municipalities, and because of the Democratic Party's success in so few political subdivisions, proportionality requires the very splitting the Ohio Constitution prohibits.



(Affidavit of Sean Trende ("Trende Aff."), ECF No. 84-1, PageID # 1226).

Secretary LaRose's implied certainty that the Third Plan would go forward, had other consequences. Mr. Gonidakis began operating under the assumption that the Third Plan would go forward. (Gonidakis Aff., ECF No. 84-1, ¶ 9, PageID # 1175). As a result, he started to engage in his usual election activity, which has historically included donating to candidates, attending rallies, and gathering with like-minded voters. (*Id.*, ¶ 8).

### E.  The Third Plan is paused and the risk of election chaos increases.

On March 16, 2022, nearly three weeks later and after substantial work on the Third Plan, the Ohio Supreme Court invalidated it. (Grandjean Aff., ECF No. 88-1, ¶ 19). This caused the county boards of elections to pause work implementing the Third Plan. (*Id.*, ¶ 20). This pause did not require undoing the work already completed, such as altering ballots already created. (*Id.*,

¶ 22). The Secretary of State, as of March 23, 2022, remains ready and able to implement the Third

Plan without disrupting the May 3 primary or creating a bifurcated election. (*Id.*, ¶ 24).

The Redistricting Commission has since reconvened to consider creating a Fourth Plan.

## III.  STANDARD OF REVIEW

In determining whether to grant a preliminary injunction, a district court considers four

factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the

movant would suffer irreparable injury absent the injunction; (3) whether the injunction would

cause substantial harm to others; and (4) whether the public interest would be served by the

issuance of an injunction.  *Daunt v. Benson*, 956 F.3d 396, 406 (6th Cir. 2020); *see also Bays v.

City of Fairborn*, 668 F.3d 814, 818-19 (6th Cir. 2012). These factors "are not prerequisites, but

rather are factors which the Court should balance." *Golden v. Kelsey-Hayes Co.,* 73 F.3d 648, 653

(6th Cir. 1996). These four factors are met here because Plaintiffs' fundamental rights risk being

denied, and there is no harm in securing the right to vote or associate.

## IV.  LAW AND ARGUMENT

Because Plaintiffs' constitutional right to vote will be violated without the Third Plan and

the four preliminary injunction factors favor Plaintiffs, this Court should issue an injunction and

order other appropriate relief necessary to continue the implementation of the Third Plan.

**A.  Plaintiffs are likely to succeed on the merits because their right to vote and right to associate risk denial.**

Without the Third Plan, Plaintiffs' right to vote will be violated, so Plaintiffs are likely to

succeed on the merits.

**1.  Without the Third Plan, no state legislative districts exist so Plaintiffs cannot vote in violation of the U.S. Constitution.**

Should Secretary LaRose cease implementing the Third Plan, then there would be no

legislative districts, in violation of the U.S. Constitution. The right to vote is a fundamental right,

and the Equal Protection Clause and the Substantive Due Process Clause prohibit blanket disenfranchisement. *George v. Hargett*, 879 F.3d 711, 727 (6th Cir. 2018) (citing *Warf v. Bd. of Elections of Green Cty.*, 619 F.3d 553, 559 (6th Cir. 2010)); *see also, League of Women Voters v. Brunner*, 548 F.3d 463, 478 (6th Cir. 2008). In these instances, "federal court intervention may be appropriate" to avoid an unfair election. *Brunner*, 548 F.3d at 478 (citing *Griffin v. Burns*, 570 F.2d 1065, 1078-79 (1st Cir. 1971)).

Here, this Court should maintain the Third Plan or Plaintiffs will be without legislative districts to vote. (*See* Gonidakis Aff., ECF No. 84-1, ¶¶ 6–17). Secretary of State LaRose began moving forward with the Third Plan in February shortly after it was adopted. (*See* Directive 2022-30, ECF No. 88-1, PageID # 1315). This included directing the local boards of elections to begin implementation. (Grandjean Aff., ECF No. 88-1, ¶ 15, PageID # 1322). Should this work be undone, Plaintiffs would not have districts to vote in or candidates to vote for: Plaintiffs' voting power would be diluted to zero. This sort of blanket disenfranchisement would violate the U.S. Constitution.

