**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **MICHAEL GONIDAKIS, et al.,** | |
| Plaintiffs, | |
| v. | Circuit Judge Amul R. Thapar |
| **FRANK LAROSE,** | Chief Judge Algenon L. Marbley |
| Defendant, and | Judge Benjamin J. Beaton |
| **LEAGUE OF WOMEN VOTERS OF OHIO and A. PHILIP RANDOLPH INSTITUTE OF OHIO,** | Case No. 2:22-cv-773 |
| Intervenor-Defendants. | |

**INTERVENOR-DEFENDANTS' OPPOSITION TO PLAINTIFFS' SECOND AMENDED
MOTION FOR A PRELIMINARY INJUNCTION
AND DECLARATORY RELIEF**

**Table of Contents**

I.    INTRODUCTION AND LOCAL RULE 7.2 SUMMARY ................................................. 1

II.   RECENT FACTUAL DEVELOPMENTS .......................................................................... 2

      A.    The Supreme Court of Ohio is Actively Supervising the Redistricting
            Process. ................................................................................................................. 2

            1.    The Ohio Constitution expressly vests exclusive and original
                  jurisdiction over partisan gerrymandering claims in the Supreme
                  Court of Ohio. .............................................................................................. 2

            2.    The Supreme Court of Ohio carefully reviewed three enacted plans
                  and invalidated them under Ohio law. .......................................................... 3

            3.    The Supreme Court of Ohio set forth a detailed procedure
                  regarding the enactment of a fourth plan. ..................................................... 5

      B.    The Ohio Redistricting Process Is Moving Forward Expeditiously. ..................... 5

            1.    The Commission schedules daily meetings to keep progress on
                  track. ............................................................................................................. 5

            2.    The Commission hires two independent map drawers. ................................. 5

            3.    The Commission unanimously adopts instructions to guide the
                  map-drawing process. ................................................................................... 6

            4.    The independent map drawers immediately get to work. ............................. 8

      C.    At Present, Ohio Is Not Proceeding with General Assembly Elections as
            Part of the May 3, 2022 Primary. ....................................................................... 11

III.  LEGAL STANDARD ...................................................................................................... 12

IV.   ARGUMENT .................................................................................................................... 13

      A.    Plaintiffs are Unlikely to Succeed on the Merits. ............................................... 13

            1.    Plaintiffs' claims fail under *Growe*: ........................................................... 13

            2.    No election will be held under the 2010 district lines. ............................... 16

            3.    Imposing the Third Plan, which the Supreme Court of Ohio
                  invalidated as unconstitutional, is contrary to federal law and
                  principles of comity. ................................................................................... 16

            4.    Plaintiffs' voting rights are not at risk for arbitrary denial. .............. **Error!**

**Bookmark not defined.**

B.    Plaintiffs Do Not Face Irreparable Harm................................................ 22

C.    Issuing the Preliminary Injunction Would Cause Substantial Harm to
Third Parties................................................................................................ 24

    1.    Plaintiffs sidestepped this element entirely................................. 24

    2.    Compelling Secretary LaRose to proceed with elections pursuant
to an unconstitutional district plan will cause substantial harm to
Ohio voters.................................................................................... 25

D.    Issuing a Preliminary Injunction Would Not Serve the Public Interest............... 26

E.    Plaintiffs' Claims Are Premature........................................................... 30

V.    CONCLUSION........................................................................................ 32

I.    **INTRODUCTION AND LOCAL RULE 7.2 SUMMARY**

At the end of their meeting on March 24, 2022, Commission Co-Chair Vernon Sykes remarked that "this is historic" due to the transparent nature of the proceedings and that "we are making progress." *Ohio Redistricting Commission Live Feed*, OHIO REDISTRICTING COMM'N, at 53:29 (Mar. 24, 2022), https://ohiochannel.org/live/redistricting-1. In a joint interview with Co-chairs Speaker Cupp and Senator Sykes after the Commission meeting concluded, Senator Sykes said that he was "optimistic that they're going to make the [March 28, 2022] deadline" for enacting a new plan for the General Assembly districts. Speaker Cupp echoed this sentiment, saying "agreed, agreed."[1]

The optimism of the Republican and Democratic co-chairs is well grounded. The Commission has been working diligently, transparently, and on a bipartisan basis to enact a new plan.[2] They have retained independent map drawers who are working on a televised basis, in full public view. They are thoughtfully considering all of the issues related to drawing a map, consistent with the instructions of Ohio Supreme Court. They are within 72 hours of enacting a new plan.

Nor is there any reason to conclude that such a plan would be untimely.[3] There may or may not be practical concerns regarding implementing the March 28, 2022 election plan in time for the May 3, 2022 primary; the Secretary of State is still formulating his view on this point and will present its views to the Court prior to the Preliminary Injunction hearing. But even if it

---

[1] Josh Rultenberg (@JoshRultNews), Twitter, (March 24, 2022, 8:39 PM) bit.ly/3DhpbX5.

[2] *See* Section II (pp. 2-12), *infra*.

[3] *See* Section IV.A.1 (pp. 13-16), infra; *see also Growe v. Emison*, 507 U.S. 25, 33 (1993) *Branch v. Smith*, 538 U.S. 254 (2003)

were to turn out that the March 28, 2022 Plan could not be implemented in time for the May 3, 2022 primary, there is a clear option that is superior to implementing the invalid Third Plan: if necessary (and the issue is not yet ripe) this Court can consider ordering the amendment of the primary date. That result would be a less intrusive option than ordering the implementation of the invalid Third Plan.

Nor do Plaintiffs contentions that they will somehow be forced to vote under an outdated 2010 plan bear the slightest scrutiny.[4] And their assertions that their due process rights are being violated amount to little more than a disagreement with the well-reasoned decisions of the Ohio Supreme Court.

Finally, if the March 28 Plan cannot be implemented in time for the May 3 primary, this Court can adjust the primary date.[5] But at this point, that issue is not ripe.

Accordingly, the motion for preliminary injunction should be denied.

## II.  RECENT FACTUAL DEVELOPMENTS

### A.  The Supreme Court of Ohio is Actively Supervising the Redistricting Process.

#### 1.  The Ohio Constitution expressly vests exclusive and original jurisdiction over partisan gerrymandering claims in the Supreme Court of Ohio.

In 2015, Ohio voters, by an overwhelming margin of 71.5% to 28.5%, amended the Ohio Constitution by adding express constitutional commands that legislative plans not be drawn "to favor or disfavor a political party," and that the distribution of seats "shall correspond closely to

---

[4] *See* Section IV.A.2 (pp. 16), *infra*.

[5] *See* Section IV.A.1.b (pp. 14-16), *infra*; *see also Upham v. Seamon*, 456 U.S. 37 (1982); *Sixty-Seventh Minn. State Senate v. Beens*, 406 U.S. 187 (1972); *Larios v. Cox*, 305 F. Supp. 2d 1335, 1343 (N.D. Ga. 2004)

the statewide preferences of the voters of Ohio." Ohio Const. art. XI, §§ 6(A)–(B).  The express

purpose of the constitutional amendment was to "[e]nd the partisan process for drawing Ohio

House and Senate districts and replace it with a bipartisan process with the goal of having district

boundaries that are more compact and politically competitive."  Ohio Sec'y of State, Issue 1

Ballot Language (Nov. 2015), https://bit.ly/3ElgrPY.

