**redistricting03232022.mp4**

**EXHIBIT**

**F**

**Speaker Cupp** [00:00:07] We'll have a start with a roll call,

**Clerk** [00:00:11] co-chair, speaker Cupp (present)

**Clerk** [00:00:13] co-chair, Senator Sykes (present), Governor DeWine (here) Auditor Faber (yes), President, Huffman (here), Secretary LaRose (here) Leader Russo (here). Mr. Co-Chair. A quorum is present.

**Speaker Cupp** [00:00:25] We do have a full attendance of the commission. In your folders are the minutes from the last meeting, which was March 22nd, 2022. Is there a motion to accept the minutes

**Co Chair Sykes** [00:00:39] I so move

**Speaker Cupp** [00:00:41] It's been moved is there a second? (All right). Been moved and seconded that the minutes be approved are there any objections or amendments to the minutes? I see none. The minutes are accepted without objection. At this time we have some budget items to take care of. Pay some bills. I would. We have a bill for $7500 to the Calper [?] Corporation for Aptitude Licenses and three thousand fifty nine dollars and eighty seven cents to Micro Center for computer equipment. I would move that the commission approve payment for these expenses.

**Co Chair Sykes** [00:01:23] I would second,.

**Speaker Cupp** [00:01:24] And there's a second. Is there any discussion or are there any objections? Hearing none the motion to be approved without objection. it's in here. Is this in the folders? All right. So to provide an update on the federal mediators in your package, you'll find a letter from Chief Judge Sutton on the two, addressed to the two co-chairs, formalizing our engagement of the mediation services of the six Federal Circuit. Are there any questions on that before we move to the next item of business?

**Co Chair Sykes** [00:02:31] One update and the mediators are here, of course, but they are also starting to reach out to each member of the commission, initially with an interview, so they may or will be in contact with each member at your convenience to start the process.

**Speaker Cupp** [00:02:59] We also have with us this evening the two independent map drawers, and I would like to welcome both of you to come to the podium for a few moments and introduce yourselves and be entertained by the commission if they have questions. No, that's not quite the right way.

**Michael McDonald** [00:03:22] Hello, I'm Michael McDonald, I'm a professor at the University of Florida.

**Doug Johnson** [00:03:26] And I'm Doug Johnson from the National Demographics.

**Speaker Cupp** [00:03:30] We appreciate both of you being able to come here on relatively short notice. Thank you. Are there any questions or things anybody wants to address to

the two experts here? All right, I guess that was pretty short, so thank you. All right. So it seems to me the next item would be discussing the ground rules and instructions for the the map drawers. Chair recognizes Senator Huffman.

**President Huffman** [00:04:11] Thank you, Mr. Co-Chair. Distributed earlier today was a set of 18 proposed ground rules. These are things to help facilitate, both for the independent map makers and the staff, the public to try to allow this process to move along in a in a smooth way, unequivocal way allow decisions to be made. And I think those these have been already seen and reviewed and commented upon. We have a list of proposed amendments or changes to them, and I'm not sure who's proposing those, but we'll find out shortly. And so I would move that these rules be adopted by the commission for the purposes of the next several days to allow the mapmaking process to go forward.

**Speaker Cupp** [00:05:10] So there's a motion made to adopt these rules as the rules for guiding and directing, I guess more than guiding the the mapmakers is there is a ssecond?

**Co Chair Sykes** [00:05:22] Before there is a second I would if I could just provide for explanation. The co-chair and I had a discussion yesterday about this and our stance were directed to formulate and help us work through what these guidelines or guides might be. And we were to exchange these prior to this meeting so that we could try to come up with consensus. We also have because of the speaker's session today, we did not have the ample opportunity to make that exchange prior to this meeting. We also have a list that we have produced. Some of them are alike and some of them are not. And we would like consideration for this, that we could possibly take a recess for a few minutes to review both of the proposals and see if we can come up... We'll work out a consensus on these concepts.

**Speaker Cupp** [00:06:37] So the proposal is that we take a few minutes for recess and that we then reconvene and discuss them here in open session.

**Leader Russo** [00:06:46] Mr. Chair,

**Speaker Cupp** [00:06:48] Leader Russo,.

**Leader Russo** [00:06:48] Thank you. Thank you, Mr. Chair. I would also. I am not sure if the map makers themselves had have seen these rules as well, because I just want to make sure that some of the things that we have on here that they are actually practical. And if there are any concerns, I'd like to hear from our map makers. You know, for example, there's a rule in here about using one computer, which I think may be an issue. So I would recommend too that we allow the map makers also to look at them to see if there's any suggestions that they might have if... Just from a practical standpoint, some of this is not workable.

**Speaker Cupp** [00:07:28] Is there any objection to the see what we're about to ask them to do. All right. So we will we will do that. Any objection to how you. 30, 30 minute recess? I'm... I can proceed, I haven't had a chance to read them, but I'm sure I can follow along as we go if we want, but I'm open

**Co Chair Sykes** [00:08:02] maybe at least 10 minutes to review

**Speaker Cupp** [00:08:03] All right, let's do it for 15 minutes. And during that time, the big the both items can be given to the Mr Johnson and Mr McDonald and and will reconvene. The committee will be in recess for 15 minutes more or less.

**Speaker Cupp** [00:33:06] Pursuant to the recess, the Ohio Redistricting Commission will come back to order. There has been a motion to adopt. Yes. Yes. That there there's been a motion to adopt. I don't know what we call these...instructions to the map drawers or rules of procedure here by Senator Huffman. And I will second that the procedure is we will go through them one by one, they're 17 items. And then when we get through those 17 items, we will pick up the proposed work plan or plan of work for the independent map makers that Senator Sykes has provided to me. And when and then or when Auditor of State has an item as well. So,.

**President Huffman** [00:34:06] Mr. Chair.

**Speaker Cupp** [00:34:09] I'll second your motion,

**President Huffman** [00:34:10] yes, thank you. And I had been kind of getting bits of pieces of paper from a lot of folks. In fact, if you wouldn't mind, I would go through those with the suggested changes. I have the the changes I've received, which I'm going to assume the blueprint is from Senator Sykes, if that's OK, even though Leader Russo may have some and then I have Senator Auditor Faber's suggested change and additional changes from Secretary LaRose. I'm not sure everybody has all of those, but they might. So if it's OK, I would go through and we might be able to do it that way.

**Co Chair Sykes** [00:34:49] If if I could add also, I guess, maybe we need a modification to the motion because we're not considering all of them at one time. We're considering one at a time.

**President Huffman** [00:35:00] Well, that's true in terms of the consideration. If what you're asking is you want to vote on each individual you want to have, it looks like it may actually be 22 votes. Yes. That's fine. Well, I'll withdraw my motion than to on the original 18 and then move that the item number one on the list that I submitted be adopted by the committee.

**Speaker Cupp** [00:35:28] All right. You know, withdraw my second on the original motion and I'll second the new motion.

**President Huffman** [00:35:34] OK, may I speak to number one Mr. Chair?

**Speaker Cupp** [00:35:36] OK, we're a number one.

**President Huffman** [00:35:37] All right. Very good. So the suggested change in blue is actually to the, I think, the previous version of this and the document submitted here. I think actually, although not the same language actually is the same change this was provided to us by Auditor Faber, maybe an hour or so ago before the meeting. So but I think it does the same thing that yours does. And if you want to just accept what's on the paper, unless we want to have discussion about how they may be different?

**Leader Russo** [00:36:14] Mr. Chair.

**Speaker Cupp** [00:36:16] Leader Russo,.

**Leader Russo** [00:36:17] Thank you, Mr. Chair. I agree with the Senate President Huffman that the change does mostly address, except I would call out that having seven staff in contract map drawers. Again, we're actually at eight. If we just want to say commission staff and map drawers, I think, or commissioners' staff and map drawers that probably will solve that. But on the Democratic side, we each have a staff, but then we have our contract member. So it's actually eight, not seven.

**President Huffman** [00:36:54] Well, let me let me ask this just so we can get. How do you want to change number one? What language would you want to insert in there?

**Leader Russo** [00:37:02] My suggestion is to change the word seven and the commissioner's staff contract map drawers.

**President Huffman** [00:37:14] mean, keep the word seven or

**Leader Russo** [00:37:16] no strike it,

**President Huffman** [00:37:17] strike seven and insert

**Leader Russo** [00:37:21] commissioners

**President Huffman** [00:37:22] in that same spot.

[00:37:24] Yes. Meaning each of the commissioners.

**President Huffman** [00:37:28] OK. Did the secretary get that OK? I don't have any objection to that. OK. Move the question then, if unless there's additional changes

**Speaker Cupp** [00:37:46] Alright, so I guess that would be a motion to amend number one to strike seven in the second line. But depending on which sheet you're looking at, of course, and add. And add..replace seven with the word commissioners. Do you have any objection to that? Hearing, no objection, we've approved number one.

**President Huffman** [00:38:18] OK. I was then I would move number two on the list, Mr. Chairman. And then the suggested change from Senator Sykes is acceptable to me. So I would I would amend the number two to say the independent map draw shall draft any General Assembly district plan at the direction of their district and commission and in accordance with the Ohio Constitution and the Supreme Court of Ohio's order. So that's an acceptable change.

**Speaker Cupp** [00:38:50] Any discussion on that? Without objection ww'll adopt number two, as read by Senator Huffman, and we had to mark these sheets, so we know which is which. All right. I know he's working off that one, but we're moving him back and forth. So the one without the inter-lineation in blue, we'll call. Proposal A. And the one that has the blue interlineation we will call Proposal B. And so we have adopted one from Proposal A and we've adopted a number two from Proposal B.

**Gov. DeWine** [00:39:48] One A as amended.

**Speaker Cupp** [00:39:50] Yes, one A as amended, yes, that's correct.

**President Huffman** [00:39:55] All right. I next move. Item three on proposal A. And the... Do we actually need a second? (second). Well, we got one, so the there's only one suggested change from Proposal B, and that's to strike under the paren at the end. Insert the letter three, for six. I'm opposed to that, and perhaps we can get into that in more detail when we get to the mediation efforts in in 14 through 16. So I just ask that we hold that in abeyance until we get to that part. Mr cochair is that all right?

