IN THE SUPREME COURT OF OHIO

| | |
|---|---|
| League of Women Voters of Ohio, A. Philip Randolph Institute of Ohio, Tom Harry, Tracy Beavers, Valerie Lee, Iris Meltzer, Sherry Rose, Bonnie Bishop, | |
| *Petitioners*, | Original Action Pursuant to Ohio Const., Art. XI |
| v. | |
| Ohio Redistricting Commission, Michael DeWine, Frank LaRose, Keith Faber, Matt Huffman, Robert R. Cupp, Vernon Sykes, and Emilia S. Sykes, | 2021-1193 |
| *Respondents*. | |

---

**PETITIONERS' MOTION FOR AN ORDER DIRECTING RESPONDENTS TO SHOW CAUSE FOR WHY THEY SHOULD NOT BE HELD IN CONTEMPT OF THE COURT'S MARCH 16, 2022 ORDER**

---

Freda J. Levenson (0045916)
*Counsel of Record*
ACLU OF OHIO FOUNDATION, INC.
4506 Chester Avenue
Cleveland, Ohio 44103
(614) 586-1972 x125
flevenson@acluohio.org

David J. Carey (0088787)
ACLU OF OHIO FOUNDATION, INC.
1108 City Park Avenue, Suite 203
Columbus, Ohio 43206
(614) 586-1972 x2004
dcarey@acluohio.org

Alora Thomas (PHV 22010-2022)
Julie A. Ebenstein (PHV 25423-2022)
AMERICAN CIVIL LIBERTIES UNION

Dave Yost
Ohio Attorney General
Julie M. Pfeiffer (0069762)
Michael A. Walton (0092201)
Assistant Attorneys General
Jonathan D. Blanton (0070035)
Deputy Attorney General
Michael J. Hendershot (0081842)
Deputy Solicitor
Constitutional Offices Section
30 E. Broad Street, 16th Floor
Columbus, Ohio 43215
(614) 466-2872
bridget.coontz@ohioago.gov

*Counsel for Respondents Ohio Secretary of State LaRose and Ohio Auditor Faber*

125 Broad Street
New York, New York 10004
(212) 519-7866
athomas@aclu.org

Robert D. Fram (PHV 25414-2022)
Donald Brown (PHV 25480-2022)
David Denuyl (PHV 25452-2022)
Joshua González (PHV 25424-2022)
Juliana Goldrosen (PHV 25193-2022)
COVINGTON & BURLING, LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105
(415) 591-6000
rfram@cov.com

Alexander Thomson (PHV 25462-2022)
COVINGTON & BURLING, LLP
One CityCenter
850 Tenth Street, NW
Washington, District of Columbia 20001
(202) 662-5425
ajthomson@cov.com

Anupam Sharma (PHV 25418-2022)
Yale Fu (PHV 25419-2022)
COVINGTON & BURLING, LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, California 94306
(650) 632-4700
asharma@cov.com

*Counsel for Petitioners*

Phillip J. Strach
Thomas A. Farr
John E. Branch, III
Alyssa M. Riggins
NELSON MULLINS RILEY & SCARBOROUGH, LLP
4140 Parklake Ave., Suite 200
Raleigh, North Carolina 27612
(919) 329-3812
phil.strach@nelsonmullins.com

*Counsel for Respondents House Speaker
Robert R. Cupp and Senate President Matt
Huffman*

Dave Yost
Ohio Attorney General

John W. Zeiger (0010707)
Marion H. Little, Jr. (0042679)
Christopher J. Hogan (0079829)
ZEIGER, TIGGES & LITTLE LLP
3500 Huntington Center
41 South High Street
Columbus, Ohio 43215
(614) 365-9900
(Fax) (614) 365-7900
zeiger@litohio.com

*Counsel for Respondent Governor Mike
DeWine*

C. Benjamin Cooper (0093103)
Charles H. Cooper Jr. (0037295)
Chelsea C. Weaver (0096850)
COOPER & ELLIOTT LLC
305 West Nationwide Boulevard
Columbus, Ohio 43215
(614) 481-6000
benc@cooperelliott.com

*Special Counsel for Respondents Senator
Vernon Sykes and House Minority Leader
Allison Russo*

Dave Yost

ii

Ohio Attorney General

Erik J. Clark (0078732)
Ashley Merino (0096853)
ORGAN LAW LLP
1330 Dublin Road
Columbus, Ohio 43215
(614) 481-0900
ejclark@organlegal.com
amerino@organlegal.com

Special Counsel to Attorney General Dave
Yost

*Counsel for Respondent The Ohio
Redistricting Commission*

## Table of Contents

I.  Introduction ................................................................................................................ 1

II.  Factual Developments ............................................................................................. 3

    A.  This Court Invalidates the Third Plan. ............................................................ 3

    B.  Outwardly, the Commission Demonstrates a Commitment to Complying
        With the Court's Order. .................................................................................... 3

        1.  The Commission hires two independent map drawers. ............................ 4

        2.  The Commission unanimously adopts instructions to guide the
            map-drawing process. ............................................................................... 4

        3.  The independent map drawers immediately get to work. ......................... 6

        4.  The mapmakers and the Commission make progress. .............................. 7

        5.  The independently drawn map is almost complete. .................................. 9

    C.  Partisan Considerations Take Over. ................................................................ 9

        1.  The Republican Commissioners pull the rug out of the map-
            drawing process. ...................................................................................... 9

        2.  The secret Republican map is introduced. ............................................. 11

        3.  The partisan Republican map is adopted. ............................................... 12

        4.  The independent map is complete - before the Court's deadline ............. 13

        5.  The Section 8(C)(2) Statement. .............................................................. 14

        6.  The Minority Statement. ......................................................................... 15

III.  Legal Standard ..................................................................................................... 16

IV.  Argument .............................................................................................................. 17

    A.  The Commission Flagrantly Violated the Procedural Requirements of This
        Court's March 16, 2022 Order ....................................................................... 17

        1.  The Commission did not "draft and adopt an entirely new General
            Assembly–district plan" .......................................................................... 17

        2.  The Commission did not adopt a map that was drafted "in public." ........ 18

   3. The Commission did not adopt a map that was the product of "frequent meetings to demonstrate their bipartisan efforts to reach a constitutional plan." ............................................................................. 19

   4. The district plan adopted by the Commission "has been the product of just one political party.".......................................................... 20

  B. The Eleventh-Hour Plan Violates the Ohio Constitution and the Substantive Requirements of this Court's Order. .................................................. 21

  C. This Court has the Power to Stay the Eleventh-Hour Plan and Direct the Enactment of a Compliant Map. ........................................................................... 24

V. Conclusion ................................................................................................................. 25

## I.   INTRODUCTION

*"There seems to be no end to the arrogance of the supermajority."*

Ohio Redistricting Commission Co-Chair Vernon Sykes on March 28, 2022.[1]

This motion should not have been necessary.  In response to the Court's March 16 order, the Ohio Redistricting Commission ("Commission") appeared finally to take positive steps towards a constitutional General Assembly map:  the Commission was meeting daily; rigorous map-drawing procedures and mediation processes were developed; independent map drawers were retained and working round the clock; and the result was a proposed General Assembly map on March 28, as the Court requested.

But then matters took a shocking turn, as the process was hijacked by four Republican Commissioners (the "Four Commissioners").  The plan adopted by the Commission at the eleventh-hour on March 28 ("the Eleventh-Hour Plan") and submitted to the Court is not the bipartisan, transparently drawn, map of the entire Commission.  By its sponsors' admission, it is the invalidated second revised plan (the "Third Plan") with "only minor changes."  *Id.* at 02:28:22.

The Eleventh-Hour Plan does virtually nothing to correct the gross partisan asymmetry in the distribution of "toss up" seats (seats in the range of 48% to 52% partisan lean).  It reduces the number of Democratic leaning toss-up seats from 19 to 17 in the House and from seven to six in the Senate.  There remain precisely zero Republican seats in this range.  If one eliminates the toss up seats from consideration, the partisan imbalance of the Eleventh-Hour Plan is crystal clear:  there are 72 Republican leaning seats and 37 Democratic leaning seats.  The Republicans

---

[1] Mar. 28, 2022 Ohio Redistricting Comm'n Hrg., at 01:16:44, https://bit.ly/3Dsh6in.

thereby enjoy 66% of the safe seats in the General Assembly, contrary to their 54% statewide vote share.  *See* Warshaw Aff. at 4-6.

Those changes were implemented exclusively by Mr. Springhetti, a Republican staff member.  The map was introduced to the Commission on March 28, 2022 at 9:30 pm.  Five of the Commission members had not seen the map prior to its introduction.  None of the members were allowed to offer amendments to the map.  A recess to review the new map was denied.  At 10:30 pm, the new map was adopted by the Commission by a 4-3 vote.

