**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| MICHAEL GONIDAKIS, ET AL. | : | CASE NO. 2:22-CV-773 |
| | : | |
| PLAINTIFFS | : | CHIEF JUDGE ALGENON L. |
| | : | MARBLEY |
| | : | |
| VS. | : | |
| | : | CIRCUIT JUDGE AMUL R. |
| FRANK LAROSE, | : | THAPAR |
| | : | |
| DEFENDANTS. | : | JUDGE BENJAMIN J. BEATON |

<u>**SIMON PLAINTIFFS' SECOND MOTION FOR TEMPORARY RESTRAINING**</u>
<u>**ORDER, PRELIMINARY INJUNCTION AND PARTIAL SUMMARY**</u>
<u>**JUDGMENT**</u>

By reason of the Ohio Supreme Court Order issued late on March 29, 2022, Ohio,

deferring consideration of whether the Ohio Congressional Redistricting Plan approved on

March 2, 2022, by the Ohio Redistricting Commission comports with the Ohio Constitution

(Exhibit A) , in accordance with Federal Rules of Civil Procedure 56 and 65, Plaintiffs,

the Honorable Kenneth L. Simon, the Honorable Lewis W. Macklin, II and Helen

Youngblood, (hereinafter "the Simon Parties"), respectfully move this Honorable Court for

an immediate order enjoining Defendants, their agents and successors in office, and all

persons acting in concert with them from administering, implementing, or conducting any

election for representative for the 6th Ohio United States Congressional District proposed

in the March 2, 2022, Congressional Redistricting Plan. Exhibit B.

The district proposed by Defendants was configured through a process that violated

Section 2 the Voting Rights Act of 1965, as amended, 52 U.S.C. Sec 10301, et. seq. and,

unlawfully dilutes the voting strength of plaintiffs' putative class, Black voters in

Mahoning and Trumbull Counties, Ohio. Although the Simon parties' do not purport to

represent Black voters statewide, the violation of the VRA by defendants injured Black

voters throughout Ohio . The violations by Defendants were intentional. The Simon parties sued to enjoin implementation of this Districting plan timely and have been repeatedly required to await action by the State of Ohio to rectify its redistricting impasse. Now the Simon parties are being subjected to the risk of immediate irreparable harm by being forced to vote in an election where their voting strength has through redistricting been practically nullified in violation of the VRA. It is now imperative that this Honorable Court act immediately to remedy this violation.

In this case Defendants consciously ignored the Voting Rights Act, 52 U.S.C. §10301, et seq. They also ignored the opinion in Armour v. Ohio., Exhibit C, which documents a history of intentional racial discrimination against the Simon parties in redistricting by the State of Ohio in Plaintiffs geographic area and evidence of continued racially polarized voting. The testimony of defendants chief map maker, Mr. Di Rossi, at Exhibit E and the comments of President Huffman and Speaker Cupp at Exhibit F, and proof that Defendants failed to comply with the VRA and have as a result drawn district maps that dilute the voting strength of Plaintiff's putative class aside from violating state law.

A Memorandum in support of this motion, Proposed Order and Exhibits are attached.

/s/ Percy Squire_____
Percy Squire (0022010)
Percy Squire Co., LLC
341 S. Third Street, Suite 10
Columbus, Ohio 43215
(614) 224-6528, Telephone
(614) 224-6529, Facsimile
psquire@sp-lawfirm.com

## MEMORANDUM

## A. BACKGROUND

Plaintiffs in this action have filed an intervenor complaint that alleges five members of the Ohio Redistricting Commission and the Redistricting Commission intentionally violated Section 2 of the Voting Rights Act 52 U.S.C. §10301, et seq in connection with the proposed configuration of the 2021 Congressional Plan for the 6th Ohio Congressional District. The 6th Congressional District dilutes Plaintiffs voting strength by splitting the cities of Youngstown and Warren into separate districts and submerging Youngstown Plaintiffs into a racially polarized voting block of voters located in several racially polarized voting counties south of Mahoning County.

