## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| Michael Gonidakis, *et al.*, | : | |
| | : | Case No. 2:22-cv-773 |
| Plaintiffs, | : | |
| | : | |
| v. | : | Chief Judge Algenon L. Marbley |
| | : | |
| Frank LaRose, | : | Circuit Judge Amul R. Thapar |
| | : | |
| Defendant. | : | Judge Benjamin J. Beaton |

## PLAINTIFFS' POST-HEARING BRIEF IN SUPPORT OF SECOND MOTION FOR PRELIMINARY INJUNCTION AND DECLARATORY RELIEF

## TABLE OF CONTENTS

I.     STATEMENT OF THE CASE ........................................................................ 3

II.    FACTS ........................................................................................................ 3

III.   STANDING ................................................................................................. 8

IV.   STANDARD OF REVIEW .......................................................................... 9

V.    ANALYSIS .................................................................................................. 9

     A.     Plaintiffs are likely to succeed on the merits because their right to vote and right to associate risk denial. ............................................... 9

         1.    The cancelation of the primary election for state legislative office completely disenfranchised Plaintiffs. ................................. 9

         2.    The cancelation of the primary election for state legislative office violated Plaintiffs' right to associate......................................... 10

     B.     Plaintiffs will suffer irreparable harm unless this Court adopts a plan before April 20, 2022. ..................................................................... 11

     C.     Adopting a plan will benefit third parties and the public. ........................ 12

VI.   REMEDY ................................................................................................... 12

     A.     This Court should adopt a plan blessed by the Redistricting Commission. ................................................................................................ 12

         1.    Because this Court should defer to the Redistricting Commission, it should adopt the Fourth Plan. ............................. 14

         2.    Alternatively, this Court should adopt the Third Plan. ................. 16

         3.    It matters not that the Redistricting Plans may conflict with the Ohio Constitution.......................................................................... 16

     B.     Alternatively, this Court may adopt the 2011 map for the 2022 election only. ........................................................................................................... 18

     C.     There is no time for a new map by April 20, 2022. ................................. 20

     D.     This Court should avoid the alternative plans unendorsed by the Redistricting Commission. ...................................................................... 22

         1.    The so-called "Independent Plan" has significant flaws, including previously undisclosed involvement by Mr. Glassburn......................... 22

         2.    Dr. Rodden conceded that his plan should not be used. ................. 23

     E.     The Simon Parties' claims should not prevent the adoption of the Third or Fourth Plan. ......................................................................................... 23

VII.   CONCLUSION .......................................................................................... 25

       APPENDIX................................................................................................... 27

## I.     STATEMENT OF THE CASE

Because the primary election for state legislative offices was canceled, there is no question that Plaintiffs are suffering a constitutional harm. With the deadline to adopt a new plan two weeks away, one question remains, "What plan?"

Because this Court should defer to the legislative body vested by the Ohio Constitution to make redistricting decisions, this Court should adopt the most recent plan passed by a majority of the Ohio Redistricting Commission. That is the Fourth Plan. And this Court should do so even if the Ohio Supreme Court later finds the Fourth Plan out of compliance. This is required to protect Plaintiffs' fundamental rights. *See Perry v. Perez*, 565 U.S. 388, 393 (2012); *Reynolds v. Sims*, 377 U.S. 533, 554 (1964). Alternatively, this Court should adopt the 2011 map on an interim basis.

## II.    FACTS

The preliminary injunction hearing showed that Plaintiffs cannot exercise their constitutional rights related to the primary election for state legislative office, and this Court should adopt a map on or before April 20, 2022, to avoid the complete disenfranchisement of Plaintiffs.

### A.  Ohio's 2011 legislative district maps.

The State of Ohio has a bicameral legislature, with a House of Representatives and a Senate. Historically, the Ohio Constitution has provided for 99 Representatives and 33 Senators, with the districts determined using the federal decennial census to divide the total population of the state by 99 and 33. *See* Ohio Constitution, Article XI, Section 2.

Ohio's 2011 legislative district maps were created after receipt of the 2010 U.S. Census data showing that Ohio had a population of 11,536,504 people. The 2011 legislative district maps were created in accordance with the U.S. Constitution and the Ohio Constitution. *See Wilson v. Kasich*, 134 Ohio St.3d 221, 2012-Ohio-5367, 981 N.E.2d 814, ¶ 48.

## B. 2015 amendments to the Ohio Constitution.

In 2015, voters amended the Ohio Constitution with "Issue 1," which created a bipartisan process for drawing new state legislative districts led by the Ohio Redistricting Commission. The Redistricting Commission, under Article XI, "shall be responsible for the redistricting of this state for the general assembly." Ohio Constitution, Article XI, Section 1(A). Its seven members include four appointees controlled by the General Assembly and three executives, the governor, auditor of state, and secretary of state. *Id.*

State legislative district plans approved by a bipartisan majority of the Redistricting Commission are valid for ten years, while a district plan approved by a simple majority are valid for four years. *See* Ohio Constitution, Article XI, Sections 8(B) and 8(C)(1)(a). In approving the state legislative districts under Article XI, Section 1, the Redistricting Commission considers various factors, such as not splitting political subdivisions. *See* Ohio Constitution, Article XI, Section 3(B).

