**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| MICHAEL GONIDAKIS, MARY PARKER, MARGARET CONDITT, BETH VANDERKOOI, LINDA SMITH, DELBERT DUDUIT, THOMAS W. KIDD JR., DUCIA HAMM, | |
| Plaintiffs, | Case No. 2:22-cv-00773 |
| BRIA BENNETT, REGINA C. ADAMS, KATHLEEN M. BRINKMAN, MARTHA CLARK, SUSANNE L. DYKE, MERYL NEIMAN, HOLLY OYSTER, CONSTANCE RUBIN, EVERETT TOTTY, | Chief Judge Algenon L. Marbley Judge Amul R. Thapar Judge Benjamin J. Beaton |
| Intervenor-Plaintiffs, | |
| v. | |
| FRANK LAROSE, in his capacity as Ohio Secretary of State, | |
| Defendant. | |

**BENNETT PETITIONERS' POST-HEARING BRIEF**
**REGARDING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Intervenor-Plaintiffs Bria Bennett, Regina C. Adams, Kathleen M. Brinkman, Martha

Clark, Susanne L. Dyke, Meryl Neiman, Holly Oyster, Constance Rubin, and Everett Totty (the

"Bennett Petitioners") submit this post-hearing brief on Plaintiffs' Motion for a Preliminary

Injunction, in accordance with the Court's Order, ECF No. 143.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION AND LOCAL RULE 7.2(a)(3) SUMMARY ................................... 1

BACKGROUND ........................................................................................................... 3

LEGAL STANDARD .................................................................................................... 5

ARGUMENT ................................................................................................................. 6

   I.   The Court should avoid ordering any relief for as long as is possible without limiting its ability to intervene effectively if necessary. ....................................... 6

   II.  If the Court does impose a General Assembly plan, it must be consistent with the substantive requirements of both Ohio and federal law. ...................................... 8

     A.   The Court must follow Ohio law to the greatest extent possible without interfering with federal rights. ........................................................................ 8

     B.   The Ohio Constitution imposes express partisan fairness requirements. ........ 9

     C.   The Court can adopt a plan that was not adopted by the Commission. ......... 11

   III.  The Third and Fourth Plans adopted by the Commission violate the Ohio Constitution. ....................................................................................................... 16

     A.   The Third Plan .............................................................................................. 16

     B.   The Fourth Plan ........................................................................................... 18

   IV.  The Court has at least two lawful plans before it: the Corrected Independent Map Drawers' Plan and the Rodden III Plan. ............................................................ 20

     A.   The Corrected Independent Map Drawers' Plan .......................................... 21

     B.   The Rodden III Plan .................................................................................... 23

   V.   Elections under the 2011 Plan would violate voters' rights under both federal and Ohio law. .............................................................................................................. 24

CONCLUSION ............................................................................................................ 26

CERTIFICATE OF SERVICE .................................................................................... 28

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Branch v. Smith*,
    538 U.S. 254 (2003)..........................................................................................................7

*Carter v. Chapman*,
    No. 7 MM 2022, 2022 WL 549106 (Pa. Feb. 23, 2022)...................................12, 23

*Cincinnati, Wilmington & Zanesfile R.R. Co. v. Comm'rs of Clinton Cnty.*,
    1 Ohio St. 77 (1852)...........................................................................................2, 12, 15

*Evenwel v. Abbott*,
    578 U.S. 54 (2016)..........................................................................................................3, 25

*Florida v. Powell*,
    559 U.S. 50 (2010)..........................................................................................................11

*Gentry v. Deuth*,
    456 F.3d 687 (6th Cir. 2006) ........................................................................................2, 13

*Growe v. Emison*,
    507 U.S. 25 (1993)..........................................................................................................1, 6, 7

*Harper v. Hall*,
    No. 21 CVS 500085 (N.C. Sup. Ct. Feb. 23, 2022)...................................................12

*Johnson v. Wis. Elections Comm'n*,
    967 N.W.2d 469 (Wis. 2021)........................................................................................12

*Large v. Fremont Cnty., Wyo.*,
    670 F.3d 1133 (10th Cir. 2012) ................................................................... *passim*

*League of Women Voters of Ohio v. Ohio Redistricting Comm'n*,
    2022-Ohio-789 2022 WL 803033 (Ohio Mar. 16, 2022) ............................... *passim*

*League of Women Voters of Ohio v. Ohio Redistricting Comm'n*,
    No. 2022-Ohio-342, 2022 WL 354619 (Ohio Feb. 7, 2022) .......................... *passim*

*League of Women Voters of Ohio v. Ohio Redistricting Comm'n*,
    No. 2022-Ohio-65, 2022 WL 110261 (Ohio Jan. 12, 2022)........................... *passim*

*Leary v. Daeschner*,
    228 F.3d 729 (6th Cir. 2000) ........................................................................................6

*Mahan v. Howell*,
410 U.S. 315 (1973)........................................................................................3, 25

*Middletown v. Ferguson*,
25 Ohio St. 3d 71 (Ohio 1986)...............................................................................12

*Mullaney v. Wilbur*,
421 U.S. 684 (1975)...............................................................................................11

*Ne. Ohio Coal. for the Homeless v. Husted*,
696 F.3d 580 (6th Cir. 2012)....................................................................................5

*New Mexico v. Dep't of Interior*,
854 F.3d 1207 (10th Cir. 2017) ................................................................................7

*State ex. rel. Ohio Acad. of Trial Lawyers v. Sheward*,
86 Ohio St. 3d 451 (1999).....................................................................................13

*State ex rel. Ohio Gen. Assembly v. Brunner*,
114 Ohio St. 3d 386 (2007)...............................................................................2, 12

*Perry v. Perez*,
565 U.S. 388 (2012)..................................................................................................8

*Reynolds v. Sims*,
377 U.S. 533 (1964).....................................................................................1, 8, 9, 16

*Swann v. Adams*,
385 U.S. 440 (1967)............................................................................................3, 25

*Upham v. Seamon*,
456 U.S. 37 (1982) (per curiam) ..............................................................................9

*Wattson v. Simon*,
970 N.W.2d 42 (Minn. Feb. 15, 2022)....................................................................12

*White v. Weiser*,
412 U.S. 783 (1973)............................................................................................1, 8, 9

*Wilson v. Kasich*,
134 Ohio St. 3d 221 (2012)....................................................................................26

*Ex Parte Young*,
209 U.S. 123 (1908)................................................................................................14

## INTRODUCTION AND LOCAL RULE 7.2(a)(3) SUMMARY

"[R]eapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court." *Growe v. Emison*, 507 U.S. 25, 34 (1993) (quoting *Chapman v. Meier*, 420 U.S. 1, 27 (1975)). And if a federal court must intervene in the redistricting process, it must not "intrude upon state policy any more than necessary" to protect federal rights. *White v. Weiser*, 412 U.S. 783, 795 (1973) (quoting *Whitcomb v. Chavis*, 403 U.S. 124, 160 (1973)). This Court has carefully followed these principles to date, declining to intervene in Ohio's General Assembly redistricting process as long as possible to provide the state with as much time as possible to adopt a lawful General Assembly plan on its own. As the time when federal intervention may become necessary approaches, the Court's goal must remain the same: to do the least amount of damage to Ohio law, consistent with federal rights.

