# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

MICHAEL GONIDAKIS, et al.,
                    *Plaintiffs*,

    v.

FRANK LAROSE, in his official capacity,
                    *Defendant,*

and

SENATOR VERNON SYKES and HOUSE
MINORITY LEADER ALLISON RUSSO, in their
capacities as members of the Ohio
Redistricting Commission,
                    *Intervenors-*
                    *Defendants.*

Case No. 2:22-cv-773

Chief Judge Algenon L. Marbley

Circuit Judge Amul R. Thapar

Judge Benjamin J. Beaton

(Three-Judge District Court)

**Intervenors-Defendants Senator Vernon Sykes and House Minority
Leader Allison Russo's Supplemental Post-Hearing Brief**

## TABLE OF CONTENTS

Introduction ..................................................................................................................... 1

    I.    Federal courts setting electoral maps must harmonize federal law with
        state policy choices to the greatest extent possible ................................................. 2

    II.    The Court cannot require Ohioans to vote under the 2011 map or the
        Redistricting Commission's Third Plan ................................................................. 3

    III.    If this Court were to order the adoption of a map, it should select the
        independent Johnson/McDonald map ..................................................................... 8

        A.    Unlike the Fourth Plan, the Johnson/McDonald map complies
            with Article XI, Section 6's substantive standards ..................................... 9

        B.    The Johnson/McDonald map is the only map "drafted" by the
            Commission, as required by the state constitution and the Ohio
            Supreme Court .......................................................................................... 11

Conclusion ..................................................................................................................... 12

## INTRODUCTION

A federal court facing an impending state election without a valid map follows a well-travelled path. Initially, the court must allow the state officials responsible for map drawing the opportunity to fix the problem themselves. *See Growe v. Emison*, 507 U.S. 25, 35–36 (1993). This Court has appropriately followed—and continues to follow—that dictate. It has afforded Ohio ample time to devise a map that complies with both the federal and state constitutions. But if Ohio's effort fails, this Court takes on the "unwelcome obligation," but solemn responsibility, of setting an interim map to be used in the upcoming elections. *See Connor v. Finch*, 431 U.S. 407, 415 (1977).

In that event, the appropriate remedy is clear: This Court should order Secretary LaRose to adopt the map drawn by a bipartisan pair of independent mapmakers appointed by the Ohio Redistricting Commission. That map—which was drafted in public view to ensure a fair and transparent process—satisfies all of the substantive commands of the recent amendments to the Ohio Constitution as well as the Ohio Supreme Court's recent orders. This relief would prevent any threatened violation of the federal constitution while remaining faithful to Ohio law.

Just as clear, the alternative maps—the Third and Fourth Plans adopted by the Commission and the old Ohio map drawn in 2011—are not permissible remedies. In our system of federalism, redistricting is primarily the responsibility and duty of the states. The Supreme Court has thus repeatedly instructed that a federal-court-ordered map may stray from a state's policies only where necessary to cure a federal constitutional violation. Each of the three alternative maps, however, squarely violates the Ohio Constitution—without any benefit of curing a federal right. And the 2011 map is doubly flawed: Because the most recent census has shown that it is severely malapportioned, it would also inflict a *new* federal injury on Ohio voters. Ordering the adoption

1

of any of these maps would thus disregard the policy choices of the people of Ohio, reflected in their state constitution, and unnecessarily infringe their federal rights.[1]

## I. Federal courts setting electoral maps must harmonize federal law with state policy choices to the greatest extent possible.

The guiding principles for federal courts setting a redistricting map have been "well-known" for half a century and necessitate a two-step inquiry here. *Sixty-Seventh Minn. State Senate v. Beens*, 406 U.S. 187, 196 (1972) (per curiam).

*First*, the court-ordered plan must comply with federal law. This means, of course, that the map must be consistent with the federal constitution and federal statutory law. The Supreme Court has also instructed that any "court-ordered reapportionment plan of a state legislature must avoid use of multimember districts, and . . . must ordinarily achieve the goal of population equality with little more than de minimis variation" unless there are "persuasive justifications" for a different approach. *Finch*, 431 U.S. at 414. These federal requirements may be disregarded only out of "necessity"— that is, when no federally compliant alternative map can be implemented in time to hold the election. *Upham v. Seamon*, 456 U.S. 37, 44 (1982) (per curiam).

