# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**MICHAEL GONIDAKIS, et al.,**

        Plaintiffs,

            v.

**FRANK LAROSE,**

        Defendant, and

**LEAGUE OF WOMEN VOTERS OF OHIO and A. PHILIP RANDOLPH INSTITUTE OF OHIO,**

        Intervenor-Defendants.

Circuit Judge Amul R. Thapar
Chief Judge Algenon L. Marbley
Judge Benjamin J. Beaton

Case No. 2:22-cv-773

---

## INTERVENOR-DEFENDANTS' SUBMISSION REGARDING THE ROLE OF THE FEDERAL COURT CONCERNING THE OHIO GENERAL ASSEMBLY REDISTRICTING PLAN

**Table of Contents**

I.     INTRODUCTION AND LOCAL RULE 7.2 SUMMARY. ................................................ 1

II.    IF THE GENERAL ASSEMBLY DOES NOT ACT BY APRIL 20, 2022 THIS COURT SHOULD MOVE THE PRIMARY DATE TO AUGUST 2, 2022.................... 3

III.   PLAINTIFFS PRELIMINARY INJUNCTION MOTION SHOULD BE DENIED.................................................................................................................... 5

    A.    Plaintiffs Are Not Likely To Succeed on the Merits. .............................................. 5

        1.    The Third Plan cannot be enacted because it was invalidated by the Supreme Court of Ohio. .............................................................. 5

        2.    There is no basis for preempting the ruling of the Supreme Court of Ohio. ................................................................................... 7

        3.    The Third Plan was invalidated for substantial reasons: it fails to comply with Article XI Section 6(A) and 6(B) of the Ohio Constitution.............................................................................. 8

            a)    The Third Plan Violated Section 6(B). ......................................... 9

            b)    The Third Plan Violated Section 6(A). ......................................... 10

        4.    The Fourth Plan is No Better. ................................................................ 11

            a)    The Fourth Plan Is Substantively Indistinguishable from the Invalidated Third Plan................................................................ 11

            b)    The Fourth Plan Violates Sections 6(A) and 6(B). ..................... 12

    B.    Plaintiffs Will Not Suffer Irreparable Harm if the Third or Fourth Plan Is Not Imposed................................................................................................ 13

    C.    The Balance of Hardships Does Not Favor the Plaintiffs..................................... 13

    D.    The Public Interest Does Not Favor the Plaintiffs. ............................................... 14

IV.   THERE ARE CONSTITUTIONALLY COMPLIANT ALTERNATIVES THAT CAN BE IMPLEMENTED EXPEDITIOUSLY. .............................................................. 15

    A.    The Independent Plan Is Available for  Prompt Implementation. ........................ 15

        1.    The Independent Plan Was Substantively Completed the Evening of March 28, Before the Court's Midnight Deadline................................. 15

2.      Expert Analysis Confirms: the Independent Plan is Substantively Compliant with the Ohio Constitution. ...................................................... 16

B.      Alternatively, the Court Can Direct the Implementation of the Rodden Plan. ........................................................................................................... 18

V.      THIS COURT SHOULD NOT DIRECT THAT THE 2022 ELECTIONS TAKE PLACE PURSUANT TO THE 2011 PLAN. .................................................. 19

A.      Imposition of the 2011 Plan Would Violate Federal and State Law. .................. 19

1.      Imposition of the 2011 Plan Violates Federal Law. ............................... 19

2.      Imposition of the 2011 Plan Violates State Law. .................................... 20

B.      Imposition of the 2011 Plan is Wholly Unnecessary. ........................................ 21

VI.      THE PROPOSED PROCESS MOVING FORWARD. .................................... 21

A.      The State Process Should Be Permitted to Work to an Orderly Conclusion with an April 20 Deadline So That a Valid Plan Can Be Adopted for an August 2 Primary. ................................................................................................ 21

B.      *Growe* Does Not Require This Court to Endorse a Deadline for the Completion of the State Process that Results in the Imposition of the Third Plan. ........................................................................................................... 22

C.      As a Fail-Safe in the Event That the Ohio Process Does Not Timely Resolve,  This Court Should Promptly Appoint Special Masters to Finalize the Independent Plan. ........................................................................................ 23

VII.      CONCLUSION. ............................................................................................ 24

## I.    INTRODUCTION AND LOCAL RULE 7.2 SUMMARY.

It is an essential component of our federal system that a federal court "should not pre-empt the legislative task nor intrude upon state policy any more than necessary." *White v. Weiser*, 412 U.S. 783, 795 (1973) (internal quotations omitted).  In service of that interest, *Growe v. Emison*, 507 U.S. 25 (1993) instructs federal courts to refrain from interfering in state redistricting processes as long as possible, to permit the state to devise a lawful reapportionment plan.  This Court has observed:  "What we're trying to do is the least amount of damage to Ohio law. We're going to do some damage if we get involved; there's just no question. So we're trying to do the least."  Tr. of Hr'g on P.I. Mot., ECF 150 at PageID # 4343:1–3.

The imposition of an invalidated Third (or "Fourth") Plan hardly qualifies as a measured intervention that respects the state process.[1]  On the contrary, to do so would be to violate federal and state law.  Nor should this Court delay until it has no other option than to order the Third Plan, which would mean imposing a map that violates the Ohio Constitution, at enormous cost to state autonomy.  By the same token, it is also clear that the imposition of the unquestionably now malapportioned 2011 Plan is not a necessary or desirable solution.[2]  Such drastic measures are hardly in order given that a substantively compliant plan is available: the map drawn by the Independent Map Drawers (the "Independent Plan").[3]  With a few hours' work and the correction of a few technical details, it is ready for implementation.

As to what this Court should do, and when[4]:

---

[1] *See* Section III.A, *infra* (pp. 5-12); *see also Growe v. Emison*, 507 U.S. 25 (1993); *Bush v. Gore*, 531 U.S. 98 (2000); *White v. Weiser*, 412 U.S. 783, 795 (1973).
[2] *See* Section V, *infra* (pp. 18-21); *see also Evenwel v. Abbott*, 578 U.S. 54 (2016).
[3] *See* Section IV (pp. 14-18), *infra*.
[4] *See* Section VI (pp. 21-23), *infra*.

