# EXHIBIT 9

## Ohio Redistricting Commission 03-21-2022

http://ohiochannel.org/video/ohio-redistricting-commission-3-21-2022

**Co-Chair Speaker Bob Cupp** [00:00:03] The staff please call the roll

**Clerk** [00:00:05] Co-chair Speaker Cupp.

**Co-Chair Speaker Bob Cupp** [00:00:06] Present.

**Clerk** [00:00:06] Co-chair Senator Sykes.

**Co-Chair Sen. Vernon Sykes** [00:00:08] Present.

**Clerk** [00:00:08] Governor DeWine.

**Governor Mike DeWine** [00:00:10] Here.

**Clerk** [00:00:10] Auditor Faber

**Auditor of State Keith Faber** [00:00:11] Here.

**Clerk** [00:00:11] President Huffman.

**Senate President Matt Huffman** [00:00:13] Here.

**Clerk** [00:00:13] Secretary LaRose.

**Secretary of State Frank LaRose** [00:00:14] Here.

**Clerk** [00:00:14] Leader Russo.

**House Minority Leader Allison Russo** [00:00:15] Here.

**Clerk** [00:00:16] Mr. co-chair a quorum is present.

**Co-Chair Speaker Bob Cupp** [00:00:19] A quorum is present. All members are present in your folders are the minutes of the last meeting on March the 19th 2022. Is there a motion to accept the minutes?

**Senate President Matt Huffman** [00:00:31] Motion.

**Co-Chair Sen. Vernon Sykes** [00:00:31] Second.

[00:00:32] It's been moved and seconded that the minutes be adopted as presented. Are there any objections or amendments to the minutes? Hearing and seeing none, the minutes be accepted without objection? Is there further business to come before this meeting of the Ohio Redistricting Commission? Chair recognizes Co-Chair Senator Sykes.

**Co-Chair Sen. Vernon Sykes** [00:00:53] Thank you, co-chair. Ladies and gentlemen, we have the responsibility have made a decision that we were going to hire, retain

independent map drawers and to come to some agreement on it. We had decided in our last meeting that that each side would be able to recommend. Each co-chair would recommend to the body and the body would consider approving the recommendations being made. And at this time, I would like to offer up Professor Michael McDonald. He has a bachelor's in economics and political science. He's an expert in redistricting elections and methodology. He is a professor at the University of Florida, and he has been a consultant or considered an expert witness in redistricting issues in Alaska, Arizona, California, Georgia, Michigan, New Jersey, New York, Ohio, Oklahoma, Texas and Virginia. And he is available to come to Ohio right away to work on this project. And we have disseminated this information, distribute his more detailed resumé for the benefit of all of the members of the commission, and we would offer this as our suggestion or recommendation to the body.

**Co-Chair Speaker Bob Cupp** [00:02:39] Thank you, co-chair. So we also, I also took a look at finding independent consultant and interviewed several people. The one that seems to me to be suitable would be a Douglas Johnson, president of National Demographics Corporation, and he has consulted on redistricting both at the state and local level in numerous jurisdictions. He is also available to come to Ohio, unlike others that were have been discussed. And he is actually there are multiple people that work for him, so he has a capability of producing suggestions or map or analyzing maps, whichever the commission should decide that, that we want. And so that would be my recommendation to the commission is to hire or retain Douglas Johnson to help us with this project and process. I will let me just before we do that, I will also say that I have endeavored to find a person that would be available to be a mediator. There was also what we talked about. I contacted the Ohio State Bar Association as and asked for some, some some names, as I predicted Saturday evening that it was going to be difficult to be able to find somebody over the weekend. And while I do have, I had two names and one of them suddenly indicated they were not interested, I have not had an opportunity to contact the other. So just as a report on progress on that front.

**Co-Chair Sen. Vernon Sykes** [00:04:55] Mr. Co-Chair, I also have some progress. I did as well talk with several people. I was able to be successful with them in particular. I've been recently confirmed with the and approved by the Chief Judge Sutton of the United States Court of Appeals, the Sixth Circuit, that the mediators that they use would be available to us to help us in this venture. They'd be available immediately and it would not cost us anything.

**Co-Chair Speaker Bob Cupp** [00:05:33] Mediators provided by the federal court system is that?

**Co-Chair Sen. Vernon Sykes** [00:05:36] Yes, that work in the United States Court of Appeals, the Sixth Circuit.

**Co-Chair Speaker Bob Cupp** [00:05:47] So there you have it. That's our report.

**Co-Chair Sen. Vernon Sykes** [00:05:56] Mr. Co-chair, if I may, then I would make a motion that we did this by the commission, approved the two map drawers that we have recommended as we were instructed in our last meeting so that they can start working together to provide us with a map so that we map for the commission so that we can comply with the court order.

**Co-Chair Speaker Bob Cupp** [00:06:23] The motion, is there a second?

**House Minority Leader Allison Russo** [00:06:26] Second.

**Co-Chair Speaker Bob Cupp** [00:06:26] It's been seconded by Leader Russo. I will say that this is coming in here. Tonight is the first time that I've seen the resume for the Mr. McDonald, I think it is. So it was. I know we had several experts that were floated and I will admit that I was involved in other matters today. And so whenever the resumé came, I wasn't available to to look at it. So. So I don't really know much about him.

