# EXHIBIT 10

# IN THE SUPREME COURT OF OHIO

| | | |
|---|---|---|
| **League of Women Voters of Ohio,** *et al.*, | : | |
| | : | **Case No. 2021-1193** |
| **Petitioners,** | : | |
| | : | **Original Action Filed Pursuant to** |
| **v.** | : | **Ohio Constitution, Article XI, Section 9(A)** |
| | : | |
| **Ohio Redistricting Commission,** *et al.*, | : | **[Apportionment Case Pursuant to S. Ct.** |
| | : | **Prac. R. 14.03]** |
| **Respondents.** | : | |

| | | |
|---|---|---|
| **Bria Bennett,** *et al.*, | : | |
| | : | **Case No. 2021-1198** |
| **Petitioners,** | : | |
| | : | **Original Action Filed Pursuant to** |
| **v.** | : | **Ohio Constitution, Article XI, Section 9(A)** |
| | : | |
| **Ohio Redistricting Commission,** *et al.*, | : | **[Apportionment Case Pursuant to S. Ct.** |
| | : | **Prac. R. 14.03]** |
| **Respondents.** | : | |

| | | |
|---|---|---|
| **The Ohio Organizing Collaborative,** *et al.*, | : | |
| | : | **Case No. 2021-1210** |
| **Petitioners,** | : | |
| | : | **Original Action Filed Pursuant to** |
| **v.** | : | **Ohio Constitution, Article XI, Section 9(A)** |
| | : | |
| **Ohio Redistricting Commission,** *et al.*, | : | **[Apportionment Case Pursuant to S. Ct.** |
| | : | **Prac. R. 14.03]** |
| **Respondents.** | : | |

## RESPONSE OF RESPONDENTS SENATOR VERNON SYKES AND HOUSE MINORITY LEADER C. ALLISON RUSSO TO PETITIONERS' OBJECTIONS

C. BENJAMIN COOPER (0093103)
   *Counsel of Record*
CHARLES H. COOPER, JR. (0037295)
CHELSEA C. WEAVER (0096850)
Cooper & Elliott, LLC
305 West Nationwide Boulevard
Columbus, Ohio 43215
(614) 481-6000
(614) 481-6001 (fax)
benc@cooperelliott.com
chipc@cooperelliott.com
chelseaw@cooperelliott.com

**Special Counsel for Respondents
Senator Vernon Sykes and
House Minority Leader C. Allison Russo**

FREDA J. LEVENSON (0045916)
ACLU of Ohio Foundation, Inc.
4506 Chester Avenue
Cleveland, OH 44103
Tel: (614) 586-1972 x125
flevenson@acluohio.org

DAVID J. CAREY (0088787)
ACLU of Ohio Foundation, Inc.
1108 City Park Avenue, Suite 203
Columbus, OH 43206
Tel: (614) 586-1972 x2004
dcarey@acluohio.org

ALORA THOMAS (PHV 22010)
JULIE A. EBENSTEIN (PHV 25423)
American Civil Liberties Union
125 Broad Street
New York, NY 10004
Tel: (212) 519-7866
athomas@aclu.org
jebenstein@aclu.org

ROBERT D. FRAM (PHV 25414)
DONALD BROWN (PHV 25480)
JOSHUA GONZÁLEZ (PHV 25424)
DAVID DENUYL (PHV 25452)
JULIANA GOLDROSEN (PHV 25193)
Covington & Burling LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
Tel: (415) 591-6000
rfram@cov.com

ALEXANDER THOMAS (PHV 25462)
Covington & Burling LLP
850 W. Tenth Street, NW
Washington DC 20001
Tel: (202) 662-5968
athomson@cov.com

ANUPAM SHARMA (PHV 25418)
YALE FU (PHV 25419)
Covington & Burling LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306
Tel: (650) 632-4716
asharma@cov.com
yfu@cov.com

**Counsel for Petitioners**
**League of Women Voters of Ohio,** *et al.*

DONALD J. MCTIGUE (0022849)
DEREK S. CLINGER (0092075)
McTigue Colombo & Clinger LLC
545 East Town Street
Columbus, OH 43215
Tel: (614) 263-7000
dmctigue@electionlawgroup.com
dclinger@electionlawgroup.com

ABHA KHANNA (PHV 2189)
BEN STAFFORD (PHV 25433)
Elias Law Group
1700 Seventh Ave., Suite 2100
Seattle, WA 98101
Tel: (206) 656-0716
akhanna@elias.law
bstafford@elias.law

JYOTI JASRASARIA (PHV 25401)
SPENCER W. KLEIN (PHV 25432)
Elias Law Group
10 G Street NE, Suite 600
Washington, DC 20002
Tel: (202) 968-4490
jjasrasaria@elias.law
sklein@elias.law

**Counsel for Petitioners
Bria Bennett, *et al.***

ALICIA L. BANNON (PHV 25409)
YURIJ RUDENSKY (PHV 25422)
HARRY BLACK (PHV 25544)
Brennan Center for Justice at NYU School
of Law
120 Broadway, Suite 1750
New York, NY 10271
Tel: (646) 292-8310
alicia.bannon@nyu.edu

PETER M. ELLIS (0070264)
M. PATRICK YINGLING (PHV 10145)
NATALIE R. SALAZAR
Reed Smith LLP
10 South Wacker Drive, 40th Floor
Chicago, IL 60606
Tel: (312) 207-1000
pellis@reedsmith.com

BRIAN A. SUTHERLAND (PHV 25406)
Reed Smith LLP
101 Second Street, Suite 1800
San Francisco, CA 94105
Tel: (415) 543-8700
bsutherland@reedsmith.com

BEN R. FLIEGEL (PHV 25411)
Reed Smith LLP
355 South Grand Avenue, Suite 2900
Los Angeles, CA 90071
Tel: (213) 457-8000
bfliegel@reedsmith.com

BRAD A. FUNARI (PHV 3139)
DANIELLE L. STEWART (0084086)
Reed Smith LLP
225 Fifth Avenue
Pittsburgh, PA 15222
Tel: (412) 288-4583
bfunari@reedsmith.com
dstewart@reedsmith.com

**Counsel for Petitioners**
**The Ohio Organizing Collaborative,** *et al.*

JOHN W. ZEIGER (0010707)
MARION H. LITTLE, JR. (0042679)
CHRISTOPHER J. HOGAN (0079829)
Zeiger, Tigges & Little LLP
3500 Huntington Center
41 South High Street
Columbus, Ohio 43215
Tel: (614) 365-9900
zeiger@litohio.com
little@litohio.com
hogan@litohio.com

**Counsel for Respondent**
**Governor Mike DeWine**


JONATHAN D. BLANTON (0070035)
JULIE M. PFEIFFER (0069762)
MICHAEL A. WALTON (0092201)
Ohio Attorney General
30 E. Broad Street, 16th Floor
Columbus, OH 43215
Tel: (614) 466-2872
jonathan.blanton@ohioago.gov
julie.pfeiffer@ohioago.gov
michael.walton@ohioago.gov

**Counsel for Respondents**
**Secretary of State Frank LaRose and**
**Auditor Keith Faber**

ERIK J. CLARK (0078732)
ASHLEY MERINO (0096853)
Organ Law LLP
1330 Dublin Road
Columbus, OH 43215
Tel: (614) 481-0900
ejclark@organlegal.com
amerino@organlegal.com

