# EXHIBIT 11

# IN THE SUPREME COURT OF OHIO

| | | |
|---|---|---|
| **League of Women Voters of Ohio,** *et al.*, | : | |
| | : | **Case No. 2021-1193** |
| **Petitioners,** | : | |
| | : | **Original Action Filed Pursuant to** |
| **v.** | : | **Ohio Constitution, Article XI, Section 9(A)** |
| | : | |
| **Ohio Redistricting Commission,** *et al.*, | : | **[Apportionment Case Pursuant to S. Ct.** |
| | : | **Prac. R. 14.03]** |
| **Respondents.** | : | |

---

| | | |
|---|---|---|
| **Bria Bennett,** *et al.*, | : | |
| | : | **Case No. 2021-1198** |
| **Petitioners,** | : | |
| | : | **Original Action Filed Pursuant to** |
| **v.** | : | **Ohio Constitution, Article XI, Section 9(A)** |
| | : | |
| **Ohio Redistricting Commission,** *et al.*, | : | **[Apportionment Case Pursuant to S. Ct.** |
| | : | **Prac. R. 14.03]** |
| **Respondents.** | : | |

---

| | | |
|---|---|---|
| **The Ohio Organizing Collaborative,** *et al.*, | : | |
| | : | **Case No. 2021-1210** |
| **Petitioners,** | : | |
| | : | **Original Action Filed Pursuant to** |
| **v.** | : | **Ohio Constitution, Article XI, Section 9(A)** |
| | : | |
| **Ohio Redistricting Commission,** *et al.*, | : | **[Apportionment Case Pursuant to S. Ct.** |
| | : | **Prac. R. 14.03]** |
| **Respondents.** | : | |

---

## RESPONSE OF RESPONDENTS SENATOR VERNON SYKES AND HOUSE MINORITY LEADER C. ALLISON RUSSO TO PETITIONERS' OBJECTIONS

C. BENJAMIN COOPER (0093103)
  *Counsel of Record*
CHARLES H. COOPER, JR. (0037295)
CHELSEA C. WEAVER (0096850)
Cooper & Elliott, LLC
305 West Nationwide Boulevard
Columbus, Ohio 43215
(614) 481-6000
(614) 481-6001 (fax)
benc@cooperelliott.com
chipc@cooperelliott.com
chelseaw@cooperelliott.com

**Special Counsel for Respondents
Senator Vernon Sykes and
House Minority Leader C. Allison Russo**

FREDA J. LEVENSON (0045916)
ACLU of Ohio Foundation, Inc.
4506 Chester Avenue
Cleveland, OH 44103
Tel: (614) 586-1972 x125
flevenson@acluohio.org

DAVID J. CAREY (0088787)
ACLU of Ohio Foundation, Inc.
1108 City Park Avenue, Suite 203
Columbus, OH 43206
Tel: (614) 586-1972 x2004
dcarey@acluohio.org

ALORA THOMAS (PHV 22010)
JULIE A. EBENSTEIN (PHV 25423)
American Civil Liberties Union
125 Broad Street
New York, NY 10004
Tel: (212) 519-7866
athomas@aclu.org
jebenstein@aclu.org

ROBERT D. FRAM (PHV 25414)
DONALD BROWN (PHV 25480)
JOSHUA GONZÁLEZ (PHV 25424)
DAVID DENUYL (PHV 25452)
JULIANA GOLDROSEN (PHV 25193)
Covington & Burling LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
Tel: (415) 591-6000
rfram@cov.com

ALEXANDER THOMAS (PHV 25462)
Covington & Burling LLP
850 W. Tenth Street, NW
Washington DC 20001
Tel: (202) 662-5968
athomson@cov.com

ANUPAM SHARMA (PHV 25418)
YALE FU (PHV 25419)
Covington & Burling LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306
Tel: (650) 632-4716
asharma@cov.com
yfu@cov.com

**Counsel for Petitioners**
**League of Women Voters of Ohio,** *et al.*

DONALD J. MCTIGUE (0022849)
DEREK S. CLINGER (0092075)
McTigue Colombo & Clinger LLC
545 East Town Street
Columbus, OH 43215
Tel: (614) 263-7000
dmctigue@electionlawgroup.com
dclinger@electionlawgroup.com

ABHA KHANNA (PHV 2189)
BEN STAFFORD (PHV 25433)
Elias Law Group
1700 Seventh Ave., Suite 2100
Seattle, WA 98101
Tel: (206) 656-0716
akhanna@elias.law
bstafford@elias.law

JYOTI JASRASARIA (PHV 25401)
SPENCER W. KLEIN (PHV 25432)
Elias Law Group
10 G Street NE, Suite 600
Washington, DC 20002
Tel: (202) 968-4490
jjasrasaria@elias.law
sklein@elias.law

**Counsel for Petitioners
Bria Bennett, *et al.***

ALICIA L. BANNON (PHV 25409)
YURIJ RUDENSKY (PHV 25422)
HARRY BLACK (PHV 25544)
Brennan Center for Justice at NYU School
of Law
120 Broadway, Suite 1750
New York, NY 10271
Tel: (646) 292-8310
alicia.bannon@nyu.edu

PETER M. ELLIS (0070264)
M. PATRICK YINGLING (PHV 10145)
NATALIE R. SALAZAR
Reed Smith LLP
10 South Wacker Drive, 40th Floor
Chicago, IL 60606
Tel: (312) 207-1000
pellis@reedsmith.com

BRIAN A. SUTHERLAND (PHV 25406)
Reed Smith LLP
101 Second Street, Suite 1800
San Francisco, CA 94105
Tel: (415) 543-8700
bsutherland@reedsmith.com

BEN R. FLIEGEL (PHV 25411)
Reed Smith LLP
355 South Grand Avenue, Suite 2900
Los Angeles, CA 90071
Tel: (213) 457-8000
bfliegel@reedsmith.com

BRAD A. FUNARI (PHV 3139)
DANIELLE L. STEWART (0084086)
Reed Smith LLP
225 Fifth Avenue
Pittsburgh, PA 15222
Tel: (412) 288-4583
bfunari@reedsmith.com
dstewart@reedsmith.com

**Counsel for Petitioners**
**The Ohio Organizing Collaborative,** *et al.*

JOHN W. ZEIGER (0010707)
MARION H. LITTLE, JR. (0042679)
CHRISTOPHER J. HOGAN (0079829)
Zeiger, Tigges & Little LLP
3500 Huntington Center
41 South High Street
Columbus, Ohio 43215
Tel: (614) 365-9900
zeiger@litohio.com
little@litohio.com
hogan@litohio.com

