# EXHIBIT 14

Supreme Court of Ohio Clerk of Court - Filed April 01, 2022 - Case No. 2021-1210

## IN THE SUPREME COURT OF OHIO

| | | |
|---|---|---|
| THE OHIO ORGANIZING COLLABORATIVE, *et al.*, | : | Case No. 2021-1210 |
| | : | |
| | : | **APPORTIONMENT CASE** |
| *Petitioners*, | : | |
| *v.* | : | Filed pursuant to S.Ct.Prac.R. 14.03(A) |
| | : | and Section 9 of Article XI of the Ohio |
| OHIO REDISTRICTING | : | Constitution to challenge a plan of |
| COMMISSION, *et al.*, | : | apportionment promulgated pursuant to |
| | : | Article XI. |
| *Respondents*. | : | |
| | : | |

---

## OBJECTIONS AND REQUEST FOR REMEDIES

## OF PETITIONERS THE OHIO ORGANIZING COLLABORATIVE, ET AL.

---

Alicia L. Bannon (PHV 25409-2022)
Yurij Rudensky (PHV 25422-2022)
Harry Isaiah Black (PHV 25544-2022)
BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
Tel: (646) 292-8310
Fax: (212) 463-7308
alicia.bannon@nyu.edu

Brian A. Sutherland (PHV 25406-2022)
REED SMITH LLP
101 Second Street, Suite 1800
San Francisco, CA 94105
Tel: (415) 543-8700
Fax: (415) 391-8269
bsutherland@reedsmith.com

Peter M. Ellis (0070264)
    *Counsel of Record*
M. Patrick Yingling (PHV 10145-2022)
REED SMITH LLP
10 South Wacker Drive, 40th Floor
Chicago, IL 60606
Tel: (312) 207-1000
Fax: (312) 207-6400
pellis@reedsmith.com

*Attorneys for Petitioners*
*The Ohio Organizing Collaborative, et al.*

(listing of counsel for petitioners continued on next page)

Ben R. Fliegel (PHV 25411-2022)
REED SMITH LLP
355 South Grand Avenue, Suite 2900
Los Angeles, CA 90071
Tel:  (213) 457-8000
Fax: (213) 457-8080
bfliegel@reedsmith.com

Brad A. Funari (PHV 3139-2022)
Danielle L. Stewart (0084086)
Reed Smith Centre
REED SMITH LLP
225 Fifth Avenue
Pittsburgh, PA 15222
Tel:  (412) 288-4583
Fax: (412) 288-3063
bfunari@reedsmith.com
dstewart@reedsmith.com

*Attorneys for Petitioners*
*The Ohio Organizing Collaborative, et al.*

(counsel for respondents listed on next page)

**Counsel for Respondents**

C. Benjamin Cooper (0093103)
  *Counsel of Record*
Charles H. Cooper, Jr. (0037295)
Chelsea C. Weaver (0096850)
COOPER & ELLIOTT, LLC
305 West Nationwide Boulevard
Columbus, Ohio 43215
Tel:  (614) 481-6000
Fax: (614) 481-6001
benc@cooperelliott.com
chipc@cooperelliott.com
chelseaw@cooperelliott.com

*Special Counsel for Respondents*
*Senator Vernon Sykes and*
*House Minority Leader C. Allison Russo*

Erik J. Clark (0078732)
  *Counsel of Record*
Ashley Merino (0096853)
ORGAN LAW LLP
1330 Dublin Road
Columbus, Ohio 43215
Tel: (614) 481-0900
Fax: (614) 481-0904
ejclark@organlegal.com
amerino@organlegal.com

*Counsel for Respondent*
*Ohio Redistricting Commission*

(counsel for respondents listed on next page)

**Counsel for Respondents**
**(Cont.)**

W. Stuart Dornette (0002955)
Beth A. Bryan (0082076)
Philip D. Williamson (0097174)
TAFT STETTINIUS & HOLLISTER LLP
425 Walnut St., Suite 1800
Cincinnati, Ohio 45202-3957
Tel: (513) 381-2838
Fax: (513) 381-0205
dornette@taftlaw.com
bryan@taftlaw.com
pwilliamson@taftlaw.com

Phillip J. Strach
Thomas A. Farr
John E. Branch, III
Alyssa M. Riggins
Greg McGuire
NELSON MULLINS RILEY &
SCARBOROUGH LLP
4140 Parklake Ave., Suite 200
Raleigh, North Carolina 27612
Tel: (919) 329-3812
Fax: (919) 329-3799
phil.strach@nelsonmullins.com
tom.farr@nelsonmullins.com
john.branch@nelsonmullins.com
alyssa.riggins@nelsonmullins.com
greg.mcguire@nelsonmullins.com

*Counsel for Respondents*
*Senate President Matt Huffman and*
*House Speaker Robert Cupp*

