**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **MICHAEL GONIDAKIS, et al.,** : | |
| : | Case No. 2:22-CV-773 |
| **Plaintiffs,** : | |
| : | **Chief Judge Algenon Marbley** |
| v. : | |
| : | **Circuit Judge Amul R. Thapar** |
| **FRANK LaROSE et al.,** : | |
| : | **Judge Benjamin J. Beaton** |
| **Defendants.** : | |

**OHIO SECRETARY OF STATE LAROSE'S RESPONSE IN OPPOSITION TO PLAINTIFFS' SECOND AMENDED MOTION FOR A PRELIMINARY INJUNCTION**

**I.     INTRODUCTION**

Simply put, the Plaintiffs are not likely to succeed on the merits of their claims as they rely on a factual inaccuracy – that Ohio lacks legislative districts. *See* Second Am. Mot. for PI, Doc. 96, PAGEID #1582.  Because, as of March 28, 2022, Ohio has state legislative districts.  And as the lead Plaintiff made clear at the preliminary injunction hearing, he simply wants to be able to support a candidate for general assembly in whichever legislative district he ultimately resides.  PI Hrg. Tr., Doc. 150, PAGEID #4349.  He will get that chance.  True, it will not be in time for the May 3 primary election, early voting for which has already begun *without* primaries for the legislative districts, but it will be in time for *a* primary election later in 2022.  And that will happen without this Court granting Plaintiffs' Second Amended Motion for a Preliminary Injunction, which seeks implementation of the Ohio Redistricting Commission's ("the Commission") February 24, 2022 General Assembly district plan ("the Third Plan").  *See* Second Am. Mot. for PI, Doc. 96, PAGEID #1595.  Though it was not passed in time to be used in the May 3 primary,

the Commission's latest plan, the March 28, 2022 General Assembly district plan ("the Fourth Plan) is currently valid (as of this filing), is the operative plan, and can—and should—be implemented. When a primary election will be held on that plan remains to be seen, but it will happen. To be clear, the May 3 primary election is still going on for all other races. The only races that are not on the May 3 Ohio primary election ballot are those for General Assembly and political party State Central Committeepersons. Accordingly, Plaintiffs' Motion (Doc. 96) should be denied.

In addition to responding to the Plaintiffs' Motion, this Court posed two questions to the parties at the March 30 Preliminary Injunction hearing – (1) if the Court is to intervene, what relief would each party prefer be ordered; and (2) what, if anything, either prohibits or allows this Court to order the implementation of the 2011 legislative district maps? *See* PI Hrg Tr., Doc. 150, PAGEID #4465. As to the Court's first question, at present, from an election administration standpoint, an August 2, 2022 primary for General Assembly and State Central Committee candidates which uses the Fourth Plan is preferable, even if the Ohio Supreme Court later invalidates the Fourth Plan. Additionally, it might become necessary for this Court to issue additional orders to automatically adjust the various statutory dates for primary elections in Ohio and a constitutional deadline related to the adoption of a new district plan. As to the Court's second question, while the Secretary acknowledges the legislative districts adopted in the 2011 redistricting cycle are the last maps approved by the Supreme Court of Ohio and have been successfully used in every legislative election from 2012 through 2020, the 2011 legislative districts are now malapportioned and it would be easier for Ohio's 88 county boards of election to use the Fourth Plan for the 2022 election as Secretary LaRose's office does not possess the original

2011 electronic data files used in creating the 2011 district maps and is not certain where they could be found, even assuming they still exist.

## II. BACKGROUND

The facts and procedural history of this case have been heavily briefed by the parties previously, and this Court heard extensive testimony during the March 30 Preliminary Injunction Hearing. Therefore, for the sake of brevity, Secretary LaRose offers the following updates that have occurred since that hearing concluded.

### *Voting in Ohio for the May 3 Primary Election has begun.*

As of today, voting in the May 3 primary election has begun for all offices except members of the General Assembly and political party State Central Committeepersons. *See* Ex. 1, Affidavit of Amanda Grandjean, p. 1, ¶ 3. Specifically, on or about April 1, 2022, Ohio's 88 county boards of elections began sending UOCAVA ballots overseas that included all of Ohio's 2022 primary election races except those for General Assembly and State Central Committee. *Id.* Similarly, on April 5, early, in-person voting and absentee voting began in all 88 counties on all races other than the General Assembly and State Central Committee races. *Id.* Ohio's May 3 primary election is underway.

