**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| MICHAEL GONIDAKIS et al., | Case No. 2:22-cv-00773 |
| Plaintiffs, | Circuit Judge Amul R. Thapar |
| | Chief Judge Algenon L. Marbley |
| THE OHIO ORGANIZING COLLABORATIVE, COUNCIL ON AMERICAN-ISLAMIC RELATIONS, OHIO, OHIO ENVIRONMENTAL COUNCIL, SAMUEL GRESHAM JR., AHMAD ABOUKAR, MIKAYLA LEE, PRENTISS HANEY, PIERRETTE TALLEY, and CRYSTAL BRYANT, | Judge Benjamin J. Beaton |
| | Magistrate Judge Elizabeth Preston Deavers |
| | **ORAL ARGUMENT REQUESTED** |
| Intervenor-Plaintiffs, | |
| v. | |
| FRANK LAROSE, in his official capacity, | |
| Defendant. | |

## INTERVENOR-PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

The Ohio Organizing Collaborative ("OOC"), Council on American-Islamic Relations, Ohio ("CAIR-Ohio"), Ohio Environmental Council ("OEC"), Samuel Gresham Jr., Ahmad Aboukar, Mikayla Lee, Prentiss Haney, Pierrette Talley, and Crystal Bryant (collectively, the "OCC Plaintiffs") hereby move, pursuant to Fed. R. Civ. P. 65, in the event that there is no operative General Assembly district plan in effect on April 20, 2022, for a Preliminary Injunction ordering Defendant Frank Larose, in his official capacity as Secretary of State of Ohio, to implement the Revised Johnson/McDonald Plan submitted via the Declaration of Dr. Megan Gall with this motion for the 2022 General Assembly primary and general election. This Motion is accompanied by a Memorandum in Support that details the grounds for granting the requested relief.

Given the complexity of the factual and legal issues presented, OOC Plaintiffs request an evidentiary hearing and will file a separate motion with this Court in accordance with Local Rule 7.1(b)(1).  Alternatively, they request oral argument to facilitate the fair resolution of this case.

Dated: April 6, 2022

Respectfully submitted,

/s/ Christina J. Marshall
Christina J. Marshall (Ohio Bar No. 0069963)
*Trial Attorney*
MILLER, CANFIELD, PADDOCK
AND STONE, P.L.C.
1100 Superior Avenue E, Suite 1750
Cleveland, OH 44114
(248) 267-3256
marshall@millercanfield.com

Alicia L. Bannon (*pro hac vice pending*)          Peter M. Ellis
Yurij Rudensky (*pro hac vice*)                        REED SMITH LLP
Harry Isaiah Black (*pro hac vice pending*)        10 South Wacker Drive, 40th Floor
BRENNAN CENTER FOR JUSTICE                     Chicago, IL 60606
AT NYU SCHOOL OF LAW                              Tel:  (312) 207-1000
120 Broadway, Suite 1750                              Fax: (312) 207-6400
New York, NY 10271                                     pellis@reedsmith.com
Tel:  (646) 292-8310
Fax: (212) 463-7308                                      Brian A. Sutherland (*pro hac vice*)
alicia.bannon@nyu.edu                                   REED SMITH LLP
                                                                101 Second Street, Suite 1800
                                                                San Francisco, CA 94105
                                                                Tel:  (415) 543-8700
                                                                Fax: (415) 391-8269
                                                                bsutherland@reedsmith.com

                                                                Ben R. Fliegel (*pro hac vice*)
                                                                REED SMITH LLP
                                                                355 South Grand Avenue, Suite 2900
                                                                Los Angeles, CA 90071
                                                                Tel:  (213) 457-8000
                                                                Fax: (213) 457-8080
                                                                bfliegel@reedsmith.com

*Attorneys for Intervenor-Plaintiffs*
*The Ohio Organizing Collaborative, et al.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

MICHAEL GONIDAKIS et al.,

      Plaintiffs,

THE OHIO ORGANIZING
COLLABORATIVE, COUNCIL ON
AMERICAN-ISLAMIC RELATIONS,
OHIO, OHIO ENVIRONMENTAL
COUNCIL, SAMUEL GRESHAM JR.,
AHMAD ABOUKAR, MIKAYLA LEE,
PRENTISS HANEY, PIERRETTE
TALLEY, and CRYSTAL BRYANT,

      Intervenor-Plaintiffs,

v.

FRANK LAROSE, in his official capacity,

      Defendant.

Case No. 2:22-cv-00773

Circuit Judge Amul R. Thapar
Chief Judge Algenon L. Marbley
Judge Benjamin J. Beaton
Magistrate Judge Elizabeth Preston Deavers

**MEMORANDUM IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION
BY INTERVENOR-PLAINTIFFS
THE OHIO ORGANIZING COLLABORATIVE, ET AL.**

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

I.     OHIOANS AMEND THEIR STATE CONSTITUTION TO PROHIBIT POLITICAL GERRYMANDERING ................................................................. 2

II.    THE OHIO SUPREME COURT INVALIDATES THE PLAN BECAUSE IT VIOLATES SECTION 6(A) AND SECTION 6(B) OF ARTICLE XI OF THE OHIO CONSTITUTION ......................................................... 3

III.   THE OHIO SUPREME COURT INVALIDATES TWO REVISED PLANS BECAUSE THEY VIOLATED SECTION 6(A) AND SECTION 6(B) OF ARTICLE XI OF THE OHIO CONSTITUTION ................................. 5

IV.   THE COMMISSION UNDERMINES INDEPENDENT MAP DRAWERS AND RE-ADOPTS THE INVALIDATED THIRD PLAN WITH COSMETIC CHANGES ......................................................... 6

ARGUMENT ...................................................................................................................... 8

