# **EXHIBIT L**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| MICHAEL GONIDAKIS et al.,<br><br>                  Plaintiffs,<br><br>THE OHIO ORGANIZING COLLABORATIVE, COUNCIL ON AMERICAN-ISLAMIC RELATIONS, OHIO, OHIO ENVIRONMENTAL COUNCIL, SAMUEL GRESHAM JR., AHMAD ABOUKAR, MIKAYLA LEE, PRENTISS HANEY, PIERRETTE TALLEY, and CRYSTAL BRYANT,<br><br>                  Intervenor-Plaintiffs,<br>v.<br><br>FRANK LAROSE, in his official capacity,<br><br>                  Defendant. | Case No. 2:22-cv-00773<br><br>Circuit Judge Amul R. Thapar<br><br>Chief Judge Algenon L. Marbley<br><br>Judge Benjamin J. Beaton<br><br>Magistrate Judge Elizabeth Preston Deavers |

# DECLARATION OF MOLLY SHACK

Molly Shack, having been duly sworn, deposes and states as follows:

1. I am over the age of eighteen years and a resident of Columbus, Ohio. The matters set forth in this Declaration are based upon my personal knowledge.

2. I am a full-time employee and officer of The Ohio Organizing Collaborative ("OOC"), where I serve as Co-Executive Director.

3. The OOC is a nonprofit organization incorporated in Ohio with a multi-pronged mission of organizing everyday Ohioans to build transformative power for racial, social, and economic justice. It is organized and exists under Ohio law, with its principal place of business at 25 E Boardman St., Youngstown, OH 44503. The OOC is made up of four grassroots organizing membership projects and dozens of campaigns that represent underrepresented constituencies: Black, brown, and immigrant Ohioans; college students; people of faith, unemployed workers, care providers and the families they serve, and people working in the care economy. The OOC currently has five members on its Board of Directors, all of whom, on information and belief, are registered Ohio voters. It also has hundreds of members concentrated in Columbus, Cleveland, Dayton and Cincinnati, and thousands of supporters and volunteers in almost every metropolitan area across the state.

4. One of the OOC's state and local priorities is structural democracy reform, which it pursues through grassroots community organizing, large-scale civic engagement, and strategic communication. Its non-partisan voter engagement program, for example, has helped register hundreds of thousands of Ohioans to vote. The OOC is especially focused on engaging young voters and voters of color in the civic process. And, over the last year, the OOC helped drive community organizing and public engagement strategies during the redistricting process to

1

ensure that Ohio would get a fair map outcome. The OOC convened a nonpartisan citizens commission which modeled a thorough and robust community engagement process to produce constitutional, fair, and proportional maps within deadlines set out in Ohio's constitution. During the community information gathering process, the Ohio Citizens' Redistricting Commission engaged with thousands of people, with a pai1icular focus on uplifting the voices of Black, brown, and immigrant Ohioans. Members, officers, and volunteers of the OOC regularly engage with state lawmakers to advance their agenda of economic and racial justice and structural democracy reform.

5. During the past ten years working with the OOC, I have personally observed the ways in which the gerrymandered districts in the previous cycle's redistricting plan—the 2011 Plan—directly impair the OOC's mission of encouraging civic engagement and fair districts. I have seen that because the 2011 Plan gave disproportionate control over public policy to a single group, the Plan thereby deterred and discouraged OOC's members and partners, along with other Ohio voters, from engaging in the political process which, in turn, made it more difficult for the OOC to engage voters on issues. More broadly, in my experience, voters often become discouraged if they come to believe that their popular support for a policy is largely irrelevant if voters who live in other districts oppose it. Voter discouragement caused by gerrymandered districts hinders the OOC's large scale civil engagement and strategic communications work.

6. The 2011 Plan also hampered the OOC's ability to advance a legislative agenda focused on policies that help improve economic, social, educational, and health outcomes for its members. Since legislative districts were gerrymandered to amplify the voices of one group of voters, OOC needed to divert resources away from programs or policies that it favored in order

to respond to proposals that cater only to a minority of Ohio voters and had no chance of passing under a system in which representatives reflect majority opinion.

7. Earlier this year, for example, the state Senate proposed to eliminate Step Up To Quality, the State's standard-monitoring system and ranking method for licensed child care programs. Despite the broad bipartisan and popular support for Step Up To Quality, OOC had to divert resources to campaign for maintaining the State's system because, under the 2011 Plan, even widely unpopular proposals can be enacted into law since the Plan favors one group of voters over another. Diverting resources to defend and advocate for Step Up To Quality necessarily meant that OOC was not able to use those resources to advance other objectives.

