IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DISTRICT

| | |
|---|---|
| MICHAEL GONIDAKIS, ET AL., <br><br> PLAINTIFFS, <br><br> AND <br><br> THE HONORABLE REVEREND KENNETH L. SIMON, ET AL., <br><br> INTERVENOR-PLAINTIFFS, <br><br> VS. <br><br> GOVERNOR MIKE DEWINE, GOVERNOR AND MEMBER OF THE OHIO REDISTRICTING COMMISSION, ET AL., <br><br> DEFENDANTS. | **CASE NO. 2:22-CV-00773** <br><br> CHIEF JUDGE ALGENON L. MARBLEY <br><br> JUDGE AMUL R. THAPAR <br><br> JUDGE BENJAMIN J. BEATON |

**INTERVENOR-DEFENDANTS HUFFMAN AND CUPP'S MEMORANDUM IN OPPOSITION TO SIMON INTERVENOR-PLAINTIFFS' SECOND MOTION FOR TEMPORARY RESTRAINING ORDER**

Intervenor-Defendants Senate President Matt Huffman and Speaker Robert R. Cupp ("Legislative Defendants") file this Memorandum in Opposition to Intervenor-Plaintiffs' Kenneth L. Simon, Lewis Macklin, and Helen Youngblood's (collectively, "Simon Intervenors") Second Motion for Temporary Restraining Order.

**Factual and Procedural Background**

*Ohio's Congressional Redistricting Process*

On May 8, 2018, the voters of Ohio approved an amendment to Ohio's Constitution that, for the first time in Ohio's history, governs congressional redistricting. That amendment, Article XIX of the Ohio Constitution, was submitted to the voters by the general assembly. Similar to the

amendments to Article XI that voters approved in 2015, Article XIX sets forth a detailed process for how a congressional district plan is to be adopted in Ohio.

### *Constitutional Timeline*

Under Article XIX, congressional redistricting does not begin until after the Ohio Redistricting Commission concludes its process for general assembly redistricting. The general assembly initially has until the last day of September to pass a congressional district plan with the support of at least two-thirds of the members of each house of the general assembly (including at least one-half of the members of the two largest parties, in both houses). Article XIX, Section 1(A). At this stage, a plan passed by the general assembly will be effective for ten years.

If the general assembly does not pass such a plan by the last day of September during a redistricting year, congressional districting authority then transfers to the Ohio Redistricting Commission during the month of October. Any plan enacted by the Commission in this second stage must receive the support of at least four of the seven Commission members, including at least two Commission members from each of the two largest political parties represented in the general assembly. *See* Article XIX, Section 1(B). If the Commission passes a plan in October, the plan will be effective for ten years.

If the Commission does not adopt such a plan before the last day of October during a redistricting year, congressional redistricting authority returns to the general assembly. Article XIX, Section 1(C)(1). At this final stage, the general assembly must pass a congressional district plan no later than the last day of November during a redistricting year. Article XIX, Section 1(C)(1). For a congressional district plan to be effective for ten years at this stage, it must be supported by at least two-thirds of the members of each house of the general assembly (including at least one-third of the members of each of the two largest political parties in each house). If,

however, a congressional plan is only approved by a simple majority of each house of the members of the general assembly, any such plan will remain in effect for only four years ("simple majority map"). Article XIX, Section 1(C)(2)-(3). All congressional district plans must comply with the requirements of Article XIX of the Ohio Constitution[1] and federal law.

### *Original Actions in the Supreme Court of Ohio*

On January 14, 2022, the Supreme Court of Ohio invalidated the first congressional plan passed by the General Assembly and signed into law by Governor DeWine on November 20, 2021 (the "First Plan"). *Adams v. DeWine*, Slip Opinion No. 2022-Ohio-89. Following the Ohio court's invalidation of the First Plan, the general assembly did not pass a new remedial congressional district plan within the thirty days provided under Section 3 of Article XIX. Thus, that obligation passed to the Commission. Article XIX, Section 3(B)(2).

