**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DISTRICT**

| MICHAEL GONIDAKIS, ET AL. | : | CASE NO. 2:22-CV-773 |
| --- | --- | --- |
| PLAINTIFFS | : | CHIEF JUDGE ALGENON L. MARBLEY |
| VS. | : | |
| FRANK LAROSE, | : | CIRCUIT JUDGE AMUL R. THAPAR |
| DEFENDANTS. | : | JUDGE BENJAMIN J. BEATON |

**REPLY OF SIMON PARTIES TO SECRETARY LAROSE, AUDITOR FABER AND GOVERNOR DEWINE'S MEMORANDUM IN OPPOSITION TO SIMON PARTIES' SECOND MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND PARTIAL SUMMARY JUDGMENT, ECF DOCKET #168 AND TO INTERVENOR -DEFENDANTS HUFFMAN AND CUPP'S MEMORANDUM IN OPPOSITION TO SIMON INTERVENOR-PLAINTIFFS' SECOND MOTION FOR TEMPORARY RESTRAINING ORDER, ECF DOCKET #167**

**I.      INTRODUCTION**

The arguments within the Opposition to the Simon Parties Second Motion for Temporary Restraining Order, Preliminary Injunction and Partial Summary Judgment are both legally and factually incorrect and warrant immediate rejection.

Defendants LaRose, Faber and DeWine (hereinafter the "Executive Defendants") contend that the Simon Parties should be denied relief because they sat out litigation in the Ohio Supreme Court, voting is already underway, relief is unavailable under the Federal Voting Rights Act 52 U.S.C. §10301(b) due to inability of the Simon Parties to meet the required preconditions, failure to demonstrate irreparable harm and untimeliness under the *Purcell* principle and laches. Defendants Huffman and Cupp (hereinafter "the Legislative Leaders") contend that the Simon Parties' Complaint and Motion for an injunction are flawed and thus not cognizable under the VRA or 14th Amendment racial gerrymandering standards. The Legislative Leaders also state reliance by the Simon Parties on the decision

of a Sixth Circuit appointed three-judge district court in *Armour v. Ohio,* 775 F. Supp. 1044 (6th Cir. 1991) is misplaced.

For reasons explained fully below, neither Opposition Memorandum has merit. Accordingly, the Simon Parties hereby reiterate their request for immediate intervention by this Honorable Court, lest the Stae of Ohio continue to its ongoing violation of the Simon Parties' voting rights.

## II.     OPPOSITION INITIAL ARGUMENT-LACHES

### A.     LACHES

The argument that the Simon Parties failed to exercise reasonable diligence in connection with their challenge to the current proposed Ohio 6th United States Congressional District is baseless. On the very first day of Regional hearings concerning the current redistricting process, August 23, 2021, Plaintiff, Reverend Kenneth L. Simon and Undersigned Counsel appeared before the Ohio Redistricting Commission and presented a proposed map for a new congressional district for the Ohio Mahoning Valley. ECF Docket #147-4, on September 14, 2021, counsel for Simon Parties appeared before the Ohio Redistricting Commission, and again presented a proposed Congressional Maon September 15,2021  See, Exhibit A – Transcript of September 14, 2021 . On November 16, 2021, the Ohio General Assembly Panel Ohio Congressional Plan, Senate Bill 258. Defendant DeWin signed  S.B. 217 into law on November 20, 2021.

Because the Congressional District proposed by Defendants was adopted pursuant to a policy which gave no consideration to racial demographics, the testimony of the Simon Parties at Redistricting Hearings, the fact that the Court in *Armour* had found intentional violations of the 15th Amendment in *Armour*, violation of a VRA and the geographic area within by the proposed 6th Congressional District had a history of 14th and 15th Amendment

2

violations, as discussed in the *Armour* Opinion, the Simon Parties filed an action in United States District Court for the Northern District of Ohio, as a case related to *Armour*, eleven days later December 1,2021, Case No. 4:21-cv-2267.

On December 13, 2021, the Simon Parties moved in the N.D. Ohio for Class Certification and a three judge district court. On December 21, 2021 Defendants moved to stay. On January 3, 2022, the Simon Parties moved the N.D. Ohio Court for an injunction prohibiting elections under the proposed 6th District Plan. On January 4, 2022, the Simon Parties filed opposition to Defendants' Motion to Stay. On January 12, 2022 the N.D. Ohio action was stayed, at the request of Defendants, in difference to litigation in the Ohio Supreme Court.On January 14, 2022 the Ohio Supreme Court invalidated the November 20, 2021 Congressional Plan.

