# EXHIBIT

# A

**EXHIBIT A**

2004

### THE OHIO STATE CONSTITUTION

### A REFERENCE GUIDE

**Steven H. Steinglass & Gino J. Scarselli**

PART I:  THE CONSTITUTIONAL HISTORY OF OHIO
     INTRODUCTION
     THE OHIO TERRITORY AND THE NORTHWEST ORDINANCE: THE PRELUDE
     TO STATEHOOD
     Early Ohio
     The Northwest Ordinance
     Governance under Arthur St. Clair and the Push for Statehood
     STATEHOOD AND OHIO'S FIRST CONSTITUTION
     The Constitutional Convention of 1802
          The Status of African Americans
          Approval and Statehood
     The Ohio Constitution of 1802
     OHIO'S EXPERIENCE UNDER THE CONSTITUTION OF 1802
     Judicial Review: A Major Constitutional Crisis
     OHIO'S SECOND CONSTITUTION
     The Campaign to Replace the Constitution of 1802
     The Constitutional Convention of 1850-51
          Elections, Suffrage, and the Status of African Americans
          Other Reforms
          Convention and Electoral Approval
          The Constitution of 1851
     THE 1873-74 CONSTITUTIONAL CONVENTION
     FROM 1874 TO THE 1912 CONSTITUTIONAL CONVENTION
     THE 1912 CONSTITUTIONAL CONVENTION: CONSTITUTIONAL REVISION IN
     THE PROGRESSIVE ERA
     The Progressive Movement and the Call for a Convention
     The Constitutional Convention of 1912
     CONSTITUTIONAL CHANGE FROM 1912 TO THE TWENTY-FIRST CENTURY
     The First Half of the Twentieth Century: the Unfinished Agenda
          Prohibition
          Suffrage
          Other Amendments
     Constitutional Revision in the Latter Half of the Twentieth Century
          The 1950s & 1960s
              Public Debt
              Governmental organization and reapportionment

Modern Courts Amendment

The 1970s and the Constitutional Revision Commission

The 1980s

The 1990s

The 2000s

The Ohio Constitution and the Court at the Beginning of the Twenty-first Century

The Ohio Supreme Court and Judicial Review

Judicial Selection

The Ohio Supreme Court and Stare Decisis

2

PART I

THE CONSTITUTIONAL HISTORY OF OHIO

**INTRODUCTION**

In 2003, Ohio celebrated its bicentennial.  In two centuries of statehood, Ohio, the seventeenth state admitted to the union and the first state carved out of the Northwest Territory, has had only two constitutions.  The current constitution, the Ohio Constitution of 1851, is the eighth oldest in the country and the third oldest outside New England.[1]  The state's constitutional history has its roots in the 1787 decision of the Continental Congress, acting under the Articles of Confederation, to enact the Northwest Ordinance which organized the western lands and set in motion the process that resulted in the creation of Ohio and the four other new states that were carved from the Northwest Territory.

Despite having had only two constitutions, Ohio has had four constitutional conventions, three of which resulted in significant constitutional change.  The first, the Constitutional Convention of 1802, produced Ohio's first constitution and guided the territory into statehood with a government dominated by the legislative branch and a constitution resistant to amendment.  The second, the Constitutional Convention of 1850-51, altered the balance of power among the branches of government by limiting legislative power and created a constitution that was easier to amend.  The third convention, which took place in 1873-74, proposed a constitution that would have significantly restructured state government and given the governor the power to veto legislation, but the voters rejected it.  The fourth, and last convention, the Constitutional Convention of 1912, avoided the fate of the proposed 1874 constitution and produced major constitutional change by presenting the electorate with forty-two independent amendments, thirty-four of which the voters adopted.

Ohio's constitutional history is closely tied to the social and political changes taking place nationally and within the state, and the three successful constitutional conventions were part of popular democratic movements.  The first convention produced a constitution that was not only the culmination of the movement for statehood but also the result of the successful effort, both nationally and in the Ohio Territory, by Thomas Jefferson and the Republicans to wrest political power from the Federalists.  The 1802 Constitution represented a rejection of the Federalist belief in a strong centralized government and established a Jeffersonian model of government in which the legislature was the dominant branch of state government.[2]

---

1.     The only state constitutions outside New England that are older than the Ohio Constitution of 1851 are the Wisconsin Constitution of 1846 and the Indiana Constitution of 1851.  See William F. Swindler, ed. Sources and Documents of United States Constitutions (7 vols.) (New York: Oceana Publications Inc., 1978).

2.     Randolph C. Downes, "Ohio's First Constitution," Northwest Ohio Quarterly XXV (Winter 1952-53): 12.

Increasing dissatisfaction with state governments created a revisionist fervor that swept the country in the mid-1800s. Spurred in large part by the ideals of Jacksonian democracy, which emphasized popular control over government and a distrust of corporations and financial institutions, fourteen states held constitutional conventions between 1842 and 1853.[3]  The particular grievances leading to the Constitutional Convention of 1850-51 included the legislature's financial irresponsibility in the construction of the state transportation system, its control over the judiciary and other state officers, and problems in the administration of the judicial system.

The Constitutional Convention of 1912 grew out of the Progressive movement that dominated American politics in the late nineteenth and early twentieth centuries.  This last convention set the stage for the piecemeal approach to constitutional revision that has characterized constitutional change in Ohio ever since..

## THE OHIO TERRITORY AND THE NORTHWEST ORDINANCE: THE PRELUDE TO STATEHOOD

### Early Ohio

The State of Ohio has its origin in the experiences of the people who settled the area west of Pennsylvania and north of the Ohio River in what was known as the "Ohio country."  Their experiences were shaped in a land that for much of its early history was in a state of nearly constant conflict as a result of competing claims from Indian tribes and from England and France, Europe's two most powerful nations.

The first inhabitants of what would become Ohio were Native Americans, but little is known of the Ohio tribes before 1600.  The Erie inhabited the southern shore of Lake Erie in the early 1600s, but the Iroquois decimated them in the 1650s in the Beaver Wars.[4]  The Iroquois had little interest in the Ohio lands other than as a hunting ground for beaver and did not establish any major settlements. Ohio thus remained largely uninhabited from the late 1650s until the early 1700s when the Miami emigrated southward and settled in the western part of Ohio. Around the same time, the Shawnee, Wyandot, and later the Delaware moved into the region from the east and north to escape the Iroquois and the western migration of white settlers.[5]

The French were the first Europeans to set foot in the what would become Ohio.  France

---

3.      Howard McDonald, "A Study in Constitution Making – Ohio: 1802-1874" (Ph.D. dissertation, University of Michigan, 1916), 59.

4.      William A. Hunter, "History of the Ohio Valley," in William C. Sturtevant, ed., Handbook of North American Indians, vol. 15 Northeast (Washington: Smithsonian Institution 1978), 588; R. Douglas Hurt, The Ohio Frontier, Crucible of the Old Northwest, 1720-1830 (Bloomington: Indiana University Press 1996), 7-9.

5.      See Eugene H. Roseboom and Francis P. Weisenburger, A History of Ohio, (Columbus: Ohio Historical Society 1991), 13-16.

based its claim to the Ohio territory on the purported discovery of Ohio by La Salle in 1669-70,[6] but by the mid-1700s, French, English, and colonial traders could be found throughout Ohio. In an attempt to reestablish alliances with tribes sympathetic to the English, the French-Canadian Cèloron de Bienville in 1749 led an expedition from the Great Lakes to the Ohio River and reclaimed the Ohio country in the name of the Louis XV, King of France.[7] By mid-century England realized the growing importance of the area, and the colony of Virginia in 1750 established the Ohio Company to secure lands along the Ohio River for settlement. Recognizing the growing threat from England, the French armed friendly tribes and with their help drove out the tribes aligned with the English. With the defeat iof "La Demoiselle," the chief of a rebel group of Miami who had negotiated a treaty with the English, the French effectively gained control of the Ohio River valley.[8]

The escalating rivalry over the Ohio country finally led to the outbreak of the French-Indian War in 1754. After almost a decade of fighting, France surrendered most of its North American territories to England in the 1763 Treaty of Paris. In the same year, to protect their interest in the fur trade and to avoid provoking another war with the Indians, the British issued a proclamation limiting white colonial settlement west of the Allegheny Mountains.[9] The 1763 Royal Proclamation was largely unenforceable, but it nonetheless outraged the colonists, especially land speculators and veterans of the French and Indian War to whom the British had promised land as bounty for fighting the French. In fact, the resentment toward Britain's administration and control of the western territories was among the grievances against the British that eventually led to the Declaration of Independence.

The defeat of England in the Revolutionary War gave the United States clear title to what became Ohio, but the area was still subject to the land claims of Indian tribes and of certain states. During the Revolutionary War, the Continental Congress had tried to persuade the colonies that claimed western lands through "sea-to-sea" clauses in their original charters (Connecticut, Massachusetts, and Virginia) or through their relationship with the Iroquois Confederacy (New York) to cede these lands to the United States.[10] The Continental Congress viewed the western lands as a source of income for the new government and as a means of paying the debt incurred during the war, but states did not begin to surrender their claims until

---

6. Ibid., 18-19.

7. James K. Richard, "Icon of Empire," <u>Timeline</u> (Ohio Historical Society, April-May 1988): 18.

8. Hurt, <u>The Ohio Frontier</u>, 34-39.

9. Beverley W. Bond, Jr., <u>The Foundations of Ohio</u>, vol. I of Carl Wittke, ed., <u>The History of the State of Ohio</u> (Columbus: Ohio State Archaeological and Historical Society, 1941), 174-75.

10. Jack N. Rakove, "Ambiguous Achievement: The Northwest Ordinance," in Frederick D. Williams, ed., <u>The Northwest Ordinance: Essays on Its Formulation, Provisions, and Legacy</u> (East Lansing: Michigan State University Press 1988), 8-9.

they faced bankruptcy in late 1779.[11]  Eventually, all the states relinquished their claims, but Virginia and Connecticut, both of which had claims to the western territories north of the Ohio River, did so with reservations.

In January 1781, Virginia offered to cede its western lands under the condition that it reserve a tract of land to compensate Revolutionary War veterans.  Congress eventually accepted this offer in 1784, and Virginia reserved four million acres, known as the Virginia Military District, between the Little Miami and Scioto Rivers.[12]  Following Virginia, Connecticut ceded its western claims to the national government but, unlike Virginia, retained jurisdiction over its reserved lands.[13]  Connecticut retained jurisdiction over its 3.8 million acres in reserved lands on the southern shore of Lake Erie until 1800 when it surrendered jurisdiction to the United States.[14]  Settled mostly by New Englanders with strong Congregationalist roots, these lands, known as the Western Reserve, would develop an identity distinct from the rest of the state.[15]

With the elimination of most of Virginia's claims, Congress began planning for the settlement of the northwest.  The Land Ordinance of 1785 authorized the survey and sale of land in southeastern Ohio.  Two years later, Congress enacted the Ordinance of 1787, which established a territorial government and a process for the admission of Ohio and eventually four other states into the union.

In 1788, a small group of New Englanders established the first permanent, legal settlement in Ohio at Marietta.[16]  White settlement, however, had actually begun in the Ohio Territory in the early eighteenth century when many Scottish-Irish immigrants, who first settled in New England, fled to the Quaker colony of Pennsylvania to seek religious freedom from Puritan persecution.  The Scottish-Irish migration increased steadily, and settlements began to appear in the western parts of Pennsylvania and Virginia.  By the 1780s many western frontiersmen of Scottish-Irish ancestry had moved illegally into what is now Ohio. [17]

The Scottish-Irish from Pennsylvania and Virginia came with strong beliefs in individual freedom and economic independence and were extremely influential in Ohio's early development.[18]  The Virginians who settled mostly in southern Ohio were chiefly responsible for the push for statehood and for Ohio's first constitution.  The presence of Scottish-Irish squatters, however, created an obstacle for the orderly sale of Ohio lands.  In 1785, Congress ordered the army under the direction of Lt. Colonel Josiah Harman to remove the squatters in preparation for

---

11.      Ibid., 10.
12.      Bond, Foundations of Ohio, 252-53.
13.      Ibid.; John D. Barnhart, Valley of Democracy: The Frontier versus the Plantation in the Ohio Valley, 1775-1818 (Bloomington: Indiana University Press, 1953), 122-23.
14.      Bond, Foundations of Ohio, 454-55.
15.      Ibid., 371.
16.      Ibid., 281-83.
17.      Robert E. Chaddock, Ohio Before 1850: A Study of the Early Influence of Pennsylvania and Southern Populations in Ohio (New York: Longmans, Green, 1908), 31-33.
18.      Ibid., 33.

legitimate settlement.  Harman's expedition failed miserably, and the squatters remained until another war with the Indians forced them out.[19]

As the migration of white settlers increased, relations with the Indian nations worsened. During the revolution, most Ohio tribes allied themselves with the British in the hope that this alliance would prevent colonial expansion in the Ohio Territory.[20]  After the war, Indian resentment toward the Americans, and to some extent the British, continued.  The Ohio Indians believed that the British in the 1783 Treaty of Paris ending the Revolutionary War had abandoned their pledge to respect Indian lands north of the Ohio River.  By 1783, the Continental Congress all but ignored the Indian Boundary Line of 1768 that had been fixed by the Treaty of Fort Stanwix between the British and the Iroquois.[21]  In 1784 and 1785, the United States negotiated its own series of treaties forcing a number of tribes to surrender their lands north of the Ohio River and to admit to being "under the protection of the United States and of no other sovereign whatsoever."[22]

Despite the treaties, relations with the Indians soured when the two most powerful tribes, the Miami and the Shawnee, refused to surrender their lands.[23]  By 1791, the United States government and the Ohio Indians were on the brink of war. In the spring of that year, Congress appropriated money for the establishment of a western army to deal with the Indians.  President George Washington appointed the Federalist governor of the Northwest Territory, Arthur St. Clair, to command this army, and in the Fall of 1791, St. Clair launched a major, but unsuccessful,  military offensive against the Miami.  St. Clair's army suffered the worst defeat ever of an American force by Indians,[24] leading President Washington to remove St. Clair and to give Major General "Mad" Anthony Wayne, the hero of the Battle of Stony Point, command of the western army.  On August 20, 1794, Wayne defeated the Indians at the Battle of Fallen Timbers (outside present day Toledo).  The defeat at Fallen Timbers forced the Indians to agree to the Treaty of Greenville in which the Ohio tribes relinquished most of their claims to the territory. Although the conflict with the Indians did not end immediately, the Treaty of Greenville largely took the Indians out of the path of white settlement of the Ohio Territory.[25]

**The Northwest Ordinance**

Ohio's constitutional history begins with the Ordinance of 1787, better known as the Northwest Ordinance. In many ways, the Northwest Ordinance can be viewed Ohio's first

---

19.    Hurt, The Ohio Frontier, 148.

20.    Ibid., 76.

21.    Thomas H. Smith, ed. An Ohio Reader: 1750 to the Civil War (Grand Rapids: William B. Eerdmans, 1975), 67.

22.    Ibid., 72; Charles J. Kappler, ed. Indian Affairs: Laws and Treaties, vol. II (Treaties) (Washington: Government Printing Office, 1904), 7.

23.    Hurt, The Ohio Frontier, 96.

24.    Ibid., 118 (estimating 623 soldiers killed and 258 wounded).

25.    Smith, An Ohio Reader: 1750 to the Civil, 69.

"constitution." It not only established a government for the Northwest Territory—a prerequisite for the orderly settlement of the west—but also set the terms for the admission of Ohio and four other states into the union. The Ordinance, which Ohio's first historian Caleb Atwater called the "Magna Carta of Ohio,"[26] also guaranteed the inhabitants of the territory certain fundamental rights that would later become part of the Ohio Constitution.

The Northwest Ordinance created a three-stage process for the creation of new states as the population of the territory increased. The idea of tying statehood to population had first appeared in Jefferson's Ordinance of 1784, the Continental Congress's earlier attempt to establish the terms of statehood for the western territories, including territories south of the Ohio River.[27] Unlike the 1784 Ordinance, however, the Northwest Ordinance established a strong central government that was initially undemocratic. The 1784 Ordinance "though inoperative, was legally in force until 1787"[28] and would have allowed the settlers of the territories to create their own government by adopting the constitution and laws of one of the original states. Many members of Congress, however, had doubts about the character and loyalties of the frontier settlers and believed that a strong central government was needed to attract the kind of settlers who would be better able to form republican governments.[29]

The Northwest Ordinance also differed from the Ordinance of 1784 by authorizing the creation of fewer states. On the recommendation of James Monroe, the Ordinance of 1787 set an upper limit of five states that could be carved from the Northwest Territory rather than the ten that Jefferson had envisioned. Monroe believed that if too many states were formed from the Northwest Territory some would never achieve a population sufficient for statehood and those that would be formed would have little in common with their eastern counterparts. He also believed that the creation of too many states in the Northwest Territory would work against the political interests of the federal government and the eastern states.[30]

The Northwest Ordinance gave the Continental Congress supreme authority over the Northwest Territory during the first stage of development. In this initial stage, Congress would appoint a governor to function as chief executive of the territory with control over the militia, Indian affairs, and the appointment of magistrates and civil officers in the counties and townships. Congress would also appoint a secretary and provide the territory with a judicial system consisting of three judges who would exercise common law jurisdiction over the territory. Under the scrutiny of Congress, the three judges and the governor would have the authority to

---

26.     Peter S. Onuf, "The Importance of the Northwest Ordinance, in <u>Liberty's Legacy: Our Celebration of the Northwest Ordinance and the United States Constitution</u> (Columbus: The Ohio Historical Society, 1987), 14 (quoting Caleb Atwater).

27.     Peter S. Onuf, <u>Statehood and Union: A History of the Northwest Ordinance</u>. (Bloomington: Indiana Univ. Press, 1987), 46-49.

28.     Jay Amos Barrett, <u>Evolution of the Ordinance of 1787</u> (New York: Putnam, 1891), 26.

29.     Onuf, <u>Statehood and Union</u>, 49-50.

30.     Barrett, <u>Evolution of the Ordinance of 1787</u>, 34.

8

adopt criminal and civil laws for the territory.[31]

The next stage of development would occur once the population reached 5,000 free, adult male inhabitants. At that point, the territory could elect representatives to a General Assembly consisting of the governor, an elected house of representatives, and a five-member legislative council appointed by Congress from a list of residents nominated by the territorial house of representatives. All bills passed by a majority in the house of representatives and in the legislative council would go to the governor for his assent at which point the governor would have the authority to exercise a veto.[32]

Finally, a "state" would be ready for admission to the union when it reached a population of 60,000 free, adult male inhabitants. Article Five of the Articles of Compact—those sections of the Northwest Ordinance that were an unalterable compact between the original states and the people and new states of the Northwest Territory—promised admission into the union "on an equal footing with the original states" and delineated the boundaries of three to five new states. Any of the "states" that reached the population threshold could form a government and draft a permanent constitution provided that "the constitution and government so to be formed, shall be republican, and in conformity to the principles contained in these articles . . ." Article Five also allowed admission to the union by an act of Congress when there was a population of fewer than 60,000 free, adult male inhabitants. Eventually Ohio and all the states in the Northwest Territory other than Michigan entered the union through enabling acts.[33]

Besides providing a structure for the government of the Northwest Territory and the promise of statehood, the Northwest Ordinance contained a declaration of specific, fundamental rights. The Northwest Ordinance was, in fact, the first national document to include such a declaration or bill of rights. The Articles of Confederation, under which the Ordinance was enacted, contained no bill of rights, and the adoption of the first ten amendments to the U.S. Constitution did not occur until 1791. Among the rights guaranteed by the Northwest Ordinance in its Articles of Compact were the rights to religious freedom, habeas corpus, trial by jury, due process, and reasonable bail (except in capital cases). The Ordinance also prohibited excessive fines, cruel and unusual punishment, and laws that impaired the obligation of contracts. Finally, the Ordinance included a clause encouraging schools and the means of education, a provision promising respect and fair treatment towards the Indians (which was generally ignored), and significantly, a prohibition against slavery and involuntary servitude.

The prohibition against slavery as well as other individual rights contained in the Northwest Ordinance's Articles of Compact were "forever remain unalterable." This effort to bind the states, however, became the subject of an intense legal and political debate especially concerning the continuing legal effect of the Northwest Ordinance's prohibition against slavery. Ultimately, both the U.S. and Ohio Supreme Courts held that state constitutions superseded the

---

31.     Ordinance of 1787, sections 3-8 (July 13, 1787).
32.     Ibid., sections 9-13.
33.     See Susan P. Fino, The Michigan State Constitution: A Reference Guide (Westport, Conn.: Greenwood Press, 1996), 5.

Ordinance (<u>Strader v. Graham</u>, 1850; <u>State ex rel. Donahey v. Edmonson</u>, 1913), but the fundamental rights protected by the Northwest Ordinance, including the prohibition against slavery, became part of the 1802 Ohio Constitution and remain to this day part of the Ohio Constitution.

**Governance under Arthur St. Clair and the Push for Statehood**

With the adoption of the Ordinance of 1787, the Continental Congress appointed Arthur St. Clair as territorial governor. No person has likely had as great an influence on Ohio's constitutional history as St. Clair. Ironically, in reaction to St. Clair's stormy rule as territorial governor, Ohio vested nearly all governmental power in the legislature and created one of the weakest executive branches of any state.

