**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF**
**OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| MICHAEL GONIDAKIS, MARY PARKER, MARGARET CONDITT, BETH VANDERKOOI, LINDA SMITH, DELBERT DUDUIT, THOMAS W. KIDD JR., DUCIA HAMM, | |
| Plaintiffs, | Case No. 2:22-cv-00773 |
| BRIA BENNETT, REGINA C. ADAMS, KATHLEEN M. BRINKMAN, MARTHA CLARK, SUSANNE L. DYKE, MERYL NEIMAN, HOLLY OYSTER, CONSTANCE RUBIN, EVERETT TOTTY, | Chief Judge Algenon L. Marbley Judge Amul R. Thapar Judge Benjamin J. Beaton |
| Intervenor-Plaintiffs, | |
| v. | |
| FRANK LAROSE, in his capacity as Ohio Secretary of State, | |
| Defendant. | |

**BENNETT PETITIONERS' RESPONSE TO POST-HEARING BRIEFS**
**REGARDING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Intervenor-Plaintiffs Bria Bennett, Regina C. Adams, Kathleen M. Brinkman, Martha

Clark, Susanne L. Dyke, Meryl Neiman, Holly Oyster, Constance Rubin, and Everett Totty (the

"Bennett Petitioners") submit this response to other parties' post-hearing briefs on Plaintiffs'

Motion for a Preliminary Injunction, and to answer the three questions posed by the Court to the

parties, in accordance with the Court's Orders, ECF Nos. 143 and 172.

## TABLE OF CONTENTS

INTRODUCTION AND LOCAL RULE 7.2(A) SUMMARY ....................................................... 1

ARGUMENT ............................................................................................................................. 2

    I.   Answer to Question 1: Failure to conduct a primary election that state law requires violates federal rights under the Due Process Clause and the First Amendment................ 2

    II.  Answer to Question 2: Ohio may not decline to hold a primary and go straight to the general election. ................................................................................................ 6

    III. Answer to Question 3: The federal court has authority to require a primary to be held to protect federal rights, and it should do so on April 20 if there is no lawful map and scheduled primary. ................................................................................. 9

    IV. The Court must order the use of a substantively lawful plan, not an unlawful plan passed by the Commission. ............................................................................. 11

    V.  The Third and Fourth Plans are unconstitutional. .................................................. 15

    VI. The 2011 Plan is unconstitutionally malapportioned and violates Ohio law.................... 17

    VII. Both the Corrected Independent Map Drawers' Plan and the Rodden III Plan are lawful and could be imposed by the Court........................................................ 19

       A.  The Corrected Independent Map Drawers' Plan .......................................... 20

       B.  The Rodden III Plan ................................................................................... 23

CONCLUSION........................................................................................................................ 24

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abrams v. Johnson,*
    521 U.S. 74 (1997)................................................................................13

*Anderson v. Celebrezze,*
    460 U.S. 780 (1983)........................................................................1, 4, 5, 9

*Bennett v. Ohio Redistricting Comm'n,*
    No. 2021-1198 (Ohio Jan. 28, 2022) ......................................................21

*Bonas v. Town of N. Smithfield,*
    265 F.3d 69 (1st Cir. 2001)............................................................1, 3, 10, 11

*Branch v. Smith,*
    538 U.S. 254 (2003)................................................................................5

*California Democratic Party v. Jones,*
    530 U.S. 567 (2000)................................................................................4

*Carter v. Chapman,*
    No. 7 MM 2022, 2022 WL 549106 (Pa. Feb. 23, 2022).........................10

*Cincinnati, Wilmington & Zanesville R.R. Co. v. Comm'rs of Clinton Cnty.,*
    1 Ohio St. 77 (1852)......................................................................2, 12, 14

*Diaz v. Silver,*
    932 F. Supp. 462 (E.D.N.Y. 1996) ........................................................18

*Duncan v. Poythress,*
    657 F.2d 691 (5th Cir. 1981) ........................................................1, 3, 10, 11

*Evenwel v. Abbott,*
    578 U.S. 54 (2016)............................................................................17, 18

*Gentry v. Deuth,*
    456 F.3d 687 (6th Cir. 2006) ........................................................2, 12, 14

*Griffin v. Burns,*
    570 F.2d 1065 (1st Cir. 1978)................................................................3

*Harper v. Hall,*
    379 N.C. 656 (2021), *reconsideration dismissed*, 867 S.E.2d 185 (N.C. 2022).....................10

*Jolivette v. Husted*,
    694 F.3d 760 (6th Cir. 2012) ................................................................8

*Large v. Fremont Cnty., Wyo.*,
    670 F.3d 1133 (10th Cir. 2012) ....................................................2, 12, 14

*Larios v. Cox*,
    305 F. Supp. 2d 1335 (N.D. Ga. 2004) ................................................10

*League of Women Voters of Ohio v. Ohio Redistricting Comm'n*,
    2022-Ohio-789, 2022 WL 803033 (Ohio Mar. 16, 2022) ...............15, 21

*League of Women Voters of Ohio v. Ohio Redistricting Comm'n*,
    No. 2022-Ohio-65, 2022 WL 110261 (Ohio Jan. 12, 2022) ................23

*Middletown v. Ferguson*,
    25 Ohio St. 3d 71 (1986) ................................................................12, 14

*Navajo Nation v. Ariz. Indep. Redistricting Comm'n*,
    230 F. Supp. 2d 998 (D. Ariz. 2002) .............................................13, 14

*Nolles v. State Comm. for Reorg. of Sch. Dists.*,
    524 F.3d 892 (8th Cir. 2008) ................................................................3

*State ex. rel. Ohio Acad. of Trial Lawyers v. Sheward*,
    86 Ohio St. 3d 451 (1999) ..............................................................12, 14

*State ex rel. Ohio Gen. Assembly v. Brunner*,
    114 Ohio St. 3d 386 (2007) ................................................................12

*Perry v. Perez*,
    565 U.S. 388 (2012) .............................................................*passim*

*Pileggi v. Aichele*,
    843 F. Supp. 2d 584 (E.D. Pa. 2012) ..................................................18

*Reynolds v. Sims*,
    377 U.S. 533 (1964) .............................................................*passim*

*Sixty-Seventh Minn. State Senate v. Beens*,
    406 U.S. 187 (1972) ..............................................................................10

*Smith v. Allwright*,
    321 U.S. 649 (1944) ................................................................................3

*Straw v. Barbour Cnty.*,
    864 F. Supp. 1148 (M.D. Ala. 1994) .............................................13, 14

*Tallahassee Branch of NAACP v. Leon Cnty., Fla.*,
     827 F.2d 1436 (11th Cir. 1987) ................................................................13, 14

*Tashjian v. Republican Party of Conn.*,
     479 U.S. 208 (1986).............................................................................................3, 4

*Upham v. Seamon*,
     456 U.S. 37 (1982) (per curiam) ......................................................................10

