# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| MICHAEL GONIDAKIS, et al., *Plaintiffs*, <br><br> v. <br><br> FRANK LAROSE, in his official capacity, *Defendant,* <br><br> and <br><br> SENATOR VERNON SYKES and HOUSE MINORITY LEADER ALLISON RUSSO, in their capacities as members of the Ohio Redistricting Commission, *Intervenors-Defendants.* | Case No. 2:22-cv-773 <br><br> Chief Judge Algenon L. Marbley <br><br> Circuit Judge Amul R. Thapar <br><br> Judge Benjamin J. Beaton <br><br> (Three-Judge District Court) |

**Intervenors-Defendants Senator Vernon Sykes and House Minority Leader Allison Russo's Supplemental Post-Hearing Reply Brief**

**TABLE OF CONTENTS**

Introduction .................................................................................................................................. 1

Argument .................................................................................................................................... 2

I.    This Court must select the map that best complies with state policy: the Johnson/McDonald Plan ................................................................................................ 2

      A.    The 2011 map is administratively unworkable and constitutionally defective ............................................................................................................. 2

      B.    The Court cannot order Secretary LaRose to implement the Third or Fourth Plan ............................................................................................................ 3

      C.    The Johnson/McDonald Plan complies with the Ohio Constitution and is the most appropriate remedy, if one is necessary ............................................. 10

II.    This Court possesses the authority to order use of an interim map and to move the primary date .................................................................................................................. 11

      A.    Holding a general election without a primary is not feasible and would risk a violation of Ohioans' First Amendment rights ........................................... 12

      B.    Under the Supremacy Clause, this Court can move the date of the primary to preserve the federal right to vote ........................................................ 14

Conclusion ................................................................................................................................. 15

## INTRODUCTION

A federal court fashioning a reapportionment plan is required to select the plan that follows state policy to the greatest extent possible while complying with federal law. *White v. Weiser*, 412 U.S. 783, 795 (1973). A state's clearest pronouncements of its policy are found in its constitution and statutes. So when, as here, a court is presented with one plan that satisfies federal law and state law and another plan that satisfies federal law but violates state law, the choice for the court is easy: it must order the use of the plan that comports with the law of both sovereigns.

The plaintiffs nonetheless ask this Court to choose a plan that violates the Ohio Constitution out of "deference" to the Ohio Redistricting Commission. But there is no basis for "deference" to a proposal that violates state law. That's because a state's policy is not determined by the unbridled discretion of elected officials, who are constrained by the laws that vest them with authority and, ultimately, the state's constitution. When they transgress those limits, their decisions reflect no more than their personal preferences, not the policy of the state.

To see why, consider the implications of the plaintiffs' rule in a noncontroversial hypothetical. The Ohio Constitution requires 99 seats in the Ohio House of Representatives and 33 in the Senate. Ohio Const. art. XI, § 1(C). Assume if, in response to a federal court striking down a General Assembly plan as malapportioned, a party asked the federal court to implement a Redistricting Commission map that fixed the one-person-one vote problem but created an equal number of House and Senate seats. Would the federal court be bound to order that plan be used in an upcoming election?

The answer is surely no, lest the Redistricting Commission be given carte blanche to amend the Ohio Constitution. Rather, the elementary principles that govern court-ordered remedial plans leave no doubt about the appropriate remedy in this case (if one is necessary). The 2011 map, the

1

Third Plan, and the Fourth Plan each squarely violates the Ohio Constitution and, consequently, the relevant policy of the state. Because the Johnson/McDonald Plan, by contrast, complies with the substantive commands of the Ohio Constitution, it best reflects state policy and should be used in the upcoming election if Ohio does not develop its own map prior to April 20.

This Court also has authority to order use of an interim map and move the date of the primary if Ohio officials fail to act. Under the circumstances presented here, where there is minimal time before the general election process must begin and it is unclear how a general election could be carried out without a primary, the failure to hold one would violate the plaintiffs', and all Ohioans', federal rights. To protect against that result, this Court may order the use of a map. And because the current primary date, like the absence of a map, threatens those federal rights in the same way, the Court likewise has authority to postpone that date. But to respect federalism and the State's primacy in setting its own apportionment standards, that interim map must comply with not just federal, but also state, substantive constitutional law.

