**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| MICHAEL GONIDAKIS et al., | Case No. 2:22-cv-00773 |
| Plaintiffs, | Chief Judge Algenon L. Marbley |
| | Judge Amul R. Thapar |
| THE OHIO ORGANIZING | Judge Benjamin J. Beaton |
| COLLABORATIVE, COUNCIL ON | |
| AMERICAN-ISLAMIC RELATIONS, | Magistrate Judge Elizabeth P. Deavers |
| OHIO, OHIO ENVIRONMENTAL | |
| COUNCIL, SAMUEL GRESHAM JR., | |
| AHMAD ABOUKAR, MIKAYLA LEE, | |
| PRENTISS HANEY, PIERRETTE | |
| TALLEY, and CRYSTAL BRYANT, | |
| Intervenor-Plaintiffs, | |
| v. | |
| FRANK LAROSE, in his official capacity, | |
| Defendant. | |

**ANSWERS TO THE PANEL'S QUESTIONS**

**AND RESPONSES TO THE GONIDAKIS PLAINTIFFS AND DEFENDANT LAROSE**

**OF THE OHIO ORGANIZING COLLABORATIVE, ET AL.**

## TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................... 1

ANSWERS TO THE COURT'S THREE ADDITIONAL QUESTIONS ..................................... 2

I.  Ohio May Not Conduct a General Election without a Primary Election .......................... 2

II.  Because Not Holding a Primary Election Would Imperil the General Election, the
Constitution Protects the Right to Vote in the Primary ........................................... 3

III.  This Court Has Equitable Authority to Move the Primary Election ................................ 6

RESPONSES TO GONIDAKIS PLAINTIFFS AND DEFENDANT LAROSE ........................... 7

I.  Response to Gonidakis Plaintiffs ...................................................................... 7

  A.  The Ohio Supreme Court, Not the Commission, Determines Whether a
Plan Is Valid and Consistent with Ohio Law ............................................. 8

  B.  The Revised Johnson/McDonald Plan Is the Best Remedy Because It
Advances Significant and Substantive State Interests ................................. 11

  C.  Compliance with the Ohio Constitution Is Necessary to Allow This Court
to Adopt a Plan That Provides for More Than *De Minimis* Deviation ............... 14

  D.  The 2011 District Plan Is Unconstitutional ............................................... 15

II.  Response to Secretary LaRose ...................................................................... 15

  A.  Administrative Convenience Is Not a Valid Basis for Implementing a
Remedial Plan That Violates Ohio Law and Even If It Were, Secretary
LaRose Has Not Demonstrated the March 28 Plan Is Easier to Implement ....... 16

  B.  Secretary LaRose Effectively Confirms That Implementing 2011 Plan Is
Neither Feasible Nor Legally Permissible ................................................ 18

CONCLUSION .......................................................................................................... 19

## INTRODUCTION

If the Ohio Supreme Court invalidates the Commission's March 28 plan (also referred to in this litigation as the "Fourth Plan"), this Court should order the implementation of a General Assembly district plan for the 2022 election cycle. Ohio cannot have a successful general election without a primary, and Ohio voters have a fundamental right to vote for and associate with their representatives and to equal representation. To vindicate these fundamental rights, this Court has the power and duty to order a remedial plan and reschedule the 2022 General Assembly primary elections when the day comes. According to the Secretary of State, that day is April 20, 2022. On these points, the parties are largely in agreement, or at least provisionally accept for purposes of this Court's upcoming ruling on the motions for a preliminary injunction. The core dispute is whether the Court should order (i) the implementation of the March 28 plan, even if the Ohio Supreme Court has invalidated it as incompatible with substantive requirements of the Ohio Constitution, or (ii) the revised version of the Johnson/McDonald plan submitted by Dr. Jonathan Rodden, which is compatible and complies with all substantive requirements of the Ohio Constitution.

The choice is clear as a matter of law and justice. Only the revised Johnson/McDonald plan carries out the intent of Ohio's voters in amending the Ohio Constitution to require fair districts and meets the strictures for federal court-adopted state legislative plans. If the Ohio Supreme Court invalidates the March 28 plan, as is likely, then that plan does not effectuate Ohio's state policy and does not carry out the intent of the voters, as a matter of controlling law of the state's highest court. In sum, this Court should order a plan that honors state law as best as possible under the circumstances, which the March 28 plan could not were it invalidated. The best option under the

difficult circumstances of this case, caused by the Commission repeatedly enacting unconstitutional plans, is the revised Johnson/McDonald plan.

The Gonidakis Plaintiffs and Secretary LaRose suggest that trying times call instead for implementation of the March 28 plan, regardless of what the Ohio Constitution or the Ohio Supreme Court may say. Their arguments are meritless. We respond to their arguments and answer the Court's questions below.

