**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **MICHAEL GONIDAKIS, et al.,** | |
| Plaintiffs, | |
| v. | Circuit Judge Amul R. Thapar<br>Chief Judge Algenon L. Marbley<br>Judge Benjamin J. Beaton |
| **FRANK LAROSE,** | |
| Defendant, and | Case No. 2:22-cv-773 |
| **LEAGUE OF WOMEN VOTERS OF OHIO and A. PHILIP RANDOLPH INSTITUTE OF OHIO,** | |
| Intervenor-Defendants. | |

**INTERVENOR-DEFENDANTS' RESPONSIVE SUBMISSION REGARDING THE
ROLE OF THE  FEDERAL COURT
CONCERNING THE OHIO GENERAL ASSEMBLY REDISTRICTING PLAN**

**Table of Contents**

I.     INTRODUCTION AND LOCAL RULE 7.2 STATEMENT ........................................... 1

II.    THIS COURT SHOULD NOT DIRECT A MAP THAT HAS BEEN HELD TO BE INVALID UNDER THE OHIO CONSTITUTION. .................................................... 2

    A.    Federal Courts Must Defer to State Law to the Greatest Extent Consistent With Federal Law. ...................................................................... 2

    B.    Ohio's Policy Choices Are Reflected First and Foremost by the Ohio Constitution as Construed by the Supreme Court of Ohio, Not the Acts of the Commission. .......................................................................... 4

        1.    The Ohio Constitution determines the validity of the plans. ..................... 4

        2.    The Supreme Court of Ohio determines the meaning of the provisions of the Ohio Constitution. ............................................... 5

        3.    Under the Ohio Constitution, the Supreme Court of Ohio's legal conclusions regarding redistricting maps require deference. ....................... 6

        4.    Because the Commission's maps were passed outside the Commission's authority, they are mere *ultra vires* acts that do not reflect state policy choices. .......................................................... 7

        5.    *Arizona State Legislature* does not authorize this Court to ignore the Ohio Constitution. ........................................................... 9

III.   THIS COURT SHOULD NOT DIRECT THAT ELECTIONS BE HELD UNDER THE MALAPPORTIONED 2011 PLAN. ............................................................. 9

    A.    Plaintiffs' New Theory Eviscerates Their Case. ..................................... 10

    B.    There Is No Basis for Plaintiffs' Complete Reversal. .............................. 12

IV.   A SUBSTANTIALLY COMPLIANT PLAN ALREADY EXISTS. ............................... 13

    A.    The Independent Plan Complied with the Ohio Court's Process. ........................ 13

    B.    The Independent Plan Was Already Substantively Compliant. ............................ 16

    C.    The Corrected Independent Plan Is Fully Compliant. .......................................... 17

V.    PLAINTIFFS WILL SUFFER NO IRREPARABLE INJURY DUE TO THE FAILURE TO ENACT THE THIRD OR FOURTH MAPS. ........................................... 18

VI.   RESPONSES TO THE COURT'S THREE QUESTIONS ........................................... 19

A.  Question 1: *Is there a federal right to vote in a primary if state law requires a primary for state elections? (Please provide the specific text in the Constitution or a constitutional doctrine that grounds this right).* ................. 19

B.  Question 2: *May Ohio simply not hold a primary and have a general election? If so, how would Ohio law provide for a general election for those seats?* ..................................................................................... 21

C.  Question 3: *Does the federal court have authority to move a primary election? Where does this authority come from?* .................................................... 22

VII.  THIS COURT CAN ENACT REMEDIES THAT MINIMALLY INVADE THE STATE REDISTRICTING, ELECTION, AND JUDICIAL PROCESS. ....................... 23

A.  The State Redistricting Process Should Be Permitted to Continue Until April 20, 2022. ............................................................................................ 23

B.  This Court Should Only Set a Primary Date if Ohio Does Not Do So by April 20, 2022. ............................................................................................ 23

C.  The Independent Plan Can Be Timely Implemented if this Court Must Implement a Plan. ..................................................................................... 24

1.  The Independent Plan can be readily implemented. ................................ 24

2.  There is time to implement the Independent Plan. ................................. 25

3.  Drs. Johnson and McDonald should be appointed as Special Masters to confirm that the (Revised) Independent Plan is complete and fully compliant. .................................................................. 25

VIII.  CONCLUSION ............................................................................................ 26

## I.    INTRODUCTION AND LOCAL RULE 7.2 STATEMENT

Plaintiffs ask this Court to ignore the Ohio Constitution and direct the implementation of plans that have been held invalid by the Supreme Court of Ohio.[1]  In the alternative, they now reverse course and seek implementation of the 2011 map – an ironic request, since the very purpose of their Complaint and original motion for preliminary injunction was to avoid any risk of that malapportioned map being implemented.[2]  All the while, Plaintiffs ignore the fact that a substantively compliant plan presently exists – the plan drawn for the Ohio Redistricting Commission (the "Commission") by the Independent map-drawers (the "Independent Plan").[3]  It can be implemented in short order.  Given the facts, Plaintiffs have no irreparable injury.[4]

In response to the Court's three questions, Intervenor-Defendants submit[5]:

(1) Where the state election law scheme includes the right to vote in a primary, the federal right to vote extends to the right to vote in that primary.

(2) Under Ohio law, the General Assembly can dispense with a primary and provide for a petition process for a November election.  That change, however, would require a new act of the legislature.

(3) This Court has the authority to set a primary date should the Ohio legislature fail to act.

---

[1] *See* Section II (pp. 2-9), *infra*; *see also Bush v. Gore*, 531 U.S. 98 (2000); *Reynolds v. Sims*, 377 U.S. 533 (1964); *White v. Wesier*, 412 U.S. 783 (1973); *Ohio ex rel. Skaggs v. Brunner*, 549 F.3d 468 (6th Cir. 2008).

[2] *See* Section III (pp. 9-13), *infra.*

[3] *See* Section IV (pp. 13-18), *infra.*

[4] *See* Section V (pp. 18-19), *infra*; *see also D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019).

[5] *See* Section VI (pp. 9-23), *infra*; *see also Smith v. Allwright*, 321 U.S. 649 (1944).

This Court should permit Ohio to carry out its choice by April 20, 2022.[6]  If Ohio does not set a primary date by April 20 or pass a law so that the November election can proceed by petition, this Court should direct an August 2, 2022 primary.  This Court should also set April 20, 2022 as the deadline for the implementation of a district plan – and should do so if Ohio has not enacted a plan by that date.

To make sure that a plan is in place by April 20, this Court should appoint Drs. McDonald and Johnson as special masters so that they can finalize the Independent Plan.  Given the minimal amount of work that would be required, Intervenor-Defendants submit that this work can commence on Monday, April 18, 2022.

