# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

MICHAEL GONIDAKIS, *et al.*,  :
                         :
         **Plaintiffs,**      :     **Case No. 2:22-cv-0773**
                         :
   **v.**                     :
                         :
FRANK LAROSE, in his capacity as  :
Ohio Secretary of State, *et al.*,  :
                         :
        **Defendants.**    :

## MEMORANDUM OPINION & ORDER

BEFORE:  THAPAR, Circuit Judge; MARBLEY, Chief District Judge; and BEATON, District Judge.

The court delivered a PER CURIAM opinion in which THAPAR and BEATON, JJ., joined, and MARBLEY, C.J., joined in part.  MARBLEY, C.J. (pp. 59–82), delivered a separate opinion dissenting in part.

PER CURIAM.  State officials, not federal courts, draw state electoral districts.  But what happens if states fail to do so—no elections?  The U.S. Supreme Court has given a clear answer:  Federal courts must impose new maps to protect the right to vote.  *See Branch v. Smith*, 538 U.S. 254, 260–62 (2003).  But they must do so only as a last resort, after giving states every opportunity to carry out elections consistent with state law.  *See Growe v. Emison*, 507 U.S. 25, 34 (1993).

That is where we find ourselves today.  An Ohio statute mandates that primary elections occur in less than two weeks.  And early voting has already begun for congressional and statewide primaries.  But state-legislative candidates are not on those ballots because the State has not adopted a map of their districts.

Ohio's Constitution assigns responsibility for mapmaking to the Ohio Redistricting Commission, a body of seven executive and legislative officials.  The Commission has approved

four state-legislative maps. But the Ohio Supreme Court has rejected all of them as inconsistent with state constitutional requirements regarding proportionality and partisan favoritism. Each time, that court—constitutionally barred from imposing a map itself—has ordered the Commission to try again. And each time, the Commission's effort has failed to survive judicial review.

By now everyone agrees that legal and practical requirements preclude Ohio from holding a primary election for its state legislature on May 3, the date provided by statute. And the Ohio Supreme Court's most recent deadline for the Commission to craft a fifth map (which would be subject to a fifth round of litigation) falls *after* the so-called "drop dead" date of April 20. That is when every party to this litigation agrees a map would have to be in place for the state to conduct a primary that both complies with state election law and allows for an orderly general election in November.

Fearful that this time loop would nix the primary election entirely, a group of voters came to federal court and asked that we intervene to protect their right to vote in a primary election for state legislators. All parties agree federal law protects the right to vote in an election that is mandated by state law, and all parties agree that right would be violated if Ohio didn't hold a state-legislative primary. But we were summoned too late to ensure a May 3 primary for those seats. And the Commission was still drawing a fourth map when we were asked to intervene.

At that time, federalism and comity counseled that we sit tight and allow the state process to play out. And even today, we hope that the State can resolve the deadlock. But the Supreme Court has told us that at some point we must intervene to protect the right to vote.

To determine when that would be, this three-judge district court heard undisputed testimony that Ohio law requires 90 days for pre-election steps (candidate filings, residency requirements, overseas ballot distribution, early voting, and the like) plus another two weeks for

county boards to reprogram the system with a new map. That is the minimum amount of time the State needs, under current federal and state regulations, between adopting a new map and holding a primary election. We also heard testimony making clear that August 2—the date when Ohio holds special elections—is the last practicable date on which to conduct a primary election without disrupting the general election scheduled for November 8.

Putting these facts together, all parties agree that April 20 is the drop-dead date to choose a new map that can be implemented in time for a primary and general election. That date has come, but a new map has not. So now this court must select a map to ensure Ohioans may vote in a state-legislative election this year.

Among the options presented to us, the Commission's third map has one significant advantage over the others—a shorter timeline between selection and election. That is because the counties had already begun implementing that map when the Secretary of State told them to "press pause" after the Ohio Supreme Court rejected it on March 16. Because 80 of the 88 counties implemented Map 3 and "maintain a backup in their voter registration system," its drop-dead date is May 28—more than a month later than the others. *See* LaRose's Resp. to Second Mot. for Prelim. Inj. (DN 103) 11. Consistent with the U.S. Supreme Court's holdings in *Growe* and *Branch*, this remedy vindicates the federal right to vote while maximizing the time available to the State to exercise its responsibility to draw voting districts.

The Ohio Supreme Court's latest opinion also asked us to wait a bit longer. It surmised that either the Ohio legislature or this court could change Ohio's election laws to allow for a primary even later than August 2. That is only half right: Ohio's elected leaders might still approve a lawful map or change Ohio election laws and deadlines, and our choice of remedy is designed to give them still another chance to do so. But the record evidence makes clear that this

court cannot wait any later than May 28 without jeopardizing the right to vote, overriding a host of state election laws and deadlines, and inviting the electoral chaos and confusion that the U.S. Supreme Court has repeatedly instructed lower courts to avoid. *See Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) (per curiam). As of today, no map exists, uncertainty persists, and nothing ensures that a state-legislative election will happen at all. This court's intervention, however, can restore a lawful and orderly election by ensuring Ohio voters, candidates, and officials know the districts that will apply—at least as a last resort.

So we stay our hand until May 28. But if the State remains unable to implement its own valid map that satisfies federal law, then we must implement Map 3 to safeguard the rights of Ohio's voters. Handed a menu of unappetizing options, we defer ordering Map 3 as long as possible—a final pause in hope that Ohio finally approves a map that complies with federal and state law.

If the State fails to act, however, this timeline will ensure Ohioans can vote in the election that state law requires:

- All parties agree that Ohio cannot hold a primary for the General Assembly on May 3. In the event that Ohio does not reach a resolution before May 28, we will order that the state-legislative primary races be held on the special-election date of **August 2, 2022**. The evidence before the court makes overwhelmingly clear that this is the least disruptive, costly, and confusing way for a federal court to preserve Ohioans' right to vote in primary races required by state law.

- This court declines to order the implementation of a map until the last possible day, which we find to be **May 28, 2022**. Based on the testimony at the preliminary-injunction hearing, this is the deadline for Ohio's election officials to feasibly implement a federally imposed

map in time for the August 2 primary and to avoid disrupting the November 8 general election.

- To meet the August 2 election date while affording the State as much time as possible to act, Map 3 is the map we will order to be implemented on May 28, for the 2022 election cycle only, if Ohio does not approve a lawful map before then.

- If at any point before May 28, 2022, Ohio enacts a new map, changes its election deadlines, or resolves this case, then the Defendant, Secretary of State Frank LaRose, must promptly update us.

If there is any good news to come out of this litigation, it is this: The three judges on this panel agree on almost everything. We agree that the plaintiffs have standing, that Ohioans are entitled to have a primary, and that plaintiffs are entitled to a preliminary injunction. But most importantly, we all agree that the federal courts should serve as a last resort, not a first stop.

We only respectfully part ways on the ultimate remedy. Our colleague supports a map that the Commission rejected, and thus the Supreme Court never ruled on. We, on the other hand, choose a map that the Commission approved but the Ohio Supreme Court rejected. Admittedly, neither checks every box.

But on two dimensions—time and democratic accountability—we see Map 3 as the best option available. Start with time. Map 3 gives Ohio the best odds of resolving this crisis through its own processes. The dissent might view these additional five-and-a-half weeks as unlikely to bear fruit. But we remain optimistic that the Commission and the Ohio Supreme Court can set aside their differences and work together to find a solution. After all, a State-made solution, unlike ours, would last four or even ten years. And we are confident that not a single member of the Commission or the Ohio Supreme Court wants to run through this gauntlet again next spring.

Map 3 also is the better option when it comes to democratic accountability. Ohio's voters put the pen in the Commission's hands. Only they are authorized by Ohio's constitutional charter to draft an electoral map. By picking Map 3, we come closest to respecting that delegation of power.

In explaining our order, we divide the opinion in four parts. First, we trace the unusual and winding path that Ohio has followed to end up mapless in federal court. Second, we discuss why we have jurisdiction. Third, we explain why the Plaintiffs appear, at this stage, likely to succeed on the merits. Last, we determine the appropriate remedy.

## I.

## A.

Before we begin, it is helpful to clear some brush by explaining Ohio and federal law as it stands today—that is, how we must accept it in deciding whether to impose a map and date to vindicate Ohioans' federal right to vote.

The General Assembly, Ohio's legislature, is comprised of a house of representatives and a senate. Ohio Const. art. II, § 1. There are 99 representatives who serve two-year terms and 33 senators (one per three house districts) who serve four-year terms. *Id.* art. II, § 2; *id.* art. XI, §§ 3, 4(A). The Ohio Constitution requires that primaries be held for these and other state-elective offices, although the details are filled out by statutes and regulations. *Id.* art. V, § 7.

By statute, this year's primary elections for the General Assembly must be held on May 3. Ohio Rev. Code Ann. § 3501.01(E)(1). This year's general election is likewise fixed for November 8th. *Id.* § 3501.01(A). Ohio's elections are subject to numerous other statutory dates as well. *See* Prelim. Aug. 2 Election Calendar (DN 164-1) 7–8. And state law enables only the General Assembly to change these dates. *See, e.g.*, *League of Women Voters of Ohio v. Ohio Redistricting*

*Comm'n* (*LOWV IV*), Nos. 2021-1193, 2021-1198, 2021-1210, 2022 WL 1113988, at *16 (Ohio Apr. 14, 2022). Statewide authority for overseeing and implementing elections rests with the Secretary of State (Defendant Frank LaRose). Ohio Rev. Code Ann. § 3501.04. But 88 county boards of elections must implement the map and prepare ballots to administer elections. *Id.* § 3501.11; Hr'g Tr. (DN 150) 15.

Overseeing an election requires much more than simply counting the ballots cast on election day. Ohio has almost a month of early voting before both the primary and general election. The State must also make ballots available for servicemembers and overseas voters. 52 U.S.C. § 20302 (a)(8). In addition, Secretary LaRose, along with Ohio's 88 county boards, must navigate countless regulations under Ohio law such as certifying candidates' petitions for office and adjudicating protests about candidate eligibility. Hr'g Tr. 15–19.

These regulations (and others like them) explain why Ohio must have a map ready 90 days before the primary election. At this point, all parties agree that the State cannot hold its primary on May 3. *See, e.g.*, LaRose Response to Court Questions (DN 113) 6–11; Hr'g Tr. 231–32 (plaintiffs agreeing with LaRose). And to hold the general election on time, the last date that a primary can be held is August 2. Grandjean Affidavit (DN 113-1) ¶ 15; Hr'g Tr. 19, 65.

Between these 90 days and the two weeks necessary to program new maps, the Secretary would need 104 days to enact a new map for an August 2 primary. Ohio Const. art. XI, § 9(C); Hr'g Tr. 15–17, 24, 42, 79–85. Working backwards from August 2 means that Ohio must thus have a new map by April 20 under current law. *Id.* All the parties agree on this. *Id.* at 232, 234–36, 239, 242, 246. So we call this date the "drop dead" date. If the State does not have a map ready to go by that date, then even the August 2 primary date would be unfeasible—an intolerable situation from all parties' perspectives.

But this timeline has two exceptions. First, Ohio's elected officials could modify the State's election dates or streamline its pre-election protocols to allow for a primary later than the August 2 mark, though nothing in the record indicates they are likely to do so. Hr'g Tr. 19, 22–23, 48–49, 78–80, 87, 109. Second, the evidence presented to this court indicates the State had already begun implementing Map 3 before the Ohio Supreme Court rejected that map. Given that head start, the Director of Elections and Deputy Assistant Secretary of State testified that Ohio could implement Map 3 (and only Map 3) as late as May 28 while still complying with state election laws in advance of an August 2 primary date. Hr'g Tr. 19–21, 59–61, 107.[1]

Ohio's Constitution also imposes several constraints that explain today's showdown. In 2015, Ohio's voters amended the State's Constitution to establish a new system for drawing legislative districts following the decennial census. Three provisions are relevant.

First, the 2015 amendments to the Ohio Constitution created the Ohio Redistricting Commission, a seven-member body composed of the governor, the auditor of state, the secretary of state, one person appointed by the speaker of the House of Representatives, one person appointed by the House minority leader, one person appointed by the Senate president, and one person appointed by the Senate minority leader. Ohio Const. art. XI, § 1(A). The Commission is tasked with drawing Ohio's map for the state-legislative elections by September 1 of any year ending in the numeral one—in other words, after the release of the federal decennial census. *Id.* art. XI, § 1(C).

---

[1] Various statutory deadlines and periods, along with administrative steps required of state election officials, make April 20 the current drop-dead date for a new map. Hr'g Tr. 76–87. Ohio could theoretically shorten some of those periods. In fact, it did just that for the May 3 primary when it appeared the state-legislative races might sneak onto that ballot at the last minute. *See* Act of Jan. 28, 2022 (H.B. 93), 2022 Ohio Laws File 71, § 4; Hr'g Tr. 19, 22–23, 48–49, 79. But the record doesn't indicate what steps the General Assembly could or would take on this issue.

Second, the Constitution specifies that the Commission "shall attempt to draw a general assembly district plan" that meets three standards:

- Partisan favoritism: No plan "shall be drawn primarily to favor or disfavor a political party."

- Proportionality: The "statewide proportion of districts whose voters, based on statewide state and federal partisan general election results during the last ten years, favor each political party shall correspond closely to the statewide preferences of the voters of Ohio."

- Compactness: "General assembly districts shall be compact."

Ohio Const. art. XI, § 6(A)–(C).

Third, a map's duration depends on its degree of support within the Commission. If the Commission votes for a plan with at least two members of each of the two major political parties in the majority, then the map applies for ten years. *Id.* art. XI, § 8(B). But if the Commission is unable to pass a map with that degree of bipartisan support, an "impasse procedure" specifies that the approved map may remain in effect for only four years. *Id.* art. XI, § 8(C)(1)(a).

The Constitution also grants the Ohio Supreme Court "exclusive, original jurisdiction in all cases arising under" these redistricting provisions. *Id.* art. XI, § 9(A). But the Constitution expressly states that "[n]o court shall order, in any circumstance, the implementation or enforcement of any general assembly district plan that has not been approved by the commission in the manner prescribed by this article." *Id.* art. XI, § 9(D)(1). Nor may a court command the Commission to "adopt a particular general assembly district plan or . . . draw a particular district." *Id.* art. XI, § 9(D)(2).

B.

Our decision comes near the end, not the beginning, of a long and strange Ohio redistricting process. The trip thus far has included four Commission-enacted maps, one Commission-declared impasse, four Ohio Supreme Court decisions, two Ohio contempt proceedings, and two other federal cases.

Under state law, the Commission should have finished its maps by September 1, 2021. But that assumed the federal government would release 2020 census data on time in April 2021. *See* 13 U.S.C. § 141. Due to the pandemic, however, the Census Bureau announced in February that it would not release the data until late September 2021. So Ohio sued the U.S. Department of Commerce to obtain the information sooner. *See Ohio v. Raimondo*, 848 F. App'x 187, 188 (6th Cir. 2021). Ultimately, Ohio settled with the federal government and got the data in August 2021—more than three months late.

The next month, the Commission approved its first map (Map 1) on a 5-2 basis that tracked the partisan affiliations of its members. But various challengers to the map, several of whom are now intervenors in this litigation, sued the Commission under Article XI of the Ohio Constitution. Almost four months later, a 4-3 majority of the Ohio Supreme Court struck down this map on January 12. *League of Women Voters of Ohio v. Ohio Redistricting Comm'n*, (*LOWV I*) Nos. 2021-1193, 2021-1198, 2021-1210, 2022 WL 110261, at *28 (Ohio Jan. 12, 2022). The ruling rested on three points. First, the majority found that the Commission's Republican members controlled the drafting process, leading the court to infer that the Commission drew the map with the predominant intent to favor the Republican Party. *Id.* at *24. Second, the majority read the Ohio Constitution as requiring that the members of the Commission work together collectively to draft the map. *Id.* at *25. Map 1, however, was drafted only by staffers employed by the

Republican leadership. *Id*. Third, the majority concluded that Map 1 had a partisan skew that favored Republicans to win between 61 to 68 of the 99 House seats and 20 to 24 of the Senate's 33 seats. *Id*. at *25–27. This exceeded the Republicans' vote share over the past ten years of federal and state elections (roughly 55 percent). *Id*. The majority ordered the Commission to be reconstituted and to adopt a new plan within ten days. *Id*. at *29.

By that deadline, the Commission—voting on the same 5-2 lines—approved a second map (Map 2) that was more favorable to the Democrats. Substantively, Map 2 had 57 Republican-leaning seats and 42 Democratic-leaning seats in the state House and a 20-to-13 presumed advantage for Republicans in the state Senate. Procedurally, the Commission included input from outside experts as well as members of both the Republican and Democratic caucuses.

Weeks later, the Ohio Supreme Court again held that the Commission-approved map violated section 6(A) and 6(B) of Article XI of the Ohio Constitution. *League of Women Voters of Ohio v. Ohio Redistricting Comm'n*, (*LOWV II*), Nos. 2021-1193, 2021-1198, 2021-1210, 2022 WL 354619, at *14 (Ohio Feb. 7, 2022). The four-justice majority criticized the Commission for beginning with Map 1 as a baseline rather than starting from scratch. *Id*. at *7. The opinion described this as a sign of the Commission's desire "to preserve as much partisan favoritism as could be salvaged from [Map 1]," not (as the dissenters suggested) a means of complying with the Ohio Supreme Court's ten-day timeline to produce a second map. *Id*. at *8. The majority opinion further criticized the Commission's rejection of "easy and obvious changes" that would have created more Democratic seats without altering the plan's compactness. *Id*. The League of Women Voters—a challenger to Map 2 before the Ohio Supreme Court and now an Intervenor-Defendant in this case—also marshaled statistical evidence that the Commission drew the map asymmetrically in a manner that favored the Republicans. *Id*. at *9. Though the May 3 primary

election was rapidly approaching, the Ohio Supreme Court refused to stay its judgment in striking down Map 2; the ball was in the General Assembly's court to postpone the election if necessary. The decision gave the Commission another ten days to produce a third map. *Id.* at *14.

