UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **MICHAEL GONIDAKIS,** *et al.*, | : |
| Plaintiffs, | : Case No. 2:22-cv-0773 |
| v. | : Chief Judge Algenon L. Marbley |
| | : Judge Amul R. Thapar |
| **FRANK LAROSE,** in his capacity as Ohio Secretary of State, *et al.*, | : Judge Benjamin J. Beaton |
| Defendants. | : |

**MEMORANDUM OPINION & ORDER**

BEFORE: THAPAR, Circuit Judge; MARBLEY, Chief District Judge; and BEATON, District Judge.

The court delivered a PER CURIAM opinion in which THAPAR and BEATON, JJ., joined. MARBLEY, C.J. (pp. 8–15), delivered a separate opinion concurring in the judgment.

PER CURIAM. Ohio has struggled to come up with a map for its state elections. This failure has prompted several rounds of litigation. The facts, procedural history, and how we got here are all laid out in the Court's prior opinion. *See Gonidakis v. LaRose*, No. 2:22-cv-0773, 2022 WL 1175617, at *3 (S.D. Ohio Apr. 20, 2022). This order resolves the remaining claims.

On April 20, this Court ordered Map 3 to be imposed on May 28 for the 2022 election cycle if no new map was passed. *Id.* at *30. The Simon Intervenors (Simon) quickly moved to alter or amend this Court's order to comply with the Voting Rights Act. Mot. to Alter (DN 197). In doing so, Simon refers to his opposition to Plaintiffs' preliminary injunction (DN 100) and his previous motion for a temporary restraining order, preliminary injunction, and summary judgment (DN 141) on his claim that Map 4 dilutes African American voting power in violation of the Voting Rights

1

Act.[1] More specifically, Simon maintains that Map 3's 33rd Senate district and 59th House district ("the Districts") run afoul of federal law and ignore the "historical findings set forth . . . in *Armour v. Ohio*." Prelim. Inj. Opp'n at 2–3 (citing 775 F. Supp. 1044 (N.D. Ohio 1991)).[2]

Simon raises two related points. First, he observes that the Commission eschewed any consideration of race from the outset of the redistricting process. Second, he identifies that the Districts have been historically drawn in ways that the neighboring U.S. District Court held to violate the VRA. *See Armour v. Ohio*, 775 F. Supp. 1044 (N.D. Ohio 1991). Putting these pieces together, Simon contends that any map considered by the Commission, including Map 3, would violate the Voting Rights Act. Why? Because the Commission refused to consider race. Prelim. Inj. Opp'n at 4–5, 7; Mot. to Alter at 6.

We hold that Simon has not carried his burden as plaintiff to establish a violation of the Voting Rights Act. Beginning with the statute, Section 2 of the Voting Rights Act prohibits voting practices that "*result*[] in a denial or abridgment of the right . . . to vote on account of race or color." 52 U.S.C. § 10301(a) (emphasis added). A violation rests "on the totality of the circumstances" and exists only if the members "of a class of citizens . . . have less opportunity than other members of the electorate to participate in the political process and to elect

---

[1] The Simon Parties' First Motion for a Temporary Restraining Order only targeted Map 4. Since the Court will impose Map 3 if Ohio does not adopt a workable map by May 28, 2022, this motion is likely moot unless Map 4 comes before us again. But the logic of the motion could equally apply to Map 3. And since Simon is referring to previous motions and his opposition in his motion to alter or amend, we will treat the arguments from these filings as incorporated.

[2] Simon also brings these claims against the 6th Congressional district. First TRO at 3–4. We already denied Simon intervention to challenge the U.S. Congressional map when we denied his second TRO. DN 185; *United States v. City of Detroit*, 712 F.3d 925, 931–32 (6th Cir. 2013) (courts can limit types of claims brought under mandatory intervention based on the underlying suit). Simon also claims the Districts are racially gerrymandered in violation of the Fourteenth and Fifteenth Amendments but explicitly states that he is not moving on those claims currently. First TRO at 3. So we refuse to consider those challenges here. What's more, even if we were to consider them, the primary election has already occurred, raising obvious concerns about this Court's intervention in an ongoing election. *See generally Purcell v. Gonzalez*, 549 U.S. 1, 5 (2006).

representatives of their choice." *Id.* § 10301(b). *See also Thornburg v. Gingles*, 478 U.S. 30, 43–44 (1986) (discussing repudiation of the "intent test" in favor of a "results test").