Because blanket disenfranchisement violates the U.S. Constitution, Plaintiffs are likely to succeed on the merits.

### 2. Alternatively, the state legislative districts are based on the 2010 census, so they are now malapportioned in violation of the U.S. Constitution.

The Third Plan should also be maintained because using the old legislative districts is not an option. *See Evenwel v. Abbott*, 578 U.S. 54, 59, 136 S. Ct. 1120, 1124 (2016). As the U.S. Supreme Court recently explained, when drawing state legislative districts, the maximum population deviation between the largest and smallest districts is 10%. *Id.* (citing *Brown v. Thomson*, 462 U.S. 835, 842-843, 103 S. Ct. 2690, 77 L. Ed. 2d 214 (1983)). In fact, "[m]aximum deviations above 10% are presumptively impermissible." *Id.* Such deviations violate the Equal

Protection Clause of the U.S. Constitution. *Id.* (citing *Reynolds v. Sims*, 377 U.S. 533, 568, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964)); *see also, Kopald v. Carr*, 343 F. Supp. 51, 52 (M.D. Tenn. 1972).

Here, the population in Plaintiffs' state legislative districts are more than 10% above the least populous state legislative districts, in violation of the Equal Protection Clause, so this Court should adopt the Third Plan. Plaintiffs' house and senate districts are based on the 2010 decennial census. (*See* FSC., ECF No. 86, ¶¶ 69–72). Mr. Gonidakis, Ms. Vanderkooi, and Ms. Smith live in Franklin County, which has gained more than 150,000 people since the last census, and their respective cities have experienced more than 10% in population gains. (*Id.*). Mr. Gonidakis lives in Dublin, Ohio, which has grown in population by more than 20%, so his legislative districts are malapportioned. (Gonidakis Aff., ECF No. 84-1, ¶ 6).

Because Ohio's population has changed, so too has the population in the state legislative districts. Double-digit growth in some areas and population losses in others means that the state legislative districts cannot be within 5% of the target population for a state legislative district. (*See id.*; FSC, ECF No. 86, ¶¶ 70–72). As a result, Plaintiffs' districts, including House Districts 18, 19, 21, 52, 62, 68, 70, and 90 and Senate Districts 3, 4, 7, 14, 15, 16, 19, and 22, dilute their vote in violation of the "one-person, one-vote" requirement.

For these reasons, Plaintiffs are likely to succeed on the merits.

### 3. Plaintiffs cannot freely associate with others in their district in violation of the U.S. Constitution.

This Court should maintain the Third Plan so Plaintiffs may freely associate. "The rights of political association and free speech occupy a similarly hallowed place in the constitutional pantheon." *Graveline v. Benson*, 992 F.3d 524, 535 (6th Cir. 2021) (citation omitted). The "right to associate with the political party of one's choice is an integral part of the basic constitutional

freedom." *Mich. State A. Philip Randolph Inst. v. Johnson*, 749 F. App'x 342, 363 (6th Cir. 2018) (quoting *Kusper v. Pontikes*, 414 U.S. 51, 57, 94 S. Ct. 303, 38 L. Ed. 2d 260 (1973)). Though the right to politically associate is not absolute, a severe restriction must be narrowly drawn to advance a state interest of compelling importance. *Kishore v. Whitmer*, 972 F.3d 745, 749 (6th Cir. 2020) (citation omitted).

Here, should this Court allow the Third Plan to lapse, Plaintiffs cannot associate with members of their state legislative districts in violation of the U.S. Constitution. Mr. Gonidakis, for example, has historically learned about his candidates, supported candidates, and associated with like-minded voters. (Gonidakis Aff., ECF No. 84-1, ¶ 7). He has started to do so under the Third Plan. (*Id.*, ¶ 9). Should this Court allow the Third Plan to be undone, then Mr. Gonidakis' work will be undone, too. (*Id.*). Moreover, he will be unable to associate with those in his state legislative districts because none will exist.