Article XI of the Ohio Constitution, as amended, gives the Supreme Court of Ohio a

central role in supervising the enactment of any legislative plan.  It provides the Supreme Court

of Ohio with exclusive and original jurisdiction over all actions arising under Article XI, and

grants it the authority to invalidate "any general assembly district plan made by the Ohio

redistricting commission."  Ohio Const. art. XI, §§ 9(A)–(B); *League of Women Voters of Ohio

v. Ohio Redistricting Comm'n*, 2022-Ohio-65, ¶ 69.  Moreover, in the event that the Supreme

Court of Ohio finds a plan to be constitutionally defective, it has the express authority to order

the Commission to "convene, and ascertain and determine a general assembly district plan in

conformity with such provisions of this constitution as are then valid."  Ohio Const. art. XI, §

9(B).

### 2.    The Supreme Court of Ohio carefully reviewed three enacted plans and invalidated them under Ohio law.

On September 16, 2021, the Commission voted along strict party lines to enact a General

Assembly district plan to be in effect for the next four years.  A week later, on September 23,

2021, Intervenor-Defendants League of Women Voters  filed a complaint in the Supreme Court

of Ohio, alleging that the Commission's district plan violated Article XI of the Ohio

Constitution.  Specifically, Intervenor-Defendants alleged that the Commission violated Sections

6(A) and 6(B) of Article XI by enacting a plan that (i) primarily favored the Republican Party,

and (ii) failed to correspond closely to the statewide preferences of the voters of Ohio.  *See*

3

Compl. ¶ 91, *League of Women Voters of Ohio, et al. v. Ohio Redistricting Comm'n, et al*., No. 2021-1193.

Following expedited discovery, full merits briefing, and oral argument, the Supreme Court of Ohio, on January 12, 2022, struck down the Commission's plan. In so doing, it carefully examined (and affirmed) its authority to remedy a partisan gerrymander, *League of Women Voters of Ohio*, 2022-Ohio-65, ¶¶ 64–75, ordered the Commission to reconvene to adopt a new plan within ten days of the Court's decision, and expressly retained jurisdiction to review the constitutionally compliant plan once adopted by the Commission, id. ¶ 137.

On January 22, 2022, the Commission adopted a revised plan, to which Intervenor-Defendants, three days later, lodged objections, explaining that the revised plan violated Article XI, Sections 6(A) and 6(B). *See* Pet'rs' Obj. to Ohio Redistricting Comm'n's Revised Map, *League of Women Voters of Ohio v. Ohio Redistricting Comm'n*, No. 2021-1193.

Roughly two weeks later, on February 7, 2022, the Supreme Court of Ohio sustained Intervenor-Defendants' objections and struck down the Commission's Revised Plan for "violat[ing] [] Article XI, Sections 6(A) and 6(B) of the Ohio Constitution." *League of Women Voters of Ohio v. Ohio Redistricting Comm'n*., 2022-Ohio-342, ¶ 3. On February 24, 2022, the Commission passed a second revised plan (the "Third Plan"), to which Intervenor-Defendants again filed objections. *See* Obj. to Ohio Redistricting Comm'n's Feb. 24, 2022 Revised Pla*n, League of Women Voters of Ohio v. Ohio Redistricting Comm'n*, No. 2021-1193.

On March 16, 2022 the Supreme Court of Ohio issued its Opinion and Order, sustaining Petitioners' objections to the Third Plan on the basis of violations of Article XI, Sections 6(A) and 6(B) of the Ohio Constitution. *03/16/2022 Case Announcements #2*, 2022-Ohio-790 (hereinafter "March 16, 2022 Order").

      3. **The Supreme Court of Ohio set forth a detailed procedure regarding the enactment of a fourth plan.**

In its March 16, 2022 Order, the Ohio Court spelled out just how the Third Plan's

constitutional defects should be remedied:

- The Supreme Court of Ohio ordered that the Commission be reconstituted and convene in order to draft and adopt a new Ohio General Assembly district plan that conforms with the Ohio Constitution.  *Id.*;

- "To promote transparency and increase public trust," the order requires the Commission to conduct its drafting "in public[.]"  *Id.*;

- To make sure that the work of the Commission is done effectively, the Court ordered the Commission to "convene frequent meetings to demonstrate their bipartisan efforts to reach a constitutional plan within the time set by th[e] court."  *Id.*  ;

- And to make sure that the work is done expeditiously, the new plan must be filed with the Secretary of State no later than March 28, 2022.  *Id.*[6]

      B. **The Ohio Redistricting Process Is Moving Forward Expeditiously.**

      1. **The Commission schedules daily meetings to keep progress on track.**

The Commission immediately began complying with the Ohio Court's Order.  The

Commission first met on Saturday, March 19 and scheduled meetings *every day* through

Monday, March 28.  *See* Commission Meetings, OHIO REDISTRICTING COMM'N,

https://redistricting.ohio.gov/meetings (accessed Mar. 23, 2022).

      2. **The Commission hires two independent map drawers.**

The Commission agreed to hire two independent map drawers and a mediator to assist in

the map-drawing process.  *See* Tr. of 3-19-2022 Ohio Redistricting Comm'n Meeting, ECF No.

91-2 at PageID # at 1482.  The two independent map drawers include one map drawer selected

by Republican Commissioners, Douglas Johnson, and one map drawer selected by Democratic

---

[6] In addition, the Ohio Court set forth an aggressive (72 hour) schedule for the filing of objections, if any, and responses (again, 72 hours), if any, to any revised plan.  *Id.*

commissioners, Dr. Michael McDonald. *See* Tr. of 3-21-2022 Ohio Redistricting Comm'n Meeting, ECF No. 91-3 at PageID # 1488-1489. The mediators work with the Sixth Circuit Court of Appeals and were recommended to Co-Chair Sykes by Chief Justice Sutton. *Id.* at PageID # 1489. Both the map drawers and the mediators were hired by the unanimous decision of all seven Commissioners. *Id.* at PageID # 1501.

Immediately following their appointment, the two map drawers flew in from out of state for their first meeting with the Commission on Wednesday, March 23 and to receive instructions for their work. *See* Ex. A (Tr. of 3-23-2022 Ohio Redistricting Comm'n Meeting) at 02:59.

### 3. The Commission unanimously adopts instructions to guide the map-drawing process.

At the March 23 Commission meeting, after two-and-a-half hours of substantive discussion, the commissioners unanimously agreed to adopt 24 detailed instructions to guide the work of the map drawers. *See* Ex. A (Tr. of 3-23-2022 Ohio Redistricting Comm'n Meeting); Ground Rules for Map Drawers (Mar. 23, 2022), OHIO REDISTRICTING COMM'N, bit.ly/3tDhqYs. These Rules, which are attached as Ex. B, hereto, include:

- Rule 1: The map drawers shall include the two independent map drawers hired by the Redistricting Commission and Commissioners' staff/contractor map drawers. *Ground Rules for Map Drawers*, OHIO REDISTRICTING COMM'N , (Mar. 23, 2022), bit.ly/3tDhqYs.