**Speaker Cupp** [00:40:36] Without, objection we will hold that one.

**President Huffman** [00:40:38] All right. So number four, I move number four, be adopted under proposal A.

**Speaker Cupp** [00:40:49] Yes, Mr McDonald.

**President Huffman** [00:40:52] We do have a second? Do I need a second? You give me a second?

**Speaker Cupp** [00:40:57] I'm sorry, Dr. MacDonald,.

**Michael McDonald** [00:40:59] Dr. MacDonald, thank you very much, commissioners. I've looked over this and my colleague Doug Johnson's looked over these requirements. We would like to be able to view any report that has been produced by the your staff or consultants up to this point, that would help us with compliance with the state constitution. And what I'm really talking about here is the Constitution has certain requirements for drawing districts out of counties and certain requirements of that. And we believe there's likely a report that's been generated which would list out all of those counties that are either single districts or require a certain number of districts within them to be in compliance with the Constitution. So we would like to be able to access that report.

**President Huffman** [00:41:59] Could, Mr. Chairman if you wouldn't mind stand at the microphone there because I am not as it's relates to number four. What about how is that relevant to what you mentioned a report of some kind? So is there is there something in number 4 which you think will make it difficult for you to get your work done?

**Michael McDonald** [00:42:17] it's the words work product

**President Huffman** [00:42:25] OK, so it's just or work product, otherwise the rest of that is acceptable.

**Michael McDonald** [00:42:31] Yes, sir.

**President Huffman** [00:42:32] OK,.

**Speaker Cupp** [00:42:34] So we had our conversation. You were because the Ohio Constitution requires certain things. You are interested in knowing what the constitutional requirement was by... In terms of certain counties. Is that is that right? So it is kind of like a list that Wayne County, for example, is a single county district and, you know, wherever these counties require to-- two districts or is that that's the kind of thing that you you're looking for?

**Michael McDonald** [00:43:05] Yes, we are. Yes.

**Doug Johnson** [00:43:07] And if I may just add that I suggest just to keep the process independent and clean would leave in the not accessing plan proposals a work product unless approved by the commission. So we could come to you with what we're interested in seeing and get your approval to do that.

**Speaker Cupp** [00:43:25] All right. So we'll take a look at what you're asking for and see if it is tainted in any way by prior work.

**Speaker Cupp** [00:43:37] secretary LaRose first

**Sec of State LaRose** [00:43:39] Thank you Chair, gentlemen, good to meet you. Looking forward to working with you. I think that what you're asking for is fine as far as accessing work product generally, and I like the idea that with the permission of the commission. But I think this is also why it's important for the four commission staffers that have been working on this process since September--well, before that to be working with you, I mean, the four individuals 2 working for the minority, 2 working for the majority, they could probably recite that list of counties off the top of their head. And for them to be in the room working with you, all I think will be, I think, make that kind of thing easier, whether they have a report or not that lists those counties. These are the four people that know the rather complex rules that exist in the Ohio Constitution quite well and I think can aid you in the work that you're doing just by collaborating together.

**Speaker Cupp** [00:44:34] Auditor Faber,

**Auditor Faber** [00:44:36] I was essentially going to make the same point, rely on the other seven people that are in the room, and I think that takes care of those issues because I think certainly the four people who have experience with the software added by the other three or four people, they can certainly tell you where those those pitfalls are, where those county limitations are and whether there's a report out there. I don't know. I haven't seen a report. I've seen the whole red green map discussion early on. In the first set of maps. It's counties that you had limitations in counties you didn't have limitations and splitting. But in the end, I agree that's going to help you immensely getting up to speed quickly by just saying, OK, what counties do we have to worry about? What are the unique issues. And if we go through this, as I've proposed in the past, starting with the complex areas, meaning that the big counties that we're going to have issues, a lot of those other things are going to work themselves out when you solve those issues and the big counties which have other issues. So that would be my suggestion, essentially what Secretary LaRose was adding.

**Speaker Cupp** [00:45:39] Leader, Russo

**Leader Russo** [00:45:42] thank you, Mr. Chair. So I guess my question to both of the map drawers is, you know, given what we've heard from two of the commissioners about being able to utilize the staff in the room, would that still satisfy, I think, your concerns or would you also need to still have I mean, specifically, you were talking about or work product. Would you still want to have access to that even with the staff? And so I guess we're trying to understand, would that satisfy the concerns

**Michael McDonald** [00:46:15] from this discussion I take it that you believe that the knowledge that those staffers have is not work product necessarily. And so I believe that that will be sufficient for us to have their knowledge

**President Huffman** [00:46:33] Very good. Well, I think based on that, then I would just ask that number four, go in in its entirety, as stated on Proposal A.

**Speaker Cupp** [00:46:42] All right. Any objection to four, as stated on Proposal A? All right. Hearing no objection. Number four is from proposal A is included.

**President Huffman** [00:46:53] Thank you for explanation, gentlemen. There are no, as far as I know, no suggested changes to Numbers five and six on Proposal A. Number.

**Michael McDonald** [00:47:05] My I speak.

**President Huffman** [00:47:06] Oh yes, sir. Yeah.

**Michael McDonald** [00:47:08] So we were having a discussion with your staff and mappers about the data that's needed here. And I learned in that discussion, by the way, I've been helping you and I didn't even realize it. Ohio University provided you with data that we produced at the University of Florida, so

**Speaker Cupp** [00:47:32] I don't know did we give an authorization to subcontract this is kind of concerning? (audience laughs)

**Michael McDonald** [00:47:36] Well, we did it for substantially less than half a million dollars.

**Co Chair Sykes** [00:47:41] I was wondering how much you know you got for

**Michael McDonald** [00:47:46] so. So we've already taken the election data and disaggregated it down to the census block level. And I don't know if if someone has done that for the staff at this point and for the mapping that you've been doing up to this point. So we could use the data that we've already generated to accomplish number five. I it's not it doesn't say where the data should come from, but I don't know if that's going to be a sticking point because I think the partisan staff have both produced these databases and I don't think it's the same they've done. They are they were not coordinating when they were producing those data.

**Doug Johnson** [00:48:32] If I might get a little bigger picture, which is, is there a data set already in existence that you've both been using? You want us to use or do you want us to build a database?

**President Huffman** [00:48:41] The first one,

**President Huffman** [00:48:43] I mean, I think every if I could Mr. Chair,  Every map and all the work that has been done by both sides up to this time has used what is described in number five. So that's why we put it in there. Isn't that correct?

**Co Chair Sykes** [00:48:57] It's also Mr. Chair, if I might. It's on the commission's website, so everyone would have access to it. So I don't know if you had a chance to peruse our website.

**Michael McDonald** [00:49:08] I guess so. Yeah. And that's I, you know, it's our data too. So it's they. I should be clear on this Ohio University produced 2020 data. The 2018 and 2016 data they provided you is from the effort that we did with the University of Florida. And so there's a step where you have to take data that's report at the precincts because I'm sure you're all elected officials and know how elections work. But it has to be put within census blocks, which are smaller. And there's a --when we're doing the redistricting, we're drawing districts out of the census blocks generally. And so we need to have that data that's at the census block level. It takes some time to do that disaggregation, if there's a, you know, if there's one database that both sides have been using and they're agreed upon that-- great, we're done. ...but I don't know if that's the case talking with both the partisan staff, I don't know if that's true or not. And so, otherwise, we have to do this and Maptitude takes a long time to run to do that desegregation.

**Auditor Faber** [00:50:23] But Mr. Speaker, I think you're getting signals from at least I'm looking at the Democrat staff and Mr. Dirossi says that all of our staff have agreed on that database. So that unified database exists. And that's I think what's referenced here. And I'm seeing the. I'm getting yes from both the Democrat map drawers and the Republican map drawers.

**Michael McDonald** [00:50:45] OK, well then that issue is off the table for me. I just wanted to make sure that we're moving along as fast as we can and taking that step out of the process.

**Co Chair Sykes** [00:50:55] Yeah, yeah. All right. So five and six. Any objection to five and six from Proposal A? Without objection. Five and six are agreed to from Proposal A.

**President Huffman** [00:51:09] All right. Mr. Chairman, I would move number six on Proposal A. The suggested changes from Senator Sykes was to insert the word-- there to two changes to that one is to insert the word independent.

**Speaker Cupp** [00:51:24] There would be number Seven.

**President Huffman** [00:51:26] Seven. I'm sorry. Did I not say that OK? He wanted to insert the word independent. I don't particularly have any problem with that, but I just wanted everybody who was involved all to be using the same thing. But I do think from what I understand that the Maptitude is sort of the top of the line software and that that is to be used. And I'm not. I know that there are other mapping devices for a variety of reasons. Some of those are not involving redistricting and I and if GIS means Dave's redistricting, which we've had cited many times, we've had a number of people testify that, well, yeah, the data isn't exactly perfect. Sometimes it doesn't line up. So I'm not sure why we would do something that we knew we-- generally accepted by who I think we should just stick with Maptitude, which is what largely has been used.

**Co Chair Sykes** [00:52:33] Mr. Co-Chair, if I might, we didn't want to limit particularly the map drawers, they're coming from different parts of the country, we didn't want to limit them in any way. And that's why we--so Maptitude is still applicable. Still can be utilized. Mm-Hmm. But any other software they want to use could be applicable too.

**President Huffman** [00:52:54] Yeah. Well, I what I don't want is there to be after we leave tonight and they go to work here over the next several hours and days that that very crucial piece of information is not decided. I mean, is there a preference we say Maptitude only or should we have a whole variety of other things available?

**Michael McDonald** [00:53:18] Well, since I've coauthored software, that's not Maptitude, I prefer the other acceptable G.I.S software, (audience laughter) yeah, but that's just my preference. I can work in Maptitude if that's what you want me to work with.

**President Huffman** [00:53:34] I just don't want to walk out. And there's a there's a discussion back and forth about different ones. I mean, right, should we decide that?

**Co Chair Sykes** [00:53:47] I think if we just leave it with the flexibility, I think it would be appropriate.

**President Huffman** [00:53:54] Well, what you want to do, Bob?

**Speaker Cupp** [00:53:59] I'm not I'm not comfortable with-- I think if we're going to do this as a unitary thing, we ought to work on the same thing. And so I understand that, you know, that may not be your preference, but you can do it. How about Maptitude for you. You OK with Maptitude?

**Doug Johnson** [00:54:15] Yes. Yes. The only thing I'm wrestling with is, you know, there may be a situation. We want to look at something in Google Maps or something like that.

**Speaker Cupp** [00:54:25] Google Maps?

**Doug Johnson** [00:54:27] It comes up a lot, actually. But ... If we can run in a special circumstance, we always ask. Maptitude is fine.

**Michael McDonald** [00:54:38] If I could also say something, I as I understand it, we have a desktop computer that's going to be set up in the room and there's going to be a camera that's pointing at it and that has Maptitutde on it. And what I think may be the preferences is any mapping that happens must have happened on that. Visually, publicly on that computer might be the what we're really talking about here, so if we need to look at something else, we could do so, but we should do it in a way that is visually apparent.