The Court ordered the Commission to "draft and adopt an **entirely new** General Assembly–district plan." *League of Women Voters of Ohio v. Ohio Redistricting Comm.,* Slip Opinion No. 2022-Ohio-789, ¶ 44 (hereinafter "March 16, 2022 Order") (emphasis added).  The Court also mandated that "the drafting should occur in public," and that the "commissioners should convene frequent meetings to demonstrate their bipartisan efforts to reach a constitutional plan." *Id*.  The Commission's adopted map is not entirely new, it was not drafted by the Commission, it was not drafted in public, and it was intentionally withheld from the Commission's meetings until the eleventh-hour.  This blatantly violates the Court's March 16, 2022 order.

As a result, the Court should place the continued contempt hearing back on calendar as soon as practicable.  Upon a finding of contempt this Court should require the Four Commissioners to purge their contempt by the following two measures:  (1) the Court should stay implementation of the Eleventh-Hour Plan so as to clear the way for the Commission to resume its work; and (2) direct the Commission to enact a plan consistent with Court's March 16, 2022 order.  Further Petitioners request that this court award Petitioners' attorneys' fees pursuant to a finding of bad faith and/or under R.C. 2323.51.

## II.     FACTUAL DEVELOPMENTS

### A.     This Court Invalidates the Third Plan.

On February 24, 2022, the Commission passed the Third Plan, to which Petitioners filed objections. *See* Obj. to Ohio Redistricting Comm'n's Feb. 24, 2022 Revised Plan, *League of Women Voters of Ohio v. Ohio Redistricting Comm'n*, No. 2021-1193 (Feb. 28, 2022). As with the first two plans, this Court issued an Opinion and Order, sustaining Petitioners' objections on the basis of violations of Article XI, Sections 6(A) and 6(B) of the Ohio Constitution. March 16, 2022 Order.

In its March 16, 2022 Order, the Court spelled out just how the Third Plan's constitutional defects should be remedied:

- The Supreme Court of Ohio ordered that the Commission be reconstituted and convene in order to "draft and adopt an entirely new General Assembly–district plan" that conforms with the Ohio Constitution. *Id.* ¶ 44;

- "To promote transparency and increase public trust," the order requires the Commission to conduct its drafting "in public[.]" *Id.*;

- To make sure that the work of the Commission is done effectively, the Court ordered the Commission to "convene frequent meetings to demonstrate their bipartisan efforts to reach a constitutional plan within the time set by th[e] court." *Id.*;

- And to make sure that the work is done expeditiously, the new plan must be filed with the Secretary of State no later than March 28, 2022. *Id.* ¶ 45.

### B.     Outwardly, the Commission Demonstrates a Commitment to Complying With the Court's Order.

The Commission initially attempted to comply with the Court's Order. The Commission first met on Saturday, March 19 and scheduled meetings *every day* through Monday, March 28. *See Commission Meetings*, Ohio Redistricting Comm'n, https://redistricting.ohio.gov/meetings (accessed Mar. 28, 2022).

### 1. The Commission hires two independent map drawers.

In an effort to craft a bipartisan map, the Commission agreed to hire two independent map drawers and a mediator to assist in the map-drawing process. *See* Mar. 19, 2022 Ohio Redistricting Comm'n Hrg., at 01:29:29-01:32:08, https://bit.ly/3JP96KE. The two independent map drawers included one map drawer selected by Republican Commissioners, Mr. Douglas Johnson, and one selected by Democratic Commissioners, Dr. Michael McDonald. *See* Mar. 21, 2022 Ohio Redistricting Comm'n Hrg., at 0:00:53-00:02:39, 00:54:08, https://bit.ly/3LpUCBg. The Commission agreed to compensate each map drawer at a rate of $450/hour. Susan Tebben, *Ohio Republicans abandon independent mapmakers to pass slightly modified GOP maps*, News 5 Cleveland, (Mar. 29, 2022), https://bit.ly/3JKpCvv (accessed Mar. 29, 2022). Both the map drawers and the mediators were hired by the unanimous decision of all seven Commissioners. *See* Mar. 21, 2022 Ohio Redistricting Comm'n Hrg., at 00:54:08, https://bit.ly/3LpUCBg.

Immediately following their appointment, the two map drawers flew in from out of state for their first meeting with the Commission on Wednesday, March 23 and to receive instructions for their work. *See* Mar. 23, 2022 Ohio Redistricting Comm'n Hrg., at 02:59, https://bit.ly/3wKUBno.

### 2. The Commission unanimously adopts instructions to guide the map-drawing process.

At the March 23 Commission meeting, after two-and-a-half hours of substantive discussion, the Commissioners unanimously agreed to adopt 24 detailed instructions to guide the work of the map drawers. *See* Ground Rules for Map Drawers, Ohio Redistricting Comm'n (Mar. 23, 2022), bit.ly/3tDhqYs. These Rules directly sought to respond to the Court's Order, and include, in part:

- Rule 1: The map drawers shall include the two independent map drawers hired by the

Redistricting Commission and Commissioners' staff/contractor map drawers.  *Id.*

- Rule 2:  The independent map drawers shall draft any General Assembly district plan at the direction of the Redistricting Commission and in accordance with the Ohio Constitution and Supreme Court of Ohio's orders.  *Id.*

- Rule 3:  The independent map drawers shall answer to each of the Redistricting Commission members.  However, any conflicting direction from the Redistricting Commission members shall be resolved via a mediation process.  (Rules 12-16).  *Id.*

- Rule 4:  The independent map drawers shall produce an entirely new general assembly district plan that has not been previously submitted to the Redistricting Commission.  The independent map drawers shall not include or consider any general assembly plan proposals or work product produced prior to Wednesday, March 23, 2022 when drafting the entirely new general assembly district plan.  *Id.*

- Rule 8:  The independent map drawers shall utilize one computer purchased by the Redistricting Commission to draft any general assembly district plan.  Two additional computers may be used for preparation purposes by the independent map drawers on site. *Id.*

- Rule 10:  The independent map drawers shall draw a general assembly district plan that conforms with the Ohio Constitution including Article 11, Sections 1, 2, 3, 4, 5, 6, and 7, the Constitution of the United States and applicable federal laws.  *Id.*

- Rule 11:  The independent map drawers shall draw a general assembly district plan that conforms with the opinions of the Ohio Supreme Court and the United States Supreme Court.  *Id.*

- Rule 20:  The Statehouse's Ohio Government TV will livestream the map making process.  OGT will stream the map drawers whenever they are working in the room.  *Id.*

- Rule 21:  Commissioners or their designated staff shall have unlimited access to the map drawers, but shall contact both Dr. McDonald and Mr. Johnson simultaneously.  *Id.*

- Rule 22:  The independent map drawers will provide regular progress updates to the Commission at each of the Commission's scheduled meetings.  *Id.*

- Rule 23:  Commissioners can expect to provide feedback and guidance to the independent map drawers in these meetings in addition to their individual outreach to the independent map drawers.  *Id.*

### 3. The independent map drawers immediately get to work.

The next morning, on March 24, the independent map drawers began their work to draw new general assembly maps. They met in room 116 of the Statehouse and utilized two computers to draw the maps. Designated staff of the Commissioners, both Republican and Democrat, participated throughout the day, providing feedback to the map drawers in real time and fielding questions about Ohio's geography. *See* Mar. 24, 2022 Ohio Redistricting Comm'n Hrg., https://bit.ly/3wUs4vE. Consistent with the Ohio Constitution and Auditor Faber's suggestion to start with the complex counties that would present the most issues, the map drawers began their work with Franklin County. *See* Ohio Const., art. XI § 3(C)(1); Mar. 23, 2022 Ohio Redistricting Comm'n Hrg., at 44:36, https://bit.ly/3wKUBno.

That evening, the map drawers met with the Commission to brief them on their progress and to seek their guidance on some outstanding questions. Dr. McDonald noted that he had "tackled the difficult part of Franklin County" and expected to finish the county by Thursday evening. Mar. 24, 2022 Ohio Redistricting Comm'n Hrg., at 03:18, bit.ly/3IJpomW. Mr. Johnson agreed, noting that although it was "slow going," the map drawers were "making progress." *Id.* at 06:49.