Plaintiffs' motion should be granted as a threshold matter in this action for the reason Defendants have stated publicly that the challenged district was configured without any regard whatsoever to whether the proposed district impairs Plaintiffs' ability to participate equally in the electoral process and elect representatives of choice. Defendants, despite the clear admonitions of the VRA that no voting…standard practice or procedure shall be imposed in a manner that dilutes Black voting strength and the historical findings set forth by this Court in Armour v. Ohio, 775 F. Supp. 1044 (6th Cir. 1991) concerning the role of race in elections in Mahoning County, Ohio, adopted a wholesale policy of ignoring racial demographics in Mahoning County elections[1]. An injunction should be issued for the reason Defendants conduct here violates the clear instruction of the United States

---

[1] [R]edistricting legislatures will almost always be aware of racial demographics, but that sort of race consciousness does not lead inevitably to impermissible race discrimination. See, Shaw v. Reno, 509 U.S. 630, 646. Here defendants configured districts without any consideration of racial demographics and therefore drew districts that failed to take into account historical and previous judicial findings of racial block voting..

Supreme Court concerning the procedure that should be followed to comply with §2 of the VRA. See, Thornburg v. Gingles, 478 U.S. 30 (1986).

In Thornburg, the United States Supreme Court stated both amended §2 and its legislative history make clear, in evaluating a statutory claim of vote dilution through districting, courts, and implicitly legislative bodies configuring legislature districts, must consider the "totality of the circumstances" and determine, based "upon a searching practical evaluation of the past and present reality,' S. Rep. at 30 (footnote omitted), whether the proposed structure results in the political process being equally open to minority voters. "'This determination is peculiarly dependent upon the facts of each case,'" Rogers, supra, at 621, quoting Nevett v. Sides, 571 F.2d 209, 224 (CA5 1978), and requires "an intensely local appraisal of the design and impact" of the contested electoral mechanisms. 458 U.S. at 458 U. S. 622. The issue underlying this motion is whether Defendants violated §2 and Armour by totally disregarding race when they configured the districts challenged here. The clear answer to this question is yes. Accordingly, judgment should issue preliminarily enjoining the use of the challenged districts and granting partial summary judgment in relation to the question of whether Defendants violated the VRA by intentionally ignoring the totality of circumstances and the 15th Amendment by ignoring the VRA intentionally.

## B. DEFENDANTS' POLICY CONCERNING ROLE OF RACE CONTRARY TO LAW

In order to comply with the VRA the redistricting process must take into consideration whether a white "majority votes sufficiently as a bloc to enable it…usually to defeat the minority's preferred candidate." Thornburg v. Gingles, 478 U.S. 30, 51 (1986). Here, Plaintiffs provided evidence to Defendants demonstrating that consideration of race

were necessary to comply with the findings in <u>Armour</u> to prevent "retrogression in respect to Plaintiffs' ability…to elect their preferred candidates of choice.'" See, <u>Alabama Legislative Black Caucus v. Alabama</u>, 135 S. Ct. 1257, 1263 (2015) (quoting 52 U.S.C. § 10304(b)).  Defendants here stated explicitly that they made a policy level decision to completely disregard race and whether the proposed districts impair the rights of  Black Mahoning County voters or takes into account their findings in <u>Armour</u> historical.

The Voting Rights Act violations complained of herein were not  innocent mistakes. Defendants were fully  aware of their duties under the VRA, but conspired to intentionally violate the previous ruling of this Court in <u>Armour</u>  and the clear language of Section 2 in favor of partisan political advantage. Defendants intentionally discriminated by ignoring <u>Armour's</u> 15th Amendment findings and failed to follow federal VRA methodology, which specifically harmed Plaintiffs' class in Mahoning County, but also generally diluted Black voting power across Ohio.