Article XI limits the role of the Ohio Supreme Court. Unlike federal courts, the Ohio Supreme Court cannot order that a particular plan for state legislative districts be adopted. *See* Ohio Constitution, Article XI, Section 9(D). Instead, the Ohio Supreme Court is limited to returning the issue to the Redistricting Commission. *Id.*

## C. The Redistricting Commission adopts First Plan and Second Plan, and both are rejected by the Ohio Supreme Court.

The Redistricting Commission adopted the First Plan in September 2021. (First Plan, Plaintiffs' Exhibit 2; March 30, 2022 Preliminary Injunction Hearing Transcript ("Tr"), ECF No. 150, PageID # 4241, 7:24–25). In January 2022, the First Plan was rejected by the Ohio Supreme Court. (*01/12/2022 Case Announcements #2*, 2022-Ohio-86, Pls. Ex. 3). The Redistricting

Commission was instructed to "adopt a new plan within ten days." (*Id.*). Soon after, the Redistricting Commission adopted a new plan, the Second Plan. (Second Plan, Pls. Ex. 4).

Because of Ohio's election calendar (Pls. Ex. 1), while the Second Plan was pending before the Ohio Supreme Court, the General Assembly passed uncodified law to temporarily alter Ohio's statutory election structure. (Sub. H.B. No. 93 ("House Bill 93"), Section 4, p. 29, Pls. Ex. 5). House Bill 93 allowed Ohio's Chief Election Officer, the Secretary of State, to adjust most election-related deadlines. (*Id.* at (G)). But the primary election remained on May 3, 2022. (*Id.*).

The Ohio Supreme Court then rejected the Second Plan. (*02/07/2022 Case Announcements #2*, 2022-Ohio-349, Pls. Ex. 6). The Court ordered that the Redistricting Commission "be reconstituted and . . . convene and draft an entirely new General Assembly-district plan . . . ." (*Id.*). This new Third Plan was to be adopted on or before February 17, 2022, and filed with the Court on or before February 18, 2022. (*Id.*).

### D. The Redistricting Commission declares impasse, then adopts Third Plan, which is again rejected.

In response to the Ohio Supreme Court's latest rejection, the Redistricting Commission declared that there was an "impasse," and it was no longer possible for a majority to adopt a plan. (Pls. Ex. 7). Despite the initial impasse, the Redistricting Commission later adopted the Third Plan. (Third Plan, Pls. Ex. 8).

Two days later, Secretary of State Frank LaRose issued a directive implementing the Third Plan, Directive 2022-26. (Pls. Ex. 9). Directive 2022-26 instructed the local boards of elections to immediately begin carrying out the Third Plan. (*Id.*, p. 2). As result, the local boards of elections began that work. (Tr., ECF No. 150, PageID # 4293, 59:16–21). Work on the Third Plan was reinforced through at least two other directives issued by Secretary LaRose. (Pls. Exs. 10, 11; Affidavit of Amanda Grandjean ("Grandjean Aff."), ECF No. 88-1, ¶ 15, PageID # 1322).

Despite the time and effort invested by local boards of education, the Ohio Supreme Court invalidated the Third Plan. (*03/16/2022 Case Announcements #2*, 2022-Ohio-790, Pls. Ex. 12). The Ohio Supreme Court again ordered the Redistricting Commission to reconvene, but to draft the next plan in public. (*Id.*).

The next day, Secretary LaRose issued Directive 2022-30. (Pls. Ex. 13). This "paused" any new work by the local boards on the Third Plan. (Tr., ECF No. 150, PageID # 4274, 40:20). Because the state legislative races were paused yet Ohio law compelled the other races forward, the state legislative races were removed from the ballot. (*See* Pls. Ex. 14). As a result, the primary election for state legislative offices was canceled. (Tr., ECF No. 150, PageID # 4247, 13:17).

### E. The Fourth Plan is adopted and is likely to be rejected because it is much like the Third Plan.

Following the rejection of the Third Plan, the Redistricting Commission adopted the Fourth Plan on March 28, 2022. (Pls. Ex. 15). Even though it was a new plan, there were few changes made from the Third Plan. (Tr., ECF No. 150, PageID # 4370, 136:5). Under the Third Plan, the districts that were "competitive" for a particular party (i.e., likely to vote for a particular party 50% to 52% of the time) were mainly assigned to Democrats rather than Republicans. (*Id.*). The same was true for the Fourth Plan. (*Id.*, PageID # 4370, 136: 11–21). The Fourth Plan has been challenged in the Ohio Supreme Court. That challenge remains pending.

### F. The Redistricting Commission rejects other plans.

While the Redistricting Commission has sole authority under the Ohio Constitution to consider and adopt plans, advocates have pushed for alternate plans. The "MacDonald and Johnson Plan" or the so-called "Independent Plan" was rejected by the Redistricting Commission. (Tr., ECF No. 150, PageID # 4377, 143: 9–10). When presented to the Redistricting Commission, the "Independent Plan" was incomplete and had technical flaws. (*Id.*, 135:3). Dr. Johnson, who

developed the plan, explained that it was not in final form: "I cannot say it was a final constitutional map." (Affidavit of Dr. Douglas Johnson ("Dr. Johnson Aff."), Appendix, Exhibit A, ¶ 18). And even though it was incomplete, this plan it was introduced by one member of the Redistricting Commission. (Commission Meeting, Transcript – Part 5 at 1:13).[1] A 5-2 majority of the Redistricting Commission rejected it. (*Id.* at 21:32).

Another plan was developed by an individual hired for litigation purposes, Dr. Jonathon Rodden. But Dr. Rodden conceded that his plan failed the partisanship requirement of the Ohio Constitution. (*Id.*, 186:17–187:22). He also conceded that it was not suggested by any member of the Redistricting Commission, though it was uploaded to the public portal for consideration. (*Id.*, 199:12–15).

### G. The Secretary of State needs a map no later than April 20, 2022, for an August 2, 2022, primary election for state legislative offices.