As explained in Part I, *infra* pp. 6-8, the Court should continue to abstain from ordering any relief until April 20. Testimony at the March 30 hearing confirmed that so long as a final plan is in place no later than April 20, Ohio can conduct a General Assembly primary on August 2 without any disruption to the usual election deadlines and time periods, for either the primary or the general election. Thus, the Court should give Ohio until April 20 to adopt a lawful plan. At that time, if the Court believes relief will ultimately be warranted, the Court should act, as waiting longer risks unacceptably limiting the Court's remedial options, potentially requiring a greater intrusion into Ohio law than would otherwise be required to protect federal rights.

As explained in Part II, *infra* pp. 8-15, if relief does become necessary, the Court must order the use of a General Assembly plan that complies with substantive requirements of both Ohio and federal law. The Court is required to comply with Ohio law to the greatest extent possible without impairing federal rights. *Infra* Part II.A, pp. 8-9; *White*, 412 U.S. at 795; *Reynolds v. Sims*, 377 U.S. 533, 584 (1964). That includes imposing a plan that meets the Ohio Constitution's

1

detailed partisan fairness requirements, which the Ohio Supreme Court has authoritatively interpreted in great detail. *Infra* Part II.B, pp. 9-11. To comply with those requirements, the Court must order the use of a General Assembly plan that was not adopted by the Commission if—as will necessarily be the case if relief is needed—that is the only way to impose a plan consistent with the substantive requirements of the Ohio Constitution. *Infra* Part II.C, pp. 11-15. The Ohio Constitution is the paramount law of the state and the sole source of the Commission's redistricting authority, so the Commission's actions in violation of the Ohio Constitution's requirements are *ultra vires* acts that are without legal effect. *Gentry v. Deuth*, 456 F.3d 687, 697 (6th Cir. 2006); *State ex rel. Ohio Gen. Assembly v. Brunner*, 114 Ohio St. 3d 386, 393 (2007); *Cincinnati, Wilmington & Zanesfile R.R. Co. v. Comm'rs of Clinton Cnty.*, 1 Ohio St. 77, 85 (1852). The Court cannot give effect to unconstitutional plans adopted by the Commission without improperly elevating the Commission over the sovereign people who expressly limited the Commission's redistricting authority to the adoption of plans compliant with the Ohio Constitution. *See Large v. Fremont Cnty., Wyo.*, 670 F.3d 1133, 1147 (10th Cir. 2012).

As explained in Part III, *infra* pp. 15-20, the Ohio Supreme Court has already ruled that the Third Plan adopted by the Commission violates the Ohio Constitution, and the evidence before the Court shows that the Fourth Plan is nearly identical to the Third Plan—99.7% unchanged—and unconstitutional for the same reason.

As explained in Part IV, however, *infra* pp. 20-24, the Court has at least two plans before it that fully comply with the substantive requirements of both Ohio and federal law: a plan developed by the independent map drawers retained by the Commission (the "Corrected

Independent Map Drawers' Plan")[1]; and a plan entirely developed by Stanford Political Scientist Dr. Jonathan Rodden (the "Rodden III Plan"). The existence of these plans demonstrates that there is no inherent or necessary conflict between protecting federal rights and complying with Ohio law, and thus no justification for ordering the use of a General Assembly plan that violates Ohio law.

Finally, as explained in Part V, *infra* pp. 24-26, the Court may not order elections to proceed under the 2011 Plan without violating voters' rights under both federal *and* Ohio law. As a result of population changes within Ohio, the 2011 Plan is now grievously malapportioned, with a maximum deviation between the most overpopulated and most underpopulated districts of more than 34 percent in the House and more than 25 percent in the Senate—far in excess of what the Equal Protection Clause allows. *Evenwel v. Abbott*, 578 U.S. 54, 60 (2016); *Mahan v. Howell*, 410 U.S. 315, 329 (1973); *Swann v. Adams*, 385 U.S. 440, 444 (1967). Moreover, the 2011 Plan was adopted before the 2015 constitutional amendments that created the Commission and imposed partisan fairness requirements on General Assembly plans. If it were imposed today, the 2011 Plan would violate those requirements, which were adopted in large part in response to the blatantly partisan process that produced the 2011 Plan, a clear partisan gerrymander.

## BACKGROUND

The legal and factual background for this case is described in detail in the Bennett Petitioners' Opposition to Plaintiffs' Motion for Temporary Restraining Order, ECF No. 90 at PageID 1330-37, and Opposition to Plaintiffs' Motion for a Preliminary Injunction, ECF No. 107 at PageID 2532-34.

---

[1] As explained below, the Corrected Map Drawers' Plan includes a handful of minor corrections by the Bennett Petitioners' expert Dr. Rodden.

On March 28, after the submission of the Bennett Petitioners' Opposition, the Ohio Redistricting Commission adopted a new General Assembly apportionment plan (the "Fourth Plan"). *See* ECF No. 118. Unfortunately, the Commission did so by abandoning, at the eleventh hour, a plan being finalized by two independent map drawers retained by the Commission specifically to enact a lawful plan. Instead, the Commission voted late on March 28 to make only extraordinarily minor changes to the Third Plan, leaving more than 99.7% of Ohio's population in the same districts as before. Tr. 135:7-9, 145:15-22, 174:19-175:3. Further, the Commission abandoned the neutral, Commission-wide process that the Ohio Supreme Court had ordered: the Fourth Plan was prepared by partisan map drawers reporting only to certain Commissioners, just like every plan adopted before it. Tr. 135:7-136:7, 175:1-4. The next day, the Bennett Petitioners and others filed renewed motions for an order directing the Commission and its members to show cause why they should not be held in contempt for violating the Ohio Supreme Court's orders. ECF Nos. 134, 152. Objections to the Fourth Plan are fully briefed in the Ohio Supreme Court as of 9:00 a.m. on April 4.

Meanwhile, this Court heard testimony and representations from counsel on March 30 that it is already too late to hold a May 3 General Assembly primary, under *any* plan, Tr. 11:19-13:17, but that an August 2 General Assembly primary would not interfere in any way with the November general election, Tr. 65:14-21. The Court also heard testimony that to enable an August 2 primary under an otherwise normal election schedule, including time for candidates to move into new districts if they choose and circulate and file their candidacy petitions, Ohio must have a final General Assembly plan no later than April 20. Tr. 83:13-86:4.

The various plans that are before the Court may be viewed on "Dave's Redistricting App," a free website, at the following links:

- 2011 Plan – House: https://davesredistricting.org/maps#viewmap::8db12bef-0510-4386-be22-19949a43b73c.

- 2011 Plan – Senate: https://davesredistricting.org/maps#viewmap::bc4f22d5-75d7-42f5-a628-c1dc9b0740e4.

- Third Plan – House: https://davesredistricting.org/maps#viewmap::488ab72e-581f-4dfe-a0c7-8c0eb502e9db.