---

[1] If the state processes fail to generate a map that complies with both the Ohio and federal constitutions by April 20, 2022, Senator Sykes and Leader Russo do not dispute that the preliminary-injunction factors will weigh in favor of the plaintiffs. In that event, this Court will have to step in to move the primary date and order Secretary LaRose to implement an interim map to be used in this year's elections. To streamline briefing, and in light of the previous briefing on the preliminary-injunction factors, ECF No. 110, this brief addresses only what remedy would be appropriate—in particular, what map this Court should select—should this Court's intervention become necessary. *See, e.g.*, *NAACP-Greensboro Branch v. Guilford Cnty. Bd. of Elections*, 858 F. Supp. 2d 516, 529 (M.D.N.C. 2012) (addressing remedy separately from preliminary injunction factors); *Caster v. Merrill*, 2022 WL 264819, at *82 (N.D. Ala. Jan. 24, 2022) (same).

As for the state-legislative primary date, the evidence at this stage makes clear (and the parties appear to agree) that it should be rescheduled to August 2, 2022. *See, e.g.*, ECF No. 113 at 14; *see also Beens*, 406 U.S. at 201 n.11 (1972) (federal courts have authority to move state deadlines to prevent injury to federal rights).

*Second*, if these federal minimums are satisfied, the court must then select the plan that pursues the state's policies to the greatest extent possible. This rule respects the states' "primary jurisdiction over legislative apportionment." *White v. Weiser*, 412 U.S. 783, 795 (1973) (quotation marks omitted). In light of the states' primacy in this area, "adherence to state policy" is required so long as it "does not detract from the requirements of the Federal Constitution." *Id.* Put differently, a federal court setting a map may disregard state law only if it is necessary to cure a federal constitutional violation.

The relevant state policy comes from the state's constitution and duly enacted laws. *See id.* This means, first and foremost, that "courts should attempt to accommodate the relief ordered to the apportionment provisions of state constitutions insofar as is possible." *Reynolds v. Sims*, 377 U.S. 533, 584 (1964); *Shayer v. Kirkpatrick*, 541 F. Supp. 922, 932 (W.D. Mo.), *aff'd sub nom. Schatzle v. Kirkpatrick*, 456 U.S. 966 (1982) (examining state constitutional requirements after determining compliance with federal law). Courts must also follow valid state statutes, including any portions of a challenged law that do not conflict with federal requirements. *See North Carolina v. Covington*, 138 S. Ct. 2548, 2555 (2018) (per curiam). But federal courts are not bound to follow "laws" that violate the state constitution. *See, e.g.*, *Shayer*, 541 F. Supp. at 932 (refusing to treat the policy reflected in a proposed bill that was not enacted as the policy of the state because doing so "would be a massive intrusion into the [state] legislative process"). That's because these unconstitutional and invalid laws do *not* reflect the state's policies.

## II.     The Court cannot require Ohioans to vote under the 2011 map or the Redistricting Commission's Third Plan.

Because this Court must follow state policy in selecting which redistricting plan to implement, this Court can easily dispatch with the 2011 map and the Redistricting Commission's Third Plan.

***The 2011 map.*** No party has asked this Court to revive the now off-the-books 2011 map. Indeed, the plaintiffs who initiated this action specifically allege in Count I of their complaint that being forced to vote under the 2011 map would violate their federal constitutional rights. It would be anomalous to grant as "relief" to a plaintiff the very thing that the plaintiff claims would cause it injury. That is reason enough to reject the 2011 map.