1

- At present, no primary date is in effect for the state legislative elections. To interfere as little as possible in the state process, however, this Court should permit the General Assembly with a further opportunity to set the primary date. Only if the General Assembly fails to act by April 20, 2022 should this Court direct a date for the primary for the elections for the state legislature. In that event, this Court should set the primary for the latest date that the Secretary of State has stated is feasible, *i.e.,* August 2, 2022.

- This Court should permit the state process to result in a district plan for the General Assembly elections. To make sure that a timely plan is enacted, the Court should order the adoption of a plan for that election on **April 20, 2022**. The Secretary has testified that to set a later date would necessitate the enactment of the invalid Third Plan, which would create greater disruption to state law and processes, contrary to Supreme Court precedent, including the reasoning of *Growe*.

- In advance of April 20, the Court should appoint a special master to correct the remaining few technical details of the already substantively compliant Independent Plan so that it is available for implementation by April 20. To meet this deadline, the Special Master should be directed to start work on April 18.

The above actions by this court are all that need to done to resolve this dispute. Thus, there is no basis for Plaintiffs' motion for preliminary injunction seeking unnecessarily precipitous - and much more drastic - relief. It should be denied.[5]

---

[5] This memorandum sets forth Intervenors' additional reasons why the preliminary injunction should be denied. It further addresses specific questions raised by the Court. We note that some

## II. IF THE GENERAL ASSEMBLY DOES NOT ACT BY APRIL 20, 2022 THIS COURT SHOULD MOVE THE PRIMARY DATE TO AUGUST 2, 2022.

To satisfy its obligations under *Growe*, if the General Assembly does not set a new primary date, this court should schedule the primary for August 2. It has the authority to do so.

*An August 2, 2022 Primary will permit voting to take place under a lawful plan.* The Secretary of State's filing on March 28, confirmed by the testimony of Amanda Grandjean at the March 30 preliminary injunction hearing, established two key points: (1) that it is too late for primary elections for Ohio General Assembly offices to be held on May 3, 2022 under *any* plan;[6] and (2) that the primary election for these offices may be delayed to as late as August 2, 2022 without interfering with the ability to hold a general election "in regular order." Response to Questions Contained in Order Issued March 25, 2022, ECF No. 113 at PageID # 2911–2912, 2919. Moreover, the Secretary has represented that the latest date for the enactment of a district plan for an August 2, 2022 election is 104 days before the primary date, *i.e.,* April 20, 2022. Tr. of Hr'g on P.I. Mot., ECF 150 at PageID # 4317:3–4318:25, 4319:22–25.

These facts establish three critical parameters regarding the election schedule. First, at present there is no operative primary date for the General Assembly elections. Second, the primary date, once established, will necessarily affect the "drop dead" date to have a district plan in place, and thus needs to be set as a precondition for the adoption of a district plan. Third, assuming the latest possible primary date is August 2, then the latest possible date for directing a plan for that primary is necessarily April 20, 2022.

---

of the responses to these questions underscore that the Plaintiffs will not suffer any irreparable injury should their motion be denied, given the scheduling options before the Court.

[6] Indeed, voting has begun for the May 3, 2022 primary and the ballots for that primarily conspicuously ***do not*** include the General Assembly elections. Tyler Buchanan, Early Voting Begins in Ohio for 2020 Primary Election, Axios Columbus (Apr. 5, 2022), https://tinyurl.com/562jf8e6.

*The General Assembly should first be afforded a chance to set the primary date.* Under *Growe,* this Court should intervene only if there is no prospect that the state process will timely resolve the redistricting dispute. *Growe*, 507 U.S. at 34. If the general assembly does not set a date in time, then this Court's stepping in to set a date would be a necessary, and substantially less intrusive, option than other forms of relief.

In the ordinary course, setting the primary date is the role and prerogative of the Ohio General Assembly. This Court therefore should not take on that task until it is clear that the General Assembly will not do so in time to conduct an orderly election. As set forth above, the latest possible primary date has been represented by Ohio's Chief Elections official, Secretary LaRose, to be August 2, 2022. And, per Secretary LaRose, the last date for the enactment of a plan to govern a primary on that date is April 20, 2022. Accordingly, the General Assembly should be given until April 20, 2022 to set the primary date for the General Assembly elections.

*As a last resort, this court has the authority to move the primary date.* Should the General Assembly fail to act, this Court has the authority to take this step. *See, e.g., Sixty-Seventh Minn. State Senate v. Beens,* 406 U.S. 187, 201 n.11 (1972) ("If time presses too seriously [to implement a remedial reapportionment plan], the District Court has the power appropriately to extend the [election deadline] time limitations imposed by state law."); *Quilter v. Voinovich*, 794 F. Supp. 756, 757 (N.D. Ohio 1992), rev'd on other grounds, 507 U.S. 146 (1993) (finding state legislative districts unconstitutional, vacating the primary date, and ordering a new one); *see also Larios v. Cox,* 305 F. Supp. 2d 1335, 1342 (N.D. Ga. 2004) ("We also observe that the court has broad equitable power to delay certain aspects of the electoral process if necessary").

To reiterate: this step should not be taken lightly. The General Assembly should be afforded the opportunity to set a new primary date consistent with the representations of the Secretary of State – both as regards the primary date and the deadline for the enactment of a district plan for that election (*i.e.*, April 20, 2022). This Court should act to set a primary date only if the General Assembly fails to do so.

## III.   PLAINTIFFS PRELIMINARY INJUNCTION MOTION SHOULD BE DENIED.

In assessing whether to grant a preliminary injunction, courts evaluate: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction." *Ne. Ohio Coal. for the Homeless v. Husted,* 696 F.3d 580, 590–91 (6th Cir. 2012).