**Senate President Matt Huffman** [00:07:07] It's under discussion? So, Mr. Co-Chair?

**Co-Chair Speaker Bob Cupp** [00:07:14] Senator Huffman,

**Senate President Matt Huffman** [00:07:15] Yeah, certainly I didn't I don't know anything about Mr. McDonald, but I certainly accept the suggestions of co-chair Sykes. I would note for those who did not have an opportunity to talk to the suggested mapmakers by Attorney General Yost that they are not available for most of the time. They would be working at least after Friday, and I think one of them did not want to come to Ohio. So this gentleman who apparently are willing to come to Ohio and be here for this eight days that we have left, I think are preferable. But do we have, I guess, in complying with the court's order? The mapmaking is supposed to be done in public. And I mean, I say literally that means a room accessible to the public and is, I guess, what kind of instructions are going to be given to these folks in terms of who they can communicate with? Are they only communicating with our staff and or commission members, the members of the media, members of the Legislature, et cetera? I just think that needs to get clarified so that there's not kind of a confusion about that. And I'm not sure that we I don't think they're going to work tonight, but perhaps that's the subject of a of another meeting. But I think we need to clarify how those how that's going to happen.

**Co-Chair Sen. Vernon Sykes** [00:08:58] I think we had some discussion in our last meeting about the meeting with our map drawers, we had identified four of them as well that the staffs of the commission, at least one from each of the commissioners, those persons that we hold it in a public place that we possibly live stream the deliberations in that we would offer a place, a public place, one of our committee hearing rooms, possibly or theater that would be available and accessible to the public. As with most of these meetings, the co-chairs have worked out the details, but I think it's important, as you've mentioned, to have some general idea of how this will be conducted.

**Co-Chair Speaker Bob Cupp** [00:10:09] Chair recognizes Auditor Faber.

**Auditor of State Keith Faber** [00:10:11] Along those same lines, I just want to make sure we're all clear on what the obligations and goals are of what our map makers are going to do because it's going to change my concerns about who the quote unquote map makers are. My understanding is, is that what we're looking for is people essentially to move stuff around the map that we tell them to move. I don't I'm not looking for and I don't think the court suggested that we look for somebody to draw a map and then we we get to say, that's the map or that's the map were presented with. I think the court said we're going to draw a map. And so if the process is other than that, that these map makers are coming here to say, here's here's the map that we think you guys should adopt. I don't want to hear it. And candidly, that's not what I think our obligation is in this process. So if we're

3

picking people that are essentially going to sit around a table and say, OK, this is how you comply with two, three, four, five and seven, and then this is what you get to on Article six, and these are the options you can move left or right that we discussed last time working with our Gang of Seven, our gang of four, then that's fine. If it's going to be anything other than that, then I've got some questions, frankly, about both of these individuals who I know nothing about. And I would just start out with this one. Mr. McDonald was referenced is participating in a number of lawsuits as an expert witness. Did he or was he ever retained by any of the individuals involved as an expert witness that are involved in this set of litigation by any of the organizations or their affiliated entities and suing us? And who did he testify for? If he's going to hold himself out as an expert witness? And I'd ask the same thing of Douglas Johnson. I just looked at Mr. McDonald's résumé. He has a very interesting resume. But he has testified in redistricting cases all up and down. And so my guess is he has some opinions and I guessing those opinions are probably consistent with people on one side of this case or another. We heard objections that came from Leader Russo that may be a person who had done an analysis on the maps for for the Attorney General's Office may not be qualified or should not be allowed to do this. I'm questioning that in this capacity. Those concerns are much more mitigated and much, much less in the forefront of my concerns. If essentially we're bringing people in that know how to use Maptitude and know how to move districts around and know how to tell us what precincts can go where and not violate two, three, four, five and seven. I just want to make sure we're all clear on what the goal of the map drawers are and that they understand what their goal and roles are so that when we come in and say, Hey, we want to move this here, we want to move that there, we want to know what happens if that happens. It's a much different scenario. That's what I ask for a discussion on.

**Co-Chair Sen. Vernon Sykes** [00:13:19] I would if I could. I think it's clear that the court has made it clear that it should be a map that's produced by the commission and any map makers that we hire, retain are supposed to produce something for us. And we of course, always have the right and privilege to make any edits or any other requirements that we would like to have made during this during this process. I think that the court and the attorney general recognize that it could be beneficial to us to have some independent people assist us with this process and make a recommendation to us. And we still have the authority to make the final decisions or edits or tweaks to whatever's being presented by the outside independent consultants.