**Counsel for Respondent**
**Ohio Redistricting Commission**

W. STUART DORNETTE (0002955)
BETH A. BRYAN (0082076)
PHILIP D. WILLIAMSON (0097174)
Taft Stettinius & Hollister LLP
425 Walnut St., Suite 1800
Cincinnati, OH 45202
Tel: (513) 381-2838
dornette@taftlaw.com
bryan@taftlaw.com
pwilliamson@taftlaw.com

PHILLIP J. STRACH (PHV 25444)
THOMAS A. FARR (PHV 25461)
JOHN E. BRANCH, III (PHV 25460)
ALYSSA M. RIGGINS (PHV 25441)
GREG MCGUIRE (PHV 25483)
Nelson Mullins Riley & Scarborough LLP
4140 Parklake Ave., Suite 200
Raleigh, NC 27612
Tel: (919) 329-3812
phil.strach@nelsonmullins.com
tom.farr@nelsonmullins.com
john.branch@nelsonmullins.com
alyssa.riggins@nelsonmullins.com
greg.mcguire@nelsonmullins.com

**Counsel for Respondents**
**Senate President Matt Huffman and**
**House Speaker Robert Cupp**

# IN THE SUPREME COURT OF OHIO

| | | |
|---|---|---|
| **League of Women Voters of Ohio,** *et al.*, | : | |
| | : | **Case No. 2021-1193** |
| **Petitioners,** | : | |
| | : | **Original Action Filed Pursuant to** |
| **v.** | : | **Ohio Constitution, Article XI, Section 9(A)** |
| | : | |
| **Ohio Redistricting Commission,** *et al.*, | : | **[Apportionment Case Pursuant to S. Ct.** |
| | : | **Prac. R. 14.03]** |
| **Respondents.** | : | |

---

| | | |
|---|---|---|
| **Bria Bennett,** *et al.*, | : | |
| | : | **Case No. 2021-1198** |
| **Petitioners,** | : | |
| | : | **Original Action Filed Pursuant to** |
| **v.** | : | **Ohio Constitution, Article XI, Section 9(A)** |
| | : | |
| **Ohio Redistricting Commission,** *et al.*, | : | **[Apportionment Case Pursuant to S. Ct.** |
| | : | **Prac. R. 14.03]** |
| **Respondents.** | : | |

---

| | | |
|---|---|---|
| **The Ohio Organizing Collaborative,** *et al.*, | : | |
| | : | **Case No. 2021-1210** |
| **Petitioners,** | : | |
| | : | **Original Action Filed Pursuant to** |
| **v.** | : | **Ohio Constitution, Article XI, Section 9(A)** |
| | : | |
| **Ohio Redistricting Commission,** *et al.*, | : | **[Apportionment Case Pursuant to S. Ct.** |
| | : | **Prac. R. 14.03]** |
| **Respondents.** | : | |

---

## AFFIDAVIT OF RESPONDENT VERNON SYKES

---

State of Ohio
County of Franklin, SS:

I, Vernon Sykes, hereby submit the following affidavit and state under oath and penalty of

perjury as follows:

1.      I am the State Senator for Ohio's 28th Senate District.

2.      I serve as a commissioner on, and co-chair of, the Ohio Redistricting Commission

("Commission"). I am the only Black person and person of color on the Commission. I serve as a

representative of the Democratic Party, along with House Minority Leader Allison Russo

(together, the "Democratic Commissioners"). The remaining five Commissioners are Republicans

(together, the "Republican Commissioners"). I was sued in the above-captioned case and am a

named Respondent. The Ohio Supreme Court, however, has recognized that my interests align

more with the Petitioners than that of the Commission or the Republican Commissioners. Opinion

2022-Ohio-65, ¶ 66.

3.      I submit this affidavit in response to the Court's March 16, 2022 order to respond

to the Petitioners' renewed motions for an order directing Respondents to show cause as to why

the Commission and Respondents should not be held in contempt.

4.      In addition to this affidavit, I have filed three other affidavits in these proceedings,

each of which detail my efforts throughout the redistricting process to comply with the Ohio

Constitution and all the orders of this Court, which are incorporated by reference. *See* March 3,

2022 Affidavit of Vernon Sykes in support of Respondents' Response to Petitioners' Objections;

February 23, 2022 Affidavit of Vernon Sykes in support of Respondents' Response to Court's

February 18 Show Cause Order; Jan. 28, 2022 Affidavit of Vernon Sykes in support of

Respondents' Response to Petitioner's Objections.

**Introduction**

5.     It is with great disappointment that I file this affidavit with the Court. Yet again, because of the actions of my Republican colleagues, I find myself asking this Court not to hold me in contempt.

6.     At every step I have worked diligently to comply with the Constitution and this Court's orders. Among other things, described in greater detail below, I took the following actions: (1) pushed the Commission to meet early and often; (2) encouraged the Commission to utilize independent mapmakers and mediators; (3) pressed for a transparent process; (4) voted for the independent maps because they satisfy all the constitutional requirements; and (5) resisted—albeit unsuccessfully—the hijacking of the process by Republican Commissioners, all of which disparaged the independent mapmakers' efforts and four of whom adopted an unconstitutional map over my dissent.

7.     In many ways, the Commission's process following this Court's March 16, 2022 order was a model of cooperation and transparency—one that should have transpired from the outset, but, even if belated, was still an encapsulation of the fair mapping process the Ohio voters mandated in Article XI of the Ohio Constitution. The Court made several strong suggestions in its March 16 order: hire an independent mapdrawer to draw the maps, draw the maps in public, and do not let the partisan mapdrawers control the mouse. Opinion, 2022-Ohio-789 ¶¶ 30, 44 ("*LWV III*").

8.     And the Commission listened. The Commission hired independent mapdrawers to work on behalf of *the Commission*, not any party. The Commission (at least at first) ordered those mapdrawers to follow only Article XI and this Court's orders. And those independent mapdrawers

2

worked in public—their every discussion with staff or Commissioners, click of the mouse, and late-night work sessions viewable via livestream on the Ohio Channel.

9.     Through these collaborative efforts, the independent mapdrawers drew General Assembly maps that satisfied the Constitution, as delineated in this Court's orders.

10.     As detailed below, I both led and supported all of these efforts to have independent maps, even in the face of the Republican Commissioners' stall tactics and pessimism regarding the independent mapdrawers' ability to complete the task. And I voted for the independent mapdrawers' plans.

11.     But the Republican Commissioners were more concerned with protecting their supermajority than following the Constitution, this Court's orders, and their duty to the public. Rather than adopting the independent mapdrawers' plans, four of the Republican Commissioners unilaterally adopted new General Assembly maps on March 28, 2022 (the "Fourth Plan") that is nearly identical to the last one (the "Third Plan") that this Court found unconstitutional on March 16, 2022. *LWV III* ¶ 44. I did not vote to adopt those maps because I believe they violate Article XI of the Ohio Constitution, as well as the Ohio Supreme Court's orders.

12.     It is with sadness that I report that this Court's suggestion—to hire independent mapmakers who draw the maps in public—and clear orders regarding proportionality and symmetry, were not enough for my Republican colleagues. But I am also hopeful that, with an aggressive order from this Court, we can return to the independent mapdrawers' plans, finalize them quickly (to the extent any finalizing is even necessary), and have a constitutional plan for Ohio's voters. We have made so much progress, and I still hope that—with this Court's further guidance—we can deliver constitutional maps to the people of Ohio.

**The Democratic Commissioners Worked Diligently to Schedule Frequent Meetings and Hire Independent Mapdrawers and Mediators Upon Receiving the March 16 Order.**

13.     **Wednesday, March 16, 2022**. As urged by the Democratic Commissioners, the Ohio Supreme Court invalidated the Third Plan in an opinion and order published at approximately 9:45pm on March 16, 2022.