**Counsel for Respondent
Governor Mike DeWine**


JONATHAN D. BLANTON (0070035)
JULIE M. PFEIFFER (0069762)
MICHAEL A. WALTON (0092201)
Ohio Attorney General
30 E. Broad Street, 16th Floor
Columbus, OH 43215
Tel: (614) 466-2872
jonathan.blanton@ohioago.gov
julie.pfeiffer@ohioago.gov
michael.walton@ohioago.gov

**Counsel for Respondents
Secretary of State Frank LaRose and
Auditor Keith Faber**

ERIK J. CLARK (0078732)
ASHLEY MERINO (0096853)
Organ Law LLP
1330 Dublin Road
Columbus, OH 43215
Tel: (614) 481-0900
ejclark@organlegal.com
amerino@organlegal.com

**Counsel for Respondent
Ohio Redistricting Commission**

W. STUART DORNETTE (0002955)
BETH A. BRYAN (0082076)
PHILIP D. WILLIAMSON (0097174)
Taft Stettinius & Hollister LLP
425 Walnut St., Suite 1800
Cincinnati, OH 45202
Tel: (513) 381-2838
dornette@taftlaw.com
bryan@taftlaw.com
pwilliamson@taftlaw.com

PHILLIP J. STRACH (PHV 25444)
THOMAS A. FARR (PHV 25461)
JOHN E. BRANCH, III (PHV 25460)
ALYSSA M. RIGGINS (PHV 25441)
GREG MCGUIRE (PHV 25483)
Nelson Mullins Riley & Scarborough LLP
4140 Parklake Ave., Suite 200
Raleigh, NC 27612
Tel: (919) 329-3812
phil.strach@nelsonmullins.com
tom.farr@nelsonmullins.com
john.branch@nelsonmullins.com
alyssa.riggins@nelsonmullins.com
greg.mcguire@nelsonmullins.com

**Counsel for Respondents
Senate President Matt Huffman and
House Speaker Robert Cupp**

## IN THE SUPREME COURT OF OHIO

| | | |
|---|---|---|
| **League of Women Voters of Ohio,** *et al.*, | : | |
| | : | **Case No. 2021-1193** |
| **Petitioners,** | : | |
| | : | **Original Action Filed Pursuant to** |
| **v.** | : | **Ohio Constitution, Article XI, Section 9(A)** |
| | : | |
| **Ohio Redistricting Commission,** *et al.*, | : | **[Apportionment Case Pursuant to S. Ct.** |
| | : | **Prac. R. 14.03]** |
| **Respondents.** | : | |

---

| | | |
|---|---|---|
| **Bria Bennett,** *et al.*, | : | |
| | : | **Case No. 2021-1198** |
| **Petitioners,** | : | |
| | : | **Original Action Filed Pursuant to** |
| **v.** | : | **Ohio Constitution, Article XI, Section 9(A)** |
| | : | |
| **Ohio Redistricting Commission,** *et al.*, | : | **[Apportionment Case Pursuant to S. Ct.** |
| | : | **Prac. R. 14.03]** |
| **Respondents.** | : | |

---

| | | |
|---|---|---|
| **The Ohio Organizing Collaborative,** *et al.*, | : | |
| | : | **Case No. 2021-1210** |
| **Petitioners,** | : | |
| | : | **Original Action Filed Pursuant to** |
| **v.** | : | **Ohio Constitution, Article XI, Section 9(A)** |
| | : | |
| **Ohio Redistricting Commission,** *et al.*, | : | **[Apportionment Case Pursuant to S. Ct.** |
| | : | **Prac. R. 14.03]** |
| **Respondents.** | : | |

---

## AFFIDAVIT OF RESPONDENT ALLISON RUSSO

State of Ohio
County of Franklin, SS:

I, C. Allison Russo, hereby submit the following affidavit and state under oath and penalty of perjury as follows:

**Introductory Information**

1. I have personal knowledge of all the information below.

2. I am a member of the Ohio House of Representatives, representing District 24. I assumed office on January 1, 2019. On January 12, 2022, the Ohio House Democratic Caucus elected me as the Ohio House Minority Leader. I was sworn in as Minority Leader during the House's session on January 26, 2022.

3. I serve as a Commissioner on the Ohio Redistricting Commission ("Commission"). I am the only woman on the Commission. I serve as a representative from the Democratic Party, along with Co-Chair Senator Vernon Sykes (together, the "Democratic Commissioners"). The remaining five Commissioners are Republicans (together, the "Republican Commissioners").

4. I was sued in the above-captioned case and am a named Respondent. The Ohio Supreme Court, however, has recognized that my interests align more with the Petitioners than that of the Commission or the Republican Commissioners. Opinion 2022-Ohio-65, ¶ 66. I have urged the Supreme Court to invalidate the Commission's previous General Assembly maps because they violated Section 6, Article XI of the Ohio Constitution.

5. On March 16, 2022, the Ohio Supreme Court declared the Commission's third General Assembly plan (the "Third Plan") invalid and directed the Commission to create a new plan by March 28, 2022. Opinion, 2022-Ohio-789 ("*LWV III*").

6. On March 30, 2022, the Supreme Court ordered that "responses, if any," to "petitioners' motion for an order directing respondents to show cause for why they should not be

held in contempt of the court's March 16, 2022 order," be filed by April 4, 2022. I submit this affidavit in response to that order. I have filed three affidavits in this case previously, each detailing my efforts to comply with the Ohio Constitution and this Court's orders. I incorporate those by reference. *See* March 2, 2022 Affidavit of C. Allison Russo; February 23, 2022 Affidavit of C. Allison Russo; January 28, 2022 Affidavit of C. Allison Russo.

7.      The Petitioners' motions for an order to show cause accurately describes the Commission's process and actions following the March 16 order. As described, the Commission hired independent mapdrawers (one selected by each caucus), who were drawing maps from scratch, in public, with direction from the Commission which was meeting almost daily. But, just days before that transparent, independent process to develop a constitutional plan concluded—when my Republican colleagues could see that an independent plan would emerge—they attempted to undermine the entire process.