OHIO ATTORNEY GENERAL
Bridget C. Coontz (0072919)
    *Counsel of Record*
Julie M. Pfeiffer (0069762)
Michael A. Walton (0092201)
    *Assistant Attorneys General*
Michael J. Hendershot (0081842)
    *Deputy Solicitor*
30 E. Broad Street, 16th Floor
Columbus, OH 43215
Tel:  (614) 466-2872
Fax: (614) 728-7592
bridget.coontz@ohioago.gov
julie.pfeiffer@ohioago.gov
michael.walton@ohioago.gov
michael.hendershot@ohioago.gov

*Counsel for Respondents*
*Secretary of State Frank LaRose, and*
*Auditor Keith Faber*

John W. Zeiger (0010707)
Marion H. Little, Jr. (0042679)
Christopher J. Hogan (0079829)
ZEIGER, TIGGES & LITTLE LLP
3500 Huntington Center
41 South High Street
Columbus, Ohio 43215
Tel: (614) 365-9900
zeiger@litohio.com
little@litohio.com
hogan@litohio.com

*Counsel for Respondent*
*Governor Mike DeWine*

**Counsel for *Amici Curiae***

Subodh Chandra (0069233)
Donald Screen (0044070)
   *Counsel of Record*
THE CHANDRA LAW FIRM LLC
The Chandra Law Building
1265 West 6th Street
Cleveland, Ohio 44113
Tel: (216) 578-1700
subodh.chandra@chandralaw.com
donald.screen@chandralaw.com

Janette McCarthy Wallace (0066257)
Anthony P. Ashton*
Anna Kathryn Barnes*
NAACP
Office of the General Counsel
4805 Mount Hope Drive
Baltimore, MD 21215
Tel.: (410) 580-5777
jlouard@naacpnet.org
aashton@naacpnet.org
abarnes@naacpnet.org

Jon Greenbaum*
Ezra D. Rosenberg*
Pooja Chaudhuri*
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street, N.W., Ste. 900
Washington, D.C. 20005
Tel.: (202) 662-8600
jgreenbaum@lawyerscommittee.org
erosenberg@lawyerscommittee.org
pchaudhuri@lawyerscommittee.org

*Not Admitted to the State Bar of Ohio

*Counsel for Amicus Curiae The Ohio
State Conference of the NAACP*

Stephanie Marie Chmiel (0087555)
Mary Elizabeth Csarny (0097682)
THOMPSON HINE LLP
41 S. High Street, Suite 1700
Columbus, OH 43215
Tel.: (614) 469-3247
Fax: (614) 469-3361
stephanie.chmiel@thompsonhine.com
mary.csarny@thompsonhine.com

*Counsel for Amicus Curiae David Niven*

Andrew William Garth (0088905)
   *City Solicitor*
Emily Smart Woerner (0089349)
   *Deputy City Solicitor*
Shannon Doyle Price (0100744)
   *Assistant City Solicitor*
CITY OF CINCINNATI
801 Plum Street, Room 214
Cincinnati, Ohio 45202
Tel.: (513) 352-3307
Fax: (513) 352-1515
emily.woerner@cincinnati-oh.gov
shannon.price@cincinnati-oh.gov

*Counsel for Amicus Curiae City of
Cincinnati*

Donald C. Brey (0021965)
Ryan C. Spitzer (0093515)
ISAAC WILES & BURKHOLDER, LLC
Two Miranova Place, Suite 700
Columbus, Ohio 43215-5098
Tel.: (614) 221-2121
Facsimile: 614-365-9516
dbrey@isaacwiles.com

*Counsel for Amicus Curiae Renew Ohio*

# IN THE SUPREME COURT OF OHIO

THE OHIO ORGANIZING
COLLABORATIVE, *et al.*,

        *Petitioners*,

    *v.*

OHIO REDISTRICTING
COMMISSION, *et al.*,

        *Respondents*.

:   Case No. 2021-1210
:
:   **APPORTIONMENT CASE**
:
:   Filed pursuant to S.Ct.Prac.R. 14.03(A)
:   and section 9 of Article XI of the Ohio
:   Constitution to challenge a plan of
:   apportionment promulgated pursuant to
:   Article XI.
:
:
:

---

## AFFIDAVIT OF MICHAEL S. LATNER

## IN SUPPORT OF OBJECTIONS

---

I, Michael S. Latner, having been duly sworn and cautioned according to law, hereby state that I am over the age of eighteen years and am competent to testify as to the facts set forth below based on my personal knowledge and having personally examined all records referenced in this affidavit, and further state as follows:

1.      I am a Professor in the Political Science Department at California Polytechnic State University. My qualifications, teaching and research experience, and knowledge and understanding of redistricting is detailed in my prior submission to this Court on October 22, 2021.

2.      I am familiar with and have studied Article XI of the Ohio Constitution. I am also familiar with this Court's opinions in this case, *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, Slip Opinion No. 2022-Ohio-65, Slip Opinion No. 2022-Ohio-342, and Slip Opinion No. 2022-Ohio-789.