### *The Fourth Plan is challenged in the Ohio Supreme Court.*

On April 1, 2022, the Bennett, OOC, and LWV Intervenor-Plaintiffs, petitioners in the various actions before the Ohio Supreme Court, filed objections to the Fourth Plan in their respective cases. *See* Dockets for *Ohio Organizing Collaborative, et al. v. Ohio Redistricting Commission, et al.*, No. 2021-1210; *Bennett, et al. v. Ohio Redistricting Commission, et al.*, No. 2021-1198; *League of Women Voters of Ohio, et al. v. Ohio Redistricting Commission, et al.*, No. 2021-1193. On April 4, the respondents in those cases, including Secretary LaRose, filed responses to those objections. *Id.* Although the Petitioners' objections are now decisional, as of

3

the filing of this *Response*, the Ohio Supreme Court has not yet issued a ruling, and the Fourth Plan stands.

### III. LAW AND ARGUMENT

#### A. Plaintiffs' Second Amended Motion for a Preliminary Injunction should be denied.

"[A] preliminary injunction is an extraordinary and drastic remedy . . . that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). The movant "bears the burden of justifying such relief," and it is "never awarded as of right." *ACLU Fund of Mich. v. Livingston Cnty.,* 796 F.3d 636, 642 (6th Cir. 2015). Indeed, "the proof required is much more stringent than the proof required to survive a summary judgment motion." *Farnsworth v. Nationstar Mortg., LLC*, 569 F. App'x 421, 425 (6th Cir. 2014) (quotation and alternation omitted). When determining whether to grant a party's request for such a remedy, district courts must balance four factors: "'(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.'" *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (citation omitted).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.,* 555 U.S. 7, 20 (2008). As to the first factor, a plaintiff must establish a "strong" likelihood of success, *Jolivette v. Husted*, 694 F.3d 760, 765 (6th Cir. 2012) (quotation omitted); a mere "possib[ility]" of success does not suffice, *Summit Cnty. Democratic Cent. & Exec. Comm.*

4

*v. Blackwell*, 388 F.3d 547, 551 (6th Cir. 2004). Similarly, the plaintiff must show a likelihood, not just a possibility, of irreparable injury. *Winter*, 555 U.S. at 22. Here, the Plaintiffs fail to meet that burden, and their request for a preliminary injunction must be denied.

      **1.**      **Plaintiffs cannot succeed on the merits of their claim.**

Plaintiffs are not likely to succeed on the merits of their constitutional claims that their rights to vote and to associate have been violated. All of Plaintiffs' claims—and motion for injunctive relief—are predicated upon the same inaccurate fact– that Ohio lacks state legislative districts or is about to use the 2011 districts. *See, e.g.*, Second Am. Mot. for PI, Doc. 96, PAGEID #1582 ("Without the Third Plan, no state legislative districts exist so Plaintiffs cannot vote in violation of the U.S. Constitution."). The Commission enacted the Fourth Plan. It is presumed to be constitutional and should not be supplanted with the Third. *See Wilson v. Kasich*, 981 N.E.2d 814, 821-822, 134 Ohio St. 3d 221 (2012).

Given this fact, Plaintiffs cannot succeed on their claims for relief, much less their request for a preliminary injunction. That is, Plaintiffs cannot succeed on claims premised upon the lack of current districts, when Ohio *has* legislative districts.

      **2.**      **Plaintiffs will not suffer irreparable harm absent an injunction.**

Plaintiffs will not be harmed absent an order implementing the Third Plan because a primary election for General Assembly members and State Central Committee will proceed, albeit at a date other than May 3. In other words, even if this Court denies the injunction (as it should), state legislative districts exist, and Plaintiffs will still be able to exercise their right to vote for a candidate. Simply put, Plaintiffs will not be harmed. True, the issue now is one of timing. Earlier during Ohio's redistricting litigation, there was a point at which it was possible for the Secretary and Ohio's boards of election to implement the Third Plan for the May 3 primary election. And even as late as the March 30 hearing, it may have been possible for the Secretary and the boards

to have implemented the Third Plan for a "unified" primary election on May 24, if this Court had so ruled on that day. But both of those points have now passed, and it is now undisputed that the state legislative primary will have to take place at a later date. *See* Tr. of PI Hrg, Doc. 150, PAGEID #4247. As a primary election for General Assembly and State Central Committee races will occur later in 2022, Plaintiffs will not be harmed if the Third Plan is not immediately implemented. There is still time to hold a state legislative primary absent an injunction, and that primary can be held on the schedule further explained herein.