I.     THE OOC PLAINTIFFS' REQUESTED INJUNCTIVE RELIEF BEST RESOLVES THE FEDERAL AND STATE CONSTITUTIONAL INJURIES STEMMING FROM MALAPPORTIONMENT ................................................... 8

I.     THE OOC PLAINTIFFS HAVE A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS ......................................................... 9

1.   THE REVISED JOHNSON/MCDONALD PLAN COMPLIES WITH ALL SUBSTANTIVE PROVISIONS OF THE OHIO CONSTITUTION. .................................................... 11

2.   THE REVISED JOHNSON/MCDONALD PLAN BEST COMPLIES WITH THE PROCEDURAL PROVISIONS OF THE OHIO CONSTITUTION. .................................................... 13

II.   THE REQUESTED RELIEF IS NECESSARY TO AVOID IRREPARABLE HARM ......................................................... 14

III.   ISSUANCE OF THE REQUESTED RELIEF WOULD CAUSE NO HARM TO OTHERS ......................................................... 15

IV.   THE PUBLIC INTEREST WOULD BE SERVED BY GRANTING THE REQUESTED RELIEF ......................................................... 16

II.    THERE IS NO JUSTIFICATION FOR USING THE 2011 PLAN IN THE 2022 ELECTION ................................................................. 17

III.   THERE IS NO JUSTIFICATION FOR USING A PLAN THE OHIO SUPREME COURT HAS INVALIDATED ......................................................... 19

CONCLUSION ................................................................................................................... 20

i

## INTRODUCTION

In 2015, Ohioans voted overwhelmingly to amend the state constitution, including establishing partisan fairness and proportionality standards for the state's General Assembly plan. On March 28, 2022, the Ohio Redistricting Commission ("Commission") flouted these provisions for the fourth time this cycle, enacting a plan that plainly violates the state constitution and prior orders of the Ohio Supreme Court. The Ohio Supreme Court has retained jurisdiction in ongoing state court litigation, and the OOC Plaintiffs filed objections to the March 28 Plan (Exhibit A, OOC Objections and Request for Remedies) and sought other relief to compel compliance with the Ohio Constitution. (Exhibit B, OOC Joinder in Renewed Motion for Order to Show Cause).

If the Ohio Supreme Court invalidates the March 28 Plan and there are no operative maps on April 20, 2022, the OOC Plaintiffs seek a preliminary injunction ordering the implementation of a General Assembly plan for the 2022 primary and general election. This plan should comport with federal law and the Ohio Constitution, including its partisan fairness and proportionality provisions. *See White v. Weiser*, 412 U.S. 783, 795 (1973) ("a federal district court, in the context of legislative reapportionment, should follow the policies and preferences of the State, as expressed in . . . *constitutional* provisions . . . whenever adherence to state policy does not detract from the requirements of the Federal Constitution." (emphasis added)).

With this motion, the OOC Plaintiffs submit a modified version of a General Assembly plan that was jointly produced by two independent map-drawers hired by the Commission, one identified by each party (the "Revised Johnson/McDonald Plan", Exhibit C, Gall Declaration at ¶¶ 42-46). This revised plan corrects some minor technical issues in the plan originally produced by these map-drawers (the "Johnson/McDonald Plan") and complies with both federal and state law.

1

The OOC Plaintiffs request that this Court order the implementation of the Revised Johnson/McDonald Plan or any substantially similar plan.

To give due respect to federal law and the Ohio constitution, this Court should reject any calls for the implementation of the prior decade's plan ("2011 Plan"). Not only is the 2011 Plan malapportioned and no easier to implement for the 2022 election than the Revised Johnson/McDonald Plan, but it was drawn before the 2015 amendments and fails to comply with numerous provisions of Article XI of the Ohio Constitution. Nor should this Court order the use of any other plan that fails to materially comply with the Ohio Constitution. Finally, this Court should give full faith and credit to the Ohio Supreme Court's rulings and reject any request to order the use of a plan invalidated by the state high court.

## BACKGROUND

### I.    Ohioans Amend their State Constitution to Prohibit Political Gerrymandering

In 2011, Ohio's General Assembly district plan was adopted by the then-operative "Ohio Apportionment Board" pursuant to a prior version of Article XI of the Ohio Constitution, which the Ohio Supreme Court ruled permitted the Board to favor or disfavor a political party during map-drawing. *See Wilson v. Kasich*, 134 Ohio St. 3d 221, 225, 981 N.E.2d 814, 820. In the wake of this decision, Ohioans sought *enforceable* rights against partisan gerrymandering. In 2014, the General Assembly adopted a joint resolution to propose amendments to Article XI, and Senate President Matthew Huffman and Senator Vernon Sykes formed Fair Districts for Ohio, an organization supporting the amendment. *See League of Women Voters of Ohio v. Ohio Redistricting Comm'n*, --N.E.3d--, 2022 WL 110261, at *10 (Ohio Jan. 12, 2022) ("*League I*"). The organization issued literature, including a flyer stating that the amendment would bring about the following reforms:

38934407.4/066667.00811

*Fairness*

- Protects against gerrymandering by prohibiting any district from primarily favoring one political party.
- Requires districts to closely follow the statewide preferences of the voters.

*Accountable*

- Creates a process for the Ohio Supreme court to order the commission to redraw the map if the plan favors one political party.

*Id.* In November 2015, Ohioans approved Issue 1 with more than 71 percent of the vote, *id.* at *1; *id.* at *4 (Brunner, J., concurring)—thereby rejected the redistricting regime that produced the 2011 plan.