8. As a second example, OOC supports commonsense, bipartisan reforms to criminal sentencing that work to ameliorate the impact of harsh drug possession laws and reduce the disparate impact that such laws have on Black communities in Ohio. OOC and others campaigned for and secured bipartisan support for Senate Bill 3, a sentencing reform bill that would reclassify low-level drug possession felonies as misdemeanors. Despite popular support for reducing the severe and inequitable impact of criminal drug possession laws, the state House Speaker declined to bring Senate Bill 3 to the floor for a vote. Thus, OOC was unable to translate popular support for a bipartisan position into public policy. As a gerrymandered map, the 2011 Plan effectively ensured that representatives need not be responsive to Ohio voters as a whole. Instead, under the 2011 Plan, representatives from the favored political party need only be responsive to favored voters, who wield disproportionate influence over Ohio law and policy.

9. As a third example, the 2011 Plan forced the OOC to spend time, energy, and resources opposing bills that are broadly unpopular and would not exist without the gerrymandered plan. Recently, the General Assembly pushed through a "Stand Your Ground"

3

law over the objections of organizations from a diverse set of interests and a wide breadth of political views, including police chiefs, the Ohio Prosecuting Attorney Association, gun control advocacy groups, and many organizations that represent communities of color. The law expands the situations in which Ohioans can use lethal force against one another. Rather than focusing on its core mission of helping communities, the OOC had to use resources to oppose a law that, but for gerrymandered districts that are unresponsive to majority opinion, likely would not have been enacted.

10. The OOC also runs a robust, nonpartisan civic engagement program to reach hundreds of thousands of voters through canvassing, community engagement, and phone and text banking. For example, leading up to the 2020 election, we sent more than one million text messages, made more than 410,000 phone calls, and registered about 10,000 people to vote. Our grassroots leaders made over 28,000 relational contacts – 65 percent of those were with Black voters and 60 percent of whom were young people between the ages of 18- and 39-years-old. Our goal is to register, educate, and engage new, Black, and/or young voters to engage in our democracy who are often left out of the political discussion. In our experience, gerrymandered districts like the 2011 Plan that make political outcomes virtually predetermined make it more difficult to convince these constituencies to register and participate in elections. This means we spend more time and resources on outreach and make our get-out-the-vote campaigns more challenging for elections at all levels.

11. If this Court leaves the 2011 Plan in place or otherwise adopts one of the Ohio Redistricting Commission's invalidated plans, which are also gerrymandered, OOC and its members will continue to suffer the costs and harms discussed above. Based on my personal experience and position at OOC, I can state that any gerrymandered plan will require the OOC to

4

dedicate additional staff and resources to advance its goals, to divert resources to issues that would not require resources under fair and constitutional maps, and to spend time and energy to counteract the discouraging effects of a system that tells some voters that their voices carry less weight than that of other voters.

12. The 2011 Plan would also harm the OOC and our members because the OOC worked to pass the 2015 amendment to Article XI of the Ohio Constitution and change the process for drawing General Assembly districts. Thanks to these changes encompassed by the amendment, we mobilized our membership this redistricting cycle and organized to influence the Ohio redistricting commission, working within a coalition of other grassroots organizations to submit testimony to gather community input, generate maps based on public testimony, and submit them to the Ohio Redistricting Commission so that it could pass a fair General Assembly district plan for the 2020 cycle.

13. The OOC devoted significant resources and staff time to this effort to ensure that the 2015 reforms would produce representational outcomes that better reflected Ohio's diverse communities and produce a plan that was not gerrymandered. In other words, our investment in redistricting was to ensure a complete departure from the abuse-prone system that generated the extremely gerrymandered 2011 Plan and led to the 2015 amendment.

14. Unfortunately, the Ohio Redistricting Commission did not comply with the Ohio Constitution when it enacted a plan on September 16, 2021. Despite the changes in Ohio's constitution, the Commission's plan was designed to produce the same partisan supermajority. Our organization expended and continues to expend resources to challenge the Commission's illegal plan in the Ohio Supreme Court and to give effect to new redistricting safeguards. The

5

Ohio Supreme Court has issued three opinions that each protect our members' constitutional right to fair maps.

15. As a result of its campaign work in 2015, involvement in redistricting in 2021, and its ongoing state court litigation to enforce the Ohio Constitution, the OOC has significant interest in preventing the implementation of a General Assembly district plan that does not comply with the Ohio Constitution. Imposing the 2011 Plan would undermine the rulings of the Ohio Supreme Court that hold our members' have a right to fair maps, as well as all of the time and resources that OOC devoted to securing better representational outcomes for our members and constituencies.

16. Additionally, adoption of the 2011 Plan this cycle would injure OOC's members and constituents because its unequal districts due to population shifts further dilute our members' votes. When a district is overpopulated vis-à-vis another district, the votes of residents of the former district carry less weight than those of the latter district. Such malapportionment translates into unequal representation. Many of our members would be forced to vote in such overpopulated districts if this court were to implement the 2011 Plan. This would be particularly harmful to OOC given the growth of Ohio's communities of color and immigrant communities that form key constituencies for the OOC and imform much of the work that we do. Hence, the OOC has a significant interest in preventing the implementation of a General Assembly district plan that additionally does not comply with the U.S. Constitution.

17. I declare under penalty of perjury that the foregoing is true and correct.

_Molly Shack_
Molly Shack

7

Columbus, Ohio

April 6, 2022