The Commission met on February 24, March 1, and March 2, 2022 to hear public testimony and to discuss adopting a new congressional district plan. Race was not used or considered in the drawing the new congressional district plan. In fact, throughout this entire redistricting cycle, the Ohio General Assembly and the Ohio Redistricting Commission have taken specific precautions to ensure that racial data was neither loaded into the mapmaker computers nor used by the General Assembly or the Commission when developing a congressional district plan for Ohio.

---

[1] These requirements include that districts be single member districts, that each district have equal population, that the plan complies with the Ohio Constitution and federal law, and that each district be contiguous. Article XIX, Section 2(A), 2(B)(1)-(3). All congressional district plans must also comply with criteria for the division of counties and townships and municipal corporations. Article XIX, Section 2(B)(4)–(8). Article XIX also provides for an additional criterion that applies solely to simple majority maps drawn by the general assembly. Article XIX, Section 1(C)(3).

The Commission adopted a congressional district plan on March 2, 2022 (the "Second Plan"). The Second Plan has been fully implemented by the Secretary of State and all eighty-eight county boards of elections for use in the upcoming May 3, 2022 primary election.[2]

Instead of promptly filing a new complaint challenging the newly adopted Second Plan, the Petitioners in *Adams v. DeWine,* No. 2021-1428, and *League of Women Voters of Ohio v. Ohio Redistricting Commission,* No. 2021-1499, filed motions to enforce and motions to amend their complaints that were unanimously denied by the Ohio Supreme Court as procedurally improper. *See* 03/18/2022 Case Announcements #3, 2022-Ohio-871.

On March 21, 2022, the *Adams* petitioners filed a new complaint in *Neiman v. LaRose*, No. 2022-0298, challenging the Second Plan. The *League of Women Voters of Ohio* petitioners followed and filed a new complaint on March 22, 2022 in *League of Women Voters of Ohio v. LaRose*, No. 2022-0303 ("*LWVO II*"). Simon Intervenors cite to the Supreme Court of Ohio's March 29, 2022 decision consolidating *Neiman* and *LWVO II* and setting forth a scheduling order in that matter as purportedly "deferring consideration of whether" the Second Plan "comports with the Ohio Constitution." (Simon Intervenors' Motion, ECF No. 147, p 1). Not so. The consolidated matters are under an expedited schedule under Ohio S. Ct. Prac. R. 12.04(A)(1).

### *Current Federal Litigation*

Plaintiffs filed this lawsuit due to an impasse after the Ohio Supreme Court ordered the Redistricting Commission to draw a third plan for Ohio general assembly districts and ask this

---

[2] *See, e.g.,* the directive to County Boards of Election issued by Secretary of State LaRose on March 2, 2022. Press Release, Ohio Secretary of State (March 2, 2022), https://www.ohiosos.gov/media-center/press-releases/2022/2022-03-02b/. On April 4, the Secretary of State announced that the May 3 primary "is underway" and early in-person voting began on April 5, 2022. Press Release, Ohio Secretary of State, https://www.ohiosos.gov/media-center/press-releases/2022/2022-04-04/.

Court to order that the Commission's Second Plan on legislative redistricting be adopted for this election cycle. (ECF No. 1). The Plaintiffs sought preliminary injunctive relief to effectuate their request for this election cycle. (ECF No. 2). Responses to the motion were filed, the matter temporarily stayed, and after the Commission adopted a third general assembly district plan, Plaintiffs moved this Court to adopt that Third Plan as opposed to the Second Plan, after it too was rejected by the Ohio Supreme Court. (*See, e.g.*, ECF Nos. 72, 75). This Court proceeded with establishment of the panel and a briefing schedule. (ECF Nos. 82, 83).