On February 21, 2022, in order to preserve this status under the first-to-file rule, the Simon Parties moved to Intervene in this action. On March 2, 2022, Defendants approved a new Congressional Plan.

The March 2, 2022 Plan suffered from the same defects as the November 20, 2022 Plan. On March 23, 2022 the Simon Parties filed a Complaint challenging the March 2, 2022 Plan.

On March 29, 2022 in State Court litigation the Ohio Supreme Court deferred a ruling on the validity of the March 2, 2022 Congressional Plan. On March 30, 2022 the Simon Parties moved to enjoin the March 2, 2022 Congressional Plan.

Defendants contend that the Simon Parties have not acted with appropriate diligence. Defendants' argument, as can be seen from the foregoing chronology, is weak. The Simon Parties have actively and timely participated in all aspects of the current redistricting process.

The Defendants contend that the Simon Parties' choice to litigate in federal Court should result in denial or relief.

The current seemingly endless cycle of submission and rejection in the Ohio Supreme Court illustrates an unfortunate flaw in the Ohio redistricting process. In order to preclude an action in federal Court, the State should have an adequate state remedy available, Ohio does not. The current redistricting fiasco is evidence of that. In addition, the Simon Parties seek relief under the VRA based in part, on a previous federal Court order and history of violations of the 14th and 15th Amendments.  In other words the Simon Parties seek "Bail-In" relief under §3 of the VRA as well as relief under Sec 2.

Section 3 relief was sought initially by the Simon parties  in the Court where the previous relief was accorded, the ND Ohio

 According to the recent opinion in League of Women Voters v. Lee , Case No 4:21-CV-186 ND Florida: Section 3(c) of the VRA states "Retention of jurisdiction to prevent commencement of new devices to deny or abridge the right to vote," section 3(c) provides additional remedies for Plaintiffs who have successfully challenged voting restrictions under the Fourteenth or Fifteenth Amendments. Under section 3(c), if a Court finds that a "political subdivision" has committed intentional race discrimination in voting, it "shall retain jurisdiction for such period as it may deem appropriate." 52 U.S.C. § 10302(c).

Section 3(c) is "[a] hybrid of sections 2 and 5" of the VRA. Travis Crum, *The Voting Rights Act's Secret Weapon: Pocket Trigger Litigation and Dynamic Preclearance,* 119 Yale. L. J. 1992, 2006 (2010). "Section 3 authorizes courts to impose preclearance in response to violations of the Fourteenth and Fifteenth Amendments." *Id*.; see also Pub. L. No. 89-110, § 3(c), 79 Stat. 437, 437-38 (1965). Congress designed section 3(c) "to deal

4

with denials or abridgments of the right to vote in so-called 'pockets of discrimination'—that is, areas outside the States and subdivisions to which the prohibitions of section 4(a) are in effect." H.R. Rep. No. 80-439, at 23 (1965). Section 3(c) was intended to supplement sections 4 and 5 "by providing for judicial scrutiny of new or changed voting requirements, [and] to insure against the erection of new and onerous discriminatory voting barriers by State or political subdivisions which had been found to have discriminated." Just as courts can "bail out" states that have stopped discriminating, they can "bail in" states who have recently discriminated, but who were not already subject to preclearance.

Section 3(c) allows preclearance; in that way, it resembles sections 4 and 5. But section 3(c) does not raise the same constitutional concerns raised in Shelby County. Unlike section 4, section 3(c) does not sort jurisdictions into categories based on their long-past history of discrimination. While "section 4's coverage … required[] preclearance in jurisdictions with histories of racial discrimination in voting dating back to the 1960s and 1970s," section 3(c) "requires a court to find—or a jurisdiction to admit—a constitutional violation." Crum supra, at 2009. Put another way, rather than rely "on decades-old data relevant to decades-old problems" section 3(c) relies on the most up-to-date data possible. *Shelby Cnty.*, 570 U.S. at 553.