Born in Scotland in the 1730s and indentured to a medical doctor, St. Clair purchased his freedom with an inheritance from his mother's death in the 1750s. He then received an ensign's commission in the British Army and came to the American colonies to begin a distinguished military career, though he later fought against Britain in the Revolutionary War. Initially commissioned as a colonel in the Continental Army, he worked his way to the rank of Major General and became an advisor and close friend to George Washington. When the war ended, St. Clair entered political life as a Pennsylvania delegate to the Continental Congress. In 1787, before becoming Northwest Territorial Governor, he was elected President of the Continental Congress, the most powerful position under the Articles of Confederation. Despite his devastating defeat at the hands of the Indians in 1791, he continued as territorial governor until Thomas Jefferson fired him in 1802 following St. Clair's speech at the 1802 Constitutional Convention. [34]

St. Clair was an ardent Federalist, and his tenure as governor was marked by an intense political rivalry with the Jeffersonian Republicans (also called Democrats at that time). As governor, St. Clair was required "to represent the interests of the national government and exercise jurisdiction over some of the most fervent believers in the primacy of local sovereignty and democracy in the nation."[35] Because they were individualistic and resistant to national authority, the early settlers of the Northwest Territory were difficult to govern. Mainly Republican, they strongly opposed St. Clair's autocratic rule. St. Clair, on the other hand, who once described the settlers as "a multitude of indigent and ignorant people," had no faith in the ability of the settlers to govern themselves.[36]

The political rivalry between the Republicans and St. Clair reached new levels soon after

---

34. William Henry Smith, ed., <u>The St. Clair Papers</u>, vol. I (Cincinnati: Robert Clarke, 1882): 2-4.

35. J. Martin West, "Arthur St. Clair," <u>Timeline</u> (Ohio Historical Society, April-May 1988): 53.

36. Randolph C. Downes, <u>Frontier Ohio, 1788-1803</u> (Columbus: Ohio Historical Society, 1935), 189.

the election of the first territorial legislature in 1799. The political infighting between the governor and the mostly Republican legislature came to a head when the legislature began passing bills creating new counties and abolishing property qualifications for voting. Faced with these initiatives, St. Clair exercised his veto and struck down not only these bills but more than a third of all bills passed during the first legislative session.[37] As a result, the territorial legislature increasingly split along national party lines.[38] For the most part, New Englanders tended to side with the Federalist St. Clair, while settlers from Pennsylvania and the southern states, who were the majority of settlers, tended to side with the Republicans.

St. Clair's unpopularity among Republicans also stemmed from his opposition to statehood. By 1800, Republicans began setting their sights on statehood, but St. Clair, as with most Federalists, felt the territory was not ready to become a state because it had not properly evolved through the process established by the Northwest Ordinance. The territory lacked both political stability and the 60,000 inhabitants that would have required admission into the union. To delay statehood (and prevent the admission into the union of a Republican state), St. Clair proposed dividing the Northwest Territory into three districts rather than the two authorized under the Northwest Ordinance. St. Clair 's plan called for the subdivision of the Northwest Territory into an eastern division with the Federalist-controlled Marietta as the capital, a central division with Cincinnati as its capital, and a western division with Vincennes in the Indiana Territory as its capital.[39]

For Federalists the plan had the advantage of splitting the strong Republican center of Ohio in half. Congress, however, rejected St. Clair's proposal and on May 7, 1800, divided the Northwest Territory into two districts, creating the Indiana territory and establishing Chillicothe as the seat of the eastern division.[40] In 1801, St. Clair again proposed dividing the Northwest Territory into three districts, but this time with the support of leading Cincinnati Republicans who wanted the capital moved from Chillicothe, he was able to push his plan through the second territorial legislature and resubmit it to Congress.[41]

Although Congress again rejected St. Clair's proposed division, this time by a vote of 81 to 5,[42] his plan nonetheless infuriated the Chillicothe Republicans. The tension between the governor and some Republicans of that city became so great that St. Clair narrowly escaped a

---

37. Thomas R. Swisher, ed., Ohio Constitution Handbook (Cleveland: Banks-Baldwin Law Publishing Co., 1990), xi; SaImon P. Chase ed., The Statutes of Ohio and the Nortwestern Territory, vol. I (Cincinnati, F.S. Benton, 1833), 29.

38. See Chaddock, Ohio Before 1850, 56.

39. Ibid., 57; Downes, "Ohio's First Constitution," 14. St. Clair had originally proposed dividing the Northwest Territory into three divisions in 1790.

40. An Act to divide the territory of the United States northwest of the Ohio into two separate governments, 6 Cong. Ch. 41, 2 Stat. 58 (May 7, 1800).

41. See Downes, Frontier Ohio, 198-200.

42. Bond, Foundations of Ohio, 470.

mob when he visited Chillicothe in December 1801.[43]  Ironically, rather than delay statehood, St. Clair's plan had the effect of accelerating it.  Chillicothe became the center of the statehood movement, and a group of staunch Republicans, known as the "Chillicothe faction," headed by Nathaniel Massie, Edward Tiffin, and Thomas Worthington turned its attention to the nation's capital to lobby for statehood.

Worthington, Tiffin's brother-in-law and a native of Virginia who served in the territorial legislature, traveled to Washington to lobby Congress and the new Jefferson administration for early admission.  Since the territory lacked 60,000 free, adult, male inhabitants, Worthington sought a congressional act authorizing statehood.  At the same time, the Chillicothe faction organized a committee to inundate Congress with petitions to demonstrate the strong public support for statehood.  In Washington, Worthington was overwhelmed by the support of the Jeffersonians, who had just defeated the Federalists in the contested election of 1800. In a letter to Massie on January 14, 1802, three days after arriving in the nation's capital, Worthington wrote, "so far I can determine [I] have reason to believe we shall obtain our utmost wishes . . .."[44]

The Jefferson administration welcomed the admission of Ohio since it gave the Republicans an opportunity to obtain two more Senators, one more member of the United States House of Representatives, and three more electoral college votes.[45]  Beyond the political advantages in bringing Ohio into the union, Jefferson had always disliked the form of territorial government established by the Northwest Ordinance.  In a letter dated January 23, 1800, Jefferson wrote, "surely such a government as the first form prescribed for the territories is a despotic oligarchy without one rational object."[46]

Worthington eventually met with President Jefferson and with William B. Giles, a leader in the House of Representatives from Virginia.  Giles, who strongly supported statehood, established a committee to collect petitions from Ohio citizens and to prepare a report on statehood for Congress.  On March 4, 1802, the committee released its report calling for a congressional Enabling Act to organize Ohio as a state.[47]  In opposition, Federalists attacked the report on republican principles.  They argued that the Enabling Act would usurp the popular rights of the citizens of the territory since neither the territorial legislature nor the people through a referendum were given an opportunity to vote on statehood.[48]  Moreover, the opponents of statehood maintained that the Articles of Compact of the Northwest Ordinance gave Congress no power to require a constitutional convention as a precondition of admission into the union.[49] Despite Federalist opposition, the bill had no trouble passing, and on April 30, 1802, President

---

43.    Chaddock, Ohio Before 1850, 58-59.

44.    Downes, Frontier Ohio, 213.

45.    McDonald, "A Study in Constitution Making," 7-8.

46.    Chaddock, Ohio Before 1850, 61.

47.    Annals of Congress, 7 Cong. 1 Sess., 1097-1100.

48.    Chaddock, Ohio Before 1850, 59; see also Downes, Frontier Ohio, 216.

49.    See Annals of Congress, 7 Cong. 1 Sess. 1103, 1112-13.

Jefferson signed the Enabling Act.[50]

The Enabling Act fixed the boundary of Ohio along the lines of the Northwest Ordinance and called for the election of thirty-five delegates to a constitutional convention in Chillicothe on the first Monday of November 1802. The act eliminated all property qualifications for voting and set the terms for the election of delegates. The act also reserved a section of each township for the support of schools and offered the new state the salt springs in the Scioto and Muskingum valleys and a percentage of the proceeds from the sale of lands owned by Congress for public roads in exchange for a promise not to tax lands sold by Congress for five years.[51]

## STATEHOOD AND OHIO'S FIRST CONSTITUTION

Predictably, the campaign for delegates to Ohio's first constitutional convention centered on the issue of statehood. With a majority of the territory favoring statehood, the Federalists were in a difficult position having opposed the Enabling Act. Federalists (and some Cincinnati Republicans) continued to argue against the legality of the Enabling Act and for their earlier division plan (the St. Clair's plan), which they contended would only temporarily delay statehood, if at all.[52] A number of Federalists also accused Republicans of wanting to introduce slavery—a charge vigorously denied by Massie, Worthington and other Republican leaders.[53]

In contrast to the Federalists, the Republicans had all the advantages. They had proven their commitment to statehood and ran a well-organized campaign creating numerous Republican societies throughout Ohio to galvanize support. Republicans were also aided by a change in the election law that allowed voters to cast their ballots in townships throughout each county as well as in the county seat making it easier for backwoodsmen, mostly Republican, to vote. And not surprisingly, the election resulted in a landslide victory for Republicans, who won at least 26 of the 35 seats to the constitutional convention.[54]

### The Constitutional Convention of 1802

The 35 delegates who convened in Chillicothe on November 1, 1802, represented a diverse array of professionals, including lawyers, clergymen, physicians, merchants, farmers, and speculators with lawyers predominating. Five delegates to the convention ultimately became Ohio Governors: Edward Tiflin, Thomas Kirker, Thomas Worthington, Jeremiah Morrow, and

---

50.    Act of Apr. 30, 1802, ch. 40, 2 Stat. 173 (amended 1803).

51.    Ibid.; see also Atwater, History of the State of Ohio, 170 (discussing the "inducements" offered to the people of the territory).

52.    Barnhart, Valley of Democracy, 151; Downes, Ohio Frontier, 232-39.

53.    See generally Barbara A. Terzian, "Effusions of Folly and Fanaticism: Race, Gender and Constitution-Making in Ohio, 1802-1923 (Ph.D. dissertation, The Ohio State University, 1999), 59-70.

54    Ibid., 74 (citing a letter from Thomas Worthington to President Jefferson)..

Samuel Huntington.[55]  The dominant Chillicothe faction included Massie, Worthington, Tiffin, and Michael Baldwin, a young lawyer originally from Connecticut.  Besides one delegate from Hamilton County, Federalists sent delegates from Washington County, which included the New England strongholds of Marietta and Zanesville, and Jefferson County with its capital in Steubenville. Well-known Federalists included General Rufus Putnam, Benjamin Ines Gilman, Ephraim Cutler, and John McIntire.  An interesting aspect of the makeup of the delegates was their age, leading Caleb Atwater to remark that "[t]he framers . . . [though] well qualified . . . were generally . . . young men, who had been little engaged in legislation . . . [and] could not . . . take a very wide survey of human societies."[56]  Over half of the delegates were under forty, including all of the leaders of the Chillicothe faction, and a number were even in their twenties. Worthington was only twenty-nine years old, and Baldwin was three years his junior.[57]

Most of the delegates were from Virginia  (10), Pennsylvania (7), or Maryland (5), with the largest minority from Virginia.[58]  Both Massie and Worthington were born in Virginia. Tiffin, who emigrated From England in his teens, married and lived in Virginia before moving to Ohio.  Several delegates had at various times lived in Kentucky, and only a handful were from New England.[59]

The convention, firmly under the control of the Jeffersonians, elected Tiffin, who would become Ohio's first governor, as president and Thomas Scott, also of Chillicothe, as secretary. Arthur St. Clair, who was still territorial governor, was treated as an outsider, and Republicans thwarted his efforts to have a role at the convention.  A motion was made on the third day of the convention to allow St. Clair to address the delegates. Worthington, who had previously submitted charges against St. Clair in an effort to have him dismissed as territorial governor, voted against the motion, but Massie voted in favor of allowing St. Clair to speak. No friend of the governor, Massie believed that, if allowed to speak, St. Clair would accomplish what Worthington and Massie could not: his removal from office.  "Give him enough rope and he will hang himself."[60]  Massie was right.  Permitted to address the convention by a vote of 19 to 14, St. Clair launched into a diatribe against Congress and the conditions imposed by the Enabling Act. He defiantly declared that the Enabling Act of 1802, passed by a Republican Congress, was null and void. and that "[f]or all internal affairs we have a complete legislature of our own, and in them are no more bound by an act of Congress than we would be bound by edict of the first

---

55.    Governor James E. Campbell, Speech reproduced in Charles B. Galbreath, History of Ohio, vol. 1 (Chicago: American Historical Society, 1925), 274.

56.    Atwater, History of the State of Ohio, 171.

57.    Terzian, "Effusions of Folly," 95-98, 75.

58.    Ibid., 76.

59.    See Barnhart, Valley of Democracy, 153-54.

60.    William T. Utter, The Frontier State 1803-1825. Vol. II of Carl Wittke, ed., The History of the State of Ohio (Columbus: Ohio State Archaeological and Historical Society, 1942), 12 (quoting David Mead Massie, Nathaniel Massie: A Pioneer of Ohio: A Sketch of His Life and Selections From His Correspondence (Cincinnati: Robert Clark, 1896), 222-23).

14

consul of France."[61] St. Clair's speech, which President Jefferson characterized as "an intemperance and indecorum of language toward the Legislature of the United States", convinced the President to remove him as governor ending St. Clair's political career.[62]

Following St. Clair's address, the delegates, as required by the Enabling Act, voted on the question of whether "it is expedient, at this time, to form a constitution and State government." St. Clair obviously did not dissuade the delegates. The question was approved by a vote of thirty-two to one. Ephraim Cutler, a staunch Federalist from Washington County, cast the only dissenting vote.[63]

Once underway, the convention organized committees to draft the various articles of the constitution. Under the rules of the convention, Tiffin, as president, appointed members of the committees subject to addition or amendment by motion of any member.[64] The convention formed eight committees to draft what would become the eight articles of the constitution. The rules of the convention required three readings before an article, section or resolution could be adopted.[65] The general practice of the convention was to have a committee draft an article or resolution and then submit it to the delegates sitting as a committee of the whole for discussion and amendment. An article or resolution would then be tabled for consideration a second time when it could be further amended before a final vote.[66]

Republicans formed a majority in each committee, but they only once voted on a recorded vote as a single block.[67] Unfortunately, the journal of the convention does not include the debates so there is no official record of the positions or arguments of individual delegates or even the delegates responsible for particular motions. For the most part, the journal recorded only the composition of committees, motions made on the floor of the convention, and the yeas and nays of particular votes.

**The Status of African Americans**

Some of the most contested issues at the convention involved the status of African Americans. The delegates never voted on a proposal to introduce slavery—at least not on the floor of the convention. There were, however, two votes on the slavery section recorded in the convention's journal, but they involved votes on involuntary servitude and indentures.[68]

---

61. William Henry Smith, ed., The St. Clair Papers, vol. II, 594 (also published in Smith, An Ohio Reader: 1750 to the Civil War, 63).

62. Utter, The Frontier State, 13.

63. Barnhart, Valley of Democracy, 155.

64. Journal of the [1802] Convention, published in Ohio Archaeological and Historical Publications, vol. 5 (1897) (hereinafter, 1802 Journal), 87, Rule 25.

65. Ibid., 86, Rule 23.

66. See generally ibid.

67. Barnhart, Valley of Democracy, 155.

68. See 1802 Journal, 110-11.

Ephraim Cutler, the sole delegate to vote against statehood, claimed in his memoirs that the committee on the Bill of Rights narrowly defeated a motion by Republicans to permit a limited form of slavery, [69] but a number of historians have questioned Cutler's account. [70] Moreover, the convention adopted a morally forceful probably legally ineffective provision perpetually barring the introduction of slavery. "[N]o alteration of this constitution shall ever take place, so as to introduce slavery or involuntary servitude into this state." [71]

Although there seems to have been no serious support for a pro-slavery amendment at the convention, [72] opposition to slavery did not translate into support for African American rights. On November 22, 1802, the committee of the whole submitted a draft that limited suffrage to white male residents who paid or were charged with a state or county tax. The convention defeated by a vote of 19 to 14 a motion to omit the word "white" from that section. [73] Following an unsuccessful motion that would have eliminated the tax requirement on voting, a motion to enfranchise "all male negroes and mulattoes now residing in this territory . . . if they shall within ____ months make a record of their citizenship" passed by a vote of 19 to 15. [74] This victory for African American suffrage, however, was short-lived. Four days after extending the franchise to African Americans, the convention reconsidered the issue and voted 17 to 17 on a motion to strike the entire amendment. The tie required Edward Tiffin, the President of the convention, to cast the deciding vote, and he joined his fellow Virginia Republicans, including the leaders of the Chillicothe faction, in opposing suffrage. [75] Though he had freed his own slaves, Tiflin believed that "the immediate neighborhood of two slave-holding States made it impolitic to offer such an inducement for the influx of an undesirable class to the new State." [76]

Ironically, the decision by the convention to deny African Americans the right to vote was actually a vote to disenfranchise blacks. There had not been any racial limitation on voting for delegates to the convention, and there is evidence that at least one African American voted in the

69. Julia Perkins Cutler, Life and Times of Ephraim Cutler (Cincinnati: Robert Clark, 1890)(reprinted New York: Arno Press, 1971), 74-76.

70. See, e.g., Terzian, "Effusions of Folly," 95-98; see also William Gilmore, Life of Edward Tiffin (Chillicothe, OH: Horney & Son, 1897), 72-77; Helen M. Thurston, "The 1802 Constitutional Convention and Status of the Negro," Ohio History 81 (Winter 1972), 24.

71. 1802 Const., art. VII, § 5.

72. See Terzian, "Effusions of Folly," 98. Notwithstanding questions about the accuracy of Cutler's account of what occurred in committee, he is credited with drafting the substance of the section banning slavery and involuntary servitude. Ibid.

73. 1802 Journal, 113.

74. Ibid., 114 (blank in Journal). The delegates, however, defeated a motion that would have extended the franchise to the descendants of African American voters by a single vote. Ibid.

75. Ibid., 122. See also Terzian, "Effusions of Folly," 105-06.

76. Gilmore, Life of Edward Tiffin, 76.

election for delegates.[77]  By this action, Ohio became the first northern state and the second state in the union (South Carolina was the first) to include a racial restriction on voting in its constitution.[78]

Following the initial votes on African American suffrage, the delegates voted 19 to 16 to approve an anti-civil rights amendment that denied "negroes and mulattos" the right to hold office, serve in the military, and testify in any court against a white person.[79]  Tiffin voted with the majority to deny African Americans these specific rights —the only time he voted other than to break a tie.  On November 26, the same day Tiffin broke the tie and denied African Americans suffrage, the convention reconsidered its earlier vote and defeated the anti-civil rights amendment by a single vote. In effect, the convention decided to let the legislature determine the rights of African Americans.  Less than two years later, the legislature would begin passing laws limiting African American rights.[80]

### Approval and Statehood

The convention adjourned on November 29, 1802, less than a month after the delegates had convened.  Before adjourning, the delegates voted to accept, with slight modification, the proposals from Congress concerning the lands set aside for schools, the salt mines, and the sale of public lands.  The delegates also adopted a schedule that provided for the transition from territorial law and set elections for first Tuesday in January 1803.[81]  Consistent with the practice of the time, the delegates defeated a proposal to submit the new constitution to the people for approval on a vote 27 to 7[82] with the Jeffersonian Republicans ironically arguing against a popular verdict on the constitution on the ground that a referendum on the constitution would be a waste of time and money.[83]

Following the convention, Worthington traveled to Congress to deliver a copy of the constitution, the convention's conditional acceptance of the proposals contained in the Enabling Act, and an address to President Jefferson and Congress. [84]  Congress acknowledged Ohio as a

---

77.  Terzian, "Effusions of Folly," 54.

78.  G. Alan Tarr, "The Ohio Constitution of 1802: An Introduction," February 2000, http://www-camlaw.rutgers.edu/statecon/ohio.doc (March 22, 2004).

79.  1802 Journal, 115-16.

80.  See Terzian, "Effusions of Folly," 113-18.

81.  Schedule, 1802 Ohio Constitution.

82.  1802 Journal, 97-98. Between 1787 and 1821 only three states, Massachusetts, New Hampshire and New York submitted their constitutions to the people for ratification.  See McDonald, "Study of Constitution Making," 51-52; Emilius O. Randall and Daniel J. Ryan, History of Ohio, The Rise and Progress of an American State, vol. III (New York: The Century History Company, 1912), 125.

83.  McDonald, "Study of Constitution Making," 49-50.

84.  Ibid.

state in an act of February 19, 1803, but it never took formal action to admit Ohio into the union.[85] Consequently, there have a number of competing views as to when Ohio first became a state, and five different dates have been proposed, including April 30, 1802, the date on which Congress passed the Enabling Act permitting Ohio to pursue statehood; November 29, 1802, the date on which the convention adjourned; February 19, 1803, the date on which Congress passed an Act extending federal laws to the "State" of Ohio; and March 1, 1803, the date on which the General Assembly first met; and March 3, 1802, the date on which Congress consented to a final modification of the Enabling Act.[86]  In 1902, the Ohio General Assembly officially recognized the birth of the state on March 1, 1803, [87] and in 1953, Congress formally recognized Ohio as the seventeenth state of the union.[88]

**The Ohio Constitution of 1802**

The Ohio Constitution of 1802 consisted of a preamble and eight articles.  The most prominent article, Article I, Legislative Power, established the supremacy of the legislature.  The other branches of government were defined in Articles II (Executive) and III (Judiciary).  Other Articles provided for Electors and Elections (Art, IV), Militia Officers (Art. V), Civil Officers (Art. VI), Miscellaneous Provisions (Art. VII), and the Bill of Rights (Art. VIII).

Consistent with the Jeffersonian views of a majority of the delegates, the convention vested most of the political power of the state in a bicameral legislature, the General Assembly, consisting of a senate and a house of representatives.  The constitution gave the General Assembly the power to make law without interference from the executive branch.  A bill would become law if passed by both houses of the General Assembly and signed by the president of the senate and the speaker of the house (Art. I, section 17).  The General Assembly had the power to appoint most civil officers, including the secretary of state (Art. II, section 16), state treasurer and state auditor (Art. VI, section 2), and all judges except justices of the peace (Art. III, section 8).  The General Assembly also had broad powers to apportion seats in the legislature (Art. I, sections 2 and 6), to fix the number of senators (Art. I, section 6), and to create new counties (Art. VII, section 3).  Since the General Assembly's power was plenary, unlike Congress whose powers are specifically enumerated, the Ohio legislature could take any act not specifically prohibited by the constitution.  (See Commentary, Art. II, section 1).