*Watkins v. Mabus*,
     771 F. Supp. 789 (S.D. Miss. 1991).................................................................18

*Wattson v. Simon*,
     970 N.W.2d 42 (Minn. Feb. 15, 2022)..............................................................18

*White v. Weiser*,
     412 U.S. 783 (1973) ................................................................................... *passim*

*Williams v. Rhodes*,
     393 U.S. 23 (1968)..........................................................................................1, 4, 5

*Yang v. Kosinski*,
     960 F.3d 119 (2d Cir. 2020).................................................................................4

**Statutes**

Ohio R.C. § 3501.01 ...................................................................................................6, 8

Ohio R.C. § 3505.03 .......................................................................................................7

Ohio R.C. § 3513.01 .......................................................................................................6

Ohio R.C. § 3513.02 .......................................................................................................7

Ohio R.C. § 3513.257 ...................................................................................................7, 8

Ohio R.C. § 3517.01 .......................................................................................................8

Ohio R.C. § 3517.012 ...................................................................................................7-9

**Other Authorities**

Ohio Const. art. V, § 7 ...................................................................................................6

Ohio Const. art. XI, § 6..................................................................................................19

## INTRODUCTION AND LOCAL RULE 7.2(A) SUMMARY

The Court asked the parties to address whether there is a federal right to vote in a primary if state law requires a primary for state elections. The answer is yes. *Infra* Part I, pp. 2-6. For Ohio to fail to hold a legally-required election would violate federal rights protected by the Due Process Clause, *Bonas v. Town of N. Smithfield*, 265 F.3d 69, 75 (1st Cir. 2001); *Duncan v. Poythress*, 657 F.2d 691, 703 (5th Cir. 1981), and associational rights of voters, candidates, and political parties protected by the First Amendment, *Williams v. Rhodes*, 393 U.S. 23, 31 (1968).

For the same reason, the answer to the Court's second question—whether Ohio may simply not hold a primary and have a general election—is no. *Infra* Part II, pp. 6-9. To hold no primary would, under existing Ohio law, bar Democratic and Republican candidates' access to the general election ballot—itself a violation of federal rights as established by the U.S. Supreme Court's decision in *Williams*, 393 U.S. at 31, and *Anderson v. Celebrezze*, 460 U.S. 780, 793-94, 806 (1983).

Finally, the Court asked about its authority to "move a primary election." If the state courts will not act to require Ohio to hold its primary, the time is fast approaching when it will be necessary and within the Court's authority to require a primary to protect Petitioners' and all Ohioans' federal rights, described above. *Infra* Part III, pp. 9-11; *Bonas*, 265 F.3 at 76; *Duncan*, 657 F.2d at 693. The Court should act on April 20, if the state process has not yet yielded a lawful district plan and a scheduled General Assembly primary.

Should that come to pass, this Court must order the use of a plan that comports with only federal law, but also the Ohio Constitution. *Infra* Part IV, pp. 11-15. Federal courts entering relief in redistricting cases must follow the substantive requirements of state law to the greatest extent possible. *White v. Weiser*, 412 U.S. 783, 795 (1973); *see also Perry v. Perez*, 565 U.S. 388, 393 (2012); *Reynolds v. Sims*, 377 U.S. 533, 584 (1964). e Federal courts may not order the use of

substantively unlawful plans passed by state officials, as such plans are void and *ultra vires*. *Large v. Fremont Cnty., Wyo.*, 670 F.3d 1133, 1147 (10th Cir. 2012); *Gentry v. Deuth*, 456 F.3d 687, 697 (6th Cir. 2006); *Cincinnati, Wilmington & Zanesville R.R. Co. v. Comm'rs of Clinton Cnty.*, 1 Ohio St. 77, 86 (1852).

The plans adopted by the Ohio Redistricting Commission (the "Commission") do not comply with Ohio law—and the Commission has no legal authority to adopt unconstitutional plans. *Infra* Part V, pp. 15-17. The 2011 Plan is the worst option of all those before the Court: it violates both federal law and Ohio law, and it would not even carry any benefits of simplifying electoral administration as compared with a completely new plan. *Infra* Part VI, pp. 17-19. The good news is that there are at least two plans already in existence that comply with Ohio and federal law: the Corrected Independent Map Drawers' Plan and the Rodden III Plan. *Infra* Part VII, pp. 20-24. If intervention becomes necessary to protect Ohioans' federal rights, this Court should impose a lawful plan such as the Corrected Independent Map Drawers' Plan or the Rodden III Plan to be implemented at a primary election on August 2, 2022

## ARGUMENT

### I.  Answer to Question 1: Failure to conduct a primary election that state law requires violates federal rights under the Due Process Clause and the First Amendment.

The Court asked the parties: "Is there a federal right to vote in a primary if state law requires a primary for state elections?" Order, ECF No. 172. The answer is yes.

State officials violate federal rights under the Due Process Clause and associational rights protected by the First Amendment if they fail to conduct a primary election that state law requires them to conduct. "Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections." *Reynolds*, 377 U.S. at 554. "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and

any restrictions on that right strike at the heart of representative government." *Id.* at 555. And the right to vote in a primary is no different. *See Smith v. Allwright*, 321 U.S. 649, 661-62 (1944) ("It may now be taken as a postulate that the right to vote in such a primary for the nomination of candidates without discrimination by the State, like the right to vote in a general election, is a right secured by the Constitution."); *Griffin v. Burns*, 570 F.2d 1065, 1075 (1st Cir. 1978) ("Primaries as well as general elections are protected as an integral part of the election process.").

Courts have therefore consistently held that state officials' failure to conduct an election that state law requires violates federal rights protected by the Due Process Clause. *Bonas*, 265 F.3d at 75 ("[T]otal and complete disenfranchisement of the electorate as a whole is patently and fundamentally unfair (and, hence, amenable to rectification in a federal court)."); *Duncan*, 657 F.2d at 703 (holding the Due Process Clause protects "the right to be free from the purposeful decision of state officials to deny the citizens of a state the right to vote in an election mandated by law"); *see also Nolles v. State Comm. for Reorg. of Sch. Dists.*, 524 F.3d 892, 898 (8th Cir. 2008) ("[V]oters can challenge a state election procedure in federal court . . . when election officials refuse to hold an election though required by state law, resulting in a complete disenfranchisement . . . ."). While the issue has arisen only rarely—state officials do not usually fail to conduct an election that state law requires—the Bennett Petitioners are aware of no contrary cases.