## ARGUMENT

**I.     This Court must select the map that best complies with state policy: the Johnson/McDonald Plan.**

**A.    The 2011 map is administratively unworkable and constitutionally defective.**

The 2011 map is not a viable option. At the outset, far from representing the status quo, there are serious doubts that Secretary LaRose could even comply with an order directing him to use the 2011 map. His office no longer possesses the electronic files necessary to carry out an election under the 2011 map. ECF No. 164 at 14. It is unclear whether they could be recreated at all. But at a minimum, it would be a "very difficult and time-consuming task," and the Secretary has provided no assurance that he could complete it in time for the state to hold a primary on August 2. *Id.*; *see also id.* at 3 ("Secretary LaRose's office does not possess the original 2011

2

electronic data files . . . and is not certain where they could be found, even assuming they exist."). Given the available alternatives, there is no reason for this Court to require the Secretary to attempt that burdensome endeavor and put the primary and general elections at risk.

But there is a more basic reason to reject the 2011 map: It fails each of the two requirements that the Supreme Court has set forth for court-ordered remedial apportionment plans. First, as all parties agree, the 2011 map violates federal law because it is malapportioned. ECF No. 160 at 18; ECF No. 161 at 3; ECF No. 164 at 12-13. The plaintiffs ask this Court to disregard that federal infirmity for this election only, ECF No. 160 at 19, but they cite no authority for the proposition that it is permissible to order an election under an unconstitutional map when time remains to implement a constitutional one.[1] Second, the 2011 map violates, not follows, state policy. Not only does it violate the Ohio Constitution's anti-gerrymandering provisions, *see* ECF No. 162 at 5, but given the universal agreement that the map is now malapportioned, it is also indisputable that the map violates Ohio's independent population-equality requirement. *See* Ohio Const. art. XI, § 3(B)(1).

Simply put, the 2011 map inflicts federal injuries, fails to follow state policies mandated by the Ohio Constitution, and risks that the primary may not be held in a timely fashion at all. It is not an appropriate remedy.

### B. The Court cannot order Secretary LaRose to implement the Third or Fourth Plan.

In asking this Court to adopt the Third or Fourth Plan, the plaintiffs make no claim that either complies with the Ohio Constitution. Instead, they deride the charter governing the people

---

[1] *Watkins v. Mabus*, 771 F. Supp. 789 (S.D. Miss. 1991), which the plaintiffs invoke as support for using the 2011 map, is not to the contrary. In addition to identifying a litany of problems, including potential violations with the Voting Rights Act, with the plans submitted by the parties, the court explained that, "if elections are to be timely held, they must be held pursuant to existing law," i.e., the malapportioned map. *Id.* at 801. That is not the case here.

of Ohio as "more statutory than capital 'C' constitutional" and urge this Court to disregard its substantive mandates either out of "deference" to the preferences of some members of the Redistricting Commission or, joined by Secretary LaRose, for reasons of administrative convenience. ECF No. 160 at 18. These arguments fundamentally misunderstand the basis for federal-court-deference to state policies, find no support in the case law, and should be rejected.

**1.** To repeat: a federal court setting an interim apportionment plan must follow state policies unless they conflict with federal law. *White*, 412 U.S. at 796. This directive requires federal courts to follow valid state constitutional provisions and laws that speak directly to the method of drawing a map. Thus, as we previously explained, in *Beens*, a district court was required to follow Minnesota's valid law setting the number of seats in the state's legislature when crafting an interim plan. *Sixty-Seventh Minnesota State Senate v. Beens*, 406 U.S. 187, 197 (1972). In that case, the governor had adopted a different "current policy," but the U.S. Supreme Court made clear that such a policy could not justify departing from the controlling state law; only a conflict with federal law could. *Id.* at 197, 199.