## ANSWERS TO THE COURT'S THREE ADDITIONAL QUESTIONS

On April 7, this panel posed three additional questions to the parties. ECF No. 172 (Additional Questions Order). The OOC parties answer those questions below. We answer question 2 first, followed by 1 and then 3.

### I. Ohio May Not Conduct a General Election without a Primary Election

The Ohio Constitution requires that "[a]ll nominations for elective state, district, county and municipal offices *shall be made at direct primary elections* or by petition as provided by law." Ohio Const. Art. V, §7. (emphasis added). This command has been codified in Ohio Rev. Code § 3513.01(A), which necessitates primary elections for General Assembly candidates seeking a nomination from an established political party. These primary elections "shall be held on the first Tuesday after the first Monday in May of each year except years in which a presidential primary election is held." Ohio Rev. Code § 3501.01(E)(1).

As for petition-based paths to appear on the general election ballot, Ohio law permits candidates of newly formed political parties that have been officially recognized to file nominating petitions no later than 110 days before the general election. Ohio Rev. Code § 3517.012(A)(1); (B)(1). Separately, independent candidates can file nominating petitions the day prior to the scheduled primary election day. Ohio Rev. Code § 3513.257. These exceptions are not viable

alternatives to primaries. In fact, the deadline for independent candidates to file their nominating petitions presupposes the existence of a primary. Without a primary, members of major parties could not appear on the general election ballot without, at minimum, renouncing their existing party affiliations and running as independents or starting new political parties.

Avoiding a primary altogether would precipitate electoral chaos with both intra- and inter-party contests playing out on the November ballot without the benefits that established party affiliations offer the electorate. In turn, this could produce a General Assembly where some large portion of members were elected with a narrow plurality of votes. Given these options, this Court must conclude that primary elections are required under state law to ensure that there is an orderly general election.

## II. Because Not Holding a Primary Election Would Imperil the General Election, the Constitution Protects the Right to Vote in the Primary

The U.S. Constitution protects the right to vote because "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). The federal right to vote in Ohio's state law-mandated primary election is rooted in the First and Fourteenth Amendments. The failure to schedule a primary election for the General Assembly, and the unavoidable repercussions for the general election, implicates key associational and due process rights of Ohio voters.

The U.S. Supreme Court has established that "[r]epresentative democracy in any populous unit of governance is unimaginable without the ability of citizens to band together in promoting candidates who espouse their political views." *California Democratic Party v. Jones*, 530 U.S. 567, 574 (2000). "The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom." *Kusper v. Pontikes*, 414 U.S. 51, 57 (1973) (citation omitted).

A burden on a protected associational right is subject to the analytical framework articulated in *Anderson/Burdick*. *Libertarian Party of Ohio v. Brunner*, 567 F. Supp. 2d 1006, 1013 (S.D. Ohio 2008). This framework requires the Court to consider the character and magnitude of the asserted injury. *Id.*

Here, the burden would be severe because pursuant to Ohio law, candidates from established parties, including the Republican and Democratic parties, would not be able to run under preferred party labels and would have to create new political parties just to appear on the general ballot. Citizens, long accustomed to voting for candidates from one or both of Ohio's established parties, would have great difficulty in identifying preferred candidates and would be required to choose a third-party candidate from newly formed parties that have no track record on issues or governance. It is difficult to imagine a more significant burden on the ability of citizens to associate with their favored candidates or with a party of their choice. As such, the failure to hold a primary election would have to survive heightened scrutiny. *See id.* at 1014 (citing *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). There can be no compelling state interest in Ohio failing to give effect to its own election regulations. Accordingly, failing to hold a primary would impermissibly burden associational rights.

Failure to hold a primary would also violate due process rights. The Sixth Circuit has held that "[a] state's election process may be found fundamentally unfair only in the 'exceptional case,' such as where 'a state employs non-uniform rules, standards and procedures that result in significant disenfranchisement and vote dilution . . . or significantly departs from previous state election practice." *George v. Hargett*, 879 F.3d 711, 726-27 (6th Cir. 2018) (quoting *Warf v. Board of Elections of Green County*, 619 F.3d 553, 559 (6th Cir. 2010)).

In *Bonas v. Town of North Smithfield*, the First Circuit applied this principle to a town's failure to schedule elections in violation of the town charter. 265 F.3d 69, 72 (1st Cir. 2001). There, the court found that "total and complete disenfranchisement of the electorate as a whole is patently and fundamentally unfair," which made the dispute justiciable in federal court. *Id.* at 75. Ultimately, the *Bonas* court upheld the lower court's ruling ordering that elections be held per the town charter. *Id.* at 78. Similarly, in *Duncan v. Poythress*, the Fifth Circuit intervened to vindicate the Georgia electorate's state statutory right to a special election to fill a judicial vacancy. 657 F.2d 691, 703-04 (5th Cir., Unit B 1981). In describing the violation, the court reasoned that "[i]t is fundamentally unfair and constitutionally impermissible for public officials to disenfranchise voters in violation of state law so that they may fill the seats of government through the power of appointment." *Id.* at 704.