## II. THIS COURT SHOULD NOT DIRECT A MAP THAT HAS BEEN HELD TO BE INVALID UNDER THE OHIO CONSTITUTION.

### A. Federal Courts Must Defer to State Law to the Greatest Extent Consistent With Federal Law.

A federal court may not compel state officials to implement a plan in defiance of state law, when the underlying state law is not in direct conflict with federal law.  *See, e.g.*, *Bush v. Gore,* 531 U.S. 98, 111 (2000) (per curiam) (refusing to direct the Florida Supreme Court to issue an order in violation of the Florida Election Code); *see* Int.-Def Sub. Regarding the Role of the Fed. Ct., ECF No. 163 at 4945-4946.

Plaintiffs remarkably argue that this court should not be "troubled" by the disregard for the Ohio Constitution that they invite.  *See* Pls.' Post-Hr'g Br. in Support of Second Mot. for P.I., ECF No. 160 at PageID # 4525.  They implausibly maintain that there is nothing "sacrosanct" about the document because it covers a wider array of issues and has a lower barrier to being

---

[6] *See* Section VII (pp. 23-25), *infra*.

amended than its federal counterpart. *Id*. at PageID # 4525-4526. There is no logical link between these premises and Plaintiffs' invitation to ignore the state constitution.

Plaintiffs buttress these *non sequiturs* with references to constitutional provisions governing livestock. *See* Pls.' Post-Hr'g Br. in Support of Second Mot. for P.I., ECF No. 160 at PageID # 4525-26 (referencing Ohio Constitution, art. XIV, §1, which creates a Livestock Care Standards Board). But Article XI is not chicken feed. Article XI deals with a fundamental component of Ohio's system of self-government. It was passed with 71.5% of the popular vote. It is not so easily discarded.

Plaintiffs seek to invoke the Supremacy Clause to justify their disregard for the Ohio Constitution. Plaintiffs overreach.

No one denies that the Supremacy Clause demands federal law prevail "[w]hen there is an unavoidable conflict" with state law, *see* Pls.' Post-Hr'g Br. in Support of Second Mot. for P.I., ECF No. 160 at PageID # 4524 (quoting *Reynolds v. Sims*, 377 U.S. 533, 584 (1964)). But a need for federal intervention does not give federal courts *carte blanche* to disregard aspects of the state redistricting legal structure not inconsistent with federal law. *See Upham v. Seamon*, 456 U.S. 37, 42–43 (1982) (per curiam) (A federal court may not impose a "court-ordered plan that reject[s] state policy choices more than [is] necessary to meet the specific constitutional violations involved" because a "district court's modifications of a state plan are limited to those necessary to cure any constitutional or statutory defect."). And as previously explained, there is no conflict here between Ohio's Article XI and the United States Constitution. *See id.* at PageID # 4947-4948.

Indeed, on the very page of the *Reynolds* opinion to which Plaintiffs cite, the Supreme Court states unambiguously that "courts should attempt to accommodate the relief ordered to the

apportionment provisions of state constitutions insofar as is possible." *Reynolds*, 377 U.S. at

584. Casting aside the state constitution hardly meets that test.

**B.** **Ohio's Policy Choices Are Reflected First and Foremost by the Ohio Constitution as Construed by the Supreme Court of Ohio, Not the Acts of the Commission.**

Plaintiffs argue that it is the acts of the Commission, and not the Ohio Constitution or the

Supreme Court of Ohio, that reflect Ohio's policy choices. Not so.

**1.** **The Ohio Constitution determines the validity of the plans.**

Adherence to state policy requires adherence to state law. *See White v. Wesier*, 412 U.S.

783, 795 (1973) ("[A] federal district court, in the context of legislative reapportionment, should

follow the policies and preferences of the State, as expressed in statutory and constitutional

provisions or in the reapportionment plans proposed by the state legislature, whenever adherence

to state policy does not detract from the requirements of the Federal Constitution[]."); *see also*

*Shayer v. Kirkpatrick*, 541 F. Supp. 922, 932 (W.D. Mo.), *aff'd sub nom. Schatzle v. Kirkpatrick*,

456 U.S. 966 (1982) (prioritizing state constitutional requirements after determining compliance

with federal law).

And all state governmental decisions – whether those of the legislature or the

Commission – are subordinate to the state's constitution. After all, "[a]n unconstitutional act is

not a law; it confers no rights; it imposes no duties; affords no protection; it creates no office; it

is in legal contemplation, as inoperative as though it had never been passed." *Norton v. Shelby*

*County*, 118 U.S. 425, 442 (1886); *Shayer*, 541 F. Supp. at 932 (prioritizing the state's

constitutional requirements for redistricting above non-legal expressions of state policy, and

refusing to treat the policy reflected in a proposed bill that was not enacted as the policy of the

state because doing so "would be a massive intrusion into the [state] legislative process"). The

Supreme Court of Ohio has unremarkably held that the Ohio Constitution is the supreme law of

the state that supersedes other governmental actions. *State ex rel. Weinberger v. Miller,* 87 Ohio St. 12, 26-27 (1912) ("There can be no honest controversy but that the written Constitution of the state is the paramount law . . . it is the duty of the court to sustain the paramount law and refuse to enforce any and all legislation in contravention thereof.").

> ## 2. The Supreme Court of Ohio determines the meaning of the provisions of the Ohio Constitution.

There is no dispute that the Supreme Court of Ohio is "the ultimate arbiter of Ohio law." *Ohio ex rel. Skaggs v. Brunner,* 549 F.3d 468, 472 (6th Cir. 2008); *see, e.g., Hortonville Dist. v. Hortonville Ed. Assn,* 426 U.S. 482, 488 (1976) ("We are, of course, bound to accept the interpretation of [state] law by the highest court of [that] State.").

Not surprisingly, Ohio's Attorney General and Secretary of State do not disagree. They have acknowledged they are duty-bound to follow the Supreme Court of Ohio's interpretation of the Ohio Constitution as regards redistricting plans. *See* Feb. 22, 2022 Letter from Attorney General Yost to Ohio General Assembly, ECF No. 91-4 at PageID # 1505 ("The federal court may not order the use of a map that was rejected by the Ohio Supreme Court, where the underlying provision of the state constitution has not been found to violate the federal constitution."); LaRose Br., ECF No. 164 at Page ID # 5395 n.2 ("If the Supreme Court were to rule that the Fourth Plan violates Art. XI, then the Secretary, as a statewide official who swore an Oath to obey Ohio's Constitution, should no longer advocate for the adoption of the Fourth Plan.").

State Courts are given particular deference when interpreting law governing state elections. *See Democratic Nat'l Comm. v. Wisconsin State Legislature,* 141 S. Ct. 28 (2020) (noting the difference in "the authority of state courts to apply their own constitutions to election regulations" and cases involving federal elections) (Roberts, CJ, concurring); *see also*

*Democratic Nat'l Comm.,* 141 S. Ct. at 34 n.1 (noting the particular deference given to state court interpretation of state constitutions for state elections) (Kavanaugh, J, concurring).