The Commission failed to pass a map within that window of time. Indeed, the Commission filed a "Notice of Impasse" (not to be confused with the "impasse procedure" described above) with the Ohio Supreme Court on the deadline day after the members ran into gridlock. *League of Women Voters of Ohio v. Ohio Redistricting Comm'n* (*LOWV III*), Nos. 2021-1193, 2021-1198, 2021-1210, 2022 WL 803033, at *3 (Ohio Mar. 16, 2022). But the Ohio Supreme Court didn't take no for an answer. Instead, it ordered the Commission to explain why it shouldn't be held in contempt for failing to comply with the deadline. *Id.* Perhaps prompted by this order, the Commission produced Map 3 on February 24. *Id.* at *5. At that time, recognizing the urgency of the situation, Secretary LaRose began implementing Map 3 for the primary election. Directive 2022-30 (DN 88-1) 2–3. But the Ohio Supreme Court invalidated Map 3 on March 16—less than three weeks before early voting was slated to begin. *LOWV III*, 2022 WL 803033, at *11. The majority found once again that the "main goal of the individuals who drafted [Map 3] was to favor the Republican Party." *Id.* at *5. And the majority reached this conclusion by noting the map's partisan skew and that Republican staffers drew this map too. *Id.* at *8. The Ohio Supreme Court ordered the Commission to draft a new map by March 28 and encouraged the Commission to use independent mapmakers and to make its proceedings available to the public. *Id.* at *11.

The Commission approved a fourth map—albeit barely—approving a fourth map by a 4-3 margin hours before the deadline. And just six days ago, the Ohio Supreme Court rejected the Commission's fourth map, concluding it was "materially identical" to Map 3. *LOWV IV*, 2022

WL 1113988, at *18. The Ohio Supreme Court ordered the Commission to reassemble and to produce a fifth map by May 6, 2022. *Id.* at ¶ 79.

Across these four decisions, three Ohio Supreme Court justices remained in dissent. And their opinions made five main points.

First, the dissenting justices argued that the Ohio Constitution does not authorize the Ohio Supreme Court to invalidate a Commission-drawn map on partisan favoritism and proportionality grounds alone.[2] In their view, the Ohio Constitution does not render "stand-alone violation[s]" of the partisan favoritism and proportionality provisions "judicially enforceable." *LOWV III*, 2022 WL 803033, at *25 (Kennedy & DeWine, JJ., dissenting). The Ohio Supreme Court can reject a Commission-drawn map on the grounds of partisan favoritism or proportionality only if the map violates other provisions of the Ohio Constitution regarding the size, contiguity, and boundaries of electoral districts. *See id.* (citing Ohio Const. art. XI, § 9(D)(3)).[3]

Second, the dissent charged the majority with seeking to "micromanage the commission" by requiring "all seven commissioners gather around a computer with the redistricting software and jointly draft a plan." *LOWV III,* 2022 WL 803033, at *14 (Kennedy & DeWine, JJ., dissenting). According to the dissenters, "[n]othing in the Constitution" requires the Commission to jointly draw a map. *Id.* at *16. The Constitution instead contemplates that "bipartisan agreement may not always be possible to obtain." Lack of bipartisan agreement does "not invalidate the plan"—it merely results in a plan "that lasts four years" rather than ten. *Id.* at *15.

---

[2] While there are several dissents across the four cases, for ease, we refer to them collectively as the dissent.

[3] These sections are not in dispute in this case.

Third, the dissent disagreed with the majority that the Ohio Constitution demands strict proportionality.[4]  The majority adopted a "partisan symmetry" standard that requires mapmakers to match the distribution of safe seats between the parties to each party's share of the vote over the past ten years.  *See LOWV III*, 2022 WL 803033, at *10–11; *LOWV IV*, 2022 WL 1113988, at *17.  But the dissent noted that this standard lacks any grounding "in the text of the [Ohio] Constitution" and is not workable.  *LOWV IV*, 2022 WL 1113988, at *29 (DeWine, J., dissenting).

Fourth, even assuming that state law calls for "partisan symmetry," the dissent faulted the majority for arbitrarily distinguishing between "competitive" and "safe" seats.  The majority had decided that a seat was "competitive" rather than "safe" if the majority party only had a four-point cushion—i.e., 52 percent of the voters in a particular district favored the majority party while 48 percent of the voters favored the minority party.  *See LOWV III*, 2022 WL 803033, at *8 (criticizing Map 3 for including 19 districts where "the Democratic vote share is between 50 and 52 percent").  The dissent stated that this "proposed 52-percent-vote-share benchmark is not grounded anywhere in the Ohio Constitution."  *LOWV IV*, 2022 WL 1113988, at *29 (Fischer, J., dissenting).

Fifth, the dissent faulted the majority for agreeing that the Ohio Supreme Court could not draw a map itself, but then "repeatedly attempt[ing] to micromanage the commission's work, imposing requirements found nowhere in the Constitution."  *LOWV IV*, 2022 WL 1113988, at *30 (DeWine, J., dissenting).  According to the dissent, this included the "judicially created requirements" that the Commission hire independent mapmakers, "draft the plan in public and

---

[4] Professor Jonathan Rodden, an expert witness for one of the Intervenors, provided unrebutted testimony that no other state in the Nation has a strict proportionality requirement.  Hr'g Tr. 169–172.  And while political scientists and mapmakers often disagree on which metric best measures partisan fairness, most agree that strict proportionality structurally favors the minority party.  *See* Jonathan A. Rodden, *Why Cities Lose* 176–181 (Basic Books 2019); *see also* Nicholas O. Stephanopoulos & Eric M. McGhee, *Partisan Gerrymandering and the Efficiency Gap*, 82 U. Chi. L. Rev. 831, 853–54 (2015).

convene frequent meetings," and "adopt a new plan within ten days." *LOWV III*, 2022 WL 803033, at *35 (Fischer, J., dissenting) (internal quotation omitted).

C.

This lawsuit began after the Ohio Supreme Court enjoined Map 2. On February 18, 2022, a group of Ohio Republican voters and activists sued the Commission and the Secretary, complaining that they lacked any legislative districts that would allow them to organize, campaign, and ultimately vote for offices as they had in past election cycles. They raised three legal claims: (1) they currently reside in malapportioned districts (under the map implemented after the 2010 census), (2) the lack of a new map means they cannot vote and campaign in a primary, and (3) the uncertainty enshrouding Ohio's state elections makes it impossible for them to associate for electoral purposes. Am. Compl. (DN 8). As relief, the Plaintiffs ask this court to impose a map (either the Commission's Map 3 or its Map 4) to ensure that Ohio holds a primary this year.

After the Plaintiffs sued, several parties who challenged the Commission's maps in the Ohio Supreme Court moved to intervene as Defendants. These include the League of Women Voters of Ohio and the A. Phillip Randolph Institute of Ohio; the Bennett Parties (Bennett); the Ohio Organizing Collaborative; and the Democratic members of the Commission, State Senator Vernon Sykes and House Minority Leader Allison Russo. DN 3; DN 6; DN 12; DN 34. All the intervening Defendants opposed the relief requested by the Plaintiffs and asked this court, at least for the time being, to defer to the process playing out at the Commission and the Ohio Supreme Court.

This federal litigation began before a single judge, Chief Judge Marbley of the Southern District of Ohio, on February 18. On February 24, the Commission approved Map 3 and Secretary LaRose immediately began implementing it in hopes of including the state-legislative races on the

May 3 primary ballot.  The day after the Ohio Supreme Court ruled against Map 3, however, Plaintiffs requested a three-judge panel under 28 U.S.C. § 2284, a preliminary injunction barring the use of the 2010 maps, and a schedule to impose Map 2.  First Prelim. Inj. (DN 2) 15.  The next day, Chief Judge Marbley agreed with the Plaintiffs and asked the Chief Judge of the U.S. Court of Appeals for the Sixth Circuit to compose this three-judge district court.

As we got up to speed, the Plaintiffs moved for a temporary restraining order and a second preliminary injunction to ensure a May 3 primary could take place.  (DN 84; DN 96).  But Secretary LaRose informed us that the state-court litigation had eliminated any prospect that the State could hold its General Assembly primary election on May 3 as statutorily scheduled.  We held a TRO hearing on March 25 and decided to hold the TRO in abeyance.  We also asked Secretary LaRose to tell us the last day Ohio could hold a primary election without disrupting the general election. After the preliminary-injunction hearing, we requested supplementary briefing from the parties on whether a federal right existed and what relief we should award.

Based on the uncontroverted evidence that we heard across multiple hearings, we make the following findings of fact:

- It is too late for Ohio to include the General Assembly races on the ballot for the May 3 primary as statutorily required.

- 80 of 88 counties in the State had implemented Map 3 when the Ohio Supreme Court rejected that map.

- August 2 is the last date that Ohio can hold a primary election without disrupting the general election, at least without Ohio's elected officials amending the state's election laws.

- Under current state law, April 20 is the last day that Ohio can implement a map other than Map 3 to ensure a primary does take place on August 2.

- Ohio can adopt Map 3 as late as May 28 and still meet the August 2 deadline.

All parties agree that the primary should be moved to August 2. But they disagree about the appropriate map. The Plaintiffs now ask for Map 3 or 4. Secretary LaRose advocated for Map 4 before the Ohio Supreme Court rejected it.[5] The Intervenors all oppose Maps 3 and 4. Instead, they want the maps drafted by two "independent" mapmakers hired by the Commission; a map offered by Bennett's expert witness, Professor Rodden; or a new map created by a court-appointed special master.

## II.

Before we analyze the merits, we must address the preliminary matter of our jurisdiction. Article III grants federal courts the "judicial Power" to resolve only "Cases" or "Controversies." This imposes jurisdictional limits we cannot ignore. "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (cleaned up). At the same time, however, when we do have jurisdiction over a matter, our obligation to hear and decide the case is "virtually unflagging." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976).

---

[5] LaRose advocated for Map 4 because it was not enjoined at the time of briefing and came closest to Map 3. LaRose Remedy Br. (DN 164) 11–12. The appeal of Map 3, for LaRose, rested on administrative ease: 80 of the 88 counties had already implemented Map 3. *Id.* But LaRose made it clear that he would withdraw his support for Map 4 if it was enjoined. *Id.* at 7 n.2.

A.  Standing

We begin, as Article III requires, with standing.  Under settled law, the Plaintiffs must provide evidence that they suffered an injury in fact that the Defendants caused (or will cause) and that we can remedy.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  The party invoking our jurisdiction bears the burden of establishing each element to the extent required at each stage of the litigation.  *Id.*  For a preliminary injunction to issue, the Plaintiffs must demonstrate a likelihood that at least one of them has standing.  *See Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 256 n.4 (6th Cir. 2018). No party challenges causation, and the alleged injury of vote deprivation would plainly be redressed by an order from this court requiring a primary election and setting a map.[6]

As to injury in fact, Bennett initially argued that the Plaintiffs had only a "generalized grievance" shared by all Ohioans.[7]  Bennett's First TRO Resp. (DN 90) 17.  While it is fair for them to raise the question, precedent reveals that the Plaintiffs have stated individualized injuries.

The U.S. Supreme Court has framed the right to vote as a fundamental right because it is "preservative of other basic civil and political rights."  *Reynolds v. Sims*, 377 U.S. 533, 562 (1964). For that reason, the Supreme Court has told us that "the Constitution . . . protects the right of all qualified citizens to vote, in state as well as in federal elections."  *Id.* at 554.  Despite its global import, however, the Court has taken pains to emphasize that a person's right to vote is individual

---

[6] The League of Women Voters contends that the Plaintiffs' injuries cannot be redressed by their request for Map 3. They make two points.  First, the Plaintiffs do not have a right to that map.  And second, they cannot have that map because it violates state law.  We see things differently.  The Plaintiffs' injury is either the absence of a primary or one held using malapportioned maps.  To remedy this injury, they need a primary date and an apportioned map.  Map 3 can help redress this injury.  To be sure, so could other maps.  But which map to choose is a question of equitable remedies, not redressability.

[7] Bennett later accepted that the Plaintiffs have standing after it became clear that Ohio could not oversee a primary election on May 3.  Hr'g Tr. 244–46.  And for good reason.  Still, we run the gauntlet here on account of our independent duty to assure ourselves of standing.

and personal in nature. *Baker v. Carr*, 369 U.S. 186, 204–06 (1962); *Reynolds*, 377 U.S. at 561. And from this core right extends a broader range of legally protected interests that can ground standing. *See, e.g.*, *Burdick v. Takushi*, 504 U.S. 428, 433 (1992); *see also Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351–52 (11th Cir. 2009) ("A plaintiff need not have the franchise wholly denied to suffer injury. Any concrete, particularized, non-hypothetical injury to a legally protected interest is sufficient." (cleaned up)).

At the same time, the U.S. Supreme Court has been equally clear that federal courts are not the appropriate forum for plaintiffs to adjudicate abstract harms that are "plainly undifferentiated and common to all members of the public." *Lance v. Coffman*, 549 U.S. 437, 440–41 (2007) (cleaned up). *Lance* is illustrative. There, four Colorado voters sought to require the secretary of state to use the state legislature's map rather than the state supreme court's map to comply with the Elections Clause. *Id.* at 437–38. The plaintiffs had little else to say. They did not, for example, allege that the choice of one map over the other injured them personally. As the Court saw it, the plaintiffs' sole injury boiled down to a complaint "that the law—specifically the Elections Clause—has not been followed." *Id.* at 442. That was not enough to earn them a ticket into federal court. *Id.* at 439. In dismissing the suit for lack of standing, the Court reiterated that a harm is legally cognizable only if it is particularized to the plaintiffs. *Id.* at 442; *see also Ex parte Levitt*, 302 U.S. 633, 636 (1937) (holding that a claim that Justice Black was unconstitutionally appointed, without an injury particularized to the plaintiff, is "merely a general interest common to all members of the public").

In reaching this result, the Court expressly and disfavorably compared the *Lance* plaintiffs' asserted injury to "the sorts of injuries alleged by plaintiffs in voting rights cases where [the Court has] found standing." 549 U.S. at 442 (citing *Baker*, 369 U.S. at 207–08). The Court has told us

that the line between *Baker* and *Lance* turns on whether the plaintiff "has a personal stake in the outcome distinct from a generally available grievance about government." *Gill v. Whitford*, 138 S. Ct. 1916, 1923 (2018) (cleaned up). In other words, plaintiffs must show they have a personal stake in the litigation by pointing to the "invasion of a legally protected interest" that "affects the plaintiff in a personal and individual way." *Id.* at 1929 (cleaned up).

The *Gill* Court's analysis further clarifies how this test cashes out in practice. The plaintiffs there sought entirely new maps because their votes were being "diluted" due to partisan gerrymandering. *Id.* Those claims, however, are district specific. *Id.* And the Court expressly distinguished malapportionment cases like *Baker* and *Reynolds*—where wholesale revisions are inherently required to ensure equality—from partisan-gerrymandering claims that could be resolved on a district-by-district basis. *Id.* In an effort to break this chain of reasoning, the plaintiffs also argued that partisan gerrymandering harms their interest in "collective representation in the legislature, and in influencing the legislature's overall composition and policymaking." *Id.* (cleaned up). But the Court was not swayed because an "abstract interest in policies adopted by the legislature" is precisely the sort of generalized injury that cannot confer standing. *Id.* In remanding *Gill* to the district court to determine whether the plaintiffs had standing, the Court's instructions emphasized that they must put forward evidence "that would tend to demonstrate a burden on their individual votes." *Id.* at 1934.

The Plaintiffs in this case made this showing at the preliminary-injunction hearing. Start with what they have *not* said. The Plaintiffs do not, for example, contend that the lack of a map merely violates some abstract provision that affects all Ohioans in equal part. Nor have they stipulated an interest in any broad policy goals or legislative outcomes. Instead, they have mounted evidence that Ohio's lack of a map would directly harm them. From their vantage point, the lack

of a map means they cannot campaign, donate, or even vote in a primary election to determine who will represent them. That is a particularized and concrete injury even if it is one shared by many Ohioans.

Common sense also confirms that the Plaintiffs have standing. For starters, courts have long held that a voter suffers a concrete injury in fact when the voter's personal right to vote for the state legislature is diluted by a malapportioned map. *See, e.g.*, *Baker*, 369 U.S. at 204–06. It is hard to imagine that a state can be summoned to court for using an outdated map yet avoid litigation by declining to use any map at all. And what's more, the collapse of a primary election is no small thing. Such elections determine which candidates will receive the often essential support of one of the two major political parties in the general election. *Cf. Clingman v. Beaver*, 544 U.S. 581, 598 (2005) (O'Connor, J., concurring).

In addition, a quick glance at the testimony of lead Plaintiff Michael Gonidakis shows how the lack of a map has disrupted his usual participation in the political process. He testified, for instance, that he knew his state senator, had consistently voted in state primaries, and would regularly do research on the candidates, go "door-to-door for candidates," attend rallies, donate, put up yard signs, and more. Hr'g Tr. 114, 116; *cf. Carney v. Adams*, 141 S. Ct. 493, 500 (2020) (finding that a challenger to Delaware's state-office requirements lacked standing because he had no prior record of interest in applying for the position). When asked whether his "interest in this election is just the same as any old voter," Gonidakis distinguished his interest from that of a generalized voter: His own "voter intensity personally is always at a hundred percent." Hr'g Tr. 117. Gonidakis's main concern is not when he can vote or what map is used but whether he can participate at all in the manner he is used to. *Id.* at 115. He is concerned that he will either have to vote in his old malapportioned district or have no district at all. Gonidakis Aff. (DN 84-

1) ¶ 13.  This lack of a map has created "ongoing confusion," "hamper[ing] [his] ability to learn about candidates, support candidates and associate with like-minded voters."  *Id.* ¶ 16.  Indeed, Gonidakis states, for example, that he began his typical electoral involvement under Map 3 but had to stop when it was enjoined.  *Id.* ¶ 9.  He now worries that this work "will be for nothing."  *Id.* ¶ 12.

Total disenfranchisement, wasted effort, and voter confusion are concrete injuries particularized to the Plaintiffs, especially highly engaged voters like Gonidakis.  *See Billups*, 554 F.3d at 1351–52; *Harding v. Edwards*, 484 F. Supp. 3d 299, 311 (M.D. La. 2020) (stating voter confusion can be an individualized injury in certain contexts).  Testimony from several Intervenor-Defendants (or their members) corroborates the concrete and individualized interests at stake.  Hr'g Tr. 203–217.  They likewise testified credibly regarding their interest in seeing a lawful primary election take place.  We find that this evidence, at least at this stage of the litigation, suffices to satisfy the Plaintiffs' burden for purposes of standing.