The Supreme Court has interpreted this provision to require three "necessary preconditions" to prove that an electoral structure frustrates the ability of minority voters to "elect representatives of their choice." *Id.* at 50. Under *Gingles*, Plaintiffs bear the burden of proving by a preponderance of the evidence that: (1) the "minority group" is "sufficiently large and geographically compact to constitute a majority in a single-member district;" (2) the minority group is "politically cohesive;" and (3) "the white majority vot[es] sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Growe v. Emison*, 507 U.S. 25, 40 (1993) (quoting *Gingles*, 478 U.S. at 50–51). If the plaintiff makes this showing, we then analyze whether a violation has occurred under the totality-of-the-circumstances test. *See Bartlett v. Strickland*, 556 U.S. 1, 11–12 (2009).

Though this test comes from statutory text, *Gingles* tells us to look to a Senate report that accompanied the 1982 amendments to the VRA for our guideposts. That report offers several factors such as the history of voting discrimination in the jurisdiction and whether the minority group has a track record of political success in the jurisdiction. 478 U.S. at 44–45 (citing S. Rep. No. 97–417 (1982)); *see also League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 426 (2006).

Simon's primary argument is that the Commission flunks the totality-of-the-circumstances test because it intentionally ignored race by all accounts. First TRO at 2, 4–10. But his case fails to make the showing required by *Gingles* and its progeny for at least two reasons.

First, Section 2 is focused on "results." 52 U.S.C. § 10301(a). The statute does not aim to prohibit the use of any particular *method* of redistricting. *See Bonilla v. City Council of City of*

3

*Chi.*, 809 F. Supp. 590, 596 (N.D. Ill. 1992).  The Commission's choice to not consider race goes to the choice of method, not results.  After all, not taking race into account does not necessarily result in vote dilution.  Indeed, under the Fourteenth Amendment, the Supreme Court presumptively favors maps drawn without race in mind.  *Cf. Cooper v. Harris*, 137 S. Ct. 1455, 1464 (2017) ("When a State invokes the VRA to justify race-based districting, it must show (to meet the 'narrow tailoring' requirement) that it had 'a strong basis in evidence' for concluding that the statute required its action.").  In response to a question about whether any decisions held that declining to account for race was sufficient to prove a violation, counsel for Simon pointed only to *Gingles*.  In tracing Section 2's history, however, *Gingles* made clear that Congress created a "results test" requiring plaintiffs to "demonstrate that, under the totality of the circumstances, the devices *result* in unequal access to the electoral process."  478 U.S. at 35, 46 (emphasis added).

Second, Simon impermissibly shifts the burden of proof onto the Commission.  Simon contends that "the redistricting process must take into consideration whether a white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate."  Prelim. Inj. Opp'n at 4 (quotation omitted).  Simon argues the State's failure to do so is fatal because Ohio officials have a duty to consider racial demographics under the VRA.  *Id*.

But it is Simon's burden to satisfy this Court of these three preconditions, not the Commission's ex ante burden to show it accounted for all the *Gingles* factors.  *Voinovich v. Quilter*, 507 U.S. 146, 155–56 (1993) (district court incorrectly placed the burden on the state despite the statute placing the "burden of proving an apportionment's invalidity squarely on the plaintiff's shoulders").  "*Plaintiffs* must demonstrate that, under the totality of the circumstances, the devices result in unequal access to the electoral process," and "the results test does not assume the existence of racial bloc voting; *plaintiffs* must prove it."  *Gingles*, 478 U.S. at 46 (emphases

4

added). This allocation of the burden of proof is logical: "Congress could not have intended the State to prove the invalidity of its own apportionment." *Voinovich*, 507 U.S. at 156. It is up to Simon, not the Commission, to prove in the first instance that each of the *Gingles* preconditions are met and *then* show dilution under the totality of the circumstances. Simon has not identified any evidence that any of the maps that the Commission proposed, much less Map 3, drew districts in a manner that resulted in vote dilution or a lack of equal opportunity.

Consider *Gingles*' first precondition. Simon must prove that the minority group can form a compact majority-minority district—a district where more than half the voters are from the minority group. *Strickland*, 556 U.S. at 11. A district where the minority bloc can only win elections by "influencing" the majority or getting crossover votes doesn't satisfy this precondition. *Id.* at 12–14. Simon has offered no statistical evidence about how a hypothetical majority-minority district could be made. *See, e.g.*, *Fairley v. Hattiesburg*, 584 F.3d 660, 669 (5th Cir. 2009) (plaintiffs typically must propose hypothetical districts to bear the burden in a VRA case).