The absolute restriction on Plaintiffs' right to associate has no state interest of compelling importance. There is no state interest in completely disenfranchising voters. There is also no state interest in a six-month back-and-forth between the Redistricting Commission and the Ohio Supreme Court that yields no state legislative districts. As a result, Plaintiffs' denial of the freedom to associate is a separate and independent violation of the U.S. Constitution in addition to any disenfranchisement potentially caused by eliminating the Third Plan, and Plaintiffs are likely to succeed on the merits of this claim.

### 4. Without the Third Plan, Plaintiffs' voting rights risk arbitrary denial.

This Court should maintain the Third Plan because the Ohio Supreme Court's evolving standards violate the U.S. Constitution. The Due Process Clause of the Fourteenth Amendment states that no State shall "deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. Amend XIV, § 1. It "imposes on the **States** the standards necessary to ensure

that judicial proceedings are fundamentally fair," *Lassiter v. Dep't of Soc. Servs.,* 452 U.S. 18, 33 (1981), requiring that litigants receive "notice and opportunity for hearing appropriate to the nature of the case," *Mullane v. Cent. Hanover Bank & Tr. Co.,* 339 U.S. 306, 313 (1950) (emphasis added). This procedural fairness requirement applies to state courts. *See Reich,* 513 U.S. at 110–14; *Bouie v. City of Columbia,* 378 U.S. 347, 354–55 (1964); *Saunders, v. Shaw,* 244 U.S. 317, 319–20 (1917).

The U.S. Supreme Court has repeatedly recognized that a state supreme court cannot give "retroactive effect" to an "unforeseeable" decision, if the application of that decision would deny "a litigant a [fair] hearing." *Bouie,* 378 U.S. at 354–55; *Reich,* 513 U.S. at 110–14; *Saunders,* 244 U.S. at 319–20. In *Saunders,* a defendant won a judgment in a state trial court after that court concluded that the plaintiff's factual claim "was not open to the plaintiff" under then-existing law. 244 U.S. at 319–20. The state supreme court reversed, resting its opinion on a case decided *after* the trial court's judgment, thus making the plaintiff's factual claim legally available to him. But what the state supreme court did not do was remand the action to the trial court to afford the defendant "the proper opportunity to present his evidence" on that now-relevant factual claim. *Id.* at 319. Unsurprisingly, the Supreme Court of the United States reversed, holding that it is "contrary to the 14th Amendment" for a state supreme court to reverse the favorable judgment obtained by a defendant based on the application of a new judicial decision without also remanding to give the defendant "a chance to put his evidence in" to respond to that new decision—at least where the defendant never "had the proper opportunity to present his evidence" before. *Id.*

Similarly, in *Reich,* a plaintiff sought a tax refund for retirement payments paid by the federal government after his military service. 513 U.S. at 108. The Supreme Court of the United States had declared state laws that exempted from taxation retirement benefits paid by the State,

12

but not by the federal government unconstitutional, and Georgia repealed its version of that statute. *Id.* The plaintiff sued to recoup those taxes paid on his federal benefits under that repealed statute, but the Georgia Supreme Court first opined that its "refund statute [did] not [] apply to the situation where the law under which the taxes are assessed and collected is itself subsequently declared to be unconstitutional or otherwise invalid." *Id.* at 109 (citation omitted).