- Rule 2: The independent map drawers shall draft any General Assembly district plan at the direction of the Redistricting Commission and in accordance with the Ohio Constitution and Supreme Court of Ohio's orders. *Id.*

- Rule 3: The independent map drawers shall answer to each of the Redistricting Commission members. However, any conflicting direction from the Redistricting Commission members shall be resolved via a mediation process. (Rules 12-16). *Id.*

- Rule 4: The independent map drawers shall produce an entirely new general assembly district plan that has not been previously submitted to the Redistricting Commission. The independent map drawers shall not include or consider any general assembly plan proposals or work product produced prior to Wednesday, March 23, 2022 when drafting the entirely new general assembly district plan. *Id.*

- Rule 5:  The map drawers shall utilize statewide election results and geography from 2016, 2018, and 2020 for the purpose of measuring the partisan lean of individual districts.  *Id.*

- Rule 6:  When considering the election results, Republican votes cast plus Democratic vote casts shall equal 100% of the total vote.  *Id.*

- Rule 7:  Any General Assembly district plan shall be drawn in the Maptitude software program.  *Id.*

- Rule 8:  The independent map drawers shall utilize one computer purchased by the Redistricting Commission to draft any general assembly district plan.  Two additional computers may be used for preparation purposes by the independent map drawers on site. *Id.*

- Rule 9:  Racial data will neither be loaded onto the computers nor shall it be utilized by the map drawers in any way.  *Id.*

- Rule 10:  The independent map drawers shall draw a general assembly district plan that conforms with the Ohio Constitution including Article 11, Sections 1, 2, 3, 4, 5, 6, and 7, the Constitution of the United States and applicable federal laws.  *Id.*

- Rule 11:  The independent map drawers shall draw a general assembly district plan that conforms with the opinions of the Ohio Supreme Court and the United States Supreme Court.  *Id.*

- Rule 12:  Should the independent map drawers encounter a disagreement between themselves regarding the application of Art. 11 of the Ohio Constitution and/or the opinions of the Ohio Supreme Court, the issue shall be referred to the full Commission. *Id.*

- Rule 13:  Should the full Redistricting Commission reach a unanimous consensus, the independent map drawers shall implement the instructions of the full Redistricting Commission.  *Id.*

- Rule 14:  Should the full Redistricting Commission not be able to resolve the issue by unanimous consensus, the issue shall be referred to mediation.  *Id.*

- Rule 15:  Should mediation fail to resolve the issue, the issue shall be presented to the full Redistricting commission for a vote.  A majority vote of the Commission shall resolve the issue.  *Id.*

- Rule 20:  The Statehouse's Ohio Government TV will livestream the map making process.  OGT will stream the map drawers whenever they are working in the room.  *Id.*

- Rule 21:  Commissioners or their designated staff shall have unlimited access to the map drawers, but shall contact both Dr. McDonald and Mr. Johnson simultaneously.  *Id.*

- Rule 22:  The independent map drawers will provide regular progress updates to the Commission at each of the Commission's scheduled meetings.  *Id.*

- Rule 23:  Commissioners can expect to provide feedback and guidance to the independent map drawers in these meetings in addition to their individual outreach to the independent map drawers.  *Id.*

- Rule 24:  Public access will be available in a nearby room where video from the work room will be broadcast.  *Id.*

### 4.  The independent map drawers immediately get to work.

The next morning, on March 24, the independent map drawers began their work to draw new general assembly maps.  They met in room 116 of the Statehouse and utilized two computers to draw the maps.  As directed by the Commission, they removed racial data, loaded the rest of the data from the statewide elections results from 2016, 2018, and 2020 into Maptitude, and aggregated the data.  With the assistance of Republican and Democratic Commission staffers, the map drawers tested the data to ensure its accuracy, and confirmed that it was ready to use.  Designated staff of the Commissioners participated throughout the day, providing feedback to the map drawers in real time and fielding questions about Ohio's geography.  *See Ohio Redistricting Commission Live Feed*, OHIO REDISTRICTING COMM'N, (Mar. 24, 2022), https://ohiochannel.org/live/redistricting-1.

Consistent with the Ohio Constitution and Auditor Faber's suggestion to start with the complex counties that would present the most issues, the map drawers began their work with Franklin County. *See March 24, 2022 Ohio Redistricting Comm'n Hrg.*, at 03:15, bit.ly/3IJpomW.; Ohio Const., art. XI § 3(C)(1); Ex. A (Tr. of 3-23-2022 Ohio Redistricting Comm'n Meeting) at 44:36.



Ohio Redistricting Commission - Computer 2 **LIVE**

*See* Ohio *Redistricting Commission Live Feed*, OHIO REDISTRICTING COMM'N, (Mar. 24, 2022), https://ohiochannel.org/live/redistricting-1.

That evening, the map drawers met with the Commission to brief them on their progress and to seek their guidance on some outstanding questions. Dr. McDonald noted that he had "tackled the difficult part of Franklin County" and expected to finish the county by Thursday evening. *March 24, 2022 Ohio Redistricting Comm'n Hrg.*, at 03:18, bit.ly/3IJpomW. Mr. Johnson agreed, noting that although it was "slow going," the map drawers were "making progress." *Id.* at 06:49.

The map drawers also raised the issue of determining what constitutes a competitive district and how the map drawers should assign or designate toss-up districts. Although the map drawers recommended different approaches, they agreed that they could continue their map drawing unimpeded without the Commission deciding that evening. *Id.* at 34:01. The

9

Commissioners also agreed, with Senate President Huffman remarking that "It sounds like a lot of the work can proceed in this issue, which I think is significant, while this gets resolved." *Id.* at 47:47.  The Commission also agreed to consider the issue and provide the map drawers with a decision.  *Id.* at 52:54.

At the end of the meeting, Commission Co-Chair Vernon Sykes remarked that "this is historic" due to the transparent nature of the proceedings and that "we are making progress."  *Id.* at 53:29.  In a joint interview with Co-chairs Speaker Cupp and Senator Sykes after the Commission meeting concluded, Senator Sykes said that he was "still optimistic that they're going to make the deadline."  Josh Rultenberg (@JoshRultNews), Twitter, (Mar. 24, 2022, 8:39 PM) bit.ly/3DhpbX5.  Speaker Cupp echoed this sentiment, saying "agreed, agreed." *Id.*

At the Friday, March 25, 2022 afternoon meeting of the Commission, the mapdrawers informed the Commission that they successfully drafted their proposals for districts in Cuyahoga, Franklin, Hamilton, and Summit Counties, and were steadily making progress on Montgomery County.  *March 25, 2022, Ohio Redistricting Comm'n Hrg.*, at 04:04, bit.ly/3JJeSNM.  When asked by Commissioner Allison Russo the timeline in which they expected to propose a full map to the Commission, Mr. Johnson noted that while it was a ballpark estimate, he thought that the map drawers could provide full working drafts by the afternoon of Saturday, March 26.  *Id.*  at 10:02. Dr. McDonald agreed noting that "I hope by tomorrow afternoon at the latest, we will have something that is a statewide map."  *Id*. at  11:51. He further explained the two mapdrawers are more than one third of the way through, and, according to the Commission consultants, the mapdrawers have gotten through "the roughest parts of the state to draw districts."  *Id.* at 11:08.  Each mapdrawer also presented on their computer screens the two proposals they have each drafted and walked the Commission through the completed counties.  *See generally id.* Mr.

10

Johnson noted that the representatives of the commissioners who have been in the map drawing room to answer questions, have helpfully informed the map drawers about "lessons learned" from the past map drawing exercises.  *Id.* at 31:23. After finishing a review of the map drawing in Hamilton County, the Commission recessed with plans to reconvene on the following afternoon of March 26.



## C.    At Present, Ohio Is Not Proceeding with General Assembly Elections as Part of the May 3, 2022 Primary.

As a result of the Supreme Court of Ohio's rulings, the Third Plan is presently not operative.  Thus, when the Secretary responded to the Motion for a TRO, he stated that while work had been undertaken under the Third Plan, "once the Supreme Court invalidated it, he had no choice but to pause those preparations." Ohio Sec'y of State LaRose's Resp. to Pls.' Mot. for a TRO to Maintain the Third Plan, ECF No. 88 at PageID # 1310.