**Co Chair Sykes** [00:55:16] I do understand also you could bring Google Maps into Maptitutde?

**Doug Johnson** [00:55:23] sort of. Yeah, I mean,

**Speaker Cupp** [00:55:27] it sounds like at least one of the staff mapmakers knows how to do that, right?

**Doug Johnson** [00:55:32] I know, I know how to do it. It's just slow and and has some limitations to it. So I mean, I'd be comfortable leaving it as Maptitude. And if we run into special circumstance, we can run. We can check with you,

**Leader Russo** [00:55:48] Mr. Chair, can can I make a suggestion that perhaps if we say that any final map drawing is in Maptitude, but that allows you a little bit more flexibility as you're sort of, you know, if you've got a work off to the side, maybe you want to look at some other things that other software is a little friendlier. Because I know all of these have different friendliness levels to them that I think the point here is that we want a product that is in Maptitude, but understand that there may be throughout the work process that you're looking at, perhaps some other things or in other platforms. I don't know if that makes sense to the remainder of the commission, but ...

**Michael McDonald** [00:56:41] I would find that acceptable. I would like that. Yes.

**President Huffman** [00:56:45] Mr. Chair, let me suggest that this amendment to my amendment to number seven so would read the map drawers shall utilze Maptitude when drawing the General Assembly District Plan, additional software or mapping--additional mapping software may be used in background and preparation work.

**Doug Johnson** [00:57:08] Well, I want to be clear that we're doing it all on the one computer, so I don't want to open the door to us.

**President Huffman** [00:57:14] OK. Yeah, I mean, yeah, I mean, the point is that the point is that the Supreme Court has been explicit that the drafting the drafting shall occur in public and the commission shall draft the plan. Well, we'll get to that later, I guess so. I don't I'm not really sure how we get around using only one that's been used for drafting the plan.

**Speaker Cupp** [00:57:40] So. We could say any General Assembly district plan shall be drawn in Maptitude, that sort of is kind of what the leader Russo said that I may look at other things, but then you have to do it in maptitude. And so the plan is, in my end up the plan is in Maptitude.

**Doug Johnson** [00:58:02] Yes, I think if you say drawn in Maptitude and all work shall be done on the publicly viewed computer. Yeah.

**President Huffman** [00:58:12] OK, so I'd like seven to stay as it is because. Right. Or are you trying to add to it?

**Co Chair Sykes** [00:58:20] I was revising it and enhancing.

**President Huffman** [00:58:24] All right. Sure. Go ahead.

**Speaker Cupp** [00:58:28] See any General Assembly district plan shall be drawn--Would you say in Maptitude or with Maptitude? In Maptitude. Okay, so just a suggestion here. So any General Assembly district plan shall be drawn in Maptitude

**President Huffman** [00:58:56] it's good.

**Speaker Cupp** [00:58:57] And in there was and. Was it something about the publicly available? No, I think that's that was handled. It's probably already handled, OK...But any General Assembly district plan shall be drawn in mattitude,.

**President Huffman** [00:59:24] So moved.

**Speaker Cupp** [00:59:25] Any objection. Hearing no objection Number seven as amended in proposal A accepted

**President Huffman** [00:59:33] Mr. Chairman Number eight The members utilize one computer purchased by the Redistricting Commission to draft any General Assembly district plan. Does that...Leader Russo commented on that? Does that? I think I think the map drawers, Mr. McDonald just indicated. I think what why that is and I I don't again, if we want to insert the word independent map drawers, I don't think it really changes what we're doing here. But. I guess I would need to know what the purpose of these proposed changes, the number eight are.

**Speaker Cupp** [01:00:17] It Russo thank you,.

**Leader Russo** [01:00:18] Mr. Chair. So this is this is actually where I would like to hear from the map maker to make sure that the I think the intent of this rule, as originally drafted, is to facilitate the public drawing piece of this. But I just want to understand, is this practical from a working standpoint, from the two mat makers? That is my that's our biggest concern with this particular rule.

**Michael McDonald** [01:00:47] I'll be honest and say, I don't know until we get into the process of how this is going to work. I hope that we can make it work and we will work as best as we can. It's unique. I've never operated in this circumstance before where we have one computer and it's, you know, public. I would say North Carolina did something like this earlier this cycle. So it's possible they've managed to do it. So I'm hopeful that we'll be as successful as what North Carolina did.

**Leader Russo** [01:01:23] Will this slow you down to have only one computer? Does it make more sense to you for each of you to have a computer with public screens and talking with each other, I'm trying to understand. Again, we want to facilitate quick work and not bog you down with what if we're limiting you in this way?

**Co Chair Sykes** [01:01:46] If I could add, also know it seems to me that you both could have independent computers working. But when you make a decision on how you want to draw something then you would use of my computer to do that? Would that be workable?

**President Huffman** [01:02:03] Is that three computers,

**Co Chair Sykes** [01:02:05] yes. Well, they're used to working on the computers, and we don't usually work on a computer with someone else. You have your individual computers.

**Doug Johnson** [01:02:16] Yeah, I mean, traditionally that would be how we would work. But I'm not sure that meets the the court's order, you know, because, you know, if we got three screens going live, you yeah, they're being recorded and no one's gonna be able to follow what's going on in all three computers. So I guess that would be a traditional approach I'm I haven't read the letter I got here 45 minutes before this meeting, so I haven't not read the last Supreme Court order yet, so I don't know how specific it was about doing this on my computer.

**President Huffman** [01:02:52] Mr. Co-Chair for the benefit of the independent mapmakers, the court's order says the drafting shall occur in public and if one mapmakers

doesn't drafting here and the others drafting here, and somehow something else happens here. The drafting isn't all happening in public, and that's that's the purpose of this rule is to try to abide by the court's specific order.

**Michael McDonald** [01:03:22] I think my preference is to have two workstations essentially so that we can both be working in parallel. I think that's going to speed up the process. I do agree that though we should have a process where any final-- once we've been working parallel, if we have a final change that needs to be implemented, that has to be, you know, there's one computer where that's happening on and that if we had two workstations side by side that we would have cameras on those workstations so people could see what's happening independently. I think otherwise, we're talking about scheduling equal time for us to be working on the computer is the other solution here.

**President Huffman** [01:04:07] So, so does a workstation --Oh, so so two computers. One screen,

**Michael McDonald** [01:04:15] two computers, two screens.

**President Huffman** [01:04:17] Yeah, yeah.

**Co Chair Sykes** [01:04:18] If all the time, that's what we're doing is, yeah, if I if we had cameras on all three and with the understanding that anytime you want to do something in dealing with the map, making a decision about a line or whatever that goes on the one in the middle, but you still would have independence, computer and screen to do your work so so that we can try to do this in the next three or four days. So I think it would be it would satisfy the court and we're going to we have the ability to have the camera on all of them, on all of them at the same time.

**Speaker Cupp** [01:05:05] So a couple of a couple of questions. So would we end up with two maps because you're working independently, you take little parts of and put putting together in one. But we still have two maps out here that would be, I think, contrary to the court's requirement. As far as. I'm not even going to characterize it. The other question, the other thing is we have one camera in the room. So are we're going to have one camera that's going to show both screens?

**Doug Johnson** [01:05:38] I mean, if I might on that question Co Chair Cupp is a I'm sure that I mean, if you look around here, they can bring in more cameras. The challenges for people watching, you know the pictures, you can get really, really small. If there's if there's three screens being broadcast at once and you're not going to able to see on your laptop screen after. So see what's going on. You have to be on a big screen TV show.

**President Huffman** [01:06:00] So Mr. Co chair, my my concern is if this results in a map that is not passed unanimously and if it's a five to two or four to three vote like the votes that we've had in the past and the map that is passed is largely a map that is drawn by--on one of the computers, but not the other one. Then it seems to me we run afoul of the court saying, Well, this map maker drew the map. It wasn't drawn by the commission. I mean, the conundrum here is that there has to be one commission effort --the court's order, by the way, said hire one map maker. We've hired two. And whether it's a two headed, I could say two headed monster, but two headed intelligent, good looking being of some kind here. They do have to work together, maybe not simultaneously, but what he's doing. He can't be doing something different. And you know, they're taking the instructions of the

commission and working with the staff who already knows a lot of things like that. So I'm concerned about the final plan being generated out of this computer or that computer. And you know, that's that's the point of this is that it has to be the commission's computer. Whichever one that is,

**Michael McDonald** [01:07:29] if I may, I'd like to explain my reasoning on this is that as you're mapping, you're often exploring different options and it's going to limit our ability to search for different options as we're drawing plans if only one person's being able to look at it and draw districts at one time. So it's but it would happen. I would envision is that what we are both looking at Franklin County and we are looking at ways of drawing Franklin County and we're talking with one another as we're doing that and we're saying, Hey, how about here? Yeah, that looks like a good approach. Or, Hey, I tried this approach, but it doesn't work for this reason. And and then we don't go on a dead end that way. That's really what I'm thinking about here. But at the end of the day, we would then have agreement to say, OK, this looks like the the approach for Franklin. If we do this on one computer, I could see a scenario where Mr. Johnson's working for two hours on Franklin and then I get two hours to work on Franklin's same computer. And then we have to reconcile. Those plans would be better if we're working in parallel rather than working serially on each of the different areas of the state.

**Auditor Faber** [01:08:51] Mr. Speaker.

**Speaker Cupp** [01:08:53] Auditor Faber

**Auditor Faber** [01:08:54] I. I don't have a problem with anything you just said. I envision a process and I think it is consistent with my understanding with the court ask that you guys can work on your own computers, your own software, coming up with ideas, doing manipulation, working with our seven, eight staff members, coming up with ideas for areas. But when you want to bring an issue and remember, and just so we're clear on this, it's my understanding of what we're asking you to do is to draw maps that we instruct you how you're going to draw. And so when it comes to making a decision as to how you make splits or where it is until we sign off on it, it didn't happen. And so when you want to come up with ideas to present to us, particularly in regional areas at a time, those ought to be done on the single computer. But where you get ideas as to how you're going to split, I fully anticipate that you guys work on your own computers, probably in the same room collectively and you say, Hey, I got something I want to show you. You put it up on this. You link it over. You put it up on the single shared computer. You put it so everybody can see it and the other map drawer-- that doesn't work because you forgot Upper Arlington is actually its own city and you split it three times and and then you go back and you say, Oh, OK. And then you go back to your computer and you work on it and you say, Hey, I got a better idea. And you come over and you say, Oh, this is good, and you put it on the one computer and the other nine people in the room say, Well, that's good. Except now Upper Arlington's OK. But Dublin, which also goes into three other counties, is a problem. And so that kind of debate should happen on the single computer, the final product that we're going to review and discuss should be on the single computer. But if we require you to share time on the computer, good luck us hitting a Monday deadline just for the reference point.