At the end of the meeting, Commission Co-Chair Vernon Sykes remarked that "this is historic" due to the transparent nature of the proceedings and that "we are making progress." *Id.* at 49:32. In a joint interview with Co-Chairs Speaker Cupp and Senator Sykes after the Commission meeting concluded, Senator Sykes said that he was "still optimistic that they're going to make the deadline." Josh Rultenberg (@JoshRultNews), Twitter, (Mar. 24, 2022, 8:39 PM), bit.ly/3DhpbX5. Speaker Cupp echoed this sentiment, saying "agreed, agreed." *Id.*

### 4.    The mapmakers and the Commission make progress.

At the Friday, March 25, 2022 afternoon meeting of the Commission, the map drawers informed the Commission that they made even more progress and had successfully drafted their proposals for districts in Cuyahoga, Franklin, Hamilton, and Summit Counties, and were steadily making progress on Montgomery County.  Mar. 25, 2022, Ohio Redistricting Comm'n Hrg., at 04:04, bit.ly/3JJeSNM.  Each map drawer also presented on their computer screens the two proposals they had each drafted and walked the Commission through the completed counties. *See generally id.*  Mr. Johnson noted that the representatives of the Commissioners who had been in the map drawing room to answer questions, had helpfully informed the map drawers about "lessons learned" from the past map drawing exercises.  *Id.* at 31:23.  After finishing a review of the map drawing in Hamilton County, the Commission recessed with plans to reconvene on the following afternoon of March 26.

The next day, on March 26, 2022, the Commission met again to hear from the map drawers on their progress and to discuss any outstanding issues.  The map drawers noted that they had made significant progress on their separate maps and intended to "merge" their two maps together, after receiving guidance from the Commission on certain districting choices in Franklin, Montgomery, and Cuyahoga counties.  Mar. 26, 2022, Ohio Redistricting Comm'n Hrg., at 35:39-36:53, http://bitly.ws/pHiD.  After extended debate, the Commission agreed they would wait to evaluate each district in the context of the whole map before weighing in.  *Id.* at 01:58:02.  Republican Commissioners also requested that that the mapmakers consider the addresses of incumbents when creating district lines, while the Democratic Commissioners expressed opposition to this.  *See id.* at 41:31-58:14.  The Commission agreed to bring the issue to mediation.  *Id.* at 01:00:15, 01:05:57.

7

By the next afternoon, on March 27, the map drawers completed their respective maps and presented their maps to the Commission. Mar. 27, 2022, Ohio Redistricting Comm'n Hrg., at 01:50, http://bitly.ws/pHoI. The maps closely aligned on proportionality and symmetry issues, but differed on the configurations in several counties. *Id.* at 02:45. The map drawers presented their different county configurations to the Commission and presented the Commissioners with options for Montgomery, Cuyahoga, and Franklin counties. *Id.* at 5:50. The Commission recessed for two hours so that every Commissioner could have the opportunity to meet with the map drawers and review each map in detail on their respective computers. *Id.* at 01:24:00. After returning from recess, the Commission provided their collective guidance, without disagreement, to the map drawers on how to district Montgomery, Cuyahoga, and Franklin counties. *Id.* at 01:26:06.

At that hearing, the Commission also announced they had worked together in mediation and reached a consensus on the incumbent issue. Jointly, the Commission instructed the mapmakers that: "Upon completion of the independent map drawers' merger of their independent versions of the House and Senate maps and prior to any presentation to the Commission, the independent map drawers shall consider the residence locations of non-term limited House and Senate incumbents, and Senate incumbents in midterm, in drafting a Commission map, and where possible without violating constitutional principles, avoid pairing incumbents and also drawing districts such that Senators protected under Section 5 of Article 11 no longer live in the district they represent." *See* Mediation Statement – Instructions – As Adopted (Mar. 27, 2022), Ohio Redistricting Comm'n., https://redistricting.ohio.gov/meetings. As a result of these decisions, the map drawers agreed that they could merge their two respective maps for consideration by the Commission. *Id.* at 01:52:00.

8

### 5. The independently drawn map is almost complete.

The next morning, on March 28, the map drawers notified the Commission that they had successfully merged their two maps and were methodically going through the state, with the help of the Commission consultants, to fix any technical issues. The map drawers also noted that they were in a position to review the incumbent information and incorporate changes to the map that reduced pairing incumbents within the same district and ensured that incumbents still in the middle of their terms could serve out the rest of their terms. Mar. 28, 2022 Ohio Redistricting Comm'n Hrg., at 02:34, https://bit.ly/3Dsh6in. The Commission then recessed to allow the map drawers to finish drafting the unified map. During the recess, multiple Commissioners met with the map drawers to provide feedback and offer suggestions to the map drawers. *See generally Ohio Redistricting Commission Live Feed*, Ohio Redistricting Comm'n, (Mar. 28, 2022), https://ohiochannel.org/live/redistricting-1.

### C. Partisan Considerations Take Over.

#### 1. The Republican Commissioners pull the rug out of the map-drawing process.

At 4:30 PM that afternoon, map drawer Mr. Johnson informed the Committee that he and Dr. McDonald were just a "couple hours away" from completing their map and presenting it to the Commission. Mar. 28, 2022 Ohio Redistricting Comm'n Hrg., at 21:27, https://bit.ly/3Dsh6in. Co-Chair Sykes noted that the Commission was meeting then to make "suggestions and edits to cross the finish line." *Id.* at 21:35. Halfway through the hearing, Senate President Huffman abruptly announced that the Commission had to "pass a map by 10:30 PM" in order to comply with the Court's midnight deadline. *Id.* at 01:04:05. Without a shred of respect for this Court's order, Senate President Huffman motioned to have the Commission turn instead to the invalidated February 24 map as a starting point, have his partisan map drawing

consultants, Mr. DiRossi and Mr. Springhetti make changes to that map, and pass it by 10:30 PM that night. *Id.* at 01:07:28.

Minority Leader Russo immediately objected. So did Co-Chair Sykes. Co-Chair Sykes remarked that the motion was "ridiculous" and that "to distract the staff and map drawers and to divert to some other task is ridiculous . . . contrary to the directive, the spirit and the direction of the court." *Id.* at 01:08:39. Leader Russo explained that "this is so disingenuous . . . the court has ordered us to create a map, as a commission, starting from scratch and that is what we have done. And we have brought in these outside independent map makers who have spent an enormous amount of time . . . to totally undercut that at this point, number one is again a smack in the face to Ohio voters and completely disregarding the Court order . . . The Court would much rather us work and finish this job then to again submit another unconditional map that is not drawn by the entire commission or submit nothing . . ." *Id.* at 01:10:02. Leader Russo suggested the Commission meet in mediation to resolve the dispute. *Id.* at 01:13:41. Senate President Huffman immediately rebuffed her. *Id.* at 01:16:22. Co-Chair Sykes observed that "[t]here seems to be no end to the arrogance of the supermajority." *Id.* at 01:16:44.

Over the objections of the two Democratic Commissioners, each and every Republican Commissioner voted for Senate President Huffman's motion to resuscitate the invalidated Third Plan. *Id.* at 01:25:00. During the recess, independent map drawer Mr. Johnson continued to do his work on camera for the public to see, supported by the Democratic staff consultants. *See generally* Ohio Redistricting Commission Live Feed, Ohio Redistricting Comm'n, (Mar. 28, 2022), https://ohiochannel.org/live/redistricting-1. Meanwhile, the only Republican staff consultant available to assist with map drawing, Mr. Blake Springhetti, stopped providing guidance to Mr. Johnson and instead imported the invalidated Third Plan onto one of the

10

working computers, made changes for about 45 minutes to a select few districts, and completed his work.  Mar. 28, 2022 Ohio Redistricting Comm'n Hrg., at 01:47:08, https://bit.ly/3Dsh6in. During the recess, Senate President Huffman spoke with reporters, and informed them that he came up with the idea to bypass the independent mapmakers that Saturday (March 26).  Andrew Tobias (@AndrewJTobias), Twitter, (Mar. 28, 2022, 6:04 PM), https://bit.ly/36vQrW4.

### 2.  The secret Republican map is introduced.

At approximately 9:30 PM, Mr. Johnson informed the Commission he had completed his full House map and was "making progress as fast as humanly possible" to complete the Senate map and get a full map done that evening.  Mar. 28, 2022 Ohio Redistricting Comm'n Hrg., at 01:26:58, https://bit.ly/3Dsh6in.  When asked by Co-Chair Sykes how long it would take to complete his work, Mr. Johnson estimated he could complete his work within the next 45 minutes to an hour.  *Id.* at 01:28:08.

Notwithstanding Mr. Johnson's progress, Senate President Huffman and Speaker Cupp introduced the Eleventh-Hour Plan, which was crafted by Mr. Springhetti in the recess period. *Id.* at 01:40:22; Mar. 28, 2022 Cupp Plan, General Assembly District Plan – Adopted by Commission, Ohio Redistricting Comm'n, https://redistricting.ohio.gov/maps.  They proceeded to pass out PDFs of the map along with a population deviation spreadsheet.  Mar. 28, 2022 Ohio Redistricting Comm'n Hrg., at 01:36:44, https://bit.ly/3Dsh6in.  Speaker Cupp then read off prepared remarks, explaining that "this was the best that could be done in the time allotted by the Supreme Court . . . We have followed the Supreme Court's direction . . . and they have led us to this moment . . . At this late hour we have to comply as best we can."  *Id.* at 01:39:26.  Leader Russo responded that "this process, this motion, and this map put before us is a complete farce," noting that she had been handed just a PDF of the map along with population deviations, but did

11

not receive any details on the partisan lean of each district or any information about the symmetry of competitive districts. *Id.* at 01:44:25. Leader Russo requested the opportunity to offer amendments to the Eleventh-Hour Plan. Her request was denied. *Id.* at 01:36:49.