The specific intentional conduct of Defendants complained of herein should operate to invalidate the challenged plans because, despite having been advised of the findings of this Court in <u>Armour</u> concerning historical racial discrimination and the duty under the VRA to engage in an intensely local appraisal of indigenous political reality in Ohio and Mahoning County and the totality of circumstances test set forth in the Senate Report enacting Section 2, Defendants gave specific instructions to their staff responsible  for the drawing of district maps to disregard race, racial bloc voting or any other racial consideration  in connection with district configuration.. (See, Exhibit D for input provided by Plaintiffs to Defendants during redistricting.)

Further, support for this assertion is found in the following exchange that occurred during hearings before the Ohio Redistricting Commission on September 9, 2021.

Ray DiRossi: Urn, [00:03:30] I am Ray DiRossi and as was mentioned, I'm from the caucus staff for the Senate Majority Caucus and my colleague Blake Springhetti, caucus staff for the Ohio House Majority Caucus. Urn, co-chairs and distinguished members of the Redistricting Commission, it's great to be with you today.

Sykes: Uh, thank you to the co-chairs and to Mr. Springhetti and Mr. DiRossi. Thank you, uh, for the work that you put together, uh, put, so you could present to us to get, today. Excuse me. Uh, my question is specific to, urn, how this current map complies with, uh, any provisions of the Voting Rights Act and what provisions of the Voting Rights Act [00:22:30] d- did you consider in constructing this map that you presented, or these maps that you presented today?

Ray DiRossi: Co-chairs, Leader Sykes, thank you for the question. We did not use demographic data or racial data in the production of our maps.
Sykes: Any follow up.

Vernon Sykes: Yes, please.

Sykes: Thank you for answering the question. Uh, so are there any provisions of the Voting Rights Act in which you considered while you drew the, or while you drew these maps [00:23:00] before us today?

Ray DiRossi: I guess I would ... Co-chairs I guess I would say it on my previous statement, we did not use racial data or demographic data for the map, but we feel that the map complies with all the provisions of the Ohio Constitution.

Sykes: Thank you. Uh, I appreciate your answer, and I, I certainly appreciate the brevity of it. Uh, can you explain why you didn't consider any parts of the Voting Rights Act in your consideration of these maps [00:23:30] before us today?

Ray DiRossi: Well, I said we didn't consider racial data or demographic data in our maps, but we were directed not to use that data by the legislative leaders, and so we did not use it.

Audience: (laughs)

Vernon Sykes: Yeah. [inaudible 00:23:46].

Sykes: So I, I would count myself as a legislative leader and I don't think that I shared that information with you and I, this is not an ambush, this is simply a question. The Voting Rights Act is certainly, uh, a part of our, uh, [00:24:00] election and electoral fabric. Uh, and so really just trying to get a better idea of how we are, or not in compliance with that, with these

> maps. So, urn, hopefully we can have some deeper conversations about that, but, but again, thank you for your responses.
>
> Ray DiRossi:  Thank you.

See, Exhibit E, DiRossi Transcript, pp. 789-790. Also see, Exhibit F for comments by President Huffman and Speaker Cupp concerning refusal to consider racially polarized voting and racial demographics.

This testimony is clear evidence that the legislative leadership in Ohio intentionally disregarded whether the proposed districts diluted Black voting strength or the existence among other things, of racial block voting.

According to Mr. DiRossi, the lead representative for defendants in the redistricting process, the Defendants intentionally decided to ignore race, and the Voting Rights Act, but also previous judicial findings of official racial discrimination in legislative districting in Ohio.  The approach to redistricting followed the Defendants, results in vote dilution, because it ignores preexisting judicial findings in <u>Armour</u> of racial block voting and the Senate Report factors discussed in <u>Armour</u>.