During the preliminary injunction hearing, this Court recognized that April 20, 2022 is the "drop-dead" date to adopt a plan for the 2022 General Assembly election. (Tr., ECF No. 150, PageID # 4347, 113:2). This would allow for the full primary election calendar. (*Id.*). Using April 20, 2022, facilitates a primary election on August 2, 2022. (*Id.*, PageID # 4269, 35:13). A primary election on August 2, 2022, for state legislative office is advantageous because many local boards of elections hold special elections that day, which means lower costs than a stand-alone primary election for General Assembly seats. (*Id.*, PageID # 4285, 51:7).

---

[1] *Commission Meeting*, OHIO REDISTRICTING COMMISSION, March 28, 2022, Transcript – Part 5 *available at* https://redistricting.ohio.gov/meetings (last accessed April 5, 2022).

III.   **STANDING**

Because Plaintiffs have been disenfranchised, they have standing to bring their claims.[2] In voting rights-related cases, plaintiffs generally have standing by identifying their specific districts impacted, the election-activity impacted, and an imminent risk of harm. *See, e.g.*, *Nemes v. Bensinger*, 467 F. Supp. 3d 509, 522 (W.D. Ky. 2020). Standing is more broadly conveyed when an election has been cancelled, creating a non-apportionment claim. *See Igartúa v. Obama*, 842 F.3d 149, 155 (1st Cir. 2016) (discussing *Adams v. Clinton*, 531 U.S. 941 (2000)). Even though disenfranchisement is felt widely, denying everyone the right to vote is "sufficiently concrete and personalized to confer standing." *Weltner v. Raffensperger*, No. 1:20-cv-01407-ODE, 2020 U.S. Dist. LEXIS 247760, at *18 (N.D. Ga. May 18, 2020) (the bar against generalized grievances does not apply to voting rights).

Plaintiffs have standing because they have each been disenfranchised. The hearing showed that Mr. Gonidakis is a registered voter in Ohio. (Tr., ECF No. 150, PageID # 4348, 114:13). He is the president of Ohio Right to Life. (*Id.*, 115:4). He typically engages in election activity, such as candidate research, going door-to-door, attending rallies, and handing out yard signs, among other election activity. (*Id.*, 114:22–25). But Mr. Gonidakis cannot vote because there is no primary election for general assembly candidates currently scheduled. (Tr., ECF No. 150, PageID # 4247, 13:17). As a result, Mr. Gonidakis' voting and related rights have been denied. While Mr. Gonidakis is not alone in this harm, because voting is an individualized fundamental right, his harm is sufficiently particularized and concrete to confer standing.

---

[2] Though the Bennett Petitioners conceded standing during the preliminary injunction hearing, Plaintiffs respond to the motions to dismiss. (ECF Nos. 132, 133).

IV.    **STANDARD OF REVIEW**

In determining whether to grant a preliminary injunction, a district court considers four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction. *Daunt v. Benson*, 956 F.3d 396, 406 (6th Cir. 2020); *see also Bays v. City of Fairborn*, 668 F.3d 814, 818-19 (6th Cir. 2012). These factors "are not prerequisites, but rather are factors which the Court should balance." *Golden v. Kelsey-Hayes Co.,* 73 F.3d 648, 653 (6th Cir. 1996). These four factors are met here because Plaintiffs' fundamental rights risk denial, and there is no harm in securing the right to vote or associate.

V.    **ANALYSIS**

The preliminary injunction hearing showed that Plaintiffs are likely to succeed on the merits of their constitutional claims, and the public interest requires state legislative districts.

### A. Plaintiffs are likely to succeed on the merits because their right to vote and right to associate risk denial.

The preliminary injunction hearing confirmed that Plaintiffs' constitutional rights are being violated because there is no primary election currently scheduled for state legislative offices.

#### 1. The cancelation of the primary election for state legislative office completely disenfranchised Plaintiffs.

This Court should find that the canceled primary election completely disenfranchised Plaintiffs in violation of the U.S. Constitution. The right to vote is a fundamental right, and the Equal Protection Clause and the Substantive Due Process Clause prohibit blanket disenfranchisement. *George v. Hargett*, 879 F.3d 711, 727 (6th Cir. 2018) (citing *Warf v. Bd. of Elections of Green Cty.*, 619 F.3d 553, 559 (6th Cir. 2010)). Examples of complete disenfranchisement violations include a municipal government refusing to hold an election, as in

9

*Bonas v. Town of North Smithfield*, 265 F.3d 69, 74 (1st Cir. 2001), and the Governor of Georgia filling a seat on the Georgia Supreme Court rather than holding an election, as in *Duncan v. Poythress*, 657 F.2d 691, 702 (5th Cir. 1981). Constitutional rights are no less important when a primary election is involved. *Griffin v. Burns*, 570 F.2d 1065, 1074 (1st Cir. 1978).

Here, Plaintiffs have been disenfranchised so they are likely to succeed on the merits of their claims. The hearing showed that Mr. Gonidakis is a registered voter in Ohio. (Tr., ECF No. 150, PageID # 4348, 114:13). But Mr. Gonidakis cannot vote because there is no primary election for general assembly candidates currently scheduled. (*Id.*, 13:17). As result, Plaintiffs, including Mr. Gonidakis, have been completely disenfranchised. Because blanket disenfranchisement violates the U.S. Constitution, Plaintiffs are likely to succeed on the merits.