- Third Plan – Senate: https://davesredistricting.org/maps#viewmap::158ee081-376b-44b6-a550-915f5988a30f.

- Fourth Plan – House: https://davesredistricting.org/maps#viewmap::4a20a11c-a95f-45a8-89ea-cbe741777e97.

- Fourth Plan – Senate: https://davesredistricting.org/maps#viewmap::39605ccb-6872-41bd-99d4-f1b495b2a2fc.

- Corrected Independent Map Drawers' Plan – House: https://davesredistricting.org/maps#viewmap::550beca6-85ca-4049-9925-b6163549b488.

- Corrected Independent Map Drawers' Plan – Senate: https://davesredistricting.org/maps#viewmap::2345f29b-1184-4674-be6e-0a15af5d7b4c.

- Rodden III Plan – House: https://davesredistricting.org/maps#viewmap::593b05f8-8859-4348-8f0f-4f9248a162fd.

- Rodden III Plan – Senate: https://davesredistricting.org/maps#viewmap::af842936-bcb8-4cd9-a912-01853a441ab3.

## LEGAL STANDARD

In determining whether to issue a preliminary injunction, the Court must consider: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction." *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 590–91 (6th Cir. 2012). "[T]he preliminary injunction is an 'extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied "only in [the] limited circumstances" which clearly demand

it.'" *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (quoting *Direx Isr., Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991)).

## ARGUMENT

The Bennett Petitioners' prior briefing has focused on each of the four preliminary injunction factors. *See* ECF Nos. 90, 107. Given the testimony heard, representations made, and questions asked at the March 30 hearing, the Bennett Petitioners focus this post-hearing brief on remedial issues, explaining why—if the Court concludes that Plaintiffs have met their burden and that relief will ultimately be required—the Court should continue to wait as long as possible before ordering relief in response to Plaintiffs' motion, and why any relief that the Court does ultimately order must be consistent, to the greatest extent possible, with Ohio law.

### I. The Court should avoid ordering any relief for as long as is possible without limiting its ability to intervene effectively if necessary.

As the Court's actions to date have recognized, "'reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court,'" and the Court must "defer consideration of disputes involving redistricting where the State, through its legislative *or* judicial branch, has begun to address that highly political task itself." *Growe*, 507 U.S. at 33 (quoting *Chapman*, 420 U.S. at 27). Ohio's redistricting process has undeniably taken substantial time, but the Ohio Supreme Court remains actively engaged in efforts to bring the work of the Redistricting Commission to a conclusion, with objections to the Commission's Fourth Plan fully briefed before the Ohio Supreme Court and awaiting a decision. As the Court has until now, the Court should continue to give Ohio a chance to resolve the apportionment of its state legislative districts on its own, for as long as possible.

The Court should therefore not adopt any remedy until necessary—and that includes not prematurely revealing what remedy it may order in the event that federal intervention becomes

necessary. Deferral under *Growe* requires not only that a federal court not "affirmatively obstruct state reapportionment" but also that the court not "permit federal litigation to be used to impede it." *Growe*, 507 U.S. at 34. For the Court to reveal what plan it will impose if the Commission is unable to adopt a lawful plan would fundamentally affect and impede the Commission's ability to agree on a lawful plan. *See New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1234-35 (10th Cir. 2017) (describing how changes to a party's "best alternative to a negotiated agreement" affect the prospect of a negotiated resolution). In *Branch*, for example, the federal court did not promulgate its own, fallback redistricting plan until after the state had already adopted its own proposal, subject only to preclearance by the Department of Justice. *Branch v. Smith*, 538 U.S. 254, 259-60 (2003). This Court should similarly wait as long as possible—until at least April 20.

*Growe*'s requirement of deferral does not last forever, however: at a certain point, the Court must take action if necessary to protect federal rights. *See id.* at 1235. At the March 30 hearing, counsel to the Secretary of State office represented that to avoid disrupting the general election, Ohio's primary election must be held by August 2. Tr. 65:14-20. And an employee of the Secretary of State's office testified that holding a primary election on August 2 without compressing various pre-election time periods under Ohio law requires a final plan by April 20. Tr. 83:13-86:4. If the Court credits this testimony and if it concludes that protection of federal rights requires ensuring that an August 2 primary is held, then if Ohio has not adopted a final plan by April 20, the Court should order a remedy at that time. To wait longer under those circumstances would risk greater, rather than less, disruption to Ohio law, by potentially requiring the use of a plan that violates the Ohio Constitution or the elimination of statutory time periods under state law for candidates to

7

move into their districts and file for election. Tr. 77:5-78:16.[2] That would violate the first rule of federal court intervention in state redistricting: to not "intrude upon state policy any more than necessary" to protect federal rights. *White*, 412 U.S. at 795 (quoting *Whitcomb v. Chavis*, 403 U.S. 124, 160 (1973)).

## II. If the Court does impose a General Assembly plan, it must be consistent with the substantive requirements of both Ohio and federal law.

### A. The Court must follow Ohio law to the greatest extent possible without interfering with federal rights.

If the Court does ultimately order relief because Ohio is unable to adopt a General Assembly plan in time, the Court must order Ohio to conduct General Assembly elections under a plan that complies with the substantive requirements of Ohio law. In adopting a reapportionment plan to protect federal rights, federal courts must "follow the policies and preferences of the State, as expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature, whenever adherence to state policy does not detract from the requirements of the Federal Constitution." *White*, 412 U.S. at 795; *see also Perry v. Perez*, 565 U.S. 388, 393 (2012); *Reynolds*, 377 U.S. at 584 ("[C]ourts should attempt to accommodate the relief ordered to the apportionment provisions of state constitutions insofar as is possible."). Thus, a federal court

---

[2] The Bennett Petitioners previously argued that Plaintiffs lack standing or a federal claim. ECF No. 107 at PageID 2540-47. Those arguments, however, were based on the posture of the case and the specific relief that Plaintiffs then sought. *See id.* In particular, Plaintiffs' focus was on the approaching May 3 primary, with Plaintiffs asking the Court to order the use of a General Plan that violates the Ohio Constitution so as to allow a General Assembly primary to occur on May 3. ECF No. 96 at 1578. As the Bennett Petitioners argued, and Mr. Gonidakis's own testimony at the March 30 hearing confirmed, Mr. Gonidakis was not injured, and his federal rights were not threatened, by a mere delay to the General Assembly primary beyond May 3. ECF No. 107 at PageID 2540-47; Tr. 115:8-14.

The Bennett Petitioners have always acknowledged, however, that if there were a threat that no election at all will be held, then there would be a threatened violation of federal rights and the requisite injury-in-fact. ECF No. 107 at PageID 2543, 2545. As time continues to pass and Ohio still has not been able to produce a valid General Assembly plan, that threat has become more concrete.

may not impose a "court-ordered plan that reject[s] state policy choices more than [is] necessary to meet the specific [federal] constitutional violations involved." *Upham v. Seamon*, 456 U.S. 37, 42 (1982) (per curiam). This is just a particular application of general preemption principles, under which federal law displaces state redistricting laws only if those laws "are an *unavoidable obstacle* to the vindication of the federal right." *Large*, 670 F.3d at 1145.