The 2011 map also cannot satisfy either of the two requirements for a court-ordered map. *First*, it violates federal law because, as the plaintiffs have alleged, Ohio's population changes over the past decade have decimated the 2011 map's population equality. ECF No. 86 ¶ 71. An election under that map would, in the words of the Ohio Attorney General's office, yield "clear malapportionment," PI Tr. 87:2, and therefore violate the principle of one-person one-vote. That, in turn, would invite continued litigation and the possibility of a special election to cure the tainted election. *See, e.g.*, *Tucker v. Burford*, 603 F. Supp. 276, 279 (N.D. Miss. 1985) ("In this case, wherein officials were elected from admittedly malapportioned districts, and pre-election relief was sought, . . . this court has no difficulty in determining that the terms of the officials elected . . . should be shortened and a special election held to fill the remainder of these terms."); *cf. Personhuballah v. Alcorn*, 155 F. Supp. 3d 552, 562 (E.D. Va. 2016) (three-judge court) (rejecting map that may trigger strict scrutiny under federal law). Reflecting these risks, courts facing no map after a census regularly choose a new one rather than revert to the old one. *See Perry v. Perez,* 565 U.S. 388, 391–92 (2012) (per curiam); *Beens*, 406 U.S. at 195; *cf. Brown v. Jacobsen*, 2022 WL 683089, at *11 (D. Mont. Mar. 8, 2022) (three-judge court) (deference to state policy under the Supreme Court's case law does not equate to "chang[ing] existing state maps as little as possible").

*Second*, the 2011 map does not reflect Ohio policy. Indeed, that map—"among the worst gerrymanders in the country at that time," PI Tr. 221:14–15—prompted the adoption of the very

state constitutional amendment that precipitated this case. The 2011 map had been challenged as a partisan gerrymander, but the Ohio Supreme Court held that the Ohio Constitution did not prohibit drawing a map with partisan advantage in mind. *See Wilson v. Kasich*, 981 N.E.2d 814, 827 (Ohio 2012). The people of Ohio responded by taking the extraordinary step of amending their constitution to ensure they would not have to vote under similarly gerrymandered maps in the future. It would be an affront to that choice to force Ohioans to vote under that same map for another election cycle when there are other options available that more closely comply with federal and state law. *See League of Women Voters of Ohio v. Ohio Redistricting Comm'n*, 2022-Ohio-65, ¶¶ 3–5, 101 (January 12, 2022) ("*LWV I*").

Practical considerations do not support overlooking the 2011 map's fatal flaws. Simply put, the 2011 map no longer reflects the status quo. As Deputy Secretary of State and Director of Elections Amanda Grandjean testified, the status quo right now is that different county boards of elections have in place different maps—but all from 2022. PI Tr. 39:23–40:17. There is no evidence that any county boards have prepared for an election based on the 2011 map. It would therefore be just as administratively burdensome, if not more so, for Ohio's election officials to implement the 2011 map as it would be to implement any other map.

***The Third Plan.*** Though potentially compliant with federal law, the Third Plan does not reflect state policy. Just the opposite. The Ohio Supreme Court—the authoritative voice on Ohio law—expressly held that the Third Plan violates it. Specifically, that Court held that the Third Plan violated the Ohio Constitution's command to minimize partisan line drawing. *League of Women Voters of Ohio v. Ohio Redistricting Comm'n*, 2022-Ohio-789, ¶¶ 25–42 (March 16, 2022) (per curiam) ("*LWV III*"); *see also* PI Tr. 174:1–9. And the Court further held that the Third Plan was procedurally defective because it was not drafted by the Commission as a whole, as the Ohio

Constitution requires. *See id*. Other courts faced with a government-defendant's proposed solution that violates state law have not hesitated to devise their own remedies. *See, e.g.*, *Large v. Fremont Cnty.*, 670 F.3d 1133, 1146 (10th Cir. 2012); *Harper v. City of Chicago Heights*, 223 F.3d 593, 601 (7th Cir. 2000); *Montes v. City of Yakima*, 2015 WL 11120964, at *7 (E.D. Wash. Feb. 17, 2015). Here, moreover, the Commission has not even chosen to intervene and propose the map itself. Because the Third Plan is null under state law—and this Court has in front of it other plans that do not violate state law—this Court must reject it.

The Supreme Court's decision in *Beens* demonstrates why it would be wrong to treat the Third Plan as state policy deserving of deference. Following the 1970 census, the Minnesota legislature attempted to reapportion its state legislative districts, but the governor vetoed it. So the "endeavor failed to become law" under Minnesota's constitution. *Beens*, 406 U.S. at 189–90 & n.5. As a result, the prior law, the 1966 act, which established both the number of districts and their boundaries, remained in effect. A three-judge court promptly declared the 1966 act invalid because population shifts identified in the recent census meant the map outlined in the act violated federal law. It then drew its own map that "drastically" reduced the number of seats in the legislature to ease the task of pursuing population equality among districts while maintaining the boundaries of political subdivisions. *Id.* at 191, 200; *see also id.* at 202 (Stewart, J., dissenting).