### A.   Plaintiffs Are Not Likely To Succeed on the Merits.

In their motion, Plaintiffs seek the imposition of the Fourth Plan and, as an alternative, the Third Plan. Pls.' Post-Hr'g Br. in Support of Second Mot. For P.I., ECF 160 at PageID # 4522–24. Plaintiffs' requested relief improperly asks this Court to impose a plan that the Ohio Supreme Court has already ruled violates Article XI, Sections 6(A) and 6(B) of the Ohio Constitution or that is materially indistinguishable from that Plan. Such drastic action is unnecessary given the availability of the map drawn by the independent map drawers under the direction of the Ohio Redistricting Commission..

#### 1.   The Third Plan cannot be enacted because it was invalidated by the Supreme Court of Ohio.

To the extent that this Court imposes any particular redistricting plan, it must be a plan that complies with Ohio state law. *See, e.g.*, *Bush v. Gore*, 531 U.S. 98, 111 (2000) (per curiam)

(rejecting a proposed remedy on the grounds that it would require remanding to the Florida Supreme Court to issue an order in violation of the Florida Election Code); *White*, 412 U.S. at 795 (in crafting an apportionment remedy, federal courts should not "intrude upon state policy any more than necessary"); *Upham v. Seamon*, 456 U.S. 37, 42 (1982) (similar). In so doing, this Court must respect the rights safeguarded by the Ohio Constitution, absent an *unavoidable* conflict. *See, e.g.*, *Guar. Tr. Co. of N.Y. v. York*, 326 U.S. 99, 105 (1945) ("Congress never gave, nor did the federal courts ever claim, the power to deny [sic] substantive rights created by State law . . . .").

The right not to vote under the invalidated Third Plan is one such right. The Supreme Court of Ohio has already declared the Third Plan invalid, "in its entirety," under the Ohio Constitution. *League of Women Voters of Ohio v. Ohio Redistricting Comm'n*, 2022-Ohio-789, ¶ 44 (Ohio Mar. 16, 2022) ("*LWVO III*"). There is no dispute that the Supreme Court of Ohio is "the ultimate arbiter of Ohio law." *Ohio ex rel. Skaggs v. Brunner*, 549 F.3d 468, 472 (6th Cir. 2008); *see, e.g.*, *Hortonville Dist. v. Hortonville Ed. Assn*, 426 U.S. 482, 488 (1976) ("We are, of course, bound to accept the interpretation of [state] law by the highest court of [that] State."). Further, state Courts are given particular deference when interpreting law governing state elections. *See Democratic Nat'l Comm. v. Wisconsin State Legislature*, 141 S. Ct. 28, 208 L. Ed. 2d 247 (2020) (noting the difference in "the authority of state courts to apply their own constitutions to election regulations" and cases involving federal elections) (Roberts, CJ, concurring); *see also Democratic Nat'l Comm.*, 141 S. Ct. at 34 n.1 (noting the particular deference given to state court interpretation of state constitutions for state elections) (Kavanaugh, J, concurring).

The role of the Supreme Court of Ohio is specifically defined by the Ohio Constitution in regards to the validity of the district plan for the General Assembly. After the Ohio state legislature proposed a ballot initiative to amend its Constitution, the voters of Ohio—the same individuals whose right to vote Plaintiffs claim to be defending—overwhelmingly voted to amend Article XI of the Ohio Constitution to its current form. *See League of Women Voters of Ohio v. Ohio Redistricting Comm'n*, *et al.,* 2022-Ohio-65, ¶ 101 (Ohio Jan. 12, 2022) ("*LWVO I*"). The state legislature and voters carefully considered the process by which redistricting should occur in Ohio. Most important here, the voters chose to vest the Supreme Court of Ohio with the authority to invalidate a redistricting plan, and they required the Commission to comply with any state court order invalidating such a plan. *See* Ohio Const. art. XI, § 9(A)–(B)

Put simply, this Court should not overturn the will of the state legislature and Ohio voters, as clearly expressed in the state Constitution and interpreted by the Supreme Court of Ohio. Not surprisingly, Ohio's Attorney General has acknowledged as much, *see* Feb. 22, 2022 Letter from Attorney General Yost to Ohio General Assembly, ECF No. 91-4 at PageID # 1505 ("The federal court may not order the use of a map that was rejected by the Ohio Supreme Court, where the underlying provision of the state constitution has not been found to violate the federal constitution.").

### 2. There is no basis for preempting the ruling of the Supreme Court of Ohio.

Plaintiffs' briefing relies on case law that unremarkably states that federal law controls where there is an *unavoidable conflict* between state and federal law. *See* PI Mot., ECF No. 96 at PageID # 1593 (citing *Reynolds v. Sims*, 377 U.S. 533, 584 (1964). But, on the very page of the *Reynolds* opinion to which Plaintiffs have cited, the Supreme Court also states unambiguously that "courts should attempt to accommodate the relief ordered to the

apportionment provisions of state constitutions insofar as is possible." *Reynolds*, 377 U.S. at

584. Thus, so long as there exists the possibility of a map that complies with both the Ohio

Constitution and federal law, it is vital that the Court avoid trampling on state constitutional

requirements. *See Upham*, 456 U.S. at 42 (per curiam) (A federal court may not impose a

"court-ordered plan that reject[s] state policy choices more than [is] necessary to meet the

specific constitutional violations involved" because a "district court's modifications of a state

plan are limited to those necessary to cure any constitutional or statutory defect.").

  *Reynolds* and *Upham* are just particular applications of general preemption principles,

under which federal law displaces state redistricting laws only if those laws "are an *unavoidable*

*obstacle* to the vindication of the federal right." *Large v. Fremont Cnty., Wyo.,* 670 F.3d 1133,

1145 (10th Cir. 2012) (emphasis in original). Federal courts may not "gratuitously disregard[]

state laws—laws that need *not* be disturbed to cure the [federal law] violation." *Id.* (emphasis in

original). "In that situation, the conflict with state law is not a necessary consequence of the

remedial operation of federal law but, rather, it reflects a mere policy disagreement" between the

state law and the reviewing court. *Id.* at 1146.