**Auditor of State Keith Faber** [00:14:25] My only response to be that is, OK. And I accept what you said because I generally agree that we're drawing the map. But my reading of the court's opinion was the court really wanted the commission to hire somebody to run the computers and do that, that work that before we had relied on either the staff that worked for the Democrat Legislative Caucus or the Republican legislative caucuses. OK, whether this is the person you hire and again, I'm much less concerned as long as we're hiring somebody to do the technical and that understand how maptitude works and understand the distinctions of the loading problems that we've heard about maptitude versus Dave's Redistricting in the precinct splits and all that stuff. That's all technical stuff that frankly, none of us are ever going to master. But if the person is coming in to give us some outside expertise on the foibles or joy of this concept in redistricting or another concept, I'm sorry that that's something that we hire experts to testify to us about, not to draw maps for us. And so to me, that's a very different analysis. So as long as that's the understanding, I don't object to either one of these two individuals who I know nothing about. But if we're coming with some other expertise in some other idea that I need to know a lot more about both of these two individuals.

**Co-Chair Speaker Bob Cupp** [00:15:47] Leader Russo,

**House Minority Leader Allison Russo** [00:15:50] Thank you, Mr. Chair. I think, you know, to echo what I think I'm hearing from the auditor, just to say that, you know, certainly my expectation is not that we give both the Constitution and the court decisions which should guide any mapmaker, regardless of whether they're independent mapmakers or ones that we are part of our staff, that they go off, produce a map in a black box and they come back to us to report. I don't think that that is neither what any of us seek to achieve, nor is it in the spirit of the court's decision that very clearly laid out that this should be happening in public. So I personally have envisioned this, and I'm not sure if this is in line with the rest of the commission is that this is number one. These two individuals are working together. They come with the technical expertise they are following with the Constitution and the court order have directed. But there will be decision points in discussion that they will need us to weigh in and and there will be multiple as I suspect there are multiple ways to accomplish this. And there, as we've seen in various iterations of maps that have been presented to this commission, that we will need to weigh in on. So I don't think that this is just sending them off to make a map and come back to us. I think that this is very much a they are helping us implement as a commission and coming with their technical expertise, but using the Constitution and the court decision as the guidance.

**Co-Chair Speaker Bob Cupp** [00:17:32] Further discussion. Secretary LaRose.

**Secretary of State Frank LaRose** [00:17:48] Yeah, thanks, Baker. And just something to add, and I think that the two individuals that have been recommended, I'm sure, are highly qualified and very purposeful and hardworking and all of that. That doesn't change the fact that we have an enormously complex process with enormously complex rules here in Ohio that are, you know, require a specialized skill. We've got four people that have that specialized skill. Those are the the two very hardworking staffers that have been working for the Republicans and the two very hardworking staffers that have been working for the Democrats. I think that those four individuals are skilled and know this process better than really anybody. And I think that whoever the outside map makers are that we hire should also work together with the four staffers that we have maybe even all six of them in a room together, quite honestly, because I think that's the best possibility, and I remain skeptical that this is going to yield a workable result, but that's the best possibility that we could get that done.

**Co-Chair Speaker Bob Cupp** [00:18:53] Further discussion.

**Governor Mike DeWine** [00:18:56] Mr. Chairman?

**Co-Chair Speaker Bob Cupp** [00:18:57] Governor DeWine.

**Governor Mike DeWine** [00:19:00] What do you think as both the chairs i the timing of these two individuals hitting Ohio and being able to start work? And I'm I'm curious about that, obviously, because we're in a hurry. But second, you know, we may want to before they really get too far into it to have them actually in front of this panel or commission? So there is an understanding of how this is going to work. I mean, I guess I would understand it to be that it's it's a continuous process that they would come back to us with different issues at the appropriate at the appropriate time and that we certainly should have the ability to go into the map room at any time and check on how they're doing and what the

progress is and what they foresee the issues to be. So I guess the question is what what is the timing and if, if, if the two of you if you know, I mean, I know.

**Co-Chair Sen. Vernon Sykes** [00:20:16] If I could co-chair, I have also distributed a suggested timetable for our meetings. And I believe a copy was sent to everyone. If not, let's make sure we have that? and on Wednesday, at five o'clock was the time that I thought would be give them time to get in here and get to get together in time for our meeting at that particular meeting, for them to make initial presentations, introductions for us to to exchange expectations and so forth.

**Co-Chair Speaker Bob Cupp** [00:21:04] OK, I think the proposal was just being circulated now. I have not seen it. I'm just thinking out loud while it's being distributed, whether we want to have a written description of what we were expecting them to do so that they know and we know what it is that we are asking the experts to do.

**Co-Chair Sen. Vernon Sykes** [00:21:35] I think that would be appropriate on the for the meeting on Wednesday to to have them as well. I think that would be good.

**Co-Chair Speaker Bob Cupp** [00:21:45] It might be better to have it before then. So they know if whatever it is, if that's something they're willing to live with, I guess. So I mean, I I don't know how they'll come thinking about this. I do know that Mr. Johnson indicated that he was available for a variety of ways that we wanted to do it. So I did. Since I've had a discussion with him, my I think I understand that Mr. McDonald, I do not know, of course.

**Co-Chair Sen. Vernon Sykes** [00:22:17] And one suggestion I might have co-chair is that on tomorrow morning for our meeting tomorrow morning, it could be a part of it could be a work session of where we actually put that statement together based on some, I'm sure, in advance each of us or may have some ideas of that we can exchange of ideas in advance. But to have a work session tomorrow morning for our regular scheduled meeting time at 9:00 a.m. to kind of work out that that arrangement.