14.     That order, as I understand it, set forth important mandates and guidance to the Commission that I diligently worked to follow throughout the process.

15.     *First*, it invalidated the Third Plan in part because of the "gross and unnecessary disparity in the allocation of close districts," as the Third Plan had 19 so-called Democratic-leaning House districts and 7 so-called Democratic-leaning Senate districts that were in the 50 – 52% margin, and no such Republican-leaning House or Senate districts. *LWV III* ¶ 43. That meant, going forward, the Commission needed to draw a plan that met the 45-54 proportionality ratio, as close as possible while complying with Article XI, §§ 2, 3, 4, 5, and 7—but in doing so, competitive seats of between 50 and 52% needed to be symmetrically allocated and not be so one-sided against either party.

16.     *Second*, the Court ordered the Commission "to be reconstituted and to convene and that the commission draft and adopt an entirely new General Assembly-district plan that conforms with the Ohio Constitution, including Article XI, Sections 6(A) and 6(B)." *LWV III* ¶ 44. Based on the Court's reasoning, I understood this to be a command that the Commission as a body, rather than partisan staff, draft the General Assembly plan.

17.     *Third*, the Court told the Commission that we "should retain an independent mapdrawer—who answers to all commission members, not only to the Republican legislative leaders—to draft a plan." *LWV III* ¶ 30. I thought this was an excellent way to move forward and

could take the partisan influence out of the process—an independent person (or persons) could "draft a plan."

18.     *Fourth*, the Court mandated a "transparent process," including that "drafting should occur in public" and that "the commissioners should convene frequent meetings." *LWV III* ¶ 44.

19.     The Court gave the Commission a deadline of March 28 to file a new plan with the Secretary of State and until March 29 at 9:00am to file the plan with the Court. *LWV III* ¶ 45.

20.     **Thursday, March 17, 2022**. First thing in the morning, I spoke with the Senate Minority's legal counsel to discuss the opinion and asked them to work with me in getting the Commission to comply with the Court's order. Then I attempted to reach Co-Chair Speaker Cupp to discuss reconvening the commission, setting frequent meetings, hiring independent mapdrawers, and otherwise work to comply with the Court's March 16 order. When I finally reached Co-Chair Cupp in the afternoon, he was noncommittal as to taking any steps, including the basic step of when he would agree to call a first meeting of the Commission.

21.     Later that afternoon I sent a formal letter to Co-Chair Cupp and the rest of the Commission reiterating the points I had made in our phone conversation; namely, that we should have frequent meetings, that the public should be notified in advance of those meetings, and that the process should be transparent. I specifically suggested that we retain independent mapdrawers and mediators. That March 17 letter is attached as Exhibit A.

22.     **Friday, March 18, 2022**. In the late morning, I spoke with Co-Chair Cupp, and he agreed to schedule a Commission meeting for Saturday at 2:00pm.

23.     That day, we also received a letter from Attorney General Yost discussing his suggestions for "steps forward" given the March 16 Order. Specifically, Yost encouraged daily meetings and drafting maps in public. He also stated that "[t]he Court directed the commission to

hire new mapmakers not beholden to either political caucus," and, to that end, explained that he had retained Sean Trende, a Republican analyst, and Bernie Grofman, a Democratic professor of political science, to help in the mapdrawing process. Attorney General Yost's letter is attached as Exhibit B.

24.     The Attorney General, as "chief legal officer of the state" also articulated what was and was not permissible in drawing a new map. He explained to us that the Court "established <52% as the threshold for a 'leaning' district; any index less than that is viewed by the Court as a competitive district," and are "excluded[d]" from the proportionality calculation. And he told us that "efforts to protect incumbents are improper" and, citing the Court's opinions, "'can neither be a legitimate and neutral goal nor comport with Article XI, Section 6(A).'" *Id.*

25.     **Saturday, March 19, 2022.** The Commission met for the first time after the order on March 19, 2022. At that meeting, the Commissioners discussed several possibilities of moving forward; some appeared to want to move forward solely with the partisan staff drawing. I pushed for hiring independent mapdrawers, in accordance with the Court's suggestion. However, I was concerned that the Commission would not agree on a single mapdrawer and agreed that we could hire two independent mapdrawers, one selected by each caucus of the Commission. Though each mapdrawer would be selected by a caucus, they would both be independent and work for the Commission as a whole. I also suggested hiring a mediator in case disagreements arose.

26.     President Huffman noted that one advantage of having independent mapdrawers is that they are not "beholden to anyone in particular" and do not know where any incumbents live. Acknowledging that the Court had singled him out for his previous prioritizing of incumbency, President Huffman stated: "I think [prioritizing incumbency] was also criticized by the court [and]

that we should not consider incumbency in drawing these maps. So, I just want to kind of get that out." Tr. 3/19/2022 at 46:22.

27.     Co-Chair Cupp expressed that he was "skeptical" regarding mediation, pointed out a number of "practical concerns" regarding the process, and hoped that Commission "members aren't being overly optimistic." Tr. 3/19/2022 at 1:00:44

28.     At the conclusion of the meeting, the Commission authorized the co-chairs to make recommendations to the Commission regarding hiring independent mapdrawers and mediators. And the Commission scheduled three upcoming meetings: Sunday, March 20 at 7:00pm (if needed); Monday, March 21 at 7:00pm, and Tuesday, March 22 at 9:00am.

29.     **Sunday, March 20, 2022.** I immediately began the work of securing independent mapmakers. On Sunday, March 20, my staff or I had calls with four different mapmakers.

30.     Along with Leader Russo and several of our staff, I also had a Zoom call that morning with Professor Michal McDonald about his availability to participate in the mapdrawing process as an independent mapdrawer.

31.     In the afternoon, I spoke with Nate Persily, a professor at Stanford Law School. Dr. Persily was only willing to undertake this project if he were selected as the only mapdrawer by the leadership from both caucuses.

32.     At approximately 1:00pm, I had a telephonic meeting with Mr. Grofman and Mr. Trende. Attorney General Yost, Leader Russo, and several staff members were also present. I understood from Yost that President Huffman and Co-Chair Speaker Cupp were having a similar call with Mr. Grofman and Mr. Trende later that afternoon. Although I had concerns about Mr. Trende, given his previous involvement in this matter as an expert for the Republican Commissioners, I agreed to go forward with these two independent mapdrawers. Given that the

Attorney General had already vetted these two mapdrawers and given that they had worked together successfully in Virginia, I felt it most important that we start the drafting process immediately, so I agreed with these recommendations.

33.    I also moved forward with getting suggestions for a mediator. I reached out to Nancy Rogers, esteemed former dean of The Ohio State University Moritz College of Law and former Attorney General, for her suggestions for potential mediators. She provided me with a list of nationally acclaimed mediators and also said she would contact the chief mediator at the Sixth Circuit's mediation office. The chief judge of the Sixth Circuit gave permission to the mediators for the Commission to use their services. Chief Judge Sutton's letter regarding mediation is attached as Exhibit C.  Subsequently, the Commissioners unanimously agreed to those mediators.