8.      The result: just minutes before the independent mapdrawers completed the most final version of their map, Co-chairman Cupp with Senator Huffman's second proposed adopting maps, drawn by the Republican mapdrawers alone, that were over 97% the same as the Third Plan this Court already held unconstitutional. The Republicans would not allow any amendments or even time to review. And, with a vote of four of the Republican Commissioners, the Commission adopted that plan (the "Fourth Plan"). I voted against that plan and instead for the independent mapdrawers' plan.

9.      I understand that Petitioners again seek to have this Court hold the Commission and/or Commissioners in contempt. Last time that Petitioners made such a request, the Commission (over my dissent) failed to adopt a map at all even though the Democratic Commissioners and Petitioners had presented constitutional maps that could have been adopted.

2

This time there is a plan, but, as I said in our March 28, 2022 Commission meeting as the Republican Commissioners again violated their duty to adopt a constitutional map, it was a "farce." As before, the Republican Commissioners could have adopted a constitutional plan. They had been observing, monitoring, and guiding the independent mapdrawers for days. But they chose not to because it would weaken their supermajority.

10.     As detailed below, since this Court's March 16 order, I worked diligently alongside Co-Chair Sykes to comply with the order. Together, we (1) requested that the Commission meet immediately and often; (2) identified and procured independent mapdrawers and mediators; (3) were willing to work collaboratively with the other Commissioners and their staff on any plans or ideas had they been proposed; and (4) moved to adopt a new constitutional plan prepared in public by the independent mapdrawers. Because I worked diligently to help the Commission produce a constitutional plan, voted for that constitutional plan, and opposed the Republican Commissioners' last-minute takeover and unconstitutional Fourth Plan, I respectfully request that the Court does not order me to show cause or hold me in contempt.

11.     But I do ask the Court to take strong action to ensure that the Commission adopt a constitutional map before the federal court usurps our constitutional process and selects a plan on April 20, 2022. Indeed, that court has indicated that it is even entertaining mandating plans that this Court has held are unconstitutional. With Article XI, the voters of Ohio asked for the Commission to draw fair maps and entrusted the Ohio Supreme Court with both the power and responsibility to protect that choice. It is still my hope that, with this Court's help, we can fulfill that responsibility to the people of Ohio.

**Immediately After the Court's Order, the Democratic Commissioners Worked Diligently to Arrange for Frequent Meetings and for a New Plan to be Drawn in Public by Independent Experts.**

12.     **Wednesday, March 16, 2022**. As urged by the Democratic Commissioners, the Ohio Supreme Court invalidated the Third Plan in an opinion and order published at approximately 9:45pm on March 16, 2022. Having received notice of the Court's order on Wednesday evening, I hoped that a notice of the Commission's next meeting would be issued post haste, but was prepared to call for one if not, as the Commission needed to reconvene to, once again, adopt new maps.

13.     The March 16 order set forth clear rules and guidance for the Commission that I diligently worked to follow throughout the process. After holding the Third Map invalid, the Court described a process that should be followed. It held that the Commission "be reconstituted" and that "the commission draft and adopt an entirely new General Assembly-district plan." *LWV III* ¶ 44. Based on the Court's explanations, I took this to mean that the Commission itself, rather than the partisan staff who had been drawing maps, had to oversee the mapdrawing process. The map had to be "entirely new"—that is, not start from one of the previous unconstitutional versions. And the Court said that we should hire an "independent" mapdrawer that answers to the entire Commission—not just some Commissioners—"to draft a plan" for the Commission. *LWV III* ¶¶ 30, 44.  And it stated that the process should be "transparent," that "drafting should occur in public," and that "the commissioners should convene frequent meetings." *LWV III* ¶ 44.

14.     The March 16 order also made clear the substantive requirements for adopting a constitutional map. It invalidated the Third Plan in part because of the "gross and unnecessary disparity in the allocation of close districts," as the Third Plan had 19 so-called Democratic-leaning House districts and 7 so-called Democratic-leaning Senate districts that were in the 50 – 52%

4

margin, and no such Republican-leaning House or Senate districts. *LWV III* ¶ 43. That meant, going forward, the Commission needed to draw a plan that met the 45-54 proportionality ratio, as close as possible while complying with Article XI, §§ 2, 3, 4, 5, and 7—but in doing so, competitive seats of between 50 and 52% needed to be symmetrically allocated and not be so one-sided against either party.

15. The Court gave the Commission a deadline of March 28 to file a new plan with the Secretary of State and until March 29 at 9am to file the plan with the Court.

16. **Thursday, March 17, 2022.** The morning after receiving the Ohio Supreme Court's decision that the Commission's maps were unconstitutional and the order for the Commission to draw new constitutional maps, I directed my staff to follow the Court's order, prepare for the Commission to adopt constitutional maps, and make themselves available to the other Commission members and their staff.

17. Because I had not yet seen a notice of a scheduled meeting, I sent a letter to my fellow Commissioners urging that we meet frequently and hire independent map drawers. A copy of that letter is attached as Exhibit A. I received a letter that day from Co-Chair Sykes calling for immediate and frequent meetings as well.

18. I also wrote to Senator Robert McColley on March 17 to arrange for the Legislative Task Force on Redistricting Co-chairs to allocate whatever funding might be necessary to the Commission to engage independent map drawers. Senator McColley and I serve as co-chairs of that Task Force, and from that role I knew (as I had said at multiple Commission meetings) that there were ample funds to hire experts and other support for the Commission.

19. **Friday, March 18, 2022.** On Friday, March 18, I was pleased to see that the Commission co-chairs had noticed a Commission meeting at 2:00pm the next day.

20.     I also received a memo sent to all Commissioners by the Attorney General that evening, which is attached as Exhibit B. The Attorney General, in his role as "chief legal officer of the state," took the opportunity to explain the March 16 order to the Commissioners and make recommendations about "steps forward." Yost encouraged daily meetings and drafting in public. He also states that "[t]he Court directed the commission to hire new mapmakers not beholden to either political caucus," and, to that end, explained that he had retained Sean Trende, a Republican analyst, and Bernie Grofman, a Democratic professor of political science, to help in the mapdrawing process. The pair had just completed state legislative maps that are now being implemented in Virginia.

21.     As to the substance of drawing a plan, the Attorney General also told us that districts that were drawn to have between 50% and 52% partisan slant were considered "competitive" districts and could not be counted as Democratic or Republican leaning; they are "exclude[d]" from the proportionality calculation. He also warned that "efforts to protect incumbents are improper."