3.    I have previously submitted an affidavit and expert report to this Court concerning the compliance of the General Assembly district plan adopted by the Ohio Redistricting Commission on September 15, 2021 (the "Original Plan"), an affidavit regarding the revised General Assembly district plan adopted by the Ohio Redistricting Commission on January 22, 2022 (the "First Revised Plan"), and an affidavit regarding the revised General Assembly district plan adopted by the Ohio Redistricting Commission on February 24, 2022 (the "Second Revised Plan"). I now submit a subsequent affidavit to assess the third revised General Assembly district plan adopted by the Ohio Redistricting Commission on March 28, 2022 (the "Third Revised Plan") and the General Assembly district plan adopted during the previous redistricting cycle by the Ohio Apportionment Board, which was "the body then responsible for drawing Ohio's legislative-district maps[,]"[1] on September 30, 2011 ("2011 Plan").[2]

4.    Specifically, I have been asked to analyze the Third Revised Plan for compliance with Article XI of the Ohio Constitution. To conduct this analysis, I rely on total population data from the 2010 and 2020 Decennial Census and 2016-2020 election data from the Voting and Election Science Team (VEST) datahub.[3] These data, including shapefile data, are publicly available through several repositories and mapping projects.[4] I have also reviewed several other plans for comparison, including a plan submitted on March 28, 2022 by two independent map drawers hired by the Commission, Douglas Johnson and Michael McDonald ("Johnson/McDonald"), and a plan submitted on February 15, 2022 by Ms. Bria Bennett, one of

---

[1] Slip Opinion No. 2022-Ohio-65, ¶ 340.

[2] These plans both include maps for the state House and Senate. References below to these individual maps will retain this nomenclature, e.g., "Original House," "First Revised Senate" and "Second Revised House".

[3] https://dataverse.harvard.edu/dataverse/electionscience.

[4] I obtained data from the following:
    Redistricting Data Hub: https://redistrictingdatahub.org/data/about-our-data/#pl.
    Dave's Redistricting App: https://davesredistricting.org/.

the named petitioners in *Bennett, et al. v. Ohio Redistricting Commission, et al.*, No. 2021-1198, which was the third plan prepared by Dr. Jonathan Rodden in this litigation ("Rodden III"). In a letter to the Ohio Redistricting Commission dated February 15, 2022, counsel for the petitioners in *Bennett* and *League of Women Voters* stated that the Rodden III plan "fully complies" with Article XI, Section 3's line-drawing requirements and Article XI, Section 5's requirements for the numbering of state Senate districts. I have also independently reviewed the Rodden III plan for constitutional compliance. I have not identified any deviations from these line-drawing and numbering requirements. The February 15, 2022 letter, and all of the above-referenced plans, are available for download on the Ohio Redistricting Commission's website.[5]

5.    I have also been asked to analyze the 2011 Plan to determine whether the Plan reflects equipopulous districts when applied to Ohio's current demographic configuration, *i.e.*, whether the Plan is malapportioned. For this analysis, I used 2020 Census population data and overlayed the 2020 state legislative House plan TIGRIS redistricting files provided by the US Census, i.e. last decade's House plan that was used in the 2020 election.

6.    I am receiving compensation for my study and testimony at an hourly rate of $250 per hour. My compensation is in no way dependent on the outcome of the dispute.

### SUMMARY OF MY OPINIONS

7.    The Third Revised Plan continues to run afoul of principles of proportionality and symmetry, in a manner that is very similar to the Ohio Supreme Court's recent findings with respect to the Second Revised Plan. Indeed, the two plans are virtually identical: a comparison of the Second and Third Revised Plans' House districts reveals that only 0.265 percent of the population changed districts at all. The continuity between the two plans results in similar

---

[5] https://www.redistricting.ohio.gov/maps.

partisan performance. Alternative plans, including Johnson/McDonald and Rodden III, achieve substantially greater proportionality and partisan symmetry.

8. Like the invalidated Second Revised Plan, the Third Revised Plan nominally creates 54 Republican leaning House districts and 45 Democratic leaning House districts. However, this summary statistic is misleading because 17 of the seats that favor Democrats are actually toss-up districts, while *none* of the seats that favor Republicans fall into this category. In other words, 17 out of the 45 Democratic-leaning districts have been drawn to be between 50 and 52 percent or less Democratic, while *zero* Republican-leaning districts that fall into this toss-up category. Excluding toss-ups, 34 percent of the House seats favor Democrats, while 66 percent of those seats favor Republicans, yielding a difference in proportionality from statewide vote shares of 12 percent. Compared to the First Revised Plan, which created 14 such toss-ups, the Third Revised House map actually performs worse with a two-point vote swing, as a result of the three additional toss-ups.

9. The Senate map functions similarly. The Third Revised Plan nominally creates 18 Republican leaning districts and 15 Democratic leaning districts, but 6 of the Democratic districts are toss-ups, while once again *none* of the Republican districts fall into that category. Excluding toss-ups, 33 percent of the Third Revised Senate seats favor Democrats, while 67 percent of those seats favor Republicans, creating a disproportionality from statewide voting averages of 13 percent. Like the House map, the Third Revised Senate map performs worse than the First Revised Plan with a two-point vote swing.