> **3. Plaintiffs' requested injunction will cause substantial harm to the existing redistricting process and the public interest will not be served if this Court supplants those processes.**

The Commission passed a Fourth Plan that, as a matter of law, is to be implemented absent the Ohio Supreme Court ordering otherwise. This Court should not intervene while the state court processes are well underway and while the Fourth Plan, which is presumed to be constitutional, remains operative. *See Wilson v. Kasich*, 981 N.E.2d 814, 821-822, 134 Ohio St. 3d 221 (2012); *see also Growe v. Emison*, 507 U.S. 25, 33 (1993) ("reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court…[and] [a]bsent evidence that these state branches will timely fail to perform that duty, a federal court must neither affirmatively obstruct state apportionment nor permit federal litigation to be use to impede it.") (internal quotation and citation omitted). At this point, the public interest will not be served by disturbing those processes only to implement a map rejected by the Ohio Supreme Court, *i.e.*, the Third Plan.

For these reasons, Plaintiffs' Motion (Doc. 96) should be denied.

    **B.    From an elections administration viewpoint, an August 2 primary election for General Assembly candidates using the Fourth Plan is preferable.**

In response to this Court's question as to what each party's preferred relief is should the Court intervene, the Secretary prefers that this Court[1] order an August 2 primary election for General Assembly candidates using the Fourth Plan. Assuming that the Ohio Supreme Court does not invalidate the Fourth Plan, then half of this Court's work is done – the Fourth Plan will be implemented. The only remaining issue would be the date for the primary election for General Assembly and State Central Committee candidates.

However, even if the Ohio Supreme Court were to invalidate the Fourth Plan, it remains the most efficient choice. Notably, this position is solely from the point of view of ease of elections administration for a General Assembly primary election.[2] And, for the reasons that follow, an August 2 primary using the Fourth Plan would be the easiest for Ohio's 88 county boards of elections to implement.

    **1.    August 2 is the preferred date to hold a primary election for General Assembly and State Central Committee candidates.**

An August 2 primary election date for General Assembly and State Central Committee

---

[1] The Secretary would prefer, due to separation of powers and federalism concerns, that it be the Ohio General Assembly that would act to schedule the later legislative primary on August 2, 2022. As of this filing, however, the General Assembly has not acted to do so. Nor does it appear from their session calendar that the legislature will be in session to take any such action before the so-called "drop dead" date of April 20, 2022, for this Court to intervene that was established at the March 30, 2022 hearing.

[2] As has been stated, as of this filing, the Supreme Court of Ohio has not ruled on the constitutionality, under Art. XI of the Ohio Constitution, of the Fourth Plan. If the Supreme Court were to rule that the Fourth Plan violates Art. XI, then the Secretary, as a statewide official who swore an Oath to obey Ohio's Constitution, should no longer advocate for the adoption of the Fourth Plan. But, if this Court's question to the Secretary is, as it was at the hearing on March 30, 2022, of all the General Assembly district plans the Supreme Court has invalidated which one would he prefer to be ordered by this Court, then for the reasons that follow, his preference would be for the most recent plan approved by the Redistricting Commission, *i.e.*, the Fourth Plan.

candidates is preferable as it would allow for the primary election to proceed in as normal of course as it can. In even-numbered years in Ohio, primary elections take place over a 90-day period. *See* Ohio Rev. Code § 3513.05 (providing that candidates for party nomination at a primary election for offices elected in even-numbered years must file their declarations of candidacy and petitions no later than "the ninetieth day before the day of the primary election . . ."). Specifically, all of the normal time frames during that 90-day period that apply to a primary election (*e.g.* time for candidate petition filing, time for petition protests) could still be met if the primary election is held on August 2. This presumes that this Court select a district plan by April 20, 2022,[3] should the state process fail to yield a final map. So, if the undisputed "drop dead" date of April 20th is met, which is the date for the adoption of a specific general assembly district plan and the Court declaring an August 2nd primary date, then an August 2nd primary would allow everything related to a primary election on that date to proceed according to the normal time frames for primaries under Ohio law.