Despite these significant changes, the 2021 process of enacting a General Assembly plan remained thoroughly partisan. Senate President Huffman and House Speaker Robert Cupp oversaw its creation, using their personal staffers to draw a plan. *Id.* at *6. These partisan staff were not instructed to comply with the new fairness criteria. *Id.* at *7. Ultimately, the Commission voted 5 to 2, along party lines, to adopt a slightly modified version of the Huffman/Cupp-orchestrated plan. *Id.* at *4. Notwithstanding the 2015 amendments, this plan would have produced much the same gerrymandered results as the 2011 Plan it replaced.

**II.   The Ohio Supreme Court Invalidates the Plan Because it Violates Section 6(A) and Section 6(B) of Article XI of the Ohio Constitution**

Three separate petitioner groups—including the OOC Plaintiffs—filed suit in the Ohio Supreme Court against the Commission and its members. *League I*, at *5-6. On January 12, 2022, the court ruled that the plan violated Section 6 of Article XI. *See generally League I*. The court acknowledged that Section 6 "speaks not of desire but of direction: the commission *shall attempt* to achieve the standards of that section." *Id.* at *17 (emphasis in original). "If it is possible for a district plan to comply with Section 6 and [the other map-drawing requirements in Article XI], the commission must adopt a plan that does so." *Id.*

3

With respect to Section 6(B), which requires a plan that reflects the statewide voting preferences of Ohioans, the court stated that "there is no dispute that under this methodology, which looks at votes cast in statewide elections over the relevant period, about 54 percent of Ohio voters preferred Republican candidates and about 46 percent of Ohio voters preferred Democratic candidates." *Id.* at *22. According to the court, "the commission did not attempt to comply with the standard set forth in that section" and "even if Senate President Huffman and House Speaker Cupp had had the right target in mind, the evidence shows that they never asked the principal map drawers . . . to try to comply with Section 6." *Id.* at *23.

With respect to Section 6(A), which prohibits drawing a plan primarily to favor or disfavor a political party, the court recognized that "[a] map-drawing *process* may support an inference of predominant partisan intent[,]" *League I*, at *24 (emphasis added), and that "[t]he evidence here demonstrates that Senate President Huffman and House Speaker Cupp controlled the process of drawing the maps that the commission ultimately adopted." *Id.* The one-sided partisan process led to one-sided partisan results. Under the plan, "if Republican candidates won 54 percent of the statewide vote under the adopted plan, they would win 64 House seats (a supermajority)" and "with the same statewide vote-share percentage, Democratic candidates would not win even a bare majority of the House seats under the adopted plan." *Id.* at *25. For the Senate, "the Republican candidates would win an average of 17 percent more seats than Democratic candidates for the same vote share." *Id.*

The Ohio Supreme Court concluded by stating that, "because the election cycle *should not proceed with a General Assembly-district map that we have declared invalid*, it is appropriate to issue further remedial orders in an effort to have the redistricting commission adopt a plan that complies with Article XI in time for the plan to be effective for the 2022 election cycle[,]" *Id.* at

38934407.4/066667.00811

*28 (emphasis added). With that, it ordered the Commission to adopt a constitutional plan and retained jurisdiction to ensure that happened. *Id.* at *29.

### III.     The Ohio Supreme Court Invalidates Two Revised Plans Because They Violated Section 6(A) and Section 6(B) of Article XI of the Ohio Constitution

The three remedial processes and three revised plans that followed failed to comply with the Ohio Constitution and the Ohio Supreme Court's clear instructions. Time and again, the Ohio Supreme Court found that the Commission's work violated Section 6(A) and Section 6(B) of Article XI of the Ohio Constitution. Each plan made minor adjustments to the heavily-partisan original plan and maximized Republican advantage by creating a large number of toss-up districts for Democrats and safe districts outside the competitive range for Republicans.

During the first redraw, Republican commissioners instructed their staffers to use the "base map"—*i.e.*, the invalidated plan—as a "starting point." *League of Women Voters of Ohio v. Ohio Redistricting Comm'n*, 2022 WL 354619, at *4 (Ohio Feb. 7, 2022) ("*League II*"). In its *League II* opinion, the court characterized this approach as "an intent to preserve as much partisan favoritism as could be salvaged." *Id.* at *8. The large number of nominally Democratic districts that were toss-ups and lack of Republican equivalents provided further proof of intent. *Id.* The court also emphasized that it did "not read Article XI, Section 6(B) as prohibiting the creation of competitive districts," but that toss-up districts "must either be excluded from the proportionality assessment or be allocated to each party in close proportion to its statewide vote share." *Id.* at *13. It gave the Commission ten days to generate a new plan. *Id.* at *14.

The Commission waited eight days after the court's ruling to convene for the second redraw. *See League of Women Voters of Ohio v. State Redistricting Comm'n*, 2022 WL 803033, at *2 (Ohio March 16, 2022) ("*League III*"). At that meeting, a Democratic plan was rejected on a party-line vote. *Id.* at *2-3. Rather than adopting an alternative, the Commission adjourned and

declared impasse on February 18. *Id.* at *3. That same morning, the Gonidakis Plaintiffs filed this action. ECF 1. The Ohio Supreme Court ordered the Commissioners to appear to show-cause as to why they should not be held in contempt. *League III* at *4. Following this order, the Commission convened and passed the third plan (February 24 Plan), which, like its predecessors, was drafted with only Republican input. *Id.*

Substantively, this plan differed little from the first redraw; procedurally, its development was even worse. The Ohio Supreme Court declared it to be unlawful. *See generally League III*. Notably, the court found that the Commission's "concern for protecting incumbents is not grounded in Article XI" and it clarified that Article XI was adopted to address the "extreme disproportionality" that the 2011 Plan facilitated. *Id.* at *9.