Simon Intervenors argue that the Second Plan (as well as the state legislative plans), passed by the Commission, violate Section 2 of the Voting Rights Act of 1964. (ECF No. 92). This Court heard argument March 30, 2022 on the pending motions and responses for preliminary relief and entered a post-hearing briefing schedule on the same day. (ECF No. 143). Counsel for Simon Intervenors admitted, at the hearing, that the then pending first TRO could proceed with the preliminary injunction and its briefing schedule. (*See* ECF No. 150, p. 241). Nonetheless, Simon Intervenors filed a Second Motion for TRO seeking to enjoin the use of the Second Plan. (ECF No. 147). A Local Rule 65.1 conference has been set for Monday, April 11, 2022 on the Simon Intervenors' TRO request. (ECF No. 152)

## Argument

### I. Standard

"The Sixth Circuit has explained that 'the purpose of a TRO under rule 65 is to preserve the status quo so that a reasoned resolution of a dispute may be had.'" *ABX Air, Inc. v. International Brotherhood of Teamsters*, 219 F. Supp. 3d 655, 669–70 (S.D. Ohio 2016) (internal citation omitted). Under Rule 65 of the Federal Rules of Civil Procedure, the movant bears the burden of proof that emergency injunctive relief is necessary under the circumstances. *Overstreet*

*v. Lexington–Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) ("An injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it."). To determine whether to grant injunctive relief, courts must balance four factors: "(1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction." *Overstreet v. Lexington-Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002) (internal citation omitted). "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000). "The standard for issuing a temporary restraining order is logically the same as for a preliminary injunction, with emphasis, however, on irreparable harm given that the purpose of a temporary restraining order is to maintain the status quo." *ABX Air, Inc*., 219 F. Supp. 3d at 670.

**II.   Simon Intervenors fail to meet their burden of proof and their Second Motion for Temporary Restraining Order should be denied.**

**A. Simon Intervenors' claims are unclear and fundamentally flawed.**

The Simon Intervenors' claims are at best muddled and at worst contradictory, but are in any event fundamentally flawed. On the one hand, they claim that Defendants have engaged in "racial gerrymandering." (ECF No. 92 at PageID 1511). On the other they seem to charge that Defendants engaged in vote dilution under Section 2 of the Voting Rights Act of 1965 ("VRA"), 52 U.S.C. § 10301, by not drawing so-called influence districts in certain areas of the legislative and congressional plans. (ECF No. 92 at PageID 1524, 1525, 1526-28). As explained below, racial gerrymandering claims are distinct from vote dilution claims yet the Simon Intervenors appear to commingle them.

But the gravamen of Simon Intervenors' dissatisfaction with the plans is that racial data was not used in drawing them. The claim seems to be that the failure to consult racial data in drawing legislative or congressional districts is in and of itself a violation of the VRA or racial gerrymandering. Simon Intervenors cite no authority justifying this meritless position. It is not surprising that no authority is cited because Simon Intervenors have the law exactly backwards.

First, as explained more fully below, racial gerrymandering claims require proof that race was the predominant motive for drawing a district without evidence that the district serves a compelling governmental interest. But here it is undisputed that race was not used at all, much less as a predominant motive. Simon Intervenors cite no authority for the senseless proposition that the non-use of race in drawing a district equates to the predominant use of race in drawing that district. If anything, the non-use of racial data supports the *absence* of a racial gerrymandering claim and undermines any assertion that race was used in an inappropriate way.

Second, as to vote dilution claims, the Simon Intervenors also have it backwards. As explained more fully below, constructing race-conscious districts is only required if there is *evidence* supporting it. This generally comes in the form of a racial polarization study demonstrating the existence of legally significant racially polarized voting as defined by the three preconditions in *Thornburg v. Gingles*. *Cooper v. Harris*, 137 S.Ct. 1455, 1470 (2017), citing *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986). There is no such evidence here and Simon Intervenors have not submitted any such evidence to this point. Simon Intervenors are free to conduct such a study and use it to support a claim that majority-minority districts must be drawn. But there is no authority holding that the mapdrawing authority must conduct such a study itself and Simon Intervenors cite none. Section 2 does not operate as a de facto preclearance requirement

in which the mapdrawing authority must affirmatively demonstrate anything. Any claim to the contrary is fundamentally flawed and does not warrant injunctive relief of any kind.