*Jeffers v. Clinton*, 740 F. Supp. 585 (E.D. Ark. 1990), is the seminal case interpreting the section. There, a three-judge district court panel imposed a preclearance requirement on Arkansas after determining that it "ha[d] committed a number of constitutional violations of the voting rights of black citizens." *Id* at 586. With a few caveats, this Court finds the *Jeffers*, courts first ask "whether violations of the Fourteenth or Fifteenth Amendments justifying equitable relief have occurred within the State." *Perez v. Abbott*, 390 F. Supp. 3d 803, 813 (W.D. Tex. 2019). On this point, *Jeffers* explained that

5

"more than one violation must be shown." 740 F. Supp. at 600. But there are reasons to doubt this conclusion. For one, it "runs counter to statutorily mandated rules of construction." Crum supra, at 2007 n.88; 1 U.S.C. § 1 ("In determining the meaning of any Act of Congress, unless the context indicates otherwise . . . words importing the plural include the singular …"). Plus, "any statute that violates the Fifteenth Amendment necessarily violates countless citizens' Fifteenth Amendment rights." Crum supra, at 2007 n.88. At any rate, because this Court already found that, over the past 20 years, Florida has repeatedly targeted Black voters because of their affiliation with the Democratic party, this Court need not resolve this issue. The first *Jeffers* factor is met.

Next, under *Jeffers*, courts ask whether "the remedy of preclearance should be imposed." *Perez*, 390 F. Supp. 3d at 813. Recall that the statute says that this Court, upon finding a Fifteenth Amendment violation, "shall retain jurisdiction for such period as it may deem appropriate." 52 U.S.C. § 10302(c) (emphasis added). *Jeffers* reasoned that the word "shall" in section 3(c) does not strip courts of their discretion. 740 F. Supp. at 600 (stating that [i]t is standard doctrine that statutes stating that courts 'shall' grant equitable relief upon the occurrence of a certain state of affairs are not literally construed"). This Court questions whether courts may so casually disregard an express directive from Congress. See *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("The . . . instruction comes in terms of the mandatory 'shall,' which normally creates an obligation impervious to judicial discretion."). Still, because this Court finds that equity favors imposing preclearance, it need not decide whether "shall" really means shall.

6

Having determined that courts may exercise discretion in deciding whether to award 3(c) relief, *Jeffers* set out a series of non-exhaustive factors to guide that discretion. 740 F. Supp. at 601. These factors include (1) whether "the violations [have] been persistent and repeated," (2) whether the violations are "recent or distant in time," (3) whether preclearance would prevent future violations, (4) whether the violations have "been remedied by judicial decree or otherwise," (5) whether the violations are likely to recur, and (6) whether "political developments, independent of this litigation, make recurrence more or less likely." *Id*.Given the Jeffers factors Defendants had a duty to at least look at and consider the Simon parties' racial data.

### 1. LIKELIHOOD OF SUCCESS ON THE MERITS

Defendants allege that the Simon Parties are unlikely to succeed on the merits of their VRA claim because the Simon Parties can not satisfy the first *Thornbury v. Gingles*, 478 U.S. 30 106 S. Ct. 2752 (1986) precondition, a threshold showing that the minority group is sufficiently large and geographically compact to constitute a majority in a single member district. Defendant's claim is baseless.

To begin, *Gingles* arose in the context of a North Carolina challenge to a multi member districting scheme. There was also a general election run off requirement, unlike Ohio where in a plurality will suffice to win an election for U.S. Representatives.

The Court in *Gingles* stated expressly it was not deciding which standards apply to other types of claims of establishing a bright line rule.The Court stated:

We have no occasion to consider whether § 2 permits, and if it does, what standards should pertain to, a claim brought by a minority group, that is not sufficiently large and compact to constitute a majority in a single-member district, alleging that the use of a multi-member district impairs its ability to influence elections.

7

We note also that we have no occasion to consider whether the standards we apply to respondents' claims that multi-member districts operate to dilute the vote of geographically cohesive minority groups, that are large enough to constitute majorities in single-member districts and that are contained within the boundaries of challenged multi-member districts, are fully pertinent to other sorts of vote-dilution claims, such as a claim alleging that the splitting of a large and geographically cohesive minority between two or more multimember or single-member districts resulted in the dilution of the minority vote.