The executive and judicial branches were clearly subordinate to the legislature.  The executive power of the state was vested in the governor who was elected to a two-year term and could serve at most six years in an eight-year period (Art. II, section 3).  As a result of St. Clair's rule and Jefferson's distrust of a strong executive, the constitution severely restricted the governor's powers.  The governor was commander-in-chief of the militia (Art. II, section 10) and

---

85.   Act of Feb. 19, 1803, ch. 7, 2 Stat. 201.
86.   See Utter, The Frontier State, 31.
87.   Ibid.
88.   Pub. L. No. 83-204, 67 Stat. 407 (1953).

had the power to grant reprieves and pardons, except in cases of impeachment (Art. II, section 5), but the governor lacked veto power and had no power of appointment other than the power to fill certain vacancies while the General Assembly was in recess (Art. II, section 8) and to appoint the adjutant general of the state militia (Art. V, section 6). Or, in the words of Caleb Atwater,

> Owing to their ill will towards Governor St. Clair, the members of the convention, made our governor a mere cypher. He can pardon criminals, appoint the adjutant general, sign commissions, and fill temporary vacancies, but he has no voice in making the laws, no veto power, nor has he the power to interfere in appointing any of our officers.[89]

In fact, the 1802 Constitution was the only constitution adopted by a state between 1801 and 1830 that did not grant the governor power to veto legislation,[90] and the Whig Governor Tom Corwin once succinctly but irreverently observed that Ohio governors "are confined to the appointment of notaries and the pardoning of democrats."[91]

The judiciary consisted of a supreme court, courts of common plea, and justices of the peace. The legislature appointed all judges (other than Justices of the Peace) for seven-year terms "if so long they behave well" (Art. III, section 8), while voters of the respective townships elected Justices of the Peace, who were not subject to a good behavior requirement, to three-year terms (Art. III, section 11). The supreme court, which originally consisted of three justices, had both original and appellate jurisdiction and was obligated to hold court annually in every county of the state (Art. III, sections 2 and 10). Common pleas courts had jurisdiction over all criminal, common law, and matters of equity, as well as probate and testamentary matters (Art. III, section 5).

The article on electors and elections limited the right to vote to white males twenty-one or older who paid or were charged with a state or county tax (Art. IV, section 1). Most state constitution of the time limited suffrage to males and imposed a tax requirement, which under the Ohio Constitution could be avoided by working on the public roads (Art. IV, section 5). The inclusion of racial restrictions in the constitution, however, was unusual, and Ohio became the only non-slave state at that time to include a racial restriction on voting in its constitution.[92]

Both the structure of the new government and the inclusion of a Bill of Rights were designed to protect individual rights. By limiting the power of the governor and establishing a system of legislative supremacy, the drafters of the constitution sought to prevent abuse of governmental power. The constitution reflected a kind of popular democracy in which the legislature restrained executive power and the people restrained the legislature through frequent elections with representatives standing for election annually and senators biennially (Art. I,

---

89. Atwater, History of the State of Ohio, 172-73.
90. G. Alan Tarr, "The Ohio Constitution of 1802: An Introduction."
91. Governor James E. Campbell, Speech reproduced in Galbreath, History of Ohio, vol. 1, 272.
92. See ibid.

sections 3 and 5). Beyond these structural protections, the Bill of Rights incorporated all of the protections contained in the federal Bill of Rights and in the Northwest Ordinance.

The Ohio Bill of Rights also included positive rights that were not taken from either the federal Bill of Rights or the Northwest Ordinance. For example, section 23 of the Bill of Rights prohibited poll taxes, calling them "grievous and oppressive." Section 7 gave every person redress in the courts "by due course of law, and right and justice administered, without denial or delay." Section 6 guaranteed free and open printing presses and, in contrast to the common law, allowed truth to be offered as a defense in prosecutions for libeling public officials. Also, section 25 prevented the passage of any law barring poor citizens from participating in schools, colleges or universities receiving public funds. In total, the Ohio Bill of Rights included twenty-eight sections, which constituted a more detailed enumeration of rights and greater protection from government abuse than the first ten amendments to the U.S. Constitution.

Given that the 1802 Constitution was drafted in less than a month, it is not surprising that it borrowed many provisions from other sources. The fairly new federal Constitution of 1787, however, was not an important influence on the Ohio Constitution. As with most state constitutions at the start of the nineteenth century, the Ohio Constitution was structured along the lines of the Articles of Confederation, which vested most power in the legislature. The Ohio Constitution lacked the system of checks and balances found in the federal Constitution and, with respect to the distribution of powers, more closely resembled the English parliamentary system than the federal system.[93]

The 1802 Constitution derived most of its provisions from the state constitutions of Tennessee, Kentucky, and Pennsylvania, but the Tennessee Constitution was the most influential. The Republicans at the convention apparently expected the Ohio Constitution to be modeled on the Virginia Constitution, but Virginia had not revised its constitution since 1776 and was seen as "somewhat out of fashion both as to form and content."[94] Willing Byrd, the Republican delegate chiefly responsible for choosing a model, instead looked to the more recent 1796 Tennessee Constitution.[95]

The original Ohio and Tennessee Constitutions have fifty sections in common, many of which were exact duplicates.[96] Article I on Legislative Powers shared sixteen of twenty-eight sections with Tennessee, including sections providing for two-year terms for senators and a two-thirds quorum requirement in each house and a section allowing bills to originate in either house. Also, ten of sixteen sections of Article II on Executive Powers were borrowed from Tennessee as was the decision to deny the governor the veto power. All seven sections of Article V, which dealt with the militia, were modeled on the militia sections of the Tennessee constitution, and one-third of Ohio's Bill of Rights was derived from the Tennessee Declaration of Rights.

Reflecting the frontier experiences of many of the delegates, the Ohio Constitution also

---

93. See McDonald, "Study of Constitution Making," 28.
94. Ibid, 27; Cutler, Life of Ephraim Cutler, 69.
95. See McDonald, "Study of Constitution Making," 27.
96. See Barnhart, Valley of Democracy, 157-58.

borrowed a number of provisions from the 1790 Pennsylvania and 1799 Kentucky constitutions.[97] Two-thirds of Article III, which dealt with the Judiciary, were taken from the Pennsylvania and Kentucky documents. The Ohio provision requiring supreme court justices to hold court annually in each county was derived from Pennsylvania as was the division of counties into common pleas districts.[98] In addition, six of the sixteen sections of Ohio's Bill of Rights came from either the Pennsylvania or Kentucky constitutions.[99]

Despite the similarities between the Ohio Constitution and the constitutions of Pennsylvania, Kentucky, and Tennessee, there were also important differences. For example, unlike the Pennsylvania and Kentucky Constitutions, the Ohio Constitution did not give the governor the veto power and very much of the appointment power. In addition, the Ohio governor and state senators served for terms of two years, less than the terms provided for those offices under the Pennsylvania and Kentucky constitutions.[100] Unlike Tennessee, Ohio representatives were elected annually instead of biennially, and unlike Tennessee, where the governor, legislators, and voters were required to own freehold estates, there was no requirement that property be owned by Ohio legislators, the governor, or the electors.

When compared as a whole to the Constitutions of Tennessee, Pennsylvania, and Kentucky, the Ohio Constitution was a much more radically democratic document. It was also a document that may have been well-suited for a rural, frontier state with a small population, but it would soon prove ill-suited for one of the fastest growing states in the nation.

**OHIO'S EXPERIENCE UNDER THE CONSTITUTION OF 1802**

The Constitution of 1802 contained a number of major weaknesses that ultimately led to its complete revision in 1851. The most notable flaws concerned the supremacy of the General Assembly, the inefficiency of the judicial system, and the difficulty of amending the constitution. Without the possibility of a gubernatorial veto, there was no check on legislative action. In addition, most of the General Assembly's time was spent on special legislation for corporations and municipalities. In fact, the General Assembly was accused of creating needless legislation to prolong legislative sessions and thus increase the compensation of members who were paid on a daily basis.[101] The General Assembly also had the power to create new counties and appoint judges and other county officers, thus maintaining a widespread system of political patronage. Finally, there were few constitutional constraints on drawing legislative districts. As a result of this system of legislative supremacy, there were many abuses, including the all-too-common practices of logrolling and gerrymandering.[102]

---

97. Ibid., 158.
98. McDonald, "Study of Constitution Making," 28.
99. Barnhart, Valley of Democracy, 158.
100. Ibid.
101 . Chaddock, Ohio Before 1850, 71.
102. See Randolph C. Downes, "Ohio's Second Constitution," Northwest Ohio

21

The General Assembly's complete control over fiscal matters also led to unrestricted spending and to the creation of an enormous debt during the era of internal improvements from 1825, when the construction of the Ohio canals began, through the 1840s. During this period, the General Assembly authorized financing backed by the full faith and credit of the state for the construction of the state's transportation system. At one point, the annual state debt approached nearly $20 million.[103] As a result, the General Assembly turned to new forms of taxation and began taxing personal property as well as real property thereby angering taxpayers. The public's outrage was further inflamed by special legislation that accompanied internal improvements, especially after the Panic of 1837, which caused the failure of most Ohio banks. The General Assembly had given banks and canal, turnpike, and railroad companies special tax breaks and other benefits and had allowed banks to be chartered with little or no capital or hard currency, thus facilitating their default when the financial crisis hit in 1837. In addition, under the Loan Act of 1837, also known as the "Plunder Law," the General Assembly was authorized to subsidize private transportation companies and even began to enter risky ventures with transportation companies. Many of these companies went bankrupt requiring taxpayers to make up the losses.[104]

The judicial system also began to show signs of strain soon after statehood. As early as 1815, Governor Thomas Worthington recommended revising the constitution to correct problems associated with the judiciary.[105] The principal problem that Governor Worthington identified concerned the inability of the courts to meet the needs of a growing population.[106] The Ohio Supreme Court not only operated as an appellate court but also as a court of original jurisdiction. Moreover, the constitution required the justices to ride circuit and hold court in each county annually (1802 Const., Art. III, sections 2 and 10). Ohio had only nine counties in 1802, but by 1835, there were eight times as many and this requirement proved to be expensive and ultimately unworkable.[107] By 1850 when the second constitutional convention convened, the number of counties had increased to eighty-seven, one short of today. Moreover, the court could not handle the caseload resulting from the rapid growth of the state's population. Ohio had gone from a frontier state with approximately 50,000 inhabitants in 1802 to one of the largest states in the union by mid-century. In 1820, the state had more than half a million inhabitants. By 1830, the

---

Quarterly XXVI (Spring 1953): 74.

103. For a short but excellent summary of this period, see Swisher, Ohio Constitution Handbook, xix-xxi.

104. Ibid.

105. McDonald, "Study of Constitution Making," 63.

106. Ibid, 62.

107. Commenting on the burdens imposed on supreme court justices, in 1835 Justice John C. Wright of the Ohio Supreme Court wrote that the supreme court judges "now hold Court in seventy-two counties each year, requiring twenty-two hundred and fifty miles travel! The number of cases on their trial docket, in 1834, was fourteen hundred and fifty-nine!" Quoted in Swisher, Ohio Constitution Handbook, xvii.

population approached one million, and by 1850 there were nearly two million people living in Ohio.[108]

Finally, a major weakness of the 1802 Constitution was the difficulty of amending the document.  The constitution provided only for amendments by constitutional convention, but to convene a convention two-thirds of each house of the General Assembly had to agree to submit the question to the voters who then had to approve the proposal to hold a constitutional convention(1802 Const., Art. VII, section 5).  Before the successful call for a convention in 1849, the General Assembly had placed the question on the ballot only once, in 1819, when the voters defeated the call by a vote of 6,987 to 29,315.[109]

### Judicial Review: A Major Constitutional Crisis

The 1802 Constitution, like the U.S. Constitution, did not include a provision expressly giving the judiciary the power to hold acts of the legislature unconstitutional.  In 1803, the U.S. Supreme Court in Marbury v. Madison (1803) established the doctrine of judicial review under the federal Constitution.  Even before Marbury, a number of state courts had implicitly or explicitly recognized judicial review,[110] but Ohio with its constitutional commitment to legislative supremacy and with a weak and dependent judiciary seemed an unlikely place for the doctrine of judicial review.  Nonetheless, soon after statehood, a crisis of constitutional magnitude erupted over judicial review.

The controversy surrounding judicial review in Ohio centered on an 1805 act that gave justices of the peace jurisdiction in civil cases involving less than fifty dollars.  In 1806, Judge Calvin Pease of the common pleas court for the Third Circuit (Jefferson and Belmont Counties) declared the act void and in conflict with the right to a jury trial under Article VIII, section 8 of the Ohio Constitution.  In 1807, the act was again challenged, and this time the case reached the Ohio Supreme Court.  In Rutherford v. M'Fadden (1807)[111] Ohio Supreme Court Chief Justice Samuel Huntington and Supreme Court Judge George Tod declared the act unconstitutional.  In his opinion, Justice Huntington declared that the judiciary "must [be] in compliance with their duty, compare the legislative act with the Constitution, and if they find such act contrary to the Constitution, or prohibited by it . . . [I]t is the duty of the court to declare it no law."  Relying on

---

108.    See "United States Resident Population by State: 1790 – 1850," at http://www.wnjpin.state.nj.us/OneStopCareerCenter/LaborMarketInformation/lmi01/poptrd1.htm (March 22, 2004).

109     Ibid., 63.

110.    See William E. Nelson, "Commentary: Changing Conceptions of Judicial Review: The Evolution of Constitutional Theory in the States, 1790-1860," 120 U. Pa. L. Rev. (1972): 1167-69.

111.    Rutherford v. M'Fadden is an unreported decision, but the opinion with an historical comment is published in Ervin H. Pollack, ed., Ohio Unreported Judicial Decisions, Prior to 1823 (Indianapolis: Allen Smith, 1952), 71.

the Ohio Constitution as the basis for the decision, Justice Huntington acknowledged <u>Marbury</u> without expressly citing the case.

> I have considered this case as depending upon the construction of our own constitution and laws, without quoting the authority of other decisions, though well aware, that . . . I am supported by the judgment of the supreme court of the U.S. and of every court of the individual states, which has had the question before them, all of whom have decided that the courts of law possess the power of enquiring into the constitutionality of legislative acts.[112]

> Judge Tod in his concurring opinion agreed that the act was unconstitutional and that the doctrine of judicial review "in our constitution is founded in the wisest policy, as it raises an insuperable barrier against encroachments of the one branch on the rights and powers of another."[113]

The court's decision was not well-received by the General Assembly, which passed a resolution on January 4, 1808 stating "[t]hat the judges of the state are not authorized by Constitution to set aside an act of the Legislature by declaring the same unconstitutional and void."[114]  Soon after the gubernatorial election of 1808 in which Chief Justice Huntington became Ohio's third governor, the House of Representatives approved articles of impeachment against Judges Tod and Pease for "their exercise of the power of judicial nullification."[115]  The Senate tried both judges in separate proceedings, but they both escaped conviction by votes of fifteen to nine against them, one vote short of the two-thirds majority required for conviction.[116]

Politically, the struggle over judicial review split the Republican Party and helped elect Huntington governor over his Republican rival Thomas Worthington, who opposed judicial review.[117]  The anti-court Republicans, however, continued to control the General Assembly after the impeachments of Judges Tod and Pease, and notwithstanding the <u>M'Fadden</u> decision, the General Assembly extended the jurisdiction of justices of the peace in civil cases from fifty dollars to seventy dollars.[118]  Finally, in 1810, the General Assembly passed what is known as the "sweeping resolution," which declared that all judicial offices carrying seven-year terms would be vacant even if the incumbent had taken office through an interim appointment to fill a vacancy.  This resolution had the effect of "sweeping" from office judges who were then replaced

---

112.  Ibid., 83.

113.  Ibid., 92.

114.  Randall & Ryan, <u>History of Ohio</u>, vol. V, 118.

115.  <u>See</u> Utter, <u>The Frontier State</u>, 45-51.

116.  <u>See</u> Pollack, <u>Ohio Unreported Judicial Decisions</u>, 102-03.

117.  William T. Utter, "Judicial Review in Early Ohio," <u>Mississippi Valley Historical Review</u>, vol. xiv (June 1927): 13.

118.  <u>See</u> Pollack, <u>Ohio Unreported Judicial Decisions</u>, 102-03.

by the General Assembly with judges more sympathetic to the majority of Republicans.[119] Nonetheless, "the practical defeat of the exponents of judicial review . . . was short-lived" and by 1815 the General Assembly appointed Judge Pease to the Supreme Court and thus vindicated the principle of judicial review.[120]

## OHIO'S SECOND CONSTITUTION

### The Campaign to Replace the Constitution of 1802

Despite the flaws with the 1802 Constitution, there was little interest in calling a constitutional convention following the voters' rejection of a convention in 1819 until the mid-to-late 1830s. The movement to revise the constitution resurfaced following the Panic of 1837, which was popularly blamed, at least in part, on the General Assembly's banking and fiscal policies. One of the first calls for a convention came from Ohio historian Caleb Atwater. In his influential work History of the State of Ohio published in 1838, Atwater noted that the principal weakness of the 1802 Constitution was the extreme power it had given to the legislature and recommended specific changes to constrain legislative power.[121]

Besides the legislature's disastrous economic policies and the continuing problems with the judiciary, the public's disgust with gerrymandering contributed to the call for a constitutional convention. During the 1840s, the Whigs and Jacksonian Democrats, the two major parties, were evenly split, and the party in power spent much of the legislative session engineering the next election.[122]

The movement for constitutional change in Ohio was part of the "orgy of nineteenth-century constitution-making" that swept through the country.[123] Many of the states that held conventions to revise their constitutions had economic and structural problems similar to those in Ohio, and the people often blamed their legislatures for the same economic problems resulting from internal improvements and bank failures that plagued Ohio.[124]

The revisionist movement in Ohio gained momentum in 1843 when Ohio Governor Wilson Shannon publicly called for a convention. The following year a resolution calling for a constitutional convention failed to receive the two-thirds vote required by the 1802 Constitution, as did two subsequent resolutions in 1846 and 1847, but support for a convention continued to grow. By 1847, the division over calling a convention split along party lines. The Democratic

---

119. See Utter, "Judicial Review in Early Ohio," 22-23.

120. See Pollack, Ohio Unreported Judicial Decisions, 104-05.

121. Atwater, History of the State of Ohio, 172-74; see also McDonald, "Study of Constitution Making," 68-69.

122. See Downes, "Ohio's Second Constitution," 75-76.

123. G. Alan Tarr, Understanding State Constitutions (Princeton: Princeton University Press, 1998), 97.

124. See generally ibid., 111-13.

25

Party supported a constitutional convention, while the more conservative Whig Party generally opposed the call for a convention. By 1849, however, the political situation had changed, and with the support of Whig Governor William Bebb and the Free Soil Party, which represented the abolitionist movement, Democrats succeeded in passing almost unanimously a resolution calling for a constitutional convention.[125]

Once the resolution passed, attention turned to the campaign. Despite the acquiescence of the Whigs in submitting the question to the voters, the party was divided, and many Whigs openly opposed the convention. Newspapers on each side of the issue tried to influence the electorate before the October general election.[126] On the Democratic side, the Ohio Statesman, was the most vocal supporter of a constitutional convention. Six months before the election, the Columbus paper published a special weekly paper advocating a new constitution and promoting a number of reforms including universal, white manhood suffrage, judicial reform, the election of all government officials, and limitations on state debt.[127] On the other side, the leading Whig paper, The Ohio State Journal, urged the voters to defeat the proposal.[128]

The campaign culminated on October 9, 1849 in an overwhelming victory of 145,698 to 51,161 in support of a constitutional convention (Appendix A). In February 1850, the General Assembly passed an act calling for the election of delegates in April and set the date for convening the convention for the first Monday in May 1850.[129]

**The Constitutional Convention of 1850-51**

Ohio's second constitutional convention convened in Columbus on May 6, 1850. In contrast to the first convention, which consisted of thirty-five delegates, the second convention had 108 delegates, sixty-four Democrats, forty-one Whigs, and three Free-Soilers.[130] The convention elected William Medill of Fairfield County as president and W.H. Gill of Guernsey County as secretary. Also in contrast to the first convention, the second convention took much longer to complete its work, one hundred and sixty-three days compared to less than a month. Due to a cholera epidemic, the convention adjourned on July 9, 1850, and reconvened in Cincinnati on December 2, 1850, where the rest of the official business took place until the document was completed in March 1851.[131]

---

125. McDonald, "Study of Constitution Making," 70-71.

126. Ibid., 71-72.

127. Ibid., 72-73.

128. Ibid., 72.

129. Laws of Ohio, vol. 48, p.19 (Feb. 11, 1850).

130. See Isaac F. Patterson, The Constitutions of Ohio: Amendments and Proposed Amendments. Cleveland: Arthur H. Clark, 1912), 109 (hereinafter "The Constitutions of Ohio"). Patterson lists sixty-eight Democrats, but this apparently includes four who were chosen to replace delegates who had resigned.

131. See McDonald "Study of Constitution Making," 98; Patterson, "The Constitutions

Among the delegates to the 1850-51 convention, forty-three were lawyers, thirty were farmers, and eight were physicians.[132] The remainder included businessmen, publishers, and members of the trades. Fifteen of the delegates were judges, and more than half had served in Congress or the General Assembly. The convention included a number of prominent men from both parties. On the Democratic side, some of the most notable included: William Medill, president of the convention, who served in the General Assembly, Congress, and as governor; Rufus Ranney, a Democrat who served on the Ohio Supreme Court; William Groesbeck, a well-known lawyer who later defended President Andrew Johnson at his impeachment trial; and Charles Reemelin, a German-born merchant who was a member of the legislature who was one of the most radical Democrats. On the Whig side, Peter Hitchcock served as state senator and as state supreme court justice for twenty-eight years; Joseph Vance was Ohio's first Whig governor; and Henry Stanbery, who served as Ohio's first attorney general, as Attorney General of the United States, and with William Grosbeck as counsel for President Andrew Johnson during the latter's impeachment trial.[133]

The convention also had its share of delegates who, in the words of historian C. B. Galbreath, "would probably not have recognized a state constitution had it come walking up the principal street of the capital city."[134] The delegates spent much of the early days of the convention on a "silly discussion" over the form of the oath to be taken by the delegates, a dispute over inviting clergy to offer a prayer, and a partisan debate over the hiring of a printer.[135]

As with the 1802 convention, the delegates to the 1850-51 convention performed most of their work in committee. On May 14, 1850, the president of the convention appointed members to eighteen standing committees, sixteen of which were responsible for drafting the various articles of the constitution.[136] The general practice of the convention was for the standing committees to submit draft articles in the form of reports to the convention sitting as a committee of the whole. The delegates debated and amended the reports and then sent them back to the standing committees for further review. The standing committees would then send the reports to the convention where they were debated a second time before a final vote. Resolutions offered by delegates were generally referred to the appropriate standing committee but could also be considered on the convention floor where they could be amended, rejected, or substituted with new resolutions. This process often made it difficult for delegates to know exactly what was under consideration at a particular time.[137]

---

of Ohio," 109.