*Bonas* and *Duncan* did not involve primary elections, but if anything, the failure to hold a primary election to determine political parties' nominees implicates *more* federal rights, not fewer: specifically, associational rights protected by the First Amendment. "The freedom of association protected by the First and Fourteenth Amendments includes partisan political organization." *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214 (1986). And while states have

3

substantial power to regulate "the election process for state offices," that "authority does not extinguish the State's responsibility to observe the limits established by the First Amendment rights of the State's citizens." *Id.* at 217. "The right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes." *Williams*, 393 U.S. at 31. "So also, the right to vote is heavily burdened if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot." *Id.* Actions by a state that deny political parties a reasonable opportunity to place their nominees on the ballot therefore impose "heavy burdens on the right to vote and to associate," and must be supported by a "compelling interest." *Id.*; *see also Yang v. Kosinski*, 960 F.3d 119, 124 (2d Cir. 2020) (finding plaintiffs likely to succeed on claim that New York's cancellation of the 2020 Democratic primary "unduly burdened their rights of free speech and association"). *Cf. California Democratic Party v. Jones*, 530 U.S. 567, 575 (2000) ("Unsurprisingly, our cases vigorously affirm the special place the First Amendment reserves for, and the special protection it accords, the process by which a political party 'select[s] a standard bearer who best represents the party's ideologies and preferences.'" (citation omitted)); *Anderson*, 460 U.S. at 786 ("The impact of candidate eligibility requirements on voters implicates basic constitutional rights.").

As explained in the next section, under Ohio election law, if no General Assembly primary is held, then it appears that there will be no opportunity for General Assembly candidates nominated by the Democratic and Republican Parties to obtain a place on the general election ballot. *Infra* Part II. And while independent candidates might be eligible to be listed, if they are able to file nomination petitions in time, candidates affiliated with a political party are flatly prohibited from running as independent candidates. *Id.* The result would be effectively the inverse of the situation that the Supreme Court held unconstitutional in *Williams*: an election in which only

independents, and not nominees of the major parties, will be listed on the ballot. *See Williams*, 393 U.S. at 24; *see also Anderson*, 460 U.S. at 806 (holding that Ohio's requirement that independent candidates file nominating petitions in March in order to appear on the general election ballot unduly burdened First and Fourteenth Amendment rights). For Ohio to keep all candidates affiliated with existing political parties off the ballot would deny those candidates "an equal opportunity to win votes" and would burden Ohioans' associational rights to at least as great an extent as would keeping minor parties off the ballot. *Id.* at 31. The result would be an extraordinary burden on voters', candidates', and parties' associational rights, and would deny millions of Ohioans the right to vote for their candidates of choice.

What's more, the above discussion assumes that Ohio will be able to adopt a constitutional General Assembly plan in time for the November general election without intervention by this Court. The Bennett Petitioners have been steadfast in urging the Court to give Ohio as long as possible to adopt a lawful map, but they share other Ohioans' frustration and astonishment at the events of the past several months. Ohio was unable to adopt a General Assembly plan in time for the May 3 primary, yet the General Assembly took no steps to reschedule that primary, and still has not done so.[1] In these circumstances, if Ohio fails to adopt a lawful plan by May 3, it is not clear that Ohio will be able to do so in time for the November general election.

At some point, deferral must come to an end so that an orderly election may be held. *See Branch v. Smith*, 538 U.S. 254, 260-62 (2003) (affirming district court's decision to order use of

---

[1] According to recent reporting, Ohio House of Representatives Speaker Robert Cupp has confirmed that the General Assembly has no plans to introduce legislation setting a new primary date, claiming that "the process was 'in the hands of the federal court,' despite various court documents in which he argued that the election is a legislative issue and any changes should be made in the General Assembly." Susan Tebben, *Ohio House Speaker says no primary election legislation coming soon*, Ohio Capital Journal (Apr. 7, 2022, 3:50 AM) https://ohiocapitaljournal .com/2022/04/07/ohio-house-speaker-says-no-primary-election-legislation-coming-soon/.

its own plan in time for the candidate qualification deadline in March of an election year). Based on the evidence before the Court, that point is April 20 or very shortly thereafter.

## II.     Answer to Question 2: Ohio may not decline to hold a primary and go straight to the general election.

The Court next asked the parties: "May Ohio simply not hold a primary and have a general election? If so, how would Ohio law provide for a general election for those seats?" Order, ECF No. 172. The answer is no.

The Ohio Constitution and Ohio statutes require a primary election for General Assembly seats and all other partisan elective offices. Ohio Const. art. V, § 7 ("All nominations for elective state, district, county and municipal offices shall be made at direct primary elections or by petition as provided by law"); Ohio R.C. § 3513.01(A) ("[P]rimary elections shall be held for the purpose of nominating persons as candidates of political parties for election to offices to be voted for at the succeeding general election."). Many provisions of the Ohio Election Code are premised on the holding of a primary election, and the failure to hold a primary would have grave consequences for the general election.[2] Most significantly, without a primary election, there will be few or potentially no General Assembly candidates eligible to be listed on the general election ballot.

There are only three ways for a candidate's name to be placed on the general election ballot in Ohio: the candidate must have been "nominated at the most recent primary election as [a]

---

[2] Ohio law defines a primary as "an election held for the purpose of nominating persons as candidates for political parties for election to offices, and for the purpose of electing persons as members of the controlling committees of political parties and as delegates and alternates to the conventions of political parties." Ohio R.C. § 3501.01(E)(1). It goes on to provide a date which such primary election is held: "the first Tuesday after the first Monday in May of each year except in years in which a presidential primary election is held." *Id.* Nothing about the definition of "primary" is limited to primary elections held on those dates—if the Court orders that a primary be held on August 2, it will still qualify as a "primary" under the statutory definition. *See id.*

candidate[] of a political party," *id.* § 3505.03(A),[3] the candidate must have been "nominated by [a] nominating petition[]," *id.*, or the candidate must be the nominee of a newly formed political party, *id.* § 3517.012(B), (C).

If no General Assembly primary is held, then there will be no General Assembly candidates nominated as candidates of a political party at the "most recent primary election," as the May 3, 2022 primary will not include any General Assembly candidates and the most recent General Assembly primary would have been conducted more than two years ago under different, now invalid districts. Thus, there would be no nominees for the 2022 General Assembly districts by existing Ohio political parties—the Democratic and Republican Parties—on the general election ballot.

It is possible, but not certain, that candidates nominated by nominating petitions could still be listed on the general election ballot. However, nomination by nominating petition is available only to "independent candidates," and only for "an office for which candidates may be nominated at a primary election." *Id.* § 3513.257. If no General Assembly primary is held, it is unclear whether General Assembly seats would still qualify as an "office for which candidates may be nominated at a primary election." *Id.* This is because the deadline for filing a nominating petition is "not later than four p.m. of the day before the day of the primary election" that is "immediately preceding the general election at which such candidacy is to be voted for by the voters. . . ." *Id.* While there is currently a May 3 primary scheduled for *other* offices, General Assembly offices will not appear on the May 3 ballot. Accordingly, "candidacy" for such offices will *not* "be voted for by the voters" on May 3, and thus there is no applicable statutory deadline for nominating petitions for

---

[3] There is an exception if only one candidate validly petitions to be a candidate in a primary in an odd-numbered year, but 2022 is an even-numbered year. Ohio R.C. § 3513.02.

independent General Assembly candidates. Even assuming, in these circumstances, that a May 2 deadline applies, that is just a few weeks away. *Id.* In that short time, candidates would need to gather signatures of eligible voters equal to one percent of the number of ballots cast for governor in the legislative district in which they desire to run in the most recent election. *Id.* § 3513.257(C). And, of course, until there are established districts, it is impossible for candidates to know the legislative district in which they desire to run and in which they must collect petition signatures.