Ordering the implementation of the Third or the Fourth Plan would contravene this basic framework. The plaintiffs do not contend that either Plan complies with the Ohio Constitution. Nor can they—both plans blatantly violate it. The Ohio Supreme Court, the authoritative voice on the state's constitution, already held that the Third Plan is unconstitutional. *League of Women Voters of Ohio v. Ohio Redistricting Comm'n*, 2022-Ohio-789, ¶¶ 25–42 (March 16, 2022) (per curiam). And the Fourth Plan, the plaintiffs admit, is essentially the same. ECF No. 160 at 16. Using one of those plans anyway would be unlawful. It would displace the Ohio Constitution despite the availability of constitutionally compliant alternatives—the McDonald/Johnson Plan

4

and the Rodden Plan—and thus despite the absence of an "unavoidable conflict" with federal law. *Reynolds v. Sims*, 377 U.S. 533, 584 (1964). That is not permissible.

For that reason, courts have consistently rejected proposed remedial maps that violate state substantive law. Consider *Farnum v. Burns*, 561 F. Supp. 83 (D.R.I. 1983) (three-judge court), which in many ways resembles this case. With no map in place for the upcoming 1982 election, the government-defendants proposed that the court order the use of a map that was not set to take effect until the 1984 election. *Id.* at 87, 90 n.1. The court declined to order use of the 1984 map in full because it violated state law. In particular, the drawing of certain districts violated the Rhode Island Constitution's requirement of compactness—a mandate "intended to . . . prevent the political gerrymander." *Id.* at 90. The court therefore jettisoned those portions of the map. But for the remaining components of the 1984 map, untainted by any violation of the state constitution, the court held that deference was proper. *Id.* at 92 & n.13.

Other courts presented with proposed remedial plans that violate state law have similarly refused to adopt them. *See, e.g.*, *Large v. Fremont Cnty.*, 670 F.3d 1133, 1146 (10th Cir. 2012) (rejecting proposed plan that called for one single-member district and one four-member district, which state law did not permit); *Montes v. City of Yakima*, 2015 WL 11120964, at *5 (E.D. Wash. Feb. 17, 2015) ("If the plan proposed by Defendants conflicts with the policy choices of the Washington State legislature, it is owed no deference."); *McMillan v. Escambia Cnty.,*, 559 F. Supp. 720, 725 (N.D. Fla. 1983) (rejecting proposed plan that called for seven-member board of commissioners when constitution required five members); *cf. Harper v. City of Chicago Heights*, 223 F.3d 593, 601 (7th Cir. 2000) (reversing remedial plan that required "cumulative voting" not permitted by state law).

**2.** The plaintiffs claim that this Court still must order the adoption of the Third or Fourth plan because "deference" to the Redistricting Commission is required "even if [a proposed] legislative plan may violate state law." ECF No. 160 at 13. But they identify no case in which a federal court ordered use of a map that violated the substantive mandates of state law. Instead, they point to a trio of cases that involved a violation of state *procedural* requirements that govern the enactment of an apportionment plan. *See Tallahassee Branch of NAACP v. Leon Cnty.*, 827 F.2d 1436 (11th Cir. 1987) (proposed plan not submitted to voters for approval); *Navajo Nation v. Ariz. Indep. Redistricting Comm'n*, 230 F. Supp. 2d 998 (D. Ariz. 2002) (proposed plan not enacted in compliance with open meeting laws); *Straw v. Barbour Cnty.*, 864 F. Supp. 1148 (M.D. Ala. 1994) (same).

That difference matters because procedural defects, unlike substantive violations, must be set aside to protect federal rights. A court ordering an interim map will, by definition, fail to comply with certain state-law procedural requirements for enacting a map through the legislative process. Take *Leon County*—one of the plaintiffs' cases. There, state law required the Leon County Commission to submit a redistricting change to voters for approval, which the Commission failed to do before presenting its plan to the court. 827 F.2d at 1437. The Eleventh Circuit rejected an argument that this procedural deficiency precluded deference to the substance of the Commission's proposal. *Id.* at 1440. And that makes sense. Whether the court chose the Commission's proposal or one from the plaintiff, the result would be the same: the court's order would not have been submitted to the vote of the people of Leon County for approval. It would achieve nothing to reject a plan because of a defect that the alternative also possesses.[2]

---

[2] There are still other reasons to reject these cases. *Navajo Nation* and *Straw* held that "exigent circumstances" justified deference to a legislative proposal despite a violation of state

6

In this way, strict compliance with procedural requirements would prevent any map from being used and thus stand as an obstacle to the vindication of federal rights. So, the existence of that defect in all options justifies setting it aside to protect the federal rights at issue—it presents the requisite "unavoidable conflict." But when, as here, the alternatives do comply with the state's substantive requirements, setting those requirements aside serves no federal end.