Failure to reschedule the May 3 primary for General Assembly seats would likewise produce an exceptional case of fundamental unfairness comparable to those in *Bonas* and *Duncan*. Ohio voters ratified Article V, Section 7 of the Ohio Constitution in 1912 and the provisions that provide for direct primaries became effective on January 1, 1913. *Fitzgerald v. City of Cleveland*, 88 Ohio St. 338, 354, 103 N.E. 512, 516 (1913). Since then, primary elections have been held to select general election candidates for the General Assembly, including in recent years. *See generally* https://www.ohiosos.gov/elections/election-results-and-data/.

Thus, not holding primary elections for General Assembly in 2022 would be a significant and unprecedented departure from century-long practice mandated by the Ohio Constitution. This departure would also provide for non-uniformity in Ohio with federal and statewide elections having the benefit of primaries, but not General Assembly districts.

### III.     This Court Has Equitable Authority to Move the Primary Election

Perhaps most importantly, the need to reset a state legislative primary date in this case is incidental to the ongoing impasse-induced malapportionment in Ohio's General Assembly and arises directly from those federal claims. The U.S. Supreme Court has endorsed the view that district courts have the discretion to determine whether the facts of a particular case warrant rescheduling a primary election in an impasse-based malapportionment situation. *See Upham v. Seamon*, 456 U.S. 37, 44 (1982) (per curiam) (concluding that the trial court should determine "whether to modify its judgment and reschedule the primary elections for Dallas County or . . . to allow the election to go forward in accordance with the present schedule" despite its legal error); *Miller v. Bibb County School District*, No. 5:12-CV-00239-HL, 2012 WL 2529440, at *2 (M.D. Ga. June 5, 2012) (finding that "the most practicable and least disruptive remedy for the claims asserted by Plaintiffs is to require that the general primary election for School Board be conducted on August 21, 2012, the date now set for primary run-off election.").

A federal court's equitable authority in redistricting matters is not limited to rescheduling elections. Many courts, including the U.S. Supreme Court, have held that cases involving unconstitutional burdens on the right to vote warrant shortening terms of elected offices and ordering new special elections so that lawmakers can be elected under legally compliant schemes. *See, e.g., Hadnott v. Amos*, 394 U.S. 358, 367 (1969); *Goosby v. Town Board of Town of Hempstead*, 180 F.3d 476, 498 (2d Cir. 1999); *Griffin v. Burns*, 570 F.2d 1065, 1079-80 (1st Cir. 1978); *Smith v. Beasley*, 946 F. Supp. 1174, 1212-13 (D.S.C. 1996); *Clark v. Roemer*, 777 F. Supp. 471, 484 (M.D. La. 1991). Of course, here, the equitable remedy sought is much less intrusive than a shortening of terms for state lawmakers and the ordering of special elections. Moreover, as discussed above, it is necessary for General Assembly primaries to be set and an extensive record exists that establishes that August 2, a date already reserved for special elections, is both fair and

workable. These equities tilt entirely in favor of this Court resolving the malapportionment that exists in this case and rescheduling the May 3, 2022 primary for August 2, 2022.

## RESPONSES TO GONIDAKIS PLAINTIFFS AND DEFENDANT LAROSE

The OOC parties are at odds with the Gonidakis Plaintiffs and Secretary LaRose in certain respects that call for a response. Contrary to their arguments, if the Ohio Supreme Court invalidates the Commission's March 28 plan, this Court cannot override the Ohio Supreme Court and order the implementation of that very same plan. Nor should this Court order the implementation of the 2011 Plan, which would violate the OOC Plaintiffs' federal and state constitutional rights. Rather, it should order the implementation of the revised Johnson/McDonald plan, as corrected by the Bennett Plaintiffs and their expert, Dr. Jonathan Rodden, on April 8, 2022. *See* ECF Nos. 177 & 177-1 (Notice of Correction). In the alternative, the OOC Plaintiffs do not object to the implementation of the Rodden III plan, which was submitted to this Court by the Bennett Plaintiffs, or to the request by the League of Women Voters Defendants that this Court appoint Drs. Johnson and McDonald as special masters to finalize the Johnson/McDonald Plan.

## I.     Response to Gonidakis Plaintiffs

The Gonidakis Plaintiffs make three arguments in support of their bid for the March 28 plan. They argue (A) that this Court should defer to the Ohio Redistricting Commission, even when its plans are unconstitutional as a matter of Ohio law; (B) that the Court should not order the implementation of the revised Johnson/McDonald plan, and (C) that the Court may order the implementation of the 2011 district plan, even though that would be unconstitutional as a matter of federal law. These arguments are meritless.