This is true for acts of the legislature. It is no less true as to legislative actions by the Commission.

### 3. Under the Ohio Constitution, the Supreme Court of Ohio's legal conclusions regarding redistricting maps require deference.

Article XI, Section 9(A) vests review of the actions of the Commission in the original and exclusive jurisdiction of the Supreme Court of Ohio. Section 9(B) clearly states the authority of the Supreme Court of Ohio to invalidate districting plans, as it provides for procedures in the event that "any general assembly district plan made by the Ohio redistricting commission, or any district is determined to be invalid by an unappealed final order of a court of competent jurisdiction." As noted above, these provisions were approved by 71.5% of the Ohio electorate in 2015. In so doing, those voters established a judicial check on redistricting decisions made through the acts of those with political power. Plaintiffs now act as if this entire amendment process did not occur. They contend that it is sufficient that the Third and Fourth Plans were "adopted by elected officials that may be held accountable at the ballot box." *See* Pls.' Post-Hr'g Br. in Support of Second Mot. for P.I., ECF No. 160 at PageID # 4525. In other words, Plaintiffs seek a reversion to the days of unfettered majority-rule.

It is therefore of critical importance that the Supreme Court of Ohio has already declared the Third Plan invalid, "in its entirety," under the Ohio Constitution. *League of Women Voters of Ohio v. Ohio Redistricting Comm'n*, 2022-Ohio-789, ¶ 44 (Mar. 16, 2022) ("*LWVO III*"). And the "Fourth Plan" is virtually indistinguishable from the Third Plan. *See* Warshaw Affidavit, ECF No. 163-7 at PageID # 5183; Rodden Affidavit, ECF No. 163-14 at PageID # 5331. Indeed, that is one point as to which all parties agree. Ohio Sec. of State Larose's Resp. in Opp. to Pls.'

Sec. Am. Mot. for a P.I., ECF No. 164 at PageID # 5399 ("the Fourth Plan is very similar to the Third Plan"); Pls.' Post-Hr'g Br. in Support of Second Mot. for P.I., ECF No. 160, PageID # 4514 ("Even though [the Fourth Plan] was a new plan, there were few changes made from the Third Plan"). Thus, even Plaintiffs admit that the "Fourth Plan is . . . likely to be rejected" in pending challenges in front of the Supreme Court of Ohio. *Id.*

4. **Because the Commission's maps were passed outside the Commission's authority, they are mere *ultra vires* acts that do not reflect state policy choices.**

Because the Commission's plans violate the Ohio Constitution, they have no legal authority. *See, e.g.*, *Post v. Supervisors*, 105 U.S. 667, 669 (1881) ("An act of the legislature of a State, which has been held by its highest court not to be a statute of the State, because never passed as its Constitution requires, cannot be held by the courts of the United States, upon the same evidence, to be a law of the State."). The Sixth Circuit has made clear that "*ultra vires* acts bear no legitimate force in a government under the law. A public act without legitimate force is indistinct under the law from an act that never was, or an act that has been voided." *Gentry v. Deuth*, 456 F.3d 687, 697 (6th Cir. 2006). The Commission's adoption of unconstitutional plans was "a proceeding without the authority of, and one which does not affect, the state in its sovereign or governmental capacity. It is simply an illegal act upon the part of . . . state official[s] in attempting, by the use of the name of the state," to violate state law. *Ex Parte Young*, 209 U.S. 123, 159 (1908).

Plaintiffs correctly state that the Commission, not the Ohio Court, "decides redistricting-related policy issues." Pls.' Post-Hr'g Br. in Support of Second Mot. for P.I., ECF No. 160 at PageID # 4522. But Plaintiffs miss the forest for the trees – the defects with the Third and Fourth maps result from violations of the Ohio Constitution, not mere policy decisions. Under

Article XI, the decision to pass a map dominated by partisan interests is not left to legislative discretion – it is an unambiguous violation of Ohio law.

Plaintiffs cite to Eleventh Circuit precedent for the notion that a plan adopted by a state subdivision in violation of state law should still merit deference by federal courts. *See* Pls.' Post-Hr'g Br. in Support of Second Mot. for P.I., ECF No. 160 at PageID # 4521 (citing *Tallahassee Branch of NAACP v. Leon Cty.*, 827 F.2d 1436 (11th Cir. 1987)). But the Tenth Circuit sharply disagreed with the majority opinion in *Tallahassee*, emphasizing that "deference must run first and foremost to the legislative decision-making of the sovereign State and, only through it, to its subordinate political subdivision." *Large v. Fremont Cty.*, Wyo., 670 F.3d 1133, 1146 (10th Cir. 2012). "After all, it is the State that imbues the political subdivision with the apportionment power, and the subdivision cannot stand on an independent and equal footing with respect to its creator." *Id.* at 1146. And when "a political subdivision of a State substantively contravenes the laws of that State—at least insofar as that contravention is not sanctioned by higher federal law—it no longer acts as an agent of that sovereign, and therefore is due no federal-court deference." *Id.* Were the court to defer to the county, the court explained, it "would be granting deference to the wrong authority. We would, in essence, be using the authority of the federal courts to elevate a subordinate over its superior." *Id.* at 1147. Thus, the Tenth Circuit concluded that the district court had appropriately "implemented a plan of its own design" to remedy the Section 2 violation, rather than adopting a plan proposed by the county but that needlessly violated other aspects of state law. *Id* at 1148. Here, by seeking deference to the Commission in violation of the constitutional amendment that created it, Plaintiffs seek deference to the wrong authority.

     **5.**    *Arizona State Legislature* **does not authorize this Court to ignore the Ohio Constitution.**

Plaintiffs cite *Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787 (2015) for the accurate statement that legislative authority may be vested in a Commission. Their citation is inapt for two reasons.

First, that case considered the viability of the Arizona elections scheme under Article I, Section 4 of the United States Constitution, which governs congressional elections and is inapplicable to state legislative elections. *Ariz. State Legis.*, 576 U.S. at 792.

Second, even if the logic of that case were to be extended to this case, it does not support Plaintiffs' contention that this Court should ignore the Ohio Constitution. The Court's reasoning in *Arizona* makes clear that it is the will of the people – not any particular legislative body – that ultimately reigns supreme. *Arizona* makes clear that the people may choose to constrain their legislators in how elections are to be carried out. *See id.* at 822. This respect for the people of a state to set their own redistricting process is essential even when the Elections Clause applies (which it does not here) because of "the fundamental premise that all political power flows from the people." *Id*. at 824.