Frankly, Bennett's original theory of standing would upend much of federal election law.  It is hard to imagine what a plaintiff would have to muster for standing if today's showing is not enough.  Indeed, other courts facing similar election challenges have routinely declined to doubt the individualized interest of voter-plaintiffs.  *See, e.g.*, *Bonas v. Town of North Smithfield*, 265 F.3d 69, 73 (1st Cir. 2001) (holding voters had standing to challenge cancellation of city council election); *Duncan v. Poythress*, 657 F.2d 691, 704–05 (5th Cir. 1981) (declining to address standing when voters challenged cancellation of statewide judicial election).  To the best of our knowledge, no federal court has dismissed a comparable right-to-vote case on standing grounds.  Likewise, we are unaware of any districting or apportionment challenge relevant to the *Growe-Branch* line of authority invoked by the Plaintiffs that has been rejected for lack of standing.  Many

of these cases have featured plaintiffs whose interests in a threatened future election appear consistent with those of the parties here. Bennett's original implication that all voters' interests are more or less equivalent, and thus none could vindicate the right to vote in an election a state threatened not to hold, appears to be entirely novel.

Bennett point to two other decisions, yet neither extends far enough. In *Nolles v. State Committee for Reorganization of School Districts*, the Eighth Circuit held that voters stated only a generalized grievance by claiming their right to vote was denied when the Nebraska Constitution required a state law to go into effect before a referendum could be held to reject the law. 524 F.3d 892, 900 (8th Cir. 2008). Just like *Lance*, the plaintiffs' claim was about how the Nebraska Constitution was applied to a Nebraska referendum procedure. *Id.* There was no evidence that this denied the individual voters any right. *Id.* For the Eighth Circuit, that made all the difference. Relying on *Bonas* and *Duncan*, the court expressly noted that a state's failure to hold an election "though required by state law" was one such instance when plaintiffs could challenge state electoral proceedings in federal court. *Id.* at 898.

Likewise, in *Looper v. Boman*, the plaintiff was a politician who claimed that certain election irregularities prevented more people from voting for him, even though he won the election. 958 F. Supp. 341, 344 (M.D. Tenn. 1997). The district court ruled that the plaintiff had not suffered an injury, as the "violations allegedly disenfranchised certain voters, not Plaintiff, of their right to vote for Plaintiff." *Id.* Here, it is the actual voters who are being disenfranchised, which is particularized.

It is true that the Plaintiffs seek relief that will benefit all Ohioans interested in voting in the primaries. But the reason they are in court is to ensure that they can cast their own ballots. That is a textbook individualized harm. *See Weltner v. Raffensperger*, No. 1:20-cv-01407, 2020

WL 8116173, at *6 (N.D. Ga. May 18, 2020) (holding that a burden on an individual's right to vote is particularized even if it is broadly shared). And the Plaintiffs have provided sufficient evidence that they will imminently face such injuries.

## B. Ripeness

Several parties also argue that this case is unripe because "[t]he state process is still underway and there is ample time for its completion in light of the representation by the Secretary of State that the primary can be held as late as August 2." League of Women Voters Mot. to Dismiss (DN 132) 11; League of Women Voters' Resp. to Second Mot. for Prelim. Inj. (DN 111) 2, 16–18; Bennett's TRO Resp. Br. (DN 90) 18–21. On their view, this court should not wade into these waters yet because Ohio's elected officials could enact a new redistricting plan that ensures Ohioans can vote in a primary election this year. They're half right: Ohio's officials still can roll up their sleeves and solve this problem on their own. But the mere possibility that Ohio could still resolve this on its own doesn't render this case unripe. Ripeness is a question of timing that prevents courts from "entangling themselves in abstract disagreements" through "premature adjudication." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985). We're well past that point. (Some defendants even argued—unpersuasively—that this court waited too long to get involved.) As all parties agree, Ohio's last date for implementing a new map under current law is April 20. And that date has come.

Indeed, other federal courts have found similar disputes ripe with far more runway before election day. *See, e.g.*, *Favors v. Cuomo*, 866 F. Supp. 2d 176, 184–85 (E.D.N.Y. 2012) (holding a challenge to New York's failure to produce a map was ripe and required a special master because there was less than a month until the primary qualifying deadline); *see also S.C. State Conf. of NAACP v. McMaster*, No. 3:21-CV-3302, 2021 WL 5282843, at *6 (D.S.C. Nov. 12, 2021)

(setting a January date for ripeness because this would be imminent in light of March primary filing deadlines); *Smith v. Clark* (*Smith II*), 189 F. Supp. 2d 503, 506 (S.D. Miss. 2002) (similar); *Arrington v. Elections Bd.*, 173 F. Supp. 2d 856, 865 (E.D. Wis. 2001) ("[T]he present lawsuit would be ripe when citizens need to start preparing for the primary elections."); *Flateau v. Anderson*, 537 F. Supp. 257, 265–66 (S.D.N.Y. 1982) (finding case ripe even though primaries were six months off and the legislature was in session). Similar deadlines have long passed here. This case is ripe.

### C. Statutory Jurisdiction

What about statutory jurisdiction to justify the empanelment of this three-judge court in response to the Plaintiffs' lawsuit? Section 2284(a) calls for a three-judge panel whenever "an action is filed challenging the constitutionality of . . . the apportionment of any statewide legislative body." One Intervenor offers a cursory argument that this challenge falls outside the ambit of section 2284 and should've remained before a single district judge. League of Women Voters' Suppl. Br. (DN 184) 11.

But the Plaintiffs' fundamental challenge is to the allocation of Ohio's legislative representation across its voters. *See* Am. Compl. ¶¶ 8, 59–77, 83. And just because the Plaintiffs are willing to accept the malapportioned maps as a final alternative to having no election does not mean these claims have been conceded. Pls.' Remedy Br. (DN 160) 18–20 (responding that the court "may" but shouldn't use malapportioned maps, and even then for one cycle at most).

A pair of cases show why the chief judges of the Southern District and Sixth Circuit were right to convene this panel. In *Igartua v. Obama*, the First Circuit held that, when it comes to standing for three-judge district courts, there is no difference between cases concerning malapportionment and cases challenging non-apportionment for an entire territory. 842 F.3d 149,

154–55 (1st Cir. 2016) (indicating that a voter had standing to challenge the non-apportionment of U.S. House seats to Puerto Rico and was entitled to a three-judge panel). Although non-apportionment is not the same thing as a lack of district lines, the Plaintiffs currently face a situation that is quite similar: They lack assigned state representatives (claim 1) or are subject to malapportioned maps (claim 2). *See* Second Mot. for Prelim. Inj. 8–10 (maintaining both claims). The "inclusive" language of section 2284(a) would encompass claims that the Plaintiffs have not been apportioned any state-legislative districts or, if they have, the districts are malapportioned.

The First Circuit's decision, moreover, relied heavily on precedent that voters had standing and could use a three-judge district court to challenge the non-apportionment of a representative for District of Columbia, where the apportionment of multiple districts wasn't at issue. *Igartua*, 842 F.3d at 153–54 (citing *Adams v. Clinton*, 90 F. Supp. 2d 35, 38, 41, 72 (D.D.C. 2000) (finding an injury was obvious and upholding appointment of a three-judge district court for non-apportionment claims)). The Supreme Court affirmed without explanation, indicating it agreed there was standing and that a three-judge district court was proper. *Adams v. Clinton*, 531 U.S. 941 (2000). And the jurisdictional questions were before the Court: Justice Stevens noted his dissent on this point, saying he would have dismissed rather than affirmed. *Id.*; *Igartua*, 842 F.3d at 154 (explaining that both jurisdictional questions were the primary grounds for appeal in *Adams*, yet only Justice Stevens sought dismissal).

\*　　\*　　\*

These cases illustrate that injuries to an individual's voting rights are appropriately before this three-judge court—and also underscores why they are particularized and concrete. *See Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316, 332 (1999) (holding a resident's "expected

loss of a Representative . . . undoubtedly satisfies the injury-in-fact requirement," even though many others face the same injury and the resident will have representation).

### III.

We consider four factors in determining whether a preliminary injunction should issue: whether (1) the movant has shown a likelihood of success on the merits; (2) the movant will be irreparably injured absent the injunction; (3) issuing an injunction will cause substantial harm to others; and (4) the injunction furthers the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009). These factors are "to be balanced, not prerequisites that must be met." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). Nonetheless, in constitutional litigation, the first factor is ordinarily dispositive. *Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020) (per curiam) (order). That's because "[w]hen constitutional rights are threatened or impaired," we presume irreparable injury. *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012). And no cognizable harm results from reversing unconstitutional conduct, so "it is always in the public interest to prevent violation of a party's constitutional rights." *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001) (cleaned up). Thus, we focus our analysis on the Plaintiffs' likelihood of success on the merits.

### A. Likelihood of Success on the Merits

Although not alone sufficient, likelihood of success often is the "determinative factor." *Dahl v. Bd. of Trs. of W. Mich. Univ.*, 15 F.4th 728, 730 (6th Cir. 2021). The Plaintiffs claim that, without our intervention, the State will either absolutely deny them their right to vote in a primary

mandated by state law or require them to vote in a primary using malapportioned maps.[8]  Second

Mot. Prelim. Inj. 8–10.  At the preliminary-injunction stage, at least, for reasons explained below,

the Plaintiffs' claims are likely to succeed.

"Undeniably the Constitution of the United States protects the right of all qualified citizens

to vote, in state as well as in federal elections."  *Reynolds*, 377 U.S. 554.  But what about primary

elections conducted to select nominees from the major political parties to stand in general

elections?  Historically, parties and states did not use primaries to nominate candidates.  Yet the

Constitution applies once a state decides to hold a primary.  *See Smith v. Allwright*, 321 U.S. 649,

663–64 (1944) (holding a primary is state action to which the Constitution applies); *United States*

*v. Classic*, 313 U.S. 299, 311–12 (1941) (stating that alteration of ballots in a primary for U.S.

House violated federal rights and could be prosecuted as such); *Gray v. Sanders*, 372 U.S. 368,

380 (1963) (finding use of weighted votes under Georgia's county-unit system for statewide

primaries was unconstitutional).  Indeed, the Supreme Court has even approved of federal

intervention pegged to state primary deadlines.  *See Branch*, 538 U.S. at 260 (praising the district

court's decision to wait to intervene until a drop-dead date based on the state's primary laws).  So

if a state holds a primary for its officers, including state representatives and senators, the Federal

Constitution's protection of the right to vote applies.

---

[8] Several parties also contend that, under Ohio law, candidates nominated by the Democratic or Republican parties might not have the opportunity to run in the general election if the State primary does not take place.  *See, e.g.*, Bennett Rights Br. (DN 181) 7 (citing Ohio Rev. Code Ann. § 3513.257 (providing that petitions are available for only independent or non-major party candidates)); Plaintiffs Rights Br. (DN 180) 4–5; *see also Yang v. Kosinski*, 960 F.3d 119, 124 (2d Cir. 2020) (holding that canceling the Democratic primary "unduly burdened their rights of free speech and association").  As we agree with the Plaintiffs that they are likely to succeed at this particular posture, we need not decide this novel and thorny question of state law.  Setting aside the merits of this position, it is undeniable that allowing the primary to go entirely by the wayside would wreak tremendous havoc on state elections and the state legislature itself.  The alternative, presumably, would require opening the entire state-legislative slate to unaffiliated candidates who appear by petition on the ballot.  Even if such an approach might find support as an original matter— and it might well—no binding authority compels us to reach that conclusion and order the attendant disruption in this unusual and accelerated posture.

What does the Constitution require for these elections? We have a clear answer to this question for the Plaintiffs' second constitutional claim, which asserts that the State will force them to vote in a primary election that includes malapportioned legislative districts. Under the one-person, one-vote principle, the right to vote includes an equal-protection guarantee to have one's vote weighted reasonably equally in the state legislature. This means that malapportioned districts violate the Constitution by diluting relative voting power. *See Reynolds*, 377 U.S. at 556 (invalidating Alabama state-legislative districts as malapportioned).

The Plaintiffs' first constitutional claim raises a murkier question: Does a state violate the Constitution if it does not hold a primary though state law guarantees one? We requested briefing on this question. And all the parties said "yes" in response. While we are not bound by the parties' agreement as to the law, courts may and sometimes do accept it for the purpose of deciding the case or controversy in front of them (absent any jurisdictional issue that they have a duty to address on their own initiative). *See, e.g.*, *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 487 (2010) ("The parties agree that [SEC] Commissioners [are not removable at will], and we decide the case with that understanding." (citations omitted)); *cf.* Gary Lawson, *Stipulating the Law*, 109 Mich. L. Rev. 1191 (2011) (advocating for courts to broadly respect the parties' stipulations of law).[9] Plus, preliminary injunctions are emergency orders, which courts must decide on a rushed schedule. So there's no time for the type of study ordinarily necessary to decide difficult constitutional questions.

---

[9] In the absence of adequate adversarial briefing and time we are cautious to dig too deep into the origins of an otherwise uncontested right. With more time and materials, perhaps we would consider the issues differently. *Cf. Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 487 (2001) (Thomas, J., concurring) ("As it is, none of the parties to these cases has examined the text of the Constitution or asked us to reconsider our precedents . . . .").

Moreover, it is not like the parties are without support. The two circuits that have decided this issue found that the Constitution houses such a right. The First Circuit, for example, found a substantive-due-process violation when the state discounted certain ballots after an election had occurred. *See Griffin v. Burns*, 570 F.2d 1065, 1074, 1077 (1st Cir. 1978).[10] The court made clear that local election irregularities ordinarily do not rise to the level of violating the Constitution when adequate state remedies exist. *Id.* at 1077. But if the election process "reaches the point of patent and fundamental unfairness," then federal rights come into play. *Id.* The court found that this was such a case because "almost ten percent of the qualified and voting electorate was, in effect, denied its vote." *Id.* at 1078–79.

Similarly, the Fifth Circuit found that failing to hold a judicial election mandated by state law violates substantive due process. *See Duncan*, 657 F.2d at 703–04. Indeed, the Fifth Circuit said it could "conceive of no more fundamental flaw in the electoral process than the deprivation of the right to vote altogether." *Id.*

Then, the next time the First Circuit faced the issue, it found that a city's failure to host a general election for town council and a school committee as required by law was "fundamentally unfair" and violated substantive due process. *Bonas*, 265 F.3d at 75 (requiring city to conduct the election). In *Bonas*, the First Circuit reaffirmed that federal courts may correct state electoral processes when a breakdown in the state process had led to the "total and complete

---

[10] If this were the only case endorsing this novel substantive-due-process claim, we might consider forging a different path. After all, substantive due process has no clear textual basis and "guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). So the Supreme Court has cautioned that "self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." *Id.* And the First Circuit did not rest its conclusion on clear Supreme Court precedent or doctrines. But we are hesitant to create a circuit split, when the only other circuit to study the issue has followed the First Circuit, and we don't have the benefit of adversarial briefing or time.

disenfranchisement of the electorate as a whole." *Id.* That analysis "starts—and ends—with a question of state law: Do state and local rules mandate an election"? *Id.*

While the Sixth Circuit does not have a case answering this question, it has endorsed the logic of these decisions. In *League of Women Voters of Ohio v. Brunner*, the Sixth Circuit, relying on *Griffin*, held that a plaintiff's complaint that Ohio utilizes "non-uniform rules, standards, and procedures" that result in "massive disenfranchisement and unreasonable dilution of the vote" properly stated a violation of substantive due process. 548 F.3d 463, 478–79 (6th Cir. 2008). Alleged procedural irregularities that may have discounted tens of thousands of votes amounted to a violation akin to "significant disenfranchisement." *Id.* In a subsequent case, the Sixth Circuit held that not counting absentee votes reasonably applied state precedent and therefore didn't violate due process. *See Warf v. Bd. of Elections of Green Cnty.*, 619 F.3d 553, 559 (6th Cir. 2010). But there, the court similarly cited all of the above cases and noted that "[w]e have held that '[t]he Due Process clause is implicated, and § 1983 relief is appropriate, in the exceptional case where a state's voting system is fundamentally unfair.'" *Id.* (quoting *Brunner*, 548 F.3d at 478). If procedural irregularities can violate substantive due process when they result in "massive disenfranchisement," then it is difficult to see how Ohio has not similarly violated the Constitution by forgoing a primary election guaranteed by its own state constitution.

That said, at least two reasons call into question whether these decisions in fact guide our decision. First, it is unclear whether a three-judge district court is bound by circuit precedent at all. *See* Joshua A. Douglas & Michael E. Solimine, *Precedent, Three-Judge District Courts, and the Law of Democracy*, 107 Geo. L.J. 413, 438–54 (2019). This is because decisions by three-judge district courts are subject to review by only the Supreme Court, not the courts of appeals. *Id.* Second, the decisions most closely on point—*Duncan* and *Bonas*—involved the cancellation

of elections entirely—enabling some wholly different method of choosing the official (gubernatorial appointment or incumbency, respectively). Ohio's failure to conduct a primary election would not destroy the right to vote to the same degree as in those cases, assuming that the general election still takes place as scheduled. And while *Griffin* involved a state primary, the issue was discounting votes after the primary was held. The First Circuit later distinguished its decision in *Griffin*, for example, in holding that the cancellation of a ballot initiative didn't violate federal rights because "[i]n constitutional terms, states may foreclose initiative petitions entirely." *Henry v. Connolly*, 910 F.2d 1000, 1003 (1st Cir. 1990) ("[I]t is important to remember that the federal nose cannot be poked into the state's tent unless some constitutional infirmity exists."). So these decisions still do not definitively resolve whether a state must constitutionally hold a primary if state law requires it. They just prevent the total cancellation of all elections for an elected position and require fairness if a primary is actually held.