At best, Simon offers the demographics of a couple of counties. He claims two counties—Trumbull and Mahoning—have historically been aligned and are now fragmented. Mot. to Alter at 3–4. But Simon admits that as a result of the latest census, each Senate district will include about 357,559 people. *Id.* At no point does Simon show how a compact district could be drawn to include everyone in these counties, as their combined population exceeds 430,000 people. U.S. Census Bureau, *2020 Redistricting Data Tables* (April 26, 2022), https://data.census.gov/cedsci/all?q=&y=2020&d=DEC%20Redistricting%20Data%20%28PL%2094-171%29. And even if a district could be drawn, it would still not amount to a majority-minority district. By his own numbers, those counties contain only 17,200 and 34,835 African-Americans, respectively. Mot. to Alter at 3–4. Since the number of African-Americans in the area

5

totals 52,035 while a typical Senate district will have 357,559 people, African-Americans would only account for about 15% of the district.[3] Thus, the most Simon can muster is an "influence district"—which the Voting Rights Act does not require. *Strickland*, 556 U.S. at 13.

How about the second precondition of whether the minority group is politically cohesive? *Growe*, 507 U.S. at 41–42. Again, Simon offers no current evidence. Instead, he assumes that African Americans in this area vote in lockstep. First TRO at 8. Yet the Supreme Court has expressly rejected an across-the-board assumption. Under well-settled law, we cannot use "national voting patterns" as a "substitute for proof that bloc voting occurred" in a particular area. *Growe*, 507 U.S. at 42. The same holds true for the third precondition of whether the white majority votes sufficiently as a bloc to thwart minority candidates. *Id*. at 40. Without proving these preconditions, Simon cannot show an injury, much less a violation of the Voting Rights Act. *Id*. at 41 ("[T]here neither has been a wrong nor can be a remedy."); *see also Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 372 (S.D.N.Y. 2004). Nor does Simon provide any current evidence for the "totality of the circumstances" factors. *Gingles*, 478 U.S. at 44–45.

Instead of addressing these specific preconditions and factors, Simon primarily relies on the findings from *Armour v. Ohio*, 775 F. Supp. 1044 (N.D. Ohio 1991). There are two problems with this approach. First, the *Armour* court did not conduct a *Gingles* analysis because it concluded (erroneously, we now know) that *Gingles* did not apply to single-member districts. *Id*. at 1051 (refusing to apply the *Gingles* preconditions); *Strickland*, 556 U.S. at 11 (*Gingles* preconditions apply). Second, the Youngstown area has seen sweeping demographic changes in the three decades since *Armour* was decided. So while *Armour* did consider many of the factors relevant to the totality-of-the-circumstances analysis at the time, for purposes of today's claim that decision

---

[3] Simon does not offer any analysis of the relevant populations for purposes of the 59th House district.

6

supplies historical facts, not the holistic analysis that would suffice for Simon to prevail. Simon would, at a minimum, need to make a showing that racially polarized voting patterns persist today.

Simon's remaining argument is that the Commission's refusal to account for *Armour* or consider race is proof positive of intentional discrimination. First TRO at 6. Simon's evidence falls short of the robust showing ordinarily required for a meritorious intentional-discrimination claim. *See, e.g.*, *Cooper*, 137 S. Ct. at 1473–74 (citing *Hunt v. Cromartie*, 526 U.S. 541, 546–47 (1999)). Indeed, Simon points to no precedent indicating that a refusal to consider race amounts to primary evidence of an intent to discriminate.

Simon's failure to establish the *Gingles* preconditions mean he has not shown a likelihood of success for a TRO or preliminary injunction, nor has he justified the Court altering its judgment. Thus, we DENY Simon's Motion to Alter or Amend the Court's earlier judgment (DN 197) as well as Simon's Motion for a Temporary Restraining Order, Preliminary Injunction, and Summary Judgment (DN 141).