The U.S. Supreme Court remanded for reconsideration in light of an intervening decision in *Harper v. Virginia Department of Taxation,* 509 U.S. 86 (1993). Instead of considering the intervening opinion, the Georgia Supreme Court denied the plaintiff's tax-refund request by claiming, for the first time, that its own predeprivation state-law remedies sufficed to remedy any Due Process Clause violation, even though previously the State also offered postdeprivation remedies. *Reich,* 513 U.S. at 110. This was an entirely different explanation than the Georgia court offered in its first opinion. On appeal, the U.S. Supreme Court explained that this was exactly "what a State may *not* do . . . reconfigur[ing] its scheme, unfairly, in *midcourse*—to 'bait and switch'" the plaintiff. *Id.* at 111. The Georgia Supreme Court's reliance on predeprivation procedures, this Court held, "was entirely beside the point" because "no reasonable taxpayer would have thought that they represented . . . the exclusive remedy for unlawful taxes." *Id.* (emphasis omitted).

This Court should maintain the Third Plan because the Plaintiffs' voting rights could be arbitrarily denied. In its decision invalidating the original legislative plan, the Ohio Supreme Court held that the plan was unconstitutional for failing to "closely correspond" to the Ohio statewide voter preference of 54% Republican to 46% Democrat. *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, Slip Opinion No. 2022-Ohio-65, ¶ 88. In response, the Redistricting Commission enacted the first remedial plan with the goal of closely corresponding to the 54-46

ratio. *See League of Women Voters of Ohio v. Ohio Redistricting Comm.*, Slip Opinion No. 2022-Ohio-342, ¶ 97 (Kennedy and DeWine, JJ., dissenting). The Court shortly thereafter invalidated the first remedial plan; apparently "closely correspond" meant "exactly." *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, Slip Opinion No. 2022-Ohio-342, ¶¶ 63–64. Now required to draw an *exact* 54-46 plan, the Redistricting Commission again met the Ohio Supreme Court's new criteria and enacted a second revised plan with five more democratic leaning state House districts and two more democratic leaning state Senate districts, representing a perfect statewide proportionality of 54% to 46%. *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, Slip Opinion No. 2022-Ohio-789, ¶ 84 (Kennedy and DeWine, JJ., dissenting). Yet again, the Court invalidated the plan after arbitrarily creating a new formula that assessed individual districts, instead of the plan as a whole. *Id.* at ¶ 85.

The Ohio Supreme Court's untenable one-upmanship is also seen in its shifting definition of a competitive district. In *LWV I*, the Court merely required the first remedial map to meet the 54-46 "statewide proportion of Republican-leaning districts to Democratic-leaning districts." *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, Slip Opinion No. 2022-Ohio-65, ¶ 86. When the Redistricting Commission met this standard in the Second Plan, the Court cried foul and for the first time held that labeling 50-51% Democratic-leaning districts as competitive was "absurd on its face." *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, Slip Opinion No. 2022-Ohio-342, at ¶ 61. The Redistricting Commission then enacted the Third Plan that "reduced from 12 to five the number of seats favoring Democrats by less than 51 percent." *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, Slip Opinion No. 2022-Ohio-789, ¶ 87 (Kennedy and DeWine, JJ., dissenting). Yet again, the Court invalidated the plan after arbitrarily deciding that "even districts in which Democrats have a 2 percent advantage do not

count as districts that "'favor" [the Democratic] party.'" *Id.* at ¶ 88 (citing majority opinion at ¶ 41).

The Ohio Supreme Court's three decisions further conflict in their analysis of expert reports and statistical measures by creating, then ignoring, benchmarks for what might be constitutional. *Id.* at ¶¶ 94–102. The end result sought by the Ohio Supreme Court is unknown to all. But the current result is "electoral chaos for Ohioans," *id.* at ¶ 59, created at the expense of Plaintiffs' Due Process rights.

For these reasons, Plaintiffs are likely to succeed on the merits of their claims.

## B. The Third Plan avoids Plaintiffs' irreparable harm—denial of the rights to vote and associate.

Implementing the Third Plan secures Plaintiffs' right to vote and associate in the May 3, 2022, primary election. When constitutional rights are threatened or impaired, irreparable injury is presumed. *See ACLU of Ky. v. McCreary County, Ky.*, 354 F.3d 438, 445 (6th Cir. 2003). The right to vote and the right to associate are constitutional rights. *Reynolds v. Sims*, 377 U.S. 533, 554-555, (1964). A restriction of the fundamental right to vote and associate thus constitutes irreparable injury. *Obama for Am. v. Husted*, 697 F.3d 423, 436 (2012) (citation omitted); *see also Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986).