On March 23, that "pause" escalated to a removal of the General Assembly elections from the ballot. Given the constrained time frame and unprecedented electoral circumstances, Secretary LaRose issued a directive to all Ohio Boards of Elections:

> In the wake of the Ohio Supreme Court's decision last week invalidating the February 24, 2022 General Assembly district plan, **it is not possible to include the primary contests for the Ohio House, Ohio Senate, and State Central Committee on the May 3, 2022 Primary Election ballot.** The Plaintiffs in the federal court case *Gonidakis v. LaRose* filed a motion on Monday asking the court to order the use of the February 24, 2022 district plan for the primary. But the federal court's ultimate decision on that motion has not been made as of the issuance of this Directive or rather in time for boards of elections to finalize ballots for the May 3, 2022 Primary Election. Likewise, the General Assembly has not changed the date of the election. Therefore, offices and candidates for Ohio House, Ohio Senate, or State Central Committee will not appear on the ballot. T

*See* Ohio Sec'y of State LaRose's Notice of Issuance of Ohio Sec'y of State Directive 2022-31, ECF No. 97 at PageID # 1597 (emphasis added).

The Secretary then succinctly summarized the situation, stating, "this is the only currently lawful and reasonable option to continue to move forward toward the May 3, 2022 Primary Election at this unprecedented point in time." *Id.* at PageID # 1599.

In his statement to the media, on March 24, 2022, the Secretary estimated that March 31 was the hard deadline for knowing which plan would govern the May 3 primary. *See* Ex. C (Cleveland.com Article). At the hearing on the Temporary Restraining Order, however, counsel for the Secretary of State was unable to state the final "drop dead" dates for the implementation of a plan. They are to state their position at the hearing on the preliminary injunction.

## III. LEGAL STANDARD

In assessing whether to grant a preliminary injunction, courts evaluate: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer

irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction." *Ne. Ohio Coal. for the Homeless v. Husted,* 696 F.3d 580, 590–91 (6th Cir. 2012). Moreover, this Court should only adjudicate ripe claims: here Plaintiffs claims are manifestly premature as this Court can address any concerns about the manner in which a Fourth Plan can be implemented by adjusting the primary date (if necessary).

## IV. ARGUMENT

### A. Plaintiffs are Unlikely to Succeed on the Merits.

Plaintiffs' claims suffer from four fatal defects on the merits: (1) there is no impasse at this point justifying the intervention of the federal court; (2) there is no reasonable prospect that Ohio will vote under the 2010 Plan; (3) under principles of comity, this Court should not impose a plan that the Ohio Supreme Court has found to be invalid; and (4) Plaintiffs rights are not at risk of arbitrary denial so as to constitute a violation of due process,

#### 1. Plaintiffs' claims fail under *Growe*:

##### a) The State Process is Moving Expeditiously Towards a Conclusion.

So long as the Ohio redistricting process is working effectively towards a new map, federal intervention is improper. *See Growe v. Emison*, 507 U.S. 25, 33 (1993) ("In the reapportionment context, the Court has required federal judges to defer consideration of disputes involving redistricting where the State, through its legislative *or* judicial branch, has begun to address that highly political task itself."). In its ruling from the bench, the District Court distinguished this case from the federal intervention in *Branch v. Smith*, 538 U.S. 254 (2003), by accurately noting that in *Branch* there was "no prospect" of resolution before the election. Tr. of Status Conf., ECF No. 69 at PageID # 1003; *Branch*, 538 U.S. at 265 ("we affirm the injunction

on the basis . . . that the state-court plan had not been precleared and had no prospect of being precleared in time for the 2002 election").

Because a very real, and imminent, prospect for resolution remains possible in this case, deferral continues to be warranted. As long as this is the case, Plaintiffs cannot succeed on the merits of their claim that federal imposition of an invalidated map is justified.

The Ohio redistricting process is not at an impasse. To the contrary, the Commission is moving with seriousness and speed towards enacting a new map – a draft of which may be available to the Commission as soon as *tomorrow*. The Commission is working long days – conducting 6 meetings between March 19 and March 25, with more scheduled throughout the weekend – to meet its March 28 deadline. It is utilizing independent experts and a Sixth Circuit mediation team to bridge the partisan divide. The process, governed by a set of unanimously agreed upon standards, is both highly sophisticated and fully within the public view. These procedural innovations, spurred on by the clear and effective order of the Supreme Court of Ohio, constitute a dramatic improvement over prior map-drawing processes. They signal a real change in the workings of the Commission, and significant movement towards a final Fourth Plan.

### b) *Ohio's Process Will Likely Be Timely.*

On March 23, 2022, Secretary LaRose issued a directive removing the General Assembly election from the May 3 primary ballot. *See* Ohio Sec'y of State LaRose's Notice of Issuance of Ohio Sec'y of State Directive 2022-31, ECF No. 97 at PageID # 1597. The Secretary has indicated, however, that it would be possible to utilize a Supplemental Ballot, and that his "drop-dead" date to make that decision was March 31. *See* Ex. C (Cleveland.com Article). Accordingly, while logistically difficult, there remains the prospect that the March 28, 2022 Plan could be implemented in time for the May 3, 2022 primary.

14

If that were to prove impractical, there are less intrusive options than imposing the invalid Third Plan.   In particular, this Court has the authority to move the primary date if necessary.  *See, e.g.*, *Upham v. Seamon*, 456 U.S. 37, 44 (1982) ("[W]e leave it to [the District Court] in the first instance to determine whether to modify its judgment [as to the state's congressional apportionment plan] and reschedule the [congressional] primary elections for Dallas County or . . . to allow the election to go forward in accordance with the present schedule."); *Sixty-Seventh Minn. State Senate v. Beens*, 406 U.S. 187, 201 n.11 (1972) ("If time presses too seriously [to implement a remedial reapportionment plan], the District Court has the power appropriately to extend the [election deadline] time limitations imposed by state law."); *see also* *Larios v. Cox*, 305 F. Supp. 2d 1335, 1343 (N.D. Ga. 2004) (noting court's power to extend election deadlines and ordering new statewide maps be drawn in time for upcoming primary election).

Nor does the fact that there might be challenges to the March 28, 2022 Plan constitute a barrier to such relief.  *Cf. Growe*, 507 U.S. at 35 ("The District Court also expressed concern over the lack of time for orderly appeal, prior to the State's primaries, of any judgment that might issue from the state court….We fail to see the relevance of the speed of appellate review. *Germano* requires only that the state agencies adopt a constitutional plan 'within ample time ... to be utilized in the [upcoming] election'…. It does not require appellate review of the plan prior to the election, and such a requirement would ignore the reality that States must often redistrict in the most exigent circumstances[.]") (quoting *Scott v. Germano*, 381 U.S. 407, 409 (1965)).

Once enacted on March 28, 2022, the plan is valid unless and until it is invalidated. Thus, were this Court to order the implementation of the March 28, 2022 Plan it would be ordering the implementation of a plan that is not invalid.  That is a world of difference from

ordering the implementation of the Third Plan which *has been held to be invalid*. There is no warrant for such a drastic result.

> ### 2. No election will be held under the 2010 district lines.

Just as there is no chance of Ohio cancelling the 2022 General Assembly elections, there is also no chance that Ohio will hold an election under the 2010 district lines. Plaintiffs state that "using the old legislative districts is not an option." *See* PI Mot., ECF No. 96 at PageID # 1583. No one has suggested otherwise. Plaintiffs' logic on this point follows the same flawed reasoning as the prior argument – that the lack of an operative 2022 district map *at this time* means there will be no map at all based on the 2020 census. Ohio is still in the process of working towards new maps, and there is no indication that said maps will fail to be fairly apportioned in light of the 2020 census data.