**President Huffman** [01:10:38] So, so let me think, and it's great points auditor Faber How about if we add to sentence eight two additional computers may be used by the

mapmakers at the in the mapmaking making room, not off site or back in the hotel room. Two additional computers may be used for preparation work. Would that be alright?

**Michael McDonald** [01:11:02] That would be fine with me.

**Doug Johnson** [01:11:03] OK. You know, it certainly works and it's much more efficient. The the challenge is that we will have looked at scenarios and ruled them out that you'll never see.

**President Huffman** [01:11:16] well, that they're not they're not destroyed or I suppose they are. But that's what I mean. What we're really interested in is the court's order, which says it has to be drawn in public and endure, as we said, two sides to the coin here and have to be doing it together. But if you're working here and you're working here when you come together, what's on the computer is both of your work product OK, so that would be the my amendment to add to number eight. And if that works for the mapmakers,

**Speaker Cupp** [01:11:48] it would you would you restate that?

**President Huffman** [01:11:51] Sure. Two additional computers may be used for preparation work on site.

**Speaker Cupp** [01:12:01] By the independent mapmakers, right? So, Mr. Shellenbarger,..we have it...OK, so those would be off camera or are they going to be on camera? That's the next question. The preparation, everything will be on camera is what they agreed to put on.

**President Huffman** [01:12:33] Well, under the transparency rules, I think they need to be on camera.

**Speaker Cupp** [01:12:42] OK.

**Dan Shellenbarger** [01:12:43] Our phenomenal staff at the Ohio Channel can have no problem getting to that.

**Speaker Cupp** [01:12:47] . OK.

**Dan Shellenbarger** [01:12:48] We already have something set up right now for 2 screens, and we have one computer down there and we could add another computer or another screen.

**Speaker Cupp** [01:12:57] OK, so that's clear what what is going to be on screen is. Is there in separately working in preparation? Is that going to be on screen or when they they decide, was this will this will work? We're going to we're going to put that on the screen or we're going to have all three on the screen. I'm just asking you we need to get these things settled before we we do it, and then I have a final additional question that is, is your preparation? Once, once there is a consensus on it--is is the rest going to be deleted from the preparation computers or in the end is are each of you going to have separate maps? Even though there is a a a consensus map, you're still going to have separate maps, which is going to get tied up in litigation. So the commission isn't doing that at all anyway, according to the court order.

**Michael McDonald** [01:13:58] I think we'll just have the one consensus map. I mean, we're going to be mapping around and making changes, and we're not going to be saving every single change that we make as we're drawing test maps. So I think once we have our consensus and we come to agreement where we don't have consensus and we come to you and look for your guidance, you know, that's that's where we'll have safe points in the process. I don't know if Doug has a different opinion, but that's my opinion.

**Doug Johnson** [01:14:34] Yeah, I mean, that's the dead ends or the things we can look at on the side and don't bring the main computer. Yeah. Aren't, aren't--I guess they'll be that they'll be on the wide screen shot on the TV, but that's about it.

**Speaker Cupp** [01:14:50] So occasionally you'll have updates on the third screen where the --I don't know. We haven't decided how many screens are going to be televised. But clearly, which is one where they've come together that will be televised? Yes. And maybe you have periodic updates on it that you separate I. I'm just trying to get a sense of what it is. I've never been through a process like this before, and that's why we're told we have to do so.

**Michael McDonald** [01:15:17] I do like the idea of having one computer where that's the canonical version. That's the one that is the working version that we're going to be showing you. And then on the side, we're exploring different options and seeing what we can come up with. I know this is a really difficult problem and there are lots of puzzle pieces that you can fit together here. And so we're going to run into dead ends. I'm sure that your mapers themselves have run into several dead ends through this process. So I fully expect that we're going to have that same issue and we're going to need to come over as fast as we can.

**Speaker Cupp** [01:16:00] Leader Russo

**Leader Russo** [01:16:01] Thank you, Mr. Chair. I think as the gentleman from the Ohio channel has noted, there is certainly the capacity to show all three screens. You know, whether you're working in the two computers working on the putting some sort of consensus on the one computer. But we'll remind you if we're in a room. I mean, this is a it's it's public. It's being streamed, I presume. So all of those discussions, you know, will be available to the public. I think it meets the spirit certainly of the court order and is entirely transparent the process.

**Doug Johnson** [01:16:37] You actually bring up a good point, which is on the stream, do we need to have a camera on the room so that people can tell who's talking? Or do we just have the screens on on screen, you guys? Yeah. And yeah, he's got it covered. The question is, is just keep in mind each screen we add your your image at home gets smaller and smaller. So I think the staff behind you might be happy to buy some because they might this might be their chance to get some big screens in the office.

**Leader Russo** [01:17:12] Mr. Chair, you know, to to answer, honestly, any of this is such a huge improvement in the transparency process that I think the people at home will be OK with smaller screens.

**Co Chair Sykes** [01:17:30] Isn't there a wide screen? You know, nevermind. I don't know.

**Speaker Cupp** [01:17:41] Maybe we'll have to see how the screen stuff works as we get into the process. I mean, I'm advised, however, that when you do prepratory, we'll have to see how the public records law applies to your preparatory work and whether or not we're going to end up with three maps anyway. So which is a concerning development so but let's let's do number eight, we have to kind of move along. So as I understand 8 would now read the map drawers shall utilize one computer purchased by the registering commission to draft any General Assembly district plan. Two additional computers for preparation. Two additional... Um.

**President Huffman** [01:18:33] Computers may be used for preparation purposes, .

**Speaker Cupp** [01:18:40] For preparation purposes, independent map makers.

**President Huffman** [01:18:43] on site, on site. Right.

**Co Chair Sykes** [01:18:45] And independent, the independent. The word independent,

**Speaker Cupp** [01:18:51] I would I don't have any objections, either, although I think we already said the map makers are independents, but we'll add that. OK. All right, is there any objection to eight as amended on Proposal A? There is no objection. Eight as amended, on proposal A will be accepted.

**President Huffman** [01:19:25] Mr. Chairman, propose and move that point number nine be adopted by the commission. This is racial data will neither be loaded onto the computer nor shall it be utilized by the map drawers in any way. Commissioners may recall, but perhaps not Leader Russo she wasn't on the commission in September that this was a point of discussion by the commission when the two maps-- both see the map for the General Assembly on September and then actually also the congressional map that was eventually adopted by the General Assembly at the end of November did not use racial data. So none of the three maps so far the commission has adopted... Either for the General Assembly or the two for congressional, have used that. As I argued in September, these the use of the stat is illegal under federal law, unless there are a whole variety of requirements that require that, that be used. There in the various lawsuits that were filed with the Supreme Court and have sent this issue back to them, all three of the opinions the court has no instructions or otherwise has not opined that this data should be used, nor have any of the parties who have brought the appeals to these brought this as an issue to the Supreme Court. So I don't think that we since we've argued this issue, it hasn't been used three times. None of the opponents who brought these lawsuits have asked for it, nor has the Supreme Court ordered or otherwise suggested that we use it. So I think we should adopt number nine, as is.

**Speaker Cupp** [01:21:26] I'll second that.

**Co Chair Sykes** [01:21:27] Mr. Chairman, even though is not a required requirement. It's not inappropriate. It's allowable, particularly as secondary information. And I don't see why we would not want to avail the map drawers to all of the information that could be helpful and useful in in map drawing for informational purposes and to be used only in accordance with the federal law. So our language here stipulates that that it would only utilized in accordance with the federal law. So we're not trying to violate the law. We just want to have access.

**President Huffman** [01:22:13] Mr Co Chair, I think it is a violation of federal law and it also is I think that if the level or the determining factor is inappropriateness, not only is it in violation of federal law and therefore inappropriate, it adds another layer of complexity and discussion. And again, we've we've determined this issue a number of times. The opponents of this have not brought this up as an issue. The court has not instructed or opined on it.

**Leader Russo** [01:22:51] Mr. Chair,

**Speaker Cupp** [01:22:53] Leader Russo.

**Leader Russo** [01:22:54] Can I ask the Senate president Huffman, because I wasn't here in September, how is it a violation of federal law? I mean, in what way? Having the information accessible, my understanding is that it shouldn't be the primarily used or considered that is the violation of federal law. So I'm somewhat perplexed. And how you're saying having it accessible as additional information available is a violation of federal law.

**President Huffman** [01:23:25] Well, I'm not. I'm not sure what you mean by accessible as additional information, either. It is used in the mapping process or it's not. It's not. If this is the information we're using, the census data, the precincts and all of that, and that's being used to draw the map than it is. But another set of data over here that's accessible, either it's being used or it's not. And we have not used that. And the reason we haven't used it is because federal law prohibits the drawing of maps and districts based on race, unless there has been some presentation of evidence and a court determines that it's appropriate in a particular case. So we're kind of around the edges about inappropriate, accessible. It's here. Those aren't the standards. Either the standards are that it's legally required or it's not legally required. We have a lot of requirements in our constitution. I daresay more than any other state in terms of how we draw maps. But not only is this not a requirement, it's illegal to do, and that's what we have determined several times in this commission. And again, none of the opponents have brought that up as an issue in the Supreme Court has ordered us to do that to sort of insert this complex issue at the last moment here. I think the standard is inappropriate would also be inappropriate.

**Co Chair Sykes** [01:25:12] Co Chair, I'd like to ask the mapmakers, do they have your opinion on this?

**Doug Johnson** [01:25:20] Well, ask a question, and I don't speak for Dr. McDonald so he can weigh in on it too, but I think to a degree, you're both right. The the door to using this data in redistricting is typically a racially polarized voting study. And I don't know. I don't believe that's been done, but I would like to ask and confirm whether or not that's been done, because without

**Speaker Cupp** [01:25:45] no information like that has been submitted to the commission.

**Michael McDonald** [01:25:54] I would say at this stage in the process, we would need a primary election data and none of that is available. So in the limited amount of time that we have to do our work, I would defer to President Huffman and no, I would rather not look at racial data.

**Speaker Cupp** [01:26:23] Is there an objection to number nine, although I would say now we have three computers instead of the computer, so I would guess that any onto any of the three computers.