Co-Chair Sykes further noted that the Republicans withdrew from the map drawing process over the previous day and stopped assisting the independent map drawers. He noted that "in the last day, [majority staff] haven't been present to assist in the process, so instead of putting the attention on the independent map drawer to satisfy the Constitution, they withdrew and d[id] their own drawing to violate the requirements." *Id.* at 01:48:49.

In an extended back-and-forth between Speaker Cupp and Leader Russo, Speaker Cupp confirmed that Mr. Springhetti worked off of the previously invalidated Third Plan. *Id.* at 01:55:43. He also confirmed that the only changes made from the Third Plan resulted in the Eleventh-Hour Plan having two fewer asymmetrical Democratic House Districts and one fewer asymmetrical Democratic Senate districts. *Id.* at 01:43:19. As a result, while the Third Plan had 19 House Democratic seats in the 50-52% range, the Eleventh-Hour Plan has 17 House Democratic seats in that range and no competitive Republican seats. And, while the Third Plan had seven Democratic Senate seats in the 50-52% range, the Eleventh-Hour Plan has six Democratic Senate seats in that range and no competitive Republican seats. *Id.* at 01:57:58; *see also* Minority Statement (Mar. 28, 2022) at 4, Ohio Redistricting Comm'n, https://bit.ly/38bOGO7.

### 3. The partisan Republican map is adopted.

After that, Leader Russo suggested that the Commission recess to review the Eleventh-Hour Plan. Senate President Huffman opposed Leader Russo's request. Leader Russo then summarized the Republican Commissioners' request: "you're asking us, as a commission, to

vote on a map that clearly violates the court order and Constitution as interpreted through the court's order because you don't want to give the map maker an independent map maker, the commission's mapmaker, the additional time to do the work. Frankly, I'd rather be here for a couple hours longer then to have to come back and go through this process again because this map has been declared unconstitutional and thrown out by the Court?" Mar. 28, 2022 Ohio Redistricting Comm'n Hrg., at 02:04:43, https://bit.ly/3Dsh6in. Receiving no response to her question, Leader Russo then asked each of the Commissioners when they first saw the Eleventh-Hour Plan. *Id.* at 02:06:26. Commissioners Sykes, DeWine, LaRose, and Faber all noted that the first time they saw the plan was at the hearing moments ago. Commissioners Huffman and Cupp did not answer. *Id.* at 02:07:03.

Co-Chair Sykes and Leader Russo then motioned to have the Commission request that the Ohio Supreme Court grant a 12-hour extension of the deadline to pass a map. *Id.* at 02:11:11. Their motion was ignored. Leader Russo then requested a 30 minute recess to review the Eleventh-Hour Plan. *Id.* at 12:13:08. Her request was again rebuffed. The Eleventh-Hour Plan was then brought up and adopted by a 4-3 vote, with both Democratic Commissioners voting against the Plan. *Id.* at 02:20:09.

### 4. The independent map is complete - before the Court's deadline.

Following a 30 minute recess, the Commission reconvened at 11 PM. At that time, Dr. Johnson completed his maps (the "Independent Plan"), posted them on the Commission's website at 10:46 PM (approximately 20 minutes after the Commission's adoption of the Eleventh-Hour Plan), and made them available to the Commission members. *See* Monday Evening 3-28 Revised-Draft-Independent Map Drawers-10:46 PM (Mar. 28, 2022), General Assembly District Plans – Draft Plans Drawn by Independent Map Drawers, Ohio Redistricting

13

Comm'n, https://redistricting.ohio.gov/maps. Co-Chair Sykes then moved for the Commission to replace the Eleventh-Hour Plan by instead adopting the Independent Plan. Mar. 28, 2022 Ohio Redistricting Comm'n Hrg., at 02:23:41, https://bit.ly/3Dsh6in. He further noted that the Independent Plan achieved strict proportionality, and Leader Russo noted that the Plan was significantly more symmetrical than the Eleventh-Hour Plan because it had only three House Democratic and three House Republican seats falling within the 50-52% range, and only two Senate Democratic and no Senate Republican seats falling within that competitive range. *Id.* at 02:24:54. Although the Independent Plan was presented an hour before midnight, addressing Republican Commissioners' concerns about meeting the Court's deadline, all Republican Commissioners came out against it, citing the lack of time to review the plan as a reason for the rejection. *Id.* at 02:27:53.[2]

In expressing his opposition to the Independent Plan, Senate President Huffman confessed that he supported the Eleventh-Hour Plan over the Independent Plan because the Eleventh-Hour Plan made "only minor changes" to the invalidated Third Plan. *Id.* at 02:28:22. Shortly thereafter, the Independent Plan was rejected in a 5-2 vote, with all Republican Commissioners voting against the plan, and the two Democratic Commissioners voting in favor. *Id.* at 02:43:38.

### 5. The Section 8(C)(2) Statement.

The Commission then proceeded to adopt the Section 8(C)(2) Statement ("the Statement") drafted by the Republicans. That statement, ostensibly written before the Independent Plan was published on the Commission's website 72 minutes before midnight,

---

[2] Curiously, the lack of time to review the Eleventh Hour Plan was not an obstacle to its passing to the Four Commissioners.

14

falsely claimed that "[t]he independent map[ ]drawers were unable to produce [a constitutional] plan by the Ohio Supreme Court's deadline." Section 8(C)(2) Statement (Mar. 28, 2022) at 1, Ohio Redistricting Comm'n, https://bit.ly/3JS9qIv. And despite the Court's Order that an entirely new plan be drawn, the Statement confesses that "on the final evening of March 28, 2022, the Commission instructed Commission member staff to prepare, with the assistance of the independent map[ ]drawers, a modification of the plan adopted by the Commission on February 24, 2022 ("Third Plan") that more closely complies with the Court's orders than the Third Plan." *Id.* at 2. And while the Statement claims that the final adopted plan meets "strict proportionality," it vaguely asserts that "[t]he Commission also improved upon the number of asymmetric districts identified in *LWV*" by "reduc[ing] the number of these districts as compared to the Third Plan." *Id.*

### 6. The Minority Statement.

In response, Leader Russo read into the record the minority statement endorsed by her and Co-Chair Sykes. The minority statement explains that the "[f]rom March 16, 2022 until March 28, 2022, the Minority Commissioners made every attempt to move the process along to comply with the Supreme Court's clear orders. The Minority Commissioners pushed for frequent hearings, as strongly suggested by the Court. In fact, the Minority Commissioners tried to convene the Commission every day, including on Sunday, March 20, to propose independent mapmakers. The Republicans demurred." Minority Statement (Mar. 28, 2022) at 2, Ohio Redistricting Comm'n, https://bit.ly/38bOGO7.

The minority statement also notes that "[t]he Minority Commissioners fought for an open and transparent process. The map drawing was done entirely on a live stream – complete, with audio – for everyone to observe. Yet, in a bunker at the Bureau of Worker Compensation

15

building, a secret map was developed, at some unknown time, in violation of the orders of the state's highest judicial authority. The process and outcome, despite all the efforts for public viewing, expert input, and bipartisan oversight, was still conducted in the shadows." *Id.* Further, "[t]he Majority Commissioners, through President Huffman, announced their secret efforts late on the last day as a parachute they have apparently planned on for much of this process." *Id*. And again, "it is the Republican Senate president's map drawer who was sequestered in a secret location drawing the map. The map was neither drafted by the Commission, nor does it have the input of Minority Commissioners." *Id.* at 3. The ultimate product, a map that contains "an astounding 17 Democratic toss-up seats in the House between 50-52% partisan share and zero Republicans in the same range" and "six Democratic Senate seats falling between 50-52%, and zero Republicans in the same range" is "a nearly identical gerrymander to the plan overturned by the Supreme Court of Ohio just 12 days ago." *Id.* at 4.

## III.   LEGAL STANDARD

Ohio law confers on courts the power to hold people in contempt for violating its orders. Ohio Rev. Code Ann. § 2705.01 ("A person guilty of any of the following acts may be punished as for a contempt: (A) Disobedience of, or resistance to, a lawful . . . order . . . of a court or officer"). Moreover, "courts have inherent authority—authority that has existed since the very beginning of the common law—to compel obedience of their lawfully issued orders." C*ramer v. Petrie*, 1994-Ohio-404, 70 Ohio St.3d 131, 133.