### C.  <u>VOTING RIGHTS ACT</u>

Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, prohibits voting practices and procedures that discriminate on the basis of race, color, or membership in a language minority group. "The essence of a § 2 claim is that a certain electoral laws, practices, or structures interact with social and historical conditions to cause an inequality in the opportunities enjoyed by protected voters to elect their preferred representatives." <u>Gingles</u>, 478 U.S. at 47. Defendants failed to determine whether the proposed districts caused inequality despite a permanent injunction from <u>Armour</u> and the duty to consider the

totality of circumstances. This threshold failure by Defendants warrants the entry of summary judgment on Plaintiffs' VRA claim.

### D. SUMMARY JUDGMENT IN SECTION 2 LITIGATION

Summary judgment is warranted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). In deciding whether there is a genuine issue of material fact, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. Anderson, 477 U.S. at 255. To determine which facts are "material," a court must look to the substantive law on which the claim rests. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A "genuine issue" is one whose resolution could affect the outcome of the action. Id. In the absence of a genuine issue of material fact, the court may enter judgment against the movant if the non-movant is entitled to judgment as a matter of law. See, e.g., Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 104 (6th Cir. 1995); Markva v. Haveman, 168 F. Supp. 2d 695, 706-07 (E.D. Mich. 2001).

In Section 2 cases, summary judgment usually "presents particular challenges due to the fact-driven nature of the legal tests required by the Supreme Court." Ga. State Conference of NAACP v. Fayette Cty. Bd. of Comm'rs, 775 F.3d 1336, 1348 (11th Cir. 2015). Because district courts must conduct "a searching practical evaluation of the past and present reality" in a jurisdiction, Gingles, 478 U.S. at 79, and a "comprehensive, not limited, canvassing of relevant facts," De Grandy, 512 U.S. at 1011, summary adjudication is rarely possible, see, e.g., Metts v. Murphy, 363 F.3d 8, 12 (1st Cir. 2004). Particularly when resolution turns on "disputed issues presented by the experts' analysis," full development of the record is often necessary. Mallory v. Eyrich, 707 F. Supp. 947, 054

(S.D. Ohio 1989). Unlike the usual §2 case here Defendants openly concede that they ignored the totality of circumstances. Accordingly, a VRA violation should glow automatically from that failure.

Defendants actions, the total failure to even consider race, renders the U.S. Congressional Plan invalid which warrants the issuance of a preliminary injunction. Support for this assertion is below.

Defendants began the Redistricting process with an express declaration from lead map drawer Mr. Ray DiRossi, that Ohio's legislative leadership instructed map drawers to not consider race. This unlawful policy has been followed by Defendants throughout the map drawing process and infects the Third Plan. See, Exhibit E, DiRossi, Deposition, pp. 789-790.

As recently as March 23, 2022, the Defendant Ohio Redistricting Commission reiterated its intention to craft new legislative districts without considering race and issued unlawful instructions to newly engaged experts to that effect. See, Item 9, Exhibit F, Rules issued to map drawers for 4th Round. Ironically, Defendants contend that federal law prohibits consideration of race. See, Exhibit F, Testimony of Mr. Huffman starting at 01:19:25." Federal law prohibits considerations of race ..." Also see Testimony of Speaker Cupp, Exhibit C, 01:19:25. "No information like that has been submitted to the Commission." Contrary to these statements the Simon Parties submitted "information like that" to the Commission on multiple occasions, including on its initial day of hearings on August 23, 2021. Exhibit D. Simon Parties initial input.

## E. TEMPORARY RESTRAINING ORDER

The Supreme Court has "long held that federal courts may in some circumstances grant injunctive relief against" state and federal officials "who are violating, or planning to