### 2. The cancelation of the primary election for state legislative office violated Plaintiffs' right to associate.

This Court should find that the canceled primary election for state legislative offices violated Plaintiffs' right to associate. "The rights of political association and free speech occupy a similarly hallowed place in the constitutional pantheon." *Graveline v. Benson*, 992 F.3d 524, 535 (6th Cir. 2021) (citation omitted). The "right to associate with the political party of one's choice is an integral part of the basic constitutional freedom." *Mich. State A. Philip Randolph Inst. v. Johnson*, 749 F. App'x 342, 363 (6th Cir. 2018) (quoting *Kusper v. Pontikes*, 414 U.S. 51, 57, 94 S. Ct. 303, 38 L. Ed. 2d 260 (1973)). This includes vetting candidates, as "Debate on the qualifications of candidates is at the core of our electoral process and of the First Amendment freedoms . . . ." *Republican Party v. White*, 536 U.S. 765, 781, 122 S. Ct. 2528, 2538 (2002) (citation and internal quotation marks omitted). And while the right to politically associate is not absolute, a severe restriction must be narrowly drawn to advance a state interest of compelling importance. *Kishore v. Whitmer*, 972 F.3d 745, 749 (6th Cir. 2020) (citation omitted).

Here, Plaintiffs cannot associate with members of their state legislative districts in violation of the U.S. Constitution, and there is no state interest for doing so. The hearing showed that Mr. Gonidakis is a registered voter in Ohio, and he engages in election-related speech, such as candidate research, going door-to-door, attending rallies, and handing out yard signs, among other things. (Tr., ECF No. 150, PageID # 4348, 114:13–25). But Mr. Gonidakis cannot engage in this speech for legislative candidates because he has no legislative districts. (*Id.*, 13:17). Secretary LaRose has advanced no state interest supporting this denial. This denial is a separate violation of the U.S. Constitution along with any disenfranchisement caused by eliminating the primary election. Plaintiffs are therefore likely to succeed on the merits of this claim.

### B. Plaintiffs will suffer irreparable harm unless this Court adopts a plan before April 20, 2022.

Because there is no primary election for state legislative office scheduled, Plaintiffs will suffer irreparable harm without this Court's action. When constitutional rights are threatened or impaired, irreparable injury is presumed. *See ACLU of Ky. v. McCreary County, Ky.*, 354 F.3d 438, 445 (6th Cir. 2003). The right to vote and the right to associate are constitutional rights. *Reynolds v. Sims*, 377 U.S. 533, 554-555, (1964). A restriction of these fundamental rights thus constitutes irreparable injury. *Obama for Am. v. Husted*, 697 F.3d 423, 436 (2012) (citation omitted); *see also Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986).

Here, the hearing showed that Plaintiffs are suffering irreparable harm because their constitutional rights have been deprived. Plaintiffs would vote and associate with candidates but cannot do so because the primary election for state legislative offices was canceled. (Tr., ECF No. 150, PageID # 4348, 114). The denial of these rights is an irreparable harm that Plaintiffs will suffer absent an injunction by this Court because there is no statutory authority for the election of

state legislative offices to take place, and no election is currently scheduled. (Tr., ECF No. 150, 13:17).

### C. Adopting a plan will benefit third parties and the public.

Because there is no primary election for state legislative offices, third parties and the public will benefit from this Court adopting a plan. As the Sixth Circuit has recognized, "it is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994). Although states have "a strong interest in their ability to enforce state election law requirements . . . members of the public, however, 'have a strong interest in exercising the fundamental political right to vote.'" *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 244 (6th Cir. 2011) (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)). "That interest is best served by favoring enfranchisement and ensuring that qualified voters' exercise of their right to vote is successful." *Hunter*, 635 F.3d at 244.

Here, adopting a plan serves the public interest by protecting the constitutional rights of Ohioans. Because there is no scheduled primary election, action by this Court causing an election to take place will best serve the public and third parties. (Tr., ECF No. 150, 13:17). As this Court found during the hearing, the public interest is best served by scheduling the primary election for state legislative office on August 2, 2022, and adopting a plan no later than April 20, 2022.

## VI. <u>REMEDY</u>

Because Plaintiffs' rights will be violated if there are no state legislative districts, this Court should adopt the Fourth Plan no later than April 20, 2022, and move the primary election to August 2, 2022.

### A. This Court should adopt a plan blessed by the Redistricting Commission.

This Court should look no further than a plan adopted by the legislative authority: the Redistricting Commission. Redistricting, including redistricting performed by a redistricting

12

commission, is a legislative function. *Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 808 (2015) (redistricting legislative authority properly delegated to redistricting commission). District courts should be "guided by the *legislative* policies underlying a state plan—even one that was itself unenforceable . . . ." *Perry v. Perez*, 565 U.S. 388, 393 (2012) (emphasis added) (citation and quotation omitted). "[S]tate legislatures have 'primary jurisdiction' over legislative reapportionment." *White v. Weiser*, 412 U.S. 783, 795 (1973) (citations omitted). Redistricting is a policy choice, and "courts aren't supposed to second guess policymakers based on their own subjective judgments of what makes for good policy." *Adams & Boyle, P.C. v. Slatery*, 956 F.3d 913, 936 (6th Cir. 2020) (Thapar, J., dissenting) (citing *Perry v. Perez*, 565 U.S. 388, 394 (2012)).

In adopting a plan, federal courts defer to legislative bodies—even if that legislative plan may violate state law. In *Navajo Nation v. Ariz. Indep. Redistricting Comm'n*, 230 F. Supp. 2d 998 (D. Ariz. 2002), a federal court found that an independent commission deserved deference even though it violated state law. *Id.* at 1008. In *Straw v. Barbour Cty.*, 864 F. Supp. 1148 (M.D. Ala. 1994), a district court deferred to a county commission that violated state law: "Assuming without so finding that a state law violation does exist, that would not cause the plan passed by the commission to lose its status as a legislative plan." *Id.* at 1155. And in *Tallahassee Branch of NAACP v. Leon Cty.*, 827 F.2d 1436 (11th Cir. 1987), the 11th Circuit found that a district court properly deferred to a plan adopted by a board of county commissioners even though the commissioners violated state law. *Id.* at 1438–40. It was not the courts' job to second guess policymakers.