The federal rights at issue here—First Amendment associational rights and the one-person, one-vote right under the Equal Protection Clause—would be satisfied by any properly apportioned plan. The sole Plaintiff to provide evidence of any injury, Mr. Gonidakis, was very clear about that: he does not "care what voting plan is adopted," so long as he is able to vote. Tr. 115:8-9. Adherence to Ohio's substantive constitutional requirements for General Assembly plans therefore "does not detract from the requirements of the Federal Constitution," so those requirements remain valid and un-preempted, and there is no basis for the Court to adopt a plan that violates them. *White*, 412 U.S. at 795; *see also Reynolds*, 377 U.S. at 584; *Large*, 670 F.3d at 1147-48.

**B.      The Ohio Constitution imposes express partisan fairness requirements.**

"In November 2015, Ohio voters overwhelmingly approved an amendment to the Ohio Constitution that . . . established a new process for creating General Assembly districts." *League of Women Voters of Ohio v. Ohio Redistricting Comm'n*, No. 2022-Ohio-65, ¶ 4, 2022 WL 110261 (Ohio Jan. 12, 2022) ("*LWV I*"). That amendment, which became Article XI of the Ohio Constitution, imposed various requirements for a General Assembly district plan. Of particular relevance, Section 6 of Article XI mandates that the Commission "shall attempt to draw a general assembly district plan that meets all of the following standards":

> (A) No general assembly district plan shall be drawn primarily to favor or disfavor a political party.
>
> (B) The statewide proportion of districts whose voters, based on statewide state and federal partisan general election results during the last ten years,

favor each political party shall correspond closely to the statewide preferences of the voters of Ohio.

(C) General assembly districts shall be compact.

Ohio Const. art. XI, § 6. The Commission may not "violate the district standards described in Section 2, 3, 4, 5, or 7" in an effort to comply with Section 6. *Id.* If, however, it is possible to draw a plan that meets these standards while complying with the other substantive provisions of Article XI, the Commission must do so. *See LWV I* at ¶ 87-88.

A Section 6(A) violation is determined by "discern[ing] the map drawers' intent." *Id.* at ¶ 116. "[D]irect or circumstantial evidence may establish that a districting plan was drawn primarily to favor one political party over another." *Id.* at ¶ 117 (citations omitted). Such evidence can include a "map-drawing process," such as one in which "the legislative caucuses of the two major political parties—i.e., the groups with the most self-interest in protecting their own members— drew maps for the commission to consider." *Id.* at ¶¶ 118-19. Respondents' "awareness of the partisan effects" of a plan also "supports an 'inference of predominant partisan intent.'" *League of Women Voters of Ohio v. Ohio Redistricting Comm'n*, No. 2022-Ohio-342, ¶ 37, 2022 WL 354619 (Ohio Feb. 7, 2022) ("*LWV II*") (quoting *LWV I* at ¶ 118).

The Ohio Supreme Court has explained that there is "further evidence of a Section 6(A) violation" where the Commission has adopted "a plan in which the quality of partisan favoritism is monolithically disparate." *Id.* at ¶ 40. For example, the "adoption of a plan that labels what are by any definition 'competitive' or 'toss-up' districts as 'Democratic-leaning'—at least when the plan contains no proportional share of similar 'Republican-leaning' districts—is demonstrative of an intent to favor the Republican Party." *Id.*. In other words, "[t]he remarkably one-sided distribution of toss-up districts is evidence of an intentionally biased map." *League of Women*

*Voters of Ohio v. Ohio Redistricting Comm'n*, 2022-Ohio-789, ¶ 33 2022 WL 803033 (Ohio Mar. 16, 2022) ("*LWV III*").

Section 6(B) provides that the Commission "shall attempt" to draw a district plan that meets the following standard: "The statewide proportion of districts whose voters, based on statewide state and federal partisan general election results during the last ten years, favor each political party shall correspond closely to the statewide preferences of the voters of Ohio." "Under this methodology, there is no dispute that 'about 54 percent of Ohio voters preferred Republican candidates and about 46 percent of Ohio voters preferred Democratic candidates' in the relevant past elections." *LWV II* at ¶ 51 (quoting *LWV I* at ¶ 108). The Supreme Court of Ohio has explained that "competitive districts"—those that do not clearly "favor" one party over the other—"must either be excluded from the proportionality assessment or be allocated to each party in close proportion to its statewide vote share." *Id.* at ¶ 62.

The Ohio Supreme Court's construction of these provisions of the Ohio Constitution are controlling on this Court. *See Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975) ("[S]tate courts are the ultimate expositors of state law."); *Florida v. Powell*, 559 U.S. 50, 56 (2010) ("It is fundamental . . . that state courts be left free and unfettered by us in interpreting their state constitutions." (quotations omitted)). As a result, the parties cannot use this action to advance any conflicting interpretations of the Ohio Constitution's partisan fairness requirements.

### C.    The Court can adopt a plan that was not adopted by the Commission.

While the Court must not impose a plan that violates the substantive requirements of Ohio law, including the partisan fairness requirements, the Court is free to impose a plan that has not been adopted by the Commission. If the Court must impose a plan, it is only because *no* lawful plan has been adopted by the Commission: otherwise, there would be no need for federal relief. And the Court cannot privilege an *unlawful* plan adopted by the Commission over a *lawful* plan

11

that the Commission failed to adopt without improperly elevating unlawful acts by the Commission over the requirements of the Ohio Constitution, the "state's most fundamental law," *State ex rel. Ohio Gen. Assembly v. Brunner*, 114 Ohio St. 3d at 393. Thus, if the Court imposes a plan, it must do what many courts have done and impose a plan proposed by litigants. *See, e.g.*, *Johnson v. Wis. Elections Comm'n*, 967 N.W.2d 469, 490 (Wis. 2021); Order on Remedial Plans, *Harper v. Hall*, No. 21 CVS 500085 (N.C. Sup. Ct. Feb. 23, 2022) (previously filed as ECF No. 107-2); *Carter v. Chapman*, No. 7 MM 2022, 2022 WL 549106 (Pa. Feb. 23, 2022); *Wattson v. Simon*, 970 N.W.2d 42 (Minn. Feb. 15, 2022).

It is true that the Ohio Constitution empowers the Commission—and only the Commission—to adopt General Assembly plans. But the Ohio Constitution limited that grant of authority by requiring that the Commission adopt only plans that comply with substantive requirements. *See generally* Ohio Const. art. XI. The Commission has never validly exercised that power. Rather, when the Commission adopted the unconstitutional Third and Fourth Plans, it acted *ultra vires*, beyond the authority delegated to it by the people of Ohio in the Ohio Constitution.