Although the Supreme Court agreed that, "[u]nder these circumstances judicial relief was appropriate," it vacated the district court's remedy for departing from state policy. *Id.* at 195. The Court explained that the district court had erred in invalidating the portions of the 1966 act that established the number of seats in the legislature when it was only the district boundary lines that violated the federal constitution. *Id.* at 197. That meant that the 1966 act, and the number of seats it set, was still the state's policy—and the district court violated it by reducing the number of seats.

Importantly, in ascertaining current state policy governing the number of legislative seats, the Supreme Court focused on the 1996 act, not the legislative proposal that had recently failed. The number of seats had been a part of the dispute between the legislature and the governor—who called for a reduction in size—that ultimately led to the latter's veto. *Beens v. Erdahl*, 336 F. Supp. 715, 720 (D. Minn. 1972) (three-judge court). But the governor's view, because it was not passed into law consistent with the Minnesota Constitution, represented only "the executive's proffered current policy," just as the "the reapportionment plan he vetoed . . . represented only the legislatures proffered current policy." *Beens*, 406 U.S. at 197. It therefore could not justify the district court's decision to reduce the legislature's size, and the district court was required to follow the policy reflected in Minnesota's valid laws.

The failure of the Third Plan here mirrors the governor's proffered policy in *Beens*. There, the governor's vote, though necessary to enact a valid plan under state law, was not sufficient and so it reflected only his "current" proffered policy. Likewise, here, a majority of the Commission's vote, though necessary under Ohio law, is not sufficient; the plan for which they vote must also comply with the Ohio Constitution and the Ohio Supreme Court's orders. Because the Third Plan does not, it is void under state law and thus represents no more than the "proffered current policy" preferences of the members of the Commission who voted for it.

Finally, adopting the Third Plan would create perverse incentives. If this Court implements the Third Plan even though it has been found to violate the state constitution, the Redistricting Commission would have little reason to comply with the Ohio Constitution in the future. The Commission—and analogous bodies in other states—could comfortably disregard the state constitution knowing that, at the end of the day, a federal court would allow their plan to take

effect anyway. A rule of law that, in this way, undermines the fundamental restraint that the people of Ohio have put in place does not advance the policy of the state.

**III.    If this Court were to order the adoption of a map, it should select the independent Johnson/McDonald map.**

The available map that best reflects the State's policies and preferences here is the bipartisan map drawn by independent mapmakers, Dr. Douglas Johnson (appointed by the Republican Commissioners) and Dr. Michael McDonald (appointed by the Democratic Commissioners), that the Commission appointed at the direction of the Ohio Supreme Court. These experts, assisted by the Commission's staff, worked nonstop for nearly six days straight to create a map that satisfied the state constitution's requirements and the Ohio Supreme Court's orders. They worked transparently and in public, resolved any technical disagreements by consensus or with the assistance of mediators, and produced complete House and Senate maps by the court-ordered deadline of March 28. And this Johnson/McDonald map achieved nearly perfect partisan symmetry, proportionality, and compactness—the key factors required under Article XI of the Ohio Constitution.

Critically, the Johnson/McDonald map is, in every measure, also better than the only map adopted by the Commission not yet struck down by Ohio Supreme Court—the Fourth Plan. As the Ohio Supreme Court's deadline for a new map approached, Republican staffers drew up the Fourth Plan out of sight and without input from the full Commission. It is "almost identical" to the unconstitutional Third Plan. PI Tr. 174:22; *see, e.g.*, Susan Tebben, *Ohio Republicans abandon independent mapmakers to pass slightly modified GOP maps*, Ohio Capital Journal (March 29, 2022) https://perma.cc/JX2B-756W. Yet, with almost no debate or meaningful consideration, a partisan majority voted to adopt this patently unconstitutional plan. This sham process and partisan product is antithetical to what Ohio's Constitution, and the overwhelming majority of voters who

recently amended it, envisioned. Accordingly, if this Court orders the adoption of a state-legislative-district map, it should select the independent Johnson/McDonald map.