> **3.**  **The Third Plan was invalidated for substantial reasons: it fails to comply with Article XI Section 6(A) and 6(B) of the Ohio Constitution.**

  The Supreme Court of Ohio invalidated the Third Plan[7] for good reason: it was a partisan

gerrymander that violated Article XI, Sections 6(A) and 6(B) of the Ohio Constitution. Respect

for that Constitution should compel this Court to decline to impose this invalidated Third Plan.

---

[7] *See* Ex. 1, Third Plan; Ex. 2, Third Plan Native Files.

        a)       The Third Plan Violated Section 6(B).

Section 6(B) requires the commission to attempt to draw a plan in which the proportion of General Assembly seats that "favor each political party . . . correspond[s] closely to the statewide preferences of the voters of Ohio."  Ohio Const. art. XI, § 6(B).  Over the past decade of statewide elections, Ohioans have cast 54% of their votes for Republicans and 46% of their votes for Democrats.  *LWVO I*, ¶ 108.  In comparing the 54-to-46 preference of Ohio's voters to General Assembly districts, the Ohio Supreme Court has determined that toss-up districts with less than 52% vote share for either party do not "'favor' a political party within the meaning of Section 6(B)," *LWVO III*, ¶ 40, and therefore "must either be excluded . . . or be allocated to each party in close proportion to its statewide vote share."  *Id.* ¶ 38 (quoting *League of Women Voters of Ohio v. Ohio Redistricting Comm'n, et al.,* 2022-Ohio-342, ¶ 62 (Ohio Feb. 7, 2022) ("*LWVO II*")).

The Third Plan, like the Second Plan that the Supreme Court of Ohio had recently invalidated, was stacked with an extreme number of districts that were labeled Democratic-leaning but were, in reality, toss-ups.  In the Ohio House, 19 of 45 ostensibly Democratic seats actually had Democratic vote share between 50 and 52 percent; in the Senate, 7 of 15 ostensibly Democratic seats were in that range.  *LWVO III*, ¶ 32.  But there was not a *single* Republican seat in this 50-52% toss-up range.  *Id.*

By creating 26 ostensibly Democratic toss-up districts in the House and Senate and no comparable Republican districts, the Third Plan created a plainly disproportionate map.  As a result, the Court ruled, those seats should properly be excluded from the comparison, thus "giv[ing] Republicans a 67.9 percent share of the non-excluded districts (72 out of 106) and Democrats 32.1 percent (34 out of 106)."  *Id.* ¶ 42.  This allocation of 67.9% of the seats in the General Assembly was materially more than the 54% of the statewide votes earned by the

Republican Party over the past decade. *Id*. The Supreme Court of Ohio accordingly determined that this distribution "d[id] not 'correspond closely' to the statewide preferences of Ohio's voters and violate[d] Article XI, Section 6(B) of the Ohio Constitution." *Id*.

> b) The Third Plan Violated Section 6(A).

Article XI, Section 6(A) requires that legislative plans not be "drawn primarily to favor or disfavor a political party." Ohio Const. art. XI, § 6(A). To determine whether a legislative plan has been "drawn primarily to favor or disfavor a political party," the Supreme Court of Ohio has consistently looked both to the process that produced the plan and to the plan itself. This evidence—process and substance—proved beyond a reasonable doubt that majority-party commissioners drew the Third Plan with the "overriding intent to maintain as much of an advantage as possible for members of their political party." *LWVO III*, ¶ 32.

*On process,* each of the Supreme Court of Ohio's decisions have faulted the Commission for disregarding the requirement in Article XI of the Ohio Constitution that "*[t]he commission,*" rather than a particular party, "*shall draft*" redistricting plans. *Id*. ¶ 25 (citing Ohio Const. art. XI, § 1(C)); *see also LWVO I*, ¶¶ 118–120; *LWVO II*, ¶ 34.

The Third Plan was no exception; it was drafted and adopted through an entirely partisan process that "did not allow the minority-party commission members to provide input . . . much less let them participate in its creation." *LWVO III*, ¶ 30. Indeed, majority-party legislative staffers drafted the Third Plan entirely in secret. *Id*. ¶¶ 3–13. This plan was not unveiled to minority-party commissioners until just hours before they would have to vote on it. *Id*. ¶¶ 13–16, 29. When the minority-party commissioners asked to provide feedback, their requests were rebuffed. *Id*. The Supreme Court of Ohio concluded that this "one-sided process [wa]s evidence of an intent to draw a plan that favors the Republican Party at the expense of the Democratic Party." *Id*. ¶ 30.

*On substance*, the Supreme Court of Ohio determined that the "remarkably one-sided distribution of toss-up districts is evidence of an intentionally biased map." *Id.* ¶ 33. The result of this skewed distribution was that an election with a uniform two-point swing for Republicans would give that party commanding supermajorities in both houses, whereas a uniform two-point swing in favor of the Democrats would give that party absolutely nothing. *Id.* ¶ 42. Because this "evidence show[ed] — overwhelmingly — that the individuals who drafted the second revised plan primarily intended to favor the Republican Party," that court held that the Third Plan violated Article XI, Section 6(A) of the Ohio Constitution. *Id.* ¶ 34.

### 4. The Fourth Plan is No Better.

On March 28, 2022, the Commission passed the Fourth Plan. *See* Ex. 3, Fourth Plan; Ex. 4, Fourth Plan Native Files. The Fourth Plan is equally invalid under the Ohio Constitution: it is nearly identical to the Third Plan already invalidated by the Supreme Court of Ohio, with only trivial changes.

### a) The Fourth Plan Is Substantively Indistinguishable from the Invalidated Third Plan.

'Fourth Plan' is practically a misnomer. The Fourth Plan that the Commission adopted on March 28, by their own sponsor's admission, consists of the invalidated Third Plan with "only minor changes." Ex. 5, Tr. of Mar. 28, 2022 Ohio Redistricting Comm'n Hrg., at 117:14. These "minor changes" impact ***less than one third of one percent of Ohio's voters***, and do not remedy the constitutional defects that the Supreme Court of Ohio identified when invalidating the Third Plan. Ex. 6, Affidavit of Dr. Christopher Warshaw (Mar. 29, 2022) at 7 (hereinafter "Warshaw Aff.").

b) The Fourth Plan Violates Sections 6(A) and 6(B).