**Co-Chair Speaker Bob Cupp** [00:23:01] It's certainly a possibility.

**Senate President Matt Huffman** [00:23:09] Mr. Co-chair. I guess I'm I'm wondering about the governor's question is, is are the map makers are, I assume, are even though this paper says tomorrow morning at nine co-chair Sykes, you're suggesting they'll be here Wednesday?

**Co-Chair Sen. Vernon Sykes** [00:23:26] Wednesday.

**Senate President Matt Huffman** [00:23:27] OK. All right. So that, I think, answers the governor's question, right? We're talking about the map makers being here Wednesday.

**Governor Mike DeWine** [00:23:34] The answer is they cannot be here till Wednesday. Is that what I think?

**Senate President Matt Huffman** [00:23:37] I think that's

**Co-Chair Sen. Vernon Sykes** [00:23:40] From what we've been able to figure out so far. Yes. OK.

**Senate President Matt Huffman** [00:23:44] One in Florida and one in California, right? I believe, right?

**Co-Chair Sen. Vernon Sykes** [00:23:50] I believe so. OK.

**Co-Chair Speaker Bob Cupp** [00:23:52] Leader Russo.

**House Minority Leader Allison Russo** [00:23:54] So I think my understanding is probably tomorrow as a travel day for Italy. Mr McDonnell, given that it is eight o'clock now on a Monday evening, so they will, I assume, probably both be arriving tomorrow. So I think it's fair to expect that on Wednesday they would be available in front of this commission. But certainly that does not prevent us from meeting in the morning to talk about, you know, specifically what our expectations are for each of them, at least in my conversations with Mr MacDonald. I think he is very flexible, has worked in a variety of different circumstances. So whatever the expectations are of this commission, he is adaptable to because he has worked in several different settings and scenarios to be able to do this kind of work.

**Co-Chair Speaker Bob Cupp** [00:24:46] I did not ask Mr. Johnson when he could arrive here. I asked him whether if he if he was willing and able to come to Ohio, and he said he was. So, I'd have to follow up with to see what timetable might be. I'm just checking your

**Auditor of State Keith Faber** [00:25:13] While we're looking at our schedules. And maybe it's because the auditor in me has some fiscal questions. I first question who's retaining these folks and what are they charging us? Those people who are coming in generally aren't doing it for the goodness of their heart. And if they are, then I have a question about that because usually they're they have some other interest. And then secondly, who's responsible for paying them? And then do we have a state contracting issue? I assume these are likely going to be fairly expensive items. And do we have a controlling board issue or how are we going to get this approved? I'm just curious whether anybody run those traps to ground. Whether we have to do an RFQ, an RFP usually if it's under $50,000, we don't, but do we have to run it past controlling board for approval? Do we have to? And, and, and so I just asked that question before we agree to commit to something that we may or may not have authority to do.

**Co-Chair Sen. Vernon Sykes** [00:26:20] I can help you co-chair. Leader Russo,

**House Minority Leader Allison Russo** [00:26:27] Thank you and thank you, Auditor Faber, for that question. I have actually looked into this a little bit and we do have some experience actually as a commission approving staff and expenses. We've got about $70,000 that is left for this commission. So, you know, again, we can vote to approve this expense and we've got that remaining in this commission's budget. We also have close to $4 million that is left in the task force budget. I've already spoken with my co-chair, Senator McColley. And you know, if there are needs of this commission, we can very quickly issue the allocation of necessary funds. We have actually done a contract through that process that was fairly quick and we can certainly set the limit at forty nine thousand from each of those components if necessary. So I'm saying all of that to say that we can issue those contracts fairly quickly. Have LSC take a look at it, which is what we've done before when we hired our consultant and get the necessary funds allocated.

**Auditor of State Keith Faber** [00:27:47] I would just like, again, those funds may be there, I have no idea. Again, we've had no role other than the co-chairs in allocating funds in this process. I just want to make sure I mean, as I've been reminded, apparently we passed good government legislation to make certain exemptions for some of these contracting requirements for the General Assembly. There's a General Assembly is the one that's making the contracts through the the task force budget or wherever you have some authority and discretion. Regular state agencies do not. So I just want to make sure whatever we're doing, we're doing in a transparent manner and we're making sure we're doing it correctly. And then frankly, I don't have a clue of what these people expect to be paid. But for somebody getting on a plane from Florida or California and bring a team here or whatever they need is not going to be inexpensive because it is a short duration, even inexpensive, maybe relatively affordable. But I just want to make sure that's transparent and that we all know what that is. The other thing I would ask is that both of these two individuals. Make a conflicts disclosure specifically about and frankly, we can hire them knowing they have a conflict, but we need to know what those conflicts are. It's just been handed to me that one of these gentlemen testified in a case as an expert witness for the League of Women Voters who was a party in this action. And I go, I just ask that question because we need to know those conflicts as all lawyer friends on this board know we can waive conflicts, but you can't waive a conflict you don't know about. And in that regard, I just ask that we have a conflict disclosure from the two individuals.