34.    At approximately 3:00pm, Co-Chair Cupp informed me that he did not want to go forward with the 7:00pm meeting that night. He had suggested as much at an 11:00 call earlier that morning, when he said he had not heard back from the other Republican Commissioners about their availability for the scheduled 7:00pm meeting. But I had stressed the need for the Commission meeting. In the 3:00pm call, Co-Chair Cupp said he had a 4:30pm meeting scheduled with Mr. Grofman and Mr. Trende and did not know if a 7:00pm meeting was feasible. I suggested delaying the meeting to 8:00pm if necessary. Ultimately, at approximately 4:15pm, Co-Chair Cupp called me again to say it was not feasible to go forward with the meeting and that the Republican Commissioners, even after two days, did not have sufficient information about Mr. Grofman and Mr. Trende. The meeting was canceled.

35.    That evening, I requested that the Senate Minority legal counsel draft a letter to the Commission announcing that Leader Russo and I supported hiring Mr. Grofman and Mr. Trende

in the interests of time and compromise. That letter, attached as Exhibit D, was sent to all the Commissioners at approximately 6:30pm.

36.     **Monday, March 21, 2022**. Given that Co-Chair Cupp had told me that the Sunday meeting was not feasible, I was determined to ensure that the Commission, going forward, met every day. Along with Leader Russo, I sent a letter to the other Commissioners proposing a daily meeting schedule through March 28. That letter is attached as Exhibit E.

37.     Despite my and Leader Russo's agreement to using Mr. Grofman and Mr. Trende, at the Monday, March 21 Commission hearing, the Republican Commissioners announced that they did not want to move forward with that team, but instead proposed Dr. Douglas Johnson from the National Demographics Corporation, as their selected independent mapdrawer. Given that Mr. Grofman expressed that his availability during the week may be limited for personal reasons, Leader Russo and I suggested Dr. Michael McDonald, a professor from the University of Florida, as our selected independent mapdrawer. The two would work together in drafting a new plan for the Commission's consideration, with the assistance of the Commissioners' staff.

38.     Although the two had been selected, Co-Chair Cupp still wanted to delay. Rather than formally approve these two independent mapdrawers—so that they could get on flights to Columbus the next morning—Co-Chair Cupp suggested talking to the proposed mapdrawers over the next couple days about the specific details of an arrangement and learning the precise rules for the state signing a contract (which the Auditor did not offer), and settling other details. Tr. 3/21/2022 at 33:05. To avoid delay, Leader Russo and I formally moved and pushed for a recess so that members could study the choices and get the answers to Co-Chair Cupp's questions. Republican members suggested that they should instead wait until the morning. *Id*. at 39:52. But upon our urging, the Commission recessed for an hour.

39.     Upon resuming the meeting, the Commission approved hiring the two independent mapmakers.

40.     **Tuesday, March 22, 2022.** At the 9:00am meeting, the Commission established a daily meeting schedule through March 28, which the public could attend virtually or in person. Additionally, upon my request, the Sixth Circuit's mediation office presented to the Commission about their services and mediation in general.

41.     Throughout the rest of the day, I directed my staff to work on ensuring that everything was ready for the mediators to get to work when they arrived. (Dr. McDonald arrived late Tuesday night, and Dr. Johnson arrived mid-day on Wednesday.) Democratic staff sought input on contracts and conflicts from the Legislative Service Commission and the Ohio Attorney General's Office and, with input from House Majority Counsel, later drafted a retention letter for Dr. McDonald and Dr. Johnson. Democratic staff worked on other logistical arrangements, such as for appropriate technology, room reservations, and livestreaming.

42.     **Wednesday, March 23, 2022.** At my direction, on the morning of March 23, my staff worked to finalize the engagement letters for the independent mapdrawers and, with Co-Chair Cupp's consent, emailed the independent mapdrawers formalizing their engagement, clarifying expectations for appearance at that evening's Commission meeting, and offering to answer questions and provide them with any assistance. These engagement letters are attached as Exhibit F.

43.     Prior to the 5:00pm meeting, the Republican Commissioners circulated proposed ground rules for the independent mapdrawing process. Leader Russo and I examined that proposal and made some suggestions.

44. At the meeting that evening, Dr. McDonald and Dr. Johnson spoke to the Commission about their needs and preferences for undertaking the mapdrawing process—including on topics about data sets, numbers of computers, and mapdrawing software. With their input, the Commissioners discussed and voted on each ground rule. The finalized ground rules are attached as Exhibit G. Among others, the ground rules required the independent mapdrawers, using Maptitude software and new computers provided by the Commission, to: draft an entirely new General Assembly district plan at the direction of the Commission and in accordance with the Ohio Constitution and the Court's orders; answer to the Commission members; and not consider district plans or work product produced before March 23.

45. Finally, at about 7:40pm—a full week after the Supreme Court's order—the independent mapdrawers were hired and authorized to get to work.

### The Independent Mapdrawers, following a Transparent and Collaborative Process, Worked Diligently to Complete a Constitutional Map.

46. **Thursday, March 24, 2022.** The mapdrawers commenced their work on Thursday, March 24 first thing in the morning. At approximately 8:00am, the Ohio Channel began to livestream the "workroom"—a committee room at the Capitol that was set up for the mapdrawers. Legislative staff set up computers and downloaded the necessary software. There were some delays in getting the proper data in the software program, as the Commission's ground rules required data that did not have any race-based statistics. Once these issues were resolved, the mapmakers got to work.

47. Though belated, the independent mapdrawing process occurred in a collaborative and transparent fashion. I observed their work both by visiting the workroom and via the livestream. Dr. McDonald and Dr. Johnson each had separate computers where they could draft and try out ideas. They sat next to each other and chatted frequently. They suggested different

11

ideas, each pursuing different suggestions not based on partisan advantage or hidden motives, but in a pure attempt to see what would work. Sometimes they encountered dead ends and would have to try to draw parts of the map again, though they relied on the Commissioners' previously hired mapdrawers—Mr. Chris Glassburn and Mr. Randall Routt from the Democrats, and Mr. Ray DiRossi and Mr. Blake Springhetti from the Republicans—to help avoid pitfalls. They were developing a truly independent map, in public, with no single party pulling strings behind the scenes.

48.     At the Commission's 7:00pm meeting, the independent mapdrawers provided an update on their progress to the Commission and then got back to work.

49.     **Friday, March 25, 2022.** On Friday, March 25, 2022, the independent mapdrawers continued to work diligently and made progress toward completing a plan. There was no indication that they would not finish on time or would be unable to comply with the Court's orders.

50.     The Commission met at 2:00pm. The mapdrawers provided the Commission with an update, and the Commission discussed specifics, including alternatives for Franklin County pairing. Yet the Republican Commissioners bogged down the process by repeatedly stressing compliance with sections of the Ohio Constitution already being adhered to and by emphasizing compactness and diminishing section 6(B), which demands proportional representation based on ten years of statewide election results.

51.     Following the meeting, I received a memo from Co-Chair Cupp regarding new instructions that the Republican Commissioners wanted to give to the mapdrawers from the Co-Chairs. To me, the proposal read like a mechanism to slow down the mapdrawing process, was unnecessarily redundant of what had already been requested in the last Commission meeting, and gave more power to the majority to slow the process down. So, I opposed it. My response in

12

opposition to the Republican Commissioners' proposals is attached as Exhibit H. The Republican's rules would have:

- Required the mapmakers to provide multiple different options for Franklin County because President Huffman wanted alternatives to what they had drawn.

- Required mapmakers to provide notice of any areas they wanted feedback on 90 minutes before the scheduled meeting.

- Prior to drafting a singular plan from both of the mapdrawers together, the mapdrawers would have to present multiple different individual full plans to the Commission and receive feedback before being allowed to present a merged plan.