22.     I was encouraged by this memorandum, as I believed it set forth some important steps the Commission needed to take and provided a clear and faithful interpretation of the Court's order. If the Republican Commissioners were willing to follow their own Attorney General's advice and interpretation, we could adopt a constitutional map.

23.     **Saturday, March 19, 2022.** On Saturday, March 19, 2022, the Commission reconvened for the first time since the Court's order invalidating the Third Plan. The Commission tentatively agreed to retain independent mapdrawers—one selected by each caucus—who would be charged with drawing a plan that was compliant with the Ohio Constitution and this Court's orders. And there was consensus, including several statements from Governor DeWine, that the

independent mapdrawers should just be ordered to follow the Ohio Constitution and the Court's three decisions, Tr. 3/19/2022 at 00:40:14, 01:15:47, nothing else. President Huffman, acknowledging that the Court had singled him out for his previous prioritizing of incumbency, stated: "I think [prioritizing incumbency] was also criticized by the court [and] that we should not consider incumbency in drawing these maps. So I just want to kind of get that out." Tr. 3/19/2022 at 46:22.

24.     The Commission decided to empower the co-chairs to prepare a recommendation for a pair of mapdrawers. I expressed concern that the Commission itself, rather than the Attorney General, should hire independent mapdrawers; as it was our duty in the Constitution and as articulated by the Court. I also expressed concern that Mr. Trende, one of the experts the Attorney General had selected, had already appeared as an expert witness for the Republican Commissioners in this very case. While I explained that any expert was going to have bias and have appeared in the past for previous political parties or advocacy groups, I was concerned about direct conflicts of interest in this same matter. But I did not close the door on the Attorney General's recommendation and kept an open mind; it was important that we move quickly to get independent mapdrawers working.

25.     Also at the March 19 meeting, the Commission scheduled meetings each day through Tuesday, March 22, and the Commission directed all the Commissioners' staff to work together over the weekend until independent mapdrawers were hired.

26.     I believed the Commission meeting went well, but I was concerned by Co-chair Cupp's comments that other Commissioners seemed excessively optimistic. Tr. 3/19/2022 at 1:00:44. Likewise, while I was encouraged by Governor DeWine's comments emphasizing the Commission's duty to adopt maps and follow the Court's orders, I was also concerned by the

Governor's comments suggesting that it might not be possible to draw a constitutional map. I believed and still believe that maps complying with Article XI, Sections 2, 3, 4, 5, and 7, **_and_** 6 can be created in a relatively short period of time and well within the time frames ordered by the Court. The record clearly shows it is achievable. But I felt apprehensive because of the three previous refusals of Republican Commissioners to follow the dictates of our state constitution. And even at this first meeting, the Republican Commissioners were planting the seeds for the process to fail; saying that there would not be enough time (there was) or that a constitutional map satisfying the Court's orders was impossible (it's not). But I also felt excited to try again, finally with a process the people deserved: independent mapdrawers whose work would be livestreamed to the public. I knew we could adopt constitutional maps and pressed forward despite signals from some Republican Commissioners that they might run the same playbook of denial, delay, and dereliction.

27.     I asked my staff to identify potential independent mapdrawers and attempt to set up meetings so we could have multiple options.

28.     After the Commission meeting, at around 6:00pm, Mr. Randall Routt contacted all Commissioners' staff letting them know he, Democratic contractor Chris Glassburn, and my staff were available to meet over the weekend as the Commission had just directed.

29.     **Sunday, March 20, 2022.** I proceeded with identifying and meeting with potential independent mapdrawers, as I wanted the Commission to retain a pair of mapdrawers to start as soon as possible. My staff set up calls with Nathaniel Persily and Michael McDonald in the morning. The Attorney General scheduled a call for Co-Chair Sykes and me to meet his recommended experts Bernard Grofman and Sean Trende in the afternoon. Dr. Persily indicated that he was available but only as a solo independent mapdrawer. Dr. McDonald indicated he would

be available and could work in a pair and in public with another mapping professional selected by the other Commission members if needed. Mr. Grofman and Mr. Trende indicated that they could work well together and complete Ohio maps in a short time, but they had some schedule limitations and Mr. Grofman could not be in Ohio in person.

30.     Despite my concerns, Senator Sykes and I agreed that we would recommend proceeding with the Attorney General Grofman/Trende recommendation because we wanted to move quickly and, given that they had been recommended by the Attorney General, we thought it might be the most acceptable pair to the other Commissioners. We expressed such agreement in a letter we sent to the other Commissioners that day, attached as Exhibit C. We hoped that our agreeability would speed up the process by allowing the Commission to approve hiring experts that night. If the Commission decided against the initial pair, we would proceed with recommending Dr. McDonald.

31.     Additionally, my staff reported to me that they met with the other Commissioners' staff for about 90 minutes on this Sunday to discuss what the independent mapdrawers would need to begin and complete their process. My staff described it as an agreeable meeting, and we were ready for the 6:00pm Commission meeting that evening to make our recommendations for mapdrawers. We had an abundance of options and the direction that we as a Commission would give to the mapdrawers seemed clear.

32.     Unfortunately, later that afternoon, Co-Chair Sykes informed me that Co-Chair Cupp wanted to cancel that night's meeting because he was not prepared with a mapdrawer recommendation and because many of the Republican Commissioners were not available. I felt confident that independent mapdrawers could complete maps for Ohio quickly, but I was

9

concerned about what I viewed as an unnecessary delay in getting them started. Senator Sykes and I decided the next morning to insist that all scheduled meetings go forward.

33.     **Monday, March 21, 2022 — Wednesday, March 23, 2022.**  During the early part of the week, the Commission made progress on setting up an independent and transparent mapdrawing process. It made progress in several ways:

34.     *First,* the Commission retained two independent mapdrawers; one selected by each caucus. On Monday, March 21, 2022, I learned that the Republicans had decided not to go along with the Attorney General's Grofman/Trende recommendation and instead chose Dr. Douglas Johnson. Co-Chair Sykes and I selected Dr. McDonald, who could arrive in Columbus the next day. The Commission approved hiring these two experts to work together to draft a plan. The Commission also agreed to ground rules for the independent mapdrawers during a meeting on Wednesday, March 23. By those rules, the mapdrawers were instructed to draw maps from scratch (not based on previous plans) that complied with the Ohio Constitution and the Court's orders— no other considerations were included. The rules set up a transparent process where Democratic and Republican staff could always be present, and the public could view the workroom via livestream.