10. A truly proportional districting plan yields proportional shares of seats for votes across a range of possible outcomes. The Third Revised Plan is designed to approximate proportionality for a single election outcome, i.e., one in which Democrats earn 46 percent of

the statewide vote, while Republicans earn 54 percent. But statistically speaking, the likelihood of an election with that exact result is small. Rather, ebbs and flows in partisan vote share are to be expected. A small two percentage point shift in the electorate in favor of Republicans would be expected to wipe out 17 Democratic House seats and 6 Democratic Senate seats, giving Republicans 72% percent of House seats and 73% percent of Senate seats—a supermajority in both chambers. Equivalent shifts among voters in favor of Democrats would not yield *any* additional seats, much less the extreme gains that Republicans would see. Because of the Third Revised Plan Plan's asymmetric reliance on toss-up districts, it sets a performance ceiling for Democrats and a performance floor for Republicans. Thus, similar to the First and Second Revised Plans, the Third Revised Plan performs like a "winner-take-all" gerrymander but with only a one-way ratchet in favor of Republicans.

11.     The Third Revised Plan also produces significant asymmetry, and therefore continues to systemically disfavor Democratic voters. The Third Revised Plan does little to improve on the significant asymmetry of either the Original Plan, the First Revised Plan, or the Second Revised Plan, which is a direct outgrowth of what appears to be a minimalist approach to meeting proportionality standards in Section 6(B).

12.     Viable comparison plans submitted to the Commission, including the Johnson/McDonald and Rodden III plans, create at least 42 percent Democratic House and Senate districts, including toss-ups, and would not generate extreme disproportionalities under two-point swing election scenarios. These comparison plans also achieve substantially greater partisan symmetry in both the House and Senate.

13.     I also conclude that the 2011 Plan is malapportioned. Of the 99 House districts, 40 exceed 5 percent population deviations. Five House districts are below ideal population

2: 2:22-cv-00773-ALM-ART-BJB Doc #: 163-15 Filed: 04/06/22 Page: 12 of 29 PAGEID #: 5371

estimates by more than 10 percent, with an average deviation of -12.3 percent. Twenty one districts are five to ten percent below population requirements, with an average deviation of -7.2 percent. Seven districts exceed population requirements by 5 to 10 percent, with an average deviation of +7.5 percent, and seven districts exceed population requirements by more than 10 percent, with an average population deviation of +13.5 percent. The maximum deviation for the 2011 House Plan using 2020 population estimates is 34.2 percent. There are currently over 4.5 million Ohio residents living in over-populated districts, meaning that they would be underrepresented by living in districts with more constituents per representative relative to other Ohioans.

### ANALYSIS AND OPINIONS

## I. The Proportion of Districts in the Third Revised Plan That Favor Each Political Party Does Not Correspond with the Statewide Preferences of the Voters of Ohio

14. To conduct the proportionality analysis, I employed the same methodology and used the same data sources as those I employed in my earlier affidavits and expert report, as modified by guidance from the Ohio Supreme Court in its February 7, 2022 opinion: "[C]ompetitive districts . . . must either be excluded from the proportionality assessment or be allocated to each party in close proportion to its statewide vote share." Slip Op. 2022-Ohio-342, ¶ 62; see also Slip Opinion No. 2022-Ohio-789, ¶ 38 (reaffirming this guidance).

15. I proceeded in four steps. First, I calculated the statewide preferences of the voters of Ohio, based on available statewide state and federal partisan general election results during the last ten years. Second, I calculated the statewide proportion of districts whose voters favor each political party, as well as the proportion of toss-up districts, based on the same set of statewide elections. I did this for the House and the Senate maps in the Third Revised Plan, as well as for the Second Revised Plan, First Revised Plan, the Original Plan, and alternative plans

submitted to the Commission (Johnson/McDonald, Rodden III). Then, to determine whether the statewide election figures "closely correspond" to the partisan seat shares from the plans, I calculated the difference between those two figures. Finally, I compared the difference between statewide election figures and partisan seat shares in the prior plans and alternative plans.

### a. Proportionality When Toss-Up Districts Are Excluded

16.     Tables 1 and 2 display statewide vote share. The tables lay out the Democratic (DEM) and Republican (GOP) seats and seat share for the respective House and Senate Third Revised Plan, as well as the toss-up districts that are estimated to yield vote shares from 48 to 52 percent for either party.[6]  Excluding the toss-up districts, the Third Revised House Plan yields respective Democratic and Republican seat shares of 34 and 66 percent. Compared to statewide vote shares, these seat shares produce a disproportionality of 12 percent. For the Third Revised Senate Plan, once toss-up districts are removed, the respective Democratic and Republican seat shares of 33 and 67 percent produce a disproportionality of 13 percent.

---

[6] In the Court's most recent opinion, it stated that districts within this range are "'competitive' . . . and . . . must be excluded when assessing [a] plan's overall proportionality." Slip Opinion No. 2022-Ohio-789, ¶ 42.