As Deputy Assistant Secretary of State Amanda Grandjean testified, an Ohio "election calendar typically begins 90 days before an election." *Id.* at PAGEID #4253; *see also* Pl's Ex. 1, 2022 Ohio Elections Calendar. The process starts with the deadline for candidates to file their declaration of candidacy, which occurs 90 days before an election. *See* Ohio Rev. Code § 3513.05. Encompassed within this 90-day period are a number of other deadlines. *See e.g.*, *id.* (Boards of elections must certify the validity and sufficiency of partisan candidates' petitions 78 days prior to

---

[3] And whomever is the author of the plan the Court selects is able to supply the Secretary, also by April 20, with the electronic shape files, Census block assignment files, written legal descriptions of the districts, and the designations of the most populous county in each House and Senate district. These are all things needed by the county boards of election to reprogram their voter registration systems and elections management systems. If the Fourth Plan is selected by this Court, then the Secretary already has all the required information to distribute to the county boards of elections.

the primary election; Protests against partisan candidates' petitions due 74 days prior to the election; Secretary of State must certify to boards of elections the form of official ballots for primary election 70 days prior to the primary election); *see also* Ohio Rev. Code § 3511.04 (UOCAVA absentee ballots for primary election must be ready for use 46 days prior to the primary election). Again, these are only a few examples of the many deadlines that must be met in order to conduct a primary election in "regular order."

Because of this redistricting cycle, Deputy Assistant Secretary Grandjean explained that a primary election could still be conducted using a 104-day schedule, with the extra 14 days on top of the usual 90-day primary period needed for the boards of election to reprogram their voter registration and voting equipment systems to whatever new district map is being used. PI Hrg. Tr., Doc. 150, PAGEID #4316-4317. And April 20 is 104 days before August 2. This is further illustrated by the updated 2022 Ohio Elections Calendar, which shows when the statutory deadlines would fall if the primary election for General Assembly and State Central Committee candidates were to be scheduled for August 2. *See* Ex. 1, Grandjean Affidavit, Ex. A. The 104-day schedule also gives Ohio's 88 county boards of elections enough time "to reprogram [their] voter registration systems[,]" which would take approximately 14 days. PI Hrg. Tr., Doc. 150, PAGEID #4258. In other words, any date for the General Assembly primary that is earlier than August 2 and Ohio's election calendar must be condensed, and any date later than August 2 and Ohio would run into the issue of overlapping elections, which "should be avoided at all costs." *Id.* at PAGEID #4328.

From an elections administration standpoint, it is important to note that Ohio's statutory deadlines, as it relates to a primary election, are not defined as specific days. For example, declarations of candidacy and petitions are not due each year on a specific date. Rather, deadlines

are determined based on how many days from the primary election an action must be taken. *See, e.g.*, Ohio Rev. Code § 3513.05 (among others, the deadline for candidates to file their declaration of candidacy is 90 days before the primary election). The issue here, however, is that the "primary election" date is set by statute as "the first Tuesday after the first Monday in May of each year except in years in which a presidential primary election is held." Ohio Rev. Code § 3501.01(E)(1). Therefore, in order to have all the applicable deadlines *automatically* changed, for the purposes of holding a primary election on August 2 for General Assembly and State Central Committee candidates, this Court would have to order that, for the 2022 election cycle, August 2 *is* a "primary election" under Ohio Rev. Code § 3501.01(E)(1) that will occur on August 2.

Finally, if this Court were to adopt the Fourth Plan, then, in addition to setting the primary election for General Assembly and State Central Committee for August 2, this Court should further clarify that the Ohio Const. Art. XI, Sec. 9(C) ("9(C)") "clock" began to run on March 28, the date the Fourth Plan was implemented, and ends on April 27, 2022. Ohio Const. Art. XI, Sec. 9(C) states, "[n]otwithstanding any provision of this constitution or any law regarding the residence of senators and representatives, a general assembly district plan made pursuant to this section *shall allow thirty days for persons to change residence in order to be eligible for election*." (Emphasis added.) This would give a state legislative candidate until April 27 (30 days after March 28) to move into the district in which he or she intends to run, if necessary.