To avoid yet another partisan plan, the court provided procedural guidance, instructing the Commission to "retain an independent map drawer—who answers to all commission members, not only to the Republican legislative leaders—to draft a plan through a transparent process" and emphasizing that "the drafting should occur in public and the commissioners should convene frequent meetings to demonstrate their bipartisan efforts to reach a constitutional plan within the time set by this court." *Id.* at *7, *11. Once again, the Commission had 10 days to produce compliant maps – with explicit direction from the court that the "commission" collectively draft a plan and that it be "entirely new." *Id.* at *11.  Once again, the Commission failed.

## IV. The Commission Undermines Independent Map Drawers and Re-adopts the Invalidated Third Plan with Cosmetic Changes

For the third redraw, the Commission retained two outside consultants: Dr. Douglas Johnson from the National Demographics Corporation and Dr. Michael McDonald from the University of Florida. (Exhibit D, 3/23/22 Hrg Tr. at 00:53-04:55).  By March 26, each independent map drawer had a House map to present. (Exhibit E, 03/26/22 Hrg Tr.). Both maps achieved

proportionality—54 Republican-leaning districts and 45 Democratic-leaning districts. (*Id.* at 30:09-34:18). The independent map drawers reported that their respective maps did not have significant differences. (*Id.* at 35:39-38:00). The day before the court-ordered deadline to produce a new plan, the Commission instructed the map drawers to consider residence of non-term-limited House and Senate incumbents and avoid pairing them together. (03/27/22 Mediation Statement).[1]

On March 27, the map drawers reported having completed Senate and House maps. (Exhibit F, 03/27/22 Hrg Tr. at 1:30-7:03). On March 28, when the Commission convened in the morning, the independent map drawers explained that they had merged their plans into one and started "cleanup" of technical defects. (Exhibit G, 3/28/22 Hrg Tr., Part 1 at 1:31-4:00). They also indicated that they would consider incumbent data as directed. (*Id.* at 8:09-18:09). When the Commission reconvened at about 4:30 p.m., the independent map drawers reported that they had nearly finished considering incumbent addresses in the House map, (Exhibit H, 3/28/22 Hrg Tr., Part 2 at 00:10-02:22), and that a complete Senate map would be available later in the day. (*Id.* at 02:22-03:16).

But Republican commissioners had other plans. Senate President Huffman stated, "I think we need a failsafe" and "I think we need something else for the Commission to be able to vote on." (*Id.* at 43:41-50:08). He moved to alter the February 24 Plan—which the Ohio Supreme Court had invalidated. (*Id.* at 43:41-50:08). Senator Sykes argued that "to distract the staff and map drawers and to divert to some other task is ridiculous [and] contrary to the directive, the spirit and the direction of the court." (*Id.* at 50:16-51:35). Leader Russo argued that, under the Ohio Supreme

---

[1] Ohio Redistricting Commission, 2022-03-27 Mediation Statement – Instructions – As Adopted, https://redistricting.ohio.gov/assets/organizations/redistricting-commission/events/commission-meeting-march-27-2022-280/2022-03-27-mediation-statement-instructions-as-adopted.pdf.

38934407.4/066667.00811

Court's orders, the Commission should not use an unconstitutional plan as a starting point for enacting a new plan. (*Id.* at 54:34-55:36).

Nonetheless, the Commission approved Senate President Huffman's motion on a party-line vote, (Exhibit I, 3/28/22 Hrg Tr., Part 3 at 07:32-08:06), and diverted the Republican staff mapper from aiding Dr. Johnson to implementing superficial changes to the February 24 Plan. (Exhibit J, 3/28/22 Hrg Tr., Part 4 at 18:39-30:59). About two-and-a-half hours before the deadline, Dr. Johnson reported that he had completed the House map and needed about 45 minutes for the Senate map. (*Id.* at 00:22-03:02). Senate President Huffman argued that the Commission should "move on" and consider the tweaked February 24 Plan, despite the Ohio Supreme Court's order that the Commission produce an "entirely new" plan. (*Id.* at 10:17-11:04). The Commission adopted that plan and recessed to craft an explanatory statement. (*Id.* at 54:03-54:34). During the recess, Dr. Johnson completed the Johnson/McDonald plan and posted it to the Commission's website.[2]

On March 30, the Ohio Supreme Court ordered the Commission and its members to show cause why they should not be held in contempt. On April 1, OOC Plaintiffs filed renewed objections to the plan. The March 28 Plan suffers the same infirmities as the February 24 Plan.

**ARGUMENT**

I. **The OOC Plaintiffs' Requested Injunctive Relief Best Resolves the Federal and State Constitutional Injuries Stemming from Malapportionment**

This Court's review focuses on the four factors that a plaintiff must establish to obtain injunctive relief: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public

---

[2] The Johnson/McDonald Plan is available on the Commission's website and labeled "Johnson McDonald Independent Plan 328 Final," https://redistricting.ohio.gov/maps.

interest would be served by the issuance of the injunction." *Northeast Ohio Coal. v. Husted*, 696 F.3d 580, 590-91 (6th Cir. 2012). A preliminary injunction ordering the use of the plan prepared by the independent map-drawers hired by the Commission, with or without minor adjustments to address minor technical defects, is supported by all four factors.