### B. Claims for Racial Gerrymandering are separate and distinct from claims alleging violation of Section 2.

Simon Intervenors appear to have conflated claims that can be made under Section 2 of the VRA with claims for racial gerrymandering under the Fourteenth Amendment. Section 2 protects minority groups from vote dilution. Districts based upon race may be ordered by a court or adopted by a legislature only under narrow circumstances. *Cooper, supra*, citing *Gingles*, 478 U.S. at 50-51. In contrast, claims for racial gerrymandering are based upon allegations that race was the predominant motive for drawing a district without evidence that the district serves a compelling governmental interest - such as protecting the state from liability under Section 2. *Id.* These two claims are "analytically distinct." *Miller v. Johnson*, 515 U.S. 900, 911 (1995), citing *Shaw v. Reno*, 509 U.S. 630, 652 (1993) ("*Shaw I*"). Simon Intervenors have not alleged or offered evidence to support a finding they are likely to prevail on the required elements for each of these claims.

There is no dispute that the VRA requires the creation of districts based upon race but only when there is evidence to support such a remedy. *Gingles* is, of course, the leading case involving alleged violations of Section 2 of the VRA. There the United States Supreme Court established three "threshold" conditions that plaintiffs must demonstrate to prove a violation of Section 2:

1. that a "minority group" is "sufficiently large and geographically compact to constitute a majority" in "some reasonably configured legislative district;"

2. that the minority group must be "politically cohesive;" and

3. that "a district's white majority must 'vote [] sufficiently as a bloc'" to usually "defeat the minority's preferred candidate.'"

*Cooper*, 137 S. Ct. at 1470 (citing *Gingles*, 478 U.S. at 50–51).

Under these preconditions, there is a significant difference between "racially polarized voting" versus "legally significant racially polarized voting." *Gingles*, 478 U.S. at 52–55. "Racially polarized voting" exists whenever "there is a consistent relationship between [the] race of the voter and the way in which the voter votes." *Id*. at 53 n.21. But *Gingles* requires evidence of "legally significant racially polarized voting." *Id.* at 55. This occurs only when "less than 50% of white voters cast a ballot for the black candidate." *Id*. Thus, a Section 2 plaintiff can prevail only when there is proof that the white majority usually votes as a bloc to defeat the minority's preferred candidate. *Cooper*, 137 S. Ct. at 1470; *Covington v. North Carolina*, 316 F.R.D. 117, 167 (M.D.N.C. 2016), *aff'd*, 137 S. Ct. 2211 (2017) (Mem.).

These Section 2 standards create a tension with the Fourteenth Amendment that first surfaced in *Shaw I* and *Shaw v. Hunt*, 517 U.S. 899 (1996) ("*Shaw II*"). Both cases involved challenges to North Carolina's infamous Twelfth Congressional District, often referred to as the "I-85" or "highway" district. *Shaw I*, 509 U.S. at 635–36. In 1992, the North Carolina General Assembly enacted The Twelfth District, and another bizarre looking district (North Carolina's First Congressional District) to obtain preclearance of its congressional plan under Section 5 of the VRA. *Shaw I*, 509 U.S. 634–35. In *Shaw I*, the Court held that plaintiffs had stated a claim upon which relief could be granted based upon their allegations that voters had been assigned to districts because of their race and remanded the case to the district court for further proceedings. *Id*. at 658.

In *Shaw II*, the Court relied upon *Miller*, 515 U.S. at 916, holding that plaintiffs in racial gerrymandering claims brought under the Fourteenth Amendment must prove that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Shaw II*, 517 U.S at 905. After finding that the Shaw

plaintiffs had carried this burden, the Court then examined the State's argument that compliance with the VRA constituted a "compelling governmental interest" that would justify the use of racial classifications. *Shaw II*, 517 U.S. at 909-911. The Court noted that the use of racial classifications might be justified based upon "a strong basis in evidence" that the use of race was "necessary" to remedy "the effects of past or present racial discrimination…." *Id*. at 909.

The Court then assumed, without deciding, that compliance with the VRA could further a compelling government interest. However, it rejected the State's argument that adopting the Twelfth Congressional District was necessary to obtain preclearance under Section 5. The Court rejected this defense on the grounds that it was based upon an illegal "maximization of black districts" theory adopted by the United States Department of Justice. *Id*. at 911–13. The Court also rejected the State's Section 2 defense on the grounds that the Twelfth Congressional district was not based upon a geographically compact minority population, and therefore did not satisfy the first of the *Gingles* threshold conditions. *Id*. at 913–18.