In a different kind of case, for example a gerrymander case, plaintiffs might allege that the minority group that is sufficiently large and compact to constitute a single-member district has been split between two or more multi-member or single member districts, with the effect of diluting the potential strength of the minority vote. *1052 Id. at 46 D. 12,106 S. Ct. at 2764 n. 12; at 50 n. 16, 1.06 S. Ct. at 276711. 16. (emphasis added).

Here the size and scope of the Simon Class has yet to be determined. However, the Simon Parties submitted a proposed District to the Defendants on September 16, 2021, Exhibit A, that suggests a district where Black voters would satisfy the first *Gingles* precondition.

According to the 2020 Census, Ohio's current population is 11, 779, 488. See, *2020 Census*, P.L. 94-171. An Ohio Congressional district will have a representative ratio of 1:787,527 citizens. The Simon Parties proposed a district, as indicated at Exhibit A, that instead of separating the Black community in Warren, Ohio, from the Black community in Youngstown, Ohio, two communities that have historically belonged to the same media market and standard metropolitan statistical area, due to the linkage of their histories and economics, or submerging these communities into areas south of Mahoning County, the county where Youngstown is located, the district should extend west or northwest to

8

include additional voters with similar interests. In this manner extremely polarized racial voting will be avoided . A Black has never been elected to county wide office in Mahoning or Trumbull County

Under the districts proposed by the Simon Parties the total voting aged white population is 333,776. The total voting aged Black population is 284,338. When this total voting block is further divided by political party, which would be required in a *Gingles* threshold condition analysis, the Simon Parties class would be sufficiently large a geographically compact to prevail in a singe member election. The data in Exhibit B was complied by Dr. Mark J. Sallings, Maxine Goodman Levin College of Urban Affairs, Cleveland State University.

The Simon Parties do not merely seek relief under §2 of the VRA. Relief is also requested under §3, due to the history in northeast Ohio as a "pocket of discrimination." In Youngstown alone, violations of the 15th Amendment in districting was found in *Armour* aside from *Armour*, violations of the Fourteenth Amendment due to racial discrimination were found in the police department. *Williams v. Vokovich*, 720 F.2d 909 (6th Cir. 1983) and in public schools *Alexander v. Board of Education*, 675 F.2d 787 (6th Cir. 1982). This is pointed out to say, even if Simon can not satisfy the requirements for relief under §2 of the VRA, the history of violation under the 14th and 15th Amendments would still entitle Simon to relief under §3 of the VRA. Most importantly , Defendants had a duty under the VRA once the Simon Parties brought this history to Defendants attention to at least consider it as requested on August 23, 2021 on the first day of Ohio Redistricting Commission hearings to "consider it." Instead Defendants established a statewide policy of giving no consideration whatsoever to racial demographics, notwithstanding the requirements of the VRA and *Armour* being brought to their attention.

In order to avoid the need to resurrect the shameful history of treatment of descendants of persons formerly held in bondage in the United States, slaves, the VRA focused on whether a challenged voting mechanism results in the processes leading to nomination and election not being equally open to minority voters. Defendants' policy of zero consideration of racial demographics frustrates any means to measure whether the location of a district boundary results in dilution of Black voting strength. The need to consider racial demographics in order to determine if the location of boundaries results in vote dilution was confirmed by Mr. Glassburn at the Court's March 29, 2022 hearing. Mr. Glassburn testified as follows concerning "results":

> Q. So given that you did have available to you, if you had elected to use it -- if the Commission had elected to use it, the ability to analyze the voting behavior of homogeneous precincts racially, the exclusion of that information, then, would prevent you from determining whether the lines that were drawn in these districts resulted in vote dilution or not. It took that ability away from you, didn't it?
>
> A. Without the census racial data, no, we could not look at racial data. However, we also did not have any Gingles test which is a -- which is the analyzation of racially polarized voting. We did not have any documents that suggest there was racially polarized voting that followed that Gingles criteria for any part the state.
>
> Q. Wouldn't it be part of the analysis of the mapmakers to look at, if the racial data was available, whether or not the lines they were recommending resulted in the processes leading to nomination or election not being equally open to black voters?
>
> A. No.
>
> Q. How could you contend -- how could you, then, determine what the results would be of a particular configuration on black voters if you did not include that in the process of determining where these district lines would be?
>
> A. There was no racial analysis done.
>
> Q. So you couldn't determine the results. Would you agree with me?
>
> A. Yes.