132. Randall & Ryan, History of Ohio, vol. IV, 112.

133. See McDonald "Study of Constitution Making," 75-84.

134. C. B. Galbreath, Constitutional Conventions of Ohio (Columbus: Stoneman Press, 1911), 23-24.

135. Ibid., 24-25; see also Patterson, "The Constitutions of Ohio," 33.

136. Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Ohio, 1850-51, vol. 1 (1851) 55 (hereinafter 1850-51 Debates).

137. See Patterson, "The Constitutions of Ohio," 32-33.

Political differences between Whigs and Democrats surfaced early and led to increasingly partisan debates by the end of the convention. In general, the Whigs, who either opposed or at best halfheartedly supported the convention, favored modest changes to the existing constitution.[138] The Democrats, who were the driving force behind the convention, supported broad reforms and ultimately a new constitution. At the center of the dispute between Whigs and Democrats were economic and financial issues. The Democratic Party was dominated by Jacksonians who shared a general distrust of corporations, especially banks. They were willing to restrict the legislature's power over fiscal matters and special legislation that benefited corporations, but they also wanted to give the legislature an unqualified power to repeal special privileges and benefits granted to corporations The more radical anti-bank Democrats or "Locofocos," who controlled a majority of the party, also wanted a ban on all banks and a prohibition on the circulation of paper money. The Whig Party, on the other hand, was aligned with powerful financial and business interests, and most Whigs defended the existing economic order. Whigs fought especially hard against the repeal of special benefits for corporations. They considered corporate charters to be inviolable contracts that could not be abridged by legislative action.[139]

The Democrats had a strong majority and had they been united as a party they could have forced whatever reforms they wanted through the convention. A number of conservative Democrats, however, joined Whigs to defeat the more radical economic proposals supported by a majority of their party.[140] Nonetheless, there was enough support among Democrats (and some Whigs) for the moderate and radical Democrats to achieve most of their economic goals, including constitutional provisions restricting the power of the legislature to tax, to incur debt, and to pass special legislation.

### Elections, Suffrage, and the Status of African Americans

The views of former President Andrew Jackson also influenced the debate on elections and suffrage. The Jacksonian principle of popular democracy [141] led to a general agreement on the need to provide for the election of judges and other government officials and on the elimination of the tax requirement on voting.

While universal manhood suffrage for whites passed without debate,[142] the delegates bitterly debated the status of African Americans. Slavery was not at issue, but suffrage and equal

---

138. McDonald, "Study in Constitution Making," 81.

139. See generally Eugene H. Roseboom., The Civil War Era: 1850-1873, vol. IV of Carl Wittke, ed., The History of the State of Ohio (Columbus: Ohio State Archaeological and Historical Society, 1944), 124-34.

140. McDonald, "Study in Constitution Making," 81.

141 See generally Arthur M. Schlesinger, Jr., The Age of Jackson (Boston: Little, Brown, and Company, 1945).

142. 1850-51 Debates.

rights for African Americans aroused some of the strongest feelings at the convention. Some delegates even objected to the receipt of petitions supporting African American rights, especially petitions from African Americans themselves. William Sawyer of Auglaize County, the most outspoken opponent of civil and political rights for African Americans, found such petitions "revolting" and refused to "permit even his fellow citizens to petition that negroes shall be entitled to all of the privileges and immunities of white men, without raising his voice against it."[143] Sawyer believed that blacks were an inferior race, that slavery had benefited blacks, and that the principle espoused in the Declaration of Independence that all men were created equal only applied to the Anglo Saxon race.[144] He also predicted "bloodshed" and "persecution" if African Americans were permitted to vote.[145] Another delegate, Simeon Nash of Gallia County, argued that given the public sentiment the delegates risked having the constitution defeated by the voters if they proposed a constitutional amendment allowing African Americans to vote.[146] By a final vote of 75 to 13, the proposal to remove the word "white" from the constitution failed with all of the votes favoring the petition coming from the Western Reserve.[147] The proposal to remove "male" from this section fared no better. Meeting strong opposition, the proposal failed 72 to 7, again with only delegates from the Western Reserve voting in favor of the proposal.[148]

Sawyer's extreme views may not have been shared by a majority of delegates, but there is no question that there was strong anti-black sentiment at the convention and in many parts of the state. In fact, the convention received petitions not only in opposition to suffrage and equal rights for blacks but also in support of both a ban on black immigration into Ohio and for funds for colonization of blacks to create, in effect, an "Ohio in Africa."[149] James Worthington, a delegate and the son of Thomas Worthington, agreed with the observation that "at the time of the Revolution there was less prejudice against the black race than there is at present" and in the future it was likely that "the longer the two races occupy the same soil, the greater will be their revulsion and the stronger the prejudice."[150]

Most of the opposition to African American rights came from the southern counties along the Ohio River, although there were also strong anti-black feelings in the western part of the state.[151] In contrast, the greatest support for African American rights came from the Western Reserve. Norton Townshend, S. J. Andrews, and Reuben Hitchcock, delegates from Lorain and Cuyahoga counties, advocated the removal of racial discrimination in voting by excluding the

---

143. Ibid., vol. 1, 31, 56.

144. Ibid., vol. 1, 56-57.

145. Ibid., vol. 2, 638; Frank U. Quillin, <u>The Color Line in Ohio: A History of Race Prejudice in a Typical Northern State</u> (New York: Negro Universities Press, 1913), 79.

146. <u>1850-51 Debates</u>, vol. 2, 553; Quillin, <u>The Color Line in Ohio</u>, 80-81.

147. <u>1850-51 Debates</u>, vol. 2, 554, 556; Quillin, <u>The Color Line in Ohio</u>, 81.

148. <u>1850-51 Debates</u>, vol. 2, 555; Terzian, "Effusions of Folly," 212.

149. Terzian, "Effusions of Folly," 183-84.

150. <u>1850-51 Debates</u>, vol. 2, 639.

151. <u>See</u> Terzian, "Effusions of Folly," 194-99.

word "white" from the suffrage section.  Townshend introduced the amendment to remove the word "white" and argued forcefully that to deny African Americans the right to vote was "unjust," "anti-democratic," and "impolitic."[152]  Hitchcock maintained that including the word "white" in the constitution violated the equality of men, "that great principle upon which our government is based," and was "hostile to everything that elevates and dignifies the name of man."[153]

The vote to remove the word "white" from the section on voter qualifications failed by a vote of 66 to 12.[154]  Following this vote, James Taylor of Erie County moved to amend the section by allowing the legislature "to extend the right of suffrage to inhabitants of this State not hereby qualified as electors." Taylor's amendment was defeated 68 to 11.[155]  Thus, the convention ensured not only that suffrage would be limited to whites but that the legislature could do nothing about it.  African Americans, however, would be counted for the purpose of apportionment.[156]

The delegates also rejected a motion to remove the word "white" from the article on the militia by a vote of 66 to 22.[157]  The state militia would consist only of white males.  A vote to insert the word "white" before "children" in the section requiring the General Assembly to "secure a thorough and efficient system of common schools, free to all children of the State" apparently passed but would have no effect since the delegates later voted to delete all language in the section after the phrase "common schools."[158]  The delegates, however, rejected the amendments to ban immigration and to support the colonization of African Americans, although these amendments received more votes than the amendment for African American suffrage.  As with suffrage, immigration and colonization generated heated debates.[159]  The amendment to ban immigration met with so much opposition, including from opponents of African American rights who pointed out that such a ban had been tried under the Black Laws for forty years and failed and would likely violate the U.S. Constitution, that it was withdrawn.  In its place, proponents of the anti-immigration policy moved to add a section allowing the legislature to discourage the immigration of blacks "consistent with the Constitution of the United States."  This motion failed by a vote of 58 to 39.[160]  Once it was recognized that there would be no ban on immigration, the amendment to finance the colonization of blacks lost supporters, and colonization failed by a

---

152.  1850-51 Debates, vol. 2, 550-52; see also Terzian, "Effusions of Folly," 206-09.
153.  Ibid., vol. 2, 552
154.  The final vote was 75 to 13; ten members were absent during the original vote, and later nine of them cast their vote against African American suffrage.  Terzian, "Effusions of Folly," 210.
155.  Ibid., vol. 2, 555-56.
156.  See Quillin, The Color Line in Ohio, 82.
157.  1850-51 Debates, vol. 2, 350.
158.  See Quillin, The Color Line in Ohio, 83-84.
159.  See Terzian, "Effusions of Folly," 212-24.
160.  1850-51 Debates, vol. 2, 604.

vote of 71 to 26.[161]

Compared to the debate on African American suffrage, there was hardly any debate on women's suffrage at the convention, but the proposal for women's suffrage met the same fate. Notwithstanding an active women's suffrage movement outside the convention and the receipt of petitions signed by hundreds of women, the delegates overwhelming rejected an amendment to remove the word "male" by a vote of 72 to 7.  Again, the only votes in support came from the Western Reserve delegation. [162]

### Other Reforms

Besides rejecting suffrage for African Americans and women, the delegates also rejected other reforms, including proposals to ban capital punishment and to prevent a home from being taken by creditors.  Both these proposals, however, garnered more votes than either African American or women's suffrage.  The proposal by the select committee on capital punishment to abolish capital punishment would have added the following section to the constitution:  "Human life shall ever be held inviolate. The true object of punishment being, in addition to the security of society, to reform and not to exterminate mankind; human life shall never be taken as a punishment for crime, but the highest punishment inflicted for crime shall be imprisonment during life in the state penitentiary."[163]  But the delegates tabled indefinitely the committee's recommendation, thus effectively defeating the proposal, though it did receive thirty-four votes.[164]  The proposal guaranteeing the right to a home, introduced by J. McCormick of Adams County, provided that: "Each family is entitled to become and be possessed of a home, which shall be exempt from sale, for the payment of debts or discharge of liabilities arising from contract."  McCormick's amendment failed by a vote of 60 to 31.[165]

### Convention and Electoral Approval

On March 10, 1851, the convention adjourned.  Unlike the first convention, not all delegates supported the final document.  The new constitution passed by a vote of 79 to 14 with 13 Whigs and one Free Soiler voting against it.[166]  Also, in contrast to the 1802 convention and not required to do so by the 1802 Constitution, the 1850-51 convention decided to submit the new constitution to the people for approval.[167]  The delegates also agreed to submit the question

---

161.    Ibid., 598, 605.

162.    Terzian, "Effusions of Folly," 186-93, 210-12.

163.    1850-51 Debates, vol. 2, 20.

164.    Ibid., vol. 2, 34.

165.    Ibid., vol. 2, 471, 475.

166.    Ibid., vol. 2, 870.

167.    After the approval of a convention by the electorate, the General Assembly as part of the legislation organizing the convention enacted a statutory requirement that the new constitution be submitted to the voters for their adoption or rejection, Laws of Ohio, vol. 48,

31

of whether the General Assembly could license the traffic in intoxicating liquor to the voters on a separate ballot. The liquor question was one of the most divisive at the convention. More than twenty thousand Ohioans signed petitions opposed to the traffic in liquor.[168] The delegates opposed to trafficking in liquor, however, were divided between those who favored licensing so that it could be regulated and those who supported an outright ban and opposed licensing because they believed it made liquor, a social evil, respectable.

On June 17, 1851, the Ohio electorate voted on whether to support the new constitution. As with the vote leading to the convention, the campaign and vote for ratification generally followed party lines. Democrats supported the constitution, while most Whigs and most of the Whig press opposed it. The voters approved the new constitution by a close vote of 125,564 to 109, 276.[169] The new constitution went into effect on September 1, 1851 and remains the fundamental law of Ohio. On the separate ballot on licensing traffic in intoxicating liquor, 104,255 voted yes and 113,237 voted no, but under the strange wording of the proposition this vote resulted in the adoption of Art. XV, section 9, prohibiting the granting of licenses to traffic in intoxicating liquors.[170]

**The Constitution of 1851**

The 1850-51 convention produced a document radically different form Ohio's first constitution. The 1851 Constitution contains 3,000 more words than the 1802 Constitution and nine new articles for a total of sixteen articles, one less than the current version.[171] The new articles adopted in 1851 dealt with Education (Art. VI), Public Institutions (Art. VI), Public Debt and Public Works (Art. VIII), County and Township Organizations (Art. X), Apportionment (Art. XI), Finance and Taxation (Art. XII), Corporations (Art. XIII), Jurisprudence (Art. XIV), and Amendments (Art. XVI). The 1850-51 convention also reordered the document by bringing the Bill of Rights, which was the final article in the 1802 Constitution, to the beginning of the new constitution.

The most sweeping changes to the 1802 Constitution involved the powers of the General Assembly. The 1802 Constitution reflected a view of the legislature as the embodiment of popular democracy and ideally as subject to as few restrictions as necessary to implement the public will. Over the course of five decades under the first constitution, however, the people

---

p.29, section 7 (Feb. 22, 1850), a provision that may not have been binding on the convention. See McDonald, "Study in Constitution Making," 74.

168. Ibid., 74.

169. Patterson, "The Constitutions of Ohio," 109.

170. Schedule, 1851 Ohio Constitution.

171. Patterson, "The Constitutions of Ohio," 38. The 1851 Constitution dropped Article VI on Civil Officers, and in 1915 and 1912 respectively, the electorate adopted Article XVII on Elections and Article XVIII on Municipal Home Rule. Article XIV on Jurisprudence was part of the 1851 Constitution, but the voters eliminated it in 1953.

began to see the legislature as the source of many, if not most, of the problems of government, and the new constitution reflected this general distrust of legislative power.

The 1851 Constitution curtailed legislative power in three principal ways. First, the new constitution took the appointment power away from the General Assembly. All key executive branch officers became elected officials, as did all judges.

Second, in a victory for Jacksonian Democrats, the 1851 Constitution contained a number of provisions limiting the power of the legislature to enact economic and special legislation. Article I, section 2 prohibited the General Assembly from granting special privileges and immunities that could not be altered or repealed. Article XIII on Corporations contained a number of sections limiting the legislature's power to grant special powers and privileges to corporations. Section 1 of that article provided that the legislature "shall pass no special act conferring special corporate powers." Section 2 required corporations to be formed under the general laws, thereby effectively prohibiting the incorporation of private and municipal corporations by special acts. Section 3 imposed personal liability on stockholders, satisfying one of the main objectives of the Democratic agenda. Section 4 subjected corporations to the same taxation as individuals, and section 7 prohibited the General Assembly from enacting laws "authorizing associations with banking powers" without a referendum. The article on Finance and Taxation, Article XII, required taxation by uniform rule, which meant that all property had to assessed at its true value in money and required the General Assembly to pass laws taxing banks.

Article VIII on Public Debt and Public Works addressed problems associated with the state debt. Article VIII limited the legislature's plenary power to incur debt and to finance internal improvement projects. Sections 1 through 3 of Article VIII set a maximum limit of $750,000 on the total amount of debt the state could carry annually from deficits or revenue failures except in times of emergency. Other provisions of Article VIII established a sinking fund to pay off the existing state debt and prohibited the state from financing or entering into joint ventures with private corporations. Section 7 of Article XII contained perhaps the most drastic response to the debt resulting from internal improvements. It prohibited the General Assembly from incurring any debt for internal improvements.

Third, the 1851 Constitution limited the power of the legislature to apportion house and senate districts. Article XI on Apportionment addressed the problems of gerrymandering by establishing a system of districting seats for the General Assembly based on county lines and a "population ratio" calculated by taking the state's population, as determined every ten years by the national census, and dividing by one hundred. The result was an apportionment formula that drastically limited the power of the majority party to draw legislative districts. Article XI, however, did not apply to U.S. Congressional districts and thus gerrymandering at that level continued. The new constitution also dealt a serious blow to the system of political patronage by limiting the legislature's power to form new counties and thus create new offices. Article II, section 30 required new counties to contain at least 400 square miles and required the consent of the residents of existing counties before a new county could be formed.

Besides these restrictions on legislative power, the new constitution required that compensation for legislators be fixed by law to eliminate the practice of prolonging legislative sessions to increase compensation. Finally, the new constitution established biennial sessions for

both houses of the General Assembly to cut down on needless legislation that was often rushed through at the end of each legislative session.[172]

The 1851 Constitution also brought significant changes to the judicial branch. These changes addressed the inefficiency of the court system, especially at the supreme court level, and sought to make the judiciary independent of the legislature.

To alleviate the backlog of cases, the new constitution restructured the judiciary. It vested the judicial power of the state in a supreme court, district courts, courts of common pleas, probate courts, justices of the peace and other inferior courts that the General Assembly could create. The new constitution established a five judge supreme court with original jurisdiction limited to habeas corpus proceedings and special writs and with appellate jurisdiction "as may be provided by law" (Art. IV, section 2). In effect, this provision made the supreme court primarily a court of final review. The new constitution also divided the state into nine common pleas districts and created, for the first time, intermediate appellate courts called "district courts." These intermediate appellate courts consisted of one supreme court judge and the judges of the courts of common pleas within the district with a quorum consisting of any three judges. One district court was assigned to each of the nine common pleas districts and each exercised appellate jurisdiction over the decisions of the courts of common pleas. In addition, the constitution mandated the creation of a probate court for each count to hear probate matters that were previously heard in the common pleas courts.

The most important change in the judicial article removed judicial selection from the General Assembly by providing for the at large election of supreme court justices. The decision to have judges elected rather than appointed followed the trend of most states that were revising their constitutions at that time.[173] The election of judge's, however, did not come without debate. The opponents of an elective system argued that such a system would destroy any sense of merit and would lead to the election of "sons of the wealthy and well-born" who were politically connected.[174] Other delegates argued that supreme court justices should be elected by district rather than by the state at large. Their fear was that the justices would all be elected from the party that had control of the state, but ultimately, the proponents of statewide elections prevailed.[175]

--------

172.    The adoption of biennial sessions did not sit well with legislators. Beginning in 1855, the General Assembly adjourned for the entire second session, and in 1857 and 1859 proposed constitutional amendments to allow for annual sessions. Although the voters did not approve these amendments, the General Assembly continued its practice of adjourning after the first session until 1895. See Patterson, "The Constitutions of Ohio," 22, 162, 169.

173.    See Francis R. Aumann, "The Selection, Tenure, Retirement and Compensation of Judges in Ohio," 5 U. Cin. L. Rev. 408 (1931): 410 n.5.

174.    1850-51 Debates, vol. 2, 353; see Frederick Woodbridge, "A History of Separation of Powers in Ohio: A Study in Administrative Law," 13 U. Cin. L. Rev. 191 (1939): 223-24.

175.    1850-51 Debates, vol. 1, 585.

Despite these changes, the constitution did not solve all the problems confronting the judiciary. While the popular election of judges insulated the judiciary from the legislature, it did not diminish the influence of political parties. The constitution allowed judges to be nominated by party caucuses or conventions and to run for election on party tickets.[176] The creation of intermediate appellate courts—the district courts—failed to stem the increasing docket of the supreme court or to lessen the court's burdens and became "only a halting place for cases on their way from the Common Pleas Court to the Supreme Court."[177] Moreover, the new constitution still required supreme court justices to ride circuit as district court judges since district courts were required to hold court in at least three places in their respective districts each year (1851 Const, Art. IV, section 5). The situation worsened to the point that the General Assembly in 1857 proposed a constitutional amendment that would have eliminated the requirement that supreme court justices sit as district court judges. When this amendment failed, the supreme court simply ignored the constitutional provision upholding, without discussion, the constitutionality of a district court without the presence of a supreme court justice (King v. Safford, 1869).[178]

The 1851 Constitution added the offices of lieutenant governor, auditor, treasurer, and attorney general to the executive branch, which under the first constitution consisted only of the governor and the secretary of state, but the executive branch remained the weakest of the three branches. There was some debate over giving the governor veto power, including a proposal that would have allowed the legislature to override a veto by a simple majority vote, but this was more of an attempt to prevent "hasty and ill-considered legislation" rather than make the executive a co-equal branch of government.[179] The attitude towards a powerful executive in 1851 had changed only slightly since 1802. One delegate remarked that even a qualified veto would jeopardize the adoption of the new constitution.[180] In the end, the opponents of an executive veto prevailed, and the office of the governor remained basically the same.

The Bill of Rights generated little debate at the 1850-51 convention. Most of the provisions were adopted by the convention with little or no change from the committee report. One exception was the second part of Article I, section 2, concerning the power of the legislature to amend or repeal special privileges and immunities. The debate on that provision, which implicated corporate charters, lasted more than a month (See Commentary, Art. I, section 2). Overall, the new constitution reorganized the Bill of Rights and reworded many of its provisions but made only a few substantive changes. Imprisonment for debt was restricted to cases involving fraud, and juries were required to determine compensation in cases where property was

---

176.    Aumann, "The Selection of Judges," 411-12.

177.    Patterson, "The Constitutions of Ohio," 25.

178.    See Warren Cunningham, "The Judiciary in Ohio," 20 U. Cin. L. Rev. 239 (1951): 246.

179.    1850-51 Debates, vol. 2, 292-93; see also ibid., vol. 1, 310-11; McDonald, "Study of Constitution Making," 133-35.

180.    1850-51 Debates, vol. 2, 293.

taken for public use. In addition, the 1851 Constitution replaced the prohibition against discriminating against the poor in education (1802 Const., Art. VIII, section 25; see Commentary, Art. VI) with a new article on education requiring the state to establish "a thorough and efficient system of common schools." (Art. VI, section 2).

Article XVI of the new constitution addressed the ways to amend the constitution. The 1802 Constitution could only be amended through a constitutional convention recommended by two-thirds of the members of the General Assembly and approved by a majority of all electors voting at the election. The new constitution retained the ability to use a constitutional convention to begin the process of amending the constitution but included three significant changes in the process of proposing and approving constitutional amendments.