Worse, Ohio's definition of "independent candidate" would disqualify most would-be candidates for General Assembly offices, particularly those who would have pursued party nomination. To seek nomination by petition, an independent candidate must make a good-faith assertion of non-affiliation with any political party. *Id.* § 3501.01(I). Serving on a party's executive or central committee, membership in party clubs or organizations, or even describing oneself as a "Democrat" or "Republican" will disqualify a person from being an independent candidate. *Jolivette v. Husted*, 694 F.3d 760, 766-70 (6th Cir. 2012) (upholding this requirement against a First Amendment challenge). This provision will prevent members of the Democratic and Republican Parties from seeking to qualify as independent candidates if no primary is held.

Finally, some Ohioans could also conceivably form one or more new political parties to nominate candidates under Ohio R.C. § 3517.012. To do so, the new parties would need to submit a party formation petition at least 125 days before the general election—July 6—with signatures from qualified voters equal to one percent of the votes cast in Ohio in the 2020 presidential election, including at least 500 voters from each of half of Ohio's congressional districts. *Id.* §§ 3517.01(A)(1), 3517.012. Moreover, candidates' petitions for nomination by such a new party would need to be signed by at least five qualified voters "who have not voted as a member of a different political party at any primary election within the current year or the immediately

preceding two calendar years"—*i.e.*, no one who voted in a 2020 presidential primary, or any primary since, including the May 3 primary, could sign such a petition. *Id.* § 3517.012(B)(2)(b). These candidates would need to run as candidates of the new political party, not as Democrats or Republicans. And if multiple candidates sought nomination by a new political party for the same office, the party committee—not Ohio voters—would decide which candidate receives the nomination and appears on the ballot. *Id.* § 3517.012(C)(1).

Thus, if Ohio were to fail to hold a primary election for General Assembly candidates, it would have drastic consequences, with Ohio's existing political parties—the Democratic and Republican Parties—entirely unable to place nominees on the ballot, and an uphill road, at best, for independent candidates and the nominees of new political parties to qualify. Such an election would deprive the vast majority of Ohioans, who support one of the two existing parties, of the opportunity to vote for their candidates of choice for General Assembly. *See Anderson*, 460 U.S. at 787-88 (explaining that the right to vote and the freedom of association are burdened by the "exclusion of candidates" from the ballot).

### III. Answer to Question 3: The federal court has authority to require a primary to be held to protect federal rights, and it should do so on April 20 if there is no lawful map and scheduled primary.

Third and finally, the Court has asked whether it has authority to "move a primary election." Order, ECF No. 172. The answer is yes. At this point, however, with the May 3 primary underway without General Assembly candidates on the ballot, the question is not whether the Court can *move* the General Assembly primary; Ohio's own actions have ensured that primary will not take place as originally scheduled.

Rather, the question is whether the federal court can order that the primary *occur*. The Court's authority to order Ohio to hold a General Assembly primary follows directly from the fact that the failure to hold such a primary would violate federal rights. *Supra* Part I. When state

officials have failed to hold a state election in violation of federal rights, courts have not hesitated

to order that the election be held to protect those rights. *See Bonas*, 265 F.3d at 76 ("The violation

is striking—leading, as we have said, to disenfranchisement of the electorate as a whole—and the

district court has prudently selected a remedy that allows the electoral machinery to move forward

without continuing federal involvement. That remedy simply orders the Town to hold an election

in 2001."); *Duncan*, 657 F.2d at 693 (affirming "the decision of the district court . . . to order the

calling of a special election to fill the vacancy on the Georgia Supreme Court"). And in other

redistricting cases, courts have often postponed or rescheduled primary elections where necessary

to protect federal rights. *See, e.g.*, *Sixty-Seventh Minn. State Senate v. Beens*, 406 U.S. 187, 201

n.11 (1972) ("If time presses too seriously [to implement a remedial reapportionment plan], the

District Court has the power appropriately to extend the [election deadline] time limitations

imposed by state law."); *see also Upham v. Seamon*, 456 U.S. 37, 44 (1982) (per curiam) ("[W]e

leave it to [the District Court] in the first instance to determine whether to . . . reschedule the

[congressional] primary elections.").[4]

The need for this Court's intervention to set a new primary date reflects a remarkable

failure of Ohio's political leadership; in particular, the Ohio Redistricting Commission's refusal to

abide by the directives of the Ohio Supreme Court to adopt a constitutional General Assembly

Plan and the General Assembly's refusal to reset the primary election deadline itself. The latest in

---

[4] *See also Larios v. Cox*, 305 F. Supp. 2d 1335, 1343 (N.D. Ga. 2004) (noting the court's
power to extend election deadlines and ordering new statewide maps be drawn in time for
upcoming primary election); *Carter v. Chapman*, No. 7 MM 2022, 2022 WL 549106 (Pa. Feb. 23,
2022) (modifying congressional and statewide election calendar "to provide for an orderly election
process" due to impasse and noting suspension of state legislative election deadlines until
resolution of litigation); Order, *In the Matter of 2022 Legislative Districting of the State*, Misc.
Nos. 21, 24, 25, 26, 27 (Md. Mar. 15, 2022) (postponing 2022 gubernatorial primary and related
deadlines) (attached as Exhibit 1); *Harper v. Hall*, 379 N.C. 656, 658 (2021), *reconsideration
dismissed*, 867 S.E.2d 185 (N.C. 2022) (postponing 2022 primary and related deadlines).

this exercise in political brinksmanship appears designed to gridlock Ohio's redistricting process in the hopes that (as further discussed in the next section) the Court will order use of a plan that violates the Ohio Constitution and the holdings of the Ohio Supreme Court.

It thus seems increasingly apparent that absent a federal court order, Ohio officials will not hold a General Assembly primary at all. Secretary LaRose confidently asserts that "[w]hen a primary election will be held . . . remains to be seen, but it will happen." Br., ECF No. 164 at PageID # 5390. But his faith is unfounded. As he later acknowledges in a footnote, the General Assembly so far "has not acted to" schedule a new primary and will not be in session before April 20, the date by which intervention is needed. *Id.* at PageID # 5395 n.2.

Under the circumstances, where Ohio officials seem insistent on violating federal rights by professing themselves unable to schedule an election that they admit the state constitution requires, the Court has the unenviable duty to step in and defend federal rights by ordering that the election occur and setting a date for it. *Bonas*, 265 F.3d at 76; *Duncan*, 657 F.2d at 693. If the present situation persists on April 20, that is what the Court should do.