Ordering a map that contains a procedural defect is different for a second reason: It does not result in a court ordering state officials to violate state laws. At the end of the day, courts in apportionment cases are asked to enjoin a defendant, here Secretary LaRose, to carry out an election. If the map violates state substantive law—for instance, if the state constitution calls for a legislature containing between 40 and 60 seats but the map has only 20—then the election official is forced to violate state law or face contempt sanctions. But if the map was merely proposed to the court after a deficient process—for instance, a government-defendant failed to comply with an open-meeting law before proposing a 50-seat map—the election official subject to the injunction violates no state law in complying with the court's order. Unless absolutely necessary, a federal court should not order a state official to contravene state law. *See, e.g.*, *Cleveland Cnty. Ass'n for Gov't by People v. Cleveland Cnty. Bd. Of Comm'rs*, 142 F.3d 468, 477 (D.C. Cir. 1998) ("[I]f a violation of federal law necessitates a remedy barred by state law, the state law must give way; if no such violation exists, principles of federalism dictate that state law governs."); *Kasper v. Bd.*

---

law. Here, that exigency is lacking, as Secretary LaRose has represented that his office can conduct an election under the alternative maps so long as this Court issues an order by April 20 (and he receives the necessary electronic files by the same date). *Leon County*, for its part, rested its decision on a misinterpretation of Supreme Court case law, *see Large v. Fremont Cnty.*, 670 F.3d 1133, 1143 (10th Cir. 2012), and has been applied narrowly by courts in the Eleventh Circuit, *see, e.g.*, *Georgia State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 996 F. Supp. 2d 1353, 1369 (N.D. Ga. 2014) (collecting cases).

*Of Election Comm'rs of the City of Chicago*, 814 F.2d 332, 341 (7th Cir. 1987) (affirming rejection of consent decree that "commits the [state] Board to violate state law" when not necessary to protect federal rights).

In this case, ordering Secretary LaRose to implement the Third or Fourth Plan would be to order him to defy the Ohio Supreme Court. As he has explained, "as a statewide official who swore an Oath to obey Ohio's Constitution," he cannot faithfully execute that duty if "this court order[s] the use of a Redistricting Plan that a majority of the Supreme Court of Ohio has ruled violated Article XI of the Ohio Constitution." ECF No. 113 at 8. Unless that extreme step is necessary to protect a federal right, that cannot be done. And, because of the alternatives available here, it is not.

The plaintiffs assert that *North Carolina v. Covington*, 138 S. Ct. 2548 (2018) (per curiam), counsels otherwise, but that is wrong. To start, in that case, the plaintiffs asked, and the district court agreed, to strike down a North Carolina map on state law grounds unrelated to their injury of being subjected to racial gerrymandering. *Id.* at 2554; *cf. Covington v. North Carolina*, 283 F. Supp. 3d 410, 424 (M.D.N.C. 2018) (three-judge court) (considering argument that new map mooted the plaintiffs' claims). No one here asks this Court to invalidate a map—much less to do so in a way that would not redress the injury claimed. Rather, the question for this Court is what map to affirmatively *order* be implemented. Just as respect for the state's role in *Covington* necessitated that the federal court not toss out a map on state-law grounds, respect for state policy choices here demands that this Court not affirmatively order a gratuitous violation of state law.

In any event, even if the district court's remedial task in *Covington* were analogous—and it is not—*Covington* also involved a procedural defect. The plaintiffs asserted that North Carolina's new map was improper because it was drawn mid-decade (after a prior map was struck

8

down for violating federal law). *Id.* But of course, the alternative—a map drawn by a court-appointed special master—also could not comply with the North Carolina Constitution's timing requirements. Thus, strict adherence with North Carolina's procedural requirements would preclude a map from ever being enacted.

**3.** Nor can the plaintiffs' and Secretary LaRose's claims of administrative convenience justify use of the Third or Fourth Plan. The principles that underlie the requirement that federal courts follow state policy to the greatest extent possible make that clear.