**A.    The Ohio Supreme Court, Not the Commission, Determines Whether a Plan Is Valid and Consistent with Ohio Law**

The Gonidakis Plaintiffs do not and cannot defend the Commission's plans, including the March 28 plan, *as consistent with Ohio law*. Instead, they urge this Court to dismiss Ohio law as unimportant. They blithely assert that "there is nothing sacrosanct about the Ohio Constitution" ECF No. 160 at PageID #4525 (Post-Hearing Brief). And they compare the Ohio Constitution to statutes, which, they say, means that this Court "should not be concerned about adopting a plan that may be found unconstitutional by the Ohio Supreme Court." *Id.* at PageID #4526.

In the same breath, however, the Gonidakis Plaintiffs assert that two provisions of the Ohio Constitution *are* entitled to respect. They note (*id.* at PageID #4522) that the Ohio Constitution provides that the "Ohio redistricting commission shall be responsible for the redistricting of this state for the general assembly" (Ohio Const., Art. XI, § 1(A)) and that courts may not draw a district plan or order the implantation of a plan (Ohio Const., Art. XI, § 9(D)). These selected provisions form the sole textual basis for their sweeping assertion that this Court "should look no further" than a plan adopted by the Commission. *Id.* at PageID #4520. The Gonidakis Plaintiffs cannot have it both ways, arguing that this Court can ignore the Ohio Constitution while simultaneously relying on that very constitution to justify its deference to the Commission's invalidated plans. Federal courts must consider state constitutional redistricting requirements when required to draw maps. *See White v. Weiser*, 412 U.S. 783, 795 (1973) ("[A] federal district court, in the context of legislative reapportionment, should follow the policies and preferences of the State, as expressed in . . . constitutional provisions . . . whenever adherence to state policy does not detract from the requirements of the Federal Constitution." (emphasis added)). The Ohio Constitution makes clear that the Court must look beyond the fact that the Commission adopted a plan in assessing whether the plan carries out Ohio law.

The Ohio Constitution explicitly grants the Ohio Supreme Court jurisdiction to review apportionment cases. *See* Ohio Const., Art. XI, § 9(A)-(B); *League of Women Voters of Ohio v. Ohio Redistricting Comm'n*, --N.E.3d--, 2022-Ohio-65, 2022 WL 110261 (Ohio Jan. 12, 2022) ("*League I*"). The Ohio Supreme Court has the power to determine that a Commission plan is invalid and to order the Commission to reconvene. *See id.* Thus, under the text of the Ohio Constitution, as authoritatively construed by the State's highest court, the Commission does *not* have the last word as to whether its plans are faithful to the People's intent in enacting and amending Article XI. Put simply, Ohioans delegated to the Ohio Supreme Court—not the Commission—the authority to "to say what the law is." *State v. Parker*, 2019-Ohio-3848 ¶ 31, 157 Ohio St. 3d 460, 466, 137 N.E.3d 1151, 1158. Thus, while the Commission has discretion to make lawful choices within the confines of Article XI, it has no discretion to violate Article XI or redefine what the law requires.

The Gonidakis Plaintiffs argue that under federal precedents, and regardless of what the Ohio Constitution may say, this Court should defer to the Commission's expression of "legislative policies." ECF No. 160 at PageID #4521 (Post-Hearing Brief). This argument again mistakenly assumes that anything the Commission enacts amounts to Ohio "policy." Neither a statute nor a redistricting plan is "legislative policy" if it is unconstitutional under the same law that authorized its drafting in the first place and beyond the authority of the lawmaking body to enact, i.e., *ultra vires*. In the cases that the Gonidakis Plaintiffs cite, no state high court had invalidated the legislature's or a commission's plan as unconstitutional as a matter of state law. Therefore, the federal courts in those cases could say that the state's enacted plan was indeed an expression of substantive state law and policy. *See Perry v. Perez*, 565 U.S. 388 (2012); *White*, 412 U.S. 783.

In a handful of decisions, federal courts have reasoned that a commission or legislature may have enacted a plan that reflects the law of the state, even when failing to comply with certain procedural requirements because of exigent circumstances. For example, the Gonidakis Plaintiffs cite *Navajo Nation v. Arizona Independent Redistricting Commission*, which held that a commission's plan was entitled to deference even though the commission was unable to comply with a public notice requirement for meetings. 230 F. Supp. 2d 998, 1008 (D. Ariz. 2002); *see also Straw v. Barbour County*, 864 F. Supp. 1148, 1155 (M.D. Ala. 1994) (same).