Here the will of the people was plainly stated in Ohio Constitution Article XI, which both sets forth limitations on the Commission's authority and specifically provides for judicial review by the Ohio Supreme Court. Accordingly, this Court ought not impose maps inconsistent with Article XI out of misplaced deference to the Commission's non-legal acts.

## III.    THIS COURT SHOULD NOT DIRECT THAT ELECTIONS BE HELD UNDER THE MALAPPORTIONED 2011 PLAN.

Despite their previous contention that "using the old legislative districts is not an option," Pls.' Second Am. Mot. for P.I., ECF No. 96 at PageID # 1583, Plaintiffs now argue that "this Court should adopt the 2011 map on an interim basis." Pls.' Post-Hr'g Br. in Support of Second

Mot. for P.I., ECF No. 160 at PageID # 4511.  In so doing, Plaintiffs' argument distills to the contention that this Court should impose as a *remedy* the very harm that this lawsuit was allegedly filed to prevent – an election under the 2011 malapportioned plan.  Plaintiffs' new theory undercuts their argument on the merits, their claims of irreparable harm, and their attempt to invoke this Court's jurisdiction.

### A.      Plaintiffs' New Theory Eviscerates Their Case.

*Self-destruction of Plaintiffs' Claims on the Merits.*  This entire action is predicated in large part on Plaintiffs' claim that they will be forced to vote in the malapportioned 2011 districts absent federal interference.  *See, e.g.*, FSC, ECF No. 86, ¶ 8 ("Plaintiffs live in . . . malapportioned state legislative districts . . . thus harming Plaintiffs"); *id.* ¶¶ 78-81 (asserting that Plaintiffs' 14th Amendment rights are being violated because they live in overpopulated districts under the 2011 map and they will suffer vote dilution if elections are allowed to take place)l  *see also id.* ¶ 99 (requesting that this Panel "[d]eclare that the removing the [sic] current configurations of Ohio's state legislative districts . . . violates the First and Fourteenth Amendments to the U.S. Constitution" and asking that this Court "[p]ermanently enjoin Defendant and all persons acting on his behalf or in concert with him from implementing, enforcing, or conducting any elections under Ohio's current state legislative districts other than the Third Plan.").

To substantiate these claims, Plaintiffs have explained in detail why the 2010 map is malapportioned after the most recent census.  *See*, *e.g.*, *id.* ¶¶ 29-31; Pls.' Second Am. Mot. for P.I., ECF No. 96, PageID # 1578, 1583-84.  There is no dispute as to those facts.  *See* Int.-Def Sub. Regarding the Role of the Fed. Ct., ECF No. 163 at PageID # 4959-4960.

But if Plaintiffs no longer find these facts violate their rights under the Fourteenth or First Amendments then their claims have gone up in smoke.

*Evisceration of Plaintiffs' Theory of Irreparable Harm.*  Plaintiffs have explicitly and repeatedly identified the possibility of voting under the 2011 malapportioned districts as an irrevocable harm that warrants injunction.  *See* First Supplemental Amended Complaint, ECF No. 86, at PageID # 1272 (requesting a preliminary injunction because "should the Secretary of Stop [sic] implementing the Third Plan, then Plaintiffs will effectively no [sic] state legislative districts or their state legislative districts are outdated [sic], so they are very likely to succeed on the merits of their claim"); Pls.' Second Am. Mot. for P.I., ECF No. 96, PageID # 1590 (arguing that imposing the Third Plan will benefit third parties because "[o]ver 100,000 Ohioans live in each of the now malapportioned 2010 state legislative districts where Plaintiffs live . . . To the extent those districts are still in effect, hundreds of thousands of Ohio voters are disenfranchised by malapportioned districts").

Plaintiffs no longer assert this harm.  This begs the question:  if Plaintiffs have no problem with voting under the 2011 districts, what irreparable harm is this preliminary injunction intended to prevent?

*Undermining of Plaintiffs' Attempt to Invoke the Jurisdiction of this Court.*  Plaintiffs invoked the jurisdiction of this three-judge panel in the first place by asserting that they were "challenging the constitutionality of the apportionment of Ohio's statewide legislative body." First Supplemental Amended Complaint, ECF No. 86, at PageID # 1272.  In so doing, Plaintiffs invoked 28 U.S.C. § 2284.  That provision, however, provides this Panel with jurisdiction over actions "*challenging* the constitutionality of . . . the apportionment of any statewide legislative body."  (emphasis added).  Now that Plaintiffs are no longer challenging a malapportioned plan, but rather *requesting* one, it is unclear on what basis Plaintiffs invoke this Court's jurisdiction.

### B.  There Is No Basis for Plaintiffs' Complete Reversal.

The case upon which Plaintiffs now rely, *Watkins v. Mabus*, 771 F. Supp. 789, 791 (S.D.

Miss. 1991), *aff'd in part, vacated in part*, 502 U.S. 954 (1991), does not justify their change in

position.  *See* Pls.' Post-Hr'g Br. in Support of Second Mot. for P.I., ECF No. 160 at PageID #

4527.

Put simply, *Watkins* does not justify the imposition of the 2011 malapportioned plan here.

In that case, the Court did not have any acceptable alternative plans available.  *See Watkins*, 771

F. Supp. at 800 (S.D. Miss.) (explaining that "the reports prepared by the court-appointed experts

demonstrate serious problems with the plaintiffs' designated plans" and "[t]he plans submitted by

the parties for the House suffer from the same problems").  In contrast, here the Court has other

valid plans available and ready to be implemented.  *See*, *infra*, Section VII.C.  Indeed, the

authority Plaintiffs cited in their prior pleadings was far more applicable to the facts at hand.  *See*

Pls.' Second Am. Mot. for P.I., ECF No. 96, PageID # 1583 (citing *Evenwel v. Abbott*, 578 U.S.

54, 59 (2016) to support the proposition that "using the old legislative districts is not an option");

*Evenwel*, 578 U.S. at 60 ("Maximum deviations above 10% are presumptively impermissible.").

*      *      *

Up until a few days ago, the one thing that every party in this action agreed on was that

this Court should not impose the malapportioned 2011 plan.  *See* Int-Pls. Ohio Organizing

Commission's Mot. For a P.I., ECF No. 165, PageID # 5440 ("There is no justification for

imposing Ohio's malapportioned 2011 Plan for the 2022 election."); Int-Pls. Bennet Pets.' Post-

Hearing Br. Re. Pls.' Mot. For a P.I, ECF No. 161, PageID # 4581 ("There is a reason no party

had proposed the use of the 2011 Plan: to conduct elections under that plan would violate both

federal and Ohio law."); Ohio Sec. of State Larose's Resp. in Opp. to Pls.' Sec. Amen. Mot. For

a P.I., ECF No. 164, PageID # 5401 ("The Secretary does not object to the Panel ordering the use

of the "current" 2011 district plan, *but he assumes that the Court would order that any population malapportionment issues be addressed*." (emphasis added)). Plaintiffs' new stance to the contrary should not be credited.