Perhaps we could break new ground on these fronts with time and adversarial briefing. But we have neither. And multiple decisions from the Supreme Court and other federal courts put great stock in the constitutional necessity of protecting voters from unfair denials of the franchise when state law provides for an election. We know of no case holding otherwise. While we might not be bound by Sixth Circuit precedent, we do not know of another three-judge district panel that has contradicted the circuit under which it sits.[11]

---

[11] *See* Douglas & Solimine, *supra*, at 439–41 (finding a majority of courts believe they are bound, but some have questioned this); *Parker v. Ohio*, 263 F. Supp. 2d 1100, 1105 (S.D. Ohio 2003) (considering itself "bound by precedent in this circuit" while sitting as a three-judge district court reviewing Ohio redistricting); *Russell v. Hathaway*, 423 F. Supp. 833, 835 (N.D. Tex. 1976) (explaining why such courts are bound). *But see Jehovah's Witnesses in State of Wash. v. King Cnty. Hosp.*, 278 F. Supp. 488, 504–05 (W.D. Wash. 1967) (claiming that such courts are not bound while still respecting circuit precedent).

Several other factors counsel caution at this stage. We are mindful, for instance, that we inherited this dispute with little time to make a reasoned decision. And this case's posture—coming to us as a preliminary injunction—also favors recognizing that the Plaintiffs are likely to establish a violation of their rights if Ohio fails entirely to hold a state-legislative primary election. Moreover, this right might exist as a matter of procedural due process. Consider the facts on the ground. Ohio guarantees the Plaintiffs a right to vote in a state primary election every two years. State law also sets out the procedures for that right. And now the State threatens to abruptly pull the rug out from under the voters. Add this all together and it's more than plausible that the Plaintiffs have a procedural-due-process bone to pick given how everything has played out so far.[12]

Once we accept the existence of this right, analyzing the Plaintiffs' second claim—that not holding a primary required by state law would violate their federal right to vote—becomes easy. Multiple aspects of Ohio law require a primary for General Assembly seats. First and foremost, the Ohio Constitution says that "all nominations" shall "be made at direct primary elections or by petition as provided by law." Ohio Const. art. V, § 7. State statutes say the same and set numerous deadlines and procedures. Ohio Rev. Code Ann. §§ 3501.01(E)(1) (primaries held in most cases), 3513.01 (same and procedures), 3513.05 (dates for declaring candidacy), 3513.32 (procedures for primaries for special elections), 3509.01 (dates and procedures for absentee voting). So under the

---

[12] At the same time, we should emphasize the narrowness of our holding. While "[n]early every State in the Nation now mandates that political parties select their candidates for national or statewide office by means of primary elections," nothing in the Constitution compels states to hold primaries. *Clingman*, 544 U.S. at 599 (O'Connor, J., concurring) (cleaned up). But if a state makes primary elections a crucial juncture in the electoral process, then it cannot change the rules late in the fourth quarter by simply failing to draw a map. Any finding to the contrary would invite absurd results. Imagine if the Ohio Supreme Court justices and the members of the Commission—all of whom are elected officials—decided to cancel the primaries to protect their seats. It would be astonishing if Ohioans had no recourse in such a scenario.

logic of *Bonas*, the fact that state law requires a primary means that not holding a primary violates the Constitution.  In short, the Plaintiffs are likely to succeed on the merits.[13]

## B. The Other Factors

Since the Plaintiffs are likely to succeed on the merits at this preliminary posture, they are entitled to an injunction pending appeal.  That's because the first prong is dispositive here, as it is in most constitutional cases.  *See ACLU of Ky. v. McCreary County*, 354 F.3d 438, 445 (6th Cir. 2003).  The restriction of fundamental rights such as the right to vote constitutes an irreparable injury.  *Husted*, 697 F.3d at 436 (cleaned up); *see also Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) ("[W]hen reviewing a motion for a preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated.").  We have similarly recognized that "it is always in the public interest to prevent the violation of a party's constitutional rights."  *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998).  Nor does anything in the record suggest that a third party will be harmed by this court's intervention to ensure that Ohio will hold a primary election for state-legislative offices.

## IV.

So the Plaintiffs have shown, at the preliminary-injunction phase, that Ohio's failure to implement new state-legislative districts in time for the May 3 primary election likely infringes their right to vote.  But this alone does not answer the difficult and related questions of when and how the Court should intervene to protect that right.

## A. *Growe*, *Branch*, and *Purcell*

Federal courts must be sensitive to timing when adjudicating disputes regarding state-run elections.  The Supreme Court has instructed us to give the widest berth possible to state officials

---

[13] The Plaintiffs also bring a freedom-of-association claim.  Am. Compl. ¶ 77 (Count III).  Because we grant relief on the other claims, we need not address this claim.

to cure any federal-law defects in their state's electoral process before we intervene. *See Growe*, 507 U.S. 25; *Branch*, 538 U.S. 254. *Growe* and *Branch* illuminate the path we take today.

*Growe* featured parallel impasse suits filed by different groups of Minnesota voters in state and federal court. 507 U.S. at 29. Minnesota had not yet approved new maps, based on the 1990 census, as the 1992 elections approached. Both sets of plaintiffs argued that Minnesota's congressional and legislative maps were therefore malapportioned in violation of federal and state law. *Id.* To preserve the right to vote in those elections, the federal district court set a January 20, 1992, deadline for the state legislature to complete its redistricting work. In case the legislature failed to discharge that duty, the federal court proceeded to appoint special masters to develop a contingency plan. *Id.* Meanwhile, the state court issued its own preliminary legislative-redistricting plan and ordered that its plan would take effect on January 21, 1992, in the event of legislative inaction. *Id.* The federal district court then issued an order purporting to stay the state-court proceedings, enjoin the parties from using the state-court map, adopt the maps prepared by its own special master, and permanently enjoin any interference with those plans. *Id.*

That was a step (or two) too far. In reversing the district court, the Supreme Court made clear that federal judges must "defer consideration" of redistricting disputes "where the State, through its legislative *or* judicial branch, has begun to address that highly political task itself." *Id.* at 33. That's because redistricting "is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court." *Id.* at 34 (citing *Chapman v. Meier*, 420 U.S. 1, 27 (1975)).

The *Growe* Court's reasoning directly applies to this situation. What the district court should have done, the *Growe* Court explained, was "establish a deadline by which, if the [state court] had not acted, the federal court would proceed." *Id.* at 36. The district court's error was

principally one of timing. There would have been no problem if the district court had adopted its own plan after "it had been apparent that the state court, through no fault of the District Court itself, would not develop a redistricting plan in time for the primaries." *Id.* But when a state's various branches are attempting to redistrict, a federal court should defer intervening until it must do so to protect the federal right to vote in an election required by state law.

*Branch* represents the other side of the same coin. There, the Mississippi legislature failed to adopt a redistricting plan. 538 U.S. at 258. Parallel litigation began in state and federal court. *Id.* at 259. The federal district court deferred ruling on the federal plaintiffs' motion for a preliminary injunction, but explained that it would impose its own plan if the state court could not adopt one of its own by a specified drop-dead date (the primary qualifying deadline on March 1). *Id.* (citing *Smith II*, 189 F. Supp. 2d at 503). In January, the district court became concerned that the state court could not create a workable map by the drop-dead date, so the federal court began creating its own map. *Id.* at 260 (citing *Smith II*, 189 F. Supp. 2d at 508–09). And when the state court did in fact fail to meet the necessary deadline, the federal court implemented its map and enjoined the state court's proceedings. *Id.* (citing *Smith v. Clark* (*Smith IV*), 189 F. Supp. 2d 548, 558 (S.D. Miss. 2002)).

In affirming this course of action, the Supreme Court reminded us that "[w]hen the State, through its legislature or other authorized body, cannot produce the needed decision, then federal courts are left to embark on the delicate task of redistricting." *Id.* at 278 (cleaned up). The Court distinguished *Branch* from *Growe* because this time the district court gave "the state court adequate opportunity to develop a redistricting plan." *Id.* at 262.

*Growe* and *Branch* reflect deep-seated principles of federalism and comity. Together, they tell us that a federal court's job is circumscribed. So we must remain in the wings and act only

when it becomes clear that the "state branches will fail timely to perform [their] duty." *Growe*, 507 U.S. at 34. But at some point, the threat to the right to vote becomes so great that a federal court must intervene.

The principles underlying *Growe* and *Branch* comport with the *Purcell* principle here. *See Purcell*, 549 U.S. 1. Under *Purcell*, "federal courts ordinarily should not enjoin a state's election laws in the period close to an election." *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring). Guided by this principle, the Supreme Court has repeatedly stayed injunctions by lower federal courts close to elections. *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 30–31 (2020) (Kavanaugh, J., concurring) (collecting cases). And this necessarily means that federal courts must sometimes allow elections to go forward even if some state processes might violate federal or state law. *See, e.g.*, *Milligan*, 142 S. Ct. at 879–80 (Kavanaugh, J., concurring) (explaining his vote to stay an injunction that ordered the state to draw new maps in compliance with the Voting Rights Act). Indeed, the Supreme Court has long held that even malapportioned maps may be implemented "where an impending election is imminent and a State's election machinery is already in progress." *Reynolds*, 377 U.S. at 585. This is because "[w]hen an election is close at hand, the rules of the road must be clear and settled." *Milligan*, 142 S. Ct. at 880 (Kavanaugh, J., concurring).

*Purcell*'s logic recognizes that judicial intrusion in elections is dangerous work. Even under the best circumstances—and these are decidedly not those—"[r]unning elections state-wide is extraordinarily complicated and difficult." *Id.* (Kavanaugh, J., concurring). "Even seemingly innocuous late-in-the-day judicial alterations to state election laws can interfere with administration of an election and cause unanticipated consequences." *Democratic Nat'l Comm.*, 141 S. Ct. at 31 (Kavanaugh, J., concurring). For these reasons and more, the responsibility of

running an election rests with states' elected officials. *Id.* at 29 (Gorsuch, J., concurring); *see also* U.S. Const. art. I, § 4, cl. 1.

Our role in vindicating federal rights against this state backdrop is carefully limited. *Purcell* reflects a desire to "prevent[] voter confusion [and] election administrator confusion"— all in service of the state's "interest in running an orderly, efficient election and in giving citizens (including the losing candidates and their supporters) confidence in the fairness of the election." *Democratic Nat'l Comm.*, 141 S. Ct. at 31 (Kavanaugh, J., concurring). In our Nation, where we have resolved to decide our differences by ballot, there is perhaps no interest of greater importance.

And when viewed in that light, *Purcell* comports with *Growe* and *Branch*. To be sure, these cases cash out in different ways. Under *Purcell*, the federal court must *abstain* from intervening in an ongoing election to ensure its smooth operation. Under *Growe* and *Branch*, by contrast, the federal court must *act*—but only to ensure the orderly operation of an election that otherwise wouldn't occur. Our role is to backstop state processes that have proven incapable of protecting the right to vote. In short, *Purcell* seeks to prevent federal courts from *causing* chaos in state elections (by upending an election practice that the state has already set), whereas *Growe* and *Branch* seek to compel federal courts to *minimize* chaos and uncertainty in those elections (by imposing an election practice when the state has failed to set one).

On which side of this divide does this case sit? The answer should be obvious. Ohio has no map. Its (first) primary election is already underway. Uncontroverted evidence shows its (second) primary election cannot be held later than the August 2 special election without overriding countless Ohio election laws, deadlines, and procedures. To be sure, the Ohio Redistricting Commission and the Ohio Supreme Court continue to bat maps back and forth. But this court has no evidence before it indicating that the fifth time will be the charm. Nor do we

have any evidence that it will resolve the impasse before the April 20 deadline to begin preparing for a primary with a new map. Indeed, the Ohio Supreme Court's deadlines for a new map and further litigation guarantee that a state-approved map won't exist until *after* the drop-dead date.

This case thus presents the rare moment when the logic underpinning *Purcell* actually calls for intervention. Why? Because without judicial relief in some form, the evidence indicates that Ohio may not have an election *at all*—and certainly not one compliant with state election laws and deadlines. Unlike the typical *Purcell* case, we are not being asked to enjoin an existing state law in a manner that would disrupt an otherwise functional election.[14] Instead, we're asked to ensure an election happens in the first place. And we're asked to intervene at the last possible moment consistent with state law.

Considering the principles underlying a recent *Purcell* decision alongside the lower-court decision affirmed in *Branch* illustrates when and why a federal court should intervene here. In *Merrill v. Milligan*, Justice Kavanaugh invoked *Purcell* to explain the dangers of enjoining Alabama's map as election day approached: Any alterations at that stage would sow "chaos for candidates, campaign organizations, independent groups, political parties, and voters." 142 S. Ct. at 880 (Kavanaugh, J., concurring). His opinion also observed, in language that mirrors testimony and evidence in this case, that conducting elections "requires enormous advance preparations by state and local officials and poses significant logistical challenges." *Id.* (cleaned up). The risk of disruption under those circumstances meant that a federal court should not enjoin an existing map a month before the state was to hold its primary election. *Id.*

---

[14] *See, e.g.*, *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (staying last-minute district-court injunction requiring Wisconsin to count absentee votes postmarked after the primary-election date); *Democratic Nat'l Comm.*, 141 S. Ct. at 28 (staying similar injunction right before general election); *Andino v. Middleton*, 141 S. Ct. 9, 10 (2020) (staying district-court injunction against South Carolina's witness requirement for absentee voting due to proximity to election); *Clarno v. People Not Politicians Or.*, 141 S. Ct. 206, 206 (2020) (staying injunction lowering signature requirements for an initiative); *Merrill v. People First of Ala.*, 141 S. Ct. 25, 25 (2020) (staying injunction based on ADA violation related to curbside voting during pandemic).

The lower court in *Branch*, like this court, addressed the opposite scenario: a status quo of no orderly primary election, and perhaps no primary election at all, absent federal intervention. Asserting federal authority to impose a map, consistent with the state-election calendar, was preferable to "delay[ing] the establishment of election districts and advance qualifying dates," which would "create confusion, misapprehension and burdens for the voters, for the political parties, and for the candidates." *Smith II*, 189 F. Supp. 2d at 510. Following the census, Mississippi's districts (like Ohio's) were changing, so voters and candidates needed to learn their districts, meet candidates, donate, campaign, organize, and vote. *Id.* This was the basis—approved by the Supreme Court—for the federal district court setting a deadline to impose a map: It served as a backstop that state election officials could implement, consistent with state election law and deadlines, unless the state actors involved in redistricting timely approved a new map. *Id.* at 535–36.

Even though one decision stayed federal intervention and one blessed it, *Milligan* and *Branch* are easily read in harmony: Both reflect the need of voters, candidates, and officials for certainty in election districts, procedures, and dates. *Milligan* ensured that a map remained in place, while *Branch* ensured a map existed at all.

This case tracks *Branch*. For Plaintiff Gonidakis, the lack of a map has already "hampered [his] ability to learn about candidates, support candidates, and associate with like-minded voters." Gonidakis Aff. 16. He began his typical electoral involvement under Map 3 but had to stop when the Secretary of State "pressed pause" on implementing it. *Id.* at 12; Directive 2022-30, at 1. This created confusion among voters and candidates alike. Gonidakis Aff. 12.

Moreover, state officials have explained the difficulties of changing maps and holding elections in Ohio. Hr'g Tr. 15–18, 27–33, 41–45 (noting administrative difficulties in Ohio and

issues with implementing new maps). Holding elections is also a costly business. Ohio estimates that it will have to spend around $20 million to hold a second primary election because no map was in place in time for the original primary date. *Id.* at 12, 31–33. That number will only rise if this court stayed its hand even longer. What's more, we would be asking county officials, vendors, poll workers, and others to remain in limbo until an unknown date when they would run an election using an unknown map under an unknown calendar. *Id.* at 94–95 (Grandjean testifying that overlapping elections and other costs of moving the election past August 2 would be severe). The only thing certain about further delay is that it would disrupt the general election as well as the primary.

So we find ourselves at this intersection of *Growe*, *Branch*, and *Purcell*. We must provide the State as much time as possible to fix its own problems in line with *Growe* and *Branch*. But at some point, the court must step in to provide a map if the State's officials fail to discharge their duties. Principles of federalism continue to constrain our discretion once we've decided to intervene. In such a case, we've been told to "follow the policies and preferences of the State . . . whenever adherence to state policy does not detract from the requirements of the Federal Constitution." *White v. Weiser*, 412 U.S. 783, 795 (1973). Guided by these instructions, we consider our remedial choices.

### B. Primary Date

We would be the first to admit that courts ordinarily should not move state-election dates. *See, e.g.*, *Smith II*, 189 F. Supp. 2d at 510–11. Last-minute changes can stymie election officials, consume state resources, confuse voters, and depress turnout. *See Milligan*, 142 S. Ct. at 880 (Kavanaugh, J., concurring). But Ohio's Constitution guarantees that a primary election must take place this year for state-legislative races. Ohio Const. art. V, § 7. And state law requires a primary

to be held on May 3; that's already underway for other races. Ohio Rev. Code Ann. § 3501.01(E)(1). Yet Secretary LaRose told us that including state-legislative races on that ballot became impossible even before we held our preliminary-injunction hearing. LaRose's Resp. to Ct. Questions 6–11; Hr'g Tr. 11–13, 231–32. No party disputes this fact.

Indeed, every party calls for the court to move the primary date to ensure an election is held and Ohioans' federal rights safeguarded. We have that authority. It is well settled that district courts in such cases have "broad discretion to fashion equitable remedies." *Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 460 (6th Cir. 2004). And that discretion extends to moving state-election dates when necessary to vindicate federal rights.[15]

The appropriate date is also fairly clear. The Deputy Secretary of State testified that August 2 is the latest date that a primary could be held without disrupting the general election. Grandjean Aff. ¶ 15; Grandjean Second Aff. (DN 164-1) 3–4; Hr'g Tr. 19, 65. This is due, in large part, to a number of provisions in federal statutes, state laws, and the Ohio Constitution that set procedures and deadlines in the run-up to Ohio elections. *See, e.g.*, Tr. at 65; 2022 Ohio Elections Calendar (DN 164-1) 7–8; 52 U.S.C. § 20302(a)(8) (providing that overseas ballots must be received 45 days out); Ohio Const. art. XVI, § 1 (requiring that constitutional amendments be submitted 90 days before the election to be placed on the ballot for a referendum); Ohio Rev. Code Ann. § 3513.263 (setting deadlines of 90 days before election for nominating petitions and 74 days for

---

[15] *See Upham v. Seamon*, 456 U.S. 37, 44 (1982) (per curiam) (allowing the district court on remand "in the first instance to determine whether to modify its judgment and reschedule the primary elections"); *Sixty-Seventh Minn. State Senate v. Beens*, 406 U.S. 187, 201 n.11 (1972) (explaining the primary deadlines and noting "[i]f time presses too seriously, the District Court has the power appropriately to extend the time limitations imposed by state law"); *Wright v. Sumter Cnty. Bd. of Elections & Registration*, No. 1:14-cv-42, 2018 WL 7365178, at *3–4 (M.D. Ga. Mar. 30, 2018) (enjoining school-board elections and moving them to November general election, which "would cause minimal disruptions" since voters were accustomed to elections held at that time); *Larios v. Cox*, 305 F. Supp. 2d 1335, 1342–43 (N.D. Ga. 2004) (addressing election deadlines and perceiving "no reason why the court could not extend that period if this proves to be necessary to ensure constitutional elections").

protests). And while we have no choice but to move the primary date, we should disturb state election deadlines and procedures as little as possible. *See Smith II*, 189 F. Supp. 2d at 510–11 (refusing to move primary-qualification deadline to provide the state more time). The Ohio Elections Calendar weaves together countless intricate and interdependent dates and procedures. Judges simply cannot know all the consequences when we start tugging on those strings. We can only be confident that our intervention *will* disrupt the system in ways known and unknown—which is why we must leave the state electoral process intact as much as we can. Setting the primary for August 2 does that: In addition to falling at the end of the period when Ohio could hold a primary without disrupting the general election, it has the added benefit of aligning with pre-set special elections in the State. This will mitigate the risk to voter turnout, election administrability, and state costs.[16] Perhaps for those reasons, no party seeks a different date. Hr'g Tr. 234, 236, 239, 241, 246.