_____
**AMUL R. THAPAR**
**UNITED STATES CIRCUIT JUDGE**

_____
**BENJAMIN J. BEATON**
**UNITED STATES DISTRICT JUDGE**

## **MARBLEY, C.J., CONCURRING**

I concur in the majority's finding that the Simon Parties have not carried their burden under *Thornburg v. Gingles*, 478 U.S. 30 (1986), and therefore cannot obtain injunctive relief on their Voting Rights Act claims. I write separately to comment on the continuing vitality of *Armour*, to elucidate the law on race-conscious redistricting, and to clarify the mistaken belief of some Commissioners that federal law prohibited them from considering racial demographic data. In my view, both the Commissioners and the majority have neglected the permissible role of race-consciousness in service of traditional redistricting criteria. That practice does not run afoul of Supreme Court jurisprudence, and it would have spoken to some of the Simon Parties' core concerns. Still, the Simon Parties cannot compel it under the Voting Rights Act, so I concur in the majority's ruling.

The Simon Parties are successors to the plaintiff class in *Armour v. State of Ohio*, a 1991 case challenging Ohio's redistricting practices in the greater Youngstown area. (ECF No. 92 ¶ 10). The court in *Armour* sustained plaintiffs' challenges under the Fifteenth Amendment and Section 2 of the Voting Rights Act. 775 F. Supp. 1044 (N.D. Ohio 1991) (three-judge panel). The court found that "the line dividing Youngstown between districts 52 and 53 . . . was intended to split the black community in order to dilute the potential effectiveness of the black vote," *Id.* at 1061, and that "a reconfigured district" would permit plaintiffs to "elect a candidate of their choice." *Id.* at 1060.

The court reached this conclusion after a lengthy discussion of historical discrimination in the Mahoning Valley, which it described as "a way of life . . . since blacks settled in the area at the turn of the [twentieth] century." *Id.* at 1058–59. The opinion detailed steel companies' segregated corporate housing, the success of the Ku Klux Klan as a local political party, racism in the police force, conspicuous discrimination in city employment, denial of service by local businesses,

8

segregated public schools, restrictive housing covenants, and exclusion from social organizations. *Id.* at 1053–55. The court then reviewed how that discrimination manifested in racially disparate income figures, poverty rates, educational attainment, unemployment, and political participation. *Id.* at 1055–56. The effects were especially pronounced in elections: because "white voters in Youngstown d[id] not support black candidates," "[n]o black ha[d] ever won a county-wide election," and "[o]nly one black candidate ha[d] ever won a city-wide election other than for school board." *Id.* at 1056–58. State representatives had "little incentive to consider black voters" and had "not been sensitive to [their] needs." *Id.* at 1058. The court concluded that "white race-based bloc voting work[ed] in conjunction with the division of the black voters to permit and indeed compel political parties to ignore minority candidates, and to discourage black candidates from seeking office." *Id.* at 1059.

To the Simon Parties, history is repeating. Resting on *Armour*, they contend that the Ohio Redistricting Commission has produced maps in which "the voting strength of the Black residents of Youngstown is illegally and unconstitutionally diluted and abridged by a white majority voting bloc." (ECF No. 92 ¶ 45). They allege violations of Section 2 of the Voting Rights Act, intentional racial discrimination under the Fourteenth and Fifteenth Amendments, and an undue burden on voting rights under the First and Fourteenth Amendments. The core of their argument is that the Commission adopted "an unlawful blanket state policy to ignore racial demographics and the totality of circumstances applicable to whether the [redistricting] Plan diminishes the Simon Parties' ability to nominate and elect representatives of choice." (ECF No. 197 at 1).

Beginning with the statute, Section 2 of the Voting Rights Act provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . as provided in subsection (b).

9

> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. . . .

52 U.S.C. § 10301. Accordingly, in the redistricting context, Section 2 looks to the "results" of proposed or actual plans, rather than the intent behind them. *See Gingles*, 478 U.S. at 43–44 (discussing repudiation of the "intent test" in the Senate Report accompanying Congress's 1982 amendments, in favor of a results test). It does not proscribe particular methods of redistricting, absent a showing that the practice results in a denial or abridgement of voting rights on account of race.

In the seminal case *Thornburg v. Gingles*, the Supreme Court discussed when a showing of minority vote dilution could support a claim under Section 2. The Court set out three preconditions:

> First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. . . . Second, the minority group must be able to show that it is politically cohesive. . . . Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate.

*Id.* at 50–51. Where one or more is lacking, the results test is not satisfied; "there neither has been a wrong nor can be a remedy." *Growe v. Emison*, 507 U.S. 25, 40–41 (1993).