This Court should grant Plaintiffs' motion for a preliminary injunction and order the continued implementation of the Third Plan to avoid Plaintiffs' irreparable injury. Without the Third Plan, Plaintiffs cannot vote (or would vote in old districts) and cannot associate with candidates and like-minded voters. These deprivations violate the U.S. Constitution. As a result, without the Third Plan, there is an assumption that Plaintiffs will suffer irreparable harm appropriate for injunctive relief.

The Third Plan is important because additional time will not produce a Fourth Plan. The process of adopting a new plan using the Redistricting Commission started six months ago. Since then, there have been three plans adopted by the Redistricting Commission and three plans rejected by the Ohio Supreme Court. While the Redistricting Commission may be considering a Fourth Plan, there is no indication this back-and-forth will yield a Fourth Plan. Moreover, the opposing parties have objected to the plans with the Ohio Supreme Court, and will likely do so again even if a Fourth Plan is adopted, returning the issue to the Ohio Supreme Court. Past events show that more time is not the solution.

Beyond the uncertainty of a nonexistent Fourth Plan, the General Assembly controls the primary date. The General Assembly is not required to move the primary date or alter the primary schedule to create two primaries—one for non-statewide legislative elections and another special primary for statewide legislative elections. Likewise, the Ohio Supreme Court lacks the ability to modify the May 3, 2022, primary election date on its own. It also cannot adopt its own legislative districting plan. *See* Ohio Constitution, Article XI, Section 9(D). Only maintaining the Third Plan keeps Ohio on track for one primary on May 3, 2022.

For all these reasons, Plaintiffs will suffer an irreparable injury without the adoption of the Third Plan by this Court, and the Third Plan, based on the ongoing failure of Ohio's process, is the only solution.

### C. Maintaining the Third Plan will benefit Third Parties.

Plaintiffs are not the only Ohio voters disenfranchised by the failure of Ohio's redistricting process. Over 100,000 Ohioans live in each of the now malapportioned 2010 state legislative districts where Plaintiffs live. (ECF No. 86-1, FSC, Exhibit C, PAGEID# 1294). To the extent those districts are still in effect, hundreds of thousands of Ohio voters are disenfranchised by malapportioned districts. To the extent no state legislative districts are in effect, all Ohio voters

are disenfranchised, lacking any opportunity to vote for state legislators with an election just weeks away. Thus, a preliminary injunction will further the interests of all Ohio voters, not just Plaintiffs.

### D. Maintaining the Third Plan will serve the public interest by protecting constitutional rights, reducing confusion, and conserving public funds.

Granting Plaintiffs' motion for a preliminary injunction will also serve the public interest by protecting the constitutional voting rights of Ohio citizens, preventing further electoral chaos and confusion, and avoiding the waste of millions of dollars of public funds.

First, maintaining the Third Plan serves the public interest by protecting voting rights. As the Sixth Circuit has recognized, "it is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994). Although states have "a strong interest in their ability to enforce state election law requirements . . . members of the public, however, 'have a strong interest in exercising the fundamental political right to vote.'" *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 244 (6th Cir. 2011), quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). "That interest is best served by favoring enfranchisement and ensuring that qualified voters' exercise of their right to vote is successful." *Hunter*, 635 F.3d at 244. Accordingly, maintaining the Third Plan will serve the public interest by ensuring that Ohio voters live in established and properly apportioned districts before the primary election. By requiring the implementation of a Third Plan that is properly apportioned based on Ohio's current population, the Court will ensure the protection of Ohio voters right to vote and associate. These rights will be lost if the May 3 primary comes to pass with malapportioned or nonexistent state legislative districts—issues solved by maintaining the Third Plan.