Implicit in Plaintiffs' argument seems to be the notion that, if no new map is adopted in time for the 2022 election, than the 2010 district lines will be used as a default. Plaintiffs have not offered a single shred of evidence explaining what would motivate the Commission, the Supreme Court of Ohio, and Secretary LaRose to proceed on this illogical course of action. But, if Plaintiffs' fears of a total impasse come to pass, and Ohio reaches the point at which there is no time to adopt a new map, then plaintiffs can seek federal intervention to implement a new map. Even in this worst-case scenario, Plaintiffs still face no risk of living in malapportioned districts.

> ### 3. Imposing the Third Plan, which the Supreme Court of Ohio invalidated as unconstitutional, is contrary to federal law and principles of comity.

Plaintiffs incorrectly claim that this Court may impose the Third Plan and force state elections to proceed under a plan that the Supreme Court of Ohio has been found to be unconstitutional. *See* PI Mot., ECF No. 96 at PageID # 1593-95. A federal court cannot compel

16

state officials to violate state law.  *See, e.g.*, *Bush v. Gore*, 531 U.S. 98, 111 (2000) (per curiam) (rejecting a proposed remedy on the grounds that it would require remanding to the Florida Supreme Court to issue an order in violation of the Florida Election Code).

Nor can a federal court choose to ignore rights created by the Ohio Constitution and enforced by the Supreme Court of Ohio.  *See, e.g.*, *Guar. Tr. Co. of N.Y. v. York*, 326 U.S. 99, 105 (1945) ("Congress never gave, nor did the federal courts ever claim, the power to deny [sic] substantive rights created by State law . . . ."); *Peters v. Gilchrist*, 222 U.S. 483, 492 (1912) ("The question as to whether a particular law has been passed in such manner as to become a valid law under the Constitution of the state is a state, and not a Federal, question.  Courts of the United States are therefore under obligation to follow the adjudications of the courts of the state whose law is in question.").

Moreover, a federal court "should not pre-empt the legislative task nor 'intrude upon state policy any more than necessary.'"  *White v. Weiser*, 412 U.S. 783, 795 (1973); *see Voinovich v. Quilter*, 507 U.S. 146, 156 (1993).  Further the interpretation of the Ohio constitutional provisions as they relate to the General Assembly map are already under the jurisdiction of the Ohio Supreme Court.  State Courts are given particular deference when interpreting law governing state elections.  *See Democratic Nat'l Comm. v. Wisconsin State Legislature*, 141 S. Ct. 28, 208 L. Ed. 2d 247 (2020) (noting the difference in in "the authority of state courts to apply their own constitutions to election regulations" and cases involving federal elections) (Roberts, CJ, concurring); see also Democratic Nat'l Comm., 141 S. Ct. at 34 n.1 (noting the particular deference given to state court interpretation of state constitutions for state elections) (Kavanaugh, J, concurring).

17

None of the cases cited by Plaintiffs stand for the proposition that this Court may impose a plan that has already been invalided in its entirety by the Supreme Court of Ohio for violating the state constitution.[7]  Such a conclusion runs contrary to the principles that a federal court cannot compel state officials to violate state law, *Bush*, 531 U.S. at 111, and should not preempt the state legislature nor intrude upon state policy, *White*, 412 U.S. at 783.

Plaintiffs instead rely on case law that unremarkably states that federal law controls where there is an *unavoidable conflict* between state and federal law.  *See* PI Mot., ECF No. 96 at PageID # 1593 (citing *Reynolds v. Sims*, 377 U.S. 533, 584 (1964)).  Yet, Plaintiffs do not argue that the Ohio constitutional provisions underlying the Supreme Court of Ohio's decisions are somehow directly preempted by federal law.  Nor could they:  federal law does not require the drawing of unfair districts that primarily favor one political party.  The Supreme Court of Ohio's decision that the Third Plan violates the Ohio Constitution and is invalid "in its entirety" is controlling on this Court.  *League of Women Voters of Ohio v. Ohio Redistricting Comm'n*, 2022-Ohio-789, at *11; *Rucho v. Common Cause*, 139 S. Ct. 2484, 2506–07, (2019) ("We conclude that partisan gerrymandering claims present political questions beyond the reach of the federal courts.").

Contrary to Plaintiffs contention, the Third Plan is not "a lawful one."  PI Mot., ECF No. 96 at PageID # 1594.  This precludes federal imposition of the Third Plan, and Ohio's Attorney General has acknowledged as much.  *See* Feb. 22, 2022 Letter from Attorney General Yost to Ohio General Assembly, ECF No. 91-4  at PageID # 1505, ("The federal court may not order the

---

[7] Plaintiffs seek an injunction that would permit the Secretary of State "to carry out the 2022 primary and general election" before this Court even comes to a final conclusion on the merits of Plaintiffs' federal constitutional claim.  *See* PI Mot., ECF No. 96 at PageID # 1595. Granting a preliminary injunction would effectively impose the Third Plan on Ohio voters.

use of a map that was rejected by the Ohio Supreme Court, where the underlying provision of the state constitution has not been found to violate the federal constitution.").

Plaintiffs offer several policy reasons for why this Court should override the Supreme Court of Ohio's decision and implement the Third Plan as opposed to drawing its own plan. PI Mot., ECF No. 96 at PageID # 1594. They assert that imposing the Third Plan might conserve state resources, and that the elected officials of the Commission, rather than unelected federal judges, should draw the redistricting plan. Ironically, Plaintiffs apparently don't appreciate that their requested relief would run counter to these very federalism concerns because they are asking this Court to impose the Third Plan and short-circuit the work of elected state court justices and the Commission whose next plan is imminent.

More to the point, Plaintiffs' requested relief is contrary to the well-established principle that a federal court should not preempt the actions of state legislatures or intrude upon state policy. *See White*, 412 U.S. at 795; *Chapman v. Meier*, 420 U.S. 1, 27 (1975) ("[R]eapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court.").

After the Ohio state legislature proposed a ballot initiative to amend its Constitution, the voters of Ohio—the same individuals whose right to vote Plaintiffs claim to be defending—overwhelmingly voted to amend Article XI of the Ohio Constitution to its current form. *See League of Women Voters of Ohio v. Ohio Redistricting Comm'n*, 2022-Ohio-65, at *10 . The state legislature and voters carefully considered the process by which redistricting should occur in Ohio. They chose to vest the Supreme Court of Ohio with the authority to invalidate a

19

redistricting plan, and they required the Commission to comply with any state court order invalidating such a plan.  *See* Ohio Const. art. XI, § 9(A)-(B).[8]

This Court should not overturn the will of the state legislature and Ohio voters:  it must provide an opportunity for the carefully designed Ohio constitutional process to play out, a process that will render a new map by March 28th.  *See Lawyer v. Dep't of Justice*, 521 U.S. 567, 588 (1997) (Scalia, J., dissenting) ("The District Court's failure to give Florida a reasonable opportunity to craft its own solution after a judicial finding that the current districting was unconstitutional—or even (since here such a finding was never made) after the judicial finding that a constitutional claim is 'fairly litigable'—was most assuredly error. . . .  The 'opportunity to apportion' that our case law requires the state legislature to be afforded is an opportunity to apportion through normal legislative processes, not through courthouse negotiations . . . followed by a court decree.")

While Plaintiffs cite to cases where district courts have enacted plans that violated the federal constitution, those cases did not involve states with a redistricting process similar to Ohio's.  *See McConchie v. Scholz*, 2021 WL 4866354, at *19 (N.D. Ill. Oct. 19, 2021) (finding the Illinois Constitution did not require formation of the redistricting commission following court invalidation of the redistricting plan); *Kopald v. Carr*, 343 F. Supp. 51, 53-54 (M.D. Tenn. 1972) (proposing that the federal court would formulate a reapportionment plan only if the state general assembly did not).  Here too, the Court should respect the Ohio Constitution and permit the Commission an adequate opportunity to comply with the Supreme Court of Ohio's order.