**President Huffman** [01:26:39] So I add the letter s on the end of computer

**Speaker Cupp** [01:26:43] onto the computers, yes, I think that would solve that problem. Is there objection to number nine with with the addition that computer is now computers? Hearing no objection, number nine from Proposal A is adopted,

**President Huffman** [01:27:08] Mr. Co-Chair, I move that number 10 be adopted with the proposed amendment, added the word independent before map in the first line of number 10, as suggested by Senator Sykes.

**Speaker Cupp** [01:27:30] All right, is there any objection to number 10 from Proposal A adding independent before the word maps in the independent maps drawer? Without objection number 10 from Proposal A as amended will be accepted

**President Huffman** [01:27:51] as to number 11. Mr. Chairman, I think it's the first I move number 11. And again, I think the only assertion is Senator Sykes requested the word independent before the word map in the first line on number 11. And that's acceptable, and I would move with that change for the acceptance of number 11.

**Speaker Cupp** [01:28:12] All right. Number 11 be amended to add the term independent before map drawers

**Doug Johnson** [01:28:21] co chair, if I might. Just (yes), a clarifying question. The reference to the United States Supreme Court just like in general, I am not aware of any specific U.S. Supreme Court rulings in this proceeding. Correct?

**Speaker Cupp** [01:28:33] that we're not aware of any either. But anything could happen in this (audience laughter)  All right. Any objection to a number 11 as amended, in proposal A? Hearing none that will be accepted.

**President Huffman** [01:28:49] Mr. Co-Chair, then I'd move number 12 and again, the same, the same insertion. That suggestion of Senator Sykes would put in the word independent before map. And the other suggestion is that we change the word amongst to between. And I am not --I guess I'm not a -- that's fine with me. I can't think of good words to say about that.

**Speaker Cupp** [01:29:21] OK number 12 as amended independent before mapmakers -- drawers. I guess drawers. And change amongst to between. Any objection to number 12 from Proposal A as amended? Hearing none, it will be adopted, accepted.

**President Huffman** [01:29:52] And then, Mr. Chairman, number 13, I would move that and again with the same insertion requested by Senator Sykes with the word independent before mapmakers -- or mapdrawers.

**Speaker Cupp** [01:30:03] Mapdrawers. all right, any objection to number 13 from Proposal A? And right on this side proposal. As amended, hearing none number 13 is accepted.

**President Huffman** [01:30:20] Mr. Co-Chair. If I could, I'd like to talk to proposals 14, 15 and 16 together, and so what this suggested attempt at resolution is if there is disagreement under No. 12, the issue is referred to the full commission and if in fact, the redistricting commission under 13 has a unanimous conclusion, the map drawers shall implement those instructions, and I think that's relatively simple to see. However, if the map makers under 12 have a disagreement, if the issue is brought to the redistricting commission and there is not a unanimous consensus by the Commission, 14 says that that issue shall be referred to mediation. And the request of Senator Sykes is to strike 14 and not have that issue referred to mediation, which I guess to be honest with you, I thought that's why we got the mediators. So I'm wondering about the request to strike that.

**Speaker Cupp** [01:31:45] Any discussion?

**Co Chair Sykes** [01:31:49]  Can we stand at ease for a second?

**Speaker Cupp** [01:31:53] Sure. The Commission will stand at ease.

**Speaker Cupp** [01:31:54]  The commission will come back to order. Co-chair Sykes,

**Co Chair Sykes** [01:35:47] thank you, co-chair in reviewing this, we wanted to make sure that we weren't putting some measures in place that would have that would bog down this process. But I believe the president of the senate is correct. This is why we had the mediator. And we will withdraw our objections to those three items. We just want to make sure that we do- we manage this so that we will not bog it down so we can comply with the timeframe that we have that has been stipulated.

**President Huffman** [01:36:29] Very good. So if I'm understanding the points 14, 15 and 16 are all acceptable, Senator Sykes. So I'll just move all of those jointly rather than going through each one.

**Speaker Cupp** [01:36:45] Any discussion? Leader Russo.

**Leader Russo** [01:36:50] Just quickly added I'm fine with moving them all together. But just to add that, I think you know, one of the concerns is as issues and conflict and disagreement arises, we are going to be meeting every day, getting updates. You know those things, you should move on to something else and bring them all to us at one time. I think the concern is stopping with each single one without moving on concurrently to other pieces so that we can be as a commission during our time going through all of those things. That's the only concern. It's just not bogging this down.

**Speaker Cupp** [01:37:33] Any further discussion. So without objection, number 14, 15, 16 and 17 from proposal,

**President Huffman** [01:37:43] no. Only 14 through 16.

**Speaker Cupp** [01:37:46] 14, 15 and 16 from Proposal A. Any objection? There is no objection. They are accepted.

**President Huffman** [01:37:53] All right. Now as to Mr. Co-chair as to number 17, point 17. I do have a insertion that the Secretary of State handed me his notes. Secretary of State, can I go ahead and do this?

**Sec of State LaRose** [01:38:07] You can. I can describe them if you'd like, but do you want?

**President Huffman** [01:38:11] Well, I'll let the secretary talk about why these are important and I can give the specific language. Go ahead, sir.

**Sec of State LaRose** [01:38:15] Thank you, Mr. President, Co-Chair, co-chairs. Once the work of the commission is done and the maps get filed with my office, those maps are in effect at that point. But of course, the work that the boards of elections need to do is just beginning and in order for the boards of elections to do really what amounts to five or six weeks worth of work, programing these into their voter registration system, beginning to line the right voters up with the right districts so that people receive the correct ballot when they show up to vote. We need a few things beyond what's been listed here. They are the equivalency files, the shape files. This talks about the descriptions, but I wanted to add the word legal in front of those of the legal descriptions of the geographical districts. And then also that most populous county by district description, which is a relatively simple thing to arrive at. Mr. Springhetti and Mr. DeRossi both know this, and they were able to really quickly get that stuff to us. But by really quickly, I mean normally would take three weeks. They were able to get it done in like a week and a few days. So within 10 days to two weeks is the other thing. I'd like to add that we would need those files so that the boards of elections can start to program.

**President Huffman** [01:39:33] So if I think if I have this right and I'll ask the secretary to confirm. My amendment to 17 that was submitted to to the commission so far, I guess my amendment to the proposed rule is in the third line before the word description. We would, you insert the word legal.

**Co Chair Sykes** [01:39:58] Right.

**President Huffman** [01:39:58] And after in the same third line after the word district, we would insert the words shape files, comma equivalency files, comma and county population and the filing location of the most populous county.

**Sec of State LaRose** [01:40:19] Correct.

**President Huffman** [01:40:19] And then the fifth and then the final change to the proposed 17 would be to add the words at the end of the fourth line within 10 days.

**Sec of State LaRose** [01:40:32] Correct.

**President Huffman** [01:40:33] OK. So that is the proposed 17 that I'm putting forward to the commission and I know that the senator Sykes have moved to strike all of the original proposed 17. So and it looks like the map makers have an opinion, too.

**President Huffman** [01:40:51] So the if I could speak on it, we did have a chance opportunity to talk to the co-chairs, to the map makers about this particular issue. And our main concern was, again, timetable. We want to make sure up into now the block files, or shaped files are the only ones that we were had been responsible in majority and minority responsible for submitting as the maps. We know that these takes a lot of this. This requirement may take up more time and we just want to make sure that we're not trying to

get them to comply with this all by March 28. So I think they may have some comments to add to it.

**Michael McDonald** [01:41:34] Yes, I just want to echo that. We can easily get you the block equivalency file and the shape file. If it's possible, since your staff have experience with transmitting the other information to you. It probably, if we can, under our direction that your staff can produce that other information might be acceptable to get it to you to your office?

**Sec of State LaRose** [01:42:00] Long as it can be done accurately and be done within 10 days, I would defer to the president and the speaker because the two staffers that I named who have done this work very quickly. I mean, in the past, including pulling all nighters to get it done. Thank you, guys. They work for them. So it would be that would be their call.

**Doug Johnson** [01:42:21] I completely agree with. Dr. McDonald just said and add it may have worked out on the past map. Keep in mind that the Senate assignments can get very complicated and and I would agree with Dr. McDonald that maybe once that once the lines are drawn, it might be better if the Senate assignments are handled by legal staff here.

**Sec of State LaRose** [01:42:44] We're talking about the Article 11, Section five Senate assignments.

**Doug Johnson** [01:42:49] Yeah, you can. You can end up with a district being the largest district in multiple Senate districts. And so then who does that get assigned to? And it just leaves that the law just puts that on the commission in those. And I suspect they may be able to do it fast because there may not have been any of those situations, but that would be very awkward. Part of the independence is we don't know where your incumbents live or what they represented in the past. And so it's probably better at that point if those who know those things do make those final calls if they need to be made.

**Co Chair Sykes** [01:43:29] Again, our only issue is just making sure that we have enough time to do it if the staff can provide this function. I think it could be helpful.

**Speaker Cupp** [01:43:39] Well, at least one of the staff advises me that if the staff isn't the ones that draw it, that they're going to have difficulty understanding what the legal directions or legal description is, and it's going to be difficult for them to sort of pick it up and do it. So I don't know.

**Sec of State LaRose** [01:44:02] Speaker, could I make a suggestion, perhaps that maybe the experienced staffers that have done this work in the past would collaborate with our independent map drawers for the creation of those legal descriptions?

**President Huffman** [01:44:21] Well, I would say that's that certainly willing to do that, but I also want to make sure that those things are not done independently and without the knowledge of all seven commissioners and their staff, because I think that's the spirit of most of the things that we've been. We've been doing.

**Speaker Cupp** [01:44:38] So it very well may be. We're going to have to get some more information about the process and see how how that can be can be done. And so maybe we'll have to we have to we have to revisit this one on that point. Leader Russo.

**Leader Russo** [01:44:57] Thank you, Mr. Chair. I think the important piece for us, as we were looking at this was just being very clear that providing the and I'm going to totally mess this up. But the block assignment files, et cetera, by March 28 is distinct from some of these other pieces that do can take 10 days, actually sometimes can take a couple of weeks that we're very clear that that is not part of what is expected on March 28. The legal description, because typically that has come two weeks, two weeks after.

**Sec of State LaRose** [01:45:37] And I don't think anybody would reasonably expect that the the legal description would be done the same day that the maps are filed. But if we want to put it in there, and that's why I said within 10 days is what I was asking for.

**Speaker Cupp** [01:45:49] I would just add that if we're part of the team writing the legal descriptions, I don't know how you what yours look like, but that may not fit within our budget as well. So we may need some additional because as you just said, it's seven to 10 days with some over some all nighters.