"Contempt is defined in general terms as disobedience of a court order." *Matter of D.S.S.*, 2020-Ohio-5387, ¶ 11, 163 N.E.3d 59, 61 (internal quotations omitted). *See also Marden v. Marden*, 108 Ohio App.3d 568, 570 (1996) ("'Civil contempt' is defined as that which exists in failing to do something ordered by the court in a civil action for the benefit of the opposing

party"). "To support a [civil] contempt finding, the moving party must establish by clear and convincing evidence that a valid court order exists, that the offending party had knowledge of the order, and that the offending party violated such order." *In re A.A.J.*, 2015-Ohio-2222, ¶ 12, 36 N.E.3d 791, 794. However, "[o]nce the movant establishes this prima facie case of contempt, the burden then shifts to the contemnor to prove his inability to comply with the court order . . . The inability that excuses compliance **cannot be self-imposed**, fraudulent, or due to an intentional evasion of the order." *Id.* at 795 (emphasis added). "In addition, proof of purposeful, willing or intentional violation of a court order is not a prerequisite to a finding of contempt." *Pugh v. Pugh*, 15 Ohio St.3d 136, 140 (1984) (emphasis in original).

## IV.  ARGUMENT

### A.  The Commission Flagrantly Violated the Procedural Requirements of This Court's March 16, 2022 Order.

On March 16, 2022, this Court ordered the Commission to "draft and adopt an entirely new General Assembly–district plan that conforms with the Ohio Constitution, including Article XI, Sections 6(A) and 6(B)." The Court also mandated that "the drafting should occur in public," and that the "commissioners should convene frequent meetings to demonstrate their bipartisan efforts to reach a constitutional plan." Mar. 16, 2022 Order at ¶ 44. The Commission's adoption of the  Eleventh-Hour Plan fails to comply with any of the Court's requirements.

#### 1.  The Commission did not "draft and adopt an entirely new General Assembly–district plan"

The Eleventh-Hour Plan was simply the Third Plan with "only minor changes." Mar. 28, 2022 Ohio Redistricting Comm'n Hrg., at 02:28:22, https://bit.ly/3Dsh6in. This is no surprise given the fact that the Eleventh-Hour Plan was drafted using the Third Plan as a starting point.

17

*Id.* at 01:59:57.  In fact, the only modifications to the Eleventh-Hour Plan were not made by any member of the Commission, but instead by Mr. Springhetti, ostensibly over the span of a couple of hours just prior to its introduction and adoption by the Commission.  The Commission members were even prohibited from offering any amendments to the Eleventh-Hour Plan when it was revealed at 9:30 pm on March 28.  *Id.* at 01:36:49.  The Court's order was clear—the adopted plan needed to be an "entirely new" plan that was "drafted" by the Commission.  Mar. 16, 2022 Order at ¶ 44.  Instead, the Commission did exactly what they were told not to: "simply adopt [a plan] drafted by legislative staff at the direction of members of one political party." *Id.* at ¶ 31.

### 2.    The Commission did not adopt a map that was drafted "in public."

The Court ordered the drafting of the Commission's map should be done "in public" in order "to promote transparency and increase public trust."  Mar. 16, 2022 Order at ¶ 44.

The Eleventh-Hour Plan was not drafted in public.  Instead, it was derived from the Third Plan, which as the Court already noted, was drafted in secret by Republican staffers. March 16, 2022 Order at ¶¶ 27-31. The only public "drafting" of the map that occurred was the handful of hours where Mr. Springhetti made minor changes to the Third Plan to arrive at the Eleventh-Hour Plan.[3]  Making a handful of ambiguous minor changes in public does not transform a map that was overwhelmingly drafted outside the public eye and under complete control of the Republican Party.

---

[3] Even though Mr. Springhetti was drafting portions of the map in public, the public was not given any explanation of what, if any, guidelines he was to follow when drawing the map.  The Commission's 8(c)(2) statement merely states that Mr. Springhetti was "instructed" to make a map that that "more closely complies with the Court's orders than the Third Plan."  *See* Section 8(C)(2) Statement (Mar. 28, 2022) at 2, Ohio Redistricting Comm'n, https://bit.ly/3JS9qIv.  In contrast, the public was given a list of 24 rules that the independent map drawers were to follow.

3.      **The Commission did not adopt a map that was the product of "frequent meetings to demonstrate their bipartisan efforts to reach a constitutional plan."**

A third requirement of the Court's order was to hold frequent public "meetings to demonstrate their bipartisan efforts to reach a constitutional plan within the time set by this court." March 16, 2022 Order at ¶ 44. The Commission did hold frequent public meetings, and those meetings did discuss efforts to draw and adopt a constitutional plan on a bipartisan basis. The problem is that those meetings were a farce—they had nothing to do with the Eleventh-Hour Plan.

The details about the Eleventh-Hour Plan were intentionally withheld from the Commission meetings. More specifically, Senate President Huffman admitted that he came up with the idea to bypass the independent mapmakers on Saturday, March 26. Andrew Tobias (@AndrewJTobias), Twitter, (Mar. 28, 2022, 6:04 PM) https://bit.ly/36vQrW4. Absent from Mr. Huffman's comments is any explanation for why he did not mention to any of his Commission colleagues his plan until March 28 at 4:30 pm. Instead, Huffman and his Republican colleagues on the Commission wasted the Commission's valuable, diminishing, and remaining hours by litigating an illegitimate demand to insert an extraconstitutional requirement into the process—requiring the independent mapmakers draw districts to protect incumbents.[4] This was an issue this Court had already considered and conclusively rejected. Mar. 16, 2022 Order at ¶ 36. ("Senate President Huffman's concern for protecting incumbents is not grounded in Article XI.").

---

[4] The need to protect incumbents required mediators to resolve. The resolution required the independent map makers to attempt to redraw districts to incorporate where incumbents lived. *See* Mediation Statement – Instructions – As Adopted (Mar. 27, 2022), Ohio Redistricting Comm'n, https://redistricting.ohio.gov/meetings. This had the effect of increasing the amount of work the independent map makers needed to do prior to the March 28 deadline.

**4. The district plan adopted by the Commission "has been the product of just one political party."**

Throughout this process, the Court has criticized the Commission for "a flawed process in which the General Assembly–district plan adopted by the commission has been the product of just one political party." Mar. 16, 2022 Order at ¶ 31. That remains the case today.

Despite giving off the appearance of cooperation and bipartisanship, members of the Commission were working behind the scenes to undermine those efforts. Just like the Third Plan, "[t]he Democratic members of the commission had no opportunity to provide input in creating" the Eleventh-Hour Plan, "and they had no meaningful opportunity to review and discuss it or to propose amendments once it was presented at the commission hearing on February 27, 2022." *Id.* at ¶ 27.

And, just like before, members of the Commission secretly prepared the Eleventh-Hour Plan only to reveal it to the rest of the Commission at the last minute. *Id.* at ¶ 28 ("Senate President Huffman and House Speaker Cupp did not reveal that they were working on a new district plan until the commission meeting on February 22 . . . At that point, Senate President Huffman told members of the media that he and House Speaker Cupp had been working on a new plan since February 11."). Lastly, the Commission was asked to vote on the Eleventh-Hour Plan less than an hour after it was introduced—even less time than what had occurred under the Third Plan. *Id.* at ¶ 29.

Thus, it is not surprising that the Eleventh-Hour Plan does not meet the requirements laid out in Article XI, Sections 6(A) and 6(B) of the Ohio Constitution, just as the Third Plan did not. *Id.* at ¶ 32 ("The evidence shows that the individuals who controlled the map-drawing process exercised that control with the overriding intent to maintain as much of an advantage as possible for members of their political party."). Indeed, the Eleventh-Hour Plan only provides

20

marginal—at best—improvements over the Third Plan. For example, the Third Plan had 19 House Democratic seats in the 50-52% range, and the Eleventh-Hour Plan has 17 House Democratic seats and no Republican seats in that range. Similarly, the Third Plan had seven Democratic Senate seats in the 50-52% range, and the Eleventh-Hour Plan has six Democratic Senate seats and no Republican seats in that range. *See* Warshaw Aff. at 2-3; *see also* Mar. 28, 2022 Ohio Redistricting Comm'n Hrg., at 01:59:57. https://bit.ly/3Dsh6in; *see also* Minority Statement (Mar. 28, 2022) at 4, Ohio Redistricting Comm'n, https://bit.ly/38bOGO7.

### B. The Eleventh-Hour Plan Violates the Ohio Constitution and the Substantive Requirements of this Court's Order.

It should come as no surprise that a plan that is was intended only to provide minor adjustments to the invalid Third Plan should reflect the same constitutional defects. In so doing it violated the substantive requirements of this Court's orders.