violate, federal law." Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320, 326-27 (2015) (citing Osborn v. Bank of United States, 9 Wheat. 738, 838-39 (1824); Ex parte Young, 209 U.S. 123, 150-51 (1908); Am. Sch. of Magnetic Healing v. McAnnulty, 187 U.S. 94, 110 (1902)). This power to enjoin unlawful "actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." Id. At 327. While Congress may prohibit courts from awarding such equitable relief, id. at 327-28, Congress need not confer the power to award such relief in order for courts to exercise that power: the power is an inherent aspect of the courts' equitable authority, see, e.g., Am. School of Magnetic Healing, 187 U.S. at 110; see also Barry v. Lyon, No. 13-cv-13185, 2015 U.S. Dist. LEXIS 174347, at *5 (E.D. Mich. June 5, 2015); In re Trump, 928 F.3d 360, 373 (4th Cir. 2019); Int'l Refugee Assistance Project v. Trump, 883 F.3d 233, 287 (4th Cir. 2018) (en banc) (Gregory, J., concurring); Sierra Club v. Trump, 929 F.3d 670, 694 (9th Cir. 2019); CNSP, Inc. v. City of Santa Fe, 755 F. App'x 845, 849 (10th Cir. 2019).

Courts must balance "four factors ... when considering a motion for a temporary restraining order: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." City of Pontiac Retired Emples. Ass'n v. Schimmel, 751 F.3d 427, 430 (6th Cir. 2014) (internal quotation marks omitted). The standard for a permanent injunction is identical, except that the movant must show "actual success on the merits" instead of a likelihood of success on the merits. Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 546 n.12 (1987). A permanent injunction is in place here via Armour. Defendants totally ignored Armour.

The purpose of a temporary restraining order is "to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." United States v. Alabama, 791 F.2d 1450, 1459 (11th Cir. 1986) (affirming preliminary injunction). An injury is considered to be irreparable "if it cannot be undone through monetary remedies." Scott v. Roberts, 612 F.3d 1279, 1295 (11th Cir. 2010); Cunningham v. Adams, 808 F.2d 815, 821 (11th Cir. 1987); see also Charles H. Wesley Educ. Found., Inc. v. Cox, 32*, Supp. 2d 1358, 1368 (N.D. Ga. 2004) (Cox I), aff'd, 408 F.3d 1349 (11ᵗʰ Cir. 2005) (Cox II) ("no monetary award can remedy the fact that [plaintiff] will not be permitted to vote in the precinct of her new residence."); see also United States v. Georgia, 892 F. Supp. 2d 1367, 1377 (N.D. Ga. 2012) (entering a preliminary injunction where "the potential deprivation of the ability to vote, the most basic of American citizens' rights, outweigh[ed] the cost and inconvenience" that the state might suffer, which were comparatively minor).

As explained below, injunctive relief is warranted, because all four elements strongly weigh in Plaintiffs' favor. Plaintiffs are likely to succeed on the merits. They will suffer irreparable harm if the 2022 elections are conducted using constitutionally infirm districts. The balance of hardships weighs in favor of Plaintiffs as well: Ohioan's fundamental right to vote would be infringed absent an injunction, outweighing any burden that Defendant might experience in complying with the requested injunction. The requested injunction would serve the public interest because protecting the right to vote is unquestionably in the public interest.

## 1. PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS OF THEIR VRA CLAIM

A claim of racial gerrymandering usually requires "a two-step analysis." Cooper v. Harris, 137 S. Ct. 1455, 1463 (2017). "First, the plaintiff must prove that 'race was the

predominant factor motivating the legislature's decision to place a significant number of voters within -or without a particular district.'" Id. (quoting Miller v. Johnson, 515 U.S. 900, 916 (1995)). "Second, if racial considerations predominated over others, the design of the district must withstand strict scrutiny. The burden thus shifts to the State to prove that its-race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." Id. at 1464. A compelling interest may require racially gerrymandered Districts in order to comply with the Voting Rights Act. Here, whether the race required a given district structure was totally ignored. This act itself harmed Plaintiffs in light of the locales history, as documented in the Armour Opinion and in the subsequent history of Mahoning County that Defendants totally disregard.