Here, the Redistricting Commission is a legislative body that deserves deference from this Court, no matter if its plan conforms to the Ohio Constitution as interpreted by the Ohio Supreme

Court. First, The Ohio Constitution explicitly charges the members of the Redistricting Commission, most of which the General Assembly controls, to be "responsible for the redistricting of this state for the general assembly." Ohio Constitution, Article XI, Section 1(A). Thus, the Redistricting Commission is the legislative body that decides redistricting-related policy issues. It deserves deference.

Second, the Redistricting Commission, not the Ohio Supreme Court, is the policy-making body. While the members of the Redistricting Commission hold the pen, the Ohio Supreme Court "rule[s] narrowly on the issues before us, leaving public-policy matters to the General Assembly."[3] The Ohio Supreme Court cannot even draw its own maps or move the primary election. *See* Ohio Constitution, Article XI, Section 9(D). Thus, it cannot make the difficult district-drawing policy decisions that deserve deference.

Because the Redistricting Commission is a legislative body charged with the tough policy decisions related to map drawing, this Court should defer to the Redistricting Commission.

1. **Because this Court should defer to the Redistricting Commission, it should adopt the Fourth Plan.**

In deferring to the Redistricting Commission, this Court should adopt the most recent plan adopted by the majority of the Redistricting Commission, the Fourth Plan. The Fourth Plan was considered by seven members of the Redistricting Commission, including four General Assembly appointees, Speaker of the House Robert R. Cupp, Senator Vernon Sykes, Senate President Matt Huffman, and Minority Leader Allison Russo, and three executive members, Governor Mike DeWine, Auditor Keith Faber, and Secretary of State Frank LaRose.

---

[3] *Hope Acad. Broadway Campus v. White Hat Mgmt., L.L.C.*, 2015-Ohio-3716, ¶ 2, 145 Ohio St. 3d 29, 31, 46 N.E.3d 665, 668.

In exercising their policy judgment, the members of the Redistricting Commission voted on the Fourth Plan in public session.[4] Co-Chair Speaker Cupp noted that there were 17 asymmetrical seats in the House of Representatives in this plan, down from 19 in Third Plan, and seven asymmetrical seats in this plan, down from eight in the Third Plan. (*Id.* at 32:28). A vote was held, and as required by Article XI, Section 1 of the Ohio Constitution, a 4-3 majority of the Redistricting Commission approved the plan. (*Id.* at 52:24).

The Redistricting Commission also considered the map created by Dr. Johnson and Dr. McDonald. (Transcript – Part 5 at 21:32).[5] It was rejected by a 5-2 vote. (*Id.*). Several reasons were provided. Governor DeWine noted that the plan sacrificed local communities to gain proportionality: "Yes, it did hit proportionality and did have a similar number of competitive districts or indeed, but less compact districts, fewer communities of interest being kept together, more splits, cities and fewer competitive districts." (*Id.* at 9:18). Auditor Faber echoed that reasoning: "Few Democrats in Bellaire would feel represented by a Columbus Democrat, and few Republicans in Millersburg would feel represented by a Strongsville Republican. It has nothing to do with the partisan label and everything to do with the way local issues affect our politics." (*Id.* at 13:09). It was a policy choice to reject the type of partisan map created by Dr. Johnson and Dr. McDonald in favor of keeping communities together.

The Fourth Plan was also adopted over the Johnson and McDonald plan because of technical issues with the latter plan. (*Id.* at 1:13). Members of the Redistricting Commission noted that the map was not completed when it was put before the Redistricting Commission. (*Id.*; *see*

---

[4] *Commission Meeting*, OHIO REDISTRICTING COMMISSION, March 28, 2022, Transcript – Part 4 *available at* https://redistricting.ohio.gov/meetings (last accessed April 5, 2022).

[5] *Commission Meeting*, March 28, 2022, Transcript – Part 5

*also* Dr. Johnson Aff., Appendix, Exhibit A, ¶ 18). This would have also required work beyond the March 28, 2022, deadline afforded to the Redistricting Commission by the Ohio Supreme Court. (*See* Transcript – Part 5 at 4:39).

As a result, the Fourth Plan was formally adopted by the Redistricting Commission and submitted to Secretary of State and the Ohio Supreme Court. As of today, it has not been invalidated by the Court. Thus, this Court should defer to the policy considerations of the Redistricting Commission and adopt the Fourth Plan as its own on or before April 20, 2022 for an August 2, 2022 primary election.

### 2. Alternatively, this Court should adopt the Third Plan.

Alternatively, this Court should adopt the Third Plan. The Third Plan was also adopted by the Redistricting Commission, consistent with Ohio Constitution, Article XI, Section 1. (Tr. ECF No. 150, PageID # 4370, 136:5). There are few differences between the Fourth Plan and Third Plan in terms of substance. (*Id.*). Yet the Third Plan has the advantage of prior implementation by the local boards of elections, meaning it is the least disruptive to implement. (*See id.*, PageID # 4296, 62:8). So this Court, in the alternative, should adopt the Third Plan on or before April 20, 2022 for a primary election held on August 2, 2022.

### 3. It matters not that the Redistricting Plans may conflict with the Ohio Constitution.

This Court should adopt one of the Redistricting Commission's plans even if the Ohio Supreme Court found it unconstitutional.