At the very foundation of Ohio law is the principle "that all political power resides with the people," and that the people have "the most undoubted right to delegate just as much, or just as little, of this political power with which they are invested as they see proper, and to such agents or departments of government as they see fit to designate." *Cincinnati, Wilmington & Zanesfile R.R.*, 1 Ohio St. at 85. The Ohio Constitution governs "the manner and extent of this delegation; and from that instrument, alone, must every department of the government derive its authority to exercise any portion of political power." *Id.* Acts of a governmental body are therefore "void" if they "do[] not fall within the general grant of power to that body or [are] expressly prohibited by some provision of the constitution." *Id.* at 86; *see also Middletown v. Ferguson*, 25 Ohio St. 3d

71, 80 (Ohio 1986) ("an unconstitutional law must be treated as having no effect whatsoever from the date of its enactment").

It makes no difference if the Commissioners who voted for the plans in question thought that they were valid. After a failed experiment with legislative supremacy in the early 19th century, it has been established for centuries in Ohio—as under federal law—that it is courts, not the other governmental agents themselves, who ultimately decide what the Ohio Constitution requires, and thereby serve "as a check on the other branches" in their carrying out of delegated authority. *See State ex. rel. Ohio Acad. of Trial Lawyers v. Sheward*, 86 Ohio St. 3d 451, 462-67 (1999). To rule otherwise, the Ohio Supreme Court has explained, would be to render "our constitution a blank paper" by making governmental actors "the sole judges of their constitutionality," with "no guarantee for a single right to citizens." *Id.* at 463 (quoting *Rutherford v. M'Faddon* (1807), in Pollack, Ohio Unreported Judicial Decisions Prior to 1823 at 71 (1952)). This concern is fully present here: if this Court were to elevate the procedural requirement of passage by the Commission over the Ohio Constitution's substantive requirements, those requirements would be a dead letter, with the Commission free to pass whatever unlawful plans it liked, secure in the knowledge that a federal court would enforce them regardless.

Thus, the Commission's 4-to-3 adoption of the unconstitutional Third and Fourth Plans were *ultra vires* acts, undertaken in excess of the limited political authority delegated by the people to the Commission under the Ohio Constitution. Such "*ultra vires* acts bear no legitimate force in a government under the law. A public act without legitimate force is indistinct under the law from an act that never was, or an act that has been voided." *Gentry v. Deuth*, 456 F.3d at 697. And so the Commission's adoption of unconstitutional plans was "a proceeding without the authority of, and one that does not affect, the state in its sovereign or governmental capacity. It is simply an

13

illegal act upon the part of . . . state official[s] in attempting, by the use of the name of the state," to violate state law. *Ex Parte Young*, 209 U.S. 123, 159 (1908).[3]

The Tenth Circuit confronted an analogous situation in *Large*, and it reached the same conclusion. There, a federal court had ruled that a county's at-large system for electing its five county commissioners violated § 2 of the Voting Rights Act because it prevented a Native American minority from electing any representative. 670 F.3d at 1135. The federal court had then ordered the county to adopt a remedial plan to cure the violation. *Id.* The county responded by adopting a plan under which one county commissioner would be elected to represent a majority-Native American district, while the remaining four county commissioners were elected at-large by the rest of the county. *Id.* at 1136. The problem with this remedial plan, *Large* explained, was "that this 'hybrid' election scheme is not authorized under Wyoming law." *Id.* Rather, Wyoming law required either that *all* county commissioners be elected at-large, or that each be elected from a single-member district. *Id.* Thus, while ordinarily, federal courts must defer to state remedial plans, the Tenth Circuit's affirmed the district court's refusal to adopt this one. *Id.* at 1137, 1148.

In so holding, the Tenth Circuit explained that its "deference must run first and foremost to the legislative decision-making of the sovereign State and, only through it, to its subordinate political subdivision." *Id.* at 1146. Because state law did not allow for the remedial plan adopted by the county, "it is *only* the dictate of this federal court that would give the County the authority to implement its plan." *Id.* at 1145, 1147. "After all, it is the State that imbues the political subdivision with the apportionment power, and the subdivision cannot stand on an independent

---

[3] *Ex Parte Young*, of course, involved a violation of the U.S. Constitution, but from the perspective of Ohio officials, the effect of violating the Ohio and U.S. Constitutions are the same—in each case, the official's act "comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character . . . ." *Id.* at 159.

and equal footing with respect to its creator." *Id.* at 1146. And when "a political subdivision of a State substantively contravenes the laws of that State—at least insofar as that contravention is not sanctioned by higher federal law—it no longer acts as an agent of that sovereign, and therefore is due no federal-court deference." *Id.* Were the court to defer to the county in violating state law, the court explained, it "would be granting deference to the wrong authority. We would, in essence, be using the authority of the federal courts to elevate a subordinate over its superior." *Id.* at 1147. And thus, the district court had properly "implemented a plan of its own design" to remedy the Section 2 violation, rather than adopting a plan proposed by the county but that needlessly violated other aspects of state law. *Id* at 1148.

The present case, of course, does not involve plans drafted by a local government. But just as a local government is subservient to the state and possessed with authority only to act in accordance with state laws, *id.* at 1146, so too Ohio government officials are subservient to the people of Ohio and possessed only with such authority as the Ohio Constitution grants them. *Cincinnati, Wilmington & Zanesfile R.R.*, 1 Ohio St. at 85. The Court's deference is to the redistricting choices of *Ohio*, not to those of Ohio officials who needlessly violated Ohio's paramount law. Much as in *Large*, to impose an *unlawful* plan on the grounds that it was adopted by the Commission, the proper actor, would be "using the authority of the federal courts to elevate a subordinate over its superior," 670 F.3d at 1147—here, elevating the Commission members over the sovereign people of Ohio, who delegated apportionment to the Commission *only* insofar as the Commission complies with the requirements of the Constitution. Simply put, the Commission's unconstitutional adopted plans are nullities to be ignored, not embodiments of state policy that require deference from this Court.

15

### III.    The Third and Fourth Plans adopted by the Commission violate the Ohio Constitution.

Both the Third and the Fourth Plans adopted by the Commission violate the Ohio Constitution: the Ohio Supreme Court has already held the Third Plan unconstitutional, and the Fourth Plan is nearly identical in relevant substance. And as explained in the next section, *infra* Part IV, no violation of the Ohio Constitution is necessary: it is entirely possible to draw General Assembly plans that fully comply with the substantive requirements of the Ohio Constitution and federal law. The Court therefore may not order the use of the Third or Fourth Plan, because to do so would fail to "accommodate the relief ordered to the apportionment provisions of state constitutions insofar as is possible," *Reynolds*, 377 U.S. at 585, and would instead improperly "contravene[] state laws that have not been remedially abrogated by the Supremacy Clause," *Large*, 670 F.3d at 1148.

#### A.    The Third Plan

The Ohio Supreme Court struck down the Commission's Third Plan on March 16, finding that it violated Section 6(A) and 6(B) of Article XI. *LWV III*, at ¶ 2.