**A.** **Unlike the Fourth Plan, the Johnson/McDonald map complies with Article XI, Section 6's substantive standards.[2]**

Article XI, Section 6 of the Ohio Constitution requires that, to the extent possible while meeting the other requirements, the Commission adopt a redistricting plan that (1) has symmetrical partisan fairness, (2) is proportional, and (3) is compact. Ohio Const., art. XI, § 6. The undisputed record evidence here shows that the Johnson/McDonald map satisfies Section 6's criteria—almost perfectly.

**1.** To start, the independent map demonstrates complete partisan fairness. The Ohio Supreme Court has explained that parity in the number of toss-up districts is critical to satisfying Section 6(A)'s command that "[n]o general assembly district plan . . . be drawn primarily to favor or disfavor a political party." *LWV III*, 2022-Ohio-789 ¶ 33. The Johnson/McDonald map does just that: it includes three "Democratic-leaning" districts and three "Republican-leaning" districts (i.e., competitive districts in which the Democratic or Republican electoral performances over the past decade was between 50% and 52%). PI Tr. 179:8–10.

The independent map is also the "most proportional" map among all the options. PI Tr. 179:14–16. Section 6(b) requires that, once toss-up districts are removed, the proportion of Republican- and Democratic-leaning districts resemble the proportion of their vote shares in the last ten year's elections. *LWV III*, 2022-Ohio-789 ¶ 42. The independent map achieves nearly perfect proportionality: it contains 54.8% Republican seats and 45.2% Democratic seats—virtually

---

[2] The Rodden plan, submitted by the Bennett petitioners, also complies with Article XI's requirements. But Senator Sykes and Leader Russo focus on the Johnson/McDonald plan here, given that it was drafted by the Commission pursuant to the Ohio Supreme Court's orders.

identical to the actual 54%-46% statewide split in favor of Republicans. *See, e.g.*, ECF 144-2; PI Tr. 179:12–13.

Finally, the independent map is the most compact. *See* PI Tr. 138:14–22 (explaining what compactness means). In fact, it "scored better" in terms of compactness than any of the other maps that the Commission has considered. PI Tr. 139:1–4.

In short, it is difficult to imagine a redistricting plan that more closely conforms with Ohio's constitutional requirements than the independent Johnson/McDonald map.

**2.** By contrast, the Fourth Plan fails to come anywhere close to satisfying these requirements. Because the Fourth Plan is "essentially the same plan" as the constitutionally defective Third Plan, *see id.* at 174:22–175:4 ("99.7 percent of the voters are in the same district in the third and fourth plan"), it contains the exact same constitutional flaws.

Start with partisan symmetry. The Third Plan violated Section 6(A) because it included 19 Democratic-leaning toss-up districts and zero Republican ones. *LWV III*, 2022-Ohio-789 ¶¶ 32–33. Because all the Fourth Plan does is make "a couple of small moves in a couple of district lines," PI Tr. 175:10–12, it barely differs on this score: It includes 17 Democratic-leaning toss up districts and, again, zero Republican ones. *Id.* at 137:23–138:4 (Glassburn); *id.* at 175:7–12 (Rodden). That, too, is "remarkably one-sided" and constitutionally defective. *LWV III*, 2022-Ohio-789 ¶ 33. As the Ohio Supreme Court held, "when a plan labels every 'competitive' or 'toss-up' district as a Democratic-leaning one, that is evidence of intent to favor the Republican Party." *Id.* ¶ 34.

The Fourth Plan, like the Third Plan, also remains egregiously disproportional in violation of Section 6(B). When excluding competitive districts, Republican seats make up nearly 66% of the total districts—dramatically more than the actual statewide partisan split. PI Tr. 178:5–11. There's no disputing that that figure violates the Ohio Constitution. It is barely less than 67.9% of

the Third Plan and is in fact *more* than the First Plan's 64.4% share for Republicans, which the Ohio Supreme Court also held violated Article XI, Section 6(B). *LWV III*, 2022-Ohio-789 ¶ 42.

Odds are likely that the Ohio Supreme Court will strike down this mirror image of the Third Plan. But if it has not yet acted, nothing commends the adoption of a plan that is obviously unconstitutional—and fifty years of Supreme Court precedent instructing that federal courts setting interim maps must follow state policy prohibits it.