*Violation of Section 6(A): Process*. This Fourth Plan was the result of a partisan process that violated Section 6(A) in order to favor the Republican Party. In particular:

- On the final day of the map drawing process, as the independent map-drawers neared completion of their maps, a partisan majority of the commission suddenly and without prior notice moved to have majority-party staffers make minor adjustments to the invalidated Third Plan. Ex 5, Tr. of Mar. 28, 2022 Ohio Redistricting Comm'n Hrg., at 56:8–57:2; *see also* Mot. to Dismiss, ECF 132 at PageID # 3092–3094.

- The Fourth Plan was then introduced and adopted within an hour, without any opportunity for review or analysis. Ex 5, Tr. of Mar. 28, 2022 Ohio Redistricting Comm'n Hrg., at 79:8–81:3, 109:10–111:1.

- Minority-party commissioners had no opportunity to participate in its creation, and all of their requests to review the plan or provide input were rebuffed. *Id.* at 105:18–22, 106:21–107:13.

*Violation of Section 6(A): Substance.* The Fourth Plan sustains the Third Plan's asymmetric allocation of toss-up districts. This Fourth Plan creates 17 House districts with 50-52% Democratic vote share and 6 Senate districts with 50-52% Democratic vote share. Ex. 6, Warshaw Aff. at 2–3. Again, there is not a *single* Republican district in this range. *Id.* at 5–6. This asymmetry in close districts demonstrates the majority-party commissioners' continued intent to favor their political party at the expense of Ohio's voters and Constitution.

*Violation of 6(B)*: The extremely disproportionate allocation of toss-up districts in the Fourth Plan also continues to violate Article XI, Section 6(B) of the Ohio Constitution. The Supreme Court of Ohio has invalidated plans that "d[id] not 'correspond closely' to the statewide

preferences of Ohio's voters and violate[d] Article XI, Section 6(B) of the Ohio Constitution"

when 64.4% of their districts and 67.9% of their districts favored Republicans. *LWVO III*, ¶ 42.

When the toss-up districts in the Fourth Plan are excluded, as they must be, that plan gives the

Republican Party a full 66% of seats in both the Ohio House and Senate. Ex. 6, Warshaw Aff. at

3–6.

> **B.**     **Plaintiffs Will Not Suffer Irreparable Harm if the Third or Fourth Plan Is Not Imposed.**

An "indispensable" requirement to a motion for a preliminary injunction is the threat of

"imminent and irreparable injury." *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir.

2019). That injury "'must be both certain and immediate,' not 'speculative or theoretical.'" *Id.*

The harm that plaintiffs claim to contend with is the possibility that they will be forced to vote

under a districting plan more than a decade old or have their right to vote revoked completely.

Pls.' Mot. For a T.R.O. to Maintain the Third Plan, ECF No. 84 at PageID # 1160–1164. But

such fears remain purely speculative at this point.

Plaintiffs here will not suffer irreparable injury if the Third or Fourth Plan is not ordered

by this Court. Alternative remedies plainly exist, including the enactment of the Independent Plan

(as set forth below). Thus, this factor weighs against granting a preliminary injunction.

> **C.**     **The Balance of Hardships Does Not Favor the Plaintiffs.**

"In exercising its discretion with respect to a motion for a preliminary injunction, a

district court must give consideration to . . . whether issuance of the injunction would cause

substantial harm to others." *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001). Compelling

Secretary LaRose to proceed with elections pursuant to the unconstitutional Third or Fourth

Plans will cause substantial harm to Ohio voters.

Ohio affirmed its commitment to ending the harm of partisan gerrymandering in 2015, when an overwhelming majority (71.5% to 28.5%) of the electorate voted to amend Article XI to require that districts not be drawn "to favor or disfavor a political party," and that the distribution of seats "shall correspond closely to the statewide preferences of the voters of Ohio."  Ohio Constitution, Article XI, §§ 6(A), 6(B).  Here, the Supreme Court of Ohio has found that the Third Plan is a partisan gerrymander in violation of Article XI of the Ohio Constitution.  *See* Section II.A.3, *supra*.  The virtually indistinguishable Fourth Plan is presently under review by the Ohio Supreme Court.  *See e.g.,* Pet'rs' Obj. to Commission's Mar. 28, 2022 Revised Plan, League of Women Voters of Ohio et al. v. Ohio Redistricting Comm'n, et al., 2021-Ohio-1198 (Apr. 1, 2022).  Forcing Ohioans to once again vote in gerrymandered districts would cause the very harm that voters sought to eliminate by amending Article XI in 2015.  This factor weighs heavily against granting a preliminary injunction.

### D.     The Public Interest Does Not Favor the Plaintiffs.

"In exercising its discretion with respect to a motion for a preliminary injunction, a district court must give consideration to . . . whether the public interest would be served by issuance of the injunction."  *Bonnell*, 241 F.3d at 809.  Here, Plaintiffs have not shown that issuing a preliminary injunction to compel the implementation of an unconstitutional district plan serves the public interest.  *See id.* at 826 (finding that the public interest would not be served where the court "[did] not find that Plaintiff's alleged harm outweighs the potential harm to others").  To the contrary, Ohioans have a great interest in voting in constitutional districts, and protecting the integrity of their constitutional schemes as well as the decisions of their highest state court.  Thus, this element also weighs against issuing a preliminary injunction.  *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (explaining that a preliminary injunction is "an

14

extraordinary and drastic remedy" and should not be granted unless "the movant, *by a clear showing*, carries the burden of persuasion" [emphasis in original]).

## IV.     THERE ARE CONSTITUTIONALLY COMPLIANT ALTERNATIVES THAT CAN BE IMPLEMENTED EXPEDITIOUSLY.

It is not necessary for this Court to impose the unconstitutional Third or Fourth Plan.  Nor is it necessary for this Court to start from scratch.  A plan already exists that substantively complies with the Ohio Constitution and the instructions of the Ohio Supreme Court , and which was the product of substantial investment of time and resources during the state map drawing process: the Independent Plan.  With a minor quality control review (which can be done within a day) to correct any potential technical details, the Independent Plan is ready for adoption and implementation.  *See* Ex. 7, Independent Plan; Ex. 8, Independent Plan Native Files. Alternatively, a second plan – the "Rodden Plan" was submitted to the Commission; it is constitutionally compliant and could be readily implemented.