**Co-Chair Sen. Vernon Sykes** [00:29:27] We can consider it a friendly amendment, we'll add to it, for sure.

**Co-Chair Sen. Vernon Sykes** [00:29:43] So Leader Russo.

**Co-Chair Sen. Vernon Sykes** [00:29:44] Sure, just as a quick follow up to that and to let you know that we have reached out also to LSC just to make sure that, you know, the proper procedures are followed so that we get this these contracts and make sure that the payment is is all certainly appropriate. Regarding, you know, the the rates. We do have some idea based on what the attorney general with the two potential options that they had that he had reached out to. We at least have an idea of what was negotiated with those individuals, so we at least have a threshold. I would say, I dare say that probably neither of the co-chairs has yet talked about rates with these individuals. So I hesitate to even throw anything out there at this point without having that discussion first. But we at least know from the attorney general's previous discussions what I think would be reasonable to expect from these individuals.

**Auditor of State Keith Faber** [00:30:54] I don't know what that is.

**Senate President Matt Huffman** [00:30:56] You know, Mr. Chair, Co-Chair, I don't. Auditor just mentioned I don't know what those suggested rates either were. But just just to be clear. Speaker Cupp and I had a conversation with these two individuals yesterday afternoon, and I believe leader Russo and Senator Sykes did. Also, just to be clear, those two individuals, one was in California and made it clear he's not traveling to Ohio for this. So I just know the out of town rate is usually not as much as the, I'm going to sit in my kitchen and work on my computer rate, the other individual who happens to be local, from nearby Delaware County. He was not able to work after three o'clock for a variety of reasons, and both of them after Friday were not available. So. And I also, after kind of some inquiry, believe that they were not really familiar with the frankly extraordinary constitutional requirements that we have in Ohio that I I think you might ask Mr. Glassburn

or some of the others that really other states don't have. They weren't really familiar with that, nor the details of the Supreme Court decisions. So whatever it is that they were quoted, they probably like a lot of things, sometimes you get get quoted prices and they say, Oh, I didn't know you wanted five bathrooms. I quoted you only two bathrooms in this house, so. But the point remains, I guess, that we we should try to figure out what the cost is and the contracting complexities and those things. So but you know, just I want to make that point.

**Co-Chair Sen. Vernon Sykes** [00:32:46] Additional point. I'm glad you raised that issue. Those issues have been delegated to the co-chairs. Previous contracts and we will do our due diligence to make sure we comply with all the necessary requirements.

**Co-Chair Speaker Bob Cupp** [00:33:05] It would seem to me that would be prudent that rather than proceeding with the resolution today that we ought to try to get the answers to these questions and bring them back to the commission tomorrow with the what the cost is, when can they be here? What is the the technical requirements for signing the contract? Where does the the the money appropriately come from? What kind of conflicts disclosure should we have? And as well as what is in these some written description of what it is we're asking them to do. So I don't know that we can determine all of that right now. I'm not sure how best to do it by nine o'clock tomorrow, but I mean, it's a lot of a lot of information now. Maybe, maybe you've already done some and LSC can provide that fairly quickly. But it would seem to me that it would be better to have all this in order before we proceed with actually hiring anybody.

**Governor Mike DeWine** [00:34:14] Chairman.

**Co-Chair Speaker Bob Cupp** [00:34:15] Governor?

**Governor Mike DeWine** [00:34:15] I certainly understand all that. I just I hope that we're able to communicate to them that all likelihood they're going to be hired. I'd hate to lose another day. I mean, if we're into tomorrow and we don't know until whatever time, then they've got to make flights and then we push it back another day. I'm just I'm just concerned about the time here, so.

**Co-Chair Sen. Vernon Sykes** [00:34:44] I agree with the governor, I am concerned about the time on a very short fuse and we have the funds, the ability and guidance. And I think we should move posthaste ahead. I think it's important for us to keep on schedule so that we can comply with a court order.

**Governor Mike DeWine** [00:35:09] Mr. Chairman, I did not mean to say that we should not do this, wait until 9:00 to do it, but I just hope that we're in contact with both of them and make sure that we're getting flights booked in or they're getting flights booked. And we're we're moving forward. I'm just I'm concerned about losing another day. That's my concern. So I don't mind waiting till tomorrow to voting on it. That's fine. But I just don't want I don't want to lose another day here.

**Co-Chair Speaker Bob Cupp** [00:35:37] So I was suggesting they you try to gather as much of that this evening as possible and so that we're ready tomorrow. If we if we can be and I guess we're going to meet tomorrow to maybe review what it is their scope of work is which we've talked about in generalities, but not in really any kind of specific. Leader Russo?