The Republican Commissioners included this proposal in the minutes at the start of the Commission's next meeting and, although the Commission never formally adopted this proposal, the mapdrawers always attempted to give the Commission as much notice as possible, at least an hour before a meeting, of areas that they wanted guidance on and sent the relevant map files to the Commissioners' staff. And the mapdrawers always welcomed feedback and suggestions about alternatives; indeed, Commissioners would stop by and ask that certain areas be drawn in specific ways if possible.

### Over My Objection, the Republican Commissioners Prioritized Protecting Incumbents and Attempted to Derail the Independent Mapdrawers' Progress.

52. **Saturday, March 26, 2022**. By Saturday, March 26—with two full days left before our deadline—each of the mapdrawers had completed a draft House map to present to the Commission. (House maps were completed first because Senate districts are combinations of three House districts.) Both plans had 45 Democratic-leaning House districts and 54 Republican-leaning House districts. Not only had both the Republican-selected and the Democratic-selected independent mapdrawers achieved partisan proportionality, but they had achieved almost perfect

partisan symmetry for competitive districts. Both maps had three Democratic-leaning districts between 50% and 52%; the Johnson map had two such Republican districts and the McDonald map had three.

53.     At the 4:00pm Commission meeting, the independent mapdrawers requested feedback from the Commission so that they had guidance before they merged their two maps. For instance, the maps diverged on how they treated Montgomery County and the map drawers sought the Commission's preference. The Commission did not give direct feedback, even after a long recess.

54.     By this point it was clear that the independent mapdrawers, if given the guidance needed by the Commission, could timely complete the task. Each had drawn proportional and symmetrical maps, and there were not too many disagreements between the two. The prospect of completion of fair maps seemed to rattle the Republican Commissioners, and they started to impede and discredit the process. They started to complain that the maps were not compact (they were) and that there was insufficient time for public input (which they had never prioritized before).

55.     President Huffman's main complaint was that the maps double bunked Republican incumbents. Apparently, he had already forgotten what he had told us at the first Commission meeting on March 19—that we shouldn't consider or prioritize incumbents. Up to that point, the maps had been drawn without any incumbency data, so any resulting districts that had multiple incumbents living within them was a by-product of drawing a constitutional map. But President Huffman would not allow it. He proposed that, before a merged clean map was even drawn, incumbency data be added and that the mapdrawers be directed to avoid placing multiple incumbents in the same district to the extent possible. Though President Huffman's concern started

14

out targeted at Senators who were in the middle of their terms, it expanded to wanting, to the extent possible, all House and Senate incumbents protected by the new maps.

56.     I immediately objected, as did Leader Russo. I was concerned that adding incumbency data would slow down the process and make the maps less compact and symmetrical. Additionally, the Court had warned us about using incumbency data, and the Attorney General, following that opinion, told us it was "improper." I suggested that the issue go to mediation. At approximately 7:30pm, we began mediating these issues about incumbency.

57.     **Sunday, March 27, 2022**. The Commissioners continued to work with the mediator to try to reach a resolution on the incumbency issue. Though I did not want any incumbency data used, I also had to face the reality that the Republican Commissioners have the majority, and they wanted to require the independent mapdrawers to incorporate incumbency into their maps *even before* they had created a single constitutional map without incumbent consideration. To move the process forward, we agreed to a resolution that would allow the independent mapdrawers to draw a clean map first, before tainting it with trying to protect all the incumbents.

58.     The final resolution of our mediation was an agreement to instruct the mapmakers, which we did, as follows: "Upon completion of the independent map drawers' merger of their independent versions of the House and Senate maps and prior to any presentation to the Commission, the independent mapdrawers shall consider the residence locations of non-term limited House and Senate incumbents, and Senate incumbents in mid-term, in drafting a Commission map, and where possible without violating constitutional principles, avoid pairing incumbents and also drawing districts such that Senators protected under Section 5 of Article 11 no longer live in the district they represent. Incumbents will be identified as House or Senate and

no other identifying information shall be used." *See* Mediation Agreement—Instructions to Mapdrawers with Regard to Incumbents, as adopted March 27, 2022.

59.     At the March 27 hearing, each independent mapdrawer also presented their complete maps. Before combining them, they again sought the Commission's input. For example, they wanted the Commission's decision—as they had asked the previous day—as to whether a district drawn that included some of Montgomery County should extend to Green County or to Preble County. The Commission recessed to evaluate the different plans. Yet, even after recess, the Republican Commissioners expressed their opposition to voting to give clear guidance on these issues to the mapdrawers. Several of the Commissioners expressed their informal views, and Leader Russo asked that the mapdrawers move forward with their understanding based on that discussion.

60.     That night, after the meeting, my staff informed me that the independent mapdrawers had agreed on a merged plan and were working on cleaning it up for any minor errors (the "Pre-Incumbent Independent Plan").

### The Republican Commissioners Hijacked the Independent Mapdrawing Process and Passed an Unconstitutional Map Drawn by Republican Staff.

61.     **Monday, March 28, 2022.** By Monday mid-morning, the independent mapdrawers had completed cleaning up the Pre-Incumbent Independent Plan. As they explained to the Commission at the 11:00am meeting, that plan achieved perfect partisan proportionality in both the House and Senate. It also was symmetrical with respect to competitive seats; there were three Democratic-leaning and three Republican-leaning House seats between 50% and 52% in the House; and two Democratic-leaning and no Republican-leaning Senate seats between 50% and 52%. That plan was posted on the Commission's website.

62.     The mapdrawers stated that they would then add the incumbent data, which was being loaded into their computers.

63.     When the Commission reconvened in the afternoon, I was pleased when Dr. Johnson and Dr. McDonald announced that they were just a couple of hours away from completing their map, having adjusted district lines (per the Republicans) to protect incumbents.

64.     But what I took as a sign of success, was a sign of danger to my Republican colleagues—we could have a fair and independent map. President Huffman announced, for the first time, that to comply with the Court's midnight deadline, the map actually had to be completed and adopted by 10:30pm so there was enough time to email the data files to the Secretary of State. Then he suggested, because he was concerned that the independent mapdrawers would not meet this deadline, that he would have the Republican mapdrawers tweak the Third Plan so that the Commission could pass that. Though he presented it as a backup "parachute," in case the independent mapdrawers failed to meet the deadline, it became clear that it was far from just a backup. President Huffman stated that he spoke to Mr. DiRossi and that Mr. DiRossi, despite being sick, was able to work on a separate map. While presented as a last-minute backup plan, President Huffman later admitted to hatching the plan three days earlier.

65.     I immediately objected, as did Leader Russo. We explained that such a process would contravene this Court's orders and the Constitution. I suggested that if we needed more time, we should ask for an extension—not pass another unconstitutional map drawn in a bunker by a partisan Republican mapdrawer. What President Huffman was proposing was, as I said, "ridiculous." As I stated at the meeting:

> "[A]ll the time, money and resources we've put into coming up with a constitutional map. We have independent mapmakers. Each of them have drawn separate and apart constitutional maps that comply with the court order. They've put together a unified map that just need edits that we can make in this time period to comply with the requirements.

17

> To distract us, the staff, and the independent mapdrawer to divert to some other tasks is ridiculous, contrary to the directive, contrary to the spirit and the direction of the court.

Tr. 3/28/2022 at 50:16

66.     The Republican Commissioners were not willing to ask the Court for extra time, even though they passed the Third Plan over a week late. Over my and Leader Russo's dissent, the Commission voted to adopt President Huffman's proposal.