35.     *Second*, the Commission decided to utilize mediators. Co-Chair Sykes had been working on identifying potential mediators to aid the Commission in case of disagreements between the members or disagreements between the mapdrawers. At the Monday, March 21, 2022 meeting, at Co-Chair Sykes' invitation, the Commission heard a presentation from the Sixth Circuit's Chief Mediator, and the next day the Commission decided to utilize the Sixth Circuit's mediation office to resolve disputes should any arise. My staff and I met with the mediators to have introductory conversations and learn about the mediation process.

36. *Third*, the Commission adopted a schedule of daily meetings extending the Court's March 28 deadline. The Commission also engaged the Sixth Circuit mediators to assist the Commission where needed in the days ahead. Later that evening, Dr. McDonald arrived in Ohio.

37. Throughout each of these days, my goal was to keep the process moving as quickly as possible while complying with the constitution and this Court's orders. That meant while I may have preferred different ground rules or different processes, I held my objections to a minimum to facilitate the completion of this process. I truly believed that the Commission could adopt a constitutional map through a transparent process with independent mapmakers. At the same time, however, based on their past actions, I was worried that my fellow commissioners might sabotage or abandon this new process at any time.

**The Independent Mapdrawers, following a Transparent and Collaborative Process, Worked Diligently to Complete a Constitutional Map.**

38. **Thursday, March 24, 2022.** The mapdrawers commenced their work on Thursday, March 24. At approximately 8:00am, the Ohio Channel began to livestream the "workroom"—a committee room at the Capitol that was set up for the mapdrawers. Legislative staff set up computers and installed the necessary software. There were some delays in getting the proper data in the software program, and my staff reported to me that the Republican mapmakers were not being helpful in resolving these issues. But once these issues were resolved, the mapmakers got to work.

39. I directed my staff to make sure that either Mr. Glassburn or Mr. Routt were always in the workroom with the independent mapdrawers to provide any assistance requested.

40. At the Commission's 7:00pm meeting, the mapdrawers provided an update on their progress to the Commission, then got back to work.

11

41. **Friday, March 25, 2022.** The independent mapdrawers continued to work diligently and made progress toward completing a plan. There was no indication that they would not finish on time or would be unable to comply with the Court's orders. Quite the opposite, though belated, I was finally seeing an independent and transparent process to draw maps that were compliant with the constitution and not designed to entrench the Republicans' supermajority. The fair process that Ohio voters had asked for was taking shape. I observed the independent mapmaking process both by visiting the workroom and via the livestream. Dr. McDonald and Dr. Johnson each had separate computers where they could draft and try out ideas. They sat next to each other and chatted frequently. They suggested different ideas, each pursuing different suggestions not based on partisan advantage or hidden motives, but in a pure attempt to just see what would work. They were developing a truly independent map, in public, with no single party pulling strings behind the scenes.

42. While the independent mapdrawers were making good progress and following the Commission's ground rules, it was clear that my Republican colleagues were becoming frustrated by the possibility that it would be successful. Our Commission meetings became filled with Republican complaints about printouts not being large enough, maps not being shared long enough in advance before meetings, not enough options for each region being provided, and not enough Commissioner input. Yet, each time the independent mapdrawers asked for guidance, the Commission refused to give it. Even if we recessed to have more time to look at proposed options, the Commissioners still refused to provide the requested guidance.

### Over My Objection, the Republican Commissioners Prioritized Protecting Incumbents and Attempted to Derail the Independent Mapdrawers' Progress.

43. **Saturday, March 26, 2022**. By Saturday, March 26—with two full days left before our deadline—each of the mapdrawers had completed a draft House map to present to the

12

Commission. (House maps were completed first because Senate districts are combinations of three House districts.) Both plans had 45 Democratic-leaning House districts and 54 Republican-leaning House districts. Not only had both the Republican-selected and the Democratic-selected independent mapdrawers achieved partisan proportionality, but they had achieved almost perfect partisan symmetry for competitive districts. Both maps had three Democratic-leaning districts between 50% and 52%; the Johnson map had two such Republican districts; and the McDonald map had three.

44.    At the 4:00pm Commission meeting, after hearing the update from the independent mapdrawers, it was clear that they could timely complete the task. Each had drawn proportional and symmetrical maps, and there were not too many disagreements between the two.

45.    The Republican Commissioners, however, seemed to want to obstruct and discredit the independent process in any way possible. The Republican Commissioners, for example, started to complain that the maps were not compact (they were).  And President Huffman's main complaint was that the maps placed several Republican incumbents in the same district (a practice he called "double bunking"). At that point, the independent mapdrawers did not have access to any addresses for incumbents; so any double bunking was inadvertent and a byproduct of drawing constitutional maps. But President Huffman and the Republican Commissioners indicated that they would never support a map that did not protect their colleagues. President Huffman had apparently already forgotten what he had told us at the first Commission meeting on March 19—that we shouldn't consider or prioritize incumbents. He proposed that, before a merged clean map was even drawn, incumbency data be added and that the mapdrawers be directed to avoid placing multiple incumbents in the same district to the extent possible. Though President Huffman's

13

concern started out targeted at Senators who were in the middle of their terms, it expanded to wanting, to the extent possible, all House and Senate incumbents protected by the new maps.

46. I immediately objected, as did Co-Chair Sykes. I was concerned that adding in incumbency data would slow down the process and make the maps less compact and symmetrical. The goal was to produce constitutional maps; that was our top priority, not protecting incumbents. And the Court had warned us about using incumbency data and the Attorney General, following that opinion, told us it was "improper." Co-Chair Sykes suggested that the issue go to mediation.

47. **Sunday, March 27, 2022**. On Sunday, March 27, we worked with the mediator on coming to a resolution of the incumbency issue. Though I did not want any incumbency data used, we also had to face the reality that the Republican Commissioners have the majority, and they wanted—as they stated at the Commission meetings—to require the independent mapdrawers to incorporate incumbency into their maps *even before* they had created a single constitutional map without incumbent consideration. To move the process forward, we agreed to a resolution that would allow the independent mapdrawers to draw a clean map first, before tainting it with trying to protect all the incumbents.