TABLE 1

## Proportionality of Third Revised House Plan

|  | VOTE SHARE | SEATS | SEAT SHARE | SEAT SHARE WITHOUT TOSS-UPS | DIFFERENCE |
|---|---|---|---|---|---|
| DEM | 46% | 28 | 28% | 34% | −12% |
| GOP | 54% | 54 | 55% | 66% | 12% |
| Toss-ups (48-52%) |  | 17 | 17% |  |  |
|  |  |  |  | **Disproportionality without toss-ups** | **12%** |

TABLE 2

## Proportionality of Third Revised Senate Plan

|  | VOTE SHARE | SEATS | SEAT SHARE | SEAT SHARE WITHOUT TOSS-UPS | DIFFERENCE |
|---|---|---|---|---|---|
| DEM | 46% | 9 | 27% | 33% | −13% |
| GOP | 54% | 18 | 55% | 67% | 13% |
| Toss-ups (48-52%) |  | 6 | 18% |  |  |
|  |  |  |  | **Disproportionality without toss-ups** | **13%** |

### b.  Proportionality When Toss-Up Districts Are Included

17.     As noted above, the Third Revised Plan has a significant and unusually large number of House and Senate districts that lean Democratic by razor-thin margins.[7] If the "lean" of the districts is unbiased, or randomly distributed between the two parties, it is reasonable to expect the parties to split these districts roughly 50/50 over the course of elections due to ebbs and flows in voter support. However, the design of the toss-up districts in the Third Revised Plan—just like the design of the First and Second Revised Plans—looks anything but random.

---

[7] Under a normal distribution, about 7 percent of districts would fall into this "toss-up" range, *i.e.*, 7 House seats and 2 Senate seats.

18.     Tables 3 and 4 display the results of my analysis when toss-up districts are allocated to each party, including the impact of minor (2 percent) uniform vote swings for the Third Revised Plan, Second Revised Plan, the First Revised Plan, the Original Plan, the Johnson/McDonald plan, and the Rodden III plan. For the Third Revised House Plan, the number of toss-up districts is extremely large (17). See Table 3. Note that alternative plans contain only 3 to 6 toss-ups, closer to what would be expected across a normal distribution.

19.     Subtracting 2 percent from the expected Republican vote shares in each district and adding it to the Democratic vote shows that such a vote swing would result in *zero* additional Democratic seats, because Democrats are already favored to win all 17 toss-ups in the Third Revised Plan. However, the same minor vote swing toward Republicans would give them all 17 seats, or a 72 percent supermajority of seats with 56 percent of the vote. This is the same underlying design found in the Second Revised Plan and the First Revised Plan. Notably, under either the Johnson/McDonald or Rodden III plans, both parties would benefit from minor vote swings in their favor, as should be the case under a fair plan.

TABLE 3

## Swing Analysis of Original, Revised, and Alternative House Plans

| PLAN | SEAT SHARES WITH TOSS-UP (D/R) | TOSS-UPS (D/R) | +2%D | SEAT SHARES WITH D SWING | +2%R | SEAT SHARES WITH R SWING |
|---|---|---|---|---|---|---|
| 3rd Revised | 45%/55% | 17/0 | no change | 45%/55% | +17R | 23%/72% |
| 2nd Revised | 45%/55% | 19/0 | no change | 45%/55% | +19R | 26%/74% |
| 1st Revised | 42%/58% | 14/0 | no change | 42%/58% | +14R | 28%/72% |
| Original | 35%/65% | 3/2 | +2D | 37%/63% | +3R | 34%/66% |
| Johnson/McDonald | 45%/55% | 3/3 | +3D | 49%/51% | +3R | 42%/58% |
| Rodden III | 43%/57% | 2/1 | +1D | 44%/56% | +2R | 41%/59% |

20.     The same pattern is revealed in the Third Revised Senate Plan. See Table 4. Indeed, I find that the Third Revised Senate Plan, which has 6 districts that barely lean

Democratic and no corresponding Republican toss-up districts, performs worse than the First Revised Plan. Both the number and partisan lean of these districts is designed to benefit Republicans. With a two-point swing in favor of Republicans, Republicans are expected to win a 73 percent supermajority of Senate seats. By contrast, the Democratic Senate seat share would remain at 55 percent with an analogous 2 percent vote swing in their favor.

**TABLE 4**

### Swing Analysis of Original, Revised, and Alternative Senate Plans

| PLAN | SEAT SHARES WITH TOSS-UP (D/R) | TOSS-UPS (D/R) | +2%D | SEAT SHARES WITH D SWING | +2%R | SEAT SHARES WITH R SWING |
|---|---|---|---|---|---|---|
| 3rd Revised | 45%/55% | 6/0 | no change | 45%/55% | +6R | 27%/73% |
| 2nd Revised | 45%/55% | 8/0 | no change | 45%/55% | +8R | 21%/79% |
| 1st Revised | 39%/61% | 3/2 | +2D | 45%/55% | +3R | 30%/70% |
| Original | 27%/73% | 0/2 | +2D | 33%/64% | no change | 27%/73% |
| Johnson/McDonald | 45%/55% | 2/0 | no change | 45%/55% | +2R | 39%/61% |
| Rodden III | 42%/58% | 2/1 | +1D | 44%/56% | +2R | 41%/59% |