This 9(C) schedule is consistent with the Ohio Constitution. *See* Ohio Const., Art. XI, Sec. 9(C). Also, because the 9(C) clock would end on April 27, any issues associated with 9(C) and declaration of candidacies are likely to be minimal because the 30 days would end a full week prior to the deadline to file candidacy petitions (May 4). *See* Ex. 1, Grandjean Affidavit, Ex. A. This is important because a declaration was filed of a legislative candidate that stopped looking

for a new residence, under the Third Plan, once the Supreme Court of Ohio ruled on March 16, 2022 (i.e., 10 days before that Plan's 9C deadline would have ended on March 26, 2022) that the Third Plan violated Article XI of the Ohio Constitution. *See generally* Declaration of Rick Neal, Doc. 144-1. IF this Court were to order the use of the Fourth Plan for the 2022 General Assembly primary election even if the Supreme Court were to rule that it violates Ohio's Constitution, it is important to the proposed August 2 primary election calendar, *see* Ex. 1, Grandjean Affidavit, Ex. A, that the 9(C) period end on April 27 before the putative new candidate filing deadline of May 4, 2022.

Accordingly, an August 2 primary election for all General Assembly and State Central Committee candidates is most efficient, from an elections administration standpoint.

### 2. The Fourth Plan is preferable given its practical benefits.

To the extent that the Fourth Plan is invalidated by the Ohio Supreme Court, the Fourth Plan is still, from an elections administration standpoint, the most practically beneficial. Specifically, the Fourth Plan is very similar to the Third Plan, as explained by Dr. Rodden at the preliminary injunction hearing. *See* PI Hrg. Tr. at p. 4408-4409 (explaining that "99.7 percent of the voters are in the same district in the third and fourth plan."). When the Third Plan was originally passed, Secretary LaRose instructed Ohio's 88 county boards of elections to begin preparations for the May 3 primary using the Third Plan. *See generally* Pl's Ex. 9, Directive 2022-26. And after the Ohio Supreme Court invalidated the Third Plan and when it became clear that a unified May 3 primary was impossible, Secretary LaRose instructed Ohio's 88 county boards of elections to "maintain a copy database of the ballot program file" that contained the Third Plan. *See* Pl's Ex. 14, Directive 2022-31 at p. 2.

A survey of Ohio's 88 county boards of elections conducted by the Secretary's Office revealed that 80 of 88 were able to maintain a backup in their *voter registration* systems of the

11

Third Plan. *See* Ex. 1, Grandjean Affidavit, Ex. B. Of the 8 counties that do not have a backup of the Third Plan in their voter registration systems, half indicated that their districts were not changed by the Fourth Plan. *See id.* As for the counties' *election management* systems *(i.e.*, voting and vote tabulation systems), 76 of the 88 were able to maintain a backup of Third Plan. Thus, by implementing the Fourth Plan, a similar plan to that of the Third Plan, the vast majority of the county boards of election would not have to start from scratch. Rather, they could start from a backup copy and update the Plan accordingly.

In other words, although the Fourth Plan is still a "new" map, which would require reprogramming, Dr. Rodden testified that the only changes from the Third Plan to the Fourth Plan were in Franklin and Stark (the county where Canton is) counties. *See* PI Hrg. Tr., Doc. 150, PAGEID #4408-4409. Thus, only a few counties would potentially need to "reprogram" their systems. *See* Ex. 1, Grandjean Affidavit at p. 3, ¶ 9; *id.*, Ex. B. Given the tight timeline that Ohio is working with, any help that this Court can give the county boards of elections the better.[4]

Accordingly, the Fourth Plan is the most efficient, from a purely elections administration standpoint, regardless of whether it is ultimately invalidated by the Ohio Supreme Court.

**C.    Although not the Secretary's first choice, this Court is not prohibited from ordering implementation of the now-lapsed 2011 General Assembly District maps for use in Ohio's 2022 General Assembly primary election.**

The Secretary is aware of no precedent or rule that would prevent this court from ordering Ohio's 2022 General Assembly election to proceed based upon the state's 2011 District Plan while

---

[4] In reading this, the Court may ponder, why not use the Third map. Again, the only reason why the Secretary suggested, from a purely elections administration standpoint, that the Third map would be preferred was *only* if this Court were inclined to order a unified May 24 primary election for all offices. *See* Affidavit of Amanda Grandjean, Doc. 113-1, PAGEID #2929. As that option is no longer possible, *see supra* at p. 5-6, the preferred option is the Fourth map.

accounting for any likely malapportionment issues. That does not, however, mean that such an order would be simple to implement practically or legally. First, the practical.