## I.     The OOC Plaintiffs Have a Strong Likelihood of Success on the Merits

Should there be no 2022 General Assembly plan in effect on April 20, 2022, the Ohio General Assembly districts will be substantially malapportioned, in violation of the OOC Plaintiffs' federal constitutional rights. The U.S. Constitution requires both chambers of a legislature to be "apportioned on a population basis," which means districts must be "as nearly of equal population as is practicable." *Reynolds v. Sims*, 377 U.S. 533, 577 (1964). The Supreme Court has established that a map with a maximum population deviation of more than 10 percent is "presumptively impermissible." *Evenwel v. Abbott*, 578 U.S. 54, 60 n.2 (2016). Applying 2020 Census data to the 2011 Plan, the maximum population deviation among House districts is 34.23 percent and among Senate districts is 25.26 percent. (Exhibit C, Gall Declaration at ¶¶ 34, 36). Moreover, 45 of 99 House districts and 13 of 33 Senate districts are beyond these permissible thresholds. (*Id.*)

Given the extent of the deviation, there can be no dispute that the 2011 Plan is malapportioned. The only question is the proper relief. It is well-established that "a federal district court . . . should follow the policies and preferences of the State, as expressed in statutory and *constitutional* provisions or in the reapportionment plans proposed by the state legislature, whenever adherence to state policy does not detract from the requirements of the Federal Constitution." *White v. Weiser*, 412 U.S. 783, 795 (1973) (emphasis added). For this reason, while a federal court "must ordinarily achieve the goal of population equality with little more than de

9

minimis variation" when adopting state legislative districts, state policy considerations can be a "persuasive justification[]" for allowing greater variation. *Chapman v. Meier*, 420 U.S. 1, 26-27 (1975). "Where important and significant state considerations rationally mandate departure from [the de minimis population variation] standards," courts must explain why minimal variance cannot be achieved. *Id.* at 27. For instance, a recent three judge panel accepted a proposed map that featured a 9.44 percent variance because it adhered to county boundary rules and other codified state policies, and modified it slightly to reduce the variance to 6.72 percent. *Brown v. Jacobsen*, --- F. Supp. 3d ---, 2022 WL 683089, at *12-13 (D. Mont. March 8. 2022).

In Ohio, Article XI of the Ohio Constitution provides "important and significant" state policy considerations that must be considered by federal courts. Sections 3 and 4 of Article XI set out detailed, prioritized rules for allocating representation to counties based on population, splitting sub-state units of government, and permissible population deviations, among other things.[3] Section 6 sets out standards requiring that no plan primarily favor or disfavor a political party, that districts correspond closely to the statewide preferences of Ohio voters, and that districts be compact. The Ohio Supreme Court has given detailed guidance about the administration of both the partisan fairness and the proportionality standards. *See League I,* 2022 WL 110261; *League II,* 2022 WL 354619; *League III,* 2022 WL 803033.

Both federal and state law counsel in favor of selecting the Revised Johnson/McDonald Plan put forward by OOC Plaintiffs.[4] Its maximum population deviation is 9.97 percent, less than the permitted 10 percent. (Exhibit C, Gall Declaration at ¶¶ 43, 45). These variances are necessary

---

[3] Notably, the Ohio Constitution allows for a full 10 percent deviation as a matter of state policy. Ohio. Const. Art. XI, Sec. 3(B)(1). Presumably, so that all other criteria can be satisfied.
[4] This plan is available at Exhibit K and was prepared by Dr. Megan Gall, a political scientist and demographer.

and justified by "important and significant state considerations," i.e., the Ohio Constitution. As Dr. Gall explains in her expert affidavit, to comply with the constitution's line-drawing and proportionality requirements, any General Assembly district plan will need to include a maximum deviation near or at the 10 percent limit.  (Exhibit C, Gall Declaration at ¶¶ 47-48). For example, Section 3(C)(2) requires giving counties within the 10 percent deviation range their own House districts. According to the 2020 Census, Wayne County and Richland County are entitled to such districts, but this alone creates a deviation of at least 7 percent, without addressing any other line-drawing requirements. The Revised Johnson/McDonald Plan is also the plan that best meets Ohio's important and significant policy considerations, as reflected in the Ohio Constitution.

### 1. The Revised Johnson/McDonald Plan Complies with All Substantive Provisions of the Ohio Constitution.

The Ohio Constitution contains exacting rules governing county, municipality, and township splits in the creation of House districts. *See* Ohio Const. Art. XI, Sec. 3. Specifically, once the ideal population is calculated, House districts are allocated to populous counties and splits of municipalities, and townships are minimized based on permissible deviations from the ideal population. Ohio Const. Art. XI, Sec. 3(C)(1); (C)(2); (D)(1)(c); (D)(2). Section 4 of Article XI provides similar instructions for the combination of House districts into Senate districts. Ohio Const. Art. XI, Sec. 4(B)(1). The Revised Johnson/McDonald plan complies with all provisions of Sections 3 and 4. (Exhibit C, Gall Declaration at  ¶¶ 23-28). Indeed, Dr. Gall made minor alterations to the Johnson/McDonald plan specifically to resolve any lingering technical issues and ensure compliance with the allocation of district and sub-state unit split rules. (*Id.* at ¶¶ 23-26).

The Revised Johnson/McDonald plan also complies with Section 6 of Article XI, which imposes three additional requirements for legislative maps: proportionality, partisan fairness, and compactness. These provisions are mandatory unless it is "impossible" to achieve them while also

following the map drawing requirements laid out in the rest of Article XI. *League I*, 2022 WL 110261 at *17. Section 6(B) requires General Assembly districts that "favor each political party" to "correspond closely to the statewide preferences of the voters of Ohio" as determined by statewide races over the course of the prior decade. Ohio Const. Art. XI, Sec. 6(B). Over that stretch, 54 percent of Ohioans voted for Republicans and 46 percent for Democrats in statewide elections. *League I*, 2022 WL 110261 at *23. The proportion of districts favoring each party in the Revised Johnson/McDonald plan matches that split nearly perfectly with 55 percent of districts favoring Republicans and 45 percent, Democrats, when toss-up districts are included. (Exhibit L, Latner Declaration, Tables 5 & 6). Further, this plan allocates toss-up districts evenly across the parties, *id.*, thereby avoiding constitutional infirmities in plans rejected by the Ohio Supreme Court. *See League III*, 2022 WL 803033 at *9. This plan performs better than any of the maps produced by the Commission (Exhibit L, Latner Declaration at ¶ 34) and will produce proportional results that correlate closely to the preferences of Ohio voters across a variety of foreseeable election scenarios.