The Supreme Court has also provided guidance that is relevant here in two important cases, *League of United Latin American Citizens (LULAC) v. Perry*, 548 U.S. 399 (2006), and *Bartlett v. Strickland*, 556 U.S. 1 (2009). To understand these two decisions, it is important to define three different terms used by the courts to describe election districts "in relation to the requirements of the Voting Rights Act." *Bartlett*, 556 U.S. at 13. In "majority-minority" districts, "a minority group composes a numerical, working majority of the voting-age population." *Id.* There is no dispute that Section 2 can require the creation of this type of district. *Id.* "At the other end of the spectrum" are "influence" districts. "in which the minority group can influence the outcome of an election[.]" *Id*. Finally, "crossover" districts are districts "in which the minority group is less than a majority of the population, but is potentially large enough to elect its candidate of choice with

the help of voters who are members of the white majority and who cross over to support the minority's preferred candidate." *Bartlett*, 556 U.S. at 13 (internal citation omitted).

The issue in *LULAC* was whether Section 2 justifies a state legislature's decision to draw race-based influence districts with a targeted minority population of less than 50%. In *LULAC*, the Court held that Section 2 does not justify a state's use of race to create influence districts. *LULAC*, 548 U.S. at 445. The Court warned that interpreting Section 2 as requiring legislatures to adopt influence districts "would unnecessarily infuse race into virtually every redistricting, raising serious constitutional questions." *LULAC*, 548 U.S. at 445–46.

Subsequently, in *Bartlett*, the Court was called upon to decide whether Section 2 could be used by a state to justify using race to draw crossover districts. The Defendants-Petitioners in *Bartlett* argued that crossover districts satisfy the first *Gingles* condition because they allow the minority group to elect their candidate of choice and are therefore "'effective minority districts.'" *Id.* at 14. The Court rejected this proposition holding that Section 2 only authorizes state legislatures to use race to draw districts where a geographically compact minority group constitutes an actual majority of the voters. *Id.* at 14–18. Reaffirming its warning in *LULAC*, the Court stated "[to] the extent there is any doubt about whether § 2 calls for the majority-minority rule, we resolve that doubt by avoiding serious constitutional concerns under the Equal Protection Clause." *Id.* at 21.

After the decisions in *LULAC* and *Bartlett*, there can be no dispute that a legislature cannot use race to draw districts absent evidence of a geographically compact minority group that would constitute an actual majority in a single member district. *See Cooper,* 137 S. Ct. at 1464. But that is what the Simon Intervenors ask this Court to do. They ask this Court to enjoin the current legislative and congressional plans and order the State to use racial data to create influence

districts. In essence, the Simon Intervenors ask this Court to order the State to engage in racial gerrymandering. No evidence of legally significant racially polarized voting exists that would justify drawing districts based solely upon race. And even if such evidence existed, there is no evidence of a geographically compact minority population that could be used to draw a VRA district in any event. And to top it off, the Simon Intervenors are not even asking this Court to order the drawing of remedial VRA districts—they are asking for influence districts which the Supreme Court has long rejected as a VRA remedy. Accordingly the TRO should be denied.

### C. The Intervenors have failed to allege or offer any evidence to support either a claim under Section 2 or a claim for racial gerrymandering.

To the extent Simon Intervenors allege that the Second Plan on congressional redistricting violates Section 2, they have failed to allege or offer proof that a "minority group" is "sufficiently large and compact to constitute a majority" in "some reasonably configured legislative district." *Cooper, supra*. Nor have Simon Intervenors alleged or offered proof that a "district's white majority votes "as a bloc" to usually "defeat the minority's preferred candidate of choice." *Id*. Simon Intervenors' claims seek "influence" districts in which African American voters may influence the results of an election. *Bartlett*, *supra*. But these types of districts have been ruled out as a Section 2 remedy by the Supreme Court in *LULAC*, *supra*.