> Q. And your failure to include those results was the result of express directions given to you by the redistricting commission. Would you agree with that statement?
>
> A. Yes. In this round and all others.

According to the 2020 Census 13.1% of Ohio's population is Black, 1,521,462 persons. The VRA extends protection to this group not only from the effects of historical de jure racial discrimination but also de facto. Defendants blanket refusal to even consider the history provided to them by the Simon Parties, not only injured the Simon Parties, it may have resulted in the dilution of the voting strength of Blacks in other Ohio locales where on intensely local appraisal of indigenous political reality and searching evaluation of past and present conditions was totally ignored by Defendants.

For these reasons, the Simon Parties have requested relief not only under the VRA, but also §3 of the 14th Amendment, which basically says if a State fails to accord complete rights of suffrage to former slaves, then those former slaves do not count toward the number of elected officials that the State is entitled to have as representatives in Congress.

In this case of Ohio, an express directive, Rule 9 on the Defendants guidance to the mapmakers and instruction to map drawers, was given by the most senior legislative officials to violate the VRA by not considering any racial demographics. This de jure discriminatory policy harmed 13% of Ohio's population, not just the Simon Parties. If Defendant's continue with this intentional disregard of §§2 and 3 of the VRA, Ohio should have its Congressional denominator reduced by 13% of the State's population , the extent to which it failed to comply with §3 of the 14th Amendment.

Defendants contend that the Simon Parties are asserting an influence claim. As pointed out above they are not. However, contrary to Defendants' argument influence claims are not barred in the Sixth Circuit by reason of the decision in *Growe v. Emison*,

11

507 U.S. 25 (1993) and *Cousins v. Sunquist*, 145 F.3d 818 (6th Cir. 1998). Defendants argument is incorrect. *Growe* stated explicitly "to establish a vote-dilution claim with respect to a multimember district plan, a plaintiff must establish three threshold conditions." This case does not deal with a multimember districting plan. *Growe* was factually similar to *Gingles*, both involved multimember plans. Defendants also content that an influence claim is barred by *Cousins v. Sundquist*, 145 F. 3d 818 (6th Cir. 1998). Although there is dicta in *Cousin* concerning an influence claim, the decision did not turn the size of the minority voting group Plaintiffs, the decision rested on inability to meet the third *Gingles* precondition, proof of racial block voting. The claim of the Simon Parties is because of the duties imposed under §§2 and 3 of the VRA and the findings in *Armour* , the Defendants' should have considered racial demographics when drafting the 6th Congressional District.

Defendants still have a chance to reconsider the 6th District lines as litigation is ongoing in the State system concerning the March 2, 2022 map.

For reasons stated above the Simon Parties timely brought their claim in federal court.

It bears mentioning that Defendants suggest that the Simon Parties should have joined the litigation in State court. The Simon Parties seek to vindicate and rely upon the findings in *Armour* as a component for their claim to §3 relief. While the Simon Parties wholly support the 2015 Amendments to the Ohio Constitution concerning redistricting, these amendments do not provide an adequate remedy due to the endless cycle of rejection and resubmission that may, and unfortunately, is occurring.

The Simon Parties became involved in this process from its outset. They are now faced with having to vote for Congressional representative in a racially discriminatory

12

district. Given the Defendants' malfeasance in the creation of this predicament, holding final certification of the May 3 primary in abeyance pending the outcome of litigation concerning the March 2, 2022 map is a small measure of justice to the Simon Parties who to date have had their concerns relegated to back-of-the-bus status.

*Growe* does not require a different result *Growe* counseled deference to State proceedings, where the state proceedings were an adequate remedy. Ohio's State procedure, as evidenced by the current predicament is not.

Defendants also raise *Purcell v. Gonzalez*, 549 U.S. 1 (2006). *Purcell*, stated "court orders affecting elections especially conflicting orders, can themselves result in voter confusion and consequential incentive to remain away from the policy. *Id* at 4.

Early voting has already started in Ohio. Affording the Simon Parties a remedy on the back end is not going to effect the May 3 primary. Voters are already confused and turn out is already low. These circumstances are due to Defendants' conduct. The Simon Parties do not seek to enjoin or disrupt an election; they request that unless the election is determined to be fair, the results should not be certified.