First, the new constitution required that the question of whether to hold a constitutional convention be submitted to the voters every twenty years. Second, the new constitution gave the General Assembly the power to propose constitutional amendments through a three-fifths vote. Third, unlike the policies under the 1802 Constitution, amendments to the 1851 Constitution and proposed new constitutions had to be approved by the electorate. However, the new constitution provided that amendments proposed by a constitutional convention would take effect if approved by a majority of those voting on the particular amendment, but that amendments proposed by the General Assembly would only become effective if approved by a majority of those voting at the election rather than a simple majority on the proposition itself. This supermajority requirement for amendments proposed by the General Assembly became a serious limitation on constitutional revision and, along with the flawed judicial article, led to the call for a third constitutional convention in 1871.

## THE 1873-74 CONSTITUTIONAL CONVENTION

Various interests converged in 1871 for the twenty-year vote on the question of holding a convention.[181] Both the liquor industry and the temperance movement wanted to revisit the liquor question. Corporate interests favored an end to unlimited shareholder liability, and railroad companies sought special privileges. Opponents of corporate power wanted stricter regulations on corporations and railroads. The women's suffrage movement lobbied to have the elective franchise opened, and the legal profession (with public support) pushed for changes to the judicial article.[182]

The need to revise the judicial system was probably the chief reason for calling a convention. By this time, "the supreme court was four years in arrears with its work and that with all diligence on the part of the judges the law's delays were destined to become more vexatious and expensive."[183] Besides the general recognition that the judicial article had to be revised, both the Democratic and Republican parties agreed that a convention was needed

---

181. See Galbreath, "Constitutional Conventions of Ohio," 32-34.
182. Ibid.
183. Galbreath, "Constitutional Conventions of Ohio," 34.

36

because of the continued difficulty in amending the constitution. The voters had not approved any of the seven amendments proposed by the General Assembly between 1851 and 1871, although six of the seven received a majority vote of those voting on the particular amendment (Schedule B). Thus, these six amendments would have been approved but for the requirement that proposed amendments had to be approved by a majority of those voting at the election. With the support of both parties, the voters on October 10, 1871 approved the call for a convention by a vote of 267,618 to 104,231.

One hundred and five delegates convened in Columbus on May 13, 1873, and continuing in Cincinnati, the convention adjourned one year later on May 15, 1874. The delegates initially elected Morrison Waite as president, but President Ulysses S. Grant appointed him Chief Justice of the U.S. Supreme Court. The convention then elected Rufus King to the position.[184]

Republicans dominated the convention, as they had Ohio politics since the Civil War, but there was little sign of partisan politics. More than either of the first two conventions, the 1873-74 Convention was dominated by lawyers and labeled a "lawyers' convention."[185] In keeping with the label, the convention produced a record much longer than even the 1850-51 convention. The record of the proceedings and debates covers more than 4,800 pages, and the proposed constitution contained more than 15,000 words, more than two and a half times longer than the 6,700 word 1851 Constitution.[186]

The proposed constitution addressed the two major areas of concern, the judiciary and the amendment process. The most innovative proposed amendment to the judicial article was a section that would have established a commission of supreme court justices whose terms expired in 1874 to assist the supreme court in deciding cases.[187] Regarding the process of amending the constitution, the convention proposed an amendment that would have required a three-fifths vote of the General Assembly to call a constitutional convention rather than the two-thirds vote necessary under the 1851 Constitution. Most importantly, the convention also proposed eliminating the supermajority requirement in favor of a simple majority vote to adopt proposed amendments. The delegates, however, proposed dispensing with the mandatory vote every twenty years on whether to call a convention.

The convention also proposed to give the governor veto power, which could be overridden by a three-fifths vote of both houses; to require a separate vote recording the yeas and nays on any appropriation item if requested by a legislator; and to prohibit anyone interested in a state contract from becoming a member of the General Assembly. To lessen powerful corporate

---

184. Patterson, "The Constitutions of Ohio," 176.

185. Patterson, "The Constitutions of Ohio," 36. The proposed Constitution of 1874 is reprinted in Patterson, "The Constitutions of Ohio," 182-236.

186 Ibid., 38.

187. Proposed 1874 Ohio Constitution, art. IV, section 4. The proposed provision would have also allowed the General Assembly to authorize the governor to appoint other such commissions if requested by the supreme court. Proposed 1874 Const., art. IV, § 4; see Patterson, "The Constitutions of Ohio," 199.

37

interests, the convention proposed to allow the General Assembly to "prevent unjust enrichment" by corporations, to prohibit railroads from imposing excessive fees, and to pass regulations providing for the health and safety of miners. The convention decided to allow cumulative voting in elections for corporate directors, and to allow cumulative voting in the two largest counties—at that time Hamilton and Cuyahoga Counties.[188] On race and gender issues, the convention proposed removing the word "white" from the voter qualification section to make it consistent with the recently ratified Fifteenth Amendment to the U.S. Constitution, which guaranteed African Americans the right to vote, and from the militia section, but it defeated a proposal to remove the word "male" and thus grant women the right to vote. As a small consolation, the convention proposed that women be permitted to hold any school office other than state commissioner of public schools.[189]

The proposed constitution was much more detailed than the existing constitution and contained a number of popular reforms, but it also included enough divisive provisions that "[a] great number of interests were displeased with one part or another of it, and it needed no prophet to foretell its defeat at the hands of the electors."[190]

Following the approach used in 1851 to separate the vote on the proposed constitution from the vote on the liquor issue, the convention had sought to improve the electoral prospects for the new constitution by having the voters vote separately on controversial proposals: (1) to assure minority party representation on the supreme and circuit courts; (2) to allow the General Assembly to provide aid to railroads; and (3) to prohibit the granting of licenses to traffic in liquor.[191] Nonetheless, the presence of these provisions (the first two of which were rejected overwhelmingly by the voters) dealt a fatal blow to the entire document. Interest groups that opposed these proposals urged their defeat as well as the defeat of the proposed constitution. For example, prohibitionists voted "in mass" not only against the proposal to allow liquor licensing but also against the entire constitution "for fear that was the only way to defeat licens[ing]."[192] Finally, the convention took so long to complete its work that whatever interest the press and public had in a new constitution faded.[193] Thus, due to a lack of interest, confusion, and misinformation, the proposed constitution of 1874 was rejected by a vote of 250,169 to 102,885.[194]

---

188.  Proposed 1874 Const., art XIV, section 12; Patterson, "The Constitutions of Ohio," 223.

189.  Proposed 1874 Const., art. VI, section 3; Patterson, "The Constitutions of Ohio," 206.

190.  Patterson, "The Constitutions of Ohio," 37.

191.  See Patterson, "The Constitutions of Ohio," 232-36. See also Appendix B.

192.  Patterson, "The Constitutions of Ohio," 347-48 (quoting The Ohio State Journal, August 20, 1874).

193.  Swisher, Ohio Constitution Handbook, xxviii.

194.  Patterson, "The Constitutions of Ohio," 176.

38

## FROM 1874 TO THE 1912 CONSTITUTIONAL CONVENTION

After the rejection of the proposed 1874 Constitution, Ohio would not have another constitutional convention for nearly forty years. In 1891, under the mandatory twenty-year vote, the voters rejected a proposal to hold a convention by a vote of 161,722 to 99,789.[195] And in 1897, the Ohio Supreme Court rejected an attempt by the General Assembly to propose a constitutional convention by joint resolution, because the proposal included changes to the state election law that were "so intimately connected with the recommendation for calling a convention" that they could not be made by joint resolution (State ex rel. Attorney General v. Kinney, 1897).

During this almost forty year period between constitutional conventions, many of the issues that had been addressed at the 1873-74 Constitutional Convention came before the voters as separate proposals, but in this period they approved only eleven amendments while rejecting nineteen (though thirteen of these failed because of the supermajority requirement).

Taxes were the subject of a number of proposed amendments during this period. The Constitution of 1851 established a uniform tax structure that required both real and personal property to be assessed alike according to their true value in money. The uniform rule sought to make the tax system more equitable by treating real and personal property the same, but valuation problems, the willingness of people to conceal their property, and the lack of serious enforcement produced some absurd results. For example, in 1910 Hamilton County, which includes Cincinnati, with a population of over 460,000 but recorded less money deposits in that year than Darke County with a population of less than 43,000.[196]

Notwithstanding concerns about the equity of the tax system, the voters did not approve any of the five amendments proposing some form of non-uniform classification.[197] In fact, the only tax amendment that the voters approved during this period was one exempting state, local, and school bonds from taxation in 1905. Still, concerns about the uniform rule continued to arouse controversy and played a role in the movement for a constitutional convention in 1912.

Taxation was not the only subject of multiple proposals during this period. Problems of inefficiency and overcrowded dockets had long plagued the Ohio court system, and the General Assembly proposed four amendments concerning the courts in the ten years following the 1873-74 convention. In 1875, for example, to help the supreme court deal with its backlog of cases the

---

195. Appendix A. The proposal to hold a convention received less than one-eighth of the 803,328 total votes cast (see Patterson, "The Constitutions of Ohio," 269) and thus fell far short of the requisite "majority of all the electors voting at said election" required under Article XVI, section 2.

196. Lloyd Sponholtz, "Progressivism in Microcosm: An Analysis of the Political Forces at Work in the Ohio Constitutional Convention of 1912," (Ph.D. dissertation, University of Pittsburgh, 1969), 85-86.

197. But see Patterson, "The Constitutions of Ohio," 23 (counting seven rejected tax classification amendments).

voters approved an unusual amendment that authorized the governor with the advice and consent of the Senate to appoint a five-member commission that had the same power as the supreme court to decide cases.[198]  Designed as a temporary measure, the commission had a three-year term from 1876 to 1879, but the constitutional provision, Art. IV, section 22, remains part of the current constitution, and the General Assembly, which also approved the use of the commission for two years in the 1880s, retains the power to create such commissions.[199]

Other changes in the court system proved difficult to achieve.  In 1877 and 1879, the voters rejected constitutional amendments concerning the organization of the courts, and in 1878 the Ohio Supreme Court held unconstitutional legislation that had authorized the court to assign three common pleas judges in each district to serve as the district court, thus creating an intermediate appellate court composed of judges without trial court responsibilities (In the Matter of the Assignment of Judges to Hold District Courts, 1878).  Finally, in 1883 the voters approved an amendment that replaced the district courts with a new system of appellate courts, the circuit courts.  The amendment also permitted the Ohio Supreme Court, with the approval of the General Assembly, to split itself into two divisions of three justices each to hear and decide cases.[200]  Despite these efforts, calls for judicial reform and concerns about the court's docket remained part of the political agenda in the years leading to the 1912 convention .

The most significant amendment adopted during this period changed the balance of power among the branches of government by giving the governor a veto power that included the power to line item veto provisions in appropriation bills.  Legislative supremacy had been somewhat tempered by the 1851 Constitution, but efforts to give the governor the veto power were not successful.  The 1874 proposed constitution included an amendment that would have given the governor veto power, but it failed with the rest of the constitution.  Finally, with the support of both the Democratic and Republican Parties, the voters in 1903, one hundred years after statehood, approved a constitutional amendment giving the governor the power to veto acts of legislation.

Among the other proposals that the voters approved were three amendments in 1885 changing the election day to the first Tuesday after the first Monday in November for various state and local officials to conform to the federal election day, an amendment in 1885 concerning the terms of township officers, an amendment in 1905 concerning the terms of state and local elected officials and the filling of vacancies, an amendments in 1903 giving each county at least one representative in the Ohio House of Representatives, and a provision affecting stockholder liability in 1903 (Appendix B).

Amendments rejected during this period included in addition to the five on tax classifications and the two on the courts included two involving liquor, three involving election dates, two involving apportionment, one involving the classification of cities, one involving biennial elections for various state and local officials, one involving biennial sessions of the

---

198.    The proposed  Constitution of 1874 had included a similar amendment.
199.    See Swisher, Ohio Constitution Handbook, xxix.
200.    Patterson, "The Constitutions of Ohio," 250-53.

General Assembly, one involving the override of vetoes, and one that would have imposed a special tax on dogs allowing them to be confiscated and killed if the tax was not paid.[201]

Notwithstanding the adoption of some important amendments, the 1851 Constitution remained difficult to amend because of the supermajority requirement. Of the thirty-seven amendments that the General Assembly submitted to the voters between 1851 and the 1912 Constitutional Convention (excluding the three proposed amendments submitted to the voters with the proposed 1874 Constitution and for which the supermajority requirement was inapplicable), the voters approved only eleven. Of the twenty-six that failed, nineteen received a majority of votes but not a majority of votes cast in the election and thus failed as a result of the supermajority requirement. See Appendix B (noting the amendments that failed under the supermajority requirement).

The introduction of the Australian ballot in 1891 compounded the problem, as political parties supporting constitutional amendments were no longer able to have the "yes" part of the party ticket count as support for the amendment, and the great majority of voters voting straight party tickets overlooked the marking of a vote for the amendment.[202]

In 1902, the General Assembly passed an act that allowed political parties to place issues on the ballot in such a way that a straight party vote automatically counted as a vote for the proposed amendment. The Ohio Supreme Court approved this voting procedure (State ex rel. Sheets v. Laylin, 1903), and in 1903 and 1905 the voters approved five of the eight amendments presented to them under it, including the amendment giving the governor the veto power.[203] However, the repeal of the law permitting party endorsements in advance of the 1908 vote on still another taxation amendment doomed that amendment.[204] Thus, apart from this short period, the voters added relatively few amendments to the 1851 Constitution, but in 1912 the pace of constitutional change in Ohio was about to accelerate rapidly.

Some of the impetus for a constitutional convention came from the courts. During the latter part of the 19th and the first decade of the 20th century, the Ohio Supreme Court became more willing to exercise its power of judicial review to strike down legislative enactments, especially those involving the health, safety, and economic security of Ohio's working people.

- In 1895, the court held unconstitutional an act imposing a a direct inheritance tax because it exempt estates not exceeding $20,000 in value and taxed larger estates at a higher rate (State ex rel. Schwartz v. Ferris, 1895).

In 1896 the court invalidated legislation that allowed subcontractors and laborers who did not contract with property owners to place mechanic's liens on the owners' property Palmer v.

---

201.  Ibid., 237-95 (full text of proposed amendments between 1875 and 1908).
202.  Ibid., 24.
203.  See Walter F. Dodd, The Revision and Amendment of State Constitutions (New York: Da Capo Press, 1970), 194-97.
204.  Patterson, "The Constitutions of Ohio," 25.

<u>Tingle,</u> 1896).

- In 1897, the court held unconstitutional the Torrens system of land registration, which was designed to simplify the transfer of real estate (<u>State ex rel Attorney General v. Guilbert</u>, 1897).

- In 1898, the court struck down an act that regulated the sanitary construction of house drainage and plumbing because it required some but not all plumbers to obtain a license (<u>State v. Gardner</u>, 1898).

- In 1901 the court struck down an act providing pensions for school teachers because it took property from one citizen for the benefit of another (<u>Hibbard v. State</u>, 1901).

In 1902 the court held unconstitutional the eight-hour work day on public works (<u>City of Cleveland v. Clements Bros. Construction Co.</u>, 1902).

- In 1902, the court struck down an act designed to protect life and property against injury or damage, resulting from the operation of steam engines and boilers by incompetent engineers (<u>Harmon v. State</u>, 1902).

- In 1902, the court held unconstitutional city charters because they constituted local legislation (<u>State of Ohio ex rel. Knisely v. Jones</u>, 1902).

- In 1906, the court invalidated an act to provide up to $25 quarterly in relief for the worthy blind on the ground that law required the expenditure of public funds raised by taxation for a private purpose (<u>Auditor of Lucas County v. State ex rel. Boyles</u>, 1906).

- In 1909. the court held that the use of voting machines violated the requirement of Article V, section 1 that "[a]ll elections shall be by ballot." (<u>State ex rel. Karlinger v. Board of Deputy State Supervisors of Elections</u>, 1909).

Finally, the court's 1912 decision upholding Ohio's optional workers' compensation statute by a thin 4-2 margin (<u>State ex rel. Yaple v. Creamer</u>, 1912) on the eve of the convention raised the concerns on the part of reformers who supported a compulsory program. The fact that the New York Court of Appeals in 1911 had invalidated that state's compulsory program on state constitutionals grounds (<u>Ives v. South Buffalo Railway Co.</u>, 1911) underscored the need to assure the existence of legislative power as did an opinion of the Attorney General that had called into question the authority of municipalities to insure public buildings and of the state to regulate insurance.[205]

---

205. <u>See</u> Sponholtz, "Progressivism in Microcosm," 116-20.

**THE 1912 CONSTITUTIONAL CONVENTION: CONSTITUTIONAL REVISION IN THE PROGRESSIVE ERA**

**The Progressive Movement and the Call for a Convention**

The decades following Reconstruction marked the beginning of the transformation from agrarian to modern society. The expansion of the railroads, technological innovation, and rapid industrialization brought great economic and social change, but along with the creation of enormous wealth, these years also saw the emergence of what seemed to be a permanent underclass, urban slums, and the worst depression the country had yet experienced. In the late nineteenth and early twentieth centuries, the inequalities of the "Gilded Age" gave rise to the Progressive Movement made up of diverse groups of social and political reformers. Progressives included political reformers, labor unions, prohibitionists, and a host of other groups, and although they were not unified by a specific social agenda or political party, they shared a common distrust of laissez-faire capitalism, unrestrained monopolies and the corrupt political machines of the era.[206]

Progressives were at the forefront of drives to revise state constitutions between 1900 and 1920 when thirteen states held constitutional conventions. In Ohio, the call for a constitutional convention was led by the Direct Legislation League, a group of urban Progressives headed by Herbert Bigelow, a Cincinnati minister and protégé of Cleveland mayor Tom L. Johnson, one of the state's first great Progressive leaders. The Direct Legislation League's principal goal was to give citizens more of a direct voice in government. Specifically, the League campaigned for the adoption of an initiative and referendum amendment that would allow citizens to sidestep the legislature (and thus powerful business interests) and directly petition the voters to enact new laws and to amend the constitution.

The call for a convention also drew support from conservative groups, the largest of which was the Ohio State Board of Commerce ("OSBC"). The OSBC opposed initiative and referendum as well as most of the other Progressive reforms, but it nonetheless supported the call for a convention to overhaul Ohio's tax system by repealing the constitution's uniform tax rule. The OSBC favored a classification system that would tax different property at different rates with the goal of reducing taxes on businesses and investments.[207] Finally, the liquor interests wanted the convention to approve an amendment that would permit the licensing of saloons.

A vote on whether to have a constitutional convention would normally have been held in 1911 under the mandatory twenty-year rule, but public support for a convention was so great that

---

206 <u>See</u> John Whiteclay Chambers II, <u>The Tyranny of Change: America in the Progressive Era, 1900-1917</u>, (New York: St. Martin's Press, 1980), 113; Arthur S. Link and Richard L. McCormick, <u>Progressivism</u>, (Arlington Heights, IL: Harlan Davidson, 1983), 3-4.

207. Hoyt Landon Warner, <u>Progressivism in Ohio, 1897-1917</u> (Columbus, Ohio State University Press, 1964), 295

on March 9, 1910, the Ohio General Assembly passed a bill allowing the voters to decide whether to have a convention at the upcoming election. Both the Democratic and Republican parties agreed that the selection of delegates would be non-partisan and that every straight party ticket would be counted as a vote for a convention.[208] With the support of the two major parties, the vote for a convention passed by a ten to one margin, 693,263 to 67,718. Commenting on this vote, Hoyt Warner noted that "[n]ever before in the sixty-year span has this date fallen at such a psychologically favorable time. There was a pent-up demand among various groups for such reforms as municipal home rule, legal protection of workers, improvements in court procedures, and woman suffrage."[209] Nonetheless, "the most insistent pleas for a constitutional convention came from three well-organized groups [the Direct Legislation League, the Ohio State Board of Commerce, and the liquor industry] dedicated to their own particular reform."[210]

**The Constitutional Convention of 1912**

The convention, dominated by Progressives, assembled in Columbus on January 8, 1912, with 119 delegates, including 62 Democrats, 52 Republicans, 3 Independents, and 2 Socialists.[211] The first few weeks were taken up mostly by speeches from notable Progressive leaders, including former President Theodore Roosevelt, perennial presidential candidate Williams Jennings Bryan, and Wisconsin's ex-governor, Senator Robert M. LaFollette. Despite the non-partisan election, controversy along political lines emerged over the selection of the convention's president with most Democrats favoring Herbert Bigelow. Although Bigelow was the front runner and eventually won the position, it took eleven ballots to elect him president.[212] Nonetheless, apart from the election of Bigelow, party politics seems to have played at best a minor role at the convention. "The real division was between conservatives and progressives, between 'those,' in the words of Macaulay, 'who cling to the past, distrusting change; and those who instinctively challenge precedent.'"[213]

---

208 See Robert E. Cushman, "Voting Organic Laws: The Action of the Ohio Electorate in the Revision of the State Constitution in 1912," Political Science Quarterly 28 (June 1913): 208.

209 Warner, "Progressivism in Ohio 1897-1917," 295.

210 Ibid.

211 The election was nonpartisan, and the delegates did not have to declare their party affiliation. As a result, there is no authoritative tally as to the party affiliations of the delegates, but the tally above comes from Sponholtz, "Progressivism in Microcosm," 37 & nn. 62-63. But see Galbreath, "Constitutional Conventions of Ohio," 59-60 (chart breaking down 119 delegates as follows: 63 Democrats, 49 Republicans, 2 Socialists, 4 Independents, and 1 Independent Republican).

212 "Elect Bigelow by Hard Fight in Convention," Cleveland Press, 9 January 1912, p.1.

213 Landon Warner, "Ohio's Constitutional Convention of 1912," 61 Ohio State

Early in the convention, the delegates recognized that proposals for controversial amendments could result in the rejection of the entire constitution, as many believed had happened in 1874. To avoid this risk, the delegates agreed not to present a new constitution to the voters or to submit the proposals together for an all-or-nothing vote. Instead, the delegates adopted a variant of the piecemeal approach first suggested in 1838 by Caleb Atwater, who had urged that amendments be submitted article by article,[214] and recommended that each constitutional amendment be submitted to the voters as a separate issue. In the end, the convention proposed 42 amendments to the voters, who adopted 34 of them.