## IV. The Court must order the use of a substantively lawful plan, not an unlawful plan passed by the Commission.

Controlling authority is clear: in ordering relief in the redistricting context, the Court must "follow the policies and preferences of the State, as expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature, whenever adherence to state policy does not detract from the requirements of the Federal Constitution." *Weiser*, 412 U.S. at 795; *see also Perry*, 565 U.S. at 393; *Reynolds*, 377 U.S. at 584 ("[C]ourts should attempt to accommodate the relief ordered to the apportionment provisions of state constitutions insofar as is possible.").

The Court must, however, follow the legal requirements and policy choices of *the State itself*, not of particular state officials. *Weiser*, 412 U.S. at 795; *Large*, 670 F.3d at 1147 ("[D]eference must run first and foremost to the legislative decision-making of the sovereign State and, only through it, to its subordinate political subdivision."). And when state officials violate valid state law, they act beyond their legal authority, and their "*ultra vires* acts bear no legitimate force in a government under the law." *Gentry*, 456 F.3d at 697; *Cincinnati, Wilmington & Zanesville*, 1 Ohio St. at 86 (government acts are "void" if they "do[] not fall within the general grant of power to that body, or [are] expressly prohibited by some provision of the constitution"); *Middletown v. Ferguson*, 25 Ohio St. 3d 71, 80 (1986) ("[A]n unconstitutional law must be treated as having no effect whatsoever from the date of its enactment."). To rule otherwise would be to render Ohio's "constitution a blank paper" by making governmental actors "the sole judges of their constitutionality," with "no guarantee for a single right to citizens." *State ex. rel. Ohio Acad. of Trial Lawyers v. Sheward*, 86 Ohio St. 3d 451, 463 (1999) (quoting *Rutherford v. M'Faddon* (1807), in Pollack, Ohio Unreported Judicial Decisions Prior to 1823 at 71 (1952)). Ohio law emphatically rejects that route. *See id.*

That is to say, state officials cannot disregard the Ohio Constitution, because it is the "state's most fundamental law," *State ex rel. Ohio Gen. Assembly v. Brunner*, 114 Ohio St. 3d 386, 393 (2007), and the sole means by which the sovereign people of Ohio have delegated political authority to state officials, *Cincinnati, Wilmington & Zanesville*, 1 Ohio St. at 85. "[F]rom that instrument, alone, must every department of the government derive its authority to exercise any portion of political power." *Id.* If state officials violate the Ohio Constitution, as the Commission did in adopting unconstitutional plans, they act beyond their authority, and their actions are void. *Id.* at 85-86.

Plaintiffs think otherwise. They say there is "no issue" if the Court imposes a plan that, Plaintiffs do not even bother to deny, violates the Ohio Constitution because "there is nothing sacrosanct about the Ohio Constitution." Br., ECF No. 160 at PageID # 4525.

Plaintiffs cite three cases to support this remarkable proposition, but none can sustain it. In fact, these cases support the Bennett Petitioners' argument, because each involved a violation of a state law *procedure*, not of a substantive apportionment requirement. Two of the cases involved a requirement to provide advance public notice before meetings, which was set aside due to the need to adopt a remedial plan quickly. *See Navajo Nation v. Ariz. Indep. Redistricting Comm'n*, 230 F. Supp. 2d 998, 1008 (D. Ariz. 2002) (redistricting commission did not "comply with the public notice requirements set forth in the Arizona constitution before adopting on an emergency basis" the remedial plan it proposed to the court); *Straw v. Barbour Cnty.*, 864 F. Supp. 1148, 1155 (M.D. Ala. 1994) ("[T]he county commission violated state law when it met and adopted the [remedial] plan without giving prior public notice of its meeting."). The third case involved a remedial plan proposed by a county commission that lacked legal authority to reapportion itself without conducting a referendum; the plan itself was consistent with the substantive requirements of state law. *Tallahassee Branch of NAACP v. Leon Cnty., Fla.*, 827 F.2d 1436, 1438 (11th Cir. 1987).[5]

---

[5] Plaintiffs also cite *Perry v. Perez*, 565 U.S. 388 (2012), for the proposition that federal "courts should be guided by the legislative policies underlying a state plan—even one that was itself unenforceable." Br., ECF No. 160 at PageID # 4521 (quoting *Perry*, 565 U.S. at 393). But both *Perry* and the case it cites for that proposition, *Abrams v. Johnson*, 521 U.S. 74 (1997), discussed state plans that were held unenforceable due to violations of the federal Constitution and Voting Rights Act rather than any violation of state law. *See Perry*, 565 U.S. at 393 (citing *Abrams*, 521 U.S. at 79). Those plans thus reflected state policy, albeit state policy that was preempted, in part, by federal law. In contrast, the Third and Fourth Plans violate state law, and thus do not reflect Ohio policy. Plaintiffs point to no instance of a federal court imposing a district plan that violates substantive state law, except where there was an "unavoidable conflict" between federal and state law. *See Reynolds*, 377 U.S. at 568-69, 584.

13

*Navajo Nation*, *Straw*, and *Tallahassee Branch of NAACP* thus confirm, as the Bennett Petitioners have argued, that the Court may adopt a substantively lawful plan that does not comply with state procedural requirements—here, the requirement of passage by the Commission—if doing so is necessary to protect federal rights. Br., ECF No. 161 at PageID # 4568-72. But none of those cases, or any other, suggests that the Court may impose a plan that violates valid *substantive* requirements of Ohio law, such that *no* Ohio actor could have lawfully adopted it. Fundamental principles of limited government are squarely to the contrary, as explained in *Large*: When a state body or official "substantively contravenes the laws of that State—at least insofar as that contravention is not sanctioned by higher federal law—it no longer acts as an agent of that sovereign, and therefore is due no federal-court deference." *Large*, 670 F.3d at 1146; *see also Gentry*, 456 F.3d at 697; *Cincinnati, Wilmington & Zanesville*, 1 Ohio St. at 86; *Middletown*, 25 Ohio St. 3d at 80.

Plaintiffs have no answer to *Large* and the fundamental principles of limited government and popular sovereignty that underlie it. Plaintiffs cite the Supremacy Clause, but they make no effort to explain why federal law should require the Ohio Constitution's substantive requirements to give way, rather than only the procedural requirement that a plan be adopted by the Commission. Br., ECF No. 160 at PageID # 4524-25. Precedent and respect for Ohio law require the latter route because Ohio law regards substantively unconstitutional acts as void and *ultra vires*. *Gentry*, 456 F.3d at 697; *Cincinnati, Wilmington & Zanesville*, 1 Ohio St. at 86; *Middletown*, 25 Ohio St. 3d at 80; *Ohio Acad. of Trial Lawyers*, 86 Ohio St. 3d at 463.