Our system of federalism, and the requirement that a federal court follow state policy when fashioning a remedial map that derives from it, exists not as an abstract principle, but to "secure[] the freedom of the individual." *Bond v. United States*, 564 U.S. 211, 221 (2011). By restraining the power of federal actors, this structure "makes government more responsive" to individual citizens and "more sensitive to the diverse needs of a heterogenous society." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991). These fundamental protections of individual liberty may be trampled on in the name of administrative convenience no more than the other core protections that the Constitution provides. *See, e.g.*, *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2389 (2021) (infringement on First Amendment rights not justified by claim of "administrative convenience"); *Craig v. Boren*, 429 U.S. 190, 198 (1976) (rejecting "administrative ease and convenience as sufficiently important objectives to justify gender-based classifications"); *Associated Gen. Contractors of Ohio, Inc. v. Drabik*, 214 F.3d 730, 737 (6th Cir. 2000) ("simple administrative convenience" cannot justify discrimination).

Tellingly, neither Secretary LaRose nor the plaintiffs cite a single case that treats maximum administrative simplicity as a basis for overriding valid state laws. Logistical burdens only take precedence over federal and state law when "necessity" requires; that is, when an election could

9

not be held without displacing those laws. *Upham v. Seamon*, 456 U.S. 37, 44 (1982). Because the Secretary admits that an election may be held on August 2 under any map (other than the 2011 map) that this Court orders by April 20, the comparative administrative ease or difficulty of implementing various maps cannot dictate the outcome here.

  **C.** **The Johnson/McDonald Plan complies with the Ohio Constitution and is the most appropriate remedy, if one is necessary.**

  Unlike the maps that the plaintiffs present, the Johnson/McDonald Plan adheres to the substantive requirements of the Ohio Constitution. Senator Sykes and Leader Russo also agree that, in considering the Plan, the Court should take account of the modifications made by Dr. Megan Gall and submitted to the Court by intervenor-plaintiff Ohio Organizing Collaborative. ECF No. 165 at 11–13; *cf. Brown v. Jacobsen*, 2022 WL 683089, at *13 (D. Mont. Mar. 8, 2022) (implementing map submitted by defendant with modification).

  The plaintiffs do not contest that the Johnson/McDonald Plan complies with the Ohio Constitution's substantive requirements. Instead, they invoke two purported procedural defects as a reason for this Court to reject it. Neither provides a valid basis to do so.

  First, the plaintiffs are wrong that the failure of the Redistricting Commission to adopt the Johnson/McDonald Plan precludes this Court from ordering its implementation. That is a procedural defect that, as we have just explained, need not stand as a barrier to a court selecting a remedial map. Indeed, *every* map drawn by a special master and implemented by a court fails, by definition, to secure a vote by a state legislature or adoption by its redistricting commission. Nor does it matter that the Redistricting Commission voted against the version of the Johnson/McDonald Plan presented to the Commission on March 28. That, too, is a procedural defect and it is, in any event, irrelevant. Dr. Gall's modifications, which this Court can and should incorporate into its order, are responsive to the concerns that the Redistricting Commission raised

10

(and that the plaintiffs refer to as "technical flaws," ECF No. 160 at 22). Thus, the Commission's members have not voted for or against the version of the Plan that Senator Sykes and Leader Russo ask the Court to implement.

Second, the plaintiffs assert in a single sentence that certain portions of the map were somehow "not approved" by the independent mapmakers. *See* ECF No. 160 at 22. That is nonsense.[3] As Dr. Johnson—on whom the plaintiffs rely for the specious argument—has made clear, the mapmakers could "incorporate" any proposals or suggestions made by staff "into our maps" *only if* "both sides agreed." ECF No. 160-1 at 3. Moreover, the entire map-drawing process was undertaken "in public on live web stream camera." *See* ECF No. 150 at 123. It remains available online and it speaks for itself. *See* The Ohio Channel, *Ohio Redistricting Commission - Workroom - 3-28-2022 - 3:00pm-11:00pm*, https://bit.ly/378tOal. Had the plaintiffs watched, they would have seen that the mapmakers frequently asked for, and received, technical advice and assistance from staff in the room, which included Mr. Glassburn—a point that was specifically explained both at the hearing and by Dr. Johnson himself. *See* ECF No. 150 at 123; ECF No. 160-1 at 3. Ultimately, as Dr. Johnson has confirmed, the "final map" was one "that Dr. McDonald and I drew." *Id.*

## II. This Court possesses the authority to order use of an interim map and to move the primary date.

In its supplemental order, the Court directed the parties to address (1) whether there is a federal right to vote in a primary when state law requires it, (2) whether—and, if so, how—Ohio could hold a general election without a primary, and (3) whether the Court has authority to move

---

[3] It is also beside the point. Although the McDonald/Johnson Plan does have the benefit of being developed under procedures outlined by the Ohio Supreme Court, that is, as we have explained, not necessary. This Court's primary responsibility is to select the map that best complies with the substantive mandates of Ohio law.