In other cases, courts have determined whether a plan proposed by elected officials could be deemed a "legislative plan," even if the elected officials did not have authority to propose a plan. *Large v. Fremont County*, 670 F.3d 1133, 1139 (10th Cir. 2012). In certain cases arising under the Voting Rights Act, courts have made this determination because court-ordered districts are held to different apportionment standards than legislative districts. *See id.*; *Tallahassee Branch of NAACP v. Leon County*, 827 F.2d 1436, 1438 (11th Cir. 1987).

The circuit courts in *Large* and *Tallahassee Branch of NAACP* reached different conclusions as to whether elected officials may adopt a "valid" legislative plan for remedial purposes in the absence of apportionment authority. But this Court need not resolve that split in this case because that is not the question presented by this case. Rather, the Court must address whether it can select an apportionment plan that has been struck down by a state's highest court under substantive provisions of that state's constitution, including line-drawing and proportionality requirements. *See* Ohio Const., Art. XI, §§2, 3, 4, 5, 6, and 7. No court of which the OOC parties are aware has held that a legislature or commission has adopted a valid "legislative plan" when the state's highest court has expressly invalidated that same plan on substantive grounds. Any such conclusion, especially in this case, would, nullify the voters' 2015 amendments to Article XI,

override the Ohio Supreme Court's rulings, and reject principles of comity and federalism that have guided the exercise of judicial power since this country's founding. There is no authority that would permit this Court to take that unprecedented step.

The Gonidakis Plaintiffs proceed directly from their unsupported conclusion that the Commission's plans are always valid exercises of legislative judgment to its assertion that this Court should order implementation of the March 28 plan. But if the Ohio Supreme Court invalidates the March 28 plan on substantive grounds, as is likely, then the plan will *not* be a valid exercise of legislative judgment. In that situation, the Court should implement a plan that complies with both federal law *and* the substantive requirements of Ohio law, as construed by Ohio's highest court.

**B.      The Revised Johnson/McDonald Plan Is the Best Remedy Because It Advances Significant and Substantive State Interests**

Of the plans currently before the Court, the plan that best complies with the substantive and procedural requirements of the Ohio Constitution is the revised Johnson/McDonald plan. *See* ECF No. 165 at PageID #5434-37 (Prelim. Inj. Mot.). The OOC Plaintiffs and their mapmaking expert, Dr. Megan Gall, have independently analyzed the minor revisions to the revised plan that the Bennett Plaintiffs submitted on Friday, April 8, and independently affirm that it complies with the line-drawing requirements of Article XI of the Ohio Constitution, *i.e.*, Sections 3 and 4. *See* Ex. A, Declaration of Megan Gall, dated April 11, 2022, ¶¶ 13, 18. In contrast, neither the Commission's plans nor the 2011 district plan comply with the Ohio Constitution's substantive redistricting requirements. This point is undisputed; the Gonidakis Plaintiffs do not argue that *any* of the plans for which they are advocating comply with the Ohio Constitution's substantive requirements.

The Gonidakis Plaintiffs offer three reasons why the Court should not order the implementation of the revised Johnson/McDonald plan.

First, they observe that the Commission did not adopt it. ECF No. 160 at PageID #4530 (Post-Hearing Brief). But if the Ohio Supreme Court invalidates the March 28 plan, then there will be no valid plan before the Court. In that situation, the question will be whether to order the implementation of a plan that the Commission declined to adopt because it ran out of time or, alternatively, a plan that the Ohio Supreme Court has expressly invalidated because of incompatibility with the substantive requirements of Ohio law. As between these choices, the Court should choose the plan that violates Ohio law no more than is necessary to remedy the malapportionment that would result if the parties were stuck with the 2011 district plan or no plan. The intervenors' proposed plan is not one that the Commission adopted, but it is one that all seven commissioners had a hand in guiding and supervising, and more importantly, it is a plan that complies with the substantive requirements of Ohio law. This substantive compliance means that General Assembly elections under the plan will align with the criteria and standards established by Ohio voters. Dr. Rodden's revised Johnson/McDonald plan achieves this result.

Second, the Gonidakis Plaintiffs argued that the Johnson/McDonald plan had technical flaws. ECF No. 160 at PageID #4530 (Post-Hearing Brief). But in their response filed earlier today, April 11, they make no argument that the corrected version of the plan submitted on April 8, 2022 (ECF No. 177 & 177-1) has any technical flaws. *See* ECF No. 180 at PageID #5803 (Response to Post-Hearing Brief). The OOC parties note that if all the parties agree that Dr. Rodden's revised Johnson/McDonald plan is compliant with the substantive provisions of the Ohio Constitution and federal law (or fail to identify any substantive violations), then the special master that the OOC parties had requested (ECF No. 149) may be unnecessary. Contrary to the Gonidakis Plaintiffs'

arguments (ECF No. 160 at PageID #4528-29), moreover, the OOC parties never sought a special master to *draw* a plan, as they explained in their motion. ECF No. 149 at PageID #4230. On the other hand, if any of the parties argue that Dr. Rodden's revised Johnson/McDonald plan violates the Ohio Constitution's line-drawing rules, then a special master may be helpful for resolving that technical dispute. Regardless, any minor technical issues under Ohio law regarding Dr. Rodden's revised Johnson/McDonald Plan cannot justify implementing a plan that has been invalidated by the state high court under that same law.