## IV. A SUBSTANTIALLY COMPLIANT PLAN ALREADY EXISTS.

If this Court is required to order implementation of a plan, it should not order a plan that violates the Ohio Constitution. The Independent Plan drafted by the Commission's map-drawers was substantively compliant with that Constitution weeks ago, and was able to be finalized for adoption within a day. *See* Tr. of Hr'g on P.I. Mot., ECF 150 at PageID # 4369:2–6, 4376:6–24. Indeed, Dr. Rodden has already completed this task and provided an iteration of the Independent Plan that resolves any technical defects. Ex. 2 to Int.-Pl Brief on PI Mot., Apr. 5, 2022 Decl. of Dr. Jonathan Rodden, ECF No. 161-2 at PageID # 4629–4631 (hereinafter "Rodden Apr. 5 Decl."); Ex. to Int.-Pl Notice of Correction, Suppl. Decl. of Dr. Jonathan Rodden, ECF No. 177-1 at PageID # 5772–73 (hereinafter "Rodden Suppl. Decl.").

### A. The Independent Plan Complied with the Ohio Court's Process.

The Supreme Court of Ohio invalidated the Third Plan in part because "the commission did not follow the process that Article XI [of the Ohio Constitution] requires." *LWVO III*, ¶ 25. That Article, the Court explained, requires that "*[t]he commission shall draft*" redistricting plans. *Id*. (emphasis in original) (quoting Ohio Const. art. XI, § 1(C)). But through three rounds of General Assembly redistricting, each map had been drawn entirely by staffers for Senate President Huffman and House Speaker Cupp. *Id*. ¶¶ 25–30. Minority-party commissioners were locked out of the process, and even other majority-party commissioners did not participate. *Id*.

The Court therefore ordered "that *the commission* draft and adopt an entirely new General Assembly–district plan," and recommended that "drafting should occur in public and the commissioners should convene frequent meetings to demonstrate their bipartisan efforts to reach

a constitutional plan within the time set by this court." *Id.* ¶ 44 (emphasis in original).  The Court further recommended that the Commission "retain an independent map drawer—who answers to all commission members, not only to the Republican legislative leaders—to draft a plan through a transparent process." *Id.* ¶ 30.

The Independent Plan is the product of that process.  The Commissioners unanimously agreed to hire two independent map-drawers, one nominated by each party; Douglas Johnson by the Republicans, and Michael McDonald by the Democrats.  See Ex. A to Int-Def Opp. to T.R.O. Mot., Tr. of Mar. 19, 2022 Ohio Redistricting Comm'n Hrg., ECF No. 91-2 at PageID # 1482–84; Ex. B to Int.-Def Opp. to TRO Mot., Tr. of Mar. 21, 2022 Ohio Redistricting Comm'n Hrg., ECF No. 91-3 at PageID # 1501.  Those map-drawers flew to Columbus, where the Commission provided them with 24 detailed, unanimously agreed-upon instructions to establish the parameters for their work.   Ex. B to Int.-Def Opp. to Second Amended PI Mot., Ground Rules for Map Drawers, Ohio Redistricting Comm'n (Mar. 23, 2022), ECF No. 111-3 at PageID # 2896–98.

For the next five days, those map-drawers worked tirelessly and openly, with their activities publicly viewable *via* livestream.  *See generally* Video Library, The Ohio Channel, https://tinyurl.com/hcznkpy4 (accessed Apr. 9, 2022) (archived collection of map-drawing livestream).  They met daily with the Commission to report on their progress and to seek guidance.  *See generally* Commission Meetings, Ohio Redistricting Comm'n, https://redistricting.ohio.gov/meetings (accessed Apr. 9, 2022).  Between these meetings, they were visited frequently by individual commissioners, who observed and discussed their progress. *See, e.g.*, Ohio Redistricting Commission - Workroom - 3-27-2022 - 3:00pm-11:00pm, The Ohio Channel, https://tinyurl.com/mv6hu8hv at 7:30 (visit by Senator Sykes and Governor DeWine),

12:45 (visit by Speaker Cupp and Auditor Faber), 4:40:25 (visit by Secretary LaRose and Minority Leader Russo) (accessed Apr. 9, 2022).  They incorporated requests from commissioners – spending nearly all of their final day, for instance, accommodating Senate President Huffman's wish to keep as many incumbents in their districts as possible.  *See* Ex. 5 to Int.-Def Sub. Regarding the Role of the Fed. Ct., Tr. of Mar. 28, 2022 Ohio Redistricting Comm'n Hrg., ECF No. 163-6 at PageID # 5000–07, (explaining on the morning of the March 28 that a draft map was available, but the map-drawers would incorporate incumbency before presenting to the Commission).

Before the Commission's deadline, it had a plan that substantively complied with the requirements of the Ohio Constitution.  See Ex. 10 to Int.-Def Sub. Regarding the Role of the Fed. Ct., Affidavit of Senator Vernon Sykes, ECF No. 163-11 at PageID # 5237; Ex. 11 to Int.-Def Sub. Regarding the Role of the Fed. Ct., Affidavit of Minority Leader Allison Russo, ECF No. 163-12 at PageID # 5285; Ex. 12 to Int.-Def Sub. Regarding the Role of the Fed. Ct., Affidavit of Christopher Glassburn, ECF No. 163-13 at PageID # 5308–5309.  And that plan was achieved through the steps recommended by the Supreme Court of Ohio – proving that a transparent, bipartisan process could produce a compliant plan.

Plaintiffs object that the Independent Plan cannot be adopted because Chris Glassburn, a consultant for the minority-party commissioners, "drafted portions of the map that were not approved by Dr. Johnson, Dr. McDonald, or a member of the Redistricting Commission."  *See* Pl. Br. in Support of Second PI Mot., ECF No. 160 at PageID # 4530.  This objection is puzzling, as Plaintiffs urge that this Court instead adopt the Third Plan – which was drafted exclusively by majority-party staffers operating in secret – or the Fourth Plan – which was fashioned by the

same staffers making minute adjustments to the invalidated Third Plan.  *Id.* at PageID # 4522–4523; Int.-Def Sub. Regarding the Role of the Fed. Ct.*,* ECF No. 163 at PageID # 4950–4952.