Following in the footsteps of *Branch* and *Growe*, and tracking the overwhelming evidence in this case, the state-legislative primary must be held on August 2. That is the last date, according to Secretary LaRose, when his office could hold a primary election without disrupting the general election. The Ohio General Assembly may, of course, change the primary date and election deadlines by law. If it does so, the Secretary shall file a brief outlining the new deadlines and how a primary will be held in line with federal law.

---

[16] Some have wondered if the primary election could be pushed back a few days later without disrupting the general election. *See LOWV IV*, 2022 WL 1113988, at *16; Hr'g Tr. 91–98 (ACLU attorney questioning Deputy Secretary of State regarding whether August 8 remained a possibility). *But see* League of Women Voters' Remedy Br. 2–4 (conceding primary must be moved to August 2). But the costs and disruptions from such a move would be massive, as it would require a separate special election within a week of the preset August 2 special election. Hr'g Tr. 51, 94–95. Another three-judge district court refused to order an additional special election because of scheduling overlaps, administrative difficulties, and voter confusion. *Covington v. North Carolina*, 270 F. Supp. 3d 881, 899–900 (M.D.N.C. 2017) (noting that requiring a fifth election in one year "would significantly interfere with the ordinary processes of state government"). For similar reasons, we find that August 2 is the latest—and most efficient—date the State can administer a primary without disrupting other elections. At the hearing all the parties accepted this conclusion.

### C. District Map

Our reasons for moving the primary to August 2 under *Growe* equally apply to our conclusion regarding the most appropriate map:  We must provide Ohio with as much time as possible while disrupting Ohio election laws, deadlines, and procedures as little as possible.

In choosing between maps, the Supreme Court has indicated that a district court must "adequately explain its choice of one proposed map over an alternative proposed map."  *Brown v. Jacobsen*, No. CV2192, 2022 WL 683089, at *11 (D. Mont. Mar. 8, 2022) (citing *White*, 412 U.S. at 796–97).  So long as it reasonably explains its choice, a district court has "broad discretion to fashion equitable remedies."  *Coal. for Gov't Procurement*, 365 F.3d at 460.

Which map we should select is the subject of much debate among the parties.  The Plaintiffs want Map 3 or Map 4, given that the Commission has approved those.  Pls.' Remedy Br. 12–18.  Secretary LaRose initially advocated for Map 3 because state officials have at least partially implemented it, making it the easiest (and fastest) to administer.  Hr'g Tr. 76–77.  LaRose later shifted to Map 4 as the legally preferable map, but noted that he would not advocate for it if the Ohio Supreme Court ruled against it too (as that court now has).[17]  LaRose's Remedy Br. (DN 164) 7 & n.2.  The Intervenors do not want Map 3 or Map 4 because the Ohio Supreme Court rejected those maps.  Instead, they wish to use maps drawn by independent mapmakers that were

---

[17] This shift is odd for several reasons.  The arguments Secretary LaRose makes for Map 4 are premised on the idea that Map 3 is easiest to administer.  LaRose's Remedy Br. 11–12.  And since Map 4 is similar to Map 3, it would share some of those advantages.  *Id.*  The Secretary acknowledges that his shift may seem odd, but argues that his advocacy of Map 3 was only premised on a unified primary including all 2022 primary races, which is no longer possible given that the May 3 primary for those other races is already underway.  *Id.* at 12 n.4.  That is not at all what counsel said at the hearing, however:  "If the primary does not take place in a unified fashion on May 24," then "the secretary would prefer to use map three for the later primary."  Hr'g Tr. 76 (cleaned up).  In any event, LaRose says he cannot advocate for Map 4 if the Ohio Supreme Court rejected it, which has now happened.  LaRose's Remedy Br. 7 n.2.  So the only remaining indicators of the position of the State's chief election official point to Map 3 based on its relative ease and efficiency of administration.

rejected by the Commission, a map created by one Intervenor's expert (the Rodden Map), or a map created by a special master to be appointed by this court.[18]

Each of these alternatives is flawed in some way. Maps 3 and 4, according to the Ohio Supreme Court, are inconsistent with the Ohio Constitution's proportionality and partisan-favoritism requirements. *See* Ohio Const. art. XI, § 6. The Rodden and independent mapmakers' maps haven't been approved by the Commission, as the Ohio Constitution requires. *See* Ohio Const. art. XI, §§ 1(A) (mandating that Commission approve maps), 9(D) (barring courts from doing so). In our view, this renders each map inappropriate for use in future election cycles.

Yet *Growe*, *Branch*, and *Purcell* instruct that our job is to serve as a backstop for upcoming elections. Those cases counsel that we must stay our hand as long as possible, do as little violence to state law as possible, and choose the least flawed option to vindicate the fundamental right to vote. In light of the evidence before this court—evidence of the State's ongoing failure to enact a map; evidence of the disruption that the lack of a map has caused voters, candidates, and officials; evidence that a state-legislative primary may not happen at all absent federal intervention; and evidence that further delay would override far more state law—Map 3 is the most equitable option available to this court.

As explained, the latest Ohio can hold a primary election under current law without disrupting the general election is August 2. Counting back from August 2, uncontroverted evidence establishes that Ohio must approve and begin implementing a new map by April 20 under current law for the State to conduct an election on August 2. Hr'g Tr. 79–85. Much like the

---

[18] *See generally* Simon's Second Mot. for TRO (DN 147) (asking the court to draw a map and move the primary); Bennett's Remedy Br. (DN 161) (preferring maps of independent mapmakers or Rodden); Russo's Remedy Br. (DN 162) (same); League of Women Voters' Remedy Br. (DN 163) (same); Ohio Organizing Collaborative Mot. for Prelim. Inj. (DN 165) (requesting an injunction against Map 4 and implementing the independent mapmakers' map).

primary date, this is the result of numerous federal statutes, state statutes, the Ohio Constitution, and administrative necessity. *See, e.g.*, Hr'g Tr. 15–17, 24, 42 (explaining the complexities of administering a new map, including two weeks to program new voter registration and ballots); Prelim. Aug. 2 Election Calendar 7–8 (explaining all the deadlines required to hold a primary on August 2 and the relevant laws); 52 U.S.C. § 20302(a)(8) (specifying that overseas ballots must be received 45 days out); Ohio Const. art. XVI, § 9(c) (allowing candidates 30 days after a new map to move to new districts); Ohio Rev. Code Ann. § 3513.263 (setting deadlines of 90 days before election for nominating petitions and 74 days for protests). As a result, all the parties agree that April 20 is the drop-dead date to implement a new map under current law. Hr'g Tr. 232, 235–36, 239, 242, 246. Yet Ohio still does not have a map.

But recently the Ohio Supreme Court has questioned whether the state might have more time to resolve these issues itself pursuant to *Growe*. *LOWV IV*, 2022 WL 1113988, at *16–17. Based on the uncontroverted evidence before us, there is one way to provide Ohio more time: Designate Map 3 as the backstop. We can wait longer to impose Map 3 because before the Ohio Supreme Court rejected it, the State had already begun implementing it. Directive 2022-26 (DN 70-2); Hr'g Tr. 62, 76. Some of the statutory periods have already gone into effect under Map 3, such as the 30 days for candidates to move and 90 days to register. Hr'g Tr. 28, 42–43, 53–64, 76–77, 87. And 80 of 88 county boards have already loaded Map 3 into their systems, potentially saving weeks of work, time, and money. *Id.* at 15–17, 24, 42 (reprogramming a new map other than Map 3 would take at least two weeks); Grandjean Second Aff. 10–13. The Secretary and his deputy both say that Map 3 would be the fastest to implement. Hr'g Tr. 59, 76, 87. These procedures and timelines would have to be restarted under any other map. *Id.* at 15–17, 24, 28, 42–43, 53–64, 76–77, 87. Implementing Map 3 would take only about 65 days (compared to 104

days for any other map), allowing the State to wait until May 28 to begin.  *Id.* at 77–85, 107.  This provides Ohio more than a month of additional time to fashion its own solution.

The extra time provided by Map 3 does not inherently shorten the amount of time that it would take for Ohio to implement a new map that fully aligns with state and federal law.  But it buys Ohio more time to both make a new map and find ways to shorten the implementation of that map.  For example, Ohio can change its election deadlines so an election can be held in a shorter period—as it has done in the past.  *See* Act of Jan. 28, 2022 (H.B. 93), 2022 Ohio Laws File 71, § 4.  Ohio might also find ways to ease and shorten the administration of a second primary election, such as uniform ballots or vendors, uploading the new map information as it is drafted, or more centralized coordination.  Hr'g Tr. 15–18, 41–43 (noting that some administrative issues come from programming in new maps and the decentralized nature of Ohio's election administration).  In the end, we are agnostic on the various solutions Ohio could employ.  But in the meantime, Map 3 is the only option that leaves in place the flexibility for Ohio to act.

Many of these reasons also highlight another benefit of Map 3: Reducing electoral disruptions, costs, and risk.  Indeed, federal courts often express justifiable concern about the risks and cost of election administration.  *See, e.g.*, *Covington v. North Carolina*, 270 F. Supp. 3d 881, 898–900 (M.D.N.C. 2017) (refusing to impose special election remedy because of the difficulties it would impose on election administration); *Johnson v. Smith*, No. TCA 94-40025-WS, 1994 WL 907596, at *1 (N.D. Fla. July 18, 1994) (declining to enjoin unconstitutional maps due to confusion and disruption).  As the Supreme Court has said, "a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election law[.] . . . [A] court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands

on a State in adjusting to the requirements of the court's decree." *Reynolds*, 377 U.S. at 585; *see also Milligan*, 142 S. Ct. at 880–81 (Kavanaugh, J., concurring) (explaining that part of the purpose of *Purcell* is to avoid disruptions and costs to administering elections). Map 3 causes the least disruption to the Ohio system, tracks the path nearly all county boards were already following, costs the least to implement, and allows for a primary election to proceed apace.

Understandably, many of the Intervenors argue that this court should avoid a conflict with the Ohio Constitution by steering clear of Map 3, which the Ohio Supreme Court held was insufficiently proportional and even-handed. *See, e.g.*, Bennett's Remedy Br. 11–19. The problem is that *every* map before this court violates provisions of the Ohio Constitution—that is, every map has either been enjoined by the Ohio Supreme Court or has failed to receive the approval of the Commission. *See* Ohio Const. art. XI, § 1(A).[19] In addressing the consequences of this stalemate, are we required to favor the decision of one organ of state government over another? That is the necessary implication of the Intervenors' position. Yet there are a few problems with this.

First, the Supreme Court has indicated that policy choices of a state's *legislature* take precedence in redistricting. *See Upham v. Seaman*, 456 U.S. 37, 40–41 (1982) (noting that courts should "defer to the legislative judgments the [state] plans reflect"); *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978) (similar). "State legislatures have primary jurisdiction over legislative

---

[19] For that reason, the dissent also errs in thinking that Map 3 should be discarded as the ultra vires action of the Commission. The nub of this case is that *every* map lacks legal force. But Map 3 gives the State more time than any other map for Ohio's elected officials to reach across the aisle and reach a modus vivendi. The dissent thinks that the "Republican Commission" will wait out the clock rather than work with the legislature and the Ohio Supreme Court to figure out a new map and, if necessary, a revised election timeline. We don't share the dissent's pessimism for two reasons. First, we must presume that Ohio's officials are public servants who still view partisan advantage as subordinate to the rule of law. *See Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018) ("[G]ood faith of [the] state legislature must be presumed.") (quotation omitted). Thus, Map 3 gives the Commission more time to work with the General Assembly and the Ohio Supreme Court to pass another map that will supersede Map 3. Second, Ohio's officials should find it in their self-interest to pass a new map rather than accept Map 3. This map, after all, can only operate for this election cycle. By contrast, a State-enacted map could remain in place for four or ten years. Either is a better deal for the State and the officials who are accountable to its citizens.

reapportionment." *White*, 412 U.S. at 795 (cleaned up). And courts should be "guided by the legislative policies underlying a state plan—even one that was itself unenforceable." *Perry v. Perez*, 565 U.S. 388, 393 (2012) (quotation omitted). Indeed, the Supreme Court even has a more deferential standard for malapportionment when a legislature created the map rather than a court. *Abrams v. Johnson*, 521 U.S. 74, 98 (1997).[20] And when a state delegates redistricting to a commission of elected officials, as Ohio voters did by referendum in 2015, the Supreme Court has held that the commission exercises and expresses the states' legislative preferences. *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 808 (2015). Applying this principle, several courts have deferred to legislative policy preferences even when doing so would violate other state laws, including state constitutions. In *Navajo Nation v. Arizona Independent Redistricting Commission*, a district court ordered the use of a districting plan passed by a commission even though the emergency plan did not comply with the Arizona Constitution's notice provisions. 230 F. Supp. 2d 998, 1008 (D. Ariz. 2002); *see also Straw v. Barbour County*, 864 F. Supp. 1148, 1155 & n.15 (M.D. Ala. 1994) (giving deference to commission plan despite meeting's violation of state notice requirement, where exigent circumstances existed); *Tallahassee*

---

[20] In response to the Court's questions about the primary right at issue, one Intervenor, briefly and for the first time, argued that Maps 3 and 4 may also be malapportioned. OOC Rights Br. (DN 183) 14. This is based on evidence that Map 3 has a maximum deviation of 9.97% in the House and 9.27% in the Senate. League of Women Voters' Remedy Br. Ex. 1 (DN 163-2). This is the first time this has been raised and it has not been subjected to the adversarial process, as all parties seemed to agree that Map 3 complied with the Federal Constitution. Even so, we are adopting a Commission-approved map that reflects legislative policy goals. And legislatively-passed maps with under 10% deviations are "considered to be of prima facie constitutional validity." *Connor v. Finch*, 431 U.S. 407, 414, 418 (1977). Similarly, reapportionment of state seats is subject to a lower standard than congressional seats. *White v. Regester*, 412 U.S. 755, 763–64 (1973). Based on this alone, the Supreme Court has upheld state-legislative districts with a deviation of 9.9%. *Id.* So even assuming the correctness of this Intervenor's late and untested position that Map 3 features a maximum deviation of 9.9%, the map would remain presumptively constitutional. And the Intervenor offers no additional evidence to undermine this presumption. In fact, the Ohio Constitution's provisions mean that most maps passed by the Commission will have a population deviation of close to 10%. Decl. of Megan Gall (DN 165-3) ¶¶ 47–48. Indeed, even the Independent Mapmakers' plan has a maximum deviation of 9.97%. *Id.* ¶¶ 43, 45.

*Branch of NAACP v. Leon County*, 827 F.2d 1436, 1438–39 (11th Cir. 1987) (noting that legislative plans receive more deference than court-created plans and finding the county plan was entitled to deference even though it was passed without a referendum as required by state law).

Second, we see no basis in Ohio or federal-constitutional law for favoring some provisions of the Ohio Constitution over others, as Bennett urges us to do. Bennett argues that the requirement that the Commission pass a map, and the provisions at issue in *Navajo Nation* and the other cases, are "procedural" and should not trump a "substantive" provision like partisan proportionality. Bennett's Rights Br. (DN 181) 12–15. In support of this argument, Bennett cites *Large v. Fremont County*, 670 F.3d 1133, 1147 (10th Cir. 2012), for the proposition that a state legislature is not owed deference when its map violates higher state law, such as the Ohio Constitution here. Bennett's Rights Br. 12–15; Bennett's Remedy Br. 14–15.

*Large* does not stand for such a broad proposition. There, the Tenth Circuit refused to give deference to a county's hybrid electoral scheme that violated Wyoming law. 670 F.3d at 1137, 1148. This was because the court's "deference must run first and foremost to the legislative decision-making of the sovereign State and, only through it, to its subordinate political subdivision." *Id.* at 1146. So when a "political subdivision of a State substantively contravenes the laws of that State" it is not given deference because "it no longer acts as an agent of that sovereign." *Id.* All of this was premised on the core principle that federal courts must give deference to the *state legislature*. *Id.* at 1142, 1145–47. Indeed, the Tenth Circuit cited many of the same cases we do for the proposition that state legislatures are owed deference, including *Tallahassee Branch of NAACP v. Leon County*, an Eleventh Circuit case that Bennett downgrades as "procedural." *Id.* at 1139. In no way does this imply that state-legislative decisions lose the

relative deference they are due when a court determines a map violates the state constitution—much less that "substantive" violations matter more than "procedural" ones.