I concur with the majority that the Simon Parties have not met the *Gingles* preconditions. They have not demonstrated that Black residents in the greater Youngstown area could constitute a majority in a state House or Senate district, nor have they offered current evidence of minority political cohesion or majority bloc-voting. As a result, the Voting Rights Act and *Gingles* did not require the state to draw a so-called "majority-minority" district in the Youngstown area. Nor, as

10

a general matter, does the Voting Rights Act require the creation of "influence" or "crossover" districts.[1] *Strickland*, 556 U.S. at 13, 23.

Evidently, some Commissioners believed that federal law *prohibited* any consideration of racial demographics unless the state was required to draw a *Gingles* majority-minority district. *See* ECF No. 141-6 at 16–17 (Transcript of Mar. 23, 2022 Comm'n Mt'g, Statement of Comm'r Huffman: "the use of the [racial data] stat is illegal under federal law, unless there are a whole variety of requirements that require that, that be used"). That is an inaccurate statement of law, and one I intend to clarify.

By the Commissioner's account, the use of racial data either is required when drawing a majority-minority district, or it is "illegal" altogether. Respectfully, the law is not so black and white. The Supreme Court "never has held that race-conscious state decisionmaking is impermissible in *all* circumstances." *Shaw v. Reno*, 509 U.S. 630, 642 (1993). States may use racial data outside the context of a *Gingles* district, provided it does not predominate over neutral considerations. As the Supreme Court wrote in *Strickland*: "In those areas [where the *Gingles* factors cannot be shown,] majority-minority districts would not be required in the first place; and in the exercise of lawful discretion States *could* draw crossover districts as they deemed appropriate." 556 U.S. at 24 (emphasis added). "Districts could still be designed in such places that encouraged coalitions across racial lines, but these districts would result from legislative choice, not . . . obligation." *Id.* (quoting Richard H. Pildes, *Is Voting-Rights Law Now at War with Itself? Social Science and Voting Rights in the 2000s*, 80 N.C. L. Rev. 1517, 1567 (2002)).

---

[1] These terms refer to districts where a minority group constitutes less than 50% of the voting-age population but is large enough to exercise political clout or form winning coalitions. In "influence districts," "a minority group can influence the outcome of an election even if its preferred candidate cannot be elected." *Bartlett v. Strickland*, 556 U.S. 1, 13 (2009) (plurality op.). In "crossover districts," "the minority population, at least potentially, is large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate." *Id.*

11

Fourteenth Amendment problems arise when the state relies *predominantly* on race but lacks a compelling governmental interest to justify its actions. In that instance, the state's predominant reliance on race implicates the Equal Protection Clause and the Supreme Court's racial gerrymandering jurisprudence. For example, in *Miller v. Johnson*, the Supreme Court found that "[r]ace was . . . the predominant, overriding factor explaining the General Assembly's decision to attach to the [congressional district] various appendages containing dense majority-black populations," and therefore could not be upheld "unless it satisfies strict scrutiny." 515 U.S. 900, 920 (1995). In *Shaw v. Hunt*, the Court reached a similar conclusion: it invalidated a district where "race was the legislature's predominant consideration . . . [and] the criterion that, in the State's view, could not be compromised." 517 U.S. 899, 907 (1996). In *Alabama Legislative Black Caucus v. Alabama*, the Court remanded for a predominance analysis of the state's majority-minority districts but "d[id] not express a view on the question of whether the intentional use of race in redistricting, even in the absence of proof that traditional districting principles were subordinated to race, triggers strict scrutiny." 575 U.S. 254, 274–75 (2015). Finally, in *Cooper v. Harris*, the Supreme Court rejected North Carolina's intentional design of a majority-minority district, where the state could not show the *Gingles* precondition of "effective white bloc-voting." 137 S. Ct. 1455, 1470–72 (2017). Since the Voting Rights Act could not rationalize the state's design, the Court concluded "that North Carolina's use of race as the predominant factor in designing [the congressional district] d[id] not withstand strict scrutiny." *Id.* at 1472.

Yet, the majority opinion reads these Supreme Court cases as "presumptively favor[ing] maps drawn without race in mind." That approaches the view espoused by the Commissioners. Simply accounting for race, however, does not mean that race will rise to the predominant factor. "For strict scrutiny to apply, traditional districting criteria must be *subordinated to race*." *Bush v.*

*Vera*, 517 U.S. 952, 962 (1996) (plurality op.) (citing *Miller*, 515 U.S. at 916). It "does not apply merely because redistricting is performed with consciousness of race." *Id.* at 958 (citing *Shaw v. Reno*, 509 U.S. at 644). So long as race does not predominate, "States may intentionally create majority-minority districts, and may otherwise take race into consideration, without coming under strict scrutiny." *Id.* at 993 (O'Connor, J., concurring).