Second, maintaining the Third Plan avoids confusion. This Court recognized the public's interest in avoiding such voter confusion. *League of Women Voters v. LaRose*, No. 2:20-cv-1638,

2020 U.S. Dist. LEXIS 91631, at *31 (S.D. Ohio April 3, 2020) (Watson, J.) ("[B]ecause further changes to the election procedure could cause significant additional voter confusion, the Court finds that the public interest factor weighs against [an injunction]."). Ohio's failed redistricting process has proven to be a breeding ground for confusion. The Redistricting Commission has adopted three different plans. Over six months of litigation, the Ohio Supreme Court has rejected each plan. Voters do not know what state legislative districts they live in or who their candidates will be. It is in the public interest for this Court to end this endless cycle of confusion by ordering Secretary LaRose to continue implementing the Third Plan, especially considering the risk of bifurcated primary election.

Finally, maintaining the Third Plan will also serve the public interest by saving tens of millions of dollars of public funds. When weighing the impact of a proposed injunction on the public interest, federal courts have frequently considered the effect of an injunction on the expenditure of public funds. *Coalition of Mich. Nursing Homes v. Dempsey*, 537 F. Supp. 451, 465 (E.D. Mich. 1982) ("the public at large has an interest in the conservation of the state treasury"); *Welch v. Brown*, 551 Fed. Appx. 804, 814 (6th Cir. 2014) (considering whether an injunction would affect public safety budget); *Lapeer Cnty. Medical Care Facility v. Michigan*, 765 F. Supp. 1291, 1301 (W.D. Mich. 1991) (considering the impact of a proposed injunction on the state budget); *Crawley v. Ahmed*, No. 08-14040, 2009 U.S. Dist. LEXIS 40794, at *85 (E.D. Mich. May 14, 2009) ("the problem of additional expense [to the state] must be kept in mind").

The Ohio General Assembly has already expended over $9 million to implement the Third Plan for the May 3 primary.[1] Secretary LaRose has publicly stated that moving the state legislative

---

[1] Haley BeMiller, *Secretary of State Frank Larose Says Legislative Races Won't Make May 3rd Primary*, COLUMBUS DISPATCH, March 17, 2022,

primaries to a later date may cost an additional $20 million – $25 million.[2] Considering the continuing failure of the state redistricting process since September 2021, it is, at best, speculative that Ohio will have new districts even with such a delay. By granting Plaintiffs' preliminary injunction, the Court can eliminate such wasteful expenditures while also finally putting an end to voter confusion and protecting Ohioans' constitutional voting rights. It is unquestionably in the public interest to do so.

### E. This Court has the power to implement the Third Plan.

This Court may order the Third Plan even though it was rejected by the Ohio Supreme Court. State court decisions and state constitutions must yield to the U.S. Constitution. The whole purpose of 42 U.S.C. § 1983 is to protect people from unconstitutional action under the color of state law "whether that action be executive, legislative, or judicial." *Mitchum v. Foster*, 407 U.S. 225, 242, 92 S. Ct. 2151, 2162 (1972) (citation omitted). For example, it is 42 U.S.C. § 1983 that allowed the U.S. Supreme Court to overcome the Alabama Constitution to protect voting rights under the Equal Protection Clause. *Reynolds v. Sims*, 377 U.S. 533, 537, 84 S. Ct. 1362, 1369 (1964). Indeed, the "purpose of § 1983 was to interpose the federal courts between the States and the people . . . ." *Mitchum*, 407 U.S. at 242.

Because the right to vote is so fundamental, district courts may adopt a map to fix a constitutional violation. *See Rucho v. Common Cause*, 139 S. Ct. 2484, 2495 (2019). "[T]here is a role for the courts" to resolve one-person, one-vote and other violations. *Id.* (citations omitted); *see, e.g.*, *Kopald v. Carr*, 343 F. Supp. 51, 52 (M.D. Tenn. 1972). In *Kopald*, multiple plans were proposed by the legislative authority, including one with a population variance of 21%. *Id.* In

---

www.dispatch.com/story/news/2022/03/17/ohio-redistricting-what-court-decision-means-may-3-primary/7073394001/.