---

[8] Ohio's Constitution provides that, in the event that a "general assembly district plan . . . is determined to be invalid," then the redistricting "commission shall be reconstituted . . . and determine a general assembly district plan in conformity with such provisions of this constitution."  Ohio Const. art. XI, § 9(B).

4.      **Plaintiffs' voting rights are not at risk for arbitrary denial.**

Plaintiffs argue that the Ohio Supreme Court's enforcement of these requirements has relied on "shifting definition[s]" and "evolving standards," which they allege violate the plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment. PI Mot., ECF No. 96 at PageID # 1585-1588.  That is not what has happened here.  The Ohio Supreme Court has engaged in a reasoned process.  Nor do the cases cited by the Plaintiffs support their claim.

Plaintiffs cobble together several cases to argue "that a state supreme court cannot give 'retroactive effect' to an 'unforeseeable' decision, if the application of that decision would deny 'a litigant a [fair] hearing.'" PI Mot., ECF No. 96 at PageID # 1586 (quoting *Bouie v. City of Columbia*, 378 U.S. 347, 352, 354 (1964)).  The cases Plaintiffs cite are inapposite.

*Saunders v. Shaw*, as Plaintiffs explain in their motion, identified a Due Process violation where a "state supreme court [] reverse[d] the favorable judgment obtained by a defendant based on the application of a new judicial decision without also remanding to give the defendant 'a chance to put his evidence in' to respond to that new decision."  PI Mot., ECF No. 96 at PageID # 1586.  Plaintiffs do not explain, however, how that holding would apply to them, when they are not a party to the Ohio Supreme Court proceedings; the Ohio Supreme Court has not reversed any favorable judgment; the Ohio Supreme Court has not reversed any judgment on the application of a new judicial decision; and they have not identified any response that they have been unable to lodge.

In *Reich v. Collins*, the state of Georgia violated the Due Process Clause by establishing post-deprivation remedies for incorrectly assessed state taxes but, once those taxes had been paid, eliminating those post-deprivation remedies and allowing only pre-deprivation remedies. 513 U.S. at 110-112 (explaining that Georgia had violated Due Process by reconfiguring its tax scheme and not, as Plaintiffs claim, by providing separate justifications in separate state supreme

21

court decisions). Again, it is unclear how this decision on a state's "bait and switch" tax schemes would apply to the case at hand.

And *Bouie v. City of Columbia* is even further afield, as it addressed "the requirement of the Due Process Clause that a *criminal statute* give fair warning of the conduct which it prohibits," 378 U.S. 347, 350 (1964) (emphasis added), and is not applicable to the civil claims here.

**B.     Plaintiffs Do Not Face Irreparable Harm.**

An "indispensable" requirement to a motion for a preliminary injunction is the threat of "imminent and irreparable injury."  *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019).  That injury "'must be both certain and immediate,' not 'speculative or theoretical.'"  *Id.* The harm that plaintiff's claim to contend with is the possibility that they will be forced to vote under a districting plan more than a decade old or have their right to vote revoked completely. Pls.' Mot For a TRO to Maintain the Third Plan, ECF No. 84 at PageID # 1160-1164.  But under no circumstances have either of these concerning scenarios been considered.  In fact, the Commission's intense efforts towards a fourth plan and Secretary LaRose's March 23 directive removing the General Assembly election from the May 3 primary ballot likely vitiate the risk of either of these harms coming to pass.  *See* Ohio Sec'y of State LaRose's Notice of Issuance of Ohio Sec'y of State Directive 2022-31, ECF No. 97 at PageID # 1597.

Between March 19 and March 25th, the Commission has conducted 7 separate meetings to dissect the Supreme Court's requirement for a fourth plan and taken concrete steps to move towards enactment.  They have hired two mapmakers, one chosen by the Republican commissioners and one by the Democratic commissioners, tasked specifically with working together at the direction of the Commission to craft a map.  They have retained the services of mediators from the 6th Circuit Court of Appeals to help the Commission work through the

contentious details of drafting process quickly and effectively. Co-chair Vernon Sykes, who has frequently voiced his disappointment in the commission's drafting process, expressed optimism that this process will be successful. "We've been told and have reason to expect that they will meet the timetable that we have before us." Bri Buckley, *Independent mapmakers join Ohio Redistricting Commission to redraw legislative maps*, WGME, (Mar. 23, 2022).

As the Commission diligently carries out its redistricting obligations, Secretary LaRose has made the decision to remove the General Assembly elections from the May 3 ballot. After days of considering this exact possibility, Secretary LaRose concluded:

> In the wake of the Ohio Supreme Court's decision last week invalidating the February 24, 2022 General Assembly district plan, it is not possible to include the primary contests for the Ohio House, Ohio Senate, and State Central Committee on the May 3, 2022 Primary Election ballot…This is the **only currently lawful and reasonable option** to continue to move forward toward the May 3, 2022 Primary Election at this unprecedented point in time.

Ohio Sec'y of State LaRose's Notice of Issuance of Ohio Sec'y of State Directive 2022-31, ECF No. 97 at PageID # 1597. (emphasis added).

After carefully weighing the options, Secretary LaRose issued a directive removing the General Assembly from the May 3 primary ballot to allow for a "lawful" conclusion of the Commission's work. While plaintiff's bafflingly claim that the removal of the General Assembly election from this ballot means that the election itself is unlikely to take place, this contradicts the plain facts. Pls.' Reply in Support of TRO, ECF No. 98 at PageID # 1611-1612. Senators Tina Maharath and Cecil Thomas have introduced a bill in the Ohio Senate to move the primary election to June 28th. *See* Susan Tebben, *Ohio primary date debate continues*, Ohio Capitol Journal (March 24, 2022). Republican lawmakers apparently favor a primary in August. *See* Andrew Tobias, *Amid redistricting uncertainty, Ohio pulls state legislative races from May primary ballot*, Cleveland.com (March 23, 2022 9:21 PM). Amongst this confusion and varying

23

ideas on the best time to reschedule the primary, Secretary LaRose's decision to wait for a lawful

decision from the General Assembly to reschedule the primary is not a harbinger of a

constitutional crisis—it is instead a clear-eyed assessment of what is "reasonable" in this chaotic

electoral moment. Indeed, the decision to remove the General Assembly election from the May

3 primary ballot offers Ohio officials ample time to move forward with new and constitutional

maps. At no point in this multifaceted process has any Ohio official suggested a return to the

2010 district maps or expressed concern that the election would fail to take place at all. These

far-fetched fears and disregard for the Commission's tireless effort belong to the Plaintiffs alone.

### C. Issuing the Preliminary Injunction Would Cause Substantial Harm to Third Parties.

"In exercising its discretion with respect to a motion for a preliminary injunction, a

district court must give consideration to . . . whether issuance of the injunction would cause

substantial harm to others." *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001). Because

Plaintiffs have not shown that their alleged harm outweighs the harm that this injunction would

cause to third parties, this factor weighs against granting a preliminary injunction.