**Sec of State LaRose** [01:46:06] Yeah, it's excruciating work. Yes, it really is. Yeah, yeah.

**Speaker Cupp** [01:46:14] Having done legal descriptions for deeds, even that can be excruciating, let me. So we may have to revisit this to figure out who can do what and how and under what circumstances. But Senator Huffman, I have part of your amendment here because you were going through it. After description of each House and Senate district, you added shaped files, equivalency files and something else

**President Huffman** [01:46:45] and county population and filing location for the most populous county.

**Sec of State LaRose** [01:46:53] Yeah. Correct. So as you know, candidates are required to file their petition at the most populous county board of elections, historically those that draw the maps. It's a real, this is a pretty straightforward and simple process, but to just get the list of which county is the most populous county in each district so that so that candidates know where to file their petition?

**President Huffman** [01:47:13] Yeah, so and I just handed the notes to your clerk, Mr. Co-chair. All right. You can keep that. Oh, you got it. OK?

**Speaker Cupp** [01:47:23] All right. All right. Is there any further discussion on 17 as amended? All right, hearing no discussion, is there any objection to 17 as amended from Proposal A. Hearing none, that would be accepted.

**President Huffman** [01:47:39] Mr. Chairman, I would withdraw my proposed 18 in deference to the auditor's superior proposal for 18, right?

**Speaker Cupp** [01:47:49] Auditor Faber, you have a substitute 18.

**Auditor Faber** [01:47:53] Yes, it's Mr. Chair. It is nice having a employment lawyer is your chief of staff.

**Speaker Cupp** [01:47:58] So we're going to we're going to call this one proposal C, how's that?

**Auditor Faber** [01:48:04] You all have the one sheet for 18, and essentially it makes clear who the duty is owed to by the map drawers to be consistent Supreme Court opinion that it is us that's drawing the maps, and it just also makes clear to alleviate any confusion as to whether anybody is going to be communicating with the mapdrawers on these maps but us. And I don't think there's any confusion on that, but certainly, certainly they they certainly. Just just to clarify here, it says the independent map drivers agree that they have been hired, by the Ohio Redistricting Commission. And as such, they owe a duty of fealty to the Ohio Redistricting Commission. Accordingly, the independent map drawer shall not discuss or communicate with any person, organization or group. Aside from the Ohio Redistricting Commission and the commission member staffs regarding any aspect of the crafting of any redistricting plan. Failure to abide by this requirement may result in immediate termination of the Independent Mapdrawers contract, along with all available remedial measures caused by the independent mapdrawers breached its duty of fealty to the Ohio Redistricting Commission. and the concept is pretty straightforward. You talk to us, you work with us, you don't deal with outside entities. You don't deal with former clients, former people. It shouldn't be. It shouldn't be complex or complicated.

**Doug Johnson** [01:49:24] If I might. And Dr. McDonald agrees with this. Just where it says crafting. If it could be the substance, the only thing like I want to be able to coordinate with my wife when we might finish. And let my team know when I'm when I'm free for calls and that kind of thing.

**Co Chair Sykes** [01:49:39] And he's a comedian too, I like that.

**Doug Johnson** [01:49:41] Well, I've actually been in situations where you weren't allowed to speak with your spouse about the project, and

**Auditor Faber** [01:49:48] We are not sequestering you.

**Doug Johnson** [01:49:49] Exactly right.

**Auditor Faber** [01:49:51] So regarding any aspect of how would you propose changing it?

**Doug Johnson** [01:49:55] I was just going throw out, the substance of any redistrict plan. If you're comfortable with that.

**Auditor Faber** [01:50:00] So where do you have that? Just tell me the line and the words.

**Doug Johnson** [01:50:07] Oh, I guess one two three, four... Line five where it says aspect of the crafting of any redistrict plan? OK, there could just be aspect of the substance of any redistrict plan. All really for logistical discussions being able to be outside.

**Speaker Cupp** [01:50:24] So substance includes procedure and process?

**Doug Johnson** [01:50:32] I would think so.

**Auditor Faber** [01:50:35] So you understand it.

**Doug Johnson** [01:50:37] Oh, yes, I would certainly understand as everything other than like what time I can be on the phone with somebody you know, about completely unrelated issues.

**Speaker Cupp** [01:50:49] Dr. McDonald?

**Michael McDonald** [01:50:50] I was just going to say I just assumed that this was the case, that we are working for you and only you.

**Auditor Faber** [01:50:57] You've both been independent experts for lawyers, so you understand that.

**Michael McDonald** [01:51:00] Absolutely.

**Auditor Faber** [01:51:00] I have no objection to changing it to regarding any aspect of the substance of any redistricting plan. I don't have a problem as long as we understand that the definition of substance means any of the details.

**Michael McDonald** [01:51:14] Of course.

**Auditor Faber** [01:51:15] You know, if you want to talk to your wife about what time you have to go back to work, what you're doing, the fact that that redistricting commission have been really crazy and they're micromanaging all of that is perfect communications with a spouse, It isn't necessarily perfect communications with people who are suing us or other people involved the outside. OK.

**Michael McDonald** [01:51:36] Yep.

**Speaker Cupp** [01:51:37] All right. So any objection to that change from crafting to substance? Hearing no objection to that. Is there any further discussion on Proposal C that we were considering? All right. Without objection, the Proposal C will be our number 18 and is accepted.

**President Huffman** [01:52:01] Mr. Co-chair? I have an additional proposal and I apologize to the members that this was not a part of. This was not part of the list of 18 items. And I think this maybe this is a little bit mundane, but in perhaps superfluous. But let me read this and see what the commission members think. So this would be proposal point nineteen. All work is to be done in the designated room at the State House. No materials shall be taken off site and the room shall be available 6 a.m. to 10 p.m. doesn't mean everybody has to be there 18 hours a day, but I don't want folks to say, Hey, I went over there at four o'clock and it was locked and I couldn't get in or something like that, so. And it's 6 a.m. to 10 p.m. seems like you had eight hours of sleep and, you know, 16 hours to work, that's a great day, isn't it?

**Speaker Cupp** [01:53:02] Do you want to restate or.

**President Huffman** [01:53:03] Sure, I'll start over. All work has to be done in the designated room at the State House. No materials shall be taken offsite. The room shall be available 6 a.m. to 10 p.m. each day.

**Co Chair Sykes** [01:53:19] And looking at our other proposal, I guess it's on D, I guess we can say, Oh, it's D, the first item on there is the meeting. The independent mapdrawers will be held in. We designated the North hearing room, but we understand the staff may have identified Room 116. And I think this is similar, that this is a place where they do their work.

**President Huffman** [01:53:50] Yeah, Mr.

**Auditor Faber** [01:53:51] I just can offer a friendly amendment.

**President Huffman** [01:53:54] Well, yeah, in just a response, I do think it's a similar subject matter. The two things that are not two items are the fact that we do not want materials being taken off site or removed from this room. And secondly, that the room shall be available a substantial part of the day, I said 6 a.m. to 10 p.m.. I don't know if that's enough or too little or

**Auditor Faber** [01:54:21] that's that was my friendly amendment, OK? But my friendly amendment would be to add, I don't know. Six a.m. to 10 p.m. is the right time. I don't know what time you guys work. I'm much more likely to be working past 10 a.m. than I am to be working at 6:00 a.m. But it just depends on your own personal style and time of working. So I would add if this friendly amendment or as requested or required by the drafters or the Commission. So that means if you guys decide to work all night, God bless you, work all right. As long as it's communicated and it's open and available, I would imagine we're going to have a staff with key and with access.

**Co Chair Sykes** [01:54:54] and we have obtained approval. We have other we have obtained approval from the sergeant of arms that it would be available starting five a.m. until midnight, the 28th. So so any time that they want to go in there, it would be last minute.

**Auditor Faber** [01:55:15] So make sure I understood what you said. You said it's available open five a.m. to midnight every day till the 28th or it's available starting at 5:00 a.m.

**Co Chair Sykes** [01:55:24] Starting at 5:00 a.m. tomorrow.

**Auditor Faber** [01:55:26] All the way until the 28th, 24 seven. Yes, I think that's perfectly fine with me. I just think that you had to have some basic core hours that if Huffman or Faber or anybody else wants, I'm sorry, Mr. President or or Auditor Faber want to show up that that we can do that or that we are there. But I don't have a problem giving our map drawers and our staff discretion is that when they work on this, because my suspicion is they're going to work closer to 24 seven than they are working two to eight hours or 10 hours or 12 hours to get this deadline done.

**Leader Russo** [01:56:00] Mr. Chair.

**Speaker Cupp** [01:56:00] Leader Russo.

**Leader Russo** [01:56:02] Thank you. I just wanted to say that I agree with the auditor on this. If they request that they want to have access, you know, beyond to any of those times, they should have the ability to do that. So I would not want to constrain them with specific hours that we've noted here, but as needed as requested.

**Speaker Cupp** [01:56:24] All right, so let's restate that, so we have it down correctly.

**President Huffman** [01:56:27] Well, let me stress this, Mr. Co-Chair. I'll withdraw my proposed 19 if we want to just use Senator Sykes in these these five bullet points on

Proposal D that might just that might be a better working document. And I'm fine with all of these. All of Senator Sykes proposal, the the five bullet points, if we want to enhance this in some way. By that, the main thing is I don't think materials should be removed from the room and taken to off site in any way.

**Co Chair Sykes** [01:57:04] I would agree we could add that as a friendly amendment.

**Speaker Cupp** [01:57:10] OK, we're changing North hearing room, no to what? State house room 116.

**Auditor Faber** [01:57:36] It says here they will connect their computers to individual monitors. Are we not providing them computers? Are they bringing in their own computers? Or I assume we're providing some standard computers, so we're going to have three computers. That's what I presume from our prior discussion. I'm agnostic, but I don't think these guys want to have to leave their computers.

**Co Chair Sykes** [01:57:55] I believe they asked for... You can speak for yourself.

**Michael McDonald** [01:58:01] My interpretation is we shouldn't bring our own computers into the room.

**Auditor Faber** [01:58:05] I agree.

**Speaker Cupp** [01:58:05] Correct.

**Auditor Faber** [01:58:05] So so we need to change that.

**Doug Johnson** [01:58:08] We only the only catch is that I have about 20 local jurisdictions that have to finish there, that my team is working on finishing the redistricting the next two weeks, their deadlines April 17th. So I think I'm perfectly happy with it to say there will be nothing from this project on my computer at all. Your your staff and commissioners have full access to look at my computer if I may have it in the room in case I get a call.