Most saliently, this Court invalidated the Third Plan because it asymmetrically allocated closely competitive districts. Mar. 16, 2022 Order at ¶¶ 32-34, 39-43. In particular, the Third Plan contained 19 House districts where the Democratic vote share was between 50% and 52%; it contained no Republican leaning districts in that range. It contained seven Senate districts where the Democratic vote share was in that band; and, again, zero Republican leaning districts in that band. *Id.* ¶ 39.

If one eliminated the districts in the 50-52% band from consideration, the resulting partisan imbalance under the Third Plan was unquestionable. The Republicans enjoyed 67.9% of the seats even though they only command a 54% share of the statewide votes. *Id.* ¶ 42.

The Eleventh-Hour Plan is not materially different. Under the Eleventh-Hour plan, once the seats in the 50-52% are removed from consideration, 66% of the seats (72 out of 109) lean

toward the Republican Party while only 34% of the seats (37 out of 109) lean toward the Democrats.  Warshaw Aff. at 5-6.

The near identity of the two plans is clearly demonstrated in Dr. Warshaw's affidavit.  As regards the Senate maps, 31 out of 33 districts are exactly the same:



(a) February 24 Plan

(b) March 28 Plan

Figure 1: District-level Vote Shares on Commission's February 24 and March 28 State Senate plans based on the aggregation approach used by the Commission. The vertical lines around each dot show the range of statewide election results in that district. The dotted line shows the number of seats required for the majority.

Warshaw Aff. at 4, 7.  In the House, 92 out of 99 districts are exactly the same:



(a) February 24 Plan

(b) March 28 Plan

Figure 2: District-level Vote Shares on Commission's February 24 and March 28 State House plans based on the aggregation approach used by the Commission. The vertical lines around each dot show the range of statewide election results in that district. The dotted line shows the number of seats required for the majority.

Warshaw Aff. at 6, 7.

The triviality of these differences is confirmed by the miniscule population shifts between the two maps. The March 28 Plan changes only 0.1% of the census blocks for the Senate (or 0.2% of Ohio's population) from the February 24 Plan. Similarly, the March 28 Plan changes only 0.16% of the census blocks (and 0.26% of Ohio's population) from the February 24 Plan.

23

Warshaw Aff. at 7.  Such inconsequential changes simply cannot transform an unconstitutional

Plan into a constitutional plan.

### C.     This Court has the Power to Stay the Eleventh-Hour Plan and Direct the Enactment of a Compliant Map.

This Court has broad powers to remedy contempt for its orders pursuant to Ohio Revised

Code Chapter 2705.  In particular, this Court can order a hearing to show cause pursuant to the

matter, R.C. 2705.05(A).  This Court had previously done so and then continued that hearing.  In

light of the multiple violations of this Court's order, as set forth above, that hearing should be

placed back on calendar on an expedited basis.

Moreover, this Court is not confined to the sanctions prescribed by Ohio Revised Code

Chapter 2705(A) in fashioning a remedy for contempt violations.  *Copley Twp. Bd. of Trustees v.*

*W.J. Horvath Co.*, 2011-Ohio-1214, ¶ 10, 193 Ohio App.3d 286, 291 ("R.C. 2705.05(A)

prescribes sanctions for contempt violations, but courts are not required to follow it"); *City of*

*Cincinnati v. Cincinnati Dist. Council 51*, 35 Ohio St.2d 197, 207, 299 N.E.2d 686 (1973)

("Although . . . the General Assembly may prescribe procedure in indirect contempt cases, the

power to punish for contempt has traditionally been regarded as inherent in the courts and not

subject to legislative control").  Indeed, "[c]ourts have wide discretion to determine the

punishment for contempt of their own orders." *Copley*, 2011-Ohio-1214, ¶ 10, 193 Ohio App.

3d at 291 (internal quotations and modifications omitted).

Notably, any sanction imposed for civil contempt must afford a contemnor "the

opportunity to purge his civil contempt."  In re A.A.J., 2015-Ohio-2222, ¶ 43, 36 N.E.3d 791,

800.  Here, the Commission may only purge itself of contempt by enacting a valid district plan

with all due haste.  In order to do that two things need to be done.  First, this Court should stay

the Eleventh-Hour Plan.  Second, the Commission should be  ordered to get back to work

24

adopting a plan pursuant to the Court's guidance, so as to permit the Commissioners to purge themselves of their contempt.  Finally, Petitioners request an award of Petitioners' attorneys' fees under R.C. 2323.51, with any such fees issued against the Four Commissioners jointly or severally, or apportioned between Respondents as the Court deems appropriate.

## V.    CONCLUSION

For the foregoing reasons, the Court should: (1) re-calendar the show cause hearing that was continued on February 25, 2022; (2) stay the Eleventh-Hour Plan; (3) order the Commission to continue working on plan pursuant to the Court's March 16, 2022 Order; and (4) award Petitioners' attorneys' fees under R.C. 2323.51.

Dated:  March 29, 2022

Robert D. Fram (PHV 25414-2022)
Donald Brown (PHV 25480-2022)
Joshua González (PHV 25424-2022)
David Denuyl (PHV 25452-2022)
Juliana Goldrosen (PHV 25193-2022)
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-6000
rfram@cov.com

Alexander Thomson (PHV 25462-2022)
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-5425
ajthomson@cov.com

Anupam Sharma (PHV 25418-2022)
Yale Fu (PHV 25419-2022)
COVINGTON & BURLING, LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, California 94306
(650) 632-4700
asharma@cov.com

Respectfully submitted,

*/s/ Freda J. Levenson*
Freda J. Levenson (0045916)
ACLU OF OHIO FOUNDATION, INC.
4506 Chester Avenue
Cleveland, Ohio 44103
(614) 586-1972 x125
flevenson@acluohio.org

David J. Carey (0088787)
ACLU OF OHIO FOUNDATION, INC.
1108 City Park Avenue, Suite 203
Columbus, OH 43206
(614) 586-1972 x2004
dcarey@acluohio.org

Alora Thomas (PHV 22010-2022)
Julie A. Ebenstein (PHV 25423-2022)
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street
New York, NY 10004
(212) 519-7866
athomas@aclu.org

*Counsel for Petitioners*

## CERTIFICATE OF SERVICE

I, Freda J. Levenson, hereby certify that on March 29, 2022, I caused a true and correct

copy of the following documents to be served by email upon the counsel listed below:

**PETITIONERS' MOTION FOR AN ORDER DIRECTING RESPONDENTS TO SHOW CAUSE FOR WHY THEY SHOULD NOT BE HELD IN CONTEMPT OF THE COURT'S MARCH 16, 2022 ORDER**

Freda J. Levenson (0045916)
*Counsel of Record*
ACLU OF OHIO FOUNDATION, INC.
4506 Chester Avenue
Cleveland, Ohio 44103
(614) 586-1972 x125
flevenson@acluohio.org

David J. Carey (0088787)
ACLU OF OHIO FOUNDATION, INC.
1108 City Park Avenue, Suite 203
Columbus, Ohio 43206
(614) 586-1972 x2004
dcarey@acluohio.org

Alora Thomas (PHV 22010-2022)
Julie A. Ebenstein (PHV 25423-2022)
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street
New York, New York 10004
(212) 519-7866
athomas@aclu.org

Robert D. Fram (PHV 25414-2022)
Donald Brown (PHV 25480-2022)
David Denuyl (PHV 25452-2022)
Joshua González (PHV 25424-2022)
Juliana Goldrosen (PHV 25193-2022)
COVINGTON & BURLING, LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105
(415) 591-6000
rfram@cov.com

Dave Yost
Ohio Attorney General
Julie M. Pfeiffer (0069762)
Michael A. Walton (0092201)
Assistant Attorneys General
Jonathan D. Blanton (0070035)
Deputy Attorney General
Michael J. Hendershot (0081842)
Deputy Solicitor
Constitutional Offices Section
30 E. Broad Street, 16th Floor
Columbus, Ohio 43215
(614) 466-2872
bridget.coontz@ohioago.gov

*Counsel for Respondents Ohio Secretary of State LaRose and Ohio Auditor Faber*

Phillip J. Strach
Thomas A. Farr
John E. Branch, III
Alyssa M. Riggins
NELSON MULLINS RILEY & SCARBOROUGH, LLP
4140 Parklake Ave., Suite 200
Raleigh, North Carolina 27612
(919) 329-3812
phil.strach@nelsonmullins.com

*Counsel for Respondents House Speaker Robert R. Cupp and Senate President Matt Huffman*

Dave Yost
Ohio Attorney General

26

Alexander Thomson (PHV 25462-2022)
COVINGTON & BURLING, LLP
One CityCenter
850 Tenth Street, NW
Washington, District of Columbia 20001
(202) 662-5425
ajthomson@cov.com