### 2. IRREPARABLE INJURY

In the absence of the requested injunction, Plaintiffs will suffer irreparable harm. "An injury is irreparable 'if it cannot be undone through monetary remedies.'" Scott, 612 F.3d at 1295 (quoting Cunningham v. Adams, 808 F.2d 815, 821 (11th Cir. 1987)). Recognizing this well-settled principle of law, courts considering motions for preliminary injunctions have repeatedly found that state actions infringing on the right to vote constitute irreparable injury. See, e.g., Williams v Rhodes, 393 U.S. 23, 30 (1968).

### 3. THE BALANCE OF THE EQUITIES WEIGHTS IN FAVOR OF PLAINTIFFS

The irreparable injury that Plaintiffs will suffer absent an injunction outweighs any harm Defendant will suffer if the requested injunction is granted. Plaintiffs will suffer irreparable injury to their fundamental right to vote absent an injunction. See Williams v. Rhodes, 393 U.S. 23, 30 (1968) ("the right of qualified voters ... to cast their votes effectively ... rank[s] among our most precious freedoms."); see also Scott, 612 F.3d at

1295 (citation omitted). By contrast, any potential harm Defendant would face under the requested injunction would be substantially less, particularly in light of the schedule this Court has set to avoid any interference with relevant pre-election deadlines.

"If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties, by the issuance of a mandatory injunction, or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury." Fayette County, 118 F. Supp. 3d at 1349 (quoting Canal Auth. of Fla. v. Callaway, 489 F.2d 567, 576 (5th Cir. 1974)). Indeed, "once a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure [sic] that no further elections are conducted under the invalid plan." Reynolds, 377 U.S. at 585.

### 4. PUBLIC INTEREST

The Supreme Court has long recognized that "[t]he right to vote freely for the candidate of one's choice is of essence of a democratic society and any restrictions on that right strike at the heart of representative government." Reynolds, 377 U.S. at 555; see Williams v. Rhodes, 393 U.S. 23, 30 (1968) ("[T]he right of qualified voters…to cast their votes effectively ... rank[s] among our most precious freedoms."); Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886) (the right to vote is "preservative of all rights"). In recognition of this fundamental principle, courts have repeatedly held that an infringement on the right to vote constitutes irreparable injury. See, e.g., Dillard, 640 F. Supp. at 1363; Harris v. Graddick, 593 F. Supp. 128, 135 (M.D. Ala. 1984).

The requested injunction would not be adverse to public interest. Plaintiffs and the citizens of Alabama have a fundamental right to "to cast their votes effectively." Williams v. Rhodes, 393 U.S. 23, 30 (1968) Additionally, "the protection of 'franchise-related rights is without question in the public interest,' and in such a situation, public interest is "best served by ensuring …that all citizens ... have an equal opportunity to elect the representatives of their choice." <u>Fayette County</u>, 118 F. Supp. 3d at 1349 (quoting x II, 408 F.3d at 1355). Plaintiffs' requested injunction would protect their franchise-related rights by allowing them to participate in elections using conditionally drawn districts and ensure that citizens of have an equal opportunity to elect the representatives of their choice; thus, the requested injunction would be in the public interest. On the contrary, allowing the 2022 election cycle to proceed with the racially gerrymandered map does not further any public interest.

It is unfortunate that Defendants chose to ignore the VRA and make it necessary to revive evidence of past racial injustices in order to demonstrate why all Senate Report factors should have been considered by Defendants when drawing district lines.

Defendants decision to not consider the racial history of Blacks and voting in Mahoning County requires resort to the type analysis the VRA was designed to avoid.

As stated in <u>Gingles</u>:

The Senate Report states that one reason the Senate Committee abandoned the intent test was that

"the Committee . . . heard persuasive testimony that the intent test is unnecessarily divisive because it involves charges of racism on the part of individual officials or entire communities."

S.Rep. at 36. The Committee found the testimony of Dr. Arthur S. Flemming, Chairman of the United States Commission on Civil Rights, particularly persuasive. He testified:

"[Under an intent test,] Mitigators representing excluded minorities will have to explore the motivations of individual council members, mayors, and other citizens. The question would be whether their decisions were motivated by invidious racial considerations. Such inquiries can only be divisive, threatening to destroy any existing racial progress in a community. It is the intent test, not the results test, that would make it necessary to brand individuals as racist in order to obtain judicial relief."