***First***, Plaintiffs' remedy accords with the Supremacy Clause. "When there is an unavoidable conflict between the Federal and a State Constitution, the Supremacy Clause of course controls." *Reynolds v. Sims*, 377 U.S. 533, 584, 84 S. Ct. 1362, 1393 (1964). The Supremacy

Clause requires that a state constitution must yield to prevent the deprivation of rights guaranteed by the U.S. Constitution. *See Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2288 (2020).

Here, the Ohio Constitution—as applied to Plaintiffs—deprived them of their rights under the U.S. Constitution, so the Ohio Constitution must yield. Through back-and-forth between the Redistricting Commission and the Ohio Supreme Court, Mr. Gonidakis and the other plaintiffs ended up with no primary election for state legislative office. (Tr., ECF No. 150, PageID # 4247, 13:17). This violates the U.S. Constitution, including the right to vote and the right to associate. As a result, this Court may implement a plan adopted by the Redistricting Commission, even it is later rejected by the Ohio Supreme Court.

*Second*, Plaintiffs' remedy is appropriate based on the present exigent circumstances. *Straw v. Barbour Cty.*, 864 F. Supp. 1148, 1155 (M.D. Ala. 1994). This Court found that it should adopt a plan no later than April 20, 2022, which is two weeks away from today. There are currently few maps to choose from. Only four maps have been approved by the Redistricting Commission and are ready to use. Plaintiffs specifically request that this Court adopt the Fourth Plan. While the Fourth Plan's constitutionality remains pending before the Ohio Supreme Court (and even if it is rejected), it is better than no plan. Additionally, unlike the other plans this Court could consider, it was adopted by the elected officials that may be held accountable at the ballot box. This makes the Fourth Plan an appropriate solution, especially given the looming "drop dead" date.

*Third*, this Court should not be troubled by finding that the Ohio Constitution yields under these circumstances because there is nothing sacrosanct about the Ohio Constitution. State constitutions, while important, are different than the U.S. Constitution. Unlike the U.S. Constitution, which requires three-quarters of the states to ratify any proposed change to it, a "mere

majority of the electorate may amend the constitutions of forty-seven states."[6] State constitutions, as a result, have been collectively amended more than 7,500 times through legislative amendments and amendments proposed by voters.[7] This makes state constitutional rights "more akin to statutory rights than to constitutional constraints."[8]

Ohio is no exception. The Ohio Constitution carries out a range of functions, such as creating a Livestock Care Standards Board and preventing an "idiot" from voting, to name a few. *See* Ohio Constitution, Article XIV, Section 1; Ohio Constitution, Article V, Section 6. It is more statutory than capital "C" constitutional, meaning this Court should not be concerned about adopting a plan that may be found unconstitutional by the Ohio Supreme Court.

For these reasons, this Court should find no issue finding that the Ohio Constitution as applied to Plaintiffs, rather than a particular statute, yields so that Plaintiffs may exercise rights provided by the U.S. Constitution.

**B.  Alternatively, this Court may adopt the 2011 map for the 2022 election only.**

This Court has authority to adopt the 2011 map for temporary use in the 2022 elections, notwithstanding the fact that it is malapportioned as of 2022.  *Watkins v. Mabus*, 771 F. Supp. 789 (S.D. Miss. 1991) (three-judge panel) (per curiam), *aff'd mem. in part and vacated as moot in part*, 502 U.S. 954 (1991).  But a non-malapportioned map should be adopted either by this Court or by the state authorities in time for future General Assembly elections.

---

[6] Jeffrey S. Sutton, *What Does - and Does Not - Ail State Constitutional Law*, 59 U. KAN. L. REV. 687, 690 (2011).

[7] Jessica Bulman-Pozen & Miriam Seifter, *The Democracy Principle in State Constitutions*, 119 MICH. L. REV. 860, 882 (2021).

[8] Tom Ginsburg & Eric Posner, *Subconstitutionalism*, 62 STAN. L. REV. 1583, 1606 (2010).

In *Watkins,* a three-judge panel was convened on July 10, just two months before the primary election scheduled for September 17. *Id.* at 791. Multiple parties submitted proposed maps, and the court waited for the legislative body to agree to one. *Id.* at 793. The court set a deadline of August 2 for a resolution. *Id.* at 795. The afternoon of August 2, with no agreed-on map in sight, the court issued an order that maintained the prior plan based on old census data. *Id.* at 797; *Watkins v. Mabus*, CIVIL ACTION NO. J91-0364(L), 1991 U.S. Dist. LEXIS 20379, at *5 (S.D. Miss. Aug. 2, 1991) (order adopting prior map despite changes in population).

The *Watkins* court reasoned that it was better to have a malapportioned plan than no plan: "[A]lthough the legislative districts under the 1982 plan are doubtless unconstitutionally malapportioned for a full four-year term of office, this court, exercising its equitable powers, holds that under the facts in this case, including the imminent elections, they may be constitutionally utilized for interim relief" and that "if elections are to be timely held, they must be held pursuant to existing law – the 1982 plan" and further noted that "the 1982 plan has the advantage of having been adopted by the entire Legislature." *Id*. at 789, 801

Here, just as in *Watkins*, there are no state legislative districts just two weeks from the April 20, 2022 "drop dead" date to execute a primary election. As in *Watkins*, Ohio's 2011 map was fully litigated, and approved. *See Wilson v. Kasich*, 134 Ohio St.3d 221, 2012-Ohio-5367, ¶ 2, 48 (2012) ("relators failed to rebut the presumes constitutionality accorded the 2011 apportionment plan by establishing that the plan is unconstitutional beyond a reasonable doubt."); *Ohio A. Philip Randolph Institute v. Householder*, Case No. 18-cv-00357 (S.D. Ohio Oct. 29, 2019) (ECF No. 287) ("[T]his case is dismissed for lack of jurisdiction.").