Regarding Section 6(A), the Ohio Supreme Court held that "[s]ubstantial and compelling evidence show[ed] beyond a reasonable doubt that the main goal of the individuals who drafted the [Third Plan] was to favor the Republican Party and disfavor the Democratic Party." *Id.* at ¶ 5. "Staff members of Senate President Huffman and House Speaker Cupp" had drafted the Third Plan, rather than map drawers employed by the Commission. *Id.* at ¶ 25. The Ohio Supreme Court held that Republican Legislative Commissioners' "nearly exclusive control over" map drawing "was strong evidence of partisan intent." *Id.* at ¶ 26. The Court directed that the Commission should "retain an independent map drawer – who answers to all commission members, not only to the Republican legislative leaders – to draft a plan through a transparent process." *Id.* at ¶ 30. The

16

Ohio Supreme Court explained that the partisan asymmetry of the Third Plan also constituted evidence of partisan bias in violation of Section 6(A). The Third Plan contained "19 Democratic-leaning House districts in which the Democratic vote share [was] between 50 and 52 percent" and "seven Senate districts in which the Democratic vote share is in that range," but "no Republican-leaning House or Senate districts that ha[d] a Republican vote share that [was] less than 52.7 percent." *Id.* at ¶ 32. "The remarkably one-sided distribution of toss-up districts [was] evidence of an intentionally biased map." *Id.* at ¶ 33.

The Ohio Supreme Court also held that the Third Plan violated Section 6(B). The Court explained that "the sub-52-percent districts allocated to the Democratic Party under the [Third Plan] are 'competitive' districts" and so are excluded when assessing the plan's proportionality. *Id.* at ¶ 42. Under this calculus, 67.9 percent of the non-excluded districts in the Third Plan were allocated to Republicans and 32.1 percent to Democrats. *Id.* The Court concluded that the Third Plan therefore violated Section 6(B) because it did not "correspond closely" to the statewide preferences of Ohio's voters (54% Republican/46% Democratic). *Id.* Moreover, the Court had previously explained that, in considering "[t]he commission's choice to avoid a more proportional plan," the Court was "not unmindful" of the numbers "necessary to constitute a veto-proof supermajority" in the General Assembly. *LWV II* at ¶ 39 (citing Ohio Const., art. II, § 16, which provides that a vote of 60 percent of the members of each chamber is required to override the governor's veto).[4]

---

[4] Although the Third Plan nominally gives the Republican Party less than 60 percent of the seats in the Ohio House and Senate, its asymmetric distribution of a large number of competitive seats makes it highly likely that the Republican Party would, nonetheless, achieve supermajorities in both chambers of the General Assembly, as the Ohio Supreme Court's proportionality calculus demonstrates. *See LWV III* at ¶ 42.

Based on this analysis, the Ohio Supreme Court invalidated the Third Plan "in its entirety" and ordered the Commission to "draft and adopt an entirely new General Assembly—district plan." *LWV III* at ¶ 44. It ordered the Commission to draft a remedial map in a public, transparent process with the aid of an independent map drawer. *Id.*

### B.     The Fourth Plan

The Commission adopted the Fourth Plan on March 28. *See* ECF No. 118. Unfortunately, the Fourth Plan is nearly identical to the Third Plan, and it violates Ohio's Constitution for the same reasons the Third Plan does. Tr. 136:3-138:6; 145:15-22 (Chris Glassburn: "They're essentially the same map."); 148:15-18; 174:19-175:4 ("They're almost identical . . . . They're essentially the same plan."). As between the Third and the Fourth Plan, 99.7 percent of the state's population remains in the same district; only 31,244 Ohioans out of nearly 11.8 million were placed into a different district. March 30 Affidavit of Dr. Jonathan Rodden ¶ 4, Exhibit 1 hereto. Indeed, even the Fourth Plan's proponents did not argue it was actually constitutional; rather, they argued it needed to be adopted so that the Commission did not entirely blow off a deadline imposed by the Ohio Supreme Court. *See* Tr. of Mar. 28, 2022 Comm'n Meeting Part 4, at 4, 8, https://redistricting.ohio.gov/assets/organizations/redistricting-commission/events/commission-meeting-march-28-2022-281/transcript-part-4.docx.

The Fourth Plan does not remedy the partisan fairness or proportionality violations of the Third Plan. In terms of the Section 6(A) and 6(B) requirements, the Fourth Plan's changes impact just three districts across the entire General Assembly: two in the House and one in the Senate. ECF No. 144-2 (showing reduction in Democratic toss-up seats in the House from nineteen in the Third Plan to seventeen in the Fourth Plan, with no Republican toss-up seats in either plan); Mar. 30 Rodden Aff. at 13-14, tbl. 2 (showing reduction in Democratic toss-up seats in the Senate from

18

seven in the Third Plan[5] to six in the Fourth Plan, with no Republican toss-up seats in either plan). In all three districts, the Republican map drawers nudged the projected Democratic vote share to just above 52 percent. Mar. 30 Rodden Aff. ¶¶ 19-21. Setting aside the inherent superficiality of such a maneuver, the change did little to improve the Fourth Plan's proportionality. The Fourth Plan remains starkly asymmetrical and out of line with Ohioans' voting preferences. While the Fourth Plan (like the Third Plan) achieves nominal proportionality by placing 46 percent of seats above 50 percent Democratic vote share and 54 percent of seats below that figure, its allocation of competitive districts remains wildly disparate.

The Fourth Plan violates Section 6(A) because it preserves the Third Plan's partisan bias. The Fourth Plan does not contain a single Republican-leaning House or Senate seat that falls within the 50 percent to 52 percent vote share range. . *Id.* at 10-14. Every Republican-leaning seat in the plan is drawn in such a way that the Republicans in those districts are highly likely to win. *Id.* The treatment of Democratic-leaning seats is markedly different. The Fourth Plan creates only 28 House seats in which the Democratic vote share exceeds 52 percent. *Id.* Every other nominally "Democratic-leaning" district—17 in total, or about 38 percent of the total Democratic-leaning seats—falls within the 50 percent to 52 percent range. *Id.* Likewise, the Fourth Plan contains six Senate seats that fall within that range, accounting for 40 percent of the total Democratic-leaning seats. *Id.* This asymmetry mirrors than in the invalidated Third Plan, which included 19 House seats and seven Senate seats in which the Democratic vote share fell between 50 percent and 52 percent. *See LWV III* at ¶ 32.

---

[5] The Ohio Supreme Court refers to the Third Plan as the "Second Revised Plan," and Dr. Rodden's March 30 Affidavit follows that naming convention, and thus refers to the Fourth Plan as the "Third Revised Plan."

The Fourth Plan also violates Section 6(B). Its disparate allocation of competitive districts and lack of proportionality is clear when one excludes competitive districts from the seat count, as the Ohio Supreme Court did when considering prior plans. *See LWV II* at *¶* 62 ("competitive districts . . . must either be excluded from the proportionality assessment or be allocated to each party in close proportion to its statewide vote share."); *LWV III* at ¶ 42 ("competitive" districts "must be excluded when assessing [a] plan's overall proportionality"). Under that analysis, the Fourth Plan creates just 28 Democratic seats and 54 Republican seats in the House (corresponding to a split of 34.1 percent Democratic and 65.9 percent Republican) and 9 Democratic and 18 Republican seats in the Senate (corresponding to a split of 33.3 percent Democratic and 66.7 percent Republican). Mar. 30 Rodden Aff. at 10-11, 13-14. As the Ohio Supreme Court has already held, this gross disparity in the allocation of competitive districts is neither inevitable nor required by Ohio's political geography, as demonstrated by other plans that achieve both partisan proportionality and symmetry while complying with Article XI's other requirements. *LVW I* at ¶¶ 124, 126, 131.