### B. The Johnson/McDonald map is the only map "drafted" by the Commission, as required by the state constitution and the Ohio Supreme Court.

The independent map does not only satisfy Article XI's substantive standards—it is the map that best reflects the constitutional *process* by which a redistricting map is supposed to be adopted. Article XI, Section 1(C) provides that: "The commission shall draft the proposed plan in the manner prescribed in this article." As the Ohio Supreme Court explained, this means that the Commission must do more than adopt a map that was drawn by partisan mapmakers. The state constitution requires that the Commission itself "draft" the map, and the Ohio Supreme Court specifically instructed the Commission to "retain an independent map drawer—who answers to all commission members, not only to the Republican legislative leaders—to draft a plan through a transparent process." *LWV III*, 2022-Ohio-789 ¶¶ 25, 30.

That is precisely what the Commission did—until the Republican Commissioners altered the process in the final hours. Adhering to the Ohio Supreme Court's order to make "bipartisan efforts to reach a constitutional plan," *id.* at ¶ 44, the Commission appointed independent mapmakers on a bipartisan basis and instructed them to produce a map from scratch that satisfied Article XI's standards. And, as required by the Ohio Supreme Court, the mapmakers conducted their "drafting . . . in public" so as to "promote transparency and increase public trust." *Id.* The Commission published a daily schedule of public meetings of the independent mapmakers, the

11

drafting was live streamed on the Commission's website, and the Commission provided the mapmakers with feedback in full view of the public.

In stark contrast, the manner by which the majority adopted the Fourth Plan reflects exactly the type of "one-sided" and "flawed process" that the Ohio Supreme Court already held unconstitutional. *See id*. at ¶¶ 30–31. Once again, Republican leaders "controlled the map-drawing process to the exclusion of the minority-party and other commission members." *Id.* at ¶ 26. Further, "it is clear that the commission again adopted a plan drawn by employees of the Republican caucuses." *Id.* at ¶ 28; *see* PI Tr. 157:1–4 (testifying that "map four w[as] exclusively drafted by the mapmaker for the legislative Republicans, that would be President Huffman's map drawer Ray DiRossi, and Speaker Cupp's map drawer Blake Springhetti"). And as before, "[t]he Democratic members of the commission had no opportunity to provide input in creating the [plan], and they had no meaningful opportunity to review and discuss it or to propose amendments once it was presented at the commission hearing." *LWV III*, 2022-Ohio-789 ¶ 27.

The Fourth Plan is, in short, "the product of just one political party." *Id.* at ¶ 31. That violates the Ohio Constitution, which requires "the commission to abide by its Article XI duty to draft a plan, not to simply adopt one drafted by legislative staff at the direction of members of one political party." *Id.* This Court should therefore adopt the only plan that did *not* result from such a constitutionally flawed process—the independent Johnson/McDonald map.

## CONCLUSION

For the reasons explained above, this Court should continue to allow Ohio an opportunity to develop a compliant map on its own. If it becomes necessary for this Court to intervene, it should order Secretary LaRose to adopt the Johnson/McDonald map.

Respectfully submitted,

/s/ Matthew W.H. Wessler
MATTHEW W.H. WESSLER (*pro hac vice*)
JONATHAN E. TAYLOR (*pro hac vice*)
ROBERT D. FRIEDMAN (*pro hac vice*)
GUPTA WESSLER PLLC
2001 K Street NW, Suite 850 North
Washington, DC 20006
Phone: (202) 888-1741 / Fax: (202) 888-7792
*jon@guptawessler.com*
*matt@guptawessler.com*

C. BENJAMIN COOPER
CHARLES H. COOPER, JR.
CHELSEA C. WEAVER
COOPER ELLIOTT
305 West Nationwide Boulevard
Columbus, OH 43215
Phone: (614) 481-6000 / Fax: (614) 481-6001
*benc@cooperelliott.com*
*chipc@cooperelliott.com*
*chelseaw@cooperelliott.com*

April 6, 2022                                    *Attorneys for Intervenors-Defendants*

13

**CERTIFICATE OF SERVICE**

I certify that on April 6, 2022, I filed this brief through this Court's CM/ECF system. All

participants in this case are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Matthew W.H. Wessler*
Matthew W.H. Wessler