### A.     The Independent Plan Is Available for  Prompt Implementation.

#### 1.     The Independent Plan Was Substantively Completed the Evening of March 28, Before the Court's Midnight Deadline.

On March 21, 2022, the Ohio Redistricting Commission hired two independent map drawers, including one map drawer selected by Republican Commissioners, Mr. Douglas Johnson, and one selected by Democratic Commissioners, Dr. Michael McDonald, to draft and produce a constitutionally compliant map.  Ex. 9, Tr. of Mar. 21, 2022 Ohio Redistricting Comm'n Hr'g, at 1–2.  Between March 23-28, the independent map drawers worked nearly around-the-clock to draft a constitutionally compliant map.

On the evening of March 28, at almost the *exact* time that the Fourth Plan was being adopted, and over an hour and a half before the midnight deadline, the independent map drawers completed full House and Senate General Assembly maps that were substantially complete and

15

also substantially constitutionally compliant. *See* Ex. 10, Affidavit of Senator Vernon Sykes ¶ 69; Ex. 11, Affidavit of Minority Leader Allison Russo ¶ 61; Ex. 12, Affidavit of Christopher Glassburn ¶ 20; *see also* Exs. 7-8, Johnson McDonald Independent Plan 328 Final (Mar. 28, 2022) ("Independent Plan"), General Assembly District Plans – Draft Plans Drawn by Independent Map Drawers, Ohio Redistricting Comm'n, https://redistricting.ohio.gov/maps.

Co-Chair Sykes explained that the Independent Plan complied with the Ohio Constitution's Article XI, Section 6 requirements by reaching the "constitutional partisan proportionality goals of 45 Democratic House seats leaning Democratic, and 54 leaning Republican, with 15 Democratic seats in the Senate and 18 leaning Republican in the Senate." Ex. 5, Tr. of Mar. 28, 2022 Ohio Redistricting Comm'n Hr'g, at 114; Ohio Constitution Article XI, Section 6(B). Leader Russo confirmed that the Plan also "addresse[d] the symmetry concerns of the Court" as "the House seats have three competitive Democratic seats, three competitive Republican seats. In the Senate, there are two competitive Democratic seats, and zero Republican seats. So substantially better in terms of symmetry than the map that the Commission previously adopted." Ex. 5 at 115. The Commission voted down the Independent Plan in a 2-5 vote with only Senator Sykes and Leader Russo voting in favor of the Fourth Plan.

## 2. Expert Analysis Confirms: the Independent Plan is Substantively Compliant with the Ohio Constitution.

At the March 30, 2022 preliminary injunction hearing and in affidavits filed before the Supreme Court of Ohio, three witnesses have confirmed that the Independent Plan substantively complies with the requirements of the Ohio Constitution, and that with minor technical fixes, the plan would be ready for implementation.

*Proportionality and asymmetry*. Expert witnesses confirm that the Independent Plan complies with the requirements in Article XI, Section 6 of the Ohio Constitution. They

16

demonstrate that the Independent Plan creates districts that closely correspond to the preferences of Ohio's voters, with 54 Republican-leaning seats and 45 Democratic-leaning seats in the Ohio House, and 18 Republican-leaning and 15 Democratic-leaning seats in the Ohio Senate. Critically, it does so without the extreme asymmetry in the allocation of toss-up districts that infects the Third and Fourth Plans.  *See* Exhibits to Pet'rs' Obj. to Gen. Assembly District Plan Adopted Mar. 28, 2022, Vol. II at 10-15, Ex. 13, *Bennett et al. v. Ohio Redistricting Comm'n*, *et al.*, 2021-Ohio-1198 (Apr. 1, 2022) ("Rodden Aff."); Ex. 14, Apr. 1 Obj. and Req. for Rem., Latner Aff. at 9-10, *Ohio Organizing Collaborative et al. v. Ohio Redistricting Comm'n*, *et al.*, 2021-Ohio-1210 (Apr. 1, 2022) ("Latner Aff.")  (demonstrating that the Independent Plan creates three Republican and three Democratic House seats in the 50-52% range, and two Democratic Senate seats in that range).

*Compactness.*  These witnesses also confirm that the Independent Plan is more compact than the Third or Fourth Plan, and therefore more compliant with the third requirement of Article XI, Section 6.  Dr. Rodden, an expert witness, has calculated the compactness of these plans across three common statistical measures (Reock, Polsby-Popper, and Area/Convex Hull) and demonstrated that the Independent Plan outperforms the Third and Fourth Plan consistently across all metrics. *See* Tr. of Hr'g on P.I. Mot., ECF 150 at PageID # 4416:19-4417:4; Ex. 13, Rodden Aff. at 12.  Mr. Glassburn, a Democratic consultant throughout the redistricting process, has calculated two of these measures, and confirmed Dr. Rodden's results.  *See* Tr. of Hr'g on P.I. Mot., ECF 150 at PageID # 4372:14-4373:12.

*Compliance with other requirements of Article XI.*  The Independent Plan is substantially compliant with all of the other requirements of Article XI of the Ohio Constitution (i.e., the technical requirements in Sections 2, 3, 4, 5, and 7), which concern factors such as population

equivalence, geographic splits, and the data used to draw maps.  The Independent Plan was drawn, per the Commission's instructions to the map drawers, in observance of these technical requirements. *See* Tr. of Hr'g on P.I. Mot., ECF 150 at PageID # 4376:6-24 (testimony of C. Glassburn concerning independent map-makers' compliance with these requirements); Ex. 12, Apr. 4 Resp of Sen. Sykes and House Min. Leader Russo to Pet.'s Mot. for Order to Show Cause, Glassburn Aff. at ¶ 26-27, Ohio Organizing Collaborative et al. v. Ohio Redistricting Comm'n, et al., 2021-Ohio-1210 (Apr. 4, 2022) (same). The Independent Plan Can Be Implemented Expeditiously

Mr. Glassburn testified that while there were a few minor technical flaws with the Independent Plan, *see id.* at PageID # 4367:10-20, the plan substantially met the constitutional requirements, *id.* at PageID # 4376:6-24.  Mr. Glassburn testified that the technical fixes could be completed within one day.  *Id.* at PageID # 4369:2-6.