**House Minority Leader Allison Russo** [00:36:00] Mr. chair. Yes. You know, I I would say I'm not in agreement that we should delay at least voting on the selection of these two individuals. I think certainly by tomorrow morning, we can talk about the specifics of what our expectations are. But you know, I feel like we sort of punted this a little bit on Saturday. We didn't meet yesterday to talk about this. We're now going to punt this again to tomorrow morning. Don't know if we're going to vote on this tomorrow morning and move forward with this. We need these individuals to begin to make plans to be here so that we can begin work on a map. We now are one week out from the deadline and the more we turn our wheels here. You know, the more. I just think this delay is not a wise move. Let's at least vote. There's a motion on the floor to agree with who the vote selections from the co-chairs will be. And then we can move forward with some of the details in the morning so that we have everything lined up. But I think that it is important that we keep moving forward in this.

**Senate President Matt Huffman** [00:37:17] Mr. Co-chair. Just a suggestion we can contact these individuals tonight, say we expect to approve them tomorrow morning at nine o'clock with an expectation that they're going to be here Wednesday at 5:00. But for the formal approval tomorrow, we need to have some information what they're going to charge. And sometimes if you hire somebody and they get to say how much you're going to charge, you know, but but we need to know these things. We need to know about conflicts that the auditor raised. We'd like to have all that information. We expect to formally approve the contract based on the information we are likely to get, which is a reasonable price. No conflicts that are significant that they can be here in person on Wednesday to present to the commission or answer questions. You know, with the folks that the attorney general suggested, that sounded like a good idea until we talked to them and we found out they couldn't be here for most of the time. So if there's going to be conversations with these gentlemen tonight or shortly and we can affirm the information that we're thinking is likely that they're we want to pay what they want to do, that they can be here, that there aren't any significant conflicts that they're. And I understand the charge, so to speak. So I don't think something's going to happen between now and tomorrow anyway, and we don't expect them to be here till Wednesday at 5:00, so.

**Co-Chair Speaker Bob Cupp** [00:38:58] Leader Russo,.

**Co-Chair Speaker Bob Cupp** [00:38:59] Thank you, Mr. Chair. Is there a reason that we can't recess for about 45 minutes to have these conversations? I think both of us, both co-chair Sykes and you are probably in very direct communication with each of these individuals to be available to clarify some of these questions pretty immediately.

**Senate President Matt Huffman** [00:39:22] Not me,

**Co-Chair Speaker Bob Cupp** [00:39:24] We could try. I had a phone conversation earlier in the day with Mr. Johnson. I can certainly see if he's available. But I mean, there's no way to know whether he really is or not. If we want to recess, I mean, I have no objection, anybody else have a thought on it.

**Auditor of State Keith Faber** [00:39:52] My only thought on the recesses are we really do anything by recessing tonight and talking to them versus coming back tomorrow morning, talking to them. I'm more concerned. I mean, frankly, I'd ask them to get in here Wednesday morning and start working with our Gang of four Gang of Seven to maybe give

10

us some draft ideas so we can start the process of looking at central Ohio and then looking at northeast Ohio and then looking at other places, maybe at our meeting on Wednesday to make that more productive Wednesday evening. But I think certainly. The conversations tonight would be, but for something that doesn't work out in this, we anticipate finalizing the request to hire you tomorrow. We expect you to be here Wednesday morning with the expectation that Wednesday night we can have a meaningful discussion. I think we could do that just as easily tomorrow's breaking today, but I don't care if we can get an answer in 45 minutes. We can come back, but I doubt you're going to get an answer on the conflicts. I doubt you're going to get an answer on some of those things until they have a chance to pull all that together. But but I maybe I'm willing to stay to midnight tonight, I don't care.

**Co-Chair Sen. Vernon Sykes** [00:41:00] And that's unless we take the recess.

**Co-Chair Speaker Bob Cupp** [00:41:04] All right. If without objection, we will recess for when we just recess for an hour. See if we can get in touch with it. And in the meantime, maybe anybody whose office has some forms, a conflict disclosure form try to get some information on what their requirements are for actually contracting, what kind of documents and time. To do list of things that you. Yep. So Commission will recess till nine 9:30.

**Co-Chair Speaker Bob Cupp** [00:41:40] Redistricting commission will come back to order. I would ask. Well, first of all, report that I was able to get a hold of Mr. Johnson and he is able to arrive here Wednesday, subject to airline schedules as to particularly when on Wednesday and willing to sign a disclosure of conflicts form that we talked about and compensation was was suitable. So at this point, we have a motion pending. Could we have the motion restated?

**Clerk** [00:42:19] Restate the motion for the two mapmakers?

**Co-Chair Speaker Bob Cupp** [00:42:20] Yes, please. Go ahead. Go ahead.

**Clerk** [00:42:25] Co-Chair, Speaker Cupp

**Co-Chair Speaker Bob Cupp** [00:42:27] what can you say? So what is the motion? It's for understand that's that's all right. You're doing fine.

**Clerk** [00:42:34] I'm learning this. It's great. The motion was to have the two makers, sorry,.

**Co-Chair Sen. Vernon Sykes** [00:42:45] The motion was to approve the recommendations of the two map drawers recommendations of the co-chairs to be retained by the commission to complete the work that we have ahead of us.

**Co-Chair Speaker Bob Cupp** [00:42:57] And there was a second to that. Is there further discussion on the motion? Secretary LeRose.