67.     Meanwhile, Dr. Johnson worked on completing the plan incorporating the incumbency data. (Dr. McDonald left at 5:00pm because of a class he had to teach the next morning in person in Florida.) At approximately 9:30pm, when the Commission reconvened, Dr. Johnson stated that he needed about 45 minutes to complete the Senate map, and the House map was already done. Therefore, I asked that the Commission recess for one hour to allow Dr. Johnson to complete his work so that we could consider his final plan.

68.     But the Republican Commissioners refused. President Huffman announced that Mr. Springhetti—the Republican mapdrawer—had been working on a map (the "Fourth Plan") and said the Commission should go with that "parachute." A Republican staff member handed out printouts of the Fourth Plan; the printout included no partisanship data. This was the first time I had seen the plan. Other Commissioners also said it was the first time they had seen the plan. At first glance, it appeared to be a repeat of the Third Plan, and President Huffman explained that it changed the Third Plan only minimally. Despite Leader Russo and my requests, the Republican Commissioners would not recess to allow us to review the map and suggest amendments. The Commission then proceeded to adopt the Fourth Plan by a 4-3 vote, despite the fact that there was no opportunity for any Commissioner to provide amendments, ask questions, or view analyses of the plan.

69.     At approximately 10:30pm, minutes after the Commission adopted the Fourth Plan, Dr. Johnson finished the independent map.

70.     After adopting the Fourth Plan but with the motion to adopt the majority's 8(C)(2) statement, I recessed the Commission for 30 minutes to prepare the minority's Section 8(C)(2) statement.

71.     Upon returning, at approximately 11:00pm, the Commission approved the majority's 8(C)(2) statement. I then moved to adopt the independent mapmakers' final map (the "Incumbent Independent Plan") and have it supersede the Fourth Plan. The Fourth Plan had not yet been sent to the Secretary of State, so it was not effective. (And it was clear by then that, despite President Huffman's earlier statements, it did not take over an hour to prepare files to email to the Secretary of State. Either map's files could be emailed to the Secretary of State at that time.) Looking at the independent mapdrawers' plan, the Republican Commissioners said baldly that they were not compact even though they have a greater compactness score than the Fourth Plan. They said they did not have enough time to review the Incumbent Independent Plan; but they had just voted for the Fourth Plan sight-unseen and had been receiving updates about the independent plan and were able to view its drafting for days. The Commission rejected my proposal to adopt the Incumbent Independent Plan 5-2; only Leader Russo and I voted to complete the independent, transparent, fair process that this Court urged.

## Conclusion

72.     I worked diligently to get the Commission to adopt a constitutional map, drawn by independent mapdrawers, through a transparent process, alongside Leader Russo. But we only have two votes on this seven-member Commission. Despite our efforts, we were not able to prevent President Huffman and the Republican Commissioners from hijacking the process. I

ultimately voted for the independent mapmakers' plan and against the unconstitutional Fourth Plan. I believe that my efforts, described above, demonstrate that I did not violate the Court's March 16 order and should not be held in contempt.

73.     I am hopeful, however, that with strong mandates from this Court we can resume the process with the independent mapmakers and adopt constitutional maps before the federal court takes over on April 20, 2022. I do not believe that the Republican Commissioners, without strong mandates from this Court to give them cover in their party, will abide by their constitutional duty. And I respectfully ask the Court to take such action to protect the Ohio Constitution.

FURTHER AFFIANT SAYETH NAUGHT.

STATE OF OHIO - SS.
COUNTY OF SUMMIT

_____
Vernon Sykes

Sworn to before me and subscribed in my presence this __3__ day of April, 2022.

_____
Notary Public



# Exhibit A
# to Affidavit of
# Respondent Vernon Sykes



**STATE SENATOR VERNON SYKES**
**28th District**

March 17, 2022

The Honorable Robert Cupp
Ohio House of Representatives
Columbus, Ohio 43215

Dear Co-Chair Speaker Cupp:

I write today to reiterate what I suggested on our phone call earlier today, that the Ohio Redistricting Commission meet as soon as possible in order to develop a transparent path forward to pass bipartisan, fair, and constitutional state legislative maps.

The Ohio Supreme Court has directed the Ohio Redistricting Commission to start fresh and draw maps that meet constitutional muster. We must do this by March 28. Leader Russo and I stand at the ready and believe following the Court's order is possible if we work together and do not waste time.

It is essential that we call a meeting of the Redistricting Commission as soon as possible to start the map drawing process. The Court has rightly criticized the Commission for its previous delays and inefficient use of time. I hope that we will not repeat that mistake this time – our fourth attempt. I will note that the Commission recently amended its procedural rules to also allow for any three members to call for a meeting of the Commission, rather than only the Co-Chairs. Leader Russo and I are available at any time and would welcome any other Commissioner in calling for a meeting.

The Court also ordered the Commission to meet "frequently" in order to have an open and transparent process to the public. I have suggested to you that we set a schedule and meet at least every other day in order to meet this directive and I offer that suggestion once again. It is critical that we conduct our deliberations and make map-drawing decisions in the light of day and with the opportunity for the public to provide input.

Further, I suggest that the Commission work in a bipartisan manner and hire an independent map-drawer – or alternatively, a mediator – to aid us in our efforts. I believe our staff could work together to identify a list of mutually agreeable individuals to serve in this role.

Ultimately, now is the time for us to work together in order to fulfill the wishes of Ohio voters who overwhelmingly approved these reforms to our redistricting process.

Sincerely,

Senator Vernon Sykes
Co-Chair, Ohio Redistricting Commission

CC: Members, Ohio Redistricting Commission

# Exhibit B
# to Affidavit of
# Respondent Vernon Sykes



Administration
Office: 614-466-4320

**M E M O R A N D U M**

TO:        Members of the Ohio Redistricting Commission

FROM:    Attorney General Dave Yost

DATE:    March 18, 2022

RE:        Steps forward following the decisions in *League of Women Voters of Ohio, et al. v. Ohio Redistricting Commission, et al. III* and companion cases

===================================================================

Late in the evening of March 16, the Ohio Supreme Court struck down the third set of state legislative maps. Whether I, or you, agree with the majority in this most recent decision is irrelevant. Four justices have decreed what the rules for this round of redistricting shall be. You are left with little choice but to abide by them. Accordingly, this memorandum outlines a set of steps calculated to address the perceived deficiencies raised by the majority of the Court.

I offer this framework as the chief legal officer of the state, having neither a vote nor a veto over your work. This is not a map of all possible roads to the objective of complying with the elements of the Supreme Court's decisions, but one suggested route. The Commission may choose to devise another. This is offered as a means to commence your discussions.

**<u>Meetings</u>**

The Court made much of the relatively modest number of meetings held before the February 4, 2022 Plan was enacted, and the lateness of their calling. In its most recent order, the Court only gave the Commission ten days to produce a new map, two days of which have already expired.

The Commission apparently has scheduled a meeting for tomorrow--an excellent first step. I suggest that the commission agree at that first meeting on a schedule of meetings, and to publish it. Given that only seven days remain, daily meetings would not be excessive to respond to what some of you have correctly termed a constitutional crisis. I understand one of you has already cancelled an out-of-state trip so as to be available during this period--a commendable and appropriate sacrifice in view of the seriousness of this moment. One or more members may also arrange to participate remotely by electronic means if necessary and agreeable to the commission.

## Staffing

The Court directed the commission to hire new mapmakers not beholden to either political caucus. "The commission should retain an independent map drawer—who answers to all commission members, not only to the Republican legislative leaders—to draft a plan through a transparent process." (at paragraph 30) I note that Court used "should" and not "shall," but given that this matter is heard in the Supreme Court without meaningful appeal regarding the limits of its authority, it would be wise to treat this suggestion with the degree of deference one might pay to the suggestions of one's spouse.