48. The final resolution of our mediation was an agreement to instruct the mapmakers, which we did, as follows: "Upon completion of the independent map drawers' merger of their independent versions of the House and Senate maps and prior to any presentation to the Commission, the independent mapdrawers shall consider the residence locations of non-term limited House and Senate incumbents, and Senate incumbents in mid-term, in drafting a Commission map, and where possible without violating constitutional principles, avoid pairing incumbents and also drawing districts such that Senators protected under Section 5 of Article 11 no longer live in the district they represent. Incumbents will be identified as House or Senate and

14

no other identifying information shall be used." *See* Mediation Agreement—Instructions to Mapdrawers with Regard to Incumbents, as adopted March 27, 2022.

49.     At the March 27 hearing, each independent mapdrawer also presented their plans. Before combining them and producing a unified set of maps, they sought the Commission's input again. There were multiple different options the Commission could select and get a constitutional result, and the Commission could choose. For example, they wanted the Commission's decision— as they had asked the previous day—as to whether a district drawn that included some of Montgomery County should extend to Greene County or to Preble County. The Commission recessed to evaluate the different plans. Upon returning from the recess, I moved that the Commission provide direction to the independent mapdrawers about the various areas they had given us choices about.

50.     Yet, even after recess and time to consider the various proposals, the Republican Commissioners opposed voting to give clear guidance on these issues to the mapmakers. Several of the Commissioners expressed their informal views, and then I asked that the mapmakers move forward with their understanding based on that discussion. In my view, it was hypocritical that the Commissioners had been asking for options and choices, and then when presented with options and choices that would be constitutional, the Republican Commissioners would not provide feedback. But I did not want these choices—or lack thereof—to delay the independent mapdrawers' work, so I asked them to continue.

**The Republican Commissioners Abandoned the Independent Process and Refused to Fulfill Their Obligation to Adopt a Constitutional Map.**

51.     **Monday, March 28, 2022.** On Monday morning, my staff informed me that the independent mapmakers had decided on a unified plan and were working to ensure that it did not have any technical errors. As they explained to the Commission at the 11:00am meeting, that plan

achieved perfect partisan proportionality in both the House and Senate. It also was symmetrical with respect to competitive seats; there were three Democratic-leaning and three Republican-leaning House seats between 50% and 52%; and two Democratic-leaning and no Republican-leaning Senate seats between 50% and 52%. That plan (the "Pre-Incumbent Independent Plan") was posted on the Commission's website.

52.     The goal of creating a constitutional map had been achieved. And the mapmakers stated that, before the Court's deadline, they would add the incumbent data, which was being loaded into their computers, and alter the map to unpair as many incumbents as possible without violating any of the constitutional requirements.

53.     The Commission met again in the afternoon to review the independent mapdrawers' progress. Dr. Johnson and Dr. McDonald announced that they were just a couple of hours away from completing the new maps that adjusted district lines to protect incumbents.

54.     The prospect of the independent mapdrawers' success was not welcome by my Republican colleagues. Rather than encourage the mapdrawers to finish and let them complete the task of protecting all the incumbents (as the Republican Commissioners had asked), the Republicans—led by President Huffman—pulled a bait-and-switch. President Huffman announced for the first time that to comply with the Court's midnight deadline, the map actually had to be completed and adopted by 10:30 so there was enough time to email the data files to the Secretary of State. Then he suggested, because he was concerned that the independent mapdrawers would not meet this new deadline, that Republican mapdrawers (Mr. DiRossi and Mr. Springhetti) tweak the Third Plan so that the Commission could pass that. Though he presented it as a backup "parachute" in case the independent mapdrawers failed to meet the deadline, it was clear that it was far from just a backup plan. Indeed, President Huffman had already spoken to an infirm Mr.

16

DiRossi, who was holed up at the BWC building and able to work on a separate map. And while he presented it as a last-minute backup plan, President Huffman later admitted to hatching the plan three days earlier.

55. Co-chair Sykes immediately objected, and I echoed his outrage. We explained that such a process would contravene this Court's orders and the Constitution. I suggested that if we needed more time, we should ask for an extension—not pass another unconstitutional map drawn in a bunker by a Republican mapdrawer. The Republicans were not willing to ask the Court for extra time, even though they passed the Third Plan over a week late. Over Co-chair Sykes' and my emphatic dissent, the Commission voted to adopt President Huffman's proposal.

56. Meanwhile, Dr. Johnson worked on completing the plan incorporating the incumbency data. (Dr. McDonald left at 5:00pm because of a class he had to teach the next morning in person in Florida.)

57. Later in the evening, I visited the workroom to inquire as to when the independent map would be complete. I was surprised to see that Mr. Springhetti was now working on a computer at the independent mapdrawers' table. He appeared to be working on the Third Plan and moving precincts around, but it did not look like much was changing. Mr. Springhetti was not interacting with anyone about whatever he was doing with the map on his screen.

58. At approximately 9:30pm, when the Commission reconvened, Dr. Johnson stated that he needed about 45 minutes to complete the Senate map, and the House map was already done. Therefore, the Democratic Commissioners asked that the Commission recess for one hour to allow Mr. Johnson to complete his work so that we could consider his final plan. But the Republican Commissioners refused. We again asked that the Commission request more time from the Court, noting that the language that the Republican Commissioners had read saying that no

extensions were allowed was applicable to the objections. Certainly, I felt, the Court would want us to have another few hours to work (indeed, at least until the Court opened in the morning) rather than have the Commission adopt yet another unconstitutional map. But the Republicans refused.

59.    President Huffman announced that Mr. Springhetti—the Republican mapdrawer— had been working on a map (the "Fourth Plan") and said the Commission should go with that "parachute." A Republican staff member passed out printouts of the Fourth Plan; the printout included only information about population deviation in each district. It included no partisanship information or compactness information. This was the first time I had seen the plan. I asked the other Commissioners when they had received this Fourth Plan; other Commissioners also said it was the first time they had seen the plan.

60.    President Huffman and Co-Chair Cupp explained that this Fourth Plan changed the Third Plan only minimally; they admitted that it was 97% to 98% similar. The Republican Commissioners would not recess so that the Democratic Commissioners could review the map and suggest amendments. As I said at the meeting, it was a "farce." In the Third Plan there were 19 competitive districts that the Republicans erroneously counted as "Democratic-leaning" (and no competitive Republican-leaning seats) In the Fourth Plan, there were 17—it was still grossly asymmetrical. None of the Republican Commissioners would even attest that the Fourth Plan was constitutional. Co-Chair Cupp's defense was it was the "best that can be done in the time that is available." But that was patently false—the mapmakers had already drawn a constitutional Pre-Incumbent Independent Plan and would be ready in a matter of minutes with the Incumbent Independent Plan. The Commission then proceeded to adopt the Fourth Plan by a 4-3 vote. Co-Chair Sykes and I voted against it.