21.    A comparison between the Second and Third Revised House plans illustrates how this "one winner takes all, one winner takes none" works, and how little has changed between the two plans. Figure 1 displays the Democratic vote shares for the 99 House districts, in order of increasing vote share or party lean, for both plans. First, note that both plans have an identical gap just before the 50 percent support line, where Democrats start winning seats. That absence of Republican-leaning toss-up seats is what prevents Democrats from making any gains from a 2-point vote swing. On the other side of that line, Republicans stand to gain the 17 seats ranging from 50 and 52 percent. This is a major source of asymmetry in the plans. Additionally, you can see that Democrats are packed into five districts that are 80 percent-plus Democratic, with no corresponding packed Republican districts. This is another source of asymmetry, as it allows map drawers to allocate fewer safe seats to Democrats.

22.     Second, you can only see a handful of Third Revised House Plan districts (hollow dots), because these are the only districts where voters were placed in different districts, changing their partisan support. With the exception of those six districts, the two plans are identical. As a result, the two plans perform similarly.



**Figure 1: District Level Vote Shares in House Plans**

23.     One can observe that only a small number of district populations changed between the Second and Third Revised Plans. There was only a change of 451 census blocks out of 276,478 (0.0016 percent of census blocks), which impacts only 0.265 percent of the total population.. Otherwise, the Second and Third Revised Plans are identical, which explains their similar performance.

24.     As was the case in the Second Revised Plan, this unusual pattern of district allocations suggests that the Commission again intended to use toss-up districts that are

nominally Democratic to create an illusion of increased proportionality without producing a map that would produce proportionate outcomes. That this was a deliberate choice by the Commission is underscored by existence of alternative plans, including Johnson/McDonald and Rodden III, that achieve proportionality without relying on an unusually high number of Democratic toss-up districts, as well as by the persistent asymmetry and failure of the Third Revised Plan to meet partisan fairness, which is discussed further below.

## II. The Third Revised Plan Favors Republican Voters and Disfavors Democratic Voters

25. To conduct the partisan fairness analysis, I used the same statistical and comparative partisan symmetry analysis as in my prior affidavits and expert reports.

26. First, I determined the degree to which the Third Revised Plan exhibits asymmetry in the allocation of votes to seats between the parties. Second, I compared asymmetries across the above-mentioned comparison plans. Such comparison is helpful because it demonstrates that the Commission could have introduced and adopted a less biased remedial plan.

27. Partisan symmetry is a broadly accepted metric used by political scientists to measure partisan bias.[8] The principle of partisan symmetry requires that a districting system award the same number of seats to each party's candidates for the same share of statewide votes that they receive. The question posed by a partisan symmetry analysis, in other words, is how

---

[8] Barry Burden and Corwin Smidt, "Evaluating Legislative Districts Using Measures of Partisan Bias and Simulations, *Sage Open*, 10, 4, 2020; https://doi.org/10.1177/2158244020981054; Anthony J McGann, Charles Anthony Smith, Michael Latner, Alex Keena, "A Discernable and Manageable Standard for Partisan Gerrymandering" *Election Law Journal*, 14, 4, 2015; John F. Nagle. "Measures of Partisan Bias for Legislating Fair Elections", *Election Law Journal*: 2015. pp. 346-36; .http://doi.org/10.1089/elj.2015.0311.

many more (or fewer) seats does one party get for some share of the statewide vote as compared to what another party gets for that same statewide vote share.

28.     Scientifically, accepted measures of partisan symmetry follow logically from the principle that an electoral system should treat the parties and their voters equally and that the party that wins the most votes should win the most seats.[9] As before, I estimate symmetry in two ways: (1) a simple numeric formula ($S$) that can be calculated by hand,[10] and (2) a computational model of symmetry with statistical confidence intervals. The computational symmetry models estimate symmetry in the seats-votes function across a range of vote shares, which in this case is between 45 and 55 percent, while $S$ measures symmetry in the distribution of support for parties across the districts that each party wins.

29.     To calculate the simple measure of symmetry, $S$, I take the districts that are 5 percent above or below the statewide average of party support and determine what proportion of those districts favor Democrats and what proportion favor Republicans. That is, a plan's bias under $S$ equals the proportion of seats with Democratic vote share above five percent of the Democratic average minus the proportion of seats with Republican vote share above five percent of the Republican average. Put simply, $S$ tells you whether a districting plan creates more Republican or Democratic leaning districts relative to the party's statewide average. A negative value for $S$ means Republicans are advantaged while a positive value means Democrats are advantaged. In this report, simple $S$ symmetry is charted graphically in the form of histograms. A symmetrical plan would show similar distributions of districts on either side of the vertical line denoting the average vote share; an asymmetrical plan would give the favored party more districts past the line denoting the average vote share for the party.

---

[9] McGann, et.al., "A Discernable and Manageable Standard for Partisan Gerrymandering".
[10] This metric was first developed by Anthony McGann during the writing of *Gerrymandering the States,* p. 30.