The Secretary does not object to the Panel ordering the use of the "current" 2011 district plan, but he assumes that the Court would order that any population malapportionment issues be addressed. But, even if this Court were to simply order the use of the 2011 districts as is without any 2020 population reapportionment, as this Panel learned from Deputy Assistant Secretary Grandjean during the preliminary injunction hearing, logistically that is not as easy for the 88 boards to do as one might think. *See* PI Hrg. Tr., Doc. 150, PAGEID #4273. Contrary to popular belief, there is no switch that can be flipped or centralized server that can be restarted that would bring the 2011 maps back online for all 88 county boards. *Id.* An order requiring use of the 2011 General Assembly districts would not be returning to baseline. It would be rebuilding 99 House and 33 Senate districts for the 88 boards of elections from the ground up. The boards of election would have to, once again, reprogram their systems. So, the "old" plan of 2011 would in effect be a "new" plan to the boards.

2021 was a year of decennial reapportionment and redistricting. *See* Ohio Const. Art. XI, Sec. 1(C) (the Ohio Redistricting Commission shall be convened in years ending in the numeral one for redistricting). 2011's General Assembly districts were to be superseded by districts based on the geographic distribution of Ohio's citizens as reflected in the 2020 decennial census. *See* Ohio Const. Art. XI, Sec. 3(A). When the work began, neither the Secretary nor Ohio's county boards anticipated that process being derailed, nor should they have. Mostly everyone expected a process that would yield maps and districts in sufficient time for the May 3, 2022 primary election for General Assembly candidates to proceed. In most any other year, those assumptions would have been correct. But 2021's redistricting process has proven to be anything but predictable.

13

Since September 16, 2021, the Secretary has instructed the county boards of election to re-program their systems three times. *See* PI Hrg. Tr., Doc. 150, PAGEID #4291; Ex. 1, Grandjean Affidavit, p. 3, ¶ 10. To put it differently, Ohio's 2011 General Assembly maps have been superseded no less than three times. *Id.*

In order to "return" Ohio to the 2011 General Assembly districts, the county boards would first need to locate or rebuild the original 2011 electronic files (shape files and Census Block Assignment Files), as well as the written district legal descriptions of each district and determine each district's most populous county in 2011. *See* Ex. 1, Grandjean Affidavit, p. 3, ¶ 10. The information contained in those files is necessary for the boards to reprogram, register and allocate voters to the correct General Assembly districts, as well as being able to verify candidate petition filings in the correct districts. *See id.* at p. 2, ¶ 8. The Secretary's office does not possess those original 2011 electronic files, if they even still exist, and recreating them is far from simple. *Id.* at p. 3, ¶ 10. Ohio's General Assembly districts are not built around or bound by county lines or municipal boundaries. Instead, General Assembly districts are created through compilations of Census Blocks. PI Hrg. Tr., Doc. 150, PAGEID #4367. This block-by-block building is the only way to ensure districts are properly apportioned. *See id.* at PAGEID #4367-4368. Without those original files, an order requiring Ohio to "return" to the 2011 General Assembly districts would present the Secretary and Ohio's county boards with a very difficult and time-consuming task. And all of this assumes no population adjustments are required to bring the 2011 General Assembly districts into compliance with Ohio and Federal law.

Ohio's General Assembly districts, as implemented by the 2011 plan, are no longer in balance. Ohio's population has shifted. Some cities and counties have grown. Others have seen their populations fall. Whether this Court can order a "return" to the 2011 General Assembly

14

district plan without also taking action to address the potential for malapportionment is an open question to which the Secretary has concerns.

In a Sixth Circuit case involving voting procedures, but not redistricting, the Court said that a consent decree could not itself violate equal protection, confirming that court orders to fix one problem cannot create another. *Northeast Ohio Coalition v. Husted*, 696 F.3d 580, 598 (6th Cir. 2012) ("we join the parties and the district court in finding that the consent decree's different treatment of similarly situated provisional ballots likely violates equal protection").

In non-binding cases from other district courts, every court to draw lines has said that they must follow all of the rules, including constitutional rules and statutes. *See Arizonans for Fair Representation v. Symington*, 828 F.Supp. 684, 687 (D.Ariz.1992); *see also Colleton County Council v. McConnell*, 201 F. Supp. 2d 618 (D.S.C. 2002). In *Symington*, the district court said, "Because of the legislative impasse, the court must adopt or draw a plan which complies with the Constitution, 42 U.S.C. sections 1971 through 1973ff-6 (hereinafter referred to as the 'Voting Rights Act'), and the neutral criteria which support the precept of good government." *Id.* In *McConnell*, the district court, when faced with a challenge specifically focused on malapportionment, commented that:

> Because the constitutional wrong we remedy is the malapportionment of the existing districts, the one-person, one-vote requirement of the United States Constitution is always the paramount concern of a court-ordered remedial plan. The plan for redistricting of a state's bicameral legislature must ordinarily achieve the goal of population equality with little more than de minimis variation, whereas in the congressional redistricting process, a good-faith effort to achieve precise mathematical equality is required.