The Revised Johnson/McDonald Plan also comports with Section 6(A), which forbids plans that are "drawn primarily to favor or disfavor a political party." Ohio Const. Art. XI, Sec. 6(A). In applying this rule, the Ohio Supreme Court has looked to the intent of the map-drawers as evidenced by whether the map-drawing process was "one-sided," reflecting only the input of one political party, *League III*, 2022 WL 803033 at *7, as well as measures of "partisan asymmetry" as established in the political science literature. *Id.* at *8. The record is clear that the Johnson/McDonald Plan was not produced to favor or disfavor a political party. It was produced jointly by two independent map drawers hired by the Commission, one selected by the Democratic commissioners and one selected by the Republican commissioners. They drew the plan publicly

12

and they incorporated input into the plan from the Commission as a whole, along with individual commissioners. (*See, e.g.*, Ground Rules for Map Drawers).[5] Dr. Gall made only minor revisions to the Johnson/McDonald plan to resolve a handful of technical discrepancies. (Exhibit C, Gall Declaration). Unsurprisingly, the Revised Johnson/McDonald Plan is highly symmetrical and lacks any indicia of partisan favoritism, in contrast to the maps produced by the Commission. (Exhibit L, Latner Declaration at ¶ 50). [6]

> ### 2. The Revised Johnson/McDonald Plan Best Complies with the Procedural Provisions of the Ohio Constitution.

The Johnson/McDonald Plan also comes closer than any other to meeting the procedure laid out in Section 1 of Article XI of the Ohio Constitution, which requires "the commission," as an entity, to produce a plan, with the input of both Republican and Democratic commissioners. Art. XI, Section 1(C); *see also League III,* 2022 WL 803033 at *7 (Commission has an "Article XI duty to draft a plan, not to simply adopt one drafted by legislative staff at the direction of members of one political party" and rejecting that "members of one political party alone may draw the plan."). While the Johnson/McDonald Plan was not adopted, it was produced by mappers picked by the Commissioners who provided input and guidance over the course of several days.

Nor is the Commission's decision to enact a different plan in lieu of the Johnson/McDonald Plan an indicator of legitimate state policymaking that should be given deference given the

---

[5] Ohio Redistricting Commission, Commission Meetings (March 24, 2022), Ground Rules for Map Drawers, https://redistricting.ohio.gov/meetings.
[6] The Ohio Supreme Court has rejected the Commission's arguments that drawing a proportional and symmetrical plan constitutes gerrymandering in favor of Democrats, in violation of the Ohio Constitution. *See League II,* 2022 WL 354619 at *13 ("[W]e reject the suggestion that our order constitutes a mandate to gerrymander to create Democratic-leaning districts. This suggestion implies that neither the September 2021 plan nor the revised plan were Republican-favoring gerrymanders. The evidence demonstrates otherwise. Throughout the process, the Republican map drawers refused to expressly work toward a 54 to 46 percent partisan share. Yet that is not a 'superficial ratio,' a 'Democratic ratio,' or an 'arbitrary percentage,' as one commissioner cavalierly dismissed it.").

unconstitutionality of its actions. *See White*, 412 U.S. at 797 (instructing courts to "defer to state policy in fashioning relief only where that policy is consistent with constitutional norms and is not itself vulnerable to legal challenge"); *Graves v. Barnes*, 446 F. Supp. 560, 564 (W.D. Tex. 1977) (reasoning that it is "only to the extent that the present plan demonstrates a legitimate state policy that it enjoys that privileged review"). Instead of adopting or refining the Johnson/McDonald Plan, the Commission defied the Ohio Supreme Court's ruling that instructed the Commission to draw an "entirely new" map that met all requirements of the Ohio Constitution. *League III*, 2022 WL 803033, at *11. While Dr. Johnson worked to finish the plan, the only Republican staff mapper stopped providing guidance to Dr. Johnson and instead turned his attention to tweaking the February 24 Plan. (Exhibit J, 3/28/22 Hrg Tr., Part 4 at 18:39-30:59) Ultimately, the Commission defied the Ohio Supreme Court's ruling forbidding the use of the February 24 Plan as a starting point and the minor modifications failed to remedy the Section 6 violations. Because this does not reflect legitimate state policy, the Commission's decision to forego the Johnson/McDonald Plan in favor of gerrymandered maps is not entitled to deference.

## II.     The Requested Relief Is Necessary to Avoid Irreparable Harm

The OOC Plaintiffs have also established that "in the absence of a preliminary injunction, [they are] likely to suffer irreparable harm before a decision on the merits can be rendered." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008) (citation and internal quotation marks omitted). The Secretary of State has represented that a General Assembly plan for the 2022 election needs to be ordered by April 20, 2022, for the primary to proceed in an orderly fashion. Without the relief sought by the OOC Plaintiffs—an order imposing a plan that complies with federal law and the Ohio Constitution, including its protections against partisan gerrymandering—the OOC Plaintiffs will suffer irreparable constitutional injuries.