The same is true to the extent Simon Intervenors' complaint might be construed as a claim of racial gerrymandering. Most, if not all, racial gerrymander cases involve allegations that a legislature admittedly *used* race to draw bizarre looking districts without any evidence showing that the districts were reasonably needed to protect the state from claims under Section 2. *See Cooper v. Harris*, *supra*. Here, Simon Intervenors do not allege that the Commission used race in drawing districts. In fact, they admit that the Commission *did not use* race. Instead, they argue that the congressional districts are racial gerrymanders solely because those challenged by Simon

Intervenors were not drawn using racial data. Under Simon Intervenors theory, the failure to use race in the drawing of districts makes race the predominant motive. The Legislative Defendants are aware of no precedent for this bizarre theory and Simon Intervenors cited none.

At the end of the day, whether Simon Intervenors claims are interpreted as claims for vote dilution under Section 2 or claims for racial gerrymandering, Simon Intervenors have not only failed to offer any evidence showing that they are likely to prevail – they have failed to even allege claims upon which relief can be granted.

### D. Simon Intervenors reliance on *Armour* is misplaced.

Simon Intervenors rely on the Northern District of Ohio's findings in *Armour v. Ohio*, 755 F. Supp. 1044 (1991) to argue that (1) racially polarized voting exists in Mahoning county, and (2) that the Commission defied the permanent injunction issued in *Armour*. They argue they are entitled to an injunction enjoining the use of the Second Plan for Ohio's 6th Congressional District, apparently, on *Armour* alone. This reliance is misplaced.

First, *Armour* involved a challenge solely to Ohio House Districts 52 and 53 and the injunction issued was limited solely to those state house districts — "we enjoin the defendants from using the current house district configurations for future elections." 755 F. Supp. at 1062. As seen in Simon Intervenors' Motion, ECF No. 147, and Revised Proposed Order, ECF No. 148, the relief Simon Intervenors seek is to enjoin the Secretary of State and certain County Boards of Election (none of which are a party to this lawsuit) from issuing "certificates of nomination or election to any candidate for election" for Ohio's 6th Congressional District and the four surrounding districts "whose boundaries may be revised in the event the Simon Parties prevail on the merits at trial[.]" *Armour* has no application to Simon Intervenors' requested relief.

Additionally, this Court is not bound by decisions of the Northern District of Ohio. *See Gilbert v. Nat'l Emp. Benefit Co., Inc.*, 466 F. Supp. 2d 928, 933 (N.D. Ohio 2006) ("Under stare decisis, a district court in this circuit is bound only by opinions of the U.S. Supreme Court and the U.S. Court of Appeals for the Sixth Circuit, while other authority is advisory." (quotation omitted); *Heibel v. U.S. Bank Nat'l Ass'n*, No. 2:11-CV-00593, 2012 U.S. Dist. LEXIS 139510, at *12-13 (S.D. Ohio Sep. 27, 2012). Assuming arguendo the *Armour* decision somehow applied to Congressional districts, this Court is not bound by the findings of fact and conclusions of law.

Furthermore, this Court has explicitly held that "influence claims are not cognizable in our circuit." *Parker v. Ohio*, 263 F. Supp. 2d 1100, 1104 (S.D. Ohio 2003). As noted earlier, the U.S. Supreme Court has reinforced that determination by holding "that § 2 does not require the creation of influence districts." *Bartlett v. Strickland*, 556 U.S. 1, 13 (2009) (citing *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 443 (2006) (Kennedy, J.)). Thus, under *Gingles*, Simon Intervenors squarely have the burden to show that "the African-American populations in the districts at issue are sufficiently large and geographically compact to constitute a majority." *Id.* Nothing less. Simon Intervenors provide no such evidence and are unlikely to succeed on the merits.

### E. Simon Intervenors will not suffer irreparable harm if the injunction is not issued.

Simon Intervenors appear to argue that they will suffer irreparable injury because voting rights cannot be monetarily compensated. (ECF No. 147, p 12). But that is an oversimplified and incorrect way of looking at the issue in this circumstance.

> Under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme

> was found invalid. In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles.