### III.    IRREPARABLE HARM

Plaintiffs have suffered and continue to suffer irreparable injuries. "Courts routinely deem restrictions on fundamental voting rights irreparable injury" because "once the election occurs, there can be no do-over and no redress.*" League of Women Voters of N.C. v North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). "The proper remedy for a legal provision enacted with discriminatory intent *Croson v. City of Richmond*, 422 U.S.

In the absence of the requested injunction, Plaintiffs will suffer irreparable harm. "An injury is irreparable 'if it cannot be undone through monetary remedies.'" *Scott*, 612

13

F.3d at 1295 (quoting *Cunningham v. Adams,* 808 F.2d 815, 821 (11th Cir. 1987)). Recognizing this well-settled principle of law, courts considering motions for preliminary injunctions have repeatedly found that state actions infringing on the right to vote constitute irreparable injury. See, e.g., *Williams v Rhodes*, 393 U.S. 23,30 (1968).

The purpose of a preliminary injunction is "to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits.*" United States v. Alabama*, 791 F.2d 1450, 1459 (11th Cir. 1986) (affirming preliminary injunction). An injury is considered to be irreparable "if it cannot be undone through monetary remedies." *Scott v. Roberts,* 612 F.3d 1279, 1295 (11th Cir. 2010); *Cunningham v. Adams* 808 F.2d 815, 821 (11th Cir. 1987); see also *Charles II. Wesley Educ. Found., Inc. v. Cox*, 32*, Supp. 2d 1358, 1368 (N.D. Ga. 2004) (Cox I), aff'd, 408 F.3d 1349 (11th Cir. 2005) (Cox II) ("no monetary award can remedy the fact that [plaintiff] will not be permitted to vote in the precinct of her new residence."); see also *United States v. Georgia*, 892 F. Supp. 2d 1367, 1377 (N.D. Ga. 2012) (entering a preliminary injunction where "the potential deprivation of the ability to vote, the most basic of American citizens' rights, outweigh[ed] the cost and inconvenience" that the state might suffer, which were comparatively minor).

"Once a state legislative apportionment scheme has been found unconstitutional , it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan. *Reynolds v. Sims*, 377 U.S. 533 (1964).

Some form of relief is due to the Simon Parties because the State has intentionally trampled on their fundamental voting rights or irreparable harm as a matter of law.

**IV.     HARM TO OTHERS AND PUBLIC INTEREST**

14

Enjoining the certification of the results of an unlawful election will not cause harm to others. The Simon Parties do not seek to enjoin the election, despite having been denied access to the Courts under the guise of *Growe*.

Federal courts generally have a "'virtually unflagging'" obligation to hear and decide cases within their jurisdiction. *Sprint*, 571 U.S. at 77 (quoting *Colo. River Water Conserv. Dist. v. United States*, 424 U.S. 800, 817 (1976)). Federal courts "have 'no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.'" Id. (quoting *Cohens v. Virginia*, 6 Wheat. 264, 404 1821)). "Parallel state-court proceedings do not detract from that obligation"; instead, contemporaneous federal and state litigation over the same subject matter is the norm. Id. The availability of the federal courts to adjudicate federal claims is essential to protecting federal rights especially, as relevant here, the right to vote free of intentional racial discrimination.

## V.     PUBLIC INTEREST

The public interest is served by enjoining certification for the reason amid the chaos created by the ongoing cycle of map rejection, voters in the Simon class will know that the irreparable harm caused an election under the current unconstitutional 6th District map may not be valid.  An injunction presents a remedy for the Simon Parties.

## VI.     CONCLUSION

For the above reasons the Simon Parties respectfully request the motion be granted.

15

/s/ Percy Squire  
Percy Squire (0022010)  
Percy Squire Co., LLC  
341 S. Third Street, Suite 10  
Columbus, Ohio 43215  
(614) 224-6528, Telephone  
(614) 224-6529, Facsimile  
psquire@sp-lawfirm.com  
Attorney for Intervenors-Plaintiffs  

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served by operation of the United States District Court, Southern District of Ohio electronic filing system, on April 8, 2022.

s/Percy Squire, Esq.  
Percy Squire (0022010)  
Attorney for Intervenors-Plaintiffs