The OSBC failed in its efforts to have the convention propose a constitutional amendment supporting tax classification. The proposed tax amendment that the convention submitted to the voters retained the uniform rule for the assessment of taxes on all property, real and personal, although it allowed for the classification of income and estate taxes. This was not enough to please the OSBC, and the OSBC launched a vigorous but unsuccessful campaign against the adoption of the tax amendment.

The Direct Legislation League, in contrast, faired much better with its core issue, initiative and referendum. Since Progressives dominated the convention, there was little doubt that the delegates would adopt an initiative and referendum amendment in some form. The amendment that the convention finally proposed (and which the voters approved) provided for a direct initiative to amend the constitution (Art. II, section 1a) and an indirect initiative to enact new laws (Art. II, section 1b).

The proposed initiative and referendum amendment did not please the most radical Progressives, because it did not provide for a direct initiative to enact laws and had higher percentages of required signatures than they had wanted. Moreover, laws providing for tax levies, appropriations for the expenses of the state government and state institutions, and emergency measures were not subject to initiative and referendum (Art. II, section 1d), and in a defeat for the OSBC, the initiative and referendum could not be used to pass laws classifying property at different rates for tax purposes. On the other hand, laws enacted by initiative and referendum could not be vetoed by the governor, and the initiative and referendum could be used to enact or challenge municipal laws. Most importantly, the electors could bypass the legislature and directly amend the constitution. Overall, most Progressives, including Bigelow, were pleased with the amendment.[215]

With the approval of the initiative and referendum amendment by the voters, there were then three ways to propose amendments to the constitution: by initiative petition, by proposals from the General Assembly, and by constitutional convention. In addition, the voters approved amendments to make it easier to amend the constitution. First, the majority needed in each house

---

Archaeological and Historical Quarterly 11 (1952): 18 (quoting remarks of Herbert Bigelow published in James K Mercer, ed., Ohio Legislative History vol. I (Columbus: Edward T. Miller Co., 1914-26), 410).

214. Atwater, History of the State of Ohio, 175.

215. Warner, "Ohio's Constitutional Convention of 1912, "22.

to propose a constitutional amendment was reduced from two-thirds to three-fifths. Second, voters could adopt a constitutional amendment proposed by the General Assembly with a simple majority vote rather than a majority of those voting in the election.[216]

Despite the convention's support for the initiative and the referendum, a number of other proposals about the processes of government failed to obtain the support of the delegates. The most ardent Progressives sought to limit the role of political parties in the electoral process, but the delegates defeated proposals calling for nonpartisan election of state legislators and county judges; for an open primary; for the availability of an initiative petition to call a constitutional convention; for the use of separate nonpartisan ballots for votes on constitutional amendments; and for a bar on bar on legislators serving as delegates.[217]

In addition, the Convention rejected a proposal by former President Theodore Roosevelt for the recall of judicial decisions that he made in his February 21, 1912 speech to the Convention.[218] Roosevelt was challenging his successor, President William Howard Taft, for the Republican nomination, but Progressives who strongly supported the initiative and the referendum were split on the issue of the recall of judicial decisions. The delegates, however, did support an amendment to permit the recall or removal of public officials (in addition to impeachment), a proposal that was controversial because it was seen as many as an attack on the independence of judges.[219]

For Progressives, second in importance to securing initiative and referendum was the adoption of a municipal home rule amendment that would give municipalities powers independent of the General Assembly. Municipal home rule was of particular importance to urban Progressives, including Toledo's Mayor Samuel Milton Jones and Cleveland's Mayor Tom L. Johnson, who sought increased control over local affairs but whose cities were hampered by state law. In 1902, the Ohio Supreme Court had struck down the Toledo City Charter as special legislation (State of Ohio ex rel. Knisely v. Jones, 1902), and both mayors believed that local governmental reform and a reduction in corruption required that cities be given greater freedom to manage their own affairs. At the time of the convention, municipalities could only exercise those powers granted to them by the General Assembly (See Bloom v. City of Xenia, 1877), and cities were unable to address a wide range of local issues without the support of the General Assembly.[220]

Thomas G. Fitzsimons of Cuyahoga County introduced a proposed home home rule amendment that had three goals: to allow cities to chose different types of municipal governments; to reverse the rule that municipal powers were strictly limited by the legislature and allow cities to exercise all powers of local government not in conflict with the general laws

---

216.  Warner, "Progressivism in Ohio 1897-1917," 323.

217.  See Sponholtz, "Progressivism in Microcosm," 174, 185.

218.  1912 Debates, vol. I, 378-87. See also George E. Mowry, Theodore Roosevelt and the Progressive Movement (Madison: University of Wisconsin Press, 1947): 212-18.

219.  Sponholtz, "Progressivism in Microcosm," 153.

220.  Ibid., 161.

of the state; and to allow cities to control and operate public utilities.[221]  In the committee on municipal government, Fitzsimons's proposal won over an alternative proposal by a Cincinnati delegate that would have provided more state control over municipalities and would have placed additional restrictions on the financing of municipally owned public utilities.  Once submitted to the convention, Fitzsimon's proposal drew strong opposition from the public utility lobby, which feared that municipal ownership would result in unfair competition, and from delegates who thought that the grant of control over local matters could be used by cites to regulate liquor.[222]  The convention soundly defeated an amendment by the utility lobby and ultimately adopted a final draft of Article XVIII.  The voters approved this article and thus expanded municipal power to enact ordinances and control local affairs.

The amendments that generated the most interest to the legal profession concerned the judiciary.  The convention proposed and the voters approved a number of important changes in the structure and the operation of the courts to address the problem of overcrowded dockets and to limit the ability of the Ohio Supreme Court to hold acts of the legislature unconstitutional.

At the time of the convention, the Ohio courts included justices of the peace, common pleas courts at the county level, circuit courts, and the Ohio Supreme Court, which had six justices with the position of chief justice rotating among the six.[223]  Overcrowded dockets and long delays in resolving litigation could be attributed as much, if not more, to the structure of the judiciary as to the increase in the state population.  The most glaring problems were at the circuit court and the supreme court.  Circuit courts did not function solely as appellate courts but also held trials de novo.  Thus, litigants who lost at the trial court could relitigate their entire case in the circuit courts.  The supreme court functioned as an ordinary appellate court, but, as one delegate at the convention noted, the circuit courts were considered a "sieve through which everybody goes to the supreme court."[224]  By the time of the convention, the supreme court's docket was so overcrowded that it was said to take between two and five years to have the court decide a case.[225]

To improve the efficiency of the courts, the convention proposed and the voters approved amendments that replaced the circuit courts with courts of appeals that had only limited authority to hold trials de novo.  The supreme court's appellate jurisdiction was limited by allowing

---

221. See Vaubel, "Municipal Home Rule in Ohio," 15; Harvey Walker, "Municipal Government in Ohio Before 1912," Ohio State Law Journal 9 (1948): 13-14; Proceedings and Debates of the Constitutional Convention of the State of Ohio: Convened January 9, 1912 (Columbus: The F.J. Heer Printing, 1912) vol. II, 1433 (hereinafter 1912 Debates).

222. Warner, "Ohio's Constitutional Convention of 1912," 24; Walker, "Municipal Government in Ohio Before 1912," 14-15.

223. Sponholtz, "Progressivism in Microcosm," 190.

224. 1912 Debates, vol. I, 1026 (quoted in Jonathan L. Entin, "Judicial Supermajorities and the Validity of Statutes: How Mapp Became a Fourth Amendment Landmark Instead of a First Amendment Footnote," 52 Case W. Res. L. Rev. 441 (2001): 445 n 28).

225. 1912 Debates, vol. I, 1024-25.

appeals as of right only in cases arising under the federal or state constitution, felony cases, and cases originating in the courts of appeals. A provision, however, allowed for <u>certiorari</u> or discretionary review "in cases of public or great general interest." The supreme court itself was transformed by an increase in the number of justices from six to seven and the creation of an elected, not a rotating, position of chief justice. Other amendments designed to improve the efficiency of the lower courts included an amendment requiring the assignment of a common pleas judge to each county with the legislature being able to add additional judges and a provision that replaced the constitutional requirement for justices of the peace with a provision permitting the legislature to create such a judicial office.

The most controversial issue regarding the judiciary concerned the number of votes needed for the supreme court to strike down a law as unconstitutional. Judge Hiram Peck of Hamilton County introduced a proposal that would have required an unanimous vote of supreme court justices to declare an act unconstitutional.[226] Peck's proposal, which had the support of William Jennings Bryan and which was an alternative to Theodore Roosevelt's call for the recall of unpopular decisions, was aimed at the Ohio Supreme Court, which had a reputation of striking down legislation that protected workers' rights.[227] The opinions of the members of the judiciary committee ranged from requiring unanimity to a simple majority vote.[228] Eventually, the delegates reached a compromise, and the convention proposed and the voters approved an amendment that required the concurrence of all but one supreme court justice to reverse an appellate court judgment upholding a law as constitutional. However, if the appellate court found the law unconstitutional, only a simply majority of supreme court justices was needed to uphold the decision.

This supermajority amendment not only produced the anomalous result that, as borne out in number of cases after 1912, a law could survive constitutional challenge even though a majority of the justices found it unconstitutional but also that the same law could survive a constitutional challenge in one case and be found unconstitutional on another by the same court voting the same way.[229] This exact situation occurred in the 1920s. A law requiring cities to provide free water to schools survived a constitutional challenge, although five of the seven members of the court ruled that it was unconstitutional. Three years later the same court by a five to two majority invalidated the law. The difference in the two outcomes was that the first time the issue reached the supreme court the free water act had been upheld by the court of appeals, but the second time another court of appeals had found it unconstitutional.[230]

The convention also proposed and the voters approved a number of amendments that altered the rights of litigants, including amendments that provided for three-fourths jury verdicts in civil cases, that prohibited limits on damages in wrongful death actions, and that allowed the

---

226. <u>1912 Debates</u>, 143-44; <u>see also</u> Entin, "Judicial Supermajorities," 445.

227. Ibid., 443-45.

228. Warner, "Progressivism in Ohio 1897-1917," 328-29.

229. <u>See generally</u> Entin, "Judicial Supermajorities," 452-64.

230. Ibid., 455-57.

legislature to pass laws regulating the size and vote of grand juries and the use of expert witness testimony in criminal trials. The delegates, however, took a hard stand against criminal defendants by proposing an amendment that permitted prosecutors to comment on a defendant's failure to testify at trial and that permitted both the state and the defendant to take depositions in criminal cases—both of which the voters also approved (see Appendix B).

Finally, the convention proposed and the voters approved at least seven amendments that either directly overruled decisions of the Ohio Supreme Court or that removed potential judicial barriers to legislative action.

Art. II, section 33—overruling Palmer v. Tingle, 1896, to allow subcontractors and laborers who did not contract with property owners to place mechanic's liens on the owners' property;.

- Art. II, section 34—overruling such cases as Hibbard v. State, 1901 (striking down pensions for school teachers) and Auditor of Lucas County v. State ex rel. Boyles, 1906 (providing for relief for the worth blind) and removing constitutional uncertainty concerning legislation to provide for the comfort, health, safety and general welfare of employees;

- Art. II, section 35—removing constitutional uncertainty concerning the enactment of a compulsory workers' compensation program;

- Art. II, section 37—overruling City of Cleveland v. Clements Bros. Construction Co., 1902, to establish the eight-hour work day on public works;

Art. II, section 40—overruling State ex rel Attorney General v. Guilbert, 1897, to permit the use of the Torrens system of land registration;

- VIII, section 6—removing constitutional uncertainty as to the authority of municipalities to insure public buildings and of the state to regulate insurance;

- Art. XVIII—overruling State of Ohio ex rel. Knisely v. Jones, 1902) and proposing the municipal home rule amendment.

In total, the convention recommended forty-two amendments to the voters in a special election to be held on the first Tuesday of September 1912. Progressives led by Bigelow began organizing for the campaign in January while the convention was still in progress.[231] Labor leaders and Socialists supported the amendments as a whole, as did most of the press. Opposition to the amendments did not begin in earnest until late in the campaign.[232] With the

---

231. Warner, "Progressivism in Ohio 1897-1917," 339.
232. Ibid.

defeat of its efforts to rid the constitution of the uniform taxation rule, the OSBC, which had been one of the primary groups calling for the convention, opposed passage of most amendments. The OSBC attacked the work of the delegates, especially in the rural press, and mounted a campaign under the slogan, "When in doubt, vote no," to which the Progressive newspaper, the Cleveland Plain Dealer, responded, "When in doubt, vote yes."[233]

On September 3, 1912, the voters approved thirty-four of the forty-two constitutional amendments (see Appendix B). As provided in the Schedule adopted by the delegates for the submission of amendments to the voters and Art. XVI, section 3, the supermajority requirement for approving amendments did not apply to amendments proposed by a a constitutional convention, and therefore proposed amendments only needed to receive more affirmative that negative votes to become part of the constitution regardless of whether a particular amendment received a majority of votes cast in the election.[234]

Besides the amendments already mentioned, the voters approved amendments that included a reduction in the vote required by the legislature to overturn a veto from two-thirds to three-fifths, the establishment of direct primary elections for most public officials, and the establishment of a Superintendent of Public Instruction as an officer of the executive department to replace the State Commissioner of Common Schools In contrast, the voters rejected eight amendments, including amendments that would have expanded the debt limit for intercounty roads, allowed for the regulation of outdoor advertisement, limited the use of injunctions in labor disputes, banned capital punishment, and permitted the use of voting machines. The voters also rejected an amendment to delete the word "white" from the voter qualification section of the constitution and two women's rights amendments, one to give women the right to vote and the other allowing women to be appointed as notary publics and to offices of institutions or departments that were concerned with the interests of women or children.[235]

The amendment concerning women's suffrage received a great deal of national attention. Had the amendment been approved, Ohio would have become the first state east of the Mississippi to give women the right to vote.[236] Three of the most influential women present at the convention were Myron B. Vorce, representing the Woman's Suffrage Party of Cleveland, Elizabeth Hauser of the Ohio Equal Suffrage Association, and Dora Bachman, a Socialist attorney from Cincinnati. Their main goal from the beginning of the convention was to influence the committee on elective franchise. On January 18, 1912, Dora Bachman presented a proposed amendment concerning women's suffrage to the committee. The proposal was simple in that it eliminated the word "male" from the voter qualification section.[237] W.B. Kilpatrick of Trumbull County was the most outspoken supporter of suffrage. Bigelow initially opposed women's

---

233.    Ibid., 340.
234.    See 1912 Debates, vol. 2, 2111.
235.    Appendix B.
236.    Terzian, "Effusions of Folly," 274.
237.    "Suffragets Plank Written By Woman," Cleveland Press, 18 January 1912, p. 2.

suffrage but agreed to support it if it were offered as a separate amendment.[238] The convention approved the suffrage amendment by a vote of 74 to 37 and agreed to submit it to the voters as a separate ballot by a vote of 76 to 34, but soon afterwards, the delegates agreed to submit all amendments separately.[239]

Despite the efforts of women's rights advocates, the suffrage amendment along with a proposed amendment on the eligibility of women to hold appointive offices failed miserably at the polls. The women's suffrage amendment attracted the largest number of voters but lost by the largest margin. The final vote was 336,875 to 249,420. The major reason given for the failure of women's suffrage was the fear that giving women the right to vote would add momentum to the temperance movement, which was overwhelmingly supported by women. Percy Andreae, leader of the anti-prohibition forces in Ohio, claimed that "woman suffrage owes its defeat to the Anti-Saloon League, which made of it a wet and dry issue and thus alienated from it the sympathy of the large liberal forces of the state, which stand sternly opposed to prohibition, no matter what guise it may masquerade in."[240] Another reason the suffrage vote failed may have been that the women's movement aligned itself with the third party presidential candidate Theodore Roosevelt. The New York Herald in an article on the women's suffrage amendment in Ohio wrote that "the support of the Progressive candidate proved to be the blight, instead of life and vigor."[241] The New York World stated "if the suffragists permit themselves to be bass-drummed into a third-party camp they will make two enemies for every friend they gain."[242]

The adoption of thirty-four amendments in 1912 fundamentally altered the constitutional landscape in Ohio, but the election itself was in some respects disappointing. Voter turnout was relatively low with about half as many votes cast as in the 1908 election for governor. Geographically, there was little consensus across the state. The urban parts of Ohio overwhelmingly voted in favor of all the amendments except women's suffrage and voting machines. Of the thirty-four amendments that passed, nineteen would have failed if not for the urban vote.[243] In contrast, rural areas overwhelmingly opposed most of the amendments on the ballot. There was also a division among the northern and southern regions of the state with the north more favorable to the amendments, as a whole, compared to the south. This was likely the result of large labor movements in the northern industrial cities that saw the constitutional amendments as favorable to their cause.[244]

Despite the victory of the Progressive movement, there was a general dissatisfaction among the people of the state. Many felt that the Progressives forced the constitutional

---

238. Terzian, "Effusions of Folly," 271-72.
239. Ibid., 273.
240. Cushman, "Voting Organic Laws," 223.
241. "Ohio Rebuilt Constitution," The Literary Digest, 405.
242. Ibid.
243. Cushman, "Voting Organic Laws," 220.
244. Warner, "Progressivism in Ohio 1897-1917," 341-42.

51

convention and the amendment process on them and that there was too much of a rush to bring about change. Some commentators believed that not enough time was given for the electorate to study the amendments and that this may have contributed to voter confusion and low voter turnout.[245]

The convention of 1912 was the last constitutional convention in Ohio. Voters rejected the call for constitutional conventions in 1932, 1952, 1972, and 1992 when the issue was on the ballot under the mandatory twenty-year rule (Schedule A). But the 1912 convention did not mark the end of constitutional change. The piecemeal approach to constitutional change that the delegates favored in their decision to present separate amendments to the electorate became the model of constitutional change for the balance of the century.

## CONSTITUTIONAL CHANGE FROM 1912 TO THE TWENTY-FIRST CENTURY

The 1912 Constitutional Convention is an important dividing line in Ohio constitutional history. From the adoption of Ohio's second constitution in 1851 to the 1912 Constitutional Convention, the voters amended the Ohio Constitution only eleven times with the most significant amendment being the 1903 provision giving the governor the veto power. In 1912 alone, however, the voters approved 34 amendments, more than three times as many amendments as they approved in the sixty years following the adoption of the 1851 Constitution. The 1912 Constitutional Convention also made the process of amending the constitution less difficult, and in the following ninety years the voters approved 108 of 196 proposed amendments (Table 1). Finally, in the last two decades of the twentieth century, the Ohio Supreme Court began to exercise the power of judicial review in a way that has increasingly brought it into conflict with the other branches of state government.

**Table 1**
**Amendments to the 1851 Constitution**

|              | Proposed | Adopted | Pct. Approved | Amendments per year |
|--------------|----------|---------|---------------|---------------------|
| 1852 to 1911 | 40[*]    | 11      | 27.5          | .18                 |
| 1912         | 42       | 34      | 81.0          | 34.0                |
| 1913 to 2003 | 197      | 108     | 54.8          | 1.2                 |

[*] This includes the three proposed amendments submitted separately to the voters in 1874 and rejected by them along with the proposed Constitution of 1874.

Before 1912, amendments could only be proposed by the General Assembly or by a constitutional convention, and approval of an amendment proposed by the General Assembly

---

245. C.L. Martzoloff, "Ohio: Changes in the Constitution," The American Political Science Review: Notes on Current Legislation 6 (November 1912): 573.

required a majority of the voters who voted at the election. In 1912, the convention recommended and the voters approved the use of the initiative as a method for proposing constitutional amendments (Art. I, section 1a). Even more importantly in terms of its impact on constitutional revision, the 1912 Constitutional Convention proposed and the voters approved a change in the number of votes needed to adopt an amendment proposed by the General Assembly from a majority of the electors voting in the election to a majority vote on the specific amendment. From 1851 to 1912 under the supermajority requirement, the voters approved only 11 of the 37 amendments the General Assembly proposed. The supermajority requirement, however, did not apply to amendments proposed by constitutional conventions (1851 Const., Art. XV, section 3), and in 1912, the Constitutional Convention noted in its schedule that "[e]ach amendment on which the number of affirmative votes shall exceed the number of negative votes shall become a part of the constitution." (Schedule, 1912 Amendments).

Since 1912, the pace of constitutional revision far outpaced the pre-1912 pace, and from 1913 to 2003 the voters approved 108 of 197 or 54.8% of all proposed amendments. This increase in constitutional revision is largely explained by the repeal of the supermajority requirement and not by the adoption of the initiative. In fact, during this ninety-year period, the voters approved 94 of 140 or 67.1% of the amendments proposed by the General Assembly but only 14 of the 56 or 25% of the amendments proposed by initiative petition.

The use of the initiative to propose constitutional amendments was more common in the two decades following the Constitution, when this method was used to propose seven of the first sixteen post-1912 proposals to amend the 1851 Constitution. Since the beginning of the 1950s, however, only five of the 84 amendments that the voters approved were proposed by initiative. (Table 2).