Put differently, the Ohio-law procedural requirement of passage by the Commission must give way under preemption principles because protecting federal rights requires that a plan be in place, the Court does not have before it any Commission-passed plan that is valid under Ohio law,

14

and the invalid Commission-passed plans are void. In contrast, the Court *can* adopt a plan that meets Ohio's substantive requirements, so those requirements are not preempted by federal law.

In arguing otherwise, Plaintiffs invoke exigency, pointing to the need for a plan by April 20. Br., ECF No. 160 at PageID # 4525. But the exigency would equally be met by imposing one of the lawful plans before the Court, each of which could be imposed on April 20, in time for an August 2 primary. *Infra* Part VII. Exigency therefore provides no justification for imposing a substantively unlawful plan.

The Commission had no authority to adopt redistricting plans in violation of the Ohio Constitution. It would be a strange form of federalism for this Court to empower the Commission's lawless intransigence in repeatedly violating the express limitations that the Ohio people placed on its authority, when Ohio's own legal system has strived to enforce those limitations.

## V.      The Third and Fourth Plans are unconstitutional.

Plaintiffs ask the Court to order the use of the Third or Fourth Plan adopted by the Commission, but as the Bennett Petitioners explained in their prior brief, both are unconstitutional under Ohio law. Br., ECF No. 161 at PageID # 4569-73. The Ohio Supreme Court already held the Third Plan unconstitutional "in its entirety" and ordered the Commission to "draft and adopt an entirely new General Assembly–district plan." *League of Women Voters of Ohio v. Ohio Redistricting Comm'n*, 2022-Ohio-789, ¶ 44, 2022 WL 803033 (Ohio Mar. 16, 2022) ("*LWV III*"). And after starting to do so, in the last two hours before the Court-imposed deadline, a partisan majority of the Commission instead pulled the plug and adopted the Fourth Plan, which is 99.7% identical to the Third Plan and contains nearly all of the same constitutional problems. ECF No. 161-1 ¶ 4; Tr. 136:3-138:6; 145:15-22; 148:15-18; 174:19-175:4.

No one even attempts to defend the Fourth Plan's constitutionality in this Court. Plaintiffs point out that "[a]s of today"—that is, April 6 when they filed their brief—the Fourth Plan "has

15

not been invalidated by the [Ohio Supreme] Court." Br. at Page ID # 4524, ECF No. 160. Yet elsewhere, they acknowledge that the Fourth Plan is "likely to be rejected" by the Ohio Supreme Court because of its similarity to the Third Plan, *id.* at Page ID #4514, and nowhere do they argue that the Fourth Plan complies with the constitutional requirements as the Ohio Supreme Court has construed them. *See id.* at 4522-24. Similarly, Secretary LaRose emphasizes that "as of the filing of this *Response*, the Ohio Supreme Court has not yet issued a ruling, and the Fourth Plan stands." Resp. at Page ID # 5391-92, ECF No. 164. But even though Secretary LaRose *voted* for the Fourth Plan, *see* Ohio Redistricting Comm'n, Mar. 28, 2022 Tr. Part 4, available at https://redistricting.o hio.gov/assets/organizations/redistricting-commission/events/commission-meeting-march-28-2022-281/transcript-part-4.docx (last visited Apr. 11, 2022), he offers neither evidence nor argument in this Court that it is lawful. And the statements several Commissioners made in voting for the Fourth Plan show that they never believed it was. *See id.*

Bennett Petitioners' and the other Intervenors' showing thus stands entirely unrebutted: the Fourth Plan violates the Ohio Constitution. And because, as explained in Part VII, lawful plans are available, the fact that the Fourth Plan violates the substantive redistricting requirements of the Ohio Constitution means that the Court may not order its use. *White*, 412 U.S. at 795; *Perry*, 565 U.S. at 393; *Reynolds*, 377 U.S. at 584; *supra* Part IV. In advocating for the adoption of the Third or Fourth Plans, then, Plaintiffs effectively ask the Court to act as an accessory-after-the-fact to the Commission's repeated violations of the Ohio Constitution by signing off on an *ultra vires* Commission plan.

After admitting that, "as a statewide official who swore an Oath to obey Ohio's Constitution," he "should" not advocate for an unconstitutional plan, Resp., ECF No. 164 at PageID # 5395 n.2, Secretary LaRose goes on to do just that, arguing that using the Fourth Plan

would be easier for boards of elections precisely because it is nearly identical to the unconstitutional Third Plan that many counties still have in their systems, *id.* at 5399-00. But the record is clear that Ohio can conduct an August 2 election using an entirely new plan, under an ordinary elections schedule, if the plan is adopted on April 20. Tr. 83:3-84:25; *see also* Resp., ECF No. 164 at PageID # 5396 n. 8. The Court's duty is to respect state law to the greatest extent consistent with protecting federal rights. *Weiser*, 412 U.S. at 795; *Perry*, 565 U.S. at 393; *Reynolds*, 377 U.S. at 584. It cannot adopt an unconstitutional plan simply because doing so would be a bit easier for elections officials.

### VI.     The 2011 Plan is unconstitutionally malapportioned and violates Ohio law.

The Court also cannot adopt the 2011 Plan. It violates both federal and state law. It is undisputed that the 2011 Plan is unconstitutionally malapportioned in violation of the Equal Protection Clause. Br. ECF No. 160 at PageID # 4526 (Plaintiffs); Resp., ECF No. 164 at PageID # 5400-01 (Secretary LaRose). Remarkably, Plaintiffs—whose primary legal claim has always been malapportionment—nevertheless argue that the Court could order the use of the 2011 Plan for one more election. Br., ECF No. 160 at PageID # 4526-27. Nothing could possibly justify the Court in doing so. Using the 2011 Plan is the most lawless avenue available to the Court: it would violate federal rights, it would also violate Ohio law, and it would carry no offsetting benefits.

*First*, the 2011 Plan violates federal law. It is extraordinarily malapportioned, with a maximum population deviation of 34.21 percent in the Ohio House and 25.26 percent in the Ohio Senate. Decl. of Dr. Jonathan Rodden at Page ID # 4631 ¶ 13, ECF No. 161-2. Plans with a maximum deviation of more than 10 percent are "presumptively impermissible" under the Equal Protection Clause, and no one attempts to defend the significant additional deviations in the 2011 Plan. *Evenwel v. Abbott*, 578 U.S. 54, 60 (2016) (quoting *Brown v. Thomson*, 462 U.S. 835, 842-43 (1983)). Secretary LaRose "assumes that the Court would order that any population

malapportionment issues be addressed" before ordering the use of the 2011 Plan. Resp. at Page ID # 5401, ECF No. 164. He later describes fixing malapportionment as "a *must*." *Id.* at 5404. But correcting the malapportionment issues in the 2011 Plan is not a simple or straightforward assignment. *Cf. Wattson v. Simon*, 970 N.W.2d 42 (Minn. Feb. 15, 2022) ("[W]e start with the existing [state legislative] districts, changing them as necessary to remedy [malapportionment] by applying politically neutral redistricting principles. Still, this restrained approach does not necessarily yield little change. When one district changes, so must its neighbors—a cascading effect that means even a district drawn ten years ago that remains within appropriate population deviation will need to change along with the rest of the state.").[6] Secretary LaRose provides no guidance as to how he expects that the Court could accomplish that extraordinarily fraught task in the next nine days. *See id.* It would make no sense for the Court to start from scratch at this late date when it already has a menu of properly apportioned plans in front of it, two of which—the Corrected Independent Map Drawers' Plan and the Rodden III Plan—comply fully with all substantive legal requirements.[7]

---

[6] Moreover, even when adjusting a district plan in order to remedy malapportionment, a federal court must ensure that the remedial plan conforms with substantive state law to the greatest extent possible, which would necessarily include Ohio's constitutional redistricting reforms, adopted after the 2011 Plan was enacted. *See Weiser*, 412 U.S. at 795.