11

the primary date. Under the circumstances presented here, the answers to first two questions are related: holding a general election without a primary would create chaos that would, in turn, imperil Ohioans constitutional rights. As for moving the primary date, because there is a right to vote in a state primary in this case, this Court also authority to adjust the primary date to protect that right.

   **A.**  **Holding a general election without a primary is not feasible and would risk a violation of Ohioans' First Amendment rights.**

It is unlikely that Ohio could lawfully hold a general election without a primary. As it stands, Ohio's constitution and statutes require a primary. *See* Ohio Const. art. V, § 7; Ohio Rev. Code § 3513.01. To our knowledge, since implementing primaries over a century ago, Ohio has never held a general election for its legislative races without first holding a primary. It is unclear how such a general election would proceed, if it could proceed at all.

This raises the distinct possibility that whatever happens will threaten federal constitutional rights. For instance, under current law, candidates who belong to a political party would, in the absence of a primary, be foreclosed from *even appearing* on the ballot for a general election. That is because state law mandates that "primary elections be held . . . for the purpose of nominating persons as candidates for political parties for election to offices to be voted for at the succeeding general election." Ohio Rev. Code. § 3513.01(A). In the absence of a primary, therefore, the only candidates who could successfully appear on the ballot for a general election would be those candidates who are unaffiliated with any political party. *See* Ohio Rev. Code § 3513.257 (prescribing the requirements for "independent candidates" and permitting them to participate in a general election without first appearing in a primary). That result would undoubtedly abridge voters' core right under the First Amendment "to engage in association for the advancement of beliefs and ideas" and "to cast their votes effectively." *Yang v. Kosinski*, 960 F.3d 119, 130 (2d

12

Cir. 2020) (explaining that "[t]he right to associate with the political party of one's choice is an integral part of this basic constitutional freedom [of association]," and that parties "exercise that freedom in a number of ways, including through elections to choose their nominees for public office").

And that is only one symptom of a larger problem that would arise if there were no primary this year—a problem that implicates federal rights irrespective of limitations on who may appear on a general election ballot. It is beyond dispute that Ohioans have a First Amendment right to associate in a political party, which includes the right to select a nominee around which to center their political efforts in a general election. *See Lightfoot v. Eu*, 964 F.2d 865, 872 (9th Cir. 1992) (requiring state to justify burdens on nomination process). It necessarily follows that the state cannot entirely eliminate the ability of voters to organize privately to choose a nominee. Indeed, even undue interference with selection of party leaders who can choose replacement nominees— let alone preventing the selection process from occurring at all—violates the First Amendment. *See Arizona Libertarian Party, Inc. v. Bayless*, 351 F.3d 1277, 1281 (9th Cir. 2003) (allowing nonparty members to vote for "party leaders who choose replacement candidates for candidates who die or resign" is unconstitutional).

Yet that type of complete prohibition is exactly what failing to hold a primary here would accomplish. Ohio has, until now, chosen to hold state-run primaries. That choice is permissible, but it has made Ohioans justifiably dependent on the state apparatus. Stripping voters of access to the state process at the last minute—thus thrusting them into an unprecedented and unplanned election with, at most, months until the general election process begins—would have the same practical effect as an outright bar on Democrats and Republicans coalescing around a single individual for the general elections. That could not withstand First Amendment scrutiny. Indeed,

13

it is in the face of this risk that the Sixth Circuit has warned a state election that "significantly departs from previous state election practice" can "rise to the level of a constitutional deprivation." *Warf v. Bd. of Elections of Green Cnty.*, 619 F.3d 553, 559 (6th Cir. 2010); *see also, e.g.*, *Griffin v. Burns*, 570 F.2d 1065, 1079 (1st Cir. 1978) (holding that the nullification of votes cast by absentee and shut-in ballots violated federal rights when those methods had been permitted for seven years).