Third, the Gonidakis Plaintiffs argue that "Mr. Glassburn, acting as a Democratic staffer, drafted portions of the map that were not approved by Dr. Johnson, Dr. McDonald, or a member of the Redistricting Commission." ECF No. 160 at PageID #4530 (Post-Hearing Brief). But Dr. Johnson's affidavit does not support this assertion. Dr. Johnson explained that Mr. Glassburn helped Dr. Johnson and Dr. McDonald to draw maps for "seven counties" as the deadline for completing the plan loomed, and that *both* of them reviewed and adjusted that portion of the plan. ECF No. 160-1 at ¶¶ 12-13. The Commission did not "sign off" on Mr. Glassburn's proposed seven-county solution (as adjusted by the independent mapmakers), but Dr. Johnson attributes all issues, apparently including the lack of sign-off, to the "very challenging timeline," not anything improper about the configuration of those seven counties. *Id.* at ¶¶ 15-16; *see also id.* at ¶¶ 17-22. And with the benefit of more time, the revised Johnson/McDonald plan is fully compliant with the Ohio Constitution. *See* Ex. A, Gall Decl. ¶¶13, 18. In sum, the Johnson/McDonald plan remains an independently drawn map, unlike any of the Commission's invalidated plans or the likely-soon-to-be rejected fourth plan, which were all prepared by Republican operatives. *See League of Women Voters of Ohio v. State Redistricting Comm'n*, --N.E.2d--, 2022-Ohio-789 ¶ 30, 2022 WL 803033, at *7 (Ohio March 16, 2022).

13

**C.      Compliance with the Ohio Constitution Is Necessary to Allow This Court to Adopt a Plan That Provides for More Than *De Minimis* Deviation**

Relatedly, the Gonidakis Plaintiffs do not engage with the relevant standard that constrains this Court's ability to adopt a state legislative district plan that provides for more than *de minimis* population deviation. It is well established that "substantial deviations from population equality simply cannot be tolerated in a court-ordered plan, in the absence of some compelling justification" that is rooted in state law or legitimate policy considerations. *Connor v. Finch*, 431 U.S. 407, 417 (1977) (citing *Chapman v. Meier*, 420 U.S. 1, 26-27 (1975)). The invalidated Third Plan provides for a total deviation of 9.96 percent for the House map and 9.63 percent for the Senate map. ECF No. 163-2 at PageID #4974-77 (Exhibit to Intervenor-Defendants' Submission). The unconstitutional Fourth Plan likewise features deviations of 9.97 percent and 9.63 percent, respectively, for the House and Senate maps. ECF No. 163-4 at PageID #4984-87 (Exhibit to Intervenor-Defendants' Submission). These deviations are well beyond what any prior court has considered to be *de minimis*. *See Essex v. Kobach*, 874 F. Supp. 2d 1069, 1081-83 (D. Kan. 2012) (discussing *de minimis* threshold and providing string cite for cases that have taken up the question previously). Thus, this Court must provide compelling justification for their adoption that is rooted in Ohio's substantive redistricting criteria.

As discussed above, plans ruled unconstitutional by the Ohio Supreme Court fail to satisfy this standard. Plans adjudicated to violate state law cannot be deemed to legitimately advance important state considerations or provide the necessary compelling justification. In *Connor*, the Court invalidated a lower court's adopted maps for less: the mere existence of a plan that better met state policy requirements while providing for less deviation was sufficient reason to reverse. 431 U.S. at 420-21. This is because "[i]n the absence of a convincing justification for its continued adherence to a plan that even in state policy terms is less efficacious than another plan actually

14

proposed, there can be no alternative but to set aside the District Court's decree." *Id.* Here too, a plan has been presented to the Court that actually complies with the Ohio Constitution and all relevant policy and provides for comparable population deviation. Accordingly, this Court must adopt the Revised Johnson/McDonald Plan as corrected by the Bennett Plaintiffs over the February 24 or March 28 plans.