It is also false.  Plaintiffs cite to paragraphs from an affidavit that Dr. Johnson submitted to the Supreme Court of Ohio.  In those paragraphs, Mr. Johnson states that Mr. Glassburn proposed a configuration of districts to address incumbency concerns in Northeast Ohio.  Ex. A to Pl. Br. in Support of Second PI Mot., ECF No. 160-1 at PageID # 4540.  Mr. Johnson then testifies that he and Dr. McDonald "reviewed the partisan lean" of this proposal and changed "a handful of districts," which allowed them to "maintain the partisan symmetry of our previous map." *Id.*

Nowhere does Mr. Johnson assert that Mr. Glassburn "drafted portions of the map," nor does his testimony (or the archived livestream) support this assertion. *See generally* Ohio Redistricting Commission - Workroom - 3-28-2022 - 3:00pm-11:00pm, The Ohio Channel, https://tinyurl.com/3xccsed8 at 11:00–1:17:00 (accessed Apr. 9, 2022) (showing Blake Springhetti, one of the two Republican staff map-drawers, telling Mr. Johnson to "go ahead and include" the proposal, and showing the independent map-drawers implementing the proposal). Instead, the evidence shows that both independent map-drawers reviewed, revised, and impartially implemented Mr. Glassburn's recommendation, and that their implementation did not impact the partisanship of the Independent Plan.

**B.      The Independent Plan Was Already Substantively Compliant.**

The Independent Plan submitted to the Commission on March 28 was substantively compliant with the requirements of the Ohio Constitution. That plan was drawn without partisan purpose and closely mirrors the preferences of Ohio's voters, satisfying Article XI, Sections 6(A) and 6(B) of Article XI of the Ohio Constitution. *See* Int-Def Sub. Regarding the Role of the Fed. Ct., ECF 163 at PageID # 4955–4958.

16

The Independent Plan also complied with Section 6(C) of the Ohio Constitution, which requires that "districts shall be compact." Ohio Const. art. XI, § 1(C). In fact, the Independent Plan's districts are more compact than those of the Third and Fourth Plans, as Dr. Rodden has shown. See Ex. 1 to Int.-Pl Brief on PI Mot., Mar. 30, 2022 Aff. of Dr. Jonathan Rodden, ECF No. 161-1 at PageID # 4595, 4598. Dr. Rodden compares these plans according to three common compactness metrics; the Independent Plan scores better than the Third and Fourth Plans across all of these metrics, for both the House and the Senate. Id. Dr. Warshaw has independently compared the Independent Plan to the Fourth Plans, and confirms Dr. Rodden's results. See Ex. 1, Declaration of Christopher Warshaw (Apr. 11, 2022), at 2–3.

Other sections of the Article XI govern requirements such as population variance, district numbering, and geographic splits. The Independent Plan was drawn to meet these requirements. *See* Ex. A to Pl. Br. in Support of Second PI Mot., ECF No. 160-1 at PageID # 4538 (Johnson Affidavit). Mr. Glassburn has testified that the Independent Plan substantially complies with these requirements, and that the few remaining minor technical issues could be corrected in less than a day. Tr. of Hr'g on P.I. Mot., ECF 150 at PageID # 4367:10–20, 4369:2–6.

### C. The Corrected Independent Plan Is Fully Compliant.

Dr. Rodden has proven by example that minor corrections could quickly address any technical defects in the Independent Plan. Ex. 2 to Int.-Pl Brief on PI Mot., Apr. 5, 2022 Decl. of Dr. Jonathan Rodden, ECF No. 161-2 at PageID # 4629–4631 (hereinafter "Rodden Apr. 5 Decl."); Ex. to Int.-Pl Notice of Correction, Suppl. Decl. of Dr. Jonathan Rodden, ECF No. 177-1 at PageID # 5772–73 (hereinafter "Rodden Suppl. Decl."). All told, those corrections took him about eight hours. Rodden Apr. 5 Decl. at PageID # 4631; Rodden Suppl. Decl. at PageID # 5773. Dr. Rodden's work demonstrates that this Court could appoint one or more special masters to carry out corrections and finalization as little as two days before a plan is needed.

17

The corrections that Dr. Rodden has made bring the Independent Plan into full compliance with the Ohio Constitution.  Rodden Apr. 5 Decl. at PageID # 4629–31; Rodden Suppl. Decl. at PageID # 5772–73.  Those changes were minor, and had no impact on the Independent Plan's compactness or partisan proportionality.  Rodden Apr. 5 Decl. at PageID # 4631; Rodden Suppl. Decl. at PageID # 5773; Ex. 1, Declaration of Dr. Christopher Warshaw (Apr. 11, 2022), at 2–3.  As a result, the Independent Plan can achieve full compliance with Article XI, including the requirements of Section 6 – in contrast to the unconstitutional Third and Fourth Plans, the flaws of which cannot be easily remedied.

## V.      PLAINTIFFS WILL SUFFER NO IRREPARABLE INJURY DUE TO THE FAILURE TO ENACT THE THIRD OR FOURTH MAPS.

An "indispensable" requirement to a motion for a preliminary injunction is the threat of "imminent and irreparable injury."  *D.T.*, 942 F.3d at 327.  That injury "'must be both certain and immediate,' not 'speculative or theoretical.'"  *Id.* (internal citation omitted).  Plaintiffs premise their supposed constitutional injury on two distinct and equally unsubstantiated ideas: (1) The Ohio legislative primary elections have been canceled, robbing them of their constitutional right to vote; and (2) There are no Ohio legislative districts to use in an election. *See* Pls.' Post-Hr'g Br. in Support of Second Mot. for P.I., ECF No. 160 at PageID # 4511. These unfounded arguments, called "factual[ly] inaccura[ate]" by the Secretary of State, lack both the immediacy and certainty necessary for a Preliminary Injunction.  Ohio Sec. of State Larose's Resp. in Opp. to Pls.' Sec. Amen. Mot. For a P.I.., ECF No. 164 at PageID # 5389.

Plaintiffs continue to inexplicably argue that in the absence of the panel's immediate imposition of the Third or Fourth Plan, they will suffer irreparable injury because "no state legislative districts exist".  *See, e.g.*, Pls.' Second Am. Mot. for P.I., ECF No. 96, PageID #1582. Given that the constitutionally compliant plan drawn by the independent map makers is ready to

implement (with very small adjustments) – and well within the April 20 timeframe, if need be – there is no basis for that assertion. *See* Int.-Def Sub. Regarding the Role of the Fed. Ct., ECF No. 163, PageID # 4956. With the Independent Plan nearly complete, and a clear procedure for implementing it, Plaintiffs' alleged constitutional injury of "no districts" is far from "immediate and certain." *D.T.*, 942 F.3d at 327.

Indeed, Plaintiffs seem so sure that this panel will adopt a legislative plan of some kind that they acknowledge the question is not whether the panel will choose a plan, but instead: "What plan?" Pls.' Post-Hr'g Br. in Support of Second Mot. for P.I., ECF No. 160 at PageID # 4511. This is echoed by the Secretary of State, the party most integrally involved in the mechanics of an election, who simply stated, "Plaintiffs will still be able to exercise their right to vote for a candidate." Ohio Sec. of State Larose's Resp. in Opp. to Pls.' Sec. Amen. Mot. For a P.I., ECF No. 164 at PageID # 5393.   As such, the likelihood that there will be no districts or no elections for Plaintiffs to vote in absent this court's immediate imposition of the Third or Fourth Plan is at once speculative and unlikely.