In any event, there is no basis for us to elevate some provisions of Ohio's Constitution above others. And even if some legal hierarchy exists between substantive and procedural law, why would the Commission's role prove any less substantive than the Ohio Supreme Court's review? That division of roles goes to core separation-of-powers concerns. At least in the federal context, the separation of powers is seen as the core innovation and feature of the Constitution, for "[c]oncentration of power in the hands of a single branch is a threat to liberty." *Clinton v. City of New York*, 524 U.S. 417, 450 (1998) (Kennedy, J., concurring) (citing *The Federalist No. 47*, at 301 (James Madison) (Clinton Rossiter ed., 1961); *The Federalist No. 84*, at 513, 515 (Alexander Hamilton) (Clinton Rossiter ed., 1961)). Which branch gets to redistrict and how seems to be core to the separation of powers and carries great weight. The Ohio Constitution assigns that duty to the Commission. Ohio Const. art. XI, § 1(A). This is not merely a notice requirement, as Bennett likens it. Rather, the Ohio Supreme Court itself has repeatedly made clear that the Commission's role is essential to a valid electoral map under Ohio's constitutional scheme. *LOWV IV*, 2022 WL 1113988, at *15, *17 (acknowledging the court can only review maps passed by the Commission and cannot adopt a map or direct the Commission on what to do). In light of the federal caselaw above emphasizing the deference due the legislative process in districting, we are loathe to stake out a novel and contrary position as a matter of state constitutional law. And that is especially true when, as here, the Commission's maps were rejected under a strict proportionality test that cannot easily be found in the text of Ohio's Constitution. *See* Ohio Const. art. XI, § 6 (providing that the Commission "shall attempt to draw" a map that "correspond[s] closely" to past statewide-election results).

Third, federal courts have broad equitable discretion and often temporarily implement maps that conflict with state law in some respect to avoid disruptions and to ensure that elections are carried out in an orderly fashion in conformity with federal law. *See Upham*, 456 U.S. at 44 (stating that courts may order elections be held under illegal maps when necessary); *Diaz v. Silver*, 932 F. Supp. 462, 468–69 (E.D.N.Y. 1996) (listing cases where courts allowed elections to proceed under invalidated maps); *Cosner v. Dalton*, 522 F. Supp. 350, 364 (E.D. Va. 1981) (implementing malapportioned maps due to election timeline); *Martin v. Venables*, 401 F. Supp. 611, 620–21 (D. Conn. 1975) (same); *Covington v. North Carolina*, No. 1:15cv399, 2015 WL 13806587, at *4 (M.D.N.C. Nov. 25, 2015) (refusing to enjoin racially gerrymandered map because it would be too disruptive to an election). So the fact that Map 3 does not comply with the Ohio Supreme Court's interpretation of state law does not prevent this court from imposing it—for one election cycle only—when faced with federal law violations, other state law concerns, and concerns about election administration on a short timeline. Even more so when *all* the potential maps violate some part of Ohio's Constitution. Map 3 provides Ohio with the most time to comply with all federal law while minimizing disruptions and costs in administering the required primary election.

Here, the Commission's policy preferences are reflected in Map 3 but not in the maps the Intervenors propose. And while the Ohio Constitution places numerous substantive restraints on redistricting, it also assigns mapmaking authority solely to the Commission, which has a degree of political accountability that far outstrips that of the maps affirmatively rejected by the Commission or offered by the parties in this litigation. Ohio Const. art. XI, §§ 1(A) (Commission passes maps), 9(D) (courts cannot adopt maps or direct the Commission). To uphold the primacy of the Commission and its legislative preferences while minimizing election disruptions, the Court may temporarily impose a map that does not fully comply with other aspects of the Ohio

Constitution. No one doubts that this solution is less than ideal. But it is the least bad option when faced with so many conflicting interests and laws.

The reasons for choosing Map 3 are made more apparent by comparison to the other options. Map 4 was also enjoined for violating Ohio's Constitution. The only advantage is that it is newer and arguably more compliant with the Ohio Supreme Court's rulings. But implementation has not begun, so under *Growe* we could not provide the State as much time to pass a new map that would comply with state law. Moreover, this map does not have the administrative advantages of Map 3 discussed above.

The remaining two options—Rodden's map and the independent mapmakers' draft—share the same problems: Neither was passed by the Commission through the Ohio Constitution's redistricting process, nor subjected to the critique of other mapmakers or experts, and this court lacks the time and expertise to scrutinize the maps and their various compactness and proportionality scores directly or through a special master. Hr'g Tr. 135, 143.

In the days leading up to the Ohio Supreme Court's midnight deadline for a fourth map, the Commission raised four reasons for rejecting the independent mapmakers' plan. First, the independent mapmakers' plan risked emphasizing partisan symmetry at the expense of the districts' compactness. *LOWV IV*, 2022 WL 1113988, at *5. Second, the proposed plan risked improperly splitting municipalities and counties in violation of the Ohio Constitution. *Id.* at *6. Third, the proposed plan did not consider where incumbents lived, and thus might have created districts where multiple incumbents would find themselves in a showdown. *Id.* at *4. And lastly, these concerns collectively presented a daunting task for the independent mapmakers to solve before the deadline imposed on the Commission by the Ohio Supreme Court. *Id.* at *6–7.

Indeed, even the experts themselves acknowledged these flaws. In response to questions from members of the Commission, one of the independent mapmakers, Dr. Michael McDonald, acknowledged that Ohio's "extremely challenging" political geography and the various requirements of the Ohio Constitution, as glossed by the Ohio Supreme Court, ensured that the "puzzle pieces don't fit together very well." *Id.* at *5. Dr. Douglas Johnson confirmed that Ohio's complicated political geography and redistricting rules meant that the independent mapmakers could not create a compliant map by the midnight deadline. Aff. of Dr. Douglas Johnson (DN 160-1) ¶¶ 5–6, 18, 22 (explaining remaining problems and the challenges of the process). He also said that there was "no time" for "[b]alancing the compactness" with proportionality. *Id.* ¶¶ 20–21. Moreover, some unconstitutional splits remained and the mapmakers did not have time to address the Commission's concerns with incumbency. *Id.* Professor Rodden also said that the maps unconstitutionally split certain municipalities, requiring some fixes. Decl. of Jonathan Rodden (DN 161-2) ¶¶ 5–12. Even the Ohio Supreme Court majority opinion acknowledged that fixes to these maps would be required. *LOWV IV*, 2022 WL 1113988, at *17. So these maps would still need to be modified.

As for Rodden's own map, it was never even seen by the Commission. Hr'g Tr. 169, 199. Bennett never says *why* the Commission didn't see or couldn't have seen this map. Nor does Bennett explain why one party should be able to advance its preferred map through federal litigation only, rather than through the constitutionally prescribed state-redistricting process. Were we to accept Bennett's invitation, the sandbagging incentives would be obvious: Each side would have reason to keep a map in its pocket, out of view of the constitutionally empowered actors, to present, as yet untainted, to a federal court. Our ability as generalist judges to review proposals

and adjudicate objections to a map during an accelerated TRO/preliminary-injunction timeframe is plainly inferior to that of elected officials during the actual mapmaking process.

What if this court were to undertake to draw its own map at this late date? Anything we created would face these hurdles and more. This three-judge court, which wasn't convened until March 18, 2022, never had time to choose one or more mapmakers, give them a chance to make a map that complies with state and federal law, allow the parties to comment, and then impose it by April 20. As the facts of this case illustrate in painful detail, mapmaking is not a fast or easy process, even for the quickest experts. And judges are typically neither quick nor experts in this realm. *See Dillard v. City of Greensboro*, 956 F. Supp. 1576, 1577–82 (M.D. Ala. May 22, 1997) (taking 112 days from the initial appointment of the special master to the district court adopting the special master's plan); *Favors v. Cuomo*, 866 F. Supp. 2d 176, 184–85 (E.D.N.Y. 2012) (finding a case ripe months before an election, in part to give special master time to make a map); *Diaz*, 932 F. Supp. at 467 (noting the need for time for the court and parties to review the maps). Nor would the Commission have seen any map offered by the parties or crafted by the court or a special master. No such map could give the state the maximum amount of time to implement a new map under *Growe* or approximate Map 3's relative administrative efficiency. At bottom, Map 3 is ready, passed by the Commission, and partially implemented—and the same can't be said for its rivals.

*      *      *

A reader may wonder why we wouldn't just use the 2010 map for one more election. Under the Supreme Court's *Purcell* line of authority, doing so would in some ways maximize certainty, minimize disruption, and avoid Ohio's ongoing constitutional standoff.

Extending the 2010 map for one more cycle would achieve the ultimate goal of upholding the federal right to vote in a state-mandated primary. And it would do so by resetting Ohio maps—for one more election cycle—to the status quo from before the current constitutional stalemate while new maps take shape. These districts are familiar to voters, candidates, and election officials; they were used to administer an election and install a valid state legislature just 17 months ago. Whatever problems Ohio's political geography—its townships, incorporated areas, and the like—pose for organizing precincts and allocating voters, they are problems Ohio has by now adjusted to. Representative organs of Ohio government, acting under authority conferred by then-current law, enacted those laws in a process more orthodox than the one playing out now. No court struck down those maps as inconsistent with the Voting Rights Act or any other provision of state or federal law.

Precedent exists for using old maps beyond a subsequent census to avoid "substantially disrupt[ing] the . . . election process at great expense" and "detrimental effects on the candidates and voters." *Graves v. City of Montgomery*, 807 F. Supp. 2d 1096, 1103–12 (M.D. Ala. 2011). The Supreme Court has long held that even malapportioned maps may be implemented "where an impending election is imminent and a State's election machinery is already in progress." *Reynolds*, 377 U.S. at 585. Taking that course here could help avoid conflict between federal- and state-court rulings. Indeed, these maps would avoid the need for any federal-court exposure to the current state political jousting—precisely because this court wouldn't be entering the fray to pick winners and losers among maps advanced by partisan combatants. *See generally Rucho v. Common Cause*, 139 S. Ct. 2484, 2498 (2019).

But no party has asked the court to keep the 2010 state-legislative districts in place while the Commission completes its mapmaking using the new 2020 census data. At most, the Plaintiffs

conceded—in response to this court's questioning—that this presented a permissible alternative. If any party had requested this remedy, it may well have proven the most attractive and equitable option.

Its biggest flaw is obvious, but understandable: Almost by definition, the old map is outdated and malapportioned in light of the new 2020 census data. Hr'g Tr. 87. That malapportionment is one reason why the Plaintiffs came to federal court in the first place. Am. Compl. (Count 1). And it would be unusual, to say the least, to vindicate one federal right (to vote in a state primary) by imposing a map that violates another federal right (to vote in districts that are not malapportioned). But what about this case isn't unusual? As shown by the decisions cited above, noncompliance with federal law—even federal equal-protection law—isn't necessarily fatal if other concerns threaten a state's ability to hold an election in the first place.

Another concern is that state election officials apparently no longer have the 2010 maps at the ready. Before "pressing pause," election officials were implementing Map 3 in place of the 2010 map. Grandjean Second Aff. ¶¶ 8–10; Hr'g Tr. 39–40. Indeed, the record before us indicates that many election officials may have tossed out the old map entirely and couldn't easily reinstitute the old lines even if a court ordered that as a backstop. Grandjean Second Aff. ¶¶ 10–11. So implementing this map, like every other map besides Map 3, would apparently require recreating a new map in the state voting systems. *Id.* Should the map selected by this court today be subjected to further challenge, however, it may behoove the parties and others considering the question of remedy to think harder about what it might take to salvage the old maps, conserve state law, and return Ohio's districts to the status quo ante for one additional cycle.

But in the end, we view the 2010 map as at most a second-best option because Map 3 gives the State more time to act. Thus, the court will impose Map 3 as of May 28 if Ohio has not acted.

V.

In more than one way, this case brings to mind Winston Churchill's famous quip that "democracy is the worst form of government except for all those other forms that have been tried from time to time." The same can be said for Map 3. We are acutely aware of its flaws. Yet with deference to the State in mind, we see it as the best of our bad options.

So if the State does not act before May 28, we will order the primary be moved to August 2 and Map 3 be used for only the 2022 election cycle. After that, Ohio will have to pass a new map that complies with federal and state law.

Before May 28, the General Assembly may set a new primary date or shorten the time it takes to conduct an election. If Ohio does this, the Secretary must update the court on a new election timeline.

If Ohio passes a new map before May 28, 2022, and can conduct a primary in a timely fashion, that map will go into effect.

**AMUL R. THAPAR**
**UNITED STATES CIRCUIT JUDGE**

**BENJAMIN J. BEATON**
**UNITED STATES DISTRICT JUDGE**

## MARBLEY, C.J., CONCURRING IN PART
## AND DISSENTING FROM THE REMEDY

I concur in the majority's holding on standing but dissent from the remedy. By reviving

the Commission's third map, the majority permits Ohio's General Assembly elections to go

forward in direct contravention of the 2015 redistricting amendments, as authoritatively construed

by the Ohio Supreme Court, the highest arbiter of state constitutional law. The people of Ohio and

its Supreme Court emphatically rejected the power politics that infected each of the Ohio

Redistricting Commission's proposed maps, including the third map, which the majority opinion

now endorses. The majority's goal, properly so, is to avoid intrusion on state sovereignty; yet in

so doing, the majority tables a watershed constitutional referendum, abrogates controlling

decisions of the state Supreme Court, and unwittingly rewards the Commission's brinksmanship

over the rights of Ohio voters. Decades of Supreme Court precedent command that a federal court,

when faced with the unenviable task of resolving a redistricting impasse, *must* endeavor to satisfy

the federal *and* state Constitutions. Because the majority opinion fails to accomplish this mandate,

I respectfully dissent from the relief ordered.

## I

I begin with an overview of the constitutional doctrines that guide my approach to this case.

The United States Supreme Court long has held that "reapportionment is primarily the duty and

responsibility of the State through its legislature or other body, rather than of a federal court."

*Chapman v. Meier*, 420 U.S. 1, 27 (1975) (citing *Reynolds v. Sims*, 377 U.S. 533, 586 (1964)); *see*

*also Growe v. Emison*, 507 U.S. 25, 34 (1993) ("[T]he Constitution leaves with the States primary

responsibility for apportionment of their . . . state legislative districts."). Thus, the Supreme Court

"has required federal judges to defer consideration of disputes involving redistricting where the

State, through its legislative *or* judicial branch, has begun to address that highly political task itself." *Id*. at 33 (emphasis in original).

Nonetheless, deferral under *Growe* has its limits. The Supreme Court posited that federal intervention "would have been justified" if the evidence showed "that the state court was either *unwilling or unable* to adopt a [redistricting] plan in time for the elections." *Id*. at 36–37 (emphasis added). "Absent evidence that these state branches will fail *timely* to perform that duty," the Court wrote, "a federal court must neither affirmatively obstruct state reapportionment nor permit federal litigation to be used to impede it." *Id.* at 34 (emphasis added).

When state processes reach a true impasse, federal courts have an overriding duty to protect voting rights, even if that means intruding on processes committed to the states. "Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections." *Reynolds*, 377 U.S. at 554. "That the three-judge federal court possesses the power to reapportion the State's legislature when the applicable state statutes fall short of constitutional requirements is not questioned." *Sixty-Seventh Minnesota State Senate v. Beens*, 406 U.S. 187, 195 (1972). *See also Scott v. Germano*, 381 U.S. 407, 409 (1965) (district court may intervene "in the event a valid reapportionment plan . . . is not timely adopted"). Thus, in *Branch v. Smith*, the Supreme Court held that the district court did not err in beginning "to develop its own redistricting plan," and ultimately implementing it, in light of the court's "'serious doubts'" about whether the state redistricting process would be complete in time for the election. 538 U.S. 254, 260, 265 (2003).

If a federal court truly must intervene, it has clear instructions to apply. "Whenever a district court is faced with entering an interim reapportionment order that will allow elections to go forward it is faced with the problem of 'reconciling the requirements of the Constitution with

the goals of state political policy.'" *Upham v. Seamon*, 456 U.S. 37, 43 (1982) (per curiam) (quoting *Connor v. Finch*, 431 U.S. 407, 414 (1977)). "An appropriate reconciliation of these two goals can only be reached if the district court's modifications of a state plan are limited to those necessary to cure any constitutional or statutory defect." *Id.* In crafting such a remedy, "a federal district court, in the context of legislative reapportionment, should follow the policies and preferences of the State, as expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature, whenever adherence to state policy does not detract from the requirements of the Federal Constitution." *White v. Weiser*, 412 U.S. 783, 795 (1973). "[The] district court should not pre-empt the legislative task nor 'intrude upon state policy any more than necessary,'" *id.* (quoting *Whitcomb v. Chavis*, 403 U.S. 124, 160 (1971)), and it "should attempt to accommodate the relief ordered to the apportionment provisions of state constitutions insofar as is possible." *Reynolds*, 377 U.S. at 584.

In this case, I initially adhered to *Growe* and deferred consideration while the Ohio Supreme Court rendered its decision on the Commission's third state legislative map. (ECF Nos. 55, 68). After the Ohio Supreme Court invalidated the Commission's third map, *Growe* deferral became a closer question. Accordingly, a panel was convened pursuant to 28 U.S.C. § 2284 (ECF No. 82), and it promptly heard arguments on federal intervention. The panel held in abeyance Plaintiffs' Motion for a Temporary Restraining Order and, on March 30, conducted a day-long preliminary injunction hearing. (ECF Nos. 104, 143). Based on the evidence adduced at the hearing, a redistricting plan must be received, whether from the Commission or from this Court, no later than April 20 if a primary election is to occur on August 2.

April 20 is now upon us, with no prospect that state branches will implement a legislative map in time (despite ongoing efforts). Accordingly, this case has reached the inflection point where

federal intervention must occur to preserve an August 2 primary. I concur with the majority that Plaintiffs have standing and that a preliminary injunction must issue.

Where I depart from my colleagues is over the responsibilities of this Court upon intervening. Our task, under established Supreme Court precedent, is to harmonize principles of comity with the supremacy of the federal Constitution. When we can defer to state processes no longer, we must craft a redistricting plan that cures the injury to federal voting rights but respects state policies to the maximum extent. *See Upham*, 456 U.S. at 43 (federal-court remedies must be "limited to those necessary to cure any constitutional or statutory defect").

## II

The Commission's third map—which the majority adopts as its choice relief—is irredeemably flawed. The Ohio Supreme Court, as "ultimate expositor[] of state law," *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975), declared the third map unconstitutional "beyond a reasonable doubt," just like the two preceding plans. *League of Women Voters of Ohio v. Ohio Redistricting Comm'n*, 2022-Ohio-789, ¶ 2 (Ohio S. Ct. Mar. 16, 2022) ("*League III*"). It unequivocally invalidated the map "in its entirety," *Id.* ¶ 48, for failure to satisfy the substantive redistricting criteria found in the 2015 amendments. The Constitution and the state Supreme Court are binding sources of state policy that should have received our utmost deference.