There are legitimate reasons to take a race-conscious (as opposed to race-based) approach in redistricting—for instance, preserving communities of interest. *See Rucho v. Common Cause*, 139 S.Ct. 2484, 2500 (2019) ("'traditional' districting criteria" include "keeping communities of interest together"); *see also Miller*, 515 U.S. at 920 ("A State is free to recognize communities that have a particular racial makeup, provided its action is directed toward some common thread of relevant interests."). Had the Commission looked to racial demographics in the Trumbull-Mahoning area, it could have avoided splitting Black voters in Youngstown, Campbell, Struthers, and Warren, who endured a common history of discrimination and have tended to vote as a cohesive bloc. *See Armour*, 775 F. Supp. at 1053–60. The Commission's third map, if implemented, will split Youngstown from Campbell and Struthers in the House (diminishing the "influence district" that now exists there)[2] and also will split Youngstown from Warren in the Senate.

A thorough understanding of *Armour* is key here, and the majority opinion strikes me as too hasty in its treatment. I acknowledge that *Armour* cannot substitute fully for a current showing of legally significant racially polarized voting, given the substantial demographic changes in the

---

[2] The current House District 58 joins Youngstown with Campbell and Struthers to form a district that is just under 30% Black. *See Ohio House District 58*, Ballotpedia, https://ballotpedia.org/Ohio_House_of_Representatives_District_58 (accessed May 11, 2022). There is no comparable Senate district currently, which the Simon Parties attribute to the splitting of Warren and Youngstown across Senate District 32 (approximately 7% Black) and Senate District 33 (approximately 11% Black). *See Ohio State Senate District 32*, Ballotpedia, https://ballotpedia.org/Ohio_State_Senate_District_32 (accessed May 11, 2022); *Ohio State Senate District 33*, Ballotpedia, https://ballotpedia.org/Ohio_State_Senate_District_33 (accessed May 11, 2022).

13

Youngstown area over the ensuing thirty years. And I recognize that nothing in the *Armour* court's injunction required the Commission to use racial data in all future redistricting cycles, nor to keep particular communities in the Trumbull-Mahoning area from ever being divided.[3] What *Armour* does accomplish for the Simon Parties' argument—and what the majority opinion mostly glosses over—is a compelling analysis of historical discrimination in the Mahoning Valley, as I recount above. *Armour* continues to stand for the proposition that Black residents across the Mahoning Valley form a community of interest, bound together by common history and challenges, which the state previously has endeavored to divide across strategically placed district lines. That community was worth keeping intact through the redistricting process, regardless of whether the Voting Rights Act required it.

Where a community continues to endure the entrenched effects of historical discrimination, intentional blindness to race serves to lock in an unjust status quo, not to remedy it. In this case, the Simon Parties contend the Commission's policy of racial blindness has diluted the political power of an already marginalized group, depriving them of the opportunity for a "crossover" or "influence" district in the state House and Senate. Accounting for the discriminatory history in the Mahoning Valley through a race-conscious redistricting process would have been a worthy goal for state policymakers, so I resist the insinuation that federal law precluded the Commission from even loading the data. Since the majority's previous ruling permits the Commission to draft a new redistricting plan before May 28, perhaps my clarification on the permissible uses of racial demographic data will enable the Commission to redress the Simon Parties' grievances.

---

[3] The court "declare[d] that the [then-]current boundaries of Ohio House of Representatives Districts 52 and 53 violate the Voting Rights Act of 1965 as well as the constitutions of the United States and the State of Ohio," and "enjoin[ed] the [state] from using the [then-]current house district configurations for future elections." 775 F. Supp. at 1062.

Ultimately, though, the Simon Parties ask this Court to hold that federal law required the Commission to consider race, which is a separate question from whether it could. On that point, I agree there is no federal cause of action for race-conscious redistricting absent the *Gingles* preconditions. Any "crossover" or "influence" district the state might have drawn "would result from legislative choice, not . . . obligation." *Strickland*, 556 U.S. at 24 (quoting Pildes, *supra*). Because the Simon Parties have not made their necessary showing, I join the majority in its disposition of their motions.

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATED: May 12, 2022**