[2] *Id.*

response, the court adopted a modified plan that reduced the variance to 4% and maintained jurisdiction for one election cycle. *Id.* at 54 (citing *Ely v. Klahr*, 403 U.S. 108, 91 S. Ct. 1803, 29 L. Ed. 2d 352 (1971)); *see also McConchie v. Scholz*, No. 21-cv-3091, 2021 U.S. Dist. LEXIS 201160, at *67 (N.D. Ill. Oct. 19, 2021) (ordering submission of proposed map to be considered by the court following Equal Protection Clause violation). But importantly, the "Constitution does not require the best plan, just a lawful one." *League of Women Voters v. LaRose*, No. 2:20-cv-1638, 2020 U.S. Dist. LEXIS 91631, at *32 (S.D. Ohio Apr. 3, 2020)

Here, this Court should maintain the Third Plan, which may not be the "best" plan but is a lawful one under the U.S. Constitution. This makes it an appropriate plan for this Court to adopt.

This Court should maintain the implementation of the Third Plan rather than draw its own plan, even though the Third Plan was rejected by the Ohio Supreme Court. First, Secretary LaRose has already started implementing the Third Plan. A new plan drawn by this Court would require significant state resources to carry out, assuming the state even had time do so. Second, the Redistricting Commission is made up of seven elected officials who, unlike federal judges, can be held accountable by voters. Third, these elected officials made difficult policy decisions based on the inherent geographic challenges of a Democratic voter-base that coalesces inside just a few political subdivisions. These policy decisions are best left to elected officials rather than federal judges. For theses reasons, this Court should adopt the Third Plan over a federal-created plan.[3]

Assuming this Court adopts a plan previously approved by Ohio's elected officials, this Court should adopt the Third Plan rather than the First Plan and the Second Plan. As the Redistricting Commission moved through various plans, it has increasingly approached a plan that

---

[3] In the alternative, should this Court not adopt the Third Plan, then it would need to move the current statutory election deadlines, which would be disruptive.

could be found to be acceptable by the Ohio Supreme Court. (*See* Dr. Barber Report, ECF No. 84-1, PageID # 1187). While the goal posts have been continuously moved, the end result is that the Third Plan provides more representative districts than the First Plan or the Second Plan, more closely aligning with the policy aims articulated by the Ohio Supreme Court. This progress shows that the Third Plan, while not preferred by Plaintiffs, is a more appropriate remedy than the other plans adopted by the Redistricting Commission. There is also no time now to implement the First Plan or the Second Plan.

For these reasons, this Court should maintain the implementation of the Third Plan rather than stand in the shoes of the duly elected members of the Redistricting Commission and attempt to draw its own.

## V. CONCLUSION

For all these reasons, Plaintiffs respectfully request that this Court require that Secretary of State Frank LaRose maintain the Third Plan to carry out the 2022 primary and general election.

Respectfully submitted,

**Isaac Wiles & Burkholder LLC**

*/s/ Donald C. Brey*
Donald C. Brey (0021965)
Brian M. Zets (0066544)
Matthew R. Aumann (0093612)
Ryan C. Spitzer (0093515)
Trista M. Turley (0093939)
Two Miranova Place, Suite 700
Columbus, Ohio 43215
Tel: 614-221-2121; Fax: 614-365-9516
dbrey@isaacwiles.com
bzets@isaacwiles.com
maumann@isaacwiles.com
rspitzer@isaacwiles.com
tturley@isaacwiles.com

*Attorneys for Plaintiffs Michael Gonidakis,*
*Mary Parker, Margaret Conditt, Beth Ann*

*Vanderkooi, Linda Smith, Delbert Duduit, Thomas W. Kidd, Jr., and Ducia Hamm*

## CERTIFICATE OF SERVICE

I hereby certify that on March 23, 2022, a copy of the foregoing was filed electronically.

Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system.

*/s/Donald C. Brey*
Donald C. Brey (0021965)