### 1. Plaintiffs sidestepped this element entirely.

Rather than substantively engage with the harm that issuing this injunction will cause

third parties, Plaintiffs merely reiterate that compelling Secretary LaRose to implement the Third

Plan will benefit Ohioans. PI Mot., ECF No. 96 at PageID # 1590. To support this argument,

Plaintiffs allege that Ohioans are currently living in either malapportioned districts or nonexistent

districts, and are thus disenfranchised. *Id.* at 16-17. Imposing the Third Plan would resolve this

disenfranchisement. *See id.* In other words, Plaintiffs argue that the Third Plan will benefit

Ohioans because it will resolve speculative disenfranchisement based on fictive scenarios where

Secretary LaRose either forces Ohioans to vote pursuant to the now-malapportioned 2010 census

24

districts, or districts cease to exist altogether.  Such bare allegations do not show that third parties will benefit from a preliminary injunction.  Furthermore, Plaintiffs' argument fails to actually address the crux of this element—whether the injunction itself will cause harm.

### 2. Compelling Secretary LaRose to proceed with elections pursuant to an unconstitutional district plan will cause substantial harm to Ohio voters.

Ohio has long recognized the harm of partisan gerrymandering.  "Prior to the [Ohio] Constitution of 1851, the apportionments of legislative districts had been made by the General Assembly with the result that oftentimes political advantage was sought to be gained by the party in power. Accordingly, Article XI was incorporated in the Constitution for the purpose of correcting the evils of former days."  *State ex rel. Herbert v. Bricker*, 139 Ohio St. 499, 508, 41 N.E.2d 377, 382 (1942).  "The objective sought by the constitutional provisions was the prevention of gerrymandering." *Id.* at 509.  Ohio reaffirmed its commitment to ending the harm of partisan gerrymandering in 2015, when an overwhelming majority (71.5% to 28.5%) of the electorate voted to amend Article XI to require that districts not be drawn "to favor or disfavor a political party," and that the distribution of seats "shall correspond closely to the statewide preferences of the voters of Ohio."  Ohio Constitution, Article XI, §§ 6(A), 6(B). Thus, the Ohio Constitution and the electorate recognize that politically gerrymandered district maps are harmful and must be prohibited.

Here, the Supreme Court of Ohio has found that the Third Plan is a partisan gerrymander in violation of Article XI of the Ohio Constitution.  *See* Section II.A.2, *supra*.  Forcing Ohioans to once again vote in gerrymandered districts would cause the very harm that voters sought to eliminate by amending Article XI in 2015.[9]

---

[9] The fact that partisan gerrymandering is a non-justiciable political question in federal court

**D.      Issuing a Preliminary Injunction Would Not Serve the Public Interest.**

"In exercising its discretion with respect to a motion for a preliminary injunction, a

district court must give consideration to . . . whether the public interest would be served by

issuance of the injunction." *Bonnell*, 241 F.3d at 809.  Here, plaintiffs have not shown that

issuing a preliminary injunction to compel the implementation of an unconstitutional district plan

serves the public interest.  *See id.* at 826 (finding that the public interest would not be served

where the court "[did] not find that Plaintiff's alleged harm outweighs the potential harm to

others").  Thus, this element also weighs against issuing a preliminary injunction.  *See Mazurek*

*v. Armstrong*, 520 U.S. 968, 972 (1997) (explaining that a preliminary injunction is "an

extraordinary measure" and should not be granted unless "the movant, *by a clear showing*,

carries the burden of persuasion" [emphasis in original]).

Plaintiff argues that issuing a preliminary injunction will serve the public for the

following three reasons—none of which outweigh the public's interest in voting under

constitutional General Assembly districts.

*First*, Plaintiffs allege that imposing the Third Plan serves the public interest "by ensuring

that Ohio voters live in established and properly apportioned districts before the primary

election."  PI Mot., ECF No. 96 at PageID # 1591.  However, an injunction has no remedial

effect on rights that are not threatened in the first place—and there is every indication that Ohio

---

should not preclude this Court from finding it harmful for purposes of evaluating a motion for a
preliminary injunction where state law explicitly prohibits partisan gerrymandering. *See Rucho
v. Common Cause*, 139 S. Ct. 2484, 2507 (2019) ("Our conclusion does not condone excessive
partisan gerrymandering. Nor does our conclusion condemn complaints about districting to echo
into a void. The States, for example, are actively addressing the issue on a number of fronts . . .
Provisions in state statutes and state constitutions can provide standards and guidance for state
courts to apply.").  Finding harm here does not require the Court to inquire into whether the
Third Plan is a partisan gerrymander—it need only respect that the Supreme Court of Ohio has
found that the Third Plan is a partisan gerrymander and that Ohio recognizes this as a harm.

voters will very shortly live in districts that are not only properly apportioned, but constitutionally compliant. *See infra* Section II.B. The only authorities Plaintiffs cite in support of this argument are two cases that state, respectively, that it is in the public's interest to prevent the violation of constitutional rights generally and the right to vote in particular—facts that are not in dispute. See PI Mot., ECF No. 96 at PageID # 1591. Neither of these cases involved an alleged constitutional violation as speculative as the one at issue. *See G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1076 (6th Cir. 1994) (finding standing where a city threatened to revoke Plaintiff's liquor license if presented topless dancing at his bar); *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 247 (6th Cir. 2011) (affirming preliminary injunction ordering investigation into whether poll worker error contributed to the rejection of the provisional ballots at issue, and that any such ballots found to be improperly rejected be included in the recount).

Moreover, even if there is some remote risk that allowing the Ohio redistricting process to proceed to completion could hypothetically infringe on voting rights, such a speculative risk would not outweigh the *certainty* that Ohioans' rights will be violated by being forced to vote according to districts that the Supreme Court of Ohio has found to violate the Ohio Constitution.

*Second*, Plaintiffs allege that the public is served because imposing the Third Plan "avoids confusion." PI Mot., ECF No. 96 at PageID # 1591. But Plaintiffs' sole support for this proposition is both unpublished and inapposite. *See League of Women Voters of Ohio v. LaRose*, No. 2:20-CV-1638, 2020 WL 6115006, at *1 (S.D. Ohio Apr. 3, 2020). In that case, the Court *denied* the motion for a preliminary injunction where it found that the plaintiffs' claims were unlikely to succeed on the merits and plaintiffs' requested changes to the election procedure "could cause significant additional voter confusion." *Id.* at 12. However, it is always *the*

*plaintiff's* burden to prove the elements of a preliminary injunction.  *See Mazurek*, 520 U.S. at 972.  Thus, it does not follow that just because that court *declined* to impose a preliminary injunction where it could result in voter confusion that a court is justified in *imposing* a preliminary injunction because the status quo is allegedly confusing.

Moreover, that court also noted that "[t]he Supreme Court has cautioned that 'court orders affecting elections, **especially conflicting orders**, can themselves result in voter confusion and consequent incentive to remain away from the polls.'"  *Id.* at *12 *quoting Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) (per curiam) (internal modifications omitted) (emphasis added).  Yet here, Plaintiffs are attempting to secure an order from this Court that will conflict with the order of the Supreme Court of Ohio—generating the very confusion that plaintiffs purport to shield Ohio voters from.  Indeed, the very nature of a preliminary injunction is certain to foster voter confusion in this context: a *temporary* remedy compelling Secretary LaRose to push forward an election pursuant to a map that the Supreme Court of Ohio has already found unconstitutional is the very definition of confusing—particularly if Plaintiffs cannot ultimately substantiate these issues and no permanent injunction is issued.  Thus, Plaintiffs have not shown that issuing an injunction will benefit the public by ameliorating voter confusion.