**Auditor Faber** [01:58:33] And if you're doing other work on personal, I don't care about that. I mean, I don't know about the other commissioners or will give you another office that you can keep your laptop in and use it or walk out in the hall. I don't care. That would be fine, but I don't think it matters.

**Co Chair Sykes** [01:58:47] The staff has indicated if we approve the purchase of those computers here today that it would not hamper the time.

**Co Chair Sykes** [01:59:01] Do you have the motions? So moved.

**Speaker Cupp** [01:59:07] All right, we're trying to get us all down here, so I would read Bullet Point one on proposal or first bullet point on Proposal D to read the meetings of the independent map drawers will be held in the State House Room 116 and I guess through 116 of the Ohio State House would be redundant here. This will be the designated workspace for the independent map draws. The independent map drawers will have

**Auditor Faber** [01:59:44] I wouldn't say that...

**Speaker Cupp** [01:59:50] Yes, so that's already part of the standard race. But the connection of their computers, which are already going to be monitored, right? Yeah. OK, we take that out, didn't you? Yes. What was the. There were no materials shall be.

**Clerk** [02:00:14] I see what work is to be done, and it doesn't mean to say

**Speaker Cupp** [02:00:20] Or it should be done in the designated room and no materials shall be taken off site. All right, and then we're not having the time period, right? The time is requested by the drafters or do we have any time period.

**Co Chair Sykes** [02:00:42] We don't have.

**Speaker Cupp** [02:00:44] No time period. They can just establish what they are. All right. The Statehouse Ohio Government TV will live stream the map making process in Room 116. OGT will stream the map drawers wherever they're working in the room. Independent matters, communication and work with existing map. Okay, this is a separate bullet point. Independent mapmakers communication and work with existing map makers, as are four four staff and consultant. All right, the rules regarding that. Commissioners shall have unlimited access to the map drawers, but should contact both Dr. McDonald and Mr. Johnson simultaneously, the commissioners, individual mapmakers or designated staff may send proposed maps or suggestion to the independent map makers. Both independent map drawers should receive any suggestions proposed to map or partial design maps simultaneously. I don't know, is that a problem. I thought they were the ones who are supposed to do it.

**Co Chair Sykes** [02:02:11] Yeah, they're doing it. If we talk to them

**Speaker Cupp** [02:02:17] Do you want to explain the purpose of that?

**Co Chair Sykes** [02:02:19] Yeah, we want to make. We want to make sure that we communicate with. We communicated to both of them. Not that we just meet with one of them and just really one of them all the time. We all the time, every time that we communicate with them, it would be communicating with both of them at the same time.

**Speaker Cupp** [02:02:38] That's that's not the part that I'm wondering about, and that is commissioners. Individual mapmakers or designated staff may send proposed maps or suggestions to the independent mapmakers. Both independent mapmakers should receive any suggestions or or proposed map or partial design simultaneously. Is that what we're going to be doing?

**Co Chair Sykes** [02:03:01] So if they send something or email, for instance, they would email both of them.

**Speaker Cupp** [02:03:06] No, that's not. The point is, is our mapmakers going to be sending them ideas? Is that what we're envisioning? I'm just raising the question, is that what we're going to be doing?

**President Huffman** [02:03:19] Well, co-chair. If I could. Yeah. I think the I'm going to return to the language of the court. Commission shall draft and adopt an entirely new General Assembly district plan. The drafting shall occur in public and I don't have the

Supreme Court decision. But you know, the criticism was that the caucus mapmakers, particularly the Republican Legislative Caucus mapmakers, were drawing that in fact, the commission, the seven of us and our two mapmakers should be drawing this. So I guess it seems to me that the point of having the not only all of the staff there is to provide technical assistance, perhaps explanations of certain nuances or phenomena, things like that. But actually making suggestions through our mapmakers to, I shouldn't say, our map makers. My mapmaker directly to the commission's map maker is what the court specifically is asking us not to do, that we need to tell them that. Now, you know, the question is, how does that get conveyed? And you know, I'm not sure exactly, but I I'm pretty sure that our map makers are not supposed to be telling the commission. Shouldn't say that. Our map makers are those two guys that the legislative map makers are not supposed to be telling them, here's what you should be doing. And that's that's where the line gets crossed. I think.

**Leader Russo** [02:05:01] Mr. Speaker, can I just add to that that I, I don't disagree with that at all. I think that there may be occasion where communication, whether there's a technical question that's asked. I don't know all the scenarios, but if there's a technical question, I think the intent here is any staff communication with the independent map makers should be done to both of them, not one of them. So maybe if we broaden that just communication, that might help this.

**Auditor Faber** [02:05:34] Mr. Speaker, as a reference point, it seems to me that our seven, eight people are going to be in the room with them. I expect there to be discussion as they're working on maps and in the room it's public. I think that would fully comply with the Supreme Court's order. And if you know, if there's suggestions in the room, I would frankly hope there would be because we've got people that have been dealing with this issue for over a year now that have some nuanced knowledge. If nothing else, they know where the members live and they know where the conflicts are going to be. It might be an efficiency item to have them in the room having those discussions. I don't think we ought to be sending emails or anything from outside the room, ought to be coming in. And that's why we're having people with knowledge in the room. And so I don't have a problem deleting this entire bullet point, knowing that in the room, having discussions. If you're talking to one person about an idea and it starts to get legs, then you can talk to the other person. But as long as you're all in the same room, I don't have a problem. And I would be really shocked if we divulge into two camps. You know, this is team A in the room and team B in the room. I would think they're just going to work collaboratively.

**President Huffman** [02:06:43] Mr. Co-chair, could I just add to that? I think the I think with the flag, the signal goes up here. Red flag, maybe is mapmakers and designated staff sending proposed maps or suggestions to the independent mapmakers. So proposed maps, definitely a no no. But sending sounds like it's done by email or some other type of if it's, as the auditor said, if they're in the room and the independent staffer says, Well, look here, here's a problem with that that you may not have been aware of or, you know, this is a district that is traditionally this way or whatever it is. You know, there's lots of there's, you know, transportation corridors and there's mountains even in Ohio and things like that that may be of interest. And those things can be could communicated. But I think that all has to be done in the room and not, as we say, sent, which sounds like it's coming up over the transom, if you will.

**Co Chair Sykes** [02:07:50] I don't disagree at all. I think that our idea here is to make sure that they're communicating to both of them at the same time. That's that's the main main thing.

**President Huffman** [02:08:01] And that that's certainly appropriate.

**Co Chair Sykes** [02:08:09] All right. I'm not sure how to reword that on the spot here.

**Auditor Faber** [02:08:12] I suggested to be [inaudible]

**Doug Johnson** [02:08:25] Co-chairs, I think if if if in the first full point, we have commissioners, if you made that commissioners or designated staff, and then you could eliminate the second bullet point there.

**Speaker Cupp** [02:08:39] Yes. Yeah, that would work. Commissioners or designated staff.

**Co Chair Sykes** [02:08:50] I would agree.

**Speaker Cupp** [02:08:54] All right. I think we can, we could strike out the main bullet point. Independent mapmakers communication and work with existing metros and then leave the. And make the secondary bullet point the primary bullet point there that commissioners or designated staff shall have unlimited access, add the shall to the map drawers, but shall contact both, rather than should.

**Co Chair Sykes** [02:09:33] Yes.

**Speaker Cupp** [02:09:34] Contact both Dr. McDonald and Mr. Johnson simultaneously. And then strike out the second dependent or secondary bullet point.

**Co Chair Sykes** [02:09:47] Co-chair, we could take those bullet points and put numbers on them and make it 19. The first bullet points, 19

**Speaker Cupp** [02:09:54] 19

**Co Chair Sykes** [02:09:55] and then the second one 18. I mean, 20.

**Speaker Cupp** [02:09:59] Yeah, yeah. Sometimes we do seem to go backwards.

**Co Chair Sykes** [02:10:04] And then the third one, 21, 22 and 23

**Speaker Cupp** [02:10:14] 21. Progress updates to the commission of each of the commission scheduled meetings, commissioners can expect to ride feedback and guidance on independent mapdrawers in these meetings, in addition to their individual outreach to the independent mapdrawers. So is that 22 and 23 or is it

**Co Chair Sykes** [02:10:39] Yes.

**Speaker Cupp** [02:10:41] two, three, independent mapdrawer as instructed by the commission to follow the of course, we've already had that. I think so. Can we take that out of that? Like,.

**Co Chair Sykes** [02:10:50] Yes, yes.

**Speaker Cupp** [02:10:51] That's like the third time. [inaudible].

**Clerk** [02:11:02] Huffman also have the two suggestions on this time because they have no material to be taken out of there.

**Speaker Cupp** [02:11:07] I thought that was 19, but

**Clerk** [02:11:11] only 19.

**Co Chair Sykes** [02:11:12] Sub under 19.

**Speaker Cupp** [02:11:13] that's under 19.

**Clerk** [02:11:15] OK, we agreed. Oh wait. But you struck that. Do you want to make it 24 25. I can't miss it.

**Speaker Cupp** [02:11:24] All right, I made that 19 there. All right. I just want to add that to 19 from Proposal D, OK? Is that nothing taken out of the room?

**Clerk** [02:11:37] Nothing out of the room?

**Speaker Cupp** [02:11:38] OK. Well, and all. Thank you.

**Clerk** [02:11:47] He suggests it all work will be done.

**Speaker Cupp** [02:11:49] Yes, I think that's right. [inaudible] At some point it would be, no materials shall be taken off site.

**Clerk** [02:12:05] Okay. All right. All right. All right.

**Speaker Cupp** [02:12:08] Well, if I had red ink, I would circle that one. OK. I don't know if reading it makes any sense at this point. We have 19 through 24. Let me just let me just read them just over because we're not going to be able to hand them out again here tonight. 19 will be the meeting of independent map will be held in room 116 of the Ohio State House. This will be designated workspace for the independent map drawers. No materials shall be taken off site. Number 20 State House, the State House, Ohio Government TV will livestream the map making process. In, I guessRoom 116, OGT will stream the map drawers whenever they are working in the room. That's 20. 21 is commissioners or their designated staff shall have unlimited access to the map drawers, which shall contact both Dr. McDonald and Mr. Johnson simultaneously. Point 22, the independent map drawers will provide regular progress updates to the commission. Each of the commission's scheduled meetings. 23 commissioners can expect to provide feedback and guidance to the independent mapdrawers in these meetings, in addition to their individual outreach to the individual map drawers, as provided in quote, a number 21. And I think that's it. Did I cover everything?