Anupam Sharma (PHV 25418-2022)
Yale Fu (PHV 25419-2022)
COVINGTON & BURLING, LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, California 94306
(650) 632-4700
asharma@cov.com

*Counsel for Petitioners*

John W. Zeiger (0010707)
Marion H. Little, Jr. (0042679)
Christopher J. Hogan (0079829)
ZEIGER, TIGGES & LITTLE LLP
3500 Huntington Center
41 South High Street
Columbus, Ohio 43215
(614) 365-9900
(Fax) (614) 365-7900
zeiger@litohio.com

*Counsel for Respondent Governor Mike DeWine*

C. Benjamin Cooper (0093103)
Charles H. Cooper Jr. (0037295)
Chelsea C. Weaver (0096850)
COOPER & ELLIOTT LLC
305 West Nationwide Boulevard
Columbus, Ohio 43215
(614) 481-6000
benc@cooperelliott.com

*Special Counsel for Respondents Senator Vernon Sykes and House Minority Leader Allison Russo*

Dave Yost
Ohio Attorney General

Erik J. Clark (0078732)
Ashley Merino (0096853)
ORGAN LAW LLP
1330 Dublin Road
Columbus, Ohio 43215
(614) 481-0900
ejclark@organlegal.com
amerino@organlegal.com

Special Counsel to Attorney General Dave Yost

*Counsel for Respondent The Ohio Redistricting Commission*

27

*/s/ Freda J. Levenson*
Freda J. Levenson (0045916)
Counsel for Petitioners





## Warshaw Affidavit.pdf

| | |
|---|---|
| DocVerify ID: | F5AF9847-30CA-4797-811D-73700F9E0B52 |
| Created: | March 29, 2022 11:38:16 -8:00 |
| Pages: | 1 |
| Remote Notary: | Yes / State: OH |

This document is a DocVerify VeriVaulted protected version of the document named above. It was created by a notary or on the behalf of a notary, and it is also a DocVerify E-Sign document, which means this document was created for the purposes of Electronic Signatures and/or Electronic Notary. Tampered or altered documents can be easily verified and validated with the DocVerify veriCheck system. This remote online notarization involved the use of communication technology.

Go to www.docverify.com at any time to verify or validate the authenticity and integrity of this or any other DocVerify VeriVaulted document.

**E-Signature Summary**

**E-Signature 1: Christopher Warshaw (CSW)**
March 29, 2022 11:44:08 -8:00 [C0ADEDCDC25C] [24.126.11.158]
warshaw@email.gwu.edu (Principal) (Personally Known)

**E-Signature Notary: Theresa M Sabo (TMS)**
March 29, 2022 11:44:08 -8:00 [87FEA97709D2] [65.60.141.105]
tess.sabo@gmail.com
I, Theresa M Sabo, did witness the participants named above electronically sign this document.



DocVerify documents cannot be altered or tampered with in any way once they are protected by the DocVerify VeriVault System. Best viewed with Adobe Reader or Adobe Acrobat.
All visible electronic signatures contained in this document are symbolic representations of the persons signature, and not intended to be an accurate depiction of the persons actual signature as defined by various Acts and/or Laws.



# IN THE SUPREME COURT OF OHIO

LEAGUE OF WOMEN VOTERS OF
OHIO, et al.,

      Petitioners

v.

OHIO REDISTRICTING COMMISSION,
et al.,

      Respondents.

Case No. 2021-1193

Original Action Pursuant to
   Ohio Const., Art. XI

## AFFIDAVIT OF CHRISTOPHER WARSHAW

Franklin County
       /ss
State of Ohio

      Now comes affiant Christopher Warshaw, having been first duly cautioned and sworn, deposes and states as follows:

1. I am over the age of 18 and fully competent to make this declaration. I have personal knowledge of the statements and facts contained herein.

2. For the purposes of this litigation, I have been asked by counsel for Relators to analyze relevant data and provide my expert opinions.

3. To that end, I have personally prepared the report attached to this affidavit as Exhibit A, and swear to its authenticity and to the faithfulness of the opinions expressed and, to the best of my knowledge, the accuracy of the factual statements made therein.

FURTHER AFFIANT SAYETH NAUGHT.

Executed on _____03/29/2022_____, 2022.

_____Christopher Warshaw_____
Christopher Warshaw
*Signed on 2022/03/29 11:44:08 -8:00*

Sworn and subscribed before me this ____ day of ___03/29/2022___, 2022.

_____
Notary Public

Theresa M Sabo
Commission # 2016-RE-619622
Electronic Notary Public
State of Ohio
My Comm Exp. Nov 28, 2026

Notarial act performed by audio-visual communication

# Exhibit A

# An Evaluation of the Partisan Fairness of Ohio's March 28, 2022 State Legislative Districting Plan

Christopher Warshaw[*]

March 29, 2022

[*]Associate Professor, Department of Political Science, George Washington University. `warshaw@gwu.edu`. Note that the analyses and views in this report are my own, and do not represent the views of George Washington University.

# Contents

**1 Introduction**     1

**2 Qualifications, Publications and Compensation**     1

**3 Summary**     2

**4 Proportionality Results**     3
    4.1 Close Districts on State Senate plan . . . . . . . . . . . . . . . . . . . . . 3
    4.2 Close Districts on State House plan . . . . . . . . . . . . . . . . . . . . . 5

**5 Geographic Overlap between Plans**     7
    5.1 Overlap across Senate plans . . . . . . . . . . . . . . . . . . . . . . . . . 7
    5.2 Overlap across House plans . . . . . . . . . . . . . . . . . . . . . . . . . 7
    5.3 Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**6 Conclusion**     8

# 1    Introduction

My name is Christopher Warshaw. I am an Associate Professor of Political Science at George Washington University. Previously, I was an Associate Professor at the Massachusetts Institute of Technology (MIT) from July 2016 - July 2017, and an Assistant Professor at MIT from July 2012 - July 2016.

I have been asked by counsel representing the League of Women Voters plaintiffs in this case to analyze relevant data and provide my expert opinions about whether the number of close districts in Ohio's enacted March 28, 2022 state legislative districting plans are roughly proportional between the two parties. I have also been asked to compare the March 28 and February 24 plans. Specifically, I have been asked to examine:

- The number of seats on each plan where each party is expected to receive between 50 and 51% of the vote.

- The number of seats on each plan where each party is expected to receive between 51 and 52% of the vote.

- The geographic overlap between the March 28 and February 24 plans.

# 2    Qualifications, Publications and Compensation

My Ph.D. is in Political Science, from Stanford University, where my graduate training included courses in political science and statistics. I also have a J.D. from Stanford Law School. My academic research focuses on public opinion, representation, elections, and polarization in American Politics. I have written multiple papers that focus on elections and two published articles that focus specifically on partisan gerrymandering. I also have a forthcoming book that includes an extensive analysis on the causes and consequences of partisan gerrymandering in state governments.

My curriculum vitae is attached to this report. All publications that I have authored and published appear in my curriculum vitae. My work is published or forthcoming in peer-reviewed journals such as: the *American Political Science Review*, the *American Journal of Political Science*, the *Journal of Politics*, *Political Analysis*, *Political Science Research and Methods*, the *British Journal of Political Science*, *Political Behavior*, *Science Advances*, the *Election Law Journal*, *Nature Energy*, *Public Choice*, and edited volumes from Cambridge University Press and Oxford University Press. My book entitled *Dynamic Democracy in the American States* is forthcoming from the University of Chicago Press. My non-academic writing has been published in the *New York Times* and the *Washington*

*Post.* My work has also been discussed in the *Economist* and many other prominent media outlets.

My opinions in this case are based on the knowledge I have amassed over my education, training and experience, including a detailed review of the relevant academic literature. They also follow from statistical analysis of precinct-level data on recent statewide Ohio elections. Specifically, I use precinct-level data on Ohio's statewide elections between 2016-20 from the Voting and Election Science Team (University of Florida, Wichita State University). I obtained these data from the Harvard Dataverse.[1] I merge the precinct-level returns to the proposed plans by assigning precincts to the district that has the greatest overlap with it.[2] I also use data on each Census block's land area and population.[3]

I have previously provided expert reports in this case, as well as eight other redistricting-related cases and several Census-related cases (see my CV for a current list). I am being compensated at a rate of $325 per hour. The opinions in this report are my own, and do not represent the views of George Washington University.

# 3   Summary

This report examines whether Ohio's enacted March 28, 2022 state legislative maps appear to meet the criteria in the Ohio Constitution. Specifically, it examines whether the close seats in the plans are roughly proportional between the parties.