Ibid. (footnote omitted). The grave threat to racial progress and harmony which Congress perceived from requiring proof that racism caused the adoption or maintenance of a challenged electoral mechanism is present to a much greater degree in the proposed requirement that plaintiffs demonstrate that racial animosity determined white voting patterns. Under the old intent test, plaintiffs might succeed by proving only that a limited number of elected officials were racist; under the new intent test, plaintiffs would be required to prove that most of the white community is racist in order to obtain judicial relief. It is difficult to imagine a more racially divisive requirement.

A second reason Congress rejected the old intent test was that, in most cases, it placed an "inordinately difficult burden" on § 2 plaintiffs. Ibid. The new intent test would be equally, if not more, burdensome. In order to prove that a specific factor -- racial hostility -- determined white voters' ballots, it would be necessary to demonstrate that other potentially relevant causal factors, such as socioeconomic characteristics and candidate expenditures, do not correlate better than racial animosity with white voting behavior. As one commentator has explained:

"Many of the[se] independent variables . . . would be all but impossible for a social scientist to operationalize as interval-level independent variables for use in a multiple regression equation, whether on a step-wise basis or not. To conduct such an extensive statistical analysis as this implies, moreover, can become prohibitively expensive."

"Compared to this sort of effort, proving discriminatory intent in the adoption of an at-large election system is both simple and inexpensive."

Dilution Lawsuits, 28 How.L.J. 463, 492 (1985) (footnote omitted).

The final and most dispositive reason the Senate Report repudiated the old intent test was that it "asks the wrong question." S.Rep. at 36. Amended § 2 asks instead "whether minorities have equal access to the process of electing their representatives." Ibid.

Focusing on the discriminatory intent of the voters, rather than the behavior of the voters, also asks the wrong question. All that matters under § 2 and under a functional theory of vote dilution is voter behavior, not its explanations. Moreover, as we have explained in detail, supra, requiring

15

proof that racial considerations actually caused voter behavior will result --
contrary to congressional intent -- in situations where a black minority that
functionally has been totally excluded from the political process will be
unable to establish a § 2 violation. The Senate Report's remark concerning
the old intent test thus is pertinent to the new test: the requirement that a
"court . . . make a separate . . . finding of intent, after accepting the proof of
the factors involved in the White [v. Regester, 412 U. S. 755] analysis . . .
[would] seriously clou[d] the prospects of eradicating the remaining
instances of racial discrimination in American elections."

## F.  CONCLUSION

For the above reasons, partial summary judgment should be entered in favor of

Plaintiffs and a temporary restraining order issued.

A proposed order and Exhibits are attached.

/s/ Percy Squire            
Percy Squire (0022010)
Percy Squire Co., LLC
341 S. Third Street, Suite 10
Columbus, Ohio 43215
(614) 224-6528, Telephone
(614) 224-6529, Facsimile
psquire@sp-lawfirm.com
Attorney for Intervenors-Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served by

operation of the United States District Court, Southern District of Ohio electronic filing

system, on March 31, 2022.

*s/Percy Squire, Esq.*    
Percy Squire (0022010)
Attorney for Intervenors-Plaintiffs

## EXHIBIT LIST

**EXHIBIT A.**     Ohio Supreme Court March 29, 2022 Order

**EXHIBIT B.**     Congressional Redistricting Plan

**EXHIBIT C.**     Armour v. State of Ohio, 775 F. Supp. 1044 (N.D. Ohio 1991)

**EXHIBIT D.**     Plaintiffs Input to Defendants During Redistricting Process

**EXHIBIT E.**     DiRossi Deposition Transcript

**EXHIBIT F.**     Testimony of President Huffman and Speaker Cupp at March 23, 2022 Redistrict Commission Meeting and Item 9 Redistricting Rules