The 2011 map has the advantage of having been fully approved by all state authorities and having been upheld by both state and federal courts.  However, the 2011 map has the disadvantage

of being malapportioned as of 2022. (Complaint, ECF No. 1, PageID # 12, ¶¶ 65–70). Thus, Plaintiffs prefer Ohio Redistricting Commission plans, the Fourth Plan or the Third Plan. If the 2011 map is adopted by this Court, Plaintiffs would ask that it be used only for the 2022 General Assembly elections.

### C. There is no time for a new map by April 20, 2022.

The undisputed testimony at the preliminary injunction hearing was that a 2022 General Assembly plan must be in place no later than April 20, 2022, for an August 2, 2022, primary to take place, and that August 2, 2022, is the last date on which a primary can be conducted without significantly impairing Ohio's ability to conduct a safe and secure 2022 general election.

Given that timeline, it is simply too late for this Court to create a new plan for 2022—with or without the use of a "Special Master". The expressions of optimism that a Special Master could have a plan in a matter of days are unwarranted and contrary to the experiences of courts who have used such experts.[9]

"Not only must experts be retained and given appropriate guidelines, there must also be a reasonable opportunity for review and comment by interested parties and DOJ as well as time for any necessary revisions that result from this process." *Diaz v. Silver,* 932 F.Supp. 462, 467 (E.D.N.Y. 1996).

Typically, there are several months between the appointment of a special master and the adoption of a plan. *See, e.g.*, *Wright v. Sumter Cty. Bd. of Elections & Registration*, No. 1:14-CV-42 (WLS), 2020 U.S. Dist. LEXIS 17348, at **6–22 (M.D. Ga. Jan. 29, 2020) (129 days from the appointment of the special master to the district court adopting the special master's proposed map as the interim remedial plan); *Dillard v. City of Greensboro*, 956 F. Supp. 1576, 1577-1582 (M.D.

---

[9] *See* Motion for Appointment of Special Master, ECF No. 149.

Ala. May 22, 1997) (112 days from the initial appointment of the special master to the district court adopting the special master's supplemental redistricting plan).

The shortest period that Plaintiffs could find between the appointment of a Special Master and a Court's adoption of a plan was 21 days, which the court found required a "Herculean" effort. *Favors v. Cuomo*, No. 11-CV-5632 (RR)(GEL)(DLI)(RLM), 2012 U.S. Dist. LEXIS 36910, at *15 (E.D.N.Y. Mar. 19, 2012). Here, we do not have even 21 days before the April 20, 2022, drop-dead date. *Favors v. Cuomo* involved the lack of any plan to elect members of congress from New York. Since the number of New York Congressional Districts had been reduced from 29 to 27, the use of the prior congressional district maps was not possible, and there were no other authorized maps to choose from.

Here, there is not enough time for a Special Master to draft a new plan, let alone consider other factors that may be proposed. Plaintiffs moved as fast as possible. (*See* Emergency Motion, ECF No. 53; Emergency Motion, ECF No. 73; Emergency Motion, ECF No. 75). "Ohio has some of the most complex rules for map drawing in the county; as well as the political geography of the boundaries of cities, townships, villages, et cetera, it's some of the most challenging as well." (Tr., ECF No. 150, PageID # 4356, 122:12–16). There is not enough time in the next two weeks for this Court to appoint a Special Master, for that Special Master to finalize a report, for objections to be filed to the Special Master's findings, and for this Court to rule on the new plan.

Instead, Plaintiffs submit that the best way to meet the April 20, 2022, deadline would be for this Court to choose between the Third Plan, the Fourth Plan, and 2011 map.

### D. This Court should avoid the alternative plans unendorsed by the Redistricting Commission.

Because this Court should defer to the legislative body, and there is no time for a Special Master, it should adopt one of the maps adopted by the Redistricting Commission. The alternative maps offered by the Parties should not be considered.

### 1. The so-called "Independent Plan" has significant flaws, including previously undisclosed involvement by Mr. Glassburn.

This Court should not consider the so-called Independent Plan because it has significant problems. First, the plan violates the Ohio Constitution. A key component of the Ohio Constitution is adoption by the Redistricting Commission. *See* Ohio Constitution, Article XI, Section 1(A). That failed to happen here. In fact, this plan was considered—and rejected—by the Redistricting Commission. (*Commission Meeting*, March 28, 2022, Transcript – Part 5 at 21:32). As a result, this proposed plan cannot meet the requirements of the Ohio Constitution, and this Court would be adopting policy rejected by Ohio's elected officials.

Second, the plan has technical flaws, and was significantly influenced by a Democrat staffer, Mr. Glassburn. During the hearing, it was conceded that the map had technical flaws and could not be implemented without more delay. (Tr., ECF No. 150, 135:3). This was confirmed by sworn testimony provided by Dr. Douglas Johnson, one of the authors of the McDonald and Johnson plan. (*See* Dr. Johnson Aff., Exhibit A). As explained by Dr. Johnson, the map was not final: "I cannot say it was a final constitutional map." (*Id.*, ¶ 18). More troubling, Dr. Johnson also revealed that Mr. Glassburn, acting as a Democratic staffer, drafted portions of the map that were not approved by Dr. Johnson, Dr. McDonald, or a member of the Redistricting Commission. (*Id.*, ¶¶ 12–13). Mr. Glassburn testified at this Court's hearing and failed to mention his unapproved role. (*See* Tr., ECF No. 150).

22

For these reasons, this Court should not consider the so-called Independent Plan, especially considering the previously undisclosed involvement of Mr. Glassburn.