## IV. The Court has at least two lawful plans before it: the Corrected Independent Map Drawers' Plan and the Rodden III Plan.

The Bennett Petitioners have presented evidence of two other General Assembly plans, each of which—in contrast to the unlawful Third and Fourth Plans—satisfies all substantive requirements of federal and Ohio law: a version of the plan jointly developed by the two independent map drawers retained by the full Commission, with a few corrections needed to finalize the plan (the "Corrected Independent Map Drawers' Plan") and a plan developed by Dr. Jonathan Rodden in litigation before the Ohio Supreme Court (the "Rodden III Plan"). If Ohio fails to adopt a plan in time, the Court should order the use of one of these two plans.

## A.    The Corrected Independent Map Drawers' Plan

On March 21, the Commission, in accordance with the directives of the Ohio Supreme Court in *LWV III*, retained two expert independent map drawers to produce a lawful General Assembly plan. Tr. 123:5-14. Those independent map drawers, one nominated by the Republicans on the Commission and one by the Democrats on the Commission, arrived in Ohio on March 23 and got to work late in the day after equipment was set up for them (it had not been in advance), and then worked over the next five plus days to produce General Assembly plans, which they then merged into a final plan on March 28. Tr. 126:12-14, 131:12-17; Minutes of Mar. 23, 2022 Meeting of the Ohio Redistricting Commission, https://www.redistricting.ohio.gov/assets/organizations/redistricting-commission/events/commission-meeting-march-23-2022-276/minutes-1425.pdf.  As described above, the Republican members of the Commission, over the strenuous objections of the other members, opted at the last minute to abandon the independent map drawers' work in favor of the Fourth Plan, but by then, the independent map drawers had largely completed the job, subject only to review for necessary finalization work, such as addressing minor technical issues. Tr. 133:10-20, 135:2-6.

In response to a question from the Court at the March 30 hearing, Dr. Rodden testified that at first glance, he thought the independent map drawers' plan looked compliant with the Ohio Constitution, but that he would want more time to examine the plan to verify whether it contained the kind of minor technical errors that he had encountered when making his own plan. Tr. 187:11-188:18. Since the March 30 hearing, Dr. Rodden has reviewed the independent map drawers' plan in detail and corrected certain technical errors in that plan. Apr. 5, 2022 Decl. of Jonathan Rodden ¶¶ 5-12, Exhibit 2 hereto. These corrections were minor: with one exception, they involved splits of townships and municipalities in unpopulated areas, in violation of Ohio's constitutional requirements, and even the exception required only a small reconfiguration of two districts. *Id.* at

21

¶¶ 7-8. None of Dr. Rodden's corrections altered the performance of the independent map drawers' plans in terms of compactness, number of split counties, expected partisan seat share, proportionality, or symmetry, and 99.9% of Ohio residents remain in the same district as in the independent map drawers' uncorrected plan. *Id.* at ¶¶ 11-12. In total, the corrections (to a plan with which he had no prior familiarity) took Dr. Rodden less than a day of work. *Id.* at ¶¶ 7-10.

The Corrected Independent Map Drawers' Plan complies with all substantive requirements of the Ohio Constitution. *Id.* at ¶ 10. It contains a ratio of Democratic-leaning to Republican-leaning seats that tracks Ohio's statewide partisan composition of 54 percent Republican and 46 percent Democratic. ECF No. 144-2. The House map allocates competitive seats with perfect symmetry, with three Democratic-leaning districts with a Democratic vote share between 50 percent and 52 percent and three Republican-leaning districts with a Republican vote share in that same range. *Id.* The Senate map is similarly symmetrical, with just two Democratic-leaning seats with a Democratic vote share in the 50 to 52 range and zero Republican-leaning seats with a Republican vote share in that range. Mar. 30 Rodden Aff. at 13-14, tbl. 2. The plan also proportionally allocates seats outside that range, with 42 Democratic and 51 Republican such seats in the House, corresponding to 45.2 percent Democratic and 54.8 percent Republican, and 13 Democratic and 18 Republican such seats in the Senate, corresponding to 41.9 percent Democratic and 58.1 percent Republican. *Id.* at 10-14, tbl. 1, 2; ECF No. 144-2. On each of these metrics, the Corrected Independent Map Drawers' Plan outperforms the Fourth Plan most recently adopted by the Commission. As to compactness, the Corrected Independent Map Drawers' Plan is more compact than the Fourth Plan on all three plan-wide measurements of compactness analyzed by Dr. Rodden (Reock, Polsby-Popper, and Area/Convex Hull) in both the House and Senate. ECF No. 144-2; Mar. 30 Rodden Aff. at 10-11, 13-14, tbl. 1, 2.

### B. The Rodden III Plan

The Bennett Petitioners also present the Court with the Rodden III Plan, another General Assembly district plan that complies with all of the Ohio Constitution's substantive requirements, including those regarding equal population, technical line-drawing, partisan fairness, and traditional redistricting criteria.[6] Notably, in February, the Pennsylvania Supreme Court ordered the implementation of a congressional map drawn by Dr. Rodden after a political branch impasse. *Carter*, 2022 WL 549106.

As Dr. Rodden's declaration and testimony at the March 30 hearing set forth in detail, the Rodden III Plan "complies with all of" the Ohio Constitution's substantive requirements. Tr. 167:1-2. It achieves greater proportionality than any plan adopted by the Commission to date, consistent with the state constitutional requirement that "[t]he statewide proportion of districts whose voters, based on statewide state and federal partisan general election results during the last ten years, favor each political party shall correspond closely to the statewide preferences of the voters of Ohio." Ohio Const. art. XI, § 6(B). In fact, the Rodden III Plan gets closer to proportionality than the Third Plan adopted by the Commission by *nearly 10%* in both chambers of the General Assembly, and closer to proportionality than the Fourth Plan by about 7% in the Senate and 8% in the House. Feb. 28 Aff. of Dr. Jonathan Rodden, ECF No. 107-3, ¶¶ 30, 34; Mar. 30 Rodden Decl. at ¶¶ 29-30; *see also LWV III* at ¶ 42 (explaining that "competitive" districts "must be excluded when assessing [a] plan's overall proportionality" (citing *LWV II* at ¶ 62) and holding that the Third Plan "does not 'correspond closely' to the statewide preferences of the voters of Ohio" and violates Article XI, Section 6(B)).

---

[6] Earlier iterations of Dr. Rodden's plan were submitted to the Commission for its potential consideration on February 15, and substantially similar versions were submitted to the Commission and the Ohio Supreme Court as early as October 2021. The Commission never voted to consider, adopt, or reject Dr. Rodden's plan. Tr. 169:7-14.