**B.     Alternatively, the Court Can Direct the Implementation of the Rodden Plan.**

A second compliant plan was also submitted to the Commission:  the 'Rodden Plan'.  *See* Tr. of Hr'g on P.I. Mot., ECF 150 at PageID # 4397:3-14 (testimony of Dr. Rodden at the March 30, 2022 hearing on the motion for preliminary injunction).  That plan is also fully compliant with Sections 2, 3, 4, 5, and 7 of the Ohio Constitution, and far more compliant than the Third or Fourth Plan as regards Section 6.  *See id.* at PageID # 4400:22-4401:6 (same); Ex. 3 to Intervenor-Plaintiffs' Opp. to Second Amended PI Mot., ECF No. 107-3 at PageID # 2607, 2609-2626 (Rodden Affidavit in Support of Objection to the Third Plan).  Should the Court determine that, for whatever reason, the Independent Plan does not pass muster there is a second alternative on the table.

18

## V. THIS COURT SHOULD NOT DIRECT THAT THE 2022 ELECTIONS TAKE PLACE PURSUANT TO THE 2011 PLAN.

Plaintiffs themselves state that "using the old legislative districts is not an option," *see* PI Mot., ECF No. 96 at PageID # 1583, and no party has advocated for that result. This Court should refrain from reaching out for that resolution. To do so would violate both federal and state law. Moreover, given the availability of fully constitutionally viable options: the plan provided by the independent map drawers or the Rodden plan, taking an unlawful path is unnecessary.

### A. Imposition of the 2011 Plan Would Violate Federal and State Law.

It is plain that elections under the 2011 plan would unconstitutionally require Ohio voters to vote under a malapportioned plan that violates *both* the U.S. and Ohio constitutions.

### 1. Imposition of the 2011 Plan Violates Federal Law.

Every state redraws districts based on the most recent decennial census. *Evenwel v. Abbott*, 578 U.S. 54, 60 (2016) ("Today, all States use total-population numbers from the census when designing congressional and state-legislative districts . . . ."). Ohio is no exception. *Ohio v. Raimondo*, 848 F. App'x 187, 188 (6th Cir. 2021).

The reason for this is straightforward: "the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis" because "an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living on other parts of the State." *Reynolds v. Sims*, 377 U.S. 533, 568 (1964); *see Karcher v. Daggett*, 462 U.S. 725, 737-38 (1983) (recognizing that "the census count represents the 'best population data available'" from which to make "good-faith attempts to achieve population equality" (citation omitted)).

Therefore, if elections were conducted pursuant to the previous decennial census populations and under the 2011 plan, that election would be "constitutionally suspect." *Reynolds*, 377 U.S. at 584 ("[I]f reapportionment were accomplished with less frequency, it would assuredly be constitutionally suspect."); *see Arizona Independent Election Commission v. Arizona Independent Redistricting Comm'n*, 576 U.S. 787, 811 (2015) (providing that the "one-person, one-vote" principle would not permit former districts used for congressional elections "except in the 'unlikely' event that 'the decennial census makes no districting change constitutionally necessary'" (citing *Branch v. Smith*, 538 U.S. 254, 273 (2003) (plurality opinion)).[8]

### 2. Imposition of the 2011 Plan Violates State Law.

Independently, the Ohio Constitution also requires the General Assembly maps to be based on the most recent federal decennial census. Ohio Const. art. XI § 7 (stating "district boundaries shall be created by using the boundaries . . . as they exist at the time of the federal decennial census on which the redistricting is based"); *see id.* § 3 (explaining that the population of the state for redistricting purpose shall be "determined by the federal decennial census").[9] Requiring Ohioans to vote under a plan that is based on an older census would thus also violate the state Constitution. Given federal courts "should not pre-empt the legislative task nor 'intrude upon state policy any more than necessary,'" *White v. Weiser*, 412 U.S. 783, 795 (1973), this

---

[8] According to Plaintiffs, the population changes reflected in the 2020 census show that an election under the 2011 plan would be constitutionally infirm. PI Mot., ECF No. 96 at PageID # 1583-84.

[9] *See also Raimondo*, 848 F. App'x at 188 ("Under Ohio's Constitution, Ohio uses that [census] data to redraw its state and federal voting districts."); *LWVO I*, ¶ 4 ("The commission is responsible for redistricting the boundaries of the 99 districts of the House of Representatives and the 33 Senate districts . . . after the release of the federal decennial census."); *Wilson v. Kasich*, 981 N.E.2d 814, 819 (2012) (same under previous version of Ohio Constitution).

Court should not permit an outcome that would result in elections occurring under the outdated 2011 plan, contrary to the will of Ohio voters and the state legislature.

**B.      Imposition of the 2011 Plan is Wholly Unnecessary.**

While it is plainly the general rule that this Court should not impose an illegal plan, a narrow exception has been articulated in circumstances where there is absolutely no alternative. *See Upham*, 456 at 44 ("It is true that we have authorized District Courts to order or to permit elections to be held pursuant to apportionment plans that do not in all respects measure up to the legal requirements, even constitutional requirements. Necessity has been the motivating factor in these situations.") (internal citations omitted).  That exception does not apply here.

As an initial matter, it bears emphasis that the Ohio legislative and judicial processes are still working, with enough time to redraw the General Assembly maps for the 2022 election.  The Ohio Court is in the process of reviewing Objections and Responses to the Fourth Plan.

 But even if this Court ultimately must impose a map, there are clear alternatives to the 2011 Plan.  In particular, this Court could implement a map that, like the Independent Plan, conforms to the federal and state constitution.  That map suffers from none of the manifest constitutional defects of the 2011 Plan, the Third Plan or the Fourth Plan.  Its existence makes clear that the "necessity" exception does not apply in this case.  Alternatively, as noted above, the Court could direct the implementation of the Rodden Plan.  In short, there are at least two constitutionally compliant alternatives to the 2011 Plan.