**Secretary of State Frank LaRose** [00:43:08] Yeah, so thank you, co-chair. As I'm trying to learn more about these folks that we're talking about here, it got me curious to dig in. It seems as though Michael McDonald has some affiliation. Maybe he's a on retainer with or has some affiliation with Marc Elias. That's deeply concerning to me. Basically, anybody who's affiliated with that person, somebody I don't want to do business with, but it tells me that we don't know a lot about these people. For one, I guess go back to the comment that

11

I'd made earlier that we've got for really good map drivers that know this work. And when I was looking at what the court order said, it says the commission should should, shall whatever. The commission should retain an independent map driver who answers to all commission members. It seems to me that we could take the four people we've got, put them on the commission payroll and get them to work tomorrow morning. They already know the process and they could pick up their computers, move them into a room somewhere in this building and start working together and be paid by the commission for the next seven days or whatever else. Just a just a thought. I want to put out there for conversation.

**Co-Chair Sen. Vernon Sykes** [00:44:23] Leader Russo.

**House Minority Leader Allison Russo** [00:44:24] Yes. Thank you, Mr. Chair. I just want to clarify that we have specifically asked Mr. McDonald about any potential conflicts. He has confirmed that he has no current conflicts with the current litigants in the Ohio redistricting cases. There may be some confusion. He is working with the Florida League of Women Voters on a state election law issue, not on a redistricting case there and not with the Ohio League of Women Voters. I will also note we actually didn't know this until we were just talking with Mr. McDonald or Dr. McDonald. Rather, that actually he and Doug Johnson, who is who you all have put forward, have actually worked together in Arizona for the independent commission to defend Republican crafted maps. In fact, he's worked for both Republicans and Democrats, specifically defending Republican maps in Maryland and Virginia. And then, of course, in Arizona with Mr. Doug Johnson. So I actually was pleasantly surprised to find out that these two have worked together before in the past. And I think certainly if we started digging down, I think, you know, even with Mr. Johnson, I believe that he's been a consultant with one of the attorneys retained in this case as well. So again, as I said yesterday, I think we're going to have a hard time finding any single person to do this who doesn't have some bias coming into this. The point of us each being able to make recommendations is to balance that. And again, I remind you that these individuals work for the commission and they will be working with all commissioners and at the direction of the entire commission.

**Co-Chair Speaker Bob Cupp** [00:46:17] Further discussion?

**Co-Chair Speaker Bob Cupp** [00:46:19] Again, I would just reiterate my request that we have a complete conflict disclosure of any and all law firms, any times that they work for any of the law firms involved in the current litigation or any of the times they work for any of the parties to litigation or the people funding the part of this litigation, including specifically the League of Women Voters, the ACLU, the Holder Group and the like. The fact of the matter is as long as everybody comes into this with the understanding that these these gentlemen are only going to be executing the suggestions of this committee and will not be independently operating or communicating with outside parties. Once they start working for us. If I were to hear they talk to any of these outside law firms or any of the parties, I would consider that a first level conflict of interest. And from that perspective, as long as we're under that clear assumption that they're independently working for this commission, I will. We'll go for it. But I have real concerns hearing somebody is working and has a history of working for the parties that are suing us and their purported to be independent. I would love as a lawyer to have my former experts be the ones that are called on by my opponent in the litigation. What a great concept.

**Co-Chair Sen. Vernon Sykes** [00:47:44] Co-Chair, I would also say that in talking with Mr. McDonald, what we found is he confirmed that he has no current conflicts with the current litigants at all and is willing to and of course will sign any conflict disclosure statement at the time of who we contract with him.

**Co-Chair Speaker Bob Cupp** [00:48:14] So is our standard current conflict with any of the current parties as opposed to having had employment or arrangements with the parties before they became current? We saw before the litigation, so the case so that I think that's an important point here, and I have no idea know whether there's any conflict or not. I'm just.

**Co-Chair Sen. Vernon Sykes** [00:48:51] Well, Mr. Co-chair, I think it's important we had an hour recess, in this time we were able to answer any questions that we could bring about polls to him, but also was willing to sign a disclosure conflict disclosure statement that would be more comprehensive. Yeah, know. Usually that's what happens when you have a contract, you'd have documents that are required that you have to comply with, and he's willing to do that.

**Co-Chair Speaker Bob Cupp** [00:49:21] So and I think that's fine. I don't have a I don't have a problem with that. We have a full and complete disclosure.