To assist the commission in this effort, I have retained a bipartisan duo of consulting experts through my office, who together can achieve the level of independent evaluation the court is requiring. I will make them available to the commission as a whole.

Sean Trende, a Republican analyst well-known to the readers of *Real Clear Politics,* or even causal viewers of cable news, and Bernie Grofman, a Democratic professor of political science at the University of California-Irvine, recently collaborated to produce maps for the State of Virginia. Their work was unanimously adopted by the Virginia Supreme Court.

Their charge should be simply to produce a map that complies with the Ohio Constitution and the orders of the Ohio Supreme Court. They understand the time limits of the court, the terms of the Constitution and the decisions regarding it and are prepared to go to work immediately.

Of course, you are not required to use them; I have undertaken to retain them because of the exigent circumstances created by the very short time allowed by the Court. Nor are you required to adopt their maps. It is my hope, however, that you will--their success in Virginia strongly commends them and their work to your consideration.

## Drafting in Public

The Court further wrote that the map-making should be done in public. "To promote transparency and increase public trust, the drafting should occur in public." (at paragraph 44)

The actual map-making is highly technical and performed on a single work-station. I do not read the Court's opinion to say that seven people should be jockeying in a public room to direct the operator of the mouse to do this or that conflicting action.

To comply with the Court's direction, I suggest that the Commission take public actions that achieve the clause seeking transparency and public trust. To that end the Commission could publish any maps at least 24 hours before a vote; meet in public, and receive a progress reports in public from the mapmakers prior to the completion of a map, and discuss in public any sticking points between map drafts or particular districts permutations. I believe a process like this is compliant with the public map making directive issued by the Court.

**Additional Criteria**

- The Court has now established <52% as the threshold for a "leaning" district; any index less than that is viewed by the Court as a competitive district.  The Court will exclude competitive districts from its partisanship calculation.  That is, if there are 32 competitive districts, then the remaining 100 districts must closely correspond to the 54 Republican to 46 Democrat ratio the majority has established.

- The Court wrote that efforts to protect incumbents are improper.   Such efforts "...can neither be a legitimate and neutral goal nor comport with Article XI, Section 6(A)."  (at paragraph 37)

- While competitive districts will not be counted in overall partisan balance, the Court in *dicta* was bothered by the imbalance in the number competitive districts (meaning those with an expected favorable margin of less than 52%) leaning Democratic versus those leaning Republican.  While the clustering of Democrats in urban enclaves creates challenges to making Republican-leaning districts more competitive, I would be remiss if I failed to note the Court's observation.

This is meant to be a summary of the major objections in *League III.*  The Constitution and the Court's actual opinions are controlling, of course, and my office stands ready to assist the Commission in navigating the multiple and sometimes competing objectives.

Finally, a note about process.  I have served on several multi-member bodies, and I've learned it is always a temptation to love too much my own advice, and my own theory of law.  I keep this passage from the Ohio Jury Instructions handy, and often review it before meetings:

*It is not wise to immediately express a determination to insist upon a certain verdict, because if your sense of pride is aroused, you may hesitate to change your position even if you later decide you are wrong.*

*Consult with one another, consider each other's views and deliberate with the objective of reaching an agreement, if you can do so without disturbing your individual judgment.*

*Each of you must decide… for yourself, but you should do so only after a discussion and consideration of the case with (the others).*

*Do not hesitate to change an opinion if convinced that it is wrong. However, you should not surrender honest convictions in order to be congenial or to reach a verdict solely because of the opinion of other(s).*

The hour is late, and I do not envy your task.  I hope this memorandum has made it easier to "begin again."

# Exhibit C
# to Affidavit of
# Respondent Vernon Sykes

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

CHAMBERS OF
**JEFFREY S. SUTTON**
CHIEF JUDGE



TELEPHONE
(614) 849-0134
FACSIMILE
(614) 849-0124

March 22, 2022

**<u>VIA EMAIL</u>**

The Honorable Robert R. Cupp
The Honorable Vernon Sykes
    Co-Chairs, Ohio Redistricting Commission

Dear Co-Chair Cupp and Co-Chair Sykes:

This letter is to confirm that the Ohio Redistricting Commission has engaged the services of the Office of the Circuit Mediators of the United States Court of Appeals for the Sixth Circuit to provide mediation services. Mediators Catherine Geyer and Scott Coburn will assist the Commission in negotiations to develop a state legislative district map. The expected timeframe of this engagement will begin immediately and continue through the conclusion of the approval process. Mediation services are provided as part of the mediators' services to the Court. There are no fees or expenses to the Ohio Redistricting Commission.

Consistent with the mediation practices of the Sixth Circuit, the Circuit Mediators will not share mediation communications with any judges within the Sixth Circuit, including district judges.

Sincerely,

/s/

Jeffrey S. Sutton

cc:    Marc Theriault, Circuit Executive
       Catherine C. Geyer, Chief Circuit Mediator
       Scott Coburn, Circuit Mediator

85 Marconi Boulevard, Columbus, Ohio 43215

# Exhibit D
# to Affidavit of
# Respondent Vernon Sykes




March 20, 2022

Dear Commissioners,

In our meeting yesterday, this commission set out a straightforward task to reconvene, possibly tonight, with recommendations for independent map drawers that could produce constitutional legislative districts. In an effort to aid our work as a commission, Attorney General Dave Yost retained two well-known, independent map drawers of national note, Bernard Grofman and Sean Trende.

The Democratic commission members today spoke with Grofman and Trende, as well as other highly qualified map drawing experts. We are in favor of the commission engaging the Attorney General's suggested mapmakers. We have also been in touch with nationally renowned mediators who could serve later in this process to help the commission finalize a bipartisan, constitutional set of legislative maps.

It is unfortunate that our colleagues were not prepared for a meeting tonight, which was tentatively scheduled for 7 p.m. As the deadline imposed on us by the Supreme Court of Ohio looms, time is of the essence. However, we remain confident that these issues can be resolved at our next meeting, scheduled for Monday, March 21 at 7 p.m., and the map drawing may immediately begin. There is still time for this process to result in the bipartisan, constitutional maps that the people of Ohio expect and anticipate from the commission.

Respectfully,

Senator Vernon Sykes
Co-Chair, Ohio Redistricting Commission
Senate District 28

C. Allison Russo
House Minority Leader
Commissioner, Ohio Redistricting Commission
House District 24

# Exhibit E
# to Affidavit of
# Respondent Vernon Sykes




March 21, 2022

Dear Commissioners,

As every member of the Ohio Redistricting Commission is aware, the Supreme Court of Ohio gave us a deadline of next Monday, March 28 to complete our constitutional duty to produce state legislative maps in accordance with the Ohio Constitution and the Supreme Court's orders.

Our Attorney General has offered his opinion that to meet the Court's demand of frequent meetings, that "daily meetings would not be excessive." In that spirit, we propose the following daily schedule for the Ohio Redistricting Commission:

- *The previously scheduled Tuesday, March 22 meeting at 9:00 AM*
- *Wednesday, March 23 at 5 PM*
- *Thursday, March 24 at 4 PM*
- *Friday, March 25 at 10 AM*
- *Saturday, March 26 at 1 PM*
- *Sunday, March 27 at 4 PM*
- *Monday, March 28 at 10 AM*

The above proposal is fair and meets the obligations set forth by the Supreme Court of Ohio and reiterated by the Attorney General.