61. At approximately 10:20pm, minutes after the Commission adopted the Fourth Plan, Dr. Johnson finished the independent map. I learned that Dr. Johnson had completed the Incumbent Independent Plan during the Commission's 30-minute recess after the Fourth Plan was adopted, so that the parties could prepare or review Section 8(C)(2) statements.

62. When the Commission meeting resumed at approximately 11:00pm, the Commission approved the majority's 8(C)(2) statement. Co-Chair Sykes then moved to adopt the independent mapmakers' final map (the "Incumbent Independent Plan") and have it supersede the Fourth Plan. I seconded. I explained that the Fourth Plan had not yet been sent to the Secretary of State, so it was not effective. (And it was clear by then that, despite President Huffman's earlier statements, it did not take over an hour to prepare files to email to the Secretary of State. Either map's files could be emailed to the Secretary of State at that time.) I also explained that the Commission did not dissolve immediately after a map is submitted, so if there were any errors that needed to be corrected (no one identified any), that could be accomplished in the following days.

63. The Republican Commissioners launched various unsupported attacks at the independent mapdrawers' plan, attempting to provide cover for failing to vote for a constitutional map borne of an independent and transparent process. Some Republican Commissioners said baldly that the districts were not compact even though they have a greater compactness score than the Fourth Plan. They said they did not have enough time to review the Incumbent Independent Plan; but they had just voted for the Fourth Plan sight-unseen and had been receiving updates about the independent plan and were able to view its drafting for days. The Commission voted against the Incumbent Independent Plan 5-2; only Co-Chair Sykes and I voted to complete the independent, transparent, fair process that this Court urged.

64. The Republican Commissioners have made no meritorious constitutional objection to the independent mapdrawers' maps.

65. As the evening ended, I directed my staff to rest up. We need to be ready to try again. The Fourth Plan is clearly unconstitutional, just like the Third. We need to pick up where we left off with the independent mapdrawers' map. And I have been informed that Dr. McDonald is available to continue the work if any changes are needed to the plans he produced with Dr. Johnson. With this Court's assistance, we can adopt a constitutional plan.

## Conclusion

66. Should the Ohio Supreme Court again order me to show cause why I should not be held in contempt, I believe the facts in this affidavit show that Co-Chair Sykes and I honored the Court's orders by doing everything in our power to advance the Commission toward fulfilling its duty to adopt a constitutional map. The facts also show that the Commission could easily have satisfied the Court's order if only the Republican Commissioners had been willing to comply.

67. Since Monday, March 28, no Republican Commissioner or their staff has contacted me or my staff to discuss maps, work on maps, or share any map proposals. They seem sure that, regardless of what this Court does, the federal court will allow them to go forward with an unconstitutional map on April 20. All they must do is continue to breach their duty to follow the Ohio Constitution and this Court's orders while the clock runs out. I firmly believe in the rule of law and the Constitution. The Court should not allow the Republican Commissioners to get away with such dereliction.

FURTHER AFFIANT SAYETH NAUGHT.

C. Allison Russo

Sworn to before me and subscribed in my presence this ___3rd___ day of April 2022.

Kelly Boggs Lape (inactive 10/21)
Notary Public

Kelly Boggs Lape, Attorney At Law
NOTARY PUBLIC - STATE OF OHIO
My commission has no expiration date
Sec. 147.03 R.C.

21

# Exhibit A
# to Affidavit of
# Respondent Allison Russo



## STATE SENATOR VERNON SYKES
### 28th District

March 17, 2022

The Honorable Robert Cupp
Ohio House of Representatives
Columbus, Ohio 43215

Dear Co-Chair Speaker Cupp:

I write today to reiterate what I suggested on our phone call earlier today, that the Ohio Redistricting Commission meet as soon as possible in order to develop a transparent path forward to pass bipartisan, fair, and constitutional state legislative maps.

The Ohio Supreme Court has directed the Ohio Redistricting Commission to start fresh and draw maps that meet constitutional muster. We must do this by March 28. Leader Russo and I stand at the ready and believe following the Court's order is possible if we work together and do not waste time.

It is essential that we call a meeting of the Redistricting Commission as soon as possible to start the map drawing process. The Court has rightly criticized the Commission for its previous delays and inefficient use of time. I hope that we will not repeat that mistake this time – our fourth attempt. I will note that the Commission recently amended its procedural rules to also allow for any three members to call for a meeting of the Commission, rather than only the Co-Chairs. Leader Russo and I are available at any time and would welcome any other Commissioner in calling for a meeting.

The Court also ordered the Commission to meet "frequently" in order to have an open and transparent process to the public. I have suggested to you that we set a schedule and meet at least every other day in order to meet this directive and I offer that suggestion once again. It is critical that we conduct our deliberations and make map-drawing decisions in the light of day and with the opportunity for the public to provide input.

Further, I suggest that the Commission work in a bipartisan manner and hire an independent map-drawer – or alternatively, a mediator – to aid us in our efforts. I believe our staff could work together to identify a list of mutually agreeable individuals to serve in this role.

Ultimately, now is the time for us to work together in order to fulfill the wishes of Ohio voters who overwhelmingly approved these reforms to our redistricting process.

Sincerely,

Senator Vernon Sykes
Co-Chair, Ohio Redistricting Commission


CC: Members, Ohio Redistricting Commission

# Exhibit B
# to Affidavit of
# Respondent Allison Russo



Administration
Office: 614-466-4320

# M E M O R A N D U M

TO:        Members of the Ohio Redistricting Commission

FROM:    Attorney General Dave Yost

DATE:    March 18, 2022

RE:        Steps forward following the decisions in *League of Women Voters of Ohio, et al. v. Ohio Redistricting Commission, et al. III* and companion cases

====================================================================

Late in the evening of March 16, the Ohio Supreme Court struck down the third set of state legislative maps. Whether I, or you, agree with the majority in this most recent decision is irrelevant. Four justices have decreed what the rules for this round of redistricting shall be. You are left with little choice but to abide by them. Accordingly, this memorandum outlines a set of steps calculated to address the perceived deficiencies raised by the majority of the Court.