30.     For the computational models, I calculate partisan symmetry for the plans, but instead of assuming uniform vote swing across districts, I impute random "noise" (up to five points) in 1,000 simulations of district vote distributions to reflect the idiosyncrasies and perturbations that occur in real elections over time. The procedure also allows me to calculate confidence intervals to provide estimates of statistical significance. In this report, the computational model is charted as a seats/votes *S*-curve function.

31.     Figure 2 below displays a histogram of the allocation of seats for the Third Revised House Plan, as well as the estimated seats/votes function. The histogram illustrates the skew in the allocation of seats, where more Democratic seats are won in overwhelmingly Democratic districts (80 percent vote share and above) with virtually no corollary Republican districts. This results in more wasted votes for Democrats. As a result, under the Third Revised House Plan, Democratic voters would only expect to win approximately 44% percent of House seats with 50 percent of statewide votes, as shown in the seats/votes function. By contrast, Republicans would expect to win approximately 53 percent of House seats with 50 percent of the statewide vote. Relative to their statewide vote share, Republicans have more districts where they earn 5 percent more than their statewide vote average (46) than Democrats (35), which means their voters are allocated more efficiently under the Third Revised House plan. Compared to the Second Revised Plan, the number of seats where Democrats win 5 percent or more than their statewide vote average has increased by one, slightly improving symmetry, but consistent with each of the Commission's plans, Republicans maintain a substantial, and statistically significant, advantage.



**Figure 2: Third Revised House Map Asymmetry**

32.     Figure 3 shows a similar pattern for the Third Revised Senate Plan. Because Democrats are concentrated into fewer districts, they are expected to win approximately 44 percent of seats with 50 percent of the statewide vote. By contrast, Republicans are expected to win approximately 53 percent of Senate seats with 50 percent of the statewide vote. Republicans also have more safe seats. Republicans win 15 seats (45 percent) with 5 percent more of their statewide vote share, compared to 12 seats (36 percent) for Democrats. While the Senate asymmetry simulations tend to have larger standard errors (in parentheses) due to fewer observations, these results are statistically significant, and tend to mirror the results of the Second Revised Plan. The simple symmetry measures also indicate that any improvement over the Second Revised Plan is marginal.



**Figure 3: Third Revised Senate Map Asymmetry**

33.     Most importantly, the asymmetry in both the Third Revised House and Senate maps still lags far behind the alternative plans in fairness. See Tables 5 and 6,

TABLE 5

## Asymmetry in Original, Revised, and Alternative House Plans

| PLAN | SIMPLE S | ASYMMETRY | (95% CONFIDENCE) |
|---|---|---|---|
| 3rd Revised | −11 | −11.30 | (5.6) |
| 2nd Revised | −13 | −11.60 | (5.94) |
| 1st Revised | −13 | −13.90 | (5.76) |
| Original | −15 | −15.39 | (5.87) |
| Johnson/McDonald | −4 | −5.20 | (5.63) |
| Rodden III | −6 | −8.40 | (5.38) |

TABLE 6

## Asymmetry in Original, Revised, and Alternative Senate Plans

| PLAN | SIMPLE S | ASYMMETRY | (95% CONFIDENCE) |
|---|---|---|---|
| 3rd Revised | −9 | −12.90 | (10.6) |
| 2nd Revised | −12 | −11.10 | (10.2) |
| 1st Revised | −18 | −15.70 | (10.54) |
| Original | −15 | −17.34 | (10.48) |
| Johnson/McDonald | 3 | −4.82 | (10.6) |
| Rodden III | −9 | −6.40 | (9.89) |

34.     The commission did not need to create yet another asymmetric plan, as evidenced by the fact that the Johnson/McDonald and Rodden III plans are more symmetric than the Third Revised Plan at a statistically significant level.[11] For example, if we compare the estimated House symmetry scores from those plans of -5.2 and -8.4, respectively, to the symmetry score for the Third Revised Plan, -11.3, we can say with greater than 95 percent confidence that the

---

[11] Johnson/McDonald T-Test =; -35.357, p-value < 2.2e-16; Rodden III T-test = -26.071, p-value < 2.2e-16

Third Revised House Plan will produce greater asymmetries than the Johnson/McDonald and Rodden III plans. Histograms also show that both the Johnson/McDonald and Rodden III House and Senate plans are visibly more symmetric, with greater parity in the percentage of seats where each party wins more than its statewide average. See Figures 4-7. Under the Johnson/McDonald and Rodden III plans, Democrats and Republicans are expected to receive similar seat shares with 50 percent of votes, as the seats/votes curve is visibly closer to the 50 percent votes/seats intersection. Crucially, there are no statistically significant asymmetries in either of the Johnson/McDonald maps or the Rodden III Senate plan. I should note that the simple S and computational symmetry measures diverge somewhat because they are calculated using different metrics (the number of safe seats v change in the seats/votes curve as voter preferences change). The computational measure is superior in that it is a truly predictive estimate of future performance, and it is possible to estimate the statistical significance of differences across different plans.