201 F. Supp. 2d at 627 (internal quotations and citations omitted).

The Supreme Court of the United States has joined the call for courts to look beyond the immediate problems presented to them when crafting relief in election-related cases. In *Wisc.*

*Legislature vs. Wisc. Election Comm'n*, __ S.Ct. __, 2022 U.S. LEXIS 1668, at *1 (March 23, 2022), the Wisconsin Supreme Court chose state legislative lines by having the Governor, state legislature, and others submit proposals. The Wisconsin Supreme Court chose the Governor's maps. *Id.* On review, the United States Supreme Court found that those lines violated equal protection by working to create an additional majority-minority seat, based on the Governor's or Wisconsin State Court's errant belief that the Voting Rights Act ("VRA") required it. *Id.* at *2-3. The Court did not demand perfection, but required demonstration of at least a reasonable effort to comply with Constitutional strictures. *Id.* at *7-8. Some leeway for "reasonable mistakes" may be acceptable, "[b]ut that 'leeway' does not allow a State to adopt a racial gerrymander" that is unjustified by the VRA. *Id.* (quoting *Cooper v. Harris*, 137 S. Ct. 1455, 1472 (2017)). Clearly, a court in a remedial setting must still follow equal protection principles, including, but not limited to, one-person-one-vote. In terms of re-imposing Ohio's 2011 District Plan, correcting malapportionment between Ohio's General Assembly districts is a *must*.

      Whatever path this Panel chooses, time is of the essence. Shape files and Census Block File data already exists for the Third and Fourth Plans. *See* Ex. 1, Grandjean Affidavit, p. 2, ¶ 8, n. 1. In terms of implementation by Ohio's county boards, those would be the simplest. *See supra* at p. 11-12. Choosing a "return" to the 2011 General Assembly districts without addressing the malapportionment issues is next in terms of simplicity, but still requires expert analysis to locate, rebuild, and produce the now-lost shape files and Census Block Allocation Files. If the Panel were to re-apportion the 2011 map with the 2020 Census data, then it becomes like any other plan, previously adopted or not. Accordingly, the Secretary and Ohio's 88 county boards of elections need the new electronic shape files and census block allocation files ready and in hand *no later than April 20,* so the county boards/vendors can reprogram their voting systems in preparation for

an orderly General Assembly primary election to occur on whatever date this Court or the legislature may set.

IV.  **CONCLUSION**

For the foregoing reasons, Plaintiffs' Second Amended Motion for a Preliminary Injunction (Doc. 96) should be denied. Further, in answering the questions posed by this Court: (1) An August 2 primary election for General Assembly and State Central Committee candidates using the Fourth Plan is preferable along with the other findings and conclusions requested, from an elections administration standpoint; and (2) it is preferable to use the Fourth Plan as opposed to the 2011 district maps as those districts are now likely malapportioned and trying to recreate the 2011 districts would be impracticable.

Respectfully submitted,

OHIO ATTORNEY GENERAL

*/s/ Jonathan D. Blanton*
JONATHAN D. BLANTON (0070035)
Deputy Attorney General
JULIE M. PFEIFFER (0069762)
*Counsel of Record*
MICHAEL A. WALTON (0092201)
ALLISON D. DANIEL (0096186)
Assistant Attorneys General
Constitutional Offices Section
30 E. Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: 614-466-2872 | Fax: 614-728-7592
Julie.Pfeiffer@OhioAGO.gov
Jonathan.Blanton@OhioAGO.gov
Michael.Walton@OhioAGO.gov
Allison.Daniel@OhioAGO.gov

*Counsel for Ohio Secretary of State Frank LaRose*

## CERTIFICATE OF SERVICE

I hereby certify that on April 6, 2022, the foregoing was filed with the Court.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties for whom counsel has entered an appearance.  Parties may access this filing through the Court's system.

*/s/ Jonathan D. Blanton*
JONATHAN D. BLANTON (0070035)
Deputy Attorney General