14

The relief requested by the OOC Plaintiffs protects them from voting under a malapportioned plan that would deny their federal constitutional right to "an equally effective voice in the election of members of [the] state legislature." *Reynolds*, 377 U.S. at 565; *see also Brown v. Kentucky Legislative Rsch. Comm'n*, 966 F. Supp. 2d 709, 724–25 (E.D. Ky. 2013) ("Plaintiffs have shown that legislative malapportionment has and continues to cause them irreparable injury in the form of vote dilution, for which there is no remedy at law"). The requested relief also protects the OOC Plaintiffs' rights under the 2015 amendments to the Ohio Constitution, which created cognizable state-law interests in fair districts that closely correspond with the statewide preferences of Ohio voters—and which were adopted in a direct repudiation of the gerrymandered 2011 Plan. *See* Ohio Const. Art. XI, Sec. 6; *League I*, 2022 WL 110261.

Absent the requested relief, lawmakers elected in malapportioned and/or gerrymandered districts will set policy and make budgetary and other decisions with negative long-term consequences for the interests of the OOC Plaintiffs. (*See* Exhibit L, Latner Declaration at ¶¶ 20-22 (detailing research about the harms to democracy from gerrymandered districts); Exhibit M, Declaration of Molly Shack, ¶¶ 5-10; Exhibit N, Declaration of Chris Tavenor, ¶¶ 9-13; Exhibit O, Declaration of Mikayla Lee, ¶¶ 4-7, 9). Moreover, even if constitutionally compliant maps are drawn ahead of 2024, state senators elected from districts that violate the federal or state constitution in 2022 will hold office until 2026. *See* Ohio Const. Art. II, Sec. 2 (setting four-year terms for senators); Art. XI, Sec. 5 (requiring the assignment of senators whose terms have not yet expired to newly drawn districts).

### III. Issuance of the Requested Relief Would Cause No Harm to Others

OOC Plaintiffs' requested relief gives effect both to federal rights and to the Ohio Constitution. No Ohio voters have a legal interest in continued malapportionment or

gerrymandering; indeed, the 2015 amendments to Article XI are precisely to the contrary. The implementation of the Revised Johnson/McDonald Plan would also have no greater impact on election administration than would that of any other plan. It is undisputed that the primary election cannot go forward on May 3, 2022, given the Commission's repeated failure to enact a constitutional General Assembly plan. ECF No. 97 (Notice of Issuance of Ohio Secretary of State Directive 2022-31); ECF No. 150, 3/30/22 Hr'g Tr. at 13:20–14:17. Whatever plan this Court orders, Ohio will need to administer a separate election on August 2, and take the same administrative steps to prepare counties, and voters, for the election. Except for the Commission's third plan, which was previously submitted to county election boards for implementation prior to being invalidated, each of the plans would require election officials to take the same steps to be implemented, including reprogramming their voter registration systems and reopening filing periods for candidate petitions. ECF No. 150, 3/30/22 Hr'g Tr. at 87:1–17.

## IV.  The Public Interest Would Be Served by Granting the Requested Relief

The public interest is served by ordering use of the Revised Johnson/McDonald Plan because it meets federal constitutional requirements and comports with the Ohio Constitution, including the amendments passed overwhelmingly in 2015, to the maximum extent possible. Moreover, failure to impose a plan that comports with the 2015 amendments would create perverse incentives for the Ohio Redistricting Commission to flout constitutional requirements it does not wish to implement, using the federal courts to make an end run around the Ohio Constitution and its prescribed remedies for unconstitutional maps.

Even absent Ohio's clear policy interests in a proportional and unbiased plan, the Revised Johnson/McDonald Plan also forwards prudential interests in "judicial neutrality." *Prosser v. Elections Bd.*, 793 F. Supp. 859, 867 (W.D. Wis. 1992). These exist because "[j]udges should not

16

select a plan that seeks partisan advantage—that seeks to change the ground rules so that one party can do better than it would do under a plan drawn up by persons having no political agenda." *Id.* Indeed, federal courts have rejected districts where partisan interests and political goals rather than legitimate interests motivated population deviations. *See Larios v. Cox*, 300 F. Supp. 2d 1320, 1352-53 (N.D. Ga.), *aff'd*, 542 U.S. 947 (2004).

The OOC Plaintiffs' proposed remedy satisfies all legal requirements. To the extent the Court orders the use of a different plan, it should satisfy these requirements as well or better.

## II.    There is No Justification for Using the 2011 Plan in the 2022 Election

There is no justification for imposing Ohio's malapportioned 2011 Plan for the 2022 election. The U.S. Supreme Court has, at times, allowed lower courts to order elections under plans that violate the equal population doctrine, but "[n]ecessity has been the motivating factor in these situations." *Upham v. Seamon*, 456 U.S. 37, 44 (1982). Specifically, there can be "certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress" that may justify a court withholding relief even when an apportionment is invalid. *Reynolds*, 377 U.S. at 585.

Such circumstances and necessity are not present here. As of the time of this filing, a revised date has not been set for a General Assembly primary election. However, the primary cannot go forward on May 3, 2022. ECF No. 150, 3/30/22 Hr'g Tr. at 13:20–14:17. Neither the Ohio Supreme Court nor lawmakers have set a new election schedule. In other words, Ohio's election machinery is not in progress and no impending election is imminent. Nor is there any administrative advantage to implementing the 2011 Plan over one than complies with federal and state law. *Id.*

17

These facts clearly distinguish the present situation from instances where states were permitted to use malapportioned plans. Most recently, in *Pileggi v. Aichele*, a federal judge permitted Pennsylvania's 2012 election to proceed under the prior decade's maps after the Pennsylvania Supreme Court had struck down newly drawn districts and ordered the 2001 plan to remain in effect because the election process had "already begun." 843 F. Supp. 2d 584, 593-95 (E.D. Pa. 2012). There, the court found "no reasonable alternative . . . but to allow the elections to proceed under the 2001 Plan." *Id.* at 596. That court noted other key distinctions: there had been no breakdown of the redistricting process and "no indication that the Commonwealth [had] adamantly refused to comply with constitutional mandates and court orders." *Id.* at 594. In sharp contrast, the Commission has passed four unconstitutional General Assembly plans in short order, defying clear instructions from the Ohio Supreme Court.