*Reynolds v. Sims*, 377 U.S. 533, 541 (1964). Because of considerations like this, courts routinely refuse to grant preliminary injunctive relief in Section 2 cases, even where plaintiffs in those cases (unlike Simon Intervenors here) had shown a likelihood of success on the merits. *See, e.g.*, *Covington v. North Carolina*, 316 F.R.D. 117, 177 (M.D.N.C 2016), *aff'd* 137 S. Ct. 2211 (2017) (declining to order immediate injunctive relief despite finding that districts were racial gerrymanders and in violation of section 2 and allowed the elections "to proceed as scheduled under the challenged plans[.]"). Indeed, the Supreme Court has frequently cautioned federal courts against overreaching injunctive relief in cases involving state election laws, including redistricting plans. *See, e.g.*, *Upham v. Seamon,* 456 U.S. 37, 44 (1982) ("It is true that we have authorized District Courts to order or to permit elections to be held pursuant to apportionment plans that do not in all respects measure up to the legal requirements, even constitutional requirements . . . Necessity has been the motivating factor in those situations.") (internal citations omitted); *Growe v. Emison*, 507 U.S. 25, 35 (1993) (noting that elections must often be held under a legislatively enacted plan in deference to state court action). Moreover, where, as here, there is no alternative districting plan, courts find that neither the balance of the equities nor the public interest are in favor of injunctive relief. *See, e.g.*, *Vera v. Richards*, 861 F. Supp. 1304, 1351 (S.D. Tex.1994), *aff'd Bush v. Vera*, 517 U.S. 952 (1996) (denying a stay of 1994 and 1996 elections after finding a redistricting plan unconstitutional on September 2, 1994).

Furthermore, Simon Intervenors' arguments regarding their alleged harm—i.e., that their right to vote will be irreparably harmed—are the same as those made by every VRA plaintiff. If

Simon Intervenors' arguments regarding the equities were effective, then it would "appear to justify" this extraordinary relief "in *every* racial-gerrymandering case"—something the Supreme Court has found to be insufficient to support extraordinary injunctive relief like that sought by the Simon Intervenors here. *North Carolina v. Covington*, 137 S .Ct. 1624, 1626 (2017).

### F. The State of Ohio and Legislative Defendants will suffer substantial harm if the injunction is issued.

Simon Intervenors seek to enjoin the elections in one Congressional district just a month away from Ohio's primary elections set for May 3, 2022 which, as noted above, is already underway with early voting. The United States Supreme Court held in *Purcell v. Gonzalez*, 594 U.S. 1, 4–5 (2006) (*per curiam*), that "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." In a normal election cycle, "[r]unning elections state-wide is extraordinarily complicated and difficult." *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring in grant of applications for stays). Elections officials must navigate "significant logistical challenges" that require "enormous advance preparations." *Id.* The Supreme Court has consistently admonished courts not to alter state election laws and processes in the period close to an election *Andino v. Middleton*, 141 S. Ct. 9, 10 (2020) (Kavanaugh, J., concurring in grant of stay application) see *also Milligan*, 142 S. Ct. at 879; *Merrill v. People First of Ala.*, 141 S. Ct. 25 (2020); *Merrill v. People First of Ala.*, 141 S. Ct. 190 (2020); *Clarno v. People Not Politicians*, 141 S. Ct. 206 (2020); *Little v. Reclaim Idaho*, 140 S. Ct. 2616 (2020); *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205 (2020) (per curiam); *Democratic Nat'l Comm. v. Wisc. State Legislature*, 141 S. Ct. 28 (2020) (declining to vacate stay); *Benisek v. Lamone*, 138 S. Ct. 1942 (2018) (per curiam); *Veasey v. Perry*, 574 U.S. 951 (2014).

Over a month ago, the Supreme Court in *Merrill* issued a stay of the district court's opinions enjoining the use of Alabama's congressional redistricting plan. In his concurring opinion, Justice Kavanaugh invoked the *Purcell* doctrine for the proposition that courts "should not enjoin a state's election laws in the period close to an election." 142 S. Ct. at 879-880. This is because, "filing deadlines need to be met" candidates need to "be sure what district they need to file for" or even determine "which district they live in." *Id.*

In Ohio, overseas ballots have been distributed. Press Release, Ohio Secretary of State, https://www.ohiosos.gov/media-center/press-releases/2022/2022-04-04/. The voter registration deadline, on April 4, 2022, has passed. *Id.* Early in-person voting began on April 5 at 8:00 a.m. *Id.* All of this occurred with the current congressional districts on the official primary election ballot. *Id.* Substantial harm would result to the State of Ohio if Simon Intervenors' relief is issued. Under controlling Supreme Court precedent, the requested TRO should be denied.