**TABLE 2**
**Amendments Proposed by General Assembly ("GA") and Initiative and Adopted**
**1913-2002**

| Decade | GA | GA Pass | GA Fail | Initiative | Initiative Pass | Initiative Fail | Total | Pass | Fail |
|--------|-----|---------|---------|------------|-----------------|-----------------|-------|------|------|
| 1913-19 | 7 | 2 | 5 | 14 | 4 | 10 | 21 | 6 | 15 |
| 1920s | 11 | 4 | 7 | 5 | 0 | 5 | 16 | 4 | 12 |
| 1930s | 5 | 3 | 2 | 8 | 3 | 5 | 13 | 6 | 7 |
| 1940s | 7 | 6 | 1 | 2 | 2 | 0 | 9 | 8 | 1 |
| 1950s | 23 | 18 | 5 | 1 | 0 | 1 | 24 | 18 | 6 |
| 1960s | 22 | 16 | 6 | 1 | 0 | 1 | 23 | 16 | 7 |
| 1970s | 42 | 28 | 14 | 11 | 1 | 10 | 53 | 29 | 24 |
| 1980s | 11 | 6 | 5 | 7 | 0 | 7 | 18 | 6 | 12 |
| 1990s | 11 | 10 | 1 | 6 | 4 | 2 | 17 | 14 | 3 |
| 2000-02 | 1 | 1 | 0 | 1 | 0 | 1 | 2 | 1 | 1 |
| Total | 141 | 94 | 47 | 56 | 14 | 42 | 197 | 108 | 89 |

Despite the secondary role played by the initiative in Ohio in proposing amendments that ultimately became part of the constitution, the initiative opened the political process by serving

as a means for proposing amendments that, for a variety of reasons, the General Assembly was unwilling to propose. Often, this involved amendments with populist overtones, and successful amendments proposed by initiative have included a limitation on state and municipal power to ban liquor in 1914, a requirement for submitting proposed amendments to the U.S. Constitution to the voters in 1918 (in an effort to sidetrack national prohibition), prohibition (under state law) in 1918, county home rule and a limitation on unvoted real estate taxes in 1933, the prohibition of sales tax for food consumed off-premises in 1936, the imposition of term limits in 1992, and the repeal of the soft drink excise tax in 1994. Finally, as Table 3 shows, the pace of constitutional change since 1912 has varied significantly with the most amendments being adopted in the 1950s, 1960s, and 1970s when the voters approved 63 out of 100 proposed amendments. By far, more amendments were proposed and adopted in the 1970s than in any other decade in large part due to the creation of the Ohio Constitutional Revision Commission by the General Assembly to review and recommend changes to the constitution.[246]

---

246. Constitutional Revision Commission, <u>Recommendations for Amendments to the Ohio Constitution: Final Report</u> (June 30, 1977), 16.

**TABLE 3**
**Amendments Proposed and Adopted by Decade since 1912**

|           | Proposed | Adopted | Percentage |
|-----------|----------|---------|------------|
| 1913-1919 | 21       | 6       | 28.6       |
| 1920s     | 16       | 4       | 25         |
| 1930s     | 13       | 6       | 46.2       |
| 1940s     | 9        | 8       | 88.9       |
| 1950s     | 24       | 18      | 75         |
| 1960s     | 23       | 16      | 69.6       |
| 1970s     | 53       | 29      | 54.7       |
| 1980s     | 18       | 6       | 33.3       |
| 1990s     | 17       | 14      | 82.4       |
| 2000-2003 | 3        | 1       | 33.3       |
| Totals    | 197      | 108     | 54.8       |

Since 1912, the voters have approved amendments to nearly every article of the Ohio Constitution with the articles dealing with the three branches of government (II-IV), Public Debt and Public Works (VIII), and Finance and Taxation (XII) having been amended the most (` 4). Together, these five articles account for over 60% of the changes made to the Ohio Constitution since 1912.

**TABLE 4**
**Number of Approved Amendments by Articles**
**1913 to the Present[*]**

| I.    | Bill of Rights      | 2  | X.     | County and Townships    | 3 |
|-------|---------------------|----|--------|-------------------------|---|
| II.   | Legislative         | 14 | XI.    | Apportionment           | 3 |
| III.  | Executive           | 9  | XII.   | Finance and Taxation    | 14 |
| IV.   | Judicial            | 16 | XIII.  | Corporations            | 1 |
| V.    | Elective Franchise  | 10 | XIV.   | Jurisprudence (Repealed) | 1 |
| VI.   | Education           | 4  | XV.    | Miscellaneous           | 9 |
| VII.  | Public Institutions | 1  | XVI.   | Amendments              | 1 |
| VIII. | Public Debt         | 22 | XVII.  | Elections               | 5 |
| IX.   | Militia             | 3  | XVIII. | Municipal Corporations  | 2 |

[*]   The number of changes noted in Table 4 does not match the number of amendments adopted during this period since some amendments affected more than one article.

**The First Half of the Twentieth Century: the Unfinished Agenda**

The pace of constitutional revision slowed down in Ohio in the years immediately after

55

1912 Constitutional Convention. In the balance of that second decade of the century, the voters approved only 4 of the 14 amendments proposed through the new initiative petition, while approving only 2 of the 7 proposed by the General Assembly. The pace slowed even more in the 1920s, 1930s, and 1940s during which the voters approved 18 of 38 proposed amendments. During this thirty-year period, the voters approved 13 of the 23 amendments proposed by the General Assembly, and 5 of the 15 proposed by initiative petition (Table 2). But during the 1950s, the decade with the fewest proposals, the voters approved eight of the nine proposed amendments, including both of those proposed by initiative petition and 6 of the 7 proposed by the General Assembly.

During this period—the balance of the first half of the twentieth century—several of the issues that the delegates to the 1912 Constitutional Convention had addressed continued to be an important part of the state's constitutional agenda, especially issues involving intoxicating liquor and women's suffrage.

### Prohibition

Controversy concerning the licensing of intoxicating liquors has been part of the constitutional debate in Ohio since the early nineteenth century. At common law the traffic in intoxicating liquors was a lawful business (Baker v. Beckwith, 1876: 319), but by the middle of the nineteenth century, the temperance movement in Ohio had gained enough influence to have a proposed amendment prohibiting the licensing of liquor submitted to the voters along with the proposed 1851 Constitution.[247] Through what one commentator characterized as a "masterpiece of obfuscation" the schedule to the 1851 Constitution required a separate vote on the licensing of intoxicating liquors with a "no license" vote being in favor of a constitutional prohibition on the granting of licenses to traffic in intoxicating liquors.[248] A majority of the voters on this amendment voted "no," thereby resulting in the approval by a narrow vote of Article XV, section 9 of the 1851 Constitution, which provided that "[n]o license to traffic in intoxicating liquors shall hereafter be granted in this state; but the general assembly may by law provide against evils resulting therefrom." A prohibition on licensing, however, did not necessarily constitute either a prohibition on liquor or liquor trafficking; but it did give the General Assembly broad power to regulate. Thus, in Miller v. State (1854), the Ohio Supreme Court upheld a statute making criminal the sale of intoxicating liquors to be drunk at the place where sold, the sale to minors, and the sale to persons intoxicated, and making the places where intoxicating liquor is sold in violation of the act a common nuisance to be shut up and abated. Declining to reach the issue of whether the legislature can wholly prohibit traffic in intoxicating liquors, the court made clear that both section 9 and the police power independently supported the power to regulate

---

247. The proposal, section 18 of the schedule to the 1851 Constitution, provided that "[n]o license to traffic in intoxicating liquors shall hereafter be granted in this state; but the general assembly may by law provide against evils resulting therefrom."

248. Swisher, Ohio Constitution Handbook, xxvii.

intoxicating liquors.

Recognizing the sensitivity of the liquor question, the delegates to the 1873-74 Constitutional Convention followed the pattern established in 1851 and again submitted its liquor proposal to a separate vote in an effort to insulate the constitution from political controversy. Nonetheless, the presence of the issue of licensing of intoxicating liquor on the ballot contributed to the voters' rejection of the 1874 Constitution.

Subsequently, the General Assembly attempted to require bonds as a prerequisite to tax anyone engaged in the traffic of liquor and liens on tenants engaged in the liquor business, but the Ohio Supreme Court considered these measures to be licenses and struck them down (State v. Hipp, 1882; State v. Sinks, 1884). In 1883, the Women's Christian Temperance Union, founded in Cleveland in 1874, successfully campaigned for an amendment that would have prohibited the manufacture and sale of intoxicating liquors, but the proposed amendment, though having received more positive than negative votes, failed to receive the requisite majority of votes cast in the election.[249]

In the two decades after the approval of the 1912 proposal to amend the constitution to permit the licensing of liquor, there were ten proposed constitutional amendments addressing directly or indirectly liquor licensing. In 1914, the voters approved an amendment limiting a municipality's home rule power over liquor outside of its territorial jurisdiction and specifically prohibiting the passage of any law outlawing the sale of liquor throughout the state. In 1915 and 1917, the voters rejected two amendments proposed by initiative petitions to prohibit the manufacture and sale of alcoholic beverages (Appendix B).

The momentum, however, was quickly turning in favor of the prohibitionists. In 1918, prohibitionists led by the Anti-Saloon League, which had been founded in Oberlin in 1893 and had grown into a national organization, convinced Congress to propose the Eighteenth Amendment banning the sale, manufacture and transportation of intoxicating liquor. The liquor industry in Ohio tried to prevent ratification of the Eighteenth Amendment by supporting an amendment to the Ohio Constitution that would have required a referendum before the ratification of amendments to the U.S. Constitution.[250] Ohio voters ratified this amendment in 1918, but the U.S. Supreme Court held it unconstitutional in violation of Article V of the U.S Constitution which places ratification solely in the hands of state legislatures or state conventions (Hawke v. Smith, 1920).

Prohibition in Ohio actually took effect at the end of 1918 by virtue of an amendment to the Ohio Constitution prohibiting the sale and manufacture of liquor, and it lasted for fifteen years. Finally, in 1933, the Twenty-first Amendment to the U.S. Constitution ended national prohibition, and in the same year, Ohio voters ratified an amendment that also repealed statewide prohibition.

**Suffrage**

---

249. Patterson, "The Constitutions of Ohio," 249-50.
250. Terzian, Effusions of Folly, 278.

In the years immediately after the 1912 rejection of the proposed amendment on women's suffrage, Ohio voters again addressed constitutional amendments concerning the rights of women and women's suffrage.  In 1913, the voters approved an amendment giving women the right to serve on boards or commissions that dealt with issues affecting women and children, but in 1914, the voters rejected again an amendment that would have given women the right to vote.  Unlike the liquor issue which ultimately required an amendment to the Ohio Constitution, the extension of the right to vote to women was the result of the amendment of the U.S. Constitution.  Thus, it was not until 1920 with the adoption of the Nineteenth Amendment to the U.S. Constitution that women in Ohio were given the right to vote.

With women having joined blacks as eligible to vote by federal mandate, the Ohio electorate in 1923 finally removed the phrase "white male" from the voter qualification section (Art. V, section 1) of the Ohio Constitution.  This revision was only symbolic, because the Fifteenth and Nineteenth Amendments to the U. S. Constitution had prohibited electoral disqualification on account of race and gender.  Thus, it took 53 years from the ratification of the Fifteenth Amendment in 1870 for Ohio to bring its constitution into harmony with its federal counterpart.  Moreover, nearly forty more years would pass before race and gender limitations were completely deleted from the Ohio Constitution.  The word "white" was finally removed from Article IX, section 1 listing the qualifications for militia service in 1953, five years after President Truman's executive order desegregating the military, and "male" was not removed from the same section until 1961.

### Other Amendments

Other notable amendments during the years from 1913 to 1950 included a number of taxation amendments.  In 1918, the General Assembly and an initiative proposed two irreconcilable amendments involving the taxation of property, and the voters approved both of them.  The Ohio Supreme Court in State ex rel. Greenlund v. Fulton (1919), however, held that the amendment proposed by the General Assembly would take effect over the conflicting amendment proposed by initiative petition since, pursuant to Article II, section 1b, the former received a larger number of affirmative votes.  And in 1929, the voters adopted a constitutional amendment imposing a one and one-half percent limit on unvoted ad valorem property taxes but lowered that amount to one percent in 1933 in the midst of the Depression.

In 1921, the voters began a tradition that has continued unabated and approved an amendment to Article VIII to permit the issuance of bonds for bonuses for veterans of World War I, and in 1923, the voters expanded the powers of the Industrial Commission over worker's compensation.  In 1949, the voters adopted an amendment requiring office-type ballots where candidate names were listed under each elected office rather than by party affiliation.

In 1933 the voters used the initiative for the first time in 15 years to approve amendments extending home rule to counties and limiting unvoted real estate taxes, and in 1936 the voters again used the initiative to propose an amendment (which was ultimately approved) to prohibited sales tax on food consumed on the premises.

During this period, the voters, in keeping with Ohio's anti-poll tax tradition, overwhelmingly rejected an attempt to permit the levying of a poll tax in 1921 as well as a proposal in 1938 to replace the election of supreme court and other appellate judges with an appointed system.

## Constitutional Revision in the Latter Half of the Twentieth Century

The number of amendments to the Ohio Constitution increased greatly in the latter half of the twentieth century. From 1913 through the end of the 1940s, Ohio voters approved 24 of 59 or 40.7% of proposed amendments, but in the second half of the century they approved 83 of 135 or 61.5% of proposed amendments.

### The 1950s & 1960s

During the 1950s and 1960s, the voters amended nearly every article of the constitution (see Table 2) with the most significant activity taking place concerning the issues of public debt, governmental reorganization, reapportionment, and the judicial system.

In the 1950s, the voters approved 18 of 23 amendments proposed by the General Assembly, and in the 1960s they approved 16 of 22 proposed by the General Assembly. During this period, only two amendments were proposed by initiative petition, and the voters rejected both of them—a 1958 proposal to adopt a "right to work amendment" that would have forbid closed-shop union contracts and a 1962 proposal to limit the state's power with respect to Sunday closing laws.

### Public Debt

Article VIII, which concerns the state's public debt and public works, is the article that the voters have amended most often. The Constitution of 1851 imposed a $750,000 limitation in Article VIII, section 8 on the amount of debt that the General Assembly could incur. This dollar limitation, which remarkably is still part of the Ohio Constitution, is not applicable to projects that do not involve the full faith and credit of the state. For example, bonds used to construct a bridge are not subject to the $750,000 limitation as long as the bonds are paid off by tolls, are not backed by the full faith and credit of the state, and do not obligate the state to pay for deficits in revenues (State ex rel. Public Institutional Building Authority v. Griffith, 1939). Nor does the dollar limitation apply to debt incurred for emergencies, such as the need to repel an invasion or suppress insurrection, or to debt incurred to pay off outstanding debt (Art. VIII, section 2).

In 1921, the state began the practice of adopting constitutional amendments to finance large public works and other initiatives where the borrowing was backed by the full faith and credit of the state. The 1921 amendment incurred debt to provide compensation to veterans of World War II, and since 1947 the voters have approved twenty-two amendments to Article VIII, including amendments to allow debt financing for public works projects, war veteran bonuses, highways, public buildings, industrial development, low-cost housing, coal research, aid to local

59

governments, parks and natural resources, and higher education. During this period, the voters also rejected twelve proposals to amend Article VIII. Interestingly, of the 35 proposals to amend this article through 2003, all but three were proposed by the General Assembly, and the voters rejected the three proposed in 1975 by initiative petition. Thus, the state, through the General Assembly, has been the moving force behind the successful effort to use public debt to finance state projects.

### Governmental Organization and Reapportionment

During the 1950s and 1960s, the voters approved multiple amendments concerning the organization of state government, including amendments in 1954 that extended the term of office of the governor, the lieutenant governor, the secretary of state, the treasurer of state, and the attorney general to four years (the auditor having had a four-year term under the 1851 Constitution) and limited the governor to two successive terms (a limitation applied to other state officers in an amendment proposed by initiative petition and approved in 1992), an amendment in 1956 that provided four-year terms for state senators, an amendment in 1953 that created a State Board of Education with responsibility for appointing the Superintendent of Public Instruction, an official who had been appointed by the governor under an amendment that the voters approved in 1912; an amendment in 1961 that authorized the General Assembly to require the advice and consent of the State Senate for gubernatorial appointments after the Ohio Supreme Court had held unconstitutional a statute giving the Senate this power (see Commentary to Art. III, section 21); and the Modern Courts Amendment in 1968.

During this period, the voters also approved a number of housekeeping amendments to repeal obsolete provisions, including a provision dealing with the eligibility of women to hold office as well as the entire Article XIV entitled "Jurisprudence," which had created a commission in 1851 to draft the code of civil procedure that the General Assembly adopted in 1853.[251]

Ohio's approach to apportioning seats in the General Assembly had to be changed as a result of the U.S. Supreme Court's decision in Reynolds v. Sims (1964), holding that the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution required that state legislatures be apportioned according to population. Ohio's apportionment scheme was based on county lines and created a "rural bloc" that favored voters in rural counties over voters in metropolitan counties .[252] Therefore, in 1967 the General Assembly proposed and the voters approved a constitutional amendment replacing the county-based apportionment scheme with one based on population (though retaining a preference for the drawing of district lines based on county lines)(Commentary, Art. XI).

Amendments proposed by the General Assembly that the voters rejected during the 1950s and 1960s (and did not approve on subsequent votes) included a proposal in 1954 to establish

---

251.     Harvey Walker, ed., An analysis and Appraisal of the Ohio Constitution 1851–1951 (Cincinnati: Stephen J. Wilder Foundation, 1951), 51.

252.     Swisher, Ohio Constitution Handbook, xxxvi, 427.

four year terms for both representatives and senators, a proposal in 1958 to permit county voters to form metropolitan federations, a proposal in 1969 to lower the voting age from 21 to 19, and a proposal in 1968 to create a homestead tax exemption.

### Modern Courts Amendment

In 1968, the voters approved the Modern Courts Amendment, the first major revision of the judiciary article since the 1912 Constitutional Convention. The Modern Courts Amendment reorganized the administration of the courts to address the same problem of overcrowded dockets and court backlogs that had plagued Ohio since the early days of statehood. The Modern Courts Amendment sought to provide direction and leadership for the judiciary. By the mid-1960s, Ohio had more than 400 judges operating independently,[253] and there was no central authority that could assign judges in districts with relatively light caseloads to districts with heavy caseloads.[254]

Working with the Ohio State Bar Association's Modern Courts Committee and the Legislative Service Commission's Study Committee on Judicial Administration,[255] the General Assembly in 1968 submitted a proposed amendment to the voters but only after removing a provision requiring adoption of the "Missouri plan"—a system of first appointing, then electing judges. Under the 1851 Ohio Constitution, judges are elected, although the governor has the power to fill judicial vacancies until the next election. In 1938, the voters rejected a proposed constitutional amendment that called for the appointment of supreme court and court of appeals judges and would again reject such a proposed amendment in 1987.[256]

The Modern Courts Amendment placed superintendence of the courts under the direction of the Ohio Supreme Court. The amendment gave the full court responsibility for the adoption of administrative rules for the courts, but it gave the Chief Justice special responsibility for court administration,[257] including the power to assign common pleas and court of appeals judges to other districts. The Modern Courts Amendment also authorized the court to put into place a uniform system of record keeping for all the courts in the state and to appoint an administrative director to assist the Chief Justice.

The Modern Courts Amendment also gave the Ohio Supreme Court explicit authority to adopt rules governing the practice and procedures in the Ohio courts. This constitutional grant of authority differs from the federal system in which the U.S. Supreme Court derives its rule-making authority from a federal statute, the Rules Enabling Act,[258] rather than directly from the

---

253. William W. Milligan and James E. Pohlman, "The 1968 Modern Courts Admendment to the Ohio Constitution," 29 Ohio St. L. J. 811 (1968): 821.

254. Ibid., 825.

255. Ibid., 816-17.

256. Ibid., 812.

257. Ibid., 822.

258. 28 U.S.C. §§ 2071-74.

federal Constitution. As a result of the constitutional source of its rule-making authority, the Ohio Supreme Court has struck down procedural statutes intended to govern court proceedings as inconsistent with its rules (See Rockey v. 84 Lumber Co., 1993).

The Modern Courts Amendment reorganized the lower courts by removing the constitutional status of probate courts, which were replaced by probate divisions of the common pleas courts, and by allowing the General Assembly to create new courts of appeals. Before the amendment, the General Assembly was only authorized to create courts "inferior to the courts of appeal" and to increase the number of court of appeals judges.[259] Finally, the Modern Courts Amendment repealed the controversial provision, first adopted in 1912, requiring the concurrence of all but one supreme court justice for the court to hold unconstitutional a statute that a court of appeals had upheld..

### The 1970s and the Constitutional Revision Commission

The 1970s represent the high water mark of constitutional revision for the latter half of the twentieth century with the voters having approved more amendments than in any other decade since the decade of the 1912 Constitutional Convention. During the 1970s, the voters approved 28 of the 42 amendments proposed by the General Assembly but only one of the 11 proposed by initiative petition. Many of the 29 amendments approved during this decade concerned tax exemptions, including amendments to increase the homestead exemption for senior citizens and disabled residents, the issuance of bonds to provide veteran bonuses to Vietnam veterans and to encourage industrial development, and changes to voting requirements to conform to federal law, including an amendment to lower the voting age to eighteen following the Twenty-sixth Amendment to the U.S. Constitution and an amendment to reduce the residency requirement to thirty days to conform to decisions of the U.S. Supreme Court (See Dunn v. Blumstein, 1972).

The increase in constitutional activity during the 1970s is at least partially attributable to the work of the Constitutional Revision Commission. Established in 1969 by the General Assembly in preparation for the mandatory twenty-year vote in 1972 on whether to hold a constitutional convention, the Commission undertook a thorough section-by-section review of the constitution for the purpose of recommending constitutional amendments to the General Assembly. Although the voters rejected the call for a constitutional convention in 1972 by more than 850,000 votes (2,142,534 to 1,291,267), the Commission succeeded in having many of its recommendations incorporated into fifteen amendments that the General Assembly proposed and the voters approved.[260] Some of the more important amendments included: changes to the voting

---

259. Milligan, "The 1968 Modern Courts Amendment," 840.

260. See Const. Revision Comm., Final Report, 20-21. By the time the Commission's Final Report was completed in May 1977, the voters had approved thirteen amendments originating from Commission recommendations. Subsequently, the voters approved two more amendments that originated from the Commission, one giving the General Assembly more

requirements; reorganization of the legislative article and revisions to the procedures governing the house and senate; the creation of the Ohio Ballot Board to prepare ballot language of proposed constitutional amendments; a change to the election law requiring the joint election of the governor and lieutenant governor; and changes to gubernatorial succession and disability. Some of the proposed amendments that originated from Commission recommendations but failed included a proposal to eliminate the $750,000 debt limit and to repeal the 1875 provision that allowed the General Assembly to appoint a commission to assist the supreme court in disposing of cases.

Important amendments adopted during the 1970s that did not originate from the Constitutional Revision Commission included a 1973 amendment establishing a state lottery and a 1975 amendment requiring delegates to national party conventions to be elected by the voters. Some of the non-Commission amendments that failed included amendments proposed by initiative petition in 1976 to require legislative hearings and approval of safety measures for nuclear power plants and in 1977 to prohibit the use of leg traps and other devices causing prolonged suffering to animals.