[7] The lawful plans that are available to the Court distinguish this case from *Watkins v. Mabus*, 771 F. Supp. 789 (S.D. Miss. 1991), where the court ordered an "on-time" election under the prior decade's plan due to a lack of time to fashion its own plans and serious problems with each of the parties' proposed plans. Indeed, the ready availability of alternative plans and the fact that the primary election will already not take place as scheduled underscore that this case is the *opposite* of those in which courts have allowed the implementation of a previous decade's—or any other invalid—maps. *See Pileggi v. Aichele*, 843 F. Supp. 2d 584, 596 (E.D. Pa. 2012) (ordering election to proceed under the "only-existing plan, the [previous decade's] Plan" where stopping the Secretary of State "from moving forward with the" scheduled primary was "not a reasonable option," as "the election process had already begun" under the previous decade's state legislative maps pursuant to state supreme court order); *see Diaz v. Silver*, 932 F. Supp. 462, 468–69 (E.D.N.Y. 1996) (listing cases where courts allowed elections to proceed under invalidated maps

*Second*, if it were adopted today, the 2011 Plan would also flagrantly violate Ohio law. It was adopted before the 2015 amendments to the Ohio Constitution that created today's Article XI, which established the Commission as a body, certain line-drawing criteria, and the partisan-fairness requirements of Article XI, Section 6. As the Bennett Petitioners have explained, the 2015 amendments were passed precisely to consign partisan gerrymanders like the 2011 Plan to the dustbin of Ohio redistricting history. The 2011 Plan therefore does not comply with the Ohio Constitution as it exists today, and it has never been adopted by the Commission, the body that is now tasked with adopting General Assembly plans.

*Third*, as Secretary LaRose's filing makes clear, using the 2011 Plan would not carry any efficiency advantages over using any other plan. Resp. at Page ID # 5401, ECF No. 164. Evidently, the boards of election have by now entirely removed the 2011 Plan from their systems and would have to "rebuild" those districts "from the ground up." *Id.* If boards of elections must do that, there is no reason to order them to do it with the malapportioned 2011 Plan, rather than with one of the lawful plans before the Court.

In sum, the 2011 Plan has nothing going for it: it (alone of all the plans) is malapportioned under federal law, violates Ohio law, and would be no easier for elections officials to implement than any other plan. The Court should reject that option out of hand.

### VII. Both the Corrected Independent Map Drawers' Plan and the Rodden III Plan are lawful and could be imposed by the Court.

The Court has at least two lawful options in front of it: the Corrected Independent Map Drawers' Plan and the Rodden III Plan. If Ohio has no lawful plan on April 20, the Court should order the use of one of those plans.

---

where "no alternative districting plan exists" and where doing so would avoid disruptions to regularly scheduled election dates and deadlines).

Secretary LaRose raises no objection to either plan. *See generally* Resp., ECF No. 164. He contends that implementing any plan other than the Fourth Plan will require that he be supplied on April 20 with "the electronic shape files, Census block assignment files, written legal descriptions of the districts, and the designations of the most populous county in each House and Senate district." *Id.* at 5396 n.3. The Bennett Petitioners have already made the block assignment files for the Corrected Independent Map Drawers' Plan and the Rodden III Plan available and stand ready to provide the electronic shape files and most populous county designations for those plans.[8] The appropriate state officials can use the already-submitted block assignment files to begin preparing legal descriptions of the two plans right away. Secretary LaRose has previously directed boards of elections to begin programming their systems before legal descriptions had been generated. *See* Ohio Sec'y of State, Directive 2022-26 at 3, https://www.ohiosos.gov/globalassets/elections/directives/2022/directive-2022-26.pdf (directing boards of election to "immediately begin the process of reprogramming their voter registration systems with the February 24, 2022 General Assembly district maps" even though the legal descriptions were not yet available).

### A. The Corrected Independent Map Drawers' Plan

The Corrected Independent Map Drawers' Plan is a lawful plan generated by independent map drawers retained by the Commission itself, with technical corrections that left the plan 99.9% unchanged and did nothing to affect its partisan balance. ECF No. 161-2 at PageID # 4361 ¶ 11. It complies with all substantive requirements of Ohio law, and it is properly apportioned under federal law. ECF No. 161-2 at PageID #4361 ¶ 8; *see also* ECF No. 171-1. The Court should order its use if there is no lawful plan as of April 20.

---

[8] *See* ECF No. 177-7 at PageID # 5773 ¶ 6 (link to files for Corrected Independent Map Drawers' Plan); ECF No. 107 at PageID # 2555 n.10 (link to files for Rodden III Plan).

Plaintiffs raise three objections to imposing a plan drawn by the independent map drawers. First, Plaintiffs complain that the plan was rejected by the Commission. Br. at Page ID # 4531, ECF No. 160. But as explained above, the Commission has never adopted a lawful plan—had it done so, there would be no need for the Court's intervention. *Supra* Parts IV-V. And as between a lawful plan rejected by the Commission and an unlawful one that the Commission adopted, deference to Ohio's Constitution requires that the Court favor the lawful plan. *Id.* This is especially true where only the independent map drawers' plan—unlike any of the plans that the Commission adopted—was *drafted* by map drawers retained by the Commission itself, which is a state constitutional requirement. *LWV III* at ¶ 25 ("The commission has *adopted* three plans so far, but it still has not *drafted* one." (emphasis in original); citing Ohio Const. art. XI, § 1(C) ("The commission shall draft the proposed plan . . . .")).