Given these First Amendment implications, this Court need not decide whether there is any general federal right to vote in a state-run primary, or whether Ohio could permissibly repeal its primary laws. It is enough that Ohio has created an expectancy of an official primary and that canceling it at this juncture would preclude Ohioans from exercising their right to associate in advance of the general election.

### B. Under the Supremacy Clause, this Court can move the date of the primary to preserve the federal right to vote.

Because the federal constitution protects the right to vote in a state primary under the facts present here, this Court has authority under the Supremacy Clause to move the primary date in this case. Ohio's election officials are unable to hold a primary election on the date set by Ohio law, May 3, 2022. If that date were later, or if Secretary LaRose had discretion to move it, the plaintiffs' federal rights would not be at risk (assuming that either this Court sets an interim plan or Ohio's officials develop one on their own). Thus, the law setting the date of the primary stands as an obstacle to the exercise of the federal right to vote in the primary. This is exactly the type of "unavoidable conflict" that warrants a federal court exercising its equitable authority to set aside state law. *Reynolds*, 377 U.S. at 584.

Reflecting this, federal courts have long exercised their equitable authority to move election deadlines that act as barriers to the vindication of federal rights. *See, e.g.*, *Connor v.*

14

*Johnson*, 402 U.S. 690, 693 (1971) (directing district to extend the filing date for candidates to enable election to take place under remedial plan); *People Not Politicians Oregon v. Clarno*, 472 F. Supp. 3d 890, 900 (D. Or. 2020) (ordering defendants to either allow plaintiffs' initiative on ballot or extend deadline for signatures); *Fair Maps Nev. v. Cegavske*, 463 F. Supp. 3d 1123, 1147 (D. Nev. 2020) (setting aside deadline for ballot initiatives); *United States v. Georgia*, 892 F. Supp. 2d 1367, 1378 (N.D. Ga. 2012) (extending ballot receipt deadline); *see also, e.g.*, *Beens*, 406 U.S. at 201 n.11 ("If time presses too seriously, the District Court has the power appropriately to extend the time limitations imposed by state law."); *Larios v. Cox*, 305 F. Supp. 2d 1335, 1342 (N.D. Ga. 2004) (three-judge court) ("We also observe that the court has broad equitable power to delay certain aspects of the electoral process if necessary"); *Petteway v. Henry*, 2011 WL 6148674, at *3 n.7 (S.D. Tex. Dec. 9, 2011) ("If forced to craft an interim remedy, this court has the authority to postpone these local election deadlines if necessary.").

## CONCLUSION

The Court should continue to allow Ohio officials time to develop a valid map and move the primary date. If April 20, 2022, arrives and they have yet to do so, the Court should order Secretary LaRose to conduct the primary on August 2, 2022, using the McDonald/Johnson Plan, with the corrections submitted by Dr. Gall.

Respectfully submitted,

*/s/ Matthew W.H. Wessler*
MATTHEW W.H. WESSLER (*pro hac vice*)
JONATHAN E. TAYLOR (*pro hac vice*)
ROBERT D. FRIEDMAN (*pro hac vice*)
GUPTA WESSLER PLLC
2001 K Street NW, Suite 850 North
Washington, DC 20006
Phone: (202) 888-1741 / Fax: (202) 888-7792

15

          *jon@guptawessler.com*
          *matt@guptawessler.com*

          C. BENJAMIN COOPER
          CHARLES H. COOPER, JR.
          CHELSEA C. WEAVER
          COOPER ELLIOTT
          305 West Nationwide Boulevard
          Columbus, OH 43215
          Phone: (614) 481-6000 / Fax: (614) 481-6001
          *benc@cooperelliott.com*
          *chipc@cooperelliott.com*
          *chelseaw@cooperelliott.com*

April 11, 2022          *Attorneys for Intervenors-Defendants*

## CERTIFICATE OF SERVICE

I certify that on April 11, 2022, I filed this brief through this Court's CM/ECF system. All participants in this case are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Matthew W.H. Wessler*
Matthew W.H. Wessler