### D. The 2011 District Plan Is Unconstitutional

Remarkably, the Gonidakis Plaintiffs suggest that this Court may adopt the 2011 district plan for the 2022 election cycle. ECF No. 160 at PageID #4526 (Post-Hearing Brief). This argument is stunning because the Gonidakis Plaintiffs themselves have alleged and acknowledged that conducting elections under the 2011 district plan would violate their constitutional rights. ECF No. 1 ¶¶ 59-70 (Compl.). The Gonidakis Plaintiffs' suggestion that this Court order the use of districts that are concededly unconstitutional, as opposed to a district plan that complies with federal law and the substantive requirements of Ohio law, is telling. They would rather have patently unconstitutional districts that favor Republicans than districts that comply with Ohio law. *See* ECF No. 165-11 at PageID #5543-81 (Latner Decl. ¶ 49) (noting that the 2011 House plan is an "'extreme' gerrymander" in favor of Republicans).

Because all the parties agree that the 2011 district plan would violate federal law and there is no compelling need to do so, given the available alternatives that comply with both federal law and Ohio law, under no circumstances should this Court order the implementation of the 2011 district plan.

## II. Response to Secretary LaRose

In contrast with the Gonidakis Plaintiffs, Secretary LaRose does not argue that this Court should defer to a plan that the Ohio Supreme Court has invalidated. *See* ECF No. 164 at PageID #5395 & n.2 (LaRose Response). On the other hand, any discussion of plans that the Ohio Supreme

Court has *not* invalidated, such as the Johnson/McDonald plan, is conspicuously absent from this April 6 filing.

Secretary LaRose could have offered his views about whether, as a matter of law, this Court should order the implementation of a plan that the Commission did not adopt but that complies with the substantive requirements of Article XI in all respects. After all, the Gonidakis Plaintiffs' arguments do not depend on whether Dr. Rodden's revised Johnson/McDonald plan has any technical flaws; their argument is that this Court should order one of the Commission's plans no matter what. It is not clear whether the Secretary shares that conclusion because he has offered only an opinion about the administrative convenience of implementing the March 28 plan. As explained below, however, administrative ease is not a valid reason to implement the March 28 plan.

> **A.** **Administrative Convenience Is Not a Valid Basis for Implementing a Remedial Plan That Violates Ohio Law and Even If It Were, Secretary LaRose Has Not Demonstrated the March 28 Plan Is Easier to Implement**

As a matter of both federal law and Ohio law, the incremental convenience of administering one plan over another is not a valid reason to select a plan that would burden constitutional rights and violate the Ohio Constitution. By the Secretary's own calculations, sufficient time remains to implement any plan, so long as the Court orders a plan and the Secretary obtains the requisite files by April 20. *See* ECF No. 164 at PageID #5396 & n.3 (LaRose Response). Therefore, the Court should select the plan that best complies with federal law and serves significant state interests, as construed by the Ohio Supreme Court, not the plan that is most administratively convenient.

As a matter of federal law, mere administrative convenience could never justify implementing a plan that burdens the fundamental right to vote in districts of approximately equal population. Equality in voting is "a fundamental political right, because preservative of all rights." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964) (citation and quotation marks omitted). And "it has

long been the rule that a constitutional right may not be burdened for mere administrative convenience." *Grace v. Detroit*, 760 F. Supp. 646, 653 (E.D. Mich. 1991) (citing *Frontiero v. Richardson*, 411 U.S. 677 (1973)).

Not surprisingly, the Ohio Supreme Court has likewise recognized that "administrative convenience" is "clearly insufficient" when proffered as a justification for violating a constitutional right. *See State v. Lane*, 60 Ohio St. 2d 112, 122, 397 N.E.2d 1338, 1345 (1979). That same reasoning applies to a General Assembly district plan that is unconstitutional under Article XI. To prevail on each one of their challenges to successive plans before the Ohio Supreme Court, the OOC parties and other challengers had to prove the relevant facts "beyond a reasonable doubt" (*League I* at \*15) and persuade the Court that the Commission's plan "clearly and irreconcilably" conflicted with an "express provision of the constitution" (*id.* (quotation marks and brackets omitted)). After having established that the Commission's plans are clearly and irreconcilably unconstitutional, the Ohio Supreme Court plainly would not allow the Secretary to implement them anyway, merely because it was convenient for him to do so. The Court has left no doubt on this point because it has stated that "the election cycle should not proceed with a General Assembly-district map that we have declared invalid." *League I* at \*28.