## VI.    RESPONSES TO THE COURT'S THREE QUESTIONS

### A.    Question 1:  *Is there a federal right to vote in a primary if state law requires a primary for state elections? (Please provide the specific text in the Constitution or a constitutional doctrine that grounds this right).*

The Supreme Court has found there to be a right to vote in a primary when a state has made that primary "integral" to state election procedures. *See Smith v. Allwright*, 321 U.S. 649, 664 (1944) ("When primaries become a part of the machinery for choosing officials, **state** and national, as they have here, the same tests to determine the character of discrimination **or abridgement** should be applied to the primary as are applied to the general election.") (emphasis added); *cf. United States v. Classic*, 313 U.S. 299, 318 (1941) (holding there to be a right to vote in a primary where "the primary [is] an integral part of the procedure" for choosing

congressional representatives). Here a primary for election to the General Assembly has been set forth by Ohio law.

While the Ohio *Constitution* provides for two options to nominate candidates – the primary process or the petition process, *see* Ohio. Ohio Const. Art. V, Sec. 7 – Ohio statutes have provided for a primary only for established parties, O.R.C. § 3501.01 (E)(1). Here the right to vote in a primary is in fact "integral" to the Ohio election procedure. Thus under O.R.C. § 3513.01, the general rule is that primaries are held for the purpose of nominating candidates: "Except as otherwise provided in this section and section 3517.012 of the Revised Code, primary elections shall be held as provided in division (E) of section 3501.01 of the Revised Code for the purpose of nominating persons as candidates of political parties for election to offices to be voted for at the succeeding general election."

In *Classic*, the court found a right to vote in a primary where "the state law has made the primary an integral part of the procedure of choice, or where in fact the primary effectively controls the choice." 313 U.S. at 318. *Smith v. Allwright* came to a similar conclusion, and invoked the reasoning of *Classic* in the context of elections for both federal and state office. Further courts have found that First Amendment rights attach to primary elections. *Storer v. Brown*, 415 U.S. 724, 735 (1974) ("[T]he direct party primary… is not merely an exercise or warm-up for the general election but an integral part of the entire election process, the initial stage in a two-stage process by which the people choose their public officers. It functions to winnow out and finally reject all but the chosen candidates.").

Since Ohio state law provides for primary election, the right to vote attaches. Courts determine when the right to vote has been abridged by using the *Anderson-Burdick* balancing test. *See Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992);

*Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 663 (6th Cir. 2016); *Obama for Am. v. Husted,* 697 F.3d 423, 431 (6th Cir. 2012).  Here, failure to hold any primary or a similar orderly process prescribed by Ohio law for appearance on the general election ballot would result in a severe burden on the right to vote not supported by a compelling government interest, failing the *Anderson-Burdick* test.  *See Obama for Am,* 697 F.3d at 431.

    **B.**    **Question 2:** *May Ohio simply not hold a primary and have a general election? If so, how would Ohio law provide for a general election for those seats?*[7]

The Ohio Constitution does not require primary elections.  Article V, Section 7 of the Ohio Constitution states "[a]ll nominations for elective state, district, county and municipal offices shall be made at **direct primary elections or by petition as provided by law**." (emphasis added).  The choice of whether to use a primary election or petition as a nomination process is left to the Ohio legislature.

By statute, Ohio requires primary elections "for the purpose of nominating persons as candidates of established political parties for election to offices to be voted for at the succeeding general election." O.R.C. § 3513.01.[8]  This primary election is supposed to occur "on the first Tuesday after the first Monday in May of each year."  O.R.C. § 3501.01 (E)(1).

Yet the May 3rd 2022 primary does not include 2022 General Assembly candidates. Under Ohio law, and putting aside any constraints imposed by federal law, the Ohio legislature must rectify this problem by either (1) setting a primary date for the 2022 General Assembly

---

[7] Intervenor-Defendants construe this question to concern the contours of what can be done under Ohio law, as distinct from the constraints imposed by federal law (which is the subject of Question 1, supra).

[8] Similarly, the Ohio legislature has used the nomination by petition process for independent candidates (O.R.C. § 3517.257) and newly-formed political parties (O.R.C. § 3517.257).

election to allow for nomination of candidates of political parties, or (2) setting forth a process by which petitions may be used to place candidates on the general election ballot.[9]

### C.    Question 3:  *Does the federal court have authority to move a primary election? Where does this authority come from?*

Should the General Assembly fail to act, this Court has the authority to set[10] a primary date.  *See, e.g., Sixty-Seventh Minn. State Senate v. Beens,* 406 U.S. 187, 201 n.11 (1972) ("If time presses too seriously [to implement a remedial reapportionment plan], the District Court has the power appropriately to extend the [election deadline] time limitations imposed by state law."); *Quilter v. Voinovich,* 794 F. Supp. 756, 757 (N.D. Ohio 1992), *rev'd on other grounds*, 507 U.S. 146 (1993) (finding state legislative districts unconstitutional, vacating the primary date, and ordering a new one); *see also Upham v. Seamon*, 456 U.S. 37, 44 (1982) (per curiam) ("[W]e leave it to [the District Court] in the first instance to determine whether to . . . reschedule the [congressional] primary elections.").

This power to set the primary date stems from the "broad equitable power" courts have to vindicate constitutional rights.  *See Larios v. Cox,* 305 F. Supp. 2d 1335, 1342 (N.D. Ga. 2004) ("We also observe that the court has broad equitable power to delay certain aspects of the electoral process if necessary").  The Supreme Court made this clear in *Sixty-Seventh*, when it cited to *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1 (1971), for the proposition

---

[9] Any petition process would need to be established in such a fashion to respect the rights of all political parties and their supporters to have access to the ballot and to associate in furtherance of their political beliefs.  *Williams v. Rhodes*, 393 U.S. 23, 30–31 (1968) and *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 585 (6th Cir. 2006) ("The right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes.")

[10] Intervenor-Defendants construe the term "move" in the Courts' question to mean "set" a primary date, given that, at present, there is no operative primary date for the General Assembly election that this Court needs to "move."

that a district court has the power to move back election deadlines.  *Sixty-Seventh,* 406 U.S. at

201 n.11.  The Supreme Court in *Swann* stated that "[o]nce a right and a violation have been

shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for

breadth and flexibility are inherent in equitable remedies."  402 U.S. at 15.  As such, it is clear

this Court may set a primary deadline if necessary to vindicate the constitutional rights of

Ohioans.