First, some context on the redistricting amendments is in order. In 2015, Ohio voters decisively rejected the redistricting process that generated the 2010 map, removed control from the old Apportionment Board, and vested it in the Commission. The official statement submitted in support of the referendum said it would "create a **fair, bipartisan, and transparent** redistricting process that will **make politicians accountable** to the voters[,] . . . make sure state legislative districts are drawn to be more competitive and compact, and ensure that no district plan should be

drawn to favor or disfavor a political party." (ECF No. 90-2, Ex. 2 (all emphasis original)). "Similarly, the official ballot language informed voters that the amendment would '[e]nd the partisan process for drawing Ohio House and Senate districts.'" *League I*, 2022-Ohio-65, ¶ 101 (Ohio S. Ct. Jan. 12, 2022). The referendum passed with a strong bipartisan majority: 71.5% in favor, 28.5% against. *See Statewide Issue History*, Ohio Secretary of State, https://www.ohiosos.gov/elections/election-results-and-data/historical-election-comparisons/ statewide-issue-history (accessed Apr. 19, 2022).

As the Ohio Supreme Court exhaustively has explained, none of the Commission's maps has complied with the 2015 redistricting amendments. As amended, Article XI, Section 6 gives three standards that the Commission "shall attempt" to meet in any General Assembly redistricting:

> (A) No general assembly plan shall be drawn primarily to favor or disfavor a political party.
> (B) The statewide proportion of districts whose voters, based on statewide state and federal partisan general election results during the last ten years, favor each political party shall correspond closely to the statewide preferences of the voters of Ohio.
> (C) General assembly districts shall be compact.

Ohio Const. art XI, § 6(A)–(C). "If it is possible" to abide by these standards without compromising other drafting requirements, "the commission must adopt a plan that does so." *League I*, 2022-Ohio-65, ¶ 88.

By unrebutted testimony at the preliminary injunction hearing and express holdings of the state Supreme Court, the Commission's maps fail at least two of these requirements. First, the Ohio Supreme Court has found "beyond a reasonable doubt" that every Commission map, including the third, violated Section 6(A) because "the main goal of the individuals who drafted the [third map] was to favor the Republican Party and disfavor the Democratic Party." *League III*, 2022-Ohio-789, ¶ 24. In reaching this conclusion, the Ohio Supreme Court observed that "the commission again adopted a plan drawn by employees of the Republican caucuses," to the total

exclusion of the Democratic members. *Id.* ¶¶ 27–28. The court described that process, "controlled entirely by Senate President Huffman and House Speaker Cupp," as "one-sided" and "flawed." *Id.* ¶¶ 30–31. The results provided further evidence of "an intentionally biased map," with the third map recreating the "remarkably one-sided distribution of toss-up districts" the court earlier had labeled a "hallmark[] of improper partisan intent." *Id.* ¶¶ 33–34. Combined across the House and Senate, 26 districts nominally allocated to the Democratic Party had an expected vote share of between 50% and 52%, while zero seats allocated to the Republican Party had an expected vote share less than 52.7%. *Id.* ¶ 39. This evidence, which also emerged at the Court's preliminary injunction hearing (ECF No. 150, Tr. 136:3–137:23 (Glassburn test.), 174:1–15 (Rodden test.)), "overwhelmingly" showed a violation of Section 6(A). *League III*, 2022-Ohio-789, ¶ 34. In the words of Dr. Michael Latner, the Commission's third plan "exhibit[s] extreme asymmetry . . . that's frankly worse than most of the maps we actually see employed around the United States." (ECF No. 150, Tr. 228:2–7 (Latner test.)).

The Ohio Supreme Court likewise held the Commission's third plan to violate the proportionality requirement of Section 6(B). Though the Commission's third plan achieved proportionality on the surface, it did so with a "gross and unnecessary disparity in the allocation of close districts." *League III*, 2022-Ohio-789, ¶ 43. "[T]hose districts represent the foundation of a politically asymmetric plan." *Id.* ¶ 41. As the court explained, a uniform two-point swing in favor of the Republican Party would net them all 26 "close" Democratic seats and a bicameral supermajority, while the same vote swing in favor of the Democratic Party would net them nothing. *Id.* When those close districts are excluded from the proportionality assessment—as the court has required—the Republican Party can be expected to win 67.9% of non-excluded districts, and the Democratic Party 32.1%. *Id.* ¶ 42. This is a far cry from the historical voting preferences of 54%

Republican, 46% Democratic, which form the baseline for proportionality. *League I*, 2022-Ohio-65, ¶ 108. Thus, the evidence showed a violation of Section 6(B) as well. Testimony at the Court's preliminary injunction hearing confirmed the same. (ECF No. 150, Tr. 176:18–177:24 (Rodden test.)). Dr. Latner said that "as soon as you look past the statewide single data point of 54/46 in terms of Republican and Democratic vote shares . . . there is a great deal of disproportionality that will emerge with the result of very minor vote swings." (*Id.*, Tr. 225:10–18 (Latner test.)). Per his unrebutted testimony, the toss-up districts were allocated "superficially" in the Commission's third map, "reveal[ing] the intent to have the *image* of proportionality" rather than to "correspond[] closely to the preferences of voters across a number of vote ranges." (*Id.*, Tr. 226:3–11 (Latner test.) (emphasis added)).

These rulings of the Ohio Supreme Court, pertaining to matters of state constitutional law, are controlling. "It is fundamental that state courts be left free and unfettered by us in interpreting their state constitutions." *Minnesota v. Nat'l Tea Co.*, 309 U.S. 551, 557 (1940). *See also Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482, 488 (1976) ("We are, of course, bound to accept the interpretation of [state] law by the highest court of the State."); *Shayer v. Kirkpatrick*, 541 F. Supp. 922, 931 (W.D. Mo. 1982), *aff'd sub nom. Schatzle v. Kirkpatrick*, 456 U.S. 966 (1982) ("It is important that our [court-ordered redistricting] plan adhere to the requirements of the Missouri Constitution . . . . In fact, we are obligated to do so." (citing *White*, 412 U.S. at 795)).

State actors consistently have recognized this fact. In *League I*, with election-related deadlines already looming, the Ohio Supreme Court ruled that "the election cycle should not proceed with a General Assembly–district map that we have declared invalid." 2022-Ohio-65, ¶ 136. Following the decision in *League II* and the commencement of this litigation, Attorney

General Yost wrote in a letter to the General Assembly: "The federal court may not order the use of a map that was rejected by the Ohio Supreme Court, where the underlying provision of the state constitution has not been found to violate the federal constitution." (ECF No. 91-4 at 2 (Yost Letter of Feb. 22, 2022)). In filings with this Court, Secretary LaRose has written: "[A]s a statewide elected official who swore an oath to obey Ohio's Constitution, the Secretary cannot agree to Plaintiffs' motion and ask this court to order the use of a Redistricting Plan [referring there to the third plan] that a majority of the Supreme Court of Ohio has ruled violates Article XI of the Ohio Constitution." (ECF No. 113 at 8). In his post-hearing brief, the Secretary made a similar acknowledgement with respect to the fourth plan. Despite noting its practical benefits "from the point of view of ease of elections administration," the Secretary wrote: "If the Supreme Court were to rule [as now it has] that the Fourth Plan violates Art. XI, then the Secretary, as a statewide official who swore an Oath to obey Ohio's Constitution, should no longer advocate for the adoption of the Fourth Plan." (ECF No. 164 at 7 & n.2).

The majority opinion, however, acknowledges no such duty; instead, it effectively creates a direct conflict between federal voting rights and the rulings of the Ohio Supreme Court. That should have been a last resort. The Ohio Constitution, as construed by the Ohio Supreme Court, is *not* inevitably at odds with federal voting rights. It is fully possible to craft maps that are "compliant with both state requirements . . . [and] federal law." (ECF No. 150, Tr. 187:4–11 (Rodden test.)). As I will discuss in the next section, mapmakers have proven that point with actual legislative districts that are equally apportioned and compliant with the substantive requirements of Article XI. If this Court were to adopt such a map, it would preserve federal voting rights while respecting the rulings of the state high court.

In fact, the majority concedes that the Commission's third map is "inconsistent" with the partisan fairness and proportionality requirements in Article XI, Section 6, but maintains that it is the "least flawed" and "most equitable" option. They defer to that plan in part because it represents a legislative judgment of the Commission, which "shall adopt" a General Assembly plan under Article XI, Section 1. Yet, Commission approval cannot stamp a plan as the "policies and preferences of the State," *White*, 412 U.S. at 795, where the Ohio Supreme Court has ruled that the act violated the highest law of the state. The Commission had ample opportunity to pass a lawful plan entitled to deference, but it repeatedly declined.

In *League III* and *IV*, the Ohio Supreme Court viewed the Commission's latest two maps as conscious choices to flout the redistricting criteria. It wrote in *League III*: "Because the party controlling the map-drawing process has intractably chosen outlier maps solely to maximize that party's partisan advantage, any 'chaos' is of respondents' own creation." 2022-Ohio-789, ¶ 31 n.6. And in *League IV*, the court sharply criticized the Commission's eleventh-hour abandonment of the independent map drawing process undertaken by Drs. Johnson and McDonald:

> Particularly, the evidence shows that on the final day before the commission adopted its [fourth] plan, some members of the commission blocked, rather than facilitated, Dr. McDonald's and Dr. Johnson's efforts to finish their work. The timeline of events demonstrates convincingly that the commission—or at least some members of the commission—when faced with one or more plans that closely matched constitutional requirements in the form of Dr. McDonald's and Dr. Johnson's plans, reverted to partisan considerations when time was running short, even though the potential for successful completion was high.

2022-Ohio-1235, ¶ 43 (Ohio S. Ct. Apr. 14, 2022). The court further found that the Commission's addition of an incumbency protection factor on the day before the deadline "pulled the rug out from the independent map drawers," "hinder[ed] their ability to complete their work," and "effectively prioritized protecting incumbents over the requirements of Article XI, Section 6." *Id.* ¶¶ 44–45. With the Johnson/McDonald Plan thus derailed, the Republican Commissioners opted

for a fourth plan that, by admission, was "probably 97 percent" similar to the just-invalidated third plan. *Id.* ¶ 49. In fact, it was 99.735% similar. *See id.*

I fail to see how the deliberate and unlawful acts of the Commission, authoritatively invalidated by the Ohio Supreme Court, can constitute a legislative policy pronouncement that now deserves the benefit of deference. No cases cited by the majority stand for the premise that a federal court may order the adoption of a redistricting plan the state high court has deemed unconstitutional. The closest case on point, *Perry v. Perez*, makes no mention of state-court invalidation and holds only that a federal court "'should be *guided* by the legislative policies *underlying*' a state plan—even one that was itself unenforceable" due to the preclearance requirements of the Voting Rights Act. 565 U.S. 388, 393 (2012) (emphasis added) (quoting *Abrams v. Johnson*, 521 U.S. 74, 79 (1997)). I also am mindful of the instruction in *White* to "follow the policies and preferences of the State, *as expressed in* statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature." 412 U.S. at 795 (emphasis added).

The Commission's third plan does not express the policies of the state. Like the other plans, it was an *ultra vires* enactment that the Ohio Supreme Court voided because it directly contravened state policies. *See Gentry v. Deuth*, 456 F.3d 687, 697 (6th Cir. 2006) ("*ultra vires* acts bear no legitimate force in a government under the law. A public act without legitimate force is indistinct under the law from an act that never was, or an act that has been voided."); *see also Cincinnati, Wilmington & Zanesville R.R. v. Clinton Cty. Comm'rs*, 1 Ohio St. 77, 86 (1852) (governmental acts are "void" if not "within the general grant of power to that body," or if "expressly prohibited by some provision of the constitution"). The effect of the majority opinion is to elevate the

Commission's bare approval over the substantive drafting requirements the Commissioners elected to evade.

Nor am I persuaded by the majority's reasoning that exigent circumstances justify adoption of the unconstitutional third plan. All cases the majority opinion cites for this proposition are distinguishable. In *Diaz v. Silver*, "no alternative districting plan exist[ed]," as proposed plans were not shown to be valid under the Voting Rights Act, leaving the court to "start anew" with elections planned in four months. 932 F. Supp. 462, 465, 467–68 (E.D.N.Y. 1996). In *Cosner v. Dalton*, the court permitted Virginia to use a malapportioned plan where primary elections were set to occur less than one month from the case filing. 522 F. Supp. 350, 363–64. In *Martin v. Venables*, the court permitted an election to proceed under a malapportioned plan for town council seats because the court was unable to consider the case "until well into the election timetable," in part due to plaintiffs' lack of diligence in bringing suit. 401 F. Supp. 611, 621 (D. Conn. 1975). Finally, in *Covington v. North Carolina*, the court permitted an election to proceed, despite the state court's finding of an equal protection violation, because the case could not be set for trial until *after* primary elections would take place. 2015 WL 13806587, at *1 & 4 (M.D.N.C. Nov. 25, 2015). A more general observation is found in *Upham*, a case concerning the Voting Rights Act: "It is true that we have authorized District Courts to order or to permit elections to be held pursuant to apportionment plans that do not in all respects measure up to the legal requirements, even constitutional requirements." 456 U.S. at 44. Yet, "[n]ecessity has been the motivating factor in these situations." *Id*. Here, the exigencies on which the majority relies were wholly avoidable, leaving the "necessity" cases inapposite. As I will discuss in the next section, this panel has the alternative plan that those other courts lacked: the Johnson/McDonald Plan, which complies with all constitutional drafting requirements and stands ready to implement.

The 2015 amendments to Article XI should not be set aside lightly. "There can be no honest controversy but that the written Constitution of the state is the paramount law . . . written by the supreme power of the state, the people themselves." *State ex rel. Weinberger v. Miller*, 99 N.E. 1078, 1079 (Ohio 1912). The people of Ohio, in whom "[a]ll political power is inherent," Ohio Const. art. I, § 2, supplanted the status quo when they voted by a decisive 70-30 margin to ensure the 2020 maps would be fair and proportionate. That pronouncement should have commanded deference: "Clearly, courts should attempt to accommodate the relief ordered to the apportionment provisions of state constitutions insofar as is possible." *Reynolds*, 377 U.S. at 584. The majority opinion falls short.

## III

The majority opinion is grounded on a faulty premise, reasoning that an unconstitutional map is the sole alternative and lesser evil to a cancelled election. Yet, another map was presented to this Court that complies with all substantive provisions of the state Constitution *and* was crafted under close supervision of the Commission, until it was unceremoniously abandoned. The Johnson/McDonald Plan could have been implemented in time for an August 2 primary, so as to cure all injury to federal rights. The majority dismisses the Johnson/McDonald Plan out of hand, even though the hearing testimony established that it is far more faithful than any of the Commission maps to the substantive drafting requirements of Article XI, Section 6.

The Johnson/McDonald Plan originated with the Commission, following the Ohio Supreme Court's suggestion in *League III* to "retain an independent map drawer—who answers to all commission members, not only to the Republican legislative leaders—to draft a plan through a transparent process." 2022-Ohio-789, ¶ 30. As the court later would recount in *League IV*, the Commission started down this path by retaining two such map drawers: Dr. Douglas Johnson,

nominated by the Republican Commissioners, and Dr. Michael McDonald, nominated by the Democratic Commissioners. 2022-Ohio-1235, ¶¶ 3–6. The Commission charged Drs. Johnson and McDonald with 24 "Ground Rules," which reflected all drafting requirements of Article XI and the Ohio Supreme Court rulings, and also established a dispute-resolution process using professional mediators from the Sixth Circuit Court of Appeals. *Id.* ¶¶ 7–8. From the Commission's unanimous adoption of these measures, there appeared to be a consensus that utilizing independent mapmakers would abide by the Ohio Supreme Court's instructions and would yield a lawful, partisan-neutral plan for the General Assembly.

Unfortunately, "what began as a 'historic' process devolved into the same one-sided partisan map-drawing process that led [the Ohio Supreme Court] to invalidate the previous three plans." *Id.* ¶ 39. By March 27, the day before the deadline set by the Ohio Supreme Court, Drs. Johnson and McDonald presented three plans to the Commission, which were to be consolidated, and sought "guidance on outstanding issues." *Id.* ¶ 15. Some members "offered suggestions," but the Commission "did not decide any issue by a formal vote." *Id.* ¶ 16. Senate President Huffman also announced a mediation agreement on incumbency issues, *Id.* ¶ 17, which would require some redrafting. The following day, Drs. Johnson and McDonald were addressing incumbency issues in their merged plan. With the deadline approaching, Senate President Huffman recommended a "failsafe" of revising the Commission's invalidated third map in case Drs. Johnson and McDonald were unable to present a plan in time. *Id.* ¶¶ 18, 21. The Commission approved the motion on a party-line vote, and it declined to take the issue to mediation or to seek an extension from the Ohio Supreme Court. *Id.* ¶ 22.

The *League IV* decision set out in detail how these developments sunk the Johnson/McDonald Plan and created the exigent circumstances to push through yet another partisan map:

> {¶ 44} . . . As time for completion grew shorter, the commission failed to provide the guidance that Dr. McDonald and Dr. Johnson needed, hindering their ability to complete their work.
>
> {¶ 45} Particularly problematic was Senate President Huffman's last-minute insistence that the independent map drawers consider the residence locations of non-term-limited and mid-term House and Senate incumbents in drafting a plan. The commission instructed the independent map drawers to consider incumbent residences "and where possible without violating constitutional principles, avoid pairing incumbents." Although this instruction was not necessarily inconsistent with this court's admonitions in *League III*, ___ Ohio St.3d ___, 2022-Ohio-789, ___ N.E.3d ___, at ¶ 37, because it required the map drawers to consider incumbency only "where possible," the timing of it pulled the rug out from under the independent map drawers. Rather than including the instruction in the March 23 "Ground Rules," this new criterion was imposed on March 27—one day before the deadline and after the independent map drawers had already completed separate drafts of potential district plans without consideration of incumbents' addresses. This belated instruction added to the map drawers' difficulty in finalizing their work in sufficient time for the commission to review it and file it with the secretary of state. Contrary to our admonitions in *League III*, the commission's last-minute incumbency-protection instruction to the independent map drawers effectively prioritized protecting incumbents over the requirements of Article XI, Section 6.
>
> {¶ 46} Although the commission appeared to be engaging in a more collaborative process in drafting a legislative map, the final day leading up to the adoption of the third revised plan revealed anything but that. Rather than helping the independent map drawers finish their work on a plan, the commission instead chose to modify a previously invalidated plan. That plan was prepared by a member of the Republican legislative caucus's staff, and the Democratic commission members and the statewide-officeholder commission members were effectively prevented from participating in preparing the plan. These facts indicate beyond a reasonable doubt an intent to favor the Republican Party at the expense of the Democratic Party in the commission's fourth try at drafting the General Assembly–district plan.