*Third*, plaintiffs argue that a preliminary injunction will serve the public interest "by saving tens of millions of dollars of public funds."  PI Mot., ECF No. 96 at PageID # 1591.  In none of the authorities cited by plaintiffs did the court actually find that the public's interest in *saving* public funds supported *granting* a preliminary injunction.  *See Coal. of Michigan Nursing Homes, Inc. v. Dempsey*, 537 F. Supp. 451, 465 (E.D. Mich. 1982) (denying preliminary injunction where plaintiffs' requested relief would result in increased legislative spending); *Welch v. Brown*, 551 F. App'x 804, 814 (6th Cir. 2014) (explaining that the district court had

issued a preliminary injunction where it found that *the injunction* would not force the defendants to make cuts to the public safety budget); *Lapeer Cty. Med. Care Facility v. State of Mich. Through Dep't of Soc. Servs.*, 765 F. Supp. 1291, 1301 (W.D. Mich. 1991) (granting preliminary injunction to prohibit *reduction* in Medicaid reimbursements); *Crawley v. Ahmed*, No. 08-14040, 2009 WL 1384147, at *29 (E.D. Mich. May 14, 2009) (unpublished) (granting a preliminary injunction and explaining that "[w]hile the problem of additional expense must be kept in mind, it does not justify denying Plaintiffs a right to meaningful notice and the continued receipt of Medicaid benefits to which they are entitled pending a final determination of disability-based eligibility"). Thus, plaintiffs have provided no authority supporting the argument that a preliminary injunction is appropriate where an elected official *may* be required to spend additional funds in order to comply with the Constitution.[10] Indeed, issuing this preliminary injunction could end up costing the state *more* money if Plaintiffs ultimately lose on the merits and Secretary LaRose is forced to redo election preparations pursuant to the Commission's upcoming district plan.

Plaintiffs have not shown that the benefits to the public in issuing an injunction can come close to outweighing the harm that will be caused by compelling Secretary LaRose to implement elections pursuant to an unconstitutional map—particularly where the Commission is diligently working to produce a constitutionally compliant map within the next 3 days. This element also weighs against issuing a preliminary injunction.

---

[10] Moreover, a purported increase of $20 - $25 million is negligible in the context of a state's annual budget—as Plaintiffs are well aware.

29

### E.      Plaintiffs' Claims Are Premature

Plaintiffs make the implausible claim that by ceasing to implement the Third Plan, Secretary Larose is denying their right to vote under the Ohio Constitution.  In doing so, Plaintiffs argue that the invalidation of the Third Plan is somehow tantamount to the cancellation of the entire 2022 election.  *See* Pls.' Reply in Support of TRO, ECF No. 98 at PageID # 1611.  Plaintiffs provide no concrete evidence that such a nightmarish prediction will unfold, pointing only to past delays.

A General Assembly election will undoubtedly be held.  As has been noted, the Commission is hard at working drafting a new plan.  There is every reason to believe that Ohio will resolve its redistricting process on its own.  But in the event Ohio fails to resolve its redistricting process in time for the 2022 election cycle, and federal intervention is deemed warranted under *Branch*, then on the basis of Plaintiffs' own arguments in this motion, there is nothing preventing federal relief *at that time*.  In other words, if Plaintiffs are right that this Court can impose the defunct Third Plan *now*, then it is necessarily the case that a federal court could grant the same relief *later*.  Therefore, no matter what, Ohio will hold a General Assembly election in 2022.

Given the inevitability that an election will be held, it is spurious to claim that the temporary lack of a district map for the 2022 midterms constitutes, in and of itself, an abridgement of the right to vote.  Under this logic, a state would be abridging the right to vote every redistricting cycle until the point at which it adopts a new district map, no matter how far removed from the actual election – an absurd proposition.

Nothing in federal law prohibits a delay in the primary calendar.  "[T]he Federal Constitution gives states, not federal courts, 'the ability to choose among many permissible options when designing elections.'"  *Thompson v. DeWine*, 976 F.3d 610, 620 (6th Cir.

2020) (per  curiam) (quoting *Thompson v. DeWine*, 959 F.3d 804, 812 (6th Cir. 2020)). Federal

courts "don't have the power to tell states how they should run their elections." *Id.*  That is

particularly so here, where the election is solely for state office-holders.  "Election law, as it

pertains to state and local elections, is for the most part a preserve that lies within the exclusive

competence of the state courts." *Nolles v. State Comm. for Reorganization of Sch. Dists.*, 524

F.3d 892, 898 (8th Cir. 2008) (quoting *Bonas v. Town of N. Smithfield*, 265 F.3d 69, 74 (1st Cir.

2001)).

Despite Plaintiffs' speculative fears, there is no risk of  "election officials refus[ing] to

hold an election though required by state law, resulting in a complete disenfranchisement." *Id*. at

898.  Unlike in the cases in which federal courts have found such a violation, Ohio is not

cancelling an election altogether.[11]  *Cf. Bonas*, 265 F.3d at 78 (town officials extended their

terms of office and "dispense[d] with the 2001 election" without legal authority); *Duncan v.

Poythress*, 657 F.2d 691, 695 (5th Cir. 1981) (governor appointed a new Supreme Court justice

where Georgia law required a special election).  There is no evidence that Ohio is engaged in

"blanket disfranchisement" or that Plaintiffs' voting power will be "diluted to zero," *see* PI Mot.,

ECF No. 96 at PageID # 1583.

All branches of the Ohio government are engaged in an intense effort to adopt a new plan

and facilitate a normal primary election.  The Commission is meeting *daily* to comply with the

Supreme Court of Ohio's March 28th deadline for a new plan, and there is widespread agreement

---

[11] There is no reason to believe that a delayed primary puts the general election at risk.  Ohio's
May 3 primary date is one of the earliest 2022 primary dates in the entire country.  *See* Primary
Elections by state and territory, FEDERAL VOTING ASSISTANCE PROGRAM,
https://www.fvap.gov/guide/appendix/state-elections (last visited Mar. 24, 2022). Just this week,
the U.S. Supreme Court emphasized that there is still plenty of time to draw districts for these
late-summer primaries. *See Wisc. Legislature v. Wisc. Elections Comm'n*, No. 21A471, slip op.
at 2 (U.S. Mar. 23, 2022) (per curiam).

on the need for a new General Assembly primary date.  It is a matter of when – not if – an election will occur, and a mere delay in the primary calendar does nothing to abridge Plaintiffs' voting rights.

## V.      CONCLUSION

For the foregoing reasons, the Plaintiffs' Second Amended Motion For a Preliminary Injunction and Declaratory Relief, should be Denied.


Respectfully submitted,

Robert D. Fram
COVINGTON & BURLING, LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-6000
rfram@cov.com

James Hovard*
COVINGTON & BURLING, LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306-2112
(650) 632-4700
jhovard@cov.com

\* *Pro hac vice* application forthcoming
\*\* *Pro hac vice* application pending

*/s/ Freda J. Levenson*
Freda J. Levenson (0045916)
*Counsel of Record*
ACLU OF OHIO FOUNDATION, INC.
4506 Chester Avenue
Cleveland, OH 44103
(614) 586-1972 x125
flevenson@acluohio.org

David J. Carey (0088787)
ACLU OF OHIO FOUNDATION, INC.
1108 City Park Avenue, Suite 203
Columbus, OH 43206
(614) 586-1972 x2004
dcarey@acluohio.org

Alora Thomas*
Julie A. Ebenstein*
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street
New York, NY 10004
(212) 519-7866
athomas@aclu.org
jebenstein@aclu.org

## CERTIFICATE OF SERVICE

I , Freda J. Levenson, hereby certify that on this 25th day of March, 2022, I electronically filed the foregoing with the Clerk of Court for the United States District Court for the Southern District of Ohio, Eastern Division via the ECF system, which will send notification of such filing to all counsel of record.

*/s/ Freda J. Levenson*
 Freda J. Levenson (0045916)
*Counsel for Intervenor-Defendants*