**Co Chair Sykes** [02:13:57] Yes.

**Speaker Cupp** [02:13:59] Any discussion, any objection, without objection these items and Proposal D are accepted.

**President Huffman** [02:14:10] Mr co-chair.

**Speaker Cupp** [02:14:12] Senator Huffman.

**President Huffman** [02:14:12] And roughly maybe this is all implied, or maybe not, but it's my is it the commission's understanding that only the commissioners, their staff as designated and the independent commissioners will have access physical access to this room and no other members of the public, the media, advocates whatever classification someone once put themselves in?

**Co Chair Sykes** [02:14:43] It is our understanding the room itself should be open to the public. So the public can come in and go if they wanted to observe. Not to interfere, of course not to make any statements, whether we can have a sergeant of arms there to make sure that they didn't take place. But it's the open process. We're trying to totally get away from what the appearance has been in the past. And by doing this in a hearing room, a place where we usually have, the public has access, they have them being able to come in and we can have designated hours for that. During the regular hours of the day when the State House is open.

**President Huffman** [02:15:27] I would suggest that there be a designated area for the media as there usually is space and chambers and sessions for the Legislature. Those kinds of things.

**Co Chair Sykes** [02:15:38] It's a good idea.

**Speaker Cupp** [02:15:39] Auditor Faber Auditor Faber.

**Auditor Faber** [02:15:41] My only suggestion again, my understanding is a fairly small room. And my guess is OGT could could create a satellite viewing location right next door or right in another room so that you don't actually have the crowds and the interaction, direct or indirect. I would say if OGT puts monitors in viewing right next door, I would think that would take care of everybody's concern. And OGT is shaking his head that that seems to be something they're used to. Hate to say it's an overflow location, but it would be the flow location.

**Speaker Cupp** [02:16:18] Public access will be available in a nearby room. Where video from the work room will be broadcast. I think I should say public access will only be available in the nearby room where the video from the work room will be broadcast, which is like an overflow. And any objective any further discussion on that point, there will be No. 24. Any objection? Without objection, it will be accepted. All right. Is there further business to come before the alright. I would ask Auditor Faber, you raised the issue about conflict of interest disclosure form. Do you have a forum that we can give to the consultants for that to be accomplished?

**Auditor Faber** [02:17:43] I don't have a specific form. I would think that the consultants both have had to fill out conflict of interest forms in previous work. If not, we can ask the Attorney General's Office to draft one that we send to them to two relatively quick order. But the short answer is is that we just I think we have an obligation to make sure that there

are no conflicts of interest or at least to have them disclosed so that we can waive them as you start working. It's a little late in the day to do that, but the fact is is we just want to be aware of your conflicts with anybody who is engaged in any of this litigation, any of the parties in the past, any of the parties that have done similar things direct or indirectly. And my big concern is is that you've agreed you're not going to communicate with anybody but us. that takes care most of my concerns about conflicts directly or indirectly. But I do think we have an obligation. Both of you have done work for people on this issue for a while. And so from that perspective, I do not have a forum. Does anybody have a forum to say? I don't know if there is a forum usually in litigation, you're just required to disclose all of your conflicts with people who are parties, and you may not even know who all the parties are, but it's essentially the people who are engaged in this type of activity in the last ten years. If you disclosed to us or have your offices disclose to us, who you've done work for and who the lawyers were that hired you and the lawyers that were involved. Most of that's going to include anybody we're concerned about. If not, we can ask our wonderful attorney general to create some kind of official formal document, but I don't know that we need to go to that detail.

**Michael McDonald** [02:19:21] I can tell you right now I'm not. I have no conflict with it. I'm not working with anybody. As to my knowledge, that's working.

**Co Chair Sykes** [02:19:29] As you recall.

**Michael McDonald** [02:19:29] As I recall, but to my knowledge on, I don't I don't believe I am. And if you want 10 years of history of all of my activity, I did not bring that with me. That would be on my home computer to go through all my files to get all that information so I would not be able to comply with that disclosure.

**Doug Johnson** [02:19:57] I believe you all have my resumé that's about a year old, but it has all the litigation that I believe would have crossed paths to think involved in this case. There's there's a local school district in California. That's a new case I'm working on, but that won't involve anyone. It's anywhere near here that's just local San Diego school attorneys. So, no, I don't have any conflicts other than what's in the list of past cases in there. And you all probably know better who the legal counsel were in those cases than I do. And whether or not any of them are involved in this.

**President Huffman** [02:20:33] Mr. Co-Chair, your your wise and able clerk pointed out that we did not go back. We did not adopt number three on Proposal A. And the only proposed change was striking the number six and inserting a number three. However, since the objections to 14 through 16 were withdrawn, I think number three, there aren't any objections to it. So I would just move that number three on proposal A also be adopted right?

**Speaker Cupp** [02:21:02] Is there any discussion on accepting number three and Proposal A. Was there any objection to that objection that will be also accepted?

**President Huffman** [02:21:13] Thank you.

**Speaker Cupp** [02:21:15] All right, thank you for that one.

**Doug Johnson** [02:21:19] Co-chairs, if I may. One other question, know not going to handle this as a commissioner, just let us know afterwards. But it would be good for us to

get a list of who are the designated staff people. And then probably from that list, if we reach a point where we need to reach out to the commission and say we have a dispute we want to resolve, who is it that we give that official notice to? So can you let us know as a commissioner just after this?

**Speaker Cupp** [02:21:42] Yeah, I think we'll just give you that information in writing. So you'll you'll have it and that'll be their contact information. So, Dr. Johnson, I apologize. I've called you, Mr. Johnson, and you're also a doctor. So.

**Doug Johnson** [02:21:57] OK.

**Co Chair Sykes** [02:21:57] Do you know where Room 116 is?

**Speaker Cupp** [02:22:02] All right. I think Co-Chair has a motion about being able to get equipment so that they can start to work.

**Co Chair Sykes** [02:22:09] I would move that we approve the expense of purchasing desktop computers, two of them, and also licenses the required requisite licenses that they may need in the software.

**Speaker Cupp** [02:22:26] Is there a second?

**President Huffman** [02:22:28] Second.

**Speaker Cupp** [02:22:29] It's been moved and seconded. Is there any discussion? Is there any objection to the motion? Hearing no objection, the motion is adopted unanimously. [inaudible] So let's talk about our next meeting. Our meeting is in here in here somewhere. Seven o'clock tomorrow. It's at seven o'clock tomorrow evening. It's either virtual or in-person or in-person virtual option. And we anticipate that we'll need to meet before then.

**Co Chair Sykes** [02:23:29] We do?

**Speaker Cupp** [02:23:29]  No. do we anticipate that we'll meet it, maybe before the so we have all of the open meeting requirements met, that's my only concern.

**Co Chair Sykes** [02:23:38] So we could recess if we did need to do that if we thought that was proper. But we do have on the schedule seven o'clock. Yes, and it will be in-person meeting with the virtual option for any member that would like to participate virtually. That would be available to them.

**Speaker Cupp** [02:23:57] All right. I suggest we recess in case we need to convene more quickly and we wouldn't. I would least give everybody an hour or two before we had if we had to assemble before seven o'clock tomorrow evening.

**Co Chair Sykes** [02:24:14] I think this would be helpful for us to try to stay on point. Are there in the decisions that we have to make or issues we have to deal with will have the ability to do that.

**Speaker Cupp** [02:24:28] All right. So do I hear a motion to recess until tomorrow?

**President Huffman** [02:24:33] Just to be clear, the next two meetings are maybe attended. Scheduled meetings maybe attend virtually. OK. All right. Thank you.

**Co Chair Sykes** [02:24:40] The staffs have been trained, and if you want to do that, I believe Heather has the information we'll send it directly to you. It is for you individually, not other staff, people. OK, all right.

**Speaker Cupp** [02:24:56] Without objection, we'll recess until seven p.m. tomorrow evening. Subject to an earlier call by the co-chairs if that becomes necessary, meeting adjourned.

1.  The map drawers shall include the two independent map drawers hired by the Redistricting Commission and the seven staff/contractor map drawers.

2.  The independent map drawers shall draft any General Assembly district plan at the direction of the Redistricting Commission.

3.  The independent map drawers shall answer to each of the Redistricting Commission members.  However, any conflicting direction from the Redistricting Commission members shall be resolved via the mediation process described below. (See Rules 12-16)

4.  The independent map drawers shall produce an entirely new general assembly district plan that has not been previously submitted to the Redistricting Commission.  The independent map drawers shall not include or consider any general assembly plan proposals or work product produced prior to Wednesday, March 23, 2022 when drafting the entirely new general assembly district plan.

5.  The map drawers shall utilize statewide election results and geography from 2016, 2018, and 2020 for the purpose of measuring the partisan lean of individual districts.

6.  When considering the election results, Republican votes cast plus Democratic vote casts shall equal 100% of the total vote.

7.  The map drawers shall utilize Maptitude when drawing any general assembly district plan.

8.   The map drawers shall utilize one computer purchased by the Redistricting Commission to draft any general assembly district plan.

9.   Racial data will neither be loaded onto the computer nor shall it be utilized by the map drawers in any way.

10.  The map drawers shall draw a general assembly district plan that conforms with the Ohio Constitution including Article 11, Sections 1, 2, 3, 4, 5, 6, and 7, the Constitution of the United States and applicable federal laws.

11.  The map drawers shall draw a general assembly district plan that conforms with the opinions of the Ohio Supreme Court and the United States Supreme Court.

12.  Should the map drawers encounter a disagreement amongst themselves regarding the application of Art. 11 of the Ohio Constitution and/or the opinions of the Ohio Supreme Court, the issue shall be referred to the full Commission.

13.  Should the full Redistricting Commission reach a unanimous consensus, the map drawers shall implement the instructions of the full Redistricting Commission.

14.  Should the full Redistricting Commission not be able to resolve the issue by unanimous consensus, the issue shall be referred to mediation.

15.  Should mediation fail to resolve the issue, the issue shall be presented to the full Redistricting commission for a vote.  A majority vote of the Commission shall resolve the issue.

16.  The map drawers will then implement the decision of the Commission regarding the disputed issue.

17.  Upon adoption of a general assembly district plan the independent map drawers shall complete and file with the Secretary of State, a geographical description of each House and Senate district, and any applicable Art 11, Sec. 5 Senate assignments in a manner requested by the Secretary of State.

18.  The independent map drawers shall not discuss the map drawing process with outside organizations, groups, or individuals during their engagement with the Redistricting Commission.