It finds that the close seats are not proportional between the parties. Based on the Commission's approach of aggregating the raw votes in elections from 2016-2020, there are 6 Senate districts where Democrats are expected to receive between 50 and 52% of the vote, and no Senate districts where Republicans are expected to win between 50 and 52% of the vote. Moreover, there are 17 House districts where Democrats are expected to receive between 50 and 52% of the vote and zero-Republican leaning districts in this range. The fact that all of the close seats are Democratic-leaning and none are Republican-leaning gives the Republican party a substantial advantage in the translation of votes to seats in Ohio.

The disproportionate distribution of the close seats on the March 28 plan is nearly identical as the February 24 plan that was struck down by the Ohio Supreme Court.

---

1. See `https://dataverse.harvard.edu/dataverse/electionscience`.
2. This approach is slightly different from the one I used in my initial report, which joined precincts to the district where the geographic center of the precinct was located. There is very little substantive difference between the two approaches. But my current approach appears to better match the methodology used by the Commission in its analysis.
3. I obtained these data from `https://redistrictingdatahub.org/`.

Under that plan, there were 19 Democratic-leaning House Seats in the 50-52% range and 7 Senate seats in that range. There were no Republican-leaning state senate seat and no Republican-leaning state house seats in the 50-52% range.

In fact, the February 24 and March 28 plans are geographically, nearly identical to one another. They have nearly identical assignment of Census blocks to districts. They have nearly identical assignment of population to districts. And the actual voting patterns across districts are extremely similar across plans.

Overall, my analysis echos the findings in my earlier reports. Like the Commission's three earlier plans, the March 28 plan appears to be drawn to favor the Republican political party.

# 4    Proportionality Results

In this section, I analyze the proportionality of the close seats on the Commission's February 24 state legislative plans. In order to do this, it is necessary to estimate each party's share of the votes in each district. While the Ohio Constitution clearly states that the past decade of elections shall be used for this analysis, it does not provide guidance on how these elections should be aggregated. For my analysis here, I focus on the approach used by the Commission. Their analysis appears to sum the raw votes in each district for the 9 statewide elections between 2016 and 2020 (see the Commission's Section 8(C)(2) Statement). Based on these summed votes, they determine whether Democrats or Republicans would win each district on a plan.[4]

## 4.1    Close Districts on State Senate plan

First, I analyze the proportionality of the close seats on the Commission's March 28 state Senate plan. Figure 1 shows the district-level vote shares using the aggregation approach used by the Commission. It indicates that distribution of votes across districts in these

---

4. As I discussed in a previous report, it is important to note that there are three important weaknesses of this approach. First, it only includes three election years. Moreover, it implicitly overweights the 2018 election cycle, since six of the nine election contests in this composite occurred during this cycle. This was a very strong election year for Democrats. So this is likely to over-estimate Democratic performance in future elections. This could be addressed by weighting each election year equally or including the 2012 and 2014 election years to capture the full range of elections over the past decade. Third, the Commission's approach yields a single, deterministic estimate of the winner of each district. So a district that one party is projected to win by .01% of the vote would count the same as one they are projected to win by 10%. In reality, however, the district where one party is projected to win by .01% is likely to be won by each party about half the time. In my previous report, I discussed other approaches that address these weaknesses.

plans is almost identical.



(a) February 24 Plan

(b) March 28 Plan

Figure 1: District-level Vote Shares on Commission's February 24 and March 28 State Senate plans based on the aggregation approach used by the Commission. The vertical lines around each dot show the range of statewide election results in that district. The dotted line shows the number of seats required for the majority.

Just as on the February 24 plan, the close districts are extremely disproportionate. There are 6 districts where Democrats are expected to receive between 50 and 52% of the vote, and no districts where Republicans are expected to win between 50 and 52% of the vote. This is only one less competitive Democratic-leaning district than on the February 24 plan. As a result, while the February 24 plan had 7 Senate seats in the 50-52% range of Democratic vote share, the March 28 plan has 6 Senate seats in that range and no competitive Republican seats.

The asymmetric distribution of close Senate seats gives Republicans a large advantage

in the translation of votes to seats. All 18 Republican-leaning districts are safe seats with a composite Republican vote share of 52% or more. In contrast, only 9 of the 15 Democratic-leaning districts are safe seats with a composite Democratic vote share of 52% or more. As a result, Republicans are likely to win 66% of the non-competitive seats on this plan.

More specifically, on the Commission's March 28 state senate plan there are:

- <u>2 districts</u> where Democrats are expected to receive between 50 and 51% of the vote.

- <u>4 districts</u> where Democrats are expected to receive between 51 and 52% of the vote

In contrast, there are:

- <u>no districts</u> where Republicans are expected to win between 50 and 51% of the vote.

- <u>no districts</u> where Republicans are expected to win between 51 and 52% of the vote.

- <u>no districts</u> where Republicans are expected to win between 52 and 53% of the vote.

- <u>no districts</u> where Republicans are expected to win between 53 and 54% of the vote.

## 4.2   Close Districts on State House plan

Next, I analyze the proportionality of the close seats on the Commission's March 28 state House plan. Figure 2 shows the district-level vote shares using the aggregation approach used by the Commission. It indicates that distribution of votes across districts in these plans is nearly identical to the naked eye.

Just as on the February 24 plan, the close districts are extremely disproportionate. There are <u>17 districts</u> where Democrats are expected to receive between 50 and 52% of the vote, and <u>no districts</u> where Republicans are expected to win between 50 and 52% of the vote. This is only two less competitive Democratic-leaning districts than on the February 24 plan. As a result, while the February 24 plan had 19 House seats in the 50-52% range of Democratic vote share, the March 28 plan has 17 House Democratic seats in that range and no competitive Republican seats.

Moreover, the asymmetric distribution of close House seats gives Republicans a large advantage in the translation of votes to seats. This asymmetry means that Republicans are likely to win far more than 54 seats in most elections on this plan. In fact, all 54 Republican-leaning districts are safe seats with a composite Republican vote share of 52% or more. In contrast, only 28 of the 45 Democratic-leaning districts are safe seats with a



(a) February 24 Plan

(b) March 28 Plan

Figure 2: District-level Vote Shares on Commission's February 24 and March 28 State House plans based on the aggregation approach used by the Commission. The vertical lines around each dot show the range of statewide election results in that district. The dotted line shows the number of seats required for the majority.

composite Democratic vote share of 52% or more. So Republicans are likely to win 66% of the safe seats on this plan.

More specifically, on the Commission's March 28 House plan there are:

- <u>5 districts</u> where Democrats are expected to receive between 50 and 51% of the vote.

- <u>12 districts</u> where Democrats are expected to receive between 51 and 52% of the vote

In contrast, there are:

- <u>no districts</u> where Republicans are expected to win between 50 and 51% of the vote.

- <u>no districts</u> where Republicans are expected to win between 51 and 52% of the vote.

# 5 Geographic Overlap between Plans

In this section, I analyze the overlap between the February 24 plans and the most recent plans passed on March 28. I use three approaches to determine how much the March 28 plans differ from the February 24 plans. First, I examine the number of <u>Census blocks</u> and the percentage of Ohio's <u>land area</u> assigned to new districts on the March 28 plans. Second, I examine the number of <u>people</u> in the Census blocks assigned to a different district across maps. Finally, I examine how many <u>districts</u> changed across the plans based on the composite voting data I discussed earlier.

## 5.1 Overlap across Senate plans

The March 28 Senate plan only assigns 270 Census blocks to a new district between the February 24 plan and March 28 plans (0.1% of the 276,428 census blocks in Ohio). Put differently, only .01% of the land area of Ohio changed districts across these plans. Moreover, the March 28 plan only assigns 23,823 people (0.2% of Ohio's population) into a new Senate district compared with the February 24 plan. Finally, 31 out of 33 districts are exactly the same under the two plans.

## 5.2 Overlap across House plans

The March 28 House plan only assigns 451 Census blocks to a new district between the February 24 plan and March 28 plans (0.16% of the 276,428 census blocks in Ohio). Only .11% of the land area of Ohio changed districts across these plans. In addition, the March 28 plan only assigns 31,244 people (0.26% of Ohio's population) into a new House district compared with the February 24 plan. Finally, 92 out of 99 districts are exactly the same under the two plans.

## 5.3 Summary

Overall, the February 24 and March 28 plans appear to be geographically, nearly identical. They have nearly identical assignment of Census blocks to districts. They have nearly identical assignment of population to districts. And the actual voting patterns across districts are extremely similar across plans.

# 6   Conclusion

Based on my evaluations of the Commission's March 28 enacted plans, I reach the conclusion that the close seats on these plans are not proportionate between the parties. Instead, all the close seats slightly lean toward Democrats. There are no close Republican-leaning seats. This means that Republicans are very likely to win far more than 55% of the seats on both plans. Moreover, the plans are geographically, nearly identical to the February 24 ones struck down by the Ohio Supreme Court. Thus, the new plans appear to have again been drawn to favor the Republican Party.