### 2. Dr. Rodden conceded that his plan should not be used.

Dr. Jonathon Rodden also prepared a plan, the "Rodden III" plan. This plan was not approved by the Redistricting Commission, so it suffers a similar deficiency as one mostly drawn by Dr. Johnson and Dr. McDonald. Dr. Rodden also conceded that his map failed to meet the strict partisan proportionality, which the Ohio Supreme Court stated is a requirement. *League of Women Voters of Ohio v. Ohio Redistricting Comm'n*, 2022-Ohio-342, ¶ 64 ("54 percent in favor of the Republican Party and 46 percent in favor of the Democratic Party"). Because Dr. Rodden's suggested plan fails this test, he acknowledged that this map should not be an option for this Court. (Tr. ECF No. 150, 186:17–187:22, 199:12–15; Affidavit of Jonathan Rodden, ECF No. 107-3, ¶ 30, PageID # 2614).

For these reasons, this Court should not consider the Rodden III plan as an option.

### E. The Simon Parties' claims should not prevent the adoption of the Third or Fourth Plan.

This Court should disregard the Simon Parties' challenges to the Redistricting Commission's plans, including claims under Section 2 of the Voting Rights Act ("VRA"). "[A] court, as a general rule, should be guided by the legislative policies underlying the existing plan, to the extent those policies do not lead to violations of the Constitution or the Voting Rights Act." *Abrams v. Johnson*, 521 U.S. 74, 79 (1997). "Where a State's plan faces challenges under the Constitution or § 2 of the Voting Rights Act, a district court should still be guided by that plan, except to the extent those legal challenges are shown to have a likelihood of success on the merits." *Perry v. Perez*, 565 U.S. 388, 394 (2012). A Section 2 claim requires showing discrimination in the *results* of a state's electoral procedures. 52 U.S.C. § 10301(a); *see also Thornburg v. Gingles*,

23

478 U.S. 30, 35 (1982). This means demonstrating "under the totality of the circumstances, the [challenged electoral law] results in unequal access to the electoral process." *Thornburg*, 478 U.S. at 46. "[N]o court has ever construed the Voting Rights Act as prohibiting the use of any particular method of redistricting." *Bonilla v. City Council of Chi.*, 809 F. Supp. 590, 596 (N.D. Ill. 1992) (emphasis in original).

The Simon Parties challenge the Redistricting Commission's method. But a methodology challenge, specifically a failure to consider race by the Redistricting Commission, fails the "results test" required by Section 2. The Simon Parties have not raised a single factual allegation about the results of the Third Plan, or of any plan. The Simon Parties have also failed to put forward evidence that shows, under the totality of the circumstances, there is unequal access to the electoral process as required by this stage of litigation.

Nor can the Simon Parties rely on *Armour v. Ohio* to establish the foundation for a Section 2 violation. *Armour* made very specific findings invalidating two specific electoral districts nearly 31 years ago. 775 F. Supp. 1044 (N.D. Ohio 1991).[10] A three-decades old analysis of two electoral districts that no longer exist cannot serve as the basis to prove that different districts drawn just months ago violate the VRA. This is particularly true concerning how significantly the area has changed. For example, the area's largest city, Youngstown, Ohio, dropped from around 95,000 people to 60,000 people in the intervening years, a population change of nearly 40%. The *Armour* opinion also relies on institutions that have changed significantly, such as the Youngtown City School District, which has undergone multiple fiscal emergencies and academic distress

---

[10] "Because *Armour* based its decision, at least in part, on a finding that *Gingles* did not apply to single-member-district claims, the validity of *Armour* was put in doubt by *Growe v. Emison*, 507 U.S. 25, 122 L. Ed. 2d 388, 113 S. Ct. 1075. Moreover, *Armour* has been heavily criticized by other courts. *See, e.g.*, *DeBaca*, 794 F. Supp. at 996-97; *Hastert*, 777 F. Supp. at 652-53." *Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 383 n.42 (S.D.N.Y. 2004)

commissions. *See* O.R.C. § 3302.10. The Mahoning Valley of 1991 is different from the Mahoning Valley of today—and nothing in the record closes this multiple decade gap.

      As a result, this Court should not be concerned by the Simon Parties' allegations in terms of adopting the Third Plan, or the Fourth Plan, if possible.

## VII.   <u>CONCLUSION</u>

      For all these reasons, Plaintiffs respectfully request that this Court adopt the most recent map adopted by the Redistricting Commission for the 2022 election for state legislative office, the Fourth Plan, on or before April 20, 2022, for a primary election on August 2, 2022.

Respectfully submitted,

**Isaac Wiles & Burkholder LLC**

<u>*/s/ Donald C. Brey*</u>
Donald C. Brey (0021965)
Brian M. Zets (0066544)
Matthew R. Aumann (0093612)
Ryan C. Spitzer (0093515)
Trista M. Turley (0093939)
Two Miranova Place, Suite 700
Columbus, Ohio 43215
Tel: 614-221-2121; Fax: 614-365-9516
dbrey@isaacwiles.com
bzets@isaacwiles.com
maumann@isaacwiles.com
rspitzer@isaacwiles.com
tturley@isaacwiles.com

*Attorneys for Plaintiffs Michael Gonidakis, Mary Parker, Margaret Conditt, Beth Ann Vanderkooi, Linda Smith, Delbert Duduit, Thomas W. Kidd, Jr., and Ducia Hamm*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 6, 2022, a copy of the foregoing was filed electronically.

Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system.


*/s/Donald C. Brey*
Donald C. Brey (0021965)

## **APPENDIX**

Exhibit A:      Affidavit of Dr. Douglas Johnson dated April 3, 2022.