Likewise, the Rodden III Plan was not "drawn primarily to favor or disfavor a[ny] political party," Ohio Const. art. XI, § 6(A), unlike the Third Plan. *See LWV III* at ¶ 24 ("Substantial and compelling evidence shows beyond a reasonable doubt that the main goal of the individuals who drafted the second revised plan was to favor the Republican Party and disfavor the Democratic Party."). For example, whereas the Third Plan created 19 nominally Democratic-leaning House districts with Democratic vote shares between 50% and 52% (and no Republican-leaning House districts in the same category), the Rodden III Plan creates just two (and one such Republican-leaning House district). *See* ECF No. 144-2; *see also LWV III* at ¶ 33 ("The remarkably one-sided distribution of toss-up districts is evidence of an intentionally biased map, and it leads to partisan asymmetry."). Moreover, the Rodden III Plan surpasses the Commission's Third Plan and Fourth Plan on traditional redistricting criteria such as compactness and political subdivision splits, further demonstrating lack of partisan intent. ECF No. 144-2.

Finally, the Commission did not raise a single concern with the Rodden III Plan—under state law, federal law, or otherwise—in the entire time the Rodden III Plan was before it, and the Ohio Supreme Court has already cited Dr. Rodden's plans favorably in its opinions, *see LWV I* at ¶¶ 112-13, 126, 130; *LWV II* at ¶¶ 23 n.6, 32, 47.

## V. Elections under the 2011 Plan would violate voters' rights under both federal and Ohio law.

At the March 30 hearing, the Court raised the possibility of ordering the continued use of the 2011 General Assembly plan. The Court should not do so. There is a reason no party had proposed the use of the 2011 Plan: to conduct elections under that plan would violate both federal and Ohio law.

As to federal law, the 2011 Plan is severely malapportioned in violation of the Equal Protection Clause. Indeed, the unconstitutional malapportionment of Plaintiffs' districts under the

2011 Plan has long been the principal basis for Plaintiffs' claims in this case. *See* ECF No. 1 at ¶¶ 59-61, 65-70; ECF No. 86 at ¶¶ 71-73, 78-83. And there is no dispute about it. Ohio's population distribution has changed dramatically since the 2010 census, and under the 2020 census, the 2011 Plan is severely malapportioned, with a maximum population deviation of 34.21 percent in the Ohio House and 25.26 percent in the Ohio Senate. Apr. 5 Rodden Decl. ¶ 13. A state legislative plan is "presumptively impermissible" under the one-person, one-vote rule if the "maximum population deviation between the largest and smallest district" exceeds 10 percent. *Evenwel*, 578 U.S. at 60 (quoting *Brown v. Thomson*, 462 U.S. 835, 842-43 (1983)). And while greater deviations may be permissible if the state proves they are necessary to accommodate traditional redistricting principles like preserving political subdivisions, the Supreme Court has cautioned that a 16 percent maximum deviation in pursuit of those ends "may well approach tolerable limits." *Mahan*, 410 U.S. at 329. The Supreme Court has never upheld a plan with a population deviation as great as that in the 2011 Plan. *See Swann v. Adams*, 385 U.S. at 444 (invalidating plan with "variations of 30% among senate districts and 40% among house districts"). And the population deviation in the 2011 Plan is the result of changes in Ohio's population distribution over the last decade, not of any intentional effort to further traditional redistricting principles. Secretary LaRose has made no effort to justify the use of a plan with such large deviations; to the contrary, he has conceded that using the 2011 Plan would raise a "clear malapportionment issue." Tr. 87:1-3.

If it were proposed today, the 2011 Plan would also violate the Ohio Constitution. The 2011 Plan was adopted before the 2015 amendments to the Ohio Constitution that created today's Article XI, which introduced the Commission as a body, certain line-drawing criteria, and the partisan-fairness requirements of Article XI, Section 6. When the 2011 Plan was adopted, General Assembly redistricting was the responsibility of a five member "apportionment board," and the

Ohio Constitution did not "mandate political neutrality in the reapportionment of house and senate districts." *Wilson v. Kasich*, 134 Ohio St. 3d 221, 226 (2012). The 2011 Plan was thus adopted in an overtly and extraordinarily partisan process, having been drafted in secret by the Republican members of the Apportionment Board in a blatant effort to maximize Republicans' partisan interests. *See* Relators' Merits Br. at 5-8, *Bennett v. Ohio Redistricting Comm'n*, No. 2021-1198 (Ohio Oct. 29, 2022) (citing evidence); *see generally* Jim Slagle, Ohio Redistricting Transparency Report: The Elephant in the Room (Dec. 12, 2011), https://my.lwv.org/sites/default/files/leagues/wysiwyg/%5Bcurrent-user%3Aog-user-node%3A1%3Atitle%5D/the_elephant_in_the_room_-_transparency_report.pdf. The partisan excesses of the 2011 Plan were a large part of the impetus for the 2015 amendments, and in the official statement for the 2015 amendments, Ohio voters were told that it would "[e]nd the partisan process for drawing Ohio House and Senate districts" that had prevailed before then, including in 2011. *LWV I*, at ¶ 56.

The 2011 Plan is thus maximally unlawful: it is malapportioned in violation of the Equal Protection Clause and it does not comply with the partisan neutrality provisions of Article XI that were adopted four years later to prevent a similar plan from being adopted in the future. It was not even adopted by the Commission, as the Commission did not exist at the time. There is no basis for the Court to impose the 2011 Plan as a remedy in this case.

## CONCLUSION

For the foregoing reasons, the Court should wait as long as possible to allow Ohio to implement its own, lawful redistricting plan, but if no such plan is adopted, the Court should impose a lawful plan such as the Corrected Independent Map Drawers' Plan or the Rodden III Plan.

Respectfully submitted,

/s/ Donald J. McTigue_____
Donald J. McTigue* (OH 0022849)
*Counsel of Record*
Derek S. Clinger (OH 0092075)
MCTIGUE COLOMBO & CLINGER LLC
545 East Town Street
Columbus, OH 43215
T: (614) 263-7000
F: (614) 368-6961
dmctigue@electionlawgroup.com
dclinger@electionlawgroup.com

Abha Khanna**
Ben Stafford **
ELIAS LAW GROUP LLP
1700 Seventh Ave, Suite 2100
Seattle, WA 98101
T: (206) 656-0176
F: (206) 656-0180
akhanna@elias.law
bstafford@elias.law

David R. Fox**
Jyoti Jasrasaria**
Spencer W. Klein**
Harleen Gambhir***
Raisa Cramer***
ELIAS LAW GROUP LLP
10 G St NE, Suite 600
Washington, DC 20002
T: (202) 968-4490
F: (202) 968-4498
dfox@elias.law
jjasrasaria@elias.law
sklein@elias.law
hgambhir@elias.law
rcramer@elias.law

** Admitted pro hac vice
*** Motion for admission pro hac vice
pending

*Counsel for Bennett Petitioners*

27

**CERTIFICATE OF SERVICE**

This is to certify a copy of the foregoing was served upon all counsel of record by means

of the Court's electronic filing system on this 6th Day of April, 2022.


/s/ Donald J. McTigue_____
 Donald J. McTigue (OH 0022849)