**VI.      THE PROPOSED PROCESS MOVING FORWARD.**

**A.      The State Process Should Be Permitted to Work to an Orderly Conclusion with an April 20 Deadline So That a Valid Plan Can Be Adopted for an August 2 Primary.**

As noted above, there is a need to set a date for a General Assembly primary election.  If the legislature fails to set a date, this Court should set the primary for August 2, 2022.  Given the

21

Secretary's testimony, LWV Intervenors are asking this Court to set April 20, 2022 as the date for the state map drawing process to conclude.

It bears emphasis: time remains prior to the April 20 deadline for the Ohio Supreme Court and the state process to be completed.  The Ohio Supreme Court is presently reviewing objections to the Fourth Plan and is determining the remedy to be imposed.  Petitioners' objection to the Ohio Redistricting Commission's March 28, 2022 revised plan, *League of Women Voters of Ohio v. Ohio Redistricting Comm'n, et al.,* 2021-Ohio-1193 (Ohio April 1, 2022).  It must be permitted to do so.

**B.** ***Growe* Does Not Require This Court to Endorse a Deadline for the Completion of the State Process that Results in the Imposition of the Third Plan.**

This Court can intervene to make sure that a valid plan is timely adopted.  *Growe*, 507 U.S. at 34; *see also Scott v. Germano*, 381 U.S. 407, 409 (1965) (noting that the district court may intervene "in the event a ***valid*** reapportionment plan . . . is not timely adopted") (emphasis added).  In so doing, however, this Court should not set a date so late that it ends up requiring the implementation of an *invalid* plan.

According to the representation of Jonathan Blanton of the Attorney General's Office representing the Secretary of State on March 30, the only plan that could be carried out *after* April 20, 2022 in time for an August 2, 2022 legislative primary would be the invalidated and unconstitutional Third Plan. Tr. of Hr'g on PI Mot., ECF 150 at PageID # 4311:17-4320:4.  This Court should therefore not wait past April 20.  To do so would unnecessarily incur a conflict between the state and federal constitutions, forcing a collision where none need occur. *See supra* Sections III.A.1–2 (only in the event of an *unavoidable* conflict between state and federal law does the latter preempt the former).

Delay past April 20 is not required by *Growe*, and under these circumstances such delay would in fact defy that case's reasoning.  *Growe* does not call for delay for its own sake, but only where delay serves the interests of deference to state policy and leaving intact state courts' jurisdiction. *See* 507 U.S. at 35–37.  Here, for this Court to refrain from intervening until after April 20 would end up necessitating a far *greater* intrusion on state policy.  As set forth above, ordering a map that violates at least two provisions of the Ohio Constitution, contrary to the judgment of the Supreme Court of Ohio and the expressed will of a supermajority of Ohio voters would be just such an intrusion.  To delay past April 20 in the name of deference to state autonomy would thus be a self-defeating measure.

**C.** **As a Fail-Safe in the Event That the Ohio Process Does Not Timely Resolve,  This Court Should Promptly Appoint Special Masters to Finalize the Independent Plan.**

The Independent Plan is substantively complete, in need of only a few technical refinements.  Tr. of Hr'g on PI Mot., ECF 150 at PageID # 4367:10-20.  Moreover, the independent map drawers (Johnson and McDonald) are the best equipped individuals to perform this task, given their prior investment in the process. Ex. 9, Tr. of Mar. 21, 2022 Ohio Redistricting Comm'n Hrg., at 1–2.

Accordingly, the most efficient process here would entail the appointment of the independent map drawers as Special Masters so that they can finalize the Independent Plan.  It can be accomplished within a day. Tr. of Hr'g on PI Mot., ECF 150 at PageID # 4369:2-6 ("Q. Mr. Glassburn, you had said that there might be some technical flaws in the independent mapmakers' map. How long would it take, in your opinion, to identify and fix those technical flaws? A. No more than one day.").

In light of the nominal amount of work needed to finalize the Independent Plan, LVW Intervenors propose that the Special Masters be directed to begin work on April 18.  This will

assure that that there is a plan available on April 20, 2022 should the Ohio process not produce a final plan by that date.

**VII.    CONCLUSION.**

For the foregoing reasons, this Court should deny the motion for preliminary injunction, set April 20, 2022 as the deadline for the state process to conclude prior to federal court intervention, move the primary to August 2, 2022 (should the General Assembly not do so by April 20), and appoint Drs. Johnson and McDonald as special masters to finalize the Independent Plan should it be necessary for this Court to direct its implementation.

Dated: April 6, 2022

Respectfully submitted,

/s/ Freda J. Levenson

Robert D. Fram
COVINGTON & BURLING, LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-6000
rfram@cov.com

James Hovard*
COVINGTON & BURLING, LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306-2112
(650) 632-4700
jhovard@cov.com

* Pro hac vice application forthcoming
** Pro hac vice application pending

Freda J. Levenson (0045916)
Counsel of Record
ACLU OF OHIO FOUNDATION, INC.
4506 Chester Avenue
Cleveland, OH 44103
(614) 586-1972 x125
flevenson@acluohio.org

David J. Carey (0088787)
ACLU OF OHIO FOUNDATION, INC.
1108 City Park Avenue, Suite 203
Columbus, OH 43206
(614) 586-1972 x2004
dcarey@acluohio.org

Alora Thomas*
Julie A. Ebenstein*
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street
New York, NY 10004
(212) 519-7866
athomas@aclu.org
jebenstein@aclu.org

## CERTIFICATE OF SERVICE

I , Freda J. Levenson, hereby certify that on this 6th day of April, 2022, I electronically

filed the foregoing with the Clerk of Court for the United States District Court for the Southern

District of Ohio, Eastern Division via the ECF system, which will send notification of such filing

to all counsel of record.


/s/ Freda J. Levenson
Freda J. Levenson (0045916)
*Counsel for Intervenor-Defendants*