**Co-Chair Sen. Vernon Sykes** [00:49:31] I think we have that.

**Senate President Matt Huffman** [00:49:34] Yeah, I mean, on the issue of conflict there, I think there are different standards. For example, attorneys who have represented a party in the past may represent a party against that party if the cases are unaligned or if there is a waiver by their client that they formally represented. I don't think there's that kind of restriction and this is in the legal world. I know this is a unique process, but because an expert witness was was my expert witness in the past and this has happened doesn't mean they can't be someone else's expert witness. Now if it's an expert witnesses, as the Auditor has mentioned many, many times. You know that that's is interesting. I do have the same expert CPA in Lima, Ohio. He's testified for me many times in many different kinds of cases, but in other expert witnesses who have testified, but it doesn't mean they can't go testify for the other side. So I think the key here is that that they disclose. And ultimately, I suppose the commission and if we need to, we could ask them about this Wednesday when they're here right at five o'clock Wednesday, I think is what we're talking about the time being. And we can ask them and see if there's anything that we think would be disqualifying at that time. But you know, we're going to recognize that if you're going to get people who are very good at this, they probably have a pretty extensive background and they've worked for for a lot of different people. So I think we just let that question pend for a while or until they're here and we can ask those specific questions. But good question by the speaker. We can't just be. Is there a current conflict? Is there a disqualifying conflict in some time in their background and, you know, if it's years ago? Well, what difference does that make now if it was six months ago? Maybe it does make a difference, so we just have to ask those questions.

**Co-Chair Speaker Bob Cupp** [00:51:39] Further discussion on the motion. Auditor Faber.

**Auditor of State Keith Faber** [00:51:42] And again, while I want to know about the conflicts, my primary goal towards getting to a point where we can overlook the conflicts is having these two gentlemen both understand that they work for the commission as a

whole. One of them, I'm told, sent a Twitter message out that he was about to be hired by the Democrat members on the Redistricting Commission. We're not hiring a Democrat and a Republican. We're supposed to hire independent. And the independents are supposed to work collectively for the group. And as long as that's our understanding, as long as we all have access to them, as long as we can continue to go forward in that capacity, I'm less concerned. As long as I'm assured that we're not having backroom conversations with the litigants, that we're not having other discussions that they truly, oh. I hate to use this term, but their employment loyalty feel, what is it?

**Senate President Matt Huffman** [00:52:33] Fealty.

**Auditor of State Keith Faber** [00:52:33] Fealty to the commission? I'm less concerned, but I just want to make sure we're clear on that. Based on the information that's already been out in the I guess we call it the metaverse,

**Co-Chair Sen. Vernon Sykes** [00:52:46] we have an additional hand out. We kind of outlined some of those issues.

**Senate President Matt Huffman** [00:52:50] Could I just make a comment or ask a question, I guess?

**Co-Chair Speaker Bob Cupp** [00:52:54] Senator Huffman.

**Senate President Matt Huffman** [00:52:56] Do I? I don't have Twitter on my phone. I know I'm supposed to, but I don't have time to keep up. I just read newspapers like guys my age do. If I understand what the auditors said. One of these folks tweeted out tonight that tonight that they were been hired by the Democratic members. Is that the.

**Auditor of State Keith Faber** [00:53:25] Personal News, I've been put forward as a map drawer of Democrat members of the Ohio Redistricting Commission. The Republican member put forward is Doug Johnson.

**Senate President Matt Huffman** [00:53:33] OK, well, so that's probably accurate, right? Put forward by the Democrat members. So that's probably accurate. I guess, I guess that's the other thing I would ask is during this process. How about if nobody tweets what's going on unless it's completely public process and they should be tweeting, I don't know. But we ought to have those ground rules figured out the next the next day or so. This is why I should have Twitter on my phone, right?

**Co-Chair Speaker Bob Cupp** [00:54:08] All right, there's a further discussion on the motion to hire these two experts? Hearing none, hearing no additional discussion. Is there any objection to hiring them? Without objection, the motion will be agreed to the next item is the schedule. Several members have asked me if they could have until tomorrow morning to look over the schedule to see how it compares with their schedule and adopt it at that time, if that's OK. Tomorrow at 9:00. All right.

**Co-Chair Sen. Vernon Sykes** [00:54:48] Mr. Co-chair the other item is the dealing with the mediators. The chief mediator of the Circuit Court, could be available tomorrow at our meeting just to ask questions or give us information about mediation in general or what kind of services could be offered through their organization, if you if it could be helpful.

**Co-Chair Speaker Bob Cupp** [00:55:17] Are they willing to come here? Are you suggesting we see if they're able to come,

**Co-Chair Sen. Vernon Sykes** [00:55:23] They're able to come.

**Co-Chair Speaker Bob Cupp** [00:55:24] All right. I think that would be fine if they want to provide information on what they do. Any objection to that,.

**Senate President Matt Huffman** [00:55:31] I could... [inaudible]

**Co-Chair Speaker Bob Cupp** [00:55:33] Would you want to restate?

**Co-Chair Sen. Vernon Sykes** [00:55:35] The chief of the mediators for the Circuit Court is available tomorrow morning at 9:00 to come in and just make a brief presentation about the services that could be offered.

**Senate President Matt Huffman** [00:55:50] OK.

**Co-Chair Sen. Vernon Sykes** [00:55:53] Without objection. If you want to contact them and invite them in, that would be that would be fine. And you've also passed out a draft description of the scope of map drawers. I think members can look at this till tomorrow morning. We'll talk about it then. All right. Is there any further business to come before the redistricting commission at this time? I think we are scheduled to reconvene tomorrow at nine a.m. and without objection. The commission is adjourned until 9:00 a.m. tomorrow.