Respectfully,

Senator Vernon Sykes
Co-Chair, Ohio Redistricting Commission
Senate District 28

C. Allison Russo
House Minority Leader
Commissioner, Ohio Redistricting Commission
House District 24

# Exhibit F
# to Affidavit of
# Respondent Vernon Sykes



# OHIO REDISTRICTING COMMISSION

---

March 23, 2022

Michael McDonald
Professor, University of Florida
Department of Political Science
222 Anderson Hall
P.O. Box 117325
Gainesville, FL 32611

Dear Dr. McDonald:

This letter confirms that the Ohio Redistricting Commission has approved the use of your professional services to assist the Commission, and its designated staff, in the timely production of state legislative district maps pursuant to directions provided to you by the Commission.

Your hourly rate is $450 plus related expenses for all state legislative district map work through March 28, 2022. The wages and expenses are capped at $49,000.

Sincerely,

_____
Speaker Robert R. Cupp, Co-Chair

_____
Senator Vernon Sykes, Co-Chair



## OHIO REDISTRICTING COMMISSION

March 23, 2022

Douglas Johnson
National Demographics Corporation
P.O. Box 5271
Glendale, CA 91221

Dear Mr. Johnson:

This letter confirms that the Ohio Redistricting Commission has approved the use of your professional services to assist the Commission, and its designated staff, in the timely production of state legislative district maps pursuant to directions provided to you by the Commission.

Your hourly rate is $450 plus related expenses for all state legislative district map work through March 28, 2022. The wages and expenses are capped at $49,000.

Sincerely,

_____          _____
Speaker Robert R. Cupp, Co-Chair          Senator Vernon Sykes, Co-Chair

# Exhibit G
# to Affidavit of
# Respondent Vernon Sykes



**OHIO REDISTRICTING COMMISSION**
**Ground Rules for Map Drawers – As Adopted on 3.23.2022**

1.) The map drawers shall include the two independent map drawers hired by the Redistricting Commission and Commissioners' staff/contractor map drawers.

2.) The independent map drawers shall draft any General Assembly district plan at the direction of the Redistricting Commission and in accordance with the Ohio Constitution and Supreme Court of Ohio's orders.

3.) The independent map drawers shall answer to each of the Redistricting Commission members. However, any conflicting direction from the Redistricting Commission members shall be resolved via the mediation process described below. (See Rules 12-16)

4.) The independent map drawers shall produce an entirely new general assembly district plan that has not been previously submitted to the Redistricting Commission. The independent map drawers shall not include or consider any general assembly plan proposals or work product produced prior to Wednesday, March 23, 2022 when drafting the entirely new general assembly district plan.

5.) The map drawers shall utilize statewide election results and geography from 2016, 2018, and 2020 for the purpose of measuring the partisan lean of individual districts.

6.) When considering the election results, Republican votes cast plus Democratic vote casts shall equal 100% of the total vote.

7.) Any General Assembly district plan shall be drawn in Maptitude.

8.) The independent map drawers shall utilize one computer purchased by the Redistricting Commission to draft any general assembly district plan. Two additional computers may be used for preparation purposes by the independent map makers on site.

9.) Racial data will neither be loaded onto the computers nor shall it be utilized by the map drawers in any way.

10.) The independent map drawers shall draw a general assembly district plan that conforms with the Ohio Constitution including Article 11, Sections 1, 2, 3, 4, 5, 6, and 7, the Constitution of the United States and applicable federal laws.

11.) The independent map drawers shall draw a general assembly district plan that conforms with the opinions of the Ohio Supreme Court and the United States Supreme Court.

12.) Should the independent map drawers encounter a disagreement between themselves regarding the application of Art. 11 of the Ohio Constitution and/or the opinions of the Ohio Supreme Court, the issue shall be referred to the full Commission.

13.) Should the full Redistricting Commission reach a unanimous consensus, the independent map drawers shall implement the instructions of the full Redistricting Commission.

14.) Should the full Redistricting Commission not be able to resolve the issue by unanimous consensus, the issue shall be referred to mediation.

15.) Should mediation fail to resolve the issue, the issue shall be presented to the full Redistricting commission for a vote. A majority vote of the Commission shall resolve the issue.

16.) The map drawers will then implement the decision of the Commission regarding the disputed issue.

17.) Upon adoption of a general assembly district plan the independent map drawers shall complete and file with the Secretary of State, a geographical legal description of each House and Senate district, shape files, equivalency files and county population and filing location for the most populous county in each district, and any applicable Art 11, Sec. 5 Senate assignments in a manner requested by the Secretary of State within ten days.

18.) The independent map drawers agree that they have been hired by the Ohio Redistricting Commission, and as such, they owe a duty of fidelity to the Ohio Redistricting Commission. Accordingly, the independent map drawers shall not discuss or communicate with any person, organization, or group – aside from the Ohio Redistricting Commission and the Commission members' staffs—regarding any aspect of the substance of any redistricting plan. Failure to abide by this requirement may result in the immediate termination of the independent map drawer's contract along with all available remedial measures caused by the independent map drawer's breach of their duty of fidelity to the Ohio Redistricting Commission.

19.) The meetings of independent map drawers will be held in Room 116 in the Ohio Statehouse. This will be the designated work space for the independent map drawers. No materials shall be taken off site.

20.) The Statehouse's Ohio Government TV will livestream the map making process in Room 116. OGT will stream the map drawers whenever they are working in the room.

21.) Commissioners or their designated staff shall have unlimited access to the map drawers, but shall contact both Dr. McDonald and Mr. Johnson simultaneously.

22.) The independent map drawers will provide regular progress updates to the Commission at each of the Commission's scheduled meetings.

23.) Commissioners can expect to provide feedback and guidance to the independent map drawers in these meetings in addition to their individual outreach to the independent map drawers as provided in Rule 21.

24.) Public access will be only be available in a nearby room where video from the work room will be broadcast.

# Exhibit H
# to Affidavit of
# Respondent Vernon Sykes

**From:** Rowe, Mike  Mike.Rowe@ohiosenate.gov
**Subject:** Response from Co-Chair Sykes
**Date:** March 26, 2022 at 1:50 PM
**To:** Christine.Morrison@ohiohouse.gov
**Cc:** Paul.Disantis@ohiohouse.gov



Hello Christine,

Here is the response from Senator Sykes to the memo from Speaker Cupp.

Mike Rowe
Senate Minority Chief of Staff

**********************************

Dear Co-Chair Speaker Cupp,

This letter serves as a follow up to our phone conversation earlier today.

First, I do not believe the proposed memo I received on March 25, 2022 regarding the independent mapmakers is appropriate at this time.

The independent mapmakers have previously agreed to provide different options for Franklin County and President Huffman is welcome to follow up with them any hearing. Under the independent map drawer ground rules adopted by the Commission, each Commissioner has the right to express their views or make requests to the map drawers. They can do so at a meeting or whenever else they want, so long as the Commissioner addresses both map drawers at the same time.

I do agree it is reasonable for the Commission to get information from the map drawers in advance of each Commission meeting. But rather than interrupt the map drawers themselves, I think the map drawers should work with the designated staff of Commissioners to determine how to provide updated information to the Commissioners in advance of meetings. I suggest we present and adopt this revised procedure at the next meeting.

Finally, the map drawers have our instructions and requirements from the ground rules, and I do not believe we should unnecessarily emphasize some instructions or requirements over others. I believe any change to the ground rules is unnecessary at this time.


Sincerely,


Senator Vernon Sykes, Co-Chair
Ohio Redistricting Commission