I offer this framework as the chief legal officer of the state, having neither a vote nor a veto over your work. This is not a map of all possible roads to the objective of complying with the elements of the Supreme Court's decisions, but one suggested route. The Commission may choose to devise another. This is offered as a means to commence your discussions.

## **Meetings**

The Court made much of the relatively modest number of meetings held before the February 4, 2022 Plan was enacted, and the lateness of their calling. In its most recent order, the Court only gave the Commission ten days to produce a new map, two days of which have already expired.

The Commission apparently has scheduled a meeting for tomorrow--an excellent first step. I suggest that the commission agree at that first meeting on a schedule of meetings, and to publish it. Given that only seven days remain, daily meetings would not be excessive to respond to what some of you have correctly termed a constitutional crisis. I understand one of you has already cancelled an out-of-state trip so as to be available during this period--a commendable and appropriate sacrifice in view of the seriousness of this moment. One or more members may also arrange to participate remotely by electronic means if necessary and agreeable to the commission.

## Staffing

The Court directed the commission to hire new mapmakers not beholden to either political caucus. "The commission should retain an independent map drawer—who answers to all commission members, not only to the Republican legislative leaders—to draft a plan through a transparent process." (at paragraph 30) I note that Court used "should" and not "shall," but given that this matter is heard in the Supreme Court without meaningful appeal regarding the limits of its authority, it would be wise to treat this suggestion with the degree of deference one might pay to the suggestions of one's spouse.

To assist the commission in this effort, I have retained a bipartisan duo of consulting experts through my office, who together can achieve the level of independent evaluation the court is requiring. I will make them available to the commission as a whole.

Sean Trende, a Republican analyst well-known to the readers of *Real Clear Politics,* or even causal viewers of cable news, and Bernie Grofman, a Democratic professor of political science at the University of California-Irvine, recently collaborated to produce maps for the State of Virginia. Their work was unanimously adopted by the Virginia Supreme Court.

Their charge should be simply to produce a map that complies with the Ohio Constitution and the orders of the Ohio Supreme Court. They understand the time limits of the court, the terms of the Constitution and the decisions regarding it and are prepared to go to work immediately.

Of course, you are not required to use them; I have undertaken to retain them because of the exigent circumstances created by the very short time allowed by the Court. Nor are you required to adopt their maps. It is my hope, however, that you will--their success in Virginia strongly commends them and their work to your consideration.

## Drafting in Public

The Court further wrote that the map-making should be done in public. "To promote transparency and increase public trust, the drafting should occur in public." (at paragraph 44)

The actual map-making is highly technical and performed on a single work-station. I do not read the Court's opinion to say that seven people should be jockeying in a public room to direct the operator of the mouse to do this or that conflicting action.

To comply with the Court's direction, I suggest that the Commission take public actions that achieve the clause seeking transparency and public trust. To that end the Commission could publish any maps at least 24 hours before a vote; meet in public, and receive a progress reports in public from the mapmakers prior to the completion of a map, and discuss in public any sticking points between map drafts or particular districts permutations. I believe a process like this is compliant with the public map making directive issued by the Court.

**Additional Criteria**

- The Court has now established <52% as the threshold for a "leaning" district; any index less than that is viewed by the Court as a competitive district.  The Court will exclude competitive districts from its partisanship calculation.  That is, if there are 32 competitive districts, then the remaining 100 districts must closely correspond to the 54 Republican to 46 Democrat ratio the majority has established.

- The Court wrote that efforts to protect incumbents are improper.   Such efforts "...can neither be a legitimate and neutral goal nor comport with Article XI, Section 6(A)."  (at paragraph 37)

- While competitive districts will not be counted in overall partisan balance, the Court in *dicta* was bothered by the imbalance in the number competitive districts (meaning those with an expected favorable margin of less than 52%) leaning Democratic versus those leaning Republican.  While the clustering of Democrats in urban enclaves creates challenges to making Republican-leaning districts more competitive, I would be remiss if I failed to note the Court's observation.

This is meant to be a summary of the major objections in *League III.*  The Constitution and the Court's actual opinions are controlling, of course, and my office stands ready to assist the Commission in navigating the multiple and sometimes competing objectives.

Finally, a note about process.  I have served on several multi-member bodies, and I've learned it is always a temptation to love too much my own advice, and my own theory of law.  I keep this passage from the Ohio Jury Instructions handy, and often review it before meetings:

*It is not wise to immediately express a determination to insist upon a certain verdict, because if your sense of pride is aroused, you may hesitate to change your position even if you later decide you are wrong.*

*Consult with one another, consider each other's views and deliberate with the objective of reaching an agreement, if you can do so without disturbing your individual judgment.*

*Each of you must decide... for yourself, but you should do so only after a discussion and consideration of the case with (the others).*

*Do not hesitate to change an opinion if convinced that it is wrong. However, you should not surrender honest convictions in order to be congenial or to reach a verdict solely because of the opinion of other(s).*

The hour is late, and I do not envy your task.  I hope this memorandum has made it easier to "begin again."

# Exhibit C
# to Affidavit of
# Respondent Allison Russo




March 20, 2022

Dear Commissioners,

In our meeting yesterday, this commission set out a straightforward task to reconvene, possibly tonight, with recommendations for independent map drawers that could produce constitutional legislative districts. In an effort to aid our work as a commission, Attorney General Dave Yost retained two well-known, independent map drawers of national note, Bernard Grofman and Sean Trende.

The Democratic commission members today spoke with Grofman and Trende, as well as other highly qualified map drawing experts. We are in favor of the commission engaging the Attorney General's suggested mapmakers. We have also been in touch with nationally renowned mediators who could serve later in this process to help the commission finalize a bipartisan, constitutional set of legislative maps.

It is unfortunate that our colleagues were not prepared for a meeting tonight, which was tentatively scheduled for 7 p.m. As the deadline imposed on us by the Supreme Court of Ohio looms, time is of the essence. However, we remain confident that these issues can be resolved at our next meeting, scheduled for Monday, March 21 at 7 p.m., and the map drawing may immediately begin. There is still time for this process to result in the bipartisan, constitutional maps that the people of Ohio expect and anticipate from the commission.

Respectfully,

Senator Vernon Sykes
Co-Chair, Ohio Redistricting Commission
Senate District 28

C. Allison Russo
House Minority Leader
Commissioner, Ohio Redistricting Commission
House District 24