**Figure 4: Johnson/McDonald House Map Asymmetry**



**Figure 5: Johnson/McDonald Senate Map Asymmetry**



**Figure 6: Rodden III House Map Asymmetry**

19



**Figure 7: Rodden III Senate Map Asymmetry**

### III. As a Result of Significant Population Shifts During the past Decade, the 2011 Plan is Unconstitutionally Malapportioned

35.     According to the 2010 Census, Ohio had a population of 11,536,504. Therefore, a decade ago, the ideal population of each of Ohio's 99 state House districts (*i.e.*, the State's total population divided by the number of districts) was 116,530 persons.

36.     According to the 2010 Census data, the 2011 House Plan had a maximum deviation (*i.e.*, the difference between the most populated district and least populated district) of 19,157 persons (16.44 precent of the ideal district population). Only two districts exceeded a 5 percent population deviation.

37.     The results of the 2020 Census report that Ohio's resident population as of April 2020 increased by 2.3 percent, totaling 11,799,448 persons. Consequently, the ideal population for each of Ohio's 99 state House districts as of 2020 is 119,186.

38.     While this is a relatively minor change in total statewide population, the way it has been distributed throughout the state has changed more dramatically. In the past decade,

Ohio's population has shifted significantly, which skews the current legislative districts away from population equality. Table 7 below, which was generated from Census data, reveals how populations for Ohio's legislative districts has shifted between 2010 and 2020.

39.    Table 7 shows that, between 2010 and 2020, the maximum deviation among state House districts increased from 16.4 percent to 34.2 percent.

TABLE 7

## Malapportionment in 2011 House Plan

|  | NUMBER OF DISTRICTS | AVERAGE DEVIATION |
| --- | :---: | :---: |
| Districts > -10% deviation | 5 | −12.3% |
| Districts > -5% deviation | 21 | −7.2% |
| Districts > 5% deviation | 7 | 7.5% |
| Districts > 10% deviation | 7 | 13.5% |
| **Total deviation** |  | **34.2%** |

40.    In light of these population shifts, the 2011 legislative district configurations are malapportioned. If utilized in any future election, including the 2022 elections, these configurations would dilute the strength of Petitioners' votes in legislative elections since they live in districts that have significantly larger populations than those districts in which other voters reside.

41.    Petitioner Samuel Gresham Jr. lives at 255 Old Trail Drive, Columbus, OH 43213, which is in House district 26 and Senate district 15 in the 2011 Plan. Based on 2020 census data, both House district 26 and Senate district 16 are overpopulated by more than 5%.

42.     Petitioner Ahmad Aboukar lives at 5019 Noor Park Circle, Dublin, OH 43016, which is in House district 24 and Senate district 16 in the 2011 Plan. Based on 2020 census data, both House district 24 and Senate district 16 are overpopulated by more than 5%.

43.     Petitioner Mikayla Lee lives at 111 Latta Avenue, Unit C, Columbus, OH 43215, which is in House district 18 and Senate district 15 in the 2011 Plan. Based on 2020 census data, both House district 18 and Senate district 15 are overpopulated by more than 5%.

44.     Petitioner Prentiss Haney lives at 918 Windsor Street, Cincinnati, OH 45206, which is in House district 32 and Senate district 9 in the 2011 Plan. Based on 2020 census data, House district 32 is overpopulated by more than 5%. I was also asked to review the data files accompanying the Johnson/McDonald Plan that were posted by the independent map-drawers on the Commission's website on March 28, 2022.[12] According to these files, the population deviation of each district in the Johnson/McDonald plan is less than 5 percent from perfect population equality. Thus,  the Johnson/McDonald plan complies with equal-population requirements mandated by *Reynolds v. Sims*, 377 U.S. 533 (1964).

## CONCLUSION

45.     My conclusion with respect to the Third Revised Plan echoes my earlier conclusions regarding the Second Revised Plan, as they are nearly identical plans: The Commission has again failed to produce fair maps.  The expected outcomes under the Commission's plans are not an inevitable function of Ohio's political geography, as evidenced by the performance of the Johnson/McDonald and Rodden III plans. Given that the Commission members have now repeatedly refused to adopt compliant alternative plans, and given their continued attempt to mimic proportionality through the asymmetric use of toss-up districts, I

---

[12] https://redistricting.ohio.gov/assets/district-maps/district-map-1180.zip.

must conclude that the Third Revised Plan reflects an intent to maximize partisan advantage over fairness.

46.     With respect to the 2011 Plan, I conclude that it is unconstitutionally malapportioned.

*Michael S. Latner*                    04/01/2022
_____
Michael S. Latner

State of Florida

County of Pasco

 This foregoing instrument was acknowledged before me by means of online notarization,

this 04/01/2022 by Michael S. Latner.

____ Personally Known OR ___✔Produced Identification

Type of Identification Produced _____ DRIVER LICENSE

CRYSTAL CHILLURA
Notary Public - State of Florida
Commission # HH51131
Expires on October 6, 2024

-----------------------------------------------
Crystal Chillura    Online Notary

Notarized online using audio-video communication

23