Use of the 2011 Plan would also violate Article XI of the Ohio Constitution—and the will of Ohioans who voted overwhelmingly in 2015 to amend the constitution. The 2011 Plan was enacted by a different body (the then-existing Apportionment Board), with a different process, using different criteria than what currently exists in the Ohio Constitution. Indeed, the 2011 plan that the Apportionment Board enacted was one of the most gerrymandered plans in the nation (Exhibit L, Latner Declaration at ¶ 33) and Ohio voters overhauled Article XI in 2015 specifically to prevent another such plan from ever going into effect. The 2011 Plan complies neither with the line-drawing requirements of Sections 3 and 4 of Article XI (Exhibit C, Gall Declaration at ¶ 22), nor with the proportionality and partisan fairness provisions of Section 6 (Exhibit L, Latner Declaration at ¶¶ 11-12), nor with the procedural requirements in Section 1 of Article XI as outlined in *League III*.

18

### III.    There is no Justification for Using a Plan the Ohio Supreme Court has Invalidated

There is likewise no justification for ordering the use of any plan passed by the Ohio Redistricting Commission that has been invalidated by the Ohio Supreme Court on or before April 20. Doing so would be inconsistent with giving full faith a credit to the Ohio Supreme Court's rulings. 28 U.S.C. § 1738. In *Growe v. Emison*, the U.S. Supreme Court not only required federal courts to defer action unless there was evidence that a state legislature or court could not timely address a redistricting issue, but also recognized the important role that state courts play in redistricting, including "the elementary principles of federalism and comity embodied in the full faith and credit statute, 28 U.S.C. § 1738, obligate[] federal court[s] to give [state court] judgement *legal effect*." 507 U.S. 25, 36 (1993) (emphasis in the original).

The Ohio Supreme Court has made clear that "the election cycle *should not proceed with a General Assembly-district map that we have declared invalid*." *League I*, 2022 WL 110261, at *28 (emphasis added). It invalidated the Commission's second and third plans "in [their] entirety." *League II*, 2022 WL 354619 at *14, *League III,* 2022 WL 803033 at *8. Should there not be a constitutionally compliant plan by April 20, this Court will need to intercede to ensure that Ohio's primary can proceed in a timely and orderly fashion. But in doing so it should not resurrect plans already invalidated by the Ohio Supreme Court. Such plans are not entitled to deference as a statement of Ohio public policy. *Graves* 446 F. Supp. at 564. And ordering the use of any one of these plans would functionally override the Ohio Supreme Court's decision to invalidate them. Put simply, "[f]ederal courts are not to be used as state courts of appeal." *Osborn v. Ashland Cty. Bd. of Alcohol, Drug Addiction & Mental Health Servs*., 979 F.2d 1131, 1134 (6th Cir. 1992) *(*citing *Allen, supra,* and *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 84 (1984)); *see also Williams v. Kelly*, 2005 WL 8155532, at *2 (E.D. Mich. Nov. 2, 2005) (under the *Rooker-*

19

*Feldman* doctrine, inferior federal courts also lack authority to perform appellate review of state court decisions). The Ohio Supreme Court left no avenue for an invalid plan to be used in 2022, and giving full faith and credit to the Ohio Supreme Court's rulings means that this Court should not create one.

## CONCLUSION

In the event there is no operative General Assembly Plan in effect on April 20, 2022, this Court should grant OOC Plaintiffs' motion for a preliminary injunction and order the use of the Revised Johnson/McDonald Plan for the 2022 primary and general election (Exhibit P, Proposed Order).

Dated: April 6, 2022

Respectfully submitted,

/s/ Christina J. Marshall
Christina J. Marshall (Ohio Bar No. 0069963)
    *Trial Attorney*
MILLER, CANFIELD, PADDOCK
AND STONE, P.L.C.
1100 Superior Avenue E, Suite 1750
Cleveland, OH 44114
(248) 267-3256
marshall@millercanfield.com

Alicia L. Bannon (*pro hac vice pending*)
Yurij Rudensky (*pro hac vice*)
Harry Isaiah Black (*pro hac vice pending*)
BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
Tel:  (646) 292-8310
Fax: (212) 463-7308
alicia.bannon@nyu.edu

Peter M. Ellis
REED SMITH LLP
10 South Wacker Drive, 40th Floor
Chicago, IL 60606
Tel:  (312) 207-1000
Fax: (312) 207-6400
pellis@reedsmith.com

Brian A. Sutherland (*pro hac vice*)
REED SMITH LLP
101 Second Street, Suite 1800
San Francisco, CA 94105
Tel:  (415) 543-8700
Fax: (415) 391-8269
bsutherland@reedsmith.com

Ben R. Fliegel (*pro hac vice*)
REED SMITH LLP
355 South Grand Avenue, Suite 2900
Los Angeles, CA 90071
Tel:  (213) 457-8000
Fax: (213) 457-8080
bfliegel@reedsmith.com

*Attorneys for Intervenor-Plaintiffs*
*The Ohio Organizing Collaborative, et al.*

21

## CERTIFICATE OF SERVICE

I hereby certify that on April 6, 2022, I electronically filed the foregoing document with the Clerk of the Court which will serve all attorneys of record.

/s/Christina J. Marshall

Christina J. Marshall (0069963)
MILLER, CANFIELD, PADDOCK
and STONE, P.L.C.
1100 Superior Avenue E, Suite 1750
Cleveland, OH 44114
(248) 267-3256
(248) 879-2001 (Facsimile)
marshall@millercanfield.com

38934407.4/066667.00811