### G. The public interest would not be served by enjoining the 2022 election in a single Ohio Congressional District as Simon Intervenors request.

Due to concerns inherent in the redistricting process—deference to the mapdrawing authority in providing that authority the opportunity to draw constitutional maps, and the orderly administration of elections, chief among them—Simon Intervenors cannot prove that the balance of equities is in their favor or that the public interest would be served by their requested relief. The "equitable weighing process" this Court is required to undertake includes balancing "the competing claims of injury" and "the effect on each party of the granting or withholding of the requested relief." *See North Carolina v. Covington*, 137 S.Ct. 1624, 1625 (2017).

The public interest also weighs against Simon Intervenors' requested injunction. Early voting has already begun in Ohio, and Ohio's election officials have been administering the election for weeks now. See n.2, *supra*. Each passing day is yet another day into the primary

- 18 -

elections and closer to the general elections in Ohio. *See* n.2, *supra*. Any court interference in the redistricting process would upend the orderly administration of elections. The public interest is also served by allowing the legislative bodies tasked with redistricting to handle the reapportionment responsibilities that are their constitutional obligation to see through. *See Upham,* 456 U.S. 37 at 44.

## CONCLUSION

For the foregoing reasons, Simon Intervenors' requested injunctive relief should be denied.

Respectfully submitted this the 7th day of April, 2022.

/s/ *Phillip J. Strach*
Phillip J. Strach, *pro hac vice*
phillip.strach@nelsonmullins.com
Thomas A. Farr, *pro hac vice*
tom.farr@nelsonmullins.com
John E. Branch, III, *pro hac vice*
john.branch@nelsonmullins.com
Alyssa M. Riggins, *pro hac vice*
alyssa.riggins@nelsonmullins.com
Cassie A. Holt, *pro hac vice*
cassie.holt@nelsonmullins.com
**NELSON MULLINS RILEY & SCARBOROUGH LLP**
4140 Parklake Avenue, Suite 200
Raleigh, NC 27612
Telephone: 919-329-3800

W. Stuart Dornette (0002955)
dornette@taftlaw.com
Beth A. Bryan (0082076)
bryan@taftlaw.com
Philip D. Williamson (0097174)
pwilliamson@taftlaw.com
**TAFT STETTINUS & HOLLISTER LLP**
425 Walnut St., Suite 1800
Cincinnati, OH 45202-3957
Telephone: 513-381-2838

*Counsel for Intervenor-Defendants Huffman and Cupp*

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 7th of April 2022 the foregoing document was filed via the Court's CM/ECF system which sent notice of the same to all counsel of record in this matter.

/s/ *Phillip J. Strach*
Phillip J. Strach, *pro hac vice*
phillip.strach@nelsonmullins.com
Thomas A. Farr, *pro hac vice*
tom.farr@nelsonmullins.com
John E. Branch, III, *pro hac vice*
john.branch@nelsonmullins.com
Alyssa M. Riggins, *pro hac vice*
alyssa.riggins@nelsonmullins.com
Cassie A. Holt, *pro hac vice*
cassie.holt@nelsonmullins.com
**NELSON MULLINS RILEY & SCARBOROUGH LLP**
4140 Parklake Avenue, Suite 200
Raleigh, NC 27612
Telephone: 919-329-3800

W. Stuart Dornette (0002955)
dornette@taftlaw.com
Beth A. Bryan (0082076)
bryan@taftlaw.com
Philip D. Williamson (0097174)
pwilliamson@taftlaw.com
**TAFT STETTINUS & HOLLISTER LLP**
425 Walnut St., Suite 1800
Cincinnati, OH 45202-3957
Telephone: 513-381-2838

*Counsel for Intervenor-Defendants Huffman and Cupp*