### The 1980s

During the 1980s, the number of constitutional amendments approved by the voters fell to the lowest level since the 1930s. Of the 11 amendments proposed by the General Assembly, the voters approved 6; and of the 7 proposed by initiative petition, the voters approved none. Three of the 6 approved amendments involved amendments to Article VIII to permit the issuance of bonds to finance low cost housing in 1982, coal research in 1985, and local governments projects to improve water, sewer, and waste collection and treatment facilities in 1987. During this decade, the voters also approved an amendment in 1980 allowing for the classification of real property, an amendment in 1987 requiring all proceeds from the state lottery to be used for education, and an amendment in 1989 concerning filling vacancies in the office of lieutenant governor.

The unsuccessful amendments proposed by initiative petition during the 1980s included: two proposals in 1981 to authorize private companies to sell workers' compensation insurance and to change apportionment methods for both General Assembly and congressional districts; a proposal in 1982 to elect members of the Public Utilities Commission and to finance publicly their campaigns; three proposals in 1983 to raise the drinking age to twenty-one, to repeal all taxes passed since 1982, and to require a three-fifths majority of the General Assembly to levy new taxes; and a proposal in 1987 to establish a merit system under which the governor would initially appoint supreme court and court of appeals judges.

---

control over regulating prison labor and one modifying the provisions for adopting or amending county charters.

**The 1990s**

After relatively few amendments during the 1980s, the rate of constitutional change increased in the 1990s. During the last decade of the twentieth century, the voters adopted 14 of 17 proposed amendments, including 4 of 6 submitted by initiative petition. Half of the amendments adopted concerned taxes or the state debt, including a proposal in 1990 to extend the homestead exemption for surviving spouses and proposals to issue bonds for low cost housing in 1990, the improvement of parks and the conservation of natural resources in 1993, public works and highways in 1995, and public school facilities in 1999. Reflecting the national movement to hold elected officials more accountable to the public, Ohio voters approved three separate amendments, all proposed by initiative petition, imposing term limits on members of the U.S. Congress, on members of the Ohio General Assembly, and on key executive branch officers other than the governor, whose term was already limited by the constitution. Subsequently, the U.S. Supreme Court held unconstitutional state-imposed term limits for U.S. Senators and member of the House of Representatives (U.S. Term Limits, Inc. v. Thornton, 1995), and thus the Ohio limitation on federal legislators never went into effect. Nonetheless, the provisions of the Ohio Constitution expanding term limits for state officeholders and imposing them on members of the General Assembly went into effect and remain in effect, though controversial, today.

The 1990s also saw a number of amendments reflecting a general mood of the public in support of the victims of crime and against criminal defendants. In 1994, the voter approved an amendment to afford the victims of criminal offenses "fairness, dignity, and respect in the criminal justice system," and two amendments limiting the rights of criminal defendants. The first, approved in 1994, eliminated the role of Ohio's Courts of Appeals in death penalty cases in favor of direct appeals to the Ohio Supreme Court. The second, approved in 1997, amended the Bill of Rights for only the second time since 1851 and allowed the General Assembly to set standards to deny bail to persons charged with a felony where "the proof is evident or the presumption great" that the person committed the offense and "poses a substantial risk of serious harm to any person or to the community." Finally, in 1995 the voters approved an amendment limiting the governor's power to commute sentences, an amendment that was in direct response to the commutation of seven death sentences in early 1991 by out-going Governor Richard F. Celeste. The Ohio Supreme Court had upheld the governor's use of the power of commutation (State ex rel. Maurer v. Sheward, 1994), but the voters disagreed.

Of the amendments that failed during the 1990s, two would have allowed for casino gambling. An amendment allowing the state to issue bonds for public schools failed in 1998, but the voters approved it the following year. In 1992, the voters also rejected the mandatory twenty-year question on holding a constitutional convention by nearly a million votes, 2,660,270 to 1,672,373.

**The 2000s**

The only amendment approved so far in the twenty-first century was a 2000 amendment

to Article VIII authorizing the issuance of bonds for environmental conservation (Article VIII, section 2o). In the 2002 election the voters overwhelmingly rejected a "drug treatment" amendment that was proposed by initiative and that would have required courts to offer treatment rather than imprisonment for nonviolent, first- and second-time drug offenders. The voters rejected this proposed amendment by a vote of 2,015,663 to 987,398. And in 2003, the voters rejected a proposed amendment to Article VIII that would have given state and local governments authority to issue $500 million in bonds and provide other financial assistance to support "science and technology based research and development." This proposal, advanced by Governor Bob Taft as part of his Third Frontier initiative, would have permitted state and local governments to invest public money in private business and share in the profits by creating an exception to the prohibition adopted in 1851 (and contained in Article VIII, sections 4 and 6) to address the fiscal abuses under the 1802 Constitution. Finally, this proposal would have also been an exception to the state's $750,000 debt limit as well as an exception to the 5% limit on the total indebtedness of the state (See Article VIII, section 17(A) and Commentary). The voters narrowly rejected this proposed amendment by a vote of 1,224,439 to 1,178,595.

## The Ohio Constitution and the Court at the Beginning of the Twenty-first Century

### The Ohio Supreme Court and Judicial Review

For most of Ohio's two centuries, constitutional revision primarily involved the political process with the General Assembly and the electorate playing the major roles. The judiciary, though often the subject of constitutional attention because of persistent backlogs and, at least at the 1912 Constitutional Convention, because of its perceived abuse of its power of judicial review, was an important but not the principal player on the constitutional stage.

The Ohio Supreme Court's embrace of judicial review in Rutherford v. M'Fadden (1807) in the state's first decade—despite the removal of many state court judges through the "sweeping" resolution—eventually established the primacy of the courts in interpreting the Ohio Constitution. Indeed, judicial review was sufficiently well established in Ohio by the middle of the century for the Ohio Supreme Court to observe in 1853 that

> [a] statute may, upon its face, be repugnant to the constitution, and therefore void, no matter how regular may have been the steps by which it was enacted. And although the power was at one time very seriously denied, yet it is no longer to be doubted that the courts are bound to treat such a statute as a mere nullity.

(Miller v. State, 1853, 482-83).

In the late 19th and early 20th centuries, the Ohio Supreme Court had earned the reputation as being hostile to social legislation by striking down laws designed to regulate business, to protect workers, and to provide for the general welfare. Ultimately, the court—perhaps chastened by the constitutional amendments approved in 1912—changed its course, and until the 1980s was generally deferential to the legislature.

65

The more recent history of the Ohio Constitution, however, has been marked by deep splits within the Ohio Supreme Court as well as by an unusually vitriolic struggle between the court and the General Assembly over constitutional limitations on legislative power and over the duty of the legislature to act affirmatively to meet its constitutional obligations. The former is best seen in the decisions of the court protecting the interests of personal injury plaintiffs in the face of tort reform and the latter by the controversy over the role of the court in assuring the adequacy of public funding for education.[261]

In the last two decades, as the General Assembly began enacting pro-business legislation, the court, relying on the Ohio Constitution, began to show a greater willingness to strike down measures that directly or indirectly limited the rights of workers and tort victims. During this period, the court invalidated legislation that would have imposed strict time limits on suits brought by medical malpractice claimants (Hardy v. VerMeulen, 1987; Mominee v. Sherbarth, 1986) as well as legislation that would have limited the ability of employees to sue their employers for intentional torts (Van Fossen v. Babcock & Wilcox Co., 1988). The court also extended the rights of those seeking to sue municipalities and other political subdivisions and charitable organizations by abolishing immunities that these entities enjoyed (Haverlack v. Portage Homes, Inc. 1982; Albritton v. Neighborhood Centers Association for Child Development 1984), although the General Assembly subsequently enacted legislation that partially reinstated the immunity of political subdivisions.

The conflict between the Ohio Supreme Court and the General Assembly over tort reform continued into the 1990s with the court striking down a cap on medical malpractice damage awards (Morris v. Savoy, 1991). This struggle, which a leading commentator described as a "war" between the court and the legislature,[262] culminated in the 1999 decision in State ex rel. Ohio Academy of Trial Lawyers v. Sheward (1999), in which the court, in the course of striking down omnibus tort reform legislation, reaffirmed the primacy of its role in interpreting the Ohio Constitution. "The power and duty of the judiciary to determine the constitutionality and, therefore, the validity of the acts of the other branches of government have been firmly established as an essential feature of the Ohio system of separation of powers." (State ex rel. Ohio Academy of Trial Lawyers v. Sheward, 1999 (quoting Beagle v. Walden, (1997), 508 ("'[i]nterpretation of the state and federal Constitutions is a role exclusive to the judicial branch'")). Relying on a number of constitutional grounds, including the right to a jury trial, the right to a remedy, separation of powers, and the one-subject rule, the Sheward court rejected the legislative re-enactment of a number of provisions that the court had previously held unconstitutional. And in S.B. 281 (124th General Assembly), the General Assembly revisited many of these issues in a statute that inter alia imposed a $350,000 cap on most awards of noneconomic damages in cases involving medical claims. Addressing the court directly in an

---

261. Jonathan L. Entin, "Judicial Selection and Political Culture," 30 Cap. U. L. Rev. 523 (2002): 526-38.

262. Stephen J. Werber, "Ohio Tort Reform in 1998: The War Continues," 45 Clev. St. L. Rev. 539 (1997).

unusual series of findings of fact, the General Assembly "respectfully request[ed] the Ohio Supreme Court . . . to reconsider its holdings on damage caps . . . on the deductibility of collateral source benefits . . . [and] on statutes of repose" and identified the specific decisions it wished to see reconsidered.

The dispute between the court and the General Assembly over education has been even more contentious than the dispute over tort reform and even included a threatened use of the judicial recall.[263]  Beginning with its landmark 1997 decision in DeRolph v. State (1997) and culminating in its December 2002 ruling in the same case, the court held that Ohio's system of public education relied too heavily on property taxes in violation of the constitutional duty imposed by Article VI, section 2 on the General Assembly to provide "a thorough and efficient system of common schools throughout the state."  Despite an intervening constitutional amendment approved by the voters in 1999, the court ultimately reinstated its earlier holding and "direct[ed] the General Assembly to enact a school-funding scheme that is thorough and efficient . . . ." (DeRolph IV, Ibid., 530).  Nonetheless, in 2003, the court refused to permit the Ohio courts to exercise continuing jurisdiction over the case (State ex rel. State v. Lewis, 2003), thus leaving the General Assembly free to fashion a legislative solution with only the threat of new and expensive litigation as a deterrent to legislative recalcitrance.  (See Commentary, Art. VI, section 2).

In contrast to the court's approach to issues of tort reform and educational financing, the court has been reluctant to rely on the Ohio Constitution as an independent source of constitutional rights in the area of individual rights, especially the rights of the criminally accused.  During the 1980s and 1990s, commentators criticized the court for failing to embrace the new judicial federalism, for relying almost exclusively on the federal Constitution as the source of individual rights, and for construing state constitutional provisions identically with their federal counterparts.[264]  For example, in Eastwood Mall, Inc. v. Slanco (1994), the court declined to apply the Ohio Constitution's protection of free speech to demonstrations on private property despite significant textual differences between the First Amendment and Article I, section 11 of the Ohio Constitution.  (See Commentary, Art. I, section 11).

In the early 1990s, the court appeared to be on the brink of embracing the new judicial federalism in the controversial area of search and seizure and had given Article I, section 14 of the Ohio Constitution independent meaning even though it was the mirror image of the Fourth Amendment to the U.S. Constitution (State v. Storch, 1993; State v. Brown, 1992).  However, the court subsequently drew back, declared its overriding goal to be to "harmonize" its

---

263.  See The Cincinnati Post, "Lawmaker Seeks to Oust 3 Justices" (January 17, 2003).  See also David Mayer, "Legislature Should Oust 4 Justices," Columbus Dispatch (June 6, 2001)(editorial).

264.  See Mary Cornelia Porter & G. Alan Tarr, "The New Judicial Federalism and the Ohio Supreme Court: Anatomy of a Failure," 45 Ohio St. L.J. 143 (1984); see also Kevin Francis O'Neill, "The Road Not Taken: State Constitutions as an Alternative Source of Protection for Reproductive Rights," 11 N.Y.L. Sch. J. Hum. Rts. 1 (1993): 35-38.

interpretation of the Ohio Constitution with the U.S. Supreme Court's interpretation of analogous provisions (State v. Murrell, 2002; State v. Robinette, 1997), and reversed a number of rulings that had given the Ohio Constitutional an independent construction.  (See Commentary, Art. I, section 14).[265]

Although the Ohio Supreme Court has tended to follow U.S. Supreme Court in construing analogous provisions of the state constitution, the court has at times given provisions of the Ohio Constitution independent meaning.  Indeed, in Arnold v. City of Cleveland, (1993: 42), the court described the U.S. Constitution as "provid[ing] a floor below which state court decisions may not fall" and recognized that "the Ohio Constitution is a document of independent force."  For example, the court has explicitly rejected the U.S. Supreme Court's free exercise jurisprudence and held that the analogous provision of the Ohio Constitution protects religious freedom even against religiously-neutral laws of general application (Humphrey v. Lane, 2000).  Likewise, despite the retreat on the rights of criminal defendants to be free from unreasonable search and seizure, the court has protected workers from warrantless and suspicionless searches as a condition of the receipt of workers' compensation benefits (State ex rel Ohio AFL-CIO v. Ohio Bureau of Workers' Compensation, 2002).  Nonetheless, cases such as Humphrey and AFL-CIO appear to be the exceptions rather than the rule, and the court has tended to construe provisions of the Bill of Rights to afford no greater protection than analogous provisions of the federal constitution even where the language and origin of the Ohio provisions differ significantly from their federal counterparts.

### Judicial Selection

The Ohio Supreme Court's expanded role in controversial issues involving the Ohio Constitution, its interpretations of Ohio law in such non-constitutional areas as employment, insurance, personal injury, and workers' compensation law, and its repeated conflicts with the General Assembly have contributed to an increasingly politicized judicial selection process.  In recent years there has been a significant increase in the involvement of special interest groups in judicial elections, including groups representing the interests of attorneys, business, and labor, and in the amount of money spent on judicial campaigns (including funds raised and spent independently by groups engaged in issue advocacy), and these developments have led some to question whether Ohio's commitment to an elected judiciary is consistent with the goal of having an impartial and qualified judiciary.[266]

---

265.    See Robert F. Williams, "The New Judicial Federalism in Ohio:  The First Decade," 51 Clev. St. L. Rev.  ___, ____ (2003-04) (describing the stages of the new judicial federalism, describing Ohio as a "latecomer," and noting the "backlash" in response to the expansion of rights for criminal defendants).

266.    See generally Preliminary Report—A Call to Action, Judicial Impartiality: The Next Steps (May 2003), http://www.thenextsteps.org (May 2003) (report on a forum convened by the Ray C. Bliss Institute of Applied Politics, the John Glenn Institute for Public Service and

The judicial selection process in Ohio has long been partisan, despite the 1912 amendment limiting the role of political parties, [267] and races for the Ohio Supreme Court have been "ferociously competitive."[268]  Though having a partisan overlay, the recent conflicts appear to be less about partisan politics than about ideology and the role of the courts.  As one commentator observed, "[I]f legal doctrine is politically salient, those who care about the law will seek to influence the composition of the judiciary." [269]  What had not characterized the process, until recently, has been the infusion of large amounts of funds into the process, the emergence of well-funded independent election committees willing to spend large sums free from the spending and other constraints placed on candidates, and the increasingly negative tone of judicial election campaigns.

The sharply contested supreme court election of 2000, which was characterized by unprecedented fund-raising, lavish spending by issue advocacy organizations, and a bare-knuckle campaign,[270] was followed by a judicial election in 2002 that involved an even greater amount of fundraising by candidates and their supporters.[271]  The prospect for November 2004, when four of the seven seats on the Ohio Supreme Court are on the ballot (but with only three contested races), promises to be more of the same despite the efforts of reformers to encourage a more civil debate, to limit the role of money in the judicial selection process, and to revisit the issue of the current system of judicial selection.[272]

Ohio had an appointed judiciary under the 1802 Constitution, but the General Assembly made the appointments.  In approving the 1851 Constitution, Ohio voters embraced an elected judiciary, and they rejected proposals to reduce the role of elections in judicial selection in 1938 and in 1987.  There remains today a great deal of sentiment in favor of continuing to have judges elected, and those who propose to revisit this issue and limit the right of the electorate to select judges will likely continue to face an uphill battle.

In January 2004, an ad hoc organization convened by the League of Women Voters of Ohio, the Ohio State Bar Association, Ohio Supreme Court Chief Justice Thomas J. Moyer, and

---

Public Policy, the League of Women Voters of Ohio, Chief Justice Thomas J. Moyer of the Supreme Court of Ohio, and the Ohio State Bar Association).

267.    Kathleen L. Barber, "Ohio Judicial Elections—Nonpartisan Premises with Partisan Results," 32 Ohio St. L. J. 762 (1971).

268.    Michael Solimine, "The False Promise of Judicial Elections in Ohio," 30 Cap. U .L. Rev. 559, 561 (2002).

269.    Entin, "Judicial Selection," 525.

270.    See Kara Baker, "Is Justice for Sale in Ohio? An Examination of Ohio Judicial Elections and Suggestions for Reform Focusing onthe2000 Race for the Ohio Supreme Court," 35 Akron L. Rev. 159 (2001)

271.    See James T. O'Reilly, "Writing Checks or Righting Wrongs: Election Funding and the Tort Decisions of the Ohio Supreme Court," 51 Clev. St. L. Rev.  ___, ____ (2003-04).

272.    See generally Progress Report, Judicial Impartiality: The Next Steps (January 2004), http://www.thenextsteps.org (January 2004).

some university-based good government organizations issued a report recommending the that the following steps be taken to strengthen the independent and impartial state judiciary: the lengthening of judicial terms, an increase in the "years of practice" judicial qualification, mandatory pre-election judicial training, and increases in judicial salaries.  Recognizing the unlikelihood that Ohio voters would be willing to support changes in the method of selecting judges, the organization focused instead on ways to improve Ohio's system of electing judges.  However, none of these proposals are intended to apply to the November 2004 judicial elections, although the organization's Campaign Finance Disclosure Work Group, which had deferred consideration of the regulation of third-party issue advocacy advertising because of the pendency of a case before the U.S. Supreme Court involving the constitutionality of the Bipartisan Campaign Finance Act, will likely be making an effort to amend Ohio law to regulate such issue advocacy advertising in advance of the November 2004 judicial elections as a result of the decision of the U.S. Supreme Court in McConnell v. Federal Election Commission (2003), upholding the federal regulation of the analogous provisions of federal law

Despite these efforts to reform judicial selection, Ohio may be moving in the opposite direction towards an even more robust and more expensive series of judicial campaigns.  In Republican Party of Minnesota v. White (2002), relying on the First Amendment, the U.S. Supreme Court struck down ethical rules limiting the speech of judicial candidates.  Over concerns by a dissenting justice about the impact of judicial elections on the independence of the state judiciary, the Court effectively took the position that jurisdictions that wish to continue to elect their judges will have to tolerate far more contentious judicial elections.  Moreover, the application of the First Amendment to judicial races may make it even more difficult to impose effective spending and fundraising limitations on judicial races.  Thus, White may lead to an even more robust and more expensive series of judicial elections and ironically to a more widely perceived need to alter the electoral approach to judicial selection.

### The Ohio Supreme Court and Stare Decisis

As efforts to alter various aspects of the judicial selection process in Ohio continue, the Ohio Supreme Court has signaled a willingness to reexamine its own decisions.  In Westfield Insurance Co. v. Galatis (2003), the court overturned its 1999 decision in Scott-Pontzer v. Liberty Mutual fire Insurance Co (2004), in which it had provided uninsured motorist coverage to an off-duty employee driving a spouse's car.  Scott-Pontzer, a statutory not a constitutional decision, had become very controversial, and in Westfield the court addressed when it would refuse to follow the doctrine of stare decisis and overrule earlier decisions.  In a 4-3 decision written by Justice Maureen O'Connor, the court described its approach to stare decisis as follows:

> A prior decision of the Supreme Court may be overruled where (1) the decision was wrongly decided at that time, or changes in circumstances no longer justify continued adherence to the decision, (2) the decision defies practical workability, and (3) abandoning the precedent would not create an undue hardship for those who have relied upon it

70

Ibid. (Syllabus).

Concurring in the majority opinion in Westfield, Chief Justice Thomas J. Moyer, who had dissented in Scott-Pontzer, voted to overrule the earlier decision. Recognizing that the doctrine of stare decisis embodies "a fundamental element of American jurisprudence—consistency and predictability." (Moyer, C.J., dissenting.)(quoting Gallimore v. Children's Hospital Medical Center (1993), , the Chief Justice noted that the majority's tripartite standard honored stare decisis by preventing arbitrary and discriminatory enforcement of the law while relieving courts of the obligation to follow precedents with "petrifying rigidity." (quoting Clark v. Southview Hospital & Family Health Center (1994). Agreeing that Scott-Pontzer should be limited, the Chief Justice nonetheless put the bench, the bar, the public, and perhaps the General Assembly on notice that changes in composition of the court will not necessarily result in a wholesale overruling of precedents.

> We serve the bench and the bar by adopting a cogent, clear standard by which to test claims that our precedents should not be followed. There can be little doubt that Scott-Pontzer should be limited under this standard. Our decision today does not mark a change in my belief in the importance of the predictability and consistency produced by stare decisis. No one should assume that our decision heralds a new era in which prior cases of this court will be routinely or arbitrarily overruled. Our decision, rather, is a narrow response to a decision widely recognized as an error of law, which, if left uncorrected, would have continued to produce consequences that even the majority in Scott-Pontzer could not have foreseen.

(Westfield, Ibid. 233).

As the Ohio General Assembly prepares to address an omnibus tort reform bill already passed on June 11, 2003, by the State Senate (Sub. S. B. 80, 125th General Assembly), as the Ohio Supreme Court begins the process of applying its new standard for determining the continued viability of its precedents and considers whether to heed the General Assembly's request that it reconsider some of its tort reform decisions, (S. B. 281, 124th General Assembly), and as the electorate prepares for still another hotly contested series of judicial elections, it is likely that the Ohio Constitution, the role of the Ohio Supreme Court in interpreting the constitution, and the process for selecting members of the Ohio judiciary will continue to be of great interest to all Ohioans.