Second, Plaintiffs complain that the independent map drawers' plan had technical flaws. Br., ECF No. 160 at PageID # 4530. This was true of the original independent map drawers' plan, but the Corrected Independent Map Drawers' Plan fixes those issues, while preserving 99.9% of Ohioans in the districts that the independent map drawers placed them in and leaving the plan's partisan balance unchanged. ECF Nos. 161-2, 171-1.[9]

Third, Plaintiffs complain about the involvement of staffer Chris Glassburn in providing comments and input on the independent map drawers' plan. Br. at Page ID # 4530, ECF No. 160. Contrary to Plaintiffs' misleading description that Mr. Glassburn "drafted portions of the map that

---

[9] It is not unusual for a substantively complete plan to require technical correction as a part of a cleanup process. The Bennett Petitioners note that the Commission itself has previously adopted plans that contained technical violations akin to those in the plan that the independent map drawers were finalizing. *See* Aff. of Raymond DiRossi ¶ 28, *Bennett v. Ohio Redistricting Comm'n*, No. 2021-1198 (Ohio Jan. 28, 2022) (affidavit from Republican Commissioners' map drawer identifying allegedly "Non-Significant Violations" in the Commission's Second Plan, explaining that the plan should be upheld because the issues were "minor" and "easily fixable").

were not approved by Dr. Johnson, Dr. McDonald, or a member of the Redistricting Commission," there was nothing nefarious about Mr. Glassburn's assistance. As Mr. Glassburn told this Court, he—along with two Republican staffers and another Democratic staffer—was charged with being in the room with the map drawers to offer them technical advice to assist them in completing the maps, all live-streamed to the public. Tr. 123:20-24. That is, Mr. Glassburn provided feedback in public to the map drawers, while livestreamed, pursuant to the Commission's approved procedures for working with the map drawers. Dr. Johnson explained that both he and Dr. McDonald "reviewed the partisan lean" of the suggested map portions provided by Mr. Glassburn and made changes to those suggestions. Aff. of Dr. Johnson at Page ID # 4540, ECF No. 160-1. If the Republican staffers did not weigh in on Mr. Glassburn's assistance on March 28th, it was because those staffers eschewed working with the map drawers on that day. Specifically, Mr. Springhetti, one of the Republican staffers, chose not to be in the mapping room for most of March 28th, and, when he did enter, he focused on drawing what became the Fourth Plan, rather than assisting the independent map drawers. *See* Ohio Redistricting Comm'n, Mar. 28, 2022 Tr. Part 4 at 3, https://redistricting.ohio.gov/assets/organizations/redistricting-commission/events/commission-meeting-march-28-2022-281/transcript-part-4.docx (President Huffman revealing to the Commission that "Mr. Springhetti" had been "working on" "another working document" instead of the independent map).

It is a bit rich for Plaintiffs to complain about Mr. Glassburn's publicly live-streamed assistance to Mr. Johnson, when it was the Republican staffer's choice to be absent except for when he drew what would become the Fourth Plan, rather than assisting the independent map drawers as Mr. Glassburn did. In any event, Mr. Glassburn's assistance was rendered to Mr. Johnson, the *Republican*-nominated map drawer, who finished the plans in the absence of Dr.

McDonald, the Democratic Commissioners' nominee. *See id.* at 4541-42 ¶ 17. Plaintiffs make no showing that Mr. Glassburn's assistance did anything to undermine the partisan balance of the map, and it did not. *See* Decl. of Dr. Jonathan Rodden, ECF No. 161-2.

### B.     The Rodden III Plan

Alternatively, the Court should order the use of the Rodden III Plan. Aside from arguing that the Rodden III Plan was not adopted by the Commission, *see supra* Part IV, Plaintiffs argue only that the Rodden III Plan does not meet the strict partisan proportionality requirements of the Ohio Constitution. Br., ECF No. 160 at PageID # 4531. Plaintiffs argue that Dr. Rodden "acknowledged that this map should not be an option for this Court" but that is outright false: the Court will search Plaintiffs' citations in vain for such a statement. *Id.* Rather, Dr. Rodden testified that "to [his] knowledge [his] plan met the technical criteria of the Constitution," Tr. 199:16-20, and that his plan was able "to meet the requirements of the Ohio Constitution and come closer to partisan proportionality" than the Commission's plans did. *Id.* at 186:17-21; *see also* Ex. 3, ECF No. 107-3 at PageID # 2614 ¶ 30 ("Although, admittedly, the Rodden III Plan does not achieve the perfect 54/46 split, it gets closer than the [Third Plan] by anywhere from 6 to 9 percent.").

The Ohio Constitution's partisan proportionality requirement is mandatory, but it requires a bona fide, best efforts attempt to achieve perfect partisan proportionality, rather than necessarily mandating complete success: it "contemplates that the standards set forth in it may not come to fruition, [but] it nevertheless requires the commission to try to achieve them." *League of Women Voters of Ohio v. Ohio Redistricting Comm'n*, No. 2022-Ohio-65, ¶ 90, 2022 WL 110261 (Ohio Jan. 12, 2022) ("*LWV I*"). It is undisputed that, as the Ohio Supreme Court has construed and applied the partisan proportionality requirements, the Rodden III Plan comes far closer to proportionality than the Third Plan or the Fourth Plan. Ex. 1, Expert Aff. of Dr. Jonathan Rodden, ECF No. 161-1 at PageID # 4601 ¶¶ 29-3 (Mar. 30, 2022). The Corrected Independent Map

Drawers' Plan is even better. Tr. 187:1-3. But if for whatever reason the Court does not impose the Corrected Independent Map Drawers' Plan, it should impose the Rodden III Plan. It would make no sense for the Court to reject the Rodden III Plan as insufficiently proportional and then impose a plan that is even less proportional in its stead.

## CONCLUSION

For the foregoing reasons, if intervention becomes necessary to protect Ohioans' federal rights, this Court should impose a lawful plan such as the Corrected Independent Map Drawers' Plan or the Rodden III Plan to be implemented at a primary election on August 2, 2022.

Respectfully submitted,

/s/ Donald J. McTigue_____
Donald J. McTigue* (OH 0022849)
*Counsel of Record
Derek S. Clinger (OH 0092075)
MCTIGUE COLOMBO & CLINGER LLC
545 East Town Street
Columbus, OH 43215
T: (614) 263-7000
F: (614) 368-6961
dmctigue@electionlawgroup.com
dclinger@electionlawgroup.com

Abha Khanna**
Ben Stafford **
ELIAS LAW GROUP LLP
1700 Seventh Ave, Suite 2100
Seattle, WA 98101
T: (206) 656-0176
F: (206) 656-0180
akhanna@elias.law
bstafford@elias.law

David R. Fox**
Jyoti Jasrasaria**
Spencer W. Klein**
Harleen Gambhir**
Raisa Cramer**
ELIAS LAW GROUP LLP
10 G St NE, Suite 600

Washington, DC 20002
T: (202) 968-4490
F: (202) 968-4498
dfox@elias.law
jjasrasaria@elias.law
sklein@elias.law
hgambhir@elias.law
rcramer@elias.law

** Admitted pro hac vice

*Counsel for Bennett Petitioners*

**CERTIFICATE OF SERVICE**

This is to certify a copy of the foregoing was served upon all counsel of record by means

of the Court's electronic filing system on this 11th Day of April, 2022.


/s/ Donald J. McTigue_____
 Donald J. McTigue (OH 0022849)