As the Ohio Supreme Court observed, under Ohio law, partisan gerrymandering is intolerable because it "entrenches the party in power." *League I* at \*21. Thus, the Court strongly and expressly rejected the "notion that Ohio voters rallied so strongly behind an anti-gerrymandering amendment to the Ohio Constitution yet believed at the time that the amendment was toothless." *Id.* Any such conclusion was not supported by the plain text of Article XI, its legislative history, and common sense. *See id.* If the Commission could enact one unconstitutional plan after another, run out the clock, and then ask this Court to order the implementation of its

unconstitutional plan based on administrative convenience, it would succeed in rendering Article XI's anti-gerrymandering provisions toothless, which is precisely what the Ohio Supreme Court said it may not do. *See id.*

Moreover, Secretary LaRose has not demonstrated that the March 28 plan would be significantly easier to implement than other plans, much less has he demonstrated that Ohio has a compelling interest in administrative ease that could justify the constitutional violations at issue here. The Secretary argues that the Commission's March 28 plan is administratively easier to implement than any other plan because many counties maintained a backup copy of the February 24 plan in their voter registration and election management systems. ECF No. 164 at PageID #5399-5400 (LaRose Response).  But other counties did not maintain backup copies, and in any event, Secretary LaRose does not clarify how much time could be saved by loading backup copies of an invalidated plan to registration and election management systems, especially given the number of steps involved.  Even if the backups saved a little time, as compared with loading the revised Johnson/McDonald plan, this Court has established a timeline that allows for a complete primary cycle to take place by August 2. With no need to truncate candidate declaration, protest, and certification periods, there is no material benefit to adopting the March 28 plan.

**B.     Secretary LaRose Effectively Confirms That Implementing 2011 Plan Is Neither Feasible Nor Legally Permissible**

If any more proof were needed that ordering implementation of the 2011 district plan is not only unlawful but also infeasible, Secretary LaRose's April 6 filing supplies it. Although stating in a heading that the Court is "not prohibited" from ordering implementation of the 2011 district plan for the 2022 election, he goes on to clarify that any such approach *must* account for malapportionment. *See* ECF No. 164 at PageID #5400-04 (LaRose Response). In other words, even if the 2011 district plan could supply a starting point, the Court would need to appoint

18

someone to correct the malapportionment issues that all agree would plague such an approach, which amounts to drafting a new plan. To do that, the county boards of election would need to upload the shape and Census block files into their systems, which the Secretary's office does not have in its possession. *Id.* at PageID #5402. And even "[i]f the Panel were to re-apportion the 2011 map with the 2020 Census data, then it becomes like any other plan, previously adopted or not." *Id.* at PageID #5404. Unless re-drawn from scratch, such a reapportioned plan would almost certainly *still* violate the Ohio Constitution, and, even under the Gonidakis Plaintiffs' own faulty logic, it would not be a plan adopted by the Commission either. Accordingly, as the Secretary has now confirmed, there is no good reason or lawful reason to order the implementation of the 2011 district plan (or any variation thereof, which does not yet exist), and this Court should not do so.

## CONCLUSION

If the Ohio Supreme Court declares that the General Assembly district plan enacted by the Ohio Redistricting Commission on March 28, 2022, is invalid, then this Court should grant OOC Plaintiffs' motion for a preliminary injunction and order the use of Dr. Rodden's revised Johnson/McDonald Plan for the 2022 primary and general election.

Dated: April 11, 2022

Respectfully submitted,

/s/Christina J. Marshall

Christina J. Marshall (Ohio Bar No. 0069963)
    *Trial Attorney*
MILLER, CANFIELD, PADDOCK
AND STONE, P.L.C.
1100 Superior Avenue E, Suite 1750
Cleveland, OH 44114
(248) 267-3256
marshall@millercanfield.com

Alicia L. Bannon (*pro hac vice*)
Yurij Rudensky (*pro hac vice*)
Harry Isaiah Black (*pro hac vice*)
BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
Tel:  (646) 292-8310
Fax: (212) 463-7308
alicia.bannon@nyu.edu

Peter M. Ellis (Ohio Bar No. 0070264)
REED SMITH LLP
10 South Wacker Drive, 40th Floor
Chicago, IL 60606
Tel:  (312) 207-1000
Fax: (312) 207-6400
pellis@reedsmith.com

Brian A. Sutherland (*pro hac vice*)
REED SMITH LLP
101 Second Street, Suite 1800
San Francisco, CA 94105
Tel:  (415) 543-8700
Fax: (415) 391-8269
bsutherland@reedsmith.com

Ben R. Fliegel (*pro hac vice*)
REED SMITH LLP
355 South Grand Avenue, Suite 2900
Los Angeles, CA 90071
Tel:  (213) 457-8000
Fax: (213) 457-8080
bfliegel@reedsmith.com

*Attorneys for Intervenor-Plaintiffs*
*The Ohio Organizing Collaborative, et al.*

## CERTIFICATE OF SERVICE

I hereby certify that on April 11, 2022, I electronically filed the foregoing document with

the Clerk of the Court which will serve all attorneys of record.

/s/Christina J. Marshall
Christina J. Marshall (0069963)
MILLER, CANFIELD, PADDOCK
and STONE, P.L.C.
1100 Superior Avenue E, Suite 1750
Cleveland, OH 44114
(248) 267-3256
(248) 879-2001 (Facsimile)
marshall@millercanfield.com