## VII.   THIS COURT CAN ENACT REMEDIES THAT MINIMALLY INVADE THE STATE REDISTRICTING, ELECTION, AND JUDICIAL PROCESS.

### A.   The State Redistricting Process Should Be Permitted to Continue Until April 20, 2022.

As an initial matter, the Court should not do anything that would intrude on Ohio's

redistricting process.  If an August 2, 2022 primary is scheduled, then the deadline for the

completion of the Ohio state redistricting process should be 104 days before the primary, *i.e.,* on

April 20, 2022.

### B.   This Court Should Only Set a Primary Date if Ohio Does Not Do So by April 20, 2022.

Ohio law expressly prohibits anyone other than the Ohio General Assembly from setting

a primary date.  O.R.C. § 3501.40 ("[N]o public official shall cause an election to be conducted

other than in the time, place, and manner prescribed by the Revised Code").  While this Court

has the authority to set a primary date, as noted above, *see* Section VI.C,  Intervenor-Defendants

respectfully submit that it should only do if the General Assembly fails to do so by April 20,

2022.   If this Court acts on April 20, 2022 to (1) set August 2 as the primary, and (2) order a

constitutional district plan, there will be sufficient time for the plan to be implemented.

### C.    The Independent Plan Can Be Timely Implemented if this Court Must Implement a Plan.

If a primary date is set for August 2, 2022 primary, the Secretary has testified that a redistricting plan will be needed 104 days before that date.  And to the extent the Ohio state map-drawing process reaches April 20, 2022 without a valid General Assembly plan, this Court will need to implement a plan for an August 2 primary.  Given the Court's preference to "do is the least amount of damage to Ohio law," implementing the unconstitutional Third or Fourth Plans should not be an option.  Tr. of Hr'g on P.I. Mot., ECF No. 150 at PageID # 4343:1–3.  Instead, the Court should order the implementation of the Independent Plan (with minor modifications), which is substantially compliant with Ohio's Constitution.  *See* Section IV, *supra*.

### 1.    The Independent Plan can be readily implemented.

The record demonstrates that the Independent Plan – with very few modifications – could be fully compliant with Ohio's Constitution.  *See* Section IV.C, *supra*; *see also See* Tr. of Hr'g on P.I. Mot., ECF No. 150 at PageID # 4367:10–20; 4369:2–6; 4376:6-24 (testimony of C. Glassburn).  The Independent Plan can be finalized within a day. *Id.* at PageID # 4369:2–6 ("Q. Mr. Glassburn, you had said that there might be some technical flaws in the independent mapmakers' map. How long would it take, in your opinion, to identify and fix those technical flaws? A. No more than one day.").

And the submission of a corrected Independent Plan by Dr. Rodden has further brought the Independent Plan to the point of implementation.  Rodden Apr. 5 Decl. at PageID # 4631; Rodden Suppl. Decl. at PageID # 5773; Ex. 1, Declaration of Dr. Christopher Warshaw (Apr. 11, 2022), at 1–3; *see also* Section IV.C, *supra*.

**2.     There is time to implement the Independent Plan.**

The Ohio Secretary of State has indicated that, if a primary is scheduled for August 2, it would be possible to implement a new plan, whether "previously adopted or not," so long as he has the new plan by April 20, 2022.  Ohio Sec. of State Larose's Resp. in Opp. to Pls.' Sec. Amen. Mot. For a P.I., ECF No. 164 at PageID # 5404–05 ("[T]he Secretary and Ohio's 88 county boards of elections need the new electronic shape files and census block allocation files ready and in hand no later than April 20, so the county boards/vendors can reprogram their voting systems" for use in an August 2 primary).

To the extent the timing requires modification of any of the various interstitial deadlines in Ohio's election process, the Court has the capability to adjust them to ensure the Independent Plan can be implemented.  *Id.* at PageID # 5390 ("[I]t might become necessary for this Court to issue additional orders to automatically adjust the various statutory dates for primary elections in Ohio."); *see Larios v. Cox,* 305 F. Supp. 2d 1335, 1342 (N.D. Ga. 2004) ("We also observe that the court has broad equitable power to delay certain aspects of the electoral process if necessary").

**3.     Drs. Johnson and McDonald should be appointed as Special Masters to confirm that the (Revised) Independent Plan is complete and fully compliant.**

To the extent that the completion of the Independent Plan requires a few additional days beyond April 20 to complete, the Court should permit that to occur in order to ensure the implementation of a General Assembly plan that complies with the substantive requirements of Article XI of Ohio's Constitution.  This can be done quickly by the appointment of a Special Master.

The Independent Plan can most quickly be brought to the point of implementation by the appointment of Drs. Johnson and McDonald as Special Masters.  They are the best equipped

individuals to perform this task, given their prior investment in the process.  Ex. 9 to Int.-Def

Sub. Regarding the Role of the Fed. Ct., Tr. of Mar. 21, 2022 Ohio Redistricting Comm'n Hrg.,

ECF No. 163 at PageID # 5196–97.

In light of the nominal amount of work needed to finalize the Independent Plan, LVW

Intervenor-Defendants propose that the Special Masters be directed to begin work no later than

April 18.  This will assure that that there is a plan available should the Ohio General Assembly

set August 2 as the primary date, and the Ohio process not produce a final plan by April 20.

## VIII.  CONCLUSION

This Court's guiding principle should be to interfere as little as possible with the choices

made by Ohio.  Accordingly, Intervenor-Defendants urge that this Court permit the Ohio process

to continue to its completion.

Dated: April 11, 2022

Robert D. Fram
COVINGTON & BURLING, LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-6000
rfram@cov.com

James Hovard**
COVINGTON & BURLING, LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306-2112
(650) 632-4700
jhovard@cov.com

\* *Pro hac vice* application forthcoming
\*\* *Pro hac vice* application pending

Respectfully submitted,

*/s/ Freda J. Levenson*
Freda J. Levenson (0045916)
*Counsel of Record*
ACLU OF OHIO FOUNDATION, INC.
4506 Chester Avenue
Cleveland, OH 44103
(614) 586-1972 x125
flevenson@acluohio.org

David J. Carey (0088787)
ACLU OF OHIO FOUNDATION, INC.
1108 City Park Avenue, Suite 203
Columbus, OH 43206
(614) 586-1972 x2004
dcarey@acluohio.org

Alora Thomas*
Julie A. Ebenstein*
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street
New York, NY 10004

(212) 519-7866
athomas@aclu.org
jebenstein@aclu.org

**CERTIFICATE OF SERVICE**

I , Freda J. Levenson, hereby certify that on this 11th day of April, 2022, I electronically

filed the foregoing with the Clerk of Court for the United States District Court for the Southern

District of Ohio, Eastern Division via the ECF system, which will send notification of such filing

to all counsel of record.


*/s/ Freda J. Levenson*
Freda J. Levenson (0045916)
*Counsel for Intervenor-Defendants*