*League IV*, 2022-Ohio-1235, ¶¶ 44–46.

When the Commission reconvened the evening of March 28, House Speaker Cupp determined "it was not feasible" for Drs. Johnson and McDonald to complete their maps, and he

therefore moved to adopt the "failsafe" plan—which was near identical to the third. *Id.* ¶¶ 24, 40. Without recessing to review the maps, the Commission adopted the "failsafe" as its fourth plan on a 4-3 vote, *id.* ¶¶ 26, 30, with Auditor Faber joining the two Democratic Commissioners in opposition. A mere hour after passing that plan, the Commission rejected a motion by the Democratic members, on a party-line 5-2 vote, to adopt the Johnson/McDonald Plan. *Id.* ¶¶ 28–29.

Expert witnesses at this Court's preliminary injunction hearing later testified that the Johnson/McDonald Plan completed that evening satisfies all constitutional requirements, with *de minimis* technical adjustments. (ECF No. 150, Tr. 132:17–133:20 & 142:6–24 (Glassburn test.); No. 161-2 ¶¶ 5–12 (Rodden decl.); No. 165-3 ¶¶ 23–29 (Gall decl.)). The plan attains near-perfect symmetry in competitive seats and replicates the proportionality target of 54% Republican-leaning seats, 46% Democratic-leaning seats, both marked improvements over any of the Commission's four plans. (ECF No. 144-2 (Rodden tbl.); No. 165-11 ¶ 34 (Latner decl.)).[1]

The Commission's choice to abandon and reject the Johnson/McDonald Plan stemmed from two criticisms, neither of which tarnishes it for adoption by this Court. First, the plan was not finished in time for the Commission to review a full draft and offer amendments. By the Commissioners' own statements, the primary reason to abandon the Johnson/McDonald plan was that time ran out under the Ohio Supreme Court's March 28 deadline. *See* Section 8(C)(2)

---

[1] The Johnson/McDonald Plan contains population variances of up to 9.97% between districts, which is similar to other maps approved by the Commission. (ECF No. 165-3 ¶¶ 43, 45 (Gall decl.)). This stays within permissible bounds for a state legislative plan. *Cf. Evenwel v. Abbott*, 578 U.S. 54, 59 (2016) ("Maximum deviations above 10% are presumptively impermissible."). Under *Abrams*, court-drawn legislative plans "are held to higher standards of population equality," and should "'ordinarily achieve the goal of population equality with little more than *de minimis* variation.'" 521 U.S. at 98 (quoting *Chapman*, 420 U.S. at 26–27). Even if the variations in the Johnson/McDonald Plan are viewed as more than *de minimis* (which no party has contested), I find they are supported by "historically significant state policy or unique features." *Id.* (quoting *Connor*, 431 U.S. at 419–20). Article XI, Section 3 of the Ohio Constitution permits variances of up to 10%, and the variances in the Johnson/McDonald Plan are in service of Article XI requirements such as compactness and proportionality. *See* ECF No. 165-3 ¶¶ 47–48 (Gall decl.) (Ohio's constitutional requirements are "likely to push any General Assembly plan toward the allowable 10 percent limit").

Statement of Ohio Redistricting Commission, available at https://redistricting.ohio.gov/ assets/organizations/redistricting-commission/events/commission-meeting-march-28-2022-281/ section-8c2-statement-1502.pdf ("The independent mapdrawers were unable to produce such a plan by the Ohio Supreme Court's deadline. In order to ensure the Commission adopted a general assembly district plan by the Court's deadline, on the final evening of March 28, 2022, the Commission instructed Commission member staff to prepare, with the assistance of the independent mapdrawers, a modification of the plan adopted by the Commission on February 24, 2002 [*sic*] . . . ."). The Johnson/McDonald Plan now stands ready for adoption. By unrebutted testimony at the hearing, the necessary technical adjustments would take "[n]o more than one day" to implement. (ECF No. 150, Tr. 135:2–6 (Glassburn test.)). Dr. Jonathan Rodden, the Bennett Parties' expert witness, was able to complete the task in about eight hours. (ECF No. 161-2 ¶ 10 (Rodden decl.)). Yet, the majority describes the Johnson/McDonald Plan as "incomplete" and therefore not fit for adoption.

Second, some Commissioners criticized the compactness of the Johnson/McDonald Plan, which is the only substantive grievance offered to date. Commissioners Cupp, DeWine, and Faber contended that, in pursuing partisan proportionality, the Johnson/McDonald Plan had split too many cities and reduced the number of competitive districts. *League IV*, 2022-Ohio-1235, ¶ 29. The evidence before this Court, however, shows the fourth plan that Commissioners Cupp and DeWine had voted for just an hour earlier performed *worse* on all standard compactness measures than the Johnson/McDonald Plan. (ECF No. 144-2 (Rodden tbl.)). The Commission's third plan also is less compact than the Johnson/McDonald Plan. (*Id.*).

Adopting the Johnson/McDonald Plan, or a modified version thereof, approximates the result the Commission likely would have reached if given more time. Indeed, in the *League IV* decision last week, the Ohio Supreme Court wrote:

> With time in mind, it appears that the most efficient way for the commission to proceed may well be to continue working with Dr. McDonald and Dr. Johnson to complete the plan on which they have made considerable progress—if they are willing and available and if the commission has the authority to timely retain them for additional work. By certain measures, their plan—though incomplete—is on track to being constitutionally compliant.

2022-Ohio-1235, ¶ 74.

The Ohio Supreme Court noted specifically that the Johnson/McDonald Plan "outperforms the [Commission's fourth] plan on measures of partisan symmetry and on the distribution of competitive districts[,] . . . achieves partisan proportionality that closely corresponds to statewide voter preferences, splits fewer voting precincts, and is more compact as a whole." *Id.* ¶¶ 75–76. It vindicates federal rights just as effectively as the majority's remedy, without the attendant costs of functionally nullifying rulings of the Ohio Supreme Court interpreting the state Constitution. Moreover, it hews closer to the intentions of the voters who approved the watershed 2015 redistricting amendments.

The majority criticizes the Johnson/McDonald Plan for lacking Commission approval and notes the clause in Article XI, Section 9(D) that "[n]o court shall order, in any circumstance, the implementation or enforcement of any general assembly district plan that has not been approved by the commission in the manner prescribed by this article." I answer these arguments as Judge Thapar stated at the preliminary injunction hearing: "What we're trying to do is the least amount of damage to Ohio law. We're going to do some damage if we get involved; there's just no question. So we're trying to do the least." (ECF No. 150, Tr. 109:1–3). The federal court, with the Supremacy Clause at its disposal, has the authority once *Growe* deferral ends to displace necessary

impediments to the exercise of federally protected voting rights. That is the very premise of an "impasse" case. Had the Commission approved *any* map that was viable under the state Constitution, it would be in use, and this case would be closed. Because it failed to do so, the specified redistricting procedure has not been followed—nor can it be followed in time for an election to occur. It therefore becomes the power and duty of the federal court to adopt a redistricting plan in maximum harmony with state and federal law.

To that end, numerous sister courts have taken the step the majority opinion does not, and have used their authority to consider outside plans or undertake their own map-drawing when a valid and approved plan is unavailable. *See, e.g.*, *Covington v. North Carolina*, 283 F. Supp. 3d 410 (M.D.N.C. 2018), *aff'd in part, rev'd in part*, 138 S. Ct. 2548 (2018) (panel adopted General Assembly plans of court-appointed special master, after state legislative plan was found to be racially gerrymandered); *Personhuballah v. Alcorn*, 155 F. Supp. 3d 552 (E.D. Va. 2016) (panel directed implementation of congressional plan proposed by special master, after state legislature failed to remedy constitutional violations in previously enacted plans); *Essex v. Kobach*, 874 F. Supp. 2d 1069 (D. Kan. 2012) (panel approved own congressional and General Assembly districts, after state legislature failed to approve new maps as required by state constitution); *Perez v. Texas*, 891 F. Supp. 2d 808 (W.D. Tex. 2012) (court adopted interim congressional districts proposed by litigants, with technical adjustments, after state legislature's plan failed to gain timely preclearance); *Favors v. Cuomo*, 2012 WL 928223 (E.D.N.Y. Mar. 19, 2012) (panel modified and implemented the congressional plan of the court's retained expert, after state legislature failed to delineate new districts); *Smith v. Clark*, 189 F. Supp. 2d 548 (S.D. Miss. 2002), *aff'd sub nom. Branch v. Smith*, 538 U.S. 254 (2003) (panel ordered implementation of own congressional plan, after declaring defendants' original plan unconstitutional); *Colleton Cty. Council v. McConnell*,

201 F. Supp. 2d 618 (D.S.C. 2002) (panel devised and implemented own General Assembly and congressional districts, over competing plans from state legislature and Governor, after state branches deadlocked); *Vera v. Bush*, 933 F. Supp. 1341 (S.D. Tex. 1996) (panel drew and enacted interim congressional districts, after state legislature failed to remedy racial gerrymander); *Johnson v. Miller*, 922 F. Supp. 1556 (S.D. Ga. 1995), *aff'd sub nom. Abrams v. Johnson*, 521 U.S. 74 (1997) (panel adopted own congressional districts, after state General Assembly adjourned without passing a plan); *Arizonans for Fair Representation v. Symington*, 828 F. Supp. 684 (D. Ariz. 1992), *aff'd sub nom. Hisp. Chamber of Com. v. Arizonans for Fair Representation*, 507 U.S. 981 (1993) (panel ordered adoption of congressional plan submitted by intervenors and modified by court, over plans approved by state House and Senate); *Jeffers v. Clinton*, 756 F. Supp. 1195 (E.D. Ark. 1990), *aff'd*, 498 U.S. 1019 (1991) (panel ordered adoption of General Assembly districts submitted by defendant with modifications by plaintiffs); *Shayer v. Kirkpatrick*, 541 F. Supp. 922 (W.D. Mo. 1982), *aff'd sub nom. Schatzle v. Kirkpatrick*, 456 U.S. 966 (1982) (panel formulated own congressional districts, after state legislature adjourned without adopting a plan); *Graves v. Barnes*, 446 F. Supp. 560 (W.D. Tex. 1977), *aff'd sub nom. Briscoe v. Escalante*, 435 U.S. 901 (1978) (panel implemented plaintiffs' proposed state legislative plan, where existing districts contained excessive population disparities); *Beens v. Erdahl*, 349 F. Supp. 97 (D. Minn. 1972) (panel adopted state House and Senate districts, after legislature and Governor deadlocked).

Once an impasse case is presented, the court's duty is to cure the violation of federal rights and "follow the policies and preferences of the State" where not in conflict with the federal remedy. *White*, 412 U.S. at 795. It should not have been difficult here to discern the redistricting policy of the state, as between the landslide 2015 referendum on the one hand, and the repeatedly rebuked acts of the Commission on the other. Our deference was owed to the people's clear command that

redistricting is to be fair, bipartisan, and transparent—not to the Commission's invalidated decisions to prioritize partisan favoritism over constitutional strictures. The closest embodiment of legitimate state policy is the Johnson/McDonald plan, which satisfies Article XI as interpreted by the Ohio Supreme Court, was crafted under close direction of the Commission, and was abandoned chiefly for lack of time under circumstances created by the Commission itself. On the record before this Court, there is every reason to believe that Drs. Johnson and McDonald were approaching a map that would pass muster at the Ohio Supreme Court and that the Commission would have adopted with sufficient time and political will. Enacting that plan now is consistent with a "least-damage" approach to federalism and comity. If any portion of the state Constitution must yield, surely it is the procedural clauses that the Commission itself forfeited, rather than the substantive redistricting criteria that safeguard the public's right to fair representation.

## IV

I further disagree with the majority's decision to couch its approval of the third map in the language of deferral. A significant rationale for the majority's endorsement of the third map is that Secretary LaRose would not need to repeat the preparatory steps he began before the map was invalidated, thereby shortening the implementation timeline and giving Ohio more time to craft an alternative solution. I see this not as an exercise in deferral, but as a misunderstanding of the practical effects the majority's decision will have.

The majority virtually ensures that the third map will be used for an August 2 primary. Calling the remedy a "backstop" to state processes does not change the fact that the majority has set a strong, almost immovable default. By unveiling exactly what that "backstop" will be, state actors may be led to believe that there is no urgency to reach their own solution. The options facing the state are: (1) do nothing, await a map with the desired partisan favoritism, retain the

administrative benefits of an August 2 primary, and leave the election calendar unaltered; or (2)

undertake the thorny map-drawing process for a fifth time, generate a compromise map, move the

primary to after August 2, and reset dozens of election-related deadlines through temporary

legislation. The Republican Commissioners and legislators will not blink at that invitation. Indeed,

the Republican Commissioners will benefit directly from a crisis they created, and which the Ohio

Supreme Court has attributed squarely to them.

Because the majority opinion's "backstop" changes the calculus and significantly reduces

the likelihood of a state solution, this is not deferral in the sense that *Growe* contemplates. *See*

*Growe*, 507 U.S. at 34 (federal court should "neither affirmatively obstruct state reapportionment

nor permit federal litigation to be used to impede it").

## V

Since the majority views the 2010 map as a viable but second-best alternative, I feel it

necessary to address that argument as well. As the majority opinion concedes, continued use of

the 2010 plan fails to remedy—and, in fact, causes—violations of the Equal Protection Clause, as

interpreted through the constitutional super-precedents *Baker v. Carr*, 369 U.S. 186 (1962),

*Wesberry v. Sanders*, 376 U.S. 1 (1964), and *Reynolds v. Sims*, 377 U.S. 533 (1964). It therefore

offends political rights of the highest order. "The conception of political equality from the

Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and

Nineteenth Amendments can mean only one thing—one person, one vote." *Gray v. Sanders*, 372

U.S. 368, 381 (1963). If a state were to "continue to use pre-existing districts following a new

census," then "[t]he one-person, one-vote principle . . . would bar those procedures, except in the

'unlikely' event that 'the decennial census makes no districting change constitutionally

necessary.'" *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 812

(2015) (quoting *Branch*, 538 U.S. at 273). In line with these principles, and given the significant population changes captured in the 2020 Census, there is no dispute among the parties that Ohio was obligated to reapportion its legislative districts ahead of the 2022 election.

Furthermore, continued use of the 2010 map would cause separate violations of the state Constitution because those maps never could pass muster under the post-2015 redistricting standards. By unrebutted expert testimony from the Court's preliminary injunction hearing, the 2010 maps were "among the worst gerrymanders in the country at that time," worse than all but "two or three other states" "in terms of any bias either favoring Democratic voters or Republican voters." (ECF No. 150, Tr. 221:13–222:17 (Latner test.)). Insofar as the 2010 maps were "drawn primarily to favor or disfavor a political party," they violate Article XI, Section 6(A). Likewise, the 2010 maps do not yield a "statewide proportion of districts" that "correspond[s] closely to the statewide preferences of the voters of Ohio," as required by Section 6(B). The current General Assembly is skewed significantly from the historical voting preferences of 54% Republican, 46% Democratic, that the Ohio Supreme Court has used as its benchmark. *See League I*, 2022-Ohio-65, ¶ 108. In fact, it is less proportional than the Commission's first maps, which the Ohio Supreme Court deemed unconstitutional. *Compare id.* ¶ 105 (noting Commission's "statement that 64.4 percent of all districts in the adopted plan favored Republican candidates"), *with A Guidebook for Ohio Legislators*, App'x G at 183, Ohio Legislative Service Commission, https://www.lsc.ohio.gov/documents/reference/current/guidebook/17/Appendix%20G.pdf (accessed Apr. 12, 2022) (current General Assembly contains 64 Republicans to 35 Democrats in the House, and 25 Republicans to 8 Democrats in the Senate).

Thus, continued use of the 2010 map would result in a host of state and federal constitutional issues. True, the 2010 map once was blessed by state officials; but it is not the status quo today, and it deserves no consideration after the shift in constitutional paradigms.

## VI

Under today's majority opinion, the General Assembly primary will proceed, but only by effectively vetoing the 2015 referendum and overruling the state high court. Far from respecting state sovereignty, the majority opinion resurrects a General Assembly plan in derogation of the state's policies of proportional, partisan-neutral redistricting, as codified in its most fundamental law. Ohioans will have to live under an unconstitutional redistricting plan—a fact that will hang over the General Assembly session and cloud every action it takes.

Lamentably, the majority opinion remedy moves Ohio no closer to resolving its redistricting saga. Since these maps are approved for the 2022 election only, the Commission soon will take up the task of redistricting for 2024 and beyond. I shudder at the perverse incentives of which the Commission could avail itself. The current Commissioners have attained their goal of an unconstitutionally asymmetric map by flaunting orders of the Ohio Supreme Court—flirting even with contempt—and relying on this Court to rescue their unlawful redistricting plan once they had manufactured a sufficient emergency. The 2024 Commission, faced with the options of ceding political power or simply waiting out adverse court decisions, likely will be tempted to take the same course. As Plaintiffs have maintained from the start, the perpetual turmoil and uncertainty during this redistricting cycle has harmed candidates, election officials, and the Ohio polity. Now, the Commission has learned that it is beyond reproach. While I have no belief that the majority intended this consequence, this nonetheless is the result when a federal court disarms the state Supreme Court from policing its own Constitution.

Ohioans have every right to be alarmed. They voted overwhelmingly to end the hyper-partisan redistricting process that yielded the 2010 maps, but the practical effect of the majority opinion is to set aside their command of fair representation. This begs the question: If a watershed constitutional referendum and four state Supreme Court rulings are not enough to change this broken redistricting process, what is?

Because I cannot join in the relief ordered, I respectfully